UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CELIA R. CLARK,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA;
THE INTERNAL REVENUE SERVICE,

    *Defendants*.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Celia R. Clark brings this suit for refund of her partial payment of Internal Revenue Code ("IRC") § 6700 penalties that the IRS has assessed against her for Tax Years 2008–2016. Clark made these payments pursuant to IRC § 6703(c). Plaintiff Clark additionally sues the United States for the improper disclosure of her return information under IRC § 7431.

## I.   Introduction

1.    For years, each new edition of the IRS's Internal Revenue Bulletin began with this Statement of Principles:

> The function of the Internal Revenue Service is to administer the Internal Revenue Code. Tax policy for raising revenue is determined by Congress.
>
> With this in mind, it is the duty of the Service to carry out that policy by correctly applying the laws enacted by Congress; to determine the reasonable meaning of various Code provisions in light of the Congressional purpose in enacting them; and to perform this work in a fair and impartial manner, with neither a government nor a taxpayer point of view.
>
> At the heart of administration is the interpretation of the Code. It is the responsibility of each person in the Service, charged with the duty

1

> of interpreting the law, to try to find the true meaning of the statutory
> provision and not to adopt a strained construction in the belief that he or
> she is "protecting the revenue." The revenue is properly protected only
> when we ascertain and apply the true meaning of the statute.

This statement has now been removed from the Bulletin. If the IRS remained true to these

principles today, there would be no need for this case to be brought.

2.      This case concerns more than $11 million in penalties that the IRS has assessed

against attorney Celia Clark for her role in advising and assisting with the establishment of so-

called "microcaptive" insurance companies for her clients. Congress has explicitly encouraged and

promoted microcaptive insurance companies by conferring upon them favorable tax treatment

under 26 U.S.C. § 831(b).

3.      Notwithstanding this Congressional intent, the IRS has sought to destroy the

microcaptive insurance industry. It has not done so by promulgating regulations, issuing revenue

rulings, or providing affirmative guidance that taxpayers and tax practitioners could follow.

Rather, the IRS has engaged in the unlawful "administrative repeal" of IRC § 831(b), thwarting

Congress's intent by wrongfully penalizing taxpayers and practitioners in the microcaptive space,

in a concerted effort to drive them out of that business.

4.      The IRS's treatment of Clark is emblematic of its "administrative repeal" approach.

Clark has advised clients about the potential benefits of microcaptive insurance companies, and

helped clients establish and administer them. Her practice was entirely in the open. She and her

practice were known quantities to the IRS. She has never been subject to bar discipline or—before

this case—IRS penalty.

5.      But the IRS has not given Clark a fair shake. This complaint details Clark's unfair

treatment at the IRS's hands. By way of threshold illustration, the IRS began its challenge of

Clark's activities by opening a civil administrative penalty investigation against her. The IRS then

let that investigation linger for *nine years* before finally "determining" whether Clark gave her clients incorrect advice. The Tax Anti-Injunction Act, 26 U.S.C. § 7421, as the IRS is fond of emphasizing, requires a taxpayer to wait for such an IRS administrative investigation to conclude before he or she may challenge the IRS's position. So Clark could do nothing to obtain clarity of the law or even the IRS's position during this nine-year span. Long periods, of up to 28 months, elapsed during which the "investigation" appeared to be inactive, leading Clark to believe that it might be discontinued with no penalty assessed. Meanwhile, she continued her practice, which allowed the IRS to ultimately impose penalties for nine years.

6.  Clark closed her captive practice immediately after the Tax Court held, in 2017, that one of her clients' microcaptives was not an insurance company for tax purposes. The court in that case, *Avrahami v. United States,* 149 T.C. 144 (2017), was careful to point out that it was a case of first impression, there being no previous case law or clear authority on the subject.

7.  This suit is Clark's first opportunity to have an independent authority review her case. Opportunities for settlement discussions during the investigation and IRS administrative appeal were denied or foreclosed. She asks the Court to hold the IRS accountable and allow her refund claim.

## II.   Jurisdiction

8.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1340, and 1346(a)(1) and 26 U.S.C. § 7422.

9.  Venue is proper in this Court because this suit involves a claim against the United States for refund of federal income taxes and Clark resides in the Southern District of Florida.

## III.   The Parties

10.  Clark is a natural person and resident of Palm Beach County, Florida.

11.     Defendants are the United States of America and its agency, the Internal Revenue Service.

## IV.   General Allegations

### A.     Captive Insurance and Clark's Tax Practice

12.     Clark is a tax attorney with more than thirty years of experience. She holds a JD from the University of Chicago and a Tax LLM from New York University. She has practiced at international law firms and has served on the adjunct faculty of Cardozo Law School at Yeshiva University in New York City. She has never been subject to professional discipline and—until the subject matter underlying this litigation—has never been subject to an IRS sanction or penalty.

13.     At all times, Clark has conducted her practice in a professional manner, and has been forthright with her clients and the IRS.

14.     During Tax Years 2008–2016, Clark's practice included helping small businesses establish small insurance companies. These small insurance companies have come to be referred to in both the insurance and tax planning industries as "microcaptive" insurance companies, or "microcaptives."

15.     Generally, captive insurance companies seek to provide an insured more options than are usually available from third-party insurance companies while utilizing established tax law. With traditional insurance through a third-party insurance company, an insured pays a premium to that company as part of a contract. In return for these payments, the contract calls for the insurance company to pay the insured in the event of a specified casualty—for example, a flood or a fire.  In this way, the insured is protected from these low-probability but high-damage events: if an insured's business floods, e.g., the insured can use the insurance proceeds to rebuild.

16.      A company may also choose to self-insure. That is, a company can simply save funds in anticipation of the casualty, so that—should the casualty come to pass—the company has

the cash on hand to deal with it. By engaging in self-insurance, a company can exercise greater control over its insurance needs and reduce its insurance costs.

17.     However, under the Internal Revenue Code, insurance premiums paid to an insurance company are a tax-deductible business expense. But saving to self-insure is not. Accordingly, the tax code generally preferences third-party insurance companies.

18.     To retain the benefits of self-insurance without foregoing a valuable tax deduction, many companies create insurance companies of their own. Rather than save money to self-insure, these companies pay premiums to their own insurance company.  These "captive" insurance companies then hold and invest these funds. The arrangement permits the company a tax deduction of the premiums paid, but also gives the company flexibility regarding its insurance needs (through the use of custom-tailored policies).

19.     It is widely recognized that the first modern captive insurance company was formed by Youngstown Sheet & Tube Company in the 1950s. The arrangement has been popular ever since. Today, some 90 percent of Fortune 1000 companies employ captive insurance arrangements.

20.     For several decades, only very large companies could use this strategy effectively. With the Tax Reform Act of 1986, however, the Internal Revenue Code was amended to add 26 U.S.C. § 831(b). This provision permits smaller "microcaptive" insurance companies to elect favorable tax treatment provided they receive (as of a 2015 amendment) less than $2.2 million in premiums annually.

21.     Microcaptive insurance companies are accordingly specifically authorized by the Internal Revenue Code.

22.     Clark's law practice largely centered on microcaptive insurance companies. At all times, she stayed abreast of relevant statutory, regulatory, and case law authority.  In 2006, the

Caribbean nation of St. Christopher & Nevis invited her to draft what would eventually become that country's laws regulating captive insurance companies. During her career, Clark has never made a material statement that she knew or had reason to know was false or fraudulent in connection with her work.

### B.     The IRS's Campaign Against Microcaptive Insurance Companies

23.     As set forth above, Congress, through the Internal Revenue Code, has authorized both captive insurance companies generally and microcaptives specifically. Despite this authorization, the IRS has launched a concerted campaign against them.

24.     Under the separation of powers mandated in the United States Constitution, Congress makes the laws and administrative agencies like the IRS enforce them as they are written and consistent with Congressional intent. The IRS must enforce a law even when its leadership disagrees with it. But, when it comes to microcaptive insurance companies, the IRS approach has not been to administer the law consistent with Congressional intent. Rather, it has been to destroy the industry.

25.     In 2015, the IRS attempted to persuade Congress to effectively repeal Section 831(b) by making it available only to insurance companies with no single owner accounting for more than 20% of premiums, and no participation in reinsurance or risk distribution pools. The impact of these changes would have been to kill the small captive industry entirely. The Senate Finance Committee removed the restrictive language from the proposed bill. The final legislation made it difficult for small captives to be used in estate planning, but expanded the general availability of Sec. 831(b) to captives by increasing the annual premium limit. This legislation is discussed in greater detail below.

26.     The IRS has not promulgated instructive regulations carrying out the clear Congressional intent, or issued much helpful guidance to taxpayers and practitioners. Specifically,

the IRS has refrained from stating its position regarding what kinds of captives are abusive and which are not, claiming that it lacks sufficient information to do so.  In short, the IRS has chosen to leave the law ambiguous and instead to impose penalties against prominent practitioners and market participants in the captive insurance space.  Clark found herself squarely in the middle of this conflict.

### C.     The IRS's Investigation and Penalty Assessment Against Clark

27.     In August 2012, the IRS civil examination function began an administrative penalty investigation of Clark, to determine whether she should be subject to penalty under I.R.C. § 6700, for the promotion of an abusive tax shelter.

28.     Liability for a § 6700 promoter penalty requires a taxpayer to have made or furnished, or caused another person to make or furnish, a statement about a tax benefit that the taxpayer *knows or has reason to know* is false or fraudulent as to any material matter.

29.     At the time the IRS began its investigation, the IRS had issued little guidance on microcaptive insurance companies.  Three PLRs (which cannot be relied on by taxpayers other than the recipients) relating to risk pools are discussed below.  Throughout the 90s and early aught years, the IRS had challenged the tax treatment of larger captive insurance companies in court and routinely lost. *See United Parcel Service of America, Inc. v. Comm'r*, 254 F.3d 1014 (11th Cir. 2001); *AMERCO & Subs. v. Comm'r*, 96 T.C. 18 (1991), *aff'd* 979 F.2d 162 (9th Cir. 1992); *Harper Grp. v. Comm'r*, 96 T.C. 45, 46 (1991), *aff'd* 979 F.2d 1341 (9th Cir. 1992).

30.     These challenges generally centered around whether captive insurance premiums constitute payment for "insurance" within the meaning of the law.  Surprisingly, the Internal Revenue Code does not anywhere define "insurance" for tax purposes. Nor are there any Treasury regulations providing clarity. And the IRS itself has likewise offered no guidance through revenue ruling or other publication. Rather, the IRS and the Treasury Department have left it to the courts

7

to define "insurance" for tax purposes. The courts generally rely upon a multifactor framework of interdependent and non-exclusive factors. *See Rent-A-Center, Inc. v. Comm'r*, 142 T.C. 1, 13 (2014). These factors include (1) whether the arrangement involves risk-shifting; (2) whether the arrangement involves risk-distribution; (3) whether the arrangement involves insurance risk; and (4) whether the arrangement meets commonly accepted notions of insurance. *Id.* It is by no means a clear, bright-line test. It is a case-by-case analysis dependent upon the particular facts and circumstances of the proposed insurance arrangement. *Id.* Clark was aware of these decisions.

31.     Further, during the pendency of the IRS's investigation into Clark, the IRS continued to challenge captive insurance arrangements, with no success. In each instance, the Tax Court—over the IRS's objections—held the captive insurance arrangements to be lawful and their favorable tax treatment to be appropriate. *See Rent-A-Center, Inc. v. Comm'r*, 142 T.C. 1 (2014); *R.V.I. Guar. Co. v. Comm'r*, 145 T.C. 209 (2015). Clark was also aware of these decisions.

32.     In 2015, Congress passed the Protecting Americans from Tax Hikes Act ("the PATH Act"), P.L. 114-113 Div. Q (2015). The PATH Act specifically addressed microcaptive insurance companies subject to IRC § 831(b). The IRS had lobbied Congress to make § 831(b) unavailable to microcaptive insurance companies to which any owner pays more than 20% of premiums, or which participate in a risk distribution pool. Congress rejected the IRS's request. On the contrary, Congress expanded microcaptives' favorable treatment. The PATH Act increased the maximum amount of premiums a qualifying microcaptive insurance company could receive from $1.2 million to $2.2 million, and indexed that amount to inflation.

33.     The PATH Act did impose additional requirements on § 831(b) microcaptive insurance companies, however. It required such companies to meet one of two alternative tests. Roughly stated, either (1) no more than 20% of an insurance company's premiums can come from

any one policyholder, or (2) the ownership of the microcaptive insurance company must approximate the ownership of the underlying, insured company, effectively eliminating captives as estate planning tools. Clark promptly updated her practice to accommodate and comply with the PATH Act.

34.     In May 2012 (prior to the commencement of the promoter proceeding against Clark), the Commissioner acknowledged and accepted a risk pooling arrangement for § 831(b) companies. In PLR 201224018, the IRS concluded that a pooling structure among 15 small captives achieved adequate risk shifting and distribution, "such that the contracts issued by [the insurance company] to its insureds constitute insurance for federal income tax purposes." Two similar PLRs were issued at the same time. Clark immediately restructured the pooling arrangement offered by her office to follow the model presented in the PLRs.

35.     In 2008 the IRS published an internal audit guide relating in part to captive insurance companies (Internal Revenue Service Excise Tax – Foreign Insurance Audit Techniques Guide, Chapter 6, "Captive Insurance Companies"). Clark developed her practice in compliance with the guidance in this document.

36.     The IRS's administrative penalty investigation persisted for nine years without a final decision.

37.     The IRS also audited many of Clark's clients. For years, Clark's clients received audit "no change" letters, which mean that the IRS accepted the client's § 831(b) companies as valid insurance. It was not until 2011 that the IRS challenged an § 831(b) company formed by Clark. After that time the IRS audited, and assessed deficiencies against, dozens of Clark's captive clients.

38.     One of Clark's clients took their case to Tax Court. The United States Tax Court rendered its decision on August 21, 2017 in *Avrahami v. United States*, 149 T.C. 144 (2017). This decision is the *very first by any court* addressing the tax treatment of a microcaptive insurance company. The decision is 105 pages long. Notably, it is a published decision, which is relatively rare in Tax Court. The Tax Court reserves publication for precedential decisions on matters of first impression and public importance.

39.     The Tax Court in *Avrahami* held—for the very first time—that a microcaptive insurance company failed to qualify as an insurance vehicle warranting a tax deduction. The Tax Court acknowledged that it was not a slam-dunk case for the IRS, as the decision's detail and length attest. Almost reluctantly, however, the *Avrahami* court observed that "[w]e have to make a finding on this." 149 T.C. at 190. And the Tax Court found that the *Avrahami* microcaptive insurance company failed to "accomplish sufficient risk distribution for its arrangements to be considered 'insurance' for federal income tax purposes." *Id.* at 190. The taxpayers did not appeal the decision.

40.     Importantly, the Tax Court declined to find fraud. Indeed, given the lack of clarity in the law, the Tax Court declined even to impose the far less onerous accuracy penalty under I.R.C. § 6662(a) for the Avrahamis' deduction of captive insurance premiums. *Avrahami*, 149 T.C. at 207–08. In making this decision, the Tax Court observed, "This is a case of first impression— we have discovered no other case addressing microcaptives" and that, prior to *Avrahami*, "there [was] no clear authority to guide taxpayers." *Id.* at 207.

41.     Clark fully cooperated both in her own IRS penalty examination and, consistent with her clients' privilege rights, in the examination and litigation of the Avrahamis.

42.     Immediately after the Tax Court's adverse *Avrahami* decision (again, the very first decision to address the tax treatment of microcaptives), Clark stopped advising clients that they may be entitled to a tax deduction for premiums paid to a microcaptive insurance company. Clark likewise stopped offering her clients help with establishing such microcaptive insurance companies. She closed her microcaptive insurance practice at the end of 2017.

43.     On April 12, 2021, the IRS's examination function finally concluded its penalty investigation against Clark. The IRS assessed more than $11 million in penalties against Clark for her recommendation of—and legal assistance rendered in connection with—microcaptive insurance companies. The penalties pertained to Tax Years 2008 through 2016. All of these are years before the Tax Court's *Avrahami* decision.  The IRS assessed these penalties under I.R.C. § 6700, for Clark's alleged promotion of an abusive tax shelter.

44.     A penalty under Section 6700 requires the IRS to prove, by clear and convincing evidence, that Clark knew or should have known that she made materially false statements concerning the tax treatment of microcaptive insurance companies. The Revenue Agent Report accompanying the IRS's penalty assessment described the basis for the IRS's determination that Clark had or should have had this knowledge.

45.     Curiously, the Revenue Agent's Report concluded that Clark knew or should have known her advice was bad because of the Tax Court's 2017 *Avrahami* decision. Of course, the *Avrahami* decision itself observed that it was the first case to have considered the deductibility of premiums paid to a microcaptive insurance company, and that "no clear authority" existed to guide taxpayers. 149 T.C. at 207.

46.     The Tax Court's *Avrahami* decision, issued in 2017, simply could not have impacted Clark's knowledge from 2008–2016, the years of the penalties at issue. Nor is it

particularly meaningful that the IRS sought to challenge the Avrahamis' deductions prior to the Tax Court case. *Avrahami* presented a case of first impression concerning microcaptive insurance companies. But the IRS has experienced many defeats before the Tax Court on the deductibility of premiums paid to larger captive insurance companies. The IRS has fought Congress and taxpayers all the way on captive insurance companies and, until *Avrahami*, had lost almost every battle.

47.     The IRS's Section 6700 penalty assessment against Clark is erroneous and unlawful. Clark has never made a material statement that she knew or had reason to know was false in connection with the advice she gave her clients concerning the tax treatment of microcaptive insurance companies.

### D.     The IRS's Abusive Tactics

48.     The IRS's approach to its penalty examination of Plaintiff Clark has been abusive in at least the following ways.

1.     The IRS allowed potential § 6700 penalties to accumulate against Ms. Clark for years, rather than provide clarity.

49.     The IRS began its penalty examination of Plaintiff Clark in August of 2012. Yet it did not conclude its penalty examination until April of 2021. Accordingly, the IRS let Plaintiff Clark twist in the wind for nine years while the IRS's examination function determined whether her positions on the tax treatment of microcaptive insurance companies were correct. It even took four years after the Tax Court's decision in *Avrahami* for the IRS to make a determination and issue a report.

50.     The IRS need not have proceeded like this. The IRS could have promptly issued a penalty determination against Clark for Tax Year 2012, thereby giving Clark clarity as to the IRS's position on the proper tax treatment of the microcaptive insurance companies she advised and

helped create. Clark could then have suspended her microcaptive insurance company operations while she litigated the IRS's position in Court.

51.     Proceeding in this manner would have avoided the unfair situation in which Clark now finds herself. She faces a penalty of more than $11 million. It is an enormous penalty that would destroy her financially at the tail end of her working years, with little time to reinvent herself and rebuild her practice.  Had the IRS not sandbagged Clark in this fashion, Clark could have litigated a good faith disagreement over the tax treatment of microcaptive insurance companies while providing other legal services until the matter was decided and clarity obtained.

52.     Additionally, the IRS had many other avenues through which it could have provided clarity on the treatment of microcaptive insurance companies. For example, the Treasury Department could have issued regulations that clarified when it viewed a captive insurance company as abusive. The IRS could have issued a revenue ruling or other publication. The IRS could have identified microcaptives, or a subset of them, as "listed transactions" under IRC § 6011. Or the IRS could have provided guidance at the many tax conferences and forums to which it regularly sends representatives to speak. But the IRS did none of these things.

53.     Instead, in the clearest guidance to date from the IRS on microcaptives, IRS Notice 2016-66 (effective in 2017), the IRS announced that "the Treasury Department and the IRS recognize that related parties may use captive insurance companies that make elections under Sec. 831(b) for risk management purposes that do not involve tax avoidance, but believe that there are cases in which the use of such arrangements to claim the tax benefits of treating the [C]ontracts as an insurance contract is improper." The same Notice stated that the IRS "lacks sufficient information to determine which microcaptive transactions should be identified specifically as a tax

avoidance transaction" and was imposing disclosure requirements on participants and advisors to enable it to do so. Clark complied with the disclosure requirements.

54.     Clark had no opportunity to bring the issue to a head on her own accord. In addition to not knowing whether the IRS believed her to be promoting abusive tax shelters until April 2021, the law prohibits Plaintiff (or anyone else) from seeking declaratory or injunctive relief from the courts concerning ambiguity in the tax code. *See* Tax Anti-Injunction Act, 26 U.S.C § 7421. Rather, a taxpayer's path to the courts is exactly that which Clark has taken. She must await an IRS determination, claim a refund, and sue in district court if that refund is not given. Clark accordingly remained at the mercy of the IRS until it decided that enough time had passed, that the penalty it wished to levy against Clark had become high enough, and that it would assess a penalty.

2.      The IRS boxed Clark out of litigating the merits of microcaptive insurance company taxation.

55.     Even when the IRS did decide to act, it did so in a manner unfair to Clark. Rather than issue a penalty determination against Clark that she could appeal, the IRS first chose to audit and impose penalties against her clients—most notably, the Avrahamis. This allowed the IRS to litigate the tax treatment of the microcaptive insurance companies which Clark had advised and helped create without allowing Clark to present a defense of herself. As a non-party to that litigation, Clark could not participate in the trial (other than as a fact witness called at the behest of the parties) or the briefing and could not elect to appeal the ultimate adverse determination. Of course, despite Clark's lack of an opportunity to participate in the *Avrahami* case, the IRS has used the Tax Court's *Avrahami* decision as the chief basis for the penalties it has assessed against her.

3. The IRS Refuses to Permit Clark the Ordinary Avenues of Case Resolution.

56. During the course of the IRS's penalty examination, Clark's attorneys made many attempts to reach an agreed resolution.

57. These efforts were repeatedly rebuffed without explanation.

58. Clark's efforts to reach an agreed resolution with the IRS examination function were made through the law firm of Caplin & Drysdale. Caplin & Drysdale is one of the nation's leading law firms in tax controversy matters before the IRS, including promoter penalty issues. The firm is accordingly familiar with typical IRS practice.

59. The IRS's refusal to consider an agreed resolution of this case at the exam level is not typical, and suggests a lack of good faith on the IRS's part.

E. The IRS's Unlawful Disclosure of Ms. Clark's Return Information

60. In addition to assessing unwarranted penalties against Clark, the IRS also attempted to destroy Clark's business through leaks of her protected return information.

61. Internal Revenue Code § 6103 prohibits the disclosure of "return information" concerning a taxpayer such as Clark. Section 6103(b)(2) defines "return information" broadly to include whether a taxpayer is subject to an IRS investigation, and "any other data, received by, recorded by, prepared by, furnished to, or collected by the secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under [the IRC] for any tax, penalty, interest, fine, forfeiture, or other imposition or offense."

62. Internal Revenue Code § 7431 provides a private right of action for those aggrieved by violations of IRC § 6103. Pursuant to § 7431(a)(1), "if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information

15

with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring

a civil action for damages against the United States in a district court of the United States."

63.     The IRS has engaged in a pattern of disclosing Clark's return information to drive

her out of business. This pattern has included at least the following specific acts:

a.     On May 19, 2014, IRS Revenue Agent Leroy Farquharson visited one of

Ms. Clark's clients. RA Farquharson stated to the Client's CPA, Scott Fowler of Stout McGowen

& King, LLP, that the IRS believed that Clark's work involving captive insurance companies was

illegal under IRC § 831(b) and § 953(d) and broke several other unidentified laws. RA Farquharson

further told Mr. Fowler that the IRS was "building a case" against Clark, that the IRS had "planted"

personnel at presentations given by Clark, and that someone within the IRS had instructed him to

examine as many of Ms. Clark's clients as possible.

b.     On May 8, 2014, the IRS issued a letter to another of Clark's clients.

Included in the letter were statements that Clark was a promoter of an abusive tax shelter and that

Clark was then under IRS investigation.

c.     On May 1, 2014, IRS Counsel sent a letter to a representative of one of

Clark's clients that labeled her a "promoter" of an abusive tax shelter.

d.     In or around June of 2012, an IRS agent informed attorney Matthew Howard

of Atlanta that all of Clark's captive insurance clients were being audited by the IRS.

e.     In or around November of 2014, IRS Revenue Agent Thuy Luu informed a

representative for one of Clark's clients that Clark was the subject of a promoter audit.

f.     In or around June of 2012, attorney Jay Adkisson wrote on a captive

insurance forum of his "hearsay understanding" that Clark was the subject of an IRS promoter

audit. Upon information and belief, the ultimate source of Mr. Adkisson's information was an agent or employee of the IRS.

g.      Around that same time, attorney Jay Adkisson stated on this same forum that "I have heard" that Clark is the subject of ongoing IRS audits and is "persona non grata with the IRS." Upon information and belief, the ultimate source of Mr. Adkisson's information was an agent or employee of the IRS.

h.      Complaints to the Treasury Inspector General for Tax Administration ("TIGTA") were made by Clark's counsel, Caplin & Drysdale, describing many of the incidents listed in the foregoing subparagraphs of this paragraph 63.  Caplin & Drysdale spoke to IRS and TIGTA agents.  TIGTA sent form responses refusing to comment. In addition, Clark's counsel protested to TIGTA that dozens of Clark's clients and former clients were being issued Information Document Requests relating to captive transactions in which Clark was referred to repeatedly as "the Promoter." While no written response was received, Clark spoke to an assistant to Andrew Helmers, Special Agent to TIGTA, about the use of the "Promoter" term.  Clark was told, in essence, that "Promoter" was just a word, being used in its "everyday sense," rather than as a reference to the IRC § 6700 meaning of a promoter of an abusive tax shelter.

64.      Upon information and belief, the IRS's improper disclosures were not limited to the above-referenced acts and continued throughout the IRS's penalty investigation into Clark's business.

### F.      Clark's Refund Claims

65.      On April 12, 2021, the IRS sent Clark eight CP15 Notices of Penalty Charge. These Notices contained demands for payment of penalties assessed under IRC § 6700 for each of Tax Years 2008 through 2016. The notices demanded payment by April 27, 2021, of the following amounts:

| Tax Year | Penalty |
|----------|---------|
| 2008 | $1,041,265 |
| 2009 | $976,993 |
| 2010 | $1,297,870 |
| 2011 | $1,191,450 |
| 2012 | $1,001,000 |
| 2013 | $1,776,575 |
| 2014 | $1,551,963 |
| 2015 | $1,642,063 |
| 2016 | $1,157,750 |
| **Total** | **$11,636,929** |

66.    On April 27, 2021, Clark paid the IRS fifteen percent of the penalties for each of these Tax Years, in the amounts set forth below:

| Tax Year | Payment |
|----------|---------|
| 2008 | $156,190 |
| 2009 | $146,549 |
| 2010 | $194,681 |
| 2011 | $178,718 |
| 2012 | $150,151 |
| 2013 | $266,487 |
| 2014 | $232,795 |
| 2015 | $246,310 |
| 2016 | $173,663 |
| **Total** | **$1,745,544** |

67.    On the same day, with respect to each of these payments, Clark filed a Form 6118 Claim for Refund of Tax Return Preparer and Promoter Penalties. Copies of these refund requests are attached to this Complaint as **Composite Exhibit 1**. Each of these forms was properly delivered via certified mail to the appropriate IRS Component.

68.    Clark incorporates the grounds identified in her Claims for Refund into this Complaint as if set forth in full.

69.     On Monday, October 25, 2021, Plaintiff Clark received a Letter 4670 from the Internal Revenue Service denying her refund claims and triggering her right to file a refund suit in this Court. A copy of this letter is attached to the Complaint as **Exhibit 2**.

<u>**COUNT I**</u>
(Tax Refund Against the United States)

70.     Clark incorporates paragraphs 1–69 of her Complaint into this Count I as if set forth in full.

71.     For the reasons described in this Complaint and for the reasons set forth in her claims for refund, Clark owes no penalty under 26 U.S.C. § 6700 for any of Tax Years 2008–2016. Accordingly, she is entitled to a refund of the $1,745,544 in penalties she has paid under 26 U.S.C. § 6703.

72.     Clark made claims for refund on April 27, 2021. The IRS denied these claims by letter dated October 25, 2021.

73.     Accordingly, Clark is entitled to judgment in her favor and against the United States of $1,745,544, together with costs and prejudgment interest.

<u>**COUNT II**</u>
(Disclosure of Tax Information in Violation of 26 U.S.C. § 7431 Against the United States)

74.     Clark incorporates paragraphs 1–69 of her Complaint into this Count II as if set forth in full.

75.     Pursuant to 26 U.S.C. § 7431(a)(1), "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States."

76.     Section 6103, in turn, criminalizes the disclosure of "return information" and defines this term to broadly to include "any. . . data, received by, prepared by, furnished to, or collected by the [IRS] with respect to a return or with respect to the determination of the existence, or possible existence, or liability (or the amount thereof) of any person under [the IRC] for any tax, penalty, fine, forfeiture, or other imposition, or offense."

77.     The fact that the pattern of disclosures made by the IRS, listed in Paragraph 62, were actually disclosures of return information under IRC § 6103, was not known to Clark until the IRS determination of promoter liability in her case, in April 2021. Prior to that, the substance of these disclosures was not acknowledged or was denied by TIGTA.

78.     The disclosures described in Paragraphs 59-62 of this Complaint constitute violations of 26 U.S.C. ¶ 7431(a)(1).

79.     These disclosures were made willfully, as part of an effort to damage Clark's reputation and destroy her business.

80.     Plaintiff Clark has been severely damaged by these violations. They have caused her a loss of business, wrongfully subjected her to suit, and otherwise harmed her professional reputation and caused her professional embarrassment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clark requests that the Court grant her the following relief:

A.     Judgment in her favor and against the United States on Count I, for $11,636,929.00, plus prejudgment interest and costs, including a refund of the $1,745,544 previously paid by Clark and abatement of the remaining penalties.

B.     Judgment in her favor and against the United States on Count II for (1) the greater of (a) $1,000 for each act of unauthorized inspection or disclosure of return information with respect to which the United States is found liable; or (b) the sum of the actual damages

Plaintiff sustained as a result of such unauthorized inspection or disclosure, being the amount of $10,000,000 or as determined at trial, and punitive damages; together with (2) costs; and (3) attorneys' fees.

      C.      Such other relief as may appear just and appropriate.

### **<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands trial by jury on all issues so triable.

Dated: November 10, 2021           Respectfully submitted,

**MARCUS NEIMAN RASHBAUM**
**& PINEIRO LLP**

*/s/ Derick Vollrath*
**Jeffrey Neiman**
Florida Bar. No. 544469
jneiman@mnrlawfirm.com
**Derick Vollrath**
Florida Bar No.  126740
dvollrath@mnrlawfirm.com
100 Southeast Third Avenue
Suite 805
Fort Lauderdale, FL 33394
Telephone:  (954) 462-1200
Facsimile:    (954) 688-2492
*Counsel for Plaintiff*