In the Matter of the

IRS Investigation of

Celia Rue Clark, Esq.

110 West 44th Street
New York, New York

December 4, 2012
9:40 a.m.

DEPOSITION of CELIA RUE CLARK, ESQ., a Witness in the above-entitled action, held at the above time and place, taken before ANGELA TORREGROSSA, a shorthand reporter and Notary Public within and for the State of New York.

LEX# 94601

Appearances:

INTERNAL REVENUE SERVICE
    DEBORAH O REYNOLDS, Revenue Agent
    Abusive Tax and Technical Issues
    151 Patton Avenue, Suite 167
    Asheville, North Carolina 28801

INTERNAL REVENUE SERVICE
    ALEX SHLIVKO, ESQ.
    SB/SE
    33 Maiden Lane, 14th Floor
    New York, New York 10038

INTERNAL REVENUE SERVICE
    JERRY ARRINGTON, Revenue Agent
    Abusive Tax Promotion Specialist
    151 Patton Avenue
    Asheville, North Carolina 28801

CAPLIN & DRYSDALE, ESQS.
    Attorneys for
    CELIA RUE CLARK, ESQ.
    600 Lexington Avenue, 21st Floor
    New York, New York 10022
BY:  MARK ALLISON, ESQ.
    RACHEL PARTAIN, ESQ.

ALSO PRESENT VIA TELEPHONE:
    MARYANN WATERS, ESQ.
    LYDIA HILL, REVENUE AGENT

MR. SHLIVKO: I want to go on the record, let us introduce ourselves, there are seven of us here. I want to make sure we introduce ourselves and also there is somebody on the phone. I want to make sure these people introduce themselves this way we know who we are.

My name is Alex Shlivko, I am an attorney with the small business self-employed division. I am an attorney with the IRS, Office of Chief Counsel in downtown Manhattan.

MS. REYNOLDS: I am Debbie Reynolds, I am a revenue agent with the SB/SE Promotor Group. I am located in Asheville, North Carolina.

MR. ARRINGTON: I am Jerry Arrington. I am also a revenue agent with the IRS SB/SE. I am located in Asheville, North Carolina, same office as Debbie, same group.

MS. CLARK: I am Celia Clark. I guess I was invited here.

MR. ALLISON: Mark Allison with Caplin & Drysdale on behalf of Ms. Clark.

MS. PARTAIN: Rachel Partain also with Caplin & Drysdale on behalf of Ms. Clark.

MS. WATERS: On the phone we have Mary Ann Waters and I am senior counsel SB/SE in Richmond Virginia. I am a revenue agent.

MS. HILL: Lydia Hill, I am a revenue agent in Richmond Virginia and I am in the same group that Deborah and Jerry are in.

MR. SHLIVKO: For the record, we have a court remember here as well.

**5**

C E L I A   R U E   C L A R K,  called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. SHLIVKO:

Q   Ms. Clark, just a few preliminaries, have you ever done a deposition before or have you been deposed before?

A   **No.**

Q   What about an interview on the record?

A   **No.**

Q   So let me tell you a few things that are going to happen, Ms. Reynolds is going to be asking you some questions. We'd like you to answer them truthfully and to the best of your abilities; can you do that?

A   **Yes.**

Q   If the question is not clear to you, please, let her know and we will make sure that the questions are understood; is

LEX REPORTING SERVICE
800-608-6085

Clark

**6**

that okay?

A   **Ah-huh.**

Q   At any time you can consult with your attorney or attorneys as you chose to, let us know and we will do that. Also, if you want to take a break at any time, please, let us know and we will do that.

MR. ALLISON:  Give affirmative verbal responses for the benefit of the court reporter.

THE WITNESS:  Yes, understood.

Q   Before we begin do you have any questions?

A   **No.**

Q   Are there any health reasons that would inhibit your ability to hear, understand or truthfully answer questions today?

A   **No.**

Q   Are you taking any medications?

A   **Yes.**

Q   What are those?

LEX REPORTING SERVICE
800-608-6085

Clark

**7**

A   **There are several, do you really want them, it's probably ten.**

Q   To your knowledge do they affect your ability to recollect or answer the questions truthfully?

A   **No, no.**

MR. SHLIVKO:  I think we can proceed with that.  I turn the table to Ms. Reynolds.

MS. REYNOLDS:  Thank you very much.

EXAMINATION BY
MS. REYNOLDS:

Q   What I will be doing is I will be asking you a lot of questions.  We will start with various things that deal with you personally and then move forward, but this is a civil entity investigation, possible injunction investigation.  It includes both you personally and any entity for which you control either directly or indirectly.

Today is December 4, 2012, it's approximately 9:40 a.m.  We are located at the IRS offices on 110 West 44th Street in

LEX REPORTING SERVICE
800-608-6085

Clark

**8**

New York City.  Would you please state your full name for the record and for the interview; Ms. Clark?

A   **My full name is Celia Rue Clark.**

Q   The only form of recording during this interview will be the reporter and some handwritten notes we may make.  There are no video or audio recordings being made.

MS. REYNOLDS:  We ask is that also true on your side of the table?

MR. ALLISON:  We have no recordings.

Q   Once again this is a civil investigation.  Questions I ask you today are in regard to that.  The purpose of this interview is that we want to understand the nature of your activities and influence in the direct or indirect termination of tax obligations of your clients, whether you're compensated by the clients or not.  We'd also like to understand if you're involved in any tax promotions.  If so we'd like to learn the details of the promotions and how they work.

LEX REPORTING SERVICE
800-608-6085

Clark

9

We'd like to gather information about the promotional materials and that is to enable us to evaluate the nature of the materials and statements made in transactions that are entered into.  One of the things we definitely want to obtain from you is a full and complete client list and that is name, address, SIN or EIN and we ultimately want to determine how your ideas, how the ideas you promote ultimately affect taxes.  We also want to understand how you make money in this process.  This is an opportunity for you to demonstrate that the promotion is legitimate and not abusive and the most effective way to do that is to fully cooperate and answer our questions and provide the requested information and any additional information or evidence supporting your position.

Q        Do you have any questions so far?

A        No.

Q        The possible outcomes of this interview combined with information that we gather from you and from the field could be a civil penalty, it could be an injunction or

LEX REPORTING SERVICE
800-608-6085

Clark

10

it could be a discontinuance, which would just mean that the investigation would cease.

You have already stated for the record your full name.  Please state your date of birth.

A        [REDACTED]

Q        What is your social security number?

A        [REDACTED]

Q        Are you a citizen of the United States?

A        Yes, ma'am.

Q        Do you hold any dual citizenship?

A        No.

Q        What is your current home address?

A        [REDACTED]

Q        Your current business address?

A        Clark & Gentry, PLLC, 570 Lexington Avenue, Suite 2401, New York, New York, 10022.

Q        Now, I will be asking for phone numbers, what is your home phone number?

LEX REPORTING SERVICE
800-608-6085

Clark

11

A        We no longer have a home phone.

Q        Your business main number?

A        Area code 212-370-4220.

Q        Do you have a mobile or cell phone number?

A        Yes, I do.

[REDACTED]

Q        What is the best way at one of those numbers you could be reached at; what is your preferred?

A        Office.

Q        Is your mobile phone in lieu of a home phone?

A        Yes, it is.

Q        Do you have a fax number at your business location and your home or just your business location?

A        Just the business.

Q        And that is?

A        Area code 212-370-4270.

Q        Do you have an e-mail address?

A        Yes, I do.

Q        It is?

A        C. [REDACTED]

LEX REPORTING SERVICE
800-608-6085

Clark

12

spelled out, .com.

Q        Are you currently married?

A        Yes, I am.

Q        What is your spouse's name?

A        Edgar Gentry.

Q        When were you married?

A        [REDACTED]

Q        Do you have children?

A        Yes.

Q        Can I have names and ages, please.

A        D[REDACTED] Gentry, [REDACTED]; C[REDACTED] Gentry, [REDACTED].

Q        We'd like to understand your educational background.  If you could start with college and move us forward, any kind of postgraduate work as well and any kind of courses or anything that you have taken in addition to your college work.

A        I attended three different colleges, including one abroad for my senior year.  My undergraduate degree is a BA from the University of Wisconsin at Madison.  I had a double major in Cultural Anthropology

LEX REPORTING SERVICE
800-608-6085

Clark

13

and Latin American Studies. I attended the University of Chicago Graduate Department of Anthropology for two years in a PHD Program and applied to transfer to the law school and began law school in 1976 at the University of Chicago Law School. I have my JD Degree from 1979 and I have a LLM in taxation from NYU School of Law, I believe that date was 1988.

Q    Does that conclude your education?

A    That would conclude the educational background.

Q    What about your residence history starting with college and moving forward?

A    Well, in dormitories?

Q    No, cities.

A    In cities, okay, so Wellesley Massachusetts, Bogota Columbia, Madison Wisconsin, Chicago, New York.

Q    When approximately did you come to New York?

A    1979.

Q    When were you in Bogota?

A    1971.

LEX REPORTING SERVICE
800-608-6085

Clark

14

Q    How long were you there?

A    One year.

Q    You mentioned that you studied abroad; is that the year?

A    Yes, it is.

Q    You said Wellesley, Massachusetts; is that your birth place?

A    No, that was my first college.

Q    First college?

A    Yes.

Q    Are you current on your personal and business income tax returns?

A    Yes.

Q    Have you ever been audited before either state or federal?

A    No.

Q    If you don't mind could you just tell me a little bit about your involvement in the community, your civil leadership or charitable involvement?

A    Yes.

    I'm actively involved with the Arthritis Foundation, have been on the Board of Governors for ten years. I am chair of

LEX REPORTING SERVICE
800-608-6085

Clark

15

the Planned Giving Counsel. I am active in our church in Rye, New York. Those would be the main community based activity.

Q    Have you ever filed for bankruptcy?

A    No.

Q    Have any civil lawsuits ever been filed against you or your companies?

A    The first law firm I worked at I handled a house closing my first year as a lawyer and there was an alleged theft from the house the night before the closing. The buyer sued my law firm, I believe I was named in that proceeding.

Q    Any others?

A    No.

Q    Have you ever been charged criminally for any alleged illegal conduct?

A    No.

Q    Could you go through your employment history starting with your college years and move forward.

A    Are you interested in employment during college?

LEX REPORTING SERVICE
800-608-6085

Clark

16

Q    No.

A    My first job after graduating was as a copy editor for the Helen Dwight Reid Educational Foundation in Washington, DC. I was promoted to editor of sociology reviews published by that foundation and I continued that job even after I went to law school. During law school I had a summer associates job after the first year of law school at Scott Lad Foods outside of Chicago. I had a summer associates job the following year at Whitman & Ransom in New York. I had my first job as a lawyer at Rogers & Wells in New York, I was there for six years.

Q    When did that begin?

A    1979.

    After six years I left with two young children to be cared for and at the same time I was an adjunct professor of law at Cardozo Law School of the Yeshiva University in New York. I taught a class on closely held businesses. After that I started at the LLM Program at NYU and went back to work approximately five years after I

LEX REPORTING SERVICE
800-608-6085

Clark

17

had stopped at Rogers & Wells with a law firm called Weitzner Levine & Hamburg. I was there a year and I left to start my own practice. I did that for approximately two years and I then joined a law firm in White Plains, New York as a counsel for approximately another two years. I then joined Smith, Buss & Jacobs in New York City and Yonkers, New York as a partner. I left there to start my own practice almost exactly ten years ago. That law firm has continued during that entire period of ten years, but it has changed its name recently to Clark & Gentry.

Q So it's the same practice, different name?

A Correct.

Q Does that conclude your work history?

A Yes, that's it.

Q Have you ever worked for the government in any capacity?

A No.

Q As far as professional licenses,

Clark

18

you're licensed to practice law in the State of New York?

A Yes.

Q Anywhere else?

A No.

Q Do you have happen to know your license number?

A No, I don't.

Q Have there been any suspensions, sanctions or forfeitures or any forms of disciplinary action?

A No.

Q What is the annual requirement or is there an annual requirement for a continuing professional education for your law license?

A It's 24 hours on a biennial basis.

Q Does any of that include ethics?

A Yes.

Q What is the ethic requirement?

A I believe it's four hours.

Q What is your business ownership and I'd like to know first on partnerships,

Clark

19

can you identify partnerships that you have an ownership interest in and what percentage is that ownership interest?

A Are you asking about professional associations or are you including investments?

Q I am asking about any partnership that you hold an interest in?

A Including investments?

Q Yes.

A So I will start with the professional, I am the principal part of Clark & Gentry, PLLC.

MR. ALLISON: Did you want to know the percentage?

A Ninety-five percent, anything else would be as a limited partner as an investor. I do hold limited partnership interests in several hotels. The hotels and motels are operated by my brother and they are located throughout the western states of the US. I can't think of any others.

Q Any LLC's?

A As an investor I hold a small

Clark

20

percentage interest in a LLC called Hydro Research, that's all I can think of.

Q Corporations.

A My law firm, Clark & Gentry is a S-Corporation to be clear. I cannot think of any other corporate and trusts other than publically traded equities.

Q What about trusts, are you the grantor or beneficiary trustee of any interest?

A Occasionally clients will appoint me as trustee or successor trustee. There may be a dozen or so of those situations. That is all I can think of.

Q No trust of your own?

A No.

Q Have you ever represented clients before the IRS?

A In proceedings?

Q Yes.

A In audits.

Q Could you elaborate on that, please, and tell me when and the nature of the issue?

Clark

21

A      There have probably been seven audits, of my clients in which I was involved in some capacity since I began practicing law.  In the last twelve months there have been many, many audits of my clients.

MR. ALLISON:  Just to be clear, are you representing them in those audits?

THE WITNESS:  Not as primary taxpayer representative, but as consultant.

Q      Are they complete or are they ongoing?

A      There are approximately half a dozen that are ongoing.  The others have closed all with no change, no adjustments on any issue in which I was involved with the exception of Diversified Insurance Company.

Q      Of those that were closed what was the issue, was it a single issue, was it multiple issues that included your involvement?

A      That included my involvement would be issues involving captive insurance

Clark

22

companies.

Q      The six that remain opened what are those issues?

A      Those involve captive insurance companies as well.

Q      Let me make sure I understand, those related to captive insurance you're serving as a consultant representative rather than the primary representative; do I understand you correctly?

A      Yes, but in the case of Diversified Insurance Company I believe I was the principle taxpayer representative of that corporation.

MR. ALLISON:  At one point.

A      At one point, I am no longer.

Q      In any capacity?

A      In any capacity.

Q      Did you formally withdraw your power of attorney?

A      I didn't, however, it was revoked by a subsequent power.

Q      Has the Office of Professional Responsibility ever taken any disciplinary

Clark

23

action toward you?

A      No.

Q      Have there ever been any prior investigations and/or penalties, assessments similar to what we are talking about here today?

A      No.

Q      I'd like to now focus on your entity dealing with captive insurance and any entity that you may be involved with personally.  I'd like to understand the products and services that you offer in that area and aside from that what other products and services you offer as an attorney to clients.  If you could help me there we can start with tell me about a bit about your company and the services and sort of break into those two categories; insurance related and noninsurance related.

A      The Law Firm of Clark & Gentry has a tax focus.  The services encompass estate planning, estate administration, transactional consulting, tax consulting, real estate, litigation and basic corporate

Clark

24

work.  Captive insurance has become a speciality, it does involve contractual issues and services, corporate work, insurance law and tax issues.

Within Clark & Gentry the captive insurance work represents approximately 50 percent of the revenues, the other 50 percent would be divided among those other types of services.

Q      Among those others, I want to be sure I understand, is that made up of estate planning, estate administration?

A      All of the other things I named other than captive insurance.

Q      How did you become involved in insurance?

A      I was asked to research initially a type of insurance company governed by Internal Revenue Code Section 501 (c) (15) more than ten years ago.  I was asked by a lawyer who was counsel at my firm at that time, Smith Buss & Jacobs, and I did that research, and moved from there to other insurance related tax issues beginning with

Clark

25

the Internal Revenue Code itself to understanding alternative ways that insurance companies could be taxed.

My practice since my course at Cardozo Law School has focused exclusively on closely held businesses, therefore, my focus in my tax research in insurance organizations focus on small insurance organizations such as 501 (c) (15), 831B, 806 and other Internal Revenue code provisions dealing with small insurance organizations.

Q     Do you consider yourself to be an expert in the area of small insurance companies?

A     I have never described myself that way.

Q     When you have questions who is your resource, who do you counsel with or when you have questions how do you resolve those issues, those questions?

MR. ALLISON:  You're talking about in the captive area?

MS. REYNOLDS:  In the captive area.

LEX REPORTING SERVICE
800-608-6085

Clark

26

A     Tax related questions?

Q     Any issue related to captive insurance companies?

A     I have various colleagues that work in this area or a similar area.  I will discuss issues from time to time with them and reciprocally I will discuss issues that they have that they bring to my attention.

Q     Would you please identify those colleagues?

MR. ALLISON:  How big is this universe? Obviously Ms. Clark deals with a lot of people and in the world of the captive space you know how difficult it may be identifying everybody.

Q     Who are the top five?

A     Would that be currently or ever?

Q     I understood you to say that you have been involved with captive small insurance companies over the last ten years or so.

A     Correct.

Q     In that time frame you also said

LEX REPORTING SERVICE
800-608-6085

Clark

27

that you don't consider yourself an expert, but you do communicate with colleagues.

A     During that period.

Q     During that period.

Are there five folks that you consulted with the most or communicated with the most in that ten year period that you can identify and understanding maybe today that's different than it was five years ago?

A     Right.

There is an attorney in California named Mat Brown at the Law Firm of Brown & Streza.  There is an attorney in Atlanta named Mat Howard from Moore, Ingram, Johnson & Steel I believe is the name.  There is a tax CPA in California Manuel Ramirez.  There is a CPA in Texas named Tom Prothro.  That's all I can think of at the moment.

Q     Your comment suggested there is a difference between your earlier years and the current years, which of these folks would be considered current contacts?

A     Manuel Ramirez.

Q     Are any of these folks related to

LEX REPORTING SERVICE
800-608-6085

Clark

28

you by way of family?

A     No.

Q     Is there any sharing of clients, do you send clients to them, do they send clients to you?

A     There is some sharing of clients.

Q     How does that work literally, Mr. Brown in California, how does a client of his become a client of yours?

A     There have been clients that he has referred to me for captive insurance work.  Mr. Ramirez has referred many clients to me for captive insurance work.  I have referred several clients to Mr. Ramirez for tax accounting work.  Mat Howard has referred many clients, many, many, somewhere between three and six for captive insurance and I have sent him clients for other legal reasons not captive insurance.

Q     How does that referral process work in terms of compensation, when a client is sent to you do you pay a fee back to that attorney or CPA and vice versa, how does that work?

LEX REPORTING SERVICE
800-608-6085

Clark

29

A    There is no referral fee that I either pay or accept. However, there are co-counsel arrangements in which the other counsel and I are participating, and providing services on a co-counsel basis. The client compensates each of us for the services we provide. That's also true for Mr. Ramirez, he's not an attorney, but he provided tax consulting services and accounting services and he's often hired by us on a Kovel arrangement and he's compensated according to his own bills that he sends to us and we collect from the clients.

Q    Are there any set fees among referrals, are there set dollar amount fees that you charge?

MR. ALLISON:  Are we talking only about the referral contacts?

MS. REYNOLDS:  Only the referral contacts at this point.

A    No different from cases that are not referral.

Q    What is your fee structure, your

LEX REPORTING SERVICE
800-608-6085

Clark

30

company's fee structure?

A    For captive insurance?

Q    For captive insurance as well as the other issues you mentioned earlier.

A    Okay, the captive insurance and estate planning are on a flat fee basis with an engagement letter signed at the commencement specifying the service and the charges. In the case of the captives the retainer that's requested is fully refundable if the client for any reason decides not to go forward, so the fee -- the fixed fee that's charged is only payable if the process is completed and when the process is completed. It works essentially the same way with estate planning matters.

Q    How much is that fee and when is it determined complete?

A    Over the years there has been a change in the fees for all services, would you like to know currently?

Q    Please.

A    Currently the typical fee for a St. Kitts captive insurance company is

LEX REPORTING SERVICE
800-608-6085

Clark

31

$50,000, which includes third-party service provider fees to whom we disburse their charges. Those include actuaries, insurance managers, corporate service providers and risk pool management. When it's payable the retainer is half of the fee, $25,000 payable at the commencement subject to refund if it doesn't go through. If it does go through the remaining $25,000 is payable when an insurance license has been issued, a business plan has been approved by the clients and the regulators and the initial insurance policies have been issued.

Q    You said that estate planning was similarly designed.

A    Flat fee, half payable upfront, refundable if the client desires and we have not done the work, balance payable when the work is complete.

Q    How is the dollar amount and how work is complete defined?

A    There is a fee schedule that's standard for irrevocable life insurance trusts, a will, gift trusts for kids, limited

LEX REPORTING SERVICE
800-608-6085

Clark

32

liability companies, family limited partnerships, we mostly go by the fee schedule.

And what else did you ask?

Q    When is it concluded, you said half up front and half when?

A    When the work described in the engagement letter is complete.

Q    Do you work exclusively with engagement letters with all clients?

A    In almost all cases.

Q    What is an exception?

A    An exception might be a very small matter that has to be done immediately and in those situations we may simply have an e-mail exchange.

Q    We have talked about your fee structure for captives, which you said is a flat $50,000 and with the conditions of half upfront, half when the work is completed as defined. You talked about estate planning, it's half up front, but it depends on the type of estate planning.

A    Yes.

LEX REPORTING SERVICE
800-608-6085

Clark

33

**Q**   Now, is there a formal document that describes those fee structures whether it's a will or a trust or whatever?

**A**   **Yes.**

MS. REYNOLDS:  I don't recall seeing that document.  Has that been provided?

MS. PARTAIN:  I don't recall seeing it.

MS. REYNOLDS:  We will talk about the document requests later on an individual item basis.

**A**   **If I could add something?**

**Q**   Sure.

**A**   **The third-party service provider fees included in the captive insurance engagement will total between $10,000 and $14,000.**

**Q**   In your company's books and records is that $50,000 reported as gross revenue?

**A**   **Yes, it is.**

**Q**   Are the payments to those folks reported as expenditures?

Clark

34

**A**   **Yes.**

**Q**   Now, fees associated with your other activities of the company you said there was consulting, there was tax consulting, there is real estate litigation, basic corporate work; what is the fee structure associated with that?

**A**   **It's an hourly rate.**

**Q**   What are your hourly rates?

**A**   **My hourly rate is currently $550 an hour, my partner's rate is $450 an hour, the associate rates are $275 an hour, the paralegal rates are $100 an hour.**

**Q**   I want to be sure, you indicated earlier that the percent of income, your gross revenue, 50 percent related to captive insurance legal work and 50 percent related to these other tax focused issues; estate planning, estate administration, transactional consulting, tax consulting, real estate litigation and basic corporate work; do I understand you correctly?

**A**   **Yes, except the last three you mentioned are not tax focused.**

Clark

35

**Q**   Okay, absolutely.

For your books and records, just so we understand, how do you keep your books and records; do you have a software program or how do you do that?

**A**   **We have a part-time bookkeeper who records the funds in and out on a Quick Books program.  We also have a software program for billing, which is tax approximate that shows receivables and collections.**

**Q**   How do you personally get paid?

**A**   **I have a salary and bonuses.**

**Q**   And your current salary?

**A**   **$600,000 a year.**

**Q**   Bonus, what is the determining factor in bonuses?

**A**   **The profit.**

**Q**   Do you have a captive insurance that you participate in?

**A**   **No, I do not.**

**Q**   What are your day-to-day duties within Clark & Gentry?

**A**   **I supervise the three associates, I respond to client's requests, I draft**

Clark

36

**documents, I research.**

**Q**   Do your clients come to your office or how do you conduct business with clients, do you meet them face-to-face or are you strictly an internet or phone; how do you meet new clients?

**A**   **All of the above.**

**Q**   So to break that down face-to-face what percentage?

**A**   **No, face-to-face is a is a minor part, far more communication by e-mail, webinar, conference calls.**

**Q**   You mentioned that you have three associates, may I have their names, please?

**A**   **Anjali Bhat, Diana Chen, Anthony Khatchoui.**

**Q**   Are any of these folks related to you?

**A**   **No, ma'am.**

**Q**   Do you have any family members that work at the firm, obviously these three are not family members, do you have any family members that work at the firm?

**A**   **Edgar Gentry is my husband and**

Clark

37

law partner.

Q   What is his areas of the business, do you share responsibilities or are you focused in a certain area and he's focused in a certain area?

A   Mostly the latter, his expertise is real estate, particularly commercial leasing and litigation, including Surrogate's Court litigation. There are certainly collaborative situations, particularly Surrogate's Court litigation. Often his real estate projects involved tax issues or corporate issues which I will then assist with.

Q   Does he assist you in the captive insurance programs?

A   No.

Q   Any other family members that work at the firm?

A   No.

Q   Does your spouse have any supervisory responsibilities at the firm?

A   No, he is not involved in office management matters.

LEX REPORTING SERVICE
800-608-6085

Clark

38

Q   How is he compensated?

A   Salary and bonus.

Q   What is his salary?

MS. CLARK: Calculator anyone?

MR. ALLISON: Do you want to ballpark it?

A   Something like $500,000 a year salary.

MR. SHLIVKO: Is he a 5 percent owner?

THE WITNESS: Yes.

Q   How are the associates compensated?

A   Salary.

Q   No bonus?

A   Yes, bonus, not partner's bonus, but year-end bonus.

Q   So you and your partner share the only partner's bonus?

A   Correct.

Q   Can you just ballpark the three associates salaries?

A   Slightly under $100,000 a year.

LEX REPORTING SERVICE
800-608-6085

Clark

39

Q   I want to make sure I understood you earlier, you do not pay nor do you accept, your firm, commissions or finder's fees; across the board; is that true?

A   Yes, I can confirm that we don't accept commissions, finder's fees or referral fees on the payment side. You could include a Kovel arrangement possibly. What else, occasionally a CPA will send us a case and request to be involved as a consultant on the case for which the CPA would be compensated usually directly from the client, occasionally by us. We then would charge that fee back to the client.

Q   Then you would pay that fee to the CPA through your firm?

A   On occasion.

MR. ALLISON: I want to clarify, whether in any of those situations are payments specifically in exchange for the referral itself as opposed to ongoing services?

THE WITNESS: Right, they

LEX REPORTING SERVICE
800-608-6085

Clark

40

know they must provide services of value or we do not agree to give them any compensation.

Q   Is that covered by formal document between you and that CPA?

A   No.

MR. ALLISON: I am sorry, but I do want to clarify Kovel Agreement.

THE WITNESS: The Kovel Agreement would be and on occasion with the CPA who's providing consulting services. They will be listed in our engagement letter with the clients.

Q   You don't have any independent contractors that work for your firm?

A   We have an IT person who's independent, the part-time bookkeeper is an independent contractor.

Q   What is that bookkeeper's name?

A   Patricia Santiago.

Q   How many hours a week will this

LEX REPORTING SERVICE
800-608-6085

Clark

41

person work just on average?

A   Two.

Q   With the person working two hours a week who handles the daily transactions?

A   **The office manager is responsible for cutting checks, submitting payment for bills, preparing our invoices to send to clients and on recording collections.**

Q   What is that office manager's name?

A   **Christine Edwards.**

Q   Christine Edwards is Clark & Gentry's office manager?

A   **In fact, yes, her job title is paralegal.**

Q   I guess I am confused, you mentioned three associates earlier, obviously there are more employees.

A   **Two paralegals.**

Q   The two paralegals one being Christine Edwards and the second being?

A   **Brenda Levine.**

Q   Any other employees?

A   **Temporary employees from time to**

LEX REPORTING SERVICE
800-608-6085

Clark

42

**time.**

Q   What would be an activity that a temp would be hired to do?

A   **To assist with a particular project.**

Q   Do you use a particular firm for your temp employees?

A   **No, we don't.**

Q   No lease employees?

A   **No.**

Q   Any other type of employee or associates that we haven't already covered?

A   **No.**

Q   Do you advertise?

A   **We have a website, we have a listing in Martindale Hubble. Last year we bought a small ad in Avenue Magazine. The issue was on women lawyers in New York. I can't think of anything else.**

Q   How do you get clients, how do clients come to you?

A   **Now?**

Q   Now and over the past ten years over your captive insurance history.

LEX REPORTING SERVICE
800-608-6085

Clark

43

How do clients arrive at your doorstep either by way of, literally, the doorstep or the phone or e-mail?

A   **I have given many presentations to accountants and lawyers. I have hosted and participated in many webinars. How you get clients is you do really good work for the clients you have and they tell their friends.**

Q   You say that you have given many presentations to accountants and lawyers, did you initiate the presentation or were you asked to provide the presentation?

A   **I was invited.**

Q   Well, how did that happen? How does an attorney or accountant know to call you to ask you to participate or give a presentation?

A   **I would say that the initial marketing came out of a relationship I had with a client, really a group of clients that worked with life insurance products and needed assistance in understanding the related tax issues. I researched many, many**

LEX REPORTING SERVICE
800-608-6085

Clark

44

**matters for those clients, they hosted conferences for life insurance providers, producers, accountants and lawyers and invited me to discuss insurance related tax matters and it grew from there.**

Q   You say "came out of a relationship," was that a formal relationship?

A   **A client relationship, a professional relationship.**

Q   Was that a group of professionals, was that a single person?

A   **A group of individuals who have various entities and companies all relating to life insurance products.**

Q   Did it have a formal name?

A   **My bills and my retainer agreements were from either Agilis Benefit Services or a professional holding company or possibly Executive Benefit Group all owned by the same people.**

Q   Who are those people?

A   **Dale Edwards, Steve Hardee, I can't remember the others.**

LEX REPORTING SERVICE
800-608-6085

Clark

45

Q    How many were there?

A    People?

Q    Yes.

A    Seven or eight.

Q    Seven or eight total?

A    Yes.

Q    Is that correct?

A    Yes.

Q    You mentioned Dale Edwards and Steve Hardee, were they your principle contacts?

A    Yes, ma'am.

Q    Did you have a formal agreement with these folks?

A    Yes, project by project.

Q    Does that relationship continue today?

A    It does not.

Q    When did it cease?

A    2007.

Q    May I ask the nature of it being stopped?

A    It was at their request on advice of their attorney.

Clark

46

Q    In these presentations that you mentioned, I understand you're invited based on this relationship and I am going to use Mr. Edwards and Mr. Hardee's name because that's the only two names you have Been able to provide.

How did you produce your part of the presentation or the presentation, were you directed in any way as to what went into that presentation; what kind of goals were you given? If I asked you to come speak at a presentation that I am hosting typically I would give you some idea of what I want you to talk about or to say.

A    Of course.

Q    Tell me how that happened in this situation  for you.

A    Yes, I would be given a topic, we would have discussions on the scope of that topic, how much time to devote to each related subject, how much time to leave for questions.

Q    Did you provide your presentations to Mr. Edwards and Mr. Hardee

Clark

47

before the presentation?

A    I can't recall.

Q    So it was your presentation, you created the documents and what form did the presentation take, was it literally just a conference, did you have documents that you provided, powerpoint type documents, did you hand out documents; what did that include?

A    Primarily powerpoints.

Q    Were they created by you or your staff?

A    Yes, usually the procedure was that we would send our powerpoint electronically prior to the conference.  They would prepare a handout of the slides together with other presenter's slides and their own information package.

MR. ALLISON:  I think to clarify, Ms. Reynolds' question was you and/or your staff prepared your slides?

THE WITNESS:  Correct.

MR. ALLISON:  Then Mr. Edwards and Mr. Hardee compiled

Clark

48

your slides with other slides?

THE WITNESS:  Yes, correct.

Q    First of all, did you receive a full copy of the handout, each handout?

A    I'm sure I did.

Q    Were any of your slides altered?

A    Some might be omitted, some might be requested to be simplified to improve clarity to that audience, I think that would be the extent of the alterations.

Q    I have received several powerpoint documents and I would like to get into those in greater detail as we come closer to the end of this interview; is that alright?

A    Yes.

MR. SHLIVKO:  Is there any way for you to generalize what type of slides were omitted?

THE WITNESS:  Slides referring to legal authority's diagrams that they considered overly complicated.

MR. SHLIVKO:  Thank you.

Clark

49

Q    Did I understand you correctly that Mr. Edwards and Mr. Hardee are associated primarily with life insurance producers; is that correct?

A    Yes, that is correct.

Q    The presentations in general what was the target audience?

A    We are talking now of the very, very early?

Q    We are talking about the initial marketing.

A    The invitees would be people who worked with Agilis and its affiliates in selling life insurance products. They would also invite accountants and attorneys who were interested in the uses of life insurance in different situations, but my recollection is that those earliest seminars were primarily life insurance producers.

Q    How does life insurance tie into captive insurance?

A    There is no -- there is no necessary connection at all. However --

MR. ALLISON: I am sorry, I

LEX REPORTING SERVICE
800-608-6085

Clark

50

do want to clarify whether the presentations that you were given at these conferences related to captive insurance.

THE WITNESS: Yes, they did relate to captive insurance.

A    So no necessary connection.

Q    When you say no necessary connection yet you were invited to make a presentation?

A    Yes.

Q    Did your presentations involve any discussions on uses of life insurance?

A    My own presentations did not or possibly very tangentially. There might have been a mention, but other presenters would speak about uses of life insurance in various contexts including captive insurance.

Q    Who are the other presenters that would speak of life insurance?

A    Dale Edwards himself would be the primary one.

Q    Any others?

A    Yes, there is an attorney named

LEX REPORTING SERVICE
800-608-6085

Clark

51

Alan Brown from Chicago. He was at those conferences and he spoke about life insurance in various contexts including captive insurance.

Q    Anyone else?

A    Sean King was usually a presenter on life insurance applications. Those would be the primary ones.

Q    Over what period of time did these presentations take place, you say that your relationship ceased with Edwards and Hardee in 2007; when did it begin?

A    Something like 2002 or 2003.

Q    How were you compensated for making presentations?

A    My travel expenses were covered and my lodging and meals were covered. During the conference I was not paid for my time.

Q    Who paid you travel expenses, who paid your lodging?

A    Agilis and its affiliates.

Q    Is Agilis a domestic company?

A    I'm not sure.

LEX REPORTING SERVICE
800-608-6085

Clark

52

Q    Did the presentation fall under the umbrella or name of a specific life insurance company?

A    I believe the practice was that a major life insurance company would sponsor the conference and send a representative who would pitch that company's product during the conference.

Q    Was that always different?

A    Different ones at different conferences.

Q    In that period, 2002, 2003 to 2007 how many of those presentation did you make?

A    I can't recall.

Q    One, five, twenty?

A    More than one. More than one, fewer than ten.

MR. SHLIVKO: Were they always in the same location or different locations?

THE WITNESS: Different locations.

MR. SHLIVKO: Do you recall

LEX REPORTING SERVICE
800-608-6085

Clark

53

which ones?

THE WITNESS: Several were in the US Virgin Islands and St. Croix. Several were in Texas. I think that's it.

Q   Attendance was primarily US citizens?

A   **Primarily, yes. I am not certain if -- there might have been some foreign nationals present.**

Q   Was this a multi-day event?

A   **Usually, yes, two or three days.**

Q   Over a weekend, during the middle of the week?

A   **Usually over the weekend, beginning Friday and ending Monday.**

Q   Do you have any of the handouts, the complete handouts from any of these presentations in your files?

A   **Probably I do.**

MS. REYNOLDS: We will be asking for complete copies of the handouts that you have in your file.

LEX REPORTING SERVICE
800-608-6085

Clark

54

Q   Did you also get a listing of those folks in attendance?

A   **Sometimes.**

Q   Alright that focused on the 2002, 2003 through 2007, what about 2007 to present day?

A   **Yes, I have presented in different places at the invitation of different groups.**

Q   The name of those groups and the location, please?

A   **I can remember a conference in Chicago hosted by a group headed by a man named George Huff. I can't recall the name of the organization. I co-presented at that conference with the developer of a medical practice risk retention group. There was a conference here in New York sponsored by Guardian Life Insurance Company recently, I believe 2011. There was a conference this summer at the Southern California Institute which is hosted by Strazzeri Mancini, a law firm in San Diego. There was a conference in Grand Rapids Michigan sponsored by a law firm**

LEX REPORTING SERVICE
800-608-6085

Clark

55

there. **I forget the full name, but part of it was Giamarco. There was a presentation in Detroit sponsored by a law firm, I forget the name.**

Q   When was it held?

A   **That was probably 2008, maybe 2007.**

Q   Any others?

A   **Yes, there were others, I cannot recall the specifics at the moment.**

Q   Was your presentation only part of the entire presentation or was it similarly designed like the Edwards presentations where you presented a portion or was the entire presentation yours?

A   **Almost always there were others topics and other presenters at these conferences, but there are exceptions. The one in Detroit was just me talking to the lawyers of that firm and, I am sorry, I don't recall the name.**

Q   And the topic of conversation was?

A   **The topic was small captive**

LEX REPORTING SERVICE
800-608-6085

Clark

56

**insurance companies.**

Q   Of the presentations that you made, the entire time period 2002 to present day, were you the only attorney or presenter that discussed or presented ideas about captive insurance arrangements?

A   **That would be correct with one exception.**

Q   Okay.

A   **Southern California Institute, one of the attorneys at Strazzeri Mancini co-presented with me with a different focus, this being actual client case studies.**

Q   What was the name of that person?

A   **Stephanie Downer.**

Q   You indicated earlier that captives are a speciality of your firm, small captive insurance firms are a specialty of your firm and by your being asked to present a lot of seminars or conferences over the years certainly suggested that. Who are your competitors?

A   **Initially very few, some of the gentlemen that I named when you asked who I**

LEX REPORTING SERVICE
800-608-6085

Clark

57

have consulted with on captive issues learned initially from me and became competitors. That would include Mat Howard, Mat Brown and there is another one in Atlanta. The first name is Chris, I am sorry, I can't recall the last name. In addition Jay Atkinson, Fred Turner and the law firm of Huish & Campbell in Phoenix, which has since sold it's captive practice to a company called Artex. The Stewart Law Firm in Delaware is a competitor. There is a gentleman in Michigan named Roccy Defrancesco who's a competitor. Those would be the primary ones.

Q   Were you the first in this area?

A   No, no, no, not the first, but perhaps the first to develop uses for closely held businesses.

Q   A quick follow-up question here, you indicated earlier that your fee was $50,000.

A   No.

Q   Who are the third parties --

A   Excuse me, that is not our fee, that includes the third-party service

LEX REPORTING SERVICE
800-608-6085

Clark

58

providers.

Q   That goes to my question, who are the third parties and actuaries that you share that with and what portion of that is shared?

A   All of this is itemized in our engagement letter.

Q   Okay.

A   I believe you have a form of that.

Q   I have about 3,000 documents.

A   So it's presented as a certain annual setup fee going to the insurance manager. Now, I am talking about St. Kitts. I should also say that we set up captives in very various places, but most of our clients elect to use St. Kitts because of the lower overall cost and fees. We can talk about other jurisdictions too if you like.

Q   What are your other jurisdictions that you use?

A   We have used and do use Delaware, Alabama Nevada and Kentucky. We are developing a relationship in Oklahoma.

LEX REPORTING SERVICE
800-608-6085

Clark

59

Q   Walk me through the timeline, you indicated that you're invited to make a presentation, then what happens? You make a presentation to a group of prospective clients I have to assume; is that true?

A   No, usually not. Primarily tax advisors would be the audience in attendance, occasionally they would bring clients of theirs who had a particular interest in captive insurance, so I think what you're asking is would I go to a medical conference or something like that where I had be talking to prospective clients and the answer is no.

Q   But these presentations that we have just been discussing what is the timeline and how do you receive clients as a result of the presentations?

A   Those with Mr. Edwards, those with Mr. Hardee, those with these other folks --

MR. ALLISON: I realize it is not a formal deposition, I am not going to object. I am going to note I don't think we have

LEX REPORTING SERVICE
800-608-6085

Clark

60

established that clients necessarily evolve directly from the conference. Perhaps Ms. Clark can address exactly and to the extent whether clients came out of these presentations, but I sort of want to note that.

Q   That is a good point, what is your motive for giving the presentations?

A   I actually enjoy talking about captive insurance companies to people, I enjoy educating them. I have taught in my career, I enjoy teaching. I always hoped to get clients out of the presentations, it sometimes happens, often doesn't. There is no direct -- you cannot connect the dots.

Q   So the presentations are a form of outreach, I mean I don't understand?

A   Definitely there is a marketing component, but there is no direct connection with clients. Many times an advisor talks to another advisor, that advisor may have a client in mind and that advisor that I never met might send me someone or call me and ask

LEX REPORTING SERVICE
800-608-6085

Clark

61

me do I think this person is a good client.

Q    So if you were going to book the expenses associated with these presentations in your firm's books and records, that is a marketing expense, how are they booked within your books and records?

A    **Meals and entertainment would be a category, marketing expense would be a category.**

MR. ALLISON:  I think the point is not that it's not marketing, it's clearly a form of marketing.  It's only a point of whether there is a direct correlation between going to a conference and then somebody from the conference picks up the phone and calls Ms. Clark.  My sense from Ms. Clark is that A- she wouldn't know if that is true and B- it's not typically that that direct relation occurs.

Q    You don't do any follow-up studies?

Clark

62

A    **No.**

Q    To understand where the future clients actually come from, do they knock on your door or wind up in your in box?

A    **No.**
**I do ask if someone calls that I don't know who referred you and I will learn the connection, but only if they call.**

Q    You also mentioned earlier that you do webinars, can you tell us about that, please, when it started, what you do, how the whole process happens, is it a group presentation or is it just your webinar?

A    **They are private webinars by invitation only.  We did several over the summer on medical malpractice and captive insurance.  We invited our doctor clients and their advisors.  We have done webinars for clients about various risk distribution issues including pools.  We have done many private webinars at the request of a client who wants multiple advisors to learn what I am saying, ask questions and then advise that client, that would be the universe of the**

Clark

63

**webinars.**

Q    When did they start?

A    **Oh, there were webinars -- excuse me, there were webinars back in those earli days sponsored by Agilis Benefit Services.**

Q    So you could potentially be talking as far back as 2002, 2003?

A    **Yes.**

Q    Did they continue through present day?

A    **Not passed 2007, not the Agilis.**

Q    Not the Agilis, but you do use the private webinars by invitation only and that is current?

A    **Yes.**

MR. ALLISON:  I note our court reporter has been going for almost two hours and maybe she would like a break.

MS. REYNOLDS:  Off the record.

(Whereupon, a discussion was held off the record.)

A    **Can I add something?**

Clark

64

Q    Sure.

A    **The focus of the webinars is one single topic.  The private webinars for a particular client would be focused on that client's business operations and particular circumstances, particular risk factors, particular loss histories, very specific.  The ones for the medical malpractice would be generic to physicians and the ones on the risk pools would be generic to anyone who already has a captive insurance company.**

Q    By whatever method a prospective client contacts you, what kind of documentation do you require them to provide to you?  We are talking still focusing on captive insurance arrangements.

A    **I am not sure I understand.**

Q    Do you ask them to provide any financial information?

A    **At what point?**

Q    Walk me through that process, someone dials your phone, drops an e-mail into your mailbox then what happens step by step?

Clark

65

A    Well, obviously it's not all the same. For example, someone might say, "I heard about captive insurance and someone said that you work in this area, what can you tell me about it?" In those situations I might send an executive summary, I might send any number of articles that have been written on the subject.

Q    An executive summary by yourself?

A    Yes.

Q    Articles written by yourself?

A    Other people.

Q    You haven't written any articles?

A    Not per se, not articles -- we have a narrative on the website. I did write an article for the Lindberg Newsletter a couple of years ago rebutting someone else's article, but not as a way of introducing people to the subject. I like them to hear more than just what I am saying and I tend to send articles of other people.

Q    Pardon me for interrupting you, you send them certain information then what happens next?

LEX REPORTING SERVICE
800-608-6085

---

Clark

66

A    That could be the end of it. It could be that they want to know specifically what captives could do for their business, they may request a feasibility study at that time before making a decision whether to proceed or they may be ready to proceed subject to their right to withdraw if what they are seeing developing isn't what they expect. We would send an engagement letter.

Q    Prior to the feasibility study?

A    Not always. We might do a private webinar or a conference call. We might actually ask an actuary to do a ballpark evaluation of the certain risks. Almost always the subject of comparative jurisdictions comes up and we would discuss the pro's and con's going here, going there. Often they would want a reference. At any point the process could stop, but if it continues the next step would be an engagement letter and we would begin collecting information.

Q    What type of information?

A    The type of information is any

LEX REPORTING SERVICE
800-608-6085

---

Clark

67

jurisdiction that licenses insurance companies will have rules about who can have an ownership interest or a controlling interest in the insurance company. It is highly regulated. Most of these jurisdictions that we have worked with will require some combination of professional reference, bank reference, financial statements, tax returns, copy of passport, proof of residence, criminal history, certainly bankruptcy history, prior involvement with insurance operations, a lot of personal due diligence information. That is on the regulatory side. On the actuarial side the documents that need to be collected would include their commercial insurance policies and their loss experience and tax returns for several years. That's essentially the list of documents.

Q    You gathered the documents, there appears to be an intent, there is an engagement letter. Now, what's the next step in the process?

A    We would assist in preparing an

LEX REPORTING SERVICE
800-608-6085

---

Clark

68

application to the licensing jurisdiction on that jurisdiction's form with the due diligence information, the personal due diligence information, provide attachments. There is a filing fee and then there is a process of review; additional questions, approval, possibly not approval.

MR. ALLISON:  When you say review of the questions you mean from the licensing jurisdiction?

THE WITNESS:  Yes, thank you, from the insurance regulators in that jurisdiction.

Q    Have you ever had anyone turned down?

A    We have one client who we felt might not pass the background screening because of a prior criminal incident and we requested informal guidance from the insurance regulators. They agreed with our assessment and that person did not become a shareholder, but other members of the business organization did become shareholders and the captive was structured in that way.

LEX REPORTING SERVICE
800-608-6085

Clark

69

Q   So you have not actually had one turned down you circumvented --

A   Not actually turned down.

Q   -- you circumvented in the possible termination?

A   Correct.

Q   It's been approved by the licensing jurisdiction, then what happens?

A   Really at the same time there would be the development of the feasibility study with actuarial support and input from the clients, the client's advisors, risk manager if there is one and a business plan would be developed for that particular client's case.  So usually at the same time as part of the application process the business plan or feasibility study would then be submitted to the regulators along with the other documentation.  A license is issued eventually and the particular policies described in the business plan would then be written and issued by the insurance manager on behalf of the captive insurance company.

Q   You mentioned actuaries, who

LEX REPORTING SERVICE
800-608-6085

Clark

70

identifies the actuary to be used?

A   We suggested actuaries and because we tend to develop a working relationship with one primary actuary at a time we get discounts on the rates which we pass through, so the clients like that and tend to go with our recommendations, but they are certainly free to use their own actuaries.  On occasion they do both and have an independent actuary that we have no relationship with review our actuary's work.

I am sorry, what was the end of your question.

Q   I was asking who selects the actuaries?

A   I think I did answer that.

Q   Let me back up.

You select and sometimes clients select; is that 50/50, is that 90/10?

A   No, almost all the time they will accept our recommendations.

Q   Do you use a specific actuary?

A   We tend to use a specific one primarily at any one time, but they do

LEX REPORTING SERVICE
800-608-6085

Clark

71

change, that primary actuary does change over time.

Q   Why would that be?

A   Different reasons, we have had three primary actuaries.  One reason is that I like to have different actuaries look at the same situation to see what the differences are.  It's a way of double checking to see if someone's really out of line.  You ask someone else the next year to look at the same policies for that client and if that is different that's bad.  In fact the differences have been modest.  The first insurance consultant we used did not want to do that work anymore and went in a different direction.  The second one we used was a specialist in medical malpractice insurance and after two years decided that that was all he wanted to do and the third one we are still using and that's ACR Solutions.

Q   When did you start using ACR?

A   2009.

MR. ALLISON:  I am sorry, I want to clarify one thing, it may

LEX REPORTING SERVICE
800-608-6085

Clark

72

have gotten lost in translation.  The actuary, you make a recommendation, but it's the client's final decision; is that the way it works or is it that you're selecting it on behalf of the client?

THE WITNESS:  I would say the latter is a fair description, but subject to any different opinion of the client.  In fact it's rarely challenged.

MR. SHLIVKO:  Let me also ask other than the primaries do you have secondaries?

THE WITNESS:  I don't understand.

MR. SHLIVKO:  Is there a universe of actuaries that you're using other than the three primary actuaries that you just mentioned?

THE WITNESS:  Well, yes, but they are all members of that

LEX REPORTING SERVICE
800-608-6085

Clark

73

group of three, so the ones that are no longer working for us primarily are happy to fill in as needed, give a second opinion or substitute.

MR. SHLIVKO:  Thank you.

Q     Have you gone through this process, this appears to be a lengthy process, and then a client backs out or you've determined that you don't want that person for a client or that company as a client?

A     No, we have not rejected a client, but we have had a few, a handful who have backed out.  My best recollection is that in those cases the reason was an adverse event occurring to the business or possibly a need to use cash for capital improvement.  It was simply just a change in the business plan of that operating business.  Several of those ultimately did form captives in later years, but cancelled the initial engagement.  Some of them never, never came back.

MS. REYNOLDS:  This might be

LEX REPORTING SERVICE
800-608-6085

---

Clark

74

a good breaking point.  It's 11:40, we do have a lot yet to cover.  Do you want to take a break for lunch, do you want to keep going on for another hour, but we do have a lot yet to cover?

THE WITNESS:  I am fine right now.  We can go a little longer.

MS. REYNOLDS:  Let's take a five minute break.

(Whereupon, a recess was taken at this time.)

Q     Just a quick follow-up question, the two other actuaries.

A     Besides ACR?

Q     Yes, please.

A     Peter Rauner, I meant to look up the name of his company.  It's three letters, I can't quite recall and the first one was GLK Professional Services, LTD run by Gary Ketchum.  There was -- there was another actuary we hired some time last year to review ACR's work on a completely independent

LEX REPORTING SERVICE
800-608-6085

---

Clark

75

basis and that was Actuarial Technical Solutions.

Q     Let's talk about clients, I don't want to use incorrect terminology, clients specifically as it relates to captive insurance or insurance products at all by your firm.  Is a client a person, a captive certificate holder; how do you define client?

A     Client is -- that is a great question, we have given a lot of thought to that.  Our engagement letter will be addressed to the primary operating business that will be utilizing the captive for purpose of buying insurance from it, so that would be my definition of the client formally, not necessarily the individual owner unless it happens to be a sole proprietorship.

Q     So the primary operating business that utilize the captive?

A     The captive.

Q     Typically behind a primary operating business there is a person or persons; what is the arrangements with those

LEX REPORTING SERVICE
800-608-6085

---

Clark

76

warm bodies?

A     Well, they speak on behalf of the operating business.  I mentioned that our clients are closely held businesses, very often family owned businesses.  The legal relationship with those individuals often will expand beyond the captive and include personal services such as estate planning or other tax consulting matters, sometimes succession issues.

Q     Does a primary operating business translate to a single captive, are they one for one, what is the relationship there?

A     There may be affiliates of the primary operating business.  Those affiliates may or may not participate in the captive.  Generally there would be one captive per group of affiliated businesses.

Q     When did you form or when was your first primary operating business client; what year was that?

A     For a captive insurance company?

Q     For a captive insurance company?

A     I think 2002.

LEX REPORTING SERVICE
800-608-6085

Clark

77

Q   Since that period of time through as close to present day as possible, how many primary operating business clients for captive insurance do you have or have you had?

A   Best guess would be 150.

Q   How many captive insurance companies have you formed?

A   Approximately the same number, possibly a slightly higher number.

Q   You talked before about the process of becoming a captive insurance company and the steps in that process and you talked about your upfront fee, which included additional fees, which included fees for other folks providing services over time.  Do these captives or do these primary operating businesses continue to provide compensation for you and your company?

A   Yes.
There are ongoing fees payable to various parties including our law firm. Actuary work is done every year and is compensated.  There are licensing fees, there

LEX REPORTING SERVICE
800-608-6085

Clark

78

are corporate franchise fees, insurance management fees and risk distribution fees.

Q   These are all annual fees?

A   All annually, yes, sometimes payable quarterly.

MR. ALLISON:  I just want to clarify, are they paid to you or third parties?

THE WITNESS:  It is a combination.  We do bill certain fees as a disbursement and other providers sent their bills directly.

Q   Do you record those combination as gross receipts in your company or like we talked about earlier in the $50,000?

A   Yes, we do.

Q   Are they expensed as deductions?

A   Yes.

Q   Have any captives that you formed ceased operations?

A   Many.

Q   Why?

A   Various reasons, principal owner

LEX REPORTING SERVICE
800-608-6085

Clark

79

of the business may have died.  Principal owner of the business may have retired, may have sold the business.  The business may simply not be making any money anymore. Especially since 2008 many of our small business clients have been struggling to stay afloat.  If they have not been utilizing a captive for a year or two they will liquidate.  We have had many liquidations this year that are motivated by the expectations that capital gain rates will go up next year, I mean partially motivated. Obviously there was an intention to liquidate, but there is an acceleration of that process this year.

Q   You mentioned that one of factors was "not making money anymore", why would that be a contributing factor?

A   No funds available to purchase insurance from a captive company.

Q   Is it true then that a captive, at least the captive in your set of circumstances, is driven by the profitability of the company of the primary operating

LEX REPORTING SERVICE
800-608-6085

Clark

80

business?

A   Well, it's more complicated than that.  If the business isn't doing much business it's not incurring much risk for which it would need supplemental insurance. If there is profits, but no cash, maybe they are behind on their payroll or something like that the captive would tend to be down the list of priorities of expenditure.

Q   What is a typical primary operating business, how much in premiums do they typically pay to a captive?

A   There would be a wide range for the 831B. There is a top end of the range of 1.2 million, but underneath that are anywhere from $10,000 a year and up.

MS. REYNOLDS:  Before we get away from the client list, we need to talk about that.  How do we go about getting that complete list of primary operating businesses identification?

MR. ALLISON:  Maybe that is something we can deal with off

LEX REPORTING SERVICE
800-608-6085

Clark

81

the record later, but I think there is several factors including identifying exactly what clients or what contacts we are talking about and secondly just sort of logistically putting all that together, but I think we can probably deal with that separately. I don't know that we need to sidetrack for that unless you think it's something we need to do right now.

MS. REYNOLDS: We certainly need to do it before the close of this meeting.

MR. ALLISON: That's fine.

Q   We talked about webinars, we talked about presentations, do you give any tax related seminars that may or may not include captives?

A   **Yes, I have done estate planning seminars and general tax seminars, sort of updates changes in the tax law.**

Q   How does that come about, does

Clark

82

someone invite you, do you take the initiative, how does that happen?

A   **We host them at the law firm for our clients and friends of clients.**

Q   Are you asked by anyone else?

A   **Are we asked by anyone else, probably once or twice I can't recall. Oh, right, yes, in my capacity as Planned Giving Counsel, Chair for the Arthritis Foundation I have done a number of seminars sponsored by the Arthritis Foundation.**

Q   Do you give any handouts or brochures or any documentation when you conduct these seminars or tax related seminars?

A   **Often, yes.**

Q   Created by yourself?

A   **Yes.**

Q   Do you do video tapes, CD's, audio tapes?

A   **Occasionally.**

Q   You mentioned that you like to teach, do you do any teaching, anything tax related, could be captive, could not be

Clark

83

captive; anything tax related?

A   **Not currently.**

Q   When was the last time that you did that?

A   **Other than the seminars and webinars we have discussed it would be working for Cardozo Law School.**

Q   When was that?

A   **Let's see 1986.**

Q   So not since then?

A   **Not since then.**

Q   Do you do any direct mailings to your clients or prospective clients offering any tax updates advice?

A   **Occasionally.**

Q   But it's not an annual mailing or anything like that?

A   **No.**

Q   With the anticipated changes in the tax laws, do you have plans or have you already been speaking with clients formally, informally, in writing, e-mails; anything of that nature?

A   **Yes, we sent a memo to clients in**

Clark

84

**cases where there was an individual shareholder of a captive insurance company or an individual who is a member of an entity that's the shareholder of the captive insurance company and we made a suggestion that because the current high gift tax exemption may well expire at the end of this year that they should consider major gifts this year rather than next year and in particular we would suggest that they move the stock of a captive into an estate planning remote trust.**

Q   Into what?

A   **Into an estate planning remote trust.**

Q   What is an estate planning remote trust?

A   **It's an irrevocable trust whose assets will not be part of the taxable estate of the person who contributed the assets to the trust.**

Q   Do you have planned at this time any webinars or presentations scheduled for the foreseeable future?

Clark

85

A        No, not at this time.

Q        Do you charge participants of any seminar/webinar to attend?

A        No.

Q        What do you tell people your qualifications are to give this advice?

A        To give this advice?

Q        Yes.

A        I have a curriculum vitae that's on our website and often a handout. It's not a conference in which people are physically present, on the webinar someone will usually introduce me explaining my background.

Q        Do you give them that information to speak to you?

A        Yes.

Q        Is that a prepared document that we may receive a copy of?

A        It's on my website.

Q        It's that very document.

A        Well, all of the information is on the website.

Q        Now, we walked through your education background. I don't recall if you

Clark

86

mentioned you attended any tax related seminars; did I misunderstand?

A        I do my CLE requirements and much of the courses I select are tax related.

Q        Are those face-to-face?

A        Yes, usually some are webinars.

Q        Now, would you describe your client base?

A        Closely held businesses first and foremost, high net worth individuals, a fair number of individuals who are not high net worth, but we have a relationship with going back years or relationship with family.

Q        Have you ever or do you promise or guarantee clients lower taxes by engaging in one of your programs?

A        Definitely not.

Q        You mentioned earlier that several clients have been audited or are in the process of being audited, did personally or your firm provide any guidance on how they should respond to the IRS?

A        I have to say, yes, in the sense that we would be given a copy of an IVR and

Clark

87

we would actually provide many of those documents from our files that the clients did not have accessible. In the situations where something was requested relating to a transaction from a closed year we would advise that that was a closed year and perhaps not subject to request by the IRS. That is not a clear cut situation. We would give advice based on the specific questions that were under audit and a situation of that business.

Q        In what media did you provide those responses, did you provide it verbally, did you provide it in written letter or e-mail; how did those responses come about?

A        I would say a combination of telephone calls and e-mails.

Q        Did you charge for those services?

A        Assistance in audits is part of our standard maintenance service that we provide for a flat quarterly fee of $2,000.

Q        Do you contribute or maintain any blogs that discuss tax issues?

Clark

88

A        No.

Q        I believe I asked you this earlier, I want to make sure I understood you correctly, do you consider yourself to be an authority in captive insurance programs?

A        You did ask me that and my answer was I have never described myself in those terms. I am aware that other people do describe me in those terms.

MR. SHLIVKO:  Who is the expert in that area, who would you consider the expert?

THE WITNESS:  Captive insurance is very broad, I work exclusively with small captive insurance companies. There are many national experts dealing with large captives with subspecialties from hospitals, schools, businesses of different sectors. We just do the small captives, so do I consider someone in that particular space to be more expert than me; is

Clark

89

that your question?

MR. SHLIVKO: Yes.

THE WITNESS: I don't. I am not saying I am the best.

MR. SHLIVKO: So in essence I understand you're saying there are no experts in that area.

MR. ALLISON: I think if we can narrow down the pool to the small business captive area, which Ms. Clark is in, Ms. Clark is obviously very well versed, very experienced, but she is also very modest and would never describe herself as an expert, but she is also not aware of anybody that is more experienced than her in that field.

THE WITNESS: Thank you.

Q    In the tax advice that you have given related to captive or not related to captive, has anyone disagreed with you and then how were issues like that resolved?

A    Has anyone disagreed with me, not

Clark

90

in the sense that there has been an issue relating to a particular client. I have not ever had a situation where someone with similar captive credentials, so to speak, would say, "I just don't agree", and they have gone for a second opinion on that issue or somehow they heard about it and they said they don't agree. There are many situations where people have criticized positions I have taken in an abstract way. There is a lively debate on many issues relating to captives.

Q    Among clients, among peer professionals?

A    Peer professionals.

Q    Example of one would be?

A    Life insurance.

Q    What is the debate about?

A    Can a captive invest in life insurance, what kind, how much, how soon, exactly what type of insurance, who is the insured life? There are a lot of questions relating to life insurance and captives.

Q    Is that an open forum discussion or is this just debate?

Clark

91

A    More like a grapevine discussion.

Q    Just a few more questions until we get into the specifics of some of the documents that I received.

Do you have any offshore accounts, do you personally or your firm?

A    No.

Q    Are all fees that you earn received by you personally or by your firm; your legal fees?

A    How is the check payable?

Q    How is the check payable, do they go into the company bank account?

A    They all go into the company bank account, they may be addressed to myself or my partner individually and endorsed over.

Q    Do you advise or assist clients in transferring assets offshore?

MR. ALLISON: Moving money from the US?

MS. REYNOLDS: Money or assets offshore.

A    We have on occasion assisted a client in setting up a bank account in

Clark

92

another country. We have a few clients who have trusts established in other countries with accounts in various countries, a dozen at most of all of these.

Q    Do any of them happen to be related to a captive arrangement?

A    No.

Q    Do you refer clients to attorneys, CPA's or insurance providers?

A    Insurance provider meaning life insurance?

Q    Life insurance.

You indicated earlier that there is a host of life insurance providers to some of the presentations, but it could be any insurance provider or any insurance salesman?

A    Okay, just repeat the question one more time.

Q    Do you refer clients to attorneys, CPA's or any type of insurance provider?

A    Yes, to all of that.

Q    Could you give me an example of each situation, why would you refer a client

Clark

93

Q  to an attorney?

A  Because they need legal advice in an area that is outside our expertise or possibly involves an issue of estate law in which we are not licensed to practice estate law.  CPA's as tax return preparers would be completely outside our expertise.  We do no returns and for life insurance, for other types of insurance we would give a list to people who were seeking advice on those sort of products.

Q  Is that a prepared list that you maintain?

A  No, it really depends on what the client's needs are.  For the life insurance I have a particularly close relationship with someone named Neil Feinstone, who is a completely independent life insurance consultant.  He knows more about life insurance than I ever will and he has given my clients really good advice on many occasions.

Q  Where is Mr. Feinstone?

A  He's in California, I can't

Clark

94

remember the city.

Q  What was your role?

A  Whatever the partners told me to do, I was a very junior associate.

Q  You indicated earlier that you became involved in captive insurance arrangements early 2000.

A  Yes.

Q  What is your involvement with captive insurance laws in St. Kitts?

Clark

95

A  Oh, I was hired by the government of St. Kitts to draft captive insurance legislation in 2006 and that legislation is the current captive insurance law of St. Kitts.

Q  How did that come about, how did they know to contact you direct or otherwise?

A  Well, I had heard that St. Kitts was looking for a way to enter the financial services sector and at that time in 2006 I was very dissatisfied with the services that were being provided by the British Virgin Islands, BVI.  I had possibly ten captives there in the BVI and it was not working and I was looking to redomicile them and I thought this could work if St. Kitts would allow me to guide them to develop legislation tailored to small captive insurance companies.  I can make my clients happy by moving them from the BVI and possibly use that jurisdiction in the future, so I was invited to make a presentation and there were many competing presentations to the St. Kitts governing body, not all of it obviously, to a committee

Clark

96

and I was hired.

Q  I just want to be sure I understand, it sounds like you had an interest and put yourself in that pool to be considered; am I misunderstanding you?

A  No, you're correct, I approached them and presented my idea.

Q  How many folks were involved in that pool?

A  I don't know.

Q  So you did not make your presentation a joint captive pool administration?

A  No.

Q  What is your role and your firm's role or roles in the administration of any captive insurance arrangements other than the things that we already talked about?  We talked about the ongoing fees associated with the life of the captive.  What about risk pools, talk to me, please, explain what happens there, what's going on there, how you get involved, how it works?

A  Which period would you like to

Clark

97

talk about?

Q    The scope of this investigation is from the first of 2005 to present day, it could be expanded, there is no statute of limitations. If necessary it can be expanded, but all involvement in captive insurance is the time period of my focus.

A    So obviously you know that risk distribution is one of the requirements for an insurance company to qualify as such for tax purposes. It's a difficult issue for small businesses, closely held businesses because there generally are not enough sufficient affiliated entities to allow for internal risk distribution within the affiliated group. The first thing that we did was refer clients with captives to a reinsurance broker who would recommend and place the captive in a reinsurance treaty with an intermediate insurer. The risk being insured at these various levels would be a large pool of risk at various times. The risk pools involved credit property insurance, auto service contracts, vehicle

LEX REPORTING SERVICE
800-608-6085

Clark

98

service contracts, big pooling of those contracts that are insured by -- I guess by the dealers, so that's not anything to do with us really. It would be a completely independent organization that would place captives into these reinsurance relationships and those organizations or that broker that placed the captive would be compensated for that service. We simply referred people out.

Q    Who is the broker, what's the name of the broker?

A    The primary one obviously Credit Reassurance, it's either corporation or limited at the end. They are based in Texas and the principal of that organization is Gary Fagg.

MR. ALLISON:  Can you put a time frame on it?

THE WITNESS:  So we are going chronologically, this would be in the very early days. There was simply no way that we could provide a pool to accomplish sufficient risk distribution

LEX REPORTING SERVICE
800-608-6085

Clark

99

within our client base because we did not have a big enough client base in the captive area.

MR. ALLISON:  This is early 2002, very early 2002.

A    Let's see, I have it in notes, but approximately 2003 we did have a sufficient number, barely a sufficient number of captives to do this, so we notified the clients that they could continue to work with Credit Reassurance or they could join a cross insurance arrangement with businesses like themselves that have captive insurance companies and they could simply agree to insure each other's businesses to a sufficient extent, so each captive would have the required risk distribution. We got a very good response to that and we did that by way of a direct contract between each captive and each insured.

We did that for a couple of years, maybe three years and then it got too unwieldily to do it in that way and we changed to master grid so there would be one

LEX REPORTING SERVICE
800-608-6085

Clark

100

single group contract and each captive would be listed, each insured would be listed and then there would be various amounts of insurance issued to each and every one and I know you have seen those grids. It's just a big spread sheet with X's where there is insurance and blanks where there is none and the totals would be at least 30 percent of each captive's annual premium, so the amounts would vary depending on what each captive's annual premium was. That continued until 2009, so probably for three years we did a master version with a grid. So in that situation we did not have a trust, we did not have a reinsurance arrangement. It was essentially direct insurance on one group certificate.

In 2009 we changed to have more of a formality, I think would be fair, and more independence in the management and we agreed with Pan American Reinsurance Company that that entity would act as the pooling vehicle that would directly insure each business reinsurance for whatever amount was

LEX REPORTING SERVICE
800-608-6085

Clark

101

requested and reinsure all of that risk on a blended basis to the captives associated with each business and each of those captives would assume a percentage of that blended risk that would depend on their share of the premium, the reinsurance premium paid -- Pan American paid to each captive would be obviously a percent of all the premiums paid that year and that ratio would be the percentage of the assumed risk and that would be blended, so if there was one loss in the pool of $100,000 and 100 captives were reinsurance in the pool equally it would be $1,000 each that they would be required to pay on that loss.

Q    Is that percentage you're talking about, is that what is identified in the documentation as the quota share?

A    Yes, a quota share is a percentage, exactly.

Q    You say that in 2009 we agreed with Pan American Reinsurance, who is we?

A    My law firm.

Q    Who is Pan American?

Clark

102

A    Pan American is a captive -- it is a captive insurance company licensed in Nevis that is taxed as a US domestic insurance company.

Q    Who owns Pan American?

A    The primary shareholder is a woman named Sheila Trevor-Smith who's a friend that I and my family know from Nevis. She is married to Robin Cotterel who is involved with Heritor Management or primary insurance manager for St. Kitts' Company.

Q    So there is a link between Pan American and Heritor?

A    Correct.

Q    You indicated that primary owner is Ms. Trevor-Smith, are you aware of any other owners?

A    My children -- my children own two and a half percent each. I have two children so that's five percent and there is another shareholder and I think it's Laurence Mohn. I have seen these documents, but not in a long time.

Q    How did your children acquire

Clark

103

their own share percentage?

A    Robin and Sheila did that as a gesture. The stock was not worth anything at that time and possibly has a small value now but diminimus.

Q    You're saying they purchased it?

A    No, no, it was a gift.

Q    It was a gift?

A    Yes.

Q    From?

A    From Robin and Sheila.

Q    The arrangement with Pan American began in 2009?

A    Yes.

Q    Does that continue till today?

A    It does not continue. We have a different reinsurer that we are working with this year, next year is open. We do not know, but we are right now using a company called Jade Reinsurance Group, Inc., which is a captive insurance company licensed in Alabama.

Q    Is that 2012 only?

A    So far, yes.

Clark

104

Q    Who owns Jade?

A    Jade is owned by a limited liability  company of which the members are Chris Jarvis and  Laurence Anderson.

Q    How many reinsurance pools have you administered or are you administering?

A    Since we started with Pan American in 2009 we have done two pools a year. This year we are only doing one pool, so that's '9, '10, '11, that's '7 and going back to the cross insurance days you could call those pools that would be done twice a year.

Q    And the master grid years?

A    I am including those.

Q    Help me understand, let's focus right now on the cross-insurance master grid years; twice per-year what would happen?

A    Explain that question, I don't understand.

Q    What are the mechanics, you said you had the pools twice per-year; what does that mean?

A    That means the clients were

Clark

105

invited to participate twice a year, usually they would participate only once, but it might be an earlier pool or later pool and that would be entirely their choice and the credit assurance option was always continued to be an alternative.

Q     Did I misunderstand you, you didn't have many takers, if any, once the cross insurance and the master grid was in effect?

A     That is an exaggeration, I believe I said that the clients responded favorably to the cross insurance, but there are certainly a significant number that have continued with the credit reassurance and do to this day.

Q     2012 you said you had one pool.

A     Yes.

Q     Who maintains the pool, who physically handles the paperwork associated with the pools?

A     Well, the cross-insurance structure involved insurance policies, insurance contracts issued between the

LEX REPORTING SERVICE
800-608-6085

Clark

106

captives and the businesses.  We prepared those contracts.  We would hire an actuary on our own dime to give the correct ratio between premiums and loss limits for those contracts.  We would either hold the funds in an escrow account, which would be a sub escrow cut of our attorney's escrow account, a separate sub escrow for each business.  The business would wire its premium payments into its own sub escrow account where it would sit earning interest that would be payable to that business until either the clients said send it back, I changed my mind or we closed escrow and we would close escrow when we had a sufficient number of participants to satisfy risk distribution requirement.  At that point the monies would be wired from our master attorney's escrow account to the captive insurance company's account usually by wire, sometimes by check and that would be the payment of premium to those captives on behalf of certain businesses.  We are talking now about the cross insurance days.  It would be certain businesses and the businesses

LEX REPORTING SERVICE
800-608-6085

Clark

107

would be listed on the policies and the related contracts so that it was clear which businesses were buying insurance from which captives and to what extent, but the flow of funds would have been through an escrow account.

Q     You mentioned a sub escrow account for each business, who held ownership title to that sub escrow?

A     It was under our attorney's IOLA escrow account, so it would have been Clark & Gentry or formerly Law Offices of Ceila Clark maintained at Citibank.

Q     You said the business owner could ask for that money back.

A     Yes.

Q     He or she couldn't pull it from that account, they didn't have signatory authority?

A     That is true.

Q     Is that correct?

A     That's correct.

Q     Was that sub escrow account in their specific name, did their name business

LEX REPORTING SERVICE
800-608-6085

Clark

108

name appear on it?

A     Yes, it did.

Q     Were there any monies, any funds commingled from one business to another business?

A     Never.

Q     When was the transition period from the sub escrow account to the main escrow account?

A     On the day of closing.

Q     What are the firm's fees for maintaining these pools?

A     We charge $2,500 per captive in the prior insurance arrangement.  When we changed over to Pan American, Pan American needed to be compensated for the raise being it was assuming as primary insurer.  Even though it was reinsurance it's still legally libel potentially for that risk, so Pan American received a fee of $3,000 for each captive and we retained a fee of $2000 for each captive for the administrative work.

MR. ALLISON:  Out of the $3,000?

LEX REPORTING SERVICE
800-608-6085

Clark

109

THE WITNESS:  No, no, I am sorry, Mark, in addition.  There was a $5,000 fee, three Pan Am and two to us.

Q   Did the $5,000 in total flow through your company or was it split up and three to Pan American and two to you?

A   All through us.

Q   All through you?

A   Yes.

Q   Let's see I asked who physically maintained the cross insurance records, the pool records, if I got an answer I missed it.

A   I am sorry, the records, so we would have the bank statements from Citibank that would show payments into the sub escrow account, transfers to master escrow and wire from the master escrow to the various recipients.  We would have those records, many of them have been provided to you.

Q   Who physically kept tabs on the pools, who maintained the records of those pools; was it a specific person in your firm?

A   I am not sure what records you

LEX REPORTING SERVICE
800-608-6085

---

Clark

110

mean, I am answering you as to the bank records.

Are you thinking of some other records?

Q   Who makes the cross master grid?

A   We did that as part of the preparation of the insurance contract.

Q   Was there a specific person in your firm that draws up that master grid?

A   Various people have worked on it.

Q   Do they work under your guidance?

A   Definitely.

Can I amplify something I said, because it's not quite complete without mentioning that before escrow closed each client would have a chance to review information about the applicants to the pool and chose to exclude any of them that they did not wish their captives to insure.

Q   Did they exercise that option?

A   Yes, not every year, but certainly there would be some exclusion in each and every pool.

Q   What would be a basis for one of

LEX REPORTING SERVICE
800-608-6085

---

Clark

111

those exclusions?

A   Well, we never asked actually.  We always said you can exclude for any reason or no reason, but we did get some feedback that certain people were not comfortable insuring defense contractors for terrorism risk or there was one business that was located very, very near a nuclear reactor and a couple of the captives did not want to insure.

Q   The risk being covered by the pools was?

A   That was terrorism risk.

Q   Exclusively?

A   Exclusively through 2011.

Q   And beyond 2011?

A   It's a completely different structure with Jade and there are many, many lines of insurance going through the pool.

Q   Is the Jade Structure the same fee structure?

A   For 2012 it is a $5,000 fee.  The split has shifted, we are now taking $3,000 out of the 5, Jade is taking $2,000 out of

LEX REPORTING SERVICE
800-608-6085

---

Clark

112

the 5, because we are actually doing more of the administrative work than we did with Pan American.

Q   That administrative work includes what?

A   Includes quarterly financial statements for the pool's funds while they are held in the pool.

Q   Whose control are those pool's funds in?

A   That varies.  Initially it was Citibank and our escrow account so that would be me when I was the only partner and then in 2009 it was still Citibank, but it was a trust account starting in 2009 and the trustee was me, so that would still be my control subject to the terms of the trust agreement.  In 2010 most of the monies were invested with a professional money manager called Joseph Capital and some small income was earned and credited to each participant, some continued to be held in Citibank and in both cases under a trust account title.

Q   That started in 2010, does that

LEX REPORTING SERVICE
800-608-6085

---

Clark

113

Q continue to today?

A Through last year, through '11.

Q Through 2011?

A Yes.

Q And for 2012?

A Very different. There is a trust and there is a trust account, but the trustees are Chris Jarvis and Laurence Anderson and the investment advisor is Credit Suisse and the funds are held at Credit Suisse.

Q Let's do a walk through of the monies from the business organization all the way through as far as it goes. We talked earlier about getting the captive set up and if everything goes okay there is a captive set up and there is a licensed captive. The business entity, your client, as we discussed earlier wants to insure, the risk, the premiums are determined for those. The risk, the coverages and their premiums are determined by your firm or by someone else; the coverage and the risk and the premiums who determines those?

LEX REPORTING SERVICE
800-608-6085

Clark

114

A The client is the first source of information about the business risk and they are asked about it in a questionnaire that we send frequently followed up with a conference call. The client's advisor may also have information and we do ask them. The client is the source of information on losses and claims that have been made against their commercial insurance. Client's insurance broker will probably be the most knowledgeable about the commercial insurance, what kind of riders there are, what kind of exceptions there are, so source is first clients and client's advisors. We can generally get a rough idea of what sorts of coverage would be needed to supplement the commercial, but we cannot as lawyers determine the appropriate amount of insurance either in terms of coverage limits or premium. Those determinations are made by the actuaries. They are reviewed by the insurance manager and the clients and the client's advisor many times with changes in the course of this process and the actuary

LEX REPORTING SERVICE
800-608-6085

Clark

115

may have to go back and reevaluate and reconsider based on new information that is provided after the first draft proposal is circulated. We certainly chime in as a attorneys with experience with other captives who might be insuring similar types of businesses. We might have some ideas to contribute there, but you want to go with the money flow and I am not exactly sure how that ties in.

MR. ALLISON: I think the question simply was who is determining the amount of premiums and risk coverage?

Q To have a money flow we have to know how much is flowing.

A Okay, so there would be a resolution of these issues in the course of developing the business plan and/or a feasibility study and that would then be formalized and based upon those studies the actual policies would be drafted after the license was issued.

Q Then the policies trigger a

LEX REPORTING SERVICE
800-608-6085

Clark

116

payment of premiums.

A There is a -- yeah, it triggers the legal obligations to pay those premiums for that coverage. Mechanically there would be an invoice for the premiums listed by policy.

Q Issued by?

A Well, we in fact prepare it, but it is in the name of the captive insurance company and it's addressed to the businesses or business that is purchasing those lines. The payments then would go directly from the business to the captive account.

Q You draft the invoice for the premiums that suggests to me that you don't issue that.

A No, the policies are issued when the certificates of insurance, which is your legal contract, is executed by the insurance company and that would be executed by the insurance manager on behalf of the insurance company.

Q And the insurance manager?

A That would be Heritor for the St.

LEX REPORTING SERVICE
800-608-6085

Clark

117

Kitts companies.

Q     Since you moved to St. Kitts is that all captives?

A     Heritor?

Q     Yes.

A     Yes, but there is a footnote because we do send some captives to Nevis and Nevis does not license Heritor as an insurance manager so we use another one in those situations.

Q     And that name is?

A     That name is Heritage Services.

Q     Any cross?

A     Yes, they are affiliated.

Q     So we have determined the coverage and the limits, we have determined the premiums and an invoice is drafted, submitted to the captive from the insurance manager; correct?

        MR. ALLISON:  You're talking about the actual invoice?

        MS. REYNOLDS:  The actual invoice.

Q     The actual invoice would be

LEX REPORTING SERVICE
800-608-6085

Clark

118

submitted to the business for payments?

        MR. ALLISON:  By Heritor?

A     No, we would actually send the premium invoice from our office to the business.  Once the decisions have been made on what is bought we would facilitate that by drafting the invoice.

Q     So the invoice is issued to the business or is the business in this set of circumstances the same as the insured?

A     Yes, it is.

Q     Then the insured or the potential insured would issue payment for the premiums?

A     Correct.

Q     To?

A     To its own captive account.

Q     To its own captive account?

A     Yes.

Q     The timing of the insurance policies typically it's December for a one year term, December to December; can you help me understand why that would be?

A     You say typically, I am not even sure it's a majority.

LEX REPORTING SERVICE
800-608-6085

Clark

119

Q     Correct me then.

A     Okay, they are issued at various times in the year.  There is certainly alot late year, but I am not sure that it's as much as half, I doubt it.

Q     Help me understand what determines the term of an insurance policy.

A     The term, well --

        MR. ALLISON:  Are you asking about the term or the timing of when it is issued?

        MS. REYNOLDS:  Maybe I am making a wrong assumption.

A     The policy period would be twelve months and the issue date depends -- it just depends.  Let's say a captive is formed in January, an application is submitted for a captive in January and it's St. Kitts and a license is issued in April we would expect first policies to issue in May.  There may also be subsequent policies issued in that same year so it's various time frames.

Q     Has that been true since the beginning of your dealing with captives?

LEX REPORTING SERVICE
800-608-6085

Clark

120

A     Which various times frames?

Q     The various time frames.

A     Yes, I would say so, but it's more -- it's more varied now than it was.  We have encouraged people to adopt different schedules so that our work isn't bunched in one month, which is very difficult administratively.

Q     Now, once again who physically issues the policy?

A     Heritor.

Q     Do you or your firm do any drafting?

A     Yes, we do, we draft the insurance policies.

Q     I'd like to talk now about some of the powerpoints that were included in the documents that I received, I guess you all brought copies.  Going back through the documents that I received they were not in any chronological order, so I put them in chronological order.  I find that there is a presentation for 2006 and then we jump into 2008 and then there are multiples up through

LEX REPORTING SERVICE
800-608-6085

Clark

121

the present day.  Now, you said that you have been involved in captives since early 2000, what about presentations prior to 2006?

A    Certainly there were several so those materials have been combined with other materials from other presenters and Agilis Benefits if that is what we are talking about, so I no longer have my actual original slides from those presentations.

Q    Do you have that combination?

A    I probably do from the takeaways in storage, I probably still have it.

MS. REYNOLDS:  We'd want to see those complete takeaways to use your term.

Q    I am looking at specific documents, deductible of policy premiums, it talks about a bonafide insurance company and it has a bullet point of, Insurance Formalities Are Important."  Could you give me a little background on that, you talk about formalities?

MR. ALLISON:  I think it's going to be really difficult

LEX REPORTING SERVICE
800-608-6085

Clark

122

without being able to see it.

Can we go off the record?

MS. REYNOLDS:  Sure.

(Whereupon, a discussion was held off the record.)

MS. REYNOLDS:  Back on the record.

Q    Did you go through the CD's that were provided to me?

A    I did not go through all the powerpoints.

Q    Who compiled the data for the CD's that were provided to me?

MR. ALLISON:  Ms. Clark sent them to us and we downloaded them on to CD's.

Q    So you haven't seen them in their finished form?

A    Well, I haven't reviewed them recently except for one or two just to refresh my recollection.  Mostly they are the same from one to the other.  This I do not recognize and I would never, never start a presentation with deductible policy premiums.

LEX REPORTING SERVICE
800-608-6085

Clark

123

I can't believe this is Page 1, I think this is taken out of context.

MS. PARTAIN:  It's hard to know without the CD.

A    Oh, this must have been 2009 because this was med mal.  Yeah, this was about -- this was about a business purpose discussion with and without medical malpractice insurance, but I do think this is taken out of context.  This would not have been the beginning unless I have totally forgotten.

MS. PARTAIN:  We didn't bring all 3,000 documents so we don't physically have it.

MS. REYNOLDS:  Tell me what you do have and then we will -- since there is a lot of repetition maybe we can address our questions with your paper documents as the examples.

A    This might be it.

MR. ALLISON:  We have one that starts at 2571.

LEX REPORTING SERVICE
800-608-6085

Clark

124

A    This was med mal.

MR. ALLISON:  Another one starting at 2545.  We have a similar, but slightly different slide at 2555.

Q    2555, let me see if I can pull that up and then you have the paper document that we can refer to back and forth.

MS. PARTAIN:  I have a hardcopy as well.

Q    This presentation beginning with bate's number 2545, Beneficial Use of Small Captive Insurance Company by Physicians and Medical Groups, it indicates that this particular powerpoint presentation was presented to the American Benefit Institute in Orlando, Florida on February 19, 2009, what is the American Benefit Institute?

A    I don't know much about it, there is a life insurance group in it.  They also are financial advisors, that is pretty much all I know.

Q    Who invited you to speak?

A    I was invited by Keith Mohn to

LEX REPORTING SERVICE
800-608-6085

Mark

125

talk about his program really, which is a risk retention group for physicians and medical groups and what we were trying to do was show that the combination of a medical retention group and a separate company captive could be very powerful in reducing the medical malpractice premiums paid by physicians. That is why I went. There was a discussion before mine specifically on the risk retention group and what I did was do a general captive presentation followed by specific thoughts on how the two entities could work together with reinsurance between them of the medical malpractice and save the physicians substantial medical malpractice premiums. This structure from February 2009 has been substantially altered, but there is now in place a similar program combining these types of captives.

Q    Mr. Mohn, is he related to Laurence Mohn?

A    Yes, he's his son.

Q    This is Keith?

A    Keith.

LEX REPORTING SERVICE
800-608-6085

Clark

126

Also Mark Sims was presenting for the retention group, which is named here PBR RRG.

Q    Risk retention group is that under your umbrella of did I misunderstand you someone else presented about risk retention groups?

A    Yes.

Specifically PBR risk retention group and I had been working with Keith Mohn and others since 2005 on developing a special kind of a medical risk retention group that would allow medical practices to save substantially on med mal premiums by combining the risk retention groups. You have the risk retention group reinsuring a portion of the group to the captive in return for a substantial rate reductions with excess reinsurance by Lloyds of London, which finally did come in, which is now the reinsurer of last resort at terrific rates, so this is about that potential. The license had not been issued at this time to PBR RRG. We were brainstorming -- we were talking

LEX REPORTING SERVICE
800-608-6085

Clark

127

about what might be able to be developed in this area and that was the purpose of that presentation.

Q    Mr. Mohn, does he live in the US?

A    Yes, he does.

Q    What state?

A    Michigan, but my work on this concept of the medical RRG goes back to 2005 that was not with Keith. There were different people that I consulted with and worked with on this program. It was a very, very long process. It finally did get its license at the end of 2010.

Q    Let's move on to bate's Page 2547. There are certain bullet points there, Wealth Accumulation, please go into details. What do mean by wealth accumulation in this context and basically what you told your audience?

A    So wealth accumulation ties to the fourth bullet point, which is capture profit of existing commercial coverage. If you capture the profit of commercial coverage and you manage risk carefully so that the

LEX REPORTING SERVICE
800-608-6085

Clark

128

losses are less than the premiums paid there will be a wealth accumulation in the captive that results. That is the potential benefit that is being described there, capital that results.

Q    Did you find the audience or clients that already had terrorism insurance?

A    What this audience?

Q    This audience or any audience?

A    I am sure that there were members of all of my audiences that have terrorism risks. It has been a required part of property coverage in the US since 2002, but that is not the same kind of terrorism risk that's involved in the risk pools that we were talking about prior to 2011.

Q    How are they different?

A    Well, the terrorism risk coverage that is usually an add on to property insurance will say that we will cover the damage to your property by terrorist attack, but only if and then there is a list of conditions and exclusions and the four types of terrorist attacks that are always excluded

LEX REPORTING SERVICE
800-608-6085

Clark

129

in these commercial add on policies are nuclear, chemical, biological and radiation. It is almost impossible to buy insurance for those terrorism risks on the commercial markets. The pool that provided terrorism insurance prior to 2011 provided exactly that type of coverage actually following the recommendations of the general accountability office and other government reports that have recognized the deficiencies in the terrorism risk commercial markets.

Q   In the pools that you managed, your firm has managed, has there ever been a claim?

A   We would all know about it.  A chemical or biological or nuclear or radiation attack would be huge headlines.

Q   How much in terms of dollars paid in terrorism premiums have you received over the years, the pool has managed over the years?

A   I really have no idea.

Q   What led to the second bullet point, Asset Protection, what do you mean by

LEX REPORTING SERVICE
800-608-6085

Clark

130

that?

A   The licensing jurisdictions for insurance companies will prohibit any claims against insurance company assets except by policyholder. That's how they insure that assets will be available for the policyholder, so the shareholders of the insurance company they can go bankrupt, but the assets of the insurance company cannot be reached. The creditors of the business that buys insurance, they have no standing because captive policies are always nontransferable and void upon any attempted transfer, so asset protection is definitely a potential benefit.

Q   So you're saying if you had a client that put the wrong name of a company on the application for insurance and the certificate was issued under that incorrect name and that at a later point they determined that should be transferred to Company B you're saying that voids the policy all together, that transferal?

A   No, I am not saying that.  My

LEX REPORTING SERVICE
800-608-6085

Clark

131

view of that exact situation would be that there was an error in the original contract and that a corrective certificate should be issued with the correct insured's name, so there would be an applicant and there would be someone who made the insurance premiums and that should be the policyholder.

Q   If the certificate is not corrected, what happens?

A   The insured is incorrect?

Q   Yes, and the certificate is not corrected is there an insurance policy there or not?

A   Well, you're asking a legal question, I would want to know a lot more facts.

MR. ALLISON:  Is there a particular actual scenario that was documented that we could look at?

Q   Estate planning, why would that appear on the captive insurance discussion?

A   This is a discussion of small captives.  Again they would be used by family

LEX REPORTING SERVICE
800-608-6085

Clark

132

owned businesses in large part.  In those situations if there is an accumulation of wealth in the captive over the years it may be something that the business owner would want removed from the taxable estate, which could be done by making the owner of the captive, as we were speaking before, a trust that would not be subject to estate tax.

Q   The final bullet point, Incentive to Key Employees, what does that mean?

A   A business owner might use a captive insurance company as a source sort of ESOP or employee benefit with certain amounts of stock to invest in the employees each year as an incentive for the employee to continue as an employee of that business, so then when the employee died, sold or retired that stock would be redeemed for a portion of the assets of the captive.  Again it wouldn't be worth anything if it was not a successful captive, but it might be and the incentive would be there to the employees to insure that risks and losses were minimized by the business so that the captive would be successful.

LEX REPORTING SERVICE
800-608-6085

Clark

133

Q    Would you identify this powerpoint slide as an incentive document for any participant's benefit of participation?

A    I don't understand the question.

Q    What is the purpose of this powerpoint slide in your presentation?

A    To introduce people to the potential benefits of small captive insurance companies.

Q    Bate's slide 2548, does this start the diagram of mechanics of how the captive would work?

A    Excuse me a moment.

So this would be the second topic in the outline, which is use of CIC to insure RRG high deductible for medical malpractice related coverage, ownership phase one, ownership phase two. This particular slide you're asking about, 2548, I believe is showing a possible form of ownership of a captive by two doctors who are in practice together and suggests in the text there that the ownership of the captive can include buyout and retirement provisions, which I

LEX REPORTING SERVICE
800-608-6085

Clark

134

probably would have said that they would mirror those types of provisions in the employment agreement or the partnership agreement of those two doctors in their own practice. I don't think there was more of a point than that.

Q    Is the LLC that owns he captive, is this a recommended structure or is that -- what are you trying to present here, is this something that already exists or is it something that you're recommending exist or be created?

A    Neither really, it's one way this could be done. The LLC would be important if there is going to be individual ownership because of asset protection reasons. If you don't have the LLC and you simply have the doctors as 50/50 shareholders of the captive and one of those MD's should have a horrendous judgment against him and his assets are liened those assets would include half the stock of the captive insurance company. We would want to protect the stock so that it could not be a reachable asset by

LEX REPORTING SERVICE
800-608-6085

Clark

135

creditors and the LLC would provide that kind of asset protection.

Q    Phase 2, the following slide.

A    That would be incorporating a captive into estate planning by these two physicians.

Q    How does that work?

A    These would be irrevocable trusts and their assets would not be part of the estate, the gross estate of MD 1 or MD 2.

Q    Does the trust report replace the LLC in the previous slide?

A    It could. If Phase 1 precedes Phase 2 what would have happened is that there would have been a gift from each doctor to his or her trust and since the trust by themselves have asset protection features we would simply dissolve the LLC.

Q    So it's a progression?

A    This says Phase 1 and this says Phase 2, they really could be alternatives. There are many ways of structuring ownership and this is a discussion of those different ways and why you might want to do it one way

LEX REPORTING SERVICE
800-608-6085

Clark

136

or another.

Q    In practice do you see an evolution from Phase 1 to Phase 2, do you see a -- let's start with the structure of Phase 2, what do you see in practice?

A    A wide variety of choices here. I mentioned a few minutes ago that I had sent a memo to people who owned captives individually suggesting that this might be a good time to make a gift into a trust. However, many clients have trusts from the beginning.

Q    What are the tax consequences of those gifts?

A    They would be taxable gifts.

Q    Does your firm get involved in the payments of those taxes, what those taxes would be and the dollar value of those taxes and how they appear on the returns; what is your role in that?

A    On a gift?

Q    Yes, you sound like you're recommending that they consider it?

A    Well, yes, but particularly if

LEX REPORTING SERVICE
800-608-6085

Clark

137

it's part of the plan the memo that I was referring to was saying now is a better time to do it than next year or the year after, so that is about timing not really saying they should or she shouldn't.

I forget your question.

Q The tax consequences of the gift.

A The answer really is we would be involved to the extent that the client requested involvement. At a minimum we want to review the gift's tax return. We might retain an evaluator on behalf of the client to have a good solid evaluation for the shares that were being gifted. We have done that on occasion. On occasion our assistance has not been requested or wanted even. We do have something that we have to provide if there is a gift, because we now have a different set of shareholders and they have to be approved by the licensing jurisdiction so we need to submit an application for that approval.

MS. REYNOLDS: Let's go ahead and take a lunch break at

LEX REPORTING SERVICE
800-608-6085

Clark

138

this time to regroup.

(Whereupon, a luncheon recess was taken at this time.)

Q We were going through your presentation of February 19, 2009, maybe my format is little bit difficult, let's change it up just a little bit here.

I was asking you certain questions on specific pages and what I'd like to do is just change it up and say educate us, take this same presentation and walk us through it and let us ask questions as you go through it. It may be just simpler to do that then to take it line by line.

MR. ALLISON: You want her to just simply flip pages?

Q Flip pages and explain it to us as if we were doctors.

MR. ALLISON: Is that something that you understand that you could do? I will only caution obviously it is not something that she was prepared for. We are obviously happy to

LEX REPORTING SERVICE
800-608-6085

Clark

139

answer questions, it's obviously hard for her to give an open-ended presentation. If there are particular areas it might be easier if you can identify particular areas and maybe she can talk about them by using the presentation as sort of a guide, but I am worried that it would be somewhat unwieldy to make an open-ended presentation like that.

A It would take an hour and I am not clear on whether you're saying do it as much as I can recall how I did it then or are you saying use it as a guide and talk to you?

MR. SHLIVKO: What if we change it just a bit to sort to get some type of a middle road there and if she can flip through the slides and tell us the purpose of each slide. We are not asking an for open-ended presentation. Everything that

LEX REPORTING SERVICE
800-608-6085

Clark

140

you have said during the regular presentation for which you have prepared, but maybe answer the same question, but with respect to it being asked with respect to each slide. I understand there is about ten, fifteen pages.

THE WITNESS: Twenty pages.

MR. SHLIVKO: I assume all the pages are necessary to the presentation.

MR. ALLISON: If there is something in particular that you're either concerned about or that you want for her to explain that's certainly doable. I am just worried that you will lose the context and significance if we are just sort of rushing through it or trying to identify what we think you want.

A Also, this is very much out of date. This was one of the earlier phases of development of the PBR RRG as I think I

LEX REPORTING SERVICE
800-608-6085

Clark

141

mentioned.

Q      Maybe you can point out those changes as we go through them.  We will fall back and we will go to the slide, the next slide is 2550.  That appears to be how the CSE relates to the RRG.  I see the owners physicians and you talked about that before and then you see an owners Nevada LLC; why Nevada?

A      Oh, could be anywhere.  Nevada has a very good combination of low taxes, low fees and a good  asset protection statute.  From the point of view of debtors it's very difficult to pierce a Nevada LLC.  Charging order is the exclusive judicial remedy in Nevada.  There are a few other states like that, but they tend to have higher tax or fees, so Nevada is a state that we use a lot in forming LLC's.  It's certainly not necessary.

Q      Now, the arrows that appear here what do those arrows indicate, is it ownership, is it flow of money?

A      Ownership.

LEX REPORTING SERVICE
800-608-6085

Clark

142

The owners retain the CRC law firm to form the LLC, to own the CIC and pay CIC set up costs through the CRC law firm.  This is establishing the ownership and the set up of the captive, the CIC.

Q      CRC law firm just for the record.

A      Celia R. Clark.

Q      So the owners, the physician owners Nevada LLC owns the captive insurance company the CIC?

A      Correct.

Q      Back and forth between physicians benefit resources, risk retention group what goes on; is that ownership as well there?

A      No, that is reinsurance.

Q      When it talks about 48 to 50 percent of premiums CIC for the first twenty what does that mean?

A      If you start at the purple box that says medical practice that shows the initial payment of premium for medical malpractice insurance from the medical practice to Physician Benefit Resources, Risk Retention Group, which I'd like to refer to

LEX REPORTING SERVICE
800-608-6085

Clark

143

as PBR.  PBR in turn reinsures a portion of that risk not on a quota share basis, but a portion of that exact risk from the medical practice to the captive insurance company that the medical practice physicians have set up.

Q      Okay.

A      Now, when you have a reinsurance arrangement you have reinsurance obligation for where the risk is assumed and you have a payment of reinsurance premiums and those will go in opposite directions.  The purple or blue arrow is showing the reinsurance treaty and in this arrangement the captive insurance company is reinsuring a portion of the PBR risk; okay?

Q      Okay.

A      Now, how much risk is down in the green print, it's the first 25 percent of the risk which means a quarter of each and every loss up to the 25 percent limit.  In exchange for assumption of the risk as a reinsurer, the CIC is paid a portion of the premiums that the medical practice paid to PBR.  This

LEX REPORTING SERVICE
800-608-6085

Clark

144

part is out of date currently.  The amount of premiums that are seated to the CIC is 50 percent.  It says high deductible portion there, but you can ignore that, it's 25 percent of the PBR risk, the first 25 percent for 50 percent of the premium and already that is a good deal for the CIC.  I would always point that out and it's true these are estimates they can vary depending on the severity of the risk and the loss history, so the end result would be that the same owner physicians that have control of the CIC become members of PBR individually.  That part is not clearly shown here, but the owner physicians it does say at the very bottom are shareholders of PBR RRG, so they have a small percentage interest in PBR.  They have total ownership and control of the CIC, they will be responsible to pay their share of the losses that PBR incurs as a result of the original insurance to the medical practice , but those funds, that 50 percent of premium they are not paid directly and this is not shown here, but it would have been shown in

LEX REPORTING SERVICE
800-608-6085

Clark

145

one of the other presentations. Those premiums are held in a regulation Section 114 Trust and they would be held for the entire period of the reinsurance treaty, which would be annual and any claims that are made that would be payable by the CIC would be withdrawn from that trust account and would pay the claimant it's covered loss. Whatever is left would go to the CIC at the end of that term. I think that's everything that is on this slide.

Q Let me ask you a couple more questions, the owners Nevada LLC pays medical malpractice premiums to the PBR?

A No, ma'am, the medical practice itself pays premiums to PBR.

Q I am confused then.

The owners Nevada LLC has no direct relationship to the medical practice?

A That's correct.

Q So it's a brother or sister company to --

A Correct.

Q -- for the owner?

LEX REPORTING SERVICE
800-608-6085

Clark

146

A Correct.

Q So the medical practice, the same fellow that owns the one in the circle on the left owns the medical practice?

A Yes.

Q PBR, is that a domestic entity?

A Yes, it is. It's a risk retention group licensed in Nevada.

Q Who manages that company or owns that company?

A The physicians are the owners.

Q The physicians?

A The gentlemen in the first oval there and obviously there is more than one medical group involved and the physicians would become shareholders of PBR.

Q Then once again the end result is that the owner physicians, the fellow in the oval, the collection of the fellows or females in the oval.

A Right.

Q Control their own medical practice, the CIC and are shareholders of the PBR?

LEX REPORTING SERVICE
800-608-6085

Clark

147

A Correct, they would be minority shareholders of the PBR.

Q Minority, are we talking single digit percentages or ten percent?

A However many shareholders there are they would have just their proportion and that proportion would not be determined by the premiums. It would simply be the determined by how many ultimately become shareholders, so it will be changing as more and more sign on.

Q So you have seen this in practice, what is a typical percent ownership this is 2009 through 2012?

A There are only a few shareholders unfortunately.

Q So the percentages are high?

A Yeah, the sharer percentage would be high right now, but still I don't believe anybody is above -- definitely not above 50 percent, maybe 20 percent.

Q The next line it says non-med mal Insurance Coverage that is payable directly to the CIC, payable directly by which entity?

LEX REPORTING SERVICE
800-608-6085

Clark

148

A The medical practice.

Q The medical practice once again?

A Yes.

Q Excess coverage examples, special property, business risks, employment practices and litigation.

A Yes, as examples.

Q The next line says, additional new coverage, examples of computer operations and data, loss of business income, tax indemnity, loss of hospital privileges, kidnap, ransom; what does tax indemnity mean in this context?

A One second, could we back up just a bit.

Q Sure.

A To Page 78.

Q Which is 2551.

A Yes, thank you.

The point here is that if you assume the medical practice has commercial coverage for these four risks that the captive would issue excess coverage that would cover losses exceeding the limits of

LEX REPORTING SERVICE
800-608-6085

Clark

149

the commercial coverage, that's Slide 7 and Slide 8, which is 2552, is shifting away from supplementing existing policies to issuing policies for risks that are not currently insured.

Q    Okay.

A    Tax indemnity, which you asked about, tax indemnity would cover the medical practice if it is assessed liabilities or penalties or interest by a taxing authority at any level that are based on tax returns or other disclosure documents that take a position in good faith, so anything that involves omitted income, fraud, gross negligence, frivolous positions those are not covered, but the positions that are taken in good faith that are ultimately ruled against those tax liabilities could be paid by a claim under this policy.

Q    As I look through the presentation, not just this one, but all of them, I saw no mention of terrorism, but yet that appears to be a common theme based on the number of participants; can you please

Clark

150

speak to that?

A    The coverages that we have been discussing on excess coverage and new coverages are all insurance that the captive would write to cover that medical practice, it's own related party medical practice for the risk of loss and the terrorism risk is not in that category, because their captive CIC does not insure the medical practice for terrorism risk.

Q    Then is the terrorism risk a part of your presentation or part of something else?

A    It may be in here somewhere, risk shifting and distribution, that is on Page 13, okay.  You're correct that in this presentation, as I am quickly flipping through, I do not see a description of terrorism risk.  The reason is that at the time of this presentation a different method of risk distribution was in the planning stages and was expected to be available in the near future and that's described on Slide 15, which is 2559.  The special risk

Clark

151

distribution program designed for RRG members only was a concept that would enable all of the participants in the risk retention group to in effect pool certain types of risks that relate only to medical practices not med mal, but non-med mal related risks and there are examples on the following Page 16, which is 2560, medical waste disposal and legal defense, hazardous substances, liability relating to disputes with medical insurer, HMO's, loss of patient's property, I am just reading a few of them.  The plan at the time of this presentation was that those risks would be pooled among all of the medical practice participants and that would be a sufficient portion to establish risk distribution for each of the captives without any terrorism risk.

Q    Is the terrorism risk used exclusively for risk to meet the risks distribution requirement?

A    It was the risk that was distributed through the non-medical med mal risk pools until or through 2011.

Clark

152

Q    Okay.

A    I would not agree that it was used exclusively for risk distribution, but it was the exclusive coverage in the pools. In and of itself I believe it provides valuable coverage that is not obtainable on the commercial markets.

Q    But in this particular presentation it wasn't considered?

A    No, well certainly considered, but the other developers of the RRG had plans that these types of coverages described on Page 16 would provide a unique pool of risk distribution that was tailored to medical practices only.  So obviously terrorism risk could affect anyone, but these risks would just relate to medical practices and it was thought that they could be actuarially evaluated on a group basis.  Like sometimes there are employee groups that qualify for group rates for insurance and they don't each have to be underwritten.  The thought was that this pool would be actuarially treated as a group risk.  Unfortunately the actuaries

Clark

153

were not able to develop that model so this was never put into effect.

Q     The next slide 2553 talks about the tax rules.

A     Where is that?

Q     (Indicating.)

A     Okay.

Q     So the foreign captive becomes a US domestic corporation for all US tax purposes.  No control foreign corporation rules, no foreign account rules, unless clients chooses to use a foreign account. Was that an option for them, an option that you offer to them as well?

A     No, it is simply a statement if the client chooses to use a foreign account then the clients will need to disclose that foreign account under the disclosure rules. The controlled foreign corporation rules do not apply because if a foreign licensed insurance company elects to be taxed as a US corporation under Section 953D the code itself says it is then deemed to be a US domestic corporation for Rule US Federal tax

Clark

154

purposes 953D.

Q     The next slide 2554 is a discussion about IRC 831B, in the context of this presentation how does 831B play into the medical scenario that we looked at?

A     Going back to 2550, the captive insurance company in the yellow box would elect a 831B taxation treatment, that would be the relevance of that.

Q     But the medical practice pays both premiums for non-malpractice that eventually are malpractice  that will be a portion of it that would eventually wind up in the capital, but it will also pay premiums for non-malpractice insurance coverage to the captive.  What are you using for the termination of the maximum 1.2 million, do you include both the malpractice premiums flowing back to the captive and the premiums flowing directly to the captive?

A     Yes, I am.

Q     So you're still looking at the total of 1.2 million?

A     Yes.

Clark

155

Q     Back to Slide 2554, you make a statement here to be taxed on the investment income at the C corporation rates and in the premium income up to the 1.2 million is exempt.  Tax rules continue on the next page and this page speaks to the deductibility of policy premiums; can you walk us through this page, please?

A     Yes, business risks, risk insurance premiums are deductible as an ordinary and necessary business expense, but only if they are paid to a company that qualified as an insurance company for tax purposes.  That is what is meant by the phrase bonafied insurance company and that phrase appears in many IRS rulings and in many of those rulings there is a discussion of the requirement to qualify as an insurance company and these are summarized here in very abbreviated form and continued on the next several pages.

Q     You state that it should be a bonafied insurance company, why would that be a part of the discussion because you're

Clark

156

talking about captive insurance company, why would it be construed as not a bonafied insurance company?  I guess I am unclear as to why the audience would need this reinforcement that it must be a bonafied insurance company?

MR. ALLISON:  I am going to object to the characterization, but you can continue.

MS. REYNOLDS:  Your objection is noted, but we will move forward.

A     Well, it would not be responsible legal advice to say to an audience you can form an insurance company that is licensed as a insurance company and elect 831B treatment and deduct payments to the captive.  That would not be correct, it would not be professional.  There are conditions to the deductibility and this is the discussion that begins on this page.

Q     Have you been asked to do such a thing, to create an entity that's clearly not a bonafied insurance company?

Clark

157

MR. ALLISON: You mean has somebody approached her?

MS. REYNOLDS: Has she been approached to do that?

MR. ALLISON: To create an insurance company that's knowingly not qualified?

MS. REYNOLDS: In order to obtain the deduction.

A  Not in so many words, but occasionally a client will refuse to participate in any kind of a risk pool and say I will take my chances and I do not represent those people, that would be the end of the professional relationship. I have never formed a company that I did not believe fully met the compliance requirement.

Q  So if they refuse to participate do you severe relationships?

A  Yes, ma'am.

Q  That has happened?

A  A few times.

Q  Slide number 2578, we are continuing with the tax rules, annual

Clark

158

business risk premiums must be less than or equal to 20 percent of the revenues; do you want to comment on that, please?

A  That is not actually a rule, it is a rule of thumb. It is a guideline, it is not actually a rule, but it does derive from a former version of the Internal Revenue manual that requested that auditors of businesses, if they see a situation in which more than 20 percent of revenues is being expensed for insurance premiums, property and casualty insurance premiums that it should be scrutinized. That is what that derives from and I would have stated it in more or less those terms rather than saying it is a rule.

Q  But it is listed in your presentation as a tax rule?

A  That is the heading of the slide, yes.

Q  Next slide continues with the tax rules and talks about risk distribution requirements; do you have comments for this page?

A  In this particular presentation I

Clark

159

might not have gone through that at all unless there were questions. The particular references to case law and revenue rulings was provided for future references. This was not a legal audience and I may not have said anything more than the Harper Case held that 29 percent was an adequate degree of risk distribution.

Q  Let's move to bate's number 2651, Page 17 of the presentation and if you would walk me through that diagram there.

A  Give me a moment, please.

This as best I recall was an attempt to show graphically the operation of that special risk distribution pool I was describing involving the non-medical med mal license that specifically relate to medical practice and those are listed on the proceeding page as examples. As I said it did not happen. There would not have been any non-medical, non-med mal premiums paid to the RRG by the medical group. Under the final license and approved model the RRG issues only medical malpractice.

Clark

160

Q  The next slide talks about the choice of jurisdiction, that is 2562, Page number 18.

A  Ah-huh.

Q  If you would walk us through each of those bullet points, please.

A  Okay, so the St. Kitts 2006 Captive Insurance company's Act would be an introduction to my relationship to St. Kitts and with that statute and explanation of some differences between that law and the captive law of other jurisdictions, which would lead to a comparison of the fees charged in different jurisdictions, the different capitalization requirement, the different reporting requirement, location of assets also is an issue in choice of jurisdiction, because many jurisdictions in the US and outside the US require a minimum amount of assets to be invested there. St. Kitts does not and creditor protection issues will vary from jurisdiction to jurisdiction and in general an offshore entity is more protected against predators simply because it's more

Clark

161

difficult to bring a collection proceeding there.

Q   The next slide deals with the funding of the St. Kitts captive, that is Page 19 in bate's 2563. This particular one calls for capital contribution of 36,000; is that per physician or is that per captive or what does that mean?

A   That would be a precondition to a captive obtaining an insurance license. It would be required to show that it actually had a minimum of $36,000 in a bank account titled to the insurance company. It could then be issued a provisional license which would permit it to write insurance policies for 90 days and under St. Kitts rules the earned premium income within that 90 day period can be allocated to a capital account held in a separate liquid cash account, which together with the initial $36,000 would be become the total capital.

Q   So the entity that paid you the $50,000 for the start up would also have to fund this $36,000 in the captive?

Clark

162

A   Yes.

Q   Does that typically come from the shareholder equally or is there any rhyme or reason?

A   Yes, it does. It's a capital contribution, it would come from the shareholder.

Q   So in all we have talked about so far, $50,000 plus $36,000 puts you pretty much into a licensed captive?

A   Correct.

Q   Less than $100,000, okay.

Now, the next line deals with exit strategies, this is bate's number 2564 and Slide number 20.

If the captive is such a good thing why are you talking about exit strategies before one is even formed?

A   People always ask it, almost always comes up in the very first discussion.

Q   Do they provide any details as to why they ask?

A   I think business owners and professionals usually want to understand the

Clark

163

whole transaction and the options available to them all the way through and so they ask, "Well, what about when I retire or what if I die and my stock is redeemed by my estate what are the tax consequences?", so the liquidation redemption scenario would be covered under the bullet point liquidation and the possibility of declaring dividends along the way would be covered under that first bullet point.

Q   So if dividends are generated by the captive they are paid to the shareholder?

A   Yes.

Q   It might be the trust, it might be the owners LLC?

A   Right.

Q   That would flow backward to the physician?

A   In the case of the LLC, under that slide showing the physician's owner the LLC that would be, right. In the case of the trust, the dividend funds would be held taxable to the trust unless they were distributed to beneficiaries.

Clark

164

Q   Are you aware in practice, have there been any dividends paid?

A   Oh, yes, ma'am. This year in particular because of the expected change in dividend rates beginning in January there has been something like a stampede to declare dividends before the end of the year.

Q   Liquidations?

A   Many.

Q   In your records do you keep the identity of those that are paying dividends and those that are liquidating?

A   Yes.

Q   So that's available to us?

A   Yes.

Q   Typical Timelines and Tasks, this is Slide #21, bate's number 2565.

MR. ALLISON:   We do not have that one.

MS. REYNOLDS:   Does your stop right there?

MR. ALLISON:   Yes.

MS. REYNOLDS:   What about with your other presentations do

Clark

165

you have that?

MR. ALLISON:  We have one that starts out 2390.  We also have one 2578.

MS. REYNOLDS:  What is the date on that?

MR. ALLISON:  October 2009.

MS. REYNOLDS:  Let's get a different year.

2390 let's make sure we have all the pages.  What is your last page?

MR. ALLISON:  It goes through 2304.

MS. REYNOLDS:  Okay, we do.

Q  This particular presentation is dated 6/25/08 and it does not indicate, at least on the cover page, that it was presented to any specific group; do you have any recollection of who this was presented to?

A  The title says how they benefit Shoreline Medical Groups.  Honestly I don't remember who that is, but I assume that was

LEX REPORTING SERVICE
800-608-6085

Clark

166

who this was prepared for.

May I take a minute and look through?

Q  Sure.

A  I do not recall Shoreline Medical Groups.

MS. REYNOLDS:  Do you all have another presentation?

MS. PARTAIN:  No.

Q  The captive insurance company receives premiums, you have shown that they receive premiums at least in that other scenario where it would come through the RPG I believe and through the medical practice directly.  What happens to premiums inside the captive?

A  Relating to anything in particular?

Q  We don't have examples.

A  So a portion needs to be retained in some sort of a cash equivalent and held as a reserve to pay claims and that portion would be presumptively 30 percent in St. Kitts, other jurisdictions that would be

LEX REPORTING SERVICE
800-608-6085

Clark

167

lower, it could be higher.  If you have medical malpractice risk involved it might be as high as 65 percent, whatever the regulators say needs to be maintained in reserves that has to be cash equivalent or some allowable asset mix, so that's regulatory and that will vary where the captive is set up.  The other investments are not clearly regulated.  There are some very general guidelines on diversification and liquidity and reasonable expectation of profit and not being unduly speculative, but I have researched this quite extensively and under the rules of the NAIC, National Association of Insurance Commissioners, those are guidelines that the State Insurance Commissioners use on these sorts of issues and they are only guidelines.  They don't have the force of law, but with respect to investment the guidance is from the NAIC.  There should be a diversified portfolio that would be in accordance with a prudent investor standard, but with special emphasis on the security, meaning the safety of the

LEX REPORTING SERVICE
800-608-6085

Clark

168

investments and the ability to liquidate that investment within a short term, not necessarily making cash equivalent, but within 90 days if it could be liquidated that would seem to pass muster under these NAIC Rules.  There is nothing that prohibited.  Under the NAIC rules we have captives who have invested in real estate equities, life insurance, tax exempt bonds and a variety.  They will be guided in making those decisions by their professional money managers and/or insurance advisors and that is not a service that Clark & Gentry is qualified to provide.  We are often asked and we always refuse, but we are happy to refer people to investment advisors who have a specific expertise with insurance company investments and the clients will take advice from those people.

Q  You speak of the St. Kitts requirement for the 30 percent, I just want to clarify for the record that is 30 percent of a single year's premium or a cumulative?

A  No, it's 30 percent of annual premiums unless the coverage extends beyond a

LEX REPORTING SERVICE
800-608-6085

Clark

169

year, which it may for certain kinds of insurance. It's meant to be the percentage, the 30 percent denominator of that is meant to be the total premiums payable for the coverage under which claims could be made, so as long as the coverage is outstanding or continuing those reserves need to stay in place.

Q    Just to recap, you say that your firm, Clark & Gentry, does not advise participants in the captive on how to invest excess premiums.

A    Correct, we do advise on the reserve requirement and what counts as cash equivalent, those sorts of issues relating to the reserve. We do not advise on other aspects, with one exception which is for many years I have had a concern that if there is not sufficient diversification that we could have a substance over form issue that could arise and I have cautioned people against putting all their eggs in one basket for that reason, but as long as they are diversified I really have no expertise or advice on the

LEX REPORTING SERVICE
800-608-6085

Clark

170

investment selections.

Q    You have cautioned folks about putting all their eggs in one basket, is there a mechanism, is there a document, how do you know how they invest?

A    We review the tax returns of the captive insurance companies that we represent and the tax return balance sheet will have cash, what are the other categories, receivables, other investments and then usually there is a statement describing the other investments, so we have that much information. In addition, we do request that our clients let us know when they are making a significant investment in a new investment so we can prepare corporate resolutions authorizing that and have those corporate resolutions approved by the regulators so that would be the extent of our knowledge and involvement.

Q    The purpose of the review of the tax return is?

A    Primarily to make sure that all of the premium's income is reported.

LEX REPORTING SERVICE
800-608-6085

Clark

171

Q    So for the 150 or so captives you're doing this every year?

A    Yes, ma'am.

Q    As a part of that you're reviewing that balance sheet as well?

A    Yes, those are the instructions to the paralegal that does this.

Q    Do you see captives that are loaning monies back to the owners?

A    St. Kitts' rules prohibit loan backs either to the insured or to a shareholder or affiliate of either. That is part of the 2006 Act, the Acts says that any such loans must have the prior approval of the regulators. We have had a few situations of short term loans with demand notes and guarantees of repayment of the loans. I am frankly not comfortable with that and I advise people to use that only as an emergency short term strategy and to get those loans re-paid quickly.

Q    As part of the documentation I received though so far, which is partial, there were some e-mails, just a handful. Do

LEX REPORTING SERVICE
800-608-6085

Clark

172

you have those with you?

MS. PARTAIN:  We should have those.

Q    I would like to get into those e-mails and try to understand the conversation that is going on there. It's bate's number 366 and it look like it goes through 377.

There is a lot of discussion in there about life insurance back and forth between yourself with Tom King, Sean King, I see a lot of copies to Dale Edwards and John Majors and Yvonne Justice. Please walk me through that chronologically, what is their conversation, why did it come up, what was the resolution?

A    The conversation came up because one of my clients asked for advice on whether or not to make an investment in life insurance by his captive, his company's captive, and I asked for the specifics and I learned that the amount of life insurance that was already owned by the captive essentially accounted for all of the

LEX REPORTING SERVICE
800-608-6085

Clark

173

captive's investments other than the reserve account and I ultimately advised the clients not to do that, but Tom King who was the life insurance agent on that sale and previous sales to that same client strenuously objected and sent me e-mail after e-mail arguing that there was no reason to limit life insurance of the particular kind.  He was proposing because it met all of the requirements that we have just been discussing; namely safety, because it's a highly rated carrier, future returns that would exceed what the captive could earn through government bonds or stock portfolio and I was not comfortable.  I was put off for awhile.  This whole thing was on hold for quite awhile because I was told that Sean King and Tom King were seeking advice from the IRS on this issue and I agreed to give them some time to do that and I am not positive whether or not they had the response from the IRS at the time of these e-mails. It would have been close in time in any event and the IRS reaction was negative to their

Clark

174

request and I did send a memo to this particular client, whose first name is Peter, and I told him I was concerned that there was an excessive amount of life insurance investments and that they were not sufficiently liquid.  There were enormous cash surrender charges, which means the agent is making huge commissions and if you take $100,000, let's say, and that's cash and you put it in a life insurance policy and the next day the value of that life insurance policy is $400,000 you're not preserving the liquidity of the captive's investments.  I did not believe that would pass muster with the regulatory authorities and in these e-mails there are suggestions that I make about stretching out the premium payments over a longer payment so there is less each year adding a high early cash value rider to the life insurance to preserve the liquid and they weren't buying any of it.  I got absolutely nowhere and I was, I think, clearly quite frustrated -- they were clearly quite frustrated with me and this was near

Clark

175

the end of our relationship, but I did write the letter to Peter giving him my advice and if it's relevant he rejected it and he felt that Tom's reasoning was sound and he did b[u] that insurance.

Q    These e-mails documentations here are all dated in 2009.  When did the conversation start, you said you had given them a period of time, was there something prior to these e-mails?

A    I'm sure there was.  Yes, I would say probably for three months prior.

Q    So still in 2009?

A    Still in 2009.  My memo to Peter appears right after that.

Q    I want to be clear, you did not bring up this issue of life insurance in this type of context prior to 2009?

A    No, that is not true.

Q    Please correct me.

A    So this particular discussion related to the request from Peter for advice, okay, that was 2009.  I had been having fairly intense conversations on this subject

Clark

176

with Dale Edwards since at least 2007.  Dale Edwards, Tom King, Sean King and a few others worked jointly in, I would say, crudely in selling life insurance products.  They would share commissions, I do not understand their exact relationship or agreement, but I did understand that Dale Edwards was the head of their group.  Dale Edwards was the one way back who had hired me to do tax research before I had met the others.  Dale and I spoke frequently about life insurance and investments and how that should be handled in a captive context and I did quite a bit of research on step transaction in particular and I advised him from 2007 on that there should be no investments that accounted for more than half of a captive's annual income and in particular there should not be -- shall not be more than half of the investments in life insurance and that is a conservative position.  I do not believe that as we sit here that is the law, but I had a concern that there would be eventually an IRS movement to identify this sort of excessive

Clark

177

investments either as a transaction of interest or listed transaction or simply to collapse the whole thing under step transaction, so that was the advice that I was giving Dale and I assumed that was being communicated to Tom King.  That may be an incorrect assumption, I don't know, but I thought at least at the time that Tom was aware and was following those guidelines.

Q    You indicate here that Peter rejected your advice?

A    Yes.

Q    Did Tom King reject your advice as well?

A    Yes.

Q    You indicated a relationship was severed, when was it severed and who was it severed with?

A    It was very shortly after this exchange that the audit of Diversified began and once that had begun I believed I had an obligation to continue representing Diversified during the course of that audit and I did not resign, but I did not do any

LEX REPORTING SERVICE
800-608-6085

Clark

178

additional cases with Tom King.

Q    Do you have any captives in that you're administering in the terrorism pool now that are associated with Tom King?

A    Last year 2011 one or two, at the end of 2011 I resigned from all the Tom King clients other than Diversified.

Q    If I understand you correctly, the only reason you stayed on with Diversified was because --

A    It was under audit.

Q    -- it was under audit?

A    Yes.

Q    Refresh my memory, how did you come to know Dale Edwards?

A    How I came to know him was through a introduction by a lawyer who was counsel at my firm at that time whose name was David Mandel.  David introduced me to Dale probably 2002 and Dale asked me to look at some work that another tax attorney had done for them.

Q    And Dale Edwards did what at that time?

LEX REPORTING SERVICE
800-608-6085

Clark

179

A    Dale Edwards was the principal of Agilis Benefit Services and those affiliated companies.

Q    Did you have any ownership in any of those companies?

A    No.

Q    Did you offer any of those products that a Agilis served, did you offer any of there products  to your clients?

A    I never offered or sold life insurance products to anyone.

Q    That's what you know or believed the product of that company to be, life insurance products?

A    They all involved life insurance products.

Q    Your relationship with Dale Edwards when did it cease?

A    2007.

Q    Are you involved in any captives with Mr. Edwards?

A    No.

Q    Are you familiar with a program called Extra?

LEX REPORTING SERVICE
800-608-6085

Clark

180

A    Yes.

Q    Do you understand that program, could you comment on it for us, please.

THE WITNESS:  Fair game.

MR. ALLISON:  Have you ever worked with this program?

THE WITNESS:  I did legal research on tax issues relating to that program.

Q    Okay.

A    Yes, I could explain it.

Q    Please do.

A    Extra had a few permutations, but essentially it would involve a license of intellectual property.  A license would be granted by one of the Agilis affiliates and the license would permit the business that purchased it to then set up a deferred compensation program for its employees that would be beneficial to it in various ways, including a tax deduction for that payment for the license, but involving other benefits as well and including a retirement -- a sort of non-qualified retirement account that

LEX REPORTING SERVICE
800-608-6085

Clark

181

would be expected to build up over the years and provide an incentive for key employees to stay on.

Q   Did you provide a written opinion or any kind of a legal document to that effect to document your research?

A   Yes, I did.

I wrote a very long memorandum of law that went through all of the tax issues that I could identify and that was delivered to Dale Edwards and Agilis. It was not an opinion letter and it said on the top "cannot be relied on as tax advice to a particular client seeking opinion on tax advisor's advice and this cannot be as to avoid penalties," so it was very carefully in compliance with Circular 230 at that time.

Q   Was there any follow-up to that memorandum that you issued, were you asked to do additional research or provide any additional information, was there a continuation of the professional relationship?

A   There was a continuing

Clark

182

professional relationship, issues would come up, commonly particular situations might be referred to me for my opinion or my views on whether they would raise any additional tax issues, so there were a lot of projects that I was assigned as the principal Agilis tax attorney.

Q   I'd like to go through a terrorism policy, I have some questions related to the specific policy wording.

I am looking at bate's 1698 and particularly Section D, Exclusions, Exclusions plural.

A   Excuse me, what is the policy number at the top of that policy?

Q   It says Form 2006-402.

A   Okay.

Q   Clearly it's titled, Terrorism Risk Insurance Claims Made, this policy provides coverage on a claim's made basis subject to its terms, see the general policy conditions. Once again I will fall back to Section D, the exclusions. Number one says, this policy does not apply to acts committed

Clark

183

by you or any related person, loss or expenses resulting from any dishonest, fraudulent or criminal act committed by either you or any related person, expenses resulting from a related person taking part in any political activity or the operations of any security or military force, C, nuclear fallout or radiation. It says loss or expense resulting from contamination by radioactivity, from nuclear fuel or nuclear waste from the combustion or combustion of nuclear fuel or the radioactivity or properties of an explosive nuclear assembly or any components thereof or radioactive activity resulting from a "dirty bomb"; is that correct?

A   In 2006.

MR. ALLISON: I am sorry, I want to clarify is what correct?

Q   This is listed as a exclusion what I just quoted there; is that correct?

A   That was an exclusion in 2006.

Q   Did that change?

A   Yes, it has changed.

Clark

184

Q   When?

A   The policy has been changed almost every year since 2006. Since before 2006 it is modified every year, radiation was added this current year 2012.

Q   As?

A   As an included risk.

Q   Radiation?

A   Radiation, yes.

Q   Of all forms?

A   Yes.

Q   So that's 2012?

A   2012.

Q   Section C talks about conditions, confidentiality agreement, you and every related person must make every reasonable effort not to divulge the existence of this policy; why is that?

A   That's absolutely standard insurance policy condition for the reason that if it is known that you have insurance for a particular risk someone might actually make an event happen for the purpose of getting insurance coverage. First question

Clark

185

that's ever asked in a medical malpractice case is what is your insurance coverage because that is how much is going to be claimed, so insurance carriers will always have a clause that says "This is Confidential", you cannot disclose it.

Q     What would be the consequences of disclosement?

A     In this policy?

Q     Yes, ma'am.

A     I would have to look at it to see, it may void the coverage.  If it's a condition and the condition is not met the policy I believe would not be valid.  All of the conditions would need to be met.

Q     Premiums refunded in the event policy is voided.

A     It hasn't happened, it would come up only if there was an actual loss that was claimed and it came to light and the process -- in the process of reviewing that claim that the policy had been divulged and in that situation there would definitely be a dispute whether coverage existed or not and that

Clark

186

would be determined by the claims adjustor.

MR. SHLIVKO:  What about the premiums?

THE WITNESS:  So coverage for the loss is one thing, no, I don't believe that premiums would be refundable.  If the insured had violated the determination of the coverage I believe that they don't get that money back if they do something to cause it to be invalid.

Q     This particular policy includes a definition on acts of terrorism and they say it is a defined as an act certified by the US Secretary of the Treasury in concurrence with the Secretary of State and Attorney General of the United States to be an act of terrorism, to be a violent act or an act that's dangerous to human life, property or infrastructure to have resulted in damage within the United States including its positions and territory with losses exceeding $50,000,000.  It has ($100,000,000 commencing

Clark

187

on 1/1/2007) and to have been committed by an individual who are individuals acting on behalf of any foreign person or foreign interest as part of an effort to coerce the civilian population of the United States or to influence the policy or affects the conduct of the United States government by coercion.  Does the terrorist policies still hold this definition for acts of terrorism?

A     In part, yes.

The definition that you just read is almost verbatim from the Terrorism Risk Insurance Act of 2002 and that still is the standard or the definition, but it has been expanded since 2006.  There have been developments in terrorist techniques and the insurance markets and currently that definition exists in our policy, but it has been expanded to include cyber attacks and attacks on the agricultural part of the economy so that would be agricultural and animal life, any sort of biological based agents now is specifically included and we have also included acts of war that otherwise

Clark

188

would be covered and that's a difference because in the Terrorism Risk Insurance Act acts of war are excluded and it is no longer clear what acts of terrorism are government sponsored which could make acts of war and which are not cyber attacks being the prime example.  You really don't know where they are coming from, so we do include acts of war if they would otherwise be covered.

Q     So you have expanded upon the standard US definition?

A     Yes.

Q     If you have an insured that has terrorism coverage that has foreign connections, they are in a foreign territory and an act of terrorism is committed are they covered?

MR. ALLISON:  So if the attack occurs where?

MS. REYNOLDS:  Not on US soil.

A     Not on a US possession or territory?

Q     Yes.

Clark

189

A    But it does affect their business operation somehow?

Q    Only affects the person.

A    The person.

Q    The person?

A    No, personal injury is not covered. It would only be property damage or business income interruption. If those were to somehow result from an attack on foreign soil I believe they would not be covered, but I would like to study the policy to be sure. I believe they are not covered under the RTRIA and that was not something that we changed.

Q    There is a statement identified #7, transfer of assignments seller policy and insolvency or bankruptcy of the insured. It states this policy and the benefits thereunder shall automatically terminate and be null and void upon the actual or attempted transfer, assignment or sale of this policy or the benefits provided thereunder or upon the insolvency or bankruptcy of the insured; is that a standard statement through all of

LEX REPORTING SERVICE
800-608-6085

Clark

190

the policies or has that been changed?

A    They are similar exclusions in most of the policies that we draft and the same would be true of any captive insurance policies that I've seen for the reasons we discussed. There is meant to be a exclusive relationship between the business that sets up the captive and the captive and once that policy is transferred outside the group it's not the entity that there be coverage.

Q    Item #9 talks about cancellation, the policy is noncancelable by the insured. In the event coverage is cancelled by the insurance company the earned premium shall be calculated in accordance with short rate takes commonly used by the insurance industry and any unearned premium shall be refunded to the insured accordingly. That's only if the insurance company, if you issue me a policy and I pay a premium it cannot be cancelled by you?

A    Not by you.

Q    But it can be cancelled by you the insurance company?

LEX REPORTING SERVICE
800-608-6085

Clark

191

A    Yes.

Q    Within the policy there is a promissory note clause, please, explain it to me?

A    Can I read it, please?

Q    Sure.
The clause I am reading appears on bate's page 1629, payment by promissory note. In the event that the company suffers a series of catastrophic loss occurrences that may impair the company's solvency the company may issue promissory notes to the insured for the amount of a covered claim or any portion of such amount payable over not more than three years and carrying an interest rate at least equal to the London Interbank offered rate in effect at the time the note is issued.
Is this a standard clause?

A    It's common in captive insurance to the best of my knowledge. It's essential when a captive insurance company is annually formed because they will not have enough assets to pay maximum claims against the

LEX REPORTING SERVICE
800-608-6085

Clark

192

coverage not for the first several years in most cases. Therefore, it avoids a situation where they simply default, have to go into receivership or whatever, we permit a payment over a period of time so that they can accumulate the necessary assets and avoid default.

Q    Has there been any change to that?

A    To that language I don't believe that's changed.

Q    Even though some of the majority of the captives are beginning to mature, they are not new captives?

A    Well, some are and some aren't.

Q    Okay.

A    2006 that was the cross insurance so each captive would have been insuring a group of businesses that it was not related to. If the clause is not necessary, it's not necessary because there is sufficient capital, so I don't see a need to remove it if there is sufficient capital exchange. If there is dividends I think it's a good

LEX REPORTING SERVICE
800-608-6085

Clark

193

protection for the insured to have that.

Q   Let me go through my notes.

Do you recall a summons issued to you as a third-party provider earlier in 2012 asking for the identity of participants in the terrorism pool?

A   Yes.

Q   Did you answer that summons?

MR. ALLISON:  We offered to produce  information in response to that summons.

MS. REYNOLDS:  That would be yes or no, you either did or didn't.

MS. ALLISON:  We affirmatively agreed to respond to that information subject to the appropriate certification which we never received.

Q   Can you explain to me how a copy of that summons was posted to the internet?

A   I cannot.

Q   No idea?

A   No idea, I wish I did.

Clark

194

MR. ALLISON:  We have undertaken an investigation to try to determine how that occurred because it has caused a lot of damage to Ms. Clark.  We would like to know that ourselves.  We have contacted the treasury department about that.

Q   Is there a documented list of professionals; CPA's, accountants, attorneys, financial advisors throughout the country that offer captives that you're aware of?  Are there recommended as parties to contact in the event of questions about captives and the administration and the taxation thereof?

A   Not one list, there are places to look.  There is a Captive Insurance Company Association, the members of which know who each other are and take out ads in the publications.  There is really no single place I can think of that would be comprehensive.  It's simply not that well organized as a field.

Q   One quick question, on the

Clark

195

summons you were issued on the third party who received a copy of your copy?

A   Okay, only a few people and they requested it and these were lawyers and it was their clients who would have been subject to disclosure under that summons, so rather than my notifying their clients I notified the lawyers and they each asked for a copy of that summons, Mat Howard, Mat Brown and I think there was one other, but I can't recall.

MR. ALLISON:  Well, obviously Diversified counsel would have received it.

MS. REYNOLDS:  A copy of your summons?

MR. ALLISON:  Sure.

MS. REYNOLDS:  Ms. Clark's summons?

MR. ALLISON:  I think they were entitled to notice of it.

MS. PARTAIN:  Do you mean who received it from Ms. Clark?

MS. REYNOLDS:  Who received

Clark

196

it directly from Ms. Clark?

MR. ALLISON:  I am sorry.

A   It's just Mat Howard, and Mat Brown and I do think there was one other.

MS. PARTAIN:  Obviously I received it, Mark and I received it.

THE WITNESS:  Right, right.

Q   Did you post it to the internet?

A   The answer is affirmatively no, I did not post it.

Well, I know who posted it.

Q   Oh, you do.

A   I don't know how he got it.

Q   Who posted it?

A   Roccy Defrancesco, twice, twice.

MR. ALLISON:  It appeared on his website.  The question is really how he go it and we don't know that.  We provided that information to the treasury department.

Q   You only provided a copy of the summons, the original summons you received

Clark

197

you provided to two individuals, Mat Brown and, and Mat Howard?

A   And I think there is one other, I can't think who it is.

Q   You have no offerings about what they did with the summons?

A   No, I don't.  Wait, you know who had that, Tom King had that.

Q   Throughout the documentation that I received so far in the presentation it appears to be all about the formation of captives and talks about how they structure the benefits of it and in short terms exit strategies.  I didn't see anything regarding claims.

Why would that not be a discussion about how to handle claims and manage your loss history and so forth?

A   Well, not in an introductory powerpoint, that would be something that would come up in a more detailed specific discussion.  We do have memoranda on that, we do have procedures, so those are mentioned in our engagement letters, let's see, and we

LEX REPORTING SERVICE
800-608-6085

Clark

198

have a memorandum of maintenance service that are included for the quarterly fee and those include initial claims reviews and submissions to insurance managers, so it's part of our documentation, but has not been a subject of an initial discussion.  I think a fair answer would be that it's not really any different from claims procedures under any insurance.  They are stated in policies.  They are if you have a loss you're going to know where to look to find out information or who to call and that would be most often when we get into the details of the procedures.

Q   Who developed those claims policies and procedures, was that you or someone from your office?

A   The procedures for claims?

Q   Procedures for claims.

A   Really that was the insurance manager who has worked with captive insurance and other insurance companies for 30 years and it has evolved, but we do have a clear contract in which insurance managers are responsible for claims up to a certain amount

LEX REPORTING SERVICE
800-608-6085

Clark

199

above which they go to a third-party adjustor, which is Hamlin Burton and they are under contract.

Q   All claims come through your office?

A   Not necessarily, but mostly that is the case.

Q   If they don't come through your office do you get feedback?

A   Yes.

Q   So you're aware of the claim?

A   We would be aware.

Q   Of every claim?

A   Yes, because we need to collect that information for the actuaries because it changes the risk for the subsequent years, very important.

Q   What has the claim history been?

A   In general it varies year by year.  There does seem to be pattern of relatively few claims in the early years and an increased number of claims as time goes on and on a plateau we now have, I am going to say, 40 pending claims right now.  Five years

LEX REPORTING SERVICE
800-608-6085

Clark

200

ago it would have been ten.  I don't know at what point it will peak, but from what I've read that's the pattern and once the coverage and the risk management matures there is a fairly steady and predictable flow of claims.

Q   Of that 40 what would you say the percentage is related to tax audit?

A   To tax audit?

Q   Yes.

A   Oh, small.

Q   They are small?

A   Yes.

Q   What is the predominant claim?

A   The predominant type of claim on the policy it would be a various types of business income coverage, including maybe predominantly contract cancellation.

MS. REYNOLDS:  That concludes my list of questions until we get to the document requests.  I am going to ask my colleagues if they have anything they would like to ask for follow-up, please, feel free.

LEX REPORTING SERVICE
800-608-6085

Clark

201

MR. ARRINGTON: I don't have anything to ask.

EXAMINATION BY MS. HILL:

Q My question would be related to a follow-up to her answer with regard to her involvement with Dale Edwards.

When did you say you met with Dale Edwards, what year was that?

A 2002.

Q Was that primarily in regards to captive or was it in regard to Extra or both?

A Initially I was asked to review a memorandum of law prepared by another attorney.

Q Regarding captive or Extra?

A I cannot recall exactly what the subject was and later I started researching the Extra Program issues.

Q Did you refer any clients to Mr. Edwards for the Extra promotion?

A I don't believe so.

Q Did Mr. Edwards ask you to set up any captive for any of his clients?

LEX REPORTING SERVICE
800-608-6085

Clark

202

A I don't believe so.

Q You had ceased any relationship with him in 2007; is that correct?

A Yes.

Q Was that the last was you spoke with him?

A No, no, it was a termination of a professional relationship, we have spoken occasionally since then.

Q Has it been in regards to captive or Extra or any other type of executive benefit program?

A He had questions about the Diversified audit and we talked about that to a very limited extent and I think that the last conversation I had that is probably more than two years ago.

Q So that was two years ago that you had a discussion with him, but have you spoken to him since two years ago?

A No.

Q So you said you didn't set up any captives for him or did you set up captives in which he or any of his companies, Agilis

LEX REPORTING SERVICE
800-608-6085

Clark

203

or others was an insurance broker for any of the insurance powers?

A No.

Q Are you aware of anything that he could be promoting currently?

A No.

I have no knowledge of what he's doing now.

Q I think you mentioned David Mandel.

A Yes.

Q Chris Jarvis, are they involved with setting up captive insurance companies?

A I don't know about David Mandel, I think he maybe, but I am not working with him. Chris Jarvis is one of the owners and managers of Jade Reinsurance Group, which is our current risk pool that we are using.

Q In your opinion, well, you said it wasn't an opinion, but in the memo that you wrote to Dale Edwards regarding the Extra program were you in agreement that the fees were deductible and are you still in agreement that those fees are deductible?

LEX REPORTING SERVICE
800-608-6085

Clark

204

MR. ALLISON: I am going to have to interject. Obviously that relationship at that time was an attorney/client relationship and even though the relationship has since terminated I don't know the status and we don't know the status of any attorney/client privilege relating to those communications, so I am going to advise Ms. Clark not to address the substance of any advice that was provided.

Q Ms. Clark, were you involved or were you a member of the Wealth Preservation Alliance or any such thing or anything of that nature?

A I was not a member of Wealth Preservation Alliance or Association. I am not sure that what means exactly; are you referring to life insurance groups?

Q Yes.

A No, I have never been a member of any group that sells life insurance.

LEX REPORTING SERVICE
800-608-6085

Clark

205

Q   One other question, in regards to the exit strategy of Extra did you assist with those or designing the exit strategies or was there someone else that designed that?

A   **I am confused by your question, I did mention there are several permutations of Extra. I would want to know which one you're referring to and what time frame and what you mean by assist.**

Q   Apparently within Extra there are different variations of Extra dealing with investment strategy, loan strategy, factoring, receivability, as well as some captive, so did you assist or write an opinion on all or any of those programs, Extra programs, did you assist in any way with coming up with the exit strategies to get out of those programs?

MR. ALLISON:  Well, I think Ms. Clark, I think you said you wrote a memorandum containing some research findings, so I guess the first part of that question is did you write any

LEX REPORTING SERVICE
800-608-6085

Clark

206

other opinions, memos or other legal advice with regard to the Extra program?

MR. SHLIVKO:  Concerning the exit strategies.

MR. ALLISON:  I thought it was a two part, I wasn't sure. Were there any other memos or opinions other than the memo you described?

THE WITNESS:  So there was an attorney that Agilis hired to draft the prototype operating agreement for the LLC.  That would be part of a Extra strategy in some situations and that attorney did not have familiarity or not much familiarity with partnership tax issues and Agilis hired me to assist that attorney in drafting that operating agreement.  Other than that I did write I think two, possibly three tax opinions to particular

LEX REPORTING SERVICE
800-608-6085

Clark

207

clients who had invested in one of the Extra Programs.

Q   I think you mentioned the LLC operating structure, was it pertaining to the LLC structure, the investment structure or the factoring of receivables?

A   **No, I think the best recollection I have is that those few opinions that I wrote involved the licensing of intellectual property and I wrote them after an evaluation opinion had been obtained confirming that the license fee was appropriate given the benefits provided by that intellectual property.**

Q   Do you recall what the benefits were?

A   **I think we got into this a moment ago, there is an incentive to key employees who are permitted to participate in the deferred compensation program that was designed by the Agilis companies and there are benefits to the business as well.**

Q   What about the exit strategies for the Extra program?

LEX REPORTING SERVICE
800-608-6085

Clark

208

A   **Honestly, I don't know what you're referring to.**

Q   If someone needed to get out from a program for some reason how would they exit that program?

A   **Oh, they would terminate the license agreement.**

Q   Was there any other exit strategy that you may have assisted them with?

MR. ALLISON:  I think the question, first of all, is did you assist with the exit strategies, the development of the exit strategy? I think that is the first question.

THE WITNESS:  I would say no.  I really was serving strictly as a professional tax advisor.  I was not a designer or a consultant.

MS. HILL:  That is all I have.

FURTHER EXAMINATION BY MS. REYNOLDS:

Q   Let's make a quick run down of

LEX REPORTING SERVICE
800-608-6085

Clark

209

the document requests and cover that.

First of all, entities or business activity we asked you to provide the following, this is #1-a, any and all records supporting or relating to your interest whether it be an ownership interest, partnership interest or beneficial interest.

I asked you questions today about all entities that you held an ownership interest in, did you provide a complete list of those entities listed today?

A    Yes.

Q    Documents identifying names and addresses of all persons employed as defined above in the areas of promotion, marketing operations, training, consulting or other staff positions.

Today I asked you questions about who you employ and also about independent contractors, did you provide a complete listing?

A    You mean in my answers to you today?

MR. ALLISON:  Yes.

LEX REPORTING SERVICE
800-608-6085

Clark

210

A    Yes.

Q    Are you the only person that gives these presentations that have been provided to me or are there other folks in your office that step into your shoes if you're not available?

A    I am the only person.

Q    You're the only one?

A    Yes.

Q    Next #2, provide copies of any and all documents and materials used to promote, sell, advertise or administer any property, casualty and/or life insurance product or service.

I have received the powerpoint in terms of the presentation or at least parts of them.  We talked about today you having walked away with copies from these weekend meetings or these weekends conferences or multi-day conferences.  We would like to see copies of those takeaways.

A    I can try to find them.

Q    That helps us put in context the whole meeting and so we understand what you

LEX REPORTING SERVICE
800-608-6085

Clark

211

were presenting.  It may or may not help in this investigation, but it certainly gives us a broader picture.

We ask that you provide all documents containing any statements made with respect to the tax benefits relating to the products or services.

MR. ALLISON:  I don't mean to interrupt you with regard to #2 and I am presuming #3 we are talking about captive insurance; is that right?

MS. REYNOLDS:  This is a broad spectrum here.

MR. ALLISON:  I realize that, but obviously the focus on the entire discussion today has been about captives, that is clearly where your interest lies.  Can we get past the weeds of random state administration advice that doesn't seem to really relate to the area that you're focused on?

LEX REPORTING SERVICE
800-608-6085

Clark

212

MS. REYNOLDS:  We can to the point of if estate planning involves captive insurance then that falls in that.

MR. ALLISON:  Understood, can we otherwise limit?

MS. REYNOLDS:  Yes.

MR. ALLISON:  Thank you.

Q    Are you still working on that?

A    Well, I imagine there is more to examine.

MS. WATERS:  When do you expect to provide that to us?

MR. ALLISON:  I do not know the answer to that at the moment.  I think part of the challenge is two-fold, one is we are talking about a small, small firm and this requires a tremendous diverse of resources for Ms. Clark to be able to do this since she's the one that has to actually conduct the search.  So that's frankly just going to

LEX REPORTING SERVICE
800-608-6085

Clark

213

continue to take time. Secondly, I understand that probably a good amount of this is not on site and so that means going to a storage site and drudging up old files and that is both expensive and just time consuming.

MS. WATERS: What is a ballpark?

MR. ALLISON: Given the holidays routine expectation I think next month is more realistic. I am assuming before that is not realistic.

THE WITNESS: You're correct.

MS. REYNOLDS: Are we saying January 21st, is that what we are saying here?

MR. ALLISON: Why don't we shoot for that as the goal and maybe after the New Year, the first week or so of January we can touch base, Ms. Reynolds, and

LEX REPORTING SERVICE
800-608-6085

Clark

214

we can let you know where we are and whether that timeline is still doable.

MS. REYNOLDS: Is that okay, Mary Ann?

MS. WATERS: I think that is alright. We will tentatively expect to receive them in January and if we don't we will deal with it at that time. We will hold off on a summons or anything like that till the middle of January, end of January when we talk with you.

MR. ALLISON: Just to be clear, we have from the beginning sought and we are willing continue to work cooperatively with you. The goal is to make this as painless as possible. There is just sort of legalistic limitation on a small law firm's ability to do all this and, frankly, allow Ms. Clark to

LEX REPORTING SERVICE
800-608-6085

Clark

215

maintain her day. We are trying to balance a lot of interests here.

Q Number 4 I ask for copies of or correspondence, you provided the e-mails relating to Mr. King and Mr. Edward and the life insurance. Any additional correspondence that you can find from the beginning to present day to add to that or any correspondence that you can provide relating to any of the captives, specifically issues related to life insurance. We really would like to see that and they may or may not turn out to be to your benefit, but it also might.

MS. WATER: Again we understand the holidays are almost here and if we can wrap this up by exchange of documents by January then there wouldn't be a need to go forward with this comment.

A So to clarify, e-mails and correspondence relating to life insurance

LEX REPORTING SERVICE
800-608-6085

Clark

216

between me and Tom King, between me and Dale, between me and clients?

Q Any correspondence that either promote directly or indirectly a tax benefit or tax consequence. The ones you produced were good examples, they showed that there was a discussion and threat of issues related to life insurance. Life insurance has obvious tax consequences not just for activity, the formation of the captive, but for ongoing. I mean life insurance in the estate or if there is another tax issue down the road, not just the deduction of the premiums at the captive level. Essentially we are seeing life insurance premiums being made with pretax dollars and then the benefits of the life insurance potentially were not taxed as well.

A Or the proceeds.

Q All I am saying at this point that is all the correspondence that I received, even though we asked for copies of correspondence, internal and external to include, but not limited to corporate

LEX REPORTING SERVICE
800-608-6085

Clark

217

minutes, meeting minutes, e-mails, letters, memos or notes relating to any promotion, seminar, rally webinar or event held or scheduled to be held to promote directly or indirectly tax benefits from the insurance services or products offered or administered by you, any of your entities or any agent or representative of your --

MR. ALLISON: It's obviously only Ms. Clark, I think that part is clear. We are not talking about anybody broader than that. Obviously we have a claim here about the consent of promotion. Ms. Clark clearly is in the business of assisting in the development of captive insurance companies. Nobody here is disputing that, but obviously there is a gray area that we are feeding into about what it means to promote these things to the extent that we can identify correspondence that relates to

LEX REPORTING SERVICE
800-608-6085

Clark

218

that topic we will certainly produce it certainly.

MS. WATERS: Does the IDR use the term promotion or is it broader than that, Debbie?

MS. REYNOLDS: It's to promote directly or indirectly tax benefits from the insurance service product or products offered or administered by you or any of your entities and any agent or representative of you or your entity.

MS. WATERS: I think in context what we are talking about in promoting "encourage" the use of.

MR. ALLISON: I understand.

MS. WATERS: That is what is intended by that. It's not intended necessarily to put it in the context of being an promotor of something horrible, but encouraging the use of those

LEX REPORTING SERVICE
800-608-6085

Clark

219

insurance policies, et cetera, et cetera.

MR. ALLISON: I understand and certainly the powerpoint presentation are probably the most useful explanation and presentation, but we will continue to search for other appropriate correspondence or communications.

MS. WATERS: Any of that correspondence, which would be subject to that IDR.

You guys brought that stuff with you today; is that my understanding?

MR. ALLISON: We produced a batch previously, but we are continuing to work with Ms. Clark to try to identify an efficient way to identify these materials. It's quite a challenge for a small shop like this to just simply -- by small shop I mean

LEX REPORTING SERVICE
800-608-6085

Clark

220

Ms. Clark having to go through all of her files and records to identify these kind of correspondence. It's quite a challenge.

MS. WATERS: E-mails, there might be a way you could do a certificate like a find search and pull up life insurance and try to find a good number that way.

MR. ALLISON: The other difficulty here is that these are Ms. Clark's clients and all these communications with clients have the attorney/client privilege associated with them.

MS. WATERS: You can assert that privilege, you can go ahead and say that, that is fine. Let us know that they exist and that you're asserting the privilege.

MR. ALLISON: I am trying to find the most efficient way to

LEX REPORTING SERVICE
800-608-6085

Clark

221

get for you the correspondence that is not privileged that is simply easy to produce.  We can certainly do a broader search, but then we will be creating a 1,000 page privilege log that would not be efficient for anybody.

MS. WATERS:  If you can just let us know it's out there and you're claiming a privilege for it.

MR. ALLISON:  We will do.

Q   Item #6 dealt with any training materials that you may have provided or used to administer the insurance products and services.  One quick question, when you gave the presentations were you effectively training the trainers or were you training other professionals; CPA's, attorneys, life insurance people to go out and take your information and sell to their clients?

A   **That was not my intention.**

MS. WATERS:  What was your

LEX REPORTING SERVICE
800-608-6085

---

Clark

222

intention?

THE WITNESS:  Education and obviously  as has come up earlier today marketing my own abilities to handle these kind of cases.  If people should want that service they would have my name available.

MR. ALLISON:  Without speaking for Ms. Clark, of course it wouldn't make sense economically, many people were in the audience, for them to go and do it themselves and not go out and hire Ms. Clark.  I guess I would be surprised if they took away from that that it served as a training vehicle, but I guess some people could have that understanding, but that doesn't sound like that was Ms. Clark's intention.

THE WITNESS:  That was not my intention.

LEX REPORTING SERVICE
800-608-6085

---

Clark

223

Q   You indicated earlier that you're the sole individual out of your firm that's marketing the captive insurance by way of the powerpoint.  Do you have in your records a listing or can you retrieve from your records a listing of one that you have dealt with in terms of presentation?  We talked about some in general today presentations you have made around the country, but it was an incomplete list; do you have a complete list?

A   **I don't.  Obviously I could produce that, but I don't have one ready made.**

Q   We would like that, please.

MR. ALLISON:  You would like us to create a list.  We will see what we can do.

MS. REYNOLDS:  Sticky point is #10 now the clients list, how do you move on this one?

MR. ALLISON:  Well, I think you can appreciate obviously you're dealing with a lawyer rather than an accounting firm or

LEX REPORTING SERVICE
800-608-6085

---

Clark

224

insurance broker and there is obviously very increased sensitivities by a lawyer producing client's information.  Certainly there are two ways we can deal with this, but one is I am sure the one that you prefer, which is simply to provide you a client list.  The second alternative that we have done from other examinations is provide you a list of clients using just simply either a numerical or alphabetical list where we give a designation, don't give the actual name, use their initials or something and give you a reference that indicates the kind of context in which the clients worked with Ms. Clark, captive insurance company or they were in this or that pool and involved in the cross insurance which will give you

LEX REPORTING SERVICE
800-608-6085

Clark

225

then at least the sense of how many clients were in each pool or arrangement and just give you a sense of numbers.  I get that you obviously want to be able to use this information for a direct examination of many of these clients, but we are not asserting identity privilege or anything of that sort, but I want to deal with obvious sensitivities here.  This is her business and livelihood, she is producing this information, her career is probably over, so I want to be very minimalist about the disclosure of client information.  There is just that tremendous risk here to her career, so if we can start off by identifying by some code list of clients that associates them with that particular pool or arrangement that would be I think a start,

LEX REPORTING SERVICE
800-608-6085

Clark

226

but I don't know the consequence of going sort of beyond that at this point.  I realize I am not asking you to react and decide today if that is something that's workable, but you can certainly let us know, but that is what we have done in the past.

MS. WATERS:  You're not asserting any sort of privilege with producing a client list?

MR. ALLISON:  I think the identify privilege has been resolved and we are not arguing that.

MS. PARTAIN:  I think it is my understanding there is no actual client list, one would have to be created; is that correct, there is no preexisting list?

THE WITNESS:  That's correct.

MS. WATERS:  I think our

LEX REPORTING SERVICE
800-608-6085

Clark

227

request is still out there.  We will consider what you told us today, but our request for the list with EIN is still there.

MR. ALLISON:  I understand.  I guess I will ask you to give that some thought and you can let us know your reaction.  We will work on the rest of the responses in the meantime, but you can get back to us.

MS. WATERS:  What currently does exist with regard to a record of clients?

THE WITNESS:  It would all be in our outlook context, but a lot of non-clients would be there too so that would be one place.

MS. WATERS:  Is there any sort of billing list, any other documents?

MR. SHLIVKO:  Quick Books?

MS. WATERS:  Anything that wouldn't have to be created?

LEX REPORTING SERVICE
800-608-6085

Clark

228

THE WITNESS:  Not by clients.

MR. ALLISON:  It appears that the data is there in lot of different forms, but not in the form that would easily be extractable into a single client list of captive related clients, certainly not with all the EIN and SSN records.

MR. SHLIVKO:  Did all transactions go through the escrow account?

THE WITNESS:  The cross insurance.

MR. SHLIVKO:  All transactions went through the escrow account?

THE WITNESS:  Only for the risk distribution part.

MR. SHLIVKO:  So at least for that part you would have the list project from your escrow account records?

LEX REPORTING SERVICE
800-608-6085

Clark

229

MS. PARTAIN:  Which we produced, that was in the first production and it had the Citigroup sub-account names and the information was not redacted for the captive clients, so there is names for the captive clients on their Citigroup sub escrow account list.

In addition, we produced a diversified binder, a closing binder for, I think, the 2006 period, which when I think back might have the policies that have the insureds and the master grids I think.

MS. REYNOLDS:  There is no EIN's on either one of those.

MS. WATERS:  You mentioned that occasionally you send out a newsletter or some type of correspondence to these people, did you create a listing of names and addresses?

Clark

230

THE WITNESS:  A list of e-mail addresses.

MS. WATERS:  It was you done by e-mail?

THE WITNESS:  Yes.

MS. WATERS:  Are there corresponding names that match up with the e-mails on that list?

THE WITNESS:  Not on that list.

MS. WATERS:  Then that request is still out there and we will see what happens.

Q   The next item I wanted to look at is payments received from clients.  I haven't received a general ledger or anything of that nature; is that something you're still working on and this is item #12?

A   **That would not be an available list.  The Quick Books does not itemize by clients, it would be simply a category of clients, funds received.**

Q   That will in itself be beneficial if you have it.

Clark

231

Do you isolate captives?

A   **No.**

Q   Revenue?

A   **No.**

Q   You have also told me that the captive revenue represents 50 percent of your gross revenues.

A   **Yes.**

Q   Then I, please, would like to get a copy of these general ledgers that shows the revenue.

A   **Yes.**

Q   I have received some bank account information, it is not complete for the scope of the investigation.

Will you be providing additional records?  What I have received so far is that all of the bank accounts and have they been identified?

MS. PARTAIN:  I don't know.

A   **What we provided was what we had in the office.  There are off site records for earlier years that have never been digitized.  They would have to be obtained**

Clark

232

**from storage and scanned in.**

MS. WATERS:  Approximately how many bank accounts did you guys utilize sub escrow?

THE WITNESS:  Fifty or so I think.

MS. WATERS:  They were in separate bank accounts?

THE WITNESS:  A sub escrow account under a single escrow account.

MS. WATERS:  So there would be one bank account with everything in it; is that correct?

THE WITNESS:  Yes, it shows on a single statement.

MS. WATERS:  So you wouldn't necessarily have to go to storage.  I mean we could get if from the banks potentially.

MR. ALLISON:  Banks destroy records after seven years.

MS. WATERS:  We can always

Clark

233

ask for it if there is a problem getting it from storage.

MR. ALLISON: These are all Citibank?

THE WITNESS: Yes, except early it was Bank of New York, maybe only 2002.

MS. WATERS: It might be easier than digging through boxes. I don't know what your storage is like.

MR. ALLISON: We will explore it and see if that is viable. I am afraid that the cut off is seven years. The cut off would be a problem, but we will certainly try.

MS. REYNOLDS: Next item is identification of the pools. I do have some information, but it doesn't cover the entire scope of the investigation.

How do we go about getting that.

Clark

234

MR. ALLISON: I guess there are two things that are requested and one is the documentation relating to the pools themselves?

MS. REYNOLDS: Yes, the documentation relating to the pools. Specifically I am looking for the pool and who participated in the specific pool. I mean you have the master grid, it provides the name of the captive and the name of the insured.

Q    Is there such a document for all of the pools?

A    **There would not be. Prior to the master grid there would not be a single list, because there were separate contracts for each captive and each insured. Other than the bank accounts there would be no comprehensive list.**

Q    But in those periods with the master grid there is a listing; is that correct?

A    **That's correct.**

Clark

235

Q    You do have those from the Diversified audit for '07, '08 and '09. What about for '6 and '5 and '10 and '11?

A    **Let me think, I think '5 and '6 there were master grids.**

MS. WATERS: Have those been provided?

MS. REYNOLDS: No.

MS. PARTAIN: I think they were not digitized, that is the issue.

THE WITNESS: I think that is correct.

MS. REYNOLDS: We are looking for 2005, '6, '10 and '11.

Q    I asked for the identification of who administered these pools and what I came away from earlier is yourself and a part-time person from time to time; is that correct?

A    **Administration would have been me until 2009.**

Q    Then after 2009?

A    **It would still be primarily me as**

Clark

236

**trustee, but Pan American had its own administrative staff.**

Q    I would ask for documentation about transactions associated with the pools; does such documentation exist?

A    **We did provide some of that, there would be a memo to clients announcing the efforts for the making of pool and inviting participation and listing what would need to be done if they wanted to participate. I do have some of those, I don't think I have anything prior to, I am not sure .**

MS. PARTAIN: I think '06 would have been the first one, '05 actually.

A    **Prior to '06 we did not routinely make computerized copies of our documents.**

Q    Number 18 asks for the administration policies and procedures, policies and procedures and administration guidelines and so forth; do you have formal documentation for the administration of the pools?

Clark

237

A   We have an explanatory memo and we have the governing legal documents of which would set forth very clearly the responsibilities of myself as trustee.

MR. ALLISON:  Is that the memoranda that you mentioned before?

THE WITNESS:  The operating documents themselves, the legal contract would set forth all of the policies and operating procedures.

MS. REYNOLDS:  Have those been provided for the later years?

MS. PARTAIN:  This might be good time to raise this issue.

We produced a Diversified binder in full in the second production and anything pursuant to our agreement over the phone we had a focus on Diversified with respect to those closing binders.  Because in large part

Clark

238

most of the clients will have similar binders and we don't want to pose too much of a burden on Ms. Clark to assemble all those binders and for you to have to sift through what are substantially similar documents, so would it be possible to continue on with the agreement to focus on Diversified?  I think you mentioned you might want one or two or three additional clients that we could focus on in assembling those operating documents.

MS. REYNOLDS:  Mary, would that be okay with you if we select a sample from the list that I don't have yet?

MR. ALLISON:  My guess is that you have information that we don't have about many of these clients.

MS. REYNOLDS:  Or should we

Clark

239

pull complete binders on every captive?

MS. WATERS:  Well, I think our request is out there that we are asking for everything.  If you determine that you need less than that we can let them know that, but I don't know if I would be able to say that today.

MS. REYNOLDS:  Okay.

MS. WATERS:  So our request is currently out there and it would include everything.  We understand your concerns and we will consider them, but currently we are requesting all of them.

MS. REYNOLDS:  Hopefully, we can get back with you in a few weeks and let you know if that changes.

MR. ALLISON:  That's fine.

Q   We talked about actuaries, you listed today the three actuaries, plus you had another one in this year to look over the

Clark

240

work of another.  I'd ask for a copy of the contractor's engagement letter with these folks.  Has that been provided with the actuaries?

A   I am really not sure where to find them particularly the first one with GLK since they weren't clients.  We don't have a client file for them.  I did look, I haven't found them.

MS. WATERS:  They were your actuaries, right, in essence?

MR. ALLISON:  I am not sure.

MS. WATERS:  Wouldn't you be able to get that from them.

THE WITNESS:  I am totally out of touch with the first one.  I am not sure where he is.  The second one I probably could get and the third one I could certainly get.

MS. WATERS:  That might be the better way to do that other than digging through your boxes.  If some of it is not digitized or

Clark

241

it's difficult to find you may know that you have it, but it's not readily accessible to you and it maybe easier for you to get it in another place.

MR. ALLISON:  We will explore that and see if we can go that route.

MS. REYNOLDS:  That concludes the document request.

As we review the notes and confirm some of things that we asked about today there will be additional document requests in addition to the resolution of these incomplete items here. There are a couple of other things I want to cover.

Q   Do you recall receiving my letter regarding 3164P regarding the potential for third-party contact as part of this investigation?

A   There was something about that in the letter.

LEX REPORTING SERVICE
800-608-6085

Clark

242

Q   This is dated August the 22nd, it should have come up.  I just wanted to remind you that we do expect to make third-party contact and we want to make sure that you're reminded of that.

MR. ALLISON:  If it's okay with you we may periodically ask for a list of all third-party contact.

Q   You copyrighted your presentation, you did in fact do that?

A   Yes.

MS. WATERS:  Which one of those presentations did you copyright?

THE WITNESS:  Most of them.

MS. WATERS:  Are you talking about the powerpoint ones?

THE WITNESS:  Yes.

MS. WATERS:  Do we have a copy?

I suspect that presentation may have changed depending on the audience, et cetera, but do you

LEX REPORTING SERVICE
800-608-6085

Clark

243

have a copy of the ones that were copyrighted?

MR. ALLISON:  I think that Ms. Clark said that all of them basically would have been copyrighted including the ones that we went over today.

Q   Have you had any issues with those copywrites, have you taken any action against anyone that has used your presentations?

A   No.

MS. WATERS:  To your knowledge, you provided us with all of the presentation materials?

THE WITNESS:  No, not all. I did attempt to pull a representative sample, it's not all of them.

MS. WATERS:  Am I correct, Debbie, did we ask for all of them?

MS. REYNOLDS:  We did.

LEX REPORTING SERVICE
800-608-6085

Clark

244

MS. WATERS:  That request is still out there as well.

MR. ALLISON:  We are aware of that, yes.

MS. REYNOLDS:  This investigation process will take a lengthy period of time, a minimum of a year.  We will consider the information that we have gathered from you today.  We will consider the information we gathered from parties, we will look at the documents in evidence and draw a conclusion.  We will have to keep a line of communication opened. There is additional documents we will be requesting from you and that we already requested from you and pending the resolution of those requests at this time I do not have anything further.

MS. WATERS:  I have no further questions.

MS. REYNOLDS:  The interview

LEX REPORTING SERVICE
800-608-6085

245

is closed.

-o0o-

(Whereupon, the interview of Celia R. Clark was concluded at 5:40 p.m.)

_____

CELIA R. CLARK

Subscribed and sworn to before me this ____ day of _____, 2012

_____

NOTARY PUBLIC

LEX REPORTING SERVICE
800-608-6085

---

247

(Index continued)

REQUESTS FOR PRODUCTION

DESCRIPTION                              PAGE

Production of a copy of the contractor's engagement letter with the actuaries      239

LEX REPORTING SERVICE
800-608-6085

---

246

I N D E X

WITNESS          EXAMINATION BY          PAGE
C. Clark         Mr. Shlivko          5
                 Ms. Reynolds         7, 208
                 Ms. Hill             201

REQUESTS FOR PRODUCTION
DESCRIPTION                              PAGE
Production of the slides from the takeaways                         121

Production of all documents containing any statements made with respect to tax benefits relating to the products or services                         211

Any additional correspondence to add to the e-mails or any correspondence relating to the captives specifically issues related to life insurance          215

A complete list of presentations made around the country                    223

Production of the client list          227

Production of general ledger is they exist                                    231

Production of documents pertaining to the identification of the pools          234

Production of the operating documents concerning all of the policies and operating procedures                239

LEX REPORTING SERVICE
800-608-6085

---

248

C E R T I F I C A T E

I, Angela Torregrossa, a shorthand reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_____
ANGELA TORREGROSSA

LEX REPORTING SERVICE
800-608-6085

249

ERRATA SHEET

The following are my corrections to the attached transcript:

PAGE   LINE   SHOULD READ

_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____
_____ * _____   _____

LEX REPORTING SERVICE
800-608-6085





LEX REPORTING SERVICE
800-608-6085

12/17/2012 12:24:32 PM

3

195:21, 196:3, 196:18, 204:2, 205:20, 206:7, 208:11, 209:25, 211:9, 211:16, 212:6, 212:9, 212:15, 213:11, 213:21, 214:16, 217:10, 218:19, 219:4, 219:18, 220:13, 220:24, 221:14, 222:10, 223:16, 223:22, 226:13, 227:6, 228:4, 232:23, 233:4, 233:13, 234:2, 237:6, 238:21, 239:22, 240:13, 241:7, 242:7, 243:4, 244:4

**allocated** [1] - 161:19

**allow** [4] - 95:17, 97:15, 126:14, 214:25

**allowable** [1] - 167:7

**almost** [9] - 17:11, 32:12, 63:19, 70:21, 129:4, 162:20, 184:4, 187:13, 215:19

**Almost** [2] - 55:17, 66:16

**alot** [1] - 119:4

**alphabetical** [1] - 224:15

**Alright** [1] - 54:5

**alright** [2] - 48:16, 214:8

**ALSO** [1] - 2:21

**alterations** [1] - 48:11

**altered** [2] - 48:7, 125:18

**alternative** [3] - 25:3, 105:7, 224:11

**alternatives** [1] - 135:22

**American** [18] - 13:2, 100:22, 101:8, 101:23, 101:25, 102:2, 102:6, 102:14, 103:13, 104:9, 108:16, 108:21, 109:8, 112:4, 124:17, 124:19, 236:2

**amount** [13] - 29:17, 31:21, 100:25, 114:19, 115:14, 144:2, 160:20, 172:23, 174:5, 191:14, 191:15, 198:25, 213:4

**amounts** [3] - 100:4, 100:10, 132:14

**amplify** [1] - 110:14

**Anderson** [2] - 104:5, 113:10

**Angela** [1] - 248:5

**ANGELA** [1] - 1:12

**animal** [1] - 187:23

**Anjali** [1] - 36:16

**Ann** [2] - 4:14, 214:6

**announcing** [1] - 236:8

**annual** [11] - 18:14, 18:15, 58:14, 78:4, 83:17, 100:10, 100:12, 145:6, 157:25, 168:24, 176:18

**annually** [2] - 78:5, 191:23

**answer** [16] - 5:20, 6:20, 7:5, 9:16, 59:14, 70:17, 88:7, 109:14, 137:9, 139:2, 140:4, 193:9, 196:11, 198:8, 201:7, 212:16

**answering** [1] - 110:2

**answers** [1] - 209:23

**Anthony** [1] - 36:16

**Anthropology** [2] - 12:25, 13:4

**anticipated** [1] - 83:20

**appear** [4] - 108:2, 131:23, 136:20, 141:22

**appeared** [1] - 196:18

**applicant** [1] - 131:6

**applicants** [1] - 110:18

**application** [5] - 68:2, 69:17, 119:18, 130:19, 137:22

**applications** [1] - 51:8

**applied** [1] - 13:5

**apply** [2] - 153:21, 182:25

**appoint** [1] - 20:12

**appreciate** [1] - 223:23

**approached** [3] - 96:7, 157:3, 157:5

**appropriate** [4] - 114:19, 193:19, 207:13, 219:10

**approval** [4] - 68:8, 137:23, 171:15

**approved** [5] - 31:12, 69:8, 137:21, 159:24, 170:19

**approximate** [1] - 35:10

**April** [1] - 119:20

**area** [18] - 23:14, 25:14, 25:23, 25:25, 26:6, 37:5, 37:6, 57:15, 65:5, 88:12, 89:8, 89:11, 93:4, 99:4, 127:3, 211:24, 217:21

**Area** [2] - 11:4, 11:21

**areas** [4] - 37:3, 139:5, 139:7, 209:16

**arguing** [2] - 173:8, 226:15

**arise** [1] - 169:22

**arrangement** [11] - 29:12, 39:9, 92:7, 99:13, 100:16, 103:13, 108:15, 143:10, 143:15, 225:4, 225:24

**arrangements** [6] - 29:4, 56:7, 64:17, 75:25, 94:22, 96:18

**ARRINGTON** [3] - 2:12, 3:22, 201:2

**Arrington** [1] - 3:23

**arrive** [1] - 43:2

**arrow** [1] - 143:14

**arrows** [2] - 141:22, 141:23

**Artex** [1] - 57:10

**Arthritis** [3] - 14:24, 82:10, 82:12

**article** [2] - 65:17, 65:19

**articles** [4] - 65:8, 65:14, 65:15, 65:22

**Articles** [1] - 65:12

**Asheville** [4] - 2:6, 2:14, 3:20, 3:25

**aside** [1] - 23:14

**aspects** [1] - 169:18

**assemble** [1] - 238:5

**assembling** [1] - 238:15

**assembly** [1] - 183:14

**assert** [1] - 220:19

**asserting** [3] - 220:23, 225:9, 226:11

**assessed** [1] - 149:10

**assessment** [1] - 68:22

**assessments** [1] -

23:5

**Asset** [1] - 129:25

**asset** [7] - 130:15, 134:17, 134:25, 135:3, 135:18, 141:13, 167:7

**assets** [15] - 84:20, 84:21, 91:19, 91:23, 130:5, 130:7, 130:10, 132:19, 134:22, 135:10, 160:17, 160:21, 191:25, 192:7

**assigned** [1] - 182:7

**assignment** [1] - 189:22

**assignments** [1] - 189:17

**assist** [11] - 37:14, 37:16, 42:5, 67:25, 91:18, 205:3, 205:10, 205:15, 205:17, 206:21, 208:13

**Assistance** [1] - 87:21

**assistance** [2] - 43:24, 137:16

**assisted** [2] - 91:24, 208:10

**assisting** [1] - 217:17

**associate** [2] - 34:13, 94:19

**associated** [10] - 34:3, 34:8, 49:4, 61:4, 96:20, 101:3, 105:21, 178:5, 220:18, 236:5

**associates** [9] - 16:9, 16:12, 35:24, 36:15, 38:14, 38:24, 41:18, 42:13, 225:23

**Association** [3] - 167:16, 194:19, 204:20

**associations** [1] - 19:6

**assume** [5] - 59:6, 101:5, 140:10, 148:22, 165:25

**assumed** [3] - 101:11, 143:11, 177:6

**assuming** [2] - 108:18, 213:14

**assumption** [3] - 119:14, 143:23, 177:8

**assurance** [1] - 105:6

**Atkinson** [1] - 57:7

**Atlanta** [2] - 27:15, 57:5

**attached** [1] - 249:5

**attachments** [1] - 68:5

**attack** [4] - 128:22, 129:18, 188:20, 189:10

**attacks** [4] - 128:25, 187:20, 187:21, 188:7

**attempt** [2] - 159:15, 243:19

**attempted** [2] - 130:14, 189:21

**attend** [1] - 85:4

**Attendance** [1] - 53:7

**attendance** [2] - 54:3, 59:8

**attended** [3] - 12:21, 13:2, 86:2

**attention** [1] - 26:9

**attorney** [20] - 3:12, 3:14, 6:5, 22:21, 23:15, 27:12, 27:14, 28:24, 29:9, 43:17, 45:25, 50:25, 56:5, 93:2, 178:22, 182:8, 201:16, 206:13, 206:18, 206:21

**Attorney** [1] - 186:18

**attorney's** [3] - 106:8, 106:19, 107:11

**attorney/client** [3] - 204:5, 204:10, 220:17

**attorneys** [8] - 6:5, 49:16, 56:12, 92:10, 92:21, 115:6, 194:11, 221:21

**Attorneys** [1] - 2:16

**audience** [13] - 48:10, 49:8, 59:8, 127:20, 128:7, 128:9, 128:10, 156:5, 156:15, 159:6, 222:14, 242:25

**audiences** [1] - 128:12

**audio** [2] - 8:9, 82:21

**audit** [9] - 87:11, 177:21, 177:24, 178:12, 178:13, 200:8, 200:9, 202:15, 235:3

**audited** [3] - 14:15, 86:20, 86:21

**auditors** [1] - 158:9

**audits** [5] - 20:22, 21:3, 21:6, 21:9, 87:21

**August** [2] - 10:7, 242:2

**authorities** [1] -

4

174:16
authority [3] - 88:6, 107:20, 149:11
authority's [1] - 48:22
authorizing [1] - 170:18
auto [1] - 97:25
automatically [1] - 189:20
available [8] - 79:20, 130:7, 150:23, 163:2, 164:15, 210:7, 222:9, 230:20
Avenue [5] - 2:5, 2:13, 2:17, 10:22, 42:18
average [1] - 41:2
avoid [2] - 181:16, 192:7
avoids [1] - 192:3
aware [10] - 88:9, 89:17, 102:17, 164:2, 177:10, 194:13, 199:12, 199:13, 203:5, 244:4
awhile [2] - 173:17, 173:18

## B

BA [1] - 12:23
backed [1] - 73:16
background [6] - 12:16, 13:13, 68:18, 85:14, 85:25, 121:22
backs [2] - 73:10, 171:12
backward [1] - 163:18
bad [1] - 71:13
balance [4] - 31:19, 170:9, 171:6, 215:3
ballpark [4] - 38:8, 38:23, 66:15, 213:10
bank [13] - 67:9, 91:14, 91:15, 91:25, 109:16, 110:2, 161:13, 231:14, 231:19, 232:4, 232:9, 232:14, 234:20
Bank [1] - 233:7
bankrupt [1] - 130:9
bankruptcy [4] - 15:6, 67:12, 189:18, 189:24
banks [1] - 232:22
Banks [1] - 232:23
barely [1] - 99:9

base [4] - 86:9, 99:2, 99:4, 213:25
based [9] - 15:4, 46:3, 87:10, 98:15, 115:3, 115:22, 149:12, 149:24, 187:23
basic [3] - 23:25, 34:7, 34:22
basis [10] - 18:19, 29:6, 30:7, 33:13, 75:2, 101:3, 110:25, 143:3, 152:20, 182:21
basket [2] - 169:23, 170:4
batch [1] - 219:19
bate's [9] - 124:13, 127:15, 159:10, 161:6, 162:15, 164:18, 172:8, 182:12, 191:9
Bate's [1] - 133:11
became [2] - 57:3, 94:21
become [9] - 24:2, 24:16, 28:10, 68:22, 68:24, 144:14, 146:17, 147:10, 161:22
becomes [1] - 153:9
becoming [1] - 77:13
began [4] - 13:6, 21:4, 103:14, 177:21
begin [4] - 6:15, 16:16, 51:13, 66:22
beginning [10] - 24:25, 53:17, 119:25, 123:12, 124:12, 136:13, 164:6, 192:14, 214:17, 215:10
begins [1] - 156:22
begun [1] - 177:22
behalf [9] - 4:8, 4:12, 69:24, 72:7, 76:3, 106:23, 116:22, 137:13, 187:4
behind [2] - 75:23, 80:8
beneficial [3] - 180:21, 209:8, 230:24
Beneficial [1] - 124:13
beneficiaries [1] - 163:25
beneficiary [1] - 20:10
Benefit [7] - 44:19, 44:21, 63:6, 124:17, 124:19, 142:24, 179:3

benefit [10] - 6:11, 128:4, 130:16, 132:14, 133:4, 142:14, 165:23, 202:13, 215:15, 216:5
Benefits [1] - 121:8
benefits [13] - 133:9, 180:23, 189:19, 189:23, 197:14, 207:14, 207:16, 207:23, 211:7, 216:18, 217:6, 218:9, 246:14
Best [1] - 77:7
best [7] - 5:21, 11:9, 73:16, 89:5, 159:14, 191:22, 207:8
better [2] - 137:3, 240:23
between [17] - 27:21, 28:17, 33:18, 40:6, 61:16, 99:20, 102:13, 105:25, 106:5, 125:14, 142:13, 160:12, 172:12, 190:8, 216:2, 216:3
beyond [4] - 76:8, 111:17, 168:25, 226:3
Bhat [1] - 36:16
biennial [1] - 18:18
big [4] - 26:12, 98:2, 99:3, 100:7
bill [1] - 78:11
billing [2] - 35:10, 227:21
bills [4] - 29:13, 41:8, 44:18, 78:13
binder [3] - 229:12, 229:13, 237:20
binders [4] - 237:25, 238:3, 238:6, 239:2
biological [3] - 129:3, 129:17, 187:23
birth [2] - 10:6, 14:8
bit [7] - 14:19, 23:17, 138:7, 138:8, 139:19, 148:16, 176:14
blanks [1] - 100:8
blended [3] - 101:3, 101:5, 101:12
blogs [1] - 87:25
blood [1] - 248:13
blue [1] - 143:14
board [1] - 39:5
Board [1] - 14:24
bodies [1] - 76:2
body [1] - 95:25
Bogota [2] - 13:19, 13:24
bomb [1] - 183:16

bonafide [1] - 121:19
bonafied [5] - 155:16, 155:24, 156:3, 156:6, 156:25
bonds [2] - 168:10, 173:15
Bonus [1] - 35:16
bonus [6] - 38:3, 38:17, 38:18, 38:19, 38:21
bonuses [2] - 35:13, 35:17
book [1] - 61:3
booked [1] - 61:6
bookkeeper [2] - 35:7, 40:21
bookkeeper's [1] - 40:23
books [5] - 33:20, 35:3, 35:4, 61:5, 61:7
Books [3] - 35:9, 227:23, 230:21
bottom [1] - 144:16
bought [2] - 42:18, 118:7
box [3] - 62:5, 142:20, 154:8
boxes [2] - 233:11, 240:24
brainstorming [1] - 126:25
break [7] - 6:7, 23:18, 36:9, 63:20, 74:5, 74:12, 137:25
breaking [1] - 74:2
Brenda [1] - 41:23
bring [5] - 26:9, 59:9, 123:15, 161:2, 175:18
British [1] - 95:13
broad [2] - 88:15, 211:15
broader [4] - 211:4, 217:13, 218:6, 221:5
brochures [1] - 82:14
broker [7] - 97:19, 98:8, 98:11, 98:12, 114:11, 203:2, 224:2
brother [2] - 19:21, 145:22
brought [2] - 120:20, 219:15
Brown [8] - 27:13, 27:14, 28:9, 51:2, 57:4, 195:10, 196:5, 197:2
build [1] - 181:2
bullet [8] - 121:20, 127:16, 127:22, 129:24, 132:10,

160:7, 163:8, 163:11
bunched [1] - 120:7
burden [1] - 238:4
Burton [1] - 199:3
business [81] - 3:13, 10:20, 11:3, 11:17, 11:18, 11:19, 14:13, 18:24, 31:11, 36:4, 37:4, 64:6, 66:4, 68:24, 69:14, 69:18, 69:22, 73:18, 73:20, 73:21, 75:13, 75:20, 75:24, 76:4, 76:12, 76:16, 76:21, 77:4, 79:2, 79:3, 79:4, 79:7, 80:2, 80:4, 80:5, 80:12, 87:12, 89:11, 100:25, 101:4, 106:9, 106:10, 106:13, 107:9, 107:15, 107:25, 108:5, 108:6, 111:8, 113:14, 113:19, 114:3, 115:20, 116:12, 116:14, 118:2, 118:6, 118:10, 123:8, 130:11, 132:5, 132:12, 132:17, 132:24, 148:6, 148:11, 155:10, 155:12, 158:2, 162:24, 180:18, 189:2, 189:9, 190:8, 200:17, 207:23, 209:4, 217:17, 225:13
businesses [24] - 16:23, 25:7, 57:18, 76:5, 76:6, 76:19, 77:19, 80:23, 86:10, 88:21, 97:13, 99:13, 99:16, 106:2, 106:23, 106:25, 107:4, 115:8, 116:11, 132:2, 158:10, 192:20
Buss [2] - 17:9, 24:23
buy [2] - 129:4, 175:5
buyer [1] - 15:14
buying [3] - 75:15, 107:4, 174:22
buyout [1] - 133:25
buys [1] - 130:12
BVI [3] - 95:14, 95:15, 95:21
BY [6] - 2:18, 5:7, 7:13, 201:4, 208:23, 246:5

**C**

calculated [1] - 190:16
Calculator [1] - 38:5
California [6] - 27:13, 27:17, 28:9, 54:22, 56:11, 93:25
Campbell [1] - 57:8
cancellation [2] - 190:12, 200:18
cancelled [4] - 73:23, 190:14, 190:21, 190:24
cannot [11] - 20:6, 55:10, 60:17, 114:18, 130:10, 181:13, 181:16, 185:7, 190:21, 193:23, 201:18
capacity [5] - 17:23, 21:4, 22:18, 22:19, 82:9
Capital [1] - 112:21
capital [10] - 73:19, 79:12, 128:5, 154:15, 161:7, 161:19, 161:22, 162:6, 192:23, 192:24
capitalization [1] - 160:16
Caplin [2] - 4:8, 4:11
CAPLIN [1] - 2:16
Captive [5] - 24:2, 88:14, 124:14, 160:9, 194:18
captive [188] - 21:25, 22:5, 22:8, 23:10, 24:6, 24:15, 25:23, 25:25, 26:3, 26:15, 26:21, 28:12, 28:14, 28:18, 28:20, 30:3, 30:4, 30:6, 30:25, 33:17, 34:17, 35:19, 37:16, 42:25, 49:22, 50:5, 50:7, 50:19, 51:4, 55:25, 56:7, 56:19, 57:2, 57:9, 59:11, 60:12, 62:17, 64:12, 64:17, 65:4, 68:25, 69:24, 75:6, 75:8, 75:14, 75:21, 75:22, 76:8, 76:13, 76:17, 76:18, 76:23, 76:24, 77:5, 77:8, 77:13, 79:9, 79:21, 79:22, 79:23, 80:9, 80:13, 82:25, 83:2, 84:3, 84:5, 84:12,

88:6, 88:16, 89:11, 89:22, 89:23, 90:5, 90:19, 92:7, 94:21, 94:25, 95:3, 95:5, 95:19, 96:13, 96:18, 96:21, 97:7, 97:20, 98:9, 99:4, 99:14, 99:17, 99:20, 100:2, 101:8, 102:2, 102:3, 103:22, 106:20, 108:14, 108:22, 108:23, 113:16, 113:17, 113:18, 116:10, 116:14, 117:19, 118:17, 118:18, 119:17, 119:19, 125:7, 125:12, 126:18, 128:3, 130:13, 131:23, 132:4, 132:8, 132:13, 132:20, 132:21, 132:25, 133:9, 133:13, 133:22, 133:24, 134:8, 134:19, 134:23, 135:6, 142:6, 142:10, 143:5, 143:15, 148:24, 150:5, 150:9, 153:9, 154:7, 154:17, 154:20, 154:21, 156:2, 156:18, 160:12, 161:5, 161:8, 161:11, 161:25, 162:11, 162:17, 163:13, 166:11, 166:17, 167:9, 169:12, 170:8, 172:21, 172:22, 172:24, 173:14, 176:14, 190:5, 190:9, 191:21, 191:23, 192:19, 198:21, 201:13, 201:17, 201:25, 202:11, 203:14, 205:15, 211:12, 212:4, 216:11, 216:15, 217:18, 223:4, 224:22, 228:9, 229:7, 229:8, 231:7, 234:12, 234:19, 239:3
captive's [5] - 100:10, 100:11, 173:2, 174:14, 176:18
captives [50] - 30:10, 32:19, 56:18, 58:16, 66:4, 73:22, 77:18, 78:21, 81:21, 88:19, 88:23, 90:12, 90:23, 95:14, 97:18, 98:7,

99:10, 101:3, 101:4, 101:13, 106:2, 106:22, 107:5, 110:20, 111:10, 115:6, 117:4, 117:8, 119:25, 121:3, 125:20, 131:25, 136:9, 151:18, 168:8, 171:2, 171:9, 178:3, 179:21, 192:14, 192:15, 194:13, 194:15, 197:13, 202:24, 211:19, 215:12, 231:2, 246:17
capture [2] - 127:22, 127:24
Cardozo [3] - 16:21, 25:6, 83:8
cared [1] - 16:19
career [3] - 60:14, 225:15, 225:20
carefully [2] - 127:25, 181:17
Carl [1] - 12:13
Carolina [4] - 2:6, 2:14, 3:21, 4:2
carrier [1] - 173:13
carriers [1] - 185:5
carrying [1] - 191:16
Case [1] - 159:7
case [11] - 22:12, 30:10, 39:10, 39:12, 56:14, 69:16, 159:4, 163:20, 163:22, 185:3, 199:8
cases [8] - 29:23, 32:12, 73:17, 84:2, 112:24, 178:2, 192:3, 222:6
cash [11] - 73:19, 80:7, 161:20, 166:22, 167:6, 168:4, 169:15, 170:10, 174:8, 174:10, 174:20
casualty [2] - 158:13, 210:14
catastrophic [1] - 191:11
categories [2] - 23:19, 170:10
category [4] - 61:9, 61:10, 150:9, 230:22
caused [1] - 194:5
caution [1] - 138:23
cautioned [2] - 169:22, 170:3
CD [1] - 123:5
CD's [4] - 82:20, 122:9, 122:14, 122:17
cease [3] - 10:3,

45:20, 179:19
ceased [3] - 51:12, 78:22, 202:3
Ceila [1] - 107:13
Celia [5] - 1:4, 4:4, 8:5, 142:8, 245:5
CELIA [3] - 1:10, 2:17, 245:8
cell [1] - 11:5
certain [16] - 37:5, 37:6, 53:9, 58:13, 65:24, 66:15, 78:11, 106:23, 106:25, 111:6, 127:16, 132:14, 138:9, 151:5, 169:2, 198:25
Certainly [2] - 121:5, 224:6
certainly [21] - 37:10, 56:22, 67:12, 70:9, 81:14, 105:15, 110:23, 115:5, 119:4, 140:17, 141:20, 152:11, 211:3, 218:2, 218:3, 219:5, 221:5, 226:7, 228:10, 233:18, 240:21
certificate [7] - 75:9, 100:18, 130:20, 131:4, 131:9, 131:12, 220:9
certificates [1] - 116:19
certification [1] - 193:19
certified [1] - 186:16
certify [2] - 248:7, 248:12
cetera [3] - 219:2, 219:3, 242:25
chair [1] - 14:25
Chair [1] - 82:10
challenge [3] - 212:17, 219:23, 220:6
challenged [1] - 72:13
chance [1] - 110:17
chances [1] - 157:14
change [11] - 21:17, 30:21, 71:2, 73:20, 138:7, 138:11, 139:19, 164:5, 183:24, 192:9
changed [11] - 17:14, 99:25, 100:19, 106:14, 108:16, 183:25, 184:3, 189:15, 190:2, 192:12, 242:24
changes [6] - 81:24,

83:20, 114:24, 141:4, 199:17, 239:21
changing [1] - 147:11
characterization [1] - 156:9
charge [5] - 29:18, 39:14, 85:3, 87:19, 108:14
charged [3] - 15:18, 30:14, 160:14
charges [3] - 30:10, 31:4, 174:8
Charging [1] - 141:15
charitable [1] - 14:21
check [3] - 91:12, 91:13, 106:21
checking [1] - 71:10
checks [1] - 41:7
chemical [2] - 129:3, 129:17
Chen [1] - 36:16
Chicago [6] - 13:3, 13:7, 13:20, 16:11, 51:2, 54:14
Chief [1] - 3:15
children [6] - 12:9, 16:19, 102:19, 102:21, 102:25
chime [1] - 115:5
choice [3] - 105:5, 160:3, 160:18
choices [1] - 136:7
chooses [2] - 153:13, 153:17
chose [2] - 6:5, 110:19
Chris [5] - 57:6, 104:5, 113:9, 203:13, 203:17
Christine [3] - 41:12, 41:13, 41:22
chronological [2] - 120:22, 120:23
chronologically [2] - 98:21, 172:15
church [1] - 15:3
CIC [16] - 133:16, 142:3, 142:4, 142:6, 142:11, 142:18, 143:24, 144:3, 144:8, 144:13, 144:19, 145:7, 145:10, 146:24, 147:25, 150:10
circle [1] - 146:4
Circular [1] - 181:18
circulated [1] - 115:5
circumstances [3] -

64:7, 79:24, 118:11
circumvented [2] - 69:3, 69:5
Citibank [6] - 107:14, 109:16, 112:13, 112:15, 112:23, 233:5
cities [2] - 13:17, 13:18
Citigroup [2] - 229:5, 229:9
citizen [1] - 10:11
citizens [1] - 53:8
citizenship [1] - 10:14
city [1] - 94:2
City [2] - 8:2, 17:9
civil [5] - 7:19, 8:15, 9:25, 14:20, 15:8
civilian [1] - 187:6
claim [10] - 129:15, 149:20, 185:22, 191:14, 199:12, 199:14, 199:19, 200:14, 200:15, 217:14
claim's [1] - 182:21
claimant [1] - 145:9
claimed [2] - 185:5, 185:21
claiming [1] - 221:12
claims [20] - 114:9, 130:4, 145:6, 166:23, 169:6, 186:2, 191:25, 197:16, 197:18, 198:4, 198:9, 198:15, 198:18, 198:19, 198:25, 199:5, 199:22, 199:23, 199:25, 200:6
Claims [1] - 182:20
clarify [9] - 39:20, 40:9, 47:20, 50:2, 71:25, 78:8, 168:22, 183:20, 215:24
clarity [1] - 48:10
Clark [48] - 1:4, 4:5, 4:9, 4:12, 5:9, 8:4, 8:5, 10:21, 11:25, 17:14, 19:14, 20:5, 23:21, 24:6, 26:14, 35:23, 41:13, 60:5, 61:19, 61:20, 89:12, 107:12, 107:13, 122:15, 142:8, 168:14, 169:11, 194:6, 195:24, 196:2, 204:12, 204:15, 205:21, 212:22, 214:25, 217:11, 217:16, 219:20,

220:2, 222:11, 222:16, 224:22, 238:5, 243:5, 245:5, 246:6
CLARK [5] - 1:10, 2:17, 4:4, 38:5, 245:8
Clark's [3] - 195:19, 220:15, 222:22
class [1] - 16:22
classified [1] - 94:15
clause [5] - 185:6, 191:4, 191:8, 191:20, 192:21
CLE [1] - 86:4
clear [11] - 5:23, 20:6, 21:8, 87:9, 107:3, 139:15, 175:17, 188:5, 198:23, 214:17, 217:12
clearly [9] - 61:13, 144:15, 156:24, 167:10, 174:24, 211:20, 217:16, 237:4
Clearly [1] - 182:19
Client [1] - 75:10
client [57] - 9:8, 28:9, 28:10, 28:22, 29:7, 30:12, 31:18, 39:13, 39:15, 43:22, 44:10, 56:14, 60:24, 61:2, 62:22, 62:25, 64:5, 64:14, 68:17, 71:12, 72:8, 72:12, 73:10, 73:12, 73:13, 73:15, 75:8, 75:9, 75:16, 76:21, 80:19, 86:9, 90:3, 91:25, 92:25, 94:9, 99:2, 99:3, 110:17, 113:19, 114:2, 114:7, 130:18, 137:10, 137:13, 153:17, 157:12, 173:6, 174:3, 181:15, 224:10, 225:18, 226:12, 226:19, 228:8, 240:9, 246:20
Client's [1] - 114:10
client's [10] - 35:25, 64:6, 69:13, 69:16, 72:5, 93:16, 114:6, 114:15, 114:24, 224:5
clients [114] - 8:21, 8:22, 20:12, 20:18, 21:3, 21:6, 23:16, 28:4, 28:5, 28:6, 28:7, 28:11, 28:13, 28:15, 28:17, 28:19, 29:15, 31:12, 32:11, 36:3, 36:5, 36:7, 40:17,

41:9, 42:21, 42:22, 43:2, 43:8, 43:9, 43:22, 44:2, 58:17, 59:6, 59:9, 59:14, 59:17, 60:2, 60:6, 60:15, 60:22, 62:4, 62:18, 62:20, 69:13, 70:7, 70:19, 75:4, 75:5, 76:5, 77:4, 79:7, 81:5, 82:5, 83:14, 83:22, 83:25, 86:16, 86:20, 87:3, 90:13, 91:18, 92:2, 92:9, 92:20, 93:22, 95:20, 97:18, 99:11, 104:25, 105:13, 106:13, 114:15, 114:23, 128:8, 136:12, 153:13, 153:18, 168:18, 170:15, 172:19, 173:3, 178:8, 179:10, 195:6, 195:8, 201:21, 201:25, 207:2, 216:3, 220:15, 220:16, 221:23, 223:20, 224:13, 224:21, 225:3, 225:9, 225:22, 227:15, 227:18, 228:3, 228:9, 229:7, 229:8, 230:16, 230:22, 230:23, 236:8, 238:2, 238:14, 238:24, 240:8
close [5] - 77:3, 81:15, 93:17, 106:15, 173:24
closed [7] - 21:17, 21:20, 87:6, 87:7, 106:14, 110:16, 245:2
closely [5] - 16:23, 25:7, 57:17, 76:5, 97:13
Closely [1] - 86:10
closer [1] - 48:15
closing [5] - 15:11, 15:13, 108:11, 229:12, 237:24
co [4] - 29:4, 29:6, 54:16, 56:13
co-counsel [2] - 29:4, 29:6
co-presented [2] - 54:16, 56:13
code [5] - 11:4, 11:21, 25:11, 153:23, 225:22
Code [2] - 24:20, 25:2
coerce [1] - 187:5
coercion [1] - 187:9

collaborative [1] - 37:11
collapse [1] - 177:4
colleagues [4] - 26:5, 26:11, 27:3, 200:23
collect [2] - 29:14, 199:15
collected [1] - 67:16
collecting [1] - 66:23
collection [2] - 146:20, 161:2
collections [2] - 35:11, 41:9
college [7] - 12:17, 12:20, 13:15, 14:9, 14:10, 15:22, 15:25
colleges [1] - 12:22
Columbia [1] - 13:19
com [1] - 12:2
combination [7] - 67:8, 78:11, 78:15, 87:17, 121:11, 125:5, 141:12
combined [2] - 9:23, 121:6
combining [2] - 125:19, 126:16
combustion [2] - 183:12
comfortable [3] - 111:6, 171:19, 173:16
coming [2] - 188:9, 205:18
commencement [2] - 30:9, 31:8
commencing [1] - 186:25
comment [4] - 27:20, 158:4, 180:4, 215:23
comments [1] - 158:23
commercial [13] - 37:8, 67:17, 114:10, 114:12, 114:18, 127:23, 127:24, 129:2, 129:5, 129:12, 148:22, 149:2, 152:8
commingled [1] - 108:5
Commissioners [2] - 167:16, 167:18
commissions [4] - 39:4, 39:7, 174:9, 176:6
committed [4] - 182:25, 183:4, 187:2, 188:17
committee [1] - 95:25

common [2] - 149:24, 191:21
commonly [2] - 182:3, 190:17
communicate [1] - 27:3
communicated [2] - 27:7, 177:7
communication [2] - 36:12, 244:16
communications [3] - 204:11, 219:11, 220:16
community [2] - 14:20, 15:4
companies [27] - 15:9, 22:2, 22:6, 25:4, 25:15, 26:4, 26:22, 32:2, 44:15, 56:2, 60:12, 67:3, 77:9, 88:17, 95:19, 99:15, 117:2, 130:4, 133:10, 170:8, 179:4, 179:6, 198:22, 202:25, 203:14, 207:22, 217:19
Company [8] - 21:19, 22:13, 54:20, 100:22, 102:12, 124:14, 130:23, 194:18
company [75] - 23:18, 24:19, 30:25, 34:4, 44:20, 51:24, 52:4, 52:6, 57:10, 64:12, 67:5, 69:24, 73:12, 74:20, 76:23, 76:24, 77:14, 77:20, 78:16, 79:21, 79:25, 84:3, 84:6, 91:14, 91:15, 97:11, 102:3, 102:5, 103:20, 103:22, 104:4, 109:7, 116:11, 116:21, 116:23, 121:19, 125:6, 130:5, 130:9, 130:10, 130:18, 132:13, 134:24, 142:11, 143:5, 143:16, 145:23, 146:10, 146:11, 153:22, 154:8, 155:13, 155:14, 155:16, 155:20, 155:24, 156:2, 156:4, 156:7, 156:16, 156:17, 156:25, 157:7, 157:17, 161:14, 166:11, 168:18, 179:14,

LEX REPORTING SERVICE
800-608-6085

12/17/2012 12:24:32 PM

190:15, 190:20, 190:25, 191:10, 191:13, 191:23, 224:22

**company's** [7] - 30:2, 33:20, 52:8, 106:20, 160:9, 172:21, 191:12

**comparative** [1] - 66:16

**comparison** [1] - 160:14

**compensated** [9] - 8:22, 29:13, 38:2, 38:15, 39:13, 51:15, 77:25, 98:9, 108:17

**compensates** [1] - 29:7

**compensation** [5] - 28:22, 40:4, 77:19, 180:20, 207:21

**competing** [1] - 95:23

**competitor** [2] - 57:11, 57:13

**competitors** [2] - 56:23, 57:3

**compiled** [2] - 47:25, 122:13

**complete** [17] - 9:8, 21:13, 30:19, 31:20, 31:22, 32:9, 53:19, 53:23, 80:21, 110:15, 121:15, 209:11, 209:21, 223:11, 231:15, 239:2, 246:18

**completed** [3] - 30:15, 30:16, 32:21

**completely** [5] - 74:25, 93:8, 93:19, 98:5, 111:18

**compliance** [2] - 157:18, 181:18

**complicated** [2] - 48:24, 80:3

**component** [1] - 60:21

**components** [1] - 183:15

**comprehensive** [2] - 194:23, 234:21

**computer** [1] - 148:10

**computerized** [1] - 236:19

**con's** [1] - 66:18

**concept** [2] - 127:9, 151:3

**concern** [2] - 169:19, 176:24

**concerned** [2] - 140:15, 174:4

**concerning** [1] - 246:24

**Concerning** [1] - 206:5

**concerns** [1] - 239:15

**conclude** [3] - 13:10, 13:12, 17:19

**concluded** [2] - 32:6, 245:5

**concludes** [2] - 200:20, 241:11

**conclusion** [1] - 244:15

**concurrence** [1] - 186:17

**condition** [3] - 184:21, 185:14

**conditions** [6] - 32:20, 128:24, 156:20, 182:23, 184:15, 185:16

**conduct** [5] - 15:19, 36:4, 82:15, 187:8, 212:24

**conference** [18] - 36:13, 47:7, 47:15, 51:19, 52:7, 52:9, 54:13, 54:17, 54:19, 54:21, 54:24, 59:12, 60:4, 61:17, 61:18, 66:13, 85:12, 114:5

**conferences** [8] - 44:3, 50:4, 51:3, 52:12, 55:19, 56:21, 210:20, 210:21

**Confidential** [1] - 185:7

**confidentiality** [1] - 184:16

**confirm** [2] - 39:6, 241:13

**confirming** [1] - 207:12

**confused** [3] - 41:17, 145:18, 205:6

**connect** [1] - 60:17

**connection** [5] - 49:24, 50:8, 50:10, 60:21, 62:9

**connections** [1] - 188:16

**consent** [1] - 217:15

**consequence** [2] - 216:6, 226:2

**consequences** [5] - 136:14, 137:8, 163:6, 185:8, 216:10

**conservative** [1] - 176:22

**consider** [11] - 25:13, 27:2, 84:9, 88:5, 88:13, 88:23, 136:24, 227:3, 239:16, 244:9, 244:11

**considered** [5] - 27:23, 48:23, 96:6, 152:10, 152:11

**construed** [1] - 156:3

**consult** [1] - 6:4

**consultant** [6] - 21:12, 22:9, 39:11, 71:15, 93:20, 208:21

**consulted** [3] - 27:7, 57:2, 127:11

**consulting** [10] - 23:24, 29:10, 34:5, 34:6, 34:21, 40:14, 76:10, 209:17

**consuming** [1] - 213:8

**contact** [5] - 95:8, 194:14, 241:22, 242:5, 242:10

**contacted** [1] - 194:8

**contacts** [6] - 27:23, 29:20, 29:22, 45:12, 64:14, 81:5

**containing** [3] - 205:22, 211:6, 246:13

**contamination** [1] - 183:10

**context** [13] - 123:3, 123:11, 127:19, 140:19, 148:14, 154:4, 175:19, 176:14, 210:24, 218:16, 218:23, 224:20, 227:17

**contexts** [2] - 50:19, 51:4

**continuation** [1] - 181:23

**continue** [15] - 45:17, 63:10, 77:19, 99:11, 103:16, 103:17, 113:2, 132:16, 155:6, 156:10, 177:23, 213:2, 214:19, 219:9, 238:10

**continued** [8] - 16:7, 17:12, 100:12, 105:6, 105:16, 112:23, 155:21, 247:2

**continues** [2] - 66:21, 158:21

**continuing** [5] - 18:16, 157:25, 169:8, 181:25, 219:20

**contract** [9] - 99:20, 100:2, 110:8, 116:20, 131:3, 198:24, 199:4, 200:18, 237:11

**contractor** [1] - 40:22

**contractor's** [2] - 240:3, 247:6

**contractors** [3] - 40:19, 111:7, 209:21

**contracts** [8] - 97:25, 98:2, 98:3, 105:25, 106:3, 106:6, 107:3, 234:18

**contractual** [1] - 24:3

**contribute** [2] - 87:24, 115:9

**contributed** [1] - 84:21

**contributing** [1] - 79:19

**contribution** [2] - 161:7, 162:7

**control** [6] - 7:22, 112:10, 112:18, 144:13, 144:19, 153:11

**Control** [1] - 146:23

**controlled** [1] - 153:20

**controlling** [1] - 67:4

**conversation** [6] - 55:23, 172:7, 172:16, 172:18, 175:9, 202:17

**conversations** [1] - 175:25

**cooperate** [1] - 9:16

**cooperatively** [1] - 214:19

**copies** [9] - 53:23, 120:20, 172:13, 210:11, 210:19, 210:22, 215:5, 216:23, 236:19

**copy** [16] - 16:4, 48:5, 67:10, 85:19, 86:25, 193:21, 195:3, 195:9, 195:16, 196:24, 231:11, 240:2, 242:22, 243:2, 247:6

**copyright** [1] - 242:16

**copyrighted** [3] - 242:11, 243:3, 243:7

**copywrites** [1] -

243:10

**corporate** [11] - 20:7, 23:25, 24:4, 31:5, 34:7, 34:22, 37:14, 78:2, 170:17, 170:18, 216:25

**Corporation** [1] - 20:6

**corporation** [8] - 22:15, 98:14, 153:10, 153:11, 153:20, 153:23, 153:25, 155:4

**Corporations** [1] - 20:4

**correct** [28] - 45:8, 48:3, 49:5, 49:6, 56:8, 96:7, 106:4, 107:22, 107:23, 117:20, 131:5, 145:21, 150:17, 156:19, 175:21, 183:17, 183:20, 183:22, 202:4, 213:17, 226:21, 226:24, 232:16, 234:24, 234:25, 235:14, 235:21, 243:22

**Correct** [14] - 17:18, 26:24, 38:22, 47:23, 69:7, 102:15, 118:15, 119:2, 142:12, 145:24, 146:2, 147:2, 162:12, 169:14

**corrected** [2] - 131:10, 131:13

**corrections** [1] - 249:4

**corrective** [1] - 131:4

**correctly** [5] - 22:11, 34:23, 49:2, 88:5, 178:9

**correlation** [1] - 61:16

**correspondence** [15] - 215:6, 215:9, 215:11, 215:25, 216:4, 216:22, 216:24, 217:25, 219:10, 219:13, 220:5, 221:2, 229:23, 246:16, 246:16

**corresponding** [1] - 230:8

**cost** [1] - 58:19

**costs** [1] - 142:4

**Cotterel** [1] - 102:10

**Counsel** [3] - 3:15, 15:2, 82:10

**counsel** [9] - 4:15, 17:7, 24:22, 25:19,

8

29:4, 29:5, 29:6, 178:19, 195:14
countries [2] - 92:3, 92:4
country [4] - 92:2, 194:12, 223:10, 246:19
counts [1] - 169:15
couple [5] - 65:18, 99:22, 111:10, 145:13, 241:18
course [6] - 25:5, 46:16, 114:25, 115:19, 177:24, 222:11
courses [2] - 12:19, 86:5
Court [3] - 10:18, 37:10, 37:12
court [3] - 4:23, 6:11, 63:18
cover [10] - 74:4, 74:7, 128:21, 148:25, 149:9, 150:6, 165:19, 209:2, 233:22, 241:19
coverage [37] - 113:24, 114:17, 114:20, 115:15, 116:5, 117:17, 127:23, 127:24, 128:14, 128:19, 129:8, 133:18, 148:5, 148:10, 148:23, 148:24, 149:2, 150:4, 152:5, 152:7, 154:16, 168:25, 169:6, 169:7, 182:21, 184:25, 185:3, 185:13, 185:25, 186:5, 186:10, 188:15, 190:11, 190:14, 192:2, 200:4, 200:17
Coverage [1] - 147:24
coverages [4] - 113:22, 150:3, 150:5, 152:13
covered [16] - 40:5, 42:13, 51:17, 51:18, 111:12, 145:9, 149:17, 163:8, 163:10, 188:2, 188:10, 188:18, 189:8, 189:11, 189:13, 191:14
CPA [8] - 27:17, 27:18, 28:24, 39:10, 39:12, 39:17, 40:6, 40:13
CPA's [5] - 92:10,

92:21, 93:7, 194:11, 221:21
CRC [3] - 142:2, 142:4, 142:7
create [4] - 156:24, 157:6, 223:17, 229:24
created [5] - 47:5, 47:11, 134:13, 226:20, 227:25
Created [1] - 82:18
creating [1] - 221:6
credentials [1] - 90:5
credit [3] - 97:24, 105:6, 105:16
Credit [4] - 98:13, 99:12, 113:10, 113:11
credited [1] - 112:22
creditor [1] - 160:22
creditors [2] - 130:11, 135:2
criminal [3] - 67:11, 68:19, 183:4
criminally [1] - 15:19
criticized [1] - 90:10
Croix [1] - 53:5
cross [13] - 99:12, 104:12, 104:18, 105:10, 105:14, 105:23, 106:24, 109:13, 110:6, 117:14, 192:18, 224:24, 228:15
cross-insurance [2] - 104:18, 105:23
crudely [1] - 176:4
CSE [1] - 141:7
Cultural [1] - 12:25
cumulative [1] - 168:23
current [11] - 10:16, 10:20, 14:12, 27:22, 27:23, 35:14, 63:15, 84:7, 95:5, 184:6, 203:19
curriculum [1] - 85:10
cut [4] - 87:9, 106:8, 233:15, 233:16
cutting [1] - 41:7
cyber [2] - 187:20, 188:7

## D

daily [1] - 41:5
Dale [21] - 44:24, 45:10, 50:22, 172:13, 176:2, 176:8, 176:9, 176:11, 177:6,

178:16, 178:21, 178:24, 179:2, 179:18, 181:12, 201:8, 201:10, 203:22, 216:2
damage [4] - 128:22, 186:22, 189:8, 194:6
dangerous [1] - 186:21
data [3] - 122:13, 148:11, 228:5
date [6] - 10:6, 13:9, 119:16, 140:24, 144:2, 165:7
dated [3] - 165:18, 175:8, 242:2
David [4] - 178:20, 203:10, 203:15
day-to-day [1] - 35:22
days [8] - 53:13, 63:6, 94:12, 98:22, 104:12, 106:24, 161:17, 168:5
DC [1] - 16:5
deal [7] - 7:17, 80:25, 81:9, 144:8, 214:10, 224:7, 225:11
dealers [1] - 98:4
dealing [6] - 23:10, 25:11, 88:18, 119:25, 205:12, 223:24
deals [3] - 26:14, 161:4, 162:14
dealt [2] - 221:15, 223:7
debate [3] - 90:12, 90:18, 90:25
Debbie [4] - 3:17, 4:2, 218:6, 243:23
Deborah [1] - 4:20
DEBORAH [1] - 2:4
debtors [1] - 141:14
December [5] - 1:7, 7:23, 118:21, 118:22
decide [1] - 226:5
decided [1] - 71:19
decides [1] - 30:12
decision [2] - 66:6, 72:5
decisions [2] - 118:6, 168:11
declare [1] - 164:7
declaring [1] - 163:9
deduct [1] - 156:18
deductibility [2] - 155:7, 156:21
deductible [7] - 121:18, 122:25, 133:17, 144:4,

155:11, 203:24, 203:25
deduction [3] - 157:10, 180:22, 216:14
deductions [1] - 78:19
deemed [1] - 153:24
default [2] - 192:4, 192:8
defense [2] - 111:7, 151:10
deferred [2] - 180:19, 207:21
deficiencies [1] - 129:11
define [1] - 75:9
defined [4] - 31:22, 32:22, 186:16, 209:15
Definitely [3] - 60:20, 86:18, 110:13
definitely [4] - 9:7, 130:15, 147:21, 185:24
definition [7] - 75:16, 186:15, 187:10, 187:12, 187:15, 187:19, 188:12
Defrancesco [2] - 57:13, 196:17
degree [2] - 12:23, 159:8
Degree [1] - 13:7
Delaware [2] - 57:11, 58:23
delivered [1] - 181:11
demand [1] - 171:17
demonstrate [1] - 9:14
denominator [1] - 169:4
department [4] - 94:10, 94:11, 194:9, 196:23
Department [1] - 13:3
deposed [1] - 5:11
DEPOSITION [1] - 1:10
deposition [2] - 5:11, 59:23
derive [1] - 158:7
derives [1] - 158:14
describe [3] - 86:8, 88:10, 89:16
described [8] - 25:16, 32:8, 69:22, 88:8, 128:5, 150:24,

152:13, 206:11
describes [1] - 33:3
describing [2] - 159:17, 170:12
DESCRIPTION [2] - 246:11, 247:5
description [2] - 72:10, 150:19
designation [1] - 224:16
designed [5] - 31:16, 55:14, 151:2, 205:5, 207:22
designer [1] - 208:20
designing [1] - 205:4
desires [1] - 31:18
destroy [1] - 232:23
detail [1] - 48:14
detailed [1] - 197:22
details [4] - 8:25, 127:17, 162:22, 198:14
determination [1] - 186:9
determinations [1] - 114:21
determine [4] - 9:10, 114:19, 194:4, 239:7
determined [10] - 30:19, 73:11, 113:21, 113:23, 117:16, 117:17, 130:22, 147:8, 147:10, 186:2
determines [2] - 113:25, 119:8
determining [2] - 35:16, 115:14
Detroit [2] - 55:4, 55:20
develop [4] - 57:17, 70:4, 95:18, 153:2
developed [3] - 69:15, 127:2, 198:15
developer [1] - 54:17
developers [1] - 152:12
developing [4] - 58:25, 66:9, 115:20, 126:12
development [4] - 69:11, 140:25, 208:14, 217:18
developments [1] - 187:17
devote [1] - 46:21
diagram [2] - 133:12, 159:12
diagrams [1] - 48:23
dials [1] - 64:23
Diana [2] - 12:13,

9

36:16

**die** [1] - 163:5
**died** [2] - 79:2, 132:18
**Diego** [1] - 54:24
**difference** [2] - 27:21, 188:2
**differences** [3] - 71:9, 71:14, 160:12
**different** [33] - 12:21, 17:17, 27:10, 29:23, 49:18, 52:10, 52:11, 52:22, 54:9, 54:10, 56:13, 71:7, 71:13, 71:16, 72:11, 88:21, 103:18, 111:18, 113:7, 120:6, 124:5, 127:11, 128:18, 135:24, 137:20, 150:21, 160:15, 160:16, 165:10, 198:9, 205:12, 228:6
**Different** [3] - 52:11, 52:23, 71:5
**difficult** [8] - 26:16, 97:12, 120:8, 121:25, 138:7, 141:15, 161:2, 241:2
**difficulty** [1] - 220:14
**digging** [2] - 233:10, 240:24
**digit** [1] - 147:5
**digitized** [3] - 231:25, 235:11, 240:25
**diligence** [3] - 67:14, 68:4, 68:5
**dime** [1] - 106:4
**diminimus** [1] - 103:6
**direct** [11] - 8:20, 60:17, 60:21, 61:15, 61:23, 83:13, 95:8, 99:20, 100:17, 145:20, 225:7
**directed** [1] - 46:10
**direction** [1] - 71:17
**directions** [1] - 143:13
**directly** [15] - 7:22, 39:13, 60:3, 78:14, 100:24, 116:13, 144:24, 147:24, 147:25, 154:21, 166:16, 196:2, 216:5, 217:5, 218:8
**dirty** [1] - 183:16
**disagreed** [2] - 89:23, 89:25
**disburse** [1] - 31:3

**disbursement** [1] - 78:12
**disciplinary** [2] - 18:12, 22:25
**disclose** [2] - 153:18, 185:7
**disclosement** [1] - 185:9
**disclosure** [4] - 149:13, 153:19, 195:7, 225:18
**discontinuance** [1] - 10:2
**discounts** [1] - 70:6
**discuss** [5] - 26:7, 26:8, 44:5, 66:17, 87:25
**discussed** [4] - 56:6, 83:7, 113:19, 190:7
**discussing** [3] - 59:16, 150:4, 173:12
**discussion** [22] - 63:23, 90:24, 91:2, 122:5, 123:9, 125:10, 131:23, 131:24, 135:24, 154:4, 155:18, 155:25, 156:21, 162:21, 172:10, 175:22, 197:18, 197:23, 198:7, 202:20, 211:18, 216:8
**discussions** [2] - 46:20, 50:14
**dishonest** [1] - 183:3
**disposal** [1] - 151:9
**dispute** [1] - 185:24
**disputes** [1] - 151:11
**disputing** [1] - 217:20
**dissatisfied** [1] - 95:12
**dissolve** [1] - 135:19
**distributed** [2] - 151:24, 163:25
**distribution** [18] - 62:20, 78:3, 97:10, 97:16, 98:25, 99:18, 106:17, 150:16, 150:22, 151:2, 151:18, 151:22, 152:4, 152:15, 158:22, 159:9, 159:16, 228:21
**diverse** [1] - 212:21
**diversification** [2] - 167:11, 169:20
**Diversified** [12] - 21:19, 22:13, 177:21, 177:24, 178:8,

178:11, 195:14, 202:15, 235:3, 237:19, 237:23, 238:11
**diversified** [3] - 167:22, 169:24, 229:12
**divided** [1] - 24:9
**dividend** [2] - 163:23, 164:6
**dividends** [6] - 163:9, 163:12, 164:3, 164:8, 164:12, 192:25
**division** [1] - 3:13
**divulge** [1] - 184:18
**divulged** [1] - 185:23
**doable** [2] - 140:17, 214:4
**doctor** [2] - 62:18, 135:16
**doctors** [4] - 133:22, 134:5, 134:19, 138:19
**document** [16] - 33:2, 33:7, 33:12, 40:6, 85:18, 85:21, 124:8, 133:3, 170:5, 181:6, 181:7, 200:21, 209:2, 234:14, 241:11, 241:15
**documentation** [12] - 64:15, 69:20, 82:14, 101:19, 171:23, 197:10, 198:6, 234:4, 234:7, 236:4, 236:6, 236:24
**documentations** [1] - 175:7
**documented** [2] - 131:20, 194:10
**Documents** [1] - 209:14
**documents** [33] - 36:2, 47:5, 47:7, 47:8, 47:9, 48:13, 58:12, 67:16, 67:20, 67:21, 87:3, 91:5, 102:23, 120:19, 120:21, 121:18, 123:15, 123:22, 149:13, 210:12, 211:6, 215:20, 227:22, 236:19, 237:3, 237:10, 238:8, 238:16, 244:14, 244:17, 246:13, 246:22, 246:24
**dollar** [3] - 29:17, 31:21, 136:19
**dollars** [2] - 129:19, 216:17

**domestic** [5] - 51:24, 102:4, 146:7, 153:10, 153:25
**done** [18] - 5:10, 31:19, 32:15, 62:19, 62:21, 77:24, 81:22, 82:11, 104:9, 104:13, 132:7, 134:15, 137:15, 178:23, 224:11, 226:9, 230:4, 236:11
**door** [1] - 62:5
**doorstep** [2] - 43:3, 43:4
**dormitories** [1] - 13:16
**dots** [1] - 60:17
**double** [2] - 12:25, 71:9
**doubt** [1] - 119:6
**down** [9] - 36:9, 68:16, 69:3, 69:4, 80:9, 89:10, 143:19, 208:25, 216:13
**Downer** [1] - 56:16
**downloaded** [1] - 122:16
**downtown** [1] - 3:16
**dozen** [3] - 20:14, 21:16, 92:4
**draft** [7] - 35:25, 95:3, 115:4, 116:15, 120:15, 190:4, 206:14
**drafted** [2] - 115:23, 117:18
**drafting** [3] - 118:8, 120:14, 206:22
**draw** [1] - 244:14
**draws** [1] - 110:10
**driven** [1] - 79:24
**drops** [1] - 64:23
**drudging** [1] - 213:6
**Drysdale** [2] - 4:8, 4:11
**DRYSDALE** [1] - 2:16
**dual** [1] - 10:14
**due** [3] - 67:14, 68:3, 68:4
**duly** [2] - 5:3, 248:9
**During** [4] - 16:9, 27:4, 27:5, 51:19
**during** [7] - 8:6, 15:25, 17:13, 52:8, 53:14, 140:2, 177:24
**duties** [1] - 35:22
**Dwight** [1] - 16:4

# E

**e-mail** [10] - 11:22, 32:17, 36:12, 43:4, 64:23, 87:16, 173:7, 230:3, 230:5
**e-mails** [13] - 83:23, 87:18, 171:25, 172:6, 173:23, 174:17, 175:7, 175:11, 215:6, 215:24, 217:2, 230:9, 246:16
**E-mails** [1] - 220:7
**earliest** [1] - 49:19
**early** [9] - 49:10, 94:22, 98:22, 99:5, 99:6, 121:3, 174:20, 199:22, 233:7
**earn** [2] - 91:9, 173:14
**earned** [3] - 112:22, 161:18, 190:15
**earning** [1] - 106:12
**easier** [3] - 139:6, 233:10, 241:5
**easily** [1] - 228:7
**easy** [1] - 221:4
**economically** [1] - 222:13
**economy** [1] - 187:22
**Edgar** [2] - 12:6, 36:25
**editor** [2] - 16:4, 16:6
**educate** [1] - 138:11
**educating** [1] - 60:13
**education** [3] - 13:11, 18:16, 85:25
**Education** [1] - 222:3
**Educational** [1] - 16:5
**educational** [2] - 12:16, 13:13
**Edward** [1] - 215:7
**Edwards** [29] - 41:12, 41:13, 41:22, 44:24, 45:10, 46:5, 46:25, 47:25, 49:3, 50:22, 51:12, 55:14, 59:19, 172:13, 176:2, 176:3, 176:8, 176:9, 178:16, 178:24, 179:2, 179:19, 179:22, 181:12, 201:8, 201:10, 201:22, 201:24, 203:22
**effect** [5] - 105:11,

10

151:5, 153:3, 181:7, 191:18
effective [1] - 9:15
effectively [1] - 221:19
efficient [3] - 219:21, 220:25, 221:8
effort [2] - 184:18, 187:5
efforts [1] - 236:9
eggs [2] - 169:23, 170:4
eight [2] - 45:5, 45:6
EIN [3] - 9:9, 227:5, 228:10
EIN's [1] - 229:19
either [19] - 7:22, 14:16, 29:3, 43:3, 44:19, 94:4, 98:14, 106:6, 106:13, 114:20, 140:15, 171:12, 171:13, 177:2, 183:5, 193:14, 216:4, 224:14, 229:19
elaborate [1] - 20:23
elect [3] - 58:18, 154:9, 156:17
electronically [1] - 47:15
elects [1] - 153:22
emergency [1] - 171:21
emphasis [1] - 167:24
employ [1] - 209:20
employed [2] - 3:13, 209:15
employee [6] - 42:12, 132:14, 132:16, 132:17, 132:18, 152:21
Employees [1] - 132:11
employees [10] - 41:19, 41:24, 41:25, 42:8, 42:10, 132:15, 132:23, 180:20, 181:3, 207:19
employment [4] - 15:22, 15:24, 134:4, 148:6
enable [2] - 9:3, 151:3
encompass [1] - 23:22
encourage [1] - 218:17
encouraged [1] - 120:6
encouraging [1] -

218:25
end [16] - 38:19, 48:15, 66:2, 70:13, 80:15, 84:8, 98:15, 127:14, 144:12, 145:10, 146:18, 157:15, 164:8, 175:2, 178:7, 214:14
ended [3] - 139:4, 139:12, 139:24
ending [1] - 53:17
endorsed [1] - 91:17
engagement [14] - 30:8, 32:9, 32:11, 33:18, 40:16, 58:8, 66:10, 66:22, 67:23, 73:23, 75:12, 197:25, 240:3, 247:6
engaging [1] - 86:16
enjoy [3] - 60:11, 60:13, 60:14
enormous [1] - 174:7
enter [1] - 95:10
entered [1] - 9:6
entertainment [1] - 61:8
entire [7] - 17:13, 55:13, 55:16, 56:4, 145:4, 211:18, 233:22
entirely [1] - 105:5
entities [8] - 44:15, 97:15, 125:13, 209:3, 209:10, 209:12, 217:8, 218:12
entitled [2] - 1:11, 195:22
entity [14] - 7:19, 7:21, 23:10, 23:11, 84:4, 100:23, 113:19, 146:7, 147:25, 156:24, 160:24, 161:23, 190:11, 218:14
equal [2] - 158:3, 191:17
equally [2] - 101:14, 162:4
equities [2] - 20:8, 168:9
equivalent [4] - 166:22, 167:6, 168:4, 169:16
ERRATA [1] - 249:2
error [1] - 131:3
escrow [27] - 106:7, 106:8, 106:9, 106:11, 106:15, 106:19, 107:6, 107:8, 107:10, 107:12, 107:24,

108:9, 108:10, 109:17, 109:18, 109:19, 110:16, 112:13, 228:14, 228:19, 228:24, 229:9, 232:5, 232:10, 232:11
ESOP [1] - 132:14
Especially [1] - 79:6
Esq [1] - 1:4
ESQ [6] - 1:10, 2:8, 2:17, 2:18, 2:19, 2:21
ESQS [1] - 2:16
essence [2] - 89:6, 240:12
essential [1] - 191:22
Essentially [1] - 216:15
essentially [5] - 30:16, 67:20, 100:17, 172:25, 180:15
establish [1] - 151:17
established [2] - 60:2, 92:3
establishing [1] - 142:5
estate [33] - 23:23, 23:25, 24:12, 24:13, 30:7, 30:17, 31:15, 32:22, 32:24, 34:6, 34:19, 34:20, 34:22, 37:8, 37:13, 76:9, 81:22, 84:12, 84:15, 84:17, 84:20, 93:5, 93:6, 132:6, 132:9, 135:6, 135:11, 163:5, 168:9, 212:3, 216:13
Estate [1] - 131:22
estimates [1] - 144:10
et [3] - 219:2, 242:25
ethic [1] - 18:22
ethics [1] - 18:20
evaluate [1] - 9:4
evaluated [1] - 152:20
evaluation [3] - 66:15, 137:14, 207:11
evaluator [1] - 137:13
event [9] - 53:12, 73:18, 173:24, 184:24, 185:17, 190:14, 191:10, 194:15, 217:4
eventually [4] - 69:21, 154:13, 154:14, 176:24

evidence [2] - 9:19, 244:14
evolution [1] - 136:4
evolve [1] - 60:3
evolved [1] - 198:23
exact [3] - 131:2, 143:4, 176:7
exactly [9] - 17:11, 60:5, 81:4, 90:21, 101:21, 115:10, 129:7, 201:18, 204:21
exaggeration [1] - 105:12
EXAMINATION [5] - 5:7, 7:13, 201:4, 208:23, 246:5
examination [1] - 225:8
examinations [1] - 224:12
examine [1] - 212:12
examined [1] - 5:5
Example [1] - 90:16
example [3] - 65:3, 92:24, 188:8
examples [8] - 123:22, 148:5, 148:8, 148:10, 151:8, 159:20, 166:20, 216:7
exceed [1] - 173:14
exceeding [2] - 148:25, 186:24
except [4] - 34:24, 122:21, 130:5, 233:6
exception [5] - 21:19, 32:13, 32:14, 56:9, 169:18
exceptions [2] - 55:19, 114:14
excess [4] - 126:19, 148:24, 150:4, 169:13
Excess [1] - 148:5
excessive [2] - 174:5, 176:25
exchange [6] - 32:17, 39:22, 143:22, 177:21, 192:24, 215:20
exclude [2] - 110:19, 111:4
excluded [2] - 128:25, 188:4
exclusion [3] - 110:23, 183:21, 183:23
Exclusions [2] - 182:13, 182:14
exclusions [4] - 111:2, 128:24, 182:24, 190:3

exclusive [3] - 141:16, 152:5, 190:7
Exclusively [2] - 111:15, 111:16
exclusively [5] - 25:6, 32:10, 88:16, 151:21, 152:4
Excuse [3] - 57:24, 133:14, 182:15
excuse [1] - 63:4
executed [2] - 116:20, 116:21
Executive [1] - 44:21
executive [3] - 65:7, 65:10, 202:12
exempt [2] - 155:6, 168:10
exemption [1] - 84:8
exercise [1] - 110:21
exist [5] - 134:12, 220:22, 227:14, 236:6, 246:21
existed [1] - 185:25
existence [1] - 184:18
existing [2] - 127:23, 149:4
exists [2] - 134:11, 187:19
exit [12] - 162:15, 162:18, 197:14, 205:3, 205:4, 205:18, 206:6, 207:24, 208:5, 208:9, 208:13, 208:15
expand [1] - 76:8
expanded [5] - 97:5, 97:7, 187:16, 187:20, 188:11
expect [5] - 66:10, 119:20, 212:14, 214:9, 242:4
expectation [2] - 167:12, 213:12
expectations [1] - 79:12
expected [3] - 150:23, 164:5, 181:2
expenditure [1] - 80:10
expenditures [1] - 33:25
expense [4] - 61:6, 61:9, 155:12, 183:10
expensed [2] - 78:19, 158:12
expenses [5] - 51:17, 51:21, 61:4, 183:3, 183:5
expensive [1] - 213:7

experience [2] - 67:18, 115:6
experienced [2] - 89:14, 89:18
expert [6] - 25:14, 27:2, 88:12, 88:13, 88:25, 89:16
expertise [5] - 37:7, 93:4, 93:8, 168:17, 169:25
experts [2] - 88:18, 89:8
expire [1] - 84:8
Explain [1] - 104:20
explain [6] - 96:22, 138:18, 140:16, 180:12, 191:4, 193:21
explaining [1] - 85:14
explanation [2] - 160:11, 219:7
explanatory [1] - 237:2
explore [2] - 233:14, 241:8
explosive [1] - 183:14
extends [1] - 168:25
extensively [1] - 167:14
extent [8] - 48:11, 60:6, 99:17, 107:5, 137:10, 170:20, 202:16, 217:24
external [1] - 216:24
Extra [17] - 179:25, 180:14, 201:13, 201:17, 201:20, 201:22, 202:12, 203:22, 205:3, 205:8, 205:11, 205:12, 205:17, 206:4, 206:16, 207:3, 207:25
extractable [1] - 228:8

## F

face [8] - 36:5, 36:10, 36:11, 86:6
face-to-face [4] - 36:5, 36:10, 36:11, 86:6
facilitate [1] - 118:7
fact [5] - 41:15, 71:13, 72:12, 116:9, 242:12
factor [2] - 35:17, 79:19

factoring [2] - 205:14, 207:7
factors [3] - 64:7, 79:17, 81:3
facts [1] - 131:17
Fagg [1] - 98:17
fair [4] - 72:10, 86:11, 100:20, 198:8
Fair [1] - 180:5
fairly [2] - 175:25, 200:6
faith [2] - 149:14, 149:18
fall [3] - 52:2, 141:4, 182:23
fallout [1] - 183:9
falls [1] - 212:5
familiar [1] - 179:24
familiarity [2] - 206:18, 206:19
family [10] - 28:2, 32:2, 36:21, 36:23, 36:24, 37:19, 76:6, 86:14, 102:9, 131:25
far [10] - 9:20, 17:25, 36:12, 63:8, 103:25, 113:15, 162:10, 171:24, 197:11, 231:18
favorably [1] - 105:14
fax [1] - 11:16
feasibility [5] - 66:5, 66:11, 69:11, 69:18, 115:21
features [1] - 135:18
February [3] - 124:18, 125:17, 138:6
federal [1] - 14:16
Federal [1] - 153:25
fee [31] - 28:23, 29:2, 29:25, 30:2, 30:7, 30:13, 30:18, 30:24, 31:7, 31:17, 31:23, 32:3, 32:18, 33:3, 34:7, 39:15, 39:16, 57:20, 57:24, 58:14, 68:6, 77:15, 87:23, 108:21, 108:22, 109:4, 111:22, 111:23, 198:3, 207:13
feedback [2] - 111:5, 199:10
feeding [1] - 217:22
fees [28] - 29:16, 29:17, 30:21, 31:3, 33:17, 34:3, 39:5, 39:7, 39:8, 58:19, 77:16, 77:22, 77:25, 78:2, 78:3, 78:4,

78:12, 91:9, 91:11, 96:20, 108:12, 141:13, 141:19, 160:14, 203:23, 203:25
Feinstone [2] - 93:18, 93:24
fellow [2] - 146:4, 146:19
fellows [1] - 146:20
felt [2] - 68:17, 175:4
females [1] - 146:21
few [18] - 5:9, 5:17, 56:24, 73:15, 91:3, 92:2, 136:8, 141:17, 147:16, 151:13, 157:23, 171:16, 176:3, 180:14, 195:4, 199:22, 207:9, 239:19
fewer [1] - 52:19
field [3] - 9:24, 89:19, 194:24
fifteen [1] - 140:8
Fifty [1] - 232:6
file [2] - 53:25, 240:9
filed [2] - 15:5, 15:9
files [4] - 53:20, 87:3, 213:6, 220:3
filing [1] - 68:6
fill [1] - 73:4
final [3] - 72:5, 132:10, 159:24
finally [2] - 126:21, 127:13
financial [6] - 64:20, 67:9, 95:10, 112:7, 124:22, 194:12
finder's [2] - 39:4, 39:7
findings [1] - 205:23
fine [4] - 74:8, 81:17, 220:21, 239:22
finished [1] - 122:19
firm [43] - 15:10, 15:14, 17:2, 17:6, 17:12, 20:5, 24:22, 36:22, 36:24, 37:20, 37:23, 39:4, 39:17, 40:19, 42:7, 54:24, 54:25, 55:4, 55:21, 56:18, 56:20, 57:8, 75:8, 77:23, 82:4, 86:22, 91:7, 91:10, 101:24, 109:24, 110:10, 113:23, 120:13, 129:14, 136:17, 142:3, 142:4, 142:7, 169:11, 178:19, 212:19, 223:3, 223:25

Firm [3] - 23:21, 27:13, 57:11
firm's [5] - 61:5, 94:8, 96:16, 108:12, 214:23
firms [1] - 56:19
first [38] - 5:3, 14:9, 15:10, 15:11, 16:3, 16:10, 16:13, 18:25, 57:5, 57:15, 57:16, 57:17, 71:14, 74:21, 76:21, 86:10, 97:4, 97:17, 114:2, 114:14, 115:4, 119:21, 142:18, 143:20, 144:6, 146:14, 162:21, 163:11, 174:3, 192:2, 205:24, 208:12, 208:16, 213:24, 229:3, 236:16, 240:7, 240:17
First [4] - 14:10, 48:4, 184:25, 209:3
Five [1] - 199:25
five [8] - 16:25, 19:17, 26:18, 27:6, 27:10, 52:17, 74:12, 102:21
fixed [1] - 30:13
Flat [1] - 31:17
flat [3] - 30:7, 32:20, 87:23
flip [2] - 138:17, 139:21
Flip [1] - 138:18
flipping [1] - 150:18
Floor [2] - 2:9, 2:17
Florida [1] - 124:18
flow [7] - 107:5, 109:6, 115:10, 115:16, 141:24, 163:18, 200:6
flowing [3] - 115:17, 154:20, 154:21
focus [12] - 23:9, 23:22, 25:7, 25:9, 56:13, 64:3, 97:8, 104:17, 211:17, 237:23, 238:11, 238:14
focused [8] - 25:6, 34:19, 34:25, 37:5, 37:6, 54:5, 64:5, 211:25
focusing [1] - 64:16
fold [1] - 212:18
folks [13] - 27:6, 27:22, 27:25, 33:24, 36:18, 45:15, 54:3, 59:20, 77:17, 96:9,

170:3, 210:5, 240:4
follow [6] - 57:19, 61:24, 74:15, 181:19, 200:25, 201:7
follow-up [6] - 57:19, 61:24, 74:15, 181:19, 200:25, 201:7
followed [2] - 114:5, 125:12
following [7] - 16:12, 129:8, 135:4, 151:8, 177:10, 209:5, 249:4
follows [1] - 5:6
Foods [1] - 16:11
footnote [1] - 117:7
FOR [2] - 246:10, 247:4
force [2] - 167:20, 183:8
foregoing [1] - 248:10
foreign [14] - 53:10, 153:9, 153:11, 153:12, 153:13, 153:17, 153:19, 153:20, 153:21, 187:4, 188:15, 188:16, 189:10
foremost [1] - 86:11
foreseeable [1] - 84:25
forfeitures [1] - 18:11
forget [3] - 55:2, 55:4, 137:7
forgotten [1] - 123:13
form [15] - 8:6, 47:5, 58:10, 60:18, 61:13, 68:3, 73:22, 76:20, 122:19, 133:21, 142:3, 155:21, 156:16, 169:21, 228:7
Form [1] - 182:17
formal [7] - 33:2, 40:5, 44:8, 44:17, 45:14, 59:23, 236:23
Formalities [1] - 121:21
formalities [1] - 121:23
formality [1] - 100:20
formalized [1] - 115:22
formally [3] - 22:20, 75:17, 83:22
format [1] - 138:7
formation [2] - 197:12, 216:11
formed [6] - 77:9,

12

78:21, 119:17, 157:17, 162:19, 191:24
**former** [1] - 158:8
**formerly** [1] - 107:13
**forming** [1] - 141:20
**forms** [3] - 18:11, 184:11, 228:6
**forth** [8] - 124:9, 142:13, 172:11, 197:19, 236:23, 237:4, 237:11, 248:9
**forum** [1] - 90:24
**forward** [7] - 7:18, 12:17, 13:15, 15:23, 30:13, 156:13, 215:22
**Foundation** [4] - 14:24, 16:5, 82:10, 82:12
**foundation** [1] - 16:7
**four** [3] - 18:23, 128:24, 148:23
**fourth** [1] - 127:22
**frame** [3] - 26:25, 98:19, 205:9
**frames** [3] - 119:23, 120:2, 120:3
**franchise** [1] - 78:2
**frankly** [3] - 171:19, 212:25, 214:25
**fraud** [1] - 149:15
**fraudulent** [1] - 183:4
**Fred** [1] - 57:7
**free** [2] - 70:9, 200:25
**frequently** [2] - 114:5, 176:12
**Friday** [1] - 53:17
**friend** [1] - 102:9
**friends** [2] - 43:10, 82:5
**frivolous** [1] - 149:16
**front** [2] - 32:7, 32:23
**frustrated** [2] - 174:24, 174:25
**fuel** [2] - 183:11, 183:13
**full** [7] - 8:3, 8:5, 9:7, 10:5, 48:5, 55:2, 237:20
**fully** [3] - 9:16, 30:11, 157:18
**fund** [1] - 161:25
**funding** [1] - 161:5
**funds** [11] - 35:8, 79:20, 106:6, 107:6, 108:4, 112:8, 112:11, 113:11, 144:23, 163:23, 230:23

**FURTHER** [1] - 208:23
**future** [6] - 62:3, 84:25, 95:22, 150:24, 159:5, 173:13

## G

**gain** [1] - 79:12
**game** [1] - 180:5
**Gary** [2] - 74:22, 98:17
**gather** [2] - 9:2, 9:24
**gathered** [3] - 67:21, 244:10, 244:12
**General** [1] - 186:18
**general** [12] - 49:7, 81:23, 125:12, 129:9, 160:24, 167:11, 182:22, 199:20, 223:9, 230:17, 231:11, 246:21
**generalize** [1] - 48:19
**Generally** [1] - 76:18
**generally** [2] - 97:14, 114:16
**generated** [1] - 163:12
**generic** [2] - 64:10, 64:11
**gentleman** [1] - 57:12
**gentlemen** [2] - 56:25, 146:14
**Gentry** [15] - 10:21, 11:25, 12:6, 12:13, 12:14, 17:15, 19:14, 20:5, 23:21, 24:6, 35:23, 36:25, 107:13, 168:14, 169:11
**Gentry's** [1] - 41:14
**George** [1] - 54:15
**gesture** [1] - 103:4
**Giamarco** [1] - 55:3
**gift** [9] - 31:25, 84:7, 103:8, 103:9, 135:16, 136:11, 136:22, 137:8, 137:19
**gift's** [1] - 137:12
**gifted** [1] - 137:15
**gifts** [3] - 84:9, 136:15, 136:16
**given** [12] - 43:5, 43:11, 46:12, 46:19, 50:3, 75:11, 86:25, 89:22, 93:21, 175:9, 207:13, 248:11
**Given** [1] - 213:11

**GLK** [2] - 74:22, 240:7
**goal** [2] - 213:22, 214:20
**goals** [1] - 46:11
**governed** [1] - 24:19
**governing** [2] - 95:24, 237:3
**government** [6] - 17:23, 95:2, 129:10, 173:15, 187:8, 188:5
**Governors** [1] - 14:25
**Graduate** [1] - 13:3
**graduating** [1] - 16:3
**Grand** [1] - 54:25
**granted** [1] - 180:17
**grantor** [1] - 20:10
**grapevine** [1] - 91:2
**graphically** [1] - 159:15
**gray** [1] - 217:21
**great** [1] - 75:10
**greater** [1] - 48:14
**green** [1] - 143:20
**grew** [1] - 44:6
**grid** [10] - 99:25, 100:14, 104:15, 104:18, 105:10, 110:6, 110:10, 234:11, 234:17, 234:23
**grids** [3] - 100:6, 229:16, 235:6
**gross** [6] - 33:21, 34:17, 78:16, 135:11, 149:15, 231:8
**Group** [5] - 3:19, 44:21, 103:21, 142:25, 203:18
**group** [37] - 4:3, 4:20, 43:22, 44:12, 44:14, 54:14, 54:18, 59:5, 62:13, 73:2, 76:19, 97:17, 100:2, 100:17, 124:21, 125:3, 125:6, 125:11, 126:3, 126:5, 126:11, 126:13, 126:17, 126:18, 142:14, 146:9, 146:16, 151:4, 152:20, 152:22, 152:25, 159:23, 165:20, 176:9, 190:10, 192:20, 204:25
**groups** [7] - 54:10, 54:11, 125:4, 126:8, 126:16, 152:21, 204:22

**Groups** [3] - 124:15, 165:24, 166:7
**guarantee** [1] - 86:16
**guarantees** [1] - 171:18
**Guardian** [1] - 54:20
**guess** [12] - 4:5, 41:17, 77:7, 98:3, 120:19, 156:4, 205:24, 222:16, 222:19, 227:7, 234:2, 238:21
**guidance** [4] - 68:20, 86:22, 110:12, 167:21
**guide** [3] - 95:18, 139:10, 139:17
**guided** [1] - 168:11
**guideline** [1] - 158:6
**guidelines** [5] - 167:11, 167:17, 167:19, 177:10, 236:23
**guys** [2] - 219:15, 232:5

## H

**half** [13] - 21:15, 31:7, 31:17, 32:7, 32:20, 32:21, 32:23, 102:20, 119:6, 134:23, 176:18, 176:20
**Hamburg** [1] - 17:3
**Hamlin** [1] - 199:3
**hand** [1] - 47:9
**handful** [2] - 73:15, 171:25
**handle** [2] - 197:18, 222:6
**handled** [2] - 15:11, 176:13
**handles** [2] - 41:5, 105:21
**handout** [4] - 47:16, 48:5, 85:11
**handouts** [4] - 53:18, 53:19, 53:24, 82:13
**handwritten** [1] - 8:8
**happy** [4] - 73:4, 95:20, 138:25, 168:16
**hard** [2] - 123:4, 139:3
**hardcopy** [1] - 124:11
**Hardee** [7] - 44:24, 45:11, 46:25, 47:25, 49:3, 51:13, 59:20
**Hardee's** [1] - 46:5

**Harper** [1] - 159:7
**hazardous** [1] - 151:10
**head** [1] - 176:8
**headed** [1] - 54:14
**heading** [1] - 158:19
**headlines** [1] - 129:18
**health** [1] - 6:18
**hear** [2] - 6:19, 65:20
**heard** [3] - 65:4, 90:8, 95:9
**held** [23] - 1:11, 16:23, 25:7, 55:6, 57:18, 63:24, 76:5, 86:10, 97:13, 107:9, 112:9, 112:23, 113:11, 122:6, 145:3, 145:4, 159:7, 161:20, 163:23, 166:22, 209:10, 217:4, 217:5
**Helen** [1] - 16:4
**Help** [2] - 104:17, 119:7
**help** [3] - 23:16, 118:22, 211:2
**helps** [1] - 210:24
**hereby** [1] - 248:7
**hereinbefore** [1] - 248:9
**Heritage** [1] - 117:13
**Heritor** [7] - 102:11, 102:14, 116:25, 117:5, 117:9, 118:3, 120:12
**herself** [1] - 89:16
**high** [9] - 84:7, 86:11, 86:12, 133:17, 144:4, 147:18, 147:20, 167:4, 174:20
**higher** [3] - 77:11, 141:18, 167:2
**highly** [2] - 67:6, 173:13
**HILL** [4] - 2:22, 4:17, 201:5, 208:22
**Hill** [2] - 4:17, 246:8
**himself** [1] - 50:22
**hire** [2] - 106:3, 222:16
**hired** [8] - 29:11, 42:4, 74:24, 95:2, 96:2, 176:10, 206:13, 206:21
**histories** [1] - 64:8
**history** [9] - 13:14, 15:22, 17:20, 42:25, 67:11, 67:12, 144:11, 197:19, 199:19
**HMO's** [1] - 151:12

13

hold [8] - 10:14, 19:9, 19:19, 19:25, 106:6, 173:17, 187:10, 214:11
holder [1] - 75:9
holding [1] - 44:20
holidays [2] - 213:12, 215:18
home [5] - 10:16, 10:25, 11:2, 11:14, 11:17
Honestly [2] - 165:24, 208:2
hoped [1] - 60:14
Hopefully [1] - 239:18
horrendous [1] - 134:21
horrible [1] - 218:24
hospital [1] - 148:12
hospitals [1] - 88:20
host [2] - 82:4, 92:15
hosted [4] - 43:6, 44:2, 54:14, 54:23
hosting [1] - 46:13
hotels [2] - 19:20
hour [6] - 34:12, 34:13, 34:14, 74:6, 139:14
hourly [3] - 34:9, 34:10, 34:11
hours [5] - 18:18, 18:23, 40:25, 41:4, 63:19
house [2] - 15:11, 15:13
Howard [6] - 27:15, 28:16, 57:4, 195:10, 196:4, 197:3
Hubble [1] - 42:17
Huff [1] - 54:15
huge [2] - 129:18, 174:9
Huish [1] - 57:8
human [1] - 186:21
husband [1] - 36:25
Hydro [1] - 20:2

**I**

idea [6] - 46:14, 96:8, 114:16, 129:23, 193:24, 193:25
ideas [4] - 9:10, 56:6, 115:8
identification [4] - 80:23, 233:20, 235:18, 246:23
identified [3] -

101:18, 189:16, 231:20
identifies [1] - 70:2
identify [13] - 19:2, 26:10, 27:9, 133:2, 139:7, 140:21, 176:25, 181:11, 217:24, 219:21, 219:22, 220:4, 226:14
identifying [4] - 26:17, 81:4, 209:14, 225:21
identity [3] - 164:12, 193:6, 225:10
IDR [2] - 218:4, 219:14
ignore [1] - 144:5
illegal [2] - 15:19, 94:15
imagine [1] - 212:11
immediately [1] - 32:15
impair [1] - 191:12
important [2] - 134:15, 199:18
Important [1] - 121:21
impossible [1] - 129:4
improve [1] - 48:9
improvement [1] - 73:19
Inc [1] - 103:21
Incentive [1] - 132:10
incentive [5] - 132:16, 132:22, 133:3, 181:3, 207:19
incident [1] - 68:19
include [16] - 18:20, 31:4, 39:8, 47:9, 57:4, 67:17, 76:8, 81:21, 133:24, 134:22, 154:19, 187:20, 188:9, 198:4, 216:25, 239:14
included [10] - 21:22, 21:24, 33:17, 77:15, 77:16, 120:18, 184:8, 187:24, 187:25, 198:3
Includes [1] - 112:7
includes [5] - 7:20, 31:2, 57:25, 112:5, 186:14
including [14] - 12:22, 19:6, 37:9, 50:19, 51:4, 62:21, 77:23, 81:4, 104:16, 180:22, 180:24,

186:23, 200:17, 243:7
Including [1] - 19:10
income [12] - 14:13, 34:16, 112:21, 148:11, 149:15, 155:4, 155:5, 161:18, 170:25, 176:18, 189:9, 200:17
incomplete [2] - 223:10, 241:17
incorporating [1] - 135:5
incorrect [4] - 75:5, 130:20, 131:11, 177:8
increased [2] - 199:23, 224:3
incurring [1] - 80:5
incurs [1] - 144:21
indemnity [4] - 148:12, 148:13, 149:8, 149:9
independence [1] - 100:21
independent [8] - 40:18, 40:21, 40:22, 70:11, 74:25, 93:19, 98:6, 209:20
Index [1] - 247:2
indicate [3] - 141:23, 165:18, 177:11
indicated [9] - 34:15, 56:17, 57:20, 59:3, 92:14, 94:20, 102:16, 177:17, 223:2
indicates [2] - 124:15, 224:20
Indicating [1] - 153:7
indirect [1] - 8:20
indirectly [4] - 7:22, 216:5, 217:6, 218:8
individual [7] - 33:13, 75:17, 84:2, 84:4, 134:16, 187:3, 223:3
individually [3] - 91:17, 136:10, 144:14
individuals [6] - 44:14, 76:7, 86:11, 86:12, 187:3, 197:2
industry [1] - 190:17
influence [2] - 8:19, 187:7
informal [1] - 68:20
informally [1] - 83:23
information [38] - 9:2, 9:18, 9:23, 47:18, 64:20, 65:24, 66:23, 66:24, 66:25, 67:14, 68:4, 68:5, 85:15, 85:22, 110:18, 114:3,

114:7, 114:8, 115:3, 170:14, 181:22, 193:11, 193:18, 196:22, 198:12, 199:16, 221:23, 224:5, 225:7, 225:15, 225:18, 229:6, 231:15, 233:21, 238:22, 244:10, 244:12
infrastructure [1] - 186:22
Ingram [1] - 27:15
inhibit [1] - 6:19
initial [8] - 31:13, 43:20, 49:11, 73:23, 142:22, 161:21, 198:4, 198:7
initials [1] - 224:18
initiate [1] - 43:13
initiative [1] - 82:3
injunction [2] - 7:20, 9:25
injury [1] - 189:7
input [1] - 69:12
inside [1] - 166:16
insolvency [2] - 189:18, 189:24
Institute [4] - 54:22, 56:11, 124:17, 124:19
instructions [1] - 171:7
Insurance [14] - 21:19, 22:13, 54:20, 92:11, 121:20, 124:14, 147:24, 160:9, 167:16, 167:17, 182:20, 187:14, 188:3, 194:18
insurance [275] - 21:25, 22:5, 22:8, 23:10, 23:19, 24:2, 24:5, 24:7, 24:15, 24:17, 24:19, 24:25, 25:3, 25:8, 25:9, 25:12, 25:14, 26:4, 26:22, 28:12, 28:14, 28:18, 28:20, 30:3, 30:4, 30:6, 30:25, 31:4, 31:11, 31:13, 31:24, 33:17, 34:18, 35:19, 37:17, 42:25, 43:23, 44:3, 44:5, 44:16, 49:4, 49:15, 49:17, 49:20, 49:21, 49:22, 50:5, 50:7, 50:14, 50:18, 50:19, 50:21, 51:3, 51:5, 51:8, 52:4, 52:6, 56:2, 56:7, 56:19, 58:14,

59:11, 60:12, 62:18, 64:12, 64:17, 65:4, 67:2, 67:5, 67:13, 67:17, 68:13, 68:21, 69:23, 69:24, 71:15, 71:18, 75:7, 75:15, 76:23, 76:24, 77:5, 77:8, 77:13, 78:2, 79:21, 80:6, 84:3, 84:6, 88:6, 88:15, 88:17, 90:17, 90:20, 90:21, 90:23, 92:10, 92:12, 92:13, 92:15, 92:17, 92:21, 93:9, 93:10, 93:16, 93:19, 93:21, 94:21, 94:25, 95:3, 95:5, 95:19, 96:18, 97:8, 97:11, 97:25, 99:13, 99:14, 100:5, 100:8, 100:17, 102:3, 102:5, 102:12, 103:22, 104:12, 104:18, 105:10, 105:14, 105:23, 105:24, 105:25, 106:20, 106:24, 107:4, 108:15, 109:13, 110:8, 111:20, 114:10, 114:12, 114:19, 114:23, 116:10, 116:19, 116:20, 116:22, 116:24, 117:10, 117:19, 118:20, 119:8, 120:16, 121:19, 123:10, 124:21, 128:8, 128:21, 129:4, 129:7, 130:4, 130:5, 130:9, 130:10, 130:12, 130:19, 131:7, 131:13, 131:23, 132:13, 133:9, 134:23, 142:10, 142:23, 143:5, 143:16, 144:22, 150:5, 152:22, 153:22, 154:8, 154:16, 155:11, 155:14, 155:16, 155:19, 155:24, 156:2, 156:4, 156:7, 156:16, 156:17, 156:25, 157:7, 158:12, 158:13, 161:11, 161:14, 161:16, 166:11, 168:10, 168:13, 168:18, 169:3, 170:8, 172:11, 172:21, 172:23,

14

173:5, 173:9, 174:5, 174:11, 174:12, 174:21, 175:6, 175:18, 176:5, 176:12, 176:21, 179:12, 179:15, 179:16, 184:21, 184:22, 184:25, 185:3, 185:5, 187:18, 190:5, 190:15, 190:17, 190:20, 190:25, 191:21, 191:23, 192:18, 198:5, 198:10, 198:20, 198:21, 198:22, 198:24, 203:2, 203:3, 203:14, 204:22, 204:25, 210:14, 211:12, 212:4, 215:8, 215:13, 215:25, 216:9, 216:12, 216:16, 216:18, 217:6, 217:18, 218:9, 219:2, 220:10, 221:17, 221:22, 223:4, 224:2, 224:22, 224:25, 228:16, 246:17

**insure** [9] - 99:16, 100:24, 110:20, 111:11, 113:20, 130:6, 132:23, 133:16, 150:10

**insured** [21] - 90:22, 97:22, 98:3, 99:21, 100:3, 118:11, 118:13, 118:14, 131:11, 149:6, 171:12, 186:8, 188:14, 189:18, 189:24, 190:13, 190:19, 191:14, 193:2, 234:13, 234:19

**insured's** [1] - 131:5

**insureds** [1] - 229:16

**insurer** [3] - 97:21, 108:18, 151:11

**insuring** [3] - 111:7, 115:7, 192:19

**intellectual** [3] - 180:16, 207:10, 207:14

**intended** [2] - 218:21, 218:22

**intense** [1] - 175:25

**intent** [1] - 67:22

**intention** [5] - 79:14, 221:24, 222:2, 222:23, 222:25

**Interbank** [1] -

191:18

**interest** [21] - 19:3, 19:4, 19:9, 20:2, 20:11, 59:10, 67:4, 67:5, 96:5, 106:12, 144:18, 149:11, 177:3, 187:5, 191:17, 209:6, 209:7, 209:8, 209:11, 211:20

**interested** [3] - 15:24, 49:17, 248:14

**interests** [2] - 19:20, 215:3

**interject** [1] - 204:3

**intermediate** [1] - 97:21

**INTERNAL** [3] - 2:4, 2:8, 2:12

**internal** [2] - 97:16, 216:24

**Internal** [4] - 24:20, 25:2, 25:10, 158:8

**internet** [3] - 36:6, 193:22, 196:10

**interrupt** [1] - 211:10

**interrupting** [1] - 65:23

**interruption** [1] - 189:9

**interview** [8] - 5:14, 8:4, 8:7, 8:18, 9:23, 48:15, 244:25, 245:4

**introduce** [5] - 3:3, 3:6, 3:9, 85:14, 133:8

**introduced** [1] - 178:20

**introducing** [1] - 65:19

**introduction** [2] - 160:10, 178:18

**introductory** [1] - 197:20

**invalid** [1] - 186:13

**invest** [4] - 90:19, 132:15, 169:12, 170:6

**invested** [4] - 112:20, 160:21, 168:9, 207:2

**Investigation** [1] - 1:3

**investigation** [11] - 7:19, 7:20, 8:16, 10:3, 97:3, 194:3, 211:3, 231:16, 233:23, 241:23, 244:7

**investigations** [1] - 23:5

**investment** [11] - 113:10, 155:3, 167:21, 168:3,

168:16, 170:2, 170:16, 172:20, 205:13, 207:6

**investments** [14] - 19:7, 19:10, 167:9, 168:2, 168:18, 170:11, 170:13, 173:2, 174:6, 174:14, 176:13, 176:17, 176:21, 177:2

**investor** [3] - 19:19, 19:25, 167:24

**invitation** [3] - 54:9, 62:16, 63:14

**invite** [2] - 49:16, 82:2

**invited** [11] - 4:5, 43:15, 44:5, 46:3, 50:10, 59:3, 62:18, 95:22, 105:2, 124:24, 124:25

**invitees** [1] - 49:13

**inviting** [1] - 236:10

**invoice** [9] - 116:6, 116:15, 117:18, 117:22, 117:24, 117:25, 118:5, 118:8, 118:9

**invoices** [1] - 41:8

**involve** [4] - 22:5, 24:3, 50:13, 180:15

**involved** [29] - 8:23, 14:23, 21:3, 21:18, 23:11, 24:16, 26:21, 37:13, 37:24, 39:11, 94:3, 94:21, 96:9, 96:24, 97:24, 102:11, 105:24, 121:3, 128:16, 136:17, 137:10, 146:16, 167:3, 179:16, 179:21, 203:13, 204:15, 207:10, 224:24

**involvement** [10] - 14:19, 14:21, 21:23, 21:24, 67:13, 94:24, 97:7, 137:11, 170:21, 201:8

**involves** [3] - 93:5, 149:15, 212:4

**involving** [3] - 21:25, 159:17, 180:23

**IOLA** [1] - 107:11

**IRC** [1] - 154:4

**irrevocable** [3] - 31:24, 84:19, 135:9

**IRS** [12] - 1:3, 3:14, 3:24, 7:25, 20:19, 86:23, 87:8, 155:17,

173:20, 173:23, 173:25, 176:24

**Islands** [2] - 53:4, 95:14

**isolate** [1] - 231:2

**issue** [24] - 20:25, 21:18, 21:21, 26:3, 42:19, 90:2, 90:7, 93:5, 97:12, 116:17, 118:14, 119:16, 119:21, 148:24, 160:18, 169:21, 173:20, 175:18, 190:20, 191:13, 216:13, 235:12, 237:18

**issued** [21] - 31:11, 31:14, 69:20, 69:23, 100:5, 105:25, 115:24, 116:18, 118:9, 119:3, 119:12, 119:20, 119:22, 126:24, 130:20, 131:5, 161:15, 181:20, 191:19, 193:4, 195:2

**Issued** [1] - 116:8

**Issues** [1] - 2:5

**issues** [36] - 21:22, 21:25, 22:4, 24:4, 24:5, 24:25, 25:21, 26:7, 26:8, 30:5, 34:19, 37:13, 37:14, 43:25, 57:2, 62:21, 76:11, 87:25, 89:24, 90:12, 115:19, 120:11, 159:25, 160:22, 167:18, 169:16, 180:9, 181:10, 182:2, 182:6, 201:20, 206:20, 215:13, 216:8, 243:9, 246:17

**issuing** [1] - 149:4

**IT** [1] - 40:20

**Item** [2] - 190:12, 221:15

**item** [4] - 33:13, 230:15, 230:19, 233:19

**itemize** [1] - 230:21

**itemized** [1] - 58:7

**items** [1] - 241:17

**itself** [6] - 25:2, 39:23, 145:17, 152:6, 153:24, 230:24

**IVR** [1] - 86:25

**J**

**Jacobs** [2] - 17:9, 24:23

**Jade** [7] - 103:21, 104:2, 104:3, 111:19, 111:21, 111:25, 203:18

**January** [9] - 119:18, 119:19, 164:6, 213:19, 213:24, 214:9, 214:13, 214:14, 215:21

**Jarvis** [4] - 104:5, 113:9, 203:13, 203:17

**Jay** [1] - 57:7

**JD** [1] - 13:7

**JERRY** [1] - 2:12

**Jerry** [2] - 3:22, 4:20

**job** [6] - 16:3, 16:8, 16:10, 16:12, 16:14, 41:15

**John** [1] - 172:13

**Johnson** [1] - 27:16

**join** [1] - 99:12

**joined** [2] - 17:6, 17:9

**joint** [1] - 96:13

**jointly** [1] - 176:4

**Joseph** [1] - 112:21

**judgment** [1] - 134:21

**judicial** [1] - 141:16

**jump** [1] - 120:24

**junior** [1] - 94:19

**jurisdiction** [11] - 67:2, 68:2, 68:11, 68:14, 69:9, 95:21, 137:21, 160:3, 160:18, 160:23

**jurisdiction's** [1] - 68:3

**jurisdictions** [9] - 58:20, 58:21, 66:17, 67:7, 130:3, 160:13, 160:15, 160:19, 166:25

**Justice** [1] - 172:14

**K**

**keep** [4] - 35:4, 74:6, 164:11, 244:15

**Keith** [5] - 124:25, 125:24, 125:25, 126:11, 127:10

**Kentucky** [1] - 58:24

**kept** [1] - 109:22

LEX REPORTING SERVICE
800-608-6085

12/17/2012 12:24:32 PM

15

Ketchum [1] - 74:23
key [2] - 181:3, 207:19
Key [1] - 132:11
Khatchoui [1] - 36:17
kidnap [1] - 148:13
kids [1] - 31:25
kind [16] - 12:17, 12:18, 46:11, 64:14, 90:20, 114:13, 126:13, 128:15, 135:2, 157:13, 173:9, 181:6, 220:4, 222:6, 224:20
kinds [1] - 169:2
King [16] - 51:7, 172:12, 173:4, 173:19, 176:3, 177:7, 177:14, 178:2, 178:5, 178:7, 197:9, 215:7, 216:2
Kitts [19] - 30:25, 58:15, 58:18, 94:25, 95:3, 95:6, 95:9, 95:17, 95:24, 117:2, 117:3, 119:19, 160:8, 160:10, 160:21, 161:5, 161:17, 166:25, 168:20
Kitts' [2] - 102:12, 171:11
knock [1] - 62:4
knowingly [1] - 157:8
knowledge [5] - 7:4, 170:20, 191:22, 203:8, 243:15
knowledgeable [1] - 114:12
known [1] - 184:22
knows [1] - 93:20
Kovel [4] - 29:12, 39:9, 40:9, 40:11

**L**

Lad [1] - 16:11
Lane [1] - 2:9
language [1] - 192:11
large [4] - 88:19, 97:23, 132:2, 237:25
Last [2] - 42:17, 178:6
last [11] - 21:5, 26:22, 34:24, 57:7, 74:24, 83:4, 113:3, 126:22, 165:12,

202:6, 202:17
late [1] - 119:5
Latin [1] - 13:2
latter [2] - 37:7, 72:10
Laurence [4] - 102:22, 104:5, 113:9, 125:22
law [40] - 13:5, 13:6, 15:10, 15:14, 16:8, 16:9, 16:10, 16:20, 17:2, 17:6, 17:12, 18:2, 18:17, 20:5, 21:5, 24:5, 37:2, 54:23, 54:25, 55:4, 57:8, 77:23, 81:24, 82:4, 93:5, 93:7, 94:8, 95:5, 101:24, 142:2, 142:4, 142:7, 159:4, 160:12, 160:13, 167:20, 176:23, 181:10, 201:15, 214:23
Law [9] - 13:7, 13:9, 16:21, 23:21, 25:6, 27:13, 57:11, 83:8, 107:13
laws [2] - 83:21, 94:25
lawsuits [1] - 15:8
lawyer [6] - 15:12, 16:14, 24:22, 178:18, 223:24, 224:4
lawyers [8] - 42:19, 43:6, 43:12, 44:4, 55:21, 114:18, 195:5, 195:9
lead [1] - 160:13
leadership [1] - 14:20
learn [3] - 8:24, 62:8, 62:23
learned [2] - 57:2, 172:23
lease [1] - 42:10
leasing [1] - 37:9
least [10] - 79:23, 100:9, 165:19, 166:13, 176:2, 177:9, 191:17, 210:17, 225:2, 228:22
leave [1] - 46:22
led [1] - 129:24
ledger [2] - 230:17, 246:21
ledgers [1] - 231:11
left [5] - 16:18, 17:4, 17:10, 145:10, 146:5
legal [17] - 28:19, 34:18, 48:22, 76:6,

91:11, 93:3, 116:4, 116:20, 131:15, 151:9, 156:15, 159:6, 180:8, 181:6, 206:3, 237:3, 237:10
legalistic [1] - 214:22
legally [1] - 108:19
legislation [3] - 95:4, 95:18
legitimate [1] - 9:14
lengthy [2] - 73:9, 244:8
less [5] - 128:2, 158:2, 158:15, 174:19, 239:7
Less [1] - 162:13
letter [15] - 30:8, 32:9, 40:16, 58:8, 66:10, 66:22, 67:23, 75:12, 87:15, 175:3, 181:13, 240:3, 241:20, 241:25, 247:6
letters [4] - 32:11, 74:20, 197:25, 217:2
level [2] - 149:12, 216:15
levels [1] - 97:22
Levine [2] - 17:3, 41:23
LEX [1] - 1:21
Lexington [2] - 2:17, 10:22
liabilities [2] - 149:10, 149:19
liability [3] - 32:2, 104:4, 151:10
libel [1] - 108:20
license [19] - 18:8, 18:17, 31:11, 69:20, 115:24, 117:9, 119:20, 126:23, 127:14, 159:18, 159:24, 161:11, 161:15, 180:15, 180:16, 180:18, 180:23, 207:13, 208:8
licensed [9] - 18:2, 93:6, 102:3, 103:22, 113:18, 146:9, 153:21, 156:16, 162:11
licenses [2] - 17:25, 67:2
licensing [7] - 68:2, 68:11, 69:9, 77:25, 130:3, 137:21, 207:10
liened [1] - 134:22
lies [1] - 211:20
lieu [1] - 11:13

Life [4] - 54:20, 90:17, 92:13, 216:9
life [59] - 31:24, 43:23, 44:3, 44:16, 49:4, 49:15, 49:17, 49:20, 49:21, 50:14, 50:18, 50:21, 51:3, 51:8, 52:3, 52:6, 90:19, 90:22, 90:23, 92:11, 92:15, 93:9, 93:16, 93:19, 93:20, 96:21, 124:21, 168:9, 172:11, 172:20, 172:23, 173:4, 173:9, 174:5, 174:11, 174:12, 174:21, 175:18, 176:5, 176:12, 176:21, 179:11, 179:14, 179:16, 186:21, 187:23, 204:22, 204:25, 210:14, 215:8, 215:13, 215:25, 216:9, 216:12, 216:16, 216:18, 220:10, 221:21, 246:17
light [1] - 185:21
limit [3] - 143:22, 173:8, 212:7
limitation [1] - 214:23
limitations [1] - 97:6
limited [9] - 19:18, 19:19, 31:25, 32:2, 94:14, 98:15, 104:3, 202:16, 216:25
limits [4] - 106:5, 114:20, 117:17, 148:25
Lindberg [1] - 65:17
LINE [1] - 249:7
line [7] - 71:11, 138:15, 147:23, 148:9, 162:14, 244:16
lines [2] - 111:20, 116:12
link [1] - 102:13
liquid [3] - 161:20, 174:7, 174:21
liquidate [3] - 79:10, 79:15, 168:2
liquidated [1] - 168:5
liquidating [1] - 164:13
liquidation [2] - 163:7, 163:8
liquidations [1] - 79:10
Liquidations [1] -

164:9
liquidity [2] - 167:12, 174:14
list [38] - 9:8, 67:20, 80:10, 80:19, 80:22, 93:10, 93:13, 128:23, 194:10, 194:17, 200:20, 209:11, 223:11, 223:17, 223:20, 224:10, 224:13, 224:15, 225:22, 226:12, 226:19, 226:22, 227:5, 227:21, 228:9, 228:24, 229:10, 230:2, 230:9, 230:11, 230:21, 234:17, 234:21, 238:19, 242:9, 246:18, 246:20
listed [11] - 40:15, 100:3, 107:2, 116:6, 158:17, 159:19, 177:3, 183:21, 209:12, 239:24
listing [8] - 42:17, 54:2, 209:22, 223:6, 223:7, 229:24, 234:23, 236:10
literally [3] - 28:8, 43:3, 47:6
litigation [7] - 23:25, 34:6, 34:22, 37:9, 37:10, 37:12, 148:7
live [1] - 127:5
livelihood [1] - 225:14
lively [1] - 90:11
LLC [19] - 20:2, 134:8, 134:15, 134:18, 135:2, 135:13, 135:19, 141:9, 141:15, 142:3, 142:10, 145:14, 145:19, 163:16, 163:20, 163:22, 206:15, 207:4, 207:6
LLC's [2] - 19:24, 141:20
LLM [2] - 13:8, 16:24
Lloyds [1] - 126:20
loaded [2] - 94:7, 94:12
loan [2] - 171:11, 205:13
loaning [1] - 171:10
loans [4] - 171:15, 171:17, 171:18, 171:22
located [5] - 3:20, 3:25, 7:24, 19:22,

111:9
**location** [5] - 11:17, 11:18, 52:21, 54:12, 160:17
**locations** [2] - 52:22, 52:24
**lodging** [2] - 51:18, 51:22
**Loewen** [1] - 10:18
**log** [1] - 221:7
**logistically** [1] - 81:7
**London** [2] - 126:20, 191:17
**look** [15] - 71:7, 71:12, 74:19, 131:20, 149:21, 166:3, 172:8, 178:21, 185:12, 194:18, 198:12, 230:15, 239:25, 240:9, 244:13
**looked** [1] - 154:6
**looking** [7] - 95:10, 95:16, 121:17, 154:23, 182:12, 234:8, 235:16
**lose** [1] – 140:18
**loss** [19] - 64:8, 67:18, 101:12, 101:16, 106:5, 143:22, 144:11, 145:9, 148:11, 148:12, 150:8, 151:12, 183:2, 183:9, 185:20, 186:6, 191:11, 197:19, 198:11
**losses** [6] - 114:8, 128:2, 132:24, 144:21, 148:25, 186:24
**lost** [1] - 72:2
**low** [2] - 141:12
**lower** [3] - 58:18, 86:16, 167:2
**LTD** [1] - 74:22
**lunch** [2] - 74:5, 137:25
**luncheon** [1] - 138:3
**Lydia** [1] - 4:17
**LYDIA** [1] - 2:22
**Lynch** [3] - 94:9, 94:10, 94:14

**M**

**ma'am** [8] - 10:13, 36:20, 45:13, 145:16, 157:21, 164:4, 171:4, 185:11

**Madison** [2] - 12:24, 13:19
**Magazine** [1] - 42:18
**Maiden** [1] - 2:9
**mail** [10] - 11:22, 32:17, 36:12, 43:4, 64:23, 87:16, 173:7, 230:3, 230:5
**mailbox** [1] - 64:24
**mailing** [1] - 83:17
**mailings** [1] - 83:13
**mails** [14] - 83:23, 87:18, 171:25, 172:6, 173:23, 174:17, 175:7, 175:11, 215:6, 215:24, 217:2, 220:7, 230:9, 246:16
**main** [3] - 11:3, 15:4, 108:9
**maintain** [3] - 87:24, 93:14, 215:2
**maintained** [4] - 107:14, 109:13, 109:23, 167:5
**maintaining** [1] - 108:13
**maintains** [1] - 105:20
**maintenance** [2] - 87:22, 198:2
**major** [4] - 12:25, 52:6, 84:9, 94:9
**majority** [2] - 118:25, 192:13
**Majors** [1] - 172:14
**mal** [9] - 123:7, 124:2, 126:15, 147:23, 151:6, 151:7, 151:24, 159:17, 159:22
**malpractice** [17] - 62:17, 64:9, 71:18, 123:10, 125:8, 125:15, 125:16, 133:17, 142:23, 145:15, 154:12, 154:13, 154:16, 154:19, 159:25, 167:3, 185:2
**man** [1] - 54:14
**manage** [2] - 127:25, 197:19
**managed** [3] - 129:13, 129:14, 129:21
**management** [5] - 31:6, 37:25, 78:3, 100:21, 200:5
**Management** [1] - 102:11

**manager** [13] - 41:6, 41:14, 58:15, 69:14, 69:23, 102:12, 112:20, 114:23, 116:22, 116:24, 117:10, 117:20, 198:21
**manager's** [1] - 41:10
**managers** [5] - 31:5, 168:12, 198:5, 198:24, 203:18
**manages** [1] - 146:10
**Mancini** [2] - 54:23, 56:12
**Mandel** [3] - 178:20, 203:11, 203:15
**Manhattan** [1] - 3:16
**manual** [1] - 158:9
**Manuel** [2] - 27:17, 27:24
**MARK** [1] - 2:18
**Mark** [4] - 4:7, 109:3, 126:2, 196:7
**marketing** [10] - 43:21, 49:12, 60:20, 61:6, 61:9, 61:13, 61:14, 209:16, 222:5, 223:4
**markets** [4] - 129:6, 129:12, 152:8, 187:18
**marriage** [1] - 248:14
**married** [3] - 12:3, 12:7, 102:10
**Martindale** [1] - 42:17
**Mary** [3] - 4:14, 214:6, 238:17
**MARYANN** [1] - 2:21
**Massachusetts** [2] - 13:19, 14:8
**master** [15] - 99:25, 100:14, 104:15, 104:18, 105:10, 106:19, 109:18, 109:19, 110:6, 110:10, 229:16, 234:11, 234:17, 234:23, 235:6
**Mat** [11] - 27:13, 27:15, 28:16, 57:4, 195:10, 196:4, 197:2, 197:3
**match** [1] - 230:8
**materials** [8] - 9:3, 9:4, 121:6, 121:7, 210:12, 219:22, 221:16, 243:17
**Matter** [1] - 1:2

**matter** [2] - 32:15, 248:15
**matters** [5] - 30:17, 37:25, 44:2, 44:6, 76:10
**mature** [1] - 192:14
**matures** [1] - 200:5
**maximum** [2] - 154:18, 191:25
**MD** [2] - 135:11
**MD's** [1] - 134:20
**Meals** [1] - 61:8
**meals** [1] - 51:18
**mean** [21] - 10:3, 60:19, 68:10, 79:13, 104:24, 110:2, 127:18, 129:25, 132:11, 142:19, 148:13, 157:2, 161:9, 195:23, 205:10, 209:23, 211:9, 216:12, 219:25, 232:21, 234:10
**meaning** [2] - 92:11, 167:25
**means** [6] - 104:25, 143:21, 174:8, 204:21, 213:5, 217:22
**meant** [5] - 74:19, 155:15, 169:3, 169:4, 190:7
**meantime** [1] - 227:11
**Mechanically** [1] - 116:5
**mechanics** [2] - 104:22, 133:12
**mechanism** [1] - 170:5
**med** [9] - 123:7, 124:2, 126:15, 147:23, 151:6, 151:7, 151:24, 159:17, 159:22
**media** [1] - 87:13
**medical** [53] - 54:17, 59:12, 62:17, 64:9, 71:18, 123:9, 125:4, 125:5, 125:8, 125:15, 125:16, 126:13, 126:14, 127:9, 133:17, 142:21, 142:22, 142:23, 143:4, 143:6, 143:25, 144:22, 145:14, 145:16, 145:20, 146:3, 146:5, 146:16, 146:23, 148:2, 148:3, 148:22, 149:9, 150:6, 150:7, 150:10, 151:6,

151:9, 151:11, 151:15, 151:24, 152:15, 152:18, 154:6, 154:11, 159:17, 159:18, 159:22, 159:23, 159:25, 166:15, 167:3, 185:2
**Medical** [3] - 124:15, 165:24, 166:6
**medications** [1] - 6:23
**meet** [3] - 36:5, 36:7, 151:21
**meeting** [3] - 81:16, 210:25, 217:2
**meetings** [1] - 210:20
**member** [4] - 84:4, 204:16, 204:19, 204:24
**members** [11] - 36:21, 36:23, 36:24, 37:19, 68:23, 72:25, 104:4, 128:11, 144:14, 151:2, 194:19
**memo** [9] - 83:25, 136:9, 137:2, 174:2, 175:15, 203:21, 206:10, 236:8, 237:2
**memoranda** [2] - 197:23, 237:7
**memorandum** [5] - 181:9, 181:20, 198:2, 201:15, 205:22
**memory** [1] - 178:15
**memos** [3] - 206:2, 206:9, 217:3
**mention** [3] - 50:17, 149:23, 205:7
**mentioned** [24] - 14:4, 30:5, 34:25, 36:14, 41:18, 45:10, 46:3, 62:10, 69:25, 72:23, 76:4, 79:17, 82:23, 86:2, 86:19, 107:8, 136:8, 141:2, 197:24, 203:10, 207:4, 229:20, 237:7, 238:12
**mentioning** [1] - 110:16
**Merrill** [3] - 94:9, 94:14
**met** [7] - 60:25, 157:18, 173:10, 176:11, 185:14, 185:16, 201:9
**method** [2] - 64:13, 150:21

17

**Michigan** [3] - 54:25, 57:12, 127:8
**middle** [3] - 53:14, 139:20, 214:13
**might** [37] - 32:14, 48:8, 50:16, 53:10, 60:25, 65:3, 65:7, 66:12, 66:14, 68:18, 73:25, 105:4, 115:7, 115:8, 123:23, 127:2, 132:12, 132:22, 135:25, 136:10, 137:12, 139:6, 159:2, 163:15, 167:3, 182:3, 184:23, 215:16, 220:8, 229:15, 233:9, 237:17, 238:12, 240:22
**military** [1] - 183:8
**million** [4] - 80:16, 154:18, 154:24, 155:5
**mind** [3] - 14:18, 60:24, 106:14
**mine** [1] - 125:10
**minimalist** [1] - 225:17
**minimized** [1] - 132:24
**minimum** [4] - 137:11, 160:20, 161:13, 244:8
**minor** [1] - 36:11
**minority** [1] - 147:2
**Minority** [1] - 147:4
**minute** [2] - 74:12, 166:3
**minutes** [3] - 136:8, 217:2
**mirror** [1] - 134:3
**missed** [1] - 109:14
**misunderstand** [3] - 86:3, 105:8, 126:6
**misunderstanding** [1] - 96:6
**mix** [1] - 167:7
**mobile** [2] - 11:5, 11:13
**model** [2] - 153:2, 159:24
**modest** [2] - 71:14, 89:15
**modified** [1] - 184:5
**Mohn** [6] - 102:23, 124:25, 125:21, 125:22, 126:11, 127:5
**moment** [6] - 27:19, 55:11, 133:14, 159:13, 207:18, 212:16
**Monday** [1] - 53:17

**money** [11] - 9:12, 79:5, 79:18, 91:20, 107:16, 112:20, 115:10, 115:16, 141:24, 168:12, 186:11
**Money** [1] - 91:22
**monies** [5] - 106:18, 108:4, 112:19, 113:14, 171:10
**month** [2] - 120:8, 213:13
**months** [3] - 21:5, 119:16, 175:13
**Moore** [1] - 27:15
**Most** [2] - 67:6, 242:17
**most** [13] - 9:15, 27:7, 27:8, 58:17, 92:5, 112:19, 114:11, 190:4, 192:3, 198:13, 219:7, 220:25, 238:2
**mostly** [2] - 32:3, 199:7
**Mostly** [2] - 37:7, 122:22
**motels** [1] - 19:21
**motivated** [3] - 79:11, 79:13, 94:5
**motive** [1] - 60:10
**move** [8] - 7:18, 12:17, 15:23, 84:11, 127:15, 156:13, 159:10, 223:21
**moved** [2] - 24:24, 117:3
**movement** [1] - 176:25
**Moving** [1] - 91:20
**moving** [2] - 13:15, 95:20
**MR** [121] - 3:2, 3:22, 4:7, 4:22, 5:8, 6:9, 7:8, 8:13, 19:15, 21:7, 22:16, 25:22, 26:12, 29:19, 38:7, 38:11, 39:19, 40:8, 47:19, 47:24, 48:18, 48:25, 49:25, 52:20, 52:25, 59:22, 61:11, 63:17, 68:9, 71:24, 72:14, 72:19, 73:7, 78:7, 80:24, 81:17, 88:11, 89:3, 89:6, 89:9, 91:20, 98:18, 99:5, 108:24, 115:12, 117:21, 118:3, 119:10, 121:24, 122:15, 123:24, 124:3, 131:18,

138:16, 138:20, 139:18, 140:10, 140:13, 156:8, 157:2, 157:6, 164:19, 164:23, 165:3, 165:8, 165:14, 180:6, 183:19, 186:3, 188:19, 193:10, 194:2, 195:13, 195:18, 195:21, 196:3, 196:18, 201:2, 204:2, 205:20, 206:5, 206:7, 208:11, 209:25, 211:9, 211:16, 212:6, 212:9, 212:15, 213:11, 213:21, 214:16, 217:10, 218:19, 219:4, 219:18, 220:13, 220:24, 221:14, 222:10, 223:16, 223:22, 226:13, 227:6, 227:23, 228:4, 228:12, 228:17, 228:22, 232:23, 233:4, 233:13, 234:2, 237:6, 238:21, 239:22, 240:13, 241:7, 242:7, 243:4, 244:4
**MS** [121] - 3:17, 4:4, 4:10, 4:13, 4:17, 7:11, 7:14, 8:10, 25:24, 29:21, 33:6, 33:9, 33:11, 38:5, 53:22, 63:21, 73:25, 74:11, 80:18, 81:14, 91:22, 117:23, 119:13, 121:14, 122:4, 122:7, 123:4, 123:14, 123:17, 124:10, 137:24, 156:11, 157:4, 157:9, 164:21, 164:24, 165:6, 165:9, 165:16, 166:8, 166:10, 172:3, 188:21, 193:13, 193:16, 195:16, 195:19, 195:23, 195:25, 196:6, 200:19, 201:5, 208:22, 208:24, 211:14, 212:2, 212:8, 212:13, 213:9, 213:18, 214:5, 214:7, 215:17, 218:4, 218:7, 218:15, 218:20, 219:12, 220:7, 220:19, 221:10, 221:25, 223:19,

226:10, 226:17, 226:25, 227:13, 227:20, 227:24, 229:2, 229:18, 229:20, 230:4, 230:7, 230:12, 231:21, 232:3, 232:8, 232:13, 232:19, 232:25, 233:9, 233:19, 234:6, 235:7, 235:9, 235:10, 235:15, 236:15, 237:14, 237:17, 238:17, 238:25, 239:4, 239:11, 239:12, 239:18, 240:11, 240:14, 240:22, 241:10, 242:14, 242:18, 242:21, 243:14, 243:22, 243:25, 244:2, 244:6, 244:23, 244:25
**multi** [2] - 53:12, 210:21
**multi-day** [2] - 53:12, 210:21
**multiple** [2] - 21:22, 62:23
**multiples** [1] - 120:25
**must** [6] - 40:2, 123:6, 156:6, 158:2, 171:15, 184:17
**muster** [2] - 168:6, 174:15

## N

**NAIC** [4] - 167:15, 167:21, 168:6, 168:8
**name** [39] - 3:11, 8:3, 8:5, 9:8, 10:5, 12:5, 17:14, 17:17, 27:16, 40:23, 41:11, 44:17, 46:5, 52:3, 54:11, 54:15, 55:2, 55:5, 55:22, 56:15, 57:6, 57:7, 74:20, 98:12, 107:25, 108:2, 116:10, 117:12, 117:13, 130:18, 130:21, 131:5, 174:3, 178:19, 222:8, 224:17, 234:12, 234:13
**named** [12] - 15:14, 24:14, 27:13, 27:15, 27:18, 50:25, 54:15, 56:25, 57:12, 93:18, 102:8, 126:3

**namely** [1] - 173:12
**names** [8] - 12:11, 36:15, 46:6, 209:14, 229:5, 229:8, 229:24, 230:8
**narrative** [1] - 65:16
**narrow** [1] - 89:10
**National** [1] - 167:15
**national** [1] - 88:18
**nationals** [1] - 53:11
**nature** [7] - 8:19, 9:4, 20:24, 45:22, 83:24, 204:18, 230:18
**near** [3] - 111:9, 150:24, 174:25
**necessarily** [6] - 60:3, 75:17, 168:4, 199:7, 218:22, 232:20
**necessary** [10] - 49:24, 50:8, 50:9, 97:6, 140:11, 141:21, 155:12, 192:7, 192:21, 192:22
**need** [18] - 67:16, 73:19, 80:6, 80:20, 81:11, 81:12, 81:15, 93:3, 137:22, 153:18, 156:5, 169:8, 185:16, 192:23, 199:15, 215:22, 236:11, 239:7
**needed** [5] - 43:24, 73:5, 108:17, 114:17, 208:4
**needs** [3] - 93:16, 166:21, 167:5
**negative** [1] - 173:25
**negligence** [1] - 149:16
**Neil** [1] - 93:18
**net** [2] - 86:11, 86:12
**Nevada** [11] - 58:24, 141:9, 141:10, 141:11, 141:15, 141:17, 141:19, 142:10, 145:14, 145:19, 146:9
**never** [15] - 25:16, 60:24, 73:24, 88:8, 89:15, 111:3, 122:24, 153:3, 157:17, 179:11, 193:20, 204:24, 231:24
**Never** [1] - 108:7
**Nevis** [4] - 102:4, 102:9, 117:8, 117:9
**new** [6] - 36:7, 115:3, 148:10, 150:4, 170:16, 192:15
**New** [27] - 1:6, 1:14, 2:10, 2:18, 5:4, 8:2,

10:18, 10:22, 13:20, 13:22, 15:3, 16:13, 16:14, 16:22, 17:7, 17:9, 17:10, 18:3, 42:19, 54:19, 213:23, 233:7, 248:7

**newsletter** [1] - 229:22

**Newsletter** [1] - 65:17

**Next** [3] - 158:21, 210:11, 233:19

**next** [21] - 65:25, 66:21, 67:23, 71:11, 79:13, 84:10, 103:19, 137:4, 141:5, 147:23, 148:9, 153:4, 154:3, 155:6, 155:21, 160:2, 161:4, 162:14, 174:12, 213:13, 230:15

**night** [1] - 15:13

**Ninety** [1] - 19:17

**Ninety-five** [1] - 19:17

**Nobody** [1] - 217:19

**non** [10] - 147:23, 151:7, 151:24, 154:12, 154:16, 159:17, 159:22, 180:25, 227:18

**non-clients** [1] - 227:18

**non-malpractice** [2] - 154:12, 154:16

**non-med** [3] - 147:23, 151:7, 159:22

**non-medical** [3] - 151:24, 159:17, 159:22

**non-qualified** [1] - 180:25

**noncancelable** [1] - 190:13

**none** [1] - 100:8

**noninsurance** [1] - 23:20

**nontransferable** [1] - 130:13

**North** [4] - 2:6, 2:14, 3:20, 3:25

**NOTARY** [1] - 245:13

**Notary** [3] - 1:13, 5:4, 248:6

**note** [6] - 59:25, 60:8, 63:17, 191:4, 191:10, 191:19

**noted** [1] - 156:12

**notes** [7] - 8:8, 99:7, 171:17, 191:13,

193:3, 217:3, 241:12

**nothing** [1] - 168:7

**notice** [1] - 195:22

**notified** [2] - 99:10, 195:8

**notifying** [1] - 195:8

**nowhere** [1] - 174:23

**nuclear** [8] - 111:9, 129:3, 129:17, 183:8, 183:11, 183:13, 183:14

**null** [1] - 189:21

**Number** [3] - 182:24, 215:5, 236:20

**number** [27] - 10:9, 10:25, 11:3, 11:6, 11:16, 18:8, 65:8, 77:10, 77:11, 82:11, 86:12, 99:9, 105:15, 106:16, 124:13, 149:25, 157:24, 159:10, 160:4, 162:15, 162:16, 164:18, 172:8, 182:16, 199:23, 220:11

**numbers** [3] - 10:25, 11:10, 225:5

**numerical** [1] - 224:15

**NYU** [2] - 13:8, 16:24

## O

**object** [2] - 59:24, 156:9

**objected** [1] - 173:7

**objection** [1] - 156:12

**obligation** [2] - 143:10, 177:23

**obligations** [2] - 8:21, 116:4

**obtain** [2] - 9:7, 157:10

**obtainable** [1] - 152:7

**obtained** [2] - 207:12, 231:25

**obtaining** [1] - 161:11

**obvious** [2] - 216:10, 225:12

**Obviously** [6] - 26:13, 79:14, 196:6, 204:3, 217:14, 223:12

**obviously** [21] - 36:22, 41:18, 65:2, 89:13, 95:25, 97:9,

98:13, 101:9, 138:23, 138:25, 139:2, 146:15, 152:16, 195:14, 211:17, 217:10, 217:20, 222:4, 223:23, 224:3, 225:6

**occasion** [6] - 39:18, 40:13, 70:10, 91:24, 137:16

**Occasionally** [3] - 20:12, 82:22, 83:16

**occasionally** [6] - 39:10, 39:14, 59:9, 157:12, 202:10, 229:21

**occasions** [1] - 93:23

**occurred** [1] - 194:5

**occurrences** [1] - 191:11

**occurring** [1] - 73:18

**occurs** [2] - 61:23, 188:20

**October** [1] - 165:8

**offer** [6] - 23:13, 23:15, 153:15, 179:8, 179:9, 194:13

**offered** [5] - 179:11, 191:18, 193:10, 217:7, 218:11

**offering** [1] - 83:14

**offerings** [1] - 197:6

**Office** [3] - 3:15, 11:12, 22:24

**office** [13] - 4:2, 36:4, 37:24, 41:6, 41:10, 41:14, 118:5, 129:10, 198:17, 199:6, 199:10, 210:6, 231:23

**Offices** [1] - 107:13

**offices** [1] - 7:25

**offshore** [4] - 91:6, 91:19, 91:23, 160:24

**Often** [3] - 37:12, 66:19, 82:17

**often** [7] - 29:11, 60:16, 76:6, 76:7, 85:11, 168:15, 198:13

**Oklahoma** [1] - 58:25

**old** [1] - 213:6

**omitted** [3] - 48:8, 48:20, 149:15

**Once** [3] - 8:15, 118:6, 182:23

**once** [9] - 82:8, 105:3, 105:9, 120:10, 146:18, 148:3, 177:22, 190:9, 200:4

**one** [99] - 11:9, 12:22, 22:16, 22:17, 41:21, 50:23, 52:18, 55:20, 56:8, 56:12, 57:5, 64:3, 68:17, 69:2, 69:14, 70:5, 70:24, 70:25, 71:17, 71:20, 71:25, 74:21, 76:13, 76:14, 76:18, 79:17, 86:17, 90:16, 92:19, 97:10, 98:13, 99:25, 100:5, 100:17, 101:12, 104:10, 105:18, 108:5, 110:25, 111:8, 117:10, 118:21, 120:8, 122:21, 122:23, 123:24, 124:3, 133:18, 134:14, 134:20, 135:25, 140:24, 145:2, 146:4, 146:15, 149:22, 161:6, 162:19, 164:20, 165:3, 165:5, 169:18, 169:23, 170:4, 172:19, 176:9, 178:6, 180:17, 182:24, 186:6, 194:17, 195:11, 196:5, 197:4, 203:17, 205:8, 207:2, 210:9, 212:18, 212:23, 223:7, 223:13, 223:21, 224:7, 224:8, 226:19, 227:19, 229:19, 232:14, 234:4, 236:16, 238:12, 239:25, 240:7, 240:17, 240:19, 240:20, 242:14

**One** [8] - 9:6, 14:3, 52:17, 71:6, 148:15, 194:25, 205:2, 221:18

**ones** [11] - 51:9, 52:11, 53:2, 57:14, 64:9, 64:10, 73:2, 216:6, 242:19, 243:2, 243:7

**ongoing** [6] - 21:14, 21:16, 39:24, 77:22, 96:20, 216:12

**open** [5] - 90:24, 103:19, 139:4, 139:12, 139:24

**open-ended** [3] - 139:4, 139:12, 139:24

**opened** [2] - 22:3, 244:16

**operated** [1] - 19:21

**operating** [21] - 73:21, 75:13, 75:20, 75:24, 76:4, 76:12, 76:16, 76:21, 77:4, 77:18, 79:25, 80:12, 80:22, 206:14, 206:22, 207:5, 237:9, 237:12, 238:15, 246:24, 246:25

**operation** [2] - 159:15, 189:3

**operations** [6] - 64:6, 67:13, 78:22, 148:10, 183:7, 209:17

**opinion** [11] - 72:12, 73:5, 90:7, 181:5, 181:13, 181:15, 182:4, 203:20, 203:21, 205:16, 207:12

**opinions** [4] - 206:2, 206:10, 206:25, 207:9

**opportunity** [1] - 9:13

**opposed** [1] - 39:23

**opposite** [1] - 143:13

**option** [4] - 105:6, 110:21, 153:14

**options** [1] - 163:2

**order** [4] - 120:22, 120:23, 141:16, 157:9

**ordinary** [1] - 155:12

**organization** [5] - 54:16, 68:24, 98:6, 98:16, 113:14

**organizations** [4] - 25:8, 25:9, 25:12, 98:8

**organized** [1] - 194:24

**original** [4] - 121:9, 131:3, 144:22, 196:25

**Orlando** [1] - 124:18

**otherwise** [4] - 95:8, 187:25, 188:10, 212:7

**ourselves** [3] - 3:4, 3:6, 194:8

**outcome** [1] - 248:15

**outcomes** [1] - 9:22

**outline** [1] - 133:16

**outlook** [1] - 227:17

**outreach** [1] - 60:19

**outside** [5] - 16:11, 93:4, 93:8, 160:20, 190:10

**outstanding** [1] - 169:7

**oval** [3] - 146:14, 146:20, 146:21

**overall** [1] - 58:19

overly [1] - 48:24
own [19] - 17:4, 17:11, 20:16, 29:13, 47:18, 50:15, 70:9, 102:19, 103:2, 106:4, 106:11, 118:17, 118:18, 134:5, 142:3, 146:23, 150:7, 222:5, 236:2
owned [6] - 44:21, 76:6, 104:3, 132:2, 136:9, 172:24
owner [14] - 38:12, 75:18, 78:25, 79:3, 102:16, 107:15, 132:5, 132:7, 132:12, 144:12, 144:15, 145:25, 146:19, 163:21
owners [13] - 102:18, 141:7, 141:9, 142:2, 142:9, 142:10, 145:14, 145:19, 146:12, 162:24, 163:16, 171:10, 203:17
ownership [19] - 18:24, 19:3, 19:4, 67:4, 107:9, 133:18, 133:19, 133:21, 133:24, 134:16, 135:23, 141:24, 142:5, 142:15, 144:19, 147:14, 179:5, 209:7, 209:10
Ownership [1] - 141:25
owns [7] - 102:6, 104:2, 134:8, 142:10, 146:4, 146:5, 146:10

## P

p.m [1] - 245:6
package [1] - 47:18
page [10] - 155:6, 155:7, 155:9, 156:22, 158:24, 159:20, 165:13, 165:19, 191:9, 221:7
Page [9] - 123:2, 127:15, 148:18, 150:16, 151:8, 152:14, 159:11, 160:3, 161:6
PAGE [4] - 246:5, 246:11, 247:5, 249:7
pages [8] - 138:10, 138:17, 138:18, 140:8, 140:9, 140:11,

155:22, 165:12
paid [21] - 35:12, 51:19, 51:21, 51:22, 78:8, 101:7, 101:8, 101:9, 125:8, 128:2, 129:19, 143:24, 143:25, 144:24, 149:19, 155:13, 159:22, 161:23, 163:13, 164:3, 171:22
painless [1] - 214:21
Pan [16] - 100:22, 101:7, 101:23, 101:25, 102:2, 102:6, 102:13, 103:13, 104:8, 108:16, 108:20, 109:4, 109:8, 112:3, 236:2
paper [2] - 123:21, 124:8
paperwork [1] - 105:21
paralegal [3] - 34:14, 41:16, 171:8
paralegals [2] - 41:20, 41:21
Pardon [1] - 65:23
part [38] - 19:13, 35:7, 36:12, 40:21, 46:8, 55:2, 55:12, 69:17, 84:20, 87:21, 110:7, 128:13, 132:2, 135:10, 137:2, 144:2, 144:15, 150:12, 150:13, 155:25, 171:5, 171:14, 171:23, 183:6, 187:5, 187:11, 187:21, 198:6, 205:24, 206:8, 206:16, 212:17, 217:11, 228:21, 228:23, 235:20, 237:25, 241:22
part-time [3] - 35:7, 40:21, 235:20
Partain [1] - 4:10
PARTAIN [16] - 2:19, 4:10, 33:9, 123:4, 123:14, 124:10, 166:10, 172:3, 195:23, 196:6, 226:17, 229:2, 231:21, 235:10, 236:15, 237:17
partial [1] - 171:24
partially [1] - 79:13
participant [1] - 112:22
participant's [1] - 133:4

participants [7] - 85:3, 106:16, 149:25, 151:4, 151:16, 169:12, 193:6
participate [9] - 35:20, 43:18, 76:17, 105:2, 105:3, 157:13, 157:19, 207:20, 236:12
participated [2] - 43:7, 234:9
participating [1] - 29:5
participation [2] - 133:4, 236:10
particular [36] - 42:5, 42:7, 59:10, 64:5, 64:6, 64:7, 64:8, 69:15, 69:21, 84:11, 88:24, 90:3, 124:16, 131:19, 133:19, 139:5, 139:7, 140:14, 152:9, 158:25, 159:3, 161:6, 164:5, 165:17, 166:19, 173:9, 174:3, 175:22, 176:15, 176:19, 181:14, 182:3, 184:23, 186:14, 206:25, 225:24
particularly [6] - 37:8, 37:11, 93:17, 136:25, 182:13, 240:7
parties [7] - 57:23, 58:4, 77:23, 78:9, 194:14, 244:13, 248:13
partner [6] - 17:10, 19:18, 37:2, 38:20, 91:17, 112:14
partner's [3] - 34:12, 38:18, 38:21
partners [1] - 94:18
partnership [5] - 19:8, 19:19, 134:4, 206:20, 209:8
partnerships [4] - 18:25, 19:2, 32:3, 94:15
parts [1] - 210:17
party [10] - 31:2, 33:16, 57:25, 150:7, 193:5, 195:2, 199:2, 241:22, 242:4, 242:9
pass [4] - 68:18, 70:7, 168:6, 174:15
passed [1] - 63:12
passport [1] - 67:10
past [3] - 42:24, 211:21, 226:9

patient's [1] - 151:12
Patricia [1] - 40:24
pattern [2] - 199:21, 200:4
Patton [2] - 2:5, 2:13
pay [14] - 28:23, 29:3, 39:3, 39:16, 80:13, 101:16, 116:4, 142:3, 144:20, 145:9, 154:15, 166:23, 190:21, 191:25
payable [16] - 30:14, 31:6, 31:7, 31:10, 31:17, 31:19, 77:22, 78:6, 91:12, 91:13, 106:12, 145:7, 147:24, 147:25, 169:5, 191:15
paying [1] - 164:12
payment [11] - 39:8, 41:7, 106:22, 116:2, 118:14, 142:22, 143:12, 174:19, 180:22, 191:9, 192:5
payments [10] - 33:24, 39:21, 106:10, 109:17, 116:13, 118:2, 136:18, 156:18, 174:18, 230:16
payroll [1] - 80:8
pays [3] - 145:14, 145:17, 154:11
PBR [19] - 126:3, 126:10, 126:24, 140:25, 143:2, 143:17, 143:25, 144:6, 144:14, 144:17, 144:18, 144:21, 145:15, 145:17, 146:7, 146:17, 146:25, 147:3
peak [1] - 200:3
peer [1] - 90:13
Peer [1] - 90:15
penalties [3] - 23:5, 149:11, 181:17
penalty [1] - 9:25
pending [2] - 199:25, 244:20
people [32] - 3:8, 26:14, 44:22, 44:23, 49:13, 60:12, 65:13, 65:20, 65:22, 85:6, 85:12, 88:9, 90:10, 93:11, 98:10, 110:11, 111:6, 120:6, 127:11, 133:8, 136:9, 157:15, 168:16, 168:19, 169:22, 171:20,

195:4, 221:22, 222:7, 222:13, 222:20, 229:23
People [2] - 45:3, 162:20
per [7] - 65:15, 76:18, 104:19, 104:23, 108:14, 161:8
per-year [2] - 104:19, 104:23
percent [33] - 19:17, 24:8, 34:16, 34:17, 34:18, 38:12, 100:9, 101:9, 102:20, 102:21, 142:18, 143:20, 143:22, 144:4, 144:6, 144:7, 144:23, 147:5, 147:14, 147:22, 158:3, 158:11, 159:8, 166:24, 167:4, 168:21, 168:22, 168:24, 169:4, 231:7
percentage [13] - 19:3, 19:16, 20:2, 36:10, 101:5, 101:11, 101:17, 101:21, 103:2, 144:18, 147:19, 169:3, 200:8
percentages [2] - 147:5, 147:18
Perhaps [1] - 60:4
perhaps [2] - 57:17, 87:8
period [18] - 17:13, 27:4, 27:5, 27:8, 51:10, 52:13, 56:4, 77:2, 96:25, 97:8, 108:8, 119:15, 145:5, 161:19, 175:10, 192:6, 229:14, 244:8
periodically [1] - 242:8
periods [1] - 234:22
permit [3] - 161:16, 180:18, 192:5
permitted [1] - 207:20
permutations [2] - 180:14, 205:7
person [24] - 40:20, 41:2, 41:4, 44:13, 56:15, 61:2, 68:22, 73:12, 75:8, 75:24, 84:21, 109:24, 110:9, 183:2, 183:5, 183:6, 184:17, 187:4, 189:4, 189:5, 189:6, 210:3, 210:8, 235:21
personal [5] - 14:12,

20

67:14, 68:4, 76:9, 189:7

**personally** [7] - 7:18, 7:21, 23:12, 35:12, 86:21, 91:7, 91:10

**persons** [2] - 75:25, 209:15

**pertaining** [2] - 207:5, 246:22

**Peter** [6] - 74:19, 174:3, 175:3, 175:15, 175:23, 177:11

**phase** [2] - 133:18, 133:19

**Phase** [8] - 135:4, 135:14, 135:15, 135:21, 135:22, 136:4, 136:5

**phases** [1] - 140:24

**PHD** [1] - 13:4

**Phoenix** [1] - 57:9

**phone** [13] - 3:7, 4:13, 10:24, 10:25, 11:2, 11:6, 11:13, 11:14, 36:6, 43:4, 61:18, 64:23, 237:22

**phrase** [2] - 155:16, 155:17

**physically** [6] - 85:12, 105:21, 109:12, 109:22, 120:10, 123:16

**physician** [3] - 142:9, 161:8, 163:19

**Physician** [1] - 142:24

**physician's** [1] - 163:21

**physicians** [14] - 64:10, 125:3, 125:9, 125:16, 135:7, 141:8, 142:13, 143:6, 144:13, 144:16, 146:12, 146:13, 146:16, 146:19

**Physicians** [1] - 124:14

**picks** [1] - 61:18

**picture** [1] - 211:4

**pierce** [1] - 141:15

**pitch** [1] - 52:8

**place** [10] - 1:12, 14:8, 51:11, 97:20, 98:6, 125:19, 169:9, 194:22, 227:19, 241:6

**placed** [1] - 98:9

**places** [3] - 54:9, 58:17, 194:17

**Plains** [1] - 17:7

**plan** [8] - 31:12,

69:14, 69:18, 69:22, 73:20, 115:20, 137:2, 151:13

**Planned** [2] - 15:2, 82:9

**planned** [1] - 84:23

**planning** [17] - 23:23, 24:13, 30:7, 30:17, 31:15, 32:22, 32:24, 34:20, 76:9, 81:22, 84:13, 84:15, 84:17, 131:22, 135:6, 150:22, 212:3

**plans** [2] - 83:21, 152:12

**plateau** [1] - 199:24

**play** [1] - 154:5

**PLLC** [2] - 10:21, 19:14

**plural** [1] - 182:14

**plus** [2] - 162:10, 239:24

**point** [27] - 22:16, 22:17, 29:22, 60:9, 61:12, 61:14, 64:21, 66:20, 74:2, 106:18, 121:20, 127:22, 129:25, 130:21, 132:10, 134:7, 141:3, 141:14, 144:9, 148:21, 163:8, 163:11, 200:3, 212:3, 216:21, 223:19, 226:4

**points** [2] - 127:16, 160:7

**policies** [30] - 31:13, 67:18, 69:21, 71:12, 105:24, 107:2, 115:23, 115:25, 116:18, 118:21, 119:21, 119:22, 120:16, 129:2, 130:13, 149:4, 149:5, 161:16, 187:9, 190:2, 190:4, 190:6, 198:10, 198:16, 219:2, 229:15, 236:21, 236:22, 237:12, 246:24

**policy** [38] - 116:7, 119:8, 119:15, 120:11, 121:18, 122:25, 130:23, 131:13, 149:20, 155:8, 174:11, 174:13, 182:10, 182:11, 182:15, 182:16, 182:20, 182:22, 182:25, 184:3, 184:19,

184:21, 185:10, 185:15, 185:18, 185:23, 186:14, 187:7, 187:19, 189:12, 189:17, 189:19, 189:22, 190:10, 190:13, 190:20, 191:3, 200:16

**policyholder** [3] - 130:6, 130:8, 131:8

**political** [1] - 183:7

**pool** [35] - 31:6, 89:10, 96:5, 96:10, 96:13, 97:23, 98:24, 101:13, 101:14, 104:10, 105:4, 105:18, 105:20, 109:14, 110:18, 110:24, 111:20, 112:9, 129:6, 129:21, 151:5, 152:14, 152:24, 157:13, 159:16, 178:4, 193:7, 203:19, 224:23, 225:3, 225:24, 234:9, 234:10, 236:9

**pool's** [2] - 112:8, 112:10

**pooled** [1] - 151:15

**pooling** [2] - 98:2, 100:23

**pools** [25] - 62:21, 64:11, 96:22, 97:24, 104:6, 104:9, 104:13, 104:23, 105:22, 108:13, 109:23, 109:24, 111:13, 128:16, 129:13, 151:25, 152:5, 233:20, 234:5, 234:8, 234:15, 235:19, 236:5, 236:25, 246:23

**population** [1] - 187:6

**portfolio** [2] - 167:22, 173:15

**portion** [14] - 55:15, 58:5, 126:18, 132:19, 143:2, 143:4, 143:16, 143:24, 144:4, 151:17, 154:14, 166:21, 166:23, 191:15

**pose** [1] - 238:4

**position** [3] - 9:19, 149:14, 176:22

**positions** [5] - 90:10, 149:16, 149:17, 186:24, 209:18

**positive** [1] - 173:22

**possession** [1] - 188:23

**possibility** [1] - 163:9

**possible** [7] - 7:19, 9:22, 69:6, 77:3, 133:21, 214:21, 238:9

**possibly** [11] - 39:9, 44:21, 50:16, 68:8, 73:18, 77:11, 93:5, 95:14, 95:21, 103:5, 206:24

**post** [2] - 196:10, 196:12

**posted** [3] - 193:22, 196:13, 196:16

**postgraduate** [1] - 12:18

**potential** [7] - 94:4, 118:13, 126:23, 128:4, 130:15, 133:9, 241:21

**potentially** [4] - 63:7, 108:20, 216:18, 232:22

**power** [2] - 22:21, 22:23

**powerful** [1] - 125:7

**powerpoint** [11] - 47:8, 47:14, 48:13, 124:16, 133:3, 133:7, 197:21, 210:16, 219:5, 223:5, 242:19

**powerpoints** [3] - 47:10, 120:18, 122:12

**powers** [1] - 203:3

**practice** [37] - 17:5, 17:11, 17:16, 18:2, 25:5, 52:5, 54:18, 57:10, 93:6, 133:22, 134:6, 136:3, 136:6, 142:21, 142:24, 143:5, 143:6, 143:25, 144:22, 145:16, 145:20, 146:3, 146:5, 146:24, 147:14, 148:2, 148:3, 148:22, 149:10, 150:6, 150:7, 150:10, 151:16, 154:11, 159:19, 164:2, 166:15

**practices** [5] - 126:14, 148:7, 151:6, 152:16, 152:18

**practicing** [2] - 21:4, 94:8

**precedes** [1] - 135:14

**precondition** [1] - 161:10

**predators** [1] - 160:25

**predictable** [1] - 200:6

**predominant** [2] - 200:14, 200:15

**predominantly** [1] - 200:18

**preexisting** [1] - 226:21

**prefer** [1] - 224:8

**preferred** [1] - 11:11

**preliminaries** [1] - 5:10

**premium** [17] - 100:10, 100:12, 101:7, 106:10, 106:22, 114:21, 118:5, 142:22, 144:7, 155:5, 161:18, 168:23, 174:18, 190:15, 190:18, 190:21

**premium's** [1] - 170:25

**premiums** [50] - 80:12, 101:9, 106:5, 113:21, 113:22, 113:24, 115:15, 116:2, 116:4, 116:6, 116:16, 117:18, 118:14, 121:18, 122:25, 125:8, 125:17, 126:15, 128:2, 129:20, 131:7, 142:18, 143:12, 143:24, 144:3, 144:23, 145:3, 145:15, 145:17, 147:9, 154:12, 154:15, 154:19, 154:20, 155:8, 155:11, 158:2, 158:12, 158:13, 159:22, 166:12, 166:13, 166:16, 168:25, 169:5, 169:13, 186:4, 186:7, 216:15, 216:16

**Premiums** [1] - 185:17

**preparation** [1] - 110:8

**prepare** [3] - 47:16, 116:9, 170:17

**prepared** [8] - 47:22, 85:18, 93:13, 106:2, 138:24, 140:4, 166:2, 201:15

**preparers** [1] - 93:7

LEX REPORTING SERVICE
800-608-6085

12/17/2012 12:24:32 PM

preparing [2] - 41:8, 67:25

present [11] - 53:11, 54:6, 56:4, 56:20, 63:10, 77:3, 85:13, 97:4, 121:2, 134:10, 215:10

PRESENT [1] - 2:21

presentation [57] - 43:13, 43:14, 43:19, 46:9, 46:11, 46:13, 47:2, 47:4, 47:6, 50:11, 52:2, 52:14, 55:3, 55:12, 55:13, 55:16, 59:4, 59:5, 62:14, 95:23, 96:13, 120:24, 122:25, 124:12, 124:16, 125:12, 127:4, 133:7, 138:6, 138:12, 139:4, 139:9, 139:12, 139:25, 140:3, 140:12, 149:22, 150:13, 150:18, 150:21, 151:14, 152:10, 154:5, 158:18, 158:25, 159:11, 165:17, 166:9, 197:11, 210:17, 219:6, 219:8, 223:8, 242:12, 242:23, 243:16

presentations [34] - 43:5, 43:12, 46:2, 46:25, 49:7, 50:3, 50:13, 50:15, 51:11, 51:16, 53:20, 55:15, 56:3, 59:15, 59:18, 60:7, 60:10, 60:15, 60:18, 61:4, 81:19, 84:24, 92:16, 95:24, 121:4, 121:10, 145:2, 164:25, 210:4, 221:19, 223:9, 242:15, 243:12, 246:18

presented [11] - 54:8, 54:16, 55:15, 56:6, 56:13, 58:13, 96:8, 124:17, 126:7, 165:20, 165:21

presenter [2] - 51:7, 56:5

presenter's [1] - 47:17

presenters [4] - 50:17, 50:20, 55:18, 121:7

presenting [2] - 126:2, 211:2

Preservation [2] - 204:16, 204:20

preserve [1] - 174:21

preserving [1] - 174:13

presuming [1] - 211:11

presumptively [1] - 166:24

pretax [1] - 216:17

pretty [2] - 124:22, 162:10

previous [2] - 135:13, 173:5

previously [1] - 219:19

primaries [1] - 72:15

Primarily [4] - 47:10, 53:9, 59:7, 170:24

primarily [7] - 49:4, 49:20, 53:7, 70:25, 73:4, 201:12, 235:25

primary [25] - 21:10, 22:10, 50:23, 51:9, 57:14, 70:5, 71:2, 71:6, 72:22, 75:13, 75:20, 75:23, 76:12, 76:16, 76:21, 77:4, 77:18, 79:25, 80:11, 80:22, 98:13, 102:7, 102:11, 102:16, 108:18

prime [1] - 188:7

Principal [1] - 79:2

principal [5] - 19:13, 78:25, 98:16, 179:2, 182:7

principle [2] - 22:14, 45:11

print [1] - 143:20

priorities [1] - 80:10

private [5] - 62:15, 62:22, 63:14, 64:4, 66:13

privilege [9] - 204:10, 220:17, 220:20, 220:23, 221:7, 221:12, 225:10, 226:11, 226:14

privileged [1] - 221:3

privileges [1] - 148:12

pro's [1] - 66:18

problem [2] - 233:2, 233:17

procedure [1] - 47:13

procedures [9] - 197:24, 198:9,

198:14, 198:16, 198:18, 236:21, 236:22, 237:13, 246:25

Procedures [1] - 198:19

proceed [3] - 7:9, 66:7

proceeding [3] - 15:15, 159:20, 161:2

proceedings [1] - 20:20

proceeds [1] - 216:20

process [21] - 9:13, 28:21, 30:14, 30:15, 62:13, 64:22, 66:20, 67:24, 68:7, 69:17, 73:9, 73:10, 77:13, 77:14, 79:16, 86:21, 114:25, 127:13, 185:21, 185:22, 244:7

produce [5] - 46:8, 193:11, 218:3, 221:4, 223:13

produced [5] - 216:6, 219:18, 229:3, 229:11, 237:19

producers [3] - 44:4, 49:5, 49:20

producing [3] - 224:5, 225:14, 226:12

product [4] - 52:8, 179:14, 210:15, 218:10

PRODUCTION [2] - 246:10, 247:4

production [2] - 229:4, 237:21

Production [7] - 246:12, 246:13, 246:20, 246:21, 246:22, 246:24, 247:6

products [18] - 23:13, 23:14, 43:23, 44:16, 49:15, 75:7, 93:12, 176:5, 179:9, 179:10, 179:12, 179:15, 179:17, 211:8, 217:7, 218:10, 221:17, 246:14

professional [15] - 17:25, 18:16, 19:5, 19:13, 44:11, 44:20, 67:8, 112:20, 156:20, 157:16, 168:12, 181:23, 182:2, 202:9, 208:19

Professional [2] - 22:24, 74:22

professionals [6] - 44:13, 90:14, 90:15, 162:25, 194:11, 221:21

professor [1] - 16:20

profit [4] - 35:18, 127:23, 127:24, 167:13

profitability [1] - 79:24

profits [1] - 80:7

program [19] - 35:5, 35:9, 35:10, 125:2, 125:19, 127:12, 151:2, 179:24, 180:3, 180:7, 180:10, 180:20, 202:13, 203:23, 206:4, 207:21, 207:25, 208:5, 208:6

Program [3] - 13:4, 16:24, 201:20

Programs [1] - 207:3

programs [6] - 37:17, 86:17, 88:6, 205:16, 205:17, 205:19

progression [1] - 135:20

prohibit [2] - 130:4, 171:11

prohibited [1] - 168:7

project [4] - 42:6, 45:16, 228:24

projects [2] - 37:13, 182:6

promise [1] - 86:15

promissory [3] - 191:4, 191:9, 191:13

promote [6] - 9:11, 210:13, 216:5, 217:5, 217:23, 218:8

promoted [1] - 16:6

promoting [2] - 203:6, 218:17

Promotion [1] - 2:13

promotion [7] - 9:14, 94:6, 201:22, 209:16, 217:3, 217:15, 218:5

promotional [1] - 9:3

promotions [2] - 8:24, 8:25

promotor [1] - 218:23

Promotor [1] - 3:19

proof [1] - 67:11

properties [1] - 183:14

property [13] - 97:24,

128:14, 128:20, 128:22, 148:6, 151:12, 158:12, 180:16, 186:21, 189:8, 207:11, 207:15, 210:14

proportion [2] - 147:7, 147:8

proposal [1] - 115:4

proposing [1] - 173:10

proprietorship [1] - 75:19

prospective [4] - 59:5, 59:14, 64:13, 83:14

protect [1] - 134:24

protected [1] - 160:24

Protection [1] - 129:25

protection [7] - 130:15, 134:17, 135:3, 135:18, 141:13, 160:22, 193:2

Prothro [1] - 27:18

prototype [1] - 206:14

provide [35] - 9:17, 29:8, 40:2, 43:14, 46:7, 46:24, 64:15, 64:19, 68:5, 77:19, 86:22, 87:2, 87:13, 87:14, 87:15, 87:23, 98:24, 135:2, 137:18, 152:14, 162:22, 168:14, 181:3, 181:5, 181:21, 209:4, 209:11, 209:21, 210:11, 211:5, 212:14, 215:11, 224:9, 224:13, 236:7

provided [25] - 29:10, 33:8, 47:8, 95:13, 109:21, 115:4, 122:10, 122:14, 129:6, 129:7, 159:5, 189:23, 196:21, 196:24, 197:2, 204:14, 207:14, 210:5, 215:6, 221:16, 231:22, 235:8, 237:15, 240:4, 243:15

provider [6] - 31:3, 33:16, 92:11, 92:17, 92:22, 193:5

providers [6] - 31:5, 44:3, 58:2, 78:13, 92:10, 92:15

provides [3] - 152:6,

22

182:21, 234:11
  providing [4] - 29:6, 40:14, 77:17, 231:17
  provisional [1] - 161:15
  provisions [3] - 25:11, 133:25, 134:3
  prudent [1] - 167:23
  PUBLIC [1] - 245:13
  Public [3] - 1:14, 5:4, 248:6
  publically [1] - 20:8
  publications [1] - 194:21
  published [1] - 16:7
  pull [5] - 107:18, 124:7, 220:10, 239:2, 243:19
  purchase [1] - 79:20
  purchased [2] - 103:7, 180:19
  purchasing [1] - 116:12
  purple [2] - 142:20, 143:13
  purpose [8] - 8:17, 75:15, 123:8, 127:3, 133:6, 139:23, 170:22, 184:24
  purposes [4] - 97:12, 153:11, 154:2, 155:15
  pursuant [1] - 237:21
  put [9] - 96:5, 98:18, 120:22, 130:18, 153:3, 173:16, 174:11, 210:24, 218:22
  puts [1] - 162:10
  putting [3] - 81:7, 169:23, 170:4

**Q**

  qualifications [1] - 85:7
  qualified [4] - 155:14, 157:8, 168:14, 180:25
  qualify [3] - 97:11, 152:21, 155:19
  quarter [1] - 143:21
  quarterly [4] - 78:6, 87:23, 112:7, 198:3
  questionnaire [1] - 114:4
  questions [32] - 5:19, 5:25, 6:16, 6:20, 7:6, 7:16, 9:17, 9:20,

25:18, 25:20, 25:21, 26:2, 46:23, 62:24, 68:7, 68:10, 87:10, 90:22, 91:3, 123:21, 138:10, 138:13, 139:2, 145:14, 159:3, 182:10, 194:15, 200:20, 202:14, 209:9, 209:19, 244:24
  Questions [1] - 8:16
  quick [5] - 57:19, 74:15, 194:25, 208:25, 221:18
  Quick [3] - 35:8, 227:23, 230:21
  quickly [2] - 150:18, 171:22
  quite [9] - 74:21, 110:15, 167:14, 173:18, 174:24, 174:25, 176:14, 219:23, 220:5
  quota [3] - 101:19, 101:20, 143:3
  quoted [1] - 183:22

**R**

  Rachel [1] - 4:10
  RACHEL [1] - 2:19
  Radiation [2] - 184:9, 184:10
  radiation [4] - 129:3, 129:18, 183:9, 184:5
  radioactive [1] - 183:15
  radioactivity [2] - 183:11, 183:13
  raise [3] - 108:17, 182:5, 237:18
  rally [1] - 217:4
  Ramirez [5] - 27:17, 27:24, 28:13, 28:15, 29:9
  random [1] - 211:22
  range [2] - 80:14, 80:15
  Ransom [1] - 16:13
  ransom [1] - 148:13
  Rapids [1] - 54:25
  rarely [1] - 72:13
  rate [7] - 34:9, 34:11, 34:12, 126:19, 190:16, 191:17, 191:18
  rated [1] - 173:13
  rates [9] - 34:10, 34:13, 34:14, 70:6, 79:12, 126:22,

152:22, 155:4, 164:6
  rather [5] - 22:9, 84:10, 158:16, 195:7, 223:25
  ratio [2] - 101:10, 106:4
  Rauner [1] - 74:19
  re [1] - 171:22
  re-paid [1] - 171:22
  reachable [1] - 134:25
  reached [2] - 11:10, 130:11
  react [1] - 226:5
  reaction [2] - 173:25, 227:9
  reactor [1] - 111:9
  READ [1] - 249:7
  read [3] - 187:12, 191:6, 200:4
  readily [1] - 241:4
  reading [2] - 151:13, 191:8
  ready [2] - 66:7, 223:13
  real [6] - 23:25, 34:6, 34:22, 37:8, 37:12, 168:9
  realistic [2] - 213:14, 213:15
  realize [3] - 59:22, 211:16, 226:4
  Really [2] - 69:10, 198:20
  really [23] - 7:2, 43:8, 43:22, 71:10, 93:15, 93:22, 98:5, 121:25, 125:2, 129:23, 134:14, 135:22, 137:5, 137:9, 169:25, 188:8, 194:21, 196:20, 198:8, 208:18, 211:24, 215:13, 240:6
  reason [12] - 30:12, 71:6, 73:17, 111:4, 111:5, 150:20, 162:5, 169:24, 173:8, 178:10, 184:21, 208:5
  reasonable [2] - 167:12, 184:17
  reasoning [1] - 175:5
  reasons [6] - 6:18, 28:19, 71:5, 78:25, 134:17, 190:6
  Reassurance [2] - 98:14, 99:12
  reassurance [1] - 105:16
  rebutting [1] - 65:18

recap [1] - 169:10
  receipts [1] - 78:16
  receivability [1] - 205:14
  receivables [3] - 35:11, 170:11, 207:7
  receive [5] - 48:4, 59:17, 85:19, 166:13, 214:9
  received [24] - 48:12, 91:5, 91:10, 108:21, 120:19, 120:21, 129:20, 171:24, 193:20, 195:3, 195:15, 195:24, 195:25, 196:7, 196:25, 197:11, 210:16, 216:23, 230:16, 230:17, 230:23, 231:14, 231:18
  receivership [1] - 192:5
  receives [1] - 166:12
  receiving [1] - 241:20
  recently [3] - 17:14, 54:20, 122:21
  recess [2] - 74:13, 138:4
  recipients [1] - 109:20
  reciprocally [1] - 26:8
  recognize [1] - 122:24
  recognized [1] - 129:11
  recollect [1] - 7:5
  recollection [5] - 49:18, 73:16, 122:22, 165:21, 207:8
  recommend [1] - 97:19
  recommendation [1] - 72:4
  recommendations [3] - 70:8, 70:22, 129:9
  recommended [2] - 134:9, 194:14
  recommending [2] - 134:12, 136:24
  reconsider [1] - 115:3
  record [16] - 3:3, 4:23, 5:15, 8:3, 10:5, 63:22, 63:24, 78:15, 81:2, 122:3, 122:6, 122:8, 142:7, 168:22, 227:15, 248:10

recording [2] - 8:6, 41:9
  recordings [2] - 8:9, 8:14
  records [24] - 33:21, 35:3, 35:5, 35:8, 61:5, 61:7, 109:13, 109:14, 109:15, 109:20, 109:23, 109:25, 110:3, 110:5, 164:11, 209:5, 220:3, 223:5, 223:6, 228:11, 228:25, 231:18, 231:23, 232:24
  redacted [1] - 229:6
  redeemed [2] - 132:19, 163:5
  redemption [1] - 163:7
  redomicile [1] - 95:16
  reducing [1] - 125:7
  reductions [1] - 126:19
  reevaluate [1] - 115:2
  refer [8] - 92:9, 92:20, 92:25, 97:18, 124:9, 142:25, 168:16, 201:21
  reference [4] - 66:19, 67:9, 224:19
  references [2] - 159:4, 159:5
  referral [7] - 28:21, 29:2, 29:20, 29:22, 29:24, 39:7, 39:23
  referrals [1] - 29:17
  referred [7] - 28:12, 28:13, 28:15, 28:16, 62:8, 98:10, 182:4
  referring [5] - 48:22, 137:3, 204:22, 205:9, 208:3
  Refresh [1] - 178:15
  refresh [1] - 122:22
  refund [1] - 31:8
  refundable [3] - 30:11, 31:18, 186:8
  refunded [2] - 185:17, 190:18
  refuse [3] - 157:12, 157:19, 168:15
  regard [6] - 8:17, 201:7, 201:13, 206:3, 211:10, 227:14
  Regarding [1] - 201:17
  regarding [4] - 197:15, 203:22,

12/17/2012 12:24:32 PM

regards [3] - 201:12, 202:11, 205:2
regroup [1] - 138:2
regular [1] - 140:2
regulated [2] - 67:6, 167:10
regulation [1] - 145:3
regulators [7] - 31:13, 68:14, 68:21, 69:19, 167:5, 170:19, 171:16
regulatory [3] - 67:15, 167:8, 174:16
Reid [1] - 16:4
reinforcement [1] - 156:6
reinsurance [17] - 97:19, 97:20, 98:7, 100:16, 100:25, 101:7, 101:14, 104:6, 108:19, 125:14, 126:20, 142:16, 143:9, 143:10, 143:12, 143:14, 145:5
Reinsurance [4] - 100:22, 101:23, 103:21, 203:18
reinsure [1] - 101:2
reinsurer [3] - 103:18, 126:22, 143:23
reinsures [1] - 143:2
reinsuring [2] - 126:17, 143:16
reject [1] - 177:14
rejected [3] - 73:14, 175:4, 177:12
relate [5] - 50:7, 151:6, 152:18, 159:18, 211:24
related [42] - 22:8, 23:19, 23:20, 24:25, 26:2, 26:3, 27:25, 34:17, 34:18, 36:18, 43:25, 44:5, 46:22, 50:4, 81:20, 82:15, 82:25, 83:2, 86:2, 86:5, 89:22, 92:7, 107:3, 125:21, 133:18, 150:7, 151:7, 175:23, 182:11, 183:2, 183:5, 183:6, 184:17, 192:20, 200:8, 201:6, 215:13, 216:8, 228:9, 246:17, 248:12
relates [3] - 75:6, 141:7, 217:25

Relating [1] - 166:18
relating [19] - 44:15, 87:5, 90:3, 90:12, 90:23, 151:11, 169:16, 180:9, 204:11, 209:6, 211:7, 215:7, 215:12, 215:25, 217:3, 234:5, 234:7, 246:14, 246:17
relation [1] - 61:23
relationship [31] - 43:21, 44:8, 44:9, 44:10, 44:11, 45:17, 46:4, 51:12, 58:25, 70:5, 70:12, 76:7, 76:14, 86:13, 86:14, 93:17, 145:20, 157:16, 160:10, 175:2, 176:7, 177:17, 179:18, 181:24, 182:2, 190:8, 202:3, 202:9, 204:4, 204:6, 204:7
relationships [2] - 98:7, 157:20
relatively [1] - 199:22
relevance [1] - 154:10
relevant [1] - 175:4
relied [1] - 181:14
remain [1] - 22:3
remaining [1] - 31:10
remedy [1] - 141:16
remember [5] - 4:23, 44:25, 54:13, 94:2, 165:25
remind [1] - 242:3
reminded [1] - 242:6
remote [3] - 84:13, 84:15, 84:17
remove [1] - 192:23
removed [1] - 132:6
repayment [1] - 171:18
repeat [1] - 92:18
repetition [1] - 123:20
replace [1] - 135:12
report [1] - 135:12
reported [3] - 33:21, 33:25, 170:25
reporter [5] - 1:13, 6:12, 8:7, 63:18, 248:6
reporting [1] - 160:17
reports [1] - 129:10
represent [2] - 157:15, 170:8

representative [8] - 21:11, 22:9, 22:10, 22:14, 52:7, 217:9, 218:13, 243:20
represented [1] - 20:18
representing [2] - 21:8, 177:23
represents [2] - 24:7, 231:7
request [15] - 39:11, 45:24, 62:22, 66:5, 87:8, 170:14, 174:2, 175:23, 227:2, 227:4, 230:13, 239:5, 239:12, 241:11, 244:2
requested [12] - 9:17, 30:11, 48:9, 68:20, 87:5, 101:2, 137:11, 137:17, 158:9, 195:5, 234:3, 244:19
requesting [2] - 239:17, 244:18
requests [6] - 33:12, 35:25, 200:22, 209:2, 241:15, 244:21
REQUESTS [2] - 246:10, 247:4
require [3] - 64:15, 67:8, 160:20
required [4] - 99:18, 101:15, 128:13, 161:12
requirement [11] - 18:14, 18:15, 18:22, 106:17, 151:22, 155:19, 157:18, 160:16, 160:17, 168:21, 169:15
requirements [4] - 86:4, 97:10, 158:23, 173:11
requires [1] - 212:20
Research [1] - 20:3
research [10] - 24:18, 24:24, 25:8, 36:2, 176:10, 176:15, 180:9, 181:7, 181:21, 205:23
researched [2] - 43:25, 167:14
researching [1] - 201:19
reserve [4] - 166:23, 169:15, 169:17, 173:2
reserves [2] - 167:6, 169:8
residence [2] - 13:14, 67:11

resign [1] - 177:25
resigned [1] - 178:7
resolution [4] - 115:19, 172:17, 241:16, 244:20
resolutions [2] - 170:17, 170:19
resolve [1] - 25:20
resolved [2] - 89:24, 226:15
resort [1] - 126:22
resource [1] - 25:19
resources [2] - 142:14, 212:21
Resources [1] - 142:24
respect [6] - 140:5, 140:6, 167:20, 211:7, 237:24, 246:14
respond [3] - 35:25, 86:23, 193:17
responded [1] - 105:13
response [3] - 99:19, 173:22, 193:11
responses [4] - 6:10, 87:14, 87:16, 227:10
responsibilities [3] - 37:4, 37:23, 237:5
Responsibility [1] - 22:25
responsible [4] - 41:6, 144:20, 156:14, 198:25
rest [1] - 227:10
result [5] - 59:18, 144:12, 144:21, 146:18, 189:10
resulted [1] - 186:22
resulting [4] - 183:3, 183:6, 183:10, 183:16
results [2] - 128:4, 128:6
retain [2] - 137:13, 142:2
retained [2] - 108:22, 166:21
retainer [3] - 30:11, 31:7, 44:18
retention [14] - 54:18, 125:3, 125:6, 125:11, 126:3, 126:5, 126:8, 126:10, 126:13, 126:16, 126:17, 142:14, 146:9, 151:4
Retention [1] - 142:25
retire [1] - 163:4
retired [2] - 79:3,

132:18
retirement [3] - 133:25, 180:24, 180:25
retrieve [1] - 223:6
return [5] - 93:7, 126:18, 137:12, 170:9, 170:23
returns [8] - 14:13, 67:10, 67:19, 93:9, 136:20, 149:12, 170:7, 173:13
revenue [9] - 3:18, 3:23, 4:16, 4:18, 33:22, 34:17, 159:4, 231:7, 231:12
REVENUE [4] - 2:4, 2:8, 2:12, 2:22
Revenue [7] - 2:4, 2:12, 24:20, 25:2, 25:11, 158:8, 231:4
revenues [4] - 24:8, 158:3, 158:11, 231:8
review [10] - 68:7, 68:10, 70:12, 74:25, 110:17, 137:12, 170:7, 170:22, 201:14, 241:12
reviewed [2] - 114:22, 122:20
reviewing [2] - 171:6, 185:22
reviews [2] - 16:6, 198:4
revoked [1] - 22:22
REYNOLDS [60] - 2:4, 3:17, 7:11, 7:14, 8:10, 25:24, 29:21, 33:6, 33:11, 53:22, 63:21, 73:25, 74:11, 80:18, 81:14, 91:22, 117:23, 119:13, 121:14, 122:4, 122:7, 123:17, 137:24, 156:11, 157:4, 157:9, 164:21, 164:24, 165:6, 165:9, 165:16, 166:8, 188:21, 193:13, 195:16, 195:19, 195:25, 200:19, 208:24, 211:14, 212:2, 212:8, 213:18, 214:5, 218:7, 223:19, 229:18, 233:19, 234:6, 235:9, 235:15, 237:14, 238:17, 238:25, 239:11, 239:18, 241:10, 243:25, 244:6, 244:25

Reynolds [5] - 3:18, 5:18, 7:10, 213:25, 246:7
Reynolds' [1] - 47:20
rhyme [1] - 162:4
Richmond [2] - 4:15, 4:18
rider [1] - 174:20
riders [1] - 114:13
Risk [5] - 126:5, 142:24, 182:20, 187:13, 188:3
risk [85] - 31:6, 54:18, 62:20, 64:7, 64:11, 69:13, 78:3, 80:5, 96:21, 97:9, 97:16, 97:21, 97:23, 97:24, 98:25, 99:18, 101:2, 101:6, 101:11, 106:17, 108:20, 111:8, 111:12, 111:14, 113:20, 113:21, 113:24, 114:3, 115:15, 125:3, 125:11, 126:7, 126:10, 126:13, 126:16, 126:17, 127:25, 128:15, 128:16, 128:19, 129:12, 142:14, 143:3, 143:4, 143:11, 143:17, 143:19, 143:21, 143:23, 144:6, 144:11, 146:8, 150:8, 150:11, 150:12, 150:15, 150:20, 150:22, 150:25, 151:4, 151:17, 151:19, 151:20, 151:21, 151:23, 151:25, 152:4, 152:14, 152:16, 152:25, 155:10, 157:13, 158:2, 158:22, 159:8, 159:16, 167:3, 184:8, 184:23, 199:17, 200:5, 203:19, 225:20, 228:21
risks [13] - 66:15, 128:13, 129:5, 132:23, 148:6, 148:23, 149:5, 151:5, 151:7, 151:14, 151:21, 152:17, 155:10
road [2] - 139:20, 216:14
Robin [3] - 102:10, 103:3, 103:12

Roccy [2] - 57:12, 196:17
Rogers [2] - 16:14, 17:2
role [4] - 94:17, 96:16, 96:17, 136:21
roles [1] - 96:17
rough [1] - 114:16
route [1] - 241:9
routine [1] - 213:12
routinely [1] - 236:18
RPG [1] - 166:14
RRG [11] - 126:4, 126:24, 127:9, 133:17, 140:25, 141:7, 144:17, 151:2, 152:12, 159:23, 159:24
RTRIA [1] - 189:14
Rue [2] - 1:4, 8:5
RUE [2] - 1:10, 2:17
Rule [1] - 153:25
rule [5] - 158:5, 158:6, 158:7, 158:16, 158:18
ruled [1] - 149:18
rules [13] - 67:3, 153:5, 153:12, 153:19, 153:20, 155:6, 157:25, 158:22, 161:17, 167:15, 168:8, 171:11
Rules [1] - 168:7
rulings [3] - 155:17, 155:18, 159:4
run [2] - 74:22, 208:25
rushing [1] - 140:20
Rye [2] - 10:18, 15:3

## S

S-Corporation [1] - 20:6
safety [2] - 167:25, 173:12
salaries [1] - 38:24
salary [4] - 35:13, 35:14, 38:4, 38:10
Salary [2] - 38:3, 38:16
sale [2] - 173:5, 189:22
sales [1] - 173:6
salesman [1] - 92:17
sample [2] - 238:19, 243:20
San [1] - 54:24
sanctions [1] - 18:11

Santiago [1] - 40:24
satisfy [1] - 106:17
save [2] - 125:15, 126:14
saw [1] - 149:23
SB/SE [4] - 2:9, 3:19, 3:24, 4:15
scanned [1] - 232:2
scenario [4] - 131:19, 154:6, 163:7, 166:14
schedule [2] - 31:23, 32:4
scheduled [2] - 84:24, 217:5
schedules [1] - 120:7
school [5] - 13:5, 13:6, 16:8, 16:9, 16:10
School [5] - 13:7, 13:9, 16:21, 25:6, 83:8
schools [1] - 88:21
scope [4] - 46:20, 97:3, 231:15, 233:22
Scott [1] - 16:11
screening [1] - 68:18
scrutinized [1] - 158:14
se [1] - 65:15
Sean [4] - 51:7, 172:12, 173:18, 176:3
search [4] - 212:24, 219:9, 220:9, 221:5
seated [1] - 144:3
second [10] - 41:22, 71:17, 73:5, 90:7, 129:24, 133:15, 148:15, 224:10, 237:20, 240:19
secondaries [1] - 72:16
Secondly [1] - 213:2
secondly [1] - 81:6
Secretary [2] - 186:17, 186:18
Section [6] - 24:20, 145:3, 153:23, 182:13, 182:24, 184:15
sector [1] - 95:11
sectors [1] - 88:22
security [3] - 10:8, 167:25, 183:8
see [28] - 71:8, 71:10, 83:10, 99:7, 109:12, 121:15, 122:2, 124:7, 136:3, 136:4, 136:6, 141:7,

141:9, 150:19, 158:10, 171:9, 172:13, 182:22, 185:13, 192:23, 197:15, 197:25, 210:21, 215:14, 223:17, 230:14, 233:14, 241:8
seeing [4] - 33:7, 33:10, 66:9, 216:16
seeking [3] - 93:11, 173:19, 181:15
seem [3] - 168:6, 199:21, 211:23
select [4] - 70:19, 70:20, 86:5, 238:19
selecting [1] - 72:7
selections [1] - 170:2
selects [1] - 70:15
self [1] - 3:13
self-employed [1] - 3:13
sell [2] - 210:13, 221:23
seller [1] - 189:17
selling [2] - 49:15, 176:5
sells [1] - 204:25
seminar [1] - 217:4
seminar/webinar [1] - 85:4
seminars [10] - 49:19, 56:21, 81:20, 81:23, 82:11, 82:15, 82:16, 83:6, 86:3
send [18] - 28:5, 39:10, 41:8, 47:14, 52:7, 60:25, 65:7, 65:22, 65:24, 66:10, 106:14, 114:5, 117:8, 118:4, 174:2, 229:21
sends [1] - 29:14
senior [2] - 4:15, 12:22
sense [6] - 61:19, 86:24, 90:2, 222:12, 225:2, 225:5
sensitivities [2] - 224:4, 225:12
sent [7] - 28:19, 28:23, 78:13, 83:25, 122:15, 136:8, 173:7
separate [5] - 106:9, 125:6, 161:20, 232:9, 234:18
separately [1] - 81:10
series [1] - 191:11
served [2] - 179:9,

222:18
service [14] - 30:9, 31:2, 31:5, 33:16, 57:25, 87:22, 97:25, 98:2, 98:10, 168:13, 198:2, 210:15, 218:10, 222:8
SERVICE [3] - 2:4, 2:8, 2:12
services [23] - 23:13, 23:15, 23:18, 23:22, 24:4, 24:10, 29:6, 29:8, 29:10, 29:11, 30:21, 39:24, 40:2, 40:14, 76:9, 77:17, 87:20, 95:11, 95:12, 211:8, 217:7, 221:18, 246:15
Services [5] - 44:20, 63:6, 74:22, 117:13, 179:3
serving [2] - 22:9, 208:18
set [19] - 29:16, 29:17, 58:16, 79:23, 113:16, 113:18, 118:10, 137:20, 142:4, 142:6, 143:6, 167:9, 180:19, 201:24, 202:23, 202:24, 237:4, 237:11, 248:9
sets [1] - 190:8
setting [2] - 91:25, 203:14
setup [1] - 58:14
seven [4] - 3:4, 21:2, 232:24, 233:16
Seven [2] - 45:5, 45:6
Several [3] - 53:3, 53:5, 73:21
several [12] - 7:2, 19:20, 28:15, 48:12, 62:16, 67:19, 81:3, 86:20, 121:5, 155:22, 192:2, 205:7
severe [1] - 157:20
severed [3] - 177:18, 177:19
severity [1] - 144:11
shall [4] - 176:20, 189:20, 190:15, 190:18
share [10] - 37:4, 38:20, 58:5, 101:6, 101:19, 101:20, 103:2, 143:3, 144:20, 176:6
shared [1] - 58:6

shareholder [9] - 68:23, 84:3, 84:5, 102:7, 102:22, 162:4, 162:8, 163:13, 171:13

shareholders [11] - 68:24, 130:8, 134:19, 137:20, 144:17, 146:17, 146:24, 147:3, 147:6, 147:11, 147:16

sharer [1] - 147:19

shares [1] - 137:15

sharing [2] - 28:4, 28:7

SHEET [1] - 249:2

sheet [3] - 100:7, 170:9, 171:6

Sheila [3] - 102:8, 103:3, 103:12

shelter [2] - 94:5, 94:11

shelters [1] - 94:16

shifted [1] - 111:24

shifting [2] - 149:3, 150:16

SHLIVKO [24] - 2:8, 3:2, 4:22, 5:8, 7:8, 38:11, 48:18, 48:25, 52:20, 52:25, 72:14, 72:19, 73:7, 88:11, 89:3, 89:6, 139:18, 140:10, 186:3, 206:5, 227:23, 228:12, 228:17, 228:22

Shlivko [2] - 3:11, 246:6

shoes [1] - 210:6

shoot [1] - 213:22

shop [2] - 219:24, 219:25

Shoreline [2] - 165:24, 166:6

short [5] - 168:3, 171:17, 171:21, 190:16, 197:14

shorthand [2] - 1:13, 248:5

shortly [1] - 177:20

SHOULD [1] - 249:7

show [4] - 109:17, 125:5, 159:15, 161:12

showed [1] - 216:7

showing [3] - 133:21, 143:14, 163:21

shown [4] - 144:15, 144:25, 166:12

shows [4] - 35:11, 142:21, 231:11, 232:17

side [4] - 8:11, 39:8, 67:15, 67:16

sidetrack [1] - 81:11

sift [1] - 238:7

sign [1] - 147:12

signatory [1] - 107:19

signed [1] - 30:8

significance [1] - 140:19

significant [2] - 105:15, 170:16

similar [9] - 23:6, 26:6, 90:5, 115:7, 124:5, 125:19, 190:3, 238:3, 238:8

similarly [2] - 31:16, 55:14

simpler [1] - 138:14

simplified [1] - 48:9

simply [21] - 32:16, 73:20, 79:5, 98:10, 98:23, 99:15, 115:13, 134:18, 135:19, 138:17, 147:9, 153:16, 160:25, 177:3, 192:4, 194:23, 219:25, 221:4, 224:9, 224:14, 230:22

Sims [1] - 126:2

SIN [1] - 9:9

single [12] - 21:21, 44:13, 64:4, 76:13, 100:2, 147:4, 168:23, 194:21, 228:8, 232:11, 232:18, 234:17

sister [1] - 145:22

sit [2] - 106:11, 176:23

site [3] - 213:4, 213:6, 231:23

situation [11] - 46:18, 71:8, 87:9, 87:11, 90:4, 92:25, 100:15, 131:2, 158:10, 185:24, 192:3

situations [13] - 20:14, 32:16, 37:11, 39:21, 49:18, 65:6, 87:4, 90:9, 117:11, 132:3, 171:16, 182:3, 206:17

six [4] - 16:15, 16:18, 22:3, 28:18

slide [19] - 124:6, 133:3, 133:7, 133:11, 133:19, 135:4, 135:13, 139:23, 140:7, 141:5, 141:6,

145:12, 153:4, 154:3, 158:19, 158:21, 160:2, 161:4, 163:21

Slide [7] - 149:2, 149:3, 150:24, 155:2, 157:24, 162:16, 164:18

slides [10] - 47:16, 47:17, 47:22, 48:2, 48:7, 48:20, 121:10, 139:22, 246:12

Slides [1] - 48:21

Slightly [1] - 38:25

slightly [2] - 77:11, 124:5

small [28] - 3:12, 19:25, 25:9, 25:11, 25:14, 26:21, 32:15, 42:18, 55:25, 56:18, 79:6, 88:16, 88:22, 89:11, 95:19, 97:13, 103:5, 112:21, 131:24, 133:9, 144:17, 200:11, 200:12, 212:19, 214:23, 219:24, 219:25

Small [1] - 124:13

Smith [4] - 17:9, 24:23, 102:8, 102:17

social [1] - 10:8

sociology [1] - 16:6

software [2] - 35:5, 35:9

soil [2] - 188:22, 189:11

sold [4] - 57:9, 79:4, 132:18, 179:11

sole [2] - 75:18, 223:3

solid [1] - 137:14

Solutions [2] - 71:21, 75:3

solvency [1] - 191:12

someone [19] - 60:25, 62:7, 64:23, 65:3, 65:4, 65:18, 71:11, 82:2, 85:13, 88:24, 90:4, 93:18, 113:23, 126:7, 131:7, 184:23, 198:17, 205:5, 208:4

Sometimes [1] - 54:4

sometimes [6] - 60:16, 70:19, 76:10, 78:5, 106:21, 152:20

somewhat [1] - 139:11

somewhere [2] - 28:17, 150:15

son [1] - 125:23

soon [1] - 90:20

sorry [10] - 40:8, 49:25, 55:21, 57:6, 70:13, 71:24, 109:3, 109:15, 183:19, 196:3

sort [18] - 23:18, 60:8, 81:7, 81:23, 93:11, 132:13, 139:9, 139:19, 140:20, 166:22, 176:25, 180:24, 187:23, 214:22, 225:11, 226:3, 226:11, 227:21

sorts [3] - 114:16, 167:18, 169:16

sought [1] - 214:18

sound [3] - 136:23, 175:5, 222:22

sounds [1] - 96:4

source [4] - 114:2, 114:8, 114:14, 132:13

Southern [2] - 54:22, 56:11

space [2] - 26:16, 88:24

speaking [3] - 83:22, 132:8, 222:11

speaks [1] - 155:7

special [5] - 126:12, 148:5, 150:25, 159:16, 167:24

specialist [1] - 71:18

Specialist [1] - 2:13

speciality [2] - 24:3, 56:18

specialty [1] - 56:19

specific [16] - 52:3, 64:8, 70:23, 70:24, 87:10, 107:25, 109:24, 110:9, 121:17, 125:13, 138:10, 165:20, 168:17, 182:11, 197:22, 234:10

Specifically [2] - 126:10, 234:8

specifically [8] - 39:22, 66:3, 75:6, 125:10, 159:18, 187:24, 215:12, 246:17

specifics [3] - 55:11, 91:4, 172:22

specifying [1] - 30:9

spectrum [1] - 211:15

speculative [1] - 167:13

spelled [1] - 12:2

split [2] - 109:7, 111:24

spoken [2] - 202:9, 202:21

sponsor [1] - 52:6

sponsored [6] - 54:19, 54:25, 55:4, 63:6, 82:11, 188:6

spouse [1] - 37:22

spouse's [1] - 12:5

spread [1] - 100:7

SSN [1] - 228:11

St [22] - 30:25, 53:4, 58:15, 58:18, 94:25, 95:3, 95:5, 95:9, 95:17, 95:24, 102:12, 116:25, 117:3, 119:19, 160:8, 160:10, 160:21, 161:5, 161:17, 166:24, 168:20, 171:11

staff [4] - 47:12, 47:21, 209:18, 236:3

stages [1] - 150:23

stampede [1] - 164:7

standard [8] - 31:24, 87:22, 167:24, 184:20, 187:15, 188:12, 189:25, 191:20

standing [1] - 130:12

start [16] - 7:16, 12:16, 17:4, 17:11, 19:12, 23:17, 63:3, 71:22, 122:24, 133:12, 136:5, 142:20, 161:24, 175:9, 225:21, 225:25

started [6] - 16:24, 62:12, 94:8, 104:8, 112:25, 201:19

starting [4] - 13:15, 15:22, 112:16, 124:4

starts [2] - 123:25, 165:4

state [7] - 8:2, 10:5, 14:16, 127:7, 141:19, 155:23, 211:22

State [6] - 1:14, 5:4, 18:2, 167:17, 186:18, 248:7

statement [6] - 153:16, 155:3, 170:12, 189:16, 189:25, 232:18

statements [6] - 9:5, 67:10, 109:16, 112:8, 211:6, 246:14

states [3] - 19:22,

States [5] - 10:12, 186:19, 186:23, 187:6, 187:8
status [2] - 204:8, 204:9
statute [3] - 97:5, 141:13, 160:11
stay [3] - 79:7, 169:8, 181:4
stayed [1] - 178:10
steady [1] - 200:6
Steel [1] - 27:16
step [7] - 64:24, 64:25, 66:21, 67:23, 176:15, 177:4, 210:6
Stephanie [1] - 56:16
steps [1] - 77:14
Steve [2] - 44:24, 45:11
Stewart [1] - 57:11
Sticky [1] - 223:19
Still [1] - 175:15
still [20] - 64:16, 71:21, 108:19, 112:15, 112:17, 121:13, 147:20, 154:23, 175:14, 187:9, 187:14, 203:24, 212:10, 214:4, 227:2, 227:5, 230:13, 230:18, 235:25, 244:3
stock [8] - 84:12, 103:4, 132:15, 132:18, 134:23, 134:24, 163:5, 173:15
stop [2] - 66:20, 164:22
stopped [2] - 17:2, 45:23
storage [6] - 121:13, 213:5, 232:2, 232:21, 233:3, 233:12
strategies [8] - 162:15, 162:19, 197:15, 205:4, 205:18, 206:6, 207:24, 208:14
strategy [7] - 171:21, 205:3, 205:13, 206:16, 208:9, 208:15
Strazzeri [2] - 54:23, 56:12
Street [2] - 1:6, 7:25
strenuously [1] - 173:6
stretching [1] - 174:18
Streza [1] - 27:14

strictly [2] - 36:6, 208:19
Structure [1] - 111:21
structure [14] - 29:25, 30:2, 32:19, 34:8, 105:24, 111:19, 111:22, 125:17, 134:9, 136:5, 197:13, 207:5, 207:6
structured [1] - 68:25
structures [1] - 33:3
structuring [1] - 135:23
struggling [1] - 79:7
studied [1] - 14:4
studies [3] - 56:14, 61:25, 115:22
Studies [1] - 13:2
study [6] - 66:5, 66:11, 69:12, 69:18, 115:21, 189:12
stuff [1] - 219:15
sub [12] - 106:7, 106:9, 106:11, 107:8, 107:10, 107:24, 108:9, 109:17, 229:5, 229:9, 232:5, 232:10
sub-account [1] - 229:5
subject [17] - 31:8, 46:22, 65:9, 65:20, 66:8, 66:16, 72:11, 87:8, 112:18, 132:9, 175:25, 182:22, 193:18, 195:6, 198:7, 201:19, 219:14
submissions [1] - 198:5
submit [1] - 137:22
submitted [4] - 69:19, 117:19, 118:2, 119:18
submitting [1] - 41:7
Subscribed [1] - 245:10
subsequent [3] - 22:23, 119:22, 199:17
subspecialties [1] - 88:20
substance [2] - 169:21, 204:13
substances [1] - 151:10
substantial [2] - 125:16, 126:19
substantially [3] - 125:18, 126:15, 238:8
substitute [1] - 73:6

successful [2] - 132:21, 132:25
succession [1] - 76:11
successor [1] - 20:13
sued [1] - 15:14
suffers [1] - 191:10
sufficient [10] - 97:15, 98:25, 99:9, 99:17, 106:16, 151:17, 169:20, 192:22, 192:24
sufficiently [1] - 174:7
suggest [1] - 84:11
suggested [3] - 27:20, 56:22, 70:3
suggesting [1] - 136:10
suggestion [1] - 84:6
suggestions [1] - 174:17
suggests [2] - 116:16, 133:23
Suisse [2] - 113:11, 113:12
Suite [2] - 2:5, 10:22
summarized [1] - 155:20
summary [2] - 65:7, 65:10
summer [4] - 16:9, 16:12, 54:22, 62:17
summons [13] - 193:4, 193:9, 193:12, 193:22, 195:2, 195:7, 195:10, 195:17, 195:20, 196:25, 197:7, 214:12
supervise [1] - 35:24
supervisory [1] - 37:23
supplement [1] - 114:17
supplemental [1] - 80:6
supplementing [1] - 149:4
support [1] - 69:12
supporting [2] - 9:19, 209:6
surprised [1] - 222:17
surrender [1] - 174:8
Surrogate's [2] - 37:9, 37:12
suspect [1] - 242:23
suspensions [1] - 18:10

sworn [3] - 5:3, 245:10, 248:9

**T**

table [2] - 7:10, 8:12
tabs [1] - 109:22
tailored [2] - 95:18, 152:15
takeaways [4] - 121:12, 121:15, 210:22, 246:12
takers [1] - 105:9
talks [9] - 60:22, 121:19, 142:17, 153:4, 158:22, 160:2, 184:15, 190:12, 197:13
tangentially [1] - 50:16
tapes [2] - 82:20, 82:21
target [1] - 49:8
Tasks [1] - 164:17
taught [2] - 16:22, 60:13
Tax [5] - 2:5, 2:13, 26:2, 149:8, 155:6
tax [87] - 8:20, 8:24, 14:13, 23:22, 23:24, 24:5, 24:25, 25:8, 27:17, 28:16, 29:10, 34:5, 34:19, 34:21, 34:25, 35:10, 37:13, 43:25, 44:5, 59:7, 67:10, 67:18, 76:10, 81:20, 81:23, 81:24, 82:15, 82:24, 83:2, 83:15, 83:21, 84:7, 86:2, 86:5, 87:25, 89:21, 93:7, 94:4, 94:5, 94:11, 94:16, 97:12, 132:9, 136:14, 137:8, 137:12, 141:18, 148:11, 148:13, 149:9, 149:12, 149:19, 153:5, 153:10, 153:25, 155:14, 157:25, 158:18, 158:21, 163:6, 168:10, 170:7, 170:9, 170:23, 176:10, 178:22, 180:9, 180:22, 181:10, 181:14, 181:15, 182:5, 182:7, 200:8, 200:9, 206:20, 206:25, 208:19, 211:7, 216:5, 216:6,

216:10, 216:13, 217:6, 218:9, 246:14
taxable [4] - 84:20, 132:6, 136:16, 163:24
taxation [3] - 13:8, 154:9, 194:16
taxed [5] - 25:4, 102:4, 153:22, 155:3, 216:19
taxes [6] - 9:11, 86:16, 136:18, 136:19, 141:12
taxing [1] - 149:11
taxpayer [2] - 21:11, 22:14
teach [1] - 82:24
teaching [2] - 60:14, 82:24
Technical [2] - 2:5, 75:2
techniques [1] - 187:17
TELEPHONE [1] - 2:21
telephone [1] - 87:18
temp [2] - 42:4, 42:8
Temporary [1] - 41:25
ten [13] - 7:3, 14:25, 17:12, 17:13, 24:21, 26:22, 27:8, 42:24, 52:19, 95:14, 140:8, 147:5, 200:2
tend [6] - 65:21, 70:4, 70:8, 70:24, 80:9, 141:18
tentatively [1] - 214:8
term [12] - 94:7, 94:12, 118:22, 119:8, 119:9, 119:11, 121:16, 145:11, 168:3, 171:17, 171:21, 218:5
terminate [2] - 189:20, 208:7
terminated [1] - 204:7
termination [4] - 8:20, 69:6, 154:18, 202:8
terminology [1] - 75:5
terms [11] - 28:22, 88:9, 88:10, 112:18, 114:20, 129:19, 158:16, 182:22, 197:14, 210:17, 223:8
terrific [1] - 126:22
territory [3] - 186:24,

27

188:16, 188:24

**terrorism** [27] - 111:7, 111:14, 128:8, 128:12, 128:15, 128:19, 129:5, 129:6, 129:11, 129:20, 149:23, 150:8, 150:11, 150:12, 150:20, 151:19, 151:20, 152:16, 178:4, 182:10, 186:15, 186:20, 187:10, 188:5, 188:15, 188:17, 193:7

**Terrorism** [3] - 182:19, 187:13, 188:3

**terrorist** [4] - 128:22, 128:25, 187:9, 187:17

**testified** [1] - 5:5

**testimony** [2] - 248:8, 248:11

**Texas** [3] - 27:18, 53:5, 98:15

**text** [1] - 133:23

**THE** [50] - 6:13, 21:10, 38:13, 39:25, 40:11, 47:23, 48:3, 48:21, 50:6, 52:23, 53:3, 68:12, 72:9, 72:17, 72:24, 74:8, 78:10, 88:14, 89:4, 89:20, 98:20, 109:2, 140:9, 180:5, 180:8, 186:5, 196:9, 206:12, 208:17, 213:16, 222:3, 222:24, 226:23, 227:16, 228:2, 228:15, 228:20, 230:2, 230:6, 230:10, 232:6, 232:10, 232:17, 233:6, 235:13, 237:9, 240:16, 242:17, 242:20, 243:18

**theft** [1] - 15:12

**theirs** [1] - 59:10

**theme** [1] - 149:24

**themselves** [6] - 3:9, 99:14, 135:18, 222:15, 234:5, 237:10

**Therefore** [1] - 192:3

**therefore** [1] - 25:7

**thereof** [2] - 183:15, 194:16

**thereunder** [2] - 189:20, 189:23

**thinking** [1] - 110:4

**third** [14] - 31:2, 33:16, 57:23, 57:25, 58:4, 71:20, 78:9,

193:5, 195:2, 199:2, 240:20, 241:22, 242:4, 242:9

**third-party** [8] - 31:2, 33:16, 57:25, 193:5, 199:2, 241:22, 242:4, 242:9

**thoughts** [1] - 125:13

**threat** [1] - 216:8

**three** [22] - 12:21, 28:18, 34:24, 35:24, 36:14, 36:22, 38:23, 41:18, 53:13, 71:6, 72:21, 73:2, 74:20, 99:23, 100:13, 109:4, 109:8, 175:13, 191:16, 206:24, 238:13, 239:24

**throughout** [2] - 19:22, 194:12

**Throughout** [1] - 197:10

**thumb** [1] - 158:6

**tie** [1] - 49:21

**ties** [2] - 115:11, 127:21

**timeline** [3] - 59:2, 59:17, 214:3

**Timelines** [1] - 164:17

**timing** [3] - 118:20, 119:11, 137:5

**title** [4] - 41:15, 107:10, 112:24, 165:23

**titled** [2] - 161:14, 182:19

**Today** [2] - 7:23, 209:19

**today** [22] - 6:21, 8:16, 23:7, 27:9, 45:18, 103:16, 113:2, 209:9, 209:12, 209:24, 210:18, 211:18, 219:16, 222:5, 223:9, 226:6, 227:4, 239:10, 239:24, 241:14, 243:8, 244:11

**together** [6] - 47:17, 81:8, 125:14, 130:24, 133:23, 161:21

**Tom** [13] - 27:18, 172:12, 173:4, 173:19, 176:3, 177:7, 177:9, 177:14, 178:2, 178:5, 178:7, 197:9, 216:2

**Tom's** [1] - 175:5

**took** [1] - 222:17

**top** [4] - 26:18, 80:15, 181:13, 182:16

**topic** [7] - 46:19, 46:21, 55:23, 55:25, 64:4, 133:15, 218:2

**topics** [1] - 55:18

**Torregrossa** [1] - 248:5

**TORREGROSSA** [1] - 1:13

**total** [7] - 33:18, 45:6, 109:6, 144:18, 154:24, 161:22, 169:5

**totally** [2] - 123:12, 240:16

**totals** [1] - 100:9

**touch** [2] - 213:25, 240:17

**toward** [1] - 23:2

**traded** [1] - 20:8

**trainers** [1] - 221:20

**training** [5] - 209:17, 221:15, 221:20, 222:19

**transaction** [6] - 87:6, 163:2, 176:15, 177:2, 177:3, 177:5

**transactional** [2] - 23:24, 34:21

**transactions** [5] - 9:5, 41:5, 228:13, 228:18, 236:5

**transcript** [2] - 248:10, 249:5

**transfer** [4] - 13:5, 130:14, 189:17, 189:22

**transferal** [1] - 130:24

**transferred** [2] - 130:22, 190:10

**transferring** [1] - 91:19

**transfers** [1] - 109:18

**transition** [1] - 108:8

**translate** [1] - 76:13

**translation** [1] - 72:2

**travel** [2] - 51:17, 51:21

**Treasury** [1] - 186:17

**treasury** [2] - 194:9, 196:22

**treated** [1] - 152:24

**treatment** [2] - 154:9, 156:17

**treaty** [3] - 97:20, 143:15, 145:5

**tremendous** [2] -

212:20, 225:19

**Trevor** [2] - 102:8, 102:17

**Trevor-Smith** [2] - 102:8, 102:17

**trigger** [1] - 115:25

**triggers** [1] - 116:3

**true** [12] - 8:11, 29:8, 39:5, 59:6, 61:21, 79:22, 107:21, 119:24, 144:9, 175:20, 190:5, 248:10

**Trust** [1] - 145:4

**trust** [22] - 20:16, 33:4, 84:13, 84:16, 84:18, 84:19, 84:22, 100:15, 112:16, 112:18, 112:24, 113:7, 113:8, 132:8, 135:12, 135:17, 136:11, 145:8, 163:15, 163:23, 163:24

**trustee** [6] - 20:10, 20:13, 112:17, 236:2, 237:5

**trustees** [1] - 113:9

**trusts** [7] - 20:7, 20:9, 31:25, 92:3, 135:9, 136:12

**truthfully** [3] - 5:20, 6:20, 7:6

**try** [6] - 172:6, 194:4, 210:23, 219:21, 220:11, 233:18

**trying** [5] - 125:4, 134:10, 140:21, 215:2, 220:24

**turn** [3] - 7:9, 143:2, 215:15

**turned** [3] - 68:15, 69:3, 69:4

**Turner** [1] - 57:8

**twelve** [2] - 21:5, 119:15

**twenty** [2] - 52:17, 142:18

**Twenty** [1] - 140:9

**twice** [7] - 82:8, 104:13, 104:19, 104:23, 105:2, 196:17

**two** [35] - 13:4, 16:18, 17:5, 17:8, 23:19, 41:4, 41:21, 46:6, 53:13, 63:19, 71:19, 74:16, 79:9, 102:20, 104:9, 109:5, 109:8, 122:21, 125:13, 133:19, 133:22, 134:5, 135:6,

178:6, 197:2, 202:18, 202:19, 202:21, 206:8, 206:24, 212:18, 224:6, 234:3, 238:13

**Two** [2] - 41:3, 41:20

**two-fold** [1] - 212:18

**type** [15] - 24:19, 32:24, 42:12, 47:8, 48:20, 66:24, 66:25, 90:21, 92:21, 129:8, 139:20, 175:19, 200:15, 202:12, 229:22

**types** [9] - 24:9, 93:10, 115:7, 125:20, 128:24, 134:3, 151:5, 152:13, 200:16

**Typical** [1] - 164:17

**typical** [3] - 30:24, 80:11, 147:14

**Typically** [1] - 75:23

**typically** [6] - 46:13, 61:22, 80:13, 118:21, 118:24, 162:3

## U

**ultimately** [6] - 9:9, 9:11, 73:22, 147:10, 149:18, 173:3

**umbrella** [2] - 52:3, 126:6

**unclear** [1] - 156:4

**under** [26] - 38:25, 52:2, 87:11, 107:11, 110:12, 112:24, 126:6, 130:20, 149:20, 153:19, 153:23, 161:17, 163:8, 163:10, 163:20, 167:15, 168:6, 169:6, 177:4, 178:12, 178:13, 189:13, 195:7, 198:9, 199:4, 232:11

**Under** [2] - 159:23, 168:8

**undergraduate** [1] - 12:23

**underneath** [1] - 80:16

**Understood** [1] - 212:6

**understood** [5] - 5:25, 6:14, 26:20, 39:2, 88:4

**undertaken** [1] - 194:3

28

underwritten [1] - 152:23
unduly [1] - 167:13
unearned [1] - 190:18
unfortunately [1] - 147:17
Unfortunately [1] - 152:25
unique [1] - 152:14
United [5] - 10:11, 186:19, 186:23, 187:6, 187:8
universe [3] - 26:13, 62:25, 72:20
University [4] - 12:24, 13:3, 13:6, 16:22
unless [7] - 75:18, 81:11, 123:12, 153:12, 159:3, 163:24, 168:25
unwieldily [1] - 99:24
unwieldy [1] - 139:11
up [58] - 24:12, 32:7, 32:23, 57:19, 58:16, 61:18, 61:24, 62:5, 66:17, 70:18, 74:15, 74:19, 79:13, 80:17, 91:25, 109:7, 110:10, 113:16, 113:18, 114:5, 120:25, 124:8, 138:8, 138:11, 142:4, 142:6, 143:7, 143:22, 148:15, 154:14, 155:5, 161:24, 162:21, 167:9, 172:16, 172:18, 175:18, 180:19, 181:2, 181:19, 182:3, 185:20, 190:9, 197:22, 198:25, 200:25, 201:7, 201:24, 202:23, 202:24, 203:14, 205:18, 213:6, 215:20, 220:10, 222:4, 230:8, 242:3
updates [2] - 81:24, 83:15
upfront [3] - 31:17, 32:21, 77:15
US [18] - 19:23, 53:4, 53:7, 91:21, 102:4, 127:5, 128:14, 153:10, 153:22, 153:24, 153:25, 160:19, 160:20,

186:16, 188:12, 188:21, 188:23
useful [1] - 219:7
uses [4] - 49:17, 50:14, 50:18, 57:17
utilize [2] - 75:21, 232:5
utilizing [2] - 75:14, 79:8

**V**

valid [1] - 185:15
valuable [1] - 152:7
value [5] - 40:3, 103:5, 136:19, 174:12, 174:20
variations [1] - 205:12
varied [1] - 120:5
varies [2] - 112:12, 199:20
variety [2] - 136:7, 168:10
various [19] - 7:17, 26:5, 44:15, 50:18, 51:4, 58:17, 62:20, 77:23, 92:4, 97:22, 97:23, 100:4, 109:19, 119:3, 119:23, 120:2, 120:3, 180:21, 200:16
Various [2] - 78:25, 110:11
vary [4] - 100:11, 144:10, 160:22, 167:8
vehicle [3] - 97:25, 100:24, 222:19
verbal [1] - 6:10
verbally [1] - 87:14
verbatim [1] - 187:13
versa [1] - 28:24
versed [1] - 89:13
version [2] - 100:14, 158:8
VIA [1] - 2:21
viable [1] - 233:15
vice [1] - 28:24
video [2] - 8:9, 82:20
view [2] - 131:2, 141:14
views [1] - 182:4
violated [1] - 186:9
violent [1] - 186:20
Virgin [2] - 53:4, 95:13
Virginia [2] - 4:16, 4:19
vitae [1] - 85:10
void [3] - 130:14,

185:13, 189:21
voided [1] - 185:18
voids [1] - 130:23

**W**

Wait [1] - 197:8
Walk [2] - 59:2, 64:22
walk [6] - 113:13, 138:12, 155:8, 159:12, 160:6, 172:14
walked [2] - 85:24, 210:19
wants [2] - 62:23, 113:20
war [4] - 187:25, 188:4, 188:6, 188:9
warm [1] - 76:2
Washington [1] - 16:5
waste [2] - 151:9, 183:12
WATER [1] - 215:17
WATERS [41] - 2:21, 4:13, 212:13, 213:9, 214:7, 218:4, 218:15, 218:20, 219:12, 220:7, 220:19, 221:10, 221:25, 226:10, 226:25, 227:13, 227:20, 227:24, 229:20, 230:4, 230:7, 230:12, 232:3, 232:8, 232:13, 232:19, 232:25, 233:9, 235:7, 239:4, 239:12, 240:11, 240:14, 240:22, 242:14, 242:18, 242:21, 243:14, 243:22, 244:2, 244:23
Waters [1] - 4:14
ways [5] - 25:3, 135:23, 135:25, 180:21, 224:6
Wealth [3] - 127:17, 204:16, 204:19
wealth [4] - 127:18, 127:21, 128:3, 132:4
webinar [5] - 36:13, 62:14, 66:13, 85:13, 217:4
webinars [15] - 43:7, 62:11, 62:15, 62:19, 62:22, 63:2, 63:4, 63:5, 63:14, 64:3, 64:4, 81:18, 83:7, 84:24, 86:7

website [6] - 42:16, 65:16, 85:11, 85:20, 85:23, 196:19
weeds [1] - 211:21
week [4] - 40:25, 41:5, 53:15, 213:24
weekend [3] - 53:14, 53:16, 210:19
weekends [1] - 210:20
weeks [1] - 239:20
Weitzner [1] - 17:3
Wellesley [2] - 13:18, 14:7
Wells [2] - 16:14, 17:2
West [2] - 1:6, 7:25
western [1] - 19:22
White [1] - 17:6
Whitman [1] - 16:13
whole [5] - 62:13, 163:2, 173:17, 177:4, 210:25
wide [2] - 80:14, 136:7
willing [1] - 214:18
wind [2] - 62:5, 154:14
wire [3] - 106:10, 106:21, 109:18
wired [1] - 106:18
Wisconsin [2] - 12:24, 13:20
wish [2] - 110:20, 193:25
withdraw [2] - 22:20, 66:8
withdrawn [1] - 145:8
Witness [1] - 1:11
witness [1] - 5:3
WITNESS [51] - 6:13, 21:10, 38:13, 39:25, 40:11, 47:23, 48:3, 48:21, 50:6, 52:23, 53:3, 68:12, 72:9, 72:17, 72:24, 74:8, 78:10, 88:14, 89:4, 89:20, 98:20, 109:2, 140:9, 180:5, 180:8, 186:5, 196:9, 206:12, 208:17, 213:16, 222:3, 222:24, 226:23, 227:16, 228:2, 228:15, 228:20, 230:2, 230:6, 230:10, 232:6, 232:10, 232:17, 233:6, 235:13, 237:9, 240:16, 242:17,

242:20, 243:18, 246:8
witness(es [1] - 248:8
witness(es) [1] - 248:11
woman [1] - 102:8
women [1] - 42:19
wording [1] - 182:11
words [1] - 157:11
workable [1] - 226:7
works [3] - 30:16, 72:6, 96:24
world [1] - 26:15
worried [2] - 139:10, 140:18
worth [4] - 86:11, 86:13, 103:4, 132:20
wrap [1] - 215:19
write [7] - 65:16, 150:6, 161:16, 175:2, 205:15, 205:25, 206:24
writing [1] - 83:23
written [6] - 65:8, 65:12, 65:14, 69:23, 87:15, 181:5
wrote [5] - 181:9, 203:22, 205:22, 207:10, 207:11

**X**

X's [1] - 100:7

**Y**

Year [1] - 213:23
year [60] - 12:23, 14:3, 14:5, 15:11, 16:10, 16:12, 17:4, 27:8, 35:15, 38:9, 38:19, 38:25, 42:17, 71:11, 74:24, 76:22, 77:24, 79:9, 79:11, 79:13, 79:16, 80:17, 84:9, 84:10, 87:6, 87:7, 101:10, 103:19, 104:10, 104:14, 104:19, 104:23, 105:2, 110:22, 113:3, 118:22, 119:4, 119:5, 119:23, 132:15, 137:4, 164:4, 164:8, 165:10, 169:2, 171:3, 174:20, 178:6, 184:4, 184:5, 184:6, 199:20, 199:21, 201:10, 239:25, 244:9
year's [1] - 168:23

LEX REPORTING SERVICE
800-608-6085

12/17/2012 12:24:32 PM

29

**year-end** [1] - 38:19
**years** [46] - 13:4,
14:25, 15:23, 16:15,
16:18, 16:25, 17:6,
17:8, 17:12, 17:13,
24:21, 26:22, 27:10,
27:21, 27:22, 30:20,
42:24, 56:22, 65:18,
67:19, 71:19, 73:22,
86:14, 99:23, 100:13,
104:15, 104:19,
129:21, 129:22,
132:4, 169:19, 181:2,
191:16, 192:2,
198:22, 199:17,
199:22, 199:25,
202:18, 202:19,
202:21, 231:24,
232:24, 233:16,
237:16
**yellow** [1] - 154:8
**Yeshiva** [1] - 16:21
**Yonkers** [1] - 17:10
**York** [26] - 1:6, 1:14,
2:10, 2:18, 5:5, 8:2,
10:18, 10:22, 10:23,
13:20, 13:22, 15:3,
16:13, 16:15, 16:22,
17:7, 17:9, 17:10,
18:3, 42:19, 54:19,
233:7, 248:7
**young** [1] - 16:19
**yourself** [9] - 25:13,
27:2, 65:10, 65:12,
82:18, 88:5, 96:5,
172:12, 235:20
**Yvonne** [1] - 172:14

12/17/2012 12:24:32 PM