**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 9:21-82056-CIV-CANNON/Reinhart

| | |
|---|---|
| CELIA R. CLARK,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; THE INTERNAL REVENUE SERVICE,<br><br>      Defendants. | |

**UNITED STATES' RESPONSE TO PLAINTIFF CELIA CLARK'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF
<u>HER MOTION FOR SUMMARY JUDGMENT</u>**

    Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, the United States submits this Response to Plaintiff Clark's Statement of Material Facts in support of her Motion for Summary Judgment (ECF No. 129).

//

//

//

//

//

//

//

//

//

//

*Procedural Posture*

1. Undisputed. *See* **ECF No. 127**, Joint Statement of Undisputed Facts ("Joint Statement") at 12 ¶ 1.

2. Undisputed. *See* **ECF No. 127**, Joint Statement at 13 ¶ 2.

3. Undisputed. *See* **ECF No. 127**, Joint Statement at 13 ¶3 .

*Guidance Available to Taxpayers and Practitioners*

4. Disputed in part. *See* **ECF No. 127**, Joint Statement at 13 ¶ 4. Captive insurance companies are only entitled to Section 831(b) benefits if they meet the criteria of insurance for federal tax purposes. *See CIC Servs., LLC v. Internal Revenue Serv.,* 141 S. Ct. 1582, 1587 (2021) ("The Code provides the parties to such an agreement with tax advantages. […] But no tax benefit should accrue if the money is not really for insurance."). Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

5. Disputed. In response to Clark's interrogatory number 3, the United States identified statutes, cases, and administrative guidance available to Clark that defines insurance for tax purposes. **ECF No. 129-4**, U.S. Interrog. Resp. at 10-11. Guidance defining insurance for federal tax purposes has been promulgated by the courts since at least 1941. *See, e.g.*, *Helvering v. Le Gierse*, 312 U.S. 531 (1941). Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

6. Disputed in part. *See* **ECF No. 127**, Joint Statement at 13 ¶ 6. The United States identified IRS guidance in response to Clark's interrogatory number 3 that discusses the definition of insurance. *See* **ECF No. 129-4**, U.S. Interrog. Resp. at 10-11. Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

7. Disputed as incomplete. The full agreed fact is at **ECF No. 127**, Joint Statement at 13 ¶ 7.

8. Disputed in part. *See* **ECF No. 127**, Joint Statement at 14 ¶ 8. The unagreed portion of the fact is an improper and incomplete recitation of case law. Clark is trying to fashion case holdings as admissible facts. The cases set forth tests with required elements. Furthermore, the proposed fact attempts to creates an artificial difference between captives and other insurance companies when the question is the same: whether the company meets the four traditional criteria for insurance for tax purposes. *See, e.g.*, *Rent-A-Ctr., Inc. v. Comm'r,* No. 21627-10, 2014 WL 128000 (T.C. Jan. 14, 2014); *AMERCO & Subsidiaries v. Comm'r*, No. 4330-89, 1991 WL 4981 (T.C. Jan. 24, 1991), *aff'd,* 979 F.2d 162 (9th Cir. 1992); *Securitas Holdings, Inc. v. Comm'r*, No. 21206-10, 2014 WL 5470747, at *7 (T.C. Oct. 29, 2014); *Harper Grp. & Includible Subsidiaries v. Comm'r*, 1991 WL 4980 (T.C. Jan. 24, 1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). The outcomes of cases are appropriately discussed in briefing, not in a statement of material facts. Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

### *Clark's Firm's Practice*

9. Undisputed. *See* **ECF No. 127**, Joint Statement at 14¶ 9.

10. Undisputed. *See* **ECF No. 127**, Joint Statement at 14¶ 10.

11. Disputed in part. *See* **ECF No. 127**, Joint Statement at 14 ¶ 11. The unagreed portion of the fact and the affidavit supporting it set forth an improper legal conclusion to the extent it purports to shortcut the application of case law and baselessly state that Clark's captive insurance companies "met the definition of insurance."

12. Disputed. The fact and evidence supporting it are not relevant and set forth an improper legal conclusion. Clark baselessly asserts there was "limited guidance available" for practitioners on Section 831(b), but the issue of guidance is misleading and immaterial: there

has been ample guidance on what constitutes insurance for federal tax purposes since at least 1941. *See above* ¶ 5; 8. Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

13. Disputed. The fact consists of a conclusory allegation, legal conclusion, and improper opinion to the extent it purports to shortcut the application of case law and baselessly state that Clark's captive insurance companies were "valid" and met the definition of insurance. Moreover, Clark points to no support other than her own identically worded statement for her opinions describing Congress as incentivizing Section 831 captives and characterizing her efforts as "legitimate." Furthermore, it is the United States' position that the insurance companies created by Clark were not legitimate or valid insurance companies. *See, e.g.*, Additional Facts ¶¶ 57; 64-65; 71; 80; 86.

14. Disputed. Clark knowingly made false statements to her customers about the tax benefits of her captive program. *See, e.g.*, Additional Facts ¶¶ 46-50; 56-65; 79; 87-88.

15. Disputed. Clark's knowledge is an element of 26 U.S.C. § 6700 that she cannot baldly assert as a fact in her identically worded affidavit. ECF No. 129-1 at ¶ 17. Furthermore, Clark did know or have reason to know that she made such statements. *See, e.g.*, Additional Facts ¶¶ 50; 53; 57; 62; 66; 79.

16. Disputed. Clark made numerous false statements about the tax benefits of her captives to her customers. *See generally* Additional Facts.

17. Undisputed. *See* **ECF No. 127**, Joint Statement at 15 ¶ 17.

18. Undisputed. *See* **ECF No. 127**, Joint Statement at 15 ¶ 18.

19. Disputed in part. Congress created Section 831 captives and provided them with certain tax advantages if the captives truly offer insurance. *See CIC Servs., LLC,* 141 S. Ct. at 1587

("The Code provides the parties to such an agreement with tax advantages. […] But no tax benefit should accrue if the money is not really for insurance.") Clark offers no evidence supporting her opinion regarding the intent of Congress.

20. Disputed. The fact and the affidavit supporting it set forth an opinion not based in documentary evidence. The proposed fact makes sweeping generalizations about captives and assumptions about the insurance industry supported only by Clark's identically worded affidavit. *See* ECF No. 129-1 at ¶ 20. Moreover, the fact is imprecise and incomplete in its general description of captives. **ECF No. 130-1**, Meyer Report at 75-84.

21. Disputed. Clark did not conduct her practice lawfully because she made statements about the tax benefits of her captive program that she knew or had reason to know were false. *See, e.g.*, Additional Facts ¶ 57.

22. Disputed. The fact and the affidavit supporting it are immaterial and irrelevant. The tax treatment of wholly unrelated entities seeking 26 U.S.C. § 501(c)(15) benefits has no bearing on Clark's conduct in creating her captives between 2008 and 2017.

23. Disputed. *See above* ¶ 22.

24. Disputed in part.

   a. Undisputed. *See* **ECF No. 127**, Joint Statement at 15 ¶ 24(a).

   b. Undisputed. *See* **ECF No. 127**, Joint Statement at 15 ¶ 24(b).

   c. Undisputed. *See* **ECF No. 127**, Joint Statement at 15 ¶ 24(c).

   d. Disputed. Clark knew her customers were not interested in the type of insurance they bought as long as they achieved their target premium. *See* Additional Facts ¶ 61.

   e. Disputed. *See above* ¶ 22.

   f. Disputed in part. *See* **ECF No. 127**, Joint Statement at 16 ¶ 24(f). Rosenbach testified

that Clark and her office were primarily responsible for identifying insurable risks for their customers. **ECF No. 129-7**, Rosenbach Dep. at 69:5-11.

  g. Disputed as to word "appropriate." *See* **ECF No. 127**, Joint Statement at 16 ¶ 24(g). Rauner and Rosenbach's pricing work did not comply with actuarial standards and was therefore, not appropriate. *See* Additional Facts ¶¶ 45-54.

  h. Disputed. Clark generally provided Rauner and Rosenbach with information about her customers, including their target premiums. *See, e.g.*, **Def. Ex. 103** (sample client summary sheet); *see also* Additional Facts ¶ 58. Furthermore, Rosenbach testified that Clark and her office were primarily responsible for identifying insurable risks for their customers. **ECF No. 129-7**, Rosenbach Dep. at 69:5-11. **ECF No. 129-6**, Rauner Dep. at 113:14-23.

  i. Disputed. Rauner and Rosenbach did not help Clark's clients arrive upon appropriate policy terms. **ECF No. 129-7**, Rosenbach Dep. at 69:5-11; **ECF No. 129-6**, Rauner Dep. at 113:14-23. Clark solicited a desired premium amount from her customers, communicated it to the actuaries, and told them to change the premium amounts if they did not align with the customers' preferences. *See* Additional Facts ¶¶ 56-63. Moreover, the premiums that Rauner and Rosenbach determined did not meet generally accepted actuarial standards. *See* **ECF No. 130-2**, Garland Report at 38-59.

  j. Disputed in part. *See* **ECF No. 127**, Joint Statement at 16 ¶ 24(j). Clark or a member of her firm directed Rauner and Rosenbach to increase the premium amounts if they came back lower than the target. *See* Additional Facts ¶ 62. Rauner and Rosenbach complied, often within minutes. *Id.*

  k. Disputed in part. *See* **ECF No. 127**, Joint Statement at 16 ¶ 24(k). Clark identified

herself as an insurance professional and has admittedly studied significant insurance literature. *See, e.g.*, ECF No. 129-1 at ¶ 21. Furthermore, it is immaterial that Clark does not have actuarial training, because Rosenbach told her that his work did not meet actuarial standards and another actuary, Steven Lattanzio, hired to evaluate Rosenbach's work, told her Rosenbach's work was deficient. *See* Additional Facts ¶ 53.

l. Disputed. Although the fact describes a core actuary function, it is proposed within the subset describing how Clark's program works. *See above* ¶ 24. Rosenbach testified that Clark and her office were primarily responsible for identifying insurable risks for their customers. **ECF No. 129-7**, Rosenbach Dep. at 69:5-11. Moreover, Rosenbach and Rauner did not determine appropriate premiums by analyzing risk, but by providing a premium that met the client's requested amount. *See* Additional Facts ¶¶ 56-63.

m. Disputed. The fact oversimplifies the correlation between pricing an insurance policy and risk without support for the statements. **ECF No. 130-2**, Garland Expert Report. Additionally, the fact regarding the price of a policy with no risk incorrectly cites Garland's deposition. **ECF No. 129-8**, Garland Dep. at 30:14-18 ("Q. So if an insurance policy doesn't cover any risk, the correct actuarial premium of that policy should be zero dollars. Is that fair to say? A. Well, you wouldn't have a policy. If there's no risk, you wouldn't have a policy.")

n. Disputed. Clark or a member of her firm directed Rauner and Rosenbach to increase the premium amounts if they priced an amount lower than the target. *See* Additional Facts ¶ 62.

o. Disputed. Clark's admittedly utilized form policies for her customers. **ECF No. 129-1** ¶ 24(d).

p. Undisputed. *See* **ECF No. 127**, Joint Statement at 17 ¶ 24(p).

q. Disputed. Premium payments were made by both the business insured and the owner of the business insured/captive.

r. Disputed. Claims were minimal during the years at issue. **ECF No. 130-1**, Meyer Report at 184. Captive owners made investments in illiquid assets and therefore the funds may not have been available to pay insurance claims. *See, e.g.*, **Def. Ex. 444** (email from Clark approving customer use of captive funds for school tuition); **Def. Ex. 356** (customer promissory note providing captive funds to customer investment company for $400,000). The reinsurance pools kept insufficient funds to cover any claims. *See* Additional Facts ¶¶ 28; 35; 29.

25. Undisputed. *See* ECF No. 127, Joint Statement at 17 ¶ 24(p).

26. Disputed. The fact and the affidavit supporting it set forth an opinion and an oversimplified legal conclusion from the Tax Court.

27. Disputed. Clark's reinsurance pools did not adequately distribute risk. **ECF No. 130-1**, Meyer Report at 183-185; **ECF No. 130-2**, Garland Report at 70-75.

28. Disputed. The fact and the affidavit supporting it set forth an improper legal conclusion to the extent it purports to interpret prior case holdings. As described in ¶ 27, Clark's reinsurance pools did not adequately distribute risk.

29. Disputed. The fact and the affidavit supporting it improperly characterize an opinion as a fact. The premiums for Pan-American participants were not actuarially determined nor reasonable. **ECF No. 130-2**, Garland Report at 75-77. Jade and Emerald premiums were based on a quota share of the captives' individual premiums that were also not actuarially determined nor reasonable. *Id*. *See also* Additional Facts ¶ 70. Clark knew or had reason to know that these

premiums were not actuarially determined because: Rosenbach told her so; she knew the premiums were based on a target premium rather than predetermined insurance coverages; and other actuaries and third-party advisors raised concerns with Clark about the premium pricing. *See e.g.* Additional Facts ¶¶ 50-63; 65-66; 71.

30. Disputed. *See above* ¶ 29.

31. Disputed. Clark's belief that the policies she drafted covered insurable risk was unreasonable. **ECF No. 130-1**, Meyer Report at 157-179; **ECF No. 130-2**, Garland Report at 31-38. The tax treatment of wholly unrelated entities seeking 26 U.S.C. § 501(c)(15) benefits has no bearing on Clark's conduct in creating her captives between 2008 and 2017.

32. Disputed. Clark's captive program did not transfer risk to the captive insurance companies. **ECF No. 130-1**, Meyer Report at 183-185; **ECF No. 130-2**, Garland Report at 70-75. Moreover, the fact and the affidavit supporting it are not based in documentary evidence. Clark cannot baselessly assert such a specific operation detail for all 277 of her captives without evidence.

33. Disputed. The fact and the affidavit supporting it set forth an improper legal conclusion to the extent it purports to interpret legal holdings about what constitutes insurance in the commonly accepted sense. Moreover, the United States objects to the alleged expert evidence supporting this fact under FRE 403 and FRE 702.

### *Swift* and CD Listening Bar *Tax Court Cases*

34. Disputed in part. There are two pending Tax Court cases involving Clark's customers' captives titled *Swift v. Commissioner*, Case No. 13705-16 and *CD Listening Bar v. Commissioner*, Case No. 11369-16 that involve Clark's customers. But this fact is immaterial because there has been no ruling in these cases yet; her statements are mere speculation. More

importantly, the Tax Court has already ruled that one of the captives established by Clark was not a bona fide insurance company that issued insurance for tax purposes. *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 206 (2017).[1] Thus, there is already a ruling that establishes that Clark's statements were *false* as a matter of law.

### *The IRS's Opposition to Captive Insurance*

35. Disputed. The fact is immaterial and irrelevant because a legal theory utilized by the IRS over twenty years ago has no bearing on any claims or defenses in this case.

36. Disputed. The fact mischaracterizes Dr. Meyer's opinion. In his report, Dr. Meyer acknowledges the insured and the captive are separate entities but highlights their common ownership to demonstrate the circular flow of funds as part of his broader analysis. *See* **ECF No. 130-1**, Meyer Report at 25 ("The client taxpayers (or parties or entities related to the client taxpayers) owned the business insureds and their affiliated captives. The client taxpayer business insureds paid premiums to affiliated captive insurers and the risk distribution arrangements. The affiliated captive insurers and the risk distribution entities paid claims only to the client taxpayer business insureds, owned by the client taxpayers."); *see also* **ECF No. 129-11**, Meyer Dep. 136:15-138:3.

37. Disputed in part. *See* **ECF No. 127**, Joint Statement at 18 ¶ 37. The second sentence of this fact is immaterial and irrelevant as the judicial treatment of the IRS Notice 2016-66 has no bearing on any claims or defenses in this case. Moreover, IRS Notice 2016-66 is of limited relevance to the case as it may only have impacted Clark's state of mind from November 2016 onwards, or during the last two months of the penalty period.

38. Disputed. The fact is immaterial and irrelevant. The notice and comment procedures

---

[1] The Tax Court also found Clark to be the promoter of a tax shelter. *Avrahami*, 149 T.C. 144 at 206.

9

referenced in this fact occurred outside the penalty period and have no bearing on Clark's conduct.

### *The Government's Allegations Concerning Clark's Allegedly False Statements*

39. Undisputed. *See* **ECF No. 127**, Joint Statement at 18 ¶ 39.

40. Disputed. Clark hired the actuaries in her program, directed the pricing in the premium reports, and furnished them to her customers. *See* Additional Facts ¶¶ 56-62. For purposes of § 6700 liability, the distinction between statements Clark made and those she furnished is irrelevant.

41. Disputed. The actuaries did not act independently and insufficiently documented their work. *See* Additional Facts ¶ 48. Moreover, Rosenbach told Clark that the reports did not constitute actuarial communications as they had insufficient due diligence. *See* Additional Facts ¶¶50-51.

42. Disputed. The fact and the affidavit supporting it set forth an improper legal conclusion to the extent it purports to interpret legal holdings on risk distribution from *Harper Group*. Furthermore, Clark's reinsurance pools did not adequately distribute risk. **ECF No. 130-1**, Meyer Report at 183-185; **ECF No. 130-2**, Garland Report at 70-75.

43. Disputed. Clark was involved in all aspects of the reinsurance pools. *See e.g.* Additional Facts ¶¶ 66; 68; 72-73.

44. Disputed. Clark's risk pools did not distribute risk because they were not independently managed and therefore, could not qualify as a bona fide insurance company. *See* Additional Facts ¶¶ 78-79.

**UNITED STATES' ADDITIONAL FACTS**
*Premium Pricing Reports*

45. Rosenbach and Rauner communicated their premium pricing analyses to Clark in written reports. **ECF No. 127-12**, Clark Dep. at 69:20-24.

46. The reports authored from 2008 to 2016 contained numerical and narrative portions and stated that they were prepared utilizing "generally accepted actuarial methods and practices." **Def. Exs. 117**; **217**; **426**; **427**; **428**; **323**; **116**; **429**; **430**; **431** (pricing reports 2008-2016).

47. Clark furnished the premium pricing reports to all her customers. **ECF No. 127-12**, Clark Dep. at 69:25-70:10.

48. Rauner and Rosenbach failed to explain or document their pricing assumptions and adjustment factors in the premium pricing reports in violation of generally accepted actuarial standards, like Actuarial Standard of Practice 41. **ECF No. 130-2**, Garland Report at 38-61.

49. The failure to document such assumptions led to unreasonably high premiums, like Rosenbach's premium for S Insurance of more than $835,000 per year for policies with a limit per occurrence of only $1-2 million. **ECF No. 130-2**, Garland Report at 45; 59-61.

50. Rosenbach told Clark the premium pricing reports were not actuarial communications. **Def. Ex. 139** (email); **ECF No. 129-7**, Rosenbach Dep. at 274:3-24. He explained that his pricing model needed more documentation and that "support for coverages and assumptions will also need more documentation and maybe more data." **Def. Ex. 119** (email).

51. Rosenbach told Clark he wanted to add additional disclosures to his report to warn Clark's customers of various issues associated with his pricing reports. **Def. Exs. 139; 119** (*supra* ¶50).

52. Rosenbach's disclosures were never included in the pricing reports and he did not add any additional documentation to his pricing reports to explain his pricing model, coverages, or assumptions. *See supra* ¶ 46-47; **Def. Ex. 423**, Clark Dep. at 16:23-17:7.

11

53. Clark hired Steven Lattanzio, an independent actuary, to evaluate Rosenbach's model by reviewing his pricing of one captive. **ECF No. 127-12**, Clark Dep. at 67:22-68:5. Lattanzio noted the lack of documentation supporting the pricing. **Def. Ex. 128** at 2 (Blue Herron report).

54. Clark acknowledged that this critique gave her "serious concerns." **Def. Ex. 134** (email).

55. Rosenbach did not agree with most of the critiques identified in the review and did not make any substantial changes to his pricing methodology. **ECF No. 129-7**, Rosenbach Dep. at 190:15-19; 191:21-25; 192:1-6.

*Soliciting Target Premiums*

56. Clark solicited targets for premium amounts from her customers before coverages were decided upon and before the captives were set up. **ECF No. 127-12**, Clark Dep. at 60:10-61:21; **Def. Ex. 432** (email).

57. Clark knew the targets were calculated based on her customer's tax savings or estate planning goals. **Def. Ex. 367** (email).

58. Clark provided those targets to the pricing actuaries. **ECF No. 127-12**, Clark Dep. at 66:16-19; **Def. Exs. 104** (memo); **108** (email); **109** (email).

59. Clark expressed dissatisfaction to the actuaries she hired if they asked too many follow up questions. **Def. Ex. 113** (email).

60. Clark's customers expressed disappointment when the premium was lower than the target. **Def. Exs. 148** (email); **369** (email).

61. Clark knew her customers were not interested in the type of insurance they bought as long as they hit their premium target. **Def. Exs. 122** (email); **175** (email).

62. Clark directed the pricing actuaries to increase the premium amounts if they came back lower than the target. **Def. Ex. 121** (email); **126** (email); **218** (email). The actuaries complied, typically within a few hours and without new information about the customer's risk profile. **123**

12

(email); **126** (email).

63. Clark stopped working with actuary Peter Rauner because she was unhappy that his premium determinations were too low. **ECF No.129-6**, Rauner Dep. at 82:6-24.

*Pan American, Jade, and Emerald*

64. The terrorism coverage offered by Pan American was priced as a percentage of the customer's desired total premium, without regard to the individual risk profile of the particular customer. **ECF Nos. 130-2**, Garland Report at 75-76; **129-6**, Rauner Dep. at 40:20-41:16.

65. Pan American's premiums were too high and not actuarially priced. **ECF No. 130-2**, Garland Report at 75-76.

66. Clark's customers' advisors raised concerns about Pan American's pricing with Clark directly. **Def. Exs. 328** (email); **329** (email).

67. Clark's customers paid premiums to Pan American, which then transferred all the premiums it received back to Clark's customers' captives in three installments. **ECF No. 127-17** (memo).

68. Pan American transferred 50% of the premium back to the captives three months into the policy period (**ECF No. 127-17** (memo)); 47.5% back to the captives six months into the policy period (*Id*); and the remaining 2.5% at the end of the policy period (*Id*.). Clark decided that retention amount. **ECF No. 127-13**, Clark Dep. at 36:3-6.

69. Clark decided where Jade and Emerald would be formed and who would own them. **ECF No. 127-13**, Clark Dep. at 64:5-7; **Def. Ex. 424**, Johnson Dep. at 53:7-13.

70. Clark's customers paid premiums to their captives, which then transferred at least 30% of those premiums to Jade or Emerald in what is referred to as a quota share agreement. **ECF Nos. 127-21** (memo); **127-19** (memo); **Def. Ex. 433** (memo).

71. Jade and Emerald's premiums were not actuarially priced. **ECF No. 130-2**, Garland

Report at 75-77.

72. Jade retained only 2.5% of premiums received for half of the policy period. **Def. Ex. 425**, Jarvis Dep. at 169:16-19. Emerald retained only 5% of premiums received for half of the policy period. **Def. Ex. 424**, Johnson Dep. at 83:2-6. Clark decided the amount of retained premium and timing. **Def. Exs. 425**, Jarvis Dep. at 169:20-22; **424**, Johnson Dep. at 89:4-10.

73. Clark provided tax and insurance-related advice to these reinsurance companies, prepared their state tax returns, and attended their board of directors' meetings. **ECF No. 127-13**, Clark Dep. at 43:20-44:11; 48: 20-23; 78:16-79:18; **Def. Ex. 424**, Johnson Dep. at 72:9-76:9.

74. The manager of Jade expressed concern over the early distributions from the pool to the captive owners and the 2.5% reserve as being insufficient to cover any potential claims. **Def. Ex. 425**, Jarvis Dep. at 173:10-14; **ECF No. 127-13**, Clark Dep. at 52:17-20.

75. Clark stopped recommending the Jade Reinsurance Company risk pool after the manager of that pool expressed that he wanted to retain a higher reserve of premiums to better align with reinsurance pool practices. **Def. Ex. 425**, Jarvis Dep. at 229:2-231:8.

76. Clark offered to settle an approved claim for less than the full amount in Emerald because there was insufficient funding to cover the entire claim. **Def. Ex. 434** (letter).

77. Emerald's shareholders used their own capital to pay insurance claims rather collect against the captive participants, per their obligations under the reinsurance and trust agreements. **ECF No. 127-13**, Clark Dep. at 71:11-72:8; **Def. Ex. 424**, Johnson Dep. 126:7-127:3.

78. Clark's children were part owners of Pan American, Jade and Emerald. **ECF No. 127-13**, Clark Dep. at 16:3-9; 64:17-22; **Def. Ex. 424**, Johnson Dep. at 52:23-6.

79. Clark told her customers Jade and Emerald were independently managed. **ECF Nos. 127-21** (memo); **127-19** (memo); **Def. Ex. 433** (memo).

80. Rational third-party reinsurance companies would not return 50% of premiums halfway through a policy period because that could leave them without sufficient funds to cover a potential claim. **ECF Nos. 130-1**, Meyer Report at 99-102; **130-2**, Garland Report at 73-74.

81. Clark's customers' advisors raised concerns with her about the structure of the risk pools. **Def. Ex. 330** (email).

82. Under the terms of the contracts with Clark's customers, if claims were filed after the funds had been disbursed, the risk pools would have to go back to every participating captive and attempt to collect their proportionate share of the loss. **Def. Exs. 425**, Jarvis Dep. at 173:15-23; **424**, Johnson Dep. at 91:4-11.

83. These risk pooling entities did not have the money or resources to pursue collection actions against the captives. **Def. Exs. 425**, Jarvis Dep. at 174:7-17; **424**, Johnson Dep. at 97:15-25.

84. There was no expectation for the reinsurance pools to incur real claims. **Def. Exs. 435** (email); **44** (email).

85. Pool managers encouraged claims. **Def. Ex. 425**, Jarvis Dep. at 205:25-206:5.

86. Pan American, Jade, and Emerald's structure and transactions were not typical within the insurance industry. **ECF No. 130-1**, Meyer Report at 18-21; 23-25.

*Marketing Her Program*

87. Clark marketed her program as a tax and estate planning tool. *See e.g.* **Def. Ex 436** (ppt).

88. Clark's emails with her customers focused on the tax or estate benefits of captives, rather than insurance. *See, e.g.*, **Def. Exs. 283** (email)**; 437** (email);

89. As part of their documentation to set up a captive, Clark's customers provided her with copies of their commercial insurance policies. **ECF No. 127-13,** Clark Dep. at 118:23-25.

90. On average, Clark's customers paid approximately eight times more for insurance after they formed a captive. **ECF No. 130-1**, Meyer Report at 154-56.

Dated: December 19, 2023               Respectfully submitted,

                      DAVID A. HUBBERT
                      Deputy Assistant Attorney General

                      */s/ Virginia Giannini*
                      **Lauren A. Darwit**
                      Fla. Special Bar No. A5502814
                      Lauren.A.Darwit@usdoj.gov
                      **Virginia Giannini**
                      Fla. Special Bar No. A5502881
                      Virginia.Giannini2@usdoj.gov
                      **Elisabeth Kryska**
                      Fla. Special Bar No. A5502987
                      Elisabeth.K.Kryska@usdoj.gov
                      **William Chang**
                      Fla. Special Bar No. A5502981
                      William.Chang3@usdoj.gov
                      Trial Attorneys, Tax Division
                      U.S. Department of Justice
                      P.O. Box 7238
                      Washington, D.C.  20044
                      Telephone:   (202) 307-5892
                      Facsimile:    (202) 514-6770

                      *Of Counsel:*
                          JUAN ANTONIO GONZALEZ
                          United States Attorney
                          Southern District of Florida

                      *Counsel for Defendants*