1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:21-cv-82056-CIV-CANNON

- - - - - - - - - - - - - - - X

CELIA R. CLARK,                        :

            Plaintiff,        :

V.                                     :

UNITED STATES OF AMERICA; THE   :

INTERNAL REVENUE SERVICE,        :

            Defendants.       :

- - - - - - - - - - - - - - - X


                    100 Southeast 3rd Avenue
                    Fort Lauderdale, FL 33394
                    September 11, 2023
                    9:36 a.m. - 2:24 p.m.


            VIDEOTAPED DEPOSITION OF:

                CELIA R. CLARK

                VOLUME III


        Taken before Doreen Fox Krenchicki,

Certified Court Reporter, Registered Professional

Reporter, Certificate of Merit Reporter, Certified

Realtime Reporter and Notary Public for the State

of Florida at Large, pursuant to Notice of Taking

Deposition filed in the above cause.

Clark, Celia R  - Vol. 3                        September 11, 2023

2

1                    A P P E A R A N C E S

2

3        On behalf of the Plaintiff:

4

5              Marcus Neiman Rashbaum & Pineiro, LLP

6              BY:  DERICK VOLLRATH, ESQ.

7              and  JEFFREY NEIMAN, ESQ.

8              100 Southeast 3rd Avenue

9              Suite 805

10             Ft. Lauderdale, FL 33394

11             954-462-1200

12             dvollrath@mnrplawfirm.com

13             jneiman@mnrplawfirm.com

14

15

16       On behalf of the Defendants:

17

18             LAUREN DARWIT, ESQ.

19             VIRGINIA GIANNINI, ESQ.

20             Trial Attorneys, Tax Division

21             U.S. Department of Justice

22             P.O. Box 7238

23             Washington, D.C. 20044

24             202-307-5892

25             lauren.a.darwit@usdoj.gov

Clark, Celia R  - Vol. 3                     September 11, 2023

3

```
1    ALSO PRESENT:

2

3              EDGAR GENTRY

4

5

6              SIMON EHRLICH, Videographer

7

8

9        U.S. Department of Justice:

10

11             WILLIAM CHANG (Telephonically)

12             ELISABETH KRYSKA (Telephonically)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Clark, Celia R  - Vol. 3                            September 11, 2023

4

1

2   WITNESS:                                         PAGE   3

3

4   CELIA R. CLARK

5
    Continued Direct Examination by Ms. Darwit.....   7    6
6   Cross Examination by Mr. Vollrath..............  132    7

7   Redirect Examination by Ms. Darwit............. 148    8

8

9

10

11

12

13   NUMBER                  DESCRIPTION                Page

14   11        Wilson-324999 through Wilson-325000.........  61

15   29        OJM-0012386 through OJM-0012387.............  77

16   97        Clark_PROD0088595 through

17   Clark_PROD0088597..........................   83

18   119       Wilson-330710 through Wilson-330713.........   12

19   128       ACR_IRS0304089 through ACR_IRS0304092.......   20

20   139       Wilson-330584 through Wilson-330585.........    7

21   323       ACR_IRS0321401 through ACR_IRS0321406.......   18

22   324       ClarkSDFL283990 through ClarkSDFL283991.....   29

23   325       ClarkSDFL1459336 through ClarkSDFL1459341...   30

24   326       ClarkSDFL1544863 through ClarkSDFL1544869...   33

25   327       OJM-0016849 through OJM-0016850.............   35

Clark, Celia R  - Vol. 3                         September 11, 2023

5

```
1    328       ClarkSDFL346871 through ClarkSDFL346872.....    37

2    329       ClarkSDFL716142 through ClarkSDFL716145.....    42

3    330       ClarkSDFL1448278 through ClarkSDFL1448282...    48

4    331       ClarkSDFL832564 through ClarkSDFL832565.....    56

5    332       ClarkSDFL826235 through ClarkSDFL826235.....    65

6    333       ClarkSDFL1282247 through ClarkSDFL 1282249..    72

7    334       ClarkSDFL1069633............................    88

8    335       ClarkSDFL716305 through ClarkSDFL716306.....    92

9    336       Plaintiff's Response to United States'

10             Second Set of Interrogatories...............   103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Clark, Celia R  - Vol. 3                     September 11, 2023

6

```
1              THE VIDEOGRAPHER:  We are now on the
2      record.  The time is 9:36.
3              This is the deposition of Celia R.
4      Clark in the matter of Celia R. Clark versus
5      United States, Southern District of Florida,
6      case number 9:21-cv-82056-CIV-CANNON.
7              This deposition is being held at
8      Marcus, Neiman, Rashbaum & Pineiro, 100
9      Southeast 3rd Avenue, Suite 805, Fort
10     Lauderdale, Florida 33394.  Today is
11     September 11, 2023.
12             The court reporter is Doreen Fox
13     Krenchicki.  My name is, videographer, Simon
14     Ehrlich on behalf of Henderson Legal
15     Services.
16             Counsel, please introduce yourself.
17             MS. DARWIT:  This is Lauren Darwit on
18     behalf of the United States.  Also appearing
19     on behalf of the United States is Virginia
20     Giannini, William Chang and Elisabeth Kryska.
21             MR. VOLLRATH:  Derick Vollrath and
22     Jeffrey Neiman for plaintiff, Celia Clark.
23             THE VIDEOGRAPHER:  Court reporter,
24     please swear in the witness.
25
```

7

1    Thereupon,

2                    CELIA R. CLARK,

3    having been duly sworn according to law, was

4    examined and testified as follows:

5              CONTINUED DIRECT EXAMINATION

6    BY MS. DARWIT:

7        Q.     Okay.  I'm going to show you an

8    exhibit, Ms. Clark.  This one has been previously

9    marked Exhibit 139.

10             Do you see a document on your screen?

11       **A.     Yes.**

12             **(Exhibit 139, Wilson-330584 through**

13       **Wilson-330585, was previously marked for**

14       **Identification.)**

15   BY MS. DARWIT:

16       Q.     Okay.  And I'm going to scroll down

17   here to the bottom of the second page.

18             Okay, Ms. Clark, this is an e-mail

19   that you received from Allen Rosenbach, June 20th,

20   2011, right?

21       **A.     Yes.**

22       Q.     Okay.  And in this e-mail,

23   Mr. Rosenbach states that he made a few changes to

24   the pricing report.  I added a disclosure that the

25   report does not constitute an actuarial

Clark, Celia R  - Vol. 3                    September 11, 2023

8

1   communication and used the word pricing rather

2   than actuarial.

3            Do you see that?

4      A.     Yes.

5      Q.     The bottom of the first page has your

6   response.

7            This is an e-mail that you sent to

8   Mr. Rosenbach on June 20th, 2011, right?

9      A.     Right.

10     Q.     And you asked Mr. Rosenbach, if it's

11  not an actuarial report, what is it.

12           Do you see that?

13     A.     Yes.

14     Q.     Okay.  And then the top of the first

15  page, Mr. Rosenbach responds that if this report

16  becomes an actuarial communication, the due

17  diligence required will drive the price to

18  unaffordable.

19           Do you see that?

20     A.     Yes.

21     Q.     And he also says that it was always

22  called a pricing/funding report.  We are really

23  relying on pricing models in or compared to the

24  market and adjusted with pricing

25  differences/consistencies.

Clark, Celia R  - Vol. 3                    September 11, 2023

9

1           Do you see that?

2    A.      Yes.

3    Q.      After you received this e-mail from

4  Mr. Rosenbach, did you instruct him to do

5  additional diligence for the pricing reports that

6  he prepared?

7    A.      We had several discussions.

8    Q.      And in those discussions did you

9  instruct him to do additional diligence to his

10  premium pricing reports?

11    A.      I believe the further communications

12  confirmed his original statement there in the

13  e-mail below about the cost becoming unaffordable.

14    Q.      Okay.  But did you instruct him to do

15  any additional diligence as part of his premium

16  pricing analysis?

17    A.      I don't recall.

18    Q.      And do you know if Mr. Rosenbach

19  ultimately did perform additional due diligence as

20  part of his premium pricing analysis?

21    A.      I believe he did.

22    Q.      Okay.  What sort of additional

23  diligence did he perform?

24    A.      He reexamined the rate filings he had

25  been relying on.  He updated some of them.

Clark, Celia R  - Vol. 3                              September 11, 2023

10

1       Q.      Anything else?

2       **A.      He did at one point completely change**

3    **his actuarial model.  I cannot remember exactly**

4    **when.**

5       Q.      Anything else?

6       **A.      No.**

7       Q.      Okay.  Did Mr. Rosenbach make any

8    changes to his premium pricing reports after you

9    received this e-mail?

10      **A.      Could you clarify the question?**

11      Q.      Did Mr. Rosenbach make any sort of

12   changes to his reports reflecting additional due

13   diligence that he had performed?

14      **A.      There were many changes.**

15      Q.      Do you know if any of those changes

16   were to his actual premium pricing reports?

17      **A.      Do you mean the wording of the**

18   **report, the language of the report?**

19      Q.      Yes.

20              So did he make any changes to the

21   wording of the premium pricing report?

22      **A.      I believe so.**

23      Q.      Okay.  Ultimately did Mr. Rosenbach,

24   after performing this additional due diligence,

25   tell you that his new reports were actuarial

Clark, Celia R  - Vol. 3                    September 11, 2023

11

1   reports?

2        **A.        So, yes and no.**

3        Q.        What do you mean by that?

4        **A.        His methodology was actuarial.**

5        Q.        Okay.  But here he's telling you that

6   his reports are not an actuarial communication,

7   right?

8        **A.        He is saying he is not going to state**

9   **that the report is an actuarial communication.**

10       Q.        Okay.  And in his reports that he

11  revised after this date, did he state that the

12  reports were actuarial communications?

13       **A.        I don't recall.**

14       Q.        What's your understanding of what the

15  term actuarial communication means?

16       **A.        What I recall of the discussions is**

17  **that he would have, he would have his own**

18  **insurance issues by using that word in the report.**

19       Q.        What does that mean?

20       **A.        By calling the report an actuarial**

21  **report, he would have professional liability**

22  **issues.**

23       Q.        Okay.  Do you know what sort of

24  professional liability issues?

25       **A.        It was never completely clear to me.**

Clark, Celia R - Vol. 3                    September 11, 2023

12

1      Q.      Okay.  I'll show you another

2  document.  This has been previously marked Exhibit

3  119.

4            (Exhibit 119, Wilson-330710 through

5       Wilson-330713, was previously marked for

6       Identification.)

7  BY MS. DARWIT:

8      Q.      Ms. Clark, this is an e-mail that you

9  received from Mr. Rosenbach July 7, 2011, right?

10     **A.      That's what it says.**

11     Q.      Okay.  And --

12     **A.      Could I please see what that**

13  **attachment is?**

14     Q.      Sure.

15     **A.      That was blacked out.**

16     Q.      The first page, Mr. Rosenbach tells

17  you, attached please find the start of a model

18  account documentation package.

19            Do you see that?

20     **A.      Yes.**

21     Q.      And he says that --

22            MR. VOLLRATH:  I'm sorry.  What

23       exhibit are we talking about?

24            MS. DARWIT:  Exhibit 119.

25  BY MS. DARWIT:

Clark, Celia R  - Vol. 3                    September 11, 2023

13

 1        Q.      And he says in the second paragraph:

 2   Support for coverages and assumptions will also

 3   need more documentation and maybe more data.

 4              Do you see that?

 5        **A.      Yes.**

 6        Q.      Okay.  And then if we scroll down --

 7        **A.      Could I just read the rest of that,**

 8   **please?**

 9        Q.      Yes.

10        **A.      Okay.**

11        Q.      Okay.  And the second page here

12   starts with, general disclosures, Law Offices of

13   Celia R. Clark, P.L.L.C.

14              Do you see that?

15        **A.      Yes.  Was this an attachment to the**

16   **earlier e-mails?**

17        Q.      It states in the previous e-mail that

18   attached is a start of a model account

19   documentation package.

20              Do you see that?

21        **A.      Yes.  This is the model account**

22   **documentation package from Al Rosenbach.**

23        Q.      Well, my question for you is whether

24   the disclosures starting on the second page are

25   the additional disclosures that Mr. Rosenbach

14

1    proposed adding to his report in the previous

2    exhibit.

3         A.        I don't recall this memo.

4         Q.        Okay.  Do you recall Mr. Rosenbach

5    generally proposing adding additional disclosures

6    to his premium pricing reports?

7         A.        I recall -- not specifically.

8         Q.        What do you recall?

9         A.        I recall his adding questions to the

10   questionnaire that was sent to the clients.

11        Q.        Did you request Mr. Rosenbach to

12   create a model account documentation package?

13        A.        So that would be the questionnaire,

14   if that's the questionnaire, yes, I did.  It was I

15   would say a mutual decision.

16        Q.        Okay.  But here, this is the

17   disclosure that we're looking at, right?  So this

18   is not a questionnaire?  Do you agree with that?

19        A.        It is not.

20        Q.        Okay.  Did you request Mr. Rosenbach

21   to prepare these disclosures?

22        A.        I don't recall this attachment.

23        Q.        Okay.  Okay.  And in Mr. Rosenbach's

24   e-mail, he's proposing both an increase in

25   supporting documentation in his reports for

Clark, Celia R  - Vol. 3                                September 11, 2023

15

1   coverages and assumptions and also the disclosure

2   that he appends here, right?

3        A.      I don't really see the connection

4   between this e-mail and that attachment.

5        Q.      Well, I can represent to you that

6   this document was produced to us all as one file.

7             So do you have any reason to doubt

8   that the document entitled general disclosures on

9   the second page is not the disclosure that he's

10   proposing in his e-mail on the first page?

11       A.      I don't know.  He's referring to a

12   model account documentation package and that is

13   not what's attached.

14       Q.      Okay.  So let's look at the

15   attachment, then.

16             So the first paragraph here states

17   that since the captives tend to be controlled

18   and/or owned by the insured and typically are

19   formed to be taxed only on investment income, a

20   plethora of potential issues may arise.  These

21   issues raise the uncertainty in the pricing of the

22   exposures.

23             Do you see that?

24       A.      Yes.  The last sentence of the first

25   paragraph, yes, I see that.

Clark, Celia R  - Vol. 3                    September 11, 2023

16

1      Q.       Okay.  And he also states here that

2    insured's desire a premium as close to 1.2 million

3    dollars and minimal claims to maximize their tax

4    write-offs.

5              Do you see that?

6      **A.       Yes, I see that.**

7      Q.       Okay.  And then he says, this may

8    have a tendency to overstate exposures and

9    minimize reporting of claims.

10             Do you see that?

11     **A.       Yes.**

12     Q.       Did any of that language ultimately

13    end up disclosed in Mr. Rosenbach's premium

14    pricing reports?

15     **A.       At one point he did include a**

16    **paragraph about the claims, the amount of claims.**

17     Q.       My question was whether he included

18    this particular language.

19     **A.       Just the claims part, he may have.**

20     Q.       Okay.  Do you know?

21     **A.       I believe at some point, maybe years**

22    **later.**

23     Q.       Okay.  Did Mr. Rosenbach ultimately

24    update his premium pricing reports to include

25    additional supporting documentation for coverages

Clark, Celia R  - Vol. 3                              September 11, 2023

17

1    and assumptions?

2         A.      I'm not sure.

3         Q.      Did Mr. Rosenbach update his premium

4    pricing reports to include any disclosure that his

5    reports did not constitute actuarial

6    communications?

7         A.      I'm not sure.

8         Q.      Did you notify your clients in any

9    way that Mr. Rosenbach's pricing reports did not

10   constitute actuarial communications?

11        A.      So your question included in any way?

12        Q.      Yes.

13        A.      The subject came up various times.

14        Q.      In what context?

15        A.      Speaking with clients.

16        Q.      Any written communications?

17        A.      I'm not sure.

18        Q.      Anything else?

19        A.      No.

20        Q.      Was it common for Mr. Rosenbach to

21   ask for your input before making changes to the

22   narrative portion of his premium pricing reports?

23        A.      To what?

24        Q.      The narrative --

25        A.      Narrative portion.  Yes, it was.

Clark, Celia R  - Vol. 3                              September 11, 2023

18

1      Q.      Did Clark & Gentry have any role in

2  preparing the narrative portion of Mr. Rosenbach's

3  report?

4      **A.      Yes.**

5      Q.      What particular portions of the

6  report did Clark & Gentry write?

7      **A.      Oh, I can't, I can't recall.**

8              MR. VOLLRATH:  Object to form.

9  BY MS. DARWIT:

10     Q.      Okay.

11             MS. DARWIT:  I am going to mark my

12     next exhibit, it's going to be Exhibit 323.

13     It's Bates stamped ACR_IRS0321401.

14             (Whereupon Exhibit 323,

15     ACR_IRS0321401 through ACR_IRS0321406, was

16     marked for Identification.)

17             MR. VOLLRATH:  I'm sorry.  The

18     exhibit number was?

19             MS. DARWIT:  323.

20  BY MS. DARWIT:

21     Q.      Ms. Clark, I'll kind of just skim

22  through here so you can see the various sections

23  of this document.

24             Do you see the top here, the

25  letterhead is on ACR Solutions Group letterhead?

Clark, Celia R  - Vol. 3                    September 11, 2023

19

1          A.        Yes.

2          Q.        And the subject is Gut Care Insurance

3     Company.  Do you see that?

4          A.        Yes.

5          Q.        There's a purpose and scope section,

6     right?

7          A.        Yes.

8          Q.        Distribution and use section, right?

9          A.        Yes.

10                    I'd like to read that.

11         Q.        Sure.

12         A.        Yes.  Would you continue to the next

13    sentence on the next page -- oh, that was the last

14    sentence.  To the third party.  Yes.  Okay.  Yes.

15         Q.        Okay.  Did Clark & Gentry draft the

16    purpose and scope section?

17         A.        No.

18         Q.        Did Clark & Gentry draft the

19    distribution and use section?

20         A.        No.

21         Q.        Take your time reading, but did Clark

22    & Gentry write the reliances and limitations

23    section?

24         A.        I don't recall.

25         Q.        Did Clark & Gentry draft the data

Clark, Celia R  - Vol. 3                        September 11, 2023

20

1    reliance section?

2         A.      I don't recall.

3         Q.      Did Clark & Gentry draft the premium

4    funding estimates section?

5         A.      No.

6         Q.      What about the methodology and

7    assumptions section?

8         A.      No.

9         Q.      Well, let me ask a better question.

10               Did Clark & Gentry draft the

11   methodology and assumptions section?

12        A.      No.

13        Q.      It did not?

14        A.      No.

15        Q.      Okay.  Okay.  So which portions of

16   this report did Clark & Gentry have a role in

17   drafting?

18        A.      Many of them.

19        Q.      Do you recall which specific

20   sections?

21        A.      No, I don't.

22        Q.      Next exhibit I'm going to pull up is

23   Exhibit 128.  It's been previously marked.

24               (Exhibit 128, ACR_IRS0304089 through

25        ACR_IRS0304092, was previously marked for

Clark, Celia R  - Vol. 3                                September 11, 2023

21

```
 1        Identification.)
 2   BY MS. DARWIT:
 3        Q.      Ms. Clark, do you recognize this
 4   document?
 5        A.      It looks familiar.
 6        Q.      Okay.  And this is a letter prepared
 7   by Actuarial & Technical Solutions, Inc.  Right?
 8        A.      Yes.
 9        Q.      And this letter is signed by someone
10   named Steven Lattanzio?
11        A.      Yes.
12        Q.      And the subject is Blue Herron
13   Insurance Company.  Do you see that?
14        A.      Yes.
15        Q.      Okay.  In this report, in the first
16   sentence it says that Actuarial & Technical
17   Solutions performed a limited review of the
18   premium determination for Blue Herron Insurance
19   Company.
20               Do you see that?
21        A.      Yes.
22        Q.      Did you request this review?
23        A.      Yes.
24        Q.      Did the client, Blue Herron, the
25   owner of Blue Herron Insurance Company, request
```

Clark, Celia R  - Vol. 3                    September 11, 2023

22

1    this review?

2         A.      No.

3         Q.      The date of this report is August

4    31st, 2011, right?

5         A.      Yes.

6         Q.      Did you review this report around the

7    time that it was dated?

8         A.      Yes.

9         Q.      Why did you request this review be

10   performed?

11        A.      I needed a second opinion.

12        Q.      What prompted you to want a second

13   opinion?

14        A.      I had questions about Al Rosenbach's

15   methodology, generally.

16        Q.      What sort of questions?

17        A.      I needed a second opinion.

18        Q.      What questions did you have about

19   Mr. Rosenbach's methodology?

20        A.      I didn't really even know enough to

21   have specific questions.  I needed a thorough

22   review.

23        Q.      Had someone raised concerns to you

24   about Mr. Rosenbach's methodology?

25        A.      No.

Clark, Celia R  - Vol. 3                                September 11, 2023

23

1        Q.        Blue Herron Insurance Company, is

2    that a captive insurance company that you formed?

3        **A.        Yes.**

4        Q.        On the second page here, second to

5    last paragraph, do you see where it states the

6    determination of premium like many actuarial

7    exercises requires the use of judgment?

8        **A.        Yes.**

9        Q.        And this judgment is often based on

10    years of experience, coupled with analysis of

11    available data.

12              Do you see that?

13        **A.        Yes.**

14        Q.        In instances where historical data is

15    unavailable, an actuary will often seek to utilize

16    information from a number of possible sources,

17    including information from filings made by large

18    commercial carriers.

19              Do you see that?

20        **A.        Yes.**

21        Q.        Okay.  And then in this report it

22    states that, with respect to determining premium

23    for Blue Herron, Mr. Rosenbach appears to have

24    utilized a mix of both.

25              Do you see that?

Clark, Celia R - Vol. 3                          September 11, 2023

24

1      **A.      No.  Where is that?**

2      Q.      I think it's the third to last

3   sentence, starting with, given the lack of loss

4   experience data -- excuse me.  With respect to

5   determining premium for Blue Herron, Mr. Rosenbach

6   appears to have utilized a mix of both.

7      **A.      Yes, I see that.**

8      Q.      And the next sentence states, given

9   the lack of loss experience data for the captive,

10  it is certainly reasonable to rely upon external

11  data when determining rates.

12          Right?

13     **A.      Yes.**

14     Q.      And finally the last sentence here

15  is; however, one must be sure documentation is

16  sufficient so that at a minimum another actuary

17  within the same discipline has the ability to

18  follow the process used.

19          Right?

20     **A.      Yes.**

21     Q.      Did you discuss the documentation

22  issue identified in this report with

23  Mr. Rosenbach?

24     **A.      Yes.**

25     Q.      Okay.  And what did you discuss?

Clark, Celia R  - Vol. 3                    September 11, 2023

25

1      A.      In the context of the general

2  discussion, I believe, as I recall, he was

3  generally agreeable to obtaining additional data

4  from the clients.

5      Q.      Okay.  Did you discuss anything else?

6      A.      Yes, the entire letter.

7      Q.      Okay.  And did Mr. Rosenbach increase

8  the amount of documentation that he used to

9  support his analysis after you discussed this

10 critique?

11     A.      The process had begun earlier.

12     Q.      Well, here, this report is critiquing

13 Mr. Rosenbach for having insufficient supporting

14 data, right?

15          MR. VOLLRATH:  Object to form.

16          THE WITNESS:  I would not say this is

17      a critique that, that last sentence,

18      beginning with, however, one must be sure

19      documentation is sufficient, sounds to me

20      like a general recommendation.

21 BY MS. DARWIT:

22     Q.      Okay.  And so did Mr. Rosenbach

23 ultimately change his supporting documentation

24 around the time of receiving this report?

25     A.      The process was already under way.

Clark, Celia R  - Vol. 3                                September 11, 2023

26

1    It did continue.

2         Q.      What specific additional support did

3    he include in his premium pricing reports?

4         A.      Additional data from the clients on

5    the questionnaire.

6         Q.      Was that information disclosed in his

7    premium pricing reports?

8         A.      The questionnaire was not a part of

9    that report.

10        Q.      Were there any other aspects of

11   Mr. Rosenbach's analysis that he supported with

12   additional documentation other than the

13   questionnaire?

14        A.      Would you please repeat the question?

15        Q.      Sure.

16               Were there any other aspects of

17   Mr. Rosenbach's analysis that he supported with

18   additional documentation outside of the

19   questionnaire?

20        A.      By analysis, you're referring to the

21   report itself?

22        Q.      The analysis generally.

23        A.      The methodology was altered.

24        Q.      Okay.  What about the report; did he

25   include anything else in the report?

Clark, Celia R  - Vol. 3                                    September 11, 2023

27

1          A.        I'm sorry.  Was that a question?

2          Q.        Yes.  I can rephrase it.

3                    Did he include anything else in the

4     report reflecting an increase in supporting

5     documentation?

6          A.        Not that I can recall.

7          Q.        Okay.  And then on pages three and

8     four, there are a number of bullet points, right?

9          A.        Yes, there are a number of bullet

10    points.

11         Q.        Okay.  And these outline specific

12    critiques that Mr. Lattanzio had of

13    Mr. Rosenbach's premium pricing analysis, right?

14         A.        I do not agree this is a critique, as

15    much as constructive criticism, possibly.

16         Q.        Did you discuss the constructive

17    criticism outlined in these bullet points with

18    Mr. Rosenbach?

19         A.        Yes, I did.

20         Q.        What did you discuss?

21         A.        All of them.

22         Q.        Okay.  And what, if anything, did you

23    do to ensure that Mr. Rosenbach had addressed each

24    of the constructive criticisms identified in these

25    bullets?

Clark, Celia R  - Vol. 3                                    September 11, 2023

28

1      A.      Please tell me what you mean by,
2  address.
3      Q.      Did you do anything to ensure that
4  Mr. Rosenbach had addressed the constructive
5  criticisms identified in these bullet points?
6      A.      Did I do anything.  It wasn't mine to
7  do.  He did alter his methodology quite
8  extensively, including using more recent Chubb
9  filings.
10              There were other changes, but I
11  really, I never understood his methodology, so I
12  can't be more precise.
13     Q.      Did Mr. Rosenbach tell you that he
14  had made changes addressing all of the criticisms
15  identified in these bullets?
16     A.      No.
17     Q.      Did you have reason to believe that
18  he had addressed all of the criticisms identified
19  in these bullets?
20     A.      No.
21     Q.      Other than Steve Lattanzio, did you
22  hire anyone else to review Mr. Rosenbach's work?
23     A.      We're talking about 2008 to 2016,
24  yes?
25     Q.      Yes.

Clark, Celia R  - Vol. 3                                September 11, 2023

29

```
 1          A.      No.
 2                  MS. DARWIT:  I'm going to mark my
 3          next document, it will be Exhibit 324.  It's
 4          Bates stamped ClarkSDFL283990.
 5                  (Whereupon Exhibit 324,
 6          ClarkSDFL283990 through ClarkSDFL283991, was
 7          marked for Identification.)
 8   BY MS. DARWIT:
 9          Q.      Ms. Clark, at the top here --
10                  MR. NEIMAN:  Excuse me, we don't have
11          it yet.
12                  MS. DARWIT:  Sure.
13   BY MS. DARWIT:
14          Q.      Ms. Clark --
15                  MR. NEIMAN:  We still don't have it.
16          I'm sorry.
17                  MS. DARWIT:  Did you refresh -- okay.
18          Derick, do you have it?
19                  MR. VOLLRATH:  I don't.
20                  MR. NEIMAN:  I think you might have
21          it...
22   BY MS. DARWIT:
23          Q.      Okay.  Ms. Clark, this e-mail at the
24   top here is an e-mail that you received from
25   someone named Steve Pfeiffer.  Do you see that?
```

Clark, Celia R  - Vol. 3                    September 11, 2023

1      **A.      Yes.**

2      Q.      Who is Steve Pfeiffer?

3      **A.      I don't recall.**

4      Q.      In this e-mail, Mr. Pfeiffer is

5    discussing insurance policies for one of your

6    clients, right?

7      **A.      I'm not sure.**

8      Q.      Okay.  In 2008, did any of your

9    clients hire an outside actuary to price premiums

10   for their captives' policies?

11     **A.      Some did.  I'm not certain of the**

12   **year.**

13     Q.      Okay.

14             MS. DARWIT:  I'll mark my next

15       exhibit.  It will be Exhibit 325.  It's Bates

16       stamped ClarkSDFL1459336.

17             (Whereupon Exhibit 325,

18       ClarkSDFL1459336 through ClarkSDFL1459341,

19       was marked for Identification.)

20   BY MS. DARWIT:

21     Q.      Ms. Clark, do you see a document on

22   your screen?

23     **A.      Yes.**

24             MR. VOLLRATH:  What's the number?

25       I'm sorry.

Clark, Celia R  - Vol. 3                                    September 11, 2023

31

1               MS. DARWIT:  It's 325.

2    BY MS. DARWIT:

3        Q.      And this is a New York Times article

4    entitled, IRS Is Looking Into Captive Insurance

5    Shelters, right?

6        **A.      Yes.**

7        Q.      Do you recognize this article?

8        **A.      Yes.**

9        Q.      Were you interviewed by a New York

10   Times reporter in connection with this article?

11       **A.      Yes.**

12       Q.      On the second page of this article,

13   it looks like the last paragraph here, you are

14   quoted as saying, they said a couple of things

15   that are extremely general, one about unscrupulous

16   promoters.

17               Do you see that?

18       **A.      Yes.**

19       Q.      Did you say that to this reporter?

20       **A.      I'm not certain I said exactly that.**

21       Q.      Did you discuss the dirty dozen list

22   of tax scams for 2015 with the New York Times

23   reporter?

24       **A.      I don't specifically recall.**

25       Q.      Okay.  And you're also quoted as

Clark, Celia R - Vol. 3                          September 11, 2023

32

1  saying, at the end of this paragraph here, but

2  when you're dealing with that level of generality,

3  I don't get anything out of that that would be

4  useful.  We're waiting to hear how it plays out in

5  court.

6          Do you see that?

7  A.      Yes, I see that.

8  Q.      Did you make that statement to the

9  New York Times reporter?

10 A.      Possibly.

11 Q.      Do you know?

12 A.      No.

13 Q.      Okay.  And on the fifth page, you are

14 quoted in the fourth paragraph as stating that the

15 really huge advantage that I didn't spell out in

16 the trust and estates article because I don't want

17 the wrath of an enormous agency coming down on my

18 head is that the only gift that is considered a

19 gift is the initial contribution being paid into

20 the trust.

21         Do you see that?

22 A.      I see that.

23 Q.      Did you make that statement to the

24 New York Times reporter?

25 A.      I don't believe so.

Clark, Celia R  - Vol. 3                    September 11, 2023

33

1      Q.      Do you recall what you did tell the
2  New York Times reporter?
3      **A.      It wasn't much.  The interview was**
4  **perhaps five minutes.**
5      Q.      Why is it your understanding that you
6  did not make this statement to the New York Times
7  reporter?
8      **A.      I don't remember it.**
9      Q.      Okay.  Do you not know whether you
10  made this statement to the New York Times
11  reporter?
12      **A.      I do not know.**
13      Q.      Okay.
14              MS. DARWIT:  I'll mark my next
15      document.  This will be Exhibit 326.  It's
16      Bates stamped ClarkSDFL1544863.
17              (Whereupon Exhibit 326,
18      ClarkSDFL1544863 through ClarkSDFL1544869,
19      was marked for Identification.)
20              MS. DARWIT:  Do you have it?
21              MR. NEIMAN:  No.
22              MR. VOLLRATH:  I've got it.  Your
23      computer is running behind mine.
24              (Whereupon a discussion was held off
25      the stenographic record.)

Clark, Celia R  - Vol. 3                          September 11, 2023

34

1    BY MS. DARWIT:

2         Q.      Ms. Clark, do you recognize this

3    document?

4         **A.      I have a vague recollection of his**

5    **articles, generally, Cantley's articles generally.**

6    **I have a vague recollection of them.**

7         Q.      Are you referring to Professor

8    Beckett G. Cantley referenced here?

9         **A.      Yes.**

10        Q.      And do you know Mr. Cantley?

11        **A.      No.**

12        Q.      What the about the recipient, Geoff

13   Dietrich; do you know him?

14        **A.      No.**

15        Q.      And did you -- this is dated

16   September 15, 2013, right?

17        **A.      Yes.**

18        Q.      Did you read this memo around the

19   time that it was dated?

20        **A.      I don't recall.**

21        Q.      Did you ever read this memo?

22        **A.      I don't recall.**

23        Q.      You received it at some point,

24   though, right?

25        **A.      I don't know.**

Clark, Celia R  - Vol. 3                    September 11, 2023

35

1          Q.       Okay.

2                   MS. DARWIT:  I will mark my next

3          document.  It will be Exhibit 327.  It's

4          Bates stamped OJM-0016849.

5                   (Whereupon Exhibit 327, OJM-0016849

6          through OJM-0016850, was marked for

7          Identification.)

8     BY MS. DARWIT:

9          Q.       On the bottom of the first page here,

10    it's an e-mail that you received from David

11    Mandell July 28th, 2009.  Right?

12         **A.       That's what it says.**

13         Q.       Okay.  And -- okay.  And in this

14    e-mail Mr. Mandell is asking you whether you think

15    that it's likely that captives will become a

16    transaction of interest.  Right?

17         **A.       He asks if I had looked into that**

18    **issue.**

19         Q.       Okay.  And your response to

20    Mr. Mandell is on the top of this page dated July

21    29th, 2009, right?

22         **A.       Yes.**

23         Q.       In the first paragraph, you state in

24    the -- at the end of the paragraph, we have so

25    many rulings on small captives already that I

Clark, Celia R  - Vol. 3                    September 11, 2023

36

1   doubt we will see a transaction of interest label

2   at this point.  The ones that have been issued are

3   completely different from captives.

4           Do you see that?

5       A.      I see that.

6       Q.      Which rulings are you referring to

7   here?

8       A.      I'm not certain.

9       Q.      Did you think that it was unlikely

10  that microcaptives would become a listed

11  transaction?

12      A.      What's the date of this again,

13  please?

14              I was asking for specific

15  information, I was going to run it down.  I was

16  interested.

17      Q.      Did you think that it was unlikely,

18  though, that captives would become a listed

19  transaction because there were so many rulings on

20  small captives already?

21      A.      At that point, I had no basis to

22  believe that there would be a transaction of

23  interest decision.

24      Q.      When you say that there's so many

25  rulings, are you referring to IRS guidance?

Clark, Celia R  - Vol. 3                                    September 11, 2023

37

1         A.       I am not certain.

2         Q.       Do you know whether so many rulings

3    refers to case law?

4         A.       I am not certain.

5              MS. DARWIT:  I'll mark my next

6         document.  This will be Exhibit 328.  It's

7         Bates stamped ClarkSDFL346871.

8              (Whereupon Exhibit 328,

9         ClarkSDFL346871 through ClarkSDFL346872, was

10        marked for Identification.)

11   BY MS. DARWIT:

12        Q.       Ms. Clark, starting at the bottom of

13   this first page here, do you see this e-mail from

14   Jim Fowler to Bryan Overcash and other

15   individuals?

16        A.       Yes.

17        Q.       Okay.  And this e-mail, if we scroll

18   up, was forwarded by Bryan Overcash to someone

19   with the e-mail address, SA Spencer, asking if you

20   were available for a phone call.

21              Do you see that?

22        A.       Yes.

23        Q.       And the subject of these e-mails is

24   terrorism risk level and terrorism report.  Right?

25        A.       Yes.

Clark, Celia R  - Vol. 3                                    September 11, 2023

38

1          Q.        Okay.  And this e-mail is forwarded

2     to you, November 11th, 2008.  Right?

3          **A.        That's what it says.**

4          Q.        Okay.  And then at the top here it's

5     finally your response e-mail to Mr. Spencer,

6     November 11th, 2008, right?

7          **A.        Yes.**

8          Q.        Okay.  Lets scroll back down to the

9     first e-mail here.  The fourth item -- first I'll

10    start at the top here to orient everyone.

11              In this e-mail, Mr. Fowler says that

12    he has taken the morning to review the documents

13    provided and wondered if we might be able to set

14    up another call to discuss some talking points.

15              Do you see that?

16         **A.        Yes.**

17         Q.        And he says he's prepared the bullet

18    points that he'd like to address.

19              Do you see that?

20         **A.        Yes.**

21         Q.        The fourth bullet point on this list

22    addresses pricing.

23              Do you see that?

24         **A.        Yes.**

25         Q.        And toward the bottom of this bullet,

Clark, Celia R  - Vol. 3                      September 11, 2023

39

1    there are -- there's a sentence that starts with,

2    that would lead any auditor to believe that some

3    weight should be given to the inherent discount of

4    insuring outside of the high risk zone, yet none

5    has in this example.

6               Do you see that?

7    **A.      I see that.**

8         Q.      And in this last or second to last

9    sentence here, the author states that what the

10   total numbers are projected -- when the total

11   numbers are projected out it would appear that GCS

12   would be paying $300,000 in premiums for a two

13   million dollar loss policy.

14              Right?

15   **A.      Yes.**

16        Q.      Coupled with the fact that all other

17   lines of risk may not be pooled and they would be

18   paying one million dollars of total premiums for

19   an outside coverage of two million dollars of

20   risk, all other risk being self-insured.

21              Do you see that?

22   **A.      Yes.**

23        Q.      And then he concludes, these numbers

24   would not appear to support a sufficient

25   risk-shifting analysis.  Bottom line question,

Clark, Celia R  - Vol. 3                         September 11, 2023

40

1    would you pay a million dollars for third party

2    coverage of two million dollars if there were no

3    captive tax benefits?

4              Do you see that?

5    **A.      Yes.**

6        Q.      Scrolling up to your response at the

7    very top here, you state, Steve, this is a

8    problem.  The questions show a lack of

9    understanding of the risk pool, which is not

10   really their fault since they don't have a

11   complete set of documents.

12             Right?

13   **A.      Yes.**

14       Q.      And you also go on in this e-mail to

15   state that, I am afraid the client is going to

16   have to decide whether to go forward without Dixon

17   Hughes approval or to postpone the transaction

18   until next year.

19             Do you see that?

20   **A.      Yes.**

21       Q.      And you state at the very end, this

22   is -- you state, you have the client relationship,

23   what do you recommend?

24             Do you see that?

25   **A.      I'm sorry.  Where would that be?**

Clark, Celia R  - Vol. 3                                 September 11, 2023

41

1          Q.        At the very end, this last sentence

2    here; you have the client relationship, what would

3    you recommend?

4          A.        Yes, I see that.

5          Q.        Okay.  Who is Mr. Spencer?

6          A.        I don't recall.

7          Q.        Okay.  After receiving this e-mail

8    from Mr. Spencer, did you raise any concerns to

9    Mr. Rosenbach -- let me start over.

10                   After receiving this e-mail from

11   Mr. Spencer, did you raise any concerns to

12   Mr. Rouner about the pricing of the terrorism

13   policies?

14         A.        I don't recall.

15         Q.        Do you recall otherwise responding to

16   this particular individual, Mr. Spencer, about the

17   concerns raised here?

18         A.        I don't even recall who he is.

19         Q.        Okay.  Just in general, did you have

20   concerns about the pricing of the terrorism policy

21   around the 2008 timeframe?

22         A.        I did not.

23         Q.        Did this e-mail cause any concerns to

24   you about those errors in pricing?

25         A.        Would you repeat that?  I'm sorry.  I

Clark, Celia R  - Vol. 3                            September 11, 2023

42

1  was reading.

2      Q.     Sure.  Yeah.

3             The e-mail that you received from

4  Mr. Spencer, did it cause any concerns to you

5  about the terrorism pricing?

6      A.     No.  I mean, I guess -- I really

7  should say I don't recall.

8             Reading it here now, it doesn't give

9  me cause for concern.

10     Q.     Okay.

11            MS. DARWIT:  I'll mark my next

12     document.  This will be Exhibit 329.  It's

13     Bates stamped ClarkSDFL716142.

14            (Whereupon Exhibit 329,

15     ClarkSDFL716142 through ClarkSDFL716145, was

16     marked for Identification.)

17  BY MS. DARWIT:

18     Q.     Beginning in the middle of the second

19  page here is an e-mail from someone named Steve

20  Paulin to Bruce Ogilvie.  Do you see that?

21     A.     Yes.

22     Q.     Who is Steve Paulin?

23     A.     I don't know.

24     Q.     Who is Bruce Ogilvie?

25     A.     He is someone who ultimately became a

Clark, Celia R  - Vol. 3                                September 11, 2023

43

1    client.

2         Q.       Okay.  Do you know the name of the

3    business that he owned?

4         A.       It changed.  Alliance Entertainment

5    is the old one -- or the new one.

6         Q.       Do you recall any other names it went

7    by?

8         A.       CD Listening Bar.

9         Q.       In this e-mail, Mr. Paulin states

10   that, I did not want to mention this in front of

11   Dick, but I believe your captive structure and

12   deductibility of premiums is compromised by the

13   terrorism pooling arrangement.  The large premium

14   amount may not qualify as ordinary and necessary.

15            Do you see that?

16        A.       Yes.

17        Q.       Did you form a captive insurance

18   company for Mr. Ogilvie?

19        A.       Ultimately.

20        Q.       Okay.  And when did you form that

21   captive for Mr. Ogilvie?

22        A.       I don't recall.

23        Q.       Okay.  And at the end of this

24   e-mail -- I guess in the middle of this e-mail, he

25   states that, as noted in the links below, and

Clark, Celia R  - Vol. 3                                    September 11, 2023

44

1    intimated by ICS, Celia Clark has received a

2    summons from the IRS to produce documents for each

3    insured listed on the terrorism coverage with

4    Diversified Insurance.

5            Do you see that?

6    **A.      Yes.**

7    Q.      He states that this is a red flag.

8            Do you see that?

9    **A.      Yes.**

10           **Who wrote that again, please?**

11   Q.      That is -- Mr. Paulin is the

12   individual indicated on the e-mail.

13   **A.      Okay.**

14   Q.      Okay.  And then the e-mail after that

15   is from Mr. Ogilvie to you, July 31st, 2012,

16   right?

17   **A.      Yes.**

18   Q.      Okay.  And he states in this e-mail

19   that he met with a friend who brought a friend,

20   who was Steve, who talked about captives, right?

21   **A.      Yes.**

22   Q.      Okay.  And he's asking whether the

23   IRS summons is true.

24           Do you see that?

25   **A.      Yes.**

Clark, Celia R  - Vol. 3                                        September 11, 2023

1      Q.       Okay.   And Mr. Ramirez has a response

2  to Mr. Ogilvie.   Right?

3      **A.       Yes.**

4      Q.       And then if we scroll up to the top,

5  this is your e-mail to Mr. Ogilvie and Mr. Ramirez

6  on August 1st, 2012.   Right?

7      **A.       Yes.**

8      Q.       And you state in this e-mail, the

9  short version is that a competitor of mine

10  circulated the summons with an e-mail making it

11  sound as if I was the target of an IRS

12  investigation.   That's flat out wrong and I'm

13  taking legal action.   IRS wanted confidential

14  client information relating to an audit of a

15  former client of mine that I was not authorized to

16  release without a summons.

17              Do you see that?

18      **A.       Yes.**

19      Q.       Later this month, August 2012, you

20  were notified by the IRS that you were under

21  investigation.   Right?

22      **A.       Later this month being August 2012?**

23      Q.       Yes.

24      **A.       Which investigation?**

25      Q.       Were you notified by the IRS in

Clark, Celia R  - Vol. 3                                September 11, 2023

1    August 2012 that you were under investigation for

2    potential penalties for promoting an abusive tax

3    shelter?

4          A.      It was either August or September.

5          Q.      Okay.  Did you follow up with your

6    client, Mr. Ogilvie, and tell him that you

7    actually were under investigation, to correct what

8    you had said in this e-mail?

9                  MR. VOLLRATH:  Object to form.

10                 THE WITNESS:  I don't believe so.

11   BY MS. DARWIT:

12         Q.      In general, between 2012 and 2016,

13   did you tell any of your clients that you were

14   under investigation for possible penalties for

15   promoting an abusive tax shelter?

16         A.      I told several people.  I am not

17   certain if they were clients at the time.

18         Q.      Can you recall any specific clients

19   that you notified?

20         A.      I can't recall if they were clients

21   at the time.

22         Q.      But can you recall any specific

23   clients that you told?

24         A.      I told several people.

25         Q.      Okay.  Were any of them clients?

Clark, Celia R  - Vol. 3                          September 11, 2023

47

1          **A.        Not --**

2                      MR. VOLLRATH:  Objection.  Asked and

3          answered.

4     BY MS. DARWIT:

5          Q.        You can answer.

6          **A.        At the time I told them, I don't**

7     **know.**

8          Q.        Okay.  Did you tell any potential

9     clients that you were under investigation for

10    possible penalties for promoting an abusive tax

11    shelter between 2012 and 2016?

12         **A.        Potential clients.  Yes.**

13         Q.        Who?

14         **A.        Bill Johnson.  Chris Jarvis.**

15    **Possibly others.**

16         Q.        Bill Johnson was your co-counsel on

17    various captive insurance related services, right?

18         **A.        He was.**

19         Q.        And did Mr. Johnson also have you

20    form a captive for him?

21         **A.        He had me form Emerald International**

22    **Reinsurance Company.**

23         Q.        Do you consider him a client?

24         **A.        Yes.**

25         Q.        Mr. Jarvis; did you form a captive

Clark, Celia R  - Vol. 3                                        September 11, 2023

48

1    insurance company for him?

2         **A.      I formed Jade... Jade**

3    **International -- no, I don't know if it has**

4    **"international" in there.  We formed Jade in**

5    **Alabama.**

6         Q.       Other than Mr. Johnson and

7    Mr. Jarvis, did you tell any other potential

8    clients that you were under investigation for

9    possible penalties for promoting an abusive tax

10   shelter?

11        **A.       Not that I can recall at this moment.**

12        Q.      All right.

13              MS. DARWIT:  I'll mark my next

14        document.  This will be Exhibit 330.  It's

15        Bates stamped ClarkSDFL1448278.

16              (Whereupon Exhibit 330,

17        ClarkSDFL1448278 through ClarkSDFL1448282,

18        was marked for Identification.)

19   BY MS. DARWIT:

20        Q.      All right, Ms. Clark, this is a four

21   or five page document, and I'll start in the

22   middle of the second page here.

23              This is an e-mail that you received

24   from Jerome Jonckheere, July 2nd, 2013, right?

25        **A.      Yes.**

Clark, Celia R  - Vol. 3                    September 11, 2023

                                                            49

 1       Q.      Who is Jerome Jonckheere?

 2       **A.      He is a CPA at Plante Moran.**

 3       Q.      And was he an advisor to one of your

 4   captive insurance clients?

 5       **A.      At that time, I'm not certain.**

 6       Q.      Do you see where the subject says,

 7   Imperial Crane, Captive Insurance Companies?

 8       **A.      Yes.**

 9       Q.      Imperial Crane was one of your

10   clients, right?  Imperial Crane -- yeah, Imperial

11   Crane was one of your clients, right?

12       **A.      Ultimately.**

13       Q.      And in this e-mail, he's discussing

14   something called a more likely than not confidence

15   level.

16       **A.      Right.**

17       Q.      Do you see that?

18       **A.      Yes.**

19       Q.      And that's an accounting term, right?

20       **A.      Yes.**

21       Q.      And you state in this e-mail --

22   strike that.

23               The third paragraph here, which

24   begins with, your memo discusses, the second

25   sentence, he asks, would you consider expanding on

Clark, Celia R  - Vol. 3                                   September 11, 2023

                                                                    50

1    the memorandum as a covered opinion with an MLTN

2    level of assurance as it is currently written

3    solely as an internal memo?

4              Do you see that?

5        A.    **Yes.**

6        Q.    First, what internal memo is he

7    referring to here?

8        A.    **I don't recall.**

9        Q.    Did you prepare a memo that was a

10   covered opinion with a more likely than not level

11   of assurance for Imperial Crane?

12       A.    **No.**

13       Q.    Why not?

14       A.    **As I recall, the client and its**

15   **advisors decided they didn't need that.**

16       Q.    At some point after this e-mail was

17   sent, the advisor changed their mind about asking

18   for a formal opinion from you?

19       A.    **That's my recollection.**

20       Q.    Did you ever prepare formal tax

21   opinions for your clients?

22       A.    **Not during 2008 to 2016.**

23       Q.    Other than this e-mail, were you

24   asked to prepare formal tax opinions for clients?

25       A.    **As I said, this request was dropped.**

Clark, Celia R  - Vol. 3                           September 11, 2023

1    **The question of an opinion letter came up fairly**

2    **frequently.**

3         Q.      Did you ever prepare a formal tax

4    opinion letter for a client?

5         A.      **Not for small captives, not within**

6    **2008 to 2016.**

7         Q.      Okay.  Scrolling up to page one here.

8    This is an e-mail that you sent in response to

9    Mr. Jonckheere asking him whether the client would

10   be able to claim full deduction for 2012, right?

11        A.      **Yes.**

12        Q.      Did Mr. -- Mr. Jonckheere responds to

13   you, July 5th, 2013, right?

14        A.      **Yes.**

15        Q.      And he explains in this e-mail that

16   the client can claim a full deduction, but certain

17   additional disclosures are required.  Right?

18        A.      **You said this lists additional**

19   **disclosures?  Was that your question?**

20        Q.      No.

21                He's telling you in this e-mail that

22   the client, Imperial Crane, can claim the full

23   deduction but they just have to include additional

24   disclosures on their tax returns and financial

25   statements.  Right?

Clark, Celia R  - Vol. 3                          September 11, 2023

52

1        A.       I'm not sure that this is saying
2  that, exactly --
3        Q.       Okay.
4        A.       -- the only point was that more
5  likely than not standard.
6        Q.       Okay.  But he's saying here that he
7  doesn't think the more likely than not standard
8  has been met, right?
9        A.       Yes.  At that point, yes.
10        Q.       Okay.  And if you scroll down to the
11  paragraph beginning with, where we have trouble.
12  I guess it's the third to last paragraph.  He
13  states, where we have trouble reaching the more
14  likely than not standard is due to the application
15  of the 30 percent standard for unrelated risks.
16               Do you see that?
17        A.       Where we have trouble reaching.  Yes.
18  I see that.
19               Let me read that a moment.
20               Yes.  I see it.
21        Q.       He also discusses something called
22  Harper.  Do you see that?
23        A.       Yes.
24        Q.       And is your understanding that the
25  Harper reference here is a Tax Court decision

Clark, Celia R  - Vol. 3                          September 11, 2023

53

1    about a captive insurance company?

2         A.      Yes.

3         Q.      He states that he thinks the fact of

4    Harper are significantly different than the

5    current structure, right?

6         A.      Yes.

7         Q.      And he lists a number of reasons why,

8    in this e-mail, right?

9         A.      He lists -- I'm just reading what

10   you're reading.  I'm not sure what interpretation

11   you're giving it.

12        Q.      Do you see where he states, while the

13   30 percent standard adopted in Harper could be

14   argued, the facts in Harper are significantly

15   different than the current structure, i.e., actual

16   third parties rather than risk pools, one type of

17   insurance rather than multiple lines, continuation

18   of previously purchased insurance and comparable

19   to unrelated policies concurrently sold by Harper.

20   IRC 831(b) election not made in Harper, third

21   party and related party losses were significant

22   and were paid.

23               Do you see that?

24        A.      Yes.  Yes.

25        Q.      Do you agree that your captive

Clark, Celia R  - Vol. 3                                September 11, 2023

54

1    insurance program is distinguishable from Harper

2    in the ways described here?

3         A.       I came to a different conclusion,

4    which he ultimately agreed with.

5         Q.       That wasn't my question.  It was

6    whether you agree that your captive insurance

7    structure is distinguishable from Harper in the

8    ways listed here.

9         A.       Some of it, yes.  Some of it, I would

10   have to go back and reread Harper.

11        Q.       Which part do you agree with?

12        A.       We were not -- Harper was not talking

13   about multiple lines.  I agree with that.

14        Q.       By multiple lines, do you mean the

15   reinsurance pool at issue, which was Pan American

16   at this time, only issued one line of insurance?

17        A.       Oh, excuse me.  This is 2013?

18        Q.       Yes.  Regarding 2012, right?  Do you

19   see that?

20        A.       So this was not Pan American.

21        Q.       Okay.  Pan American was not used in

22   2012?

23        A.       Not in 2013.  No, not in 2012 either.

24        Q.       Okay.  So then do you agree that --

25   with the statement here about there being multiple

55

1    lines in Harper --

2        A.        Yes, I agree with that -- no.

3    **Multiple lines in the current structure.**

4        Q.        Okay.  Is there anything else that's

5    described here that you agree is distinguishable

6    between your captive insurance program and Harper?

7        A.        **I cannot recall Harper details that**

8    **clearly at this point.**

9        Q.        Okay.  Did this e-mail cause you to

10   have any concerns about the risk pooling structure

11   that you were using at the time?

12       A.        **I take -- I took comments like this**

13   **very seriously.  The discussion was of great**

14   **interest to me.  Concern beyond that, no.**

15       Q.        Okay.

16             MS. DARWIT:  We can go off the

17       record.

18             THE VIDEOGRAPHER:  10:53, we're off

19       the record.

20             (Whereupon a discussion was held off

21       the stenographic record and video record.)

22             (Whereupon a recess was taken.)

23             THE VIDEOGRAPHER:  11:13, we're on

24       the record.

25             MS. DARWIT:  I'll mark my next

Clark, Celia R  - Vol. 3                               September 11, 2023

56

1          Exhibit which will be Exhibit 331.  It's

2          Bates stamped ClarkSDFL832564.

3                   (Whereupon Exhibit 331,

4          ClarkSDFL832564 through ClarkSDFL832565, was

5          marked for Identification.)

6    BY MS. DARWIT:

7          Q.       Ms. Clark, starting at the middle of

8    the first page here, this is an e-mail from Bill

9    Johnson to you, September 11th, 2009.  Right?

10         **A.       Right.**

11         Q.       And in this e-mail, scanning down to

12   the middle of it, do you see where he says,

13   turning to another one of my clients, I have a

14   client who is in his early 70s, but simply refuses

15   to retire from the practice of medicine.

16         **A.       Yes, I see that.**

17         Q.       Okay.  And he states, in the next

18   paragraph, that this client's taxable estate is

19   beginning to grow too quickly and he has made an

20   appointment with me for Monday, September 14th to

21   hear my latest estate planning strategies which,

22   of course, include the captive insurance company

23   owned by the multiple generation-skipping trust

24   outside of his estate.

25                   Do you see that?

Clark, Celia R  - Vol. 3                                 September 11, 2023

57

1          A.      Yes.

2          Q.      Do you agree that a captive insurance

3  company owned by multiple generation-skipping

4  trusts is an estate planning strategy?

5          A.      It could be.

6          Q.      Do you agree that it is?

7          A.      It was not my strategy, in this case.

8          Q.      Do you disagree with his

9  characterization here?

10          A.      It could work.

11          Q.      Do you agree that it is an estate

12  planning strategy, though?

13          A.      It can be.

14          Q.      Okay.  Was it common for your clients

15  to refer to your captive services as an estate

16  planning device when they were communicating with

17  you?

18          A.      So I want to point out, this is not a

19  client referring to this and it's not my services

20  he's even talking about.

21                  Bill Johnson is a very well known

22  estate planner, so he was telling me he had these

23  ideas, but he would be the one that was

24  implementing them.

25          Q.      Well, he's stating here, though, that

Clark, Celia R  - Vol. 3                    September 11, 2023

58

1   his latest estate planning strategy includes

2   captive insurance companies owned by multiple

3   generation-skipping trusts, right?

4        **A.      Yes, that's what he says.**

5        Q.      Okay.  So I'm asking you whether it

6   was common for your clients to refer to your

7   captive services as an estate planning strategy.

8        **A.      It doesn't even happen in this**

9   **e-mail.  I would say no.**

10       Q.      Was it common for your clients to

11   refer to your captive services as a tax planning

12   strategy?

13       **A.      Tax planning is part of the**

14   **discussion, always.  Almost always.  But it's not**

15   **anywhere near the end of the discussion, between**

16   **me and my clients.**

17       Q.      Okay.  So in your view, are captive

18   insurance companies tax planning devices?

19       **A.      Can be in part.**

20       Q.      Approximately how many co-counsel

21   relationships -- or rather how many clients did

22   you and Bill Johnson jointly represent?

23       **A.      I don't have a number.  It was**

24   **several.**

25       Q.      Okay.  More than five?

Clark, Celia R  - Vol. 3                    September 11, 2023

59

1          **A.        Yes.**

2          Q.        More than ten?

3          **A.        Possibly.**

4          Q.        Do you agree that the captives that

5     you formed for your clients had no value without

6     the tax benefits in sections 162 and 831(b) of the

7     tax code?

8          **A.        No.**

9          Q.        Some of your clients formed multiple

10    captives, right?

11         **A.        Yes.**

12         Q.        What business reason is there to

13    establish multiple captives?

14         **A.        Do you want to talk about a specific**

15    **case?**

16         Q.        Just generally.

17         **A.        There could be various; employee**

18    **recruitment, division along family lines,**

19    **different types of insurance.**

20              **It would be segregated, could be**

21    **segregated that way, so those would be the main**

22    **ones that I can recollect right now.**

23         Q.        The first one, about employees, can

24    you expand on that a little bit?

25         **A.        Yes.  I can give you a specific**

Clark, Celia R  - Vol. 3                              September 11, 2023

60

1   example, if you want.

2        Q.      Sure.

3        A.      There was a physicians group in

4   Illinois called Decatur Radiology and there were

5   different levels of employees within the medical

6   practice and the senior doctors wanted separate

7   ownership in a captive for their interest, but

8   they wanted a second captive that would be owned

9   over time by a growing number of the junior

10  doctors, as an employee retention and recruiting

11  tool.

12       Q.      So why were separate captives formed

13  in that situation?

14       A.      Separate ownership.

15       Q.      In order to have the captives be

16  separate -- or rather the doctors in the practice

17  were wanting to own two different companies?

18       A.      Different doctors.

19       Q.      Okay.  And when you said division of

20  along family lines as another to reason to form

21  multiple captives, what did you mean by that?

22       A.      Again, I can give you a specific

23  example.

24              Dr. J.J. Shah, three children, three

25  sets of grandchildren; they don't always agree.

Clark, Celia R  - Vol. 3                    September 11, 2023

61

1    **He did not want conflict between them after he**

2    **passed.  That was his intention, to have a captive**

3    **for each family line.  He also of course had**

4    **massive amounts of risk from the Gwinnett Clinics.**

5         Q.     So multiple captives were established

6    for Mr. Shah for estate planning reasons?

7              MR. VOLLRATH:  Object to form.

8              THE WITNESS:  No.

9              MS. DARWIT:  I'll mark my next

10        exhibit.  This will be previously marked

11        Exhibit 11.

12              (Exhibit 11, Wilson-324999 through

13        Wilson-325000, was previously marked for

14        Identification.)

15   BY MS. DARWIT:

16        Q.     I'll start at the bottom of the first

17   page here.

18              This is an e-mail that you received

19   from Mr. Wilson, December 10th, 2009.  Right?

20        **A.     Yes, that's what it says.**

21        Q.     James Wilson, was he a client of

22   yours at this time?

23        **A.     I'm not sure if he was then a client.**

24        Q.     At some point he was a client of

25   yours?

Clark, Celia R  - Vol. 3                          September 11, 2023

62

1          A.       At some point, yes.

2          Q.       The second full paragraph on the

3    second page here begins with, the post-transfer

4    chart.

5                   Do you see that?

6          A.       Yes.

7          Q.       Okay.  And in this paragraph,

8    Dr. Wilson says that the present plan is to make a

9    separate purchase of the captive by the two

10   irrevocable trusts and use the income and

11   insurance premiums from Rifa Jace to pay out the

12   revocable trust over time.

13                  Do you see that?

14         A.       Yes, I see that.

15         Q.       He continues:  Another thought was to

16   establish a second captive owned by the two

17   irrevocable trusts and use its premiums and income

18   to purchase Rifa Jace move it underneath the

19   trusts.

20                  Do you see that?

21         A.       I see it.

22         Q.       Okay.  And he says, we're considering

23   this because both Future Formulations and

24   Immunogenics Company of America are expected to

25   grow substantially over the next few years and we

Clark, Celia R  - Vol. 3                              September 11, 2023

63

1   will need a second insurance company to help

2   defray income from their added revenues.

3              Do you see that?

4        A.        Yes, I see that.

5        Q.        He says, this is because their

6   combined profits should exceed the limits of the

7   current maximum allowed for insurance premiums.

8   Right?

9        A.        I see that.

10       Q.        Is your understanding that the term

11  defray income refers to reducing taxable income?

12       A.        **For the business operations, Future**

13  **Formulations and Immunogenics were different**

14  **business operations.**

15              **Yes, I think he was talking about**

16  **profits and tax in that particular place.**

17       Q.        Okay.  And in your response here --

18  why don't you just take a look at your response

19  here and let me know when you're finished.

20       A.        Yes, I've read it.

21       Q.        Okay.  In your response, you do not

22  tell Dr. Wilson that forming a second captive

23  insurance company for the stated purpose of

24  reducing taxable income is improper.  Right?

25              MR. VOLLRATH:  Object to form.

Clark, Celia R  - Vol. 3                    September 11, 2023

64

1                    THE WITNESS:  It's not part of this

2        e-mail.

3    BY MS. DARWIT:

4        Q.      Did you ever tell Dr. Wilson that

5    forming second captives for the stated purpose of

6    reducing taxable income is improper?

7                    MR. VOLLRATH:  Object to form.

8                    THE WITNESS:  Correct me if I'm

9        wrong, you said for the purpose of, implying

10       that's the sole purpose.  Is that --

11   BY MS. DARWIT:

12       Q.      I said for the purpose, the stated

13   purpose of reducing --

14       **A.      A purpose.  A purpose.**

15               **I believe I stated a few moments ago,**

16   **it's -- generally income tax planning is part of**

17   **the discussion a client would have with my office,**

18   **and James Wilson was no exception.**

19       Q.      But in Mr. Wilson's e-mail here, tax

20   planning is not just part of the discussion; it's

21   the sole reason he identifies for forming a second

22   captive.  Right?

23       **A.      In this e-mail it is what he is**

24   **thinking about, apparently.**

25       Q.      Okay.  So did you tell him at any

Clark, Celia R  - Vol. 3                                    September 11, 2023

65

1    point that forming a second captive for the sole

2    reason of reducing taxable income is improper?

3         **A.**       **Yes.**

4         Q.       You did.

5         **A.**       **Yes.**

6         Q.       Is that in a written communication?

7         **A.**       **Yes.**

8         Q.       When was that?

9         **A.**       **At the beginning of the relationship.**

10        Q.       What kind of document; was it an

11   e-mail?

12        **A.**       **No.  The written part would be in the**

13   **executive summary, websites, articles that I wrote**

14   **that I sent to him for review.  There would be an**

15   **oral part, also, with his tax advisors.  There**

16   **were conference calls.**

17        Q.       Anything else?

18        **A.**       **Not that I recall right now.**

19        Q.       Okay.

20             MS. DARWIT:  I will mark my next

21        document.  This will be Exhibit 332.  It's

22        Bates stamped ClarkSDFL826235.

23             (Whereupon Exhibit 332,

24        ClarkSDFL826235 through ClarkSDFL826235, was

25        marked for Identification.)

Clark, Celia R  - Vol. 3                     September 11, 2023

66

1                    MR. VOLLRATH:  I'm sorry.  The number

2        again?

3                    MS. DARWIT:  332.

4    BY MS. DARWIT:

5        Q.      Ms. Clark, I'll start at the middle

6    of the first page here.

7                    This is an e-mail that you received

8    from someone named Michael Connolly, October 15th,

9    2012.  Right?

10       **A.      Yes.**

11       Q.      Who is Mr. Connolly?

12       **A.      I have a little bit of recollection**

13   **here.  I do see that, from the e-mail, that he's**

14   **with Maxis Group, which was a client.**

15       Q.      Okay.  And he states in this e-mail,

16   another question for you.  Different variation of

17   one that I asked before.  Of course this is to try

18   to maximize our CIC tax benefits.

19                    Do you see that?

20       **A.      Yes, I see that.**

21       Q.      CIC, does that stand for captive

22   insurance company?

23       **A.      Yes.**

24       Q.      And he asks -- rather he states, our

25   issue is and will always be funding our payroll

Clark, Celia R  - Vol. 3                                          September 11, 2023

67

1    after moving funds to the CIC/trust/pool.

2              Do you see that?

3    A.        Yes.

4    Q.        And then he asks you, if we need to

5    borrow funds from our personal finances to fund

6    payroll for three or four months in 2013 because

7    of the amount we put in the CIC, would that be a

8    tax issue?

9              Do you see that?

10   A.        Yes, I see that.

11   Q.        At the top here is your response

12   e-mail to Mr. Connolly dated October 18th, 2012.

13   Right?

14   A.        Yes.

15   Q.        And you tell him that borrowing from

16   payroll per se does not trouble you as long as --

17   rather, you state that borrowing from payroll per

18   se does not trouble you.  As you point out this

19   happens frequently in the small business world.

20             Right?

21   A.        Yes.

22   Q.        Okay.  And you say that zeroing out

23   taxable profit using CICs is a red flag, right?

24   A.        Yes.

25   Q.        So in this response e-mail, you're

Clark, Celia R  - Vol. 3                    September 11, 2023

68

1   telling your client that it's okay for him to use

2   his entire taxable profit toward premium payments

3   to his captive insurance company as long as the

4   previously reported -- as long as he previously

5   reported profits on his tax return.  Right?

6              MR. VOLLRATH:  Object to form.

7              THE WITNESS:  Yeah, I'm not certain I

8        can confirm that at this point.

9   BY MS. DARWIT:

10       Q.     Okay.  Well, what are you advising

11   him here?

12       **A.     Don't zero out the taxable profit.**

13       Q.     Okay.  You say here that borrowing

14   from payroll per se does not trouble you, right?

15       **A.     Yes.**

16       Q.     Okay.  And you say, if there is a

17   substantial profit reported each year after

18   premium payments to a CIC and you later have cash

19   flow problems, I'm not troubled by that.

20              Right?

21       **A.     That's what it says.**

22       Q.     What did you mean by that?

23       **A.     I don't recall.**

24       Q.     Was it common for your clients to

25   tell you that they were selecting premium targets

Clark, Celia R  - Vol. 3                               September 11, 2023

69

1    based on maximizing their tax savings?

2         A.      Certain clients.  It was common for

3    certain clients.

4         Q.      Was it common for most clients?

5         A.      It was part of the discussion, but

6    your question sounded to me a little different.

7    Could you repeat it?

8         Q.      Was it common for most of your

9    clients to tell you they were selecting premium

10   targets based upon maximizing their tax savings?

11        A.      Okay.  So, for a few clients, that

12   seemed to be their main interest.  For other

13   clients, it was more complicated than that.

14        Q.      But --

15        A.      As I recall.  It was a long time ago

16   and you're asking me to generalize.  They are not

17   really in the same category.

18        Q.      Well, I'm asking whether it's common

19   for most of your clients to tell you that.

20        A.      To only look at the tax savings?  Is

21   that the question specifically?

22        Q.      No.

23               My question is whether it was common

24   for most of your clients to tell you that they

25   were selecting premium targets based on maximizing

Clark, Celia R  - Vol. 3                    September 11, 2023

70

1    their tax savings.

2        A.      I would agree with that if there was

3    an end of a sentence which said, among other

4    reasons.

5        Q.      In this e-mail from Mr. Connolly that

6    we looked at dated October 15, 2012, what other

7    reasons does he identify here?

8        A.      So this is the one I responded to in

9    a previous e-mail?

10       Q.      Yeah.  Well, your response e-mail is

11   at the top.  You testified to that.

12       A.      Yeah, that we just talked about.

13   Okay.

14               Your sea of e-mail... let me know

15   your thoughts.

16               Okay.  Is there a question?

17       Q.      Yeah.  My question is whether there's

18   any other reasons, other than tax savings,

19   identified here in this e-mail.

20       A.      Yes.  He's concerned about

21   presentation on the tax return.

22       Q.      Okay.  But the reason why he's

23   stating that he wants to put all of his company's

24   profits toward paying premiums to the captive

25   insurance company is to maximize tax benefits,

Clark, Celia R  - Vol. 3                          September 11, 2023

71

1    right?

2         A.        He doesn't exactly say that here.

3         Q.        How do you interpret his sentence, of

4    course this is to try to maximize our CIC tax

5    benefits?

6         A.        Oh, I see it, in the first sentence.

7    CIC tax benefits.  That is the subject of this

8    e-mail, plus the tax return issue.

9         Q.        Okay.  My question is whether, in his

10   e-mail where he's telling you that he wants to use

11   all of his company's profits as the amount of

12   premiums to pay toward his captive -- strike that.

13   I'll ask the question again.

14             Does he identify anything other than

15   tax benefits in telling you the amount of premium

16   that he wants to pay towards his captive?

17        A.        Not in this e-mail.

18        Q.        Okay.  Okay.  I'll remove that

19   exhibit.

20             Do you know someone named Jerry

21   Davis?

22        A.        I'm not sure.

23        Q.        Did you work with him?

24        A.        The name rings a little bell, but

25   it's a common name.

Clark, Celia R  - Vol. 3                    September 11, 2023

72

```
 1              MS. DARWIT:  I'll mark my next
 2         exhibit.  This will be Exhibit 333.  It's
 3         Bates stamped ClarkSDFL1282247.
 4              (Whereupon Exhibit 333,
 5         ClarkSDFL1282247 through ClarkSDFL 1282249,
 6         was marked for Identification.)
 7    BY MS. DARWIT:
 8         Q.    I'll start at the bottom of the first
 9    page.
10              This is an e-mail from Mr. O'Toole,
11    Dennis O'Toole, to someone named Verlyn L'Heuruex,
12    if I'm saying that correctly, February 24th, 2013.
13    Right?
14         A.    Yes.
15         Q.    Who is Mr. O'Toole?
16         A.    He was an advisor to Verlyn
17    L'Heuruex.
18         Q.    Was Verlyn L'Heuruex one of your
19    clients?
20         A.    At some point, yes.
21         Q.    In this e-mail, Mr. O'Toole says to
22    Mr. L'Heuruex, I want to give you a few things to
23    think about before Wednesday.
24              Do you see that?
25         A.    Yes.
```

Clark, Celia R  - Vol. 3                                September 11, 2023

73

1        Q.        And he says that he spoke with an IRS

2    agent.

3                  Do you see that?

4        A.        Yes.

5        Q.        Okay.  And in the next paragraph he

6    states that the direction she is going to find

7    out -- sorry.  Let me start again.

8                  She states, the direction she is

9    going is to find out if you set up a captive

10   insurance company primarily for tax money purpose.

11                 Do you see that?

12       A.        Yes.

13       Q.        You will need to explain how you

14   looked at the business risks you had with key

15   personnel, the heavy reliance on your computer

16   systems, the reliance on foreign imports that

17   could be affected by terrorism, et cetera.

18                 Did I read that correctly?

19       A.        Yes.

20       Q.        Okay.  And he also goes on to say,

21   she, referring to the IRS employee, will ask if

22   Tim or anyone discussed with you the tax benefits

23   of setting up the captive insurance company.  You

24   could explain that this was a decision that was

25   made first to protect your company that you

Clark, Celia R  - Vol. 3                                      September 11, 2023

74

1    started from the ground, and with any business

2    decision, you always want to know what the tax

3    ramifications are.

4              Did I read that correctly?

5        A.    Yes.

6        Q.    The Tim referred to here, do you know

7    who that is?

8        A.    I think I saw the name Tim Ellsworth

9    somewhere in this string.

10       Q.    Who is Tim Ellsworth?

11       A.    There it is.

12             You had discussed liability issues

13   with Tim Ellsworth who was your attorney at the

14   time and he introduced you to the captive

15   insurance arrangements that made the insurance of

16   risks more affordable.

17             That would be Tim, Tim Ellsworth.

18       Q.    Okay.  And scrolling up, this e-mail

19   is forwarded to you by Mr. O'Toole on February

20   24th, 2013.  Right?

21       A.    Yes.

22       Q.    And he asks, am I on target with my

23   comments to Verlyn.  Right?

24       A.    Yes.

25       Q.    At the top here is an e-mail that you

Clark, Celia R  - Vol. 3                    September 11, 2023

75

1   sent to Mr. O'Toole, February 24th, 2013.  Right?

2        **A.      Yes.**

3        Q.      And you state in this e-mail that

4   your only comment is that he seems to be confusing

5   business income and business risk coverages.

6   Right?

7        **A.      Yes.**

8        Q.      And you say, otherwise, very

9   appropriate comments.  Right?

10        **A.      Yes.**

11        Q.      Why did the client here need to be

12   instructed by Mr. O'Toole on the reasons why they

13   set up their captive insurance company?

14              MR. VOLLRATH:  Object to form.

15              THE WITNESS:  I don't know that there

16        was a need.  I don't know that he expressed a

17        need.  I wasn't party to that conversation.

18   BY MS. DARWIT:

19        Q.      Sitting here today, do you think that

20   his comments were very appropriate?

21        **A.      I don't see any reason to not agree**

22   **with that.**

23              **At this juncture, I recall very**

24   **little of this client or this situation.**

25        Q.      Okay.  Do you generally think that it

Clark, Celia R  - Vol. 3                        September 11, 2023

76

1      is appropriate to instruct your clients on the

2      reasons why they set up a captive during an IRS

3      audit?

4                MR. VOLLRATH:  Object to form.

5                THE WITNESS:  I don't generally think

6          that's what a lawyer should be doing.

7      BY MS. DARWIT:

8          Q.      Then why did you say in this e-mail

9      that the comments that Mr. O'Toole said were

10     appropriate?

11         **A.      Could I go down again and see the**

12     **comments exactly?**

13         Q.      Sure.

14         **A.      Okay.  You will need to explain**

15     **how... I'm really just guessing.  I don't know why**

16     **Dennis or Tim was talking to the client in this**

17     **way.  That was their decision.  It sounds as**

18     **though the client was having memory issues.  I do**

19     **seem to recall he was an elderly man.  Perhaps**

20     **this was intended to be a reminder, but I am**

21     **guessing, so I'm not supposed to guess here and I**

22     **won't.**

23         Q.      Okay.  Okay.

24                MS. DARWIT:  I'll mark my next

25          exhibit.  This will be previously marked

Clark, Celia R  - Vol. 3                    September 11, 2023

77

```
1        Exhibit 29.
2              (Whereupon Exhibit 29, OJM-0012386
3        through OJM-0012387, was marked for
4        Identification.)
5              MR. VOLLRATH:  What number?
6              MS. DARWIT:  Exhibit 29.
7   BY MS. DARWIT:
8        Q.      Okay, Ms. Clark, do you recognize
9   this document?
10       A.      Yes.
11       Q.      Did you write this document?
12       A.      2009... I wrote the original template
13   for it, but this one could have been an associate
14   who simply changed the date.
15       Q.      Okay.  Did you write a memo generally
16   about the investment restrictions for Saint Kitts
17   captive insurance companies?
18       A.      We wrote a memo most years with
19   updates.
20       Q.      Okay.  And either you or someone at
21   your law office wrote the memo.  Right?
22       A.      Yes.
23       Q.      Did you circulate this memo to all of
24   your clients at the time?
25       A.      The Saint Kitts captive insurance
```

Clark, Celia R  - Vol. 3                    September 11, 2023

78

1   company clients that -- we attempted to circulate

2   the memo to them.

3        Q.      Okay.  You circulated this memo to

4   all of your clients who had a captive formed in

5   Saint Kitts around January of 2009.  Right?

6        A.      Yeah, I can't say that we actually

7   did.  The intention was to do that.

8        Q.      What was the purpose of this memo,

9   then?

10       A.      This was about investment

11   restrictions that would apply to a Saint Kitts

12   captive insurance company.

13       Q.      Okay.  And was this prepared for

14   clients?

15       A.      And advisors.  Probably advisors

16   more, now that I think of it.

17       Q.      Was this a memo that you circulated

18   automatically to clients or their advisors when

19   you engaged -- when they engaged you for captive

20   related services?

21       A.      Not generally.  Not at that point.

22               The engagement is -- unless there

23   were questions raised at the engagement time, this

24   would not have been circulated.

25       Q.      So was this memo only circulated upon

Clark, Celia R  - Vol. 3                              September 11, 2023

79

1    request?

2          A.      At the engagement period.

3                  So before a company is formed, right,

4    so there's nothing to invest.  So I don't know

5    that there would be anything important about

6    circulating this memo.

7          Q.      Well, putting the engagement period

8    aside, so let's just say for the entirety of the

9    tax year, which is 2009 here, did you circulate

10   this memo to all of your clients?

11         A.      Yeah, so, after the first year of

12   operations, it would have been routine, it would

13   have been the intention to circulate this memo.

14         Q.      Okay.  And you made updates to this

15   memo over time, right?

16         A.      Yes, I believe so.

17         Q.      Were the updated memos routinely

18   circulated to your clients or their advisors?

19         A.      That was the intention.

20         Q.      Do you know if it happened?

21         A.      No, I cannot confirm that.

22         Q.      Okay.  In this memo, at the end here,

23   you state that real estate, life insurance and

24   joint ventures have all been approved as

25   investments of surplus.  Right?

Clark, Celia R  - Vol. 3                          September 11, 2023

1     **A.       Yes.**

2     Q.       At some point, did you start advising

3     your clients and their advisors that life

4     insurance was no longer an appropriate investment?

5     **A.       No.**

6     Q.       From 2008 to 2016, did you advise

7     your clients that life insurance was an

8     appropriate investment of the captive insurance

9     company's funds?

10     **A.       In certain conditions.**

11     Q.       Is that a yes?

12     **A.       It's a... sometimes.**

13     Q.       In what situations was it appropriate

14     for your clients to use their captive funds to buy

15     life insurance?

16     **A.       Life insurance was approved as an**

17     **investment of surplus by the Saint Kitts**

18     **regulators and also by the US National Association**

19     **of Insurance Commissioners which had model rules**

20     **for investments of property and casualty insurance**

21     **companies.  Life insurance was permitted, but**

22     **there were issues that I tried to identify to keep**

23     **my clients on the right side of the rules.**

24     Q.       What were those issues?

25     **A.       Well, one was certainly the extent.**

Clark, Celia R  - Vol. 3                                        September 11, 2023

81

1          Q.        Are you referring to the amount of
2     the captives' funds that are allocated towards
3     purchasing life insurance?
4          **A.        Yes.**
5          Q.        So from 2008 to 2016, you thought it
6     was appropriate for your clients to purchase -- to
7     use their captive funds to purchase at least some
8     amount of life insurance.  Is that fair?
9          **A.        That was one of the issues.**
10                **The other issue was whose life was**
11    **being insured and who owned that life insurance**
12    **policy, beneficiaries and the owner, there were**
13    **issues with all of those, potentially.**
14         Q.        Were clients required to notify you
15    before having their captives purchase life
16    insurance?
17         **A.        They're not required to do that in**
18    **this memo.**
19         Q.        I'm speaking generally.
20         **A.        I would say no, but they often did.**
21         Q.        How did you communicate to your
22    clients the various restrictions applicable to
23    purchasing life insurance using the captives'
24    funds?
25         **A.        Different ways.  Phone calls.  Memos,**

Clark, Celia R  - Vol. 3                              September 11, 2023

82

1    **in particular situations.**

2        Q.      What about clients who did not seek

3    pre-approval from you before purchasing life

4    insurance; how would they know the restrictions

5    applicable to the purchase of life insurance with

6    the captives' funds?

7                MR. VOLLRATH:  Object to form.

8                THE WITNESS:  So, I think this memo

9            goes pretty far as a flag on that, because it

10           does state that the statute provides the

11           Saint Kitts Registrar may prohibit or limit

12           any investment that threatens the solvency or

13           liquidity of any such company.

14               Life insurance might very well

15           threaten solvency or liquidity.  It would

16           need to be examined in detail in a specific

17           case.

18   BY MS. DARWIT:

19       Q.      Anything other than this memo?

20       **A.      Yes, there were memos to particular**

21   **clients and there were many cell phone**

22   **conversations.**

23       Q.      Okay.

24               MS. DARWIT:  I'll mark my next

25           exhibit.  It's been previously marked Exhibit

Clark, Celia R  - Vol. 3                                September 11, 2023

83

```
 1        97.
 2                (Exhibit 97, Clark_PROD0088595
 3        through Clark_PROD0088597, was previously
 4        marked for Identification.)
 5   BY MS. DARWIT:
 6        Q.      Ms. Clark, do you recognize this
 7   document?
 8        A.      I don't remember it.
 9        Q.      Diana Chen, she was an associate
10   attorney at your office, right?
11        A.      Yes, correct.
12        Q.      And the subject here is Decatur
13   Radiology Insurance Company and Premier
14   Radiologists Insurance Company?
15        A.      Yes.
16        Q.      Do you see that?
17        A.      Yes.
18        Q.      And the first sentence here states,
19   subsequent to your May 5th, 2015 conference with
20   Dr. Boorstein, Tim Tarter, Kacie Dillon, Dennis
21   Hayes, Steve Toth, Dr. Boorstein requested an
22   internal review to determine whether any
23   compliance issues exist regarding the operations
24   and activities of DRIC and PRIC.
25                Did I read that correctly?
```

Clark, Celia R  - Vol. 3                    September 11, 2023

84

1          A.      Yes.

2          Q.      DRIC and PRIC, does that refer to the

3     two captive insurance companies formed by Decatur

4     Radiology?

5          A.      Yes.

6          Q.      And Decatur Radiology owned an LLC,

7     right?

8          A.      I don't recall.

9          Q.      Okay.  Do you recall the entity

10    Decatur Premier Investments, LLC, referred to in

11    this first paragraph?

12         A.      I don't recall it, but you asked

13    about the ownership of Decatur Premier

14    Investments.  I particularly have no clue who that

15    was.

16         Q.      On the second page here there is an

17    analysis of the proportion of the captives' funds

18    that are being allocated towards life insurance

19    premiums, right?

20         A.      Let me read it a moment.

21         Q.      Sure.

22         A.      This is starting to come back a

23    little bit.

24                 Yes, I see the third column.  Yes.

25         Q.      Okay.  Did you know about Decatur

Clark, Celia R - Vol. 3                              September 11, 2023

85

1    Radiology's investments in life insurance policies

2    at the time that they were made?

3        A.      I don't believe so.  Certainly

4    nothing specific.

5              I was not really in close contact

6    with these people.  They were advised primarily by

7    Steve Toth and Dennis Hayes, both of whom are life

8    insurance salesmen, among other things.

9        Q.      Okay.

10       A.      I do not believe I was in the loop

11   here.

12       Q.      And Ms. Chen states here, in the

13   paragraph after these charts, that the high

14   proportions create the potential for a conduit

15   structure argument, where a captive insurance

16   company's underwriting premium simply flows into

17   life insurance.

18             Do you see that?

19       A.      Yes.

20       Q.      Okay.  So did it concern you when you

21   read this memo that Dr. Boorstein and the other

22   Decatur Radiology doctors were purchasing life

23   insurance in the proportions identified here?

24       A.      Yes.

25       Q.      And what did you do about it?

Clark, Celia R  - Vol. 3                    September 11, 2023

86

1          A.       I don't recall.

2          Q.       Sitting here today, do you think it's

3     appropriate for a captive insurance company to

4     invest in life insurance in the proportions

5     identified in this chart on page two?

6          A.       You have to go year by year.

7                   Certainly we had drawn in my office,

8     and this is in writing many places, we drew a red

9     line at anything over 50 percent, but we also

10    advised caution over 40 percent.

11         Q.       Okay.  So if the captive -- so

12    captive insurance companies that were investing in

13    40 percent or less of life insurance policies, you

14    deemed those investments to be proper?

15         A.       Just on the issue of extent.  There

16    are still issues, as I mentioned before.

17         Q.       Okay.  Were your clients typically

18    named as directors of their captive insurance

19    companies?

20         A.       I don't believe so.

21         Q.       Did your clients have the ability to

22    direct the captives' funds to make investments?

23         A.       Yes.

24         Q.       Was it your understanding that your

25    client relied on you to ensure that your captives

Clark, Celia R  - Vol. 3                           September 11, 2023

87

1    complied with insurance and tax laws?

2         A.        Please repeat the question.

3         Q.        Was it your understanding that your

4    clients relied on you to ensure that their

5    captives complied with tax and insurance laws?

6         A.        The investments, as I mentioned, were

7    not under our control.  To the extent things were

8    under our control, I would say yes, our engagement

9    letter is an undertaking to assist the client with

10   compliance.

11        Q.        So in your view you were not

12   responsible for advising your clients on what

13   investments comply with insurance and tax laws?

14        A.        So we've been over the investment

15   restrictions memo.

16                  Life insurance, real estate and joint

17   ventures were mentioned, as I understand that

18   memo, were mentioned as being permissible on a

19   case by case basis.  So if the client didn't tell

20   us, we wouldn't know, unless we were reviewing the

21   tax returns, but that would be on request.

22        Q.        Okay.  But I think my question was a

23   little bit different.  It was whether your

24   clients -- whether you thought that you were

25   responsible for advising your clients on what

Clark, Celia R  - Vol. 3                                September 11, 2023

88

1      investments their captives could make that comply

2      with insurance and tax laws.

3          **A.         I heard your question.  I think I**

4      **answered your question.**

5          Q.      Could you answer it again, please?

6               MR. VOLLRATH:  Object to form.

7               THE WITNESS:  We advised them on the

8          rules, particularly in the investments area.

9          We advised on a case by case basis as

10         questions were brought to us.

11     BY MS. DARWIT:

12         Q.      Okay.

13              MS. DARWIT:  I'm going to mark my

14         next document.  This will be Exhibit 334.

15         It's Bates stamped ClarkSDFL1069633.

16              (Whereupon Exhibit 334,

17         ClarkSDFL1069633, was marked for

18         Identification.)

19     BY MS. DARWIT:

20         Q.      Ms. Clark, do you recognize this

21     document?

22         **A.      Not specifically.**

23         Q.      The subject of this document is, End

24     of Year Planning For Your CIC, correct?

25         **A.      Correct.**

Clark, Celia R  - Vol. 3                              September 11, 2023

89

1        Q.      And this is on your letterhead?

2        **A.      Yes.**

3        Q.      Did you write this memo?

4        **A.      It's -- I have no reason to believe I**

5  **didn't.  I wrote similar memos to most of my**

6  **clients, not just CIC clients.**

7        Q.      Did you circulate this memo to your

8  clients whose captives were not currently being

9  held or owned by a trust?

10       **A.      I don't recall.**

11       Q.      Why did you recommend a trust

12  ownership structure?

13             MR. VOLLRATH:  Object to form.

14             THE WITNESS:  I'm not sure that's

15       exactly what this is saying.

16             This is recommending a gift, if

17       you're planning to make a gift eventually,

18       make it now.  It's the urgency of it because

19       the law is going to change.  It doesn't

20       really say you should set up a trust.  It

21       says, if you have a trust, and not counting

22       revocable living trusts, that this is a good

23       way to use your rapidly expiring gift tax

24       exemption.

25  BY MS. DARWIT:

Clark, Celia R  - Vol. 3                    September 11, 2023

90

1      Q.      So why was it a good idea, then, for
2  your clients who had existing trusts to gift their
3  captives' stock to that trust?
4          MR. VOLLRATH:  Object to form.
5          THE WITNESS:  Yeah, it's not
6      explained here, but it certainly wouldn't be
7      limited to a gift of stock to a trust.  A
8      direct gift would work, also.
9  BY MS. DARWIT:
10     Q.      But you're recommending here, if your
11 clients did have a trust, they should transfer
12 ownership in their captive from its current
13 structure to that trust.  Right?
14     **A.      We recommend making a gift.**
15         **This year, okay, my emphasis is on**
16 **this year.  It's not -- we're not recommending**
17 **that people make gifts just for tax purposes.  I**
18 **mean, gift and estate planning is a lifetime**
19 **endeavor for most clients that I have worked with.**
20 **We're pointing out that there's an expiring**
21 **deadline here, so now's the time to think about**
22 **it.  We can discuss it with them if they want.**
23     Q.      What are the benefits of having a
24 captive owned by a trust?
25     **A.      So, if the trust beneficiaries are a**

Clark, Celia R  - Vol. 3                          September 11, 2023

91

1    generation down from the CIC owners, or two

2    generations down, there would ultimately be a tax

3    benefit to those later generations.

4         Q.      Okay.  And is that because of the

5    favorable estate planning rules?

6              MR. VOLLRATH:  Object to form.

7    BY MS. DARWIT:

8         Q.      All right.  I guess the better

9    question is, what are the tax benefits you're

10   referring to?

11        A.      Estate tax benefits.

12        Q.      Okay.  Any particular estate planning

13   rules that you're referring to?

14        A.      It's complicated.  It's a combination

15   of gift tax requirements and estate taxable

16   requirements and what's counted as a gift and

17   what's counted as an estate.  And they're not the

18   same thing.

19        Q.      Okay.  On a slightly different note,

20   at some point did you stop recommending to your

21   clients that they could make loans using their

22   captives' funds to related parties?

23        A.      The investment restrictions memo we

24   were looking at a few minutes ago did say prior

25   approval was required.

Clark, Celia R  - Vol. 3                                   September 11, 2023

92

1        Q.       At any point did you say that, in

2     general, captives cannot use their funds to make a

3     loan to a related party?

4        **A.       I think we did in an informal sense.**

5     **I mean, not -- it wasn't a rule, but clients were**

6     **reporting to us that when they're audited, that**

7     **was a big issue if there were any loans.**

8        Q.       Do you remember when that was?

9        **A.       No.  After 2012.**

10             MS. DARWIT:  Okay.  We can go off the

11       record.

12             THE VIDEOGRAPHER:  12:13, we're off

13       the record.

14             (Whereupon a recess was taken.)

15        A F T E R N O O N   S E S S I O N

16             THE VIDEOGRAPHER:  12:42, on the

17       record.

18             MS. DARWIT:  I'm going to mark an

19       exhibit, it will be marked Exhibit 335.  It's

20       Bates stamped ClarkSDFL716305.

21             (Whereupon Exhibit 335,

22       ClarkSDFL716305 through ClarkSDFL716306, was

23       marked for Identification.)

24     BY MS. DARWIT:

25        Q.       I'll start at the bottom of page one,

Clark, Celia R  - Vol. 3                              September 11, 2023

93

1    Ms. Clark.

2              This is an e-mail from Robin

3    Cotterell to you and Keith Mohn dated October 5th,

4    2011, right?

5         **A.      Yes.**

6         Q.       And in this e-mail, Mr. Cotterell is

7    discussing the Pan American Reinsurance pool,

8    right?

9         **A.       I don't see Pan American mentioned**

10   **here.**

11        Q.       Okay.  If we scroll up -- rather, if

12   we scroll down here to this first e-mail chain, do

13   you see that Mr. Cotterell is discussing December

14   renewals?

15        **A.       December renewals, yes, that's what**

16   **it's about.**

17        Q.       Okay.  Is it your understanding that

18   that refers to the Pan American December pool for

19   2011?

20        **A.       That was our reinsurance company that**

21   **we used for our clients at that time.**

22             **There's also mention of James Combs**

23   **who had nothing to do with Pan American, so I'm**

24   **not sure...**

25        Q.       Okay.  Going up to your e-mail at the

Clark, Celia R  - Vol. 3                                September 11, 2023

94

1    top here, this is an e-mail that you sent to

2    Mr. Cotterell October 5th, 2011, right?

3        A.      Yes.

4        Q.      And you state in this e-mail, we

5    really want to encourage claims, so it should not

6    be seen as a penalty for those who make them.

7                Do you see that?

8        A.      Yes.

9        Q.      And then you state, the actuary

10   stresses that the pricing is skewed since claims

11   numbers are already reduced because it is more tax

12   efficient to withdraw CIC funds as dividends.

13               Do you see that?

14       A.      Yes.

15       Q.      Why did you want to encourage claims?

16       A.      At that time I was having discussions

17   with Allen Rosenbach, the actuary, as we discussed

18   earlier this morning, and one of his issues was he

19   didn't have enough claims data to make the most

20   accurate analysis.

21       Q.      Okay.  So you wanted to encourage

22   claims so that your actuary could have more

23   information for his premium pricing analysis?

24       A.      Yes.

25       Q.      And then you state here that the

Clark, Celia R  - Vol. 3                                    September 11, 2023

95

1    actuary's pricing is skewed, right?

2        **A.       He stresses that the pricing is**

3    **skewed.**

4        Q.       Okay.  And what's your understanding

5    of why the pricing was skewed?

6        **A.       My understanding is that claims,**

7    **they're not always approved, but there has to be a**

8    **claim for there to be a loss, an insurance loss.**

9    **And the actuary's job is to estimate those losses,**

10   **part of his job.**

11       Q.       So how does the lack of claims skew

12   the pricing?

13       **A.       He has less information, if there are**

14   **losses, but no one makes claims or reports them.**

15       Q.       Did you think that your clients had

16   losses but were not filing claims for them?

17       **A.       I don't know.**

18       Q.       Did you think that there were any

19   deterrents to your clients filing claims against

20   their captives?

21       **A.       Yeah, this brief e-mail mentions the**

22   **tax treatment, but that is certainly not the only**

23   **cause, in my opinion.**

24       Q.       What other deterrents are there to

25   your clients filing claims against their captives?

Clark, Celia R  - Vol. 3                                  September 11, 2023

96

```
1        A.      A lot of it was, I believe,
2   educational.  They simply did not have it as part
3   of their routine in the operations of the
4   captives.  To think about that, they really needed
5   to think about their insurance losses in a
6   different way and that was an educational process,
7   I believe.
8        Q.      Were there any other deterrents?
9        A.      The time, the hassle, they had to
10  fill out a bunch of forms, they had to submit a
11  bunch of information proving the loss and the
12  amount of the loss.
13       Q.      Any other deterrents?
14       A.      Not that I can think of right now.
15       Q.      Why is it more tax efficient to
16  withdraw funds from the captive as dividends as
17  opposed to filing an insurance claim?
18       A.      Well, that is a generality which I
19  believe was brought out by the actuary.  I'm not
20  sure if those are my words exactly.  The tax
21  efficiency is part of it, but it's not always part
22  of it at all because insurance proceeds that are
23  received by an insured can be taxed in a variety
24  of ways, and sometimes there's no tax.  So that is
25  a gross generalization, there, in that sentence.
```

Clark, Celia R  - Vol. 3                    September 11, 2023

97

1        Q.        I'll remove this exhibit.

2                  Ms. Clark, was there an exit strategy

3    that you marketed for your captive insurance

4    program?

5        **A.        That I marketed?  No, I believe my**

6    **slides that we've seen last week, that we've**

7    **talked about specifically today, we did not**

8    **endorse any exit strategy to be advisable,**

9    **generally.**

10       Q.        Exit strategies were mentioned in

11   those PowerPoint presentations, though, right?

12       **A.        Yes, that we don't endorse them.**

13       Q.        Okay.  We can go back to Exhibit 310

14   which we looked at earlier this week -- last week.

15                 It should already be in the

16   ShareFile, but... here is the paper copy,

17   Ms. Clark.  Go ahead and look at that and go ahead

18   and find the slide that discusses exit strategies.

19       **A.        Yes, I see it.**

20       Q.        And what slide number is that?

21       **A.        10.**

22       Q.        Okay.  And slide 10, it states,

23   dividends, 20 percent federal rate, right?

24       **A.        Yes.**

25       Q.        Liquidation, 20 percent federal

Clark, Celia R  - Vol. 3                           September 11, 2023

1    capital gains rate plus tax on appreciated

2    corporate assets, right?

3         A.     Yes.

4         Q.     So was there a plan at the beginning

5    of forming a captive to ultimately get the funds

6    out through dividends or a liquidation event?

7         A.     **This is possible exit strategies --**

8    **this is 2013.  This was a private seminar that was**

9    **prepared for a particular client and I'm not sure**

10   **it was ever given to that client.**

11        Q.     Well, let's speak a little bit more

12   generally.

13               So was there generally a plan to

14   ultimately liquidate the captive at the time that

15   you were marketing it?

16        A.     **No.**

17        Q.     Okay.  So you did not market an exit

18   strategy for a client's captive?

19        A.     **Possibly you could find a set of**

20   **slides from an early year, but I tried not to get**

21   **into that.**

22        Q.     Was there any plan contemplated at

23   the time of forming the captive to ultimately

24   convert it to an S Corp. investment company?

25               MR. VOLLRATH:  Object to form.

Clark, Celia R - Vol. 3                              September 11, 2023

99

1                  You're referring to the captive.  I

2          think we either need to specify or --

3                  THE WITNESS:  Yeah --

4    BY MS. DARWIT:

5          Q.      Sure.

6                  So when you were marketing your

7    captive insurance program to potential customers,

8    did you market the program as -- or rather did you

9    market the captives as being able to be eventually

10   converted to an S Corp. investment company?

11         **A.      No, it could never be converted to an**

12   **S Corp. investment company.  S Corp. rules would**

13   **not permit it.  That would be passive income.**

14         Q.      What about marketing it to be

15   converted as just an investment company,

16   regardless of its form?

17         **A.      I really cannot answer that in the**

18   **way that it's asked, which is a general question**

19   **as if there was one solution or one discussion**

20   **with all the clients.  Didn't happen.**

21         Q.      Well, did you generally have

22   marketing efforts for your captive insurance

23   program?

24         **A.      Not beyond what we discussed in the**

25   **last couple of days.**

Clark, Celia R  - Vol. 3                          September 11, 2023

100

1       Q.      Which included seminars, PowerPoint

2    presentations, drafting various materials

3    summarizing the captive insurance program; right?

4       **A.      Yeah.  Well, the marketing, in my**

5    **view, the marketing was really limited to getting**

6    **my name out there.  The marketing -- substantive**

7    **slides are extremely basic and were not ever**

8    **intended to persuade somebody to do anything.  But**

9    **the hope was that if somebody had an interest in**

10   **it or somebody had a client who was interested,**

11   **they would maybe give me a call and then we could**

12   **discuss the specifics.**

13      Q.      Okay.  Did you tell prospective

14   clients that they could eventually get the money

15   out of their captive insurance companies by making

16   a dividend of the funds to the shareholder?

17              MR. VOLLRATH:  Object to form.

18              THE WITNESS:  There was -- I would

19         say most sets of presentations had some

20         mention of the tax -- the potential tax

21         differentials.  I mean, people were expecting

22         me to talk about taxes, but I didn't only

23         talk about taxes.

24   BY MS. DARWIT:

25      Q.      My question is about specifically

Clark, Celia R  - Vol. 3                    September 11, 2023

101

1    getting money out of the captive once it was no

2    longer needed; did you tell clients that they

3    could eventually get money out of the captive by

4    making a dividend from the captive to the ultimate

5    shareholder and then liquidating it?

6        **A.        Not beyond citing the rates.  We**

7    **always talked about the potential that there would**

8    **be no funds remaining in a captive, that it was a**

9    **risk management tool, and a major loss either in**

10   **the reinsurance pool or in the client's own**

11   **businesses would wipe it out.**

12           **So this was not an investment**

13   **strategy.  I think that's where your question is**

14   **going.  And that's not what this was.**

15       Q.      In 2017 you decided to stop offering

16   captive insurance related services, right?

17       **A.      Yes.**

18       Q.      Why?

19       **A.      Avrahami Tax Court decision.**

20       Q.      What was it about that decision that

21   made you decide to stop offering captive services?

22       **A.        It was the first ruling on the**

23   **831(b)s and it held that the particular client's**

24   **company for three particular years was not valid,**

25   **and it left me unable to recommend the 831(b)s, as**

Clark, Celia R  - Vol. 3                      September 11, 2023

102

1    a lawyer, to future potential clients.

2          Q.      At that point you recommended to your

3    clients that they convert their captives to

4    investment companies, right?

5                  MR. VOLLRATH:  Object to form.

6                  THE WITNESS:  Did I recommend it?  I

7          don't recall if I recommended it.

8    BY MS. DARWIT:

9          Q.      Okay.

10         A.      I believe I told them to consult

11   other people, other advisors.

12         Q.      Did you tell them to continue

13   operating their captives as insurance companies?

14         A.      No, I did not.

15         Q.      Did you tell them to cease operating

16   their captives as insurance companies?

17         A.      No, I did not.

18         Q.      Did you help your clients liquidate

19   their captives after you notified them that you

20   were not going to be offering captive insurance

21   related services?

22         A.      If they requested, under a separate

23   engagement.

24         Q.      Okay.  And how was the money taken

25   out of the captive?

Clark, Celia R  - Vol. 3                        September 11, 2023

103

1      A.      You asked about -- you are asking

2  about a liquidation scenario?

3      Q.      Yeah.

4      A.      So, liquidation involves a

5  dissolution and a distribution of all remaining

6  assets in the captive.

7      Q.      So the captive assets ended up in the

8  hands of the captive shareholder, right?

9      A.      Yeah, after payment of all debts.

10     Q.      Okay.

11             MS. DARWIT:  I'm going to mark my

12         next document.  This will be Exhibit 336.  It

13         doesn't have a Bates stamp.  It's the

14         interrogatory responses from this case.

15             (Whereupon Exhibit 336, Plaintiff's

16         Response to United States' Second Set of

17         Interrogatories, was marked for

18         Identification.)

19  BY MS. DARWIT:

20     Q.      Ms. Clark, this is a copy of your

21  responses to the United States' second set of

22  interrogatories.  Right?

23     A.      That's what it says.

24     Q.      I'm going to scroll down to

25  interrogatory number 7.

Clark, Celia R  - Vol. 3                          September 11, 2023

104

1              Interrogatory number 7 states, for

2     each allegation of unauthorized disclosure in your

3     complaint, identify the return information you

4     contend was disclosed, the name of the person who

5     made the disclosure, the person to whom the

6     information was disclosed, the date of the

7     disclosure, the circumstances surrounding the

8     disclosure, the date you learned the information

9     had been disclosed, and the date you alleged you

10    learned it was a disclosure of return information.

11             Did I read that correctly?

12    **A.      Yes.**

13    Q.      Okay.  We'll start with your first

14    response here.

15             You say, first, on May 19, 2014, IRS

16    Revenue Agent Leroy Farquhason visited one of

17    Ms. Clark's clients.

18             Do you see that?

19    **A.      Yes.**

20    Q.      Do you know Mr. Farquhason?

21    **A.      No.**

22    Q.      Scott Fowler is also mentioned in the

23    first response.  Do you see that?

24    **A.      Yes.**

25    Q.      Do you know him?

Clark, Celia R  - Vol. 3                              September 11, 2023

105

1          **A.        I know who he is.**

2          Q.         How do you know him?

3                      MR. VOLLRATH:   Object to form.

4                      You can answer.

5                      THE WITNESS:  So I don't know him.  I

6          know he's the CPA of Gary Harris.

7     BY MS. DARWIT:

8          Q.         Okay.  Is Gary Harris a client?

9          **A.        Yes.  Was.**

10         Q.         Have you ever spoken to Mr. Fowler?

11         **A.        Yes.**

12         Q.         When was that?

13         **A.        I don't recall.**

14         Q.         Do you recall what you discussed?

15         **A.        We discussed these comments in at**

16    **least one conversation.  We had other discussions**

17    **on other issues involving Mr. Harris.**

18         Q.         Okay.  And in this interrogatory

19    response you state that Revenue Agent Farquhason

20    told Mr. Fowler that the IRS was building a case

21    against Clark, that the IRS had planted personnel

22    at presentations by Clark, and that someone within

23    the IRS had instructed him to examine as many of

24    Clark's clients as possible.

25                    Do you see that?

Clark, Celia R  - Vol. 3                    September 11, 2023

106

1      A.      Yes.

2      Q.      How did you find out about this

3   alleged disclosure?

4      A.      Mr. Fowler called one of my

5   associates and told her, she told me.

6      Q.      Do you know which associate that was?

7      A.      Diana Chen.

8      Q.      Do you know when that was?

9      A.      Very soon after the date May 19th,

10   2014.

11      Q.      Okay.  So sometime in 2014?

12      A.      Most likely.

13      Q.      I'll go to the second response here.

14              Do you see where it states that on

15   May 8, 2014, the IRS issued a 30-day letter in the

16   matter of James Bryson Shepherd Trust?

17              Do you see that?

18      A.      Yes.

19      Q.      Okay.  James Bryson Shepherd Trust,

20   that was one of your former clients, right?

21      A.      Not the trust, but the individual.

22      Q.      Okay.  Okay.  And then it states

23   here, the trust is owned by -- excuse me.  The

24   trust is the owner of Specialized Global Insurance

25   Company, a captive insurance company.  Right?

Clark, Celia R  - Vol. 3                                    September 11, 2023

107

1       **A.        That's what it says.**

2       Q.        Okay.  And Specialized Global, is

3  that a company you formed for Mr. Shepherd?

4       **A.        Yes.**

5       Q.        Okay.  And there's a reference in

6  this paragraph to a 30-day letter.

7                 Do you see that?

8       **A.        Yes.**

9       Q.        That 30-day letter that's referenced

10  here, how did you get a copy of that letter?

11       **A.        Could I read that whole paragraph,**

12  **please?**

13       Q.        Yeah.

14       **A.        I don't recall.**

15       Q.        Okay.  Do you recall when you

16  received the letter, the 30-day letter referenced

17  here?

18       **A.        No.**

19       Q.        Moving on to the third point.  And

20  we're on page three, bottom of the page, it

21  states, on May 1st, 2014 Brandon Keim with IRS

22  counsel in Phoenix, Arizona issued a Branerton

23  letter to Tim Alan Tarter of Woolson & Tarter,

24  representative for the Avrahamis, in connection

25  with their Tax Court case.

Clark, Celia R  - Vol. 3                                September 11, 2023

108

1              Right?

2    A.        Yes.

3    Q.        Do you know Tim Tarter?

4    A.        Yes.

5    Q.        How do you know him?

6    A.        He was counsel for the Avrahamis in

7    their Tax Court case and he was counsel for

8    Dr. James Wilson in his Tax Court case.

9    Q.        When's the last time you spoke to

10   Mr. Turner?

11   A.        Probably 2017.

12   Q.        The Branerton letter -- well, I'll

13   just read it.

14            The bottom of page three says, the

15   Branerton letter defines Ms. Clark as a promoter.

16   This was nearly six years before the termination

17   of Clark's promoter proceeding and the IRS

18   assessment of a promoter penalty against Clark.

19            Do you see that?

20   A.        Yes.

21   Q.        How did you get a copy of the

22   Branerton letter referenced here?

23   A.        So it was either served on me or it

24   was served on Caplin & Drysdale as my attorneys.

25   Q.        Was that sometime in 2014?

Clark, Celia R  - Vol. 3                                    September 11, 2023

109

1          A.        No, I don't recall, and I could be

2    wrong about that.

3                    This says that the Branerton letter

4    was issued to Tim Alan Tarter.  If that's true,

5    then I assume that Mr. Tarter sent it to my

6    counsel or to me.

7          Q.        Was it common practice between you

8    and Mr. Tarter for him to share letters served on

9    him from the IRS regarding the Avrahami Tax Court

10   case?

11         A.        Was it common for him to share a

12   letter in the Avrahami case with me.  Is that the

13   correct question?

14         Q.        Yeah.  Was it his typical practice to

15   share letters regarding the Avrahami Tax Court

16   case that were offered by the IRS?

17         A.        I don't recall any other letters.

18         Q.        Okay.  Do you recall when you

19   received the Branerton letter referenced here?

20         A.        No.

21         Q.        Fourth response says, Clark was an

22   advisor to two of her clients, the Avrahamis and

23   the Wilson, who had the following cases with the

24   IRS.

25                    And two cases are listed.  Right?

Clark, Celia R  - Vol. 3                         September 11, 2023

110

1        A.      Yes.

2        Q.      And it states here, because Clark

3    served as a fact witness in the Avrahami trial as

4    well as in the Wilson trials, she was unable to

5    observe the majority of the proceedings.

6             Do you see that?

7        A.      Yes.

8        Q.      And then it states, upon information

9    and belief, the IRS refers to Clark as a promoter

10   during the trials.

11            Right?

12       A.      Yes.

13       Q.      In what capacity were you involved in

14   the Avrahami trial?

15       A.      I was a fact witness.

16       Q.      How did you find out about the

17   alleged disclosures described here?

18       A.      I had counsel present at both trials;

19   I believe they told me.  There were other persons

20   I knew who were present at the trials who also

21   reported to me.

22       Q.      Who is your counsel that was present

23   with you?

24       A.      Caplin & Drysdale.

25       Q.      Okay.  And the trial was in 2017,

Clark, Celia R  - Vol. 3                          September 11, 2023

111

1    right?

2         A.        No.

3         Q.        When was the trial -- yeah, when was

4    the trial?

5         A.        Which trial, please?

6         Q.        The Avrahami trial.

7         A.        2015.

8         Q.        2015.

9                   Did your counsel tell you about the

10   alleged disclosures during the trial around the

11   day of the trial?

12        A.        I don't recall.

13        Q.        Did they tell you about the alleged

14   disclosures in 2015?

15        A.        I don't recall.

16        Q.        And at the Wilson trial, what was

17   your capacity?

18        A.        I was a fact witness.

19        Q.        When was that trial?

20        A.        2016, I believe.

21        Q.        How did you find out about the

22   alleged disclosures referenced here?

23        A.        I also had counsel present at the

24   Wilson trial.  And I also knew other people

25   present at that trial.

Clark, Celia R - Vol. 3                                  September 11, 2023

112

1      Q.      Was your counsel also Caplin &
2  Drysdale?
3      **A.      Yes.**
4      Q.      Was that Mark Allison?
5      **A.      We talking still about Wilson?**
6      Q.      For both Avrahami and Wilson, did
7  Mark Allison attend the trial with you?
8      **A.      Mark Allison was there for part of**
9  **the Avrahami trial.  Rachel Partain of Caplin &**
10  **Drysdale was present for the other part of the**
11  **trial.**
12      Q.      The people present at the Wilson
13  trial who told you about the alleged disclosures,
14  who were they?
15      **A.      Counsel present in that case, my**
16  **counsel present, was Rachel Partain.**
17      Q.      Sorry.  I think you mentioned there
18  were also additional people present at the trial
19  that weren't your counsel that told you about the
20  disclosures, right?
21      **A.      Yes.**
22      Q.      Who were those people?
23      **A.      One person was my husband.  One**
24  **person was Manuel Ramirez.  One person was Craig**
25  **McEtee, I think is the right name, he was a CPA**

Clark, Celia R  - Vol. 3                           September 11, 2023

113

1   for Dr. Wilson.

2        Q.      Was it those same people who told you

3   about the alleged disclosures at both the Avrahami

4   and Wilson trials?

5        A.      No.

6        Q.      Which ones relate to which trials?

7        A.      Okay.  Can we do these one by one?

8        Q.      Yes.  Go for it.

9        A.      Okay.  Avrahami was Mark Allison and

10  Rachel Partain.  One of the observers was Charles

11  Lavelle, a colleague of mine.  And I believe Craig

12  McEtee was present at that trial as well.

13              I can't recall who else, that I knew

14  personally.

15              My husband was not present at that

16  trial.

17       Q.      Okay.  And what about the Wilson

18  trial?

19       A.      Rachel Partain as my counsel, my

20  husband, Manuel Ramirez, Craig McEtee; among

21  others.

22       Q.      Did your husband tell you about the

23  alleged disclosures at the Wilson trial around the

24  time of the trial?

25       A.      Probably.

Clark, Celia R  - Vol. 3                                    September 11, 2023

114

1        Q.        Okay.  So that was in 2016, then?

2        **A.        Probably.**

3        Q.        Did Manny Ramirez tell you about the

4   alleged disclosures at the Wilson trial sometime

5   in 2016?

6        **A.        I doubt it.**

7        Q.        When did he tell you about the

8   disclosures?

9        **A.        Quite a bit later.  I would guess**

10  **2017 at some point, but I do not recall**

11  **specifically.**

12       Q.        When did Charles Lavelle tell you

13  about the alleged disclosures at the Avrahami

14  trial?

15       **A.        Quite a bit after the trial.**

16       Q.        Do you recall what year?

17       **A.        So the trial was in the early part of**

18  **the year.  It could have been either 2016 or 2017.**

19       Q.        Okay.  When did Craig McEtee tell you

20  about the alleged disclosures at the Avrahami

21  trial?

22       **A.        I don't recall.**

23       Q.        Back at the document.

24                 The fifth response here says that in

25  early November 2014, Revenue Agent Thuy Luu from

Clark, Celia R  - Vol. 3                    September 11, 2023

115

1   El Monte, California issued an IDR in connection

2   with an income tax examination of Packer Pointe,

3   LLC.

4            Do you see that?

5       A.    Yes.

6       Q.    Do you know Packer Pointe, LLC?  Are

7   you familiar with that entity?

8       A.    **The name rings a bell.**

9       Q.    Do you know how you know that entity?

10      A.    **I worked with Matt Brown of Brown and**

11  **Streza on a number of his clients, but I don't**

12  **recall Packer Pointe.**

13      Q.    In this response you say that IRS

14  Revenue Agent Luu may have disclosed the contents

15  of a confidential IDR issued to Ms. Clark to third

16  parties, including Mr. Brown.

17            Do you see that?

18      A.    **Not quite.**

19      Q.    I'm sorry.  I think I'm on the wrong

20  page here.

21      A.    **Yes, so you just read me the first**

22  **sentence of that?**

23      Q.    Yes.  There is a letter on December

24  1st, 2014 from Caplin & Drysdale to Debbie

25  Reynolds of the IRS about a possible disclosure of

Clark, Celia R  - Vol. 3                    September 11, 2023

116

1    Clark's confidential return information to Matt

2    Brown.

3            Do you see that?

4    A.      Yes.

5    Q.      Okay.  And the alleged disclosure

6    that's referenced here, how did you find out about

7    it?

8    A.      Can I please reread this?

9    Q.      Yeah.

10   A.      Okay, wait, wait.  Okay.

11           I believe I had a direct conversation

12   with Matt Brown, but I don't clearly recall right

13   now.

14   Q.      Do you remember when that

15   conversation was?

16   A.      No, I don't.

17   Q.      The sixth response here, you state,

18   as explained in the September 4th, 2012 letter

19   from Caplin & Drysdale to the Treasury Inspector

20   General for Tax Administration Hotline, although

21   we do not know the source of the 6103 violations,

22   we have reason to believe that the employee may be

23   Steve Henson who is an insurance technical advisor

24   and LB&I Property & Casualty IPG front line

25   manager in Atlanta, Georgia.

Clark, Celia R  - Vol. 3                    September 11, 2023

117

1            Do you see that?

2      A.    Yes.

3            What are you quoting exactly?

4      Q.    I'm quoting what it says here,

5 beginning with, as explained in the September 4th,

6 2012 letter.

7      A.    You're quoting the 2014 Caplin &

8 Drysdale letter, correct?

9      Q.    Um-hmm.

10     A.    Okay.

11     Q.    Okay.  And then the next sentence

12 states that the letter further explains that Matt

13 Howard spoke with both Steve Henson and Deborah

14 Reynolds at the IRS prior to telling several

15 captive insurance advisors and managers that

16 certain of Clark's clients were the subject of IRS

17 examinations.

18            Do you see that?

19     A.    Yes, I see that.

20     Q.    How do you know -- do you know Matt

21 Howard?

22     A.    Yes.

23     Q.    How do you know him?

24     A.    Originally?  I don't recall exactly.

25 We were both estate planning attorneys.

Clark, Celia R  - Vol. 3                    September 11, 2023

                                                                118

1       Q.      Okay.  When's the last time you spoke

2   with him?

3       A.      It's been many, many years.  Possibly

4   ten years.

5       Q.      Okay.  Do you know Steve Henson?

6       A.      No.  I was on a conference call with

7   him once, but I never actually spoke to him

8   directly or met him.

9       Q.      When was that conference call?

10      A.      2011, I believe.

11      Q.      How did you find out about the

12  alleged disclosure identified in this paragraph?

13      A.      How I found out was that I got

14  numerous phone calls and e-mails and there were

15  postings on the Internet about, about this issue.

16  Most of them did not identify Matt Howard by name,

17  but some of them did, and others referred to him

18  as an attorney in Atlanta.

19              That's best I can tell you at this

20  point.

21      Q.      Do you know approximately when that

22  was?

23      A.      If you could scroll up again.  Let me

24  grab a couple of dates from here.

25              Okay.  The question is when I learned

Clark, Celia R  - Vol. 3                September 11, 2023

119

1  about the possibility that Matt Howard had been

2  told information, or purported to have been told

3  information from the IRS.

4                  Yeah, it was early.  It might have

5  been 2011, it might have been 2012.

6       Q.      Do you know which year?

7       A.      No.

8       Q.      Do you know if it was one of those

9  two years?

10      A.      Well, let me just say, there were

11  several of these rumors that I was never able to

12  track down to verify.  And they occurred over

13  quite a long period of time.

14      Q.      Did you hear these rumors in either

15  2011 or 2012?

16      A.      I really can't pin down the dates any

17  more than I have.

18      Q.      Okay.  And finally, the seventh

19  response here says, the circumstances surrounding

20  the disclosures that made their way to Jay

21  Adkisson are unknown to Clark at this time.

22                  The Jay Adkisson that's identified

23  here, do you know him?

24      A.      I don't believe we've met.

25      Q.      Have you ever spoken to Mr. Adkisson?

Clark, Celia R  - Vol. 3                    September 11, 2023

1       A.      I may have.

2       Q.      Do you know?

3       A.      No, I'm not certain.

4       Q.      How did you find out about the

5   alleged disclosures to Mr. Adkisson identified

6   here?

7       A.      So, as we said, we have not yet been

8   able to verify that they came from the IRS.

9               I can elaborate a little bit because

10  I remember the first clue that they may have been

11  coming from the IRS was a posting on LinkedIn by

12  Jay Adkisson.

13      Q.      When was that?

14      A.      2011 or 2012.

15      Q.      Okay.  During the IRS' investigation

16  into your liability for potential tax shelter

17  promoter penalties, your attorneys were Mark

18  Allison and Rachel Partain of Caplin & Drysdale,

19  right?

20      A.      Yes.

21      Q.      And your attorneys corresponded with

22  the IRS on your behalf as part of the

23  investigation, right?

24      A.      And to TIGTA, T-I-G-T-A, it's all

25  caps.

Clark, Celia R  - Vol. 3                      September 11, 2023

121

1       Q.      Did your attorney specifically send
2   you copies of the letter they sent to the IRS and
3   TIGTA on your behalf?

4       **A.      I would say typically, yes.**

5       Q.      Did they typically send you those
6   copies around the time that the letters were sent?

7       **A.      I believe so.**

8       Q.      Have you heard the term, promoter,
9   used within the context of IRS investigations?

10      **A.      In my own.**

11      Q.      When's the first time you heard the
12  term, promoter?

13      **A.      In the context of a 6700 penalty?**

14      Q.      Yes.

15      **A.      I believe after my own investigation
16  had commenced.**

17      Q.      So sometime in 2012?

18      **A.      That's correct.  Or possibly later.**

19      Q.      How would you define the term,
20  promoter, within the meaning of Section 6700?

21              MR. VOLLRATH:  Object to form.

22              You can answer.

23              THE WITNESS:  It's not up to me to
24      define it.  I can tell you my understanding.

25              It is a legal term of art.  As far as

Clark, Celia R  - Vol. 3                        September 11, 2023

                                                            122

1          I know, it's only appearing in the Internal

2          Revenue Code in Section 6700.  It is not

3          actually defined there.  But the title of the

4          statute is Promoter of Abusive Tax Shelters

5          and -- that's my understanding.  I really

6          can't define it.

7   BY MS. DARWIT:

8          Q.        Okay.

9          **A.        It's a matter of legal terminology.**

10         Q.        From the time that you started

11   offering captive insurance related services to the

12   time that you stopped offering them, did you stay

13   apprised of captive insurance case law and IRS

14   guidance as new guidance came out?

15         **A.        To the best of my ability.**

16         Q.        To constitute insurance for federal

17   tax purposes, do you agree that the transactions

18   between the captive insurance company and its

19   insureds must be conducted in an arm's length

20   manner?

21         **A.        I have to say no, I don't agree with**

22   **that.**

23         Q.        Why not?

24         **A.        Because a captive is a related party.**

25         Q.        Do you agree that the insurance

Clark, Celia R  - Vol. 3                    September 11, 2023

123

1    premiums that are charged by a captive should be

2    determined as if the parties are dealing at arm's

3    length?

4         A.      **There has to be objective standards.**

5    **Arm's length to me means commercial insurance**

6    **companies which are very distinguishable,**

7    **including in their premium determinations.**

8         Q.      Okay.  So do you think that premiums

9    have to be determined as if the parties are

10   dealing at arm's length, when we're talking about

11   a captive insurance policy?

12        A.      **No, I don't agree.**

13        Q.      Okay.

14               MR. VOLLRATH:  I'm going to object to

15        the form of that question on the basis of,

16        determined as if, being somewhat vague.

17               MS. DARWIT:  Okay.

18   BY MS. DARWIT:

19        Q.      Are you familiar with the concept of

20   moral hazards?

21        A.      **Yes.**

22        Q.      What is that?

23        A.      **My understanding of moral hazard is**

24   **that it is a very, very old common law rule that**

25   **essentially makes it against public policy for**

Clark, Celia R  - Vol. 3                              September 11, 2023

124

1    anyone to buy insurance and then claim for payment

2    under a policy for information -- for information

3    that was not properly disclosed before the policy

4    was filed or that the insured actually, through

5    its own fault, contributed to the loss in some

6    way, by act or omission.

7        Q.      Do you agree that a risk that is a

8    moral hazard is not an insurable risk?

9        A.      As I recall, there is case law, a lot

10   of case law, on this.

11              As I recall, the question is the

12   amount of contribution by the insured, the moral

13   hazard contribution.  There is not, again, as I

14   recall -- the policy is not void per se.

15       Q.      Do you agree that if tax benefits are

16   marketed as a significant reason to enter into an

17   insurance transaction, that indicates that the

18   transaction is not being entered into for

19   legitimate non-tax reasons?

20       A.      You're going to have to read that

21   again.

22       Q.      Sure.

23              Do you agree that if tax benefits are

24   marketed as a significant reason to enter into an

25   insurance transaction, that indicates that the

Clark, Celia R  - Vol. 3                                        September 11, 2023

125

1    transaction is not being entered into for

2    legitimate non-tax reasons?

3         A.      No, I don't agree with that.  I think

4    your question doesn't even imply that.

5         Q.      Okay.  Do you agree that it is

6    illegal to sell tax deductions?

7         A.      Yes.

8         Q.      Are you familiar with an entity

9    called Great Circle Business Insurance Limited?

10        A.      Possibly I've heard that term.

11        Q.      Do you know how you've heard that

12   term?

13        A.      No.

14        Q.      Are you familiar with an entity

15   called Platinum Re Limited?

16        A.      I've heard the term.

17        Q.      Do you know how you've heard it?

18        A.      No, I can't recall right now.

19        Q.      Are you familiar with an entity

20   called Nova Reinsurance Limited?

21        A.      That does not ring a bell.

22        Q.      We talked the other day about an

23   individual named Laurence Mohn.  Do you remember

24   that?

25        A.      Yes.

Clark, Celia R  - Vol. 3                    September 11, 2023

126

1        Q.       And he was listed as a director of
2   captive insurance companies that your firm
3   created, right?
4        **A.       He was a director of the reinsurance**
5   **pool.  I remember that.**
6        Q.       Was he a director for the actual
7   captive insurance companies themselves?
8        **A.       I don't... I'm trying to recall that.**
9   **I can't think of any that he was a director of.**
10        Q.       Was Robin Cotterell a director of any
11   captive insurance companies that your firm
12   created?
13        **A.       Yes -- director.  So either**
14   **personally or through one of his entities, Robin**
15   **was involved in the management.**
16        Q.       How did he become involved in the
17   management of the captive insurance companies that
18   you created?
19        **A.       Okay.  This is getting too general at**
20   **this point for me to be able to answer.  You've**
21   **got to tell me which jurisdictions we're talking**
22   **about; Alabama, Saint Kitts, Nevis, British Virgin**
23   **Islands.**
24        Q.       Were there certain criteria -- first,
25   who selected the directors that would be in charge

Clark, Celia R  - Vol. 3                    September 11, 2023

127

1   of the captive insurance companies you created?

2        A.      So that would be the shareholders as

3   a matter of corporate formality.  But there

4   were -- there were a lot of limitations on who

5   could qualify as a director in various

6   jurisdictions.

7        Q.      Did you recommend directors to your

8   clients?

9        A.      I'm sure I did.  From time to time.

10  Again, it's a very, very general question.

11              MR. VOLLRATH:  Lauren, can we get a

12        time on the record, when you have a moment.

13              MS. DARWIT:  Sure.  We can go off the

14        record.

15              THE VIDEOGRAPHER:  1:37, we're off

16        the record.

17              (Whereupon a discussion was held off

18        the stenographic record and video record.)

19              THE VIDEOGRAPHER:  1:39, we're on the

20        record.

21  BY MS. DARWIT:

22        Q.      Did any of your clients save on their

23  overall insurance costs once they formed a

24  captive?

25              MR. VOLLRATH:  Object to form.

Clark, Celia R  - Vol. 3                        September 11, 2023

                                                              128

1              You can answer.

2              THE WITNESS:  So your question is was

3         there a savings after the formation of a

4         captive.  That's what you said.  Once they

5         formed a captive.

6              It's too general a question for me to

7         be able to answer.

8    BY MS. DARWIT:

9         Q.    Can you think of any client of yours

10   who saved on their overall insurance costs once

11   they formed a captive?

12             MR. VOLLRATH:  Object to form.

13             THE WITNESS:  You would have to limit

14        the time period that you're asking about.

15        Some of my clients had captives for eight

16        years.  I cannot speak to the overall

17        insurance situation during that entire period

18        for each client.

19   BY MS. DARWIT:

20        Q.    But can you think of any client who

21   saved on their overall insurance costs once they

22   formed a captive?

23             MR. VOLLRATH:  Object to form.

24             You can answer the question.

25             THE WITNESS:  I am sure there are

Clark, Celia R - Vol. 3                         September 11, 2023

                                                              129

1        many.  If I could look up a few things, I

2        could give you names.  At the moment, I

3        cannot give you names.

4    BY MS. DARWIT:

5        Q.      Okay.  Did you review any documents

6    in preparation for today's -- this week's

7    deposition?

8        A.      So I've been reviewing documents in

9    this matter since 2012.  Specifically for today's

10   deposition, I assume you mean the last three days.

11       Q.      Yes.

12       A.      There were a few things I went over

13   again.

14       Q.      Do you know what specific documents

15   those were?

16       A.      I reviewed my complaint.  I reviewed

17   the deposition transcript of Chris Jarvis, the

18   transcript of Dr. James Wilson.  I reviewed the

19   Pan American Reinsurance agreements and the

20   ancillary agreements.  A bunch of e-mails.

21       Q.      Anything else?

22       A.      Not that I can recall right now.

23       Q.      What were your e-mail addresses at

24   Clark & Gentry from 2008 through 2016?

25       A.      There were two that I recall.

Clark, Celia R  - Vol. 3                              September 11, 2023

                                                                    130

1          Q.       What were they?

2          A.       CClark@cclarklaw.com.   And the other

3     one was CClark@clarkandgentry.com.

4          Q.       Okay.  An individual named Anthony

5     Khatchoui worked for you as an associate attorney

6     at Clark & Gentry, right?

7          A.       Yes, for several years.

8          Q.       And he sued Clark & Gentry after he

9     left the firm, right?

10         A.       Yes.

11         Q.       What were the allegations that he

12    made against Clark & Gentry?

13         A.       Breach of employment agreement was

14    the cause of action.

15         Q.       And what did he allege was a breach

16    of his employment agreement?

17         A.       The breach he alleged was that he was

18    not paid the money he was due when he left the

19    firm.

20         Q.       Anything else?

21         A.       And I think there was stuff in there

22    like, I don't know -- I mean, that was the gist of

23    it.

24         Q.       Okay.  Okay.  The last couple of

25    questions I have are; when is the last time that

Clark, Celia R  - Vol. 3                    September 11, 2023

131

1   you spoke to Charles Lavelle?

2       A.      Probably 2020.  Possibly 2021.

3       Q.      Okay.  And when's the last time you

4   spoke to Craig McEtee?

5       A.      It was not long before he died.

6       Q.      What year did he pass away?

7       A.      I can't recall.

8       Q.      And when's the last time you spoke to

9   Manny Ramirez?

10      A.      I spoke to him briefly when I was

11  hospitalized in Charlotte, North Carolina.  He

12  called to wish me well.

13      Q.      Was that this year?

14      A.      We're already at September.  Yeah, it

15  would have been this year.

16      Q.      Okay.

17              MS. DARWIT:  I think that concludes

18      my questioning.  We can stay on the record or

19      go off.

20              MR. VOLLRATH:  Let's stay on.

21              THE WITNESS:  Sorry, can I go to the

22      bathroom, please.

23              MR. VOLLRATH:  Certainly.  Let's go

24      off for five minutes.

25              THE VIDEOGRAPHER:  1:45, we're off

Clark, Celia R  - Vol. 3                                September 11, 2023

                                                                    132

```
1          the record.
2                    (Whereupon a recess was taken.)
3                    THE VIDEOGRAPHER:  1:50, we're on the
4          record.
5                         CROSS EXAMINATION
6     BY MR. VOLLRATH:
7          Q.        Okay, Ms. Clark, you testified on
8     direct about some of the actuarial work that was
9     done in connection with your practice.  Do you
10    recall that?
11         A.        Yes.
12         Q.        You testified that the actuaries you
13    hired prepared pricing reports.  Is that correct?
14         A.        Yes and no.  Premium funding
15    estimates was another term.
16         Q.        Okay.  What were those pricing
17    reports?
18         A.        They came in two parts.  There was a
19    narrative part and then there were exhibits that
20    showed the analysis for each line of insurance for
21    that particular captive, for that particular
22    period.
23         Q.        And did it provide the appropriate
24    pricing for a line of insurance coverage?
25         A.        Yes.
```

Clark, Celia R  - Vol. 3                    September 11, 2023

133

1        Q.      Did you believe those reports to be
2   actuarially sound?
3        A.      Yes.
4        Q.      Did you believe they were prepared by
5   a competent actuary?
6        A.      Yes.
7        Q.      You intended your clients, the
8   captive insurance companies, to be able to rely on
9   those reports to price the insurance, correct?
10               MS. DARWIT:  Object to form.
11               MR. VOLLRATH:  Can I get the basis
12       for the objection?
13               MS. DARWIT:  Leading.
14  BY MR. VOLLRATH:
15       Q.      Okay.  You can answer.
16       A.      I was aware that my clients would be
17  relying on those reports for the pricing
18  information and limits of liability.  All, you
19  know, other terms.
20       Q.      In fact that's why the reports were
21  prepared, correct?
22       A.      Yes.
23       Q.      You yourself could not evaluate the
24  actuarial work that was performed, correct?
25       A.      I could not.  Yes, you're correct.

Clark, Celia R  - Vol. 3                              September 11, 2023

                                                                    134

1        Q.      So you couldn't offer an opinion on

2    that, correct?

3        **A.      Correct.**

4                MS. DARWIT:  Object to form.

5    BY MR. VOLLRATH:

6        Q.      We saw on direct today an e-mail

7    about the difference between an actuarial

8    communication and a pricing report.  Do you recall

9    that e-mail?

10       **A.      Yes.**

11       Q.      Do you know what the difference is

12   between a pricing report and an actuarial

13   communication?

14       **A.      I don't know.**

15       Q.      Okay.  Was it your understanding that

16   the pricing report contained an actuarially

17   determined premium?

18       **A.      Yes.**

19       Q.      Was your understanding that the

20   pricing report was suitable for the purpose it was

21   being used?

22               MS. DARWIT:  Objection to form.

23   BY MR. VOLLRATH:

24       Q.      You can answer.

25       **A.      Yes.**

Clark, Celia R  - Vol. 3                    September 11, 2023

135

```
 1      Q.      How did you come to that
 2  understanding?
 3              Let me ask a better question.
 4              Did Mr. Rosenbach or Mr. Rouner
 5  inform you that the pricing report was appropriate
 6  for the purpose you asked for?
 7              MS. DARWIT:  Objection to form.
 8  BY MR. VOLLRATH:
 9      Q.      You can answer.
10      A.      So they were under engagement to
11  present a report for the use of my clients using
12  actuarial methods and assumptions.
13      Q.      You testified on direct that Clark &
14  Gentry had a role in drafting many sections of the
15  actuarial report.  Do you recall that testimony?
16      A.      Yes.
17      Q.      What did you mean by, had a role in
18  drafting many of those sections?
19      A.      Primarily we submitted comments to
20  the drafts we received.  I believe there was --
21  the comments may be included as suggested inserts
22  to a couple parts of the narrative, but that would
23  have been the role.
24      Q.      Okay.  On direct, I believe you were
25  shown a report prepared by an actuarial firm
```

Clark, Celia R  - Vol. 3                                September 11, 2023

136

1   called ATS?

2          A.       Yes.

3          Q.       And an actuary named Steve Lattanzio.

4          A.       Yes.

5          Q.       Do you recall that document?

6          A.       **Yes, I do.**

7          Q.       You commissioned that report,

8   correct?

9          A.       Yes.

10         Q.       And it contained some comments about

11  Rosenbach's work?

12         A.       Yes.

13         Q.       Did you discuss those comments with

14  Mr. Rosenbach?

15         A.       **Each and every one.**

16         Q.       Do you know whether Mr. Rosenbach

17  discussed those comments directly with

18  Mr. Lattanzio?

19         A.       **Yes.  I do believe that they had a**

20  **lengthy discussion, at least one, maybe two,**

21  **because Al Rosenbach then reported back to me what**

22  **the result of the discussion was.**

23         Q.       So Mr. Rosenbach told you that he had

24  discussed Mr. Lattanzio's comments with

25  Mr. Lattanzio?

Clark, Celia R  - Vol. 3                         September 11, 2023

137

1       A.      Yes.

2       Q.      Did Mr. Rosenbach make any changes to

3    his model to account for those comments?

4       A.      Yes.

5       Q.      What were those changes?

6       A.      **So the basis of one type of policy**

7    **analysis Rosenbach did, the fundamental basis, was**

8    **a Chubb filing for errors and omissions insurance,**

9    **I believe, that Lattanzio had suggested should be**

10   **updated.  And I know Al Rosenbach did in fact**

11   **re-review a more recent Chubb filing and amended**

12   **his methodology based on that.  That's one thing.**

13      Q.      Okay.  Are you aware of any other

14   specific changes that Mr. Rosenbach made to his

15   actuarial model in response to the Lattanzio

16   report?

17      A.      **Yes.  Indirectly.  It was a result**

18   **that he added more data into his analysis, once he**

19   **was able to do that, because he had revised the**

20   **questionnaire.**

21      Q.      Okay.  And I believe on direct you

22   testified that that process of incorporating more

23   data into Mr. Rosenbach's analysis had already

24   begun before the Lattanzio report.  Is that

25   correct?

Clark, Celia R  - Vol. 3                                          September 11, 2023

138

1          **A.        Yes.**

2          Q.        You testified at one point on direct

3     that Mr. Rosenbach completely changed his

4     actuarial model.  Do you recall that?

5                     The question is whether you recall

6     it.

7          **A.        Yes, I do recall that.**

8          Q.        Okay.  Is this episode what you were

9     talking about when you referred to a complete

10    change in Mr. Rosenbach's model?

11                    MS. DARWIT:  Objection.  Form.

12    BY MR. VOLLRATH:

13         Q.        You can answer.

14         **A.        I'm sorry, but could you repeat it?**

15         Q.        The question was; is this the change

16    that you were talking about when you said -- when

17    you testified that Mr. Rosenbach completely

18    changed his model?

19                    MS. DARWIT:  Object to form.

20    BY MR. VOLLRATH:

21         Q.        You can answer.

22         **A.        So, yes, in part.**

23                    **Also, Al Rosenbach specifically told**

24    **me that he had overhauled his methodology.**

25         Q.        Was that in response to the ATS

Clark, Celia R  - Vol. 3                                September 11, 2023

139

1    report?

2         A.       **Partly.  The work had begun before**

3    **that.**

4         Q.       So it was around the same time as the

5    ATS report.  We're not talking about two different

6    episodes.  Is that fair to say?

7         **A.       Yes.**

8         Q.       Do you know in what way, other than

9    the changes you've discussed about the Chubb

10   filing, do you know in what way -- strike that.

11            Other than the changes in the Chubb

12   filing and incorporating more information into his

13   analysis, do you know any other ways in which

14   Mr. Rosenbach changed his model?

15        **A.       So as I recall, this is a long time**

16   **ago, he adjusted the risk loads, and it shows on**

17   **his report, risk load factor, where it either**

18   **didn't before or the loads were very different.**

19   **That seemed to be key to him.  And I have -- I**

20   **cannot give you a definition of a risk load.**

21        Q.       Okay.  So you had to take his word

22   about that.

23        **A.       Yes.**

24        Q.       Did you become satisfied that

25   Mr. Rosenbach adequately addressed the comments in

Clark, Celia R  - Vol. 3                                 September 11, 2023

140

1    the ATS report?

2              MS. DARWIT:  Objection.  Form.

3    BY MR. VOLLRATH:

4        Q.     You can answer.

5        A.     Well, yes.  We discussed it.  Al

6    Rosenbach and I discussed it at length and he did

7    convince me that his methodology was more

8    particularly suited to my clients' needs.

9              I didn't get a chance to get into

10   this before, but the -- Lattanzio had a background

11   and expertise in medical malpractice premium

12   pricing and this was particularly persuasive to me

13   that Al was showing me specifically how the

14   methodologies differed between that and excess and

15   surplus lines actuarial work.  That was key, to

16   me.  Made sense.

17       Q.     So there was a discussion between you

18   and Al --

19       A.     Yes.

20       Q.     Al being Mr. Rosenbach.  Al is

21   Mr. Rosenbach?

22       A.     Yes.

23       Q.     And you discussed the comments in the

24   Lattanzio report.

25       A.     Yes.

Clark, Celia R  - Vol. 3                          September 11, 2023

141

1        Q.        And some of those comments,

2   Mr. Rosenbach accepted as valid critiques.

3        **A.        Yes.**

4                MS. DARWIT:  Objection.  Form.

5   BY MR. VOLLRATH:

6        Q.        For example, the use of an updated

7   Chubb form.

8        **A.        Yes.**

9                MS. DARWIT:  Objection.  Form.

10  BY MR. VOLLRATH:

11       Q.        Other comments that Mr. Lattanzio had

12  made Mr. Rosenbach convinced you were not valid

13  criticism?

14                MS. DARWIT:  Objection.  Form.

15                THE WITNESS:  Yes.

16                He persuaded me that he was very

17        aware of the need to increase the data and

18        the risk loads.  I think he was coming to

19        that conclusion, actually working on a

20        solution to those issues before Lattanzio.

21        So in part Lattanzio was reinforcing his own

22        view.  But -- I know I'm rattling on.  I'm

23        really tired.

24                The methodologies really differ

25        because, as I understood it, and this is what

Clark, Celia R  - Vol. 3                                September 11, 2023

142

1       really clinched it, in my mind, the medical

2       malpractice training and tradition is to rely

3       almost exclusively or to a much greater

4       extent on the file -- the rate filings, in

5       comparison to the excess and surplus lines

6       who, you know -- because they are not working

7       closely with filed -- rate filings.  It's

8       much more suited to the situation of my

9       clients who were doing non-traditional

10      insurance risk.

11  BY MR. VOLLRATH:

12      Q.      Okay.  I want to ask you about

13  Dr. Wilson.

14      **A.      Okay.**

15      Q.      We saw an e-mail on direct about

16  Dr. Wilson creating a second captive.  Do you

17  recall that e-mail?

18      **A.      Yes.**

19      Q.      To your knowledge, did Dr. Wilson

20  have an insurance purpose for creating that second

21  captive?

22          MS. DARWIT:  Objection.  Form.

23          THE WITNESS:  I don't believe it was

24      discussed in that e-mail.

25  BY MR. VOLLRATH:

Clark, Celia R  - Vol. 3                          September 11, 2023

143

1          Q.      That was not the question.

2                  The question is; in general, do you

3    recall whether he had an insurance purpose for

4    creating a second captive?

5                  MS. DARWIT:  Object to form.

6                  THE WITNESS:  Yes, I do recall.  Yes,

7          he had -- he had different insurance needs

8          between the two business lines.

9    BY MR. VOLLRATH:

10         Q.      Okay.  How do you know that?  Did you

11   talk to him?

12         **A.      I talked to him, yes.  I talked to**

13   **Craig McEtee.**

14         Q.      And who is Craig McEtee?

15         **A.      The CPA.**

16         Q.      Was it Dr. Wilson's CPA?

17         **A.      Yes.**

18         Q.      Okay.  All right.  On direct you also

19   testified about the circulation of certain memos

20   to your clients.  Do you recall that?

21         **A.      Yes.**

22         Q.      You testified that it was your

23   intention to circulate these memos on a routine

24   basis.  Do you remember that?

25         **A.      Yes.**

Clark, Celia R  - Vol. 3                                September 11, 2023

144

1        Q.        And then you also testified that you

2   couldn't confirm whether any particular client

3   received the memo, correct?

4        **A.        Correct.**

5        Q.        All right.  What did you mean by, you

6   intended to circulate the memos on a routine

7   basis?

8        **A.        Because of -- what I was referring to**

9   **is the office process where any sort of mass**

10  **e-mail would be, would be sent out by various**

11  **employees, supposedly at the same time, and the**

12  **list of clients was divided up among themselves.**

13  **I didn't have direct involvement.  And there were**

14  **e-mails that occasionally bounced because the**

15  **address was incorrect and people might have been**

16  **missed.**

17              **I just can't confirm it personally.**

18       Q.        Okay.  But the memos were drafted,

19  correct?

20       **A.        Yes.  And it was my intention, the**

21  **intention of the whole office, to circulate --**

22  **that particular one was Saint Kitts captive**

23  **insurance clients.**

24       Q.        Okay.  These e-mails were sent out,

25  correct?

Clark, Celia R  - Vol. 3                          September 11, 2023

145

1       A.       Yes, they were sent out, yes.

2       Q.       Okay.  You just don't know -- you

3  know that sometimes you received them bounced

4  back.

5       A.       Or somebody did.

6       Q.       Okay.  And you don't know exactly

7  know who those people are, correct?

8       A.       No.  No, I don't know.

9       Q.       All right.  I want to touch briefly

10  on the concept of exit strategies that you talked

11  about on direct.

12       A.       Okay.

13       Q.       First of all, each captive is

14  different.  Is that fair to say?

15                MS. DARWIT:  Objection.  Form.

16  BY MR. VOLLRATH:

17       Q.       You can answer.

18       A.       I would say yes.

19       Q.       So there is no general exit strategy.

20  Is that correct?

21                MS. DARWIT:  Objection.  Form.

22                THE WITNESS:  That's correct.

23  BY MR. VOLLRATH:

24       Q.       But in general, the captive insurance

25  companies you set up were supposed to be a

Clark, Celia R  - Vol. 3                    September 11, 2023

146

1    long-term prospect, correct?

2         A.      Yes.

3         Q.      They were supposed to insure the

4    business for the life of the business, correct?

5              MS. DARWIT:  Objection.  Form.

6              THE WITNESS:  Yeah, I mean, even that

7         is maybe a little more of a generalization.

8         But long-term, in the initial discussions, we

9         always talked about the client's intention of

10        maintenance and if they said two years, they

11        were not a good candidate.  If they said,

12        until I die, yeah, I mean -- they gave

13        different answers, but they needed to have a

14        long-term plan.

15   BY MR. VOLLRATH:

16        Q.      Okay.  Why did they need to have a

17   long-term plan, in your mind?

18        A.      **Because I didn't like setting up**

19   **something that would... that the client was**

20   **planning to use to minimize taxable income for**

21   **certain -- for a certain short period of time.**

22   **This is one of the discussions we always had.**

23        Q.      Did that reflect negatively on

24   whether they had a bona fide insurance purpose?

25        A.      **Yes, it did.**

Clark, Celia R - Vol. 3                          September 11, 2023

1          Q.       Okay.  And a short-term time horizon

2     for the captive indicated to you that they did not

3     have a valid insurance purpose?

4                   MS. DARWIT:  Objection.  Form.

5                   THE WITNESS:  Yes.  Yes, it was a

6          question of business purpose.  Yes.

7     BY MR. VOLLRATH:

8          Q.       My last set of questions here are on

9     the topic of the concept of a moral hazard.

10         **A.       Okay.**

11         Q.       Do you remember testifying about

12    that --

13         **A.       Yes, I do.**

14         Q.       You testified that that's a common

15    law rule.

16                  Is there a hard and fast rule related

17    to the presence of moral hazard, in your mind?

18         **A.       No.  I was explaining the concept as**

19    **I understood it.**

20         Q.       You can have insurance where there's

21    an element of moral hazard, correct?

22         **A.       Yes, you can.**

23         Q.       For example, you can get health

24    insurance even if you don't exercise, correct?

25                  MS. DARWIT:  Objection.  Form.

Clark, Celia R  - Vol. 3                              September 11, 2023

148

1    BY MR. VOLLRATH:

2         Q.      You can answer.

3         **A.      Yes, correct.**

4         Q.      Okay.  There are life insurance

5    policies that cover suicide, correct?

6         **A.      Yes.**

7                  MS. DARWIT:  Objection.  Form.

8    BY MR. VOLLRATH:

9         Q.      Okay.  And of course your car

10   insurance covers whether -- covers an accident

11   even if you're negligent, correct?

12        **A.      Yes.**

13                 MS. DARWIT:  Objection.  Form.

14                 MR. VOLLRATH:  I don't have any

15        further questions.

16                 MS. DARWIT:  I have just one question

17        to ask on... recross, I guess.

18                    REDIRECT EXAMINATION

19   BY MS. DARWIT:

20        Q.      I'm going to pull up the Lattanzio

21   report that Mr. Vollrath was referencing and which

22   I referenced earlier.

23                 This is previously marked Exhibit

24   128.

25                 Let me know, Ms. Clark, once the

Clark, Celia R  - Vol. 3                           September 11, 2023

149

1    document is on your screen.

2         A.      Yes, I have it.

3         Q.      I'm going to scroll down to the last

4    bullet in the list of criticisms.  And this is at

5    the top of page four here.

6         A.      Yes.

7         Q.      And this criticism discusses the

8    expense load in Mr. Rosenbach's model, right?

9         A.      Yes.

10        Q.      Is this the risk load that you were

11   referring to earlier?

12        A.      I don't know.

13        Q.      In what ways did Mr. Rosenbach update

14   his model to account for changes to the risk load?

15        A.      There was a column in the exhibits,

16   the numerical exhibits, that included that, by

17   that name, as I recall.

18        Q.      So after the Lattanzio report,

19   Mr. Rosenbach added a new column to the portion of

20   his premium pricing report that was in the

21   exhibits reflecting the risk load?

22        A.      So, right, so the change was made

23   subsequent to the Lattanzio report, but I would

24   say not totally because of that.  Maybe not even

25   because of that.  Because expense load, it sounds

Clark, Celia R  - Vol. 3                     September 11, 2023

150

1    different from risk load, but I don't really know.

2        Q.      Okay.  This critique here, criticism,

3    discussing expense loads, do you know if

4    Mr. Rosenbach updated his model to make changes

5    accounting for this criticism?

6        A.      On expense load... so assuming that's

7    not the same as a risk load... it says -- last

8    sentence there, if I could read that.  In our

9    experience we have found that specific expense

10   information is typically readily available with

11   respect to individual captives, as many of the

12   operating expenses are contractual in nature.

13           So based on that and not my separate

14   knowledge, I would say that column that I was

15   referring to for risk loads is something quite

16   different.

17       Q.      Okay.  Well, in this paragraph,

18   Mr. Lattanzio is saying that Mr. Rosenbach -- in

19   the first sentence it says that Mr. Rosenbach uses

20   the same expense load from the filings of a

21   commercial rider.  Right?

22       A.      It does say that, yes.

23       Q.      And then it says, if we were deriving

24   rates based upon a rate filing of another insurer,

25   we would prefer to remove the expense load for the

Clark, Celia R  - Vol. 3                              September 11, 2023

151

```
 1    insurer from the rates in order to derive the
 2    expected losses.
 3              Do you see that?
 4       A.       Yes, I do.
 5       Q.       And then he says, we would reflect
 6    the unique experience -- excuse me -- unique
 7    expenses of the captive in order to determine the
 8    rate, since the expenses of the commercial rider
 9    may vary materially from those of the captives.
10              Do you see that?
11       A.       Yes.
12       Q.       So do you know if Mr. Rosenbach
13    changed his calculation in terms of the expense
14    load to account for the differences between a
15    commercial insurance company and a captive
16    insurance company?
17       A.       I don't know that specifically.
18       Q.       Okay.  He did not tell you that he
19    made a change to his model in order to reflect the
20    differences in expenses between the captives and a
21    commercial insurance company?
22       A.       He may have.  I don't recall at this
23    time.
24       Q.       Okay.  And you mentioned that
25    Mr. Rosenbach added a column to his model
```

Clark, Celia R  - Vol. 3                           September 11, 2023

                                                              152

1    reflecting the risk load, right?

2         A.        That's my recollection.

3         Q.        Okay.  I'm going to go to previously

4    marked -- well, this is previously Bates stamped

5    ACR_IRS0321401.  I'm not sure what we previously

6    stamped this as, but I can pull it up in a second.

7                   MR. VOLLRATH:  It's Exhibit 323, I

8         think.

9                   MS. DARWIT:  Thank you.

10   BY MS. DARWIT:

11        Q.        I'm just going to, just to -- this is

12   a copy of a premium pricing report prepared by

13   Mr. Rosenbach, right.

14        A.        Yes.

15        Q.        I'm going to scroll to the exhibits

16   that are in this report.

17        A.        Yes.

18        Q.        And this is for a policy period

19   effective December of 2012, right?

20        A.        Yes.

21        Q.        So this is after the Lattanzio

22   report, right?

23        A.        Yes.

24        Q.        And is the risk load adjustment

25   reflected somewhere in these exhibits, beginning

Clark, Celia R  - Vol. 3                    September 11, 2023

1   on page seven?

2        A.      So the first page of -- that we're

3   looking at right now is the summary.

4        Q.      Okay.  Keep scrolling.

5        A.      Let's see.

6        Q.      Just let me know when you want me to

7   keep going.

8        A.      Trying to remember what ILF means.

9                There's a number there, says number

10  four, and then there's a coverage factor below

11  that, says .75 and then adjustment, ADJ, and then

12  .45.

13               See, I don't know what those mean.

14  But I'd like to look at a few other policy lines

15  because there were different factors for different

16  things.

17       Q.      Okay.  I'm on pdf page nine now.

18       A.      Business income protection.

19               So this doesn't say ILF.  It says

20  limit factor.

21               Look, I'm just going to say, this is

22  not my field.  There are various adjustments in

23  here that I cannot explain and I think I should

24  leave it at that.

25       Q.      Okay.  So on pdf page nine you don't

Clark, Celia R  - Vol. 3                                September 11, 2023

154

1    see, to your knowledge, anything that reflects the

2    change to the risk load?  Right?

3         **A.      I cannot tell.**

4         Q.      Okay.  Can you tell on pdf page 10

5    whether there's an adjustment reflecting a change

6    to the risk load?

7         **A.      I cannot tell.**

8         Q.      Can you tell on pdf page 11 if

9    there's an adjustment reflecting a change to the

10   risk load?

11        **A.      I do -- to answer a slightly**

12   **different question.  Under other, it says .9 and**

13   **it says LAE.  I do know that that's loss**

14   **adjustment expense.  That's kind of the limit of**

15   **my knowledge.**

16        Q.      Do you know if loss adjustment

17   expense is the same thing as risk load?

18        **A.      I'm getting back to your earlier**

19   **question about expense load.**

20        Q.      Okay.  Do you know if this loss

21   adjustment expense is the same thing as risk load?

22        **A.      I don't, but I know what it stands**

23   **for.**

24        Q.      Okay.  Pdf page 12.  Is there

25   anything on this page that reflects a change to

Clark, Celia R  - Vol. 3                                      September 11, 2023

155

 1    the risk load, in your opinion?

 2         A.       **Yeah, I don't have an opinion on**

 3    **that.  I'm really not qualified.**

 4         Q.       Well, you said earlier that --

 5         A.       **I recall, yes, I do recall.  If it's**

 6    **not in this report, it may be in another one.**

 7         Q.       Okay.  And same thing with page --

 8    pdf page 13, do you see an adjustment here that

 9    reflects a change to the risk load?

10         A.       **Not under that name.**

11         Q.       Pdf page 14, do you see an adjustment

12    here that reflects a change to the risk load?

13         A.       **Not under that name.**

14         Q.       Pdf page 15, do you see an adjustment

15    here that reflects a change to the risk load?

16         A.       **Not under that name.**

17         Q.       Okay.  Last two.

18                  Back to pdf page 16, do you see an

19    adjustment here that reflects a change to the risk

20    load?

21         A.       **Not under that name.**

22         Q.       And pdf page 17, do you see an

23    adjustment here that reflects a change to the risk

24    load?

25         A.       **Not under that name.**

Clark, Celia R  - Vol. 3                                    September 11, 2023

156

1        Q.       Okay.  So do you recall where you saw

2    the risk load adjustment that Mr. Rose -- that you

3    referenced earlier?

4                MR. VOLLRATH:  Object to form.

5                THE WITNESS:  I recall that Al told

6        me he was completely overhauling his model.

7        He mentioned risk load.  It may not -- he may

8        not have completed that by the end of 2012,

9        but I can't be more specific at this time.

10               MS. DARWIT:  Okay.

11               I think that's it for me, then.

12               THE WITNESS:  Okay.

13               MR. VOLLRATH:  Nothing further.  I

14       think we're done.  Ready to go off the

15       record?

16               MS. DARWIT:  Ready to go off the

17       record.

18               THE VIDEOGRAPHER:  2:24, we're off

19       the record.  The end of the deposition.

20               MR. VOLLRATH:  We will read.

21               MS. DARWIT:  Okay.

22               (Whereupon the deposition was

23       concluded.)

24

25

Clark, Celia R  - Vol. 3                                    September 11, 2023

157

```
 1                    (Thereupon, the taking of the

 2        deposition was concluded at 2:24 p.m.)

 3

 4                         EXCEPT FOR ANY CORRECTIONS

 5                         MADE ON THE ERRATA SHEET BY

 6                         ME, I CERTIFY THIS IS A TRUE

 7                         AND ACCURATE TRANSCRIPT.

 8                         FURTHER DEPONENT SAYETH NOT.

 9

10                    _____

11                      CELIA R. CLARK

12

13        STATE OF FLORIDA      )

14                              )  SS:

15        COUNTY OF BROWARD     )

16

17             Sworn and subscribed to before me this

18        _____ day of _____, 2023.

19        PERSONALLY KNOWN_____ OR I.D.

20        _____

21

22             _____

23             Notary Public in and for the

24             State of Florida at Large.

25        My commission expires:
```

Clark, Celia R  - Vol. 3                                        September 11, 2023

158

1                      CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA

5    COUNTY OF BROWARD

6

7

8         I, the undersigned authority, certify that

9    CELIA R. CLARK personally appeared before me and

10   was duly sworn.

11

12        Witness my hand and official seal this 21st

13   day of September 2023.

14

15

16                   _____

17                   DOREEN KRENCHICKI

18                   Notary Public - State of Florida

19                   My Commission GG 977602

20                   Expires April 12, 2024

21

22

23

24

25

159

1              REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6         I, Doreen Krenchicki, Certified Court

7    Reporter, Registered Professional Reporter,

8    Certificate of Merit Reporter and Certified

9    Realtime Reporter, certify that I was authorized

10   to and did stenographically report the foregoing

11   proceedings of CELIA R. CLARK; that a review of

12   the transcript was requested; and that the

13   transcript is a true and complete record of my

14   stenographic notes.

15        I further certify that I am not a relative,

16   employee, attorney, or counsel for any of the

17   parties, parties' attorney, or counsel connected

18   with the action, nor am I financially interested

19   in the action.

20

21        DATED this 21st day of September 2023.

22

23        _____

24        DOREEN KRENCHICKI, CCR, RPR, CRR, CM

25        Notary Public, State of Florida at Large

**A**

**a.m** 1:14
**ability** 24:17
  86:21 122:15
**able** 38:13
  51:10 99:9
  119:11 120:8
  126:20 128:7
  133:8 137:19
**abusive** 46:2
  46:15 47:10
  48:9 122:4
**accepted**
  141:2
**accident**
  148:10
**account** 12:18
  13:18,21
  14:12 15:12
  137:3 149:14
  151:14
**accounting**
  49:19 150:5
**accurate** 94:20
  157:7
**ACR** 18:25
**ACR_IRS03...**
  4:19 20:24
**ACR_IRS03...**
  4:19 20:25
**ACR_IRS03...**
  4:21 18:13
  18:15 152:5
**ACR_IRS03...**
  4:21 18:15
**act** 124:6
**action** 45:13
  130:14
  159:18,19
**activities**
  83:24
**actual** 10:16
  53:15 126:6
**actuarial** 7:25

8:2,11,16
10:3,25 11:4
11:6,9,12,15
11:20 17:5
17:10 21:7
21:16 23:6
132:8 133:24
134:7,12
135:12,15,25
137:15 138:4
140:15
**actuarially**
  133:2 134:16
**actuaries**
  132:12
**actuary** 23:15
  24:16 30:9
  94:9,17,22
  96:19 133:5
  136:3
**actuary's** 95:1
  95:9
**added** 7:24
  63:2 137:18
  149:19
  151:25
**adding** 14:1,5
  14:9
**additional** 9:5
  9:9,15,19,22
  10:12,24
  13:25 14:5
  16:25 25:3
  26:2,4,12,18
  51:17,18,23
  112:18
**address** 28:2
  37:19 38:18
  144:15
**addressed**
  27:23 28:4
  28:18 139:25
**addresses**
  38:22 129:23

**addressing**
  28:14
**adequately**
  139:25
**adjusted** 8:24
  139:16
**adjustment**
  152:24
  153:11 154:5
  154:9,14,16
  154:21 155:8
  155:11,14,19
  155:23 156:2
**adjustments**
  153:22
**Adkisson**
  119:21,22,25
  120:5,12
**Administrati...**
  116:20
**adopted** 53:13
**advantage**
  32:15
**advisable** 97:8
**advise** 80:6
**advised** 85:6
  86:10 88:7,9
**advising** 68:10
  80:2 87:12
  87:25
**advisor** 49:3
  50:17 72:16
  109:22
  116:23
**advisors** 50:15
  65:15 78:15
  78:15,18
  79:18 80:3
  102:11
  117:15
**affordable**
  74:16
**afraid** 40:15
**agency** 32:17

**agent** 73:2
  104:16
  105:19
  114:25
  115:14
**ago** 64:15
  69:15 91:24
  139:16
**agree** 14:18
  27:14 53:25
  54:6,11,13
  54:24 55:2,5
  57:2,6,11
  59:4 60:25
  70:2 75:21
  122:17,21,25
  123:12 124:7
  124:15,23
  125:3,5
**agreeable** 25:3
**agreed** 54:4
**agreement**
  130:13,16
**agreements**
  129:19,20
**ahead** 97:17
  97:17
**AI** 13:22 22:14
  136:21
  137:10
  138:23 140:5
  140:13,18,20
  140:20 156:5
**Alabama** 48:5
  126:22
**Alan** 107:23
  109:4
**allegation**
  104:2
**allegations**
  130:11
**allege** 130:15
**alleged** 104:9
  106:3 110:17

111:10,13,22
112:13 113:3
113:23 114:4
114:13,20
116:5 118:12
120:5 130:17
**Allen** 7:19
  94:17
**Alliance** 43:4
**Allison** 112:4,7
  112:8 113:9
  120:18
**allocated** 81:2
  84:18
**allowed** 63:7
**alter** 28:7
**altered** 26:23
**amended**
  137:11
**America** 1:8
  62:24
**American**
  54:15,20,21
  93:7,9,18,23
  129:19
**amount** 16:16
  25:8 43:14
  67:7 71:11
  71:15 81:1,8
  96:12 124:12
**amounts** 61:4
**analysis** 9:16
  9:20 23:10
  25:9 26:11
  26:17,20,22
  27:13 39:25
  84:17 94:20
  94:23 132:20
  137:7,18,23
  139:13
**ancillary**
  129:20
**and/or** 15:18
**answer** 47:5

88:5 99:17
105:4 121:22
126:20 128:1
128:7,24
133:15
134:24 135:9
138:13,21
140:4 145:17
148:2 154:11
**answered** 47:3
88:4
**answers**
146:13
**Anthony** 130:4
**apparently**
64:24
**appear** 39:11
39:24
**appeared**
158:9
**appearing**
6:18 122:1
**appears** 23:23
24:6
**appends** 15:2
**applicable**
81:22 82:5
**application**
52:14
**apply** 78:11
**appointment**
56:20
**appreciated**
98:1
**apprised**
122:13
**appropriate**
75:9,20 76:1
76:10 80:4,8
80:13 81:6
86:3 132:23
135:5
**approval**
40:17 91:25

**approved**
79:24 80:16
95:7
**approximately**
58:20 118:21
**April** 158:20
**area** 88:8
**argued** 53:14
**argument**
85:15
**Arizona**
107:22
**arm's** 122:19
123:2,5,10
**arrangement**
43:13
**arrangements**
74:15
**art** 121:25
**article** 31:3,7
31:10,12
32:16
**articles** 34:5,5
65:13
**aside** 79:8
**asked** 8:10
47:2 50:24
66:17 84:12
99:18 103:1
135:6
**asking** 35:14
36:14 37:19
44:22 50:17
51:9 58:5
69:16,18
103:1 128:14
**asks** 35:17
49:25 66:24
67:4 74:22
**aspects** 26:10
26:16
**assessment**
108:18
**assets** 98:2

103:6,7
**assist** 87:9
**associate**
77:13 83:9
106:6 130:5
**associates**
106:5
**Association**
80:18
**assume** 109:5
129:10
**assuming**
150:6
**assumptions**
13:2 15:1
17:1 20:7,11
135:12
**assurance**
50:2,11
**Atlanta** 116:25
118:18
**ATS** 136:1
138:25 139:5
140:1
**attached** 12:17
13:18 15:13
**attachment**
12:13 13:15
14:22 15:4
15:15
**attempted**
78:1
**attend** 112:7
**attorney** 74:13
83:10 118:18
121:1 130:5
159:16,17
**attorneys** 2:20
108:24
117:25
120:17,21
**audit** 45:14
76:3
**audited** 92:6

**auditor** 39:2
**August** 22:3
45:6,19,22
46:1,4
**author** 39:9
**authority**
158:8
**authorized**
45:15 159:9
**automatically**
78:18
**available**
23:11 37:20
150:10
**Avenue** 1:12
2:8 6:9
**Avrahami**
101:19 109:9
109:12,15
110:3,14
111:6 112:6
112:9 113:3
113:9 114:13
114:20
**Avrahamis**
107:24 108:6
109:22
**aware** 133:16
137:13
141:17

─────── **B** ───────

**back** 38:1
54:10 84:22
97:13 114:23
136:21 145:4
154:18
155:18
**background**
140:10
**Bar** 43:8
**based** 23:9
69:1,10,25
137:12

150:13,24
**basic** 100:7
**basis** 36:21
87:19 88:9
123:15
133:11 137:6
137:7 143:24
144:7
**Bates** 18:13
29:4 30:15
33:16 35:4
37:7 42:13
48:15 56:2
65:22 72:3
88:15 92:20
103:13 152:4
**bathroom**
131:22
**Beckett** 34:8
**becoming**
9:13
**beginning**
25:18 42:18
52:11 56:19
65:9 98:4
117:5 152:25
**begins** 49:24
62:3
**begun** 25:11
137:24 139:2
**behalf** 2:3,16
6:14,18,19
120:22 121:3
**belief** 110:9
**believe** 9:11
9:21 10:22
16:21 25:2
28:17 32:25
36:22 39:2
43:11 46:10
64:15 79:16
85:3,10
86:20 89:4
96:1,7,19

97:5 102:10
110:19
111:20
113:11
116:11,22
118:10
119:24 121:7
121:15 133:1
133:4 135:20
135:24
136:19 137:9
137:21
142:23
**bell** 71:24
115:8 125:21
**beneficiaries**
81:12 90:25
**benefit** 91:3
**benefits** 40:3
59:6 66:18
70:25 71:5,7
71:15 73:22
90:23 91:9
91:11 124:15
124:23
**best** 118:19
122:15
**better** 20:9
91:8 135:3
**beyond** 55:14
99:24 101:6
**big** 92:7
**Bill** 47:14,16
56:8 57:21
58:22
**bit** 59:24 66:12
84:23 87:23
98:11 114:9
114:15 120:9
**blacked** 12:15
**Blue** 21:12,18
21:24,25
23:1,23 24:5
**bona** 146:24

**Boorstein**
83:20,21
85:21
**borrow** 67:5
**borrowing**
67:15,17
68:13
**bottom** 7:17
8:5 35:9
37:12 38:25
39:25 61:16
72:8 92:25
107:20
108:14
**bounced**
144:14 145:3
**Box** 2:22
**Brandon**
107:21
**Branerton**
107:22
108:12,15,22
109:3,19
**breach** 130:13
130:15,17
**brief** 95:21
**briefly** 131:10
145:9
**British** 126:22
**brought** 44:19
88:10 96:19
**BROWARD**
157:15 158:5
159:4
**Brown** 115:10
115:10,16
116:2,12
**Bruce** 42:20
42:24
**Bryan** 37:14
37:18
**Bryson** 106:16
106:19
**building**

105:20
**bullet** 27:8,9
27:17 28:5
38:17,21,25
149:4
**bullets** 27:25
28:15,19
**bunch** 96:10
96:11 129:20
**business** 43:3
59:12 63:12
63:14 67:19
73:14 74:1
75:5,5 125:9
143:8 146:4
146:4 147:6
153:18
**businesses**
101:11
**buy** 80:14
124:1

## C

**C** 2:1
**calculation**
151:13
**California**
115:1
**call** 37:20
38:14 100:11
118:6,9
**called** 8:22
49:14 52:21
60:4 106:4
125:9,15,20
131:12 136:1
**calling** 11:20
**calls** 65:16
81:25 118:14
**candidate**
146:11
**Cantley** 34:8
34:10
**Cantley's** 34:5

**capacity**
110:13
111:17
**capital** 98:1
**Caplin** 108:24
110:24 112:1
112:9 115:24
116:19 117:7
120:18
**caps** 120:25
**captive** 23:2
24:9 31:4
40:3 43:11
43:17,21
47:17,20,25
49:4,7 53:1
53:25 54:6
55:6 56:22
57:2,15 58:2
58:7,11,17
60:7,8 61:2
62:9,16
63:22 64:22
65:1 66:21
68:3 70:24
71:12,16
73:9,23
74:14 75:13
76:2 77:17
77:25 78:4
78:12,19
80:8,14 81:7
84:3 85:15
86:3,11,12
86:18 90:12
90:24 96:16
97:3 98:5,14
98:18,23
99:1,7,22
100:3,15
101:1,3,4,8
101:16,21
102:20,25
103:6,7,8

106:25
117:15
122:11,13,18
122:24 123:1
123:11 126:2
126:7,11,17
127:1,24
128:4,5,11
128:22
132:21 133:8
142:16,21
143:4 144:22
145:13,24
147:2 151:7
151:15
**captives** 15:17
35:15,25
36:3,18,20
44:20 51:5
59:4,10,13
60:12,15,21
61:5 64:5
81:15 86:25
87:5 88:1
89:8 92:2
95:20,25
96:4 99:9
102:3,13,16
102:19
128:15
150:11 151:9
151:20
**captives'**
30:10 81:2
81:23 82:6
84:17 86:22
90:3 91:22
**car** 148:9
**Care** 19:2
**Carolina**
131:11
**carriers** 23:18
**case** 1:3 6:6
37:3 57:7

59:15 82:17
87:19,19
88:9,9
103:14
105:20
107:25 108:7
108:8 109:10
109:12,16
112:15
122:13 124:9
124:10
**cases** 109:23
109:25
**cash** 68:18
**casualty** 80:20
116:24
**category** 69:17
**cause** 1:24
41:23 42:4,9
55:9 95:23
130:14
**caution** 86:10
**CClark@ccl...**
130:2
**CClark@clar...**
130:3
**CCR** 159:24
**CD** 43:8
**cease** 102:15
**Celia** 1:5,16
4:4 6:3,4,22
7:2 13:13
44:1 157:11
158:9 159:11
**cell** 82:21
**certain** 30:11
31:20 36:8
37:1,4 46:17
49:5 51:16
68:7 69:2,3
80:10 117:16
120:3 126:24
143:19
146:21,21

**certainly** 24:10
80:25 85:3
86:7 90:6
95:22 131:23
**Certificate**
1:21 158:1
159:1,8
**Certified** 1:20
1:21 159:6,8
**certify** 157:6
158:8 159:9
159:15
**cetera** 73:17
**chain** 93:12
**chance** 140:9
**Chang** 3:11
6:20
**change** 10:2
25:23 89:19
138:10,15
149:22
151:19 154:2
154:5,9,25
155:9,12,15
155:19,23
**changed** 43:4
50:17 77:14
138:3,18
139:14
151:13
**changes** 7:23
10:8,12,14
10:15,20
17:21 28:10
28:14 137:2
137:5,14
139:9,11
149:14 150:4
**characteriza...**
57:9
**charge** 126:25
**charged** 123:1
**Charles**
113:10

114:12 131:1
**Charlotte**
131:11
**chart** 62:4 86:5
**charts** 85:13
**Chen** 83:9
85:12 106:7
**children** 60:24
**Chris** 47:14
129:17
**Chubb** 28:8
137:8,11
139:9,11
141:7
**CIC** 66:18,21
67:7 68:18
71:4,7 88:24
89:6 91:1
94:12
**CIC/trust/pool**
67:1
**CICs** 67:23
**Circle** 125:9
**circulate** 77:23
78:1 79:9,13
89:7 143:23
144:6,21
**circulated**
45:10 78:3
78:17,24,25
79:18
**circulating**
79:6
**circulation**
143:19
**circumstanc...**
104:7 119:19
**citing** 101:6
**claim** 51:10,16
51:22 95:8
96:17 124:1
**claims** 16:3,9
16:16,16,19
94:5,10,15

94:19,22
95:6,11,14
95:16,19,25
**clarify** 10:10
**Clark** 1:5,16
4:4 6:4,4,22
7:2,8,18 12:8
13:13 18:1,6
18:21 19:15
19:18,21,25
20:3,10,16
21:3 29:9,14
29:23 30:21
34:2 37:12
44:1 48:20
56:7 66:5
77:8 83:6
88:20 93:1
97:2,17
103:20
105:21,22
108:15,18
109:21 110:2
110:9 115:15
119:21
129:24 130:6
130:8,12
132:7 135:13
148:25
157:11 158:9
159:11
**Clark's** 104:17
105:24
108:17 116:1
117:16
**Clark_PROD...**
4:16 83:2
**Clark_PROD...**
4:17 83:3
**ClarkSDFL** 5:6
72:5
**ClarkSDFL1...**
5:7 88:15,17
**ClarkSDFL1...**

5:6 72:3,5
**ClarkSDFL1...**
5:3 48:15,17
**ClarkSDFL1...**
5:3 48:17
**ClarkSDFL1...**
4:23 30:16
30:18
**ClarkSDFL1...**
4:23 30:18
**ClarkSDFL1...**
4:24 33:16
33:18
**ClarkSDFL1...**
4:24 33:18
**ClarkSDFL2...**
4:22 29:4,6
**ClarkSDFL2...**
4:22 29:6
**ClarkSDFL3...**
5:1 37:7,9
**ClarkSDFL3...**
5:1 37:9
**ClarkSDFL7...**
5:2 42:13,15
**ClarkSDFL7...**
5:2 42:15
**ClarkSDFL7...**
5:8 92:20,22
**ClarkSDFL7...**
5:8 92:22
**ClarkSDFL8...**
5:5,5 65:22
65:24,24
**ClarkSDFL8...**
5:4 56:2,4
**ClarkSDFL8...**
5:4 56:4
**clear** 11:25
**clearly** 55:8
116:12
**client** 21:24
40:15,22
41:2 43:1

45:14,15
46:6 47:23
50:14 51:4,9
51:16,22
56:14 57:19
61:21,23,24
64:17 66:14
68:1 75:11
75:24 76:16
76:18 86:25
87:9,19 98:9
98:10 100:10
105:8 128:9
128:18,20
144:2 146:19
client's 56:18
98:18 101:10
101:23 146:9
clients 14:10
17:8,15 25:4
26:4 30:6,9
46:13,17,18
46:20,23,25
47:9,12 48:8
49:4,10,11
50:21,24
56:13 57:14
58:6,10,16
58:21 59:5,9
68:24 69:2,3
69:4,9,11,13
69:19,24
72:19 76:1
77:24 78:1,4
78:14,18
79:10,18
80:3,7,14,23
81:6,14,22
82:2,21
86:17,21
87:4,12,24
87:25 89:6,6
89:8 90:2,11
90:19 91:21

92:5 93:21
95:15,19,25
99:20 100:14
101:2 102:1
102:3,18
104:17
105:24
106:20
109:22
115:11
117:16 127:8
127:22
128:15 133:7
133:16
135:11 142:9
143:20
144:12,23
clients' 140:8
clinched 142:1
Clinics 61:4
close 16:2
85:5
closely 142:7
clue 84:14
120:10
CM 159:24
co-counsel
47:16 58:20
code 59:7
122:2
colleague
113:11
column 84:24
149:15,19
150:14
151:25
combination
91:14
combined
63:6
Combs 93:22
come 84:22
135:1
coming 32:17

120:11
141:18
commenced
121:16
comment 75:4
comments
55:12 74:23
75:9,20 76:9
76:12 105:15
135:19,21
136:10,13,17
136:24 137:3
139:25
140:23 141:1
141:11
commercial
23:18 123:5
150:21 151:8
151:15,21
commission
157:25
158:19
commission...
136:7
Commission...
80:19
common
17:20 57:14
58:6,10
68:24 69:2,4
69:8,18,23
71:25 109:7
109:11
123:24
147:14
communicate
81:21
communicat...
57:16
communicat...
8:1,16 11:6,9
11:15 65:6
134:8,13
communicat...

9:11 11:12
17:6,10,16
companies
49:7 58:2,18
60:17 77:17
80:21 84:3
86:12,19
100:15 102:4
102:13,16
123:6 126:2
126:7,11,17
127:1 133:8
145:25
company 19:3
21:13,19,25
23:1,2 43:18
47:22 48:1
53:1 56:22
57:3 62:24
63:1,23
66:22 68:3
70:25 73:10
73:23,25
75:13 78:1
78:12 79:3
82:13 83:13
83:14 86:3
93:20 98:24
99:10,12,15
101:24
106:25,25
107:3 122:18
151:15,16,21
company's
70:23 71:11
80:9 85:16
comparable
53:18
compared
8:23
comparison
142:5
competent
133:5

competitor
45:9
complaint
104:3 129:16
complete
40:11 138:9
159:13
completed
156:8
completely
10:2 11:25
36:3 138:3
138:17 156:6
compliance
83:23 87:10
complicated
69:13 91:14
complied 87:1
87:5
comply 87:13
88:1
compromised
43:12
computer
33:23 73:15
concept
123:19
145:10 147:9
147:18
concern 42:9
55:14 85:20
concerned
70:20
concerns
22:23 41:8
41:11,17,20
41:23 42:4
55:10
concluded
156:23 157:2
concludes
39:23 131:17
conclusion
54:3 141:19

concurrently 53:19
conditions 80:10
conducted 122:19
conduit 85:14
conference 65:16 83:19 118:6,9
confidence 49:14
confidential 45:13 115:15 116:1
confirm 68:8 79:21 144:2 144:17
confirmed 9:12
conflict 61:1
confusing 75:4
connected 159:17
connection 15:3 31:10 107:24 115:1 132:9
Connolly 66:8 66:11 67:12 70:5
consider 47:23 49:25
considered 32:18
considering 62:22
constitute 7:25 17:5,10 122:16
constructive 27:15,16,24 28:4

consult 102:10
contact 85:5
contained 134:16 136:10
contemplated 98:22
contend 104:4
contents 115:14
context 17:14 25:1 121:9 121:13
continuation 53:17
continue 19:12 26:1 102:12
Continued 4:5 7:5
continues 62:15
contractual 150:12
contributed 124:5
contribution 32:19 124:12 124:13
control 87:7,8
controlled 15:17
conversation 75:17 105:16 116:11,15
conversations 82:22
convert 98:24 102:3
converted 99:10,11,15
convince 140:7
convinced

141:12
copies 121:2,6
copy 97:16 103:20 107:10 108:21 152:12
Corp 98:24 99:10,12,12
corporate 98:2 127:3
correct 46:7 64:8 83:11 88:24,25 109:13 117:8 121:18 132:13 133:9 133:21,24,25 134:2,3 136:8 137:25 144:3,4,19 144:25 145:7 145:20,22 146:1,4 147:21,24 148:3,5,11
CORRECTIO... 157:4
correctly 72:12 73:18 74:4 83:25 104:11
corresponded 120:21
cost 9:13
costs 127:23 128:10,21
Cotterell 93:3 93:6,13 94:2 126:10
counsel 6:16 107:22 108:6 108:7 109:6 110:18,22

111:9,23
112:1,15,16
112:19
113:19
159:16,17
counted 91:16 91:17
counting 89:21
COUNTY 157:15 158:5 159:4
couple 31:14 99:25 118:24 130:24 135:22
coupled 23:10 39:16
course 56:22 61:3 66:17 71:4 148:9
court 1:1,20 6:12,23 32:5 52:25 101:19 107:25 108:7 108:8 109:9 109:15 159:6
cover 148:5
coverage 39:19 40:2 44:3 132:24 153:10
coverages 13:2 15:1 16:25 75:5
covered 50:1 50:10
covers 148:10 148:10
CPA 49:2 105:6 112:25 143:15,16
Craig 112:24 113:11,20

114:19 131:4 143:13,14
Crane 49:7,9 49:10,11 50:11 51:22
create 14:12 85:14
created 126:3 126:12,18 127:1
creating 142:16,20 143:4
criteria 126:24
criticism 27:15 27:17 141:13 149:7 150:2 150:5
criticisms 27:24 28:5 28:14,18 149:4
critique 25:10 25:17 27:14 150:2
critiques 27:12 141:2
critiquing 25:12
Cross 4:6 132:5
CRR 159:24
current 53:5 53:15 55:3 63:7 90:12
currently 50:2 89:8
customers 99:7

**D**

D.C 2:23
Darwit 2:18 4:5,7 6:17,17

7:6,15 12:7
12:24,25
18:9,11,19
18:20 21:2
25:21 29:2,8
29:12,13,17
29:22 30:14
30:20 31:1,2
33:14,20
34:1 35:2,8
37:5,11
42:11,17
46:11 47:4
48:13,19
55:16,25
56:6 61:9,15
64:3,11
65:20 66:3,4
68:9 72:1,7
75:18 76:7
76:24 77:6,7
82:18,24
83:5 88:11
88:13,19
89:25 90:9
91:7 92:10
92:18,24
99:4 100:24
102:8 103:11
103:19 105:7
122:7 123:17
123:18
127:13,21
128:8,19
129:4 131:17
133:10,13
134:4,22
135:7 138:11
138:19 140:2
141:4,9,14
142:22 143:5
145:15,21
146:5 147:4
147:25 148:7

148:13,16,19
152:9,10
156:10,16,21
**data** 13:3
19:25 23:11
23:14 24:4,9
24:11 25:3
25:14 26:4
94:19 137:18
137:23
141:17
**date** 11:11
22:3 36:12
77:14 104:6
104:8,9
106:9
**dated** 22:7
34:15,19
35:20 67:12
70:6 93:3
159:21
**dates** 118:24
119:16
**David** 35:10
**Davis** 71:21
**day** 111:11
125:22
157:18
158:13
159:21
**days** 99:25
129:10
**deadline** 90:21
**dealing** 32:2
123:2,10
**Debbie** 115:24
**Deborah**
117:13
**debts** 103:9
**Decatur** 60:4
83:12 84:3,6
84:10,13,25
85:22
**December**

61:19 93:13
93:15,18
115:23
152:19
**decide** 40:16
101:21
**decided** 50:15
101:15
**decision** 14:15
36:23 52:25
73:24 74:2
76:17 101:19
101:20
**deductibility**
43:12
**deduction**
51:10,16,23
**deductions**
125:6
**deemed** 86:14
**Defendants**
1:10 2:16
**define** 121:19
121:24 122:6
**defined** 122:3
**defines** 108:15
**definition**
139:20
**defray** 63:2,11
**Dennis** 72:11
76:16 83:20
85:7
**Department**
2:21 3:9
**DEPONENT**
157:8
**deposition**
1:15,24 6:3,7
129:7,10,17
156:19,22
157:2 159:1
**Derick** 2:6
6:21 29:18
**derive** 151:1

**deriving**
150:23
**described**
54:2 55:5
110:17
**DESCRIPTION**
4:13
**desire** 16:2
**detail** 82:16
**details** 55:7
**determination**
21:18 23:6
**determinatio...**
123:7
**determine**
83:22 151:7
**determined**
123:2,9,16
134:17
**determining**
23:22 24:5
24:11
**deterrents**
95:19,24
96:8,13
**device** 57:16
**devices** 58:18
**Diana** 83:9
106:7
**Dick** 43:11
**die** 146:12
**died** 131:5
**Dietrich** 34:13
**differ** 141:24
**differed**
140:14
**difference**
134:7,11
**differences**
151:14,20
**differences/...**
8:25
**different** 36:3
53:4,15 54:3

59:19 60:5
60:17,18
63:13 66:16
69:6 81:25
87:23 91:19
96:6 139:5
139:18 143:7
145:14
146:13 150:1
150:16
153:15,15
154:12
**differentials**
100:21
**diligence** 8:17
9:5,9,15,19
9:23 10:13
10:24
**Dillon** 83:20
**direct** 4:5 7:5
86:22 90:8
116:11 132:8
134:6 135:13
135:24
137:21 138:2
142:15
143:18
144:13
145:11
**direction** 73:6
73:8
**directly** 118:8
136:17
**director** 126:1
126:4,6,9,10
126:13 127:5
**directors**
86:18 126:25
127:7
**dirty** 31:21
**disagree** 57:8
**discipline**
24:17
**disclosed**

16:13 26:6
104:4,6,9
115:14 124:3
**disclosure**
7:24 14:17
15:1,9 17:4
104:2,5,7,8
104:10 106:3
115:25 116:5
118:12
**disclosures**
13:12,24,25
14:5,21 15:8
51:17,19,24
110:17
111:10,14,22
112:13,20
113:3,23
114:4,8,13
114:20
119:20 120:5
**discount** 39:3
**discuss** 24:21
24:25 25:5
27:16,20
31:21 38:14
90:22 100:12
136:13
**discussed**
25:9 73:22
74:12 94:17
99:24 105:14
105:15
136:17,24
139:9 140:5
140:6,23
142:24
**discusses**
49:24 52:21
97:18 149:7
**discussing**
30:5 49:13
93:7,13
150:3

**discussion**
25:2 33:24
55:13,20
58:14,15
64:17,20
69:5 99:19
127:17
136:20,22
140:17
**discussions**
9:7,8 11:16
94:16 105:16
146:8,22
**dissolution**
103:5
**distinguisha...**
54:1,7 55:5
123:6
**distribution**
19:8,19
103:5
**District** 1:1,2
6:5
**Diversified**
44:4
**divided** 144:12
**dividend**
100:16 101:4
**dividends**
94:12 96:16
97:23 98:6
**division** 2:20
59:18 60:19
**Dixon** 40:16
**doctors** 60:6
60:10,16,18
85:22
**document**
7:10 12:2
15:6,8 18:23
21:4 29:3
30:21 33:15
34:3 35:3
37:6 42:12

48:14,21
65:10,21
77:9,11 83:7
88:14,21,23
103:12
114:23 136:5
149:1
**documentati...**
12:18 13:3
13:19,22
14:12,25
15:12 16:25
24:15,21
25:8,19,23
26:12,18
27:5
**documents**
38:12 40:11
44:2 129:5,8
129:14
**doing** 76:6
142:9
**dollar** 39:13
**dollars** 16:3
39:18,19
40:1,2
**Doreen** 1:19
6:12 158:17
159:6,24
**doubt** 15:7
36:1 114:6
**dozen** 31:21
**Dr** 60:24 62:8
63:22 64:4
83:20,21
85:21 108:8
113:1 129:18
142:13,16,19
143:16
**draft** 19:15,18
19:25 20:3
20:10
**drafted** 144:18
**drafting** 20:17

100:2 135:14
135:18
**drafts** 135:20
**drawn** 86:7
**drew** 86:8
**DRIC** 83:24
84:2
**drive** 8:17
**dropped** 50:25
**Drysdale**
108:24
110:24 112:2
112:10
115:24
116:19 117:8
120:18
**due** 8:16 9:19
10:12,24
52:14 130:18
**duly** 7:3
158:10
**dvollrath@...**
2:12

─────────
**E**
─────────
**E** 2:1,1 92:15
92:15
**e-mail** 7:18,22
8:7 9:3,13
10:9 12:8
13:17 14:24
15:4,10
29:23,24
30:4 35:10
35:14 37:13
37:17,19
38:1,5,9,11
40:14 41:7
41:10,23
42:3,19 43:9
43:24,24
44:12,14,18
45:5,8,10
46:8 48:23

49:13,21
50:16,23
51:8,15,21
53:8 55:9
56:8,11 58:9
61:18 64:2
64:19,23
65:11 66:7
66:13,15
67:12,25
70:5,9,10,14
70:19 71:8
71:10,17
72:10,21
74:18,25
75:3 76:8
93:2,6,12,25
94:1,4 95:21
129:23 134:6
134:9 142:15
142:17,24
144:10
**e-mails** 13:16
37:23 118:14
129:20
144:14,24
**earlier** 13:16
25:11 94:18
97:14 148:22
149:11
154:18 155:4
156:3
**early** 56:14
98:20 114:17
114:25 119:4
**EDGAR** 3:3
**educational**
96:2,6
**effective**
152:19
**efficiency**
96:21
**efficient** 94:12
96:15

Ehrlich 3:6
6:14
eight 128:15
either 46:4
54:23 77:20
99:2 101:9
108:23
114:18
119:14
126:13
139:17
El 115:1
elaborate
120:9
elderly 76:19
election 53:20
element
147:21
Elisabeth 3:12
6:20
Ellsworth 74:8
74:10,13,17
Emerald 47:21
emphasis
90:15
employee
59:17 60:10
73:21 116:22
159:16
employees
59:23 60:5
144:11
employment
130:13,16
encourage
94:5,15,21
endeavor
90:19
ended 103:7
endorse 97:8
97:12
engaged 78:19
78:19
engagement

78:22,23
79:2,7 87:8
102:23
135:10
enormous
32:17
ensure 27:23
28:3 86:25
87:4
enter 124:16
124:24
entered
124:18 125:1
Entertainment
43:4
entire 25:6
68:2 128:17
entirety 79:8
entities 126:14
entitled 15:8
31:4
entity 84:9
115:7,9
125:8,14,19
episode 138:8
episodes
139:6
ERRATA 157:5
errors 41:24
137:8
ESQ 2:6,7,18
2:19
essentially
123:25
establish
59:13 62:16
established
61:5
estate 56:18
56:21,24
57:4,11,15
57:22 58:1,7
61:6 79:23
87:16 90:18

91:5,11,12
91:15,17
117:25
estates 32:16
estimate 95:9
estimates 20:4
132:15
et 73:17
evaluate
133:23
event 98:6
eventually
89:17 99:9
100:14 101:3
exactly 10:3
31:20 52:2
71:2 76:12
89:15 96:20
117:3,24
145:6
examination
4:5,6,7 7:5
115:2 132:5
148:18
examinations
117:17
examine
105:23
examined 7:4
82:16
example 39:5
60:1,23
141:6 147:23
exceed 63:6
exception
64:18
excess 140:14
142:5
exclusively
142:3
excuse 24:4
29:10 54:17
106:23 151:6
executive

65:13
exemption
89:24
exercise
147:24
exercises 23:7
exhibit 7:8,9
7:12 12:2,4
12:23,24
14:2 18:12
18:12,14,18
20:22,23,24
29:3,5 30:15
30:15,17
33:15,17
35:3,5 37:6,8
42:12,14
48:14,16
56:1,1,3
61:10,11,12
65:21,23
71:19 72:2,2
72:4 76:25
77:1,2,6
82:25,25
83:2 88:14
88:16 92:19
92:19,21
97:1,13
103:12,15
148:23 152:7
exhibits
132:19
149:15,16,21
152:15,25
exist 83:23
existing 90:2
exit 97:2,8,10
97:18 98:7
98:17 145:10
145:19
expand 59:24
expanding
49:25

expected
62:24 151:2
expecting
100:21
expense 149:8
149:25 150:3
150:6,9,20
150:25
151:13
154:14,17,19
154:21
expenses
150:12 151:7
151:8,20
experience
23:10 24:4,9
150:9 151:6
expertise
140:11
expires 157:25
158:20
expiring 89:23
90:20
explain 73:13
73:24 76:14
153:23
explained 90:6
116:18 117:5
explaining
147:18
explains 51:15
117:12
exposures
15:22 16:8
expressed
75:16
extensively
28:8
extent 80:25
86:15 87:7
142:4
external 24:10
extremely
31:15 100:7

**F**

**F** 92:15
**fact** 39:16 53:3
  110:3,15
  111:18
  133:20
  137:10
**factor** 139:17
  153:10,20
**factors** 153:15
**facts** 53:14
**fair** 81:8 139:6
  145:14
**fairly** 51:1
**familiar** 21:5
  115:7 123:19
  125:8,14,19
**family** 59:18
  60:20 61:3
**far** 82:9 121:25
**Farquhason**
  104:16,20
  105:19
**fast** 147:16
**fault** 40:10
  124:5
**favorable** 91:5
**February**
  72:12 74:19
  75:1
**federal** 97:23
  97:25 122:16
**fide** 146:24
**field** 153:22
**fifth** 32:13
  114:24
**file** 15:6 142:4
**filed** 1:24
  124:4 142:7
**filing** 95:16,19
  95:25 96:17
  137:8,11
  139:10,12
  150:24

**filings** 9:24
  23:17 28:9
  142:4,7
  150:20
**fill** 96:10
**finally** 24:14
  38:5 119:18
**finances** 67:5
**financial** 51:24
**financially**
  159:18
**find** 12:17 73:6
  73:9 97:18
  98:19 106:2
  110:16
  111:21 116:6
  118:11 120:4
**finished** 63:19
**firm** 126:2,11
  130:9,19
  135:25
**first** 8:5,14
  12:16 15:10
  15:16,24
  21:15 35:9
  35:23 37:13
  38:9,9 50:6
  56:8 59:23
  61:16 66:6
  71:6 72:8
  73:25 79:11
  83:18 84:11
  93:12 101:22
  104:13,15,23
  115:21
  120:10
  121:11
  126:24
  145:13
  150:19 153:2
**five** 33:4 48:21
  58:25 131:24
**FL** 1:13 2:10
**flag** 44:7 67:23

82:9
**flat** 45:12
**Florida** 1:2,23
  6:5,10
  157:13,24
  158:4,18
  159:3,25
**flow** 68:19
**flows** 85:16
**follow** 24:18
  46:5
**following**
  109:23
**follows** 7:4
**foregoing**
  159:10
**foreign** 73:16
**form** 18:8
  25:15 43:17
  43:20 46:9
  47:20,21,25
  60:20 61:7
  63:25 64:7
  68:6 75:14
  76:4 82:7
  88:6 89:13
  90:4 91:6
  98:25 99:16
  100:17 102:5
  105:3 121:21
  123:15
  127:25
  128:12,23
  133:10 134:4
  134:22 135:7
  138:11,19
  140:2 141:4
  141:7,9,14
  142:22 143:5
  145:15,21
  146:5 147:4
  147:25 148:7
  148:13 156:4
**formal** 50:18

50:20,24
  51:3
**formality**
  127:3
**formation**
  128:3
**formed** 15:19
  23:2 48:2,4
  59:5,9 60:12
  78:4 79:3
  84:3 107:3
  127:23 128:5
  128:11,22
**former** 45:15
  106:20
**forming** 63:22
  64:5,21 65:1
  98:5,23
**forms** 96:10
**Formulations**
  62:23 63:13
**Fort** 1:13 6:9
**forward** 40:16
**forwarded**
  37:18 38:1
  74:19
**found** 118:13
  150:9
**four** 27:8
  48:20 67:6
  149:5 153:10
**fourth** 32:14
  38:9,21
  109:21
**Fowler** 37:14
  38:11 104:22
  105:10,20
  106:4
**Fox** 1:19 6:12
**frequently**
  51:2 67:19
**friend** 44:19
  44:19
**front** 43:10

116:24
**Ft** 2:10
**full** 51:10,16
  51:22 62:2
**fund** 67:5
**fundamental**
  137:7
**funding** 20:4
  66:25 132:14
**funds** 67:1,5
  80:9,14 81:2
  81:7,24 82:6
  84:17 86:22
  91:22 92:2
  94:12 96:16
  98:5 100:16
  101:8
**further** 9:11
  117:12
  148:15
  156:13 157:8
  159:15
**future** 62:23
  63:12 102:1

**G**

**G** 34:8
**gains** 98:1
**Gary** 105:6,8
**GCS** 39:11
**general** 13:12
  15:8 25:1,20
  31:15 41:19
  46:12 92:2
  99:18 116:20
  126:19
  127:10 128:6
  143:2 145:19
  145:24
**generality** 32:2
  96:18
**generalization**
  96:25 146:7
**generalize**

69:16
**generally** 14:5
22:15 25:3
26:22 34:5,5
59:16 64:16
75:25 76:5
77:15 78:21
81:19 97:9
98:12,13
99:21
**generation**
91:1
**generation-s...**
56:23 57:3
58:3
**generations**
91:2,3
**Gentry** 3:3
18:1,6 19:15
19:18,22,25
20:3,10,16
129:24 130:6
130:8,12
135:14
**Geoff** 34:12
**Georgia**
116:25
**getting** 100:5
101:1 126:19
154:18
**GG** 158:19
**Giannini** 2:19
6:20
**gift** 32:18,19
89:16,17,23
90:2,7,8,14
90:18 91:15
91:16
**gifts** 90:17
**gist** 130:22
**give** 42:8
59:25 60:22
72:22 100:11
129:2,3

139:20
**given** 24:3,8
39:3 98:10
**giving** 53:11
**Global** 106:24
107:2
**go** 40:14,16
54:10 55:16
76:11 86:6
92:10 97:13
97:17,17
106:13 113:8
127:13
131:19,21,23
152:3 156:14
156:16
**goes** 73:20
82:9
**going** 7:7,16
11:8 18:11
18:12 20:22
29:2 36:15
40:15 73:6,9
88:13 89:19
92:18 93:25
101:14
102:20
103:11,24
123:14
124:20
148:20 149:3
152:3,11,15
153:7,21
**good** 89:22
90:1 146:11
**grab** 118:24
**grandchildren**
60:25
**great** 55:13
125:9
**greater** 142:3
**gross** 96:25
**ground** 74:1
**group** 18:25

60:3 66:14
**grow** 56:19
62:25
**growing** 60:9
**guess** 42:6
43:24 52:12
76:21 91:8
114:9 148:17
**guessing**
76:15,21
**guidance**
36:25 122:14
122:14
**Gut** 19:2
**Gwinnett** 61:4

────────
**H**
**hand** 158:12
**hands** 103:8
**happen** 58:8
99:20
**happened**
79:20
**happens** 67:19
**hard** 147:16
**Harper** 52:22
52:25 53:4
53:13,14,19
53:20 54:1,7
54:10,12
55:1,6,7
**Harris** 105:6,8
105:17
**hassle** 96:9
**Hayes** 83:21
85:7
**hazard** 123:23
124:8,13
147:9,17,21
**hazards**
123:20
**head** 32:18
**health** 147:23
**hear** 32:4

56:21 119:14
**heard** 88:3
121:8,11
125:10,11,16
125:17
**heavy** 73:15
**held** 6:7 33:24
55:20 89:9
101:23
127:17
**help** 63:1
102:18
**Henderson**
6:14
**Henson**
116:23
117:13 118:5
**Herron** 21:12
21:18,24,25
23:1,23 24:5
**high** 39:4
85:13
**hire** 28:22 30:9
**hired** 132:13
**historical**
23:14
**hope** 100:9
**horizon** 147:1
**hospitalized**
131:11
**Hotline** 116:20
**Howard**
117:13,21
118:16 119:1
**huge** 32:15
**Hughes** 40:17
**husband**
112:23
113:15,20,22

────────
**I**
**I.D** 157:19
**i.e** 53:15
**ICS** 44:1

**idea** 90:1
**ideas** 57:23
**Identification**
7:14 12:6
18:16 21:1
29:7 30:19
33:19 35:7
37:10 42:16
48:18 56:5
61:14 65:25
72:6 77:4
83:4 88:18
92:23 103:18
**identified**
24:22 27:24
28:5,15,18
70:19 85:23
86:5 118:12
119:22 120:5
**identifies**
64:21
**identify** 70:7
71:14 80:22
104:3 118:16
**IDR** 115:1,15
**III** 1:17
**ILF** 153:8,19
**illegal** 125:6
**Illinois** 60:4
**Immunogeni...**
62:24 63:13
**Imperial** 49:7,9
49:10,10
50:11 51:22
**implementing**
57:24
**imply** 125:4
**implying** 64:9
**important** 79:5
**imports** 73:16
**improper**
63:24 64:6
65:2
**include** 16:15

Clark, Celia R - Vol. 3                                   September 11, 2023

26:3,25 27:3
51:23 56:22
**included** 16:17
17:11 100:1
135:21
149:16
**includes** 58:1
**including**
23:17 28:8
115:16 123:7
**income** 15:19
62:10,17
63:2,11,11
63:24 64:6
64:16 65:2
75:5 99:13
115:2 146:20
153:18
**incorporating**
137:22
139:12
**incorrect**
144:15
**increase** 14:24
25:7 27:4
141:17
**indicated**
44:12 147:2
**indicates**
124:17,25
**Indirectly**
137:17
**individual**
41:16 44:12
106:21
125:23 130:4
150:11
**individuals**
37:15
**inform** 135:5
**informal** 92:4
**information**
23:16,17
26:6 36:15

45:14 94:23
95:13 96:11
104:3,6,8,10
110:8 116:1
119:2,3
124:2,2
133:18
139:12
150:10
**inherent** 39:3
**initial** 32:19
146:8
**input** 17:21
**inserts** 135:21
**Inspector**
116:19
**instances**
23:14
**instruct** 9:4,9
9:14 76:1
**instructed**
75:12 105:23
**insufficient**
25:13
**insurable**
124:8
**insurance**
11:18 19:2
21:13,18,25
23:1,2 30:5
31:4 43:17
44:4 47:17
48:1 49:4,7
53:1,17,18
54:1,6,16
55:6 56:22
57:2 58:2,18
59:19 62:11
63:1,7,23
66:22 68:3
70:25 73:10
73:23 74:15
74:15 75:13
77:17,25

78:12 79:23
80:4,7,8,15
80:16,19,20
80:21 81:3,8
81:11,16,23
82:4,5,14
83:13,14
84:3,18 85:1
85:8,15,17
85:23 86:3,4
86:12,13,18
87:1,5,13,16
88:2 95:8
96:5,17,22
97:3 99:7,22
100:3,15
101:16
102:13,16,20
106:24,25
116:23
117:15
122:11,13,16
122:18,25
123:5,11
124:1,17,25
125:9 126:2
126:7,11,17
127:1,23
128:10,17,21
132:20,24
133:8,9
137:8 142:10
142:20 143:3
143:7 144:23
145:24
146:24 147:3
147:20,24
148:4,10
151:15,16,21
**insure** 146:3
**insured** 15:18
44:3 81:11
96:23 124:4
124:12

**insured's** 16:2
**insureds**
122:19
**insurer** 150:24
151:1
**insuring** 39:4
**intended**
76:20 100:8
133:7 144:6
**intention** 61:2
78:7 79:13
79:19 143:23
144:20,21
146:9
**interest** 35:16
36:1,23
55:14 60:7
69:12 100:9
**interested**
36:16 100:10
159:18
**internal** 1:9
50:3,6 83:22
122:1
**international**
47:21 48:3,4
**Internet**
118:15
**interpret** 71:3
**interpretation**
53:10
**interrogatori...**
5:10 103:17
103:22
**interrogatory**
103:14,25
104:1 105:18
**interview** 33:3
**interviewed**
31:9
**intimated** 44:1
**introduce** 6:16
**introduced**
74:14

**invest** 79:4
86:4
**investigation**
45:12,21,24
46:1,7,14
47:9 48:8
120:15,23
121:15
**investigations**
121:9
**investing**
86:12
**investment**
15:19 77:16
78:10 80:4,8
80:17 82:12
87:14 91:23
98:24 99:10
99:12,15
101:12 102:4
**investments**
79:25 80:20
84:10,14
85:1 86:14
86:22 87:6
87:13 88:1,8
**involved**
110:13
126:15,16
**involvement**
144:13
**involves** 103:4
**involving**
105:17
**IPG** 116:24
**IRC** 53:20
**irrevocable**
62:10,17
**IRS** 31:4 36:25
44:2,23
45:11,13,20
45:25 73:1
73:21 76:2
104:15

105:20,21,23
106:15
107:21
108:17 109:9
109:16,24
110:9 115:13
115:25
117:14,16
119:3 120:8
120:11,22
121:2,9
122:13
**IRS'** 120:15
**Islands** 126:23
**issue** 24:22
35:18 54:15
66:25 67:8
71:8 81:10
86:15 92:7
118:15
**issued** 36:2
54:16 106:15
107:22 109:4
115:1,15
**issues** 11:18
11:22,24
15:20,21
74:12 76:18
80:22,24
81:9,13
83:23 86:16
94:18 105:17
141:20
**item** 38:9

**J**

**J.J** 60:24
**Jace** 62:11,18
**Jade** 48:2,2,4
**James** 61:21
64:18 93:22
106:16,19
108:8 129:18
**January** 78:5

**Jarvis** 47:14
47:25 48:7
129:17
**Jay** 119:20,22
120:12
**Jeffrey** 2:7
6:22
**Jerome** 48:24
49:1
**Jerry** 71:20
**Jim** 37:14
**jneiman@m...**
2:13
**job** 95:9,10
**Johnson**
47:14,16,19
48:6 56:9
57:21 58:22
**joint** 79:24
87:16
**jointly** 58:22
**Jonckheere**
48:24 49:1
51:9,12
**judgment** 23:7
23:9
**July** 12:9
35:11,20
44:15 48:24
51:13
**juncture** 75:23
**June** 7:19 8:8
**junior** 60:9
**jurisdictions**
126:21 127:6
**Justice** 2:21
3:9

**K**

**Kacie** 83:20
**keep** 80:22
153:4,7
**Keim** 107:21
**Keith** 93:3

**key** 73:14
139:19
140:15
**Khatchoui**
130:5
**kind** 18:21
65:10 154:14
**Kitts** 77:16,25
78:5,11
80:17 82:11
126:22
144:22
**knew** 110:20
111:24
113:13
**know** 9:18
10:15 11:23
15:11 16:20
22:20 32:11
33:9,12
34:10,13,25
37:2 42:23
43:2 47:7
48:3 63:19
70:14 71:20
74:2,6 75:15
75:16 76:15
79:4,20 82:4
84:25 87:20
95:17 104:20
104:25 105:1
105:2,5,6
106:6,8
108:3,5
115:6,9,9
116:21
117:20,20,23
118:5,21
119:6,8,23
120:2 122:1
125:11,17
129:14
130:22
133:19

134:11,14
136:16
137:10 139:8
139:10,13
141:22 142:6
143:10 145:2
145:3,6,7,8
148:25
149:12 150:1
150:3 151:12
151:17 153:6
153:13
154:13,16,20
154:22
**knowledge**
142:19
150:14 154:1
154:15
**known** 57:21
157:19
**Krenchicki**
1:19 6:13
158:17 159:6
159:24
**Kryska** 3:12
6:20

**L**

**L'Heuruex**
72:11,17,18
72:22
**label** 36:1
**lack** 24:3,9
40:8 95:11
**LAE** 154:13
**language**
10:18 16:12
16:18
**large** 1:23
23:17 43:13
157:24
159:25
**latest** 56:21
58:1

**Lattanzio**
21:10 27:12
28:21 136:3
136:18,25
137:9,15,24
140:10,24
141:11,20,21
148:20
149:18,23
150:18
152:21
**Lattanzio's**
136:24
**Lauderdale**
1:13 2:10
6:10
**Lauren** 2:18
6:17 127:11
**lauren.a.dar...**
2:25
**Laurence**
125:23
**Lavelle** 113:11
114:12 131:1
**law** 7:3 13:12
37:3 77:21
89:19 122:13
123:24 124:9
124:10
147:15
**laws** 87:1,5,13
88:2
**lawyer** 76:6
102:1
**LB&I** 116:24
**lead** 39:2
**Leading**
133:13
**learned** 104:8
104:10
118:25
**leave** 153:24
**left** 101:25
130:9,18

**legal** 6:14
  45:13 121:25
  122:9
**legitimate**
  124:19 125:2
**length** 122:19
  123:3,5,10
  140:6
**lengthy** 136:20
**Leroy** 104:16
**let's** 15:14
  79:8 98:11
  131:20,23
  153:5
**letter** 21:6,9
  25:6 51:1,4
  87:9 106:15
  107:6,9,10
  107:16,16,23
  108:12,15,22
  109:3,12,19
  115:23
  116:18 117:6
  117:8,12
  121:2
**letterhead**
  18:25,25
  89:1
**letters** 109:8
  109:15,17
  121:6
**level** 32:2
  37:24 49:15
  50:2,10
**levels** 60:5
**liability** 11:21
  11:24 74:12
  120:16
  133:18
**life** 79:23 80:3
  80:7,15,16
  80:21 81:3,8
  81:10,11,15
  81:23 82:3,5

**82:14 84:18**
  85:1,7,17,22
  86:4,13
  87:16 146:4
  148:4
**lifetime** 90:18
**limit** 82:11
  128:13
  153:20
  154:14
**limitations**
  19:22 127:4
**limited** 21:17
  90:7 100:5
  125:9,15,20
**limits** 63:6
  133:18
**line** 39:25
  54:16 61:3
  86:9 116:24
  132:20,24
**lines** 39:17
  53:17 54:13
  54:14 55:1,3
  59:18 60:20
  140:15 142:5
  143:8 153:14
**LinkedIn**
  120:11
**links** 43:25
**liquidate** 98:14
  102:18
**liquidating**
  101:5
**liquidation**
  97:25 98:6
  103:2,4
**liquidity** 82:13
  82:15
**list** 31:21
  38:21 144:12
  149:4
**listed** 36:10,18
  44:3 54:8

**109:25 126:1**
**Listening** 43:8
**lists** 51:18
  53:7,9
**little** 59:24
  66:12 69:6
  71:24 75:24
  84:23 87:23
  98:11 120:9
  146:7
**living** 89:22
**LLC** 84:6,10
  115:3,6
**LLP** 2:5
**load** 139:17,20
  149:8,10,14
  149:21,25
  150:1,6,7,20
  150:25
  151:14 152:1
  152:24 154:2
  154:6,10,17
  154:19,21
  155:1,9,12
  155:15,20,24
  156:2,7
**loads** 139:16
  139:18
  141:18 150:3
  150:15
**loan** 92:3
**loans** 91:21
  92:7
**long** 67:16
  68:3,4 69:15
  119:13 131:5
  139:15
**long-term**
  146:1,8,14
  146:17
**longer** 80:4
  101:2
**look** 15:14
  63:18 69:20

**97:17 129:1**
  153:14,21
**looked** 35:17
  70:6 73:14
  97:14
**looking** 14:17
  31:4 91:24
  153:3
**looks** 21:5
  31:13
**loop** 85:10
**loss** 24:3,9
  39:13 95:8,8
  96:11,12
  101:9 124:5
  154:13,16,20
**losses** 53:21
  95:9,14,16
  96:5 151:2
**lot** 96:1 124:9
  127:4
**Luu** 114:25
  115:14

─────────

**M**

**main** 59:21
  69:12
**maintenance**
  146:10
**major** 101:9
**majority** 110:5
**making** 17:21
  45:10 90:14
  100:15 101:4
**malpractice**
  140:11 142:2
**man** 76:19
**management**
  101:9 126:15
  126:17
**manager**
  116:25
**managers**
  117:15

**Mandell** 35:11
  35:14,20
**manner**
  122:20
**Manny** 114:3
  131:9
**Manuel** 112:24
  113:20
**Marcus** 2:5 6:8
**mark** 18:11
  29:2 30:14
  33:14 35:2
  37:5 42:11
  48:13 55:25
  61:9 65:20
  72:1 76:24
  82:24 88:13
  92:18 103:11
  112:4,7,8
  113:9 120:17
**marked** 7:9,13
  12:2,5 18:16
  20:23,25
  29:7 30:19
  33:19 35:6
  37:10 42:16
  48:18 56:5
  61:10,13
  65:25 72:6
  76:25 77:3
  82:25 83:4
  88:17 92:19
  92:23 103:17
  148:23 152:4
**market** 8:24
  98:17 99:8,9
**marketed** 97:3
  97:5 124:16
  124:24
**marketing**
  98:15 99:6
  99:14,22
  100:4,5,6
**mass** 144:9

massive 61:4
materially
  151:9
materials
  100:2
Matt 115:10
  116:1,12
  117:12,20
  118:16 119:1
matter 6:4
  106:16 122:9
  127:3 129:9
maximize 16:3
  66:18 70:25
  71:4
maximizing
  69:1,10,25
maximum 63:7
Maxis 66:14
McEtee 112:25
  113:12,20
  114:19 131:4
  143:13,14
mean 10:17
  11:3,19 28:1
  42:6 54:14
  60:21 68:22
  90:18 92:5
  100:21
  129:10
  130:22
  135:17 144:5
  146:6,12
  153:13
meaning
  121:20
means 11:15
  123:5 153:8
medical 60:5
  140:11 142:1
medicine
  56:15
memo 14:3
  34:18,21

49:24 50:3,6
  50:9 77:15
  77:18,21,23
  78:2,3,8,17
  78:25 79:6
  79:10,13,15
  79:22 81:18
  82:8,19
  85:21 87:15
  87:18 89:3,7
  91:23 144:3
memorandum
  50:1
memory 76:18
memos 79:17
  81:25 82:20
  89:5 143:19
  143:23 144:6
  144:18
mention 43:10
  93:22 100:20
mentioned
  86:16 87:6
  87:17,18
  93:9 97:10
  104:22
  112:17
  151:24 156:7
mentions
  95:21
Merit 1:21
  159:8
met 44:19 52:8
  118:8 119:24
methodologi...
  140:14
  141:24
methodology
  11:4 20:6,11
  22:15,19,24
  26:23 28:7
  28:11 137:12
  138:24 140:7
methods

135:12
Michael 66:8
microcaptives
  36:10
middle 42:18
  43:24 48:22
  56:7,12 66:5
million 16:2
  39:13,18,19
  40:1,2
mind 50:17
  142:1 146:17
  147:17
mine 28:6
  33:23 45:9
  45:15 113:11
minimal 16:3
minimize 16:9
  146:20
minimum
  24:16
minutes 33:4
  91:24 131:24
missed 144:16
mix 23:24 24:6
MLTN 50:1
model 10:3
  12:17 13:18
  13:21 14:12
  15:12 80:19
  137:3,15
  138:4,10,18
  139:14 149:8
  149:14 150:4
  151:19,25
  156:6
models 8:23
Mohn 93:3
  125:23
moment 48:11
  52:19 84:20
  127:12 129:2
moments
  64:15

Monday 56:20
money 73:10
  100:14 101:1
  101:3 102:24
  130:18
Monte 115:1
month 45:19
  45:22
months 67:6
moral 123:20
  123:23 124:8
  124:12 147:9
  147:17,21
Moran 49:2
morning 38:12
  94:18
move 62:18
moving 67:1
  107:19
multiple 53:17
  54:13,14,25
  55:3 56:23
  57:3 58:2
  59:9,13
  60:21 61:5
mutual 14:15

**N**

N 2:1 92:15,15
  92:15
name 6:13
  43:2 71:24
  71:25 74:8
  100:6 104:4
  112:25 115:8
  118:16
  149:17
  155:10,13,16
  155:21,25
named 21:10
  29:25 42:19
  66:8 71:20
  72:11 86:18
  125:23 130:4

136:3
names 43:6
  129:2,3
narrative
  17:22,24,25
  18:2 132:19
  135:22
National 80:18
nature 150:12
near 58:15
nearly 108:16
necessary
  43:14
need 13:3
  50:15 63:1
  67:4 73:13
  75:11,16,17
  76:14 82:16
  99:2 141:17
  146:16
needed 22:11
  22:17,21
  96:4 101:2
  146:13
needs 140:8
  143:7
negatively
  146:23
negligent
  148:11
Neiman 2:5,7
  6:8,22 29:10
  29:15,20
  33:21
never 11:25
  28:11 99:11
  118:7 119:11
Nevis 126:22
new 10:25
  31:3,9,22
  32:9,24 33:2
  33:6,10 43:5
  122:14
  149:19

| | | | |
|---|---|---|---|
| **nine** 153:17,25 | 72:11,15,21 | **offered** 109:16 | 103:10 |
| **non-tax** | 74:19 75:1 | **offering** | 104:13 105:8 |
| 124:19 125:2 | 75:12 76:9 | 101:15,21 | 105:18 |
| **non-traditio...** | **OATH** 158:1 | 102:20 | 106:11,19,22 |
| 142:9 | **object** 18:8 | 122:11,12 | 106:22 107:2 |
| **North** 131:11 | 25:15 46:9 | **office** 64:17 | 107:5,15 |
| **Notary** 1:22 | 61:7 63:25 | 77:21 83:10 | 109:18 |
| 157:23 | 64:7 68:6 | 86:7 144:9 | 110:25 113:7 |
| 158:18 | 75:14 76:4 | 144:21 | 113:9,17 |
| 159:25 | 82:7 88:6 | **Offices** 13:12 | 114:1,19 |
| **note** 91:19 | 89:13 90:4 | **official** 158:12 | 116:5,10,10 |
| **noted** 43:25 | 91:6 98:25 | **Ogilvie** 42:20 | 117:10,11 |
| **notes** 159:14 | 100:17 102:5 | 42:24 43:18 | 118:1,5,25 |
| **Notice** 1:23 | 105:3 121:21 | 43:21 44:15 | 119:18 |
| **notified** 45:20 | 123:14 | 45:2,5 46:6 | 120:15 122:8 |
| 45:25 46:19 | 127:25 | **oh** 18:7 19:13 | 123:8,13,17 |
| 102:19 | 128:12,23 | 54:17 71:6 | 125:5 126:19 |
| **notify** 17:8 | 133:10 134:4 | **OJM-0012386** | 129:5 130:4 |
| 81:14 | 138:19 143:5 | 4:15 77:2 | 130:24,24 |
| **Nova** 125:20 | 156:4 | **OJM-0012387** | 131:3,16 |
| **November** | **objection** 47:2 | 4:15 77:3 | 132:7,16 |
| 38:2,6 | 133:12 | **OJM-0016849** | 133:15 |
| 114:25 | 134:22 135:7 | 4:25 35:4,5 | 134:15 |
| **now's** 90:21 | 138:11 140:2 | **OJM-0016850** | 135:24 |
| **number** 4:13 | 141:4,9,14 | 4:25 35:6 | 137:13,21 |
| 6:6 18:18 | 142:22 | **okay** 7:7,16,18 | 138:8 139:21 |
| 23:16 27:8,9 | 145:15,21 | 7:22 8:14 | 142:12,14 |
| 30:24 53:7 | 146:5 147:4 | 9:14,22 10:7 | 143:10,18 |
| 58:23 60:9 | 147:25 148:7 | 10:23 11:5 | 144:18,24 |
| 66:1 77:5 | 148:13 | 11:10,23 | 145:2,6,12 |
| 97:20 103:25 | **objective** | 12:1,11 13:6 | 146:16 147:1 |
| 104:1 115:11 | 123:4 | 13:10,11 | 147:10 148:4 |
| 153:9,9 | **observe** 110:5 | 14:4,16,20 | 148:9 150:2 |
| **numbers** | **observers** | 14:23,23 | 150:17 |
| 39:10,11,23 | 113:10 | 15:14 16:1,7 | 151:18,24 |
| 94:11 | **obtaining** 25:3 | 16:20,23 | 152:3 153:4 |
| **numerical** | **occasionally** | 18:10 19:14 | 153:17,25 |
| 149:16 | 144:14 | 19:15 20:15 | 154:4,20,24 |
| **numerous** | **occurred** | 20:15 21:6 | 155:7,17 |
| 118:14 | 119:12 | 21:15 23:21 | 156:1,10,12 |
| ———— | **October** 66:8 | 24:25 25:5,7 | 156:21 |
| **O** | 67:12 70:6 | 25:22 26:24 | **old** 43:5 |
| **O** 92:15,15,15 | 93:3 94:2 | 27:7,11,22 | 123:24 |
| **O'Toole** 72:10 | **offer** 134:1 | 29:17,23 | **omission** |
| | | 30:8,13 | |
| | | 31:25 32:13 | |
| | | 33:9,13 35:1 | |
| | | 35:13,13,19 | |
| | | 37:17 38:1,4 | |
| | | 38:8 41:5,7 | |
| | | 41:19 42:10 | |
| | | 43:2,20,23 | |
| | | 44:13,14,18 | |
| | | 44:22 45:1 | |
| | | 46:5,25 47:8 | |
| | | 51:7 52:3,6 | |
| | | 52:10 54:21 | |
| | | 54:24 55:4,9 | |
| | | 55:15 56:17 | |
| | | 57:14 58:5 | |
| | | 58:17,25 | |
| | | 60:19 62:7 | |
| | | 62:22 63:17 | |
| | | 63:21 64:25 | |
| | | 65:19 66:15 | |
| | | 67:22 68:1 | |
| | | 68:10,13,16 | |
| | | 69:11 70:13 | |
| | | 70:16,22 | |
| | | 71:9,18,18 | |
| | | 73:5,20 | |
| | | 74:18 75:25 | |
| | | 76:14,23,23 | |
| | | 77:8,15,20 | |
| | | 78:3,13 | |
| | | 79:14,22 | |
| | | 82:23 84:9 | |
| | | 84:25 85:9 | |
| | | 85:20 86:11 | |
| | | 86:17 87:22 | |
| | | 88:12 90:15 | |
| | | 91:4,12,19 | |
| | | 92:10 93:11 | |
| | | 93:17,25 | |
| | | 94:21 95:4 | |
| | | 97:13,22 | |
| | | 98:17 100:13 | |
| | | 102:9,24 | |

124:6
**omissions**
137:8
**once** 101:1
118:7 127:23
128:4,10,21
137:18
148:25
**ones** 36:2
59:22 113:6
**operating**
102:13,15
150:12
**operations**
63:12,14
79:12 83:23
96:3
**opinion** 22:11
22:13,17
50:1,10,18
51:1,4 95:23
134:1 155:1
155:2
**opinions**
50:21,24
**opposed**
96:17
**oral** 65:15
**order** 60:15
151:1,7,19
**ordinary** 43:14
**orient** 38:10
**original** 9:12
77:12
**Originally**
117:24
**outline** 27:11
**outlined** 27:17
**outside** 26:18
30:9 39:4,19
56:24
**overall** 127:23
128:10,16,21
**Overcash**

37:14,18
**overhauled**
138:24
**overhauling**
156:6
**overstate** 16:8
**owned** 15:18
43:3 56:23
57:3 58:2
60:8 62:16
81:11 84:6
89:9 90:24
106:23
**owner** 21:25
81:12 106:24
**owners** 91:1
**ownership**
60:7,14
84:13 89:12
90:12

**P**
**P** 2:1,1
**P.L.L.C** 13:13
**p.m** 1:14 157:2
**P.O** 2:22
**package** 12:18
13:19,22
14:12 15:12
**Packer** 115:2,6
115:12
**page** 4:2,13
7:17 8:5,15
12:16 13:11
13:24 15:9
15:10 19:13
23:4 31:12
32:13 35:9
35:20 37:13
42:19 48:21
48:22 51:7
56:8 61:17
62:3 66:6
72:9 84:16

86:5 92:25
107:20,20
108:14
115:20 149:5
153:1,2,17
153:25 154:4
154:8,24,25
155:7,8,11
155:14,18,22
**pages** 27:7
**paid** 32:19
53:22 130:18
**Pan** 54:15,20
54:21 93:7,9
93:18,23
129:19
**paper** 97:16
**paragraph**
13:1 15:16
15:25 16:16
23:5 31:13
32:1,14
35:23,24
49:23 52:11
52:12 56:18
62:2,7 73:5
84:11 85:13
107:6,11
118:12
150:17
**part** 9:15,20
16:19 26:8
54:11 58:13
58:19 64:1
64:16,20
65:12,15
69:5 95:10
96:2,21,21
112:8,10
114:17
120:22
132:19
138:22
141:21

**Partain** 112:9
112:16
113:10,19
120:18
**particular**
16:18 18:5
41:16 63:16
82:1,20
91:12 98:9
101:23,24
132:21,21
144:2,22
**particularly**
84:14 88:8
140:8,12
**parties** 53:16
91:22 115:16
123:2,9
159:17
**parties'** 159:17
**Partly** 139:2
**parts** 132:18
135:22
**party** 19:14
40:1 53:21
53:21 75:17
92:3 122:24
**pass** 131:6
**passed** 61:2
**passive** 99:13
**Paulin** 42:20
42:22 43:9
44:11
**pay** 40:1 62:11
71:12,16
**paying** 39:12
39:18 70:24
**payment** 103:9
124:1
**payments** 68:2
68:18
**payroll** 66:25
67:6,16,17
68:14

**pdf** 153:17,25
154:4,8,24
155:8,11,14
155:18,22
**penalties** 46:2
46:14 47:10
48:9 120:17
**penalty** 94:6
108:18
121:13
**people** 46:16
46:24 85:6
90:17 100:21
102:11
111:24
112:12,18,22
113:2 144:15
145:7
**percent** 52:15
53:13 86:9
86:10,13
97:23,25
**perform** 9:19
9:23
**performed**
10:13 21:17
22:10 133:24
**performing**
10:24
**period** 79:2,7
119:13
128:14,17
132:22
146:21
152:18
**permissible**
87:18
**permit** 99:13
**permitted**
80:21
**person** 104:4
104:5 112:23
112:24,24
**personal** 67:5

113:14
126:14
144:17
157:19 158:9
**personnel**
73:15 105:21
**persons**
110:19
**persuade**
100:8
**persuaded**
141:16
**persuasive**
140:12
**Pfeiffer** 29:25
30:2,4
**Phoenix**
107:22
**phone** 37:20
81:25 82:21
118:14
**physicians**
60:3
**pin** 119:16
**Pineiro** 2:5 6:8
**place** 63:16
**places** 86:8
**plaintiff** 1:6
2:3 6:22
**Plaintiff's** 5:9
103:15
**plan** 62:8 98:4
98:13,22
146:14,17
**planner** 57:22
**planning**
56:21 57:4
57:12,16
58:1,7,11,13
58:18 61:6
64:16,20
88:24 89:17
90:18 91:5
91:12 117:25

146:20
**Plante** 49:2
**planted** 105:21
**Platinum**
125:15
**plays** 32:4
**please** 6:16,24
12:12,17
13:8 26:14
28:1 36:13
44:10 87:2
88:5 107:12
111:5 116:8
131:22
**plethora** 15:20
**plus** 71:8 98:1
**point** 10:2
16:15,21
34:23 36:2
36:21 38:21
50:16 52:4,9
55:8 57:18
61:24 62:1
65:1 67:18
68:8 72:20
78:21 80:2
91:20 92:1
102:2 107:19
114:10
118:20
126:20 138:2
**Pointe** 115:2,6
115:12
**pointing** 90:20
**points** 27:8,10
27:17 28:5
38:14,18
**policies** 30:5
30:10 41:13
53:19 85:1
86:13 148:5
**policy** 39:13
41:20 81:12
123:11,25

124:2,3,14
137:6 152:18
153:14
**pool** 40:9
54:15 93:7
93:18 101:10
126:5
**pooled** 39:17
**pooling** 43:13
55:10
**pools** 53:16
**portion** 17:22
17:25 18:2
149:19
**portions** 18:5
20:15
**possibility**
119:1
**possible** 23:16
46:14 47:10
48:9 98:7
105:24
115:25
**possibly** 27:15
32:10 47:15
59:3 98:19
118:3 121:18
125:10 131:2
**post-transfer**
62:3
**posting**
120:11
**postings**
118:15
**postpone**
40:17
**potential**
15:20 46:2
47:8,12 48:7
85:14 99:7
100:20 101:7
102:1 120:16
**potentially**
81:13

**PowerPoint**
97:11 100:1
**practice** 56:15
60:6,16
109:7,14
132:9
**pre-approval**
82:3
**precise** 28:12
**prefer** 150:25
**Premier** 83:13
84:10,13
**premium** 9:10
9:15,20 10:8
10:16,21
14:6 16:2,13
16:24 17:3
17:22 20:3
21:18 23:6
23:22 24:5
26:3,7 27:13
43:13 68:2
68:18,25
69:9,25
71:15 85:16
94:23 123:7
132:14
134:17
140:11
149:20
152:12
**premiums**
30:9 39:12
39:18 43:12
62:11,17
63:7 70:24
71:12 84:19
123:1,8
**preparation**
129:6
**prepare** 14:21
50:9,20,24
51:3
**prepared** 9:6

21:6 38:17
78:13 98:9
132:13 133:4
133:21
135:25
152:12
**preparing** 18:2
**presence**
147:17
**present** 3:1
62:8 110:18
110:20,22
111:23,25
112:10,12,15
112:16,18
113:12,15
135:11
**presentation**
70:21
**presentations**
97:11 100:2
100:19
105:22
**pretty** 82:9
**previous**
13:17 14:1
70:9
**previously** 7:8
7:13 12:2,5
20:23,25
53:18 61:10
61:13 68:4,4
76:25 82:25
83:3 148:23
152:3,4,5
**PRIC** 83:24
84:2
**price** 8:17 30:9
133:9
**pricing** 7:24
8:1,23,24 9:5
9:10,16,20
10:8,16,21
14:6 15:21

17:4,9,22
26:3,7 27:13
38:22 41:12
41:20,24
42:5 94:10
94:23 95:1,2
95:5,12
132:13,16,24
133:17 134:8
134:12,16,20
135:5 140:12
149:20
152:12
**pricing/fund...**
8:22
**primarily**
73:10 85:6
135:19
**prior** 91:24
117:14
**private** 98:8
**Probably**
78:15 108:11
113:25 114:2
131:2
**problem** 40:8
**problems**
68:19
**proceeding**
108:17
**proceedings**
110:5 159:11
**proceeds**
96:22
**process** 24:18
25:11,25
96:6 137:22
144:9
**produce** 44:2
**produced** 15:6
**professional**
1:20 11:21
11:24 159:7
**Professor** 34:7

**profit** 67:23
68:2,12,17
**profits** 63:6,16
68:5 70:24
71:11
**program** 54:1
55:6 97:4
99:7,8,23
100:3
**prohibit** 82:11
**projected**
39:10,11
**promoter**
108:15,17,18
110:9 120:17
121:8,12,20
122:4
**promoters**
31:16
**promoting**
46:2,15
47:10 48:9
**prompted**
22:12
**proper** 86:14
**properly** 124:3
**property** 80:20
116:24
**proportion**
84:17
**proportions**
85:14,23
86:4
**proposed** 14:1
**proposing**
14:5,24
15:10
**prospect**
146:1
**prospective**
100:13
**protect** 73:25
**protection**
153:18

**provide**
132:23
**provided**
38:13
**provides**
82:10
**proving** 96:11
**public** 1:22
123:25
157:23
158:18
159:25
**pull** 20:22
148:20 152:6
**purchase** 62:9
62:18 81:6,7
81:15 82:5
**purchased**
53:18
**purchasing**
81:3,23 82:3
85:22
**purported**
119:2
**purpose** 19:5
19:16 63:23
64:5,9,10,12
64:13,14,14
73:10 78:8
134:20 135:6
142:20 143:3
146:24 147:3
147:6
**purposes**
90:17 122:17
**pursuant** 1:23
**put** 67:7 70:23
**putting** 79:7

**Q**

**qualified** 155:3
**qualify** 43:14
127:5
**question**

10:10 13:23
16:17 17:11
20:9 26:14
27:1 39:25
51:1,19 54:5
66:16 69:6
69:21,23
70:16,17
71:9,13 87:2
87:22 88:3,4
91:9 99:18
100:25
101:13
109:13
118:25
123:15
124:11 125:4
127:10 128:2
128:6,24
135:3 138:5
138:15 143:1
143:2 147:6
148:16
154:12,19
**questioning**
131:18
**questionnaire**
14:10,13,14
14:18 26:5,8
26:13,19
137:20
**questions**
14:9 22:14
22:16,18,21
40:8 78:23
88:10 130:25
147:8 148:15
**quickly** 56:19
**quite** 28:7
114:9,15
115:18
119:13
150:15
**quoted** 31:14

31:25 32:14
**quoting** 117:3
117:4,7

**R**

**R** 1:5,16 2:1
4:4 6:3,4 7:2
13:13 92:15
157:11 158:9
159:11
**Rachel** 112:9
112:16
113:10,19
120:18
**Radiologists**
83:14
**Radiology**
60:4 83:13
84:4,6 85:22
**Radiology's**
85:1
**raise** 15:21
41:8,11
**raised** 22:23
41:17 78:23
**ramifications**
74:3
**Ramirez** 45:1
45:5 112:24
113:20 114:3
131:9
**rapidly** 89:23
**Rashbaum** 2:5
6:8
**rate** 9:24 97:23
98:1 142:4,7
150:24 151:8
**rates** 24:11
101:6 150:24
151:1
**rattling** 141:22
**re-review**
137:11
**reaching**

52:13,17
**read** 13:7
  19:10 34:18
  34:21 52:19
  63:20 73:18
  74:4 83:25
  84:20 85:21
  104:11
  107:11
  108:13
  115:21
  124:20 150:8
  156:20
**readily** 150:10
**reading** 19:21
  42:1,8 53:9
  53:10
**Ready** 156:14
  156:16
**real** 79:23
  87:16
**really** 8:22
  15:3 22:20
  28:11 32:15
  40:10 42:6
  69:17 76:15
  85:5 89:20
  94:5 96:4
  99:17 100:5
  119:16 122:5
  141:23,24
  142:1 150:1
  155:3
**Realtime** 1:22
  159:9
**reason** 15:7
  28:17 59:12
  60:20 64:21
  65:2 70:22
  75:21 89:4
  116:22
  124:16,24
**reasonable**
  24:10

**reasons** 53:7
  61:6 70:4,7
  70:18 75:12
  76:2 124:19
  125:2
**recall** 9:17
  11:13,16
  14:3,4,7,8,9
  14:22 18:7
  19:24 20:2
  20:19 25:2
  27:6 30:3
  31:24 33:1
  34:20,22
  41:6,14,15
  41:18 42:7
  43:6,22
  46:18,20,22
  48:11 50:8
  50:14 55:7
  65:18 68:23
  69:15 75:23
  76:19 84:8,9
  84:12 86:1
  89:10 102:7
  105:13,14
  107:14,15
  109:1,17,18
  111:12,15
  113:13
  114:10,16,22
  115:12
  116:12
  117:24 124:9
  124:11,14
  125:18 126:8
  129:22,25
  131:7 132:10
  134:8 135:15
  136:5 138:4
  138:5,7
  139:15
  142:17 143:3
  143:6,20

149:17
  151:22 155:5
  155:5 156:1
  156:5
**received** 7:19
  9:3 10:9 12:9
  29:24 34:23
  35:10 42:3
  44:1 48:23
  61:18 66:7
  96:23 107:16
  109:19
  135:20 144:3
  145:3
**receiving**
  25:24 41:7
  41:10
**recess** 55:22
  92:14 132:2
**recipient**
  34:12
**recognize** 21:3
  31:7 34:2
  77:8 83:6
  88:20
**recollect** 59:22
**recollection**
  34:4,6 50:19
  66:12 152:2
**recommend**
  40:23 41:3
  89:11 90:14
  101:25 102:6
  127:7
**recommend...**
  25:20
**recommended**
  102:2,7
**recommendi...**
  89:16 90:10
  90:16 91:20
**record** 6:2
  33:25 55:17
  55:19,21,21

55:24 92:11
  92:13,17
  127:12,14,16
  127:18,18,20
  131:18 132:1
  132:4 156:15
  156:17,19
  159:13
**recross**
  148:17
**recruiting**
  60:10
**recruitment**
  59:18
**red** 44:7 67:23
  86:8
**Redirect** 4:7
  148:18
**reduced** 94:11
**reducing**
  63:11,24
  64:6,13 65:2
**reexamined**
  9:24
**refer** 57:15
  58:6,11 84:2
**reference**
  52:25 107:5
**referenced**
  34:8 107:9
  107:16
  108:22
  109:19
  111:22 116:6
  148:22 156:3
**referencing**
  148:21
**referred** 74:6
  84:10 118:17
  138:9
**referring** 15:11
  26:20 34:7
  36:6,25 50:7
  57:19 73:21

81:1 91:10
  91:13 99:1
  144:8 149:11
  150:15
**refers** 37:3
  63:11 93:18
  110:9
**reflect** 146:23
  151:5,19
**reflected**
  152:25
**reflecting**
  10:12 27:4
  149:21 152:1
  154:5,9
**reflects** 154:1
  154:25 155:9
  155:12,15,19
  155:23
**refresh** 29:17
**refuses** 56:14
**regarding**
  54:18 83:23
  109:9,15
**regardless**
  99:16
**Registered**
  1:20 159:7
**Registrar**
  82:11
**regulators**
  80:18
**reinforcing**
  141:21
**reinsurance**
  47:22 54:15
  93:7,20
  101:10
  125:20 126:4
  129:19
**relate** 113:6
**related** 47:17
  53:21 78:20
  91:22 92:3

102:21
122:11,24
147:16
**relating** 45:14
**relationship**
40:22 41:2
65:9
**relationships**
58:21
**relative** 159:15
**release** 45:16
**reliance** 20:1
73:15,16
**reliances**
19:22
**relied** 86:25
87:4
**rely** 24:10
133:8 142:2
**relying** 8:23
9:25 133:17
**remaining**
101:8 103:5
**remember**
10:3 33:8
83:8 92:8
116:14
120:10
125:23 126:5
143:24
147:11 153:8
**reminder**
76:20
**remove** 71:18
97:1 150:25
**renewals**
93:14,15
**repeat** 26:14
41:25 69:7
87:2 138:14
**rephrase** 27:2
**report** 7:24,25
8:11,15,22
10:18,18,21

11:9,18,20
11:21 14:1
18:3,6 20:16
21:15 22:3,6
23:21 24:22
25:12,24
26:9,21,24
26:25 27:4
37:24 134:8
134:12,16,20
135:5,11,15
135:25 136:7
137:16,24
139:1,5,17
140:1,24
148:21
149:18,20,23
152:12,16,22
155:6 159:10
**reported** 68:4
68:5,17
110:21
136:21
**reporter** 1:20
1:21,21,22
6:12,23
31:10,19,23
32:9,24 33:2
33:7,11
159:7,7,8,9
**REPORTER'S**
159:1
**reporting** 16:9
92:6
**reports** 9:5,10
10:8,12,16
10:25 11:1,6
11:10,12
14:6,25
16:14,24
17:4,5,9,22
26:3,7 95:14
132:13,17
133:1,9,17

133:20
**represent** 15:5
58:22
**representative**
107:24
**request** 14:11
14:20 21:22
21:25 22:9
50:25 79:1
87:21
**requested**
83:21 102:22
159:12
**required** 8:17
51:17 81:14
81:17 91:25
**requirements**
91:15,16
**requires** 23:7
**reread** 54:10
116:8
**respect** 23:22
24:4 150:11
**responded**
70:8
**responding**
41:15
**responds** 8:15
51:12
**response** 5:9
8:6 35:19
38:5 40:6
45:1 51:8
63:17,18,21
67:11,25
70:10 103:16
104:14,23
105:19
106:13
109:21
114:24
115:13
116:17
119:19

137:15
138:25
**responses**
103:14,21
**responsible**
87:12,25
**rest** 13:7
**restrictions**
77:16 78:11
81:22 82:4
87:15 91:23
**result** 136:22
137:17
**retention**
60:10
**retire** 56:15
**return** 68:5
70:21 71:8
104:3,10
116:1
**returns** 51:24
87:21
**Revenue** 1:9
104:16
105:19
114:25
115:14 122:2
**revenues** 63:2
**review** 21:17
21:22 22:1,6
22:9,22
28:22 38:12
65:14 83:22
129:5 159:11
**reviewed**
129:16,16,18
**reviewing**
87:20 129:8
**revised** 11:11
137:19
**revocable**
62:12 89:22
**Reynolds**
115:25

117:14
**rider** 150:21
151:8
**Rifa** 62:11,18
**right** 7:20 8:8
8:9 11:7 12:9
14:17 15:2
19:6,8 21:7
22:4 24:12
24:19 25:14
27:8,13 30:6
31:5 34:16
34:24 35:11
35:16,21
37:24 38:2,6
39:14 40:12
44:16,20
45:2,6,21
47:17 48:12
48:20,24
49:10,11,16
49:19 51:10
51:13,17,25
52:8 53:5,8
54:18 56:9
56:10 58:3
59:10,22
61:19 63:8
63:24 64:22
65:18 66:9
67:13,20,23
68:5,14,20
71:1 72:13
74:20,23
75:1,6,9
77:21 78:5
79:3,15,25
80:23 83:10
84:7,19
90:13 91:8
93:4,8 94:2
95:1 96:14
97:11,23
98:2 100:3

101:16 102:4
103:8,22
106:20,25
108:1 109:25
110:11 111:1
112:20,25
116:12
120:19,23
125:18 126:3
129:22 130:6
130:9 143:18
144:5 145:9
149:8,22
150:21 152:1
152:13,19,22
153:3 154:2
**ring** 125:21
**rings** 71:24
115:8
**risk** 37:24 39:4
39:17,20,20
40:9 53:16
55:10 61:4
75:5 101:9
124:7,8
139:16,17,20
141:18
142:10
149:10,14,21
150:1,7,15
152:1,24
154:2,6,10
154:17,21
155:1,9,12
155:15,19,23
156:2,7
**risk-shifting**
39:25
**risks** 52:15
73:14 74:16
**Robin** 93:2
126:10,14
**role** 18:1 20:16
135:14,17,23

**Rose** 156:2
**Rosenbach**
7:19,23 8:8
8:10,15 9:4
9:18 10:7,11
10:23 12:9
12:16 13:22
13:25 14:4
14:11,20
16:23 17:3
17:20 23:23
24:5,23 25:7
25:13,22
27:18,23
28:4,13 41:9
94:17 135:4
136:14,16,21
136:23 137:2
137:7,10,14
138:3,17,23
139:14,25
140:6,20,21
141:2,12
149:13,19
150:4,18,19
151:12,25
152:13
**Rosenbach's**
14:23 16:13
17:9 18:2
22:14,19,24
26:11,17
27:13 28:22
136:11
137:23
138:10 149:8
**Rouner** 41:12
135:4
**routine** 79:12
96:3 143:23
144:6
**routinely**
79:17
**RPR** 159:24

**rule** 92:5
123:24
147:15,16
**rules** 80:19,23
88:8 91:5,13
99:12
**ruling** 101:22
**rulings** 35:25
36:6,19,25
37:2
**rumors** 119:11
119:14
**run** 36:15
**running** 33:23

_____
**S**

**S** 2:1 92:15,15
92:15 98:24
99:10,12,12
**SA** 37:19
**Saint** 77:16,25
78:5,11
80:17 82:11
126:22
144:22
**salesmen** 85:8
**satisfied**
139:24
**save** 127:22
**saved** 128:10
128:21
**savings** 69:1
69:10,20
70:1,18
128:3
**saw** 74:8
134:6 142:15
156:1
**SAYETH** 157:8
**saying** 11:8
31:14 32:1
52:1,6 72:12
89:15 150:18
**says** 8:21

12:10,21
13:1 16:7
21:16 35:12
38:3,11,17
49:6 56:12
58:4 61:20
62:8,22 63:5
68:21 72:21
73:1 89:21
103:23 107:1
108:14 109:3
109:21
114:24 117:4
119:19 150:7
150:19,23
151:5 153:9
153:11,19
154:12,13
**scams** 31:22
**scanning**
56:11
**scenario** 103:2
**scope** 19:5,16
**Scott** 104:22
**screen** 7:10
30:22 149:1
**scroll** 7:16
13:6 37:17
38:8 45:4
52:10 93:11
93:12 103:24
118:23 149:3
152:15
**scrolling** 40:6
51:7 74:18
153:4
**se** 67:16,18
68:14 124:14
**sea** 70:14
**seal** 158:12
**second** 5:10
7:17 13:1,11
13:24 15:9
22:11,12,17

23:4,4 31:12
39:8 42:18
48:22 49:24
60:8 62:2,3
62:16 63:1
63:22 64:5
64:21 65:1
84:16 103:16
103:21
106:13
142:16,20
143:4 152:6
**section** 19:5,8
19:16,19,23
20:1,4,7,11
121:20 122:2
**sections** 18:22
20:20 59:6
135:14,18
**see** 7:10 8:3
8:12,19 9:1
12:12,19
13:4,14,20
15:3,23,25
16:5,6,10
18:22,24
19:3 21:13
21:20 23:5
23:12,19,25
24:7 29:25
30:21 31:17
32:6,7,21,22
36:1,4,5
37:13,21
38:15,19,23
39:6,7,21
40:4,19,24
41:4 42:20
43:15 44:5,8
44:24 45:17
49:6,17 50:4
52:16,18,20
52:22 53:12
53:23 54:19

56:12,16,25
62:5,13,14
62:20,21
63:3,4,9
66:13,19,20
67:2,9,10
71:6 72:24
73:3,11
75:21 76:11
83:16 84:24
85:18 93:9
93:13 94:7
94:13 97:19
104:18,23
105:25
106:14,17
107:7 108:19
110:6 115:4
115:17 116:3
117:1,18,19
151:3,10
153:5,13
154:1 155:8
155:11,14,18
155:22
**seek** 23:15
  82:2
**seen** 94:6 97:6
**segregated**
  59:20,21
**selected**
  126:25
**selecting**
  68:25 69:9
  69:25
**self-insured**
  39:20
**sell** 125:6
**seminar** 98:8
**seminars**
  100:1
**send** 121:1,5
**senior** 60:6
**sense** 92:4

140:16
**sent** 8:7 14:10
  50:17 51:8
  65:14 75:1
  94:1 109:5
  121:2,6
  144:10,24
  145:1
**sentence**
  15:24 19:13
  19:14 21:16
  24:3,8,14
  25:17 39:1,9
  41:1 49:25
  70:3 71:3,6
  83:18 96:25
  115:22
  117:11 150:8
  150:19
**separate** 60:6
  60:12,14,16
  62:9 102:22
  150:13
**September**
  1:13 6:11
  34:16 46:4
  56:9,20
  116:18 117:5
  131:14
  158:13
  159:21
**seriously**
  55:13
**served** 108:23
  108:24 109:8
  110:3
**SERVICE** 1:9
**services** 6:15
  47:17 57:15
  57:19 58:7
  58:11 78:20
  101:16,21
  102:21
  122:11

**set** 5:10 38:13
  40:11 73:9
  75:13 76:2
  89:20 98:19
  103:16,21
  145:25 147:8
**sets** 60:25
  100:19
**setting** 73:23
  146:18
**seven** 153:1
**seventh**
  119:18
**Shah** 60:24
  61:6
**share** 109:8,11
  109:15
**ShareFile**
  97:16
**shareholder**
  100:16 101:5
  103:8
**shareholders**
  127:2
**SHEET** 157:5
**shelter** 46:3,15
  47:11 48:10
  120:16
**Shelters** 31:5
  122:4
**Shepherd**
  106:16,19
  107:3
**short** 45:9
  146:21
**short-term**
  147:1
**show** 7:7 12:1
  40:8
**showed**
  132:20
**showing**
  140:13
**shown** 135:25

**shows** 139:16
**side** 80:23
**signed** 21:9
**significant**
  53:21 124:16
  124:24
**significantly**
  53:4,14
**similar** 89:5
**Simon** 3:6
  6:13
**simply** 56:14
  77:14 85:16
  96:2
**Sitting** 75:19
  86:2
**situation**
  60:13 75:24
  128:17 142:8
**situations**
  80:13 82:1
**six** 108:16
**sixth** 116:17
**skew** 95:11
**skewed** 94:10
  95:1,3,5
**skim** 18:21
**slide** 97:18,20
  97:22
**slides** 97:6
  98:20 100:7
**slightly** 91:19
  154:11
**small** 35:25
  36:20 51:5
  67:19
**sold** 53:19
**sole** 64:10,21
  65:1
**solely** 50:3
**solution** 99:19
  141:20
**Solutions**
  18:25 21:7

21:17
**solvency**
  82:12,15
**somebody**
  100:8,9,10
  145:5
**somewhat**
  123:16
**soon** 106:9
**sorry** 12:22
  18:17 27:1
  29:16 30:25
  40:25 41:25
  66:1 73:7
  112:17
  115:19
  131:21
  138:14
**sort** 9:22 10:11
  11:23 22:16
  144:9
**sound** 45:11
  133:2
**sounded** 69:6
**sounds** 25:19
  76:17 149:25
**source** 116:21
**sources** 23:16
**Southeast**
  1:12 2:8 6:9
**Southern** 1:2
  6:5
**speak** 98:11
  128:16
**speaking**
  17:15 81:19
**Specialized**
  106:24 107:2
**specific** 20:19
  22:21 26:2
  27:11 36:14
  46:18,22
  59:14,25
  60:22 82:16

Clark, Celia R - Vol. 3

September 11, 2023

24

85:4 129:14
137:14 150:9
156:9
**specifically**
14:7 31:24
69:21 88:22
97:7 100:25
114:11 121:1
129:9 138:23
140:13
151:17
**specifics**
100:12
**specify** 99:2
**spell** 32:15
**Spencer** 37:19
38:5 41:5,8
41:11,16
42:4
**spoke** 73:1
108:9 117:13
118:1,7
131:1,4,8,10
**spoken** 105:10
119:25
**SS** 157:14
**stamp** 103:13
**stamped** 18:13
29:4 30:16
33:16 35:4
37:7 42:13
48:15 56:2
65:22 72:3
88:15 92:20
152:4,6
**stand** 66:21
**standard** 52:5
52:7,14,15
53:13
**standards**
123:4
**stands** 154:22
**start** 12:17
13:18 38:10

41:9 48:21
61:16 66:5
72:8 73:7
80:2 92:25
104:13
**started** 74:1
122:10
**starting** 13:24
24:3 37:12
56:7 84:22
**starts** 13:12
39:1
**state** 1:22 11:8
11:11 35:23
40:7,15,21
40:22 45:8
49:21 67:17
75:3 79:23
82:10 94:4,9
94:25 105:19
116:17
157:13,24
158:4,18
159:3,25
**stated** 63:23
64:5,12,15
**statement**
9:12 32:8,23
33:6,10
54:25
**statements**
51:25
**states** 1:1,8
6:5,18,19
7:23 13:17
15:16 16:1
23:5,22 24:8
39:9 43:9,25
44:7,18
52:13 53:3
53:12 56:17
66:15,24
73:6,8 83:18
85:12 97:22

104:1 106:14
106:22
107:21 110:2
110:8 117:12
**States'** 5:9
103:16,21
**stating** 32:14
57:25 70:23
**statute** 82:10
122:4
**stay** 122:12
131:18,20
**stenographic**
33:25 55:21
127:18
159:14
**stenographi...**
159:10
**Steve** 28:21
29:25 30:2
40:7 42:19
42:22 44:20
83:21 85:7
116:23
117:13 118:5
136:3
**Steven** 21:10
**stock** 90:3,7
**stop** 91:20
101:15,21
**stopped**
122:12
**strategies**
56:21 97:10
97:18 98:7
145:10
**strategy** 57:4,7
57:12 58:1,7
58:12 97:2,8
98:18 101:13
145:19
**stresses** 94:10
95:2
**Streza** 115:11

**strike** 49:22
71:12 139:10
**string** 74:9
**structure**
43:11 53:5
53:15 54:7
55:3,10
85:15 89:12
90:13
**stuff** 130:21
**subject** 17:13
19:2 21:12
37:23 49:6
71:7 83:12
88:23 117:16
**submit** 96:10
**submitted**
135:19
**subscribed**
157:17
**subsequent**
83:19 149:23
**substantial**
68:17
**substantially**
62:25
**substantive**
100:6
**sued** 130:8
**sufficient**
24:16 25:19
39:24
**suggested**
135:21 137:9
**suicide** 148:5
**suitable**
134:20
**Suite** 2:9 6:9
**suited** 140:8
142:8
**summarizing**
100:3
**summary**
65:13 153:3

**summons**
44:2,23
45:10,16
**support** 13:2
25:9 26:2
39:24
**supported**
26:11,17
**supporting**
14:25 16:25
25:13,23
27:4
**supposed**
76:21 145:25
146:3
**supposedly**
144:11
**sure** 12:14
17:2,7,17
19:11 24:15
25:18 26:15
29:12 30:7
42:2 52:1
53:10 60:2
61:23 71:22
76:13 84:21
89:14 93:24
96:20 98:9
99:5 124:22
127:9,13
128:25 152:5
**surplus** 79:25
80:17 140:15
142:5
**surrounding**
104:7 119:19
**swear** 6:24
**sworn** 7:3
157:17
158:10
**systems** 73:16

---
**T**

**T** 92:15

| | | | | |
|---|---|---|---|---|
| **T-I-G-T-A** 120:24 | 69:1,10,20 70:1,18,21 70:25 71:4,7 71:8,15 73:10,22 74:2 79:9 87:1,5,13,21 88:2 89:23 90:17 91:2,9 91:11,15 94:11 95:22 96:15,20,24 98:1 100:20 100:20 101:19 107:25 108:7 108:8 109:9 109:15 115:2 116:20 120:16 122:4 122:17 124:15,23 125:6 | 87:19 100:13 101:2 102:12 102:15 111:9 111:13 113:22 114:3 114:7,12,19 118:19 121:24 126:21 151:18 154:3 154:4,7,8 **telling** 11:5 51:21 57:22 68:1 71:10 71:15 117:14 **tells** 12:16 **template** 77:12 **ten** 59:2 118:4 **tend** 15:17 **tendency** 16:8 **term** 11:15 49:19 63:10 121:8,12,19 121:25 | 144:1 147:14 **testifying** 147:11 **testimony** 135:15 **Thank** 152:9 **thing** 91:18 137:12 154:17,21 155:7 **things** 31:14 72:22 85:8 87:7 129:1 129:12 153:16 **think** 24:2 29:20 35:14 36:9,17 52:7 63:15 72:23 74:8 75:19 75:25 76:5 78:16 82:8 86:2 87:22 | 115:15 **thorough** 22:21 **thought** 62:15 81:5 87:24 **thoughts** 70:15 **threaten** 82:15 **threatens** 82:12 **three** 27:7 60:24,24 67:6 101:24 107:20 108:14 129:10 **Thuy** 114:25 **TIGTA** 120:24 121:3 **Tim** 73:22 74:6 74:8,10,13 |
| **take** 19:21 55:12 63:18 139:21 **taken** 1:19 38:12 55:22 92:14 102:24 132:2 **talk** 59:14 100:22,23 143:11 **talked** 44:20 70:12 97:7 101:7 125:22 143:12,12 145:10 146:9 **talking** 12:23 28:23 38:14 54:12 57:20 63:15 76:16 112:5 123:10 126:21 138:9 138:16 139:5 | | | | 74:17,17 76:16 83:20 107:23 108:3 109:4 |
| **target** 45:11 74:22 **targets** 68:25 69:10,25 **Tarter** 83:20 107:23,23 108:3 109:4 109:5,8 | **taxable** 56:18 63:11,24 64:6 65:2 67:23 68:2 68:12 91:15 146:20 **taxed** 15:19 96:23 | 125:10,12,16 132:15 **termination** 108:16 **terminology** 122:9 **terms** 133:19 151:13 | 88:3 90:21 92:4 95:15 95:18 96:4,5 96:14 99:2 101:13 112:17,25 115:19 123:8 125:3 126:9 128:9,20 | **time** 6:2 19:21 22:7 25:24 34:19 46:17 46:21 47:6 49:5 54:16 55:11 60:9 61:22 62:12 69:15 74:14 |
| **tax** 2:20 16:3 31:22 40:3 46:2,15 47:10 48:9 50:20,24 51:3,24 52:25 58:11 58:13,18 59:6,7 63:16 64:16,19 65:15 66:18 67:8 68:5 | **taxes** 100:22 100:23 **technical** 21:7 21:16 116:23 **Telephonica...** 3:11,12 **tell** 10:25 28:1 28:13 33:1 46:6,13 47:8 48:7 63:22 64:4,25 67:15 68:25 69:9,19,24 | **terrorism** 37:24,24 41:12,20 42:5 43:13 44:3 73:17 **testified** 7:4 70:11 132:7 132:12 135:13 137:22 138:2 138:17 143:19,22 | 130:21 131:17 141:18 152:8 153:23 156:11,14 **thinking** 64:24 **thinks** 53:3 **third** 19:14 24:2 40:1 49:23 52:12 53:16,20 84:24 107:19 | 77:24 78:23 79:15 85:2 90:21 93:21 94:16 96:9 98:14,23 108:9 113:24 118:1 119:13 119:21 121:6 121:11 122:10,12 127:9,9,12 |

Clark, Celia R - Vol. 3

September 11, 2023

26

128:14
130:25 131:3
131:8 139:4
139:15
144:11
146:21 147:1
151:23 156:9
**timeframe**
41:21
**times** 17:13
31:3,10,22
32:9,24 33:2
33:6,10
**tired** 141:23
**title** 122:3
**today** 6:10
75:19 86:2
97:7 134:6
**today's** 129:6
129:9
**told** 46:16,23
46:24 47:6
102:10
105:20 106:5
106:5 110:19
112:13,19
113:2 119:2
119:2 136:23
138:23 156:5
**tool** 60:11
101:9
**top** 8:14 18:24
29:9,24
35:20 38:4
38:10 40:7
45:4 67:11
70:11 74:25
94:1 149:5
**topic** 147:9
**total** 39:10,10
39:18
**totally** 149:24
**Toth** 83:21
85:7

**touch** 145:9
**track** 119:12
**tradition** 142:2
**training** 142:2
**transaction**
35:16 36:1
36:11,19,22
40:17 124:17
124:18,25
125:1
**transactions**
122:17
**transcript**
129:17,18
157:7 159:12
159:13
**transfer** 90:11
**Treasury**
116:19
**treatment**
95:22
**trial** 2:20 110:3
110:14,25
111:3,4,5,6
111:10,11,16
111:19,24,25
112:7,9,11
112:13,18
113:12,16,18
113:23,24
114:4,14,15
114:17,21
**trials** 110:4,10
110:18,20
113:4,6
**tried** 80:22
98:20
**trouble** 52:11
52:13,17
67:16,18
68:14
**troubled** 68:19
**true** 44:23
109:4 157:6

159:13
**trust** 32:16,20
56:23 62:12
89:9,11,20
89:21 90:3,7
90:11,13,24
90:25 106:16
106:19,21,23
106:24
**trusts** 57:4
58:3 62:10
62:17,19
89:22 90:2
**try** 66:17 71:4
**trying** 126:8
153:8
**Turner** 108:10
**turning** 56:13
**two** 39:12,19
40:2 60:17
62:9,16 84:3
86:5 91:1
109:22,25
119:9 129:25
132:18
136:20 139:5
143:8 146:10
155:17
**type** 53:16
137:6
**types** 59:19
**typical** 109:14
**typically** 15:18
86:17 121:4
121:5 150:10

_____

**U**

**U.S** 2:21 3:9
**ultimate** 101:4
**ultimately** 9:19
10:23 16:12
16:23 25:23
42:25 43:19
49:12 54:4

91:2 98:5,14
98:23
**Um-hmm**
117:9
**unable** 101:25
110:4
**unaffordable**
8:18 9:13
**unauthorized**
104:2
**unavailable**
23:15
**uncertainty**
15:21
**underneath**
62:18
**undersigned**
158:8
**understand**
87:17
**understandi...**
11:14 33:5
40:9 52:24
63:10 86:24
87:3 93:17
95:4,6
121:24 122:5
123:23
134:15,19
135:2
**understood**
28:11 141:25
147:19
**undertaking**
87:9
**underwriting**
85:16
**unique** 151:6,6
**United** 1:1,8
5:9 6:5,18,19
103:16,21
**unknown**
119:21
**unrelated**

52:15 53:19
**unscrupulous**
31:15
**update** 16:24
17:3 149:13
**updated** 9:25
79:17 137:10
141:6 150:4
**updates** 77:19
79:14
**urgency** 89:18
**use** 19:8,19
23:7 62:10
62:17 68:1
71:10 80:14
81:7 89:23
92:2 135:11
141:6 146:20
**useful** 32:4
**uses** 150:19
**utilize** 23:15
**utilized** 23:24
24:6

_____

**V**

**V** 1:7
**vague** 34:4,6
123:16
**valid** 101:24
141:2,12
147:3
**value** 59:5
**variation**
66:16
**variety** 96:23
**various** 17:13
18:22 47:17
59:17 81:22
100:2 127:5
144:10
153:22
**vary** 151:9
**ventures**
79:24 87:17

**verify** 119:12
120:8
**Verlyn** 72:11
72:16,18
74:23
**version** 45:9
**versus** 6:4
**video** 55:21
127:18
**videographer**
3:6 6:1,13,23
55:18,23
92:12,16
127:15,19
131:25 132:3
156:18
**VIDEOTAPED**
1:15
**view** 58:17
87:11 100:5
141:22
**violations**
116:21
**Virgin** 126:22
**Virginia** 2:19
6:19
**visited** 104:16
**void** 124:14
**Vollrath** 2:6
4:6 6:21,21
12:22 18:8
18:17 25:15
29:19 30:24
33:22 46:9
47:2 61:7
63:25 64:7
66:1 68:6
75:14 76:4
77:5 82:7
88:6 89:13
90:4 91:6
98:25 100:17
102:5 105:3
121:21

123:14
127:11,25
128:12,23
131:20,23
132:6 133:11
133:14 134:5
134:23 135:8
138:12,20
140:3 141:5
141:10
142:11,25
143:9 145:16
145:23
146:15 147:7
148:1,8,14
148:21 152:7
156:4,13,20
**VOLUME** 1:17

_____

**W**

**wait** 116:10,10
**waiting** 32:4
**want** 22:12
32:16 43:10
57:18 59:14
60:1 61:1
72:22 74:2
90:22 94:5
94:15 142:12
145:9 153:6
**wanted** 45:13
60:6,8 94:21
**wanting** 60:17
**wants** 70:23
71:10,16
**Washington**
2:23
**wasn't** 28:6
33:3 54:5
75:17 92:5
**way** 17:9,11
25:25 59:21
76:17 89:23
96:6 99:18

119:20 124:6
139:8,10
**ways** 54:2,8
81:25 96:24
139:13
149:13
**We'll** 104:13
**we're** 14:17
28:23 32:4
55:18,23
62:22 90:16
90:20 92:12
107:20
123:10
126:21
127:15,19
131:14,25
132:3 139:5
153:2 156:14
156:18
**we've** 87:14
97:6,6
119:24
**websites**
65:13
**Wednesday**
72:23
**week** 97:6,14
97:14
**week's** 129:6
**weight** 39:3
**went** 43:6
129:12
**weren't** 112:19
**when's** 108:9
118:1 121:11
131:3,8
**William** 3:11
6:20
**Wilson** 61:19
61:21 62:8
63:22 64:4
64:18 108:8
109:23 110:4

111:16,24
112:5,6,12
113:1,4,17
113:23 114:4
129:18
142:13,16,19
**Wilson's** 64:19
143:16
**Wilson-3249...**
4:14 61:12
**Wilson-3250...**
4:14 61:13
**Wilson-3305...**
4:20 7:12
**Wilson-3305...**
4:20 7:13
**Wilson-3307...**
4:18 12:4
**Wilson-3307...**
4:18 12:5
**wipe** 101:11
**wish** 131:12
**withdraw**
94:12 96:16
**witness** 4:2
6:24 25:16
46:10 61:8
64:1,8 68:7
75:15 76:5
82:8 88:7
89:14 90:5
99:3 100:18
102:6 105:5
110:3,15
111:18
121:23 128:2
128:13,25
131:21
141:15
142:23 143:6
145:22 146:6
147:5 156:5
156:12
158:12

**wondered**
38:13
**Woolson**
107:23
**word** 8:1 11:18
139:21
**wording** 10:17
10:21
**words** 96:20
**work** 28:22
57:10 71:23
90:8 132:8
133:24
136:11 139:2
140:15
**worked** 90:19
115:10 130:5
**working**
141:19 142:6
**world** 67:19
**wouldn't** 87:20
90:6
**wrath** 32:17
**write** 18:6
19:22 77:11
77:15 89:3
**write-offs** 16:4
**writing** 86:8
**written** 17:16
50:2 65:6,12
**wrong** 45:12
64:9 109:2
115:19
**wrote** 44:10
65:13 77:12
77:18,21
89:5

_____

**X**

**X** 1:4,11

_____

**Y**

**yeah** 42:2
49:10 68:7
70:10,12,17

Clark, Celia R - Vol. 3                                September 11, 2023

78:6 79:11
90:5 95:21
99:3 100:4
103:3,9
107:13
109:14 111:3
116:9 119:4
131:14 146:6
146:12 155:2
**year** 30:12
40:18 68:17
79:9,11 86:6
86:6 88:24
90:15,16
98:20 114:16
114:18 119:6
131:6,13,15
**years** 16:21
23:10 62:25
77:18 101:24
108:16 118:3
118:4 119:9
128:16 130:7
146:10
**York** 31:3,9,22
32:9,24 33:2
33:6,10

___

**Z**

**zero** 68:12
**zeroing** 67:22
**zone** 39:4

___

**0**

___

**1**

**1.2** 16:2
**1:37** 127:15
**1:39** 127:19
**1:45** 131:25
**1:50** 132:3
**10** 97:21,22
154:4
**10:53** 55:18
**100** 1:12 2:8

6:8
**103** 5:10
**10th** 61:19
**11** 1:13 4:14
6:11 61:11
61:12 154:8
**11:13** 55:23
**119** 4:18 12:3
12:4,24
**11th** 38:2,6
56:9
**12** 4:18 154:24
158:20
**12:13** 92:12
**12:42** 92:16
**128** 4:19 20:23
20:24 148:24
**1282249** 5:6
72:5
**13** 155:8
**132** 4:6
**139** 4:20 7:9
7:12
**14** 155:11
**148** 4:7
**14th** 56:20
**15** 34:16 70:6
155:14
**15th** 66:8
**16** 155:18
**162** 59:6
**17** 155:22
**18** 4:21
**18th** 67:12
**19** 104:15
**19th** 106:9
**1st** 45:6
107:21
115:24

___

**2**

**2:24** 1:14
156:18 157:2
**20** 4:19 97:23

97:25
**20044** 2:23
**2008** 28:23
30:8 38:2,6
41:21 50:22
51:6 80:6
81:5 129:24
**2009** 35:11,21
56:9 61:19
77:12 78:5
79:9
**2011** 7:20 8:8
12:9 22:4
93:4,19 94:2
118:10 119:5
119:15
120:14
**2012** 44:15
45:6,19,22
46:1,12
47:11 51:10
54:18,22,23
66:9 67:12
70:6 92:9
116:18 117:6
119:5,15
120:14
121:17 129:9
152:19 156:8
**2013** 34:16
48:24 51:13
54:17,23
67:6 72:12
74:20 75:1
98:8
**2014** 104:15
106:10,11,15
107:21
108:25
114:25
115:24 117:7
**2015** 31:22
83:19 111:7
111:8,14

**2016** 28:23
46:12 47:11
50:22 51:6
80:6 81:5
111:20 114:1
114:5,18
129:24
**2017** 101:15
108:11
110:25
114:10,18
**202-307-5892**
2:24
**2020** 131:2
**2021** 131:2
**2023** 1:13 6:11
157:18
158:13
159:21
**2024** 158:20
**20th** 7:19 8:8
**21st** 158:12
159:21
**24th** 72:12
74:20 75:1
**28th** 35:11
**29** 4:15,22
77:1,2,6
**29th** 35:21
**2nd** 48:24

___

**3**

**3** 4:2
**30** 4:23 52:15
53:13
**30-day** 106:15
107:6,9,16
**300,000** 39:12
**310** 97:13
**31st** 22:4
44:15
**323** 4:21 18:12
18:14,19
152:7

**324** 4:22 29:3
29:5
**325** 4:23 30:15
30:17 31:1
**326** 4:24 33:15
33:17
**327** 4:25 35:3
35:5
**328** 5:1 37:6,8
**329** 5:2 42:12
42:14
**33** 4:24
**330** 5:3 48:14
48:16
**331** 5:4 56:1,3
**332** 5:5 65:21
65:23 66:3
**333** 5:6 72:2,4
**33394** 1:13
2:10 6:10
**334** 5:7 88:14
88:16
**335** 5:8 92:19
92:21
**336** 5:9 103:12
103:15
**35** 4:25
**37** 5:1
**3rd** 1:12 2:8
6:9

___

**4**

**40** 86:10,13
**42** 5:2
**45** 153:12
**48** 5:3
**4th** 116:18
117:5

___

**5**

**50** 86:9
**56** 5:4
**5th** 51:13
83:19 93:3
94:2

Clark, Celia R  - Vol. 3                              September 11, 2023

29

**6**

**6** 4:5
**61** 4:14
**6103** 116:21
**65** 5:5
**6700** 121:13
   121:20 122:2

**7**

**7** 4:5,6,20 12:9
   103:25 104:1
**70s** 56:14
**72** 5:6
**7238** 2:22
**75** 153:11
**77** 4:15

**8**

**8** 4:7 106:15
**805** 2:9 6:9
**83** 4:17
**831(b)** 53:20
   59:6
**831(b)s** 101:23
   101:25
**88** 5:7

**9**

**9** 154:12
**9:21-cv-820...**
   1:3 6:6
**9:36** 1:14 6:2
**92** 5:8
**954-462-1200**
   2:11
**97** 4:16 83:1,2
**977602** 158:19