1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CELIA R. CLARK,
     Plaintiff,                          Case No.
V.                                       9:21-cv-82056-CIV-CANNON
UNITED STATES OF AMERICA; THE
THE INTERNAL REVENUE SERVICE,
     Defendants.

*******************************************************

ORAL, VIDEOCONFERENCED AND VIDEOTAPED DEPOSITION OF

WILLIAM E. JOHNSON, III

JULY 24, 2023

*******************************************************

    ORAL, VIDEOCONFERENCED AND VIDEOTAPED DEPOSITION OF

WILLIAM E. JOHNSON, III, produced as a witness at the

instance of the Defendants, taken in the above-styled and

-numbered cause on the 24th day of July, 2023, A.D.,

beginning at 9:28 a.m. to 4:41 p.m., before Kelly

Hassell, RPR, CLR, CSR, in and for the State of Texas, at

the offices of U.S. Department of Justice, Tax Division,

located at 717 North Harwood Street, Suite 400, Dallas,

Texas, in accordance with the Federal Rules of Civil

Procedure and the agreement hereinafter set forth.

Johnson, III, William E.                                  July 24, 2023

2

```
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3          MR. DERICK VOLLRATH, ESQ.
           MR. JULIE LEVINE, ESQ.
4          Marcus Neiman Rashbaum & Pineiro LLP
           100 SE Third Avenue
5          Suite 805
           Fort Lauderdale, Florida  33394
6          (954) 462-1200
           dvollrath@mnrlawfirm.com
7          jlevine@mnrlawfirm.com

8

9

10   FOR THE DEFENDANTS:

11         MS. LAUREN A. DARWIT, ESQ.
           MS. VIRGINIA GIANNINI, ESQ. (Via WebEx.)
12         MS. ELISABETH KRYSKA, ESQ. (Via WebEx.)
           Trial Attorneys, Tax Division
13         U.S. Department of Justice
           P.O. Box 7238
14         Washington, D.C.  20044
           (202) 307-5892
15         lauren.a.darwit@usdoj.gov
           virginia.giannini2@usdoj.gov
16         elisabeth.k.kryska@usdoj.gov

17

18

19

20

21

22   ALSO PRESENT:

23         MR. ANTHONY MARLAR - Videographer
           MS. CELIA CLARK (Via WebEx.)
24         MR. EDGAR GENTRY (Via WebEx.)

25
```

Johnson, III, William E.                                    July 24, 2023

3

1                          I N D E X

2    Appearances................................. Page    2

3    Stipulations................................ Page   231

4    Exhibit List................................ Page    4

5    Direct Examination by Ms. Darwit............ Page    9

6    Cross-Examination by Mr. Vollrath........... Page   228

7    Signature and Corrections................... Page   233

8    Reporter's Certificate...................... Page   234

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Johnson, III, William E.                                          July 24, 2023

4

```
 1                      EXHIBITS

 2   EXHIBIT NO.  DESCRIPTION                      PAGE

 3   GOVERNMENT EXHIBITS:

 4   Exhibit 179  Email string to Mr. Muhlenbruch,   14
                  from Ms. Haskell, dated January 4,
 5                2018, subject:  Organizational
                  chart, Bates-stamped
 6                Johnson_Emerald_Production07180
                  through
 7                Johnson_Emerald_Production071804

 8   Exhibit 180  Captive Financial Statement - Pure  21
                  and Industrial Insured Annual Report
 9                for the Period Ended December 31st,
                  2016, Bates-stamped
10                Johnson_Emerald_Production00546
                  through
11                Johnson_Emerald_Production00584

12   Exhibit 181  Email string to Mr. Johnson, from   35
                  Mr. Muhlenbruch, dated December
13                29, 2017, re:  Significant changes
                  draft, Bates-stamped
14                Johnson_Emerald_Production05102
                  through
15                Johnson_Emerald_Production05107

16   Exhibit 182  Email string to Mr. Johnson and     43
                  Ms. Clark, from Ms. Chen, dated
17                March 5, 2014, subject:  Alabama
                  captive insurance company,
18                Bates-stamped CLARKSDFL1277250
                  through CLARKSDFL1277252
19
     Exhibit 183  Email string to Ms. Edwards, et     59
20                al., from Mr. Shepherd, dated
                  January 29, 2015, re: Emerald
21                payment 12-22-14, Bates-stamped
                  CLARKSDFL1228885 through
22                CLARKSDFL1228887

23   Exhibit 184  Email to Ms. Clark, et al., from    63
                  Mr. Johnson, dated January 5,
24                2016, re:  Nevis, Bates-stamped
                  Johnson_Emerald_Production03466
25                through
```

Johnson, III, William E.                                July 24, 2023

5

1                        EXHIBITS CONTINUED

2    EXHIBIT NO.   DESCRIPTION                              PAGE

3    GOVERNMENT EXHIBITS:

4    Exhibit 185   Letter from Mr. Brazaitis, dated         72
                   February 9, 2016, re:  Fee and tax
5                  return for Alabama captive insurer,
                   Bates-stamped CLARK_PROD-0123295
6                  through CLARK_PROD-0123299

7    Exhibit 186   Emerald minutes, Bates-stamped           74
                   Johnson_Emerald_Production01848
8                  through
                   Johnson_Emerald_Production01893

9
     Exhibit 187   Trust Agreement between Emerald          81
10                 International Reinsurance, Inc. and
                   the Beneficiaries, October 1, 2014,
11                 Bates-stamped CLARK_IRS0417519
                   through CLARK_IRS0417582

12
     Exhibit 188   Captive Financial Statement - Pure       99
13                 and Industrial Insured Annual Report
                   for the Period Ended December 31st,
14                 2015, Bates-stamped
                   CLARK_IRS0008368
15                 through CLARK_IRS0008406

16   Exhibit 189   Statement of Actuarial Opinion,          103
                   Emerald International
17                 Reinsurance, Inc. Bates-stamped
                   CLARK_IRS0008361 through
18                 CLARK_IRS0008367

19   Exhibit 190   Statement of Actuarial Opinion,          108
                   Emerald International
20                 Reinsurance, Inc. Bates-stamped
                   ACR_IRS0460399 through
21                 ACR_IRS0460405

22

23   Exhibit 191   Statement of Actuarial Opinion,          109
                   Emerald International
24                 Reinsurance, Inc. Bates-stamped
                   CLARK_PROD-0121246 through
25                 CLARK_PROD-0121252

Johnson, III, William E.                              July 24, 2023

6

```
 1                    EXHIBITS CONTINUED

 2   EXHIBIT NO.   DESCRIPTION                        PAGE

 3   Exhibit 192   Statement of Actuarial Opinion,    111
                   Emerald International
 4                 Reinsurance, Inc., Bates-stamped
                   ACR_IRS0460411 through
 5                 ACR_IRS0460441

 6

 7   Exhibit 193   Email string to Mr. Johnson, et    123
                   al., from Mr. Shepherd, dated
 8                 October 23, 2017, Bates-stamped
                   Johnson_Emerald_Production05479
 9                 through
                   Johnson_Emerald_Production05485
10

11   Exhibit 194   Letter to Mr. Gabbay, from         139
                   Ms. Clark, dated November 15,
12                 2016, re:  Captive Insurance
                   Planning Retainer Agreement,
13                 Bates-stamped
                   CLARK_PROD-0228077 through
14                 CLARK_PROD-0228080

15   Exhibit 195   Email string to Ms. Clark, from    146
                   Mr. Johnson, dated February 29,
16                 2012, subject:  All Star
                   Insurance Co., Ltd., Bates-stamped
17                 CLARKSDFL715403 through
                   CLARKSDFL715404
18
     Exhibit 196   Email to Mr. Chalmers and          162
19                 Mr. Burgess, from Mr. Johnson,
                   dated June 5, 2014, subject:
20                 Captive insurance companies,
                   Bates-stamped CLARKSDFL1108313
21                 through CLARKSDFL1108314
     Exhibit 197   Email string to Mr. Johnson        172
22                 and Ms. Clark, from Mr. Zeitoune,
                   dated November 19, 2010, subject:
23                 N&D Insurance Company - policy
                   applications, Bates-stamped
24                 ACR_IRS0281123 through
                   ACR_IRS0281125
25
```

Johnson, III, William E.                              July 24, 2023

7

```
 1                    EXHIBITS CONTINUED

 2    EXHIBIT NO.   DESCRIPTION                          PAGE

 3    Exhibit 198   Email string to Mr. Johnson, from    178
                    Ms. Chen, dated July 29, 2015,
 4                  subject:  Maxis Medical - business
                    risks, Bates-stamped ACR_IRS0294487
 5                  through ACR_IRS0294488

 6    Exhibit 199   Email string to Mr. Frauenheim,      181
                    from Ms. Edwards, dated September
 7                  9, 2009, subject:  Retainer agreement
                    - Celia Clark, Bates-stamped
 8                  CLARKSDFL1057372 through
                    CLARKSDFL1057373
 9
      Exhibit 200   Email string to Mr. Shepherd, et al., 189
10                  from Mr. Johnson, dated May 13, 2015,
                    subject:  Celia, Bates-stamped
11                  Johnson_Emerald_Production02965
                    through
12                  Johnson_Emerald_Production02967

13    Exhibit 201   Email string to Mr. Shepherd, et al., 193
                    from Mr. Johnson, dated May 13, 2015,
14                  subject:  Meeting with Gary Fagg,
                    Bates-stamped
15                  Johnson_Emerald_Production02968
                    through
16                  Johnson_Emerald_Production02973

17    Exhibit 202   Email to Mr. Johnson, et al., from    213
                    Mr. Shepherd, dated December 15,
18                  2014, re:  Great review of the
                    law, Bates-stamped CLARKSDFL1230003
19                  through CLARKSDFL1230004

20    Exhibit 203   Email to Mr. Johnson, et al., from    218
                    Ms. Wechsler, dated December 12,
21                  2018, subject:  Pettison attached,
                    Bates-stamped
22                  Johnson_Emerald_Production00725
                    through
23                  Johnson_Emerald_Production00768

24

25
```

Johnson, III, William E.                                    July 24, 2023

8

                    P R O C E E D I N G S

 1

 2                  THE VIDEOGRAPHER:  We are now on the

 3    record.  This begins video -- the video deposition of

 4    William E. Johnson, III, in the matter of Celia Clark

 5    versus United States of America and the Internal Revenue

 6    Service.  This case is in the United States District,

 7    Southern District of Florida, Case No.

 8    9:21-cv-82056-CIV-CANNON.

 9                  Today is Monday July 24th.  The time is

10    9:28 a.m.  This deposition is being held at the United

11    States Department of Justice, Tax Division, 717 Harwood,

12    Street, Dallas, Texas.

13                  Would counsel state appearances for the

14    record.

15                  MS. DARWIT:  This is Lauren Darwit

16    appearing on behalf of the United States.  Also appearing

17    on behalf of the United States is Virginia Giannini and

18    Elisabeth Kryska.

19                  MR. VOLLRATH:  This is Derick Vollrath on

20    behalf of Plaintiff Celia Clark.  Also appearing on

21    Ms. Clark's behalf is Julie Levine.  We also have present

22    by Zoom Ms. Clark and her husband, Edgar Gentry.

23                  (The witness was duly sworn.)

24                  THE COURT REPORTER:  Thank you.

25

Johnson, III, William E.                                          July 24, 2023

9

```
1                    WILLIAM E. JOHNSON, III,
2      having been first duly sworn to testify the truth, the
3      whole truth and nothing but the truth, testified on his
4      oath as follows:
5                         DIRECT EXAMINATION
6      BY MS. DARWIT:
7          Q    Okay.  Good morning, Mr. Johnson.
8          A    Good morning.
9          Q    Do you understand that you are testifying here
10     today under oath?
11         A    Yes.
12         Q    Do you understand that this is the same oath
13     that you would take in a courtroom in front of a judge?
14         A    Yes.
15         Q    Have you been deposed before?
16         A    Absolutely.
17         Q    How many times?
18         A    I don't know.
19         Q    Several?
20         A    Yes.
21         Q    More than five?
22         A    Perhaps.
23         Q    Okay.  Well, just to kind of give you some
24     reminders for today's deposition, I'll ask that you
25     answer all of my questions truthfully and honestly, and
```

Johnson, III, William E.                                        July 24, 2023

10

1    please answer all of my questions verbally.

2                    Does that make sense?

3        A    Yes, ma'am.

4        Q    Please let me finish my question despite any

5    urge you have to provide an immediate response, and

6    that's because the court reporter can only take down the

7    words of one person that's speaking, okay?

8        A    Yes.

9        Q    Please let me know if you don't understand any

10   of my questions, okay?

11       A    I will.

12       Q    If you remember any additional information

13   during today's deposition or if you want to change or

14   clarify a previous answer, just let me know, okay?

15       A    I will.

16       Q    Occasionally during today's deposition, counsel

17   for Ms. Clark may object, and that is simply to make a

18   note for the record.  But you should still answer the

19   question that I've asked.  I'll try to -- if there's an

20   objection, I'll try to tell you "go ahead" afterwards so

21   you know to respond.

22                    Do you understand?

23       A    Yes.

24       Q    If at any point you need to take a break, just

25   let me know.  The only thing I'll ask is that you first

Johnson, III, William E.                              July 24, 2023

11

1    answer any question that's pending before asking for a

2    break.

3        A    Yes, I shall.

4        Q    Is there anything that would prevent you from

5    understanding and truthfully answering my questions

6    today?

7        A    Not so far.

8        Q    Are you on any medications that might interfere

9    with your ability to understand my questions today?

10       A    I'm on a ton of medications.

11       Q    Would any of those --

12       A    I don't think that they will interfere with my

13   understanding of your questions.

14       Q    Got it.  Thank you.

15               MR. VOLLRATH:  Well, Lauren.

16               MS. DARWIT:  Yeah.

17               MR. VOLLRATH:  I'm having a difficult time

18   understanding the witness.  I can hear you loud and

19   clear.  Would it be possible to move the Owl closer to

20   him, maybe?

21               MS. DARWIT:  Yeah.  Oh, okay.  So the

22   video feed that they hear on the WebEx is coming through

23   the Owl?  Yeah, we'll go ahead and move it.  Thanks,

24   Derick.

25               THE WITNESS:  Do you want me to move this

Johnson, III, William E.                                          July 24, 2023

12

1    closer to my mouth?

2              MS. DARWIT:  That's good.

3              THE VIDEOGRAPHER:  That's different.

4              THE WITNESS:  Where it is or move it to --

5              MS. DARWIT:  It's good where it is.  That

6    audio is different from the audio that they're picking up

7    on the WebEx.

8              THE WITNESS:  I got you.  Okay.

9              THE VIDEOGRAPHER:  It's turned off.

10             MS. DARWIT:  Why don't we go off the

11   record for a moment while we figure this out.

12             MR. VOLLRATH:  I've lost the video feed,

13   by the way.

14             THE VIDEOGRAPHER:  Well, I just turned

15   everything off.  Shoot.

16             MS. DARWIT:  Yeah, just a second.

17             THE VIDEOGRAPHER:  We weren't doing

18   anything anyways.

19             THE COURT REPORTER:  So we're off the

20   record?

21             THE VIDEOGRAPHER:  Yes.

22             (Break taken 9:33 a.m. to 9:40 a.m.)

23             THE VIDEOGRAPHER:   We're now on the

24   record.  The time is 9:40 a.m.

25        Q    (BY MS. DARWIT)  Mr. Johnson, are you familiar

Johnson, III, William E.                              July 24, 2023

13

1   with an entity called Emerald International Reinsurance?

2       A      Yes, I am.

3       Q      How are you familiar with it?

4       A      I was a director of it and an officer of it.

5       Q      Emerald International Reinsurance was

6   incorporated in 2014; is that right?

7       A      Correct.

8       Q      Okay.  And if I refer to it as just as

9   "Emerald," will you understand what I'm talking about?

10      A      Yes.

11      Q      Okay.  Is Emerald still in business today?

12      A      No.

13      Q      What year did it go out of business?

14      A      2018.

15      Q      How would you describe what Emerald did?

16      A      It was a reinsurance company.

17      Q      What is a reinsurance company?

18      A      Reinsurance company is a company that reinsures

19  insurance liabilities of other insurance companies.

20      Q      Okay.  So does that mean that it's a company

21  that receives risks from other insurance companies and,

22  in exchange, it also gets paid an insurance premium?

23      A      Yes.

24      Q      Okay.  Who are Emerald's clients?

25      A      Emerald's clients were entirely captive

Johnson, III, William E.                    July 24, 2023

14

1   insurance companies.  I think they were -- I think most
2   were or all of them were clients of Celia Clark's.
3       Q    Okay.  From incorporation in 2014 through its
4   termination, Emerald was owned by a company called
5   Emerald Holdings Management LLC; is that right?
6       A    That's correct.
7                 MS. DARWIT:  I'm going to mark my first
8   document.  I'll mark this as Exhibit 179, and it is
9   Bates-stamped Johnson Emerald Production 7180.  Give me a
10  moment to display it.
11                (Exhibit 179 marked.)
12                MR. VOLLRATH:  Lauren, I'm sorry to
13  interrupt.  Do you have an objection to labeling that
14  Government's Exhibit 179?  Because we have different
15  numbers for the Government and for the Plaintiff.
16                MS. DARWIT:  Yes.  No objection to that.
17  So Government's Exhibit 179.
18                MR. VOLLRATH:  Thank you.
19                MS. DARWIT:  And it's still loading on my
20  end.
21                Okay.  I'll try to fix this delay at the
22  break.  I'm not sure why it's so slow but I'll press...
23      Q    (BY MS. DARWIT)  Okay.  Mr. Johnson, do you see
24  this document on the screen over there?
25      A    Well, I should have brought my distance

Henderson Legal Services

202-220-4158                    www.hendersonlegalservices.com

Johnson, III, William E.                          July 24, 2023

15

1  **glasses.**

2      Q    I can Zoom in for you.  Just give me one

3  second.

4              All right.  Thanks for your patience.

5              Okay.  So you are able to generally read

6  the documents on the screen right here, Mr. Johnson?

7      **A    It's a little blurry from this distance, but**

8  **I'm -- I'm familiar with it.**

9      Q    Okay.  And this is a five-page document.  I'm

10 on the fifth page right now because I only have a

11 question about this particular page.  So my question is,

12 is this, on Page 5 here, is this an accurate depiction of

13 the ownership structure of Emerald from 2014 through its

14 termination?

15     **A    It appears to be.  One of my trusts owned 30**

16 **percent.  Robin Trevors owned the 30 percent.  And James**

17 **Shepherd's four children's trusts I think owned 35**

18 **percent.  And then two of the Celia Clark's children I**

19 **think owned 2 and a half percent each.  That's from my**

20 **memory because I can't really -- I can't really read it**

21 **from here.  I can read Emerald Holdings at the bottom,**

22 **but the others are too small.**

23     Q    Okay.  Yeah.  No, and I think that's -- that's

24 all I needed, is what you said, so that's perfect.  And

25 just to confirm, and I might have missed this, but you

Johnson, III, William E.                                    July 24, 2023

16

1    were an owner of Emerald Holdings LLC through a trust

2    called John Mack Investment Trust, right?

3         **A    That's right.**

4         Q    Okay.  Did you know Robin Trevors before

5    getting involved in Emerald?

6         **A    Yes, I believe I did from Nevis.  I spent a lot**

7    **of time in Nevis, which is where he and his wife lived**

8    **most of the time.  They lived there half the year and**

9    **half the year in Miramichi, Canada.**

10        Q    And how -- what were your -- what was your

11   relationship with Robin Trevors before you got involved

12   in Emerald?

13        **A    There wasn't a relationship, just an**

14   **acquaintance.**

15        Q    An acquaintance?

16        **A    Uh-huh.**

17        Q    Okay.  And what about Clark's children, Carl

18   and Diana Gentry, what was your relationship with them

19   before getting involved in Emerald?

20        **A    Who?**

21        Q    Carl and Diana Gentry, what was your --

22        **A    I never met them.**

23        Q    You've never met them?

24        **A    Hunh-uh.**

25        Q    Okay.  Did you meet them after you became an

Henderson Legal Services

Johnson, III, William E.                                    July 24, 2023

17

1    owner of Emerald?

2        A    I don't recall that I ever did.

3        Q    Okay.  Did you know Jim Shepherd before getting

4    involved in Emerald?

5        A    I've known him for years.

6        Q    What was your relationship with him before you

7    got involved in Emerald?

8        A    I was his lawyer.

9        Q    Okay.  Approximately when did you meet him?

10       A    1980 maybe.

11       Q    Okay.

12       A    A long time ago.

13       Q    Did the ownership structure change at all

14   between 2014 and 2016?

15       A    I don't recall that it did.

16       Q    Okay.  So from -- from the time that Emerald

17   was formed in 2014 through at least the end of 2016, you

18   indirectly owned 30 percent of Emerald; is that right?

19       A    Yes.

20       Q    Okay.  And in addition to being an owner, you

21   were also the secretary and co-treasurer of Emerald; is

22   that right?

23       A    Yes.

24       Q    Were you the secretary and co-treasurer from

25   2014 through at least 2016?

Johnson, III, William E.                              July 24, 2023

18

1       A     I think until it was dissolved.

2       Q     Okay.  And Mr. Shepherd was the other

3   co-treasurer --

4       A     Yes.

5       Q     -- during that same time period; is that right?

6       A     Yes.

7       Q     And Robin Trevors was the president during that

8   same time period?

9       A     As I recall, yes.

10      Q     You were -- you mentioned, I think, that you

11  were also a director of Emerald from 2014 through at

12  least 2016, right?

13      A     Uh-huh.

14      Q     Okay.  Who were the other directors?

15      A     The other directors were, at different times,

16  Robin Trevors, and then we were required to have a

17  resident director in Alabama.  The first one was Curti

18  Johnson, who was a lawyer and was a general counsel for a

19  banking holding company.  And his bank had a provision

20  that they didn't want any of their officers serving on

21  any of their boards, so he had to resign.

22            And then his law partner, Skip McCoy,

23  became our resident director.  And after that Tom Egan

24  became our resident director.  Alabama wants to have

25  somebody that they can serve and have jurisdiction over.

Johnson, III, William E.                                    July 24, 2023

19

1     Q    Okay.  Do you recall approximately when Tom
2   Egan became a director?
3     A    I think 2016 or '17.
4     Q    Okay.  What is your relationship to Thomas
5   Egan?
6     A    He is the child of my mother-in-law's older
7   sister.
8     Q    Okay.  Okay.  And why was he chosen as a
9   director?
10     A    Because he lived in Alabama.
11     Q    Any other reason?
12     A    Nope.  He was a competent businessman.
13     Q    And Mr. Egan, he also agreed to serve as
14   director of other captive insurance companies, right?
15     A    I have no idea what Mr. Egan did.  He was in
16   sales all over the country.
17     Q    Okay.
18     A    He traveled all the time.
19     Q    Did Emerald have any employees?
20     A    No.
21     Q    Did Emerald have physical office space?
22     A    No.
23     Q    What were your responsibilities as secretary,
24   treasurer and a member of the board of directors at
25   Emerald?

Johnson, III, William E.                    July 24, 2023

20

1       A      I participated in management decisions.  I paid

2   the bills from the bank accounts over which I had signing

3   power.  And I kept the minutes of the meetings that we

4   had and wrote them, of course.

5       Q      Anything else?

6       A      Well, directors usually make decisions about

7   what the company will or will not do, and that's what I

8   participated in.

9       Q      Can you give an example of a management

10  decision that you made at Emerald?

11      A      Did I do what?

12      Q      Of a management decision that you made as part

13  of a director of Emerald?

14      A      Do I remember a management decision?

15      Q      Yeah.

16      A      Not a particular management decision, no.

17      Q      Okay.  In your role were you responsible for

18  reviewing and approving the financial statements of

19  Emerald?

20      A      That wasn't my job, no.  We had auditors,

21  outside auditors, and they would go over the financial

22  statements.  And then we were also audited by the

23  Department of Insurance in the State of Alabama.

24      Q      Okay.  Were you responsible for approving the

25  financial statements before they went out to the

Johnson, III, William E.                                    July 24, 2023

21

1   regulators, though?

2        **A    No, I really wasn't responsible for approving**

3   **them.**

4            MS. DARWIT:  Okay.  I'm going to mark my

5   next document.  This is Exhibit -- Government's

6   Exhibit 180.  It's Bates-stamped Johnson Emerald

7   Production 00546.

8            (Exhibit 180 marked.)

9        Q    (BY MS. DARWIT)  Okay.  And, Mr. Johnson, do

10  you recognize this document?

11       **A    Can you blow it up?**

12       Q    Sure.  This is the first page here.

13       **A    Is that the annual statement going to the State**

14  **of Alabama?**

15       Q    So do you see where it says here "Captive

16  Financial Statement, Pure and Industrial Insured Annual

17  Report For The Period Ending December 31st, 2016"?

18       **A    Yeah.  It's dated -- that's the annual**

19  **statement we send to Alabama's Insurance Commission.**

20       Q    Got it.

21       **A    Is that what that is?**

22       Q    Well, I'm asking you if that's what this is.

23       **A    Well, since I can't read it from here.  "Annual**

24  **Report For" --**

25       Q    I can also --

Johnson, III, William E.                              July 24, 2023

22

1      A    Yeah.  I can see the fiscal year end 2015, date
2  of incorporation; date we commenced business in 2014;
3  company type, it says "Pure," so I guess that's pure
4  reinsurance.  And then we have the address, our Alabama
5  address, which was Mr. Egan's address.
6      Q    Okay.  So on this document, do you see -- I'm
7  scrolling down now.  Do you see under "Contact
8  Information," it lists you?
9      A    Mr. Trevors.
10     Q    So I'm looking at the area where it says
11 "Contact Information."  I'll try to kind of highlight it
12 here for you.
13     A    Yes.  That was my office at the time.
14     Q    Okay.  So you were listed as a contact on
15 Emerald's financial statements?
16     A    Yes but as far as Alabama was concerned, they
17 always sent everything to Mr. Egan because they wanted an
18 Alabama agent.
19     Q    Got it.  Okay.
20          And scrolling down here to the bottom of
21 this first page, is this your signature?
22     A    Yes, it is.
23     Q    Okay.  Did you have any role in determining
24 whether the insurance risks that were transferred to
25 Emerald constituted insurable risks for federal tax

Johnson, III, William E.                                    July 24, 2023

23

1   purposes?

2       **A    That was not my job.**

3       Q    Whose job was it?

4       **A    That was Celia Clark's job.**

5       Q    Did you have any role in determining whether

6   Emerald accomplished risk transfer for purposes of -- or

7   for federal tax purposes?

8       **A    Oh, you mean distribution of risk?**

9       Q    Well, that's a little bit different, so we'll

10  start with risk transfer.  Are you familiar with that

11  term generally?  It's a term of art.

12      **A    Well, transfer generally with an insurance**

13  **policy means that you are transferring a risk of loss for**

14  **a premium to an insurer.**

15      Q    And did you have any role in determining

16  whether Emerald accomplished risk transfer as that --

17      **A    No.**

18      Q    -- term is defined by you --

19      **A    No.**

20      Q    -- for federal tax purposes?

21      **A    No.  It happened before we got -- before it got**

22  **to us.**

23      Q    Okay.  And I'll just ask you, let me get out my

24  full question before you respond.  I know that you know

25  where I'm going, but just so the court reporter can get

Johnson, III, William E.                                    July 24, 2023

24

1    it all down.

2              And whose -- whose role was it to

3    determine whether Emerald accomplished risk transfer for

4    federal tax purpose?

5       A    That was Celia Clark's role.

6       Q    And did you have any role in determining

7    whether Emerald accomplished risk distribution for

8    federal tax purposes?

9       A    That was the whole purpose of Emerald.

10      Q    Okay.

11      A    So, yes, all of us were involved in that.

12      Q    And who is "all of us"?

13      A    All of the directors and officers.  You can see

14   them right there.

15      Q    Okay.  And what does the term "risk

16   distribution" mean to you?

17      A    It means that the risk associated with a single

18   insurance company is distributed among other insurance

19   companies, the more the better.  This is what reinsurance

20   is all about.  And all insurance companies do this,

21   including the big ones, you know, not just these captive

22   ones.

23              All insurance companies have to distribute

24   risk, and that was our job, to distribute risk among the

25   people -- the companies that participated in our pool

Johnson, III, William E.                                      July 24, 2023

25

1    fund.

2         Q     Okay.  Did you have any role in determining

3    whether the amount of premiums charged for the insurance

4    coverage that Emerald -- or rather that was transferred

5    to Emerald as part of the reinsurance agreements was

6    reasonable?

7         A     No, I had no part in determining how much they

8    paid.

9         Q     Whose responsibility was that?

10        A     Celia Clark's.

11        Q     Do you know what the term "bona fide insurance

12   company" means for federal tax purposes?

13        A     Bona fide?

14        Q     Yeah.

15        A     That means in good faith, right?

16        Q     Okay.

17        A     It means a real one.

18        Q     Did you have any role in determining whether

19   Emerald should be considered a bona fide insurance

20   company for federal tax purposes?

21        A     Absolutely.  I was a director.  We were

22   insured -- excuse me.  We were incorporated by the State

23   of Alabama.  We were audited and supervised by the State

24   of Alabama.  We had to comply with the Alabama laws

25   regarding an insurance company.  We were a legal

Johnson, III, William E.                                    July 24, 2023

26

1   constituted insurance company recognized by the state in

2   which we were incorporated.  And we were supervised by

3   and audited by the Alabama Department of Insurance.  That

4   sounds like a bona fide insurance company to me.

5        Q    Did anyone else have responsibility over making

6   sure that Emerald was a bona fide insurance company?

7        A    I would say all of us officers.  We did our

8   best to run it the way it was set up to be run.

9        Q    And what about Celia Clark, did she have any

10  role in ensuring that Emerald was a bona fide insurance

11  company?

12       A    She had no officership, but I would say that,

13  yes, she was very concerned that we behaved properly.

14  That's --

15       Q    Okay.

16       A    -- not steal the money.

17       Q    Okay.  So moving on to some of the other

18  officers and directors, what duties did Robin Trevors

19  have?

20       A    Robin was working with Heritor who was our

21  administrator in Nevis.  And they had an office full of

22  people.  I visited their office a number of times, and

23  sometimes they had as many as ten people working in that

24  office.  And their job was to administer the interaction

25  between Emerald as a reinsurer and the companies that had

Johnson, III, William E.                                    July 24, 2023

27

1    ceded part of their risk to us, Emerald.

2        Q    Uh-huh.

3        A    And when we received a claim against one of the

4    policies, Heritor and Robin and Mr. Curt Muhlenbruch, I

5    believe was his name and their staff, which as I say, I

6    recall up to ten people in their office, maybe more,

7    would determine first whether or not the claim being made

8    was a risk being covered by our ceded reinsurance risk.

9    That was their first decision.  They were the first line

10   of -- of reviewing claims.

11                  (Cell phone interruption.)

12                  THE WITNESS:  Excuse me.  I'm getting a

13   phone call in my ear.

14                  MS. DARWIT:  Okay.

15       A    Then they would determine -- they would

16   determine whether or not, first, the coverage was in the

17   policy.  So we had assumed part of the risk of this loss.

18   If it wasn't covered by the policy, then they couldn't

19   file a claim because it was an insured risk.

20                  The next thing that they determined was

21   whether or not it appeared to be a legitimate claim.  We

22   found out -- I found out that a lot of people try to

23   defraud insurance companies and file false claims.  So

24   that was the second thing that Heritor and

25   Mr. Muhlenbruch and Robin Trevors had to determine with

Johnson, III, William E.                              July 24, 2023

28

1    their staff.  And they had people that this is what they
2    did all the time.
3              They would then, as our first line of
4    examination of claims, either admit the claim, in which
5    case we'd pay it, or contest the claim or ask for more
6    information because we didn't have adequate information.
7    And we had cases where we asked for more information we
8    needed for a year and kept giving them extensions and, in
9    fact, never got all of the information.  So we denied
10   those claims.
11             We had other claims that were made which
12   appeared to be fraudulent, and those claims we also
13   denied.  We were sued several times by companies that we
14   felt were trying to fraudulently -- or defraud the pool
15   and all the other participants in it, and so we litigated
16   those.  Most of the time when we -- oh, and excuse me.
17             We also -- when we couldn't in good faith
18   pay or agree, we used an independent nationally known
19   insurance adjusting company in Florida they called
20   Hamlin & Burton, and so we would pay a fee to Hamlin &
21   Burton to come up with a totally independent expert's
22   analysis of all of the elements that we had -- that we
23   had to cover.
24             Number one was the loss covered by the
25   policy.  Number two had the information necessary to

Johnson, III, William E.                                    July 24, 2023

29

1    determine whether the loss, the amount and the validity

2    of the claim had been satisfied.  And number three,

3    whether or not in their opinion there was fraud involved.

4    And so most of the time, after Hamlin & Burton had given

5    us their independent review, not caring to know who wins,

6    whether it's the insurance, the CIC that's filing the

7    claim that we have assumed some of the risks for,

8    Emerald, usually they would withdraw their submission of

9    claim.

10        Q    Okay.

11        A    Because they would be given detailed reasons

12   why the claim was being denied.  However, in two or three

13   instances, we had to litigate with them.  And you know,

14   some of that litigation lasted for quite a bit and spent

15   a lot of money on our lawyers fighting it.

16        Q    Uh-huh.  Okay.  Well, that's helpful.  Thanks

17   for that background.

18             So in summary, is it fair to say that

19   Robin Trevors had a heavy hand in the claims review and

20   the approval process?

21        A    Yes.

22        Q    Okay.

23        A    They -- they were the first line of review.

24        Q    Okay.  And they, who is "they"?

25        A    All of the people at Heritor.

Johnson, III, William E.                                July 24, 2023

                                                                    30

1       Q    Heritor.  Okay.
2       A    Which I believe he owned or at least owned part
3  of.
4       Q    Did he have any other role in Emerald?
5       A    That was the biggest -- that was practically
6  the biggest role.
7       Q    Okay.  And to unpack a couple of things that
8  you mentioned, do you know which captive insurance
9  companies that participated in Emerald's pool submitted
10  fraudulent claims in your opinion?
11      A    Oh, I haven't looked at that in years.
12      Q    Okay.
13      A    I haven't looked at it in years.
14      Q    And --
15      A    And I didn't know any of the people involved.
16      Q    Okay.  Got it.
17           Mr. Shepherd, what duties did he have as
18  part of Emerald?
19      A    His primary duty was to invest and manage the
20  largest part of the funds which were deposited in
21  Fidelity.  Mr. Shepherd has a great deal of experience in
22  investing money.
23      Q    Okay.
24      A    So he managed our funds and he paid a lot of
25  bills that were approved by the board out of those funds

Johnson, III, William E.                                July 24, 2023

31

1   if I didn't pay them out of the bank accounts that we

2   had.  And all the board would have to approve them,

3   everything that we paid.  These are bills of Emerald's.

4        Q    Okay.  Did Mr. Shepherd have any other duties

5   that you can think of?

6        A    Well, participating and giving us his input.

7   We all functioned as a board, whether or not he was a --

8   he was the largest shareholder through his four kids'

9   trusts.  Although, he didn't I think serve as a -- an

10  official director.  Because he was the largest

11  shareholder, we invited him to all the board meetings.

12  But because he had companies that were insured, we just

13  decided to avoid a potential appearance of a conflict of

14  interest.

15            So rather than just have him recuse

16  himself, he just didn't serve in an official capacity.

17       Q    Okay.  What, if any, duties did Carl Gentry

18  have as part of Emerald?

19       A    Absolutely none.

20       Q    What about Diana Gentry?

21       A    None.  I don't think they knew anything about

22  what was going about -- going on ever.

23       Q    Okay.

24       A    And I never met them or talked to them.

25       Q    What about Thomas Egan, what duties did he

Johnson, III, William E.                          July 24, 2023

32

1   have?

2       A     Primarily to get the mail.  And when we got

3   sued or we had stuff for me, the Department of Insurance,

4   he would get it to the rest of us.  They just insisted on

5   having a director there, but his duties in reality were

6   very limited.

7       Q    What role did Curt Muhlenbruch have in the

8   operations of Emerald?

9       A     As Robin began to deteriorate mentally -- he

10  got Alzheimer's and he died, he's dead -- Muhlenbruch

11  took over more and more of the physical running of

12  Heritor simply because Robin began to lose his memory.

13  And he died -- it was a very aggressive case.  I believe

14  he died within two years of beginning that sentence.

15      Q    Okay.  So Mr. Muhlenbruch was --

16      A     He basically took over the physical day-to-day

17  duties there at Heritor that Robin had been doing.

18      Q    Okay.  So he was responsible for claims review

19  and approval?

20      A     Yeah.

21      Q    Okay.

22      A     He had been in that -- he had been working in

23  that office for a long time.

24      Q    Okay.  And did Curt Muhlenbruch have any

25  official job title with Emerald?

Johnson, III, William E.                    July 24, 2023

33

1       A     I don't believe so.

2       Q     And would he attend the annual meetings of the

3  board of directors for Emerald?

4       A     Usually.

5       Q     Usually?

6       A     Not always, but usually.

7       Q     Okay.  Okay.  And Emerald entered into a trust

8  agreement with the captive insurance companies who

9  participated in Emerald's pool, right?

10      A     Yes.

11      Q     And the trustees of that trust were Celia

12  Clark, Dennis Hayes and Jason Lawhorn, right?

13      A     Yes.  They were all I think located -- I think

14  they were all in New York.

15      Q     Okay.  And before you got involved with

16  Emerald, did you know Dennis Hayes?

17      A     Never met him before, after or during or ever.

18      Q     Okay.  Did you know him, though?

19      A     No.

20      Q     Okay.  What about Jason Lawhorn -- Lawhorn, did

21  you know him before you got involved in Emerald?

22      A     I still don't, never did.

23      Q     Okay.  Did they have any duties as trustees of

24  Emerald?

25      A     I think that the three of them had to agree and

Johnson, III, William E.                                    July 24, 2023

34

1    sign any transfers out of that big fund, you know, and

2    that was simply a check that nobody could steal anything

3    because it was a lot of money.  I think it was Morgan

4    Stanley or J.P. Morgan, I think that's where it was, as I

5    recall.

6        Q    But you didn't work with Dennis Hayes directly?

7        A    Never -- I never saw the man, never talked to

8    him on the phone.  We had nothing to do with that pool,

9    that trust fund.

10       Q    Okay.  What was the purpose of the -- of the

11   trust fund?

12       A    To hold the money of all of the participants in

13   the pool until it was time to return whatever was left

14   after paying what had to be paid.  It was just a holding

15   vehicle.

16       Q    Okay.

17       A    But there was so much money in it, we didn't

18   want anybody to steal any of it.

19       Q    Right.

20            So is it fair to say that the trustee's

21   role was to basically hold on to and pay funds out of the

22   trust account to cover any losses that were incurred by

23   the pool?

24       A    Yes.  I'm not sure exactly how they were

25   handling that.  I mean, we did not participate in that --

Johnson, III, William E.                                    July 24, 2023

35

1    the management of the trust --

2        Q    Got it.

3        A    -- at all.  Celia did, but you know, she was

4    one of the three trustees.

5        Q    Right.  Okay.

6              MS. DARWIT:  Okay.  I'm going to mark my

7    next document.  This will be Government's Exhibit 181.

8    It's Bates-stamped Johnson Emerald Production 05102.

9              (Exhibit 181 marked.)

10       Q    (BY MS. DARWIT)  Okay.  And this is a six-page

11   document.  I'm going to scroll down to the bottom of it.

12   We'll go from the bottom to the top.

13             Okay.  So starting here at the bottom of

14   the fourth page --

15       A    Would you blow it up so I can read it?

16       Q    Yes, sir.  One second.  Is that better?  Are

17   you able to read that?

18       A    No.

19       Q    Okay.  Let me try...

20       A    Now I can read it.

21       Q    Okay.  All right.  So starting here, bottom of

22   Page 4, this is an email from Curtis Muhlenbruch to you

23   with copy to Celia Clark, Jim Shepherd, Robin Trevors, in

24   December of 2017 --

25       A    Yes.

Johnson, III, William E.                                    July 24, 2023

36

1       Q       -- right?

2       A       Uh-huh.

3       Q       Okay.  And in this email, the subject -- well,

4   the subject here says "Significant Changes Draft," right?

5       A       Yeah.  And -- oh, yeah, I think that's

6   something we had to send to the Alabama Insurance

7   Commission every year.

8       Q       Got it.  Okay.  And in this email,

9   Mr. Muhlenbruch is asking -- is letting you know that

10  Robin has asked you to read the attached and review it;

11  is that right?

12      A       Yes.  And at this point, as I say, Curt was

13  handling a lot of this stuff for Robin --

14      Q       Okay.

15      A       -- who was beginning to have issues.

16      Q       Okay.  And I'm going to scroll up now to the

17  previous page.  Thanks for bearing with me here.  I'll

18  try to fix this delay at the break.

19              Okay.  So here now we're in the middle of

20  Page 3.  This is a response to Mr. Muhlenbruch's email by

21  Celia Clark December of 2017, right?

22      A       Yeah, I can read it.

23      Q       Okay.  And she states here in this email that,

24  "Dennis says all allegations relating to investment

25  advice have been cleared or settled," right?

Johnson, III, William E.                                July 24, 2023

37

```
 1                    Do you see that?
 2        A    Yeah.  What's your question?
 3        Q    Oh, I was just asking, do you see where it says
 4   that, "Dennis says all allegations relating to investment
 5   advice have been cleared or settled"?
 6        A    Yeah.
 7        Q    Okay.  And the Dennis that's being referenced
 8   here, it's your understanding that that refers to Dennis
 9   Hayes?
10        A    Yeah, one of the three trustees of that fund.
11        Q    Okay.  And I'll scroll up.
12             Okay.  This is now a response to
13   Ms. Clark's email by Robin Trevors, December of 2017,
14   right?
15        A    Yeah.
16        Q    And in this email, Mr. Trevors writes here that
17   Mr. Hayes lost arbitration and had to make certain
18   payments as a result.
19             Do you see that?
20        A    Uh-huh.
21        Q    Is that a yes?
22        A    Yes, I can see it.
23        Q    Okay.
24        A    Sorry.
25        Q    Okay.  And then if we scroll up further...
```

Johnson, III, William E.                                    July 24, 2023

38

1              Okay.  This is now, bottom of Page 2 here,

2    this is Ms. Clark's response, same thing, December of

3    2017, right?

4        **A    Yeah.**

5        Q    Okay.  And she asks if you are willing to pay

6    $10,000 in commissions.

7              Do you see that?

8        **A    Uh-huh.**

9        Q    Okay.  All right.

10       **A    That was their annual trustee fee.**

11       Q    Got it.

12             And then I'm going to go up to the first

13   page here.

14             Okay.  So finally this is an email that

15   you sent to the group December of 2017, right?

16       **A    Uh-huh.**

17       Q    Is that a yes?

18       **A    Yes --**

19       Q    Okay.

20       **A    -- December 27th --**

21       Q    Okay.

22       **A    -- I mean, 2017.**

23       Q    Okay.  And in this email -- and I'll zoom out

24   just a bit so we can see the entirety of it.

25             Okay.  So you state in this email that you

Johnson, III, William E.                                    July 24, 2023

39

1   think that the group should accept Dennis Hayes'

2   resignation, right?

3        A    Yes.  I didn't think that we could afford to

4   have somebody with any kind of public bad publicity, and

5   since I think he had had a lot of financial difficulties,

6   it was just best to pay him for the year and accept his

7   resignation and get him out of there.

8        Q    Okay.

9        A    It was the easiest way out.

10       Q    Okay.  And the bad publicity that you're

11  referring to, is that the complaints that were submitted

12  against Mr. Hayes with FINRA alleging that he engaged in,

13  like, misconduct related to his --

14       A    Yeah.  And --

15       Q    -- investment advisory role?

16       A    -- I know nothing it.  You know, it's all

17  thirdhand.  You know, I have no firsthand knowledge of

18  what his problems were --

19       Q    Okay.

20       A    -- other than basically what you see there.

21       Q    Okay.

22       A    But if he's got a lot of bad publicity, we

23  don't need somebody as a trustee on a big trust like

24  that, even though it took all three of their signatures

25  to move any money.

Johnson, III, William E.                                    July 24, 2023

40

1     Q     Uh-huh.

2     **A     So anyway, we just said, get him out of there,**

3     **accept his resignation and pay him his fee for the year.**

4     Q     Okay.  And again, that was related to

5     complaints that were filed against him with the Financial

6     Industry Regulatory Authority?

7     **A     I don't know.  I know nothing about it**

8     **directly.  It would be pure hearsay.**

9              MR. VOLLRATH:  I'm going to object to form

10    on that question.

11    Q     (BY MS. DARWIT)  And in this email, you state

12    here in the last three lines, you see where you ask,

13    "Celia, do you have a suggestion for a replacement third

14    trustee"?

15    **A     Uh-huh.**

16    Q     And then you ask her whether Edgar would be

17    appropriate.

18              Do you see that?

19    **A     Yeah.**

20    Q     Okay.  And Edgar, is that referring to

21    Ms. Clark's husband, Edgar Gentry?

22    **A     Yes.**

23    Q     Okay.  Who ultimately replaced Dennis Hayes?

24    **A     I don't think anybody.  I don't recall.  We**

25    **ended up shutting the thing down in '18.**

Johnson, III, William E.                                    July 24, 2023

41

1      Q    Okay.  Okay.  So switching topics a little bit,
2  when did you first meet Celia Clark?
3      A    I went to a seminar in Florida as the guest of
4  a financial planning firm and a CPA firm in Dallas.  They
5  wanted me to come learn about captive insurance companies
6  because I didn't know anything about them.  And that
7  would have been about two years before, maybe it was
8  about 2012 or so.  And that's how I met her.  I went to
9  Florida and heard a seminar that she spoke at.
10     Q    Did the two of you meet at that seminar?
11     A    That was the first time we'd met, yes.  I went
12  up and introduced myself to her.
13     Q    Okay.
14     A    I'm not an insurance lawyer, so it was all
15  brand-new to me.
16     Q    Uh-huh.  And have you -- have you met with
17  Ms. Clark -- well, you have.  About how many times have
18  you met with Ms. Clark in person?
19     A    Fifteen or 20 --
20     Q    Okay.
21     A    -- over the years, usually at her office in
22  New York, or at the -- usually at her office in New York.
23     Q    Okay.  And when you first met Ms. Clark, did
24  you have an understanding of the type of work that she
25  did?

Johnson, III, William E.                                    July 24, 2023

42

```
 1        A    I learned about it at the -- at the seminar.

 2        Q    And what type of work did you learn that she

 3   does?

 4        A    She's an insurance lawyer.  I think she was

 5   even the chairman of the insurance section of the

 6   New York Bar.

 7        Q    And what kind of work did she do?

 8        A    Well, I guess anything to do with insurance law

 9   in New York.

10        Q    Okay.  Well, you mentioned that the seminar had

11   to do with captive insurance; is that right?

12        A    Yeah, it did.  That was -- that was the subject

13   of the seminar.

14        Q    Okay.  Had you heard of captive insurance

15   before you went to the seminar?

16        A    No.

17        Q    And what's your understanding of what captive

18   insurance is?

19        A    Captive insurance is where a company with a

20   great deal of risk elects to set up its own related

21   insurance company in the hopes of doing primarily two

22   things:  covering risks which are not necessarily easily

23   covered in the commercial insurance world, or being able

24   to reduce the total cost of the insurance to the company.

25             And they were primarily used by hospital
```

Johnson, III, William E.                                    July 24, 2023

43

1    holding companies.  And I read a number of the cases

2    about them, you know, when I first started studying about

3    captive insurance companies.  And then I read the

4    legislation passed by Congress allowing smaller companies

5    to have -- smaller to medium companies to have private

6    captive insurance companies as well.

7              And during the period when we were with

8    Emerald, Congress actually increased the amount of -- I

9    think it was premium that captive insurance companies

10   could receive under that particular legislation.

11             It's been a long time since I've looked at

12   these, you know.

13       Q    Okay.  Yeah.  Okay.  Fair enough.

14             Okay.  So at some point, you and Clark

15   decided to work together on Emerald, right?

16       A    Yes.

17       Q    Okay.

18             MS. DARWIT:  Okay.  I'm going to mark my

19   next document.  It's Bates-stamped CLARKSDFL 1277250.

20             (Exhibit 182 marked.)

21       Q    (BY MS. DARWIT)  And while that loads, one

22   thing you mentioned when you were just talking was that

23   one of the reasons why someone might form a captive is to

24   save on insurance costs, right?

25       A    Yes, right.  In other words, instead of paying

Johnson, III, William E.                                    July 24, 2023

                                                                    44

1    all of the premiums to a third party, where all of the

2    premium would be lost and gone forever, if they had had

3    an interest in or owned a captive insurance company, then

4    to the extent that they didn't have to pay out all of the

5    claims, all of the money that they bid in premiums for

6    claims, then they would have a substantial --

7    substantially improved financial situation.

8              You can think yourself about all the

9    insurance premiums you've paid over your life, how much

10   of that has been paid out in claims?  None.

11   Q    And you -- you were -- you worked with -- some

12   of your clients were captive insurance companies that

13   participated in Emerald's pool, right?

14   A    Yes, some of my clients were.

15   Q    Were any -- did any of your clients ultimately

16   save on their insurance costs by purchasing captive

17   insurance?

18   A    Yes.  Some of them had some losses, but to the

19   extent that they didn't pay out all of the premiums, then

20   they had a gain.  And that was the whole purpose, is

21   to -- you know, when you have a commercial insurance

22   policy, your -- your cost and loss is whatever you pay in

23   premiums.  And you may go for years without a loss.

24   Q    Uh-huh.

25   A    But if you own the policy -- if you own the

Johnson, III, William E.                                    July 24, 2023

45

1    insurance company and it has less losses than your

2    premiums, then in your group of companies, you are

3    obviously going to save money to the extent that all of

4    your premiums did not have to go to pay claims.

5        Q    Okay.  And which of your clients saved on their

6    insurance costs once they started paying for captive

7    insurance?

8        A    Several of them did.  And unfortunately, after

9    we shut this thing down, I had a couple of clients that

10   really had horrible losses.  I was sick that we

11   couldn't -- didn't have any more captive insurance.  I

12   mean, you know, total wipeout.

13            One of my clients that had had a captive

14   insurance company, their factories were destroyed in the

15   big hurricane in Puerto Rico, and the parts for their

16   assembly plant were stuck in -- offshore in the

17   freighters and they couldn't get them unloaded because

18   the San Juan Harbor was all destroyed.

19       Q    Uh-huh.

20       A    And then another client nearly avoided a

21   catastrophic loss and I was there when we -- when we

22   avoided it, and these are people that actually had, you

23   know, captives.

24       Q    Uh-huh.  And can you can you think of a

25   specific client?

Johnson, III, William E.                                    July 24, 2023

46

```
 1        A    Oh, yeah.

 2        Q    Can you name them?

 3        A    I'm not sure I should.

 4        Q    Okay.

 5        A    I mean, you know, I'm -- we may have -- I may

 6   have -- they're not a party to this thing.  And I'm not

 7   sure that I don't have attorney-client privilege with

 8   them.

 9        Q    Well, I mean, let me back up a little bit.

10        A    But yes, I can think of two in particular.

11        Q    Okay.  So -- so my question I think was a

12   little bit different to begin with.  My question was

13   whether the insurance -- the amount of insurance premiums

14   that your clients paid for insurance overall actually

15   went down once they formed a captive and started paying

16   captive insurance.  Can you think of any clients who had

17   that situation?

18        A    I don't know because I don't know what they

19   were paying before.

20        Q    Okay.  Got it.

21        A    I know that to the extent when you pay premiums

22   to a commercial insurance company, 100 percent of the

23   premiums are a loss.

24        Q    Uh-huh.

25        A    Okay.  If you own the insurance company, and
```

Johnson, III, William E.                                    July 24, 2023

47

1    there are fewer claims than what the premiums are, then

2    the difference remains in your companies, your group of

3    companies.

4         Q    Got it.

5         A    Do you see what I mean?

6         Q    Okay.  So now I'm going to go back to this

7    document here, and this one I will mark -- I don't think

8    I've marked it yet.  It's going to be Exhibit 182, and

9    again, it's Bates-stamped CLARKSDFL 1277250.

10             So starting here at the bottom -- or

11   rather, the end of the pages, this is an email from Diana

12   Chen to you with Clark copied in March of 2014, right?

13        A    You can just blow it up a little more?

14        Q    Sure.  Are you able to see that now?

15        A    It's still very hard for me to read.

16             That's better.

17        Q    Okay.  So this is an email from Diana Chen to

18   you with Clark copied in March of 2014, right?

19        A    Okay.  All right.

20        Q    Is that right?

21        A    Yes, I can see it now.

22        Q    Okay.  And Diana Chen, she worked with

23   Ms. Clark's law firm, right?

24        A    At that time, yes.

25        Q    Okay.  And she says in this email, "Bill, I'm

Johnson, III, William E.                                    July 24, 2023

48

1    sending you a list of the main expected income and

2    expenses for an insurance company that would be part of a

3    risk distribution pool structure."

4              Do you see that?

5         A    Yes.

6         Q    And she notes that it would be -- let me scroll

7    over -- that it would be an Alabama insurance company,

8    right?

9         A    Yes, uh-huh.

10        Q    Okay.  Okay.  And then under "Income," she

11   states, "6,000 fee per participant."

12             Do you see that?

13        A    Yes.

14        Q    And she states 3,000 to captive and 3,000 to

15   Clark & Gentry, right?

16        A    Yes.

17        Q    Okay.  She also states the number of

18   participants 100 to 120.

19             Do you see that?

20        A    Uh-huh.

21        Q    Okay.  And just below "Income," she lays outs

22   some expenses that would be incurred by this Alabama

23   captive insurance company, right?

24        A    Yes.

25        Q    Okay.  I'm going to scroll up to the next

Johnson, III, William E.                                    July 24, 2023

49

1    email.

2              Okay.  And here we have an email -- okay.

3    So this is an email that you sent to Ms. Clark in March

4    of 2014, right?

5         A    Yeah.  I'm having a hard time reading it again.

6         Q    All right.  Is that a little better?

7         A    Not much.

8         Q    Okay.  How about that?

9         A    Now -- now it's getting to where I think I can

10   read it okay.

11        Q    All right.  So this is an email that you sent

12   to Ms. Clark, March of 2014, right?

13        A    Uh-huh.

14        Q    Okay.  And you let her know that this looks

15   very interesting.

16              Do you see that?

17        A    Yeah.

18        Q    Okay.  And you also note in that first line

19   that you're not an insurance expert, "but you certainly

20   are."

21              Do you see that?

22        A    Yes.

23        Q    Okay.  And then you state here that "I would

24   depend on you to provide or procure the management."

25              Do you see that?

Johnson, III, William E.                         July 24, 2023

50

1      A    What was the last part?  I would be an investor
2  in -- what was the last thing?
3      Q    Oh, just that -- and this is kind of cut off
4  here but...
5      A    "So long as you can advise us on the" --
6      Q    Let me -- I have to zoom out a little bit
7  because I can't see the whole thing.
8      A    Yeah.  Basically I'm saying we would be
9  dependent upon you to guide us.
10     Q    All right.  So you state here -- I'm on this
11 sentence here.  You say, "I would have to depend on you
12 to provide or procure the management."
13          Do you see that?
14     A    Yes.
15     Q    Okay.  And then you are confirming -- in the
16 next sentence, you say, "I believe you said my part of
17 the capital would be $75,000," right?
18     A    Yeah, uh-huh.  I was afraid I might lose it,
19 and I did turn out losing every dime of it.
20     Q    Okay.  And then starting here where I've kind
21 of signaled, you state, "So long as you can advise us on
22 the proper management of the risk pool, I believe I would
23 be interested in participating," right?
24     A    Uh-huh.
25     Q    Okay.  And then here you -- you ask her what

Johnson, III, William E.                                    July 24, 2023

51

1      amount she suggests that you invest in Emerald, right?

2          A      Yeah.

3          Q      Okay.  And this is a response email from Clark,

4      March of 2014 -- sorry.  And this email here is

5      Ms. Clark's response to your email, March of 2014, right?

6          A      Yes.

7          Q      Okay.  And she explains that -- she explains

8      what her thinking is as far as the amount of capital

9      contribution --

10         A      Uh-huh.

11         Q      -- each of the owners should make; is that

12     fair?

13         A      Yeah.

14         Q      Okay.  And she also tells you that this is

15     going to be an Alabama captive insurance company?

16         A      Yes.

17         Q      Do you see that?

18         A      Yes.

19         Q      Okay.  And she also says that it's going to

20     have to have an independent captive manager in Alabama,

21     right?

22         A      An independent what?

23         Q      Captive manager.

24         A      Oh, yeah, that we had to have one Alabama

25     director.

Johnson, III, William E.                                July 24, 2023

52

1        Q    Okay.  And as far as the captive manager, they
2    also had to be licensed in Alabama?
3        **A    Yeah.  I -- I don't remember all -- I don't**
4    **remember that.  It's been too long ago.  What it nine**
5    **years ago?**
6                    MS. DARWIT:  Sorry.  We lost that last
7    question, Lauren.  The video went out.
8                    MS. DARWIT:  Oh, no problem.  Can you hear
9    me now?
10                    MR. VOLLRATH:  Yeah.  The last I heard was
11    Mr. Johnson -- was Mr. Johnson stating we had to have one
12    Alabama director.
13                    MS. DARWIT:  Okay.  Got it.
14        Q    (BY MS. DARWIT)  We had to have an Alabama
15    director.
16                    So then my question was whether Emerald
17    also had to have a captive manager that's licensed in
18    Alabama.
19        **A    I said I don't remember.**
20        Q    And just make sure -- I know it's how we
21    conversate, but make sure I finish my question before you
22    respond.
23                    Okay.  Do you have any idea why
24    Ms. Clark's children were selected as owners of Emerald?
25        **A    Yeah.  I think we wanted them to have some skin**

Johnson, III, William E.                                    July 24, 2023

53

1    in the game.

2         Q    What does that mean?

3         A    That means that if I'm going put $75,000 in

4    this dadgum thing and I'm depending upon her, I want to

5    make sure if I lose my money, they lose theirs too, which

6    I'm sure they did because I lost all of mine.

7         Q    Okay.  So is it fair to say that Clark came up

8    with the idea of creating Emerald and then she approached

9    you about it to see if you were interested?

10        A    Unquestionably.  She -- they needed to set up

11   an insurance company, and I was one of the only people

12   they thought that knew anything at all about what was

13   going on because at least I am a tax attorney.

14        Q    I think I missed the first part of your answer.

15        A    Pardon me?

16        Q    What was of the first part of your answer?

17        A    Oh, yes, I believe that they -- you know, she

18   picked me because I had some clients that had become

19   clients of hers, and they were trying to do the best job

20   that they could for risk distribution and thought that I

21   would be someone who could function as a director and

22   know something about income tax law, which I certainly

23   do.

24        Q    Got it.  Well, so my question, I think, was a

25   little bit different.  It was whether Clark came up with

Johnson, III, William E.                                    July 24, 2023

54

1   the idea of creating Emerald and then approached you

2   about it to see if you were interested.

3                   Is that how it worked?

4        A    Yes.

5        Q    Okay.

6        A    Yes.

7                   MR. VOLLRATH:  Object to form.

8        A    I didn't dream it up.

9        Q    (BY MS. DARWIT)  And -- and so that's --

10   because -- explain to me a little bit why you wanted

11   Clark's children involved.  I know you mentioned you

12   wanted them to have skin in the game.

13       A    Yeah.

14       Q    But what does that -- what does that mean?

15       A    Well, that means anytime I'm investing a whole

16   bunch of money with somebody else that I'm depending on

17   to run the company, I want them to have some money in

18   there next to mine.

19       Q    Okay.

20       A    And that is a general rule that I follow in

21   anything I invest.

22       Q    So you depended on Ms. Clark to run Emerald?

23       A    Well, I'm not sure whether the word "run"

24   Emerald is correct because we ran Emerald, but she guided

25   us in the setting up and integral parts of what Emerald

Johnson, III, William E.                                    July 24, 2023

55

1   was doing.  We couldn't have done it without her.

2        Q    Okay.  Did your discussions with Ms. Clark

3   about forming Emerald begin sometime around March of

4   2014?

5        A    Yes.

6        Q    Okay.  Before getting involved in Emerald, did

7   you have any experience with reinsurance?

8        A    None.

9        Q    Captive insurance?

10       A    None.

11       Q    And why do you think that she approached you

12   about being an owner of Emerald?

13       A    Because I had clients that had become clients

14   of hers and I understood the law.  You know, I did read

15   all of the legislation and the cases.  Everything that

16   had happened up to that period of time.

17       Q    Okay.

18       A    So I wasn't a complete -- a complete neophyte.

19   I was pretty much a neophyte, but not completely.

20       Q    And based on this email chain here, it looks

21   like Ms. Clark chose where Emerald would be incorporated;

22   is that fair?

23       A    She did what?

24       Q    She chose where Emerald would be incorporated?

25       A    Oh, yes, Alabama.

Johnson, III, William E.                              July 24, 2023

56

1        Q    And she made that decision?

2        A    She done some research about which states had

3    the best captive insurance legislation in place, and

4    Alabama was and still is, to my knowledge, one of the

5    best states.  And I -- I thought that they -- my dealings

6    with the Department of Insurance, you know, in Alabama

7    were very favorable.  I talked to the -- I think his name

8    was Mr. Duke, you know, the commissioner of insurance in

9    Alabama.  The people I dealt with in there, the insurance

10   department, were very competent people.

11       Q    Uh-huh.  And did Ms. Clark also choose the

12   ownership breakdown for Emerald's owners?

13       A    The what?

14       Q    Like the percentage ownership that each owner

15   would have, did Ms. Clark make that decision?

16       A    She didn't make the decision.  She suggested

17   that that be the amount that I took.

18       Q    And that's the -- did you accept her

19   suggestion?

20       A    I did.

21       Q    Okay.  Why?

22       A    Why?  I thought that by being able to

23   participate and seeing that my clients as well as all

24   these other people had a genuine distribution of risk,

25   which was the whole purpose of Emerald, that that would

Johnson, III, William E.                                    July 24, 2023

57

1   be good for my clients, and I might make a reasonable

2   return on my $75,000 investment.

3       Q     And so you ultimately invested the $75,000 in

4   Emerald, right?

5       A     I did.

6       Q     Okay.

7       A     Through my -- one of my trusts.

8       Q     How were the three trustees of Emerald

9   selected?

10      A     How were?

11      Q     The three trustees --

12            MR. VOLLRATH:   Object to form.

13      Q     (BY MS. DARWIT)   The three trustees of the

14  Emerald trust, how were they selected?

15      A     Oh, you mean the -- the one in New York,

16  that -- the trustees that --

17      Q     Yes.

18      A     -- or the money at the JPMorgan Chase or Morgan

19  Stanley?  Celia selected them.

20      Q     Okay.

21      A     I didn't know any of them.

22      Q     Okay.  Who decided on the amount of

23  compensation for the trustees?

24      A     It wasn't us.  It was Celia that determined

25  that.

Johnson, III, William E.                                    July 24, 2023

58

1       Q     Okay.  And I'll finish out this document here.

2             This here is an email that you sent to

3   Ms. Clark, again in March of 2014, right?

4       A     Yeah.

5       Q     Okay.  And you asked Ms. Clark if she's

6   prohibited from ownership directly, right?

7       A     Is that what I said?

8       Q     You want me to zoom in a little?

9       A     Oh, there, I can see is it, yes.

10      Q     Okay.  Good.

11      A     "Are you prohibited from ownership directly?"

12      Q     Okay.  And then scrolling all the way up to the

13  top, this is Ms. Clark's response?

14      A     "No, not in a strict sense."

15      Q     Hang on just a second.  So this is an email

16  that Ms. Clark sent you March of 2014, right?

17      A     Yes.

18      Q     Okay.  And she responds saying, "No, not in a

19  strict sense," right?

20      A     Yes.

21      Q     Okay.  And she states, "I remembered that both

22  Pan-Am -- Pan-American and Jade had a 5 percent interest

23  for my kids, and I decided it would raise the fewest

24  questions if I left it that way," right?

25      A     I didn't understand your question.

Johnson, III, William E.                                    July 24, 2023

59

1     Q    I was just asking if I read that correctly, if

2   that's what this says.

3     A    Yeah.  Uh-huh, yes.

4              MS. DARWIT:  Okay.  Why don't we go off

5   the record.

6              MS. DARWIT:  No objection.

7              THE VIDEOGRAPHER:  We are now off record

8   at 10:55 a.m.

9              (Break taken.)

10              THE VIDEOGRAPHER:  We are now on the

11   record.  The time is 11:18 a.m.

12     Q    (BY MS. DARWIT)  Okay.  Mr. Johnson, I'm going

13   to mark my next exhibit.  It will be Government's

14   Exhibit 183.

15              (Exhibit 183 marked.)

16     Q    (BY MS. DARWIT)  And it's Bates-stamped

17   CLARKSDFL 1228885.  And let me get the screen share up

18   and running again.  Okay.

19              Have you seen -- it seems to be working a

20   little bit faster.  So this is a three-page document.

21   I'll start with Page 2 here.  And this is an email from

22   someone named Christine Edwards, December -- in December

23   of 2014; is that right?

24     A    Yes.

25     Q    Okay.  And Ms. Edwards is somebody who worked

Johnson, III, William E.                                July 24, 2023

                                                                    60

1   at Ms. Clark's law firm, right?

2        A    Appears to be.

3        Q    And she states in this email, the second

4   sentence, that you should -- or rather she -- she says,

5   "Be advised, we will offset the 12,500 Emerald owes" --

6   "owes us for risk pool legal services from April through

7   December 2014," right?

8        A    Yeah.

9        Q    Okay.  And then I will scroll up here, middle

10  of Page 2 is an email from Mr. Shepherd to Ms. Edwards

11  with copy to you, Robin Trevors, and Celia Clark; is that

12  right?

13       A    Yeah, this --

14       Q    Okay.

15       A    -- came from Shepherd to Christine Edwards.

16       Q    Yeah.  And in this email, Mr. Shepherd says

17  that the -- that he spoke with Celia and her 12,500

18  participation funding was deducted from her legal fees.

19  Do you see that?

20       A    Yes.

21       Q    Okay.  And then I'm going to scroll back to the

22  top here.  The bottom of Page 1 is an email from

23  Ms. Clark in January of 2015, right?

24       A    Yes.

25       Q    Okay.  And in this email, Ms. Clark, toward the

Johnson, III, William E.                              July 24, 2023

1    bottom here mentions "If you want us to handle

2    everything, other than tax returns, we would put you on a

3    quarterly retainer.  Just let us know what you want us to

4    handle and we'll give you a quote for the work."

5              Do you see that?

6        **A    Yes.**

7        Q    Okay.  And she also says that she's leaving it

8    up to Emerald, how much Emerald wants Clark and Gentry

9    involved for -- with compliance work, right?

10       **A    Okay.**

11       Q    Do you see that?

12       **A    Yes.**

13       Q    Okay.  Okay.  So now that I've teed all that

14   up, there was a discussion at the beginning of this email

15   chain about risk pool legal services.  And I'm wondering

16   what risk pool legal services Ms. Clark provided to

17   Emerald?

18       **A    I don't remember at this point.**

19       Q    Okay.  And this email here where Ms. Clark

20   offers to handle everything other than tax returns, is

21   that -- is that a service that Emerald ultimately hired

22   Ms. Clark for?

23       **A    I don't remember that.  You know, we talked all**

24   **the time, and they -- they did the most of the insurance**

25   **parts because I'm not an insurance lawyer, and I had no**

Johnson, III, William E.                                    July 24, 2023

62

1   experience before then or after in the insurance law.  So

2   if it involved insurance, I'm sure that she did most of

3   it for us.

4        Q    Okay.  And just at a higher level, Ms. Clark

5   provided legal services to Emerald; is that fair?

6        A    Yeah, I think so.

7        Q    Okay.  And then this email at the top here is

8   an email from Robin Trevors to Ms. Clark with copy to

9   Mr. Shepherd, Ms. Edward, and you, right?

10       A    Uh-huh.

11       Q    Okay.  Is that a yes?

12       A    Shepherd, Christine Edwards, me, yes, from

13  Robin, and it was to Celia with copies to the rest of us.

14       Q    Okay.  Okay.  So do you recall what sort of

15  compliance work that's referenced in this email from

16  Ms. Clark was provided to Emerald?

17       A    I don't remember the specifics.

18       Q    Okay.  And did Emerald rely on Ms. Clark and

19  her law firm for legal counsel and advice related to tax

20  and insurance?

21       A    On the insurance, certainly.

22       Q    What about tax?

23       A    Well, I don't recall that we asked her many

24  questions about tax.  I mean, I'm -- I think I'm

25  competent to answer those questions myself.

Henderson Legal Services

202-220-4158                        www.hendersonlegalservices.com

Johnson, III, William E.                                    July 24, 2023

                                                                    63

1        Q      Okay.

2        **A      That -- that, I do know a great deal about.**

3        Q      Okay.  I am going to mark my next document.

4   This will be Exhibit 184.

5                    (Exhibit 184 marked.)

6        Q      (BY MS. DARWIT)   And it's Bates-stamped Johnson

7   Emerald Production 03466.  Okay.  And I'll scroll down to

8   the bottom here.  This is the last page, Page 3, and then

9   going up to Page 2 here, this here is an email that

10  Ms. Clark wrote in January of 2016; is that right?

11       **A      Yes, January 4th, 2016.**

12       Q      Okay.  And that's actually not the one that I

13  had a question about.  We'll start with this one here.

14  Here, again, we're on Page 2 which is Bates-stamped

15  Johnson Emerald Production 3467.

16                    This is an email that you wrote in

17  response to Ms. Clark, January of 2016; is that right?

18       **A      Yes, January 2016.**

19       Q      Okay.  And in this email, you ask Ms. Clark

20  whether Emerald can accept 80 percent of each client's

21  premium and then reinsure that 80 percent in the pool

22  instead of 30 percent.  Do you see that?

23       **A      Yes.**

24       Q      Okay.  And just more generally, you seem to be

25  asking her about how amendments to Section 831(b) of the

Johnson, III, William E.                          July 24, 2023

64

1   tax code impact Emerald; is that fair?

2       **A     Yes, that's an insurance question I'm asking**

3   **her.**

4       Q     So -- I'm sorry, I think I asked a little bit

5   different of a question.  You -- you were asking

6   Ms. Clark about how Section -- the amendments to

7   Section 831(b) --

8       **A     Yeah.**

9       Q     -- would impact Emerald; is that fair?

10      **A     Yes.**

11      Q     Okay.  And Section 831(b) is referring to

12  Section 831(b) of the Internal Revenue Code?

13      **A     Yes.**

14      Q     Is that your understanding?

15      **A     Yes, it is.**

16      Q     Okay.  Okay.  And then scrolling up here to the

17  top of the first page, which is Bates-stamped Johnson

18  Emerald Production 03466, this is your email responding

19  to Ms. Clark and others with your opinion about what the

20  amendments to Section 831(b) mean, right?  And feel free

21  to take your time.

22      **A     Yeah, I haven't -- I haven't looked at that**

23  **section in, what, eight years.**

24      Q     Just let me know when you've had a chance to

25  finish reading.

Johnson, III, William E.                                    July 24, 2023

65

1       A     Yeah, I haven't thought about this in years.

2       Q     Sure.  Just let me know when you're finished

3  reading, and I'll ask you a question.

4       A     Yeah.  It looks like we were grappling with

5  some new legislation there, and I forgot how we resolved

6  that.

7       Q     Sure.  And in the last paragraph of your email,

8  you ask her in the second line here, "Are we still a

9  reinsurance company if we accept direct premiums and then

10 cede it out to the 150 other CICs."

11            Do you see that?

12      A     Yes.

13      Q     CICs, is that referring to captive insurance

14 companies?

15      A     Uh-huh.

16      Q     And make sure you provide a verbal response.

17 Is that a yes?

18      A     Yes.

19      Q     Okay.  And -- and finally, you end this

20 paragraph by asking "Is our Alabama license sufficient to

21 allow us to accomplish reinsurance in this fashion?"

22            Do you see that?

23      A     Uh-huh.

24      Q     Was that a yes?

25      A     Is our Alabama -- yeah, that's a question.

Johnson, III, William E.                                    July 24, 2023

66

1        Q    Okay.  And, again, I'll just ask that you
2    provide a verbal response rather than saying uh-huh or
3    hunh-uh.
4        **A    Yes.**
5        Q    Just for the court reporter.
6        **A    I'm sorry.  Yes.  Yes.  I'm -- I'm asking for**
7    **the benefit of her thought, and -- on whether or not the**
8    **new legislation would require us to get a new license**
9    **from Alabama, change our approach, are we still a**
10   **reinsurance company.  I don't remember how this was**
11   **resolved.  What -- what was the date of this?**
12       Q    This is right here.  Do you see the date listed
13   here, where it says --
14       **A    January of '16.**
15       Q    January of 2016.  Do you see that?
16       **A    Yeah, uh-huh.**
17       Q    Okay.  Yeah.  Okay.  So just -- just in
18   summary, is it fair to say that you asked Clark for her
19   advice on whether Emerald should restructure in any way,
20   including changing its premium structure in order to
21   comply with the amendments to 831(b)?
22       **A    Yes.**
23       Q    Okay.  And is this the type of advice that
24   Emerald would typically seek from Ms. Clark as part of
25   the legal services she provided to Emerald?

Johnson, III, William E.                                    July 24, 2023

67

1          A      Yes.

2          Q      Okay.   Okay.   So now switching gears a little

3    bit.  Did Ms. Clark also represent Emerald as legal

4    counsel in connection with settling and disputes with

5    pool participants over claims that were submitted?

6          A      No.

7          Q      Okay.

8          A      Not that I recall that she got involved in

9    that.

10         Q      Okay.

11         A      I remember that we hired outside counsel when

12   we actually got into litigation.  We tried to settle, you

13   know, most of them, and did, but in a few cases, they

14   just wouldn't agree to settling.  If we went to court, we

15   hired litigators.

16         Q      What about pre-suit settlement negotiations,

17   was she involved in that at all?

18         A      In what?

19         Q      Pre -- pre-lawsuit settlement negotiations, so

20   before Emerald was going to file suit against somebody.

21         A      Well, it was usually the other way around.

22   They were filing suit against us to try to get us to pay

23   something we refused to pay for one of the reasons that I

24   described earlier, and that is they didn't have the

25   coverage in the policy they were trying to sue under.

Johnson, III, William E.                                        July 24, 2023

68

1              I mean, you know, if they had a loss it

2     wasn't covered in the policy, it's not covered in the

3     policy.  And then the other thing was whether or not we

4     smelled a rat, and we certainly -- I remember two or

5     three of them were -- they were trying to defraud the

6     pool.

7         Q    Okay.  So who -- who would write the -- well,

8     so just to back up a little bit.

9              When settlement negotiations started for a

10    claim that was submitted that had been approved by

11    Emerald, would some sort of document go to the pool

12    participant offering an amount to settle the claim?

13        A    Well, if we accepted the claim as valid, we'd

14    pay it up to the amount, you know, for Emerald's portion.

15    They had a lot of self, you know, insurance that they had

16    to cover, too.  But the policy, if we accepted the claim

17    as being a valid claim against an insured risk, then we

18    paid our part of it.

19        Q    In full?

20        A    Up -- well, when you say in full, up to the

21    full amount that we had accepted and for our share.

22        Q    Okay.

23        A    There were limitations, you know.

24        Q    Okay.  So maybe -- maybe I need to understand

25    this at a more basic level.  In what -- did Emerald --

Johnson, III, William E.                                    July 24, 2023

69

1    did Emerald ever settle claims that were submitted to it?

2         A    Yeah.  Yes.  Sometimes we would settle because

3    it was cheaper than litigating, and -- and there was

4    some -- there was some -- it wasn't fraud.

5         Q    Uh-huh.

6         A    Or it was covered.  There may have been some

7    questions about what really happened, but let's say that

8    the loss was covered in the policy and we may have had

9    some questions.  Usually the -- the insured would provide

10   us with answers that we had.

11             There's only one case I remember where

12   they just simply would not answer our questions.

13   Therefore, finally after giving them three or four

14   extensions over a year, we just simply had to deny the

15   claim because they wouldn't provide us with the

16   information that we needed in order to resolve the

17   legitimate questions we had.

18        Q    Okay.  So in what situations would Emerald

19   offer a settlement amount on a claim that was less than

20   the full amount that had been approved for the loss?

21        A    Not many.

22        Q    Okay.

23        A    In other words, we didn't usually do that.  We

24   either -- it was either covered, in which case we paid

25   it; or it wasn't a covered risk, in which case we

Johnson, III, William E.                                    July 24, 2023

1    wouldn't and couldn't, and there wasn't really any, you

2    know, thing to argue about.  You know, the policy either

3    covered the risk or it didn't cover the risk.

4              The ones that we had problems with were

5    questions of the integrity of the loss or the claims of

6    loss and whether or not they'd set us up for a loss that

7    they really knew was going to occur for sure.

8        Q    Okay.

9        A    In other words, it wasn't that it just

10   happened, they knew it was going to happen, and we had a

11   couple of those.

12       Q    Okay.

13       A    They knew it was going to happen.  We can't

14   insure -- insure a loss that you know, even though it

15   hadn't been filed yet, it was going to be filed.  See

16   what I mean?

17       Q    So for the few situations where Emerald settled

18   a claim for less than the full amount that was approved,

19   who handled the settlement negotiations on behalf of

20   Emerald?

21       A    Generally, we would follow the recommendations

22   with Hamlin & Burton when we got that far along.  That's

23   what they were there for.  And whoever was working with

24   them, whether it be Heritor, you know, which was our

25   first screening level, or we'd gone to Hamlin & Burton

Johnson, III, William E.                                    July 24, 2023

71

1   for their analysis.  It would eventually go to the board

2   to determine what we were going to do.

3        Q    Got it.  So any settlement negotiations with

4   the pool of participants about claims were handled by

5   Hamlin & Burton?

6        A    They didn't handle that.  They analyzed it and

7   gave us a report on their analysis of whether or not it

8   was a good claim.

9        Q    Okay.

10       A    And in detail.

11       Q    And then who --

12       A    I think --

13       Q    And then what would Emerald do with that

14   information?

15       A    We would get back to the claimant and tell

16   them, well, they agree with you, and we're going to pay

17   it, or they absolutely didn't agree, and here's a copy of

18   their -- of their analysis.

19       Q    Okay.

20       A    And so --

21       Q    And who from -- who from Emerald would do that?

22       A    I think probably in -- in most -- it wasn't me

23   usually.  I think it was probably coming from Muhlenbruch

24   and Heritor, and, you know, as long as he was well, Robin

25   Trevors --

Johnson, III, William E.                                    July 24, 2023

72

```
1       Q     Okay.
2       A     -- in their office, because they were our first
3   line.  They made the initial decision of whether it was a
4   good claim or not.
5       Q     Okay.  That makes sense.
6              And did Celia Clark prepare Emerald's tax
7   returns?
8       A     Never.
9       Q     Okay.  I'm going to go ahead and mark my next
10  document as Exhibit 185.
11             (Exhibit 185 marked.)
12      Q     (BY MS. DARWIT)  And this is Bates-stamped
13  CLARK PROD 123295.
14             Okay.  Mr. Johnson, I'll start here on
15  this first page.  This is -- well, first of all, do you
16  recognize the letterhead here?
17      A     Yes.
18      Q     Okay.  That's the letterhead for Ms. Clark's
19  law firm, Clark & Gentry, right?
20      A     Yeah.  And let me say that my answer to the
21  prior question had to do with federal tax returns.
22      Q     Got it.  Okay.  That helps clarify.
23      A     Yeah.  Well, I mean, you know --
24      Q     We'll walk through this --
25      A     -- she didn't --
```

Johnson, III, William E.                                    July 24, 2023

73

```
1          Q    -- just to be clear.
2          A    -- prepare our federal tax returns.
3          Q    Okay.  Okay.  And so in this -- this -- this
4     is -- this is a letter from Ms. Clark's law firm that
5     states that they're enclosing the tax return for the year
6     ending December 2015 for Emerald, right?
7          A    Uh-huh.
8          Q    Is that a yes?
9          A    Yes.
10         Q    Okay.
11         A    Sorry.
12         Q    Okay.  And then if we scroll down to the second
13    page, which is Bates-stamped CLARK PROD 0123296, this is
14    the tax return for the State of Alabama, Department of
15    Insurance --
16         A    Yes.
17         Q    Is that right?
18         A    Yes.
19         Q    Okay.  And it's for Emerald?
20         A    Oh, yes.  Uh-huh.  That's what it says at the
21    top.
22         Q    Okay.  All right.  And then the preparer that's
23    listed here is somebody named Michael Brazaitis.
24              Do you see that?
25         A    He works -- yeah, he worked in Celia's office.
```

Johnson, III, William E.                                    July 24, 2023

74

1      Q     Okay.  So Ms. Clark's law firm prepared state
2  tax returns for Emerald?
3      **A     Some -- well, the State of Alabama insurance**
4  **tax returns.**
5      Q     Okay.  Were there other state tax returns that
6  were prepared?
7      **A     I don't remember any.**
8      Q     Okay.  And going back up to the same page, you
9  signed Emerald's State of Alabama tax returns on behalf
10  of Emerald, right?
11      **A     Yes.**
12      Q     Okay.  That's your signature?
13      **A     That's my signature.**
14      Q     Okay.  All right.  Did Ms. Clark attend the
15  meetings of the board of directors of Emerald?
16      **A     I'm trying to think if she ever did.  You know,**
17  **I'm not sure that she did.  I just don't remember.**
18      Q     Okay.  I'll mark my next document.  This will
19  be Exhibit 186.
20                  (Exhibit 186 marked.)
21      **A     My minutes would indicate and I think I**
22  **produced all of my -- all of the minutes I did for my**
23  **annual returns.  They say who was there, and she may have**
24  **been at one or two.**
25      Q     (BY MS. DARWIT)  So would looking at the

Johnson, III, William E.                                    July 24, 2023

75

1    meeting minutes help refresh your recollection?

2         A    Sure.

3         Q    Okay.  Great.  I'll pull those up.  So what

4    I've marked as Exhibit 186 is Bates-stamped Johnson

5    Emerald Production 001848 [sic].  And I'll scroll down.

6    This is the first page here.

7              And this -- is this second page here,

8    which is Bates-stamped Johnson Emerald Production 01849,

9    is this a copy of the minutes for the meeting of the

10   board of directors of Emerald in August of 2017?

11        A    Uh-huh, and she was at that meeting, I say.

12        Q    Okay.  And Mr. Muhlenbruch was also at this

13   meeting; is that right?

14        A    Clearly he was, at least for part of it.

15        Q    Okay.  I'll zoom in a little, too.  And another

16   copy -- or rather let me give you this first.  So the --

17   the document or, rather, the page that is Bates-stamped

18   Johnson Emerald Production 01854, this is a copy of the

19   minutes for the second day of the annual meeting of the

20   board of directors.

21        A    Uh-huh.

22        Q    Is that right?

23        A    Yes.

24        Q    Okay.  And was Ms. Clark in attendance at this

25   meeting?

Johnson, III, William E.                                    July 24, 2023

76

1      A     Yes.

2      Q     Okay.  And then the page that's Bates-stamped

3   Johnson Emerald Production 01856, this is a copy of the

4   meeting minutes for the third day of the annual meeting,

5   right?

6      A     Yes.

7      Q     And Ms. Clark was in attendance at this

8   meeting?

9      A     She was.

10     Q     Okay.  I think that's the last one I have a

11  question about.

12           Why was Ms. Clark at the meetings of the

13  board of directors?

14     A     We could probe her mind.

15           THE COURT REPORTER:  I'm sorry, I didn't

16  hear that.

17     A     We could probe her mind.  We could question

18  her.  We could ask her all of the stuff that we weren't

19  expert on that; she was, insurance law, primarily.

20     Q     (BY MS. DARWIT)  Anything else?

21     A     That's good enough, isn't it?  She knew more

22  about it than all of the rest of us put together.

23     Q     Okay.  And did Ms. Clark draft the -- well,

24  first, let me ask you this:  Emerald entered into a

25  reinsurance agreement with the captives that participated

Johnson, III, William E.                                July 24, 2023

                                                                    77

1    in the -- its pool, right?

2        A    Yes.

3        Q    Okay.  And did Ms. Clark draft the reinsurance

4    agreement?

5        A    I believe she did.

6        Q     The trust agreement between Emerald and the

7    participants in the captive insurance pool, did Ms. Clark

8    also draft that?

9        A    I believe that she did.  I didn't.

10       Q    And at some point, did Emerald issue direct

11   insurance policies to captive insurance companies?

12       A    I don't believe that we ever did, although we

13   discussed it in the letter that you referred to earlier.

14       Q    Got it.

15            Emerald entered into a retrocession

16   agreement with the captives that participated in the pool

17   as well, right?

18       A    Yes.

19       Q    Okay.  And we'll talk more about what that

20   means later, but did Ms. Clark draft that retrocession

21   agreement?

22       A    I believe that she did.

23       Q    The corporate -- so -- so Emerald -- did

24   Emerald ever have to have corporate resolutions done as

25   part of changes to management directors and officers?

Johnson, III, William E.                                July 24, 2023

78

1        A     Yes, and if so, I did them.

2        Q     Okay.  So you drafted the corporate

3   resolutions?

4        A     Yeah, you know, when we -- when we needed it,

5   like changing the Alabama director.

6        Q     Got it.

7              Okay.  And who -- oh, never mind.  Scratch

8   that.

9              Okay.  I'll take this screen share down

10  for a second.  Okay.  So now I just want to walk through

11  step by step Emerald's reinsurance transactions at a

12  granular level.  So first, captive insurance companies,

13  mostly Ms. Clark's captive insurance companies, issued

14  insurance policies to insureds, right?

15       A     Yes.

16       Q     Okay.

17       A     Which would be, of course, the owner or

18  affiliated with the owner of the captive.

19       Q     Okay.

20       A     That's what a captive is.

21       Q     And those insureds paid their captives premiums

22  in exchange for that insurance coverage, right?

23       A     Yes.

24       Q     Okay.  The captives would then transfer to

25  Emerald a percentage of the risk in the corresponding

Johnson, III, William E.                                July 24, 2023

79

1    insurance premiums that they received from the insured;

2    is that right?

3         A    Yes.

4         Q    Okay.  And that was done pursuant to a

5    reinsurance agreement that Emerald executed with the

6    captives?

7         A    Yes.

8         Q    Right?

9         A    Yes.

10        Q    Okay.  And next, Emerald would transfer 100

11   percent of the risk that it assumed from the captives

12   back out to the captives, right?

13        A    I believe -- I believe that's the way it is.  I

14   don't remember exactly.

15        Q    Okay.

16             MR. VOLLRATH:  Object to form.

17        Q    (BY MS. DARWIT)  And in exchange for

18   transferring that risk, Emerald would also transfer the

19   premiums that it received back to the captives in three

20   different installments; is that right?

21        A    Yes, I believe that we would try, if based on

22   the level of claims we had, I believe we would try to

23   return half of it after six months, and we -- more of it

24   after nine months; once again, depending upon how many

25   claims we were hit with.  And then in the last -- the

Johnson, III, William E.                                    July 24, 2023

80

1    last part of what would have to be held, pretty much

2    until we resolved all of the claims.  We got a lot of

3    claims in the last part of the year, and that worried me.

4                    I was worried that we might get more

5    claims than the amount that we had kept in reserve,

6    because then you have to ask -- you have to ask for the

7    participant to return some of what we have distributed to

8    them, and they were required to do so by contract but you

9    always wonder about financial ability.

10        Q    Okay.  The applicable period for the

11   reinsurance agreements that we just talked about was

12   about one year, right?

13        A    Yes, I believe it was one year.

14        Q    And it ran from December to December, right?

15        A    Something, yes.  I think it wasn't actually

16   January to January.  I think it was December to December.

17        Q    Okay.

18        A    Because a lot of them were starting at the end

19   of the year, as a practical matter, because they wanted

20   to get the deduction in December for the year they paid

21   it.

22        Q    So the reason why the reinsurance agreement was

23   structured from December to December was to ensure that

24   the participating captives could get the insurance

25   deduction for the December year --

Johnson, III, William E.                              July 24, 2023

81

```
1        A     Yeah, earlier on.

2        Q     Earlier on?  Okay.

3        A     Yeah, earlier on rather than waiting until

4   January --

5        Q     Okay.

6        A     -- and not getting the deduction until 12

7   months later.

8        Q     Okay.  I'm going to mark another document.

9   This is going to be Exhibit 187.

10                   (Exhibit 187 marked.)

11       Q     (BY MS. DARWIT)  And it's Bates-stamped CLARK

12  IRS 0417519.

13                   Okay.  All right.  Mr. Johnson, so this is

14  a lengthier document.  You can see at the top here, it's

15  64 pages.

16       A     Yes.

17       Q     So I'm just going to scroll through slowly just

18  to give you an idea -- a general idea of what's in here,

19  and then I can zoom in on the particular section I have

20  questions about.

21                   Okay.  So starting back up at the -- the

22  first page here, this is a copy of the trust agreement

23  that Emerald and the captives that participated in its

24  pool entered into, right?

25       A     Yes, it is.
```

Johnson, III, William E.                                    July 24, 2023

82

1          Q    Okay.  And I am going to go down to Article

2     2.3, which is on the page that's Bates-stamped Clark IRS

3     0417520.  And just take a look at this paragraph, and let

4     me know once you've finished reading it, and I'll scroll

5     down to finish it out.

6          **A    Can you go further?**

7          Q    Okay.

8          **A    Okay.**

9          Q    Okay.  So according to Article 2.3, after 90

10    days into the reinsurance period, the pool participants

11    could withdraw half of the funds that --

12         **A    And I misremembered that.**

13         Q    -- that they transferred.  Oh, yeah.  No -- no

14    worries.  I'll -- I'll walk you through it, but let me

15    just get the question out so we have everything for the

16    record.

17              So 90 days into the reinsurance period,

18    the pool participants could withdraw or transfer back to

19    themselves half of the premiums that they paid into the

20    pool, right?

21         **A    That's what it says.**

22         Q    Okay.  And is that your recollection of how it

23    works?

24         **A    Well, I had thought it was 180 days they could**

25    **take kind of, you know, half of it, but I'm -- I**

Johnson, III, William E.                    July 24, 2023

83

1   remembered wrong.

2        Q    Okay.  And then after 180 days, which is about

3   six months, into the reinsurance period, the

4   beneficiaries could withdraw all but 5 percent of the

5   funds in the trust account, right?

6        A    That's what it says, yes.

7        Q    Okay.  And is that your recollection of how the

8   reinsurance transactions worked?

9        A    I remember that I worried about 5 percent not

10  being enough.

11       Q    Okay.

12       A    And that -- and remember I told you that it

13  seemed like we got a lot of claims filed in the last

14  quarter.

15       Q    Got it.

16       A    And therefore, it was a disproportionate

17  amount, and -- and that worried me.  And ultimately, you

18  know, we -- when we stopped having new business and had

19  to shut it down, that's what happened.  We lost all of

20  our -- all of our capital.  We spent our capital trying

21  to discharge our obligations, and we had no more income.

22       Q    Okay.  Okay.  Got it.  So -- so halfway through

23  the policy period, all but 5 percent of the premium funds

24  that had been transferred to Emerald were transferred

25  back to the captives; is that right?

Johnson, III, William E.                                    July 24, 2023

84

1      A      Under this agreement as you just showed it to
2    me, that's what it says.
3      Q      Okay.  At what point would the remaining 5
4    percent that was withheld be given back to the captives?
5      A      As I recall, we wouldn't give it back to them
6    until we got everything settled unless we just had, you
7    know, a good deal more than what our possible losses
8    could be.
9      Q      Okay.
10     A      I think some of it ended up not being paid back
11   for a while.
12     Q      Do you recall for the 2014 policy period when
13   the 5 percent, if it at all, was paid back to the
14   captives?
15     A      I don't remember.
16     Q      Okay.  Okay.  So getting back to the discussion
17   of the various steps in this whole reinsurance
18   transaction, if a claim were submitted against the
19   Emerald pool and the captive participants agree through
20   the retrocession agreement to pay a proportionate share
21   of the loss -- well, hang on.  Let me -- let me start
22   this again.
23            Okay.  So the captives that participated
24   in Emerald's pool agreed through the retrocession
25   agreement to pay a proportionate share of any losses,

Johnson, III, William E.                               July 24, 2023

85

1   assuming they were approved after the claims were

2   submitted, right?

3        **A     Yes, our agreement required -- it had, you**

4   **know, maximum exposure for Emerald and anything above**

5   **that was -- was on the insurer.**

6        Q    Okay.  So if any one captive declined to pay

7   its portion of the reinsurance claim, then Emerald would

8   not be able to -- to pay that claim in full, right?

9        **A     I don't remember.**

10       Q    Okay.  Did Emerald have recourse to the other

11  captives for any additional funds that it might need to

12  pay a claim if a captive chose not to participate or pay

13  up --

14       **A     Or it went bankrupt.**

15       Q    -- what it was supposed to under the agreement?

16       **A     Or it went bankrupt.  I remember we were**

17  **worried about that.**

18       Q    Hang on one second.  Sorry.  I think I missed

19  the beginning of your answer, so just give me a sec to --

20  to answer the question.

21            Did Emerald have any resource to the other

22  captives that participated in the pool in the event that

23  a captive decided that it did not want to pay additional

24  funds that would be needed to pay a claim?

25       **A     I don't remember exactly, but I do remember**

Johnson, III, William E.                                    July 24, 2023

86

1    that we advised them they would never be in the pool

2    again, which basically said, you don't -- you better go

3    find somebody else to fool with you because you're not

4    doing what you agreed to do.

5                    I don't remember exactly what the resource

6    was, but I do remember that we excluded them from ever

7    participating again if they didn't meet their

8    obligations.

9        Q    Okay.  Let's go ahead and turn back to this

10   document that was marked Exhibit 187.  And I'm going to

11   scroll to another portion here.

12                   So, Mr. Johnson, beginning here on this

13   page that's Bates-stamped CLARK IRS 0417537, I'm going to

14   go ahead and scroll like I did with the previous section

15   just so you can get a general feel for what this is.

16   Okay.

17                   Okay.  So this -- this is a copy of the

18   reinsurance agreement between Emerald and the captives

19   that participated in the reinsurance pool, right?

20       A    Yes.

21       Q    I'm going to go to Article 4.  Actually, I'm

22   going to go the -- the retrocession agreement.  I'm sorry

23   about that.

24                   So beginning here on the page that's

25   Bates-stamped CLARK IRS 0417552, I'm just going to,

Johnson, III, William E.                              July 24, 2023

87

1    again, scroll through to give you a general idea of

2    what's in this section of the document.

3              Okay.  So this is a copy of the quota

4    share retrocession agreements between Emerald and the

5    captives that participated in the pool, right?

6       A    Yes, it appears to be.

7       Q    Okay.  So I'm going to go to Article 4 here.

8    Do you see where Article 4 states that "The

9    retrocessionaires' obligations under this agreement are

10   several and not joint and are limited to the quota shares

11   shown on Exhibit 1 for the relevant coverage part"?

12      A    Yes.

13      Q    And then it states, "No retrocessionaire is

14   responsible or liable for obligations payable by any

15   other retrocessionaire hereunder."

16      A    Yes, that -- that was why I said I -- I thought

17   that all we could do was just keep them from getting in

18   our pool again if they didn't -- if they didn't pay

19   whatever the portion of our shortage was, but you can

20   imagine that joint and several in something like this

21   just would not be acceptable.  The numbers were too big.

22      Q    Okay.  So would Emerald have to bring forth

23   collection actions against a non-paying captive in order

24   to get payment?

25      A    I don't remember whether we did that or not.

Johnson, III, William E.                                    July 24, 2023

88

1      Q    But was it -- well, the -- under the agreements
2    that we just looked at, the captives were required to pay
3    if there were a claim that was approved and -- submitted
4    and approved to the pool that the trust funds couldn't
5    cover, right?
6      **A    Well, I'm right here, and it says their quota**
7    **share shown on Exhibit 1, I guess it's Exhibit 1, for the**
8    **relevant coverage, and they weren't liable for anything**
9    **other than their part.**
10     Q    Sure.
11     **A    Of the retrocession.  It -- I just haven't**
12   **thought about this in so long.  I don't remember if we**
13   **had to sue anybody for nonpayment.  I don't remember us**
14   **doing that.**
15     Q    Uh-huh.  But they were -- the captives were
16   contractually obligated to --
17     **A    Yes.**
18     Q    -- make a payment to Emerald if Emerald needed
19   funds to pay a claim, right?
20     **A    Yes.**
21     Q    Okay.
22     **A    And then I had expressed my concern about the 5**
23   **percent and whether or not it was adequate because I**
24   **didn't want to ask anybody to give their back, and it was**
25   **simply because sometimes, if I remember correctly, we had**

Johnson, III, William E.                                    July 24, 2023

1    a lot more claims toward the end of the year.

2        Q    Who came up with the 5 percent number?

3        A    I don't know.  I don't remember.

4        Q    And the -- the 5 percent number is agreed upon

5    in the trust agreement between Emerald and the captives,

6    right?

7        A    That's where we just read it.

8        Q    Okay.  And Ms. Clark wrote the trust agreement,

9    right?

10       A    Yes.

11       Q    Okay.  And when you said you expressed concerns

12   about the 5 percent reserve, who did you express those

13   concerns to?

14       A    Board members.

15       Q    Did you express those concerns to Ms. Clark?

16       A    I imagine we may have discussed it because I

17   was a little concerned that maybe we should make it more

18   than 5 percent for the reasons that I told you.  We --

19   you get a lot of surprises at the end of the year.

20       Q    So is it fair to say that you didn't think that

21   the 5 percent reserve was enough to cover any potential

22   losses?

23       A    I -- I -- I didn't know because you know we

24   hadn't had many years of experience.  I think this is the

25   first year right here, 2014.

Johnson, III, William E.                    July 24, 2023

90

1      Q    So you were relying on others to come up with

2   the 5 percent reserve figure?

3      **A    It was in the agreements that I presented.**

4   **That was what Celia came up with.  As a board member, I**

5   **just expressed my concern about what if we got a bunch of**

6   **the claims at the end of the year and they came to more**

7   **than 5 percent.  You know, you get an actuarial**

8   **experience after a while, you know, about what it usually**

9   **runs, but this was our first year.**

10     Q    Uh-huh.  Okay.  Do you know if a feasibility

11  study was ever done for Emerald to determine what amount

12  would be sufficient as a loss reserve?

13     **A    I certainly didn't do one, and I'm not -- I'm**

14  **not familiar with seeing one.**

15     Q    Do you know if Emerald's expected losses were

16  analyzed in any specific way, even if it wasn't a

17  feasibility study?

18     **A    If -- I didn't understand your question.**

19     Q    Oh, sure.  I'll re-ask it.

20          Do you know if Emerald's expected losses

21  were analyzed in any way, even if it wasn't a feasibility

22  study?

23     **A    You mean before they -- before we knew what**

24  **they were?**

25     Q    Before deciding on the 5 percent reserve in the

Johnson, III, William E.                                July 24, 2023

91

1    trust agreement.

2        A    I -- I don't know -- I don't know who came up

3    with that amount.  It wasn't me.

4        Q    Okay.  Okay.  And if -- if a claim for a

5    covered loss were made against the pool late in the year

6    and there weren't enough funds in the trust account to

7    pay the claim, it would be Emerald's responsibility to go

8    to the captive participants in order to collect money to

9    pay the claim, right?

10       A    Yes, we would ask them, and if they refused,

11   they would never be in the pool again.

12       Q    Do you know if that ever happened, that Emerald

13   had to go to the captives --

14       A    I don't remember.

15       Q    -- and ask for money?

16            And if -- if a captive refused to pay, I

17   think you answered this, but what -- do you know what

18   Emerald's remedies were if a captive refused to pay?

19       A    Well, I remember that we discussed the fact

20   that we would tell them that they would never ever be in

21   our risk pool again if they didn't pay their proportioned

22   part, but that's all I remember.  I think that was in

23   some of the -- some of our discussions at the board

24   meetings.

25       Q    Okay.

Johnson, III, William E.                                    July 24, 2023

92

1        A     So they could probably find that in our --

2    my -- my minutes.  I believe that was nine years ago, and

3    I just flat don't remember.

4        Q     Fair enough.

5              Was taking forced collection action, like

6    litigation, a remedy that Emerald discussed pursuing?

7        A     Most of our litigation was the other way

8    around.  We were being sued because we refused to pay.

9    We refused to pay for the -- because we thought we were

10   being defrauded or they refused to give us the

11   information that they were required to give us or they

12   didn't have the coverage.

13       Q     Okay.

14       A     I know there was one case where we get involved

15   in a lawsuit, and what they were basically claiming was

16   they told Celia that they wanted this coverage.  Whether

17   they did or not, who knows, but it was all verbal, and

18   the fact was that the coverage that they were trying to

19   sue on, which wasn't in the policies, wasn't in the

20   policies.

21             So, you know, they come to us and say, we

22   wouldn't want to, you know, lay this off on Emerald, and

23   I said we didn't have anything to lay off on us.  You

24   don't have -- you don't have the coverage in your

25   policies.  There's nothing we can do about that.  And I

Johnson, III, William E.                                    July 24, 2023

93

1    think they sued -- they may have sued Celia for

2    allegedly, you know, not including a coverage that they

3    asked for.

4               Of course, they might have read the policy

5    and found out it was in there.  I don't think they got

6    rid of the dadgum policy, probably.  Anyway, I believe we

7    ended up getting out of that because that just wasn't

8    something -- if it isn't in the policy, we can't reinsure

9    it, so they can go fight with Celia on that.

10   Q    Okay.  So was -- was taking forced collection

11   actions against the captives something that Emerald

12   contemplated as part of its remedies?

13   A    What was your question?

14   Q    Was taking forced collection action against the

15   captives that refused to pay something that Emerald

16   contemplated?

17   A    I don't think that we actually ever did it.

18   Q    But is it something that you had talked about

19   as a possible remedy if someone didn't pay?

20   A    I don't remember talking about it.

21   Q    But Emerald faced a risk that some captives

22   might just refuse to pay, right?  Emerald faced a risk

23   that some of the captives might just refuse to pay,

24   right?

25   A    Well, that's a hypothetical.  I mean, I -- I --

Johnson, III, William E.                                    July 24, 2023

94

1    I didn't see anything in my minutes that specifically

2    discussed that, and I don't remember.  I mean, it's

3    possible that they would refuse to pay, and they wouldn't

4    be allowed in our pool anymore.  I just don't remember.

5         Q     Okay.  Some of the pool participants were your

6    own clients, right?

7         A     Very few.

8         Q     How do you think that those clients would have

9    reacted if at the end of the year you told them not only

10   they were not going to be receiving that 5 percent --

11                   MR. VOLLRATH:  Objection to form.

12        Q     (BY MS. DARWIT) So let me start over my

13   question.

14                   How do you think that your clients would

15   have reacted if at the end of the year --

16                   MR. VOLLRATH:  Guys, I'm frozen, and I've

17   lost video and audio.  The video is back.

18                   MS. DARWIT:  The video is back?

19                   MR. VOLLRATH:  Yeah.  Sorry, I didn't --

20   there was a question about how clients may have reacted.

21   I objected, and then the video and audio cut out, so I

22   don't know what else happened.

23                   MS. DARWIT:  Can you see video and audio

24   now?

25                   MR. VOLLRATH:  I can.  Your video is

Johnson, III, William E.                    July 24, 2023

95

1  pretty granular, but -- granulated, but it's there.

2              MS. DARWIT:  Okay.  Let me see if I --

3  okay.  I'll continue, and just speak up, Derick, if we

4  have an issue again.

5              MR. VOLLRATH:  Sure.  Can I ask what

6  the -- if the question was answered and what the answer

7  was, so maybe read back the record.

8              MS. DARWIT:  So I actually didn't even get

9  the question out before I heard your objection, so we

10  must have like -- I must have cut out in the middle of my

11  question and then you objected, so there's no answer.

12             MR. VOLLRATH:  (Inaudible.)  Okay.

13             MS. DARWIT:  Okay.  So I'll re-ask this.

14      Q    (BY MS. DARWIT)  So how do you believe that

15  your clients would have reacted if -- if at the end of

16  the year you broke the news that not only were they not

17  going to be receiving the 5 percent reserve back, but

18  they also had to pay additional money into the pool to

19  pay for a submitted and approved claim?

20      **A    Well, this would be pure subjective conjecture**

21  **on my part.  If you want to know how I think anybody**

22  **would feel, they'd be pissed off.  But if that's, you**

23  **know, pure conjecture.  Probably would have just written**

24  **a check and paid it.**

25      Q    And do you believe that your clients had an

Johnson, III, William E.                          July 24, 2023

1    expectation that the 5 percent loss -- 5 percent loss

2    reserve would not be enough to cover any claims that were

3    submitted and approved?

4         A    Once again, that's pure conjecture.

5              MR. VOLLRATH:  Object to form.

6         A    I mean, I don't know what's going on in their

7    brains.

8         Q    (BY MS. DARWIT)  Well, I'm asking you whether

9    you believe that they had an expectation about that lost

10   reserve.

11        A    I never questioned them about it, and I -- that

12   would then be pure conjecture on my part.

13        Q    Okay.  Did Emerald have litigation staff?

14        A    Litigation staff?

15        Q    Yeah, did it have litigation attorneys on its

16   staff?

17        A    Absolutely not.  We didn't have any staff.

18   Remember, I told you we had no employees.

19        Q    And it did not employ anyone for collection

20   purposes?

21        A    Not that I remember.

22             MS. DARWIT:  Derick, can you hear us?

23             MR. VOLLRATH:  I can hear you, yes.

24             MS. DARWIT:  Okay.  It's just me then.

25             MR. VOLLRATH:  Thank you.

Johnson, III, William E.                                    July 24, 2023

97

1      Q    (BY MS. DARWIT)   Okay.  Did Emerald have the

2   resources to sue each captive insurance company that

3   participated in the pool for collection if needed?

4      **A    Well, we ended up, you know, in some lawsuits**

5   **after we shut down, and we spent every dime that we had**

6   **in our 150 of the $250,000 of -- of -- unfortunately, we**

7   **just had to shut it down because it was not, I thought**

8   **based on the position of the Internal Revenue Service, in**

9   **the best interest of any clients to continue to**

10  **participate in a captive insurance company because the**

11  **IRS was not interested in doing anything except shutting**

12  **down the entire industry, and that's still your position.**

13  **So I told my clients shut it down, get out of it, you**

14  **cannot afford to litigate with Big Brother.**

15     Q    So just to make sure I understood the answer to

16  my question, I asked did Emerald have the resources to

17  sue each captive insurance company for collection if

18  needed.

19     **A    Well, we don't know how much it would have**

20  **taken.  We had 100 -- excuse me 250,000 of capital paid**

21  **in, plus whatever profit that we made that we didn't**

22  **distribute.  So that's conjecture again.  How much would**

23  **it cost to sue them all?  Would we have had enough to sue**

24  **all of them?  No.  Would we have enough to sue one or two**

25  **of them that didn't pay?  Yes, I suppose we did.**

Johnson, III, William E.                                      July 24, 2023

98

1       Q      Okay.

2       **A      I mean, I don't see what that has to do with**

3  **anything.**

4       Q      Before a claim would be approved and paid, the

5  trustees and the participating captives had to be

6  notified of the anticipated loss payment, right?

7       **A      Yes.**

8       Q      And under the trust agreement, the

9  participating captive had the right to object to a lost

10 payment and request arbitration; is that right?

11      **A      I believe it did, and it seems like if more**

12 **than 50 percent objected that -- I mean there -- there**

13 **was a threshold that was pretty high.  I mean it's in the**

14 **agreement, so it says what it says.  It's in English.**

15              MS. DARWIT:  Okay.  Why don't we go off

16 the record.

17              MR. VOLLRATH:  No objection.

18              THE VIDEOGRAPHER:  We're now off the

19 record at 12:22 p.m.

20              (Lunch break taken.)

21              THE VIDEOGRAPHER:  We're now on the

22 record.  The time is 1:04 p.m.

23      Q      (BY MS. DARWIT)  Okay.  Mr. Johnson, I'm going

24 to mark my next document -- or rather, I'm going to bring

25 up a document that's been previously marked.  This

Johnson, III, William E.                                    July 24, 2023

1   document was marked as Exhibit 180.  It's Bates-stamped

2   Johnson Emerald Production 00546.  This is the annual

3   financial statement for Emerald for the period ending

4   December 2016 that we look at earlier, right?

5        A    Yes.  Yes.

6        Q    Okay.  I'm going to direct your attention to

7   Page 5 here.  This is a copy of Emerald's balance sheet

8   for the 2016 year --

9        A    Uh-huh.

10       Q    -- right?

11       A    Yes.

12       Q    Okay.  And according to the balance sheet, in

13  2016, Emerald had total assets of about $310,000, right?

14       A    Yes, that's what it says.

15       Q    And Emerald had total assets of about $345,000

16  in the year prior to 2016, so 2015; is that right?

17       A    That's what it looks like.

18       Q    Okay.  And then if we go to liabilities,

19  capital and surplus, on Lines 20 and 21, there are no

20  losses or loss adjustment expenses reported, correct?

21       A    I don't see any.

22            MS. DARWIT:  Okay.  I'm going to mark my

23  next exhibit.  This will be Exhibit 188.  It's

24  Bates-stamped CLARK IRS0008368.

25            (Exhibit 188 marked.)

Johnson, III, William E.                                    July 24, 2023

100

1       Q    (BY MS. DARWIT)  And, Mr. Johnson, this -- this
2   is a copy of Emerald's financial statements for the
3   period ending December 31st, 2015.
4       A    Yes.
5       Q    Right?
6       A    Yes.
7       Q    Okay.  And again I'll direct your attention
8   here to Page 6, which is Bates stamped CLARK IRS0008373.
9   This is the balance sheet for Emerald for the period
10  ending December 31st, 2015, correct?
11      A    Yes.
12      Q    And its assets in 2015 were about $345,000,
13  right?
14      A    That's what it says.
15      Q    And for 2014, its assets were about $330,000,
16  correct?
17      A    Yes.  Okay.  I see that.
18      Q    And for -- under "Liabilities," Lines 20 and 21
19  report zero losses or loss adjustment expenses for 2015
20  and 2014; is that accurate?
21      A    Where is it?
22      Q    So I'll kind of focus in here.
23      A    Loss adjustment expenses, is that what you're
24  talking about?
25      Q    Yeah, and losses.

Johnson, III, William E.                                    July 24, 2023

1       A    Okay.  It doesn't show any.

2       Q    Okay.  So it says zero for losses and loss

3  adjustment expenses, correct?

4       A    That's what it says.

5       Q    Okay.  And I promise I have a point.

6            Was there an audited financial statement

7  for 2014 for Emerald?

8       A    I think we were required by law to have one

9  every year, and we had a different -- we had different

10  auditors.  There was one called Langwassers, and there

11  was one called -- let's see, one in Atlanta, Georgia, a

12  guy named Greg Foster, I think was his name, Keadle -- I

13  forgot exactly what the name of the firm was.

14       Q    Okay.

15       A    Then we ended with one in Dallas that I knew.

16  It was a regional firm, and they I think did it for 2016

17  or '17.

18       Q    Got it.

19       A    So we had different -- we had different

20  auditors, all unrelated firms.

21       Q    Okay.  Got it.

22            How did Emerald determine that it had zero

23  losses for 2014, 2015 and 2016?

24       A    I don't know.  I didn't prepare this.

25       Q    Okay.  Did you review Emerald's financial

Johnson, III, William E.                                July 24, 2023

102

1    statements before they were filed?

2        A    No, I didn't prepare them.  I simply sent, you

3    know, the copy that was prepared and given to me to send

4    to them, which I did, to the State Department of

5    Insurance.

6        Q    Did you review the financial statements,

7    though?

8        A    If you mean did I go through it and go through

9    everything that the accountants did to do it, no.

10       Q    Okay.  And --

11       A    I mean, I would have had to go through all the

12   bank statements and everything else.

13       Q    Okay.  And I'll direct your attention now to

14   the page that's Bates-stamped CLARK IRS0008371.  Your

15   name is listed as a contact for Emerald on the financial

16   statements?

17       A    Yes.

18       Q    Correct?  Is that a yes?

19       A    Yes.

20       Q    Okay.  Just again, I know it's tempting, but

21   please let me get the question out before you answer.

22            Okay.  So who was responsible for

23   determining what amount of losses and loss adjustment

24   expenses to report to the regulators on Emerald's

25   financial statements?

Johnson, III, William E.                                    July 24, 2023

103

1       A    I don't remember.

2            MS. DARWIT:  Okay.  I'll mark my next

3  document.  This is Exhibit 189, and it's Bates-stamped

4  CLARK IRS0008361.  And I'll just scroll through this

5  quickly to give you a basic familiarity with it.

6            MR. VOLLRATH:  Sorry, Lauren.  Can you

7  give me the exhibit number again?

8            MS. DARWIT:  Sure.  It's Exhibit 189.

9            (Exhibit 189 marked.)

10      Q    (BY MS. DARWIT)  Okay.  Mr. Johnson,  do you

11  recognize this document?

12      A    Yes.

13      Q    This is the statement of actuarial opinion for

14  Emerald for 2014 --

15      A    Yes.

16      Q    -- right?

17      A    Uh-huh.

18      Q    Okay.  And this was prepared by someone named

19  Allen Rosenbach?

20      A    Yes.  I think he's -- what do you call them --

21  an actuary.

22      Q    Okay.  Have you ever talked with Allen

23  Rosenbach -- Rosenbach?

24      A    I don't believe I ever did.

25      Q    Okay.  And according to the scope here, it says

Johnson, III, William E.                                    July 24, 2023

104

1    that Rosenbach is examining "the actuarial assumptions

2    and methods used in determining the reserves listed in

3    Exhibit A, reflecting the annual statement and the

4    audited financial statements for year ended December

5    2014," correct?

6         **A    Yeah.  I was -- I don't think the loss**

7    **reserve -- oh, there it is.  Okay.**

8         Q    Okay.

9         **A    Okay.**

10        Q    And then under "Other Considerations" here, it

11   states that, "Emerald International Reinsurance functions

12   as a vehicle to pool diverse risks ceded to it by

13   unaffiliated captive insurance companies with gross

14   premiums for captive not exceeding 1.2 million"; is that

15   right?

16        **A    That's correct.**

17        Q    Okay.  Do you agree with that statement?

18        **A    Yes.  They're unrelated.  Their risks are as**

19   **diverse as they could be.  And they are all classified as**

20   **small captives because they don't have premiums in excess**

21   **of a million two.**

22        Q    Why is 1.2 million the figure that the premiums

23   can't exceed?

24        **A    That's because it's in the statute.**

25        Q    Is that statute Section 831(b)?

Henderson Legal Services

202-220-4158                      www.hendersonlegalservices.com

Johnson, III, William E.                                    July 24, 2023

                                                                    105

```
 1                 MR. VOLLRATH:  Objection.
 2      A     Yes, 831(b) of the Internal Revenue Code.
 3                 MR. VOLLRATH:  Sorry.  I'm just going to
 4      object to the form of the prior question.
 5                 MS. DARWIT:  Okay.
 6      Q     (BY MS. DARWIT)  All right.  And -- okay.  And
 7      then I'm just scrolling here to this last sentence of the
 8      first paragraph on this page.  Do you see where it says,
 9      "The number of CICs participating in the reinsurance pool
10      in 2014 was 148 with the total gross volume of over
11      36.6 million"?
12      A     Yes.  And did you notice the sentence before
13      that?
14      Q     I don't have a question about that sentence.
15      A     I know but I am going to make a statement
16      because you asked me that question before.
17      Q     Okay.  Well, I'm the one asking questions here,
18      so I'm not sure what you want to -- is there something
19      that you stated earlier that you wish to change?
20      A     Yes.  You asked me -- you asked me how did I
21      know there was no loss.
22      Q     Okay.
23      A     "Emerald assumes business from each CIC and
24      retrocedes all of the risk back to CIC on a quota-share
25      basis thus retaining a zero risk for its own account."
```

Johnson, III, William E.                                          July 24, 2023

                                                                        106

1    There's the answer to your question.

2         Q    What question are you referring to?

3         A    You referred to before how did I know that

4    there was zero losses.

5         Q    Uh-huh.

6         A    And I can see now it's because it was set up

7    that there wouldn't be any losses to Emerald from -- we

8    didn't -- we didn't end up assuming any net risk.

9         Q    Okay.  So you did actually do some work to

10   analyze the lost reserves that were reported on Emerald's

11   financial statements?

12        A    No, I didn't.

13             MR. VOLLRATH:  Objection.

14        A    I didn't but I didn't know the answer, but now

15   I know the answer.  That was the way it was set up.

16        Q    (BY MS. DARWIT)  Got you.  Okay.

17        A    Just pointed that out since you asked me about

18   it.

19        Q    And if we go to -- so -- okay.  So first of

20   all, let me -- let me just re-ask my question.

21             Do you see where it says, "The number of

22   CICs participating in the reinsurance pool in 2014 was

23   148, with a total gross volume of over 36.6 million"?

24        A    Yes, ma'am.

25        Q    Okay.  So Emerald received premiums of

Johnson, III, William E.                                July 24, 2023

107

1    $36.6 million in 2014; is that right?

2        **A      Yes, that's what it says.**

3                MR. VOLLRATH:   Objection; form.

4        Q    (BY MS. DARWIT)  Okay.  And then --

5                MR. VOLLRATH:   I'm sorry, Lauren.  I

6    didn't get the answer to the question.

7        Q    (BY MS. DARWIT)  If you could repeat the

8    answer.

9        **A      Yes.  The total gross volume, it says, was over**

10   **36.6 million.  That was from his actuarials report.**

11       Q    Okay.  So now I'm going to go to the page

12   Bates-stamped CLARK IRS0008363.

13               Okay.  And then under "Potential For

14   Material Adverse Development," do you see that it states

15   that the company commenced operations in June of 2014 and

16   no claims to date were reported?

17       **A      Yes, I see where it says that.**

18       Q    So is it your recollection that no claims were

19   filed against Emerald for the 2014 policy year?

20       **A      I don't remember personally, no.**

21       Q    Okay.  Okay.  And now I'm going to go to the

22   page that's Bates-stamped CLARK IRS0008366.

23               So Mr. Johnson, the reserves -- the loss

24   reserves that are reported on Line 2 of this page are

25   $250,000, right?

Johnson, III, William E.                                    July 24, 2023

108

1      A     Yes.  That's the amount of our required
2  capital, which we had.
3      Q     Okay. And did you use this report at all when
4  you were reviewing Emerald's financial statements?
5                MR. VOLLRATH:  Object to the form.
6      A     I don't remember.
7                MS. DARWIT:  Okay.  I'm going to mark my
8  next document.  This will be Exhibit 190, and it's
9  Bates-stamped ACR IRS 0460399.
10               (Exhibit 190 marked.)
11     Q     (BY MS. DARWIT)  I'll again scroll through so
12 you can see what this is.
13               Okay.  Mr. Johnson, are you familiar with
14 this document?
15     A     I believe I've seen it before.
16     Q     This is the statement of actuarial opinion for
17 Emerald for 2015, correct?
18     A     The year after the one we just looked at.
19     Q     Okay.  And again, the scope -- the scope that's
20 explained here is the same as the previous document we
21 looked at, right?
22     A     Yes.
23     Q     Okay.  And on Page 2 here do you see under
24 "Other Considerations," the last sentence of this first
25 paragraph says that, "The number of CICs participating in

Johnson, III, William E.                                    July 24, 2023

109

1    the reinsurance pool in 2015 was 159 with a total gross

2    volume of over 36.2 million"?

3        A    I do see that.

4        Q    And scrolling to the 6th page of the PDF, which

5    is Bates-stamped ACR IRS 0460404, this page reports a

6    loss reserve of about $729,000, right?

7        A    That's what it says.

8        Q    Okay.  Did Emerald receive any insurance claims

9    for the 2015 policy year?

10       A    Did who?

11       Q    Emerald.

12       A    I don't remember, but I imagine we did.

13       Q    Okay.

14       A    This was the second year of operations.

15            MS. DARWIT:  Okay.  I'll mark my next

16   document as Exhibit 191.

17            (Exhibit 191 marked.)

18            MS. DARWIT:  And this document is

19   Bates-stamped CLARK PROD 0121246.

20       Q    (BY MS. DARWIT)  I will scroll through this.

21            Do you recognize this document?

22       A    Yes.  It's the next year, the third year of

23   operations, the actuarial assumptions -- opinion.

24       Q    Okay.  And the scope of work here is the same

25   as the 2014 actuarial opinion, right?

Johnson, III, William E.                              July 24, 2023

110

1      A    It appears to follow the same source of who

2   provided the information to the actuary.

3      Q    Okay.  And it -- and just the general scope is

4   to examine the actuarial assumptions and methods used --

5      A    Yes.  I --

6      Q    -- in determining the reserves listed in annual

7   financial statements --

8      A    Uh-huh.

9      Q    -- right?

10     A    Yes.

11     Q    Okay.

12     A    It seems to be the same.

13     Q    And the second PDF page, which is Bates-stamped

14   CLARK PROD 0121247, the last sentence of the first

15   paragraph says that "In 2016, Emerald received a gross

16   volume of over 17.8 million."

17           Do you see that?

18     A    Yes.

19     Q    Okay.  And that that's referring to the

20   premiums -- insurance premiums that it received from

21   captive insurance companies, right?

22     A    Yes.  Apparently there were about a hundred of

23   them.  I believe that's the way you read that.  What is

24   that -- numbered 150 with a total of -- for 2016, the

25   number of CIC accounts numbered about 100 with the total

Johnson, III, William E.                    July 24, 2023

111

1  **gross volume with just over 17.8 million.**

2      Q    Okay.  So in 2016, Emerald received about $17.8

3  million worth of premiums from captives?

4      A    **Yes, much less than the year before.**

5      Q    Okay.  And I'll go to PDF Page 6, which is

6  Bates-stamped CLARK PROD 0121251.  And according to this

7  page, it states that the loss reserves for Emerald for

8  2016 are about $8 million, right?

9      A    **That's what it says.**

10     Q    Okay.  And do you recall if Emerald received

11  any insurance claims for the 2016 pool year?

12     A    **I'm almost certain that they did.**

13     Q    Okay.  Do you know approximately how many

14  loss --

15     A    **No.**

16     Q    -- payments it made?

17     A    **No, I have no -- I have no memory of that at**

18  **all.**

19     Q    Okay.  And again, just a reminder to please let

20  me finish the question before you respond.

21              MS. DARWIT:  I'll mark my next document as

22  Exhibit 192.  It's Bates-stamped ACR IRS 0460411.  Let me

23  scroll through this.

24              (Exhibit 192 marked.)

25     Q    (BY MS. DARWIT)  Okay.  Do you recognize this

Johnson, III, William E.                                July 24, 2023

112

1   document, Mr. Johnson?

2       **A     It appears to be a 2017-dated document, also an**

3   **actuarial report from the same actuarial firm.**

4       Q     Okay.  And that's Allen Rosenbach's firm?

5       **A     Yes, Rosenbach.  And it's for the year ending**

6   **December 31st, 2015.**

7       Q     And you noted that this document is dated May

8   of 2017, right?

9       **A     I do.**

10      Q     Do you have any idea why this report was issued

11  in May of 2017 for the year ending December of 2015?

12      **A     I have no idea.**

13      Q     Okay.  I'm going to scroll down to PDF Page 13,

14  which is Bates-stamped ACR IRS 0460423.

15            Okay.  So do you see the last three lines

16  on this page --

17      **A     Yes, I can see them.**

18      Q     -- are showing 2014 and 2015?

19      **A     Yes.**

20      Q     Okay.  And this document is entitled "Emerald

21  International Reinsurance Summary of the Gross Results"

22  for the December 2015 period, right?

23      **A     Yes, that's what it says.**

24      Q     Okay.  And according to this document, am I

25  understanding this correctly that for the 2014 and 2015

Johnson, III, William E.                                      July 24, 2023

113

1    years, Emerald reported earning about $25.6 million worth

2    of premium?

3        A    That's what I -- I believe it's in thousands.

4        Q    Yeah.  So -- or yeah, 25.6, so the 000 is kind

5    of delineated up here.

6             Do you see that?

7        A    Yes, uh-huh.

8        Q    Okay.  So for the 2014 and 2015 years, Emerald

9    reported earning about $25.6 million worth of premium?

10       A    All right.

11       Q    And --

12             MS. DARWIT:  Derick, do you have an

13   objection?

14             MR. VOLLRATH:  I did have an objection to

15   form, thank you, for that question.

16       Q    (BY MS. DARWIT)  Okay.  And then Emerald

17   reported paying $47,000 worth of the losses for 2015,

18   right?

19       A    That -- yes, "paid" -- "paid with ALAE," what

20   does that mean?

21       Q    Do you know what ALAE means?

22       A    I'm asking.  I don't know what it means.

23       Q    Okay.  And then if we look over to this column

24   here that's called "Ultimate with ALAE," it says about

25   $2.27 million, right?

Johnson, III, William E.                                    July 24, 2023

114

1       A     Yes.

2       Q     Okay.  And then if we go over to the ultimate

3   ratio reported on the right-hand side of this column

4   here, do you see where for total, it says 8.9 percent?

5       **A     Yes.  Does that mean that was the percentage of**

6   **losses from total -- or losses paid out of the total**

7   **premium?  Is that what that means?**

8       Q     Well, that's my question for you is, is it your

9   understanding that 8.9 percent reflects the loss ratio

10  for Emerald for 2014 and 2015?

11      **A     I don't know.  That looks like there's --**

12  **there's no explanation of it other than just say**

13  **"Inc. Ratio," "Ultimate Ratio" and then that other one,**

14  **"Paid Ratio."  I haven't looked at one of these things in**

15  **ages.**

16      Q     Sure.

17      **A     Yeah.  I mean, years and years and years.  No,**

18  **I don't remember, but it looks like it be may be showing**

19  **the percentage of premiums that ended up being paid --**

20      Q     Got it.

21      **A     -- for losses.**

22      Q     Okay.  Okay.  So did you consider the

23  information reflected on this page in deciding on what

24  number to report for the loss and loss adjustment

25  expenses in Emerald's financial statements?

Johnson, III, William E.                                    July 24, 2023

115

1          A      Would you ask that question again, please.

2          Q      Sure.  Did you consider the loss ratio

3    reflected here in deciding on the loss and loss

4    adjustment expenses to be reported in Emerald's financial

5    statements for 2014 and 2015?

6          A      I didn't prepare those --

7                 MR. VOLLRATH:  Object to form.

8          A      -- and so I probably didn't consider it.

9          Q      (BY MS. DARWIT) Okay.  Did you review these

10   in -- when you -- did you review this document as part of

11   your review of the financial statements for Emerald?

12         A      I do not remember.

13                MR. VOLLRATH:  Object to form.

14         Q      (BY MS. DARWIT)  Okay.  Okay.  So I guess my

15   broader question, then, about all these documents we just

16   looked at -- so let me kind of walk through it.

17                So the annual financial statements that we

18   looked at reported a zero dollar loss for 2014, 2015 and

19   2016, right?

20         A      To Emerald.

21         Q      To Emerald, correct.  Is that right?

22         A      Yes.

23         Q      Okay.  And then Allen Rosenbach's actuarial

24   opinion recommended a loss reserve of about $250,000 for

25   2014, right?

Johnson, III, William E.                    July 24, 2023

116

1     A    I don't know if he recommended that, but that

2  was what was required under the Alabama statute.

3     Q    And Allen Rosenbach's actuarial opinion

4  recommended a loss reserve of just under $800,000 for

5  2015, right?

6     A    I don't remember.

7          MR. VOLLRATH:  Object to form.

8     Q    (BY MS. DARWIT) We can go back to that

9  document, if you want me to look at it.

10    A    Yes.  Eight million -- no, there we go, 720

11  reserve...

12    Q    And let me just mark -- make sure I have this

13  marked for the record.

14         Okay.  So this was previously marked

15  Exhibit 190.  Do you see where it says that the loss

16  reserve is $728,000?

17    A    Yes, I see that.

18    Q    Okay.

19         MR. VOLLRATH:  Object to form.

20    Q    (BY MS. DARWIT) And for -- okay.  And then

21  previously marked Exhibit 191 reflects a loss reserve of

22  about $8 million, right?

23         MR. VOLLRATH:  Object to form.

24    A    It says loss and loss adjustment expenses

25  reserve as $8,054,000.

Johnson, III, William E.                                    July 24, 2023

117

1          Q    (BY MS. DARWIT)  Okay.  So -- and then the

2    actuarial opinion that we just looked at reflected a loss

3    ratio of about 8.9 percent or about 2.27 million, right?

4                    MR. VOLLRATH:  Object to form.

5          **A    If that's what -- if that's what that meant.  I**

6    **asked you if that's what that meant.**

7          Q    (BY MS. DARWIT)  Okay.

8          **A    It looks like to me like that's what it's**

9    **talking about is the percentage of premium that was paid**

10   **for losses.**

11         Q    Okay.  Fair enough.

12                    So how do you reconcile the -- I mean, we

13   can -- we can start on just the 2016 year.  So how do you

14   reconcile the $8 million that was reported on the loss

15   reserves in the actuarial opinion with the zero dollar of

16   losses reported in Emerald's financial statements for

17   2016?

18         **A    I can't resolve it (inaudible).**

19                    MR. VOLLRATH:  Object to form.

20         **A    I have no idea how it was done.  I'm not an**

21   **actuary.  I'm not a CPA.  And I got no idea how he came**

22   **up with that --**

23         Q    (BY MS. DARWIT)  Okay.

24         **A    -- none whatsoever.**

25         Q    And the loss reserve reported for 2015 of

Johnson, III, William E.                                    July 24, 2023

118

1    $800,000 -- or 735 -- $728,000, how do you reconcile that

2    with the amount that was reported as losses for Emerald

3    on its financial statements for 2015?

4         **A    Well --**

5              MR. VOLLRATH:  Object to form.

6         **A    I -- number one, I can't resolve it because I**

7    **don't know how they came up with it because, as I say,**

8    **I'm not an actuary.  I'm not a CPA.  I don't know how he**

9    **came up with it.**

10        Q    (BY MS. DARWIT)  Okay.

11        **A    I never talked to the man.**

12        Q    And do you know who would know how to reconcile

13   those figures?

14             MR. VOLLRATH:  Object to form.

15        Q    Probably Celia Clark?

16             THE COURT REPORTER:  I'm sorry.  Was there

17   an objection?

18             MR. VOLLRATH:  There was an objection.

19   There's been an objection to the past several questions.

20   I wonder if you got that.

21             THE COURT REPORTER:  That last objection

22   was inaudible.  Thanks.

23             MR. VOLLRATH:  Okay.  Lauren, I don't know

24   if you heard the objections, but do you mind if I -- if I

25   explain the objection just a little bit or --

Johnson, III, William E.                                    July 24, 2023

119

 1                    MS. DARWIT:  No, I think I'm good.

 2                    MR. VOLLRATH:  -- how do you want to do

 3     it?

 4                    MS. DARWIT:  I'm good.  I'm good.  And we

 5     heard yours, Derick.  We heard the past couple.  We just

 6     didn't hear the one that she --

 7                    MR. VOLLRATH:  I just want to make sure

 8     that the court reporter's got it.

 9                    MS. DARWIT:  Oh, well, I think she just

10     said that she heard all but the last one, was not audible

11     that you just said.  So --

12                    MR. VOLLRATH:  Okay.

13                    MS. DARWIT:  -- she jumped in right way

14     and said, can you please clarify.

15                    MR. VOLLRATH:  Perfect.  Thank you.

16                    MS. DARWIT:  Yeah.

17          Q    (BY MS. DARWIT)  Okay.  So was your -- was your

18     testimony that you're not sure how much Emerald paid out

19     as loss payments for the 2015 year?

20          **A    I can't remember.**

21          Q    Okay.  And the same thing for 2016, do you know

22     how much they paid out?

23          **A    No, hunh-uh, I can't remember at all.  It's**

24     **been seven or eight years ago.**

25          Q    Fair enough.

Johnson, III, William E.                                July 24, 2023

120

1           Did you ever review the loss ratios

2   experienced by the actual captive insurance companies who

3   participated in Emerald's pool?

4       A    I can't remember doing that.

5       Q    Okay.  Okay.  I'm shifting gears a little bit.

6   So who -- who decided whether to approve or deny an

7   insurance claim submitted to Emerald?

8       A    Originally Heritor.  If they objected to

9   Heritor's decision, it was referred to Hamlin & Burton,

10  and they prepared a detailed analysis of whether they

11  agreed with the claimant or they agreed with Heritor.

12  And that was submitted back to the claimant, and the

13  claimant either -- most of time, they accepted the Hamlin

14  & Burton analysis.  They were pretty long and detailed.

15          And I think I even included one in the

16  documents that I turned over to y'all.  And you'll see it

17  was quite lengthy and quite detailed and specific.  And

18  in the event that they still disagreed with us, then we

19  negotiated or they just sued us if we refused to pay any

20  of it.

21      Q    Okay.  And who was your primary contact at

22  Heritor?

23      A    My primary contact as long as he was fully

24  functional was Robin.  When he began to get sick, it was

25  Muhlenbruch.

Johnson, III, William E.                               July 24, 2023

121

1      Q    Okay.

2      **A    Curtis.**

3      Q    And you do you know who owned Emerald -- or who

4  owned Heritor?

5      **A    I think that Robin did, but I think that Curt**

6  **acquired some ownership in it as the responsibility began**

7  **to shift over because of Robin's illness.**

8      Q    Okay.

9      **A    But I was never a part of that, so I really**

10 **honestly don't know percentages or anything like that.**

11     Q    Okay.  Okay.  Did Heritor ever contact pool

12 participants directly about their claims?

13     **A    Did who what?**

14     Q    Did Heritor ever contact pool participants

15 directly about their insurance claims?

16     **A    I don't know.**

17          MR. VOLLRATH:  Object to form.

18     Q    (BY MS. DARWIT)  What role did Emerald play in

19 claims processing?

20     **A    What role did Emerald play in the claims**

21 **processing?**

22     Q    (Nods head.)

23     **A    We acted on the processing done by Heritor and**

24 **followed up if there was a disagreement with the Hamlin &**

25 **Burton, but we didn't make decisions until we had**

Johnson, III, William E.                                          July 24, 2023

122

1    recommendations from either Heritor or Heritor and

2    Hamlin & Burton.

3        Q    Uh-huh.

4        A    And that was a point when the board had to

5    decide what we were going to do.

6        Q    So the board decided whether a claim would

7    ultimately be approved or denied?

8        A    No, that was done.  It's what were we going to

9    do about it?  I mean, you know, if it was denied, it was

10   denied.

11       Q    Got it.  So the board would decide, after there

12   was an approval or a denial, whether to make the payment?

13       A    Yeah, whether we were going to try to negotiate

14   something or just let them sue us, if that's what they

15   decided they were going to do.

16       Q    Okay.

17       A    I mean, we were not involved in processing the

18   claims.  That was what Heritor was paid to do.

19       Q    Okay.  Did Celia Clark have any involvement in

20   deciding after a claim was approved or denied whether to

21   make a payment to a captive?

22       A    I don't think she ever did.

23            MS. DARWIT:  Okay.  Okay.  I'm going to

24   mark my next document.  This will be Exhibit 193.  It's

25   Bates-stamped Johnson Emerald Production 05479.  And this

Johnson, III, William E.                                    July 24, 2023

123

1   is a seven-page document.  I'm going to scroll down and

2   go from bottom to top.

3                  (Exhibit 193 marked.)

4       Q    (BY MS. DARWIT)  So on PDF Page 6 here, which

5   is Bates-stamped Johnson Emerald Production 05484, this

6   is an email from Robin Trevors in October of 2017, right?

7       **A    Wait a minute.  What -- on October 22nd, Robin**

8   **Trevors -- "We need to make a plan for closing out the**

9   **pools."**

10      Q    Yeah, so I'm just asking whether this is an

11  email that you wrote in October of 2017.

12      **A    Yeah, that's what it says, the date.**

13      Q    Okay.  And so Mr. Trevors states that, "We need

14  to make a plan for closing out the pools."

15                  Do you see that?

16      **A    Yes.**

17      Q    Okay.  And he's talking about the December 15

18  and December 2016 pools?

19      **A    Yes.**

20      Q    Okay.  And he -- among other things here in

21  Paragraph 3, he suggests appointing an outstanding claims

22  coordinator, right?

23      **A    Yes, he does.**

24      Q    Okay.  And Paragraph 4, he suggested the

25  current trustee should resign.

Johnson, III, William E.                              July 24, 2023

124

1              Do you see that?

2        A     That's the -- yeah, you're talking about the

3   trustees of the pool.

4        Q     Okay.  So in Paragraph 4, he's suggesting that

5   the current trustees of the Emerald pool resign?

6        A     Yes.

7        Q     Okay.  And then in Paragraph 8, he states that,

8   "Expenses will have to be settled out of the pool since

9   there's no real income available."

10             Do you see that?

11       A     Yes.

12       Q     Okay.  And I'm going to scroll up here to the

13  bottom of PDF Page 5 which is Bates-stamped Johnson

14  Emerald Production 05483.  This is an email that you sent

15  in response to Mr. Trevors, right?

16       A     Yes.

17       Q     Okay.  And you tell Mr. Trevors that you agree

18  with his course of action.  Do you see that?

19       A     I'm reading it.

20       Q     Okay.  Take your time.

21       A     Yes.  And I still agree with my evaluation

22  there.

23       Q     Okay.  Why did the trustees of the Emerald pool

24  need to resign?

25       A     I don't remember why.

Johnson, III, William E.                                    July 24, 2023

125

1      Q    And the expenses that Mr. Trevors references in
2  Paragraph 8 of his email, what did you understand those
3  to be referring to?

4      **A    Which line are you talking about?**

5      Q    Paragraph 8 here, do you see where it --
6  Mr. Trevors says --

7      **A    Yeah.**

8      Q    -- expenses will have to be --

9      **A    Out of the pool --**

10     Q    Hang on just one second.

11          Paragraph 8 here, do you see where it says
12  that expenses will have to be settled out of the pool
13  since there is no real income available?

14     **A    Yes.**

15     Q    So I'm just wondering, are those expenses
16  referring to loss payments on claims?

17     **A    Any other expenses with Hamlin & Burton, and**
18  **this was the beginning of the end, which ultimately ended**
19  **up in us having to pay all the rest of our capital**
20  **primarily in legal fees fighting some these people that**
21  **were trying to basically defraud the pool.**

22     Q    Okay.  So this refers to the third-party
23  expenses.  Here it's referring to third-party fees?

24     **A    Yeah.  Litigation is expensive.**

25     Q    Okay.  So there was not enough money in the

Johnson, III, William E.                                    July 24, 2023

126

1    Emerald trust account to cover those third-party

2    expenses?

3        A    The Emerald -- when you say the Emerald trust

4    account, you mean the Emerald bank accounts?

5        Q    The trust account that received premium

6    payments, that account.

7        A    Oh, you mean in terms of how much had not been

8    returned to the -- I believe that's -- we're talking

9    about 5 percent now that had been worrying me --

10       Q    Uh-huh.

11       A    -- ultimately turned out to be a valid worry.

12       Q    Why was it a valid worry?

13       A    Because it ate up 100 percent of our personal

14   reserves, that's why.

15       Q    Okay.

16       A    And we had no more income.

17       Q    And when you say "it," are you referring to the

18   loss payments that were made?

19       A    No, I'm referring to the mainly litigation

20   expenses.

21       Q    Litigation expenses.  Okay.

22       A    And CPA expenses.

23       Q    Okay.

24       A    For -- for -- we had all the ongoing stuff to

25   pay and no way to pay it except out of our capital, which

Johnson, III, William E.                                    July 24, 2023

127

1   was ultimately, I believe, 100 percent used up.  I don't

2   believe we got a dime back from that quarter of a million

3   dollars we put in.

4        Q    Okay.  Okay.  And -- all right.  And then you

5   state here in your second sentence of your email, that

6   you firmly believe that "we must reserve out of any

7   partial liquidation of these pools enough money to pay

8   all of such claims in the event after arbitration and/or

9   litigation such claims are upheld."

10             Do you see --

11       A    Yeah.

12       Q    -- that?  Do you see that?

13       A    Yes.

14       Q    Okay.  And then you state in the next sentence,

15  "Otherwise we are likely to lose unnecessarily all our

16  capital investment in Emerald."

17       A    Which is exactly what happened.

18       Q    Okay.  So I'm trying to understand where we are

19  at, at this point in October of 2017.  So at this point

20  in October of 2017, the 5 percent reserve for the 2015

21  and 2016 pools had not gone out to the captives yet; is

22  that right?

23       A    No, we hadn't.

24       Q    You hadn't?

25       A    As I recall we still had that money.

Johnson, III, William E.                    July 24, 2023

128

1      Q     Okay.  And --

2      A     And we had some claims that we did consider to

3  be dubious or fraudulent.

4      Q     Okay.  And at this point in October of 2017,

5  the 5 percent reserve for the 2015 and 2016 pools was

6  insufficient to cover outstanding claims against the

7  pool --

8      A     I don't remember the license --

9      Q     Hang on.  Hang on a second.  Let me get the

10  question out.

11            So the funds that were in the Emerald

12  trust account, which were the 5 percent reserve for 2015

13  and 2016, were insufficient to cover all of the

14  outstanding claims in full assuming that they were all

15  approved?

16      A     I don't know the answer to that question --

17            MR. VOLLRATH:  Object to form.

18      A     -- because I don't remember how much was there,

19  but suspected that might end up being the situation.

20      Q     (BY MS. DARWIT)  Okay.  Why would the 5 percent

21  reserve impact the capital investment of Emerald's

22  shareholders?

23      A     Why would it?

24      Q     (Nods head.)

25      A     Well, if we have to run a company without any

Johnson, III, William E.                                              July 24, 2023

129

1    income and we end up getting held liable, the company

2    does, for paying something, where is it going to come

3    from but from our capital.

4         Q    But didn't Emerald have the right to go back to

5    full participants, to ask them to pay for approved claims

6    if there wasn't enough reserve?

7         A    "Ask them" is a key part of that, not force

8    them.  And not only that, what would we use?  Hire a

9    bunch of lawyers we couldn't afford to sue them?

10        Q    But ultimately Emerald had a contractual right

11   to go after those captives that participated in the pool,

12   right?

13        A    Justice is there for those who can afford it.

14        Q    Okay.

15        A    And we couldn't afford it.

16        Q    Got it.  So you would rather lose your own

17   investment in Emerald than ask pool participants --

18        A    No.

19        Q    -- to meet their contractual obligations?

20        A    I didn't have any problem asking them at all.

21        Q    Okay.

22        A    I had a problem with probably not being able to

23   collect them.

24        Q    Okay.  And did Emerald ask the pool

25   participants --

Johnson, III, William E.                                    July 24, 2023

                                                                    130

1        A     I don't --

2        Q     -- to make payments?

3        A     I don't remember.

4        Q     So is it fair to say that in your view, the --

5   your capital contribution had to be used to pay

6   outstanding claims because you didn't think that, if push

7   came to shove and you had to force someone to pay up on a

8   loss claim, you would be able to actually get the money

9   from them?

10       A     That's what I'm saying, is that we didn't have

11  the money to hire the lawyers to press the claims.

12       Q     Okay.

13       A     I had no idea how many people would just pay

14  because a lot of them would.  A lot of them were

15  honorable.  But with the amounts of some of those claims,

16  it didn't take a whole lot of them, you know, to cause us

17  a financial disaster when we have no income, no hope of

18  income.  It was -- the handwriting was on the wall by

19  this time.  It was going to go down.  And for a while we

20  hoped that we would be able to save some of our capital

21  investment.  That turned out not to be so.

22       Q     Okay.

23       A     And I can tell you most of it went to

24  litigation expense.

25       Q     Okay.  So it wouldn't have been cost-effective

Johnson, III, William E.                    July 24, 2023

131

1    for Emerald to go after the pool participants for their
2    share in reimbursing a loss payment?
3        A    Well, I didn't want to incur a whole bunch more
4    legal fees that we probably couldn't pay and I get a
5    bunch of lawyers mad at me.  I am a lawyer, and I
6    wouldn't want to get some of my associates --
7        Q    Okay.
8        A    -- on the -- in the Dallas bar mad at me
9    because I was hiring them to do stuff they're -- you
10   know, there was no way to get them paid unless I wanted
11   to guarantee it personally, and I wasn't about to do
12   that.
13       Q    Okay.  And then here -- I just scrolled up a
14   little bit, and this is still the page that's
15   Bates-stamped Johnson Emerald Production 05483.  This is
16   an email from Mr. Shepherd to you with some others
17   copied, right?
18       A    Yes, that came from Jim Shepherd.
19       Q    Okay.  And he says here in the first sentence
20   that he agrees with you, "and I think I need to state the
21   obvious here that all pool participants need to
22   understand that this is an insurance pool, and as such,
23   it can only pay out the balance of the pool less pending
24   claims."
25       A    Yes.

Johnson, III, William E.                                    July 24, 2023

132

1       Q     Do you think that the pool participants fully
2   appreciated the risk that they would have to pay --
3   potentially pay part of the loss payment that wasn't
4   covered by the 5 percent reserve?
5       A     Well, the only ones that I talked to were my
6   clients --
7                   MR. VOLLRATH:  Object to form.
8       A     -- and I only had a very few of them in here.
9   I didn't even know all the rest of these other people.
10      Q     (BY MS. DARWIT)  Sure.
11      A     I never met them.  I haven't met them since.
12  They were total strangers.
13                  THE COURT REPORTER:  I'm sorry.
14                  MR. VOLLRATH:  I object to the form of
15  that question.
16                  THE COURT REPORTER:  I'm sorry.  The last
17  few objections, I can barely hear them.  I guess you said
18  "form."  It's pretty much inaudible.  I don't know why.
19  I'm sorry.
20                  MR. VOLLRATH:  Yeah.  All I'm saying is
21  "object to form," and that's it.  Did you hear me?
22                  THE COURT REPORTER:  On the last few
23  except the last one.  It's not -- it's not -- it's
24  not audible.
25                  MR. VOLLRATH:  (Inaudible).

Johnson, III, William E.                                    July 24, 2023

133

```
 1                 THE COURT REPORTER:  I'm sorry.  Okay.
 2                 MR. VOLLRATH:  Just let me know if you
 3    can't hear the objection, but the objection is going to
 4    be "Objection; form."
 5        Q    (BY MS. DARWIT)  Okay.  Okay.  So I can
 6    appreciate that a lot of these pool participants weren't
 7    your clients, but if we're talking about the clients that
 8    you have that participated in the pool, do you think that
 9    you fully appreciated the risk that they had, that they
10    might have to pay additional money beyond what Emerald
11    kept as part the 5 percent loss reserve?
12        A    You know, I've got to just say that that would
13    be pure conjecture and subjective on my part because I
14    was not privy to their thought processes.
15        Q    Did you ever discuss the risk of potentially
16    needing to pay additional --
17        A    I did not --
18        Q    -- money for --
19        A    I did not.  I do not remember --
20        Q    Hang on one sec.
21             Did you ever discuss the risk of needing
22    to potentially pay additional loss payments that were
23    beyond the 5 percent reserve?
24        A    I don't remember.
25        Q    Okay.  And I'm going to go ahead and scroll up
```

Johnson, III, William E.                                    July 24, 2023

134

1    to PDF Page 2, which is Bates-stamped Johnson Emerald
2    Production 05480.
3                 The bottom of this page has an email from
4    somebody by the name of Michael Strickland, right?
5         A    I don't remember who Michael Strickland was.
6         Q    Okay.  Do you remember this email?
7                 Take a second to read it and then let me
8    know.
9         A    Do I remember who?
10        Q    Just take a look at this -- at this email right
11   here that's on the screen, and then I'll ask you a
12   question.  Let me know when you're done reading.
13        A    I don't know who this Michael Strickland was.
14   He may have been an owner of one of the CICs trying to
15   figure out when he was going to get his remaining
16   premiums back, but I don't know who he is.
17        Q    Okay.  Got it.
18                Do you see in the second paragraph, the
19   second sentence where he states, "We were also told there
20   was going to be a provision made for these claims and
21   that the majority of our past-due distribution would be
22   forthcoming posthaste"?
23        A    I see what he said, yes.
24        Q    Okay.  Was there a specific, I guess, due date
25   for the distribution that he's referring to here?

Johnson, III, William E.                                    July 24, 2023

135

1      A    I don't recall that there was a specific date

2 for paying out the last 5 percent.

3      Q    Okay.

4      A    I don't remember.

5      Q    Okay.  All right.  And then just a separate

6 question that has nothing to do with this document.

7           Do you know if any claims were filed with

8 Emerald with respect to the political violence coverage

9 that it offered?

10     A    I don't recall.  I'm certainly glad we didn't

11 have any in Manhattan in 2001.  You know, the losses were

12 horrendous.  The World Trade Center was destroyed, and

13 3,000 people were killed.  Property damage was in the

14 billions.  I'm sure glad we didn't have anything there.

15     Q    That wasn't my question.

16          My question was whether any claims were

17 filed under the political violence policy that Emerald

18 reinsured.

19     A    I don't -- I don't recall.  I don't recall if

20 there were any.

21     Q    Okay.

22     A    But remember, Heritor was the one that dealt

23 the claims.

24     Q    Sure.

25     A    Not me.  You know, that's not something the

Johnson, III, William E.                    July 24, 2023

136

1   board of directors, the (inaudible) you know, stuff like

2   that.

3        Q    Okay.

4        A    That's not what the board does.

5        Q    Have you heard of Jade Reinsurance?

6        A    Yes.

7        Q    Okay.  Are you aware that that was the

8   reinsurance pool that was used to reinsure the risks --

9        A    Prior to Emerald --

10       Q    Hang on one sec.  Yeah.

11            Are you aware that that's the reinsurance

12  pool that was used by Ms. Clark in order to reinsure

13  captives that she formed those risks before Emerald?

14       A    Yes.

15       Q    Okay.

16            MR. VOLLRATH:  Object to form.

17       Q    (BY MS. DARWIT)  And why did -- do you know why

18  Ms. Clark made the switch from Jade to Emerald?

19            MR. VOLLRATH:  Object to form.

20       A    Do I know why?  I don't recall why.  Was Jade a

21  full insurance company?  I don't know.

22       Q    (BY MS. DARWIT)  Well, what do you know about

23  Jade Reinsurance?

24       A    Very little.

25       Q    Okay.  What do you remember, if anything?

Johnson, III, William E.                                    July 24, 2023

137

1        A    I think that I at one time knew who owned it,

2   but I never had any personal contact with Jade or, you

3   know, I don't know what was going on in Celia's mind or

4   whatever except that we set up a U.S. insurance company

5   organized under the laws of Alabama designed to be a real

6   bona fide, I believe was your adjective, insurance

7   company.  And those of us who were involved in it did the

8   best we could to do what we were supposed to.

9        Q    Are you familiar with a company called

10  Pan American Reinsurance Company?

11       A    No.

12       Q    Okay.  You had several co-counsel retainer

13  agreements with Ms. Clark, right?

14       A    Yes.  For my clients only.

15       Q    Yeah.  Around when approximately did you and

16  Ms. Clark begin to work together as co-counsel?

17       A    2013 or '14, somewhere in the beginning.  I

18  just don't remember.  It's been over 10 years ago.

19       Q    Okay.  What services did you provide generally

20  as part of these co-counsel retainer agreements?

21       A    I got all the information down here in Texas

22  for all of the stuff that she wanted.  I was of the gofer

23  on the ground.  She had tons of information that she

24  needed, and it was my job to go out and get it from the

25  clients.

Johnson, III, William E.                        July 24, 2023

138

1      Q    Okay.

2      A    **Get them to her.**

3      Q    As part of those co-counsel retainer

4  agreements, you and Ms. Clark agreed to form captive

5  insurance companies for your clients --

6      A    **Yeah.**

7      Q    -- right?

8      A    **Uh-huh.**

9      Q    Okay.  And you agreed to also manage those

10  captive insurance companies; is that fair?

11      A    **I didn't manage them.**

12      Q    Okay.  What sort of services would you provide

13  to the captive insurance companies that you and Ms. Clark

14  formed?

15      A    **Primarily getting all the information together**

16  **so that he could set them up.**

17      Q    So are you referring to coordinating

18  applications with --

19      A    **Yes.**

20      Q    -- customers?

21      A    **Everything that they needed.  You know, she had**

22  **lists and lists of questions.  And I would go out to**

23  **their offices and get the answers to them.**

24      Q    Okay.  Got it.

25             MS. DARWIT:  And I'll go ahead and mark my

Johnson, III, William E.                                    July 24, 2023

139

1    next document as Exhibit 194.  It's Bates-stamped CLARK

2    PROD 0228077.

3                    (Exhibit 194 marked.)

4                    MR. VOLLRATH:  And, Lauren, can I ask for

5    a five-minute break when it's a good time?

6                    MS. DARWIT:  Sure.

7                    MR. VOLLRATH:  Thanks.

8        Q    (BY MS. DARWIT)  Okay.  So, Mr. Johnson, take a

9    look at this.

10                   Okay.  And my first question is just

11   whether you recognize this document.

12       A    **I recognize the client.**

13       Q    Okay.  And this is a copy of a retainer,

14   co-counsel retainer agreement --

15       A    **Uh-huh.**

16       Q    -- you and Ms. Clark had for Jopen LLC?

17       A    **Yes.**

18       Q    Okay.  And according to this agreement, you and

19   Ms. Clark agreed to oversee the creation and maintenance

20   of a closely held insurance company to be tax qualified

21   under Section 831(b)

22       A    **Uh-huh.**

23       Q    Is that a yes?

24       A    **Yes.**

25       Q    Okay.  You also --

Johnson, III, William E.                                    July 24, 2023

                                                                    140

1                    MR. VOLLRATH:  Lauren, share your

2       screen -- sorry.  Are you sharing your screen?  Because I

3       don't have the document.

4                    MS. DARWIT:  Oh, yeah.  Hang on.  Let me

5       share it.

6                    MR. VOLLRATH:  Thank you.

7            Q     (BY MS. DARWIT)  Okay.  And then the second

8       bullet here, you and Ms. Clark agree to handle all the

9       tax issues with the company, right?

10           **A     I'm just reading it.**

11           Q     Sure.

12           **A     And it is what it says.**

13           Q     Okay.  Is that what it says?

14           **A     It says, "Overseeing the creation and**

15      **maintenance of one closely held captive insurance company**

16      **to be tax-qualified under Internal Revenue Code**

17      **Section 831(b) and licensed in Nevis.**

18                    **"Handling all domestic and foreign federal**

19      **tax issues related to the formation and continuation of**

20      **the company as well as any liquidations or distributions**

21      **of the company.**

22                    **"Submitting all materials, other than tax**

23      **returns, as required to the IRS.**

24                    **"All ongoing ordinary corporate and**

25      **federal tax matters of the company.**

Johnson, III, William E.                                     July 24, 2023

141

1              "Preparation of all insurance license

2    application papers for the company.

3              "Working with the insurance manager on

4    creation of the company business plan and design of

5    insurance policies.

6              "Overseeing the insurance manager with

7    respect to regulatory compliance.

8              "Hiring and evaluating professionals for

9    premium analysis certification."  Mr. Rosenbach -- what

10   was his name, Allen, whatever it was.

11             "Representing the company in an IRS audit

12   up to the appeals level.

13             "Acting as liaison to insurance consultant

14   and insurance brokers, if any.

15             "Reviewing tax returns prepared by the

16   company's accountant.

17             "Review of commercial insurance coverage

18   in preparation of proposals to integrate captive

19   insurance with same."

20        Q    Okay.  Did -- who wrote the retainer agreement?

21        A    Celia did.

22        Q    Okay.  How were fees allocated between you and

23   Ms. Clark?

24        A    It says right there.  It's in the agreement.

25        Q    So according to the agreement, initial fees

Johnson, III, William E.                                    July 24, 2023

142

1    would be $80,000, right?

2         A     I think for the entire thing, yeah.

3         Q     Okay.  Do you remember approximately how

4    much -- or here, I think I can direct your attention

5    here.

6         A     Yeah -- go ahead.

7         Q     Do you see where it states the amount of $3,000

8    will be paid to WEJ --

9         A     Yeah.

10        Q     -- for its share of legal services?

11        A     That's it.

12        Q     Okay.  So that was the -- the fee that you

13   received from this client?

14        A     That was it.

15        Q     Okay.

16        A     Uh-huh.

17        Q     Why did you and Ms. Clark decide to do a joint

18   retainer agreement?

19        A     Because I was the one that was out there

20   spending all the time getting the information.  I don't

21   think she had time.  Anyway, I had a relationship with

22   all of my clients.

23        Q     Okay.  And we walked through some of the

24   services under the retainer.  But I would like to know

25   who was responsible for which services.

Johnson, III, William E.                                    July 24, 2023

143

1            So I can start with the first one here.

2     Who is responsible for --

3            MR. VOLLRATH:  Lauren, would you mind

4     showing me the date on this document, just -- thank you.

5     Sorry to interrupt.

6        Q     (By MS. DARWIT)  And so as far as this first

7     bullet here, who was responsible for overseeing the

8     creation and maintenance of a captive to be tax qualified

9     under 831(b)?

10       **A     Celia, her law firm.**

11       Q     Sorry.  What was that?

12       **A     Celia's law firm.**

13       Q     Okay.  Who was responsible for handling

14    domestic and foreign federal tax issues?

15       **A     She was responsible for most of that.  I**

16    **answered a lot of the questions that the clients asked**

17    **about federal tax issues.**

18       Q     Okay.  Who submitted materials to the IRS?

19       **A     She did after I gathered up the answers that**

20    **she needed to be able to do that.**

21       Q     Okay.  Who prepared the insurance license

22    application papers for the company?

23       **A     I'm pretty sure that they did.**

24       Q     They meaning Celia Clark?

25       **A     Celia Clark's law firm.**

Johnson, III, William E.                                    July 24, 2023

144

1      Q     Okay.  And who worked with the insurance

2    manager on creating a business plan and designing

3    insurance policies?

4      **A     They wrote the business plan, Celia Clark's law**

5    **firm.**

6      Q     Okay.  And who was responsible for overseeing

7    the insurance manager with respect to regulatory

8    compliance?

9      **A     Once again, it would have been her law firm**

10     Q     And was it Ms. -- was it Ms. Clark's law firm

11    that was responsible for hiring and overseeing

12    professionals for premium analysis certification?

13     **A     Yes.  That was with, once again Allen, whatever**

14    **his last name is, the actuary.**

15     Q     Okay.  And who -- was it Ms. Clark's law firm

16    that was responsible for representing the company in an

17    IRS audit?

18     **A     Actually, we both did that.**

19     Q     Okay.  Who acted as a liaison to insurance

20    consultants and insurance brokers, if any?

21     **A     I don't recall any insurance brokers.**

22     Q     Okay.  And then who reviewed the tax returns

23    prepared by the company?

24     **A     Celia and I -- Celia did primarily, but I would**

25    **usually take a look at them too.**

Johnson, III, William E.                    July 24, 2023

145

1      Q    Okay.  And who reviewed the commercial
2  insurance coverage and prepared the proposals to
3  integrate captive coverage with the same?
4      **A    That would be Celia because I'm not an**
5  **insurance lawyer, and the only insurance I have is my**
6  **own.**
7      Q    Okay.  And separate from what's in this
8  retainer, who had responsibility for advising clients
9  about any restrictions that might be applicable to their
10  investments that the captive could make?
11     **A    Ask the question again.**
12     Q    Sure.  Who was responsible for advising clients
13  about any restrictions that apply to investments that the
14  captive could make?
15     **A    I actually did on some of the -- you know, like**
16  **no insurance, life insurance.  And then I tried to**
17  **explain to them they couldn't have any self-dealing**
18  **between the captive and the owner of the captive or the**
19  **insurers.  So I ended up answering a lot of those**
20  **questions.**
21     Q    Okay.
22     **A    They would call me and say, can we do this; and**
23  **I usually said no.**
24            MS. DARWIT:  Okay.  I'm going to mark my
25  next document.  And do you want to just move your water?

Johnson, III, William E.                                    July 24, 2023

146

1    I just keep seeing it moving, and I am afraid you're

2    going to knock it over.

3                    THE WITNESS:  Yeah.

4                    MS. DARWIT:  Thank you.

5                    Okay.  The next document will be marked

6    Exhibit --

7                    MR. VOLLRATH:  Lauren, is now a good time

8    for taking a break?

9                    MS. DARWIT:  Let me just get through this

10   document, and then we can take it, Derick.

11                   MR. VOLLRATH:  Thanks.

12                   MS. DARWIT:  Okay.  This is Exhibit 195.

13   It's Bates-stamped CLARKSDFL 715403.

14                   (Exhibit 195 marked.)

15       Q    (BY MS. DARWIT)  Okay.  And just take a moment,

16   Mr. Johnson, and please read this document.  Here, I'll

17   zoom in for you.

18       **A    Yeah, I remember that guy is a Canadian.**

19       Q    Okay.  So this -- well, let's start from the

20   beginning.  So this is an email that you sent to

21   Ms. Clark --

22       **A    Uh-huh.**

23       Q    -- in February of 2012, right?

24       **A    Yeah.**

25       Q    Okay.  And in this email, you're asking

Johnson, III, William E.                                    July 24, 2023

147

1    Ms. Clark whether one of your mutual clients could pay a

2    $200,000 dividend from his captive up to the captive

3    shareholder?

4          **A      Yeah.**

5          Q      Okay.  And in response Ms. Clark sends an email

6    to you still in February of 2012, right?

7          **A      Yeah.  I guess she was going to talk to the**

8    **Nevisian insurance commission.**

9          Q      Okay.  So in response to your email, Ms. Clark

10   states here that, "As far as All Stars dividend, it's a

11   little aggressive, but as you say, the reasons are

12   excellent."

13               Do you see that?

14         **A      Yeah, yes.**

15         Q      And then she states that she will -- "We will

16   prepare the resolutions describing the situation and

17   requesting approval," right?

18         **A      Yes.**

19         Q      Okay.  Okay.  So did you typically seek

20   Ms. Clark's guidance when a client asked you for

21   permission to make a dividend from its captive up to the

22   shareholder?

23         **A      Yeah.  Again, that's the only one I remember.**

24         Q      Okay.

25         **A      As you say, he had a big reason there.  He was**

Johnson, III, William E.                                    July 24, 2023

148

1    **trying to become a citizen.**

2        Q    Okay.

3                MS. DARWIT:  All right.  Why don't we go

4    off the record.

5                THE VIDEOGRAPHER:  We're now off the

6    record.  The time is 2:20 p.m.

7                (Break taken.)

8                THE VIDEOGRAPHER:  We're now on the

9    record.  It's 2:32.

10               MS. DARWIT:  Thank you.

11       Q    (BY MS. DARWIT)  Mr. Johnson, who was

12   responsible for advising your mutual clients with Celia

13   Clark about the need to hold back some amount of funds in

14   the captive to pay any additional claims?

15       **A    I guess it would have been Celia.**

16       Q    And Ms. Clark's advice on that topic was to

17   hold back at least 30 percent of the premiums that were

18   received as reserves; is that accurate?

19       **A    I don't remember.**

20       Q    Okay.  Who was responsible for structuring the

21   captive insurance companies' ownership?

22       **A    The ownership?**

23       Q    Uh-huh.

24       **A    Celia had to, you know, opine on who was going**

25   **to own it.**

Johnson, III, William E.                                    July 24, 2023

149

```
 1              MR. VOLLRATH:  Objection to form.
 2       A    I don't remember the rules about who could own
 3    them.
 4       Q    (BY MS. DARWIT)  Okay.
 5       A    I haven't thought about this stuff in years.
 6       Q    Sure.  To the best of your recollection, was
 7    the ownership structure of the captive important?
 8       A    Yes, I think it was.
 9       Q    And do you remember why?
10       A    No.
11       Q    Okay.
12       A    I do not.
13       Q    Did any of your clients have captive insurance
14    companies that were owned by trusts that were created for
15    the benefit of your client's family members?
16       A    Probably.
17       Q    Okay.  And why do you say "probably"?  Do you
18    remember a client --
19       A    I don't --
20       Q    -- having that structure?
21       A    I don't remember -- you know, I hadn't thought
22    about these in years.
23       Q    Okay.  And is there a reason why that is
24    probable?
25       A    Well --
```

Johnson, III, William E.                                    July 24, 2023

150

 1              MR. VOLLRATH:  Object to form.
 2        A     You -- why, in my opinion, might it be
 3   probable?
 4        Q     (BY MS. DARWIT)  Yeah.
 5        A     Well, a couple of reasons.  Number one, to
 6   separate any potential liability of the -- of the captive
 7   from the client.  And then in the event that, I guess,
 8   that -- that captive ended up acquiring, you know, a fair
 9   amount of capital over five years of operations or
10   however many years they operated, if that -- if that were
11   dividended ultimately to a trust, then that income inside
12   the trust would probably be protected from the client's,
13   you know, personal liabilities.
14        Q     Were captive insurance companies used by your
15   clients as estate planning tools?
16        A     As estate planning tools?  There wasn't a whole
17   lot of opportunity to do that.  Basically, I had -- I
18   would get all of their companies into asset-protected
19   trusts.  So in other words, the company that was insured
20   was probably already owned.
21              That's what I do.  I hardly own anything
22   other than my homestead and my cars and my toys.
23   Everything else I own is inside of generational skipping
24   trust, bulletproof, protecting my kids from divorces,
25   everything I can possibly think of.  So I think

Johnson, III, William E.                                July 24, 2023

151

```
 1    already -- I've done the estate planning.  Everything
 2    these guys own is in their trust.
 3         Q    Okay.  Did you have any clients that formed
 4    more than one captive?
 5         A    Two.
 6         Q    Okay.  What reason is there to form more than
 7    one captive?
 8         A    They changed the law --
 9              MR. VOLLRATH:  Object to form.
10         A    -- regarding the amount of total premiums, and
11    the two involved have lots, lots of companies and lots of
12    real and potential liabilities, and they're both in
13    litigation in the tax court with you guys.
14         Q    (BY MS. DARWIT)  Okay.
15         A    They have been for years.
16         Q    Do you know the names of those clients?
17         A    Yes, but I won't give them to you.
18         Q    Okay.  So you mentioned the law changing.  What
19    specifically -- what about the law changing impacts have
20    you --
21         A    The what?
22         Q    What about the law changing impacts having more
23    than one captive?
24         A    The Washington impact.
25         Q    No.  So you -- I think -- did you mention that
```

Johnson, III, William E.                                    July 24, 2023

152

1   when I asked you why form more than one captive, didn't

2   you say something about how the law changed?

3       **A      Yes, it did.**

4       Q    Okay.  What law are you referring to?

5       **A      The amount of 831(b).  It was 1 million 2, and**

6   **then it went to 2 million 2.**

7       Q    Say that again.

8       **A      The amount of premium -- maximum premium that**

9   **an 831(b) captive could have was raised by Congress from**

10  **a million 2 to 2 million 2.  It was a change in the**

11  **congressional law.**

12      Q    Okay.

13      **A      You know, it's -- they just changed the rules.**

14      Q    So if one of your clients was going to exceed

15  the $1.2 million threshold at the time before the law

16  changed --

17      **A      Yeah.**

18      Q    -- then it would form another captive if it had

19  additional premiums?

20      **A      I only had two that ever did.**

21      Q    So hang on.

22            If -- if you had a client who was going to

23  exceed the $1.2 million deduction of taxable income

24  inclusion threshold of 831(b), at that point they would

25  form a second captive?

Johnson, III, William E.                                    July 24, 2023

153

1     A     Well, in the --

2           MR. VOLLRATH:   Object to form.

3     A     -- in the particular case --

4           MR. VOLLRATH:   Object to form.

5     A     What did he say?

6     Q     (BY MS. DARWIT)  He just objected, but you can

7  go ahead and answer.

8     A     Oh, yeah.  Well, I mean I just had two that

9  ever did, and they're both in litigation with you.

10    Q     Okay.  So my question was when you had a

11 client, such as the two that you mentioned, that was --

12 that wanted to pay more than $1.2 million in premiums, at

13 that point they would form a second captive?

14    A     Well, it only happened twice.

15          MR. VOLLRATH:   Object to form.

16    Q     (BY MS. DARWIT)  They only what?

17    A     It only happened twice.

18    Q     Right.  That's not my question.

19    A     Well, you --

20    Q     My question is -- is at what point would

21 forming a second captive make sense for one of your

22 clients?

23    A     If they've got huge amounts of income from a

24 whole bunch of different companies and those companies

25 have a lot of risk.  Some of them have had some pretty

Johnson, III, William E.                                      July 24, 2023

154

1    catastrophic losses.

2         Q    Okay.  And why does the income of the client

3    matter?

4         A    Why does the income matter?

5         Q    (Nods head.)

6         A    If you're making more and more income, you got

7    more and more risk.  You got more and more operations

8    going on, you got more and more buildings.  If -- you

9    know, little companies have small problems.  Huge

10   companies have big problems.

11        Q    Okay.  And at the time that you were working

12   with Ms. Clark, did you believe that there was a type of

13   client that was ideally suited to be a captive insurance

14   customer?

15        A    Yes, ones with high amounts of risk.

16        Q    Okay.  Any other factors you would consider in

17   determining whether someone would be a good candidate for

18   a captive?

19        A    Well, if they didn't have a lot of risk, they

20   didn't have a lot to insure.

21        Q    Anything else?

22        A    Not really.  I mean, insurance companies are to

23   cover risks.  And the other thing is some of them have

24   such unusual risks that they couldn't get the insurance

25   for the commercial --

Johnson, III, William E.                               July 24, 2023

155

1       Q       Okay.

2       A       -- company.

3       Q       And one of the -- one of the benefits of

4    forming a captive insurance company is the tax benefits

5    outlined in Section 831(b), right?

6       A       One of the benefits?

7       Q       One of the benefits of forming a captive

8    insurance company --

9       A       Yeah.

10      Q       -- is the tax benefits that are outlined in

11   Section 831(b), right?

12      A       Well, that's what Congress thought.

13      Q       So that's one of the benefits of forming a

14   captive?

15      A       Well, I believe it is.

16      Q       Okay.

17      A       Would you say it was?  I mean, hell yes.

18      Q       Okay.  Another benefit of forming a captive is

19   the tax benefits outlined in Section 162 of the tax code?

20      A       Well --

21      Q       Is that accurate?

22      A       The main ones that I see are weird risks where

23   it's very hard to get coverage, okay?

24      Q       So I think you're going into a territory that

25   I'm not asking about.  I'm just asking whether one of the

Johnson, III, William E.                                    July 24, 2023

156

1    benefits of forming a captive is the tax benefits that

2    are outlined in Section 162 --

3          A     One of them is certainly --

4          Q     -- of the tax code?

5          A     -- that it's nice to be able to deduct the

6    premiums.

7          Q     Okay.  Thank you.

8                And did you explain the tax benefits of

9    forming a captive to your and Ms. Clark's mutual clients?

10         A     I would explain, that's my job.  I explain the

11   tax benefits of everything they do.

12         Q     Okay.

13         A     Or don't do.

14         Q     What risks are there associated with forming a

15   captive?

16         A     What risks?

17         Q     Uh-huh.

18         A     Well, the one that I told my clients to shut

19   them all down was not a risk.  It was an absolute

20   conclusion that the IRS was going to litigate against

21   every single one of them.

22               At the time I finally gave up on it, you

23   were litigating against 10 percent, approximately, of all

24   the captives ever set up, so I said, you can't afford to

25   litigate against Big Brother because Big Brother has a

Johnson, III, William E.                                    July 24, 2023

157

1    bigger purse than you do, and you can't afford to spend 6

2    or -- 5- or $600,000 litigating.

3              So in my opinion, you are going to be

4    attacked by the IRS.  Period.  It doesn't matter that you

5    did it right.  It doesn't matter that you -- all of these

6    risks are good.  They are out to shut them down, all of

7    them, and that is, in fact, your purpose.

8        Q    So one of the risks of forming a captive that

9    you communicated to your clients was the possibility of

10   an IRS audit; is that accurate?

11       A    It's not a possibility.  I told them it was no

12   longer a possibility, it was a guaranteed, for sure going

13   to happen.

14       Q    And just please let me finish my question.  I

15   know it's tempting to respond, but just make sure I get

16   everything out.

17             Would you say that the possibility of an

18   audit by the IRS was one of the biggest risks that your

19   clients faced who wanted to form a captive?

20       A    Number one.

21       Q    Did you ever discuss audit risks with

22   Ms. Clark?

23       A    Oh, yeah.  Of course we did.

24       Q    Did you take any steps to mitigate the risk of

25   IRS audit for your clients?

Johnson, III, William E.                                    July 24, 2023

158

1       A     Yes, I told them to shut them down.

2       Q     At what point?

3       A     As soon as it became obvious that the IRS was

4    going to litigate against every one that was ever set up.

5       Q     When was that?

6       A     Oh, probably about 2017.

7       Q     Did you do anything to mitigate the risk of

8    audit before 2017?

9       A     Yes, we tried to do it right.

10       Q     Meaning?

11       A     The main thing was Emerald, we made sure in

12    some of the earlier cases, one of the objections the IRS

13    had was that there was inadequate risk distribution, and

14    that was the job of Emerald to provide adequate risk

15    distribution.  You pointed out how many of them were in

16    that pool, 150, 138.  That's good risk distribution, very

17    good risk distribution.

18       Q     And was there anything else you did to mitigate

19    the risk of an IRS audit?

20       A     Yeah, I told them don't buy insurance and

21    they're -- don't do any of the things that the IRS

22    doesn't like, like buying insurance, life insurance for

23    the deals.  I just said, bland is best.

24       Q     Buying life insurance with the captives'

25    premium funds?

Johnson, III, William E.                                    July 24, 2023

159

1       A     Don't do it.

2       Q     Is that what you're referring to, though,

3    buying life insurance with the captives' premium funds?

4       A     Yes, don't do it.

5       Q     Okay.

6       A     That's what I told them.  You said, did I tell

7    them anything else to avoid an audit.  Yes, I told them

8    that, don't do it.

9       Q     Okay.  Anything else?

10      A     Other than shutting them down and getting them

11   out as quick as possible, no.

12      Q     Okay.

13      A     Not that I can think of.

14      Q     Did your clients or their advisors every - ever

15   raise concerns to you about the risks of forming a

16   captive?

17      A     Oh, sure, we discussed it.

18      Q     Okay.  What sort of concerns did they have?

19      A     That the IRS wanted to kill them all.

20      Q     Okay.  And what, if anything, did you say to

21   ease their concerns?

22      A     Well, as soon as I became convinced that that

23   was the purpose of the IRS in -- in dealing with the

24   captives, I said shut them down right now.

25      Q     What about before 2017, did any of your clients

Johnson, III, William E.                                    July 24, 2023

160

1    or their advisors raise concerns to you about forming a

2    captive?

3        **A      No, most of them were more excited about it**

4    **than I was.**

5        Q      Okay.  In your experience, what work was done

6    for your and Ms. Clark's mutual clients to ensure that

7    the premiums that their captives charged were not

8    excessive?

9        **A      That was the job of the actuary in New York,**

10   **that was his job.**

11       Q      Okay.  And what work was done to ensure that

12   your and Ms. Clark's clients were not paying for

13   unnecessary coverage?

14       **A      Well, if they -- if they asked me about it, I**

15   **would discuss it with them.  But, you know, realistic**

16   **losses, realistic -- excuse me -- risks, we all have.**

17   **I've had plenty of losses with my commercial insurance,**

18   **you know.  I mean, big ones.  I have been paid up to 80**

19   **or $90,000 by my insurance companies for casualty losses,**

20   **usually weather-related destruction of property that I**

21   **own.**

22              **And so if you own property, you are**

23   **subject to a great number of risks.  The other thing is**

24   **if anybody gets hurt in a property that you own, they're**

25   **going to sue the owners and everybody else if they can**

Johnson, III, William E.                                      July 24, 2023

161

1    find a suit.

2         Q    Okay.  Anything else?

3         A    Anything else what?

4         Q    So I asked you whether -- what work was done to

5    ensure that your and Ms. Clark's clients are not paying

6    for unnecessary coverage.

7         A    As I say, that wasn't my decision.  That was

8    something that was submitted to Celia, and the -- the

9    people -- if somebody talked to me about it, I can give

10   them my opinion, and as you can see, I don't withhold my

11   opinions.

12        Q    Okay.

13        A    I'm an opinionated person.

14        Q    So -- okay.  So was it your -- was it

15   Ms. Clark's role to determine whether or not clients were

16   paying for coverage that was truly necessary?

17        A    It was -- certainly wasn't mine.

18        Q    Okay.  So it was your understanding that it was

19   Ms. Clark's role?

20        A    In the Allen -- whatever the fellow's name was,

21   the actuary.

22        Q    The actuary.  Okay.

23        A    Uh-huh.  He was the one, I believe, that set

24   the premiums.

25        Q    Okay.

Johnson, III, William E.                                    July 24, 2023

162

1       A      The biggest complaints that I ran into were

2   non-covered losses.

3       Q      Okay.

4       A      Where they didn't realize that they needed the

5   coverage and then we couldn't cover them because it

6   hadn't been included in their dadgum insurance contracts.

7   I know several of my clients that, because they didn't

8   get enough guidance, didn't cover risks, which not only

9   did they have, they had losses under.  Their own captive

10  couldn't even pay them.

11      Q      Okay.  Do you think that your clients would

12  have paid the amounts that they paid to their captives

13  for the same insurance coverage to a commercial insurer?

14      A      Well --

15             MR. VOLLRATH:  Object to form.

16      A      Yeah, what do I think, I don't know.  I don't

17  know what they were paying for their commercial

18  insurance.

19      Q      (BY MS. DARWIT)  Okay.

20      A      I know what I'm paying for mine, and I'm paying

21  it through the nose.  I've got a ton of it because I have

22  a lot of risks.

23      Q      All right.  I'll mark my next document.  This

24  will be Exhibit 196.

25             (Exhibit 196 marked.)

Johnson, III, William E.                                    July 24, 2023

163

1       Q    (BY MS. DARWIT)   And it's Bates-stamped
2    CLARKSDFL 1108313.
3                All right.  Mr. Johnson, we'll kind of
4    walk through what's in here, but to just start off, this
5    is an email that you sent to someone named Matt Chalmers
6    in June of 2014; is that right?
7       **A    Yes.  That's what it appears to be, June of**
8    **2014.**
9       Q    Okay.  And the subject is "Captive Insurance
10   Companies."
11      **A    Yes.**
12      Q    And attached to this email is a P- -- yeah, a
13   PDF called "CIC Presentation" and also a PDF called "Use
14   of CID in Estate & Business Planning"; is that right?
15      **A    Pardon me?**
16      Q    So attached to this email that you sent are two
17   documents.  One's called "CIC Presentation"; the other is
18   called "Use of CID in Estate & Business Planning."
19      **A    CID, I guess that's a typo.**
20      Q    Okay.  But those -- those were attachments to
21   your email here, right?
22      **A    Yes.**
23      Q    Okay.
24      **A    Apparently.**
25      Q    All right.  Who is Mr. Chalmers?

Johnson, III, William E.                                    July 24, 2023

164

1        A    I have no idea.  I'm not sure he hire -- ever
2    hired me.
3        Q    All right.  So in this email --
4        A    It looks like he's a doctor.  "Chalmers
5    Wellness."
6        Q    Got you.  Okay.
7             And in the first sentence here you say,
8    "In our meeting today, you asked me to explain further
9    how a captive insurance company works."
10       A    Yeah.
11       Q    Do you see that?
12       A    Yeah.
13       Q    And then you say that you prepared a memo to
14   send him with a copy to a CPA explaining how a captive
15   insurance company --
16       A    Uh-huh.
17       Q    -- can be utilized to significantly reduce your
18   taxable income, and at the same time, provide the funding
19   ahead of time of any loss which one or more of your
20   companies might experience in the future?
21       A    Yes.
22       Q    Okay.  And then in the second sentence -- or
23   third sentence of the second paragraph, you state here
24   that "if at the end of the term, no loss has" -- "has
25   occurred, the premium no longer has to be held in reserve

Johnson, III, William E.                          July 24, 2023

165

1   since the potential loss it was covering for the

2   insurance company is no longer possible under that

3   particular policy" --

4        **A     Yeah, they're term policies.**

5        Q     -- do you see that?

6              Okay.  And then you say, "Therefore, after

7   the explanation -- or rather after the expiration of each

8   policy year and after new premiums have been paid for the

9   next policy year, it's entirely possible for the

10  insurance to obtain permission from the insurance

11  commission to pay a portion of its capital reserves to

12  its shareholder as a dividend."

13       **A     Yes, that's what it says.**

14       Q     Okay.  And then in the third paragraph here,

15  you lay out some advantages of form a captive; is that

16  right?

17       **A     Yes.**

18       Q     Okay.  And you state here in the first sentence

19  of the third paragraph that "The advantages" -- "the

20  advantages of CICs are that the premiums paid by the

21  various insured companies which are related by ownership

22  to the CIC are deductible by each of the companies that

23  pay the premiums but are not taxable to the CIC up to

24  1.2M in premium income per year."

25       **A     Uh-huh.**

Johnson, III, William E.                              July 24, 2023

166

1          Q     Do you see where it says that?

2          **A     Yes, I see it.**

3          Q     Okay.  CICs, does that refer to captive

4     insurance companies?

5          **A     Yes, it does.  Captive insurance company.**

6          Q     Okay.  And why is -- why do you state that it's

7     not taxable up to 1.2 million?

8          **A     Because that's the amount in 831(b) that is**

9     **excluded.**

10         Q     Okay.

11         **A     If you exceed that, you're a regular insurance**

12    **company.**

13         Q     Got you.

14                Okay.  And then moving on to the next

15    paragraph here, you explain in the first sentence that

16    "When funds are needed by the owners, which in your case

17    would be your irrevocable spendthrift generation-skipping

18    complex trust, the insurance company can pay dividends to

19    the trust owner and the maximum dividend tax rate is only

20    20 percent instead of 39.6 percent."

21                Do you see that?

22         **A     Yes.**

23         Q     Okay.  Okay.  And then finally in this next

24    paragraph here, you discuss some additional advantages of

25    a captive insurance company, right?

Johnson, III, William E.                                    July 24, 2023

167

1        A    Yes.

2        Q    Okay.  And you explain that there's certain

3   advantages of forming a captive over forming -- or of

4   participating in a qualified retirement plan?

5        A    Yes.

6        Q    Okay.  And why did you reference a retirement

7   plan here?

8        A    Why did I reference it?

9        Q    Yeah.

10       A    Well, because their benefits are you get a

11  deduction to the premiums.  You have to cover your other

12  employees to the extent that they're required under the

13  section 401(a) of the code.  And when you reach a certain

14  age, you're forced to take minimum distributions every

15  year based on either your life expectancy, or now it's

16  getting even harder and harder, and they're making it be

17  paid out at shorter and shorter periods of time, and it's

18  all ordinary income when it comes out.

19       Q    Uh-huh.

20       A    Unqualified plan distributions are ordinary

21  income.  You do avoid the payroll tax on distributions

22  from a qualified plan, but it is all ordinary income.  So

23  even if you had a whole bunch of capital gains in your

24  qualified 401(a) profit sharing or pension plan, upon

25  distribution to the beneficiaries, all of them will have

Johnson, III, William E.                                July 24, 2023

168

1    to pay ordinary income on all of it.

2        Q    Got you.

3             So in your view, were captive insurance

4    companies an alternative to qualified retirement plans?

5        A    Yes.

6        Q    And --

7        A    It's an alternative use of the income of the

8    company.

9        Q    Okay.  And then if we scroll down here, you --

10   and now we're on the page that's Bates-stamped CLARKSDFL

11   1108314.  And on the first full paragraph of this page,

12   you lay out some of the disadvantages of forming a

13   captive, right?

14       A    Yeah.

15       Q    Okay.

16       A    Cost.

17       Q    Yeah.  And you reference in this paragraph cost

18   and time, right?

19       A    Yeah.

20       Q    Okay.  And do you reference anything else in

21   this paragraph under "Disadvantages"?  Take your time.

22       A    Income tax filings, restrictions of good

23   investments.  Remember, I told you that earlier, that

24   there were some investments that you just really should

25   not do.  Yeah, and the possibility of getting a lot of

Johnson, III, William E.                    July 24, 2023

                                                        169

1    your premiums back if you didn't have too many claims.

2         Q    Well, this is talking about disadvantages,

3    right?

4         A    Pardon me?

5         Q    This is talking disadvantages?

6         A    Yeah.  Disadvantages, uh-huh.

7         Q    Okay.

8         A    Yes.

9         Q    Anything else referenced here?

10        A    Well, whatever it says.  "The ability to cover

11   risk that would otherwise not be insurable at a

12   reasonable cost, together with the opportunity of

13   postponing and ultimately saving a substantial amount of

14   tax in the event the CIC does not have too many claims."

15        Q    Okay.

16        A    Well, who knows how many losses you're going to

17   have.

18        Q    Okay.  And -- and then I'm scrolling down here

19   to the third to last paragraph.  You talk about Clark &

20   Gentry, right?

21        A    Yes.

22        Q    Okay.  And skipping back up to this paragraph

23   just above it that starts with, "If you were George."

24   You also reference here entering into a co-counsel

25   retainer agreement for the work you're proposing with

Johnson, III, William E.                                    July 24, 2023

170

1    Clark & Gentry?

2        A    Uh-huh.

3        Q    Okay.  Is that a yes?

4        A    Yes.

5        Q    Okay.

6        A    Yes.  I couldn't do it by myself, and they

7    needed me to get all the information down here, get it up

8    to them.  They didn't have time to fool with that.

9        Q    Okay.  And you -- you end this email by saying

10   "The CIC will have an immediately positive impact on your

11   2014 income taxes and should save you at least $100,000

12   and a good deal more as your gross income from all

13   sources grows."

14             Do you see that?

15       A    Uh-huh.

16       Q    Okay.  Is this email a representative sample of

17   how you described captives and their benefits to your and

18   Clark's mutual clients?

19       A    Actually, I say it was the most extensive one

20   I've ever seen.  So would I say that it was a good

21   example?  No, I'd say it was the -- the most -- most

22   thorough one I've seen.  I didn't usually have anything

23   nearly as complex.

24       Q    Okay.  Okay.  And what did your -- when you

25   were describing captives and their benefits to your and

Johnson, III, William E.                           July 24, 2023

171

1    Clark's mutual clients, what would you -- what would you

2    say normally?

3         A    What would I say normally?

4         Q    Uh-huh.

5         A    I told you earlier in my deposition that the

6    most important things are if you can cover losses that

7    will not even be insurable and available under commercial

8    policies.  They're just not there.  And I haven't had a

9    lot of clients that are in that situation.

10              And number two, maybe they would hesitate

11   to cover adequately the extent of the losses that they

12   might have simply because they knew that the premiums

13   that they paid would never come back.  In other words,

14   it's a 100 percent loss when you pay commercial

15   premiums -- and I pay a lot -- it's gone.  It's a loss.

16              Here, if they own the insurance company

17   directly or indirectly, there's a possibility that not

18   all of the premiums will be taken in losses; and

19   therefore, there's a possibility of reducing the total

20   cost of their insurance.

21        Q    Okay.  In what way is this email more extensive

22   than your normal communications describing captives and

23   their benefits?

24        A    I don't usually do a -- I'm not usually asked

25   to do such -- only the detailed explanation.

Johnson, III, William E.                                July 24, 2023

172

1       Q    Got it.  Okay.

2       **A    I mean, I was requested to do this by the CPA,**

3  **it looks like.**

4       Q    Okay.  Okay.  And it looks like -- scratch

5  that.

6              Okay.  Okay.  I'll mark another document.

7  This will be Exhibit 197.

8              (Exhibit 197 marked.)

9       Q    (BY MS. DARWIT)  It's Bates-stamped

10  ACR IRS0281123.  I'll start from the bottom and go up

11  here.

12              Okay.  Mr. Johnson, this -- this here on

13  the page that's Bates-stamped ACR IRS0281125 is an email

14  from someone named Raymond Zeitoune to you with Ms. Clark

15  copied; is that right?

16       **A    Yeah, Raymond Zeitoune.  I don't remember who**

17  **that is.**

18       Q    Okay.  And this is -- but this is an email that

19  you received from Mr. Zeitoune in November of 2010?

20       **A    Well, that's why I don't remember.  It's been**

21  **13 years ago.**

22       Q    Got you.  And in this email, Ms. Clark is

23  copied, right?

24       **A    Yes, she is -- she's copied.**

25       Q    Okay.  And Mr. Zeitoune, was he someone who

Johnson, III, William E.                                    July 24, 2023

173

1    worked for Ms. Clark's law firm?

2         **A    I have no idea.  I don't remember the man's**

3    **name at all.**

4         Q    Okay.  Got you.

5              And do you see in this email at the bottom

6    is a signature block for Mr. Zeitoune that shows the law

7    offices of Celia R. Clark?

8         **A    It looks like that's who he was working for.**

9         Q    Okay.  And any reason to doubt that

10   Mr. Zeitoune worked for Ms. Clark's law firm?

11        **A    Pardon me?**

12        Q    Any reason to doubt that Mr. Zeitoune worked

13   for Ms. Clark's law firm?

14        **A    No, he's representing that he does.  I don't**

15   **think he's lying to me.**

16        Q    Okay.  And he says in this email, "Attached are

17   two insurance policy applications and a tax

18   representation letter which will be used by the actuary

19   to determine the appropriate premiums for the insurance

20   company written by N&D insurance company"; is that right?

21        **A    I'm sorry, I was reading this.  Ask me the**

22   **question again.**

23        Q    Oh, I was just asking if you -- if you see the

24   portion of this document where Mr. Zeitoune attach --

25   says he's attaching two insurance policy applications for

Johnson, III, William E.                                    July 24, 2023

174

1    insurance coverage written by a company called N&D

2    Insurance?

3         **A       Uh-huh.**

4         Q      Okay?

5         **A       Yes.**

6         Q      And -- okay.  And he's asking you to have your

7    clients complete and sign these policy applications,

8    right?

9         **A       Yeah, that -- that guy's a doctor, and he's got**

10   **potential liability.**

11        Q      Got it.

12        **A       Yeah, I think he's a surgeon.**

13        Q      Okay.  And then scrolling up here on the page

14   Bates-stamped ACR IRS 0281124, this is an email from

15   Ms. Clark to two different people with -- with you

16   copied, right?

17        **A       Yes, it's sent to the doctor.**

18        Q      Okay.

19        **A       Oh, bypass doctor.  I know what he does.**

20        Q      Okay.  So this is an email from Ms. Clark to --

21        **A       Yeah.**

22        Q      -- two of your mutual clients with you copied,

23   right?

24        **A       Yeah.**

25        Q      Okay.  And she -- she lets them know in this

Johnson, III, William E.                                    July 24, 2023

175

1    email, the last sentence here, she says, "Time is short,

2    so we're asking you to complete these policy applications

3    at this time."  Do you see that?

4        **A    Yes.**

5        Q    Okay.

6        **A    And you can see it's because it's close to the**

7    **end of the year, November 21st.**

8        Q    Got you.  And why is that important?

9        **A    Well, because the -- the pool closes at the end**

10   **of the year.  Remember, most people are paying their**

11   **premiums then, and we close it, and then it runs until**

12   **the following December.  Remember we talked about not**

13   **doing it in January?**

14       Q    Because of the -- the tax deduction in the

15   year?

16       **A    The time -- yeah, the timing.**

17       Q    Okay.

18       **A    The timing.**

19       Q    All right.  Scrolling to the middle of this

20   page is another follow-up email from Ms. Clark to your

21   clients with you copied, right?

22       **A    Yes.**

23       Q    Okay.  And she says in this email, "We're now

24   in crisis mode.  Please help us meet our deadlines."

25              Do you see that?

Johnson, III, William E.                                    July 24, 2023

176

1      A    I'm looking.

2           Yep, busy people don't get around to

3      answering a lot of this stuff in time.

4      Q    Okay.  And then I'm now on the first PDF page,

5      which is Bates-stamped ACR IRS 0281123, and this is an

6      email from you to your clients, the Patels, with

7      Ms. Clark copied, right?

8      A    Yeah.

9      Q    Okay.  And you state in this email again that

10     "We are in crisis mode."  And you're asking them to

11     complete the applications, right?

12     A    Yeah.

13     Q    Okay.  And you state in here in the last two

14     sentences, "We are approaching absolute deadlines in

15     St. Kitts and must get all of the required information to

16     the St. Kitts Insurance Commission immediately in order

17     to get your insurance company licensed before the end of

18     the year so you can deduct your premiums in 2010."

19     A    Uh-huh.

20     Q    Do you see that?

21     A    Yep.

22     Q    And then you say, "Therefore, please complete

23     the items on the list today or at least this weekend so

24     you can forward them to Celia Clark's office by Monday.

25     Failure to do so" -- "failure to do this may prevent you

Johnson, III, William E.                                    July 24, 2023

177

1    from obtaining the deduction you need this year."  Right?

2        A    Yep.

3        Q    Okay.  Okay.  And in this email -- and -- well,

4    we'll stay with this email.  In this email you don't

5    mention here to your clients, the Patels, that failure to

6    submit applications would prevent them from obtaining

7    insurance coverage for the year, right?

8        A    Yeah, they -- it -- they're going to do it now,

9    or they're not going to have the policy.

10       Q    Got you.

11            But you don't mention failure to obtain

12   coverage for a risk.  You mention failure to obtain a tax

13   deduction, right?

14       A    Well, they can get the thing done, but I mean

15   they just aren't going to get it done this year, and we

16   don't have another pool for another year.

17       Q    But your primary concern in this email is their

18   ability to obtain a tax deduction; is that fair?

19       A    Yes, a tax deduction.  Yes, yes, yes, yes.

20       Q    Okay.

21       A    Tax deduction.  Any insurance liability that

22   you pay in your business is deductible when paid.

23       Q    All right.

24       A    And if he didn't pay it this year, he wasn't

25   going to deduct it this year.

Johnson, III, William E.                                          July 24, 2023

178

1        Q     All right.

2        **A     This is a timing issue only.**

3        Q     All right.  And then if we go up to the next

4    email in the middle of this page, your client, Mr. Patel,

5    responds to you and attaches the insurance application,

6    right?  Or at least he -- that's what he says in this

7    email, he's attaching it?

8        **A     He seemed to explain the difference between his**

9    **1099 independent contractors and his employed W-2, W-2**

10   **employees.**

11       Q     I'm just asking whether, in response to your

12   email, your client responded attaching the employment

13   practice application?

14       **A     Yes, he was -- the employment practice**

15   **application, that was part of what the insurance**

16   **company -- I mean, excuse me, that's part of what the**

17   **application was required to explain.**

18       Q     All right.  I'm going to mark my next exhibit.

19   It's -- it will be Exhibit 198.

20              (Exhibit 198 marked.)

21       Q     (BY MS. DARWIT)  It's Bates-stamped CLARKIRS

22   0294487.  I'll go bottom to top again.  Okay.  Or

23   actually on this one, I think everything is actually just

24   on this first page, it's just repeated.

25              So I'll start with the bottom of the first

Johnson, III, William E.                                    July 24, 2023

179

1   page here.  On -- on this document at the bottom here is

2   an email from someone named Diana Chen.

3        **A     Yeah.**

4        Q     In June of 2015, right?

5        **A     Yes, July the 29th, '15.**

6        Q     Okay.  And Diana Chen worked for Ms. Clark's

7   law firm?

8        **A     Yes, she did.**

9        Q     Okay.  And she's asking you in this email, I'm

10  wondering if we should ask Maxis Medical now for a list

11  of business risks they would consider as the most

12  important and also for its commercial policies, right?

13       **A     Yes, whether they -- they're not currently**

14  **covered by commercial or not adequately covered.**

15       Q     All right.

16       **A     So -- so their commercial insurance policies.**

17       Q     Okay.

18       **A     Uh-huh.**

19       Q     And then at the top of the document here is

20  your email responding to Ms. Chen in July of 2015, right?

21       **A     Yes.**

22       Q     Okay.  And you state in your email that -- in

23  the second sentence that you fear that "some of our

24  clients may be too zealous in the amount of coverage

25  they're requiring."

Johnson, III, William E.                                    July 24, 2023

180

1                    Do you see that?

2          A     Yeah.

3          Q     Okay.  Were you concerned that your clients

4     were trying to obtain too much insurance coverage?

5          A     **Obviously, that's what it appears that I was**

6     **concerned about.**

7          Q     Okay.  And meaning that their -- their

8     insurance premiums were too high?

9          A     **Yes.**

10         Q     Okay.  And what, if anything, did you do to

11    alleviate that concern that you had?

12         A     **Discussing it with the client, that's why we're**

13    **asking them to point out the risks that they have.  And**

14    **these people that are in medical services have a lot of**

15    **unusual risks that you and I don't ordinarily think**

16    **about.**

17                  **One of the worst is that they accidentally**

18    **make a mistake under Medicare or Medicaid and get in a**

19    **whole lot of trouble, not even intentionally, but just**

20    **because they filled out a form wrong.  I don't know if**

21    **you're familiar with these kinds of things, but they can**

22    **have tremendous negative economic effect if they just do**

23    **something wrong on their requirements, you know, to be**

24    **paid.**

25                  **And if they do make a serious mistake, the**

Johnson, III, William E.                                    July 24, 2023

181

1    usual deal is they don't get paid at all.  And I think

2    that that was one of the things that I was considering,

3    is administrative law risks.

4        Q    Okay.

5        A    And people in the medical field have a great

6    deal of exposure in this area of making a mistake, and

7    sometimes they even get accused of criminal activity when

8    they just filled out a form wrong.

9        Q    (Inaudible.)

10       A    Now that doesn't mean some of them are

11   criminals but...

12       Q    I'm going to mark my next document.  This will

13   be Exhibit 199.

14               (Exhibit 199 marked.)

15       Q    (BY MS. DARWIT)  It's Bates-stamped CLARKSDFL

16   1057372, and I'll start at the top here.

17               We'll go through the substance, but this

18   is an email that you sent to Ms. Clark in September of

19   2009?

20       A    Uh-huh.

21       Q    Right?

22       A    Yeah.

23       Q    Okay.  And you state here -- in this email,

24   you're talking about Technical Diagnostic Services --

25       A    Yeah.

Johnson, III, William E.                                    July 24, 2023

182

```
1        Q      -- right?  Okay.
2               And -- just give me a second.
3               Okay.  Then you state here on -- in the
4   third sentence that the son-in-law of Mr. Lapicola --
5        A      Yes.
6        Q      -- and other technical staff are reviewing the
7   costs that you discussed with them, as well as their
8   probable premium levels to quantify for Mr. Lapicola the
9   tax savings at various premium levels; is that right?
10       A      Yes.
11       Q      Okay.  So Mr. Lapicola, who is he?
12       A      He's the chairman of the board of the company
13  involved.  They build nuclear reactors, and they build
14  refineries.
15       Q      Are you referring to Technical Diagnostics
16  Services?
17       A      Yes.
18       Q      Okay.
19       A      Yes.  Yes, they have huge risks.  I mean,
20  you're -- you're probably aware of cleanup problems when
21  you have a -- a spill of -- of -- of gasoline and oil and
22  stuff.
23       Q      And I don't -- I don't mean to cut you off, but
24  my question was just whether Mr. Lapicola works for
25  Technical Diagnostic Services, so we can get to that.
```

Johnson, III, William E.                                    July 24, 2023

183

```
 1        A    He runs it.  He's --

 2        Q    Okay.

 3        A    He was the chairman of the board.

 4        Q    Got it.  All right.  Okay.

 5             And this Darrell Frauenheim person is his

 6   son-in-law?

 7        A    Yes, married his daughter.

 8        Q    Okay.  Got you.

 9        A    And she had some of the biggest risks I've ever

10   seen.

11        Q    Okay.  And then in the, I guess second to last

12   sentence, third to last sentence of this paragraph, you

13   state that Mr. Lapicola wants to have the tax benefits

14   analyzed at various levels of premium so he can then give

15   you the right budget to work with in connection with the

16   design of the policies.

17             Do you see that?

18        A    Yes.

19        Q    Okay.  And then you proceed to talk about how

20   to structure the ownership of the potential captives,

21   right?

22        A    Yes.

23        Q    Okay.

24        A    The amount of risk he had is gargantuan.

25        Q    Okay.  And then if we scroll down in this
```

Johnson, III, William E.                                July 24, 2023

184

1   email, you start to address a client other than

2   Mr. Lapicola, right?

3       A    **Yes, it looks like a physician.**

4       Q    Okay.  And in discussing this other client

5   here, you state that your -- this client's taxable estate

6   is beginning to grow too quickly, and he's made

7   appointments to hear your estate planning strategies,

8   which, of course, include the captive insurance company

9   owned by the multiple generation-skipping trust outside

10  of his estate.

11              Do you see that?

12      A    **Yes, I do.**

13      Q    Okay.  So were -- were captive insurance

14  companies an estate planning strategy?

15      A    **It's certainly one of the broad range that we**

16  **used at the time.**

17      Q    One of the broad what?

18      A    **Range.**

19      Q    Range of what?

20      A    **Estate planning.**

21      Q    Oh.

22      A    **I mean, you know, I've got a ton of them.  You**

23  **would be surprised how many.**

24      Q    Okay.

25      A    **Anyway, yes, it was just simply one of the many**

Johnson, III, William E.                                    July 24, 2023

185

1    **structures and strategies that can be used.**

2        Q     Okay.  Sorry, I just need a second to find what

3    I'm looking for.

4              Okay.  So in the third to last paragraph

5    here, you're asking for a thumbnail sketch about how to

6    proceed with this client in connection with a captive

7    insurance company owned by one of his generation-skipping

8    trusts?

9        **A     Uh-huh.**

10       Q     Do you see that?

11       **A     Yeah.**

12       Q     Okay.  And you say, "It might be possible for

13   us to load this company up since his real exposure is his

14   net worth more than his likelihood of having a

15   malpractice suit, although, as you know,

16   anesthesiologists are in a vulnerable position from a

17   medical malpractice point of view."

18       **A     Yes.**

19       Q     Do you see that?

20       **A     Yes.**

21       Q     Okay.  What did you mean by "load this company

22   up"?

23       **A     I don't know.**

24       Q     Were you referring to the cap laid out in

25   Section 831(b) for tax deduction -- or for tax

Henderson Legal Services

202-220-4158                         www.hendersonlegalservices.com

Johnson, III, William E.                              July 24, 2023

186

1    exclusions?

2         A    I don't remember.

3         Q    Okay.  Okay.  I'm like nearing the end here.

4    Maybe another 30 minutes.

5              So this is kind of a hodgepodge of random

6    questions, so bear with me.

7              How is Emerald compensated for the duties

8    it assumed with respect to the pool?

9         A    They did a flat fee for each participant.

10        Q    Okay.  Are you familiar with something called

11   ceding commissions?

12        A    Yes.

13        Q    Emerald did not charge ceding commissions?

14        A    Ceding, C-E-D-I-N-G?

15        Q    Uh-huh.

16        A    Well, I don't remember, but I know ceding is

17   when you allow somebody else to take part of your risk

18   and get part of the commissions.

19        Q    Okay.  Did Emerald charge ceding commissions,

20   do you know?

21        A    I don't remember.

22        Q    Okay.  Do you know if reinsurance companies

23   commonly charge ceding commissions?

24        A    I don't know.

25        Q    Okay.  Were the basic operations of Emerald the

Johnson, III, William E.                                    July 24, 2023

187

1    same from 2014 through at least 2016?

2        **A      Pretty much, except that, you know, they grew.**

3        Q      Okay.

4        **A      And then they went away altogether.**

5        Q      Okay.

6        **A      As I recall, the number of companies**

7    **participating was surprisingly similar, you know, for**

8    **like '15 and '16.**

9        Q      Okay.

10       **A      That's the same number of 150, somewhere around**

11   **there.**

12       Q      All right.

13       **A      That number.  Very good distribution -- risk**

14   **distribution.**

15       Q      I'm going to mark my next -- next exhibit as

16   Exhibit 200.  This is Bates-stamped Johnson Emerald

17   Production 01848.

18              And this was actually previously marked,

19   so ignore that.  This was previously marked as Exhibit

20   186.  And I'm going to go to Page 13 of the PDF, which is

21   Bates-stamped Johnson Emerald Production 01860.

22              Mr. Johnson, just take a moment to read

23   the first two pages here, and I'll kind of -- just let me

24   know when to scroll.

25       **A      Yes, we were talking about restructuring our**

Johnson, III, William E.                                July 24, 2023

188

1    business in the future.  Nothing ever came of it.

2         Q     Okay.  All right.  So that was my question.

3               Like the second paragraph here, do you see

4    where it says, "The first item to be discussed by the

5    board of directors was the structure of Saffire

6    Reinsurance"?

7         A     Yeah.  Saffire was never created.

8         Q     What was Saffire intended to be?

9         A     The only thing I remember is what's in this --

10   what's in this.

11        Q     Do you know why -- was Saffire supposed to take

12   the place of Emerald?

13        A     I don't remember.

14        Q     Okay.

15        A     But not long after that, we decided to get out

16   of the business.

17        Q     And this last paragraph on the page talks about

18   something called Star Insurance Group?

19        A     Yeah, never did it.  This was nothing but talk,

20   just discussions of possible things we might do in the

21   future, none of which we ever did.

22        Q     Okay.

23        A     So that's all it is, talk.

24        Q     Got you.

25              I'll mark my next document.  This will be

Johnson, III, William E.                                    July 24, 2023

189

1    Exhibit 200.

2                    (Exhibit 200 marked.)

3        Q    (BY MS. DARWIT)  And it's Bates-stamped Johnson

4    Emerald Production 02965.  I will start at the bottom

5    here.

6                    Okay.  So on the third PDF page, which is

7    Bates-stamped Johnson Emerald Production 02967, this is

8    an email from you to Jim Shepherd, Robin Trevors -- well,

9    just those two; is that right?

10       **A    Yeah, Robin.  What about Robin Trevors?**

11       Q    Oh, I was just asking if this is an email that

12   you sent to Mr. Shepherd and Mr. Trevors.

13       **A    It looks like it.**

14       Q    Okay.  The subject, "Celia."  Is that the

15   subject?

16       **A    Yeah.**

17       Q    Okay.  All right.  And you say in the first

18   sentence here, "Celia was delighted that we have included

19   her and Edgar in Pan American and was really happy that

20   we are going to get ownership of the CreditRe business."

21       **A    Yeah, which we didn't.**

22       Q    Okay.

23       **A    He decided not to sell it.**

24       Q    Okay.  What was the CreditRe business?

25       **A    It was a company owned by some -- somebody**

Johnson, III, William E.                                      July 24, 2023

190

1   completely independent and separate from any of us.  It
2   was primarily in the business of doing automobile, you
3   know, those prepaid automobile repair deal, you know,
4   where you pay a certain amount and if you have a -- it's
5   like a warranty for an automobile.
6                     And most of them are set up by people like
7   Carl Sewell and, you know, all of these automobile
8   dealerships.  They decided since they're doing the work
9   to repair them anyway, they might as well be getting paid
10  in the beginning, and they take the risk that they would
11  get more premium than what it cost to repair the -- the
12  cars that break down.
13       Q    Okay.
14       A    And that's what CreditRe was.  It was -- I
15  don't know how many automobile dealerships, you know,
16  it -- it covered, but I get -- I guess it was a
17  reinsurance company for these automobile dealer warranty
18  deals.
19                     Anyway, we loved the fact that it was
20  spread out over so many, many warranties.  And so
21  actuarially, you would get more dependable -- estimate
22  your profits.  You know, because actuarially, if you've
23  got a thousand of them, you know, and you've got three or
24  four years of -- so you know that 400 of them are going
25  to have claims and the other 600 aren't.

Johnson, III, William E.                                    July 24, 2023

191

1          So it was a very interesting -- it was an

2    oil company that had been around for a while, and the guy

3    that owned it was thinking about selling it.  I think

4    what he finally did though, surprisingly enough, is just

5    wrapped it up and liquidated.

6          Q     Okay.

7          A     But we -- we -- we would have been interested

8    in buying it.

9          Q     All right.  And you mentioned something called

10   Pan American in this first sentence, right?

11         A     Yeah, I -- I didn't ever know anything about

12   Pan American because it was way back when, but I guess

13   they're looking at possibly buying Pan American.  Like I

14   say, these were things that we were talking about,

15   nothing ever came of it.

16         Q     Okay.  So you don't remember what Pan American

17   was that you were referring to here?

18         A     I think it was a re -- I think it was a

19   reinsurance pool.

20         Q     Okay.

21         A     I mean, I never had any direct relationship or,

22   you know, whatever, but of course, I think Roman did,

23   but --

24         Q     Okay.

25         A     I didn't, And Jim Shepherd certainly didn't

Johnson, III, William E.                                    July 24, 2023

192

1    either.  Anyway, CreditRe happened to have been

2    headquartered here in Dallas.

3         Q    Okay.  So you don't remember --

4         A    I don't know where Pan American was.

5         Q    Okay.  So you don't remember what Pan American

6    was or what Clark and her husband had (inaudible) --

7         A    From what I remember, I think it was a -- a

8    pool, a risk pool deal, but I'm -- I have -- this is

9    nothing but hearsay.  I never was -- I never inquired

10   about it.

11        Q    Well, in this -- this email, you're ask --

12   you're saying Celia was delighted that we have included

13   her and Edgar in Pan American.  Which that --

14        A    I guess we were just talking about maybe we

15   wanted to try to acquire that company, enroll their

16   business, you know.

17        Q    Okay.  So that's the --

18        A    So I don't -- I don't remember it.

19        Q    Okay.  Got it.

20        A    I don't remember it.  I -- but I -- I do

21   remember about CreditRe because I went out and met with

22   that guy, the one that has the thousands of car

23   warranties.  And then he decided he didn't want to sell

24   it, and he just -- he ended up liquidating it, I believe.

25        Q    All right.  I am going to mark my next

Johnson, III, William E.                                    July 24, 2023

193

1    document.  It will believe Exhibit 201.

2                  (Exhibit 201 marked.)

3        Q    (BY MS. DARWIT)  It's Bates-stamped Johnson

4    Emerald Production 02968.  And I'm going to go to -- I'll

5    direct your attention to the page that's Bates-stamped

6    Johnson Emerald Production 02970.

7                  This is an email that you sent apparently

8    to Jim and Robin in May of 2015?

9        **A    Yeah, Gary Fagg is the guy that owned CreditRe.**

10       Q    Okay.  And this is an email that you sent --

11       **A    I never would have remembered his name.**

12       Q    Hang on.  There's no question pending.  Just a

13   second.

14                  This is an email that you sent to someone

15   named Jim and someone named Robin in May of 2015, right?

16       **A    Yes.**

17       Q    Okay.  All right.  And then if I scroll up to

18   the page that's Bates-stamped Johnson Emerald Production

19   02969, this is an email from Robin Trevors responding to

20   you, also May of 2015, right?

21       **A    Yes.**

22       Q    Okay.  All right.  And then the same page but

23   middle of the page, this is your email responding to

24   Mr. Trevors, also in May of 2015?

25       **A    Uh-huh.**

Johnson, III, William E.                                    July 24, 2023

194

```
 1       Q    Right?
 2       A    Yeah.
 3       Q    Okay.  And then you say in the first sentence,
 4  "I think it's entirely appropriate that we include Celia
 5  in the new Pan American Reinsurance program."
 6            Do you see that?
 7       A    Yes.
 8       Q    Okay.  And you say, "She knows more about this
 9  business than all three of us put together."
10            Do you see that?
11       A    Yep.
12       Q    Okay.
13       A    True statement.
14       Q    Okay.
15       A    A true statement.
16       Q    And --
17            MR. VOLLRATH:  I've -- I've lost video and
18  audio.
19            MS. DARWIT:  Okay.  We'll -- we'll pause
20  for a second.
21            MR. VOLLRATH:  Okay.  I heard -- the last
22  I heard was Mr. Johnson saying true statement, and that
23  was it.
24            MS. DARWIT:  Okay.  Yeah.  That's where we
25  left off.  I was pausing.
```

Johnson, III, William E.                                    July 24, 2023

195

1               MR. VOLLRATH:  Okay.

2        Q    (BY MS. DARWIT)  Okay.  And then now scrolling

3    up to the first PDF page, which is Bates-stamped Clark --

4    or Johnson Emerald Production 02968.  This is a reply

5    email from Mr. Shepherd, right?

6        **A    Yes.**

7        Q    Okay.  And he's asking you what you think about

8    Emerald owning a company called Atlas?

9               (Phone interruption.)

10              THE WITNESS:  Excuse me, let me shut this

11   off.

12       Q    (BY MS. DARWIT)  So in this email, Mr. Shepherd

13   asks you what you think about the concept of Emerald

14   owning Atlas, right?

15       **A    Yes.**

16       Q    Do you know what Atlas is?

17       **A    I think it was another insurance company.**

18       Q    Okay.

19       **A    Anyway, all of this is just talk and**

20   **discussions on stuff that we never did.**

21       Q    Okay.

22       **A    I mean, you know, talking about that company**

23   **and this company, nothing ever happened.**

24       Q    Okay.  And scrolling up to the very first email

25   on this page, this is an email that you sent to

Johnson, III, William E.                                    July 24, 2023

1    Mr. Trevors, with copy to Mr. Shepherd, May of 2015,

2    right?

3         A    Yeah.  Auto warranty or credit disability.

4                   (Phone interruption.)

5         A    This was going to spread out more risk and more

6    claims.  As I told you before, there are thousands of

7    them, and there are always warranty claims.  And I guess,

8    you know, but all this is just hypothetical because it

9    never happened.

10        Q    (BY MS. DARWIT)  Well, let's take it one step

11   at a time.  This is an email that you sent to

12   Mr. Trevors, with copy to Mr. Shepherd --

13        A    Yeah.

14        Q    -- in May of 2015, right?

15        A    Uh-huh.

16        Q    That's a yes?

17        A    Yes.

18        Q    Okay.

19        A    May of 2015.

20        Q    All right.  And you are talking about having a

21   totally separate entity that is a 943(d) Nevisian

22   Licensed captive --

23        A    Uh-huh.

24        Q    -- as the way to go?

25        A    Uh-huh.

Johnson, III, William E.                                    July 24, 2023

197

1      Q    Is that a yes?

2      **A    Yes.**

3      Q    Okay.  And you also state in this email, "For

4    all of our CICs that do not use all of their $1.2 million

5    exemption, I believe that we should strongly recommend

6    participation in the Pan American auto warranty or credit

7    disability business in order to be certain that each CIC

8    has some claims that are paid."

9           Do you see that?

10     **A    Yes.**

11     Q    Okay.  And so CICs refers to captive insurance

12   companies?

13     **A    What?**

14     Q    Does the term "CICs" refer to captive insurance

15   companies?

16     **A    It always does.**

17     Q    Okay.  What does the $1.2 million exemption

18   refer to?

19     **A    That refers to the amount of premium that can**

20   **be accepted without causing the insurance company or**

21   **captive insurance company to exceed the amount that is**

22   **allowed to a closely held captive, otherwise they become**

23   **a normal insurance company.**

24     Q    And that's under Section 831(b) of the tax

25   code?

Johnson, III, William E.                                    July 24, 2023

198

1       A     That is indeed 831(b).

2       Q     Okay.  And so was this structure that you were

3  recommending meant to be a supplement to the reinsurance

4  that was provided by the Emerald pool?

5       A     It was meant to be, but nothing ever happened.

6       Q     Okay.

7       A     You know, that when you enter into a -- an

8  insurance pool that's got thousands of warranties, you're

9  going to have claims.

10      Q     Uh-huh.

11      A     You're always going to have claims.  I think I

12  quoted something from the Internal Revenue Service that

13  the expectation of profit with the possibility of loss.

14  And one of the things that the IRS has always harped on

15  is the fact that some of these captives didn't have any

16  claims.

17            Well, if they participated in a

18  reinsurance operation, that was definitely going to have

19  claims, but actuarially, probably would make money.  Then

20  that argument about not having a realistic expectation of

21  having any claims would not apply.

22      Q     Got you.  Okay.

23      A     Because you will have claims.

24      Q     Okay.  Okay.  In 2017 Ms. Clark stopped

25  providing captive-related services, right?

Johnson, III, William E.                                    July 24, 2023

199

1      A     Yes.

2      Q     When did you hear about her office closure or

3  her practice closure?

4      A     She just sent a letter saying she was quitting.

5  I got a letter, I believe.  I don't know where it is.

6      Q     Was that in 2017?

7      A     I believe it was because that was the year

8  we -- we -- we started shutting down, and there was no

9  business.  I mean, you know, you get out, get out as

10  quick as you can.

11            And we ended up litigating with the

12  problems, you know, that we already had with people that

13  were trying to defraud the pool, and so we spent

14  thousands and thousands of dollars fighting these people

15  that were trying to defraud the pool.

16      Q     Did Emerald continue to offer reinsurance

17  services after Clark announced the practice closure?

18      A     We shut it down.  We couldn't do anything

19  except cleaning up the problems that you already had.

20      Q     Meaning paying outstanding claims?

21      A     Meaning finding people that were trying to

22  fraudulently cheat the pool.

23      Q     By submitting claims?

24      A     By submitting -- well, they'd already submitted

25  them.  We'd already disagreed, threw them out, and then

Johnson, III, William E.                                    July 24, 2023

200

1    they sued us.

2         Q    Okay.  Got it.

3              What happened to the captive insurance

4    companies that you worked with Ms. Clark on forming after

5    her practice closed?

6         A    I told them to liquidate them as quickly as

7    possible.  Don't pay another premium.  Get out of the

8    business.  You're buying a tax court case you can't

9    afford.

10        Q    Okay.

11        A    And all my other clients followed my advice.

12        Q    So on a granular level, what -- what did you do

13   to close down the captives?

14        A    Well, most of them had to be domesticated, and

15   then the income either left in the company as a domestic

16   company or just paid out to the -- dividended out in

17   liquidation with the company to whoever owned it.

18        Q    Okay.  And is that something that you did?

19        A    No.

20        Q    Who handled that?

21        A    I -- either they got other attorneys to handle

22   the liquidation, or I guess Celia's office helped

23   liquidate them.

24        Q    Okay.

25        A    But I'm -- I told all my clients get out, get

Johnson, III, William E.                    July 24, 2023

201

1    out, get out, get out.

2        Q     Did you have any clients that chose to continue

3    operating their captives after Ms. Clark stopped her

4    practice?

5        A     Well, they -- as far as I know, none of them

6    continued operating it.  I -- two of them that are in

7    litigation with the IRS, and they've been in litigation

8    forever.

9        Q     Okay.

10       A     I hope it's resolved before they die.

11       Q     Okay.  Okay.  And as part of this termination

12   and liquidation, the premiums that were held by the

13   captive were ultimately transferred back to the insured

14   or to whatever company owned the captive, right?

15       A     Yes, uh-huh.

16       Q     Okay.

17       A     I mean, once we finally settled the last of the

18   lawsuits, we returned premiums that we ended up not

19   having to pay out.

20       Q     Okay.  So the premiums ended back with the

21   insureds?

22       A     Uh-huh.

23       Q     Is that accurate?

24       A     Yeah.

25       Q     Okay.

Johnson, III, William E.                                July 24, 2023

202

1      A     When we shut Emerald down.  So I say there was
2   nothing to distribute to the shareholders.  We lost all
3   of it.
4      Q     And I'm -- so just to make sure that I'm --
5   we're both talking about the same thing, I'm asking what
6   happened to like your actual captive insurance clients.
7   Once they terminated and liquidated their captive, did
8   those funds end up being transferred back to the insured?
9                 MR. VOLLRATH:  Object to form.
10     A     Well, no, that's really not -- I honestly don't
11  know what all of those people did with their money.
12     Q     (BY MS. DARWIT)  Okay.  Got it.
13     A     I mean, I just -- I don't know.  Maybe they did
14  10 different things with it.
15     Q     Okay.  Because you weren't involved in the
16  process?
17     A     No, I -- I was not involved in --
18     Q     Okay.
19     A     In that.
20     Q     What overall return did you get on your
21  investment in Emerald?
22     A     What overall return?
23     Q     (Nods head.)
24     A     Maybe I'm -- I got some income distributions,
25  20 to 30 percent of what I invested, and the rest of it I

Johnson, III, William E.                                July 24, 2023

203

1    lost.

2         Q    Okay.

3         A    In other words, financially, it was a disaster.

4         Q    What involvement have you had in 831(b) captive

5    since Emerald closed?

6         A    Absolutely none.  And that's what I recommend

7    to everybody else, absolutely none.

8         Q    When's the last time that you communicated with

9    Ms. Clark?

10        A    It's been years, maybe three years, four years.

11        Q    And when's the last time you communicated with

12   Mr. Shepherd?

13        A    Oh, I talked to him a couple of weeks ago.

14   He's the one that's so sick.  He's the one that's got the

15   malaria.

16        Q    Is Mr. Shepherd one of your clients or one of

17   your former clients?

18        A    Yeah, and frankly, he's one of my clients

19   still, and we're friends.  I've known him for 30-plus

20   years.

21        Q    Okay.

22        A    I'm just sick about what happened to him.

23        Q    When's the last time you communicated with

24   Mr. Muhlenbruch?

25        A    God, 2017 or '18.

Johnson, III, William E.                                    July 24, 2023

204

 1      Q    Okay.  Okay.  You are an attorney, right?

 2      A    I am.

 3      Q    Okay.  And you practice law for a living?

 4      A    54 years so far.

 5      Q    Okay.  Where do you hold an active bar license?

 6      A    Texas.

 7      Q    What was your undergraduate degree?

 8      A    I have three of them.

 9      Q    Okay.  What are they?

10      A    I have a graduate -- I have an undergraduate

11 degree from Princeton, and I have a -- I have a law

12 degree from the University of Texas, and I have a

13 master's in tax law from Southern Methodist University

14 Law School.

15      Q    What was your major at Princeton?

16      A    English literature, a minor in economics.

17      Q    Okay.  So bachelor of art degree?

18      A    Yes.

19      Q    Other than your law license, do you hold any

20 other special licenses?

21      A    I have had insurance licenses in the past.

22      Q    What kind of --

23      A    Life insurance.

24      Q    Life insurance.  What kind of license is that?

25      A    I don't remember.

Johnson, III, William E.                                    July 24, 2023

205

1       Q       Okay.

2       A       It's been, you know, 30 or 40 years.

3       Q       What does the license allow you to do?

4       A       Represent an insurance company and sell life

5   policies.  I have actually forgotten.  I think it's been

6   over 40 years.

7       Q       You held that license over 40 years ago?

8       A       No, I said it's been 40 years since I had it.

9       Q       Okay.  Got it.

10              And when -- do you currently hold that

11  license?

12      A       No, I haven't had it in -- I haven't had the

13  license in 40 years.

14      Q       Got it.  Okay.

15              Did you work in between undergraduate and

16  law school?

17      A       I worked the whole time I was in school.

18      Q       Was there any -- did you go straight from

19  undergraduate school to law school though?

20      A       Yes, absolutely.  Otherwise, I was going to get

21  my head shot off in Vietnam.

22      Q       Okay.  And can you summarize your work history

23  after law school?

24      A       Yes, I practiced law starting in 1969, and I've

25  never stopped.

Johnson, III, William E.                                    July 24, 2023

206

1        Q      Where you did practice?

2        A      Here.

3        Q      In Dallas?

4        A      Yes.

5        Q      In Texas?

6        A      Yes.

7        Q      Where specifically?  A law firm?

8        A      I have had my own law firm since 1970 -- well,

9   since 1993 when my father died.

10       Q      Okay.  And --

11       A      I didn't have any partners.

12       Q      Where did you work in between 1969 and 1993?

13       A      I worked for this law firm, my dad's law firm.

14       Q      Oh, got you.

15       A      Until we left it, and my brother and my dad and

16   I are all lawyers.  We worked together until he died.

17       Q      And what's your -- what would you say is your

18   specialty as an attorney?

19       A      Asset protection.

20       Q      Asset protection?

21       A      Yes, people that have a lot of risk.

22       Q      And what type of law do you practice?

23       A      What do you mean what type of law?

24       Q      Would you categorize yourself as a tax lawyer?

25       A      Well, yes, tax lawyer, but asset protection is

Johnson, III, William E.                                    July 24, 2023

207

1   not really tax law.

2        Q     Got it.

3        A     And that is my most important thing.  In other

4   words, people that are afraid they're going to be sued or

5   have been sued or will be sued.

6        Q     Okay.  Do you have any actuarial background?

7        A     None.

8        Q     Do you have any underwriting background?

9        A     None.

10       Q     Did you speak with anyone about today's

11  deposition other than me?

12       A     I think that this gentleman here

13  (indicating) -- yeah, he's waving at me -- said he

14  probably wouldn't be asking me many questions.  He just

15  said, you know, are you going to go to the deposition?  I

16  said I don't have a choice.  So I mean, our conversation

17  must have lasted at least three minutes.  That was it.

18       Q     And are you referring to Mr. Vollrath?

19       A     Yeah.

20       Q     Okay.  And what did the two of you discuss?

21       A     The fact that I was going to appear and be

22  deposed by you and that I have produced everything, every

23  piece of paper I had that had to do with Emerald.  I

24  mean, you got it -- you got it all.  Obviously, you spent

25  a lot of time reading it all.

Johnson, III, William E.                              July 24, 2023

208

1      Q     Did you discuss the deposition with anyone

2   other than Mr. Vollrath?

3      A     No one.

4      Q     Okay.

5      A     Except that my office knows that I was going to

6   be deposed somewhere.

7      Q     Do you harbor any feelings of resentment

8   against the IRS?

9      A     Accumulated over 54 years, yes.  In fact, I

10  sued the IRS -- or, no, what I did was I got three

11  directed verdicts in a tax court case because the IRS got

12  so far out of line that -- you can imagine, you know, if

13  you get a directed verdict, that means the IRS has no

14  qualm whatsoever to support their position.  I got three

15  of them, and, as a result, my clients had spent about a

16  quarter of a million dollars.

17                  And I filed a -- I filed a motion with the

18  tax court to be reimbursed for the quarter of a million

19  dollars in costs we had, which, of course, the statute

20  requires where the IRS has nothing to support their

21  position.  And I filed a motion for sanctions against the

22  IRS for a quarter of a million dollars because they had

23  really gotten out of line.

24                  And I have 14 affidavits from people that

25  were personally familiar with what the IRS had done in

Johnson, III, William E.                                      July 24, 2023

209

1   this case.  And after I filed my motion for sanctions, I

2   had a call from the officer of the comm- -- the office --

3   the Commissioner of Internal Revenue.  And the man

4   introduced himself saying I'm Mr. so-and-so; I'm in the

5   Office of the Commissioner of Internal Revenue here in

6   Washington, and I have been given the unpleasant task of

7   making you go away.

8              And I said, that's very simple.  I want a

9   closing agreement signed by the commissioner agreeing

10  that my clients that you've mistreated so horribly owe no

11  money, no taxes whatsoever for any year over and under

12  the statute of limitations.

13             And he said, Mr. Johnson, you know the

14  commissioner himself has to sign closing agreements like

15  that.  And I said, that's your problem, but if you want

16  me to go away and withdraw my motion for sanctions,

17  that's what it's going to take.  And he said, I'll be

18  back in touch with you.

19             And I said, but I want to tell you one

20  thing.  Y'all got so far out of line in the treatment of

21  my clients of what you did that, number one, we're going

22  to get the 250,000 because you had nothing on which to

23  base your treatment of my clients, and that's what the

24  tax court said.

25             And number two, I don't know how much of

Johnson, III, William E.                                    July 24, 2023

210

1    that 250,000 sanctions that I have asked for we're going

2    to get, but I can tell you one thing for sure:  That tax

3    court is going to write an opinion that is going to

4    absolutely blister the Internal Revenue Service and your

5    behavior in this -- in this situation, and all of the

6    CPAs, all the tax attorneys in the United States are

7    going to read it.  And his answer to me, we've considered

8    that possibility, I'll be back in touch with you.

9        Q    Okay.  Do you harbor any feelings of resentment

10   against the federal government?

11       A    No.

12       Q    Okay.

13       A    How about some of the jerks that we've had in

14   the federal government.  You know, who would you like to

15   talk about, Biden or Trump?

16       Q    Do you have any financial stake in the outcome

17   of this case?

18       A    Nope, none at all.

19       Q    Did you do anything to prepare to testify at

20   today's deposition?

21       A    I got out all those records that I give you and

22   spent all day yesterday looking at them.

23       Q    Okay.  Did you look at any documents other than

24   the ones that you produced to the government?

25       A    I gave you everything I had.

Johnson, III, William E.                                July 24, 2023

211

1      Q    Have you ever been arrested?

2      **A    Never.**

3      Q    Have you ever been subject to professional

4  discipline?

5      **A    Never.**

6      Q    Are there any answers to my questions that you

7  wish to change?

8      **A    I got to read them when she finishes, no.**

9      Q    Okay.  So other than that, any substantive

10  responses sitting here today that you want to change?

11      **A    I told you the truth as far as I can remember**

12  **it.**

13      Q    Okay.

14      **A    Okay.**

15      Q    And so you -- I think you'd already answered

16  this question, and we could -- I could wait until the end

17  for this, but I'll just get it out now.

18          You want to go ahead and review the

19  transcript after the court reporter is done with it?

20      **A    Certainly.**

21      Q    Okay.

22          MS. DARWIT:  Why don't we go off the

23  record.

24          MR. VOLLRATH:  No objection.

25          THE VIDEOGRAPHER:  We are now off record.

Johnson, III, William E.                                    July 24, 2023

212

1    The time is 4:02 p.m.

2                    (Break taken.)

3                    THE VIDEOGRAPHER:  We're now on record.

4    The time is 4:12 p.m.

5        Q    (BY MS. DARWIT)  Okay.  Mr. Johnson, I just

6    have a few more questions.

7        A    All right.

8        Q    Is it your recollection that at least 30

9    percent of a captive insurance -- captive insurance

10   company's overall premiums would be transferred to

11   Emerald as part of the risk pool?

12       A    As I remember, that's what, I think, what it

13   indicated.

14       Q    Okay.  Why was 30 -- did you choose the 30

15   percent number?

16       A    I don't know where that came from but that was,

17   I believe, what we were doing.

18       Q    Okay.

19       A    I don't remember.  You remember, I'm 80 years

20   old, and I hadn't even thought about this stuff in years.

21   I'm sorry I have to think about it now.

22       Q    Okay.  So you don't remember why 30 percent --

23   at least 30 percent was chosen?

24       A    I don't remember, no.  I'm sure I had nothing

25   to do with picking it.

Johnson, III, William E.                                    July 24, 2023

213

```
 1        Q    And do you know who picked that number?
 2        A    I would have expected that Celia would have
 3   been the source of that 30 percent wherever that decision
 4   was made or why it was made, but I don't -- I don't know
 5   why.
 6              MS. DARWIT:  Okay.  I am going to mark
 7   another document.  This will be Exhibit 202, and it's
 8   Bates-stamped CLARKSDFL 1230003.
 9              (Exhibit 202 marked.)
10        Q    (BY MS. DARWIT)  Okay.  So, Mr. Johnson, this
11   is an email from Mr. Shepherd --
12        A    Uh-huh.
13        Q    -- to you in December of 2014?
14        A    Uh-huh.
15        Q    Right?
16        A    Yes.
17        Q    Okay.  And among others, Ms. Clark is copied on
18   this email, right?
19        A    Yes, she is.
20        Q    Okay.  And Mr. Shepherd is discussing an
21   article in this email, right?
22        A    Yes, apparently.
23        Q    Okay.
24        A    Pages 17 to 19.
25        Q    Okay.  And he says that this article discusses
```

Johnson, III, William E.                                    July 24, 2023

214

1    issues that are pertinent to our case.

2              Do you see that better?

3      A    "It discusses issues that are pertinent to our

4    case."

5      Q    Okay.

6      A    Uh-huh.

7      Q    Okay.  And under this heading "Avoiding

8    excessive premiums," it says that, "The service has

9    challenged premiums as being excessive and not an

10   ordinary and necessary business expense on two grounds."

11             Do you see that?

12     A    Yes, I do.

13     Q    "First," it says, "the taxpayers that paid

14   overly high premiums for the insurance that they are

15   receiving will not be able to deduct those premiums."

16     A    Uh-huh.

17     Q    Do you see that?

18     A    Yes, I do.

19     Q    And it states, "Second, taxpayers that are

20   suddenly obtaining significantly higher and unnecessary

21   levels of insurance will be not be able to deduct those

22   premiums."

23     A    Uh-huh.

24     Q    Do you see that?

25     A    Yes, I do.

Johnson, III, William E.                                    July 24, 2023

215

 1      Q    Do you agree with those statements?

 2      A    Well, yes.  If they're paying excessive

 3  premiums in excess of what the amount and risk is, that's

 4  what you have an actuary, an insurance actuary between

 5  which we always didn't have, to make determinations of

 6  what -- what the premiums should be.  That's totally out

 7  of my sphere of experience or knowledge.

 8      Q    Okay.  And did you and Ms. Clark ever discuss

 9  these concepts?

10      A    Oh, sure, we probably did.  I mean, you know,

11  but setting the premiums was not my job, and I didn't

12  pretend to have any expertise in doing that.

13      Q    Okay.  And under the heading "Reliable

14  actuarial method," do you see where it says -- I'm sorry.

15  The first sentence here, where it says that "The tax

16  court decided that insurance premiums charged by a

17  captive in a tax court case in the amount of insurance

18  provided by the captive must be based on a reliable

19  actuarial estimation of the risk of loss"?

20      A    Yes.

21      Q    Okay.  And it says, "Having premiums that are

22  consistently in great excess of the actual losses paid as

23  an indicator," that one of the two things is occurring?

24           Let me try that again.  I didn't read that

25  that well.

Johnson, III, William E.                    July 24, 2023

216

1               Do you see where it says that "having

2    premiums that are consistently in great excess of the

3    actual losses paid is an indicator that one of the two

4    things is occurring"?

5         A    Yes.

6         Q    Okay.  And the first thing that could be

7    occurring is the taxpayer could be attempting to evade

8    tax, right?

9         A    Yes.

10        Q    Are second, the company could be retaining the

11   risk, and the service might conclude that the captive was

12   not actually providing insurance.

13              Do you see that?

14        A    Yes.

15        Q    Okay.  And it also states here that a red flag

16   for the service has been when a captive is charging

17   exactly $1.2 million in premiums?

18        A    Uh-huh.

19        Q    Is that a yes?

20        A    Yes.

21        Q    Okay.  Did you discuss these concepts with

22   Ms. Clark?

23        A    I'm sure I did.  I mean, that's something that

24   we look at.  That's what we have the Allen whatever his

25   name is, that was his specialty is my understanding, and

Johnson, III, William E.                                    July 24, 2023

217

1   he has more experience in determining these questions

2   than about anybody, or at least that's the way he was

3   represented to me.

4              (Cell phone interruption.)

5       Q    (BY MS. DARWIT)  And do you agree with the

6   statement that the amount of insurance provided by a

7   captive must be based on a reliable actuarial estimate of

8   the risk of loss?

9       A    That was what we always intended and tried to

10  comply with.

11      Q    So you agree with that statement?

12      A    Yes.

13      Q    Okay.

14      A    Now, there's one part of that statement I

15  disagree with, and that is whether or not the amount of

16  premiums that you paid are the same as what your losses

17  are.  I have been paying premiums since I've been in

18  business, just in the law business 54 years, and I have a

19  lot of other companies as well.  And I've paid the

20  premiums far in excess of my claims, far in excess, and

21  I've never had anything except commercial insurance.

22      Q    Okay.

23      A    And my commercial insurance premiums are

24  running thousands of dollars a month right now, and I

25  have a substantial amount of risk now.  And I've had some

Johnson, III, William E.                                July 24, 2023

218

1    80- $90,000 and losses over the years that were covered

2    partially or, you know, entirely.  State Farm is the one

3    that I use and, you know, they're not noted for having

4    the lowest premiums around.  Their premiums are pretty

5    high compared to others, but one thing they do do, they

6    pay the claims.  And that's what I need.  You can build

7    something into your monthly budget.

8            What I didn't want to have was a huge loss

9    that I couldn't afford to pay.  So that's why I have so

10   much -- that's why I have so much liability and casualty

11   insurance myself.

12           MS. DARWIT:  I'm going to mark another

13   document as Exhibit 203.  It's Bates-stamped Johnson

14   Emerald Production 00725.

15           (Exhibit 203 marked.)

16       Q   (BY MS. DARWIT)  It's a lengthy document, so

17   I'll kind of just scroll through it here quickly.

18           Okay.  On the second page here, which is

19   Bates-stamped Johnson Emerald Production 00726, this is a

20   copy of a complaint that was filed by someone named Nick

21   Davis with NERXD LLC and Dart Company, Inc. against

22   Clark & Gentry, Rosenhouse Group, Heritor and Emerald,

23   right?

24       A   Yes, uh-huh.

25       Q   Okay.  And if we -- do you recognize this

Johnson, III, William E.                                    July 24, 2023

219

1    person's name, Nicholas Davis?

2        A    Yes.  That's one of the ones that sued us.

3        Q    Okay.  Was he a client of yours?

4        A    Nope.

5        Q    He was a captive client of Clark's?

6        A    Obviously.

7        Q    Okay.  And what do you remember about this

8    lawsuit?

9        A    I need to go back in.  It's been too many

10   years.

11       Q    Sure.

12       A    You're going too fast.  I can't read that fast,

13   ma'am.

14       Q    Okay.

15       A    Okay.  Go up a little bit.

16            Okay.  Up a little bit.

17       Q    Up?

18       A    Okay.  Up a little bit more.  Okay.

19       Q    This is the top here.

20       A    Yeah, I remember that there was this lawsuit.

21   I am trying to remember what they -- I'm trying to

22   remember what they were claiming.

23       Q    Well, I don't -- why don't I focus your

24   attention on a page that's Bates-stamped Johnson Emerald

25   Production 00730.

Johnson, III, William E.                                    July 24, 2023

220

1              According to Paragraph 17 of this

2    complaint, Emerald is a reinsurance provider for CICs

3    participating in Emerald's annual risk pools.

4              Do you see that?

5        A    Yes, uh-huh.

6        Q    And it says here that, "Emerald was represented

7    to Davis by C&G and Rosenhouse as being an independent

8    legitimate reinsurance firm, but Emerald is a business

9    related to, owned by or from whom the other defendants

10   obtained a pecuniary benefit."

11             Do you see that?

12       A    Yeah.  I'm wondering who in the world they're

13   referring to.

14       Q    Is C&G here referring to Clark & Gentry?

15       A    Oh, that's because of the little 2 and a half

16   percent interest of the two kids?

17       Q    Well, I'm asking you -- my question -- the only

18   question that's pending is does C&G refer to Clark &

19   Gentry?

20       A    Oh, yeah.

21       Q    Okay.  And do you need a moment?  Is that --

22       A    No, I'm just reading it.

23       Q    Okay.

24       A    Emerald did not employ two children of Clark &

25   Gentry.  They probably know nothing about this.

Johnson, III, William E.                                    July 24, 2023

221

1      Q    And do you see where it states in this
2    complaint that, "Clark & Gentry and its founder Celia
3    Clark also provided legal counsel to, and represented
4    Emerald in its dealings with members of its risk pool,
5    including Dart during the entire period of issue"?
6      **A    Yes.**
7      Q    And it states here, "Heritor and Emerald share
8    common ownership and employees, including Curtis
9    Muhlenbruch, and Emerald employed two children of
10   defendant C&G's founder and principal Celia Clark"?
11     **A    Yes.  And some of those statements are just**
12   **flat wrong.**
13     Q    Okay.  Which of those statements do you
14   disagree with?
15     **A    Oh, well, nobody employed -- employed those two**
16   **kids.  They probably know nothing about any of this.  And**
17   **Muhlenbruch worked for Heritor.  He never worked for**
18   **Emerald.  Heritor, however, was hired by Emerald to be**
19   **our first line of analysis of claims and it was only if**
20   **they and the claimant disagreed that we would then go to**
21   **the Florida third-party insurance claims adjuster, you**
22   **know, for their -- I think we had to pay them $5,000 when**
23   **we hired them to do that.**
24     Q    Okay.
25     **A    So there's some incorrect statements there.**

Johnson, III, William E.                                    July 24, 2023

222

1    And this is, of course, in the petition; and there are

2    usually lots of incorrect statements in petitions.

3         Q    Anything else about this paragraph incorrect?

4         A    Well, other than those two kids.  I don't think

5    Celia Clark was getting any pecuniary benefit.  She

6    certainly didn't work for Emerald.

7         Q    Okay.  Ms. Clark was a trustee of Emerald?

8         A    No.  She was a trustee of the trust fund over

9    at -- at -- what's the name of the firm, you know, the

10   big giant company?  Morgan, J.P. Morgan.  She was a

11   trustee of the trust fund that held those -- held all the

12   funds, but, you know, she worked for us.

13        Q    She was the trustee of a trust that was granted

14   by Emerald, though, right?

15        A    It's the ones that held the premiums, you know,

16   until they were either returned to the insurance

17   companies or used to pay claims.

18        Q    Okay.  And that trust was granted by Emerald,

19   right?

20        A    I don't remember who the grantor was.

21        Q    Okay.  And Ms. Clark's children were owners of

22   Emerald, right?

23        A    They were what?

24        Q    Owners of Emerald, right?

25        A    They had the little 2 and a half percent, and I

Johnson, III, William E.                              July 24, 2023

223

1    must say that's my fault, because I wanted, before I got

2    myself in there and put $75,000, which I did, as you

3    know, I lost every penny of it.  I wanted to see that she

4    at least believed in it enough to put some money in it.

5                   She didn't think it would be right for her

6    to invest in it directly, so she got her two kids' trusts

7    to do it, or maybe it was just the kids directly.  But

8    I'm actually responsible for them being in there at all.

9    It wasn't so she could make money; it was so she could

10   get me to invest my 75,000.

11       Q     Okay.  And is this the client that you referred

12   to at the very beginning of this deposition, who you said

13   they allegedly requested certain insurance coverage that

14   they didn't ultimately end up getting?

15       A     Not this one.  No, this is a different one.

16       Q     Okay.  What don't you take a look at

17   Paragraph 18 here.

18       A     Uh-huh, yeah.  Let's see.

19                   Oh, yeah.  I think this is the one where

20   they claimed that they told Celia that they wanted some

21   coverage, but it wasn't in the policies.

22       Q     Got you.

23       A     And therefore, there was nothing we could do

24   about it.  You know, if the policy on its face doesn't

25   cover the claim that they're -- that they're trying to

Johnson, III, William E.                                July 24, 2023

224

1    recover under, then there's nothing that the reinsurance

2    company can do about it.

3        Q    Got you.  So in Paragraph 18, the plaintiff

4    alleges that they filled out an application for certain

5    insurance coverages for their captive, including business

6    income insurance, that's bolded, and contract

7    cancellation insurance is bolded.

8             Do you see that?

9        A    Yeah.

10       Q    Okay.  And then in Paragraph 19, the plaintiff

11   alleges that Clark & Gentry confirmed receipt of those

12   applications, right?

13       A    Yeah.

14       Q    Okay.  And he also alleges that Clark & Gentry,

15   Rosenhouse and Davis communicated specifically about the

16   contract cancellation insurance policy application, and

17   Clark & Gentry advised Davis that it would forward --

18   forward all the insurance applications he had submitted,

19   right?

20       A    Yeah, I see what it says.  But like I say,

21   they're generally a lot of claims in the petition that

22   turn out not to be true.

23       Q    Okay.  And then in Paragraph 22, the plaintiff

24   alleges that on December 21st 2016, Clark & Gentry

25   advised Davis that Dart company had been approved to

Johnson, III, William E.                                July 24, 2023

225

1    participate in Emerald's insurance pool, right?

2        A    Uh-huh.

3        Q    Okay.  And again, contained -- he alleges, the

4    plaintiff does, in Paragraph 23, that contained in the

5    reinsurance agreement between Dart and Emerald was a page

6    that defined the coverage policies as including contract

7    cancellation, right?

8        A    Yes.

9        Q    Okay.  And then looks like in Paragraph 25 --

10   25 and 26, the plaintiff alleges that Davis was charged

11   and paid premiums for the app- -- for the policies that

12   he applied for, right?

13       A    Yes, uh-huh.

14       Q    Okay.  And he -- the plaintiffs alleges that he

15   was not warned that the policies for all applications he

16   had applied for, or that were listed in, and not excluded

17   from the reinsurance agreement he received would not

18   result in policies being issued.

19            Do you see that?

20       A    Informed Davis the amount of premiums due for

21   the insurance coverages he had applied for full premium

22   amount would be due that same day, and the

23   premium -- okay.

24            Well, once again, that's between Davis and

25   his captive.

Henderson Legal Services

202-220-4158                          www.hendersonlegalservices.com

Johnson, III, William E.                                    July 24, 2023

226

1      Q    So, yeah.  My question is just that do you see

2   where it says that Davis had not been warned that

3   policies for all applications he had applied for or that

4   were listed in and not excluded from the reinsurance

5   insurance agreement would not result in the policies

6   being issued.

7               Do you see that?

8      A    **Yeah.**

9      Q    Okay.

10     A    **Uh-huh.**

11     Q    Then he also alleges that he was not advised

12  about what policies he had been issued or provided a copy

13  of any insurance policy, right?

14     A    **Yes, I guess that's an argument he's got with**

15  **Celia.**

16     Q    Okay.  And then in Paragraph 30, do you see

17  where plaintiff alleges that he relied on the defendants'

18  representations and assurances that they would design and

19  obtain and provide the appropriate types and amounts of

20  insurance coverage necessary for his business.

21               Do you see that?

22     A    **Yes, I see it.**

23     Q    Okay.  And then in Paragraph 31, plaintiff

24  alleges that defendants promised to design and procure

25  insurance needed by Davis' business, including business

Johnson, III, William E.                                    July 24, 2023

227

1    income loss and contract cancellation.

2                Do you see that?

3        **A    Yes, I do.**

4        Q    Okay.  And he also alleges that at no time

5    after his payment of premiums did Clark & Gentry

6    Rosenhouse, Heritor or Emerald advise him that he did not

7    actually receive business income or contract cancellation

8    insurance.

9        **A    Yeah.  Well, Emerald did not issue business**

10   **income loss.  All we do is reinsure the losses that are**

11   **covered in his policy.**

12       Q    So my -- I got -- I understand that, but my

13   question is just what this says.

14               So in Paragraph 31 do you see where it

15   says that at no time was the plaintiff advised before he

16   paid the premiums that Emerald did not issue business

17   income loss or contract cancellation insurance.

18               Do you see that?

19       **A    Yes.  Well, remember, Emerald doesn't tell the**

20   **clients what we're covering.  We're covering what is in**

21   **his policies.  And the question here was I don't believe**

22   **that the coverage he was trying to sue under was in his**

23   **policies and that his argument is with -- his argument is**

24   **with Celia on whether or not he really did list that**

25   **coverage.**

Johnson, III, William E.                                    July 24, 2023

228

1              But remember, a reinsurance company can't

2    reinsure anything that isn't in the policies that they're

3    reinsuring.  So I mean, you can't make some kind of vague

4    allegations, which they did about Emerald.  Emerald

5    reinsures the policies as they are written, and the

6    argument here with Davis was -- with Celia, did she or

7    did she not include risk that he really did say he

8    needed.  Who knows?

9         Q    Okay.

10        A    I don't know.

11        Q    All right.

12        A    I'll never know.  All I know is that we

13   couldn't reinsure a risk that wasn't covered in the

14   policies he submitted to the pool.

15        Q    Okay.

16        A    Nothing we can do about that.

17             MS. DARWIT:  All right.  I think those are

18   all of my questions.  So I will turn it over to you,

19   Derick.

20             MR. VOLLRATH:  Okay.  Well, it is after

21   the close of business here on the East Coast.  I will

22   ask -- I will begin some cross-examination and see how

23   far we can get.

24                   CROSS-EXAMINATION

25   BY MR. VOLLRATH:

Johnson, III, William E.                                        July 24, 2023

229

1       Q    Mr. Johnson, you've previously spoken to me by

2   telephone, correct?

3       **A    I can't understand him.**

4       Q    I'm going to try and get closer to our

5   microphone.

6       **A    Thank you.**

7       Q    Is that a little better, Mr. Johnson?

8       **A    Yes, that's better.**

9       Q    You and I have spoken before today, correct?

10      **A    Once, yes, sir.  I believe that that's the only**

11  **time we've ever spoken on the phone.**

12      Q    And that was last week?

13      **A    Yes.**

14      Q    Another lawyer with my firm, Julie Levine, was

15  also on the phone; is that correct?

16      **A    I don't know.**

17      Q    Okay.  Do you recall that I asked you if you

18  were willing to appear to testify at the trial in this

19  matter in West Palm Beach voluntarily?

20      **A    Yes, you did ask me that.  And I said that I**

21  **would if it was going to be in Palm Beach.**

22      Q    Okay.  Or Port St. Lucie, I think we talked

23  about that possibility as well?

24      **A    Yes, so long as it's reasonably close.**

25      Q    Okay.  And nothing has changed, you still

Johnson, III, William E.                                    July 24, 2023

230

1    intend to appear voluntarily --

2        **A    I do.**

3        Q    -- to testify?

4        **A    Yeah.  I think you said it would be in April,**

5    **correct?**

6        Q    I think it is currently scheduled in April?

7        **A    Yes, uh-huh.  My son just -- is not moving**

8    **there full-time, but he's getting an apartment there,**

9    **keeping the one he has here, but he's taken a very good**

10   **position there in Palm Beach, so he'll be working there.**

11                MR. VOLLRATH:  Okay.  Well, in light of

12   that, and in light of the fact that it's now 5:40 over

13   here on the East Coast, I am going to decline to ask you

14   further questions --

15                THE WITNESS:  I will be --

16                MR. VOLLRATH:  -- okay?

17                THE WITNESS:  I'm delighted.  Like I say,

18   I'm worn out.  They've been beating me over the head, and

19   I don't think this lady likes me.

20                MR. VOLLRATH:  Okay.  I'm sure she feels

21   about you just fine.  But thank you very much for -- for

22   being here today and for subjecting yourself to a lengthy

23   day of deposition testimony.

24                THE WITNESS:  Yeah.  I guess both of you

25   are going to pound on me when I'm there at the trial.

Johnson, III, William E.                                    July 24, 2023

1                    MR. VOLLRATH:  Well, hopefully not all

2       day.

3                    Okay.  Lauren, you got anything further?

4                    MS. DARWIT:  I don't have anything

5       further.

6                    Kelly, was there something on the record

7       you wanted to discuss?

8                    THE COURT REPORTER:  Yes, please.

9                    Mr. Vollrath, did you want to order a copy

10      of the transcript?

11                   MR. VOLLRATH:  Yes.

12                   THE COURT REPORTER:  Thank you.

13                   THE WITNESS:  I've asked them to give me a

14      copy as well so that, as is the usual procedure, I have a

15      chance to read over it and see what I said, and if I said

16      it correctly and if she properly transcribed it.

17                   THE COURT REPORTER:  On that note, where

18      should I send it?

19                   THE WITNESS:  Send it to my office or send

20      it -- do you want to get it to me?

21                   MS. DARWIT:  Typically Henderson provides

22      it to the witness.  But I mean, if you -- why don't I --

23      I think I have your information, Kelly, so I'll send you

24      his email to send it to him.  Or were you talking about

25      opposing counsel, Derick Vollrath?

Johnson, III, William E.                                    July 24, 2023

232

```
 1              THE WITNESS:  Well, you're not going to
 2   send it by email, I hope.
 3              MS. DARWIT:  They usually do.
 4              THE VIDEOGRAPHER:  Do you want all this on
 5   the record?
 6              MS. DARWIT:  No.  I think we can go off
 7   the record, if you guys are okay with that.  Let's go off
 8   the record.
 9              THE VIDEOGRAPHER:  We're now off the
10   record.  The time is now 4:41 p.m.
11              (End of proceedings at 4:41 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Johnson, III, William E.                                    July 24, 2023

233

```
1                    CHANGES AND SIGNATURE

2     PAGE/LINE          CORRECTION          REASON FOR CHANGE

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14        I, _____, have read the foregoing
      deposition and hereby affix my signature that same is true
15    and correct except as noted herein.

16
                              _____
17                            WILLIAM E. JOHNSON, III
                              Case No.
18                            9:21-cv-82056-CIV-CANNON

19
      STATE OF _____ )
20
          Subscribed and sworn to before me by the said witness,
21    WILLIAM E. JOHNSON, III, on this the _____ day of
      _____, 2023.
22
                              _____
23                            NOTARY PUBLIC IN AND FOR
                              THE STATE OF TEXAS
24    My Commission Expires:

25
```

Johnson, III, William E.                    July 24, 2023

234

```
 1    STATE OF TEXAS )

 2         I, Kelly Hassell, RPR, CLR, CSR, in and for the State

 3    of Texas, do hereby certify that, pursuant to the agreement

 4    hereinbefore set forth, there came before me on the 24th

 5    day of July, A.D., 2023, at 9:28 a.m., at the offices of

 6    U.S. Department of Justice, Tax Division, located at 717

 7    North Harwood Street, Suite 400, in the City of Dallas,

 8    State of Texas, the following named person, to wit:

 9    WILLIAM E. JOHNSON, III, who was by me duly cautioned and

10    sworn to testify the truth, the whole truth and nothing but

11    the truth, of his knowledge touching and concerning the

12    matters in controversy in this cause; and that he was

13    thereupon carefully examined upon his oath, and his

14    examination was reduced to writing under my supervision;

15    that the deposition is a true record of the testimony given

16    by the witness, same to be sworn to and subscribed by said

17    witness before any Notary Public, pursuant to the agreement

18    of the parties; and that the amount of time used by each

19    party at the deposition is as follows:

20              Ms. Darwit - 5 hours, 35 minutes,

21              Mr. Vollrath - 2 minutes;

22         I further certify that I am neither attorney or

23    counsel for, nor related to or employed by, any of the

24    parties to the action in which this deposition is taken,

25    and further that I am not a relative or employee of any
```

Johnson, III, William E.                                    July 24, 2023

235

1   attorney or counsel employed by the parties hereto, or

2   financially interested in the action.

3       I further certify that, before completion of the

4   deposition, the Deponent and/or the Plaintiff/Defendant did

5   request to review the transcript.

6       In witness whereof, I have hereunto set my hand and

7   affixed my seal this 27th day of July, A.D., 2023.

8

9                    *Kelly Hassell*

10                   KELLY HASSELL, CSR No. 5729
                     Cert. Expires 10/31/24
11                   Henderson Legal Services, Inc.
                     1560 Wilson Boulevard
12                   Suite 750
                     Arlington, Virginia  22209
13                   (877) 548-8787
                     (202) 220-4162 (Fax)
14

15

16

17

18

19

20

21

22

23

24

25

Henderson Legal Services

202-220-4158                          www.hendersonlegalservices.com

Johnson, III, William E.                                July 24, 2023

1

| A | | | |
|---|---|---|---|
| **A.D** 1:18 234:5 235:7 | account 34:22 83:5 91:6 105:25 126:1 126:4,5,6 128:12 | 5:21 **ACR_IRS04...** 6:4 **ACR_IRS04...** 6:5 | 85:23 95:18 133:10,16,22 148:14 152:19 166:24 |
| **a.m** 1:19 8:10 12:22,22,24 59:8,11 234:5 | **accountant** 141:16 | **acted** 121:23 144:19 | **address** 22:4,5 22:5 184:1 |

**A.D** 1:18 234:5 235:7

**a.m** 1:19 8:10 12:22,22,24 59:8,11 234:5

**ability** 11:9 80:9 169:10 177:18

**able** 15:5 35:17 42:23 47:14 56:22 85:8 129:22 130:8,20 143:20 156:5 214:15,21

**above-styled** 1:17

**absolute** 156:19 176:14

**absolutely** 9:16 25:21 31:19 71:17 96:17 203:6 203:7 205:20 210:4

**accept** 39:1,6 40:3 56:18 63:20 65:9

**acceptable** 87:21

**accepted** 68:13,16,21 120:13 197:20

**accidentally** 180:17

**accomplish** 65:21

**accomplished** 23:6,16 24:3 24:7

account 34:22 83:5 91:6 105:25 126:1 126:4,5,6 128:12

**accountant** 141:16

**accountants** 102:9

**accounts** 20:2 31:1 110:25 126:4

**Accumulated** 208:9

**accurate** 15:12 100:20 148:18 155:21 157:10 201:23

**accused** 181:7

**acquaintance** 16:14,15

**acquire** 192:15

**acquired** 121:6

**acquiring** 150:8

**ACR** 108:9 109:5 111:22 112:14 172:10,13 174:14 176:5

**ACR_IRS02...** 6:24

**ACR_IRS02...** 6:24

**ACR_IRS02...** 7:4

**ACR_IRS02...** 7:5

**ACR_IRS04...** 5:20

**ACR_IRS04...** 5:21

**ACR_IRS04...** 6:4

**ACR_IRS04...** 6:5

**acted** 121:23 144:19

**Acting** 141:13

**action** 92:5 93:14 124:18 234:24 235:2

**actions** 87:23 93:11

**active** 204:5

**activity** 181:7

**actual** 120:2 202:6 215:22 216:3

**actuarial** 5:16 5:19,23 6:3 90:7 103:13 104:1 108:16 109:23,25 110:4 112:3 112:3 115:23 116:3 117:2 117:15 207:6 215:14,19 217:7

**actuarially** 190:21,22 198:19

**actuarials** 107:10

**actuary** 103:21 110:2 117:21 118:8 144:14 160:9 161:21 161:22 173:18 215:4 215:4

**addition** 17:20

**additional** 10:12 85:11

85:23 95:18 133:10,16,22 148:14 152:19 166:24

**address** 22:4,5 22:5 184:1

**adequate** 28:6 88:23 158:14

**adequately** 171:11 179:14

**adjective** 137:6

**adjuster** 221:21

**adjusting** 28:19

**adjustment** 99:20 100:19 100:23 101:3 102:23 114:24 115:4 116:24

**administer** 26:24

**administrative** 181:3

**administrator** 26:21

**admit** 28:4

**advantages** 165:15,19,20 166:24 167:3

**Adverse** 107:14

**advice** 36:25 37:5 62:19 66:19,23 148:16 200:11

**advise** 50:5,21 227:6

**advised** 60:5

86:1 224:17 224:25 226:11 227:15

**advising** 145:8 145:12 148:12

**advisors** 159:14 160:1

**advisory** 39:15

**affidavits** 208:24

**affiliated** 78:18

**affix** 233:14

**affixed** 235:7

**afford** 39:3 97:14 129:9 129:13,15 156:24 157:1 200:9 218:9

**afraid** 50:18 146:1 207:4

**age** 167:14

**agent** 22:18

**ages** 114:15

**aggressive** 32:13 147:11

**ago** 17:12 52:4 52:5 92:2 119:24 137:18 172:21 203:13 205:7

**agree** 28:18 33:25 67:14 71:16,17 84:19 104:17 124:17,21 140:8 215:1 217:5,11

**agreed** 19:13 84:24 86:4 89:4 120:11 120:11 138:4

Johnson, III, William E.                                    July 24, 2023

138:9 139:19
**agreeing**
209:9
**agreement**
1:24 5:9 6:12
7:7 33:8
76:25 77:4,6
77:16,21
79:5 80:22
81:22 84:1
84:20,25
85:3,15
86:18,22
87:9 89:5,8
91:1 98:8,14
139:14,18
141:20,24,25
142:18
169:25 209:9
225:5,17
226:5 234:3
234:17
**agreements**
25:5 80:11
87:4 88:1
90:3 137:13
137:20 138:4
209:14
**agrees** 131:20
**ahead** 10:20
11:23 72:9
86:9,14
133:25
138:25 142:6
153:7 164:19
211:18
**al** 4:20,23 6:7
7:9,13,17,20
**Alabama** 4:17
5:5 18:17,24
19:10 20:23
21:14 22:4
22:16,18
25:23,24,24

26:3 36:6
48:7,22
51:15,20,24
52:2,12,14
52:18 55:25
56:4,6,9
65:20,25
66:9 73:14
74:3,9 78:5
116:2 137:5
**Alabama's**
21:19
**ALAE** 113:19
113:21,24
**allegations**
36:24 37:4
228:4
**allegedly** 93:2
223:13
**alleges** 224:4
224:11,14,24
225:3,10,14
226:11,17,24
227:4
**alleging** 39:12
**Allen** 103:19
103:22 112:4
115:23 116:3
141:10
144:13
161:20
216:24
**alleviate**
180:11
**allocated**
141:22
**allow** 65:21
186:17 205:3
**allowed** 94:4
197:22
**allowing** 43:4
**alternative**
168:4,7
**altogether**

187:4
**Alzheimer's**
32:10
**amendments**
63:25 64:6
64:20 66:21
**America** 1:4
8:5
**American**
137:10
189:19
191:10,12,13
191:16 192:4
192:5,13
194:5 197:6
**amount** 25:3
29:1 43:8
46:13 51:1,8
56:17 57:22
68:12,14,21
69:19,20
70:18 80:5
83:17 90:11
91:3 102:23
108:1 118:2
142:7 148:13
150:9 151:10
152:5,8
166:8 169:13
179:24
183:24 190:4
197:19,21
215:3,17
217:6,15,25
225:20,22
234:18
**amounts**
130:15
153:23
154:15
162:12
226:19
**analysis** 28:22
71:1,7,18

120:10,14
141:9 144:12
221:19
**analyze**
106:10
**analyzed** 71:6
90:16,21
183:14
**and/or** 127:8
235:4
**anesthesiol...**
185:16
**announced**
199:17
**annual** 4:8
5:13 21:13
21:16,18,23
33:2 38:10
74:23 75:19
76:4 99:2
104:3 110:6
115:17 220:3
**answer** 9:25
10:1,14,18
11:1 53:14
53:16 62:25
69:12 72:20
85:19,20
95:6,11
97:15 102:21
106:1,14,15
107:6,8
128:16 153:7
210:7
**answered**
91:17 95:6
143:16
211:15
**answering**
11:5 145:19
176:3
**answers** 69:10
138:23
143:19 211:6

**ANTHONY**
2:23
**anticipated**
98:6
**anybody** 34:18
40:24 88:13
88:24 95:21
160:24 217:2
**anymore** 94:4
**anytime** 54:15
**anyway** 40:2
93:6 142:21
184:25 190:9
190:19 192:1
195:19
**anyways** 12:18
**apartment**
230:8
**app-** 225:11
**apparently**
110:22
163:24 193:7
213:22
**appeals**
141:12
**appear** 207:21
229:18 230:1
**appearance**
31:13
**appearances**
3:2 8:13
**appeared**
27:21 28:12
**appearing**
8:16,16,20
**appears** 15:15
60:2 87:6
110:1 112:2
163:7 180:5
**applicable**
80:10 145:9
**application**
141:2 143:22
178:5,13,15

Johnson, III, William E.                                          July 24, 2023

3

178:17 224:4
224:16
**applications**
6:23 138:18
173:17,25
174:7 175:2
176:11 177:6
224:12,18
225:15 226:3
**applied** 225:12
225:16,21
226:3
**apply** 145:13
198:21
**appointing**
123:21
**appointments**
184:7
**appreciate**
133:6
**appreciated**
132:2 133:9
**approach** 66:9
**approached**
53:8 54:1
55:11
**approaching**
176:14
**appropriate**
40:17 173:19
194:4 226:19
**approval**
29:20 32:19
122:12
147:17
**approve** 31:2
120:6
**approved**
30:25 68:10
69:20 70:18
85:1 88:3,4
95:19 96:3
98:4 122:7
122:20

128:15 129:5
224:25
**approving**
20:18,24
21:2
**approximately**
17:9 19:1
111:13
137:15 142:3
156:23
**April** 60:6
230:4,6
**arbitration**
37:17 98:10
127:8
**area** 22:10
181:6
**argue** 70:2
**argument**
198:20
226:14
227:23,23
228:6
**Arlington**
235:12
**arrested** 211:1
**art** 23:11
204:17
**article** 82:1,9
86:21 87:7,8
213:21,25
**asked** 10:19
28:7 36:10
58:5 62:23
64:4 66:18
93:3 97:16
105:16,20,20
106:17 117:6
143:16
147:20 152:1
160:14 161:4
164:8 171:24
210:1 229:17
231:13

**asking** 11:1
21:22 36:9
37:3 59:1
63:25 64:2,5
65:20 66:6
96:8 105:17
113:22
123:10
129:20
146:25
155:25,25
173:23 174:6
175:2 176:10
178:11 179:9
180:13 185:5
189:11 195:7
202:5 207:14
220:17
**asks** 38:5
195:13
**assembly**
45:16
**asset** 206:19
206:20,25
**asset-protec...**
150:18
**assets** 99:13
99:15 100:12
100:15
**associated**
24:17 156:14
**associates**
131:6
**assumed**
27:17 29:7
79:11 186:8
**assumes**
105:23
**assuming** 85:1
106:8 128:14
**assumptions**
104:1 109:23
110:4
**assurances**

226:18
**ate** 126:13
**Atlanta** 101:11
**Atlas** 195:8,14
195:16
**attach** 173:24
**attached** 7:21
36:10 163:12
163:16
173:16
**attaches** 178:5
**attaching**
173:25 178:7
178:12
**attachments**
163:20
**attacked** 157:4
**attempting**
216:7
**attend** 33:2
74:14
**attendance**
75:24 76:7
**attention** 99:6
100:7 102:13
142:4 193:5
219:24
**attorney** 53:13
204:1 206:18
234:22 235:1
**attorney-clie...**
46:7
**attorneys** 2:12
96:15 200:21
210:6
**audible** 119:10
132:24
**audio** 12:6,6
94:17,21,23
194:18
**audit** 141:11
144:17
157:10,18,21
157:25 158:8

158:19 159:7
**audited** 20:22
25:23 26:3
101:6 104:4
**auditors** 20:20
20:21 101:10
101:20
**August** 75:10
**Authority** 40:6
**auto** 196:3
197:6
**automobile**
190:2,3,5,7
190:15,17
**available**
124:9 125:13
171:7
**Avenue** 2:4
**avoid** 31:13
159:7 167:21
**avoided** 45:20
45:22
**Avoiding**
214:7
**aware** 136:7
136:11
182:20

_____
**B**
**bachelor**
204:17
**back** 46:9 47:6
60:21 68:8
71:15 74:8
79:12,19
81:21 82:18
83:25 84:4,5
84:10,13,16
86:9 88:24
94:17,18
95:7,17
105:24 116:8
120:12 127:2
129:4 134:16

Johnson, III, William E.                                        July 24, 2023

4

148:13,17
169:1,22
171:13
191:12
201:13,20
202:8 209:18
210:8 219:9
**background**
29:17 207:6
207:8
**bad** 39:4,10,22
**balance** 99:7
99:12 100:9
131:23
**bank** 18:19
20:2 31:1
102:12 126:4
**banking** 18:19
**bankrupt**
85:14,16
**bar** 42:6 131:8
204:5
**barely** 132:17
**base** 209:23
**based** 55:20
79:21 97:8
167:15
215:18 217:7
**basic** 68:25
103:5 186:25
**basically**
32:16 34:21
39:20 50:8
86:2 92:15
125:21
150:17
**basis** 105:25
**Bates** 100:8
**Bates-stamp...**
4:5,9,13,18
4:21,24 5:5,7
5:11,14,17
5:20,24 6:4,8
6:13,16,20

6:23 7:4,7,10
7:14,18,21
14:9 21:6
35:8 43:19
47:9 59:16
63:6,14
64:17 72:12
73:13 75:4,8
75:17 76:2
81:11 82:2
86:13,25
99:1,24
102:14 103:3
107:12,22
108:9 109:5
109:19
110:13 111:6
111:22
112:14
122:25 123:5
124:13
131:15 134:1
139:1 146:13
163:1 168:10
172:9,13
174:14 176:5
178:21
181:15
187:16,21
189:3,7
193:3,5,18
195:3 213:8
218:13,19
219:24
**Beach** 229:19
229:21
230:10
**bear** 186:6
**bearing** 36:17
**beating** 230:18
**began** 32:9,12
120:24 121:6
**beginning**
1:19 32:14

36:15 61:14
85:19 86:12
86:24 125:18
137:17
146:20 184:6
190:10
223:12
**begins** 8:3
**behalf** 8:16,17
8:20,21
70:19 74:9
**behaved** 26:13
**behavior**
210:5
**believe** 16:6
27:5 30:2
32:13 33:1
50:16,22
53:17 77:5,9
77:12,22
79:13,13,21
79:22 80:13
92:2 93:6
95:14,25
96:9 98:11
103:24
108:15
110:23 113:3
126:8 127:1
127:2,6
137:6 154:12
155:15
161:23
192:24 193:1
197:5 199:5
199:7 212:17
227:21
229:10
**believed** 223:4
**beneficiaries**
5:10 83:4
167:25
**benefit** 66:7
149:15

155:18
220:10 222:5
**benefits** 155:3
155:4,6,7,10
155:13,19
156:1,1,8,11
167:10
170:17,25
171:23
183:13
**best** 26:8 39:6
53:19 56:3,5
97:9 137:8
149:6 158:23
**better** 24:19
35:16 47:16
49:6 86:2
214:2 229:7
229:8
**beyond** 133:10
133:23
**bid** 44:5
**Biden** 210:15
**big** 24:21 34:1
39:23 45:15
87:21 97:14
147:25
154:10
156:25,25
160:18
222:10
**bigger** 157:1
**biggest** 30:5,6
157:18 162:1
183:9
**Bill** 47:25
**billions** 135:14
**bills** 20:2
30:25 31:3
**bit** 23:9 29:14
38:24 41:1
46:9,12 50:6
53:25 54:10
59:20 64:4

67:3 68:8
118:25 120:5
131:14
219:15,16,18
**bland** 158:23
**blister** 210:4
**block** 173:6
**blow** 21:11
35:15 47:13
**blurry** 15:7
**board** 19:24
30:25 31:2,7
31:11 33:3
71:1 74:15
75:10,20
76:13 89:14
90:4 91:23
122:4,6,11
136:1,4
182:12 183:3
188:5
**boards** 18:21
**bolded** 224:6,7
**bona** 25:11,13
25:19 26:4,6
26:10 137:6
**bottom** 15:21
22:20 35:11
35:12,13,21
38:1 47:10
60:22 61:1
63:8 123:2
124:13 134:3
172:10 173:5
178:22,25
179:1 189:4
**Boulevard**
235:11
**Box** 2:13
**brains** 96:7
**brand-new**
41:15
**Brazaitis** 5:4
73:23

Johnson, III, William E.                                    July 24, 2023

5

| | | | | |
|---|---|---|---|---|
| **break** 10:24 11:2 12:22 14:22 36:18 59:9 98:20 139:5 146:8 148:7 190:12 212:2 | 121:25 122:2 125:17 **business** 7:4 13:11,13 22:2 83:18 105:23 141:4 144:2,4 | 101:11 113:24 137:9 163:13,13,17 163:18 174:1 186:10 188:18 191:9 195:8 | 56:3 65:13 77:7,11 78:12,13,18 78:20 84:19 85:6,12,23 87:23 91:8 91:16,18 | 212:9 215:17 215:18 216:11,16 217:7 219:5 224:5 225:25 **captive-relat...** 198:25 |
| **breakdown** 56:12 | 163:14,18 177:22 | **Canada** 16:9 **Canadian** | 97:2,10,17 98:9 104:13 | **captives** 45:23 76:25 77:16 |
| **bring** 87:22 98:24 | 179:11 188:1 188:16 | 146:18 **cancellation** | 104:14 110:21 120:2 | 78:21,24 79:6,11,12 |
| **broad** 184:15 184:17 | 189:20,24 190:2 192:16 | 224:7,16 225:7 227:1 | 122:21 138:4 138:10,13 | 79:19 80:24 81:23 83:25 |
| **broader** 115:15 | 194:9 197:7 199:9 200:8 | 227:7,17 **candidate** | 140:15 141:18 143:8 | 84:4,14,23 85:11,22 |
| **broke** 95:16 | 214:10 | 154:17 | 145:3,10,14 | 86:18 87:5 |
| **brokers** 141:14 | 217:18,18 220:8 224:5 | **cap** 185:24 **capacity** 31:16 | 145:18,18 147:2,2,21 | 88:2,15 89:5 91:13 93:11 |
| 144:20,21 | 226:20,25,25 227:7,9,16 | **capital** 50:17 51:8 83:20 | 148:14,21 149:7,13 | 93:15,21,23 98:5 104:20 |
| **brother** 97:14 156:25,25 | 228:21 **businessman** | 83:20 97:20 99:19 108:2 | 150:6,8,14 151:4,7,23 | 111:3 127:21 129:11 |
| 206:15 | 19:12 | 125:19 | 152:1,9,18 | 136:13 |
| **brought** 14:25 | **busy** 176:2 | 126:25 | 152:25 | 156:24 |
| **budget** 183:15 218:7 | **buy** 158:20 **buying** 158:22 | 127:16 128:21 129:3 | 153:13,21 154:13,18 | 159:24 160:7 162:12 |
| **build** 182:13 182:13 218:6 | 158:24 159:3 191:8,13 | 130:5,20 150:9 165:11 | 155:4,7,14 155:18 156:1 | 170:17,25 171:22 |
| **buildings** 154:8 | 200:8 | 167:23 | 156:9,15 157:8,19 | 183:20 198:15 |
| **bullet** 140:8 143:7 | **bypass** 174:19 | **captive** 4:8,17 5:5,12 6:12 | 159:16 160:2 162:9 163:9 | 200:13 201:3 **captives'** |
| **bulletproof** 150:24 | **C** | 6:20 13:25 19:14 21:15 | 164:9,14 165:15 166:3 | 158:24 159:3 **car** 192:22 |
| **bunch** 54:16 90:5 129:9 | **C** 2:1 8:1 **C-E-D-I-N-G** | 24:21 30:8 33:8 41:5 | 166:5,25 167:3 168:3 | **carefully** 234:13 |
| 131:3,5 153:24 | 186:14 **C&G** 220:7,14 | 42:11,14,17 42:19 43:3,6 | 168:13 184:8 184:13 185:6 | **caring** 29:5 **Carl** 16:17,21 |
| 167:23 | 220:18 **C&G's** 221:10 | 43:9,23 44:3 44:12,16 | 196:22 197:11,14,21 | 31:17 190:7 **cars** 150:22 |
| **Burgess** 6:19 **Burton** 28:20 | **call** 27:13 103:20 | 45:6,11,13 46:15,16 | 197:22 200:3 201:13,14 | 190:12 **case** 1:3 8:6,7 |
| 28:21 29:4 70:22,25 | 145:22 209:2 **called** 13:1 | 48:14,23 51:15,20,23 | 202:6,7 203:4 212:9 | 28:5 32:13 69:11,24,25 |
| 71:5 120:9 120:14 | 14:4 16:2 28:19 101:10 | 52:1,17 55:9 | | |

Johnson, III, William E.                                      July 24, 2023

6

92:14 153:3
166:16 200:8
208:11 209:1
210:17 214:1
214:4 215:17
233:17
cases 28:7
43:1 55:15
67:13 158:12
casualty
160:19
218:10
catastrophic
45:21 154:1
categorize
206:24
cause 1:18
130:16
234:12
causing
197:20
cautioned
234:9
cede 65:10
ceded 27:1,8
104:12
ceding 186:11
186:13,14,16
186:19,23
Celia 1:2 2:23
7:7,10 8:4,20
14:2 15:18
23:4 24:5
25:10 26:9
33:11 35:3
35:23 36:21
40:13 41:2
57:19,24
60:11,17
62:13 72:6
90:4 92:16
93:1,9
118:15
122:19

141:21
143:10,24,25
144:4,24,24
145:4 148:12
148:15,24
161:8 173:7
176:24
189:14,18
192:12 194:4
213:2 221:2
221:10 222:5
223:20
226:15
227:24 228:6
Celia's 73:25
137:3 143:12
200:22
Cell 27:11
217:4
Center 135:12
Cert 235:10
certain 37:17
111:12 167:2
167:13 190:4
197:7 223:13
224:4
certainly 49:19
53:22 62:21
68:4 90:13
135:10 156:3
161:17
184:15
191:25
211:20 222:6
Certificate 3:8
certification
141:9 144:12
certify 234:3
234:22 235:3
chain 55:20
61:15
chairman 42:5
182:12 183:3
challenged

214:9
Chalmers 6:18
163:5,25
164:4
chance 64:24
231:15
change 10:13
17:13 66:9
105:19
152:10 211:7
211:10 233:2
changed 151:8
152:2,13,16
229:25
changes 4:13
36:4 77:25
233:1
changing
66:20 78:5
151:18,19,22
charge 186:13
186:19,23
charged 25:3
160:7 215:16
225:10
charging
216:16
chart 4:5
Chase 57:18
cheaper 69:3
cheat 199:22
check 34:2
95:24
Chen 4:16 7:3
47:12,17,22
179:2,6,20
child 19:6
children 15:18
16:17 52:24
54:11 220:24
221:9 222:21
children's
15:17
choice 207:16

choose 56:11
212:14
chose 55:21
55:24 85:12
201:2
chosen 19:8
212:23
Christine
59:22 60:15
62:12
CIC 29:6
105:23,24
110:25
163:13,17
165:22,23
169:14
170:10 197:7
CICs 65:10,13
105:9 106:22
108:25
134:14
165:20 166:3
197:4,11,14
220:2
CID 163:14,18
163:19
citizen 148:1
City 234:7
Civil 1:23
claim 27:3,7
27:19,21
28:4,5 29:2,7
29:9,12
68:10,12,13
68:16,17
69:15,19
70:18 71:8
72:4 84:18
85:7,8,12,24
88:3,19 91:4
91:7,9 95:19
98:4 120:7
122:6,20
130:8 223:25

claimant 71:15
120:11,12,13
221:20
claimed
223:20
claiming 92:15
219:22
claims 27:10
27:23 28:4
28:10,11,12
29:19 30:10
32:18 44:5,6
44:10 45:4
47:1 67:5
69:1 70:5
71:4 79:22
79:25 80:2,3
80:5 83:13
85:1 89:1
90:6 96:2
107:16,18
109:8 111:11
121:12,15,19
121:20
122:18
123:21
125:16 127:8
127:9 128:2
128:6,14
129:5 130:6
130:11,15
131:24
134:20 135:7
135:16,23
148:14 169:1
169:14
190:25 196:6
196:7 197:8
198:9,11,16
198:19,21,23
199:20,23
217:20 218:6
221:19,21
222:17

Johnson, III, William E.                                                    July 24, 2023

7

| | | | | |
|---|---|---|---|---|
| 224:21 | 139:1,16,19 | 176:24 179:6 | 4:22 | 46:14,16 |
| **clarify** 10:14 | 140:8 141:23 | 219:5 222:21 | **CLARKSDF...** | 53:18,19 |
| 72:22 119:14 | 142:17 | **CLARK_IRS...** | 7:18 | 55:13,13 |
| **Clark** 1:2 2:23 | 143:24 | 5:17 | **CLARKSDF...** | 56:23 57:1 |
| 4:16,23 6:11 | 146:21 147:1 | **CLARK_IRS...** | 7:19 | 94:6,8,14,20 |
| 6:15,22 7:7 | 147:5,9 | 5:18 | **CLARKSDF...** | 95:15,25 |
| 8:4,20,22 | 148:13 | **CLARK_IRS...** | 4:18 | 97:9,13 |
| 10:17 26:9 | 154:12 | 5:14 | **CLARKSDF...** | 132:6 133:7 |
| 33:12 35:23 | 157:22 | **CLARK_IRS...** | 4:18 | 133:7 137:14 |
| 36:21 41:2 | 169:19 170:1 | 5:15 | **CLARKSDF...** | 137:25 138:5 |
| 41:17,18,23 | 172:14,22 | **CLARK_IRS...** | 6:17 | 142:22 |
| 43:14 47:12 | 173:7 174:15 | 5:11 | **CLARKSDF...** | 143:16 145:8 |
| 47:18 48:15 | 174:20 | **CLARK_IRS...** | 6:17 | 145:12 147:1 |
| 49:3,12 51:3 | 175:20 176:7 | 5:11 | **classified** | 148:12 |
| 53:7,25 | 181:18 192:6 | **CLARK_PR...** | 104:19 | 149:13 |
| 54:22 55:2 | 195:3 198:24 | 5:24 | **cleaning** | 150:15 151:3 |
| 55:21 56:11 | 199:17 200:4 | **CLARK_PR...** | 199:19 | 151:16 |
| 56:15 58:3,5 | 201:3 203:9 | 5:25 | **cleanup** | 152:14 |
| 58:16 60:11 | 213:17 215:8 | **CLARK_PR...** | 182:20 | 153:22 156:9 |
| 60:23,25 | 216:22 | 5:5 | **clear** 11:19 | 156:18 157:9 |
| 61:8,16,19 | 218:22 | **CLARK_PR...** | 73:1 | 157:19,25 |
| 61:22 62:4,8 | 220:14,18,24 | 5:6 | **cleared** 36:25 | 159:14,25 |
| 62:16,18 | 221:2,3,10 | **CLARK_PR...** | 37:5 | 160:6,12 |
| 63:10,17,19 | 222:5,7 | 6:13 | **Clearly** 75:14 | 161:5,15 |
| 64:6,19 | 224:11,14,17 | **CLARK_PR...** | **client** 45:20,25 | 162:7,11 |
| 66:18,24 | 224:24 227:5 | 6:14 | 139:12 | 170:18 171:1 |
| 67:3 72:6,13 | **Clark's** 8:21 | **CLARKIRS** | 142:13 | 171:9 174:7 |
| 72:19 73:13 | 14:2 15:18 | 178:21 | 147:20 | 174:22 |
| 74:14 75:24 | 16:17 23:4 | **CLARKSDFL** | 149:18 150:7 | 175:21 176:6 |
| 76:7,12,23 | 24:5 25:10 | 43:19 47:9 | 152:22 | 177:5 179:24 |
| 77:3,7,20 | 37:13 38:2 | 59:17 146:13 | 153:11 154:2 | 180:3 200:11 |
| 81:11 82:2 | 40:21 47:23 | 163:2 168:10 | 154:13 178:4 | 200:25 201:2 |
| 86:13,25 | 51:5 52:24 | 181:15 213:8 | 178:12 | 202:6 203:16 |
| 89:8,15 | 54:11 58:13 | **CLARKSDF...** | 180:12 184:1 | 203:17,18 |
| 99:24 100:8 | 60:1 72:18 | 7:8 | 184:4 185:6 | 208:15 |
| 102:14 103:4 | 73:4 74:1 | **CLARKSDF...** | 219:3,5 | 209:10,21,23 |
| 107:12,22 | 78:13 143:25 | 7:8 | 223:11 | 227:20 |
| 109:19 | 144:4,10,15 | **CLARKSDF...** | **client's** 63:20 | **close** 175:6,11 |
| 110:14 111:6 | 147:20 | 6:20 | 149:15 | 200:13 |
| 118:15 | 148:16 156:9 | **CLARKSDF...** | 150:12 184:5 | 228:21 |
| 122:19 | 160:6,12 | 6:21 | **clients** 13:24 | 229:24 |
| 136:12,18 | 161:5,15,19 | **CLARKSDF...** | 13:25 14:2 | **closed** 200:5 |
| 137:13,16 | 170:18 171:1 | 4:21 | 44:12,14,15 | 203:5 |
| 138:4,13 | 173:1,10,13 | **CLARKSDF...** | 45:5,9,13 | **closely** 139:20 |

Johnson, III, William E.                                    July 24, 2023

8

140:15
197:22
**closer** 11:19
12:1 229:4
**closes** 175:9
**closing** 123:8
123:14 209:9
209:14
**closure** 199:2
199:3,17
**CLR** 1:20
234:2
**co-counsel**
137:12,16,20
138:3 139:14
169:24
**co-treasurer**
17:21,24
18:3
**Coast** 228:21
230:13
**code** 64:1,12
105:2 140:16
155:19 156:4
167:13
197:25
**collect** 91:8
129:23
**collection**
87:23 92:5
93:10,14
96:19 97:3
97:17
**column** 113:23
114:3
**come** 28:21
41:5 90:1
92:21 129:2
171:13
**comes** 167:18
**coming** 11:22
71:23
**comm-** 209:2
**commenced**

22:2 107:15
**commercial**
42:23 44:21
46:22 141:17
145:1 154:25
160:17
162:13,17
171:7,14
179:12,14,16
217:21,23
**commission**
21:19 36:7
147:8 165:11
176:16
233:24
**commissioner**
56:8 209:3,5
209:9,14
**commissions**
38:6 186:11
186:13,18,19
186:23
**common**
221:8
**commonly**
186:23
**communicat...**
157:9 203:8
203:11,23
224:15
**communicat...**
171:22
**companies**
6:20 13:19
13:21 14:1
19:14 24:19
24:20,23,25
26:25 27:23
28:13 30:9
31:12 33:8
41:5 43:1,3,4
43:5,6,9
44:12 45:2
47:2,3 65:14

77:11 78:12
78:13 104:13
110:21 120:2
138:5,10,13
149:14
150:14,18
151:11
153:24,24
154:9,10,22
160:19
163:10
164:20
165:21,22
166:4 168:4
184:14
186:22 187:6
197:12,15
200:4 217:19
222:17
**companies'**
148:21
**company** 4:17
6:23 13:16
13:17,18,18
13:20 14:4
18:19 20:7
22:3 24:18
25:12,20,25
26:1,4,6,11
28:19 42:19
42:21,24
44:3 45:1,14
46:22,25
48:2,7,23
51:15 53:11
54:17 65:9
66:10 97:2
97:10,17
107:15
128:25 129:1
136:21 137:4
137:7,9,10
139:20 140:9
140:15,20,21

140:25 141:2
141:4,11
143:22
144:16,23
150:19 155:2
155:4,8
164:9,15
165:2 166:5
166:12,18,25
168:8 171:16
173:20,20
174:1 176:17
178:16
182:12 184:8
185:7,13,21
189:25
190:17 191:2
192:15 195:8
195:17,22,23
197:20,21,23
200:15,16,17
201:14 205:4
216:10
218:21
222:10 224:2
224:25 228:1
**company's**
141:16
212:10
**compared**
218:5
**compensated**
186:7
**compensation**
57:23
**competent**
19:12 56:10
62:25
**complaint**
218:20 220:2
221:2
**complaints**
39:11 40:5
162:1

**complete**
55:18,18
174:7 175:2
176:11,22
**completely**
55:19 190:1
**completion**
235:3
**complex**
166:18
170:23
**compliance**
61:9 62:15
141:7 144:8
**comply** 25:24
66:21 217:10
**concept**
195:13
**concepts**
215:9 216:21
**concern** 88:22
90:5 177:17
180:11
**concerned**
22:16 26:13
89:17 180:3
180:6
**concerning**
234:11
**concerns**
89:11,13,15
159:15,18,21
160:1
**conclude**
216:11
**conclusion**
156:20
**confirm** 15:25
**confirmed**
224:11
**confirming**
50:15
**conflict** 31:13
**Congress** 43:4

Johnson, III, William E.                          July 24, 2023

9

43:8 152:9
155:12
**congressional**
152:11
**conjecture**
95:20,23
96:4,12
97:22 133:13
**connection**
67:4 183:15
185:6
**consider**
114:22 115:2
115:8 128:2
154:16
179:11
**Considerati...**
104:10
108:24
**considered**
25:19 210:7
**considering**
181:2
**consistently**
215:22 216:2
**constituted**
22:25 26:1
**consultant**
141:13
**consultants**
144:20
**contact** 22:7
22:11,14
102:15
120:21,23
121:11,14
137:2
**contained**
225:3,4
**contemplated**
93:12,16
**contest** 28:5
**continuation**
140:19

**continue** 95:3
97:9 199:16
201:2
**continued** 5:1
6:1 7:1 201:6
**contract** 80:8
224:6,16
225:6 227:1
227:7,17
**contractors**
178:9
**contracts**
162:6
**contractual**
129:10,19
**contractually**
88:16
**contribution**
51:9 130:5
**controversy**
234:12
**conversate**
52:21
**conversation**
207:16
**convinced**
159:22
**coordinating**
138:17
**coordinator**
123:22
**copied** 47:12
47:18 131:17
172:15,23,24
174:16,22
175:21 176:7
213:17
**copies** 62:13
**copy** 35:23
60:11 62:8
71:17 75:9
75:16,18
76:3 81:22
86:17 87:3

99:7 100:2
102:3 139:13
164:14 196:1
196:12
218:20
226:12 231:9
231:14
**corporate**
77:23,24
78:2 140:24
**correct** 13:7
14:6 54:24
99:20 100:10
100:16 101:3
102:18 104:5
104:16
108:17
115:21 229:2
229:9,15
230:5 233:15
**CORRECTION**
233:2
**Corrections**
3:7
**correctly** 59:1
88:25 112:25
231:16
**correspondi...**
78:25
**cost** 42:24
44:22 97:23
168:16,17
169:12
171:20
190:11
**cost-effective**
130:25
**costs** 43:24
44:16 45:6
182:7 208:19
**counsel** 8:13
10:16 18:18
62:19 67:4
67:11 221:3

231:25
234:23 235:1
**country** 19:16
**couple** 30:7
45:9 70:11
119:5 150:5
203:13
**course** 20:4
78:17 93:4
124:18
157:23 184:8
191:22
208:19 222:1
**court** 1:1 8:24
10:6 12:19
23:25 66:5
67:14 76:15
118:16,21
119:8 132:13
132:16,22
133:1 151:13
200:8 208:11
208:18
209:24 210:3
211:19
215:16,17
231:8,12,17
**courtroom**
9:13
**cover** 28:23
34:22 68:16
70:3 88:5
89:21 96:2
126:1 128:6
128:13
154:23 162:5
162:8 167:11
169:10 171:6
171:11
223:25
**coverage** 25:4
27:16 67:25
78:22 87:11
88:8 92:12

92:16,18,24
93:2 135:8
141:17 145:2
145:3 155:23
160:13 161:6
161:16 162:5
162:13 174:1
177:7,12
179:24 180:4
223:13,21
225:6 226:20
227:22,25
**coverages**
224:5 225:21
**covered** 27:8
27:18 28:24
42:23 68:2,2
69:6,8,24,25
70:3 91:5
132:4 179:14
179:14
190:16 218:1
227:11
228:13
**covering**
42:22 165:1
227:20,20
**CPA** 41:4
117:21 118:8
126:22
164:14 172:2
**CPAs** 210:6
**created** 149:14
188:7
**creating** 53:8
54:1 144:2
**creation**
139:19
140:14 141:4
143:8
**credit** 196:3
197:6
**CreditRe**
189:20,24

Johnson, III, William E.                                    July 24, 2023

10

190:14 192:1
192:21 193:9
**criminal** 181:7
**criminals**
181:11
**crisis** 175:24
176:10
**cross-exami...**
3:6 228:22
228:24
**CSR** 1:20
234:2 235:10
**current** 123:25
124:5
**currently**
179:13
205:10 230:6
**Curt** 27:4 32:7
32:24 36:12
121:5
**Curti** 18:17
**Curtis** 35:22
121:2 221:8
**customer**
154:14
**customers**
138:20
**cut** 50:3 94:21
95:10 182:23

_____
**D**
**D** 3:1 8:1
**D.C** 2:14
**dad** 206:15
**dad's** 206:13
**dadgum** 53:4
93:6 162:6
**Dallas** 1:22
8:12 41:4
101:15 131:8
192:2 206:3
234:7
**damage**
135:13

**Darrell** 183:5
**Dart** 218:21
221:5 224:25
225:5
**Darwit** 2:11
3:5 8:15,15
9:6 11:16,21
12:2,5,10,16
12:25 14:7
14:16,19,23
21:4,9 27:14
35:6,10
40:11 43:18
43:21 52:6,8
52:13,14
54:9 57:13
59:4,6,12,16
63:6 72:12
74:25 76:20
79:17 81:11
94:12,18,23
95:2,8,13,14
96:8,22,24
97:1 98:15
98:23 99:22
100:1 103:2
103:8,10
105:5,6
106:16 107:4
107:7 108:7
108:11
109:15,18,20
111:21,25
113:12,16
115:9,14
116:8,20
117:1,7,23
118:10 119:1
119:4,9,13
119:16,17
121:18
122:23 123:4
128:20
132:10 133:5

136:17,22
138:25 139:6
139:8 140:4
140:7 143:6
145:24 146:4
146:9,12,15
148:3,10,11
149:4 150:4
151:14 153:6
153:16
162:19 163:1
172:9 178:21
181:15 189:3
193:3 194:19
194:24 195:2
195:12
196:10
202:12
211:22 212:5
213:6,10
217:5 218:12
218:16
228:17 231:4
231:21 232:3
232:6 234:20
**date** 22:1,2
66:11,12
107:16
123:12
134:24 135:1
143:4
**dated** 4:4,12
4:16,20,23
5:4 6:7,11,15
6:19,22 7:3,6
7:10,13,17
7:20 21:18
112:7
**daughter**
183:7
**Davis** 218:21
219:1 220:7
224:15,17,25
225:10,20,24

226:2 228:6
**Davis'** 226:25
**day** 1:18 75:19
76:4 210:22
225:22
230:23 231:2
233:21 234:5
235:7
**day-to-day**
32:16
**days** 82:10,17
82:24 83:2
**dead** 32:10
**deadlines**
175:24
176:14
**deal** 30:21
42:20 63:2
84:7 170:12
181:1,6
190:3 192:8
**dealer** 190:17
**dealerships**
190:8,15
**dealing** 159:23
**dealings** 56:5
221:4
**deals** 158:23
190:18
**dealt** 56:9
135:22
**December** 4:9
4:12 5:13
7:17,20
21:17 35:24
36:21 37:13
38:2,15,20
59:22,22
60:7 73:6
80:14,14,16
80:16,20,23
80:23,25
99:4 100:3
100:10 104:4

112:6,11,22
123:17,18
175:12
213:13
224:24
**decide** 122:5
122:11
142:17
**decided** 31:13
43:15 57:22
58:23 85:23
120:6 122:6
122:15
188:15
189:23 190:8
192:23
215:16
**deciding** 90:25
114:23 115:3
122:20
**decision** 20:10
20:12,14,16
27:9 56:1,15
56:16 72:3
120:9 161:7
213:3
**decisions** 20:1
20:6 121:25
**decline** 230:13
**declined** 85:6
**deduct** 156:5
176:18
177:25
214:15,21
**deducted**
60:18
**deductible**
165:22
177:22
**deduction**
80:20,25
81:6 152:23
167:11
175:14 177:1

Henderson Legal Services

Johnson, III, William E.                                      July 24, 2023

11

177:13,18,19
177:21
185:25
**defendant**
221:10
**defendants**
1:5,17 2:10
220:9 226:24
**defendants'**
226:17
**defined** 23:18
225:6
**definitely**
198:18
**defraud** 27:23
28:14 68:5
125:21
199:13,15
**defrauded**
92:10
**degree** 204:7
204:11,12,17
**delay** 14:21
36:18
**delighted**
189:18
192:12
230:17
**delineated**
113:5
**denial** 122:12
**denied** 28:9,13
29:12 122:7
122:9,10,20
**Dennis** 33:12
33:16 34:6
36:24 37:4,7
37:8 39:1
40:23
**deny** 69:14
120:6
**department**
1:21 2:13
8:11 20:23

26:3 32:3
56:6,10
73:14 102:4
234:6
**depend** 49:24
50:11
**dependable**
190:21
**depended**
54:22
**dependent**
50:9
**depending**
53:4 54:16
79:24
**depiction**
15:12
**Deponent**
235:4
**deposed** 9:15
207:22 208:6
**deposited**
30:20
**deposition** 1:9
1:15 8:3,10
9:24 10:13
10:16 171:5
207:11,15
208:1 210:20
223:12
230:23
233:14
234:15,19,24
235:4
**Derick** 2:3
8:19 11:24
95:3 96:22
113:12 119:5
146:10
228:19
231:25
**describe** 13:15
**described**
67:24 170:17

**describing**
147:16
170:25
171:22
**DESCRIPTION**
4:2 5:2 6:2
7:2
**design** 141:4
183:16
226:18,24
**designed**
137:5
**designing**
144:2
**despite** 10:4
**destroyed**
45:14,18
135:12
**destruction**
160:20
**detail** 71:10
**detailed** 29:11
120:10,14,17
171:25
**deteriorate**
32:9
**determinatio...**
215:5
**determine**
24:3 27:7,15
27:16,25
29:1 71:2
90:11 101:22
161:15
173:19
**determined**
27:20 57:24
**determining**
22:23 23:5
23:15 24:6
25:2,7,18
102:23 104:2
110:6 154:17
217:1

**Development**
107:14
**Diagnostic**
181:24
182:25
**Diagnostics**
182:15
**Diana** 16:18,21
31:20 47:11
47:17,22
179:2,6
**die** 201:10
**died** 32:10,13
32:14 206:9
206:16
**difference**
47:2 178:8
**different** 12:3
12:6 14:14
18:15 23:9
46:12 53:25
64:5 79:20
101:9,9,19
101:19
153:24
174:15
202:14
223:15
**difficult** 11:17
**difficulties**
39:5
**dime** 50:19
97:5 127:2
**direct** 3:5 9:5
65:9 77:10
99:6 100:7
102:13 142:4
191:21 193:5
**directed**
208:11,13
**directly** 34:6
40:8 58:6,11
121:12,15
171:17 223:6

223:7
**director** 13:4
18:11,17,23
18:24 19:2,9
19:14 20:13
25:21 31:10
32:5 51:25
52:12,15
53:21 78:5
**directors**
18:14,15
19:24 20:6
24:13 26:18
33:3 74:15
75:10,20
76:13 77:25
136:1 188:5
**disability**
196:3 197:7
**disadvantag...**
168:12,21
169:2,5,6
**disagree**
217:15
221:14
**disagreed**
120:18
199:25
221:20
**disagreement**
121:24
**disaster**
130:17 203:3
**discharge**
83:21
**discipline**
211:4
**discuss**
133:15,21
157:21
160:15
166:24
207:20 208:1
215:8 216:21

Johnson, III, William E.                                      July 24, 2023

12

231:7
**discussed**
77:13 89:16
91:19 92:6
94:2 159:17
182:7 188:4
**discusses**
213:25 214:3
**discussing**
180:12 184:4
213:20
**discussion**
61:14 84:16
**discussions**
55:2 91:23
188:20
195:20
**display** 14:10
**disproportio...**
83:16
**disputes** 67:4
**dissolved** 18:1
**distance** 14:25
15:7
**distribute**
24:23,24
97:22 202:2
**distributed**
24:18 80:7
**distribution**
23:8 24:7,16
48:3 53:20
56:24 134:21
134:25
158:13,15,16
158:17
167:25
187:13,14
**distributions**
140:20
167:14,20,21
202:24
**District** 1:1,1
8:6,7

**diverse** 104:12
104:19
**dividend** 147:2
147:10,21
165:12
166:19
**dividended**
150:11
200:16
**dividends**
166:18
**Division** 1:21
2:12 8:11
234:6
**divorces**
150:24
**doctor** 164:4
174:9,17,19
**document**
14:8,24 15:9
21:5,10 22:6
35:7,11
43:19 47:7
58:1 59:20
63:3 68:11
72:10 74:18
75:17 81:8
81:14 86:10
87:2 98:24
98:25 99:1
103:3,11
108:8,14,20
109:16,18,21
111:21 112:1
112:2,7,20
112:24
115:10 116:9
122:24 123:1
135:6 139:1
139:11 140:3
143:4 145:25
146:5,10,16
162:23 172:6
173:24 179:1

179:19
181:12
188:25 193:1
213:7 218:13
218:16
**documents**
15:6 115:15
120:16
163:17
210:23
**doing** 12:17
32:17 42:21
55:1 86:4
88:14 97:11
120:4 175:13
190:2,8
212:17
215:12
**dollar** 115:18
117:15
**dollars** 127:3
199:14
208:16,19,22
217:24
**domestic**
140:18
143:14
200:15
**domesticated**
200:14
**doubt** 173:9
173:12
**draft** 4:13 36:4
76:23 77:3,8
77:20
**drafted** 78:2
**dream** 54:8
**dubious** 128:3
**due** 134:24
225:20,22
**Duke** 56:8
**duly** 8:23 9:2
234:9
**duties** 26:18

30:17 31:4
31:17,25
32:5,17
33:23 186:7
**duty** 30:19
**dvollrath@...**
2:6

───────────
**E**
───────────
**E** 1:10,16 2:1,1
3:1 8:1,1,4
9:1 233:17
233:21 234:9
**ear** 27:13
**earlier** 67:24
77:13 81:1,2
81:3 99:4
105:19
158:12
168:23 171:5
**earning** 113:1
113:9
**ease** 159:21
**easiest** 39:9
**easily** 42:22
**East** 228:21
230:13
**economic**
180:22
**economics**
204:16
**Edgar** 2:24
8:22 40:16
40:20,21
189:19
192:13
**Edward** 62:9
**Edwards** 4:19
7:6 59:22,25
60:10,15
62:12
**effect** 180:22
**Egan** 18:23
19:2,5,13,15

22:17 31:25
**Egan's** 22:5
**eight** 64:23
116:10
119:24
**either** 28:4
69:24,24
70:2 120:13
122:1 167:15
192:1 200:15
200:21
222:16
**elects** 42:20
**elements**
28:22
**Elisabeth** 2:12
8:18
**elisabeth.k....**
2:16
**email** 4:4,12
4:16,19,23
6:7,15,18,21
7:3,6,9,13,17
7:20 35:22
36:3,8,20,23
37:13,16
38:14,23,25
40:11 47:11
47:17,25
49:1,2,3,11
51:3,4,5
55:20 58:2
58:15 59:21
60:3,10,16
60:22,25
61:14,19
62:7,8,15
63:9,16,19
64:18 65:7
123:6,11
124:14 125:2
127:5 131:16
134:3,6,10
146:20,25

Johnson, III, William E.                                    July 24, 2023

| | | | | |
|---|---|---|---|---|
| 147:5,9 | 32:25 33:3,7 | 104:11 | 225:5 227:6 | 201:18,20 |
| 163:5,12,16 | 33:16,21,24 | 105:23 106:7 | 227:9,16,19 | **engaged** 39:12 |
| 163:21 164:3 | 35:8 43:8,15 | 106:25 | 228:4,4 | **English** 98:14 |
| 170:9,16 | 51:1 52:16 | 107:19 | **Emerald's** | 204:16 |
| 171:21 | 52:24 53:8 | 108:17 109:8 | 13:24,25 | **enroll** 192:15 |
| 172:13,18,22 | 54:1,22,24 | 109:11 | 22:15 30:9 | **ensure** 80:23 |
| 173:5,16 | 54:24,25 | 110:15 111:2 | 31:3 33:9 | 160:6,11 |
| 174:14,20 | 55:3,6,12,21 | 111:7,10 | 44:13 56:12 | 161:5 |
| 175:1,20,23 | 55:24 56:25 | 112:20 113:1 | 68:14 72:6 | **ensuring** |
| 176:6,9 | 57:4,8,14 | 113:8,16 | 74:9 78:11 | 26:10 |
| 177:3,4,4,17 | 60:5 61:8,8 | 114:10 | 84:24 90:15 | **enter** 198:7 |
| 178:4,7,12 | 61:17,21 | 115:11,20,21 | 90:20 91:7 | **entered** 33:7 |
| 179:2,9,20 | 62:5,16,18 | 118:2 119:18 | 91:18 99:7 | 76:24 77:15 |
| 179:22 | 63:7,15,20 | 120:7 121:3 | 100:2 101:25 | 81:24 |
| 181:18,23 | 64:1,9,18 | 121:18,20 | 102:24 | **entering** |
| 184:1 189:8 | 66:19,24,25 | 122:25 123:5 | 106:10 108:4 | 169:24 |
| 189:11 | 67:3,20 | 124:5,14,23 | 114:25 115:4 | **entire** 97:12 |
| 192:11 193:7 | 68:11,25 | 126:1,3,3,4 | 117:16 120:3 | 142:2 221:5 |
| 193:10,14,19 | 69:1,18 | 127:16 | 128:21 220:3 | **entirely** 13:25 |
| 193:23 195:5 | 70:17,20 | 128:11 129:4 | 225:1 | 165:9 194:4 |
| 195:12,24,25 | 71:13,21 | 129:10,17,24 | **employ** 96:19 | 218:2 |
| 196:11 197:3 | 73:6,19 74:2 | 131:1,15 | 220:24 | **entirety** 38:24 |
| 213:11,18,21 | 74:10,15 | 133:10 134:1 | **employed** | **entitled** 112:20 |
| 231:24 232:2 | 75:5,8,10,18 | 135:8,17 | 178:9 221:9 | **entity** 13:1 |
| **Emerald** 4:20 | 76:3,24 77:6 | 136:9,13,18 | 221:15,15 | 196:21 |
| 5:7,9,16,19 | 77:10,15,23 | 158:11,14 | 234:23 235:1 | **ESQ** 2:3,3,11 |
| 5:23 6:3 13:1 | 77:24 78:25 | 186:7,13,19 | **employee** | 2:11,12 |
| 13:5,9,11,15 | 79:5,10,18 | 186:25 | 234:25 | **estate** 150:15 |
| 14:4,5,9 | 81:23 83:24 | 187:16,21 | **employees** | 150:16 151:1 |
| 15:13,21 | 84:19 85:4,7 | 188:12 189:4 | 19:19 96:18 | 163:14,18 |
| 16:1,5,12,19 | 85:10,21 | 189:7 193:4 | 167:12 | 184:5,7,10 |
| 17:1,4,7,16 | 86:18 87:4 | 193:6,18 | 178:10 221:8 | 184:14,20 |
| 17:18,21 | 87:22 88:18 | 195:4,8,13 | **employment** | **estimate** |
| 18:11 19:19 | 88:18 89:5 | 198:4 199:16 | 178:12,14 | 190:21 217:7 |
| 19:21,25 | 90:11 91:12 | 202:1,21 | **enclosing** 73:5 | **estimation** |
| 20:10,13,19 | 92:6,22 | 203:5 207:23 | **ended** 4:9 5:13 | 215:19 |
| 21:6 22:25 | 93:11,15,21 | 212:11 | 40:25 84:10 | **et** 4:19,23 6:7 |
| 23:6,16 24:3 | 93:22 96:13 | 218:14,19,22 | 93:7 97:4 | 7:9,13,17,20 |
| 24:7,9 25:4,5 | 97:1,16 99:2 | 219:24 220:2 | 101:15 104:4 | **evade** 216:7 |
| 25:19 26:6 | 99:3,13,15 | 220:6,8,24 | 114:19 | **evaluating** |
| 26:10,25 | 100:9 101:7 | 221:4,7,9,18 | 125:18 | 141:8 |
| 27:1 29:8 | 101:22 | 221:18 222:6 | 145:19 150:8 | **evaluation** |
| 30:4,18 | 102:15 | 222:7,14,18 | 192:24 | 124:21 |
| 31:18 32:8 | 103:14 | 222:22,24 | 199:11 | **event** 85:22 |

Johnson, III, William E.                                      July 24, 2023

14

120:18 127:8
150:7 169:14
**eventually**
71:1
**everybody**
160:25 203:7
**exactly** 34:24
79:14 85:25
86:5 101:13
127:17
216:17
**examination**
3:5 9:5 28:4
234:14
**examine** 110:4
**examined**
234:13
**examining**
104:1
**example** 20:9
170:21
**exceed** 104:23
152:14,23
166:11
197:21
**exceeding**
104:14
**excellent**
147:12
**excess** 104:20
215:3,22
216:2 217:20
217:20
**excessive**
160:8 214:8
214:9 215:2
**exchange**
13:22 78:22
79:17
**excited** 160:3
**excluded** 86:6
166:9 225:16
226:4
**exclusions**

186:1
**excuse** 25:22
27:12 28:16
97:20 160:16
178:16
195:10
**executed** 79:5
**exemption**
197:5,17
**exhibit** 3:4 4:2
4:4,8,12,16
4:19,23 5:2,4
5:7,9,12,16
5:19,23 6:2,3
6:7,11,15,18
6:21 7:2,3,6
7:9,13,17,20
14:8,11,14
14:17 21:5,6
21:8 35:7,9
43:20 47:8
59:13,14,15
63:4,5 72:10
72:11 74:19
74:20 75:4
81:9,10
86:10 87:11
88:7,7 99:1
99:23,23,25
103:3,7,8,9
104:3 108:8
108:10
109:16,17
111:22,24
116:15,21
122:24 123:3
139:1,3
146:6,12,14
162:24,25
172:7,8
178:18,19,20
181:13,14
187:15,16,19
189:1,2

193:1,2
213:7,9
218:13,15
**EXHIBITS** 4:1
4:3 5:1,3 6:1
7:1
**expectancy**
167:15
**expectation**
96:1,9
198:13,20
**expected** 48:1
90:15,20
213:2
**expense**
130:24
214:10
**expenses** 48:2
48:22 99:20
100:19,23
101:3 102:24
114:25 115:4
116:24 124:8
125:1,8,12
125:15,17,23
126:2,20,21
126:22
**expensive**
125:24
**experience**
30:21 55:7
62:1 89:24
90:8 160:5
164:20 215:7
217:1
**experienced**
120:2
**expert** 49:19
76:19
**expert's** 28:21
**expertise**
215:12
**expiration**
165:7

**Expires**
233:24
235:10
**explain** 54:10
118:25
145:17 156:8
156:10,10
164:8 166:15
167:2 178:8
178:17
**explained**
108:20
**explaining**
164:14
**explains** 51:7
51:7
**explanation**
114:12 165:7
171:25
**exposure** 85:4
181:6 185:13
**express** 89:12
89:15
**expressed**
88:22 89:11
90:5
**extensions**
28:8 69:14
**extensive**
170:19
171:21
**extent** 44:4,19
45:3 46:21
167:12
171:11

---

**F**

**face** 223:24
**faced** 93:21,22
157:19
**fact** 28:9 91:19
92:18 157:7
190:19
198:15

207:21 208:9
230:12
**factories**
45:14
**factors** 154:16
**Fagg** 7:14
193:9
**failure** 176:25
176:25 177:5
177:11,12
**fair** 29:18
34:20 43:13
51:12 53:7
55:22 62:5
64:1,9 66:18
89:20 92:4
117:11
119:25 130:4
138:10 150:8
177:18
**faith** 25:15
28:17
**false** 27:23
**familiar** 12:25
13:3 15:8
23:10 90:14
108:13 137:9
180:21
186:10
208:25
**familiarity**
103:5
**family** 149:15
**far** 11:7 22:16
51:8 52:1
70:22 143:6
147:10 201:5
204:4 208:12
209:20
211:11
217:20,20
228:23
**Farm** 218:2
**fashion** 65:21

Johnson, III, William E.                                      July 24, 2023

15

fast 219:12,12
faster 59:20
father 206:9
fault 223:1
favorable 56:7
Fax 235:13
fear 179:23
feasibility
  90:10,17,21
February 5:4
  6:15 146:23
  147:6
federal 1:23
  22:25 23:7
  23:20 24:4,8
  25:12,20
  72:21 73:2
  140:18,25
  143:14,17
  210:10,14
fee 5:4 28:20
  38:10 40:3
  48:11 142:12
  186:9
feed 11:22
  12:12
feel 64:20
  86:15 95:22
feelings 208:7
  210:9
feels 230:20
fees 60:18
  125:20,23
  131:4 141:22
  141:25
fellow's
  161:20
felt 28:14
fewer 47:1
fewest 58:23
fide 25:11,13
  25:19 26:4,6
  26:10 137:6
Fidelity 30:21

field 181:5
Fifteen 41:19
fifth 15:10
fight 93:9
fighting 29:15
  125:20
  199:14
figure 12:11
  90:2 104:22
  134:15
figures 118:13
file 27:19,23
  67:20
filed 40:5
  70:15,15
  83:13 102:1
  107:19 135:7
  135:17
  208:17,17,21
  209:1 218:20
filing 29:6
  67:22
filings 168:22
filled 180:20
  181:8 224:4
finally 38:14
  65:19 69:13
  156:22
  166:23 191:4
  201:17
financial 4:8
  5:12 20:18
  20:21,25
  21:16 22:15
  39:5 40:5
  41:4 44:7
  80:9 99:3
  100:2 101:6
  101:25 102:6
  102:15,25
  104:4 106:11
  108:4 110:7
  114:25 115:4
  115:11,17

117:16 118:3
  130:17
  210:16
financially
  203:3 235:2
find 86:3 92:1
  161:1 185:2
finding 199:21
fine 230:21
finish 10:4
  52:21 58:1
  64:25 82:5
  111:20
  157:14
finished 65:2
  82:4
finishes 211:8
FINRA 39:12
firm 41:4,4
  47:23 60:1
  62:19 72:19
  73:4 74:1
  101:13,16
  112:3,4
  143:10,12,25
  144:5,9,10
  144:15 173:1
  173:10,13
  179:7 206:7
  206:8,13,13
  220:8 222:9
  229:14
firmly 127:6
firms 101:20
first 9:2 10:25
  14:7 18:17
  21:12 22:21
  27:7,9,9,16
  28:3 29:23
  38:12 41:2
  41:11,23
  43:2 49:18
  53:14,16
  64:17 70:25

72:2,15,15
  75:6,16
  76:24 78:12
  81:22 89:25
  90:9 105:8
  106:19
  108:24
  110:14
  131:19
  139:10 143:1
  143:6 164:7
  165:18
  166:15
  168:11 176:4
  178:24,25
  187:23 188:4
  189:17
  191:10 194:3
  195:3,24
  214:13
  215:15 216:6
  221:19
firsthand
  39:17
fiscal 22:1
five 9:21 150:9
five-minute
  139:5
five-page 15:9
fix 14:21 36:18
flag 216:15
flat 92:3 186:9
  221:12
Florida 1:1 2:5
  8:7 28:19
  41:3,9
  221:21
focus 100:22
  219:23
follow 54:20
  70:21 110:1
follow-up
  175:20
followed

121:24
  200:11
following
  175:12 234:8
follows 9:4
  234:19
fool 86:3 170:8
force 129:7
  130:7
forced 92:5
  93:10,14
  167:14
foregoing
  233:14
foreign 140:18
  143:14
forever 44:2
  201:8
forgot 65:5
  101:13
forgotten
  205:5
form 40:9
  43:23 54:7
  57:12 79:16
  94:11 96:5
  105:4 107:3
  108:5 113:15
  115:7,13
  116:7,19,23
  117:4,19
  118:5,14
  121:17
  128:17 132:7
  132:14,18,21
  133:4 136:16
  136:19 138:4
  149:1 150:1
  151:6,9
  152:1,18,25
  153:2,4,13
  153:15
  157:19
  162:15

Johnson, III, William E.                                       July 24, 2023

165:15
180:20 181:8
202:9
**formation**
140:19
**formed** 17:17
46:15 136:13
138:14 151:3
**former** 203:17
**forming** 55:3
153:21 155:4
155:7,13,18
156:1,9,14
157:8 159:15
160:1 167:3
167:3 168:12
200:4
**Fort** 2:5
**forth** 1:24
87:22 234:4
**forthcoming**
134:22
**forward**
176:24
224:17,18
**Foster** 101:12
**found** 27:22
27:22 93:5
**founder** 221:2
221:10
**four** 15:17
31:8 69:13
190:24
203:10
**fourth** 35:14
**frankly** 203:18
**fraud** 29:3
69:4
**fraudulent**
28:12 30:10
128:3
**fraudulently**
28:14 199:22
**Frauenheim**

7:6 183:5
**free** 64:20
**freighters**
45:17
**friends** 203:19
**front** 9:13
**frozen** 94:16
**full** 23:24
26:21 68:19
68:20,21
69:20 70:18
85:8 128:14
129:5 136:21
168:11
225:21
**full-time** 230:8
**fully** 120:23
132:1 133:9
**function** 53:21
**functional**
120:24
**functioned**
31:7
**functions**
104:11
**fund** 25:1 34:1
34:9,11
37:10 222:8
222:11
**funding** 60:18
164:18
**funds** 30:20,24
30:25 34:21
82:11 83:5
83:23 85:11
85:24 88:4
88:19 91:6
128:11
148:13
158:25 159:3
166:16 202:8
222:12
**further** 37:25
82:6 164:8

230:14 231:3
231:5 234:22
234:25 235:3
**future** 164:20
188:1,21

## G

**G** 8:1
**Gabbay** 6:11
**gain** 44:20
**gains** 167:23
**game** 53:1
54:12
**gargantuan**
183:24
**Gary** 7:14
193:9
**gasoline**
182:21
**gathered**
143:19
**gears** 67:2
120:5
**general** 18:18
54:20 81:18
86:15 87:1
110:3
**generally** 15:5
23:11,12
63:24 70:21
137:19
224:21
**generation-s...**
166:17 184:9
185:7
**generational**
150:23
**gentleman**
207:12
**Gentry** 2:24
8:22 16:18
16:21 31:17
31:20 40:21
48:15 61:8

72:19 169:20
170:1 218:22
220:14,19,25
221:2 224:11
224:14,17,24
227:5
**genuine** 56:24
**George** 169:23
**Georgia**
101:11
**getting** 16:5
16:19 17:3
27:12 49:9
55:6 81:6
84:16 87:17
93:7 129:1
138:15
142:20
159:10
167:16
168:25 190:9
222:5 223:14
230:8
**Giannini** 2:11
8:17
**giant** 222:10
**give** 9:23 14:9
15:2 20:9
61:4 75:16
81:18 84:5
85:19 87:1
88:24 92:10
92:11 103:5
103:7 151:17
161:9 182:2
183:14
210:21
231:13
**given** 29:4,11
84:4 102:3
209:6 234:15
**giving** 28:8
31:6 69:13
**glad** 135:10,14

**glasses** 15:1
**go** 10:20 11:23
12:10 13:13
20:21 35:12
38:12 44:23
45:4 47:6
59:4 68:11
71:1 72:9
82:1,6 86:2,9
86:14,21,22
87:7 91:7,13
93:9 98:15
99:18 102:8
102:8,11
106:19
107:11,21
111:5 114:2
116:8,10
123:2 129:4
129:11
130:19 131:1
133:25
137:24
138:22,25
142:6 148:3
153:7 172:10
178:3,22
181:17
187:20 193:4
196:24
205:18
207:15 209:7
209:16
211:18,22
219:9,15
221:20 232:6
232:7
**God** 203:25
**gofer** 137:22
**going** 14:7
21:4,13
23:25 31:22
31:22 35:6
35:11 36:16

Johnson, III, William E.                                          July 24, 2023

38:12 40:9
43:18 45:3
47:6,8 48:25
51:15,19
53:3,13
59:12 60:21
63:3,9 67:20
70:7,10,13
70:15 71:2
71:16 72:9
74:8 81:8,9
81:17 82:1
86:10,13,21
86:22,25
87:7 94:10
95:17 96:6
98:23,24
99:6,22
105:3,15
107:11,21
108:7 112:13
122:5,8,13
122:15,23
123:1 124:12
129:2 130:19
133:3,25
134:15,20
137:3 145:24
146:2 147:7
148:24
152:14,22
154:8 155:24
156:20 157:3
157:12 158:4
160:25
169:16 177:8
177:9,15,25
178:18
181:12
187:15,20
189:20
190:24
192:25 193:4
196:5 198:9

198:11,18
205:20 207:4
207:15,21
208:5 209:17
209:21 210:1
210:3,3,7
213:6 218:12
219:12 229:4
229:21
230:13,25
232:1
**good** 9:7,8
12:2,5 25:15
28:17 57:1
58:10 71:8
72:4 76:21
84:7 119:1,4
119:4 139:5
146:7 154:17
157:6 158:16
158:17
168:22
170:12,20
187:13 230:9
**gotten** 208:23
**government**
4:3 5:3 14:15
210:10,14,24
**Government's**
14:14,17
21:5 35:7
59:13
**graduate**
204:10
**granted**
222:13,18
**grantor** 222:20
**granular** 78:12
95:1 200:12
**granulated**
95:1
**grappling** 65:4
**great** 7:18
30:21 42:20

63:2 75:3
160:23 181:5
215:22 216:2
**Greg** 101:12
**grew** 187:2
**gross** 104:13
105:10
106:23 107:9
109:1 110:15
111:1 112:21
170:12
**ground** 137:23
**grounds**
214:10
**group** 38:15
39:1 45:2
47:2 188:18
218:22
**grow** 184:6
**grows** 170:13
**guarantee**
131:11
**guaranteed**
157:12
**guess** 22:3
42:8 88:7
115:14
132:17
134:24 147:7
148:15 150:7
163:19
183:11
190:16
191:12
192:14 196:7
200:22
226:14
230:24
**guest** 41:3
**guidance**
147:20 162:8
**guide** 50:9
**guided** 54:24
**guy** 101:12

146:18 191:2
192:22 193:9
**guy's** 174:9
**guys** 94:16
151:2,13
232:7

**H**
**half** 15:19 16:8
16:9 79:23
82:11,19,25
220:15
222:25
**halfway** 83:22
**Hamlin** 28:20
28:20 29:4
70:22,25
71:5 120:9
120:13
121:24 122:2
125:17
**hand** 29:19
235:6
**handle** 61:1,4
61:20 71:6
140:8 200:21
**handled** 70:19
71:4 200:20
**handling**
34:25 36:13
140:18
143:13
**handwriting**
130:18
**hang** 58:15
84:21 85:18
125:10 128:9
128:9 133:20
136:10 140:4
152:21
193:12
**happen** 70:10
70:13 157:13
**happened**

23:21 55:16
69:7 70:10
83:19 91:12
94:22 127:17
153:14,17
192:1 195:23
196:9 198:5
200:3 202:6
203:22
**happy** 189:19
**harbor** 45:18
208:7 210:9
**hard** 47:15
49:5 155:23
**harder** 167:16
167:16
**harped** 198:14
**Harwood** 1:22
8:11 234:7
**Haskell** 4:4
**Hassell** 1:20
234:2 235:10
**Hayes** 33:12
33:16 34:6
37:9,17
39:12 40:23
**Hayes'** 39:1
**he'll** 230:10
**head** 121:22
128:24 154:5
202:23
205:21
230:18
**heading** 214:7
215:13
**headquarter...**
192:2
**hear** 11:18,22
52:8 76:16
96:22,23
119:6 132:17
132:21 133:3
184:7 199:2
**heard** 41:9

Johnson, III, William E.                                      July 24, 2023

18

42:14 52:10
95:9 118:24
119:5,5,10
136:5 194:21
194:22
**hearsay** 40:8
192:9
**heavy** 29:19
**held** 8:10 80:1
129:1 139:20
140:15
164:25
197:22
201:12 205:7
222:11,11,15
**hell** 155:17
**help** 75:1
175:24
**helped** 200:22
**helpful** 29:16
**helps** 72:22
**Henderson**
231:21
235:11
**hereinafter**
1:24
**hereinbefore**
234:4
**hereto** 235:1
**hereunder**
87:15
**hereunto**
235:6
**Heritor** 26:20
27:4,24
29:25 30:1
32:12,17
70:24 71:24
120:8,11,22
121:4,11,14
121:23 122:1
122:1,18
135:22
218:22 221:7

221:17,18
227:6
**Heritor's** 120:9
**hesitate**
171:10
**high** 98:13
154:15 180:8
214:14 218:5
**higher** 62:4
214:20
**highlight**
22:11
**hire** 129:8
130:11 164:1
**hired** 61:21
67:11,15
164:2 221:18
221:23
**hiring** 131:9
141:8 144:11
**history** 205:22
**hit** 79:25
**hodgepodge**
186:5
**hold** 34:12,21
148:13,17
204:5,19
205:10
**holding** 18:19
34:14 43:1
**Holdings** 14:5
15:21 16:1
**homestead**
150:22
**honestly** 9:25
121:10
202:10
**honorable**
130:15
**hope** 130:17
201:10 232:2
**hoped** 130:20
**hopefully**
231:1

**hopes** 42:21
**horrendous**
135:12
**horrible** 45:10
**horribly**
209:10
**hospital** 42:25
**hours** 234:20
**huge** 153:23
154:9 182:19
218:8
**hundred**
110:22
**hunh-uh** 16:24
66:3 119:23
**hurricane**
45:15
**hurt** 160:24
**husband** 8:22
40:21 192:6
**hypothetical**
93:25 196:8

———————

**I**

**idea** 19:15
52:23 53:8
54:1 81:18
81:18 87:1
112:10,12
117:20,21
130:13 164:1
173:2
**ideally** 154:13
**ignore** 187:19
**III** 1:10,16 8:4
9:1 233:17
233:21 234:9
**illness** 121:7
**imagine** 87:20
89:16 109:12
208:12
**immediate**
10:5
**immediately**

170:10
176:16
**impact** 64:1,9
128:21
151:24
170:10
**impacts**
151:19,22
**important**
149:7 171:6
175:8 179:12
207:3
**improved** 44:7
**inadequate**
158:13
**inaudible**
95:12 117:18
118:22
132:18,25
136:1 181:9
192:6
**include** 184:8
194:4 228:7
**included**
120:15 162:6
189:18
192:12
**including**
24:21 66:20
93:2 221:5,8
224:5 225:6
226:25
**inclusion**
152:24
**income** 48:1
48:10,21
53:22 83:21
124:9 125:13
126:16 129:1
130:17,18
150:11
152:23
153:23 154:2
154:4,6

164:18
165:24
167:18,21,22
168:1,7,22
170:11,12
200:15
202:24 224:6
227:1,7,10
227:17
**incorporated**
13:6 25:22
26:2 55:21
55:24
**incorporation**
14:3 22:2
**incorrect**
221:25 222:2
222:3
**increased** 43:8
**incur** 131:3
**incurred** 34:22
48:22
**independent**
28:18,21
29:5 51:20
51:22 178:9
190:1 220:7
**indicate** 74:21
**indicated**
212:13
**indicating**
207:13
**indicator**
215:23 216:3
**indirectly**
17:18 171:17
**Industrial** 4:8
5:13 21:16
**industry** 40:6
97:12
**information**
10:12 22:8
22:11 28:6,6
28:7,9,25

Johnson, III, William E.                                      July 24, 2023

19

69:16 71:14
92:11 110:2
114:23
137:21,23
138:15
142:20 170:7
176:15
231:23
**Informed**
225:20
**initial** 72:3
141:25
**input** 31:6
**inquired** 192:9
**inside** 150:11
150:23
**insisted** 32:4
**installments**
79:20
**instance** 1:17
**instances**
29:13
**insufficient**
128:6,13
**insurable**
22:25 169:11
171:7
**insurance**
4:17 6:12,16
6:20,23
13:19,19,21
13:22 14:1
19:14 20:23
21:19 22:24
23:12 24:18
24:18,20,23
25:3,11,19
25:25 26:1,3
26:4,6,10
27:23 28:19
29:6 30:8
32:3 33:8
36:6 41:5,14
42:4,5,8,11

42:14,18,19
42:21,23,24
43:3,6,9,24
44:3,9,12,16
44:17,21
45:1,6,7,11
45:14 46:13
46:13,14,16
46:22,25
48:2,7,23
49:19 51:15
53:11 55:9
56:3,6,8,9
61:24,25
62:1,2,20,21
64:2 65:13
68:15 73:15
74:3 76:19
77:7,11,11
78:12,13,14
78:22 79:1
80:24 97:2
97:10,17
102:5 104:13
109:8 110:20
110:21
111:11 120:2
120:7 121:15
131:22
136:21 137:4
137:6 138:5
138:10,13
139:20
140:15 141:1
141:3,5,6,13
141:14,17,19
143:21 144:1
144:3,7,19
144:20,21
145:2,5,5,16
145:16 147:8
148:21
149:13
150:14

154:13,22,24
155:4,8
158:20,22,22
158:24 159:3
160:17,19
162:6,13,18
163:9 164:9
164:15 165:2
165:10,10
166:4,5,11
166:18,25
168:3 171:16
171:20
173:17,19,20
173:25 174:1
174:2 176:16
176:17 177:7
177:21 178:5
178:15
179:16 180:4
180:8 184:8
184:13 185:7
188:18
195:17
197:11,14,20
197:21,23
198:8 200:3
202:6 204:21
204:23,24
205:4 212:9
212:9 214:14
214:21 215:4
215:16,17
216:12 217:6
217:21,23
218:11
221:21
222:16
223:13 224:5
224:6,7,16
224:18 225:1
225:21 226:5
226:13,20,25
227:8,17

**insure** 70:14
70:14 154:20
**insured** 4:8
5:13 21:16
25:22 27:19
31:12 68:17
69:9 79:1
150:19
165:21
201:13 202:8
**insureds**
78:14,21
201:21
**insurer** 5:5
23:14 85:5
162:13
**insurers**
145:19
**integral** 54:25
**integrate**
141:18 145:3
**integrity** 70:5
**intend** 230:1
**intended**
188:8 217:9
**intentionally**
180:19
**interaction**
26:24
**interest** 31:14
44:3 58:22
97:9 220:16
**interested**
50:23 53:9
54:2 97:11
191:7 235:2
**interesting**
49:15 191:1
**interfere** 11:8
11:12
**Internal** 1:4
8:5 64:12
97:8 105:2
140:16

198:12 209:3
209:5 210:4
**International**
5:10,16,19
5:23 6:3 13:1
13:5 104:11
112:21
**interrupt** 14:13
143:5
**interruption**
27:11 195:9
196:4 217:4
**introduced**
41:12 209:4
**invest** 30:19
51:1 54:21
223:6,10
**invested** 57:3
202:25
**investing**
30:22 54:15
**investment**
16:2 36:24
37:4 39:15
57:2 127:16
128:21
129:17
130:21
202:21
**investments**
145:10,13
168:23,24
**investor** 50:1
**invited** 31:11
**involved** 16:5
16:11,19
17:4,7 24:11
29:3 30:15
33:15,21
54:11 55:6
61:9 62:2
67:8,17
92:14 122:17
137:7 151:11

Johnson, III, William E.

July 24, 2023

20

182:13
202:15,17
**involvement**
122:19 203:4
**irrevocable**
166:17
**IRS** 81:12 82:2
86:13,25
97:11 108:9
109:5 111:22
112:14
140:23
141:11
143:18
144:17
156:20 157:4
157:10,18,25
158:3,12,19
158:21
159:19,23
174:14 176:5
198:14 201:7
208:8,10,11
208:13,20,22
208:25
**IRS0008361**
103:4
**IRS0008363**
107:12
**IRS0008366**
107:22
**IRS0008368**
99:24
**IRS0008371**
102:14
**IRS0008373**
100:8
**IRS0281123**
172:10
**IRS0281125**
172:13
**issue** 77:10
95:4 178:2
221:5 227:9

227:16
**issued** 78:13
112:10
225:18 226:6
226:12
**issues** 36:15
140:9,19
143:14,17
214:1,3
**item** 188:4
**items** 176:23

———————
**J**
**J.P** 34:4
222:10
**Jade** 58:22
136:5,18,20
136:23 137:2
**James** 15:16
**January** 4:4,20
4:23 60:23
63:10,11,17
63:18 66:14
66:15 80:16
80:16 81:4
175:13
**Jason** 33:12
33:20
**jerks** 210:13
**Jim** 17:3 35:23
131:18 189:8
191:25 193:8
193:15
**jlevine@mnr...**
2:7
**job** 20:20 23:2
23:3,4 24:24
26:24 32:25
53:19 137:24
156:10
158:14 160:9
160:10
215:11
**John** 16:2

**Johnson** 1:10
1:16 4:12,16
4:23 6:7,15
6:19,21 7:3
7:10,13,17
7:20 8:4 9:1
9:7 12:25
14:9,23 15:6
18:18 21:6,9
35:8 52:11
52:11 59:12
63:6,15
64:17 72:14
75:4,8,18
76:3 81:13
86:12 98:23
99:2 100:1
103:10
107:23
108:13 112:11
122:25 123:5
124:13
131:15 134:1
139:8 146:16
148:11 163:3
172:12
187:16,21,22
189:3,7
193:3,6,18
194:22 195:4
209:13 212:5
213:10
218:13,19
219:24 229:1
229:7 233:17
233:21 234:9
**Johnson_E...**
4:10
**Johnson_E...**
4:11
**Johnson_E...**
7:22
**Johnson_E...**
7:23

**Johnson_E...**
5:7
**Johnson_E...**
5:8
**Johnson_E...**
7:11
**Johnson_E...**
7:12
**Johnson_E...**
7:15
**Johnson_E...**
7:16
**Johnson_E...**
4:24
**Johnson_E...**
4:14
**Johnson_E...**
4:15
**Johnson_E...**
6:8
**Johnson_E...**
6:9
**Johnson_E...**
4:6
**Johnson_E...**
4:7
**joint** 87:10,20
142:17
**Jopen** 139:16
**JPMorgan**
57:18
**Juan** 45:18
**judge** 9:13
**Julie** 2:3 8:21
229:14
**July** 1:11,18
7:3 8:9 179:5
179:20 234:5
235:7
**jumped** 119:13
**June** 6:19
107:15 163:6
163:7 179:4
**jurisdiction**

18:25
**Justice** 1:21
2:13 8:11
129:13 234:6

———————
**K**
**Keadle** 101:12
**keep** 87:17
146:1
**keeping** 230:9
**Kelly** 1:19
231:6,23
234:2 235:10
**kept** 20:3 28:8
80:5 133:11
**key** 129:7
**kids** 58:23
150:24
220:16
221:16 222:4
223:7
**kids'** 31:8
223:6
**kill** 159:19
**killed** 135:13
**kind** 9:23
22:11 39:4
42:7 50:3,20
82:25 100:22
113:4 115:16
163:3 186:5
187:23
204:22,24
218:17 228:3
**kinds** 180:21
**Kitts** 176:15
176:16
**knew** 31:21
53:12 70:7
70:10,13
76:21 90:23
101:15 137:1
171:12
**knock** 146:2

**know** 9:18
10:9,14,21
10:25 16:4
17:3 23:24
23:24 24:21
25:11 29:5
29:13 30:8
30:15 33:16
33:18,21
34:1 35:3
36:9 39:16
39:16,17
40:7,7 41:6
43:2,12
44:21 45:12
45:23 46:5
46:18,18,21
49:14 52:20
53:17,22
54:11 55:14
56:6,8 57:21
61:3,23 63:2
64:24 65:2
67:13 68:1
68:14,15,23
70:2,2,14,24
71:24 72:23
74:16 78:4
82:4,25
83:18 84:7
85:4 89:3,23
89:23 90:7,8
90:10,15,20
91:2,2,12,17
92:14,21,22
93:2 94:22
95:21,23
96:6 97:4,19
101:24 102:3
102:20
105:15,21
106:3,14,15
111:13
113:21,22

114:11 116:1
118:7,8,12
118:12,23
119:21 121:3
121:10,16
122:9 128:16
130:16
131:10 132:9
132:18 133:2
133:12 134:8
134:12,13,16
135:7,11,25
136:1,17,20
136:21,22
137:3,3
138:21
142:24
145:15
148:24
149:21 150:8
150:13
151:16
152:13 154:9
157:15
160:15,18
162:7,16,17
162:20
174:19,25
180:20,23
184:22
185:15,23
186:16,20,22
186:24 187:2
187:7,24
188:11 190:3
190:3,7,15
190:15,22,23
190:24
191:11,22
192:4,16
195:16,22
196:8 198:7
199:5,9,12
201:5 202:11

202:13 205:2
207:15
208:12
209:13,25
210:14
212:16 213:1
213:4 215:10
218:2,3
220:25
221:16,22
222:9,12,15
223:3,24
228:10,12,12
229:16
**knowledge**
39:17 56:4
215:7 234:11
**known** 17:5
28:18 203:19
**knows** 92:17
169:16 194:8
208:5 228:8
**Kryska** 2:12
8:18

---
**L**

**labeling** 14:13
**lady** 230:19
**laid** 185:24
**Langwassers**
101:10
**Lapicola** 182:4
182:8,11,24
183:13 184:2
**largest** 30:20
31:8,10
**lasted** 29:14
207:17
**late** 91:5
**Lauderdale**
2:5
**Lauren** 2:11
8:15 11:15
14:12 52:7

103:6 107:5
118:23 139:4
140:1 143:3
146:7 231:3
**lauren.a.dar...**
2:15
**law** 7:18 18:22
42:8 47:23
53:22 55:14
60:1 62:1,19
72:19 73:4
74:1 76:19
101:8 143:10
143:12,25
144:4,9,10
144:15 151:8
151:18,19,22
152:2,4,11
152:15 173:1
173:6,10,13
179:7 181:3
204:3,11,13
204:14,19
205:16,19,23
205:24 206:7
206:8,13,13
206:22,23
207:1 217:18
**Lawhorn**
33:12,20,20
**laws** 25:24
137:5
**lawsuit** 92:15
219:8,20
**lawsuits** 97:4
201:18
**lawyer** 17:8
18:18 41:14
42:4 61:25
131:5 145:5
206:24,25
229:14
**lawyers** 29:15
129:9 130:11

131:5 206:16
**lay** 92:22,23
165:15
168:12
**lays** 48:21
**learn** 41:5 42:2
**learned** 42:1
**leaving** 61:7
**left** 34:13
58:24 194:25
200:15
206:15
**legal** 25:25
60:6,18
61:15,16
62:5,19
66:25 67:3
125:20 131:4
142:10 221:3
235:11
**legislation**
43:4,10
55:15 56:3
65:5 66:8
**legitimate**
27:21 69:17
220:8
**lengthier**
81:14
**lengthy** 120:17
218:16
230:22
**let's** 69:7 86:9
101:11
146:19
196:10
223:18 232:7
**letter** 5:4 6:11
73:4 77:13
173:18 199:4
199:5
**letterhead**
72:16,18
**letting** 36:9

Johnson, III, William E.                                    July 24, 2023

22

| | | | | |
|---|---|---|---|---|
| **level** 62:4 | **likes** 230:19 | **litigating** 69:3 | 71:24 88:12 | 84:21 90:12 |
| 68:25 70:25 | **limitations** | 156:23 157:2 | 120:14,23 | 91:5 96:1,1 |
| 78:12 79:22 | 68:23 209:12 | 199:11 | 188:15 | 98:6 99:20 |
| 141:12 | **limited** 32:6 | **litigation** | 229:24 | 100:19,23 |
| 200:12 | 87:10 | 29:14 67:12 | **longer** 157:12 | 101:2 102:23 |
| **levels** 182:8,9 | **line** 27:9 28:3 | 92:6,7 96:13 | 164:25 165:2 | 104:6 105:21 |
| 183:14 | 29:23 49:18 | 96:14,15 | **look** 82:3 99:4 | 107:23 109:6 |
| 214:21 | 65:8 72:3 | 125:24 | 113:23 116:9 | 111:7,14 |
| **Levine** 2:3 | 107:24 125:4 | 126:19,21 | 134:10 139:9 | 114:9,24,24 |
| 8:21 229:14 | 208:12,23 | 127:9 130:24 | 144:25 | 115:2,3,3,18 |
| **liabilities** | 209:20 | 151:13 153:9 | 210:23 | 115:24 116:4 |
| 13:19 99:18 | 221:19 | 201:7,7 | 216:24 | 116:15,21,24 |
| 100:18 | **lines** 40:12 | **litigators** | 223:16 | 116:24 117:2 |
| 150:13 | 99:19 100:18 | 67:15 | **looked** 30:11 | 117:14,25 |
| 151:12 | 112:15 | **little** 15:7 23:9 | 30:13 43:11 | 119:19 120:1 |
| **liability** 150:6 | **liquidate** 200:6 | 41:1 46:9,12 | 64:22 88:2 | 125:16 |
| 174:10 | 200:23 | 47:13 49:6 | 108:18,21 | 126:18 130:8 |
| 177:21 | **liquidated** | 50:6 53:25 | 114:14 | 131:2 132:3 |
| 218:10 | 191:5 202:7 | 54:10 58:8 | 115:16,18 | 133:11,22 |
| **liable** 87:14 | **liquidating** | 59:20 64:4 | 117:2 | 164:19,24 |
| 88:8 129:1 | 192:24 | 67:2 68:8 | **looking** 22:10 | 165:1 171:14 |
| **liaison** 141:13 | **liquidation** | 75:15 89:17 | 74:25 176:1 | 171:15 |
| 144:19 | 127:7 200:17 | 118:25 120:5 | 185:3 191:13 | 198:13 |
| **license** 65:20 | 200:22 | 131:14 | 210:22 | 215:19 217:8 |
| 66:8 128:8 | 201:12 | 136:24 | **looks** 49:14 | 218:8 227:1 |
| 141:1 143:21 | **liquidations** | 147:11 154:9 | 55:20 65:4 | 227:10,17 |
| 204:5,19,24 | 140:20 | 219:15,16,18 | 99:17 114:11 | **losses** 34:22 |
| 205:3,7,11 | **list** 3:4 48:1 | 220:15 | 114:18 117:8 | 44:18 45:1 |
| 205:13 | 176:23 | 222:25 229:7 | 164:4 172:3 | 45:10 84:7 |
| **licensed** 52:2 | 179:10 | **lived** 16:7,8 | 172:4 173:8 | 84:25 89:22 |
| 52:17 140:17 | 227:24 | 19:10 | 184:3 189:13 | 90:15,20 |
| 176:17 | **listed** 22:14 | **living** 204:3 | 225:9 | 99:20 100:19 |
| 196:22 | 66:12 73:23 | **LLC** 14:5 16:1 | **lose** 32:12 | 100:25 101:2 |
| **licenses** | 102:15 104:2 | 139:16 | 50:18 53:5,5 | 101:23 |
| 204:20,21 | 110:6 225:16 | 218:21 | 127:15 | 102:23 106:4 |
| **life** 44:9 | 226:4 | **LLP** 2:4 | 129:16 | 106:7 113:17 |
| 145:16 | **lists** 22:8 | **load** 185:13,21 | **losing** 50:19 | 114:6,6,21 |
| 158:22,24 | 138:22,22 | **loading** 14:19 | **loss** 23:13 | 117:10,16 |
| 159:3 167:15 | **literature** | **loads** 43:21 | 27:17 28:24 | 118:2 135:11 |
| 204:23,24 | 204:16 | **located** 1:22 | 29:1 44:22 | 154:1 160:16 |
| 205:4 | **litigate** 29:13 | 33:13 234:6 | 44:23 45:21 | 160:17,19 |
| **light** 230:11,12 | 97:14 156:20 | **long** 17:12 | 46:23 68:1 | 162:2,9 |
| **likelihood** | 156:25 158:4 | 32:23 43:11 | 69:8,20 70:5 | 169:16 171:6 |
| 185:14 | **litigated** 28:15 | 50:5,21 52:4 | 70:6,6,14 | 171:11,18 |

215:22 216:3
217:16 218:1
227:10
**lost** 12:12
37:17 44:2
52:6 53:6
83:19 94:17
96:9 98:9
106:10
194:17 202:2
203:1 223:3
**lot** 16:6 27:22
29:15 30:24
34:3 36:13
39:5,22
68:15 80:2
80:18 83:13
89:1,19
130:14,14,16
133:6 143:16
145:19
150:17
153:25
154:19,20
162:22
168:25 171:9
171:15 176:3
180:14,19
206:21
207:25
217:19
224:21
**lots** 151:11,11
151:11 222:2
**loud** 11:18
**loved** 190:19
**lowest** 218:4
**Lucie** 229:22
**Lunch** 98:20
**lying** 173:15

― M ―
**ma'am** 10:3
106:24

219:13
**Mack** 16:2
**mad** 131:5,8
**mail** 32:2
**main** 48:1
155:22
158:11
**maintenance**
139:19
140:15 143:8
**major** 204:15
**majority**
134:21
**making** 26:5
154:6 167:16
181:6 209:7
**malaria** 203:15
**malpractice**
185:15,17
**man** 34:7
118:11 209:3
**man's** 173:2
**manage** 30:19
138:9,11
**managed**
30:24
**management**
14:5 20:1,9
20:12,14,16
35:1 49:24
50:12,22
77:25
**manager**
51:20,23
52:1,17
141:3,6
144:2,7
**Manhattan**
135:11
**March** 4:17
47:12,18
49:3,12 51:4
51:5 55:3
58:3,16

**Marcus** 2:4
**mark** 14:7,8
21:4 35:6
43:18 47:7
59:13 63:3
72:9 74:18
81:8 98:24
99:22 103:2
108:7 109:15
111:21
116:12
122:24
138:25
145:24
162:23 172:6
178:18
181:12
187:15
188:25
192:25 213:6
218:12
**marked** 14:11
21:8 35:9
43:20 47:8
59:15 63:5
72:11 74:20
75:4 81:10
86:10 98:25
99:1,25
103:9 108:10
109:17
111:24
116:13,14,21
123:3 139:3
146:5,14
162:25 172:8
178:20
181:14
187:18,19
189:2 193:2
213:9 218:15
**MARLAR** 2:23
**married** 183:7
**master's**

204:13
**Material**
107:14
**materials**
140:22
143:18
**Matt** 163:5
**matter** 8:4
80:19 154:3
154:4 157:4
157:5 229:19
**matters**
140:25
234:12
**maximum** 85:4
152:8 166:19
**Maxis** 7:4
179:10
**McCoy** 18:22
**mean** 13:20
23:8 24:16
34:25 38:22
45:12 46:5,9
47:5 53:2
54:14 57:15
62:24 64:20
68:1 70:16
72:23 90:23
93:25 94:2
96:6 98:2,12
98:13 102:8
102:11
113:20 114:5
114:17
117:12 122:9
122:17 126:4
126:7 153:8
154:22
155:17
160:18 172:2
177:14
178:16
181:10
182:19,23

184:22
185:21
191:21
195:22 199:9
201:17
202:13
206:23
207:16,24
215:10
216:23 228:3
231:22
**meaning**
143:24
158:10 180:7
199:20,21
**means** 23:13
24:17 25:12
25:15,17
53:3 54:15
77:20 113:21
113:22 114:7
208:13
**meant** 117:5,6
198:3,5
**Medicaid**
180:18
**medical** 7:4
179:10
180:14 181:5
185:17
**Medicare**
180:18
**medications**
11:8,10
**medium** 43:5
**meet** 16:25
17:9 41:2,10
86:7 129:19
175:24
**meeting** 7:14
75:1,9,11,13
75:19,25
76:4,4,8
164:8

meetings 20:3
  31:11 33:2
  74:15 76:12
  91:24
member 19:24
  90:4
members
  89:14 149:15
  221:4
memo 164:13
memory 15:20
  32:12 111:17
mentally 32:9
mention
  151:25 177:5
  177:11,12
mentioned
  18:10 30:8
  42:10 43:22
  54:11 151:18
  153:11 191:9
mentions 61:1
met 16:22,23
  31:24 33:17
  41:8,11,16
  41:18,23
  132:11,11
  192:21
method
  215:14
Methodist
  204:13
methods
  104:2 110:4
Michael 73:23
  134:4,5,13
microphone
  229:5
middle 36:19
  60:9 95:10
  175:19 178:4
  193:23
million 104:14
  104:21,22

105:11
106:23 107:1
107:10 109:2
110:16 111:1
111:3,8
113:1,9,25
116:10,22
117:3,14
127:2 152:5
152:6,10,10
152:15,23
153:12 166:7
197:4,17
208:16,18,22
216:17
mind 76:14,17
  78:7 118:24
  137:3 143:3
mine 53:6
  54:18 161:17
  162:20
minimum
  167:14
minor 204:16
minute 123:7
minutes 5:7
  20:3 74:21
  74:22 75:1,9
  75:19 76:4
  92:2 94:1
  186:4 207:17
  234:20,21
Miramichi 16:9
misconduct
  39:13
misrememb...
  82:12
missed 15:25
  53:14 85:18
mistake
  180:18,25
  181:6
mistreated
  209:10

mitigate
  157:24 158:7
  158:18
mode 175:24
  176:10
moment 12:11
  14:10 146:15
  187:22
  220:21
Monday 8:9
  176:24
money 26:16
  29:15 30:22
  34:3,12,17
  39:25 44:5
  45:3 53:5
  54:16,17
  57:18 91:8
  91:15 95:18
  125:25 127:7
  127:25 130:8
  130:11
  133:10,18
  198:19
  202:11
  209:11 223:4
  223:9
month 217:24
monthly 218:7
months 79:23
  79:24 81:7
  83:3
Morgan 34:3,4
  57:18 222:10
  222:10
morning 9:7,8
mother-in-la...
  19:6
motion 208:17
  208:21 209:1
  209:16
mouth 12:1
move 11:19,23
  11:25 12:4

39:25 145:25
moving 26:17
  146:1 166:14
  230:7
Muhlenbruch
  4:4,12 27:4
  27:25 32:7
  32:10,15,24
  35:22 36:9
  71:23 75:12
  120:25
  203:24 221:9
  221:17
Muhlenbruc...
  36:20
multiple 184:9
mutual 147:1
  148:12 156:9
  160:6 170:18
  171:1 174:22

**N**

N 2:1 3:1 8:1
N&D 6:23
  173:20 174:1
name 27:5
  46:2 56:7
  101:12,13
  102:15 134:4
  141:10
  144:14
  161:20 173:3
  193:11
  216:25 219:1
  222:9
named 59:22
  73:23 101:12
  103:18 163:5
  172:14 179:2
  193:15,15
  218:20 234:8
names 151:16
nationally
  28:18

nearing 186:3
nearly 45:20
  170:23
necessarily
  42:22
necessary
  28:25 161:16
  214:10
  226:20
need 10:24
  39:23 68:24
  85:11 123:8
  123:13
  124:24
  131:20,21
  148:13 177:1
  185:2 218:6
  219:9 220:21
needed 15:24
  28:8 53:10
  69:16 78:4
  85:24 88:18
  97:3,18
  137:24
  138:21
  143:20 162:4
  166:16 170:7
  226:25 228:8
needing
  133:16,21
negative
  180:22
negotiate
  122:13
negotiated
  120:19
negotiations
  67:16,19
  68:9 70:19
  71:3
Neiman 2:4
neither 234:22
neophyte
  55:18,19

**NERXD** 218:21
**net** 106:8
 185:14
**never** 16:22,23
 28:9 31:24
 33:17,22
 34:7,7,7 72:8
 78:7 86:1
 91:11,20
 96:11 118:11
 121:9 132:11
 137:2 171:13
 188:7,19
 191:21 192:9
 192:9 193:11
 195:20 196:9
 205:25 211:2
 211:5 217:21
 221:17
 228:12
**Nevis** 4:24
 16:6,7 26:21
 140:17
**Nevisian** 147:8
 196:21
**new** 33:14
 41:22,22
 42:6,9 57:15
 65:5 66:8,8
 83:18 160:9
 165:8 194:5
**news** 95:16
**nice** 156:5
**Nicholas**
 219:1
**Nick** 218:20
**nine** 52:4
 79:24 92:2
**Nods** 121:22
 128:24 154:5
 202:23
**non-covered**
 162:2
**non-paying**

 87:23
**nonpayment**
 88:13
**Nope** 19:12
 210:18 219:4
**normal** 171:22
 197:23
**normally** 171:2
 171:3
**North** 1:22
**nose** 162:21
**Notary** 233:23
 234:17
**note** 10:18
 49:18 231:17
**noted** 112:7
 218:3 233:15
**notes** 48:6
**notice** 105:12
**notified** 98:6
**November**
 6:11,22
 172:19 175:7
**nuclear** 182:13
**number** 26:22
 28:24,25
 29:2 43:1
 48:17 89:2,4
 103:7 105:9
 106:21
 108:25
 110:25
 114:24 118:6
 150:5 157:20
 160:23
 171:10 187:6
 187:10,13
 209:21,25
 212:15 213:1
**numbered**
 1:18 110:24
 110:25
**numbers**

 14:15 87:21
_____
**O**
**O** 8:1
**oath** 9:4,10,12
 234:13
**object** 10:17
 40:9 54:7
 57:12 79:16
 96:5 98:9
 105:4 108:5
 115:7,13
 116:7,19,23
 117:4,19
 118:5,14
 121:17
 128:17 132:7
 132:14,21
 136:16,19
 150:1 151:9
 153:2,4,15
 162:15 202:9
**objected** 94:21
 95:11 98:12
 120:8 153:6
**objection**
 10:20 14:13
 14:16 59:6
 94:11 95:9
 98:17 105:1
 106:13 107:3
 113:13,14
 118:17,18,19
 118:21,25
 133:3,3,4
 149:1 211:24
**objections**
 118:24
 132:17
 158:12
**obligated**
 88:16
**obligations**
 83:21 86:8

 87:9,14
 129:19
**obtain** 165:10
 177:11,12,18
 180:4 226:19
**obtained**
 220:10
**obtaining**
 177:1,6
 214:20
**obvious**
 131:21 158:3
**obviously** 45:3
 180:5 207:24
 219:6
**Occasionally**
 10:16
**occur** 70:7
**occurred**
 164:25
**occurring**
 215:23 216:4
 216:7
**October** 5:10
 6:8 123:6,7
 123:11
 127:19,20
 128:4
**offer** 69:19
 199:16
**offered** 135:9
**offering** 68:12
**offers** 61:20
**office** 19:21
 22:13 26:21
 26:22,24
 27:6 32:23
 41:21,22
 72:2 73:25
 176:24 199:2
 200:22 208:5
 209:2,5
 231:19
**officer** 13:4

 209:2
**officers** 18:20
 24:13 26:7
 26:18 77:25
**officership**
 26:12
**offices** 1:21
 138:23 173:7
 234:5
**official** 31:10
 31:16 32:25
**offset** 60:5
**offshore** 45:16
**oh** 11:21 23:8
 28:16 30:11
 36:5 37:3
 46:1 50:3
 51:24 52:8
 53:17 55:25
 57:15 58:9
 73:20 78:7
 82:13 90:19
 104:7 119:9
 126:7 140:4
 153:8 157:23
 158:6 159:17
 173:23
 174:19
 184:21
 189:11
 203:13
 206:14
 215:10
 220:15,20
 221:15
 223:19
**oil** 182:21
 191:2
**okay** 9:7,23
 10:7,10,14
 11:21 12:8
 13:8,11,20
 13:24 14:3
 14:21,23

Johnson, III, William E.

July 24, 2023

26

15:5,9,23
16:4,17,25
17:3,9,11,16
17:20 18:2
18:14 19:1,4
19:8,8,17
20:17,24
21:4,9 22:6
22:14,19,23
23:23 24:10
24:15 25:2
25:16 26:15
26:17 27:14
29:10,16,22
29:24 30:1,7
30:12,16,23
31:4,17,23
32:15,18,21
32:24 33:7,7
33:15,18,20
33:23 34:10
34:16 35:5,6
35:10,13,19
35:21 36:3,8
36:14,16,19
36:23 37:7
37:11,12,23
37:25 38:1,5
38:9,14,19
38:21,23,25
39:8,10,19
39:21 40:4
40:20,23
41:1,1,13,20
41:23 42:10
42:14 43:13
43:13,14,17
43:18 45:5
46:4,11,20
46:25 47:6
47:17,19,22
47:25 48:10
48:10,17,21
48:25 49:2,2

49:8,10,14
49:18,23
50:15,20,25
51:3,7,14,19
52:1,13,23
53:7 54:5,19
55:2,6,17
56:21 57:6
57:20,22
58:1,5,10,12
58:18,21
59:4,12,18
59:25 60:9
60:14,21,25
61:7,10,13
61:13,19
62:4,7,11,14
62:14,18
63:1,3,7,12
63:19,24
64:11,16,16
65:19 66:1
66:17,17,23
67:2,2,7,10
68:7,22,24
69:18,22
70:8,12 71:9
71:19 72:1,5
72:9,14,18
72:22 73:3,3
73:10,12,19
73:22 74:1,5
74:8,12,14
74:18 75:3
75:12,15,24
76:2,10,23
77:3,19 78:2
78:7,9,10,16
78:19,24
79:4,10,15
80:10,17
81:2,5,8,13
81:21 82:1,7
82:8,9,22

83:2,7,11,22
83:22 84:3,9
84:16,16,23
85:6,10 86:9
86:16,17
87:3,7,22
88:21 89:8
89:11 90:10
91:4,4,25
92:13 93:10
94:5 95:2,3
95:12,13
96:13,24
97:1 98:1,15
98:23 99:6
99:12,18,22
100:7,17
101:1,2,5,14
101:21,25
102:10,13,20
102:22 103:2
103:10,18,22
103:25 104:7
104:8,9,17
105:5,6,17
105:22 106:9
106:16,19,25
107:4,11,13
107:21,21
108:3,7,13
108:19,23
109:8,13,15
109:24 110:3
110:11,19
111:2,5,10
111:13,19,25
112:4,13,15
112:20,24
113:8,16,23
114:2,22,22
115:9,14,14
115:23
116:14,18,20
117:1,7,11

117:23
118:10,23
119:12,17,21
120:5,5,21
121:1,8,11
121:11
122:16,19,23
122:23
123:13,17,20
123:24 124:4
124:7,12,17
124:20,23
125:22,25
126:15,21,23
127:4,4,14
127:18 128:1
128:4,20
129:14,21,24
130:12,22,25
131:7,13,19
133:1,5,5,25
134:6,17,24
135:3,5,21
136:3,7,15
136:25
137:12,19
138:1,9,12
138:24 139:8
139:10,13,18
139:25 140:7
140:13
141:20,22
142:3,12,15
142:23
143:13,18,21
144:1,6,15
144:19,22
145:1,7,21
145:24 146:5
146:12,15,19
146:25 147:5
147:9,19,19
147:24 148:2
148:20 149:4

149:11,17,23
151:3,6,14
151:18 152:4
152:12
153:10 154:2
154:11,16
155:1,16,18
155:23 156:7
156:12 159:5
159:9,12,18
159:20 160:5
160:11 161:2
161:12,14,18
161:22,25
162:3,11,19
163:9,20,23
164:6,22
165:6,14,18
166:3,6,10
166:14,23,23
167:2,6
168:9,15,20
169:7,15,18
169:22 170:3
170:5,9,16
170:24,24
171:21 172:1
172:4,4,6,6
172:12,18,25
173:4,9,16
174:4,6,13
174:18,20,25
175:5,17,23
176:4,9,13
177:3,3,20
178:22 179:6
179:9,17,22
180:3,7,10
181:4,23
182:1,3,11
182:18 183:2
183:4,8,11
183:19,23,25
184:4,13,24

| | | | | |
|---|---|---|---|---|
| 185:2,4,12 | 219:3,7,14 | 109:14,23 | 155:10,19 | 222:21,24 |
| 185:21 186:3 | 219:15,16,18 | 150:9 154:7 | 156:2 | **ownership** |
| 186:3,10,19 | 219:18 | 186:25 | **outs** 48:21 | 15:13 17:13 |
| 186:22,25 | 220:21,23 | **opine** 148:24 | **outside** 20:21 | 56:12,14 |
| 187:3,5,9 | 221:13,24 | **opinion** 5:16 | 67:11 184:9 | 58:6,11 |
| 188:2,14,22 | 222:7,18,21 | 5:19,23 6:3 | **outstanding** | 121:6 148:21 |
| 189:6,14,17 | 223:11,16 | 29:3 30:10 | 123:21 128:6 | 148:22 149:7 |
| 189:22,24 | 224:10,14,23 | 64:19 103:13 | 128:14 130:6 | 165:21 |
| 190:13 191:6 | 225:3,9,14 | 108:16 | 199:20 | 183:20 |
| 191:16,20,24 | 225:23 226:9 | 109:23,25 | **overall** 46:14 | 189:20 221:8 |
| 192:3,5,17 | 226:16,23 | 115:24 116:3 | 202:20,22 | **owning** 195:8 |
| 192:19 | 227:4 228:9 | 117:2,15 | 212:10 | 195:14 |
| 193:10,17,22 | 228:15,20 | 150:2 157:3 | **overly** 214:14 | |
| 194:3,8,12 | 229:17,22,25 | 161:10 210:3 | **oversee** | **P** |
| 194:14,19,21 | 230:11,16,20 | **opinionated** | 139:19 | **P** 2:1,1 8:1 |
| 194:24 195:1 | 231:3 232:7 | 161:13 | **overseeing** | **P-** 163:12 |
| 195:2,7,18 | **old** 212:20 | **opinions** | 140:14 141:6 | **p.m** 1:19 98:19 |
| 195:21,24 | **older** 19:6 | 161:11 | 143:7 144:6 | 98:22 148:6 |
| 196:18 197:3 | **once** 45:6 | **opportunity** | 144:11 | 212:1,4 |
| 197:11,17 | 46:15 79:24 | 150:17 | **owe** 209:10 | 232:10,11 |
| 198:2,6,22 | 82:4 96:4 | 169:12 | **owes** 60:5,6 | **P.O** 2:13 |
| 198:24,24 | 144:9,13 | **opposing** | **Owl** 11:19,23 | **page** 3:2,3,4,5 |
| 200:2,10,18 | 201:17 202:7 | 231:25 | **owned** 14:4 | 3:6,7,8 4:2 |
| 200:24 201:9 | 225:24 | **ORAL** 1:9,15 | 15:15,16,17 | 5:2 6:2 7:2 |
| 201:11,11,16 | 229:10 | **order** 66:20 | 15:19 17:18 | 15:10,11,12 |
| 201:20,25 | **One's** 163:17 | 69:16 87:23 | 30:2,2 44:3 | 21:12 22:21 |
| 202:12,15,18 | **ones** 24:21,22 | 91:8 136:12 | 121:3,4 | 35:14,22 |
| 203:2,21 | 70:4 132:5 | 176:16 197:7 | 137:1 149:14 | 36:17,20 |
| 204:1,1,3,5,9 | 154:15 | 231:9 | 150:20 184:9 | 38:1,13 |
| 204:17 205:1 | 155:22 | **ordinarily** | 185:7 189:25 | 59:21 60:10 |
| 205:9,14,22 | 160:18 | 180:15 | 191:3 193:9 | 60:22 63:8,8 |
| 206:10 207:6 | 210:24 219:2 | **ordinary** | 200:17 | 63:9,14 |
| 207:20 208:4 | 222:15 | 140:24 | 201:14 220:9 | 64:17 72:15 |
| 210:9,12,23 | **ongoing** | 167:18,20,22 | **owner** 16:1 | 73:13 74:8 |
| 211:9,13,14 | 126:24 | 168:1 214:10 | 17:1,20 | 75:6,7,17 |
| 211:21 212:5 | 140:24 | **Organizatio...** | 55:12 56:14 | 76:2 81:22 |
| 212:14,18,22 | **operated** | 4:5 | 78:17,18 | 82:2 86:13 |
| 213:6,10,17 | 150:10 | **organized** | 134:14 | 86:24 99:7 |
| 213:20,23,25 | **operating** | 137:5 | 145:18 | 100:8 102:14 |
| 214:5,7 | 201:3,6 | **Originally** | 166:19 | 105:8 107:11 |
| 215:8,13,21 | **operation** | 120:8 | **owners** 51:11 | 107:22,24 |
| 216:6,15,21 | 198:18 | **outcome** | 52:24 56:12 | 108:23 109:4 |
| 217:13,22 | **operations** | 210:16 | 160:25 | 109:5 110:13 |
| 218:18,25 | 32:8 107:15 | **outlined** 155:5 | 166:16 | 111:5,7 |

Johnson, III, William E.                                    July 24, 2023

28

112:13,16
114:23 123:4
124:13
131:14 134:1
134:3 168:10
168:11
172:13
174:13
175:20 176:4
178:4,24
179:1 187:20
188:17 189:6
193:5,18,22
193:23 195:3
195:25
218:18
219:24 225:5
**PAGE/LINE**
233:2
**pages** 47:11
81:15 187:23
213:24
**paid** 13:22
20:1 25:8
30:24 31:3
34:14 44:9
44:10 46:14
68:18 69:24
78:21 80:20
82:19 84:10
84:13 95:24
97:20 98:4
113:19,19
114:6,14,19
117:9 119:18
119:22
122:18
131:10 142:8
160:18
162:12,12
165:8,20
167:17
171:13
177:22

180:24 181:1
190:9 197:8
200:16
214:13
215:22 216:3
217:16,19
225:11
227:16
**Palm** 229:19
229:21
230:10
**Pan** 137:10
189:19
191:10,12,13
191:16 192:4
192:5,13
194:5 197:6
**Pan-Am** 58:22
**Pan-American**
58:22
**paper** 207:23
**papers** 141:2
143:22
**paragraph**
65:7,20 82:3
105:8 108:25
110:15
123:21,24
124:4,7
125:2,5,11
134:18
164:23
165:14,19
166:15,24
168:11,17,21
169:19,22
183:12 185:4
188:3,17
220:1 222:3
223:17 224:3
224:10,23
225:4,9
226:16,23
227:14

**Pardon** 53:15
163:15 169:4
173:11
**part** 20:12 25:5
25:7 27:1,17
30:2,18,20
31:18 48:2
50:1,16
53:14,16
66:24 68:18
75:14 77:25
80:1,3 87:11
88:9 91:22
93:12 95:21
96:12 115:10
121:9 129:7
132:3 133:11
133:13
137:20 138:3
178:15,16
186:17,18
201:11
212:11
217:14
**partial** 127:7
**partially** 218:2
**participant**
48:11 68:12
80:7 186:9
**participants**
28:15 34:12
48:18 67:5
71:4 77:7
82:10,18
84:19 91:8
94:5 121:12
121:14 129:5
129:17,25
131:1,21
132:1 133:6
**participate**
34:25 56:23
85:12 97:10
225:1

**participated**
20:1,8 24:25
30:9 33:9
44:13 76:25
77:16 81:23
84:23 85:22
86:19 87:5
97:3 120:3
129:11 133:8
198:17
**participating**
31:6 50:23
80:24 86:7
98:5,9 105:9
106:22
108:25 167:4
187:7 220:3
**participation**
60:18 197:6
**particular**
15:11 20:16
43:10 46:10
81:19 153:3
165:3
**parties** 234:18
234:24 235:1
**partner** 18:22
**partners**
206:11
**parts** 45:15
54:25 61:25
**party** 44:1 46:6
234:19
**passed** 43:4
**past-due**
134:21
**Patel** 178:4
**Patels** 176:6
177:5
**patience** 15:4
**pause** 194:19
**pausing**
194:25
**pay** 28:5,18,20

31:1 34:21
38:5 39:6
40:3 44:4,19
44:22 45:4
46:21 67:22
67:23 68:14
71:16 84:20
84:25 85:6,8
85:12,12,23
85:24 87:18
88:2,19 91:7
91:9,16,18
91:21 92:8,9
93:15,19,22
93:23 94:3
95:18,19
97:25 120:19
125:19
126:25,25
127:7 129:5
130:5,7,13
131:4,23
132:2,3
133:10,16,22
147:1 148:14
153:12
162:10
165:11,23
166:18 168:1
171:14,15
177:22,24
190:4 200:7
201:19 218:6
218:9 221:22
222:17
**payable** 87:14
**paying** 34:14
43:25 45:6
46:15,19
113:17 129:2
135:2 160:12
161:5,16
162:17,20,20
175:10

199:20 215:2
217:17
**payment** 4:21
87:24 88:18
98:6,10
122:12,21
131:2 132:3
227:5
**payments**
37:18 111:16
119:19
125:16 126:6
126:18 130:2
133:22
**payroll** 167:21
**PDF** 109:4
110:13 111:5
112:13 123:4
124:13 134:1
163:13,13
176:4 187:20
189:6 195:3
**pecuniary**
220:10 222:5
**pending** 11:1
131:23
193:12
220:18
**penny** 223:3
**pension**
167:24
**people** 24:25
26:22,23
27:6,22 28:1
29:25 30:15
45:22 53:11
56:9,10,24
125:20
130:13 132:9
135:13 161:9
174:15
175:10 176:2
180:14 181:5
190:6 199:12

199:14,21
202:11
206:21 207:4
208:24
**percent** 15:16
15:16,18,19
17:18 46:22
58:22 63:20
63:21,22
79:11 83:4,9
83:23 84:4
84:13 88:23
89:2,4,12,18
89:21 90:2,7
90:25 94:10
95:17 96:1,1
98:12 114:4
114:9 117:3
126:9,13
127:1,20
128:5,12,20
132:4 133:11
133:23 135:2
148:17
156:23
166:20,20
171:14
202:25 212:9
212:15,22,23
213:3 220:16
222:25
**percentage**
56:14 78:25
114:5,19
117:9
**percentages**
121:10
**perfect** 15:24
119:15
**period** 4:9
5:13 18:5,8
21:17 43:7
55:16 80:10
82:10,17

83:3,23
84:12 99:3
100:3,9
112:22 157:4
221:5
**periods**
167:17
**permission**
147:21
165:10
**person** 10:7
41:18 161:13
183:5 234:8
**person's** 219:1
**personal**
126:13 137:2
150:13
**personally**
107:20
131:11
208:25
**pertinent**
214:1,3
**petition** 222:1
224:21
**petitions**
222:2
**Pettison** 7:21
**phone** 27:11
27:13 34:8
195:9 196:4
217:4 229:11
229:15
**physical** 19:21
32:11,16
**physician**
184:3
**picked** 53:18
213:1
**picking** 12:6
212:25
**piece** 207:23
**Pineiro** 2:4
**pissed** 95:22

**place** 56:3
188:12
**plaintiff** 1:3
2:2 8:20
14:15 224:3
224:10,23
225:4,10
226:17,23
227:15
**Plaintiff/Def...**
235:4
**plaintiffs**
225:14
**plan** 123:8,14
141:4 144:2
144:4 167:4
167:7,20,22
167:24
**planning** 6:12
41:4 150:15
150:16 151:1
163:14,18
184:7,14,20
**plans** 168:4
**plant** 45:16
**play** 121:18,20
**please** 10:1,4
10:9 102:21
111:19 115:1
119:14
146:16
157:14
175:24
176:22 231:8
**plenty** 160:17
**plus** 97:21
**point** 10:24
36:12 43:14
61:18 77:10
84:3 101:5
122:4 127:19
127:19 128:4
152:24
153:13,20

158:2 180:13
185:17
**pointed**
106:17
158:15
**policies** 27:4
77:11 78:14
92:19,20,25
141:5 144:3
165:4 171:8
179:12,16
183:16 205:5
223:21 225:6
225:11,15,18
226:3,5,12
227:21,23
228:2,5,14
**policy** 6:23
23:13 27:17
27:18 28:25
44:22,25
67:25 68:2,3
68:16 69:8
70:2 83:23
84:12 93:4,6
93:8 107:19
109:9 135:17
165:3,8,9
173:17,25
174:7 175:2
177:9 223:24
224:16
226:13
227:11
**political** 135:8
135:17
**pool** 24:25
28:14 30:9
33:9 34:8,13
34:23 44:13
48:3 50:22
60:6 61:15
61:16 63:21
67:5 68:6,11

71:4 77:1,7
77:16 81:24
82:10,18,20
84:19,24
85:22 86:1
86:19 87:5
87:18 88:4
91:5,11,21
94:4,5 95:18
97:3 104:12
105:9 106:22
109:1 111:11
120:3 121:11
121:14 124:3
124:5,8,23
125:9,12,21
128:7 129:11
129:17,24
131:1,21,22
131:23 132:1
133:6,8
136:8,12
158:16 175:9
177:16 186:8
191:19 192:8
192:8 198:4
198:8 199:13
199:15,22
212:11 221:4
225:1 228:14
**pools** 123:9,14
123:18 127:7
127:21 128:5
220:3
**Port** 229:22
**portion** 68:14
85:7 86:11
87:19 165:11
173:24
**position** 97:8
97:12 185:16
208:14,21
230:10
**positive**

170:10
**possibility**
157:9,11,12
157:17
168:25
171:17,19
198:13 210:8
229:23
**possible** 11:19
84:7 93:19
94:3 159:11
165:2,9
185:12
188:20 200:7
**possibly**
150:25
191:13
**posthaste**
134:22
**postponing**
169:13
**potential**
31:13 89:21
107:13 150:6
151:12 165:1
174:10
183:20
**potentially**
132:3 133:15
133:22
**pound** 230:25
**power** 20:3
**practical** 80:19
**practically**
30:5
**practice**
178:13,14
199:3,17
200:5 201:4
204:3 206:1
206:22
**practiced**
205:24
**Pre** 67:19

**pre-lawsuit**
67:19
**pre-suit** 67:16
**premium**
13:22 23:14
43:9 44:2
63:21 66:20
83:23 113:2
113:9 114:7
117:9 126:5
141:9 144:12
152:8,8
158:25 159:3
164:25
165:24 182:8
182:9 183:14
190:11
197:19 200:7
225:21,23
**premiums**
25:3 44:1,5,9
44:19,23
45:2,4 46:13
46:21,23
47:1 65:9
78:21 79:1
79:19 82:19
104:14,20,22
106:25
110:20,20
111:3 114:19
134:16
148:17
151:10
152:19
153:12 156:6
160:7 161:24
165:8,20,23
167:11 169:1
171:12,15,18
173:19
175:11
176:18 180:8
201:12,18,20

212:10 214:8
214:9,14,15
214:22 215:3
215:6,11,16
215:21 216:2
216:17
217:16,17,20
217:23 218:4
218:4 222:15
225:11,20
227:5,16
**prepaid** 190:3
**preparation**
141:1,18
**prepare** 72:6
73:2 101:24
102:2 115:6
147:16
210:19
**prepared** 74:1
74:6 102:3
103:18
120:10
141:15
143:21
144:23 145:2
164:13
**preparer** 73:22
**present** 2:22
8:21
**Presentation**
163:13,17
**presented**
90:3
**president** 18:7
**press** 14:22
130:11
**pretend**
215:12
**pretty** 55:19
80:1 95:1
98:13 120:14
132:18
143:23

153:25 187:2
218:4
**prevent** 11:4
176:25 177:6
**previous**
10:14 36:17
86:14 108:20
**previously**
98:25 116:14
116:21
187:18,19
229:1
**primarily** 32:2
42:21,25
76:19 125:20
138:15
144:24 190:2
**primary** 30:19
120:21,23
177:17
**Princeton**
204:11,15
**principal**
221:10
**prior** 72:21
99:16 105:4
136:9
**private** 43:5
**privilege** 46:7
**privy** 133:14
**probable**
149:24 150:3
182:8
**probably**
71:22,23
92:1 93:6
95:23 115:8
118:15
129:22 131:4
149:16,17
150:12,20
158:6 182:20
198:19
207:14

215:10
220:25
221:16
**probe** 76:14
76:17
**problem** 52:8
129:20,22
209:15
**problems**
39:18 70:4
154:9,10
182:20
199:12,19
**procedure**
1:24 231:14
**proceed**
183:19 185:6
**proceedings**
232:11
**process** 29:20
202:16
**processes**
133:14
**processing**
121:19,21,23
122:17
**procure** 49:24
50:12 226:24
**PROD** 72:13
73:13 109:19
110:14 111:6
139:2
**produced** 1:16
74:22 207:22
210:24
**Production**
14:9 21:7
35:8 63:7,15
64:18 75:5,8
75:18 76:3
99:2 122:25
123:5 124:14
131:15 134:2
187:17,21

189:4,7
193:4,6,18
195:4 218:14
218:19
219:25
**professional**
211:3
**professionals**
141:8 144:12
**profit** 97:21
167:24
198:13
**profits** 190:22
**program** 194:5
**prohibited**
58:6,11
**promise** 101:5
**promised**
226:24
**proper** 50:22
**properly** 26:13
231:16
**property**
135:13
160:20,22,24
**proportionate**
84:20,25
**proportioned**
91:21
**proposals**
141:18 145:2
**proposing**
169:25
**protected**
150:12
**protecting**
150:24
**protection**
206:19,20,25
**provide** 10:5
49:24 50:12
65:16 66:2
69:9,15
137:19

138:12
158:14
164:18
226:19
**provided**
61:16 62:5
62:16 66:25
110:2 198:4
215:18 217:6
221:3 226:12
**provider** 220:2
**provides**
231:21
**providing**
198:25
216:12
**provision**
18:19 134:20
**public** 39:4
233:23
234:17
**publicity** 39:4
39:10,22
**Puerto** 45:15
**pull** 75:3
**purchasing**
44:16
**pure** 4:8 5:12
21:16 22:3,3
40:8 95:20
95:23 96:4
96:12 133:13
**purpose** 24:4
24:9 34:10
44:20 56:25
157:7 159:23
**purposes** 23:1
23:6,7,20
24:8 25:12
25:20 96:20
**purse** 157:1
**pursuant** 79:4
234:3,17
**pursuing** 92:6

**push** 130:6
**put** 53:3 61:2
76:22 127:3
194:9 223:2
223:4

_____
**Q**
_____
**qualified**
139:20 143:8
167:4,22,24
168:4
**qualm** 208:14
**quantify** 182:8
**quarter** 83:14
127:2 208:16
208:18,22
**quarterly** 61:3
**question** 10:4
10:19 11:1
15:11,11
23:24 37:2
40:10 46:11
46:12 52:7
52:16,21
53:24 58:25
63:13 64:2,5
65:3,25
72:21 76:11
76:17 82:15
85:20 90:18
93:13 94:13
94:20 95:6,9
95:11 97:16
102:21 105:4
105:14,16
106:1,2,20
107:6 111:20
113:15 114:8
115:1,15
128:10,16
132:15
134:12 135:6
135:15,16
139:10

145:11
153:10,18,20
157:14
173:22
182:24 188:2
193:12
211:16
220:17,18
226:1 227:13
227:21
**questioned**
96:11
**questions**
9:25 10:1,10
11:5,9,13
58:24 62:24
62:25 69:7,9
69:12,17
70:5 81:20
105:17
118:19
138:22
143:16
145:20 186:6
207:14 211:6
212:6 217:1
228:18
230:14
**quick** 159:11
199:10
**quickly** 103:5
184:6 200:6
218:17
**quite** 29:14
120:17,17
**quitting** 199:4
**quota** 87:3,10
88:6
**quota-share**
105:24
**quote** 61:4
**quoted** 198:12

_____
**R**
_____

Johnson, III, William E.                                    July 24, 2023

32

**R** 1:2 2:1 8:1
    173:7
**raise** 58:23
    159:15 160:1
**raised** 152:9
**ran** 54:24
    80:14 162:1
**random** 186:5
**range** 184:15
    184:18,19
**Rashbaum** 2:4
**rat** 68:4
**rate** 166:19
**ratio** 114:3,9
    114:13,13,14
    115:2 117:3
**ratios** 120:1
**Raymond**
    172:14,16
**re-ask** 90:19
    95:13 106:20
**reach** 167:13
**reacted** 94:9
    94:15,20
    95:15
**reactors**
    182:13
**read** 15:5,20
    15:21 21:23
    35:15,17,20
    36:10,22
    43:1,3 47:15
    49:10 55:14
    59:1 89:7
    93:4 95:7
    110:23 134:7
    146:16
    187:22 210:7
    211:8 215:24
    219:12
    231:15
    233:14
**reading** 49:5
    64:25 65:3

82:4 124:19
    134:12
    140:10
    173:21
    207:25
    220:22
**real** 25:17
    124:9 125:13
    137:5 151:12
    185:13
**realistic**
    160:15,16
    198:20
**reality** 32:5
**realize** 162:4
**really** 15:20,20
    21:2 45:10
    69:7 70:1,7
    121:9 154:22
    168:24
    189:19
    202:10 207:1
    208:23
    227:24 228:7
**reason** 19:11
    80:22 147:25
    149:23 151:6
    173:9,12
    233:2
**reasonable**
    25:6 57:1
    169:12
**reasonably**
    229:24
**reasons** 29:11
    43:23 67:23
    89:18 147:11
    150:5
**recall** 17:2,15
    18:9 19:1
    27:6 34:5
    40:24 62:14
    62:23 67:8
    84:5,12

111:10
    127:25 135:1
    135:10,19,19
    136:20
    144:21 187:6
    229:17
**receipt** 224:11
**receive** 43:10
    109:8 227:7
**received** 27:3
    79:1,19
    106:25
    110:15,20
    111:2,10
    126:5 142:13
    148:18
    172:19
    225:17
**receives** 13:21
**receiving**
    94:10 95:17
    214:15
**recognize**
    21:10 72:16
    103:11
    109:21
    111:25
    139:11,12
    218:25
**recognized**
    26:1
**recollection**
    75:1 82:22
    83:7 107:18
    149:6 212:8
**recommend**
    197:5 203:6
**recommend...**
    70:21 122:1
**recommended**
    115:24 116:1
    116:4
**recommendi...**
    198:3

**reconcile**
    117:12,14
    118:1,12
**record** 8:3,14
    10:18 12:11
    12:20,24
    59:5,7,11
    82:16 95:7
    98:16,19,22
    116:13 148:4
    148:6,9
    211:23,25
    212:3 231:6
    232:5,7,8,10
    234:15
**records**
    210:21
**recourse**
    85:10
**recover** 224:1
**recuse** 31:15
**red** 216:15
**reduce** 42:24
    164:17
**reduced**
    234:14
**reducing**
    171:19
**refer** 13:8
    166:3 197:14
    197:18
    220:18
**reference**
    167:6,8
    168:17,20
    169:24
**referenced**
    37:7 62:15
    169:9
**references**
    125:1
**referred** 77:13
    106:3 120:9
    223:11

**referring** 39:11
    40:20 64:11
    65:13 106:2
    110:19 125:3
    125:16,23
    126:17,19
    134:25
    138:17 152:4
    159:2 182:15
    185:24
    191:17
    207:18
    220:13,14
**refers** 37:8
    125:22
    197:11,19
**refineries**
    182:14
**reflected**
    114:23 115:3
    117:2
**reflecting**
    104:3
**reflects** 114:9
    116:21
**refresh** 75:1
**refuse** 93:22
    93:23 94:3
**refused** 67:23
    91:10,16,18
    92:8,9,10
    93:15 120:19
**regarding**
    25:22 151:10
**regional**
    101:16
**regular** 166:11
**regulators**
    21:1 102:24
**regulatory**
    40:6 141:7
    144:7
**reimbursed**
    208:18

reimbursing 131:2
reinsurance 5:10,17,20
5:24 6:4 13:1
13:5,16,17
13:18 22:4
24:19 25:5
27:8 55:7
65:9,21
66:10 76:25
77:3 78:11
79:5 80:11
80:22 82:10
82:17 83:3,8
84:17 85:7
86:18,19
104:11 105:9
106:22 109:1
112:21 136:5
136:8,11,23
137:10
186:22 188:6
190:17
191:19 194:5
198:3,18
199:16 220:2
220:8 224:1
225:5,17
226:4 228:1
reinsure 63:21
93:8 136:8
136:12
227:10 228:2
228:13
reinsured 135:18
reinsurer 26:25
reinsures 13:18 228:5
reinsuring 228:3
related 39:13

40:4 42:20
62:19 140:19
165:21 220:9
234:23
relating 36:24
37:4
relationship 16:11,13,18
17:6 19:4
142:21
191:21
relative 234:25
relevant 87:11
88:8
reliable 215:13
215:18 217:7
relied 226:17
rely 62:18
relying 90:1
remaining 84:3 134:15
remains 47:2
remedies 91:18 93:12
remedy 92:6
93:19
remember 10:12 20:14
52:3,4,19
61:18,23
62:17 66:10
67:11 68:4
69:11 74:7
74:17 79:14
83:9,12
84:15 85:9
85:16,25,25
86:5,6 87:25
88:12,13,25
89:3 91:14
91:19,22
92:3 93:20
94:2,4 96:18
96:21 103:1

107:20 108:6
109:12
114:18
115:12 116:6
119:20,23
120:4 124:25
128:8,18
130:3 133:19
133:24 134:5
134:6,9
135:4,22
136:25
137:18 142:3
146:18
147:23
148:19 149:2
149:9,18,21
168:23
172:16,20
173:2 175:10
175:12 186:2
186:16,21
188:9,13
191:16 192:3
192:5,7,18
192:20,21
204:25
211:11
212:12,19,19
212:22,24
219:7,20,21
219:22
222:20
227:19 228:1
remembered 58:21 83:1
193:11
reminder 111:19
reminders 9:24
repair 190:3,9
190:11
repeat 107:7

repeated 178:24
replaced 40:23
replacement 40:13
reply 195:4
report 4:8 5:13
21:17,24
71:7 100:19
102:24
107:10 108:3
112:3,10
114:24
reported 99:20
106:10
107:16,24
113:1,9,17
114:3 115:4
115:18
117:14,16,25
118:2
reporter 8:24
10:6 12:19
23:25 66:5
76:15 118:16
118:21
132:13,16,22
133:1 211:19
231:8,12,17
reporter's 3:8
119:8
reports 109:5
represent 67:3
205:4
representati... 173:18
representati... 226:18
representative 170:16
represented 217:3 220:6
221:3
representing

141:11
144:16
173:14
request 98:10
235:5
requested 172:2 223:13
requesting 147:17
require 66:8
required 18:16
80:8 85:3
88:2 92:11
101:8 108:1
116:2 140:23
167:12
176:15
178:17
requirements 180:23
requires 208:20
requiring 179:25
research 56:2
resentment 208:7 210:9
reserve 80:5
89:12,21
90:2,12,25
95:17 96:2
96:10 104:7
109:6 115:24
116:4,11,16
116:21,25
117:25 127:6
127:20 128:5
128:12,21
129:6 132:4
133:11,23
164:25
reserves 104:2
106:10
107:23,24

34

| | | | | |
|---|---|---|---|---|
| 110:6 111:7 | 147:9 178:11 | 216:10 | 144:22 145:1 | 82:20 83:5 |
| 117:15 | **responses** | **retirement** | **reviewing** | 83:25 85:2,8 |
| 126:14 | 211:10 | 167:4,6 | 20:18 27:10 | 86:19 87:5 |
| 148:18 | **responsibilit...** | 168:4 | 108:4 141:15 | 88:5,6,19 |
| 165:11 | 19:23 | **retrocedes** | 182:6 | 89:6,9,25 |
| **resident** 18:17 | **responsibility** | 105:24 | **Rico** 45:15 | 91:9 93:22 |
| 18:23,24 | 25:9 26:5 | **retrocession** | **rid** 93:6 | 93:24 94:6 |
| **resign** 18:21 | 91:7 121:6 | 77:15,20 | **right** 13:6 14:5 | 98:6,9,10 |
| 123:25 124:5 | 145:8 | 84:20,24 | 15:4,6,10 | 99:4,10,13 |
| 124:24 | **responsible** | 86:22 87:4 | 16:2,3 17:18 | 99:16 100:5 |
| **resignation** | 20:17,24 | 88:11 | 17:22 18:5 | 100:13 |
| 39:2,7 40:3 | 21:2 32:18 | **retrocessio...** | 18:12 19:14 | 103:16 |
| **resolutions** | 87:14 102:22 | 87:13,15 | 24:14 25:15 | 104:15 105:6 |
| 77:24 78:3 | 142:25 143:2 | **retrocessio...** | 33:9,12 | 107:1,25 |
| 147:16 | 143:7,13,15 | 87:9 | 34:19 35:5 | 108:21 109:6 |
| **resolve** 69:16 | 144:6,11,16 | **return** 5:5 | 35:21 36:1,4 | 109:25 110:9 |
| 117:18 118:6 | 145:12 | 34:13 57:2 | 36:11,21,25 | 110:21 111:8 |
| **resolved** 65:5 | 148:12,20 | 73:5,14 | 37:14 38:3,9 | 112:8,22 |
| 66:11 80:2 | 223:8 | 79:23 80:7 | 38:15 39:2 | 113:10,18,25 |
| 201:10 | **rest** 32:4 62:13 | 202:20,22 | 42:11 43:15 | 115:19,21,25 |
| **resource** | 76:22 125:19 | **returned** 126:8 | 43:24,25 | 116:5,22 |
| 85:21 86:5 | 132:9 202:25 | 201:18 | 44:13 47:12 | 117:3 119:13 |
| **resources** | **restrictions** | 222:16 | 47:18,19,20 | 123:6,22 |
| 97:2,16 | 145:9,13 | **returns** 61:2 | 47:23 48:8 | 124:15 127:4 |
| **respect** 135:8 | 168:22 | 61:20 72:7 | 48:15,23 | 127:22 129:4 |
| 141:7 144:7 | **restructure** | 72:21 73:2 | 49:4,6,11,12 | 129:10,12 |
| 186:8 | 66:19 | 74:2,4,5,9,23 | 50:10,17,23 | 131:17 134:4 |
| **respond** 10:21 | **restructuring** | 140:23 | 51:1,5,21 | 134:10 135:5 |
| 23:24 52:22 | 187:25 | 141:15 | 57:4 58:3,6 | 137:13 138:7 |
| 111:20 | **result** 37:18 | 144:22 | 58:16,19,24 | 140:9 141:24 |
| 157:15 | 208:15 | **Revenue** 1:4 | 59:23 60:1,7 | 142:1 146:23 |
| **responded** | 225:18 226:5 | 8:5 64:12 | 60:12,23 | 147:6,17 |
| 178:12 | **Results** | 97:8 105:2 | 61:9 62:9 | 148:3 153:18 |
| **responding** | 112:21 | 140:16 | 63:10,17 | 155:5,11 |
| 64:18 179:20 | **retainer** 6:12 | 198:12 209:3 | 64:20 66:12 | 157:5 158:9 |
| 193:19,23 | 7:7 61:3 | 209:5 210:4 | 72:19 73:6 | 159:24 |
| **responds** | 137:12,20 | **review** 7:18 | 73:17,22 | 162:23 163:3 |
| 58:18 178:5 | 138:3 139:13 | 29:5,19,23 | 74:10,14 | 163:6,14,21 |
| **response** 10:5 | 139:14 | 32:18 36:10 | 75:13,22 | 163:25 164:3 |
| 36:20 37:12 | 141:20 | 101:25 102:6 | 76:5 77:1,17 | 165:16 |
| 38:2 51:3,5 | 142:18,24 | 115:9,10,11 | 78:14,22 | 166:25 |
| 58:13 63:17 | 145:8 169:25 | 120:1 141:17 | 79:2,8,12,20 | 168:13,18 |
| 65:16 66:2 | **retaining** | 211:18 235:5 | 80:12,14 | 169:3,20 |
| 124:15 147:5 | 105:25 | **reviewed** | 81:13,24 | 172:15,23 |

Johnson, III, William E.                                July 24, 2023

35

173:20 174:8
174:16,23
175:19,21
176:7,11
177:1,7,13
177:23 178:1
178:3,6,18
179:4,12,15
179:20
181:21 182:1
182:9 183:4
183:15,21
184:2 187:12
188:2 189:9
189:17 191:9
191:10
192:25
193:15,17,20
193:22 194:1
195:5,14
196:2,14,20
198:25
201:14 204:1
212:7 213:15
213:18,21
216:8 217:24
218:23
222:14,19,22
222:24 223:5
224:12,19
225:1,7,12
226:13
228:11,17
**right-hand**
  114:3
**risk** 23:6,8,10
  23:13,16
  24:3,7,15,17
  24:24,24
  27:1,8,8,17
  27:19 42:20
  48:3 50:22
  53:20 56:24
  60:6 61:15

61:16 68:17
69:25 70:3,3
78:25 79:11
79:18 91:21
93:21,22
105:24,25
106:8 132:2
133:9,15,21
153:25 154:7
154:15,19
156:19
157:24 158:7
158:13,14,16
158:17,19
169:11
177:12
183:24
186:17
187:13
190:10 192:8
196:5 206:21
212:11 215:3
215:19
216:11 217:8
217:25 220:3
221:4 228:7
228:13
**risks** 7:4 13:21
  22:24,25
  29:7 42:22
  104:12,18
  136:8,13
  154:23,24
  155:22
  156:14,16
  157:6,8,18
  157:21
  159:15
  160:16,23
  162:8,22
  179:11
  180:13,15
  181:3 182:19
  183:9

**Robin** 15:16
  16:4,11 18:7
  18:16 26:18
  26:20 27:4
  27:25 29:19
  32:9,12,17
  35:23 36:10
  36:13 37:13
  60:11 62:8
  62:13 71:24
  120:24 121:5
  123:6,7
  189:8,10,10
  193:8,15,19
**Robin's** 121:7
**role** 20:17
  22:23 23:5
  23:15 24:2,5
  24:6 25:2,18
  26:10 30:4,6
  32:7 34:21
  39:15 121:18
  121:20
  161:15,19
**Roman** 191:22
**Rosenbach**
  103:19,23,23
  104:1 112:5
  141:9
**Rosenbach's**
  112:4 115:23
  116:3
**Rosenhouse**
  218:22 220:7
  224:15 227:6
**RPR** 1:20
  234:2
**rule** 54:20
**rules** 1:23
  149:2 152:13
**run** 26:8,8
  54:17,22,23
  128:25
**running** 32:11

59:18 217:24
**runs** 90:9
  175:11 183:1

─────────────
**S**
─────────────
**S** 2:1 8:1
**Saffire** 188:5,7
  188:8,11
**sales** 19:16
**sample** 170:16
**San** 45:18
**sanctions**
  208:21 209:1
  209:16 210:1
**satisfied** 29:2
**save** 43:24
  44:16 45:3
  130:20
  170:11
**saved** 45:5
**saving** 169:13
**savings** 182:9
**saw** 34:7
**saying** 50:8
  58:18 66:2
  130:10
  132:20 170:9
  192:12
  194:22 199:4
  209:4
**says** 21:15
  22:3,10 36:4
  36:24 37:3,4
  47:25 51:19
  59:2 60:4,16
  61:7 66:13
  73:20 82:21
  83:6 84:2
  88:6 98:14
  98:14 99:14
  100:14 101:2
  101:4 103:25
  105:8 106:21
  107:2,9,17

108:25 109:7
110:15 111:9
112:23
113:24 114:4
116:15,24
123:12 125:6
125:11
131:19
140:12,13,14
141:24
165:13 166:1
169:10
173:16,25
175:1,23
178:6 188:4
213:25 214:8
214:13
215:14,15,21
216:1 220:6
224:20 226:2
227:13,15
**scheduled**
  230:6
**school** 204:14
  205:16,17,19
  205:19,23
**scope** 103:25
  108:19,19
  109:24 110:3
**scratch** 78:7
  172:4
**screen** 14:24
  15:6 59:17
  78:9 134:11
  140:2,2
**screening**
  70:25
**scroll** 35:11
  36:16 37:11
  37:25 48:6
  48:25 60:9
  60:21 63:7
  73:12 75:5
  81:17 82:4

Johnson, III, William E.                                July 24, 2023

36

86:11,14
87:1 103:4
108:11
109:20
111:23
112:13 123:1
124:12
133:25 168:9
183:25
187:24
193:17
218:17
**scrolled**
131:13
**scrolling** 22:7
22:20 58:12
64:16 105:7
109:4 169:18
174:13
175:19 195:2
195:24
**SE** 2:4
**seal** 235:7
**sec** 85:19
133:20
136:10
**second** 12:16
15:3 27:24
35:16 58:15
60:3 65:8
73:12 75:7
75:19 78:10
85:18 109:14
110:13
125:10 127:5
128:9 134:7
134:18,19
140:7 152:25
153:13,21
164:22,23
179:23 182:2
183:11 185:2
188:3 193:13
194:20

214:19
216:10
218:18
**secretary**
17:21,24
19:23
**section** 42:5
63:25 64:6,7
64:11,12,20
64:23 81:19
86:14 87:2
104:25
139:21
140:17 155:5
155:11,19
156:2 167:13
185:25
197:24
**see** 14:23
21:15 22:1,6
22:7 24:13
37:1,3,19,22
38:7,24
39:20 40:12
40:18 47:5
47:14,21
48:4,12,19
49:16,21,25
50:7,13
51:17 53:9
54:2 58:9
60:19 61:5
61:11 63:22
65:11,22
66:12,15
70:15 73:24
81:14 87:8
94:1,23 95:2
98:2 99:21
100:17
101:11 105:8
106:6,21
107:14,17
108:12,23

109:3 110:17
112:15,17
113:6 114:4
116:15,17
120:16
123:15 124:1
124:10,18
125:5,11
127:10,12
134:18,23
142:7 147:13
155:22
161:10
164:11 165:5
166:1,2,21
170:14 173:5
173:23 175:3
175:6,25
176:20 180:1
183:17
184:11
185:10,19
188:3 194:6
194:10 197:9
214:2,11,17
214:24
215:14 216:1
216:13 220:4
220:11 221:1
223:3,18
224:8,20
225:19 226:1
226:7,16,21
226:22 227:2
227:14,18
228:22
231:15
**seeing** 56:23
90:14 146:1
**seek** 66:24
147:19
**seen** 59:19
108:15
170:20,22

183:10
**selected** 52:24
57:9,14,19
**self** 68:15
**self-dealing**
145:17
**sell** 189:23
192:23 205:4
**selling** 191:3
**seminar** 41:3,9
41:10 42:1
42:10,13,15
**send** 21:19
36:6 102:3
164:14
231:18,19,19
231:23,24
232:2
**sending** 48:1
**sends** 147:5
**sense** 10:2
58:14,19
72:5 153:21
**sent** 22:17
38:15 49:3
49:11 58:2
58:16 102:2
124:14
146:20 163:5
163:16
174:17
181:18
189:12 193:7
193:10,14
195:25
196:11 199:4
**sentence**
32:14 50:11
50:16 60:4
105:7,12,14
108:24
110:14 127:5
127:14
131:19

134:19 164:7
164:22,23
165:18
166:15 175:1
179:23 182:4
183:12,12
189:18
191:10 194:3
215:15
**sentences**
176:14
**separate** 135:5
145:7 150:6
190:1 196:21
**September** 7:6
181:18
**serious** 180:25
**serve** 18:25
19:13 31:9
31:16
**service** 1:4 8:6
61:21 97:8
198:12 210:4
214:8 216:11
216:16
**services** 60:6
61:15,16
62:5 66:25
137:19
138:12
142:10,24,25
180:14
181:24
182:16,25
198:25
199:17
235:11
**serving** 18:20
**set** 1:24 26:8
42:20 53:10
70:6 106:6
106:15 137:4
138:16
156:24 158:4

161:23 190:6
234:4 235:6
**setting** 54:25
215:11
**settle** 67:12
68:12 69:1,2
**settled** 36:25
37:5 70:17
84:6 124:8
125:12
201:17
**settlement**
67:16,19
68:9 69:19
70:19 71:3
**settling** 67:4
67:14
**seven** 119:24
**seven-page**
123:1
**Sewell** 190:7
**share** 59:17
68:21 78:9
84:20,25
87:4 88:7
131:2 140:1
140:5 142:10
221:7
**shareholder**
31:8,11
147:3,22
165:12
**shareholders**
128:22 202:2
**shares** 87:10
**sharing** 140:2
167:24
**sheet** 99:7,12
100:9
**Shepherd** 4:20
6:7 7:9,13,17
17:3 18:2
30:17,21
31:4 35:23

60:10,15,16
62:9,12
131:16,18
189:8,12
191:25 195:5
195:12 196:1
196:12
203:12,16
213:11,20
**Shepherd's**
15:17
**shift** 121:7
**shifting** 120:5
**Shoot** 12:15
**short** 175:1
**shortage**
87:19
**shorter** 167:17
167:17
**shot** 205:21
**shove** 130:7
**show** 101:1
**showed** 84:1
**showing**
112:18
114:18 143:4
**shown** 87:11
88:7
**shows** 173:6
**shut** 45:9
83:19 97:5,7
97:13 156:18
157:6 158:1
159:24
195:10
199:18 202:1
**shutting** 40:25
97:11 159:10
199:8
**sic** 75:5
**sick** 45:10
120:24
203:14,22
**side** 114:3

**sign** 34:1
174:7 209:14
**signaled** 50:21
**signature** 3:7
22:21 74:12
74:13 173:6
233:1,14
**signatures**
39:24
**signed** 74:9
209:9
**Significant**
4:13 36:4
**significantly**
164:17
214:20
**signing** 20:2
**similar** 187:7
**simple** 209:8
**simply** 10:17
32:12 34:2
69:12,14
88:25 102:2
171:12
184:25
**single** 24:17
156:21
**sir** 35:16
229:10
**sister** 19:7
**sitting** 211:10
**situation** 44:7
46:17 128:19
147:16 171:9
210:5
**situations**
69:18 70:17
**six** 79:23 83:3
**six-page** 35:10
**sketch** 185:5
**skin** 52:25
54:12
**Skip** 18:22
**skipping**

150:23
169:22
**slow** 14:22
**slowly** 81:17
**small** 15:22
104:20 154:9
**smaller** 43:4,5
**smelled** 68:4
**so-and-so**
209:4
**somebody**
18:25 39:4
39:23 54:16
59:25 67:20
73:23 86:3
134:4 161:9
186:17
189:25
**son** 230:7
**son-in-law**
182:4 183:6
**soon** 158:3
159:22
**sorry** 14:12
37:24 51:4
52:6 64:4
66:6 73:11
76:15 85:18
86:22 94:19
103:6 105:3
107:5 118:16
132:13,16,19
133:1 140:2
143:5,11
173:21 185:2
212:21
215:14
**sort** 62:14
68:11 138:12
159:18
**sounds** 26:4
**source** 110:1
213:3
**sources**

170:13
**Southern** 1:1
8:7 204:13
**space** 19:21
**speak** 95:3
207:10
**speaking** 10:7
**special** 204:20
**specialty**
206:18
216:25
**specific** 45:25
90:16 120:17
134:24 135:1
**specifically**
94:1 151:19
206:7 224:15
**specifics**
62:17
**spend** 157:1
**spending**
142:20
**spendthrift**
166:17
**spent** 16:6
29:14 83:20
97:5 199:13
207:24
208:15
210:22
**sphere** 215:7
**spill** 182:21
**spoke** 41:9
60:17
**spoken** 229:1
229:9,11
**spread** 190:20
196:5
**St** 176:15,16
229:22
**staff** 27:5 28:1
96:13,14,16
96:17 182:6
**stake** 210:16

Johnson, III, William E.                                          July 24, 2023

38

stamped 100:8
Stanley 34:4
  57:19
Star 6:16
  188:18
Stars 147:10
start 23:10
  59:21 63:13
  72:14 84:21
  94:12 117:13
  143:1 146:19
  163:4 172:10
  178:25
  181:16 184:1
  189:4
started 43:2
  45:6 46:15
  68:9 199:8
starting 35:13
  35:21 47:10
  50:20 80:18
  81:21 205:24
starts 169:23
state 1:20 8:13
  20:23 21:13
  25:22,23
  26:1 38:25
  40:11 49:23
  50:10,21
  73:14 74:1,3
  74:5,9 102:4
  127:5,14
  131:20
  164:23
  165:18 166:6
  176:9,13
  179:22
  181:23 182:3
  183:13 184:5
  197:3 218:2
  233:19,23
  234:1,2,8
stated 105:19
statement 4:8

5:12,16,19
  5:23 6:3
  21:13,16,19
  99:3 101:6
  103:13 104:3
  104:17
  105:15
  108:16
  194:13,15,22
  217:6,11,14
statements
  20:18,22,25
  22:15 100:2
  102:1,6,12
  102:16,25
  104:4 106:11
  108:4 110:7
  114:25 115:5
  115:11,17
  117:16 118:3
  215:1 221:11
  221:13,25
  222:2
states 1:1,4
  8:5,6,11,16
  8:17 36:23
  48:11,14,17
  56:2,5 58:21
  60:3 73:5
  87:8,13
  104:11
  107:14 111:7
  123:13 124:7
  134:19 142:7
  147:10,15
  210:6 214:19
  216:15 221:1
  221:7
stating 52:11
statute 104:24
  104:25 116:2
  208:19
  209:12
stay 177:4

steal 26:16
  34:2,18
step 78:11,11
  196:10
steps 84:17
  157:24
Stipulations
  3:3
stopped 83:18
  198:24 201:3
  205:25
straight
  205:18
strangers
  132:12
strategies
  184:7 185:1
strategy
  184:14
Street 1:22
  8:12 234:7
Strickland
  134:4,5,13
strict 58:14,19
string 4:4,12
  4:16,19 6:7
  6:15,21 7:3,6
  7:9,13
strongly 197:5
structure
  15:13 17:13
  48:3 66:20
  149:7,20
  183:20 188:5
  198:2
structured
  80:23
structures
  185:1
structuring
  148:20
stuck 45:16
study 90:11,17
  90:22

studying 43:2
stuff 32:3
  36:13 76:18
  126:24 131:9
  136:1 137:22
  149:5 176:3
  182:22
  195:20
  212:20
subject 4:5,17
  6:16,19,22
  7:4,7,10,14
  7:21 36:3,4
  42:12 160:23
  163:9 189:14
  189:15 211:3
subjecting
  230:22
subjective
  95:20 133:13
submission
  29:8
submit 177:6
submitted
  30:9 39:11
  67:5 68:10
  69:1 84:18
  85:2 88:3
  95:19 96:3
  120:7,12
  143:18 161:8
  199:24
  224:18
  228:14
submitting
  140:22
  199:23,24
subscribed
  233:20
  234:16
substance
  181:17
substantial
  44:6 169:13

217:25
substantially
  44:7
substantive
  211:9
suddenly
  214:20
sue 67:25
  88:13 92:19
  97:2,17,23
  97:23,24
  122:14 129:9
  160:25
  227:22
sued 28:13
  32:3 92:8
  93:1,1
  120:19 200:1
  207:4,5,5
  208:10 219:2
sufficient
  65:20 90:12
suggested
  56:16 123:24
suggesting
  124:4
suggestion
  40:13 56:19
suggests 51:1
  123:21
suit 67:20,22
  161:1 185:15
Suite 1:22 2:5
  234:7 235:12
suited 154:13
summarize
  205:22
summary
  29:18 66:18
  112:21
supervised
  25:23 26:2
supervision
  234:14

supplement 198:3
support 208:14,20
suppose 97:25
supposed 85:15 137:8 188:11
sure 14:22 21:12 26:6 34:24 46:3,7 47:14 52:20 52:21 53:5,6 54:23 62:2 65:2,7,16 70:7 74:17 75:2 88:10 90:19 95:5 97:15 103:8 105:18 114:16 115:2 116:12 119:7 119:18 132:10 135:14,24 139:6 140:11 143:23 145:12 149:6 157:12,15 158:11 159:17 164:1 202:4 210:2 212:24 215:10 216:23 219:11 230:20
surgeon 174:12
surplus 99:19
surprised 184:23
surprises 89:19

surprisingly 187:7 191:4
suspected 128:19
switch 136:18
switching 41:1 67:2
sworn 8:23 9:2 233:20 234:10,16

**T**

take 9:13 10:6 10:24 64:21 78:9 82:3,25 124:20 130:16 134:7 134:10 139:8 144:25 146:10,15 157:24 167:14 168:21 186:17 187:22 188:11 190:10 196:10 209:17 223:16
taken 1:17 12:22 59:9 97:20 98:20 148:7 171:18 212:2 230:9 234:24
talk 77:19 147:7 169:19 183:19 188:19,23 195:19 210:15
talked 31:24 34:7 56:7

61:23 80:11 93:18 103:22 118:11 132:5 161:9 175:12 203:13 229:22
talking 13:9 43:22 93:20 100:24 117:9 123:17 124:2 125:4 126:8 133:7 169:2 169:5 181:24 187:25 191:14 192:14 195:22 196:20 202:5 231:24
talks 188:17
task 209:6
tax 1:21 2:12 5:4 8:11 22:25 23:7 23:20 24:4,8 25:12,20 53:13,22 61:2,20 62:19,22,24 64:1 72:6,21 73:2,5,14 74:2,4,5,9 139:20 140:9 140:19,22,25 141:15 143:8 143:14,17 144:22 151:13 155:4 155:10,19,19 156:1,4,8,11 166:19 167:21 168:22 169:14

173:17 175:14 177:12,18,19 177:21 182:9 183:13 185:25,25 197:24 200:8 204:13 206:24,25 207:1 208:11 208:18 209:24 210:2 210:6 215:15 215:17 216:8 234:6
tax-qualified 140:16
taxable 152:23 164:18 165:23 166:7 184:5
taxes 170:11 209:11
taxpayer 216:7
taxpayers 214:13,19
technical 181:24 182:6 182:15,25
teed 61:13
telephone 229:2
tell 10:20 71:15 91:20 124:17 130:23 159:6 209:19 210:2 227:19
tells 51:14
tempting 102:20 157:15
ten 26:23 27:6
term 23:11,11

23:18 24:15 25:11 164:24 165:4 197:14
terminated 202:7
termination 14:4 15:14 201:11
terms 126:7
territory 155:24
testified 9:3
testify 9:2 210:19 229:18 230:3 234:10
testifying 9:9
testimony 119:18 230:23 234:15
Texas 1:20,23 8:12 137:21 204:6,12 206:5 233:23 234:1,3,8
thank 8:24 11:14 14:18 96:25 113:15 119:15 140:6 143:4 146:4 148:10 156:7 229:6 230:21 231:12
Thanks 11:23 15:4 29:16 36:17 118:22 139:7 146:11
theirs 53:5
they'd 70:6 95:22 199:24
thing 10:25 27:20,24 38:2 40:25

Johnson, III, William E.                                  July 24, 2023

40

| | | | | |
|---|---|---|---|---|
| 43:22 45:9 | 91:22 93:1,5 | 183:12 185:4 | **threw** 199:25 | 11:6,9 13:11 |
| 46:6 50:2,7 | 93:17 94:8 | 189:6 | **thumbnail** | 164:8 176:23 |
| 53:4 68:3 | 94:14 95:21 | **third-party** | 185:5 | 211:10 229:9 |
| 70:2 119:21 | 101:8,12,16 | 125:22,23 | **time** 8:9 11:17 | 230:22 |
| 142:2 154:23 | 103:20 104:6 | 126:1 221:21 | 12:24 16:7,8 | **today's** 9:24 |
| 158:11 | 119:1,9 | **thirdhand** | 17:12,16 | 10:13,16 |
| 160:23 | 120:15 121:5 | 39:17 | 18:5,8 19:18 | 207:10 |
| 177:14 188:9 | 121:5 122:22 | **Thomas** 19:4 | 22:13 28:2 | 210:20 |
| 202:5 207:3 | 130:6 131:20 | 31:25 | 28:16 29:4 | **told** 83:12 |
| 209:20 210:2 | 132:1 133:8 | **thorough** | 32:23 34:13 | 89:18 92:16 |
| 216:6 218:5 | 137:1 142:2 | 170:22 | 41:11 43:11 | 94:9 96:18 |
| **things** 30:7 | 142:4,21 | **thought** 53:12 | 47:24 49:5 | 97:13 134:19 |
| 42:22 114:14 | 149:8 150:25 | 53:20 56:5 | 55:16 59:11 | 156:18 |
| 123:20 | 150:25 | 56:22 65:1 | 61:24 64:21 | 157:11 158:1 |
| 158:21 171:6 | 151:25 | 66:7 82:24 | 98:22 120:13 | 158:20 159:6 |
| 180:21 181:2 | 155:24 | 87:16 88:12 | 124:20 | 159:7 168:23 |
| 188:20 | 159:13 | 92:9 97:7 | 130:19 137:1 | 171:5 196:6 |
| 191:14 | 162:11,16 | 133:14 149:5 | 139:5 142:20 | 200:6,25 |
| 198:14 | 173:15 | 149:21 | 142:21 146:7 | 211:11 |
| 202:14 | 174:12 | 155:12 | 148:6 152:15 | 223:20 |
| 215:23 216:4 | 178:23 | 212:20 | 154:11 | **Tom** 18:23 |
| **think** 11:12 | 180:15 181:1 | **thousand** | 156:22 | 19:1 |
| 14:1,1 15:17 | 191:3,18,18 | 190:23 | 164:18,19 | **ton** 11:10 |
| 15:19,23 | 191:22 192:7 | **thousands** | 167:17 | 162:21 |
| 18:1,10 19:3 | 194:4 195:7 | 113:3 192:22 | 168:18,21 | 184:22 |
| 31:5,9,21 | 195:13,17 | 196:6 198:8 | 170:8 175:1 | **tons** 137:23 |
| 33:13,13,25 | 198:11 205:5 | 199:14,14 | 175:3,16 | **tools** 150:15 |
| 34:3,4 36:5 | 207:12 | 217:24 | 176:3 184:16 | 150:16 |
| 39:1,3,5 | 211:15 | **three** 29:2,12 | 196:11 203:8 | **top** 35:12 |
| 40:24 42:4 | 212:12,21 | 33:25 35:4 | 203:11,23 | 58:13 60:22 |
| 43:9 44:8 | 221:22 222:4 | 37:10 39:24 | 205:17 | 62:7 64:17 |
| 45:24 46:10 | 223:5,19 | 40:12 57:8 | 207:25 212:1 | 73:21 81:14 |
| 46:11,16 | 228:17 | 57:11,13 | 212:4 227:4 | 123:2 178:22 |
| 47:7 49:9 | 229:22 230:4 | 68:5 69:13 | 227:15 | 179:19 |
| 52:25 53:14 | 230:6,19 | 79:19 112:15 | 229:11 | 181:16 |
| 53:24 55:11 | 231:23 232:6 | 190:23 194:9 | 232:10 | 219:19 |
| 56:7 62:6,24 | **thinking** 51:8 | 203:10 204:8 | 234:18 | **topic** 148:16 |
| 64:4 71:12 | 191:3 | 207:17 | **times** 9:17 | **topics** 41:1 |
| 71:22,23 | **third** 2:4 40:13 | 208:10,14 | 18:15 26:22 | **total** 42:24 |
| 74:16,21 | 44:1 76:4 | **three-page** | 28:13 41:17 | 45:12 99:13 |
| 76:10 80:15 | 109:22 | 59:20 | **timing** 175:16 | 99:15 105:10 |
| 80:16 84:10 | 164:23 | **threshold** | 175:18 178:2 | 106:23 107:9 |
| 85:18 89:20 | 165:14,19 | 98:13 152:15 | **title** 32:25 | 109:1 110:24 |
| 89:24 91:17 | 169:19 182:4 | 152:24 | **today** 8:9 9:10 | 110:25 114:4 |

Johnson, III, William E.

July 24, 2023

41

114:6,6
132:12
151:10
171:19
**totally** 28:21
196:21 215:6
**touch** 209:18
210:8
**touching**
234:11
**toys** 150:22
**Trade** 135:12
**transaction**
84:18
**transactions**
78:11 83:8
**transcribed**
231:16
**transcript**
211:19
231:10 235:5
**transfer** 23:6
23:10,12,16
24:3 78:24
79:10,18
82:18
**transferred**
22:24 25:4
82:13 83:24
83:24 201:13
202:8 212:10
**transferring**
23:13 79:18
**transfers** 34:1
**traveled** 19:18
**treasurer**
19:24
**treatment**
209:20,23
**tremendous**
180:22
**Trevors** 15:16
16:4,11 18:7
18:16 22:9

26:18 27:25
29:19 35:23
37:13,16
60:11 62:8
71:25 123:6
123:8,13
124:15,17
125:1,6
189:8,10,12
193:19,24
196:1,12
**trial** 2:12
229:18
230:25
**tried** 67:12
145:16 158:9
217:9
**trouble** 180:19
**true** 194:13,15
194:22
224:22
233:14
234:15
**truly** 161:16
**Trump** 210:15
**trust** 5:9 16:1
16:2 33:7,11
34:9,11,22
35:1 39:23
57:14 77:6
81:22 83:5
88:4 89:5,8
91:1,6 98:8
126:1,3,5
128:12
150:11,12,24
151:2 166:18
166:19 184:9
222:8,11,13
222:18
**trustee** 38:10
39:23 40:14
123:25 222:7
222:8,11,13

**trustee's** 34:20
**trustees** 33:11
33:23 35:4
37:10 57:8
57:11,13,16
57:23 98:5
124:3,5,23
**trusts** 15:15
15:17 31:9
57:7 149:14
150:19 185:8
223:6
**truth** 9:2,3,3
211:11
234:10,10,11
**truthfully** 9:25
11:5
**try** 10:19,20
14:21 22:11
27:22 35:19
36:18 67:22
79:21,22
122:13
192:15
215:24 229:4
**trying** 28:14
53:19 67:25
68:5 74:16
83:20 92:18
125:21
127:18
134:14 148:1
180:4 199:13
199:15,21
219:21,21
223:25
227:22
**turn** 50:19
86:9 224:22
228:18
**turned** 12:9,14
120:16
126:11
130:21

**twice** 153:14
153:17
**two** 15:18
28:25 29:12
32:14 41:7
41:10 42:21
46:10 68:4
74:24 97:24
104:21 151:5
151:11
152:20 153:8
153:11
163:16
171:10
173:17,25
174:15,22
176:13
187:23 189:9
201:6 207:20
209:25
214:10
215:23 216:3
220:16,24
221:9,15
222:4 223:6
**type** 22:3
41:24 42:2
66:23 154:12
206:22,23
**types** 226:19
**typically** 66:24
147:19
231:21
**typo** 163:19

_____
**U**

**U.S** 1:21 2:13
137:4 234:6
**uh-huh** 16:16
18:13 27:2
29:16 36:2
37:20 38:8
38:16 40:1
40:15 41:16

44:24 45:19
45:24 46:24
48:9,20
49:13 50:18
50:24 51:10
56:11 59:3
62:10 65:15
65:23 66:2
66:16 69:5
73:7,20
75:11,21
88:15 90:10
99:9 103:17
106:5 110:8
113:7 122:3
126:10 138:8
139:15,22
142:16
146:22
148:23
156:17
161:23
164:16
165:25
167:19 169:6
170:2,15
171:4 174:3
176:19
179:18
181:20 185:9
186:15
193:25
196:15,23,25
198:10
201:15,22
213:12,14
214:6,16,23
216:18
218:24 220:5
223:18 225:2
225:13
226:10 230:7
**ultimate**
113:24 114:2

Johnson, III, William E.                                      July 24, 2023

42

114:13
**ultimately**
40:23 44:15
57:3 61:21
83:17 122:7
125:18
126:11 127:1
129:10
150:11
169:13
201:13
223:14
**unaffiliated**
104:13
**undergradu...**
204:7,10
205:15,19
**understand**
9:9,12 10:9
10:22 11:9
13:9 58:25
68:24 90:18
125:2 127:18
131:22
227:12 229:3
**understandi...**
11:5,13,18
37:8 41:24
42:17 64:14
112:25 114:9
161:18
216:25
**understood**
55:14 97:15
**underwriting**
207:8
**unfortunately**
45:8 97:6
**United** 1:1,4
8:5,6,10,16
8:17 210:6
**University**
204:12,13
**unloaded**

45:17
**unnecessarily**
127:15
**unnecessary**
160:13 161:6
214:20
**unpack** 30:7
**unpleasant**
209:6
**Unqualified**
167:20
**Unquestion...**
53:10
**unrelated**
101:20
104:18
**unusual**
154:24
180:15
**upheld** 127:9
**urge** 10:5
**use** 108:3
129:8 163:13
163:18 168:7
197:4 218:3
**usual** 181:1
231:14
**usually** 20:6
29:8 33:4,5,6
41:21,22
67:21 69:9
69:23 71:23
90:8 144:25
145:23
160:20
170:22
171:24,24
222:2 232:3
**utilized** 164:17

___ V ___

**V** 1:3
**vague** 228:3
**valid** 68:13,17

126:11,12
**validity** 29:1
**various** 84:17
165:21 182:9
183:14
**vehicle** 34:15
104:12
**verbal** 65:16
66:2 92:17
**verbally** 10:1
**verdict** 208:13
**verdicts**
208:11
**versus** 8:5
**video** 8:3,3
11:22 12:12
52:7 94:17
94:17,18,21
94:23,25
194:17
**VIDEOCONF...**
1:9,15
**Videographer**
2:23 8:2 12:3
12:9,14,17
12:21,23
59:7,10
98:18,21
148:5,8
211:25 212:3
232:4,9
**VIDEOTAPED**
1:9,15
**Vietnam**
205:21
**view** 130:4
168:3 185:17
**violence** 135:8
135:17
**Virginia** 2:11
8:17 235:12
**virginia.gian...**
2:15
**visited** 26:22

**Vollrath** 2:3
3:6 8:19,19
11:15,17
12:12 14:12
14:18 40:9
52:10 54:7
57:12 79:16
94:11,16,19
94:25 95:5
95:12 96:5
96:23,25
98:17 103:6
105:1,3
106:13 107:3
107:5 108:5
113:14 115:7
115:13 116:7
116:19,23
117:4,19
118:5,14,18
118:23 119:2
119:7,12,15
121:17
128:17 132:7
132:14,20,25
133:2 136:16
136:19 139:4
139:7 140:1
140:6 143:3
146:7,11
149:1 150:1
151:9 153:2
153:4,15
162:15
194:17,21
195:1 202:9
207:18 208:2
211:24
228:20,25
230:11,16,20
231:1,9,11
231:25
234:21
**volume** 105:10

106:23 107:9
109:2 110:16
111:1
**voluntarily**
229:19 230:1
**vulnerable**
185:16

___ W ___

**W-2** 178:9,9
**wait** 123:7
211:16
**waiting** 81:3
**walk** 72:24
78:10 82:14
115:16 163:4
**walked** 142:23
**wall** 130:18
**want** 10:13
11:25 18:20
34:18 53:4
54:17 58:8
61:1,3 78:10
85:23 88:24
92:22 95:21
105:18 116:9
119:2,7
131:3,6
145:25
192:23 209:8
209:15,19
211:10,18
218:8 231:9
231:20 232:4
**wanted** 22:17
41:5 52:25
54:10,12
80:19 92:16
131:10
137:22
153:12
157:19
159:19
192:15 223:1

Johnson, III, William E.                                      July 24, 2023

43

223:3,20
231:7
**wants** 18:24
61:8 183:13
**warned** 225:15
226:2
**warranties**
190:20
192:23 198:8
**warranty**
190:5,17
196:3,7
197:6
**Washington**
2:14 151:24
209:6
**wasn't** 16:13
20:20 21:2
27:18 55:18
57:24 68:2
69:4,25 70:1
70:9 71:22
80:15 90:16
90:21 91:3
92:19,19
93:7 129:6
131:11 132:3
135:15
150:16 161:7
161:17
177:24 223:9
223:21
228:13
**water** 145:25
**waving** 207:13
**way** 12:13 26:8
39:9 58:12
58:24 66:19
67:21 79:13
90:16,21
92:7 106:15
110:23
119:13
126:25

131:10
171:21
191:12
196:24 217:2
**we'll** 11:23
23:9 35:12
61:4 63:13
72:24 77:19
163:3 177:4
181:17
194:19,19
**we're** 12:19,23
36:19 63:14
71:16 98:18
98:21 126:8
133:7 148:5
148:8 168:10
175:2,23
180:12 202:5
203:19
209:21 210:1
212:3 227:20
227:20 232:9
**we've** 210:7,13
229:11
**weather-rela...**
160:20
**WebEx** 2:11
2:12,23,24
11:22 12:7
**Wechsler** 7:20
**week** 229:12
**weekend**
176:23
**weeks** 203:13
**weird** 155:22
**WEJ** 142:8
**Wellness**
164:5
**went** 20:25
41:3,8,11
42:15 46:15
52:7 67:14
85:14,16

130:23 152:6
187:4 192:21
**weren't** 12:17
76:18 88:8
91:6 133:6
202:15
**West** 229:19
**whatsoever**
117:24
208:14
209:11
**when's** 203:8
203:11,23
**whereof** 235:6
**wife** 16:7
**William** 1:10
1:16 8:4 9:1
233:17,21
234:9
**willing** 38:5
229:18
**Wilson** 235:11
**wins** 29:5
**wipeout** 45:12
**wish** 105:19
211:7
**wit** 234:8
**withdraw** 29:8
82:11,18
83:4 209:16
**withheld** 84:4
**withhold**
161:10
**witness** 1:16
8:23 11:18
11:25 12:4,8
27:12 146:3
195:10
230:15,17,24
231:13,19,22
232:1 233:20
234:16,17
235:6
**wonder** 80:9

118:20
**wondering**
61:15 125:15
179:10
220:12
**word** 54:23
**words** 10:7
43:25 69:23
70:9 150:19
171:13 203:3
207:4
**work** 34:6
41:24 42:2,7
43:15 61:4,9
62:15 106:9
109:24
137:16 160:5
160:11 161:4
169:25
183:15 190:8
205:15,22
206:12 222:6
**worked** 44:11
47:22 54:3
59:25 73:25
83:8 144:1
173:1,10,12
179:6 200:4
205:17
206:13,16
221:17,17
222:12
**working** 26:20
26:23 32:22
59:19 70:23
141:3 154:11
173:8 230:10
**works** 73:25
82:23 164:9
182:24
**world** 42:23
135:12
220:12
**worn** 230:18

**worried** 80:3,4
83:9,17
85:17
**worries** 82:14
**worry** 126:11
126:12
**worrying**
126:9
**worst** 180:17
**worth** 111:3
113:1,9,17
185:14
**wouldn't** 67:14
69:15 70:1
84:5 92:22
94:3 106:7
130:25 131:6
207:14
**wrapped** 191:5
**write** 68:7
210:3
**writes** 37:16
**writing** 234:14
**written** 95:23
173:20 174:1
228:5
**wrong** 83:1
180:20,23
181:8 221:12
**wrote** 20:4
63:10,16
89:8 123:11
141:20 144:4

| X |
|---|

**X** 3:1

| Y |
|---|

**y'all** 120:16
209:20
**yeah** 11:16,21
11:23 12:16
15:23 20:15
21:18 22:1
25:14 32:20

Johnson, III, William E.                                      July 24, 2023

44

36:5,5,22
37:2,6,10,15
38:4 39:14
40:19 42:12
43:13 46:1
49:5,17 50:8
50:18 51:2
51:13,24
52:3,10,25
54:13 58:4
59:3 60:8,13
60:16 62:6
64:8,22 65:1
65:4,25
66:16,17
69:2 72:20
72:23 73:25
78:4 81:1,3
82:13 94:19
96:15 100:25
104:6 113:4
113:4 114:17
119:16
122:13
123:10,12
124:2 125:7
125:24
127:11
132:20
136:10
137:15 138:6
140:4 142:2
142:6,9
146:3,18,24
147:4,7,14
147:23 150:4
152:17 153:8
155:9 157:23
158:20
162:16
163:12
164:10,12
165:4 167:9
168:14,17,19

168:25 169:6
172:16 174:9
174:12,21,24
175:16 176:8
176:12 177:8
179:3 180:2
181:22,25
185:11 188:7
188:19
189:10,16,21
191:11 193:9
194:2,24
196:3,13
201:24
203:18
207:13,19
219:20
220:12,20
223:18,19
224:9,13,20
226:1,8
227:9 230:4
230:24
**year** 13:13
16:8,9 22:1
28:8 36:7
39:6 40:3
69:14 73:5
80:3,12,13
80:19,20,25
89:1,19,25
90:6,9 91:5
94:9,15
95:16 99:8
99:16 101:9
104:4 107:19
108:18 109:9
109:14,22,22
111:4,11
112:5,11
117:13
119:19 165:8
165:9,24
167:15 175:7

175:10,15
176:18 177:1
177:7,15,16
177:24,25
199:7 209:11
**years** 17:5
30:11,13
32:14 41:7
41:21 44:23
52:5 64:23
65:1 89:24
92:2 113:1,8
114:17,17,17
119:24
137:18 149:5
149:22 150:9
150:10
151:15
172:21
190:24
203:10,10,10
203:20 204:4
205:2,6,7,8
205:13 208:9
212:19,20
217:18 218:1
219:10
**Yep** 176:2,21
177:2 194:11
**yesterday**
210:22
**York** 33:14
41:22,22
42:6,9 57:15
160:9

_____

**Z**

**zealous**
179:24
**Zeitoune** 6:22
172:14,16,19
172:25 173:6
173:10,12,24
**zero** 100:19

101:2,22
105:25 106:4
115:18
117:15
**zoom** 8:22
15:2 38:23
50:6 58:8
75:15 81:19
146:17

_____

**0**

**000** 113:4
**001848** 75:5
**00546** 21:7
99:2
**00725** 218:14
**00726** 218:19
**00730** 219:25
**0121246**
109:19
**0121247**
110:14
**0121251** 111:6
**0123296** 73:13
**01848** 187:17
**01849** 75:8
**01854** 75:18
**01856** 76:3
**01860** 187:21
**0228077** 139:2
**0281123** 176:5
**0281124**
174:14
**0294487**
178:22
**02965** 189:4
**02967** 189:7
**02968** 193:4
195:4
**02969** 193:19
**02970** 193:6
**03466** 63:7
64:18
**0417519** 81:12

**0417520** 82:3
**0417537** 86:13
**0417552** 86:25
**0460399** 108:9
**0460404** 109:5
**0460411**
111:22
**0460423**
112:14
**05102** 35:8
**05479** 122:25
**05480** 134:2
**05483** 124:14
131:15
**05484** 123:5

_____

**1**

**1** 5:10 60:22
87:11 88:7,7
152:5
**1.2** 104:14,22
152:15,23
153:12 166:7
197:4,17
216:17
**1.2M** 165:24
**1:04** 98:22
**10** 137:18
156:23
202:14
**10,000** 38:6
**10/31/24**
235:10
**10:55** 59:8
**100** 2:4 46:22
48:18 79:10
97:20 110:25
126:13 127:1
171:14
**100,000**
170:11
**103** 5:16
**1057372**
181:16

Henderson Legal Services

Johnson, III, William E.                                                July 24, 2023

45

| | | | | |
|---|---|---|---|---|
| **108** 5:19 | **17.8** 110:16 | 139:3 | **201** 7:13 193:1 | 113:17 |
| **109** 5:23 | 111:1,2 | **195** 6:15 | 193:2 | 114:10 115:5 |
| **1099** 178:9 | **172** 6:21 | 146:12,14 | **2010** 6:22 | 115:18 116:5 |
| **11:18** 59:11 | **178** 7:3 | **196** 6:18 | 172:19 | 117:25 118:3 |
| **1108313** 163:2 | **179** 4:4 14:8 | 162:24,25 | 176:18 | 119:19 |
| **1108314** | 14:11,14,17 | **1969** 205:24 | **2012** 6:16 41:8 | 127:20 128:5 |
| 168:11 | **18** 40:25 | 206:12 | 146:23 147:6 | 128:12 179:4 |
| **111** 6:3 | 203:25 | **197** 6:21 172:7 | **2013** 137:17 | 179:20 193:8 |
| **12** 7:20 81:6 | 223:17 224:3 | 172:8 | **2014** 4:17 5:10 | 193:15,20,24 |
| **12-22-14** 4:21 | **180** 4:8 21:6,8 | **1970** 206:8 | 6:19 7:18 | 196:1,14,19 |
| **12,500** 60:5,17 | 82:24 83:2 | **198** 7:3 178:19 | 13:6 14:3 | **2016** 4:9,24 |
| **12:22** 98:19 | 99:1 | 178:20 | 15:13 17:14 | 5:4 6:12 |
| **120** 48:18 | **181** 4:12 7:6 | **1980** 17:10 | 17:17,25 | 17:14,17,25 |
| **1228885** 59:17 | 35:7,9 | **199** 7:6 181:13 | 18:11 22:2 | 18:12 19:3 |
| **123** 6:7 | **182** 4:16 43:20 | 181:14 | 47:12,18 | 21:17 63:10 |
| **1230003** 213:8 | 47:8 | **1993** 206:9,12 | 49:4,12 51:4 | 63:11,17,18 |
| **123295** 72:13 | **183** 4:19 59:14 | | 51:5 55:4 | 66:15 99:4,8 |
| **1277250** 43:19 | 59:15 | **2** | 58:3,16 | 99:13,16 |
| 47:9 | **184** 4:23 63:4 | **2** 3:2 15:19 | 59:23 60:7 | 101:16,23 |
| **13** 7:10,13 | 63:5 | 38:1 59:21 | 84:12 89:25 | 110:15,24 |
| 112:13 | **185** 5:4 72:10 | 60:10 63:9 | 100:15,20 | 111:2,8,11 |
| 172:21 | 72:11 | 63:14 107:24 | 101:7,23 | 115:19 |
| 187:20 | **186** 5:7 74:19 | 108:23 134:1 | 103:14 104:5 | 117:13,17 |
| **138** 158:16 | 74:20 75:4 | 152:5,6,6,10 | 105:10 | 119:21 |
| **139** 6:11 | 187:20 | 152:10,10 | 106:22 107:1 | 123:18 |
| **14** 4:4 137:17 | **187** 5:9 81:9 | 220:15 | 107:15,19 | 127:21 128:5 |
| 208:24 | 81:10 86:10 | 222:25 | 109:25 | 128:13 187:1 |
| **146** 6:15 | **188** 5:12 99:23 | 234:21 | 112:18,25 | 224:24 |
| **148** 105:10 | 99:25 | **2.27** 113:25 | 113:8 114:10 | **2017** 4:13 6:8 |
| 106:23 | **189** 5:16 7:9 | 117:3 | 115:5,18,25 | 35:24 36:21 |
| **15** 6:11 7:17 | 103:3,8,9 | **2.3** 82:2,9 | 163:6,8 | 37:13 38:3 |
| 123:17 179:5 | **19** 6:22 213:24 | **2:20** 148:6 | 170:11 187:1 | 38:15,22 |
| 187:8 | 224:10 | **2:32** 148:9 | 213:13 | 75:10 112:8 |
| **150** 65:10 97:6 | **190** 5:19 108:8 | **20** 41:19 99:19 | **2015** 4:20 5:14 | 112:11 123:6 |
| 110:24 | 108:10 | 100:18 | 7:3,10,13 | 123:11 |
| 158:16 | 116:15 | 166:20 | 22:1 60:23 | 127:19,20 |
| 187:10 | **191** 5:23 | 202:25 | 73:6 99:16 | 128:4 158:6 |
| **1560** 235:11 | 109:16,17 | **200** 7:9 187:16 | 100:3,10,12 | 158:8 159:25 |
| **159** 109:1 | 116:21 | 189:1,2 | 100:19 | 198:24 199:6 |
| **16** 66:14 187:8 | **192** 6:3 111:22 | **200,000** 147:2 | 101:23 | 203:25 |
| **162** 6:18 | 111:24 | **2001** 135:11 | 108:17 109:1 | **2017-dated** |
| 155:19 156:2 | **193** 6:7 7:13 | **20044** 2:14 | 109:9 112:6 | 112:2 |
| **17** 19:3 101:17 | 122:24 123:3 | **2009** 7:7 | 112:11,18,22 | **2018** 4:5 7:21 |
| 213:24 220:1 | **194** 6:11 139:1 | 181:19 | 112:25 113:8 | 13:14 |

*Henderson Legal Services*

Johnson, III, William E.                                     July 24, 2023

46

| | | | | |
|---|---|---|---|---|
| **202** 2:14 7:17<br>213:7,9<br>235:13<br>**2023** 1:11,18<br>233:21 234:5<br>235:7<br>**203** 7:20<br>218:13,15<br>**21** 4:8 99:19<br>100:18<br>**213** 7:17<br>**218** 7:20<br>**21st** 175:7<br>224:24<br>**22** 224:23<br>**220-4162**<br>235:13<br>**22209** 235:12<br>**228** 3:6<br>**22nd** 123:7<br>**23** 6:8 225:4<br>**231** 3:3<br>**233** 3:7<br>**234** 3:8<br>**24** 1:11<br>**24th** 1:18 8:9<br>234:4<br>**25** 225:9,10<br>**25.6** 113:1,4,9<br>**250,000** 97:6<br>97:20 107:25<br>115:24<br>209:22 210:1<br>**26** 225:10<br>**27th** 38:20<br>235:7<br>**29** 4:13,20<br>6:15 7:3<br>**29th** 179:5<hr>**3**<br>**3** 36:20 63:8<br>123:21<br>**3,000** 48:14,14 | 135:13 142:7<br>**30** 15:15,16<br>17:18 63:22<br>148:17 186:4<br>202:25 205:2<br>212:8,14,14<br>212:22,23<br>213:3 226:16<br>**30-plus** 203:19<br>**307-5892** 2:14<br>**31** 226:23<br>227:14<br>**310,000** 99:13<br>**31st** 4:9 5:13<br>21:17 100:3<br>100:10 112:6<br>**330,000**<br>100:15<br>**33394** 2:5<br>**345,000** 99:15<br>100:12<br>**3467** 63:15<br>**35** 4:12 15:17<br>234:20<br>**36.2** 109:2<br>**36.6** 105:11<br>106:23 107:1<br>107:10<br>**39.6** 166:20<hr>**4**<br>**4** 3:4 4:4 35:22<br>86:21 87:7,8<br>123:24 124:4<br>**4:02** 212:1<br>**4:12** 212:4<br>**4:41** 1:19<br>232:10,11<br>**40** 205:2,6,7,8<br>205:13<br>**400** 1:22<br>190:24 234:7<br>**401(a)** 167:13<br>167:24 | **43** 4:16<br>**462-1200** 2:6<br>**47,000** 113:17<br>**4th** 63:11<hr>**5**<br>**5** 4:17,23 6:19<br>15:12 58:22<br>83:4,9,23<br>84:3,13<br>88:22 89:2,4<br>89:12,18,21<br>90:2,7,25<br>94:10 95:17<br>96:1,1 99:7<br>124:13 126:9<br>127:20 128:5<br>128:12,20<br>132:4 133:11<br>133:23 135:2<br>234:20<br>**5-** 157:2<br>**5,000** 221:22<br>**5:40** 230:12<br>**50** 98:12<br>**54** 204:4 208:9<br>217:18<br>**548-8787**<br>235:13<br>**5729** 235:10<br>**59** 4:19<hr>**6**<br>**6** 100:8 111:5<br>123:4 157:1<br>**6,000** 48:11<br>**600** 190:25<br>**600,000** 157:2<br>**63** 4:23<br>**64** 81:15<br>**6th** 109:4<hr>**7**<br>**715403** 146:13<br>**717** 1:22 8:11 | 234:6<br>**7180** 14:9<br>**72** 5:4<br>**720** 116:10<br>**7238** 2:13<br>**728,000**<br>116:16 118:1<br>**729,000** 109:6<br>**735** 118:1<br>**74** 5:7<br>**75,000** 50:17<br>53:3 57:2,3<br>223:2,10<br>**750** 235:12<hr>**8**<br>**8** 111:8 116:22<br>117:14 124:7<br>125:2,5,11<br>**8,054,000**<br>116:25<br>**8.9** 114:4,9<br>117:3<br>**80** 63:20,21<br>160:18<br>212:19<br>**80-** 218:1<br>**80,000** 142:1<br>**800,000** 116:4<br>118:1<br>**805** 2:5<br>**81** 5:9<br>**831(b)** 63:25<br>64:7,11,12<br>64:20 66:21<br>104:25 105:2<br>139:21<br>140:17 143:9<br>152:5,9,24<br>155:5,11<br>166:8 185:25<br>197:24 198:1<br>203:4<br>**877** 235:13 | **9**<br>**9** 3:5 5:4 7:7<br>**9:21-cv-820...**<br>1:3 8:8<br>233:18<br>**9:28** 1:19 8:10<br>234:5<br>**9:33** 12:22<br>**9:40** 12:22,24<br>**90** 82:9,17<br>**90,000** 160:19<br>218:1<br>**943(d)** 196:21<br>**954** 2:6<br>**99** 5:12 |