1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:21-cv-82056-CIV-CANNON

- - - - - - - - - - - - - - - X

CELIA R. CLARK,                          :

    Plaintiff,                           :

          v.                          :

UNITED STATES OF AMERICA; THE  :

INTERNAL REVENUE SERVICE,       :

    Defendants.                          :

- - - - - - - - - - - - - - - X

              Tuesday, October 18, 2022

          Deposition of CHRISTOPHER JARVIS, a

witness herein, called for examination by counsel for

Defendants in the above-entitled matter, pursuant to

notice, the witness being duly sworn by Stephanie

Barnes, a Notary Public in and for the Commonwealth

of Virginia, taken via Zoom, at 9:05 a.m., Tuesday,

October 18, 2022, and the proceedings being taken

down by Stenotype by Stephanie Barnes, and

transcribed under her direction.

Jarvis, Christopher                                    October 18, 2022

2

```
1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4              DERICK VOLLRATH, ESQ.

5              JULIE LEVIN, ESQ.

6              Marcus Neiman Rashbaum & Pineiro, LLP

7              100 Southeast Third Avenue

8              Suite 805

9              Fort Lauderdale, Florida  33394

10             (954) 462-1200

11             Dvollrath@mnrlawfirm.com

12             Jlevin@mnrlawfirm.com

13

14        On behalf of the Defendants:

15             ERIC ABERG, ESQ.

16             LAUREN DARWITT, ESQ.

17             VIRGINIA GIANNINI, ESQ.

18             LISSA KRYSKA, ESQ.

19             Trial Attorneys, Tax Division

20             U.S. Department of Justice

21             P.O. Box 7238

22             Washington, D.C.  20044

23             (202) 307-5892

24             Eric.m.aberg@usdoj.gov

25             Lauren.a.darwit@usdoj.gov
```

Jarvis, Christopher                              October 18, 2022

3

1            Virginia.giannini2@usdoj.gov

2

3      ALSO PRESENT:

4            CELIA CLARK, Plaintiff

5            EDGAR GENTRY, Plaintiff's Spouse

6            NANCY HOLMSTOCK, Videographer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jarvis, Christopher                          October 18, 2022

4

1                  C O N T E N T S

2   WITNESS                    EXAMINATION BY COUNSEL FOR

3   CHRISTOPHER JARVIS           PLAINTIFF   DEFENDANTS

4       BY MR. ABERG                          6, 285

5       BY MR. VOLLRATH          244, 289

6

7

8

9                  E X H I B I T S

10  UNITED STATES EXHIBIT NO.                      PAGE

11  Exhibit No. 21 - Clark_IRS 0213753             12

12  Exhibit No. 22 - Clark_IRS 0249061             44

13  Exhibit No. 23 - OJM-0012745                   52

14  Exhibit No. 24 - OJM-0011218                   57

15  Exhibit No. 25 - OJM-0011752                   58

16  Exhibit No. 26 - OJM-0011754                   61

17  Exhibit No. 27 - OJM-0012589                   75

18  Exhibit No. 28 - OJM-0012385                   78

19  Exhibit No. 29 - OJM-0012386                   79

20  Exhibit No. 30 - OJM-0012601                   90

21  Exhibit No. 31 - Wilson-083469                 92

22  Exhibit No. 32 - ACR_IRS 0327988              109

23  Exhibit No. 33 - ACR_IRS 0328012              119

24  Exhibit No. 34 - Clark_Prod 0207685           127

25  Exhibit No. 35 - December 2012 Memo           131

Jarvis, Christopher                    October 18, 2022

5

1   Exhibit No. 36 - Wilson-215827                139

2   Exhibit No. 37 - Clark_Prod-0581196           145

3   Exhibit No. 38 - Clark_IRS 2048932            152

4   Exhibit No. 39 - OJM-013983                   154

5   Exhibit No. 40 - OJM-0002930                  158

6   Exhibit No. 41 - Wilson-080301                163

7   Exhibit No. 42 - Clark_Prod-0009159           166

8   Exhibit No. 43 - Clark_Prod-0021021           168

9   Exhibit No. 44 - ACR_IRS 0327992              182

10  Exhibit No. 45 - Wilson-125111                186

11  Exhibit No. 46 - Clark_IRS 0001588            192

12  Exhibit No. 47 - Clark_IRS 001499             196

13  Exhibit No. 48 - Clark_IRS 0002470            199

14  Exhibit No. 49 - Clark_IRS 0001885            202

15  Exhibit No. 50 - Clark_IRS 0002609            207

16  Exhibit No. 51 - Clark_IRS 0002547            210

17  Exhibit No. 52 - Clark_IRS 0003136            213

18  Exhibit No. 53 - Clark_IRS 0002256            217

19  Exhibit No. 54 - Clark_IRS 0003180            222

20  Exhibit No. 55 - Wilson-213168                226

21  Exhibit No. 56 - Clark_IRS 0213774            228

22  Exhibit No. 57 - OJM-0012587                  234

23  Exhibit No. 58 - OJM-0000344                  241

24  PLAINTIFF'S EXHIBIT NO.                       PAGE

25  Exhibit No. 13 - Alabama Lawsuit Opinion      245

Jarvis, Christopher                              October 18, 2022

6

1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  We are on the record.

3      Here begins video deposition of Christopher Jarvis

4      taken in the matter of Celia R. Clark versus United

5      States of America, et al. in the United States

6      District Court Southern District of Florida, Case

7      Number 9:21-cv-82056-CIV-CANNON.

8                    Today's date is October 18, 2022, the time

9      is 8:06 a.m. Central Time.

10                   This deposition is being held

11     remotely by Webex video conferencing.

12                   The court reporter is Stephanie Barnes.

13     Videographer is Nancy Holmstock.  Both are

14     representing on behalf of Henderson Legal Services.

15                   Will Counsel please introduce themselves

16     and state whom they represent starting with the

17     taking attorney followed by the court

18     reporter swearing in the witness.

19                   MR. ABERG:  My name is Eric Aberg.  I'm

20     representing the United States.  Also appearing with

21     me are co-counsel Lauren Darwitt, Virginia Giannini,

22     and Lissa Kryska.

23                   Derick, I think you're muted.

24                   MR. VOLLRATH:  Thanks, Eric.

25                   This is Derick Vollrath for Celia Clark,

Jarvis, Christopher                                          October 18, 2022

7

1    the Plaintiff in this matter.  Also, with me are --

2    is Julie Levine, and Edgar Gentry is observing.

3    Whereupon,

4                     CHRISTOPHER JARVIS,

5    was called as a witness by counsel for Defendants,

6    and having been duly sworn by the Notary Public, was

7    examined and testified as follows:

8                 MR. ABERG:  Thank you, Stephanie.

9                 EXAMINATION BY COUNSEL FOR DEFENDANTS

10   BY MR. ABERG:

11       Q.    And thank you, Mr. Jarvis, for being here

12   today.

13             Just a couple quick preliminary matters.

14   I'll ask first:  Have you ever been deposed before?

15       A.    I have.

16       Q.    That's great.  So I'll -- I'll --

17       A.    Great for you?

18       Q.    -- have a -- wow.

19       A.    Sorry.

20       Q.    Sometimes we deal with witnesses who are

21   completely new to this process and it seems strange.

22   But I think once you've done it enough -- once, you

23   probably get it.  So I'll just breeze through a

24   couple really quick reminders.  So you've just been

25   sworn in by the court reporter.

Jarvis, Christopher                                    October 18, 2022

8

1          Do you understand that you are testifying

2    here today under oath?

3        **A.    I do.**

4        Q.    And the court reporter, before we

5    got started on the record, gave you a couple very

6    nice reminders about making sure the record is clear.

7    I won't reiterate those.  The only one that I think

8    is probably most important for purposes of a Webex

9    deposition like this one is make sure that

10   I'm finished asking my question before you respond.

11          There may be some objections from

12   Mr. Vollrath who's representing Ms. Clark.  Those

13   objections are simply to make a record.  You must

14   still answer my question after his objection's been

15   stated.

16          Let me know if you need a break at any

17   point today.  I'll intend -- I'll plan on taking a

18   few and if, at any point, you feel like you need an

19   extra one or we haven't -- taken a break in a while,

20   just let me know.  I'll only ask that you answer any

21   question that's pending before we break.

22          And the last thing before we get started

23   is, I need to ask whether there's anything that would

24   prevent you from understanding my questions today.

25       **A.    No.**

Jarvis, Christopher                    October 18, 2022

9

1     Q.    Are there any medications that you are

2  taking that might interfere with your ability to

3  understand or answer my questions today?

4     A.    No.

5     Q.    Are you feeling at all sick or unwell?

6     A.    No.

7     Q.    Great.

8           So, Mr. Jarvis, first I want to spend a

9  little bit of time talking about your background and

10  my first question here is:  Where did you go to

11  college and what degree or degrees did you obtain?

12     **A.    I have a degree -- a -- a Bachelor**

13  **of Science and Applied Mathematics from the**

14  **University of Rhode Island, and I have an MBA in**

15  **Finance and Entrepreneurship from UCLA.**

16     Q.    Do you hold any professional

17  certifications?

18     **A.    Certified financial planner certificate.**

19     Q.    That's also called a CFP; correct?

20     **A.    It is.**

21     Q.    And could you just explain briefly what

22  that is?

23     **A.    Let's see, it is an accreditation as**

24  **a financial -- I'm trying to think what the language**

25  **is, I'm sure I'll get it wrong.  But a**

Jarvis, Christopher                                    October 18, 2022

10

 1    certified financial planner represents clients, has

 2    a fiduciary responsibility to them and it's for

 3    issues like investing, retirement, insurance.

 4    Pretty full -- full scope of financial advisory

 5    services.

 6         Q.    Okay.  Can you describe your experience in

 7    the insurance field?

 8         A.    After I graduated from college, I worked

 9    in the actuarial department of three or four

10    different companies.  I interned at Amica, A-M-I-C-A,

11    Mutual.  Then I worked at AIPSO, A-I-P-S-O, which is

12    the assigned risk auto pooling entity that works for

13    the auto industry in the United States.  Then

14    I worked at Liberty Mutual for three years and

15    change, and then worked at Toyota Motors Insurance

16    Services, I think, last in 1996.

17             So that was my background in the actuarial

18    field before going back to business school at UCLA.

19    That's probably the bulk of the insurance industry

20    stuff that took place before -- before getting

21    involved with some of the stuff I'm going -- assume

22    you're going to ask me about.

23         Q.    So you practiced previously as an actuary.

24    How does -- how does someone generally qualify as an

25    actuary?

Jarvis, Christopher                                    October 18, 2022

11

1      A.    Usually, a math or a statistics degree and
2 then a series of professional exams, there's quite a
3 few.  You could either be a life and health actuary
4 or you could be a property and casualty actuary, and
5 I was working on the property and casualty side.
6      Q.    How would you describe the work involved
7 in actuarial practice?
8      A.    Technical, high -- highly quantitative.  I
9 guess I'd leave it at that.
10      Q.    Are there determinations you're generally
11 charged with making as an -- as an actuary?
12      A.    Meaning?
13      Q.    Well, if you had a client who were to
14 engage your services as an actuary, what would you
15 normally be doing for them?
16      A.    Well, the time -- the time that I spent
17 working in the actuarial departments of those three
18 companies I mentioned -- or four companies, I'm
19 employed by an insurance company or an insurance
20 agency, so you're working for -- working for them.
21 So we're doing forecasting, trending, interacting
22 with regulators, preparing filings.  So insurance is
23 a pretty heavily-regulated industry, so a great deal
24 of the time is spent analyzing the rates and rate
25 making.  And then the bulk of the other time is spent

Jarvis, Christopher                                    October 18, 2022

12

1    **interacting with the regulators, the insurance**

2    **departments of -- of various states.**

3        Q.    Do you practice as an actuary currently?

4        **A.    No.**

5        Q.    I'm going to mark our first exhibit for

6    today.  It is the document with Bates number

7    Clark_IRS 0213753.  And, Mr. Jarvis, since I'm only

8    going to ask you about one page in this document, I'm

9    going to share it with you on our screen.

10           (United States Exhibit No. 21 was marked

11           for identification.)

12   BY MR. ABERG:

13       Q.    Do you see my Adobe screen --

14       **A.    I do.**

15       Q.    -- in front of you?

16           Now, this is a document that appears to

17   have been prepared by Clark and Gentry Law Firm, but

18   there's an attachment to it, which is called "About

19   Chris Jarvis," and it appears to be a professional

20   bio for yourself.  And there's some of the things

21   actually that you just described to me presented on

22   here.  And in the third paragraph, which I'll attempt

23   to scan in on for your benefit, there's a reference

24   to Jade Risk.

25       **A.    Yes.**

Jarvis, Christopher                                    October 18, 2022

13

1        Q.     When did you form that company?

2        **A.     Sometime after 2000 -- sometime after**

3  **2010, I would think.  2010, 2011, somewhere in there.**

4        Q.     Did Jade Risk have office space somewhere?

5        **A.     We had office space in South -- South**

6  **Lake, Texas, and then Grapevine, Texas.**

7        Q.     That was -- you reside in -- in South

8  Lake; is that correct?

9        **A.     I reside in South Lake, Texas.  Yes.**

10       Q.     And does Jade Risk still exist today?

11       **A.     No.**

12       Q.     When did you wind it up?

13       **A.     It was sold in 2016.**

14       Q.     And what sort of work did you do through

15  Jade Risk?

16       **A.     Jade Risk did -- was a licensed insurance**

17  **agency or a life and health insurance, it was a**

18  **licensed insurance agency for property casualty**

19  **insurance, and it was a licensed captive manager in**

20  **the State of Oklahoma.**

21       Q.     Who were -- excuse me, I'll ask you a

22  different question.

23              You just mentioned that Jade was a

24  licensed captive manager, and I think the bio notes

25  that Jade offered captive insurance consulting

Jarvis, Christopher                                October 18, 2022

14

1    services.  Can you describe what your work with

2    captive through Jade entailed?

3         A.    Well, as a captive manager if someone

4    were -- well, to have a captive insurance company you

5    need to be represented by a manager.  And so the

6    states -- each state has a different licensing -- I

7    don't want to say accrediting, that wouldn't be

8    correct, but a different licensing structure.  And so

9    if someone -- if a company, business, wanted to

10   create a captive, they needed be represented by a

11   captive manager who would essentially manage the

12   paperwork and the filings and interact with

13   the insurance department on the client's behalf.

14        Q.    Who were the owners of Jade Risk?

15        A.    Myself and Lawrence Anderson.

16        Q.    Who was Lawrence -- Lawrence Anderson?

17        A.    Lawrence Anderson was a client, a friend

18   and an investor, someone who invested in the company.

19   He was not actively involved in the business.

20        Q.    And what -- what was the ownership split

21   between you and he?

22        A.    Originally, I think -- I think it was

23   50/50.

24        Q.    You mentioned that he was a client --

25   Mr. Anderson was a client, what did he engage your

Jarvis, Christopher                           October 18, 2022

15

1   services for?

2        A.    He hired -- he hired me years before

3   this and I handled a bunch of his life insurance for

4   him and his wife.

5        Q.    When you say you handled his

6   life insurance, what did you mean by that?

7        A.    As an insurance agent, did underwriting,

8   recommended policies, reviewed policies,

9   placed insurance policies.

10       Q.    Is that part of the work that you did

11  through Jade Risk as well?

12       A.    Yes.  As a licensed insurance -- insurance

13  agency, we placed insurance for clients.  Yes.

14       Q.    And who, generally speaking, were Jade

15  Risk's clients?

16       A.    Business owners predominantly.  Business

17  owners.  Some physicians.

18       Q.    In the fourth paragraph of this

19  professional bio, there's a reference to OJM Group,

20  what was that?

21       A.    Financial firm that I had prior to -- that

22  I was -- it was originally Jarvis and Mandell, and

23  then we brought in a third partner Jason O'Dell and

24  then formed OJM group.  Somewhere 2000 -- I'm going

25  to guess, '08, '07, somewhere in there.  And that was

Jarvis, Christopher                                    October 18, 2022

16

1    a financial firm -- investment advisory firm,

2    insurance agency in Cincinnati, Ohio.

3         Q.    And were OJM clients predominantly

4    business owners or were there different sorts of

5    clients that you serviced through OJM when you worked

6    there?

7         A.    Probably more -- OJM probably more

8    physicians at the time.

9         Q.    And what services did you provide

10   physicians and other clients at OJM?

11        A.    Financial planning, investment management,

12   insurance.  I'd say those three things.

13        Q.    When did you meet Celia Clark?

14        A.    My best estimate, 1999.

15        Q.    How did you meet her?

16        A.    In OJM, the M was David Mandell,

17   M-A-N-D-E-L-L, he was my partner at Jarvis and

18   Mandell and at OJM.  We were working together in Los

19   Angeles.  He wanted to move back to the East Coast,

20   so he started working for the Law firm of Smith, Buss

21   and Jacobs in, I believe, Westchester, New York.  And

22   while there, he met Celia and then I met Celia

23   through David.

24        Q.    Have you ever met Ms. Clark in person?

25        A.    I have.

Henderson Legal Services, Inc.

Jarvis, Christopher                                October 18, 2022

17

1      Q.      About how many times?

2      **A.      25 or more.**

3      Q.      When you first met her, did you have an

4    understanding about the type of work that she did?

5      **A.      I understood she was a tax attorney.**

6    **Estate planning attorney/tax attorney.**

7      Q.      When -- when was the last time you

8    communicated with Ms. Clark?

9      **A.      It's been years to the best of my**

10   **knowledge.**

11     Q.      After you met Ms. Clark, did you and she

12   begin to work together professionally?

13     **A.      Yes.**

14     Q.      And what kind of projects did you and she

15   work on?

16     **A.      When we had Jarvis and Mandell, I'd say**

17   **the first ten years the predominant amount of work we**

18   **did was referring estate planning clients.  So**

19   **clients who needed wills, trusts, LLCs, legal work**

20   **that she was quite skilled at handling, and our**

21   **clients needed it, so it was a referral basis.  We**

22   **referred clients -- David and I would refer clients**

23   **to Celia.**

24     Q.      So you were working with Mr. Mandell at

25   that time -- and just to make sure I'm understanding,

Jarvis, Christopher                              October 18, 2022

18

1    you and he had clients that you would refer to her

2    for estate planning -- legal services; is that

3    correct?

4         A.    Correct.

5         Q.    And that was beginning in 1999?

6         A.    That's my best guess.

7         Q.    When did you learn that Ms. Clark could

8    provide services related to captive insurance

9    companies?

10        A.    I don't remember.  Well, after '99,

11   somewhere before -- before 2008.  So before '03, '05,

12   it's a guess at this point.

13        Q.    And at some point, did you and she begin

14   working with mutual clients who wanted to form

15   captive insurance companies?

16        A.    What do you mean by work together?

17        Q.    Well, I understand you described your

18   initial arrangement with her was a referral

19   arrangement.  Was that the same arrangement for

20   clients who were interested in captives, would you

21   simply refer clients to her and she would perform the

22   work?

23        A.    Yes.  I would say that's how it -- that's

24   how it started and how it -- how it worked for years.

25        Q.    Okay.  What's your understanding about the

Jarvis, Christopher                                    October 18, 2022

19

1  services that Ms. Clark provided clients -- captive

2  insurance clients that you referred to her?

3       A.    Well, as a tax attorney, she would -- if

4  we had a client who was interested in a captive, we

5  would refer those clients over to -- over to Celia

6  and her firm to look at estate planning, tax, risk

7  management issues.  And then if they wanted, they

8  would engage her separately.  So the law firm was

9  always separate from -- the legal work was

10  always separate from the financial firm.  So once we

11  referred people over, that was -- there were two

12  separate -- I wouldn't say separate and distinct,

13  because they did overlap a little bit, but they were

14  two different planning engagements that a client

15  would have.

16            They'd hire us for financial planning.  If

17  they wanted to talk to us about what they could

18  invest in a captive or what was there, we

19  would handle that discussion.  But as far as tax and

20  legal issues, that was stuff that we -- we would

21  leave to Celia and her team.

22       Q.    Under this referral arrangement, was there

23  sort of a set of services that you understood

24  Ms. Clark would be able to provide each client that

25  you referred to her?

Jarvis, Christopher                          October 18, 2022

20

1        A.    I'd say so.  I've seen engagement letters

2   before.  I can't recall what was in them, but it

3   was -- Celia was always very thorough and my

4   recollection is she had engagement letters and had

5   processes and would work -- you know, would handle

6   the clients in a professional manner.  So my thought

7   was, outside of the investing -- the investing of the

8   funds inside the captive, which I don't believe she

9   had anything to do with, my thought was she would

10  handle it or refer out everything related to the

11  captive at least in the beginning.  And then we would

12  handle the investing or handle the other -- either

13  the investing in the captive or and all of the

14  financial planning outside of the captive.

15       Q.    And are you able to provide any more

16  detail -- doesn't have to be minute detail, but when

17  you say "handle everything for the captive," what --

18  what items would that generally include?

19       A.    Tax advice, creation of ownership

20  structures.  If the client had different -- required

21  different legal entities or wanted different entities

22  to own the captive, interacting with the regulators,

23  handling reinsurance, basically overseeing what the

24  client needed.  So my understanding was that she was

25  quite -- you know, had a wide range of services and

Jarvis, Christopher                                    October 18, 2022

21

1   could be quite -- quite helpful at helping

2   the clients navigate the things that were required to

3   manage an insurance company.

4       Q.    So did she provide management services in

5   addition to the legal services you just described?

6       A.    I don't know that the law firm -- I guess,

7   I don't know the answer.  I became a captive manager

8   much later.  I believe the different -- there were

9   different entities providing captive management

10  services.  I don't believe she was providing

11  captive management services, but I could be wrong.

12      Q.    And I think you've answered this, but did

13  the services that -- well, let me back up.

14            I wanted to clarify something.  You

15  mentioned in one of your answers that her firm was

16  the one handling all these items for the captives --

17  or for the captive clients that you referred to her.

18  What do you mean by "her firm"?  I know you

19  mentioned, I think, Smith, Buss and Jacobs at some

20  point.  But was there a point she changed firms

21  or formed her own firm?

22      A.    Yes.  At one point she left Smith, Buss

23  and Jacobs and formed her firm.

24      Q.    Do you know when about that was?

25      A.    No, I can't -- I can't recall.

Jarvis, Christopher                         October 18, 2022

22

1      Q.    So getting back to where I was headed,

2   it sounds like the services that you and

3   Ms. Clark provided, at least under this initial

4   arrangement where you were referring clients to her,

5   did not overlap much; is that correct?

6      A.    Correct.

7      Q.    How, if at all, did you work together when

8   you referred her clients?

9      **A.    Well, we'd be working with the same -- the**

10  **same people.  So as a financial adviser, whenever I'm**

11  **working with attorneys or accountants, there's a lot**

12  **of interaction and clients often want to get your**

13  **opinion or how might this work.  Sometimes it was**

14  **integration of investments -- if I'm going to invest**

15  **in this over here, what should I invest in over**

16  **there.  So there was some conversations with clients,**

17  **they often wanted to know what the economics might**

18  **look like, but I never handled legal work.**

19          **So you never, you know, never handled**

20  **investments or life insurance, I mean, that**

21  **wasn't -- so I'd say the actual talking to clients,**

22  **lots of overlap.  As far as doing work, we just did**

23  **different things.**

24     Q.    In connection with your work with -- with

25  clients, did you and Ms. Clark discuss the

Jarvis, Christopher                                October 18, 2022

23

 1    requirements that captive insurance companies needed

 2    to meet to satisfy the definition of insurance for

 3    tax purposes?

 4         A.    Sure.

 5         Q.    And as you sit here today, do you have

 6    some familiarity with those requirements?

 7         A.    Yes.

 8         Q.    And in what context did you discuss those

 9    requirements with Ms. Clark?

10         A.    **In what context?**

11         Q.    Well, maybe I can ask a better question.

12    Are there special issues or problems that a small

13    business might face if they were hoping to implement

14    a captive insurance company that satisfies the

15    definition of insurance?

16         A.    **Could you be more specific?  Sorry, Eric,**

17    **I'm trying to get to what your -- what question you**

18    **really want me to answer, I'm not --**

19         Q.    Sure.  If I were a small business owner

20    and I were interested in forming my own captive

21    insurance company, would there be any hurdles that I

22    might have to overcome in order to form a captive

23    that meets this definition of insurance under the

24    revenue code?

25         A.    **Sure.  You -- you have all the regulatory**

Jarvis, Christopher                                    October 18, 2022

24

1   challenges and the costs associated with it.  So it's

2   not an inexpensive proposition for someone to create

3   an insurance company.  It's relatively complicated in

4   dealing with the insurance departments.  And to be an

5   insurance company, there has to be risk shifting and

6   risk distribution and that requires people to either

7   understand insurance or hire people who understand

8   insurance to help them manage those -- those

9   challenges.

10       Q.    So you mentioned risk distribution, what's

11  your understanding of that term generally?

12       A.    My understanding of risk distribution is

13  that individual insureds are at risk for losses

14  associated with other people's risks.

15       Q.    So it's correct to say then that part

16  of -- part of what you need to do to satisfy this

17  definition of insurance is, your captive needs to

18  actually take on some risks of unrelated persons or

19  parties; is that right?

20       A.    Yes.

21       Q.    In your experience dealing with clients

22  who are thinking about forming a captive, were

23  they sometimes concerned about the prospect of

24  assuming risks of unrelated parties?

25       A.    Yes.

Jarvis, Christopher                                    October 18, 2022

25

1       Q.      The -- the client does not necessarily
2  control whether an unrelated person or entity makes a
3  claim against an insurance policy; right?  Is that
4  the problem?
5       A.      I think the challenge -- the challenge
6  with any -- well, I shouldn't say with any.  A
7  challenge with insurance and risk distribution is --
8  is always difficult to manage if -- if the person or
9  persons don't understand the risks that they're
10 taking on.  So everything we do in business or in
11 life has some form of risk.  When you become
12 comfortable or you understand those risks, then they
13 become a little more manageable.
14             If you don't understand them, clients get
15 very -- or everybody gets -- I shouldn't say
16 everybody.  It's not uncommon for people to be
17 hesitant when they don't understand the risk, the
18 significance of the risk, or how it might affect
19 them.  So, at first, I would say most people are
20 rather concerned or curious as to -- as to what any
21 risk distribution model might look like and how it
22 could affect them.
23      Q.      Mm-hmm.  That's helpful and I appreciate
24 that background.
25             If you were discussing the possibility of

Jarvis, Christopher                                October 18, 2022

26

1   forming a captive with a client, but they balked at

2   taking on the -- at the risk distribution issue,

3   taking on unrelated risks, what would you tell them?

4   Is there anything you could say that might make them

5   more comfortable?

6        A.    Well, one of the -- if people aren't -- if

7   people aren't comfortable taking on someone else's

8   risks, then maybe insurance isn't a good idea for

9   them.

10            So some of this is if you want to take --

11   clients who are looking to form captives are doing so

12   because they believe that commercial insurance is too

13   expensive for them or they feel like they're insuring

14   things at a very low -- very low probability in the

15   insurance world is called frequency.  So low

16   frequency/high severity doesn't happen very often,

17   but when it does, it's really big, that people often

18   don't insure those things because they just don't

19   happen that often.  And they feel like

20   they're throwing their money away to an insurance

21   company to transfer the risk to them.  So they like

22   the coverage and they might enjoy the fact of putting

23   money aside for that potential claim when it happens,

24   but they really don't think it's -- they think it's a

25   profitable business and they'd rather keep the profit

Jarvis, Christopher                          October 18, 2022

27

1    for themselves.

2              And so if part of that, the toll to pay to

3    drive on that road is that you have to assume risks

4    of other people, then if people aren't comfortable

5    with that, then my thought is there's no free lunch.

6    You can't get the benefits unless you're willing

7    to -- you want with the benefits of insurance, but if

8    you're not willing to take the risks, then maybe it's

9    not a good idea.

10        Q.    In the insurance industry, is there a

11   certain amount of losses that would be considered

12   reasonable to expect for an insurer?

13        A.    That's going to depend by -- by line of

14   insurance.  So I get that question a lot over the

15   last 20 years, and it just -- it just depends.  Some

16   coverages have really, really high loss ratios and

17   you might find in a high, say in medical malpractice,

18   you might find loss ratios at 90 percent.

19        Q.    Mm-hmm.

20        A.    But the company is losing a ton of money

21   because their expenses are 40 or 50 percent, but they

22   hold the money for ten years until the case goes to

23   trial and they make the money on the investments.

24   You have some other risks, where you might find ten

25   percent loss ratios are common.

Jarvis, Christopher                    October 18, 2022

28

1          So it could be 10, it could be 90.  It

2     depends on the risk.  It really does dramatically

3     change by line of coverage.  So is there a normal

4     loss ratio in insurance?  No.  I wouldn't say that

5     that's -- it's really hard to say, the liability

6     lines are way different than the property lines.

7          Q.    Mm-hmm.  And maybe that's a good place to

8     differentiate.  When you say the liability lines are

9     different than the property lines, can you describe

10    the difference between those two types of lines?

11         A.    Yeah.  So think of your auto insurance.

12    If you hit a tree, the damage is to your car or if

13    it's somebody's tree, the damage you could have done

14    is to their tree or you drive into somebody's fence,

15    you've damaged the fence.  Liability line is you hit

16    the fence and I was on the other side of the fence

17    and now you hit me.  And so hitting the fence is a

18    pretty easy claim to adjust, you know what it costs

19    and those tend to have very short periods of time

20    for -- to reconcile.  So you'll see property damage

21    is usually resolved in a very short amount of time,

22    90 days.  Could be less.

23         Liability lines, when there's a lawsuit

24    involved, I don't know when this was filed and I

25    don't know when it'll resolve, but I'm going

Jarvis, Christopher                                    October 18, 2022

29

1    to assume it's a whole lot longer than 90 days.  So

2    when someone sues someone for something because

3    there's bodily injury, those things take -- they can

4    take a year or more for somebody to bring suit.  They

5    can take a while to get to -- to negotiate a

6    settlement or to get to trial.  So liability lines

7    tend to have much higher loss ratios and the

8    money tends to sit in reserves and it's earning money

9    over time.  So the target -- the target loss ratios

10   are much higher on liability lines than they are on

11   property lines.

12            THE COURT REPORTER:  And don't forget to

13   slow down, please.

14            THE WITNESS:  I'm sorry.

15            But I would add that it also varies based

16   on how frequently -- how frequently a loss is

17   expected.  So, you know, medical malpractice can be a

18   really -- you may see some massive volatility because

19   one bad -- bad baby or misdiagnosis claim or

20   something could have an enormous loss that's really

21   high and it happens infrequently, but it's a really

22   high number.  So you have a whole lot of years with

23   really low loss ratios and then you have one spike

24   that's crazy high.

25   BY MR. ABERG:

Jarvis, Christopher                                    October 18, 2022

30

1       Q.     Are you aware of whether Ms. Clark told

2    your mutual clients that risk distribution was an

3    important thing to achieve?

4       **A.     I wasn't in conversations with her and her**

5    **clients, but I would be surprised if she hadn't**

6    **explained that that was pretty important.**

7       Q.     Did you and she ever discuss the risk

8    distribution issue that small business clients faced

9    when forming a captive?

10      **A.     In what -- in what way, Eric?**

11      Q.     Well, were you and she generally in

12   agreement that a captive should try to achieve risk

13   distribution?

14      **A.     Yes.  I would say so.**

15      Q.     Were you and she in agreement about the

16   level or extent of risk distribution that ought to be

17   sought or achieved?

18      **A.     I'd say we had a number of conversations.**

19   **I'd say in general we were -- we were in agreement.**

20   **I'd say the place that -- the place that we**

21   **might have differed on that is the how to get there.**

22   **And she's a tax expert and, to the best of my**

23   **knowledge, never worked for an insurance company.  At**

24   **least not -- not internally the way that I did.  So I**

25   **had ideas about insurance that I thought might be**

Jarvis, Christopher                                   October 18, 2022

31

1    interesting, but they may or may not have been --

2    they may or may not have been feasible to handle.

3              Some lines of insurance are very time

4    consuming.  Let's say health insurance, if

5    you're putting a captive together for a company

6    that's relatively small, let's say a couple hundred

7    of employees, if you're going to take over all

8    the claims management of the health insurance, that

9    would require you to hire a couple of people, which a

10   company may or may not want to do.

11       Q.    Interesting.  So you're -- you're

12   suggesting that you had different ideas about how to

13   effectuate risk distribution, you might have done it

14   through different types of insurance or something

15   like that?

16       A.    I would say we had brainstorming

17   conversations prior to -- prior to working together,

18   and if we hadn't had those brainstorming sessions

19   before Jade Re, I don't think we would have ended up

20   working together.  So we obviously talked about that,

21   what -- what it looked like, how to provide insurance

22   coverage in ways that would save clients money and

23   help their businesses, while also paying attention to

24   the tax issues that were important.

25       Q.    Mm-hmm.  I just want to make sure I heard

Jarvis, Christopher                                    October 18, 2022

32

1    you right.  Did you say you had those brainstorming

2    sessions and you don't think you would have ended up

3    working together on Jade Re if you hadn't had those

4    discussions beforehand?  Is that what you said?

5         **A.    Yes.**

6         Q.    Is it correct that to be respected as an

7    insurance company for -- for tax purposes, a captive

8    generally needs to be operated like a real insurance

9    company?

10        **A.    I guess the key term there is operated.**

11   **So I'm not sure what -- what that means.**

12        Q.    I'm happy to clarify.  I think

13   by "operated," I meant according to some standards or

14   practices that would be commonly accepted in the

15   insurance industry.

16        **A.    Yeah.  I think that's part of the**

17   **insurance department's job is -- that's why you file**

18   **regulatory forms every year and you have to interact,**

19   **so there are licensing or regulatory agencies that**

20   **give you guidelines that you have to follow.  So part**

21   **of being a captive manager is making sure that you're**

22   **representing the clients and filing everything timely**

23   **and accurately so that the regulators can do their**

24   **job to see whether or not you're handling it right.**

25              **So, yeah, I think that's part of why the**

Jarvis, Christopher                                    October 18, 2022

33

1   insurance -- and that was a big part of us -- that

2   was a big part of the involvement when we worked more

3   closely together was working with the regulators in

4   Oklahoma and working closely with them to make sure

5   we were doing everything that they asked us to do.

6       Q.    Did many of your clients who formed

7   captives have any experience operating an insurance

8   company?

9       A.    No.

10      Q.    And then, how did they except to be able

11  to operate their captive in a way that comported with

12  normal insurance practices?

13      A.    For the people who choose to use -- to

14  create and own a captive, the key -- my understanding

15  or my belief, I guess, is that they were excepting

16  the captive manager to help them.  So this was an

17  outsourced -- this was an outsourced management

18  function that was not inexpensive, and that --

19  that -- I don't think any of them truly wanted to run

20  insurance companies, though I'm not a psychologist.

21  But I -- if they did, they would probably have

22  been running insurance companies before we met them.

23      Q.    At the time that you were working with

24  Ms. Clark, let's say when you first started work with

25  her under this referral arrangement, did you believe

Jarvis, Christopher                              October 18, 2022

34

1    that there was a type of client that was ideally

2    suited for organizing a captive?

3        A.    I don't know if I knew -- I don't know if

4    I knew anything in the beginning.  You know, I

5    don't -- I don't know -- I think that comes after --

6    over time.  I would generally say, a business

7    owner -- someone who owns a business, someone who has

8    a significant -- significant operation that has a lot

9    of risk, you know, that's the best I can --

10       Q.    Are there any other factors you'd

11   consider, apart from operating a business with risks,

12   in determining whether someone would be a good

13   candidate for a captive?

14       A.    Business owner, size of business, amount

15   of risk.  I think that's -- that's a lot right there.

16       Q.    What do you mean by size of business?

17       A.    A larger business -- the size of business

18   is probably a proxy for risk in that someone with a

19   $100,000,000 dollar revenue company, I think it's

20   safe to say they wouldn't be doing it with one

21   location, three employees, and no risk.  So the more

22   -- the more money someone is making, the greater

23   their revenues, the greater their sales.  Again, it's

24   not always the case, but it's probably a proxy for

25   number of employees, number of locations, number of

Jarvis, Christopher                                    October 18, 2022

35

1    exposure points if you will.

2         Q.    Okay.  In explaining a captive insurance

3    company to a client who's considering it, would you

4    explain the potential tax benefits of the

5    arrangement?

6         A.    Yes.

7         Q.    What were the potential tax benefits that

8    you would have identified for a client who was

9    considering forming a captive?

10        A.    I would say that -- I would tell a

11   business owner that if they created an insurance

12   company that satisfied all of the requirements

13   necessary, that their operating business would

14   receive a tax deduction for the premiums paid to

15   their captive, the same way they would receive a

16   deduction if they paid the premiums to Geico or

17   Liberty Mutual or someone else.  And then the money

18   would be sitting inside the captive or a larger

19   amount of money would grow in reserve to

20   handle future claims.

21             And if they were fortunate enough to be in

22   business for five years, ten years, 20 years,

23   whatever it was, and they had money left over, then

24   they may see some tax benefit in the end when they

25   close their company down and the retained earnings in

Jarvis, Christopher                     October 18, 2022

36

1    the captive might come out as capital gains at some

2    point.  So, in some ways, a bit of -- a bit of a

3    Christmas club in that you put money away and it's

4    there in case you need it, so you have it.  But if

5    you're fortunate enough to manage your risks better

6    than what the insurance industry would predict, you

7    might see some benefits on the back end.

8         Q.    What do you mean when you say manage your

9    risks better, how can you --

10        A.    Sure.

11        Q.    -- how would you do that compared to a

12   commercial insurer?

13        A.    Well, the actuarial departments of

14   insurance companies work off averages and everything

15   works to the average.  If the average -- there's a

16   reason why 16-year-old male drivers have insurance

17   premiums that are much higher than 45-year-old female

18   drivers.  The risk profile is very, very different.

19   That doesn't mean that only 16-year-old males get in

20   accidents and it doesn't mean that 45-year-old

21   females never get in accidents.  So I use that

22   example, because it's just -- it's my household.

23            But the -- the idea of if -- if it would

24   cost you a certain amount to have insurance on

25   whatever the risk was, and that was the rate that

Jarvis, Christopher                    October 18, 2022

37

1    Geico, Liberty Mutual or your -- your Chubb or Hub

2    agent or broker found for you, if that was the

3    average, but you felt that workers' comp was really

4    expensive or you found that certain liability

5    coverage was really expensive because there's been a

6    rash of employee lawsuits against employers or

7    customer lawsuits against manufacturers, but you

8    really felt that your HR practices were better, you

9    felt that you had closer relationships with your

10   employees, you felt like your R&D and your

11   manufacturing was just better than everybody else,

12   and you just didn't want to get lumped, then it might

13   make a lot of sense.

14           I say the example that -- another example

15   I would use is let's say the insurance industry

16   treats U.S. postal workers the same way it

17   treats employees at FedEx because they're all

18   involved in shipping.  But maybe people who work for

19   a government agency might -- maybe they handled time

20   off and workers' comp a little differently than

21   people who work for a publicly traded company and

22   have some type of stock options.  Maybe.

23           So this was all a question for the -- this

24   was a question for business owners:  Do you believe

25   that you're significantly better than average at

Jarvis, Christopher                          October 18, 2022

38

1    handling this risk that other companies or actuaries

2    would say it should cost you this much.  Do you think

3    your results are going to be much better?  And if you

4    think they're going to be much better, then you

5    should consider a captive.  If you think they're

6    going to be much worse, then you should absolutely

7    insure those with somebody else.

8               THE COURT REPORTER:  And I would remind

9    you to slow down a bit, please.

10              MR. ABERG:  I'll -- sorry.  Thanks,

11   Stephanie.

12   BY MR. ABERG:

13        Q.    That makes a lot of sense.  And -- so I

14   lost my train of thought.  I think what I was going

15   to try to clarify there is, you mean that if you were

16   a business owner and you believed that your practices

17   were better and so your risk was really less -- your

18   risk for some particular liability was less than the

19   average, you might hope that you could insure

20   yourself and pay less for insuring that particular

21   liability; is that right?

22        A.    Yes.

23        Q.    In explaining -- again, moving back to

24   our -- if you were explaining a captive to a client

25   who was considering it, did you explain the potential

Jarvis, Christopher                                    October 18, 2022

39

1    risks of owning a captive?

2         A.    Did I explain the risks?  I'm not sure

3    which risks you're talking about.

4         Q.    Well, are there risks of forming and

5    owning your own captive?

6         A.    Sure.  I mean, the first is it's -- it's

7    not inexpensive.  So it's an expensive proposition to

8    create an insurance company, hire experts to run it.

9    And so you could spend that money hoping to take

10   advantage of your improved loss ratios better --

11   better than the average.  But there's a chance that

12   you may have experience that's worse, in which case,

13   you could lose all your premiums and lose some

14   capitalization.  And then you end up paying more for

15   insurance than if you had paid Liberty Mutual, Chubb,

16   Geico.  So that -- that's one.

17        The second is risk -- is in risk

18   distribution.  It's possible that in this risk

19   distribution model, other people that you share risks

20   with could have substantial losses and you could lose

21   a significant amount of your premium or

22   capitalization paying claims for other people.  So,

23   you know, both of those risks were risks that people

24   had to be comfortable with.

25        Q.    Can you explain how the risk that you have

Jarvis, Christopher                                      October 18, 2022

40

1    to pay out your premiums on a claim -- well, I

2    understand the risk distribution side of that.  If

3    it's someone's else claim that you've insured, you've

4    lost your money.  But if it's a policy that you've

5    insured yourself and you file a claim to your own

6    captive, is there really a loss involved there?

7    Aren't you just sort of paying your money back to

8    yourself?

9         A.    If --

10        Q.    I was just trying to understand.  Maybe

11   there's something I'm missing.  I just want to make

12   sure I understand.

13        A.    Well, you -- let's say you pay -- if it

14   costs $100,000 a year to insure yourself with Liberty

15   Mutual or some type of -- let's say it's a product

16   liability lawsuit -- product liability and you make

17   these coffee mugs and it costs you $100,000 because

18   Liberty Mutual thinks that the coffee mugs will be

19   defective at a certain rate, and people will spill

20   coffee and sue you, that's what it costs.  And you

21   pay a significant amount of money to create your

22   insurance company and you put the $100,000 premium

23   into your own insurance company, absent pooling,

24   let's eliminate the -- the distribution from your

25   side.  If you had a $100,000 of losses, you would

Jarvis, Christopher                          October 18, 2022

41

1   lose -- well, you could have $1,000,000 of losses

2   because the $100,000 of premium to Liberty Mutual may

3   have insured you for a $1,000,000 or $2,000,000 of

4   coverage.

5        Q.    Okay.

6        A.    And you have to capitalize these companies

7   with some capital to get a license.  So in that

8   situation, you could lose your capital, lose the

9   premium you paid and you're out the fees that you

10  used to pay this captive.  So that's absent pooling,

11  if you just keep that out.  So if you had really bad

12  results, it wouldn't be ideal.  I mean, there's

13  certainly an economic risk.  I mean, you're -- you're

14  in business as an insurance company, you absolutely

15  have -- there's certainly a downside to doing a

16  captive.  It's far from a risk-free situation.

17       Q.    Was the possibility of an IRS audit a risk

18  associated with forming your own captive?

19       A.    Sure.

20       Q.    And what do you tell clients who ask about

21  that type of risk?

22       A.    Certainly talk to your tax attorney.  Talk

23  to your accountant.  There was -- there had been

24  cases, some that were won, some that were lost by a

25  service, some that were won, some that were lost

Jarvis, Christopher                                  October 18, 2022

42

1    by -- by taxpayers.  And as far as I know, every

2    client who did -- who pursued a captive, whether they

3    implemented one or not, was represented by another

4    accountant or other counsel that they had had before.

5    So everyone I know who considered it, brought as many

6    professionals as they could to the table to say what

7    do you think about this.

8              So I'm -- you know, not an attorney or an

9    accountant, I'm not an enrolled agent, I don't give

10   tax device.  But I would absolutely advise them to

11   get their -- get their advisers together, look at the

12   research, talk to people who do this and decide

13   whether the risk is worth it.

14       Q.    Well, did you feel that you needed to have

15   any understanding about the tax risk involved when

16   you were advising your clients about these types of

17   deal?

18       A.    Sure.  I talked to a lot of people

19   about -- before I referred anybody to -- to Celia, I

20   had already spoken with and actually done some work

21   with maybe three or five other captive managers at

22   different times.  So they were people who -- there

23   were a lot of people doing this, there were a lot of

24   attorneys and accountants commenting on this, and so

25   this was -- sure, I definitely asked around.

Jarvis, Christopher                                October 18, 2022

43

1      Q.    Did you ever discuss audit risk with

2  Ms. Clark?

3      **A.    Did I ever discuss audit risk?  I can't**

4  **remember a specific conversation about it, but I**

5  **would be -- but I'm sure we discussed the fact**

6  **that -- the fact that audit risk would be a**

7  **significant concern of a lot of people.  Not that**

8  **getting audited is a terrible thing, but it's time**

9  **consuming and I would presume that most business**

10 **owners would want to avoid it if they could.**

11     Q.    And there's also the possibility that they

12 might receive an adverse ruling from the IRS; right?

13     **A.    Sure.**

14     Q.    Do you have an understanding about the

15 steps that were taken by Ms. Clark to try and address

16 that risk for the clients that you referred to her?

17     **A.    You'd have to be more specific.**

18     Q.    Well, maybe I'll ask -- start with a more

19 basic question.

20           Are you aware whether Ms. Clark viewed

21 audit risk as -- as a risk that was faced by your

22 clients?

23           THE COURT REPORTER:  I'm sorry, can you

24 repeat the question?  Are you aware -- I missed part.

25           MR. ABERG:  Yeah, I apologize.  I think

Jarvis, Christopher                                    October 18, 2022

44

1  these window washers are going to be done in just a

2  second.

3  BY MR. ABERG:

4      Q.    And I don't want to -- we'll take a break

5  shortly, but I don't want to -- I don't want to stop

6  now, because I know that everyone's time is valuable

7  here.  So we're going to try and soldier through

8  despite the -- the bumps we're -- we're catching on

9  the audio.

10          You know what, I'm -- I'm just going to

11  move on.  I'm not going to re-ask that question.  So

12  you can strike it or however you want to handle it on

13  the record.

14          We'll pull up our second exhibit today and

15  I realize now I didn't number, I don't think, the

16  first exhibit we marked, which included that page of

17  Mr. Jarvis' professional bio.  That should have

18  been United States Exhibit 21 just for the record.

19          We're going to mark United States Exhibit

20  22, which has the Bates number Clark_IRS 0249061.

21          (United States Exhibit No. 22 was marked

22          for identification.)

23  BY MR. ABERG:

24      Q.    And just so everyone is aware --

25          MR. VOLLRATH:  Excuse me.

Jarvis, Christopher                                    October 18, 2022

45

1           MR. ABERG:  Go ahead, Derick.

2           MR. VOLLRATH:  I'm sorry, Eric.  Can you

3    give me the Bates number again?

4           MR. ABERG:  Sure.  And Virginia is -- oh,

5    I said it wrong, I'm sorry.  It's Clark_IRS 0249016

6    and I'm going to pull that up.

7    BY MR. ABERG:

8       Q.    Okay.  Mr. Jarvis, let me know if when I'm

9    sharing my screen with you you have difficulty

10   reading anything.  I can see these reproductions,

11   which I think are scanned paper files, might be a

12   little hard to read.  So if at any point you have

13   difficulty with that, let me know.

14      **A.    Okay.**

15      Q.    You see the first page of this document,

16   Exhibit 22, is an e-mail dated in April of 2013 from

17   you to someone named Christine Edwards.

18      **A.    Yes.**

19      Q.    And you write, "I sent this to Celia

20   earlier today, I know she's busy, but I have to get

21   this out today to confirm a huge meeting for me on

22   Monday."

23           So it appears that this e-mail was to

24   Christine Edwards who was someone who worked with

25   Ms. Clark.  Did you ever meet Christine Edwards?

Jarvis, Christopher                          October 18, 2022

46

1          A.    Yes.

2          Q.    Do you know what position she held in Ms.

3   Clark's office?

4          A.    I believe she was a paralegal.

5          Q.    And in this e-mail you mentioned the

6   opportunity to meet -- oh, I'm sorry.   In the

7   earlier e-mail that you were following up on, you

8   mentioned a chance to meet with a wealthy family's

9   adviser and you note that they could open the doors

10  to more captives.   And you're asking Ms. Clark to

11  review an article that you prepared for the adviser.

12  Correct?

13         A.    That's what it looks like, yes.

14         Q.    And we're going to skip to page 3 of this

15  document.   And on Jade Risk letterhead and it appears

16  to be an article that's titled, "Avoiding the

17  70 Percent Tax on Affluent Families."   Did you draft

18  this article?

19         A.    Yes.

20         Q.    And to make sure I have this correct, did

21  you prepare this article to help explain the benefits

22  of a captive insurance company to a potential

23  client's adviser?

24         A.    Yes.

25         Q.    And why did you ask Ms. Clark to review it

Jarvis, Christopher                                    October 18, 2022

47

1    for you?

2         A.    She's a tax attorney and I wanted to see

3    if there were any things that were technically

4    incorrect.

5         Q.    And in this article under the heading, "An

6    Alternative Strategy for the Affluent," you write

7    that -- you write about the benefits of owning a

8    family insurance company or FIC.  Is a FIC a type of

9    captive insurance company?

10        A.    Yeah.  I don't remember -- I don't

11   remember ever using FIC, but I would assume that's

12   what that means.

13        Q.    And you write that integrating a family

14   insurance company into estate planning is a very

15   powerful opportunity for affluent families who have

16   outgrown traditional estate planning strategies.  And

17   my question is:  Is it correct that forming a captive

18   can be used to benefit families in estate planning?

19        A.    Yes.

20        Q.    In what ways?

21        A.    Unlike -- well, not dissimilarly to how a

22   lot of wealthy families that I've worked with

23   have operated, they give their kids opportunities to

24   make money.  So lending money at a favorable rate to

25   your kids to help them get started in business is a

Jarvis, Christopher                          October 18, 2022

48

1    way to help them generate wealth.  So the idea in

2    this article is that if you believe that you're going

3    to have better than expected loss ratios, why not let

4    your kids own the insurance company.  And if that

5    happens, then not only would you have some of the

6    potential tax benefits that were discussed earlier go

7    to your kids, but you'd also have an estate planning

8    benefit because the money the kids have earned is

9    not -- is not considered a gift.  So the idea was

10   that if you thought your insurance company was going

11   to be successful and profitable, why not have your

12   kids own it.

13        Q.    And would there also be potential estate

14   tax savings that could be gained if the captive was

15   successful in the way you've described?

16        A.    Sure.

17        Q.    I guess that's what -- I guess that's what

18   you meant when you said it would not be considered a

19   gift --

20        A.    Correct.

21        Q.    -- is that correct?

22        A.    Yes.

23        Q.    In the course of your work together, did

24   you and Ms. Clark discuss the estate planning

25   benefits associated with -- with owning a captive?

Jarvis, Christopher                                    October 18, 2022

49

1        **A.      I believe so.**

2        Q.      Did she generally agree with you that

3    captives could be a powerful opportunity for families

4    in estate planning?

5        **A.      I believe so.**

6        Q.      And was it common for you to discuss the

7    estate planning benefits when you were explaining

8    captives to potential clients?

9        **A.      Yes.**

10       Q.      Further down this document there's a

11   heading called, "Impact on Operating Businesses," and

12   on the second page under that heading -- I'll scan

13   down to it, this article identifies some benefits

14   associated with paying premiums to the captive

15   insurance company; correct?

16       **A.      Yes.**

17       Q.      There's a list.  And one of the points

18   listed on here at number three is a reduction in

19   annual profit, which the article says will create a

20   reduction in current tax liabilities.  This is the --

21   this is the tax benefit that we've already discussed,

22   which is that you can reduce tax liabilities through

23   deductions that are claimed for the insurance premium

24   payments; correct?

25       **A.      Can you ask that again?**

Jarvis, Christopher                          October 18, 2022

50

1       Q.     Point number three is simply outlining the

2  tax -- the current tax benefits, and I say that to

3  distinguish it from the estate planning benefits.

4  Point number three identifies the current tax

5  benefits that could be gained through paying premiums

6  and deducting them; correct?

7       A.     I think -- well, yes and no.

8       Q.     Okay.

9       A.     The reason I say yes and no is, given the

10 size, the numbers we're talking about on this page --

11      Q.     Okay.

12      A.     -- the one million to five million, that's

13 well in excess of the 831(b) limits.  So it looks

14 like this article is actually talking about creating

15 an insurance company, but not creating a tax favored

16 one because the five million wouldn't apply in this

17 situation.  So this is -- this is looking at simply

18 having the children run the insurance company for

19 estate planning benefits, but the income tax would

20 probably be a wash.

21             But I don't -- it's hard to say.  Again,

22 the five million throws me, but certainly if we're

23 reducing profits that's in number three, that is

24 talking about if you have that type of premium of

25 risk that you put into an insurance company that your

Jarvis, Christopher                                October 18, 2022

51

1   **kids owned, you would certainly reduce your tax**

2   **benefit.  Your tax -- your income tax, there may or**

3   **may not be the same tax on the other side.**

4        Q.    Okay.  Got it.  Got it.  Yeah, and my

5   question was bad, but your answer cleared it up for

6   me.  Thank you.

7              And so in your experience explaining these

8   transactions to clients, wealthy clients, like

9   presumably the one you were talking to here, did you

10  find that they were interested in forming a captive

11  as a way to reduce their taxes?

12       A.    **You mean absent other things, or?**

13       Q.    Not necessarily.  My question -- I don't

14  mean to be exclusive, but was that one of the reasons

15  they were interested in forming a captive?

16       A.    **I believe that the clients -- I believe**

17  **that -- that one of the things that they took into**

18  **consideration was the tax benefit, sure.**

19       Q.    Okay.  I'm going to start moving

20  through --

21       A.    **Or the tax --**

22       Q.    Oh, sorry.  Go ahead.

23       A.    **-- or the potential tax benefit.  There's**

24  **-- there's only going to be a benefit if you have**

25  **losses that are significantly less than the expected**

Jarvis, Christopher                                    October 18, 2022

52

1    loss ratio.  Right.  You have to -- you have to beat

2    the odds for there to be any tax benefit.  There's no

3    guaranteed tax benefit coming from the captive.  So

4    you get a deduction, but you still have -- you still

5    have to pay claims for you and other people.  So

6    there's still a risk and, you know, that's probably

7    why, I don't know, one percent of the people I talk

8    to may have considered it, maybe two percent.  It

9    wasn't -- you know, it's not for everybody.

10        Q.    Right.  You're saying if the captive ended

11   up incurring worse than average losses, then it'll

12   wipe out the potential tax benefits --

13        A.    Correct.

14        Q.    -- right?

15        A.    Correct.

16        Q.    We're going to mark United States Exhibit

17   Number 23, which has the Bates number OJM-0012745.

18              (United States Exhibit No. 23 was marked

19              for identification.)

20   BY MR. ABERG:

21        Q.    Did you see that document pop up on

22   my screen, Mr. Jarvis?

23        A.    Yes.

24        Q.    Okay.  This Exhibit 22 is an e-mail chain

25   and if we scan down to the bottom and look at the

Jarvis, Christopher                                October 18, 2022

53

1    first e-mail in the chain, we can see an e-mail dated

2    October -- August 23, 2010, from you to Sanjoy

3    Sundaresan.  Am I saying that name correctly?

4         **A.    You are.**

5         Q.    And who is Sanjoy?

6         **A.    He was a physician in Texas.**

7         Q.    Was he a client of yours?

8         **A.    Yes.**

9         Q.    And is it correct that Sudha Sundaresan

10   was Sanjoy's spouse?

11        **A.    Correct.**

12        Q.    And in response to your initial e-mail,

13   the second e-mail Sanjoy wrote that he's, "Engaged

14   you to help with some tax planning issues and that

15   you should be able to help us save a significant

16   amount in taxes, both personal and corporate."

17             Prior to this e-mail, did you have a

18   meeting with Sanjoy and his spouse to discuss ways

19   that they might be able to save on their taxes?

20        **A.    I was introduced to Sanjoy by his**

21   **attorney, Ken Vanway and I can't remember if we met**

22   **in person or we met on the phone.  I've met the**

23   **gentleman numerous times.  But prior to this, I can't**

24   **remember where or when we met.  But I do know that I**

25   **was introduced to him by his attorney.**

Jarvis, Christopher                                    October 18, 2022

54

1      Q.     And when you were introduced to him, did

2  you discuss forming a captive as a way that he could

3  save on taxes?

4      **A.     We discussed the -- a number of things for**

5  **him.  Quite a bit of estate planing.  He was**

6  **rather wealthy.  And as a pain management doctor**

7  **coming under a lot of scrutiny, he was actually**

8  **concerned about increased insurance costs and we**

9  **talked about how to handle that for his growing pain**

10  **management clinic in Wichita Falls.  And somewhere in**

11  **there, we did talk about a lot of estate planning, we**

12  **talked about some different retirement planning**

13  **options and we talked about the captive.**

14      Q.     And in the next e-mail up, you write that

15  you have attached some information in the second

16  paragraph -- and I'm sorry, I can't get a good sized

17  image of that for you.  But in the second paragraph,

18  you can see that you are passing along some

19  information from the attorney in New York who wrote

20  the insurance legislation in St. Kitts.  Was that

21  Celia Clark?

22      **A.     Yes.**

23      Q.     Did the Sundaresans end up engaging

24  Ms. Clark to help them form a captive?

25      **A.     I believe so.**

Jarvis, Christopher                                    October 18, 2022

55

1      Q.    And was it your understanding that one of

2   the reasons they chose to form a captive was for the

3   estate planning benefit?

4      **A.    I don't remember what happened with the**

5   **estate planning, because during the process, these**

6   **two people got divorced.  So I don't -- I remember it**

7   **created a lot of -- a lot of confusion and a lot of**

8   **difficulties.  So I don't remember if estate planning**

9   **had anything to do with it.**

10     Q.    Who got divorced?

11     **A.    Sundaresan, Sudha and Sanjoy.**

12     Q.    Okay.  Sometime after this e-mail chain

13   occurred?

14     **A.    Yeah.  Yes.  I don't remember if he**

15   **created a captive that year or if he waited another**

16   **year.  I remember the captive had numerous delays and**

17   **I'm not sure whether they took advantage of any of**

18   **the estate planning because of that.**

19     Q.    Well, in this e-mail you wrote that,

20   "There will be additional costs in creating the

21   documents and planning to leverage the larger amount

22   for estate planning purposes, but that should be less

23   than $10,000.  To potentially create millions

24   of dollars of additional estate planning benefits, I

25   am sure that the price will be nominal and well worth

Jarvis, Christopher                          October 18, 2022

56

1    it."

2              So at the time you initially spoke to

3    them, did you understand that one of the reasons they

4    wanted to engage Ms. Clark and form a captive was for

5    the estate planning benefits?

6         **A.    I knew they were interested in estate**

7    **planning -- at the time, they were interested in**

8    **estate planning for sure.  Is that the reason why**

9    **they engaged her?  You know, I don't know what their**

10   **-- I don't know what their main motivation was.**

11        Q.    And the last e-mail I want to ask a

12   question about is this next one up.  And in the first

13   paragraph you wrote that you, "Had spoken to

14   Ms. Clark and that she was happy to work with us to

15   help meet your goals."  For clients that you referred

16   to Ms. Clark, did you ordinarily try to speak with

17   her ahead of time to discuss your client's goals?

18        **A.    I would usually -- I would usually try and**

19   **give her some heads up as to what -- what the clients**

20   **wanted or what they were thinking or if they had some**

21   **questions that I couldn't answer.  If it were some --**

22   **if it were something pretty straightforward on estate**

23   **planning, I don't know that I would always do that.**

24   **But I would say, more often than not, we would have a**

25   **conversation.**

Jarvis, Christopher                                    October 18, 2022

57

1          Q.     We're going to mark -- and just so you're

2    aware, Mr. Jarvis, we are going to take a break here

3    probably in about ten minutes.  I just want to get

4    through two, three more exhibits that I think we can

5    move through reasonably quickly.  So we're going to

6    try to do that before we break.

7               We'll mark as exhibit -- United States

8    Exhibit 23, a document with the Bates number OJM

9    001 -- oh, excuse me.  Let me start over.

10              We're going to mark as exhibit -- United

11   States Exhibit 24 OJM-0011218.

12              (United States Exhibit No. 24 was marked

13              for identification.)

14   BY MR. ABERG:

15         Q.     And this document is an e-mail dated in

16   November of 2010 from you to Ms. Clark and the

17   subject line is, "Gordon Logan meeting today."  Who

18   is Gordon Logan?

19         A.     **Gordon was the -- was the CEO of Sports**

20   **Clips.**

21         Q.     And Betty -- Betty Logan was his spouse?

22         A.     **Correct.**

23         Q.     And did Mr. Logan and his spouse engage

24   you to assist with their estate planning?

25         A.     **Yes.**

Jarvis, Christopher                              October 18, 2022

58

1          Q.    And in this e-mail to Ms. Clark, the third

2     paragraph down, you wrote -- you write to her that,

3     "We went over the structure of the CIC, two trusts,

4     PLLC and life insurance."  Is CIC -- CIC in

5     that sentence refers to captive insurance company;

6     yes?

7          **A.    Yes.**

8          Q.    What is the structure that you're

9     referring to?

10         **A.    The structure of a CIC, the trust I assume**

11    **would be to own it, a preferred LLC was an investment**

12    **structure to invest between the client and his**

13    **children, and life insurance, we ultimately bought**

14    **some term insurance on Betty.  So I assume that's --**

15    **that's what that means.**

16         Q.    Did Mr. Logan ultimately retain Ms. Clark

17    to help form a captive insurance company?

18         **A.    I believe so.**

19         Q.    We'll mark as exhibit -- United States

20    Exhibit 25, a document with the Bates number

21    OJM-0011752.

22               (United States Exhibit No. 25 was marked

23               for identification.)

24    BY MR. ABERG:

25         Q.    And, Mr. Jarvis, you can see up on my

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                                October 18, 2022

59

1  screen that this is an e-mail dated November 10,

2  2020, from you to Gordon Logan and Ms. Clark is

3  copied and the subject line is, "Planning

4  Overview-Structure," and are you able to see that

5  there's an attachment to this e-mail titled,

6  "November 11th" -- "November 11th Sports Clips

7  Diagram-1"?

8       A.    Yes.  Yes.

9       Q.    And in the body of the e-mail you tell Mr.

10 Logan you want to share it with him so that he can

11 see what we are suggesting.  Is it correct that the

12 structure for Mr. Logan is one that you and Ms. Clark

13 worked on together?

14      A.    Yes.  It looks that way.

15      Q.    Was it common for Ms. Clark to be involved

16 in discussions about the structure surrounding the

17 captives that she helped for your clients?

18      A.    For the legal structure, yes.

19      Q.    Well, why was she usually involved in

20 that?

21      A.    I'm not an attorney, so if there's a trust

22 to be owned or an LLC to be created, or some other

23 legal entity to own the captive, then someone has to

24 structure that.

25            So this looks like there were two things

Henderson Legal Services, Inc.

Jarvis, Christopher                              October 18, 2022

60

1  going on with the Logans.  There was estate planning.

2  Look at point one, trust one and two, the idea of

3  trust for their two different children, so there's an

4  estate planning conversation.  And then separately

5  there is a -- number two is having a separate

6  investment entity for the captive to invest in, and

7  then there's the captive itself.

8              So the clients who are rather

9  sophisticated are looking at doing some estate

10  planning and doing a captive because they own

11  a significant franchise.  So they had a lot of risk.

12  And so she was helping with both of those things.

13  Which wasn't uncommon that she would handle some

14  estate planning and she would handle the risk

15  management and captive creation.

16     Q.    What were you and Ms. Clark attempting to

17  achieve in designing the structure discussed here for

18  Gordon -- Betty and Gordon Logan?

19              MR. VOLLRATH:  Object to form.  You can go

20  ahead and answer.

21  BY MR. ABERG:

22     Q.    You can answer.

23     A.    Well, this looks like -- it's been a long

24  time, but this looks like things like restrictive

25  language and trust provisions, this is all about the

Jarvis, Christopher                          October 18, 2022

61

1    two children and how -- how they're going to own --

2    and how the estate plan is going to protect them,

3    since they've grown a rather substantial estate.   So

4    this is -- this is all about the estate planning to

5    me.

6         Q.    And the captive was a part of that plan;

7    right?

8         A.    They were doing a captive, but this looks

9    like something else.   I mean, this language is so

10   much to me about the trust and about estate planning,

11   not necessarily about the captive.

12        Q.    We'll move to our next exhibit, which is

13   going to be U.S. Exhibit Number 26 and this a

14   document with the Bates number OJM-0011754.

15             (United States Exhibit No. 26 was marked

16             for identification.)

17             MR. VOLLRATH:   I'm sorry, Eric, can you

18   give me that again?

19             MR. ABERG:   Sure.   It's OJM-0011754.

20             MR. VOLLRATH:   Thank you.

21             MR. ABERG:   No problem.

22   BY MR. ABERG:

23        Q.    And this is the attachment -- the diagram

24   that's attached to the e-mail we just looked at.

25   Does this -- does this depict the structure that you

Jarvis, Christopher                           October 18, 2022

62

1   and Ms. Clark helped come up with for the Logans,

2   Mr. Jarvis?

3              MR. VOLLRATH:  Object to form.  You can

4   answer.

5   BY MR. ABERG:

6      Q.    You can answer.

7      **A.    Yes.  It looks that way.**

8      Q.    And the title at the top of this document

9   is, "Leveraged Planning Overview."  Does the planning

10  refer to estate planning in this document?

11     **A.    Yes.**

12     Q.    And according to the diagram, one

13  component of the structure was insurance operations,

14  which involved a captive insurance company that

15  was owned by a dynasty trust.  How common was it for

16  captive owners that you worked with and that you

17  referred to Ms. Clark to vest ownership of

18  the captive in a trust?

19     **A.    I'd say for some of them.  It wasn't all**

20  **of them.  It wasn't most of them.  But I would**

21  **say some of them would have it owned in a trust, and**

22  **some would own it in their own names, and others**

23  **would own it in a limited partnership or in a limited**

24  **liability company.  So I would say there were a**

25  **number of different potential structures.**

Jarvis, Christopher                              October 18, 2022

63

1      Q.      Were there estate planning benefits that
2  could be derived from a trust ownership?
3      **A.      Potentially.**
4      Q.      When you say potentially, how potentially?
5      **A.      You would still need to profit.  As we**
6  **discussed earlier, this only works -- this only works**
7  **for a leverage for estate planning if the -- if the**
8  **captive had favorable loss ratios.**
9      Q.      Okay.  I just have a couple more questions
10 and then we'll break.
11             We're going to return to what, I believe,
12 was marked exhibit -- U.S. Exhibit 24, which is
13 OJM-0011218.  And this is the e-mail you sent to
14 Ms. Clark about the meeting with Gordon Logan.
15             When you talk about the benefit of the
16 structure in this paragraph being upwards of thirty
17 million over time, are you referring to the potential
18 tax savings of using a captive within the structure
19 that we just looked at?
20     **A.      I'd say the benefit is the estate planning**
21 **savings.  That a big chunk of this happens from -- if**
22 **you could bring up the chart.**
23     Q.      Sure.  That would be --
24     **A.      -- find it.**
25     Q.      -- exhibit.

Jarvis, Christopher                                    October 18, 2022

64

1        A.    So the big -- the big benefit of the

2   thirty million is going to come from the middle part

3   of this diagram --

4        Q.    Okay.

5        A.    -- where the dynasty trust number two for

6   children and grandchildren owns the entity that owns

7   life insurance and that purchases stock from a big

8   part of this -- of this model with the dynasty trust

9   was coming from the left.  Which was Betty and

10  Gordon contributing their stock of Sports Clips into

11  an entity in return for -- essentially as a note to

12  get their money back plus 3.3 percent.  They expected

13  the company to grow in value so that everything above

14  3.3 percent would flow back to the kids.  They

15  also expected to buy back stock, which they did --

16  subsequently did.

17            And when all of this was happening, the

18  company was worth, I think, 40 or $50 million and now

19  it's worth $200 million.  So I'd say their estate

20  planning of the plan by transferring the stock

21  probably ended up helping the family reduce the taxes

22  by closer to 50 million.  But I don't know that it

23  had -- that had to do with interest rates being low,

24  the company growing, not necessarily the captive.

25       Q.    How did you come up with the $30 million

Jarvis, Christopher                          October 18, 2022

65

1   figure referenced in this e-mail?

2        A.    Good question.  That I don't know.  I

3   can't see it -- I can't see it from there where the

4   number came from exactly.  But it had to be from -- I

5   would assume it was from the estate planning benefit

6   and whatever estimates they gave for growth of the

7   value of the stock.  And the sentence before the 30

8   million talks about estate planning, so that makes me

9   think this is all about estate planning, not about --

10  you know, it's not about -- I don't know how you

11  would find $30 million in income tax savings, that

12  would be -- that seems to be mathematically

13  impossible.  But --

14       Q.    In the next paragraph down, in the second

15  sentence you wrote that, "Gordon seems anxious to

16  talk to the actuaries to see what they can deduct."

17  So from this e-mail, it appears Mr. Logan was

18  interested to know about the current year tax

19  deductions that he could take for payments to a

20  captive.  Agreed?

21       A.    It looks like that.

22       Q.    So to be clear, we've discussed two ways

23  that a captive could be used to create tax savings

24  for a client.  The first is the one mentioned here,

25  the immediate benefit of deductions that might be you

Jarvis, Christopher                          October 18, 2022

66

1   claimed for premiums paid, and the second longer-term

2   benefit is that the captive could be used to reduce

3   the value of the estate tax that the business owner

4   might owe when they die; is that right?

5        **A.      If they have -- if they're successful in**

6   **managing risk, both of those things are possible,**

7   **yes.**

8        Q.    And I'm moving back to, just very

9   briefly, this diagram that we looked at, which is

10  Exhibit 26 -- U.S. Exhibit 26.  There's no reference

11  on this diagram about the potential for losing money

12  from the captive insurance operations, is there?

13       **A.    Just the reserve account all the way to**

14  **the right.**

15       Q.    Okay.  And reserve account would mean an

16  account maintained for potential losses?

17       **A.      Well, that's the -- that was the initial**

18  **capitalization that would be needed to get the**

19  **license just to start, plus whatever the insurance**

20  **regulators deem necessary.  But that's the absolute**

21  **minimum out of pocket is 36 to 360 just to get a**

22  **license.**

23       Q.    Mm-hmm.  Okay.  Well right, I guess my

24  question was just -- there's no notation on this

25  diagram that the captive might have to pay out and

Jarvis, Christopher                          October 18, 2022

67

1   lose money for claims; right?

2       A.    There's no assumption of any amount of

3   money.   I don't how much is going in.  We put the up

4   to 1.2 million again because we don't know what the

5   actuaries have valued any of his insurance changes or

6   redistributions would look like.  So this is more of

7   a hypothetical what might this look like and how

8   might you use it.  But we still -- we still had a lot

9   of things up in the air.  I wouldn't say there was

10  any discussion of gains, losses, none of that was in

11  this.  This is -- this is more answering the -- how

12  will this flow, what's going to own what and how

13  might we use it.

14      Q.    So earlier we discussed the risks

15  associated with forming and owning a captive and one

16  of the risks we talked about was IRS audit risk.  Do

17  you recall?

18      A.    Yes.

19      Q.    And if you had to identify an aspect

20  of these arrangements that poses the greatest risk of

21  drawing an adverse ruling from the IRS, what would it

22  be?

23      A.    I think it would start with not following

24  the insurance -- failing to meet the regulations by

25  the regulator, I think.  If you got disqualified at

Jarvis, Christopher                          October 18, 2022

68

1    the state level, I would think it wouldn't do

2    much for your case with an -- with an audit.

3              MR. VOLLRATH:  Yeah.  And, Eric, if I

4    could object to form to that question.

5    BY MR. ABERG:

6        Q.    Well -- okay.  So your answer to me was,

7    you think the risk -- the greatest risk was one that

8    was effectively administrative, that somehow you

9    might not file the right form with the regulators; is

10   that your answer?

11             MR. VOLLRATH:  Again, I would object to

12   form.

13             THE WITNESS:  I'm not -- I mean, I'm not a

14   tax attorney, so I'd say for me -- again, coming from

15   my background, for me, the first thing would be

16   looking at -- you're an insurance company.  If there

17   are tax benefits that come from being an insurance

18   company, you better be an insurance company and

19   insurance is -- is regulated by the state.  So I

20   would assume -- to me, you said what's the biggest

21   risk.  I think the biggest risk would be not -- not

22   interacting properly with the insurance regulators.

23             Whatever that -- whatever their

24   requirements are, to me, that's the most important

25   thing.  Follow the state rules for being an insurance

Jarvis, Christopher                                    October 18, 2022

69

1    company and if you didn't do those, then you wouldn't

2    be an insurance company at all.  So to me that's the

3    -- again, I'm showing bias by my own experience in

4    working with regulators in the actuarial departments

5    of a number of companies, but that's the piece that I

6    would see is the biggest risk.

7    BY MR. ABERG:

8        Q.    Is that something that Ms. Clark assisted

9    your clients with doing?

10       **A.    Yes.  Well -- well, when we referred**

11   **clients to her, she worked with an insurance**

12   **manager -- before I was a captive manager, she had**

13   **other people she worked with who did that.**

14       Q.    Did you ever become concerned that

15   Ms. Clark was not doing enough to address that risk

16   faced by your clients?

17       **A.    No.**

18       Q.    All right.  Now is a good time for a break

19   and so we'll go off the record.

20            THE VIDEOGRAPHER:  Okay.  The time is now

21   9:52 a.m., going off the record.

22            (Recess.)

23            THE VIDEOGRAPHER:  We're back on the

24   record.  The time is now 10:09 a.m.

25   BY MR. ABERG:

Jarvis, Christopher                                October 18, 2022

70

1       Q.    Mr. Jarvis, as an adviser to your clients

2   who formed captives, were you aware of any

3   restrictions that applied to what clients could do

4   with the funds in their captives?

5       **A.    Yes.**

6       Q.    Can you describe what the restrictions

7   were?

8       **A.    To the best of my understanding, the main**

9   **thing that you couldn't do was loan or invest money**

10  **back to the company that paid the premiums.  That was**

11  **one thing I believe I was -- I learned or was told.**

12  **I can't remember how that information came to me, but**

13  **that was a big --**

14      Q.    And --

15      **A.    -- to me, that was a big -- that was the**

16  **big one.**

17      Q.    Are there any other limits that you were

18  aware of that governed the captive's use of funds?

19      **A.    There were none that I was aware of from**

20  **the insurance department.  And the one that I just**

21  **mentioned was -- I don't know if that came from IRS**

22  **guidance or -- or who gave me that bit of**

23  **information, but that was the only one I can recall**

24  **right now.**

25      Q.    Did you ever speak to your clients about

Jarvis, Christopher                          October 18, 2022

71

1    the need to hold back some amount of funds in the

2    captive so that potential claims could be paid?

3         A.    As far as I'm aware, every client that I

4    know that had a captive kept substantial funds in

5    their captive, and I don't know if any ever took

6    distributions.

7         Q.    The amount that's held back to pay claims,

8    this is sometimes called a loss reserve in

9    the insurance industry; is that correct?

10        A.    Yes.

11        Q.    And in the insurance industry, how does an

12   insurance company typically determine how much of

13   its funds should be held in the loss reserve for

14   claims?

15        A.    Going to make me go back to my actuarial

16   exam tests.  There is -- there is a process for

17   determining reserves at the insurance company limit

18   -- at the insurance company level.  I don't believe

19   those applied to any of the clients I had that did

20   captives.  And I don't say that because they're not

21   -- I don't feel that they're -- that the rules don't

22   apply to them.  It's -- I believe, every client I

23   worked with who did a captive kept all of the money

24   in reserve.  I'm not aware of any of the clients that

25   I know of who ever distributed funds out of their

Jarvis, Christopher                          October 18, 2022

72

1   captives.  Ever.

2        Q.    Is it generally important that a loss

3   reserve be maintained in cash or cash-equivalent

4   investments?

5        A.    No.  Absolutely not.

6        Q.    You disagree with that assessment?

7        A.    One hundred percent.

8        Q.    So what sort of things -- well,

9   we'll reach that.

10            Okay.  So turning back to the question I

11   asked.  You suggested there was some sort of

12   actuarial or mathematical determination that's needed

13   to determine an appropriate loss reserve for an

14   insurance company typically?

15        A.    Yes.

16        Q.    And can you describe the types of things

17   that are taken into account when --

18        A.    Sure.

19        Q.    -- when making that determination?

20        A.    Yeah.  There's -- there's reported claims.

21   So things that an insurance company has received as

22   claims before the policy year ends, and they put

23   reserves up based on the number of what they think

24   the losses might be.  So every claim has a claims

25   manager who says:  Eric just drove into Derick's

Jarvis, Christopher                          October 18, 2022

73

1    fence we think it is going to cost $23,000, so we're

2    going to hold a reserve of $23,000.  There's IBNR,

3    which is short for incurred but not reported, and

4    that's losses we believe have happened during the

5    policy year, but we haven't found out about them yet,

6    but we're still going to have to pay for them.

7    That's a separate reserve.

8              Then there are global numbers in the

9    insurance industry.  The big one, the ratio in the

10   insurance industry that's most commonly looked at for

11   financial stability, is premium-to-surplus ratio.

12   And that is how much premium do you take in per year

13   in the numerator, and how much surplus do you have in

14   the company is the denominator.

15             Companies -- a company with a three-to-one

16   premium-to-surplus ratio is considered to be stable.

17   Company at two-to-one is considered to be extremely

18   strong.  That means $2 billion of premium, which

19   may -- may represent $2 trillion of potential

20   claims -- or two hundred trillion.  But to write $2

21   billion of premium, you only need a billion dollars

22   of surplus.  So if we considered a captive writing $1

23   million of premium, if we applied the same ratios, a

24   company with $333,000 of surplus would be adequate,

25   and a company with $500,000 of surplus would be

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                                October 18, 2022

74

1   considered extremely well capitalized if you applied

2   those ratios.

3        Q.    Did anyone provide you and Ms. Clark's

4   mutual clients with advice about the amount of funds

5   that they should hold as a loss reserve?

6        A.    I don't remember.  I remember there were

7   two buckets of money in the -- the captive's assets

8   were generally -- there were generally two assets

9   that the captive held.  They held a piece of the loss

10  reserve -- of a pool, so whatever risk distribution

11  was they had some claim to, they owned some piece of

12  a pooling mechanism or reinsurance arrangement and

13  then they had whatever their retained premium was.

14  And so there was no requirement at the insurance

15  department level on the retained amount.

16           As I said, most of the clients -- most of

17  the companies that -- every company I'm aware of, was

18  way beyond that two-to-one to three-to-one ratio.

19  They were almost .5 .9 .2 they had way less premium

20  than reserves because none of the clients were

21  distributing cash.  So I would say all of these

22  captives from a -- if you considered them with

23  industry -- compared them against other companies in

24  the industry, they were actually far more heavily

25  capitalized as a ratio and it wasn't even close.

Jarvis, Christopher                                    October 18, 2022

75

1      Q.    Are you aware of your clients using
2 captive funds to invest in other ventures?
3      A.    Sure.
4      Q.    What sort of things would your clients
5 invest in?
6      A.    You could -- if you think of the regular
7 insurance industry, most insurance companies own a
8 lot of real estate, a lot of stock of publicly traded
9 companies, they own other businesses, so very common
10 for clients to invest in securities -- into
11 securities that might have some type of floor.
12           They did a lot of joint ventures that I
13 was aware of, which was a great way to increase the
14 -- to protect the assets.  To be in joint ventures
15 with -- where they would take preferred positions,
16 meaning they got all their money out before the other
17 people could get any of their money out.  So a lot of
18 stocks and bonds, a lot of joint venture
19 preferred positions into securities.  Very common.
20     Q.    We're going to mark as exhibit --
21 United -- U.S. Exhibit 27 a document with the Bates
22 number OJM-0012589.
23           (United States Exhibit No. 27 was marked
24           for identification.)
25 BY MR. ABERG:

Jarvis, Christopher                                      October 18, 2022

76

```
1        Q.      And, Mr. Jarvis, you can see on my screen
2   that this is another e-mail chain that we're marking
3   as an Exhibit, Number 27.  And focusing on the
4   second e-mail from the top, there is an e-mail from
5   you to Ms. Clark with the subject line, "Valdman
6   ASAP."  Was Valdman a client of yours?
7        A.      Yes.
8        Q.      Did -- what was -- what was Valdman's full
9   name?
10       A.      Jennifer Valdman.
11       Q.      Did Ms. Valdman engage Ms. Clark to
12  organize a captive insurance company for her?
13       A.      She did.
14       Q.      And was the name of her captive
15  Elephantis?
16       A.      Yes.
17       Q.      And here you've asked Ms. Clark, "How much
18  of the 1.1 million in Elephantis must I leave liquid
19  and how much can I invest into Bodden Place
20  Holdings?"  When you referred to liquid, are you
21  referring to cash?
22       A.      Securities.  Anything that can be turned
23  into to cash quickly to pay claims.
24       Q.      Okay.  So your question is effectively,
25  how much cash do the Valdman's need to leave in the
```

Jarvis, Christopher                                    October 18, 2022

77

1    captive and how much can they take out to invest

2    elsewhere; right?

3         **A.     No.  Not take out, but just make an**

4    **investment.  It's not a distribution.**

5              MR. VOLLRATH:  Yeah.  And object to form

6    on the question.  Sorry.

7    BY MR. ABERG:

8         Q.    Do you -- did you believe that Ms. Clark

9    was qualified to answer this type of question for the

10   captives that she organized?

11        **A.     Yes.**

12        Q.    Why?

13        **A.     She drafted the operating agreement, she**

14   **was -- I trusted her decision-making on -- on**

15   **managing the captives and managing whatever --**

16   **whatever requirements we needed to keep.**

17        Q.    Well, what requirements would you have

18   been asking about in this e-mail?

19        **A.     Was there any regulatory -- she wrote the**

20   **rules in St. Kitt, so I figured she's the right**

21   **person to ask.**

22        Q.    So sometimes there are regulatory rules

23   about how much -- how much of a captive's funds need

24   to be left liquid?

25        **A.     Since 2009, I have -- I worked more**

Jarvis, Christopher                          October 18, 2022

78

1  **closely with another regulator after the fact and**

2  **learned that that wasn't the case.  But that must**

3  **have been my understanding at the time.**

4      Q.    Ms. Clark's response to you is that you

5  should leave at least thirty percent in cash,

6  government bonds, and money -- or money market funds.

7  So her advice was that at least 30 percent of the

8  captive's funds needed to be liquid, either cash,

9  bonds or money market funds; correct?

10      **A.    That's what it says, yes.**

11      Q.    Do you know where her recommendation for

12  30 percent came from?

13      **A.    No.**

14      Q.    We'll mark as our next exhibit, U.S.

15  Exhibit Number 28, which has a Bates number

16  OJM-0012386 -- excuse me, 2385.

17          (United States Exhibit No. 28 was marked

18          for identification.)

19  BY MR. ABERG:

20      Q.    And U.S. Exhibit 26 is a September 2010

21  e-mail from Ms. Clark to you, Mr. Jarvis, with the

22  subject line, "Investment Restrictions Memo."  And

23  Ms. Clark says in this e-mail, "Not sure if you have

24  this."  Apparently referring to an attachment titled,

25  "Investment Restrictions Memo."  Are you able to see

Jarvis, Christopher                                    October 18, 2022

79

1   that on the document?

2       A.    I am.

3       Q.    We will mark the memo -- the attachment as

4   Exhibit 29.

5             (United States Exhibit No. 29 was marked

6             for identification.)

7   BY MR. ABERG:

8       Q.    And that has a Bates number OJM-0012386.

9   And this is a memorandum from Ms. Clark dated January

10  of 2009 regarding investment restrictions for St.

11  Kitts' captive insurance companies.  Could you read

12  this short first paragraph, Mr. Jarvis, which I think

13  is sufficiently blown up for you to read, and let me

14  know after you've had a chance to review it?

15      A.    Got it.  I read it.

16      Q.    According to Ms. Clark, 30 percent

17  of annual premiums is the minimum amount that must be

18  held by the captive as liquid reserves under St.

19  Kitts' law; correct?

20      A.    Yes.  That's what it says.

21      Q.    And when she advised you that at least 30

22  percent of the funds held by the Valdman's captive

23  should be in liquid assets, did you understand that

24  that advice was based on this requirement?

25      A.    I don't know if it was based on that at

Jarvis, Christopher                                    October 18, 2022

80

1    the time.  That was a long time ago.

2         Q.    And you've mentioned that Ms. Clark

3    drafted the St. Kitts' captive insurance laws; right?

4         A.    Yes.  That's my understanding.

5         Q.    Do you understand that she also drafted

6    this 30 percent requirement?

7         A.    I can see this memo, yes.

8         Q.    Do you know why she decided that 30

9    percent should be the rule under St. Kitts' law?

10              MR. VOLLRATH:  Object to form.

11              THE WITNESS:  No.  I don't know.

12   BY MR. ABERG:

13        Q.    Would you regularly consult with Ms. Clark

14   about the amount of liquid assets that should be

15   retained by captives that she formed for your

16   clients?

17        A.    No.  I would -- I would assume that if we

18   had this conversation and that was the number, we

19   didn't have to have the conversation again.

20        Q.    Who would determine the appropriate amount

21   of liquid reserves for the captives that were formed

22   for your clients?  Who was ultimately responsible?

23        A.    I don't know that it was ever an issue.

24        Q.    Why was it not ever an issue?

25        A.    Because everybody had sufficient capital

Jarvis, Christopher                              October 18, 2022

81

1    and no one was ever taking distributions.  So we

2    weren't -- we didn't have the challenges that public

3    companies have with distributions and paying

4    shareholders.  It wasn't -- we didn't have that

5    constant push and pull between the regulators and the

6    shareholders.  It wasn't -- the money stayed in the

7    captive to cover claims, people weren't trying to

8    take money out.  So it just wasn't -- it just didn't

9    seem to be an issue.

10        Q.    Well, I understand your point that the

11   captives, to your knowledge, maintained control over

12   investments that they may have made.  But do you

13   disagree with the idea that it was important to keep

14   some amount in cash or cash equivalent to pay claims

15   that might become due that year?

16        A.    Is it important to be able to pay claims?

17   Absolutely.  Is it important to keep it in cash?  No.

18        Q.    Why not?

19        A.    Because claims -- these are small

20   insurance companies.  You know when you're going to

21   have claims because you're going to make them.  So if

22   you needed to sell stock or you needed to do

23   something else, you'd have the ability to do so.

24              It's not -- we didn't have clients buying

25   real estate and buying super liquid assets, it was --

Jarvis, Christopher                              October 18, 2022

82

1    for the most part, it was cash, stocks, bonds, mutual

2    funds, things of that nature.  So it's all stuff

3    that could become liquid, it didn't need to be -- it

4    didn't need to be -- just didn't need to be cash.  I

5    mean, you'd tap into the -- I'd put on my MBA and

6    finance hat, putting it in cash would be stupid.  It

7    would be economically irresponsible to get no return,

8    because that's not what -- every other insurance

9    company is investing their returns to make money.  So

10   it just doesn't -- it just seems silly.

11       Q.    Well, I thought that earlier you said that

12   your clients were regularly investing in things like

13   businesses and real estate.  Did I misunderstand you?

14       A.    They would invest through a

15   special vehicle, a preferred LLC.  And -- and what

16   would happen in those preferred LLCs is, if the

17   captive invests with me in a separate entity, one of

18   the things that I thought was rather -- rather

19   genius, actually I think it was Celia's idea, to put

20   in -- to put in some of those special purpose

21   vehicles that if an insurance company were one of the

22   investors and they had claims, that all of a sudden

23   their rights superceded everybody else.  They could

24   force distributions they could force sale of assets,

25   they could force the general partners or the

Jarvis, Christopher                                    October 18, 2022

83

1    **managers --**

2              THE COURT REPORTER:  I'm --

3              THE WITNESS:  -- to make additional

4    capitalization.

5              Sorry.

6              THE COURT REPORTER:  I'm -- you're going

7    to have to slow down for the record, please.  Thank

8    you.

9              THE WITNESS:  Sure.

10             So the idea that they would invest through

11   another vehicle, but there would -- there would

12   always be another party who was guaranteeing that

13   investment and guaranteeing that liquidity would be

14   there to make sure that you -- the claims paying

15   ability of the company would never be jeopardized.

16   But you could get better returns.  I mean it's --

17   it's super important to have that.

18             And my -- my background is with regulators

19   and -- and then my experience in finance, it's

20   just -- it's important to get -- maximize your

21   returns with as much protection as you can get.  So

22   there might be illiquid investments, but the

23   structure of those illiquid investments

24   created immediate liquidity, if necessary.

25   BY MR. ABERG:

Jarvis, Christopher                                    October 18, 2022

84

1        Q.     And just to make sure I understood the one

2   piece of that.  You think it's super important that

3   the investments are either in fungible or

4   liquid assets or at least structured so they could be

5   liquidated quickly.  Did I understand that correctly?

6        **A.     Some of them, sure.  If I'm being**

7   **consistent with Celia's memo, then at least 30**

8   **percent needs to be immediately available or could be**

9   **turned to cash quickly.  The piece of that memo that**

10  **the -- the sentence that you overlooked,**

11  **either accidentally or purposefully, was that the**

12  **reinsurance pool will always be kept in cash.  And so**

13  **if the reinsurance pool is at 30 percent of total**

14  **premium, then the reinsurance pool will satisfy the**

15  **liquidity requirement.  It will just satisfy it by**

16  **itself.**

17       Q.     Well, it would satisfy the requirement

18  under St. Kitts' law?

19       **A.     Correct.**

20       Q.     To your knowledge, did Ms. Clark ever

21  provide -- or anyone working with her, ever provide

22  captives with any kind of analysis about how much a

23  loss reserve might be necessary for them?

24       **A.     I know that losses were tracked on the**

25  **pool.  So the pooled amounts, there was a great deal**

Jarvis, Christopher                              October 18, 2022

85

1    of communication about losses that were reported to
2    the pool, so everyone would have some idea of how the
3    reinsurance pool was performing and what to expect.
4    I don't recall what the process was for -- for
5    estimates on the retained risk.
6         Q.    So you're not aware -- to go back to my
7    question, you're not aware that anyone that she or
8    anyone working with her ever did an assessment like
9    you were talking about, an actuarial assessment, to
10   determine how much of a loss reserve any
11   particular captive should maintain?
12        A.    Well, I -- to clarify, if there weren't
13   any claims, I don't believe any additional analysis
14   was done.  Keep in mind, a captive might insure 12
15   policies and having 12, 15, 10 policies is
16   very different from having 200,000 auto policies
17   where you can assume with the law of large numbers
18   that you're going to have 32,000 claims every year.
19   That's -- you can pretty much guarantee it's going to
20   be very close to that.
21             But when there's only 12 or 15 different
22   policies written, then keeping reserves or estimating
23   what the cost of one-third of a claim might be is not
24   necessarily common.  But when there was a claim at --
25   there was a time we were using Hamlin & Burton as a

Jarvis, Christopher                                    October 18, 2022

86

1    claims manager.  So all claims went through an

2    outside claims manager who would assess the claims

3    and set a reserve.  So that was a done on a

4    claim-by-claim basis for every loss.

5             That was implemented, when I don't

6    remember exactly, but I do remember -- I do remember

7    us using Hamlin & Burton and having an outside firm.

8    So it wasn't necessarily an actuarial firm as much as

9    it was a claims management firm telling us what to

10   expect on claims once they were reported.

11        Q.   Well, did I understand one of your

12   previous answers to be that it's important -- or that

13   a typical insurance company would hold back some loss

14   reserves to pay claims that haven't been reported

15   yet --

16        A.   Yes.

17        Q.   -- is that right?

18        A.   (Nods head.)

19        Q.   And so to your knowledge, did -- and I can

20   appreciate your point that maybe captives are

21   different in terms of the volume of policies that are

22   involved.  But just to make sure I'm understanding,

23   you said that the way an insurance company would

24   typically determine an appropriate loss reserve,

25   would be keyed to some actuarial determination about

Jarvis, Christopher                          October 18, 2022

87

1   what they think the losses might be for the entire

2   set of insured risk.  Is that right?

3       A.    Can you rephrase that?  I want to make

4   sure I don't say yes --

5       Q.    Right.

6       A.    -- and it's not completely right.

7       Q.    Sure.

8            A typical insurance company, that insures

9   as you suggested 200,000 auto insurance policies,

10  to determine an appropriate amount to hold back as a

11  loss reserve rather than investing it, for example,

12  they would do some sort of mathematical determination

13  to estimate how much they think they will have to pay

14  before the end of the year; right?

15      A.    They will make estimates, yes.  Not

16  necessarily by the end of the year.

17      Q.    Okay.

18      A.    But they do make estimates.  And the

19  irony -- the irony of this is they do that for tax

20  reasons.  So insurance companies are accrual-based

21  taxpayers, not cash-basis taxpayers.  So if they take

22  in a billion dollars of premium, but they pay out

23  nothing in losses, but they claim that they have

24  600,000 of future losses that they've already

25  incurred, they just haven't paid it yet, they're only

Jarvis, Christopher                                    October 18, 2022

88

1   being taxed on $400,000 of premium.  So the loss

2   happened, they just haven't paid it.  So --

3       Q.    Okay.

4       A.    -- so they do premiums earned, premiums

5   written, they do losses paid, but they do losses

6   incurred.  And they use the losses incurred minus

7   their expenses to figure out what their profit is for

8   the year.  So they're doing that because they have

9   the profit, but they -- I mean they could be right,

10  they could be wrong.  It's not affecting their loss

11  ratio, they still keep their assets.  I mean, it

12  doesn't affect -- it affects their taxation, it

13  doesn't affect their -- their cash position.  So

14  whether you incur it or you don't, you still have the

15  cash.

16      Q.    Okay.

17      A.    Whether you --

18      Q.    My only question is:  Do you agree that

19  in ordinary insurance practice, there's some

20  determination to be made to determine the appropriate

21  amount of cash to be kept on hand to pay losses?  Is

22  that something an insurance company typically does?

23      A.    Assets, yes.  I don't remember cash

24  being -- like how much cash liquid do we have.  I

25  mean, it never came up in my years working in an

Jarvis, Christopher                                    October 18, 2022

89

1   **actuarial department.**

2        Q.    And to your knowledge, you are not aware

3   that Ms. Clark ever performed any analysis to

4   determine whether her captives were holding enough

5   liquid reserves on hand to pay claims as they came

6   due?

7        **A.    I don't remember any separate -- I don't**

8   **remember any separate analysis done on a**

9   **captive-by-captive basis.  On the pool, definitely.**

10  **Captive-by-captive, no.  And, again, I would say it**

11  **probably wasn't necessary.**

12       Q.    And I want to go back to something you

13  brought up during this segment.  You mentioned

14  structuring investments for the captive so that they

15  could invest, and perhaps an illiquid asset, in a way

16  that would allow them to liquidate their interest

17  quickly.  Do you recall that?

18       **A.    Yes.**

19       Q.    Was it Ms. Clark who recommended that type

20  of structure to you and your clients?

21       **A.    I don't remember if she came up with it or**

22  **if somebody else did.  I don't remember where it**

23  **started, but I remember -- I do recall people**

24  **having -- I do remember people implementing preferred**

25  **allocation entities, for sure.  I don't remember**

Jarvis, Christopher                          October 18, 2022

90

1    **where the idea came from, but it definitely happened.**

2         Q.    I'd like to mark our next exhibit, which

3    is U.S. Exhibit 30.

4              (United States Exhibit No. 30 was marked

5              for identification.)

6    BY MR. ABERG:

7         Q.    And it has the Bates number OJM-0012601.

8    Mr. Jarvis, this is an e-mail chain that begins with

9    an exchange -- if you scroll down to the bottom,

10   between you and Mr. Logan, your client.  And you can

11   see in this first e-mail, the second paragraph, you

12   mention that you're providing Mr. Logan with a memo

13   that explains how the captive insurance company

14   handles the third-party risk with a terrorism pool.

15   So this is a reference to the risk-pooling

16   arrangement that Ms. Clark's clients

17   were participating in at this time; correct?

18        **A.    Correct.**

19        Q.    Do you remember the name of that pooling

20   arrangement?

21        **A.    It might have been Pan-American, that's**

22   **the best I can guess.**

23        Q.    That's correct.  Will you understand if I

24   just refer to it in our conversation today as Pan-Am?

25        **A.    Sure.**

Jarvis, Christopher                                    October 18, 2022

91

1        Q.    What's your understanding about where

2   Pan-Am was located?

3        A.    Somewhere -- somewhere in the Caribbean,

4   Nevis, St. Kitts.  I don't remember.

5        Q.    And who organized Pan-Am?

6        A.    That I don't know.

7        Q.    Do you know who its owners were?

8        A.    I don't.

9        Q.    And who managed Pan-Am?

10       A.    It might have been Heritor.

11       Q.    Who is Heritor?

12       A.    Heritor was a captive manager -- an

13   insurance manager, I believe in Nevis or St. Kitts.

14       Q.    Did you know anyone who worked for

15   Heritor?

16       A.    Did I know anyone?  I believe a gentleman

17   by the name of Robin, I can't remember his last name,

18   may have been the founder or the organizer.

19       Q.    Did you ever travel to meet anyone who

20   worked for Heritor?

21       A.    I did.  I went to Nevis with -- with

22   my wife and I saw Celia and Edgar there and visited

23   with the folks at Heritor one day.

24       Q.    What was the purpose of that visit?

25       A.    Some of it was fun and some of it was to

Jarvis, Christopher                                    October 18, 2022

92

1   **meet them and talk to them about reinsurance**

2   **captives, just a general business trip.**

3       Q.    Do you have an understanding about when --

4   as to when Ms. Clark first began using Pan-Am as the

5   risk-pooling vehicle for her captive clients?

6       **A.    I don't recall.**

7       Q.    Do you have any understanding about why

8   she choose Pan-Am?

9       **A.    I don't.**

10      Q.    Okay.  We'll mark as our next exhibit,

11  U.S. Exhibit 31, a document with the Bates number

12  Wilson-083469.

13          (Wilson Exhibit No. 31 was marked for

14          identification.)

15  BY MR. ABERG:

16      Q.    And, Mr. Jarvis, you can see that this is

17  a memorandum from Ms. Clark titled, "December 2011

18  Risk Distribution Program," and it's dated

19  October 25, 2011.  In your experience, was it common

20  for Ms. Clark to send out letters or memos explaining

21  the pooling arrangements to the clients that she

22  worked with?

23      **A.    Yes.**

24      Q.    And if we scroll down, we can see

25  reference to Pan-Am Reinsurance Company and this memo

Jarvis, Christopher                                    October 18, 2022

93

1    explains how Pan-Am worked; right?

2        A.    That looks to be it.

3        Q.    Can you explain the basic mechanics of how

4    Pan-Am worked?

5        A.    No.  I mean I'd have to read it and

6    decipher it, if you want me to try to do that.

7        Q.    Sure.  Well, we can look at -- at some

8    parts of this.  Under the heading, for example,

9    "Insurance Purchase," there's an explanation that the

10   operating businesses owned by Corp's clients

11   would purchase terrorism risk insurance from Pan-Am;

12   correct?

13       A.    That's what it says.

14       Q.    And then under the heading, "Reinsurance

15   Agreement," it says that simultaneously

16   Pan-Am entered into reinsurance agreements with the

17   captives owned by Ms. Clark's clients, and pursuant

18   to those agreements the captives assumed a percentage

19   of Pan-Am's risk under the terrorism policies.  Do

20   you see that?

21       A.    Yes.

22       Q.    And the percentage of risk -- risk that

23   each captive assumed was called a quota share; is

24   that right?

25       A.    Yes.  That looks to be the case.

Jarvis, Christopher                                     October 18, 2022

94

1       Q.      And the final part of the Pan-Am

2   arrangement is described under this heading, "Trust

3   Agreement."  Are you able to see that?

4       **A.      I am.**

5       Q.      And this part of the memo explains that

6   premiums paid to Pan-Am were maintained in a trust.

7   And pursuant to a trust agreement, which provided

8   that 50 percent of the premiums would be paid to the

9   captives after 90 days and the remainder would be

10  paid to the captives after 180 days, with the

11  exception of a small percentage, 2.5 percent, that's

12  identified here as retained loss reserves.  Am I

13  understanding that paragraph correctly?

14      **A.      Yes.  It looks to be -- that looks to be**

15  **what it says.**

16      Q.      This 2011 memo, if you look right above

17  the trust agreement paragraph, also says that the

18  children of Ms. Clark owned any aggregate of five

19  percent interest in Pan-Am.  Do you have any

20  understanding as to how her children came to own an

21  interest in Pan-Am?

22      **A.      I assume she made a gift, but I -- I**

23  **honestly don't know.**

24      Q.      Do you know why they held that interest?

25      **A.      I don't.**

Jarvis, Christopher                                    October 18, 2022

95

1      Q.     And so each of your clients who formed a

2  captive with Ms. Clark purchased some amount

3  of terrorism insurance through this pool; correct?

4      **A.     I believe so.**

5      Q.     And in your experience, how did clients

6  who engaged Ms. Clark determine how much terrorism

7  insurance they wanted to buy?

8      **A.     I assume it was a conversation with the**

9  **actuaries and with Ms. Clark.**

10     Q.     Well, part of -- so you were not involved

11  in any discussion with your clients about how much

12  insurance they wanted to buy?  For example, how much

13  terrorism insurance they wanted to bay?

14     **A.     No.  As far as how much -- how much of any**

15  **particular coverage, that wasn't my -- I was not**

16  **playing any type of actuarial role with the clients**

17  **in this situation, so I didn't make recommendations**

18  **on amounts or valuation, that wasn't -- that wasn't**

19  **the role I was playing.  So whatever -- whatever the**

20  **valuations came back with when they went to outside**

21  **actuaries, that's -- that was the conversation.  I**

22  **had -- I played no role in determining how much or**

23  **that wasn't -- that wasn't my field.**

24     Q.     So your understanding was that the

25  decision about how much insurance to buy had to do

Jarvis, Christopher                                October 18, 2022

96

1    with calculations that an actuary performed?

2         A.    Correct.

3         Q.    In what way?

4         A.    We would -- I can't say routinely, because

5    we didn't do that many of them.  But normal operating

6    procedure with a client was having them submit their

7    existing insurance policies, financials, quite a bit

8    of data, and then it would be analyzed by an actuary

9    to come up with:  Here are some of the risks, here is

10   what you could -- here's what you are paying, here's

11   what you could be paying, here are some risks that

12   aren't covered by traditional insurance that we might

13   be able to cover.  And an analysis was given back to

14   clients who could say:  Yes, that looks good; or, no,

15   I'm not so interested in that particular coverage;

16   or, I'm interested in more of something else.

17              So that was all done by -- by a separate

18   analysis by somebody else, and I believe it was

19   always done by an outside actuary.  I don't believe

20   it was ever done by -- I could be wrong, but I don't

21   think it was ever done by Celia or her staff.

22        Q.    Well, maybe I'm confused.  I guess I

23   thought that an actuary was primarily involved in

24   rate making and that sort of mathematical

25   computation.  But aren't decisions about how much

Jarvis, Christopher                                    October 18, 2022

97

1    coverage you want to buy, aren't those -- it wouldn't

2    seem to me that that would need to be done by an

3    actuary.  Is that a discussion you might have --

4              MR. VOLLRATH:  Objection to form.

5              THE WITNESS:  Yeah.  I don't know if

6    there's a question there, Eric.

7    BY MR. ABERG:

8        Q.    Well my question is:  Are you saying that

9    in ordinary practice in the insurance industry, that

10   determining how much insurance coverage a business

11   might want to buy is something that an actuary is the

12   sole consultant on?  Or are there other consultants

13   who participate?

14       A.    In a traditional situation, you could have

15   a broker, you could have an agent, you could have a

16   risk manager, you could have a lot of different

17   people chime in.

18             The conversation a lot of times for

19   clients was, because the captive was so -- was so

20   expensive really, the question -- the question to the

21   actuaries was:  How much could we actually put into,

22   could we justify, could we support reasonably putting

23   into a captive?  Because if it costs you $50,000,

24   $70,000, $100,000, whatever it might be, to create a

25   captive, if you're only going to pay $50,000 of

Jarvis, Christopher                                    October 18, 2022

98

1    premium, it doesn't make any sense at all.  It's just

2    too cost -- it's not cost effective.

3              So the typical analysis when someone would

4    have a -- a feasibility study done, it would be

5    looking at your business, what does it look like,

6    what kind of risk could we cover, what premiums were

7    there and see how the client felt about insuring

8    that.  So that was the conversation was what kind of

9    risk is in this business and what does it look like,

10   and is it -- is it even worth considering this based

11   on the analysis.  So that was part of the

12   conversation that determined what was -- what was

13   going on there.

14              I'm not sure if that answered your

15   question, but that's -- you know, captive is a

16   different -- in a lot of ways it makes sense to try

17   to compare it to traditional insurance, but in so

18   many ways it's not.

19        Q.    Right.  So your explanation about why the

20   actuary might be so heavily involved in the captive

21   scenario is because you have to be able to contribute

22   a certain amount -- or you have to be able to pay a

23   certain amount of premiums into the captive for its

24   formation to really pay off, for it to be worth it;

25   is that right?

Jarvis, Christopher                                    October 18, 2022

99

1        A.    Yeah.   If I -- if you want to use legal

2   parlance, it's -- if you were going to take a case on

3   contingency, you'd want to know whether or not it's

4   worth the time to do the research and do the work.

5   And if you found that the best case scenario was the

6   case was going to have a $100,000 judgement and you

7   were going to get 30 percent of it and that was the

8   best case, but it estimated to be about $100,000 of

9   work, you wouldn't take that case.   And so, part of

10  this analysis is, if you're going to spend the money

11  to create and manage a captive and add that wrinkle

12  -- that level of complexity to your life, there's got

13  to be some opportunity to make money or to save money

14  somewhere.

15           So for a lot of people, the captive -- in

16  some instances, it was replacing insurance, existing

17  insurance.   In other instances, it was covering

18  different layers of insurance, and in some ways it

19  was formally insuring things that you weren't

20  previously insuring.   And to figure out whether or

21  not those three buckets added up to enough to justify

22  the expense and the aggravation, that was the

23  conversation -- that was the baton pass to the

24  actuary to say what does it look like.

25        Q.    Was there a certain amount of premium that

Jarvis, Christopher                                    October 18, 2022

100

1    had to be justified by an actuary to, in your mind,

2    make the formation of a captive worth it?

3         A.    Yes.

4         Q.    And what was that amount?

5         A.    I was waiting for that one.  To me, it was

6    a half million dollars of premium.  That if somebody

7    had -- if someone could justify a half million

8    dollars of risk, then that would justify the $50,000

9    expense.  Just for starters, that if you could save

10   that money, that'd be the starting point.  Because

11   the best case scenario you had was money went in and

12   it was ordinarily -- if you just looked at -- if you

13   just looked at it from an economic standpoint, the

14   best thing you could hope for was money went in that

15   might have been taxed at 40 percent and it would come

16   out at 20 percent at capital gains, if you had -- if

17   you had a long-term benefit, and that's the best case

18   scenario.

19         So if 20 percent is your delta, 20 percent

20   of 500 is 100, and the expense might be 50 grand to

21   run this thing a year, it just didn't make sense if

22   you didn't have a really substantial business with a

23   lot of risk.  It just wasn't cost effective.  And

24   that's best case scenario.  And that's, you know --

25        Q.    I would like to return to what we had

Jarvis, Christopher                                    October 18, 2022

101

1  marked as U.S. Exhibit 30, which is the e-mail chain

2  between you and Mr. Logan.  And at the beginning of

3  this chain, you talk about -- you mention you're

4  attaching a memo about the terrorism pool and in

5  response Mr. Logan says that he is confused --

6              MR. VOLLRATH:  Have we lost Eric?

7              MR. ABERG:  Can you not hear me,

8  Mr. Jarvis?

9              THE WITNESS:  I can hear you.

10              MR. ABERG:  Derick, can you not hear me?

11              MR. VOLLRATH:  Yeah, I don't think I could

12  hear you for a little bit, but I think I'm back now.

13              MR. ABERG:  Okay.  Stephanie, can you hear

14  me okay?

15              THE COURT REPORTER:  (Nods head.)

16              MR. ABERG:  Okay.

17  BY MR. ABERG:

18      Q.    And when Mr. Gordon mentions that he is

19  confused, you write back to him in this e-mail dated

20  October 14th, that 30 percent of the premium has to

21  be from unrelated parties to meet a safe harbor the

22  IRS has.  What are you referring to?

23      A.    I believe at the time there was some

24  precedent set on one of the -- either the Harpers or

25  the Humana case -- that if my -- if my memory serves

Jarvis, Christopher                                    October 18, 2022

102

1    me right, that a company with 29 percent third-party

2    risk was deemed to have third-party -- satisfactory

3    third-party risk.  So I believe at the time, the

4    understanding was that 30 percent third-party risk

5    would satisfy -- would satisfy the safe harbor.  I

6    believe that's what that's -- where that's coming

7    from.  It's been a while since I wrote that.

8         Q.    So your understanding is that 30 percent

9    of a premium that's attributable to an unrelated

10   risk, would meet the risk distribution element of the

11   definition of insurance?  Is that what you're

12   referring to here?

13        A.    Yes.

14        Q.    In the second paragraph of this e-mail,

15   you write that, "To do this, we used a very

16   attractive terrorism risk pool option for 30 percent

17   of total premium."  And in the next paragraph, I

18   believe -- oh, I'm sorry, in the next e-mail to him,

19   you actually give an example of how this might work.

20   Here, you can see where I'm highlighting.  You write

21   that, "It is part of your total premium so if you

22   decide to pay 2010 annual premium to the

23   captive insurance company of 500,000, 150,000 would

24   go through the pool and be rebated later assuming no

25   losses."

Jarvis, Christopher                          October 18, 2022

                                                           103

1                 In your experience, did your clients who

2        engaged Ms. Clark ordinarily purchase terrorism

3        insurance in an amount equal to 30 percent of their

4        total premiums?

5              **A.    I believe that was the case.**

6              Q.    And was the reason behind that calculation

7        the 30 percent safe harbor you talked about in your

8        last e-mail?

9              **A.    I think that's possible.**

10             Q.    So just to understand how it worked, a

11       client would decide how much total premiums they

12       wanted to pay in a year, and then commit 30 percent

13       of that amount to buying terrorism insurance through

14       Pan-Am.

15                 MR. VOLLRATH:   Object to form.

16       BY MR. ABERG:

17             Q.    Is that right?

18             **A.    That looks to be what we're explaining for**

19       **Logan here.   I don't remember everybody else, but**

20       **that looks to be what is here -- what I'm talking**

21       **about here with Mr. Logan.**

22             Q.    Okay.  To your knowledge, did Ms. Clark

23       ever work with Mr. Logan or any of your other clients

24       to try to understand whether they needed the amount

25       of terrorism coverage that they were buying for 30

Jarvis, Christopher                                    October 18, 2022

104

1    percent of their total premiums?

2         **A.    I don't know what she talked to with --**

3    **what she talked about with the clients.  As I said, I**

4    **wasn't -- I wasn't on those conversations.**

5         Q.    Were you privy to any conversations with

6    your clients where there was any assessment about

7    whether they needed the amount of terrorism coverage

8    that they were buying?

9         **A.    Whether they needed, I don't recall being**

10   **on conversations -- in conversations with -- with**

11   **Celia.  I remember being -- being on calls with the**

12   **actuary, but can't remember if it was ever about**

13   **terrorism.**

14        Q.    So you're not aware of any such

15   conversations; correct?

16        **A.    Yeah.  I'm not.**

17        Q.    Okay.  We'll move to our next exhibit,

18   which will be U.S. Exhibit -- oh, I'm sorry.  We're

19   going to stop with the exhibits for right now.

20             I'd like to -- we've just spoken about

21   Pan-Am, which is the risk-pooling arrangement for Ms.

22   Clark's captives initially.  I'd like to turn to Jade

23   Reinsurance Group and I understand you had some more

24   direct involvement with Jade Reinsurance Group.  Can

25   you tell me what Jade Reinsurance Group was?

Jarvis, Christopher                          October 18, 2022

105

1      A.     It's an Alabama-based reinsurance company
2  of which I was the president.
3      Q.     And in our conversation today, will you
4  understand if I refer to it as Jade Re?
5      A.     I will.
6      Q.     Who organized Jade Re?
7      A.     Can you tell me what you mean by
8  organized?
9      Q.     Who filed the -- who was listed as an
10 organizer on the paperwork that was filed with
11 regulators?
12     A.     That I don't -- I don't remember who was
13 -- I don't remember whom was listed.  I know that I
14 was president and significant shareholder,
15 and primarily responsible for the operations.  That
16 -- that I can tell you.  Who else was on it and who
17 filed it, that I can't -- I don't remember.
18     Q.     And whose idea was it to form Jade Re?
19     A.     That was a conversation between -- between
20 Celia and me.
21     Q.     What was the -- what was Ms. Clark's
22 involvement in the process of forming Jade Re?
23     A.     I would say it was very significant.
24 She -- Jade Re was designed to replace Pan-American.
25 And so these were going to be to her clients.  So I'd

Jarvis, Christopher                                October 18, 2022

106

1    say she was very involved.

2         Q.    When did you and she first begin

3    discussions about that?

4         A.    I don't know, somewhere after that memo, I

5    would think.  I don't know if it started in '09, '10,

6    '11, '12.  Somewhere in that range.  I couldn't tell

7    you exactly when.

8         Q.    Were there any other people involved in

9    the discussions about forming Jade Re to replace

10   Pan-Am?

11        A.    In the discussions, I don't think so.

12        Q.    Then why make the change from Pan-Am?

13        A.    I'd say the biggest change -- well, I

14   can't say biggest.  A significant change was having

15   the company be domiciled in the United States.  So be

16   domiciled in the United States, be subject to the

17   state insurance department here in Alabama -- not

18   here, I don't live in Alabama, but in Alabama.

19   Create a level of -- a different level of comfort

20   for the members of the reinsurance pool that

21   having -- as it was growing, having millions of

22   dollars in an offshore jurisdiction with people you

23   have no jurisdiction over and your attorneys have no

24   power over was -- was not particularly -- was not

25   ideal for the clients.  So to have funds domiciled in

Jarvis, Christopher                                    October 18, 2022

107

1    the U.S. with U.S. companies overseen by U.S.

2    regulators, that was a big push --

3         Q.    A big push by who?

4         A.    Well, for us.  I mean just wanting to

5    provide a better service for the clients.  And to

6    create better safety, create -- create -- at least

7    some perceived -- I think there was a perception at

8    the time that things that were done offshore might

9    not have been as tightly regulated as stuff in the

10   U.S.  So in an attempt to, you know, it seems kind of

11   unusual now to come -- to come onshore and create

12   more regulation and more red tape, at least the

13   perception of such, we thought was in the best

14   interest for the clients.

15              Let's move the money onshore, let's have

16   onshore regulators, let's keep all the funds here,

17   let's make -- let's help people be really comfortable

18   and eliminate any perception of fraud risk

19   or perception of impropriety, or perception of

20   anything that wasn't being done by the book, that was

21   -- that was a big push.

22        Q.    Did you ever hear about concern by clients

23   about having Pan-Am situated offshore and overseen by

24   foreign regulators?

25        A.    Probably.  Yeah, I think -- I think I'd

Jarvis, Christopher                               October 18, 2022

108

1   say yes and no.  It's probably indirect, a lot of it

2   indirectly.  Directly, maybe not so much.  But you

3   talk to a lot of people about captives, and as I said

4   before, maybe one percent or two percent of people

5   you talked to it would apply to.  So this wasn't a

6   one size fits all shoehorn for some fantastical tax

7   evasion or something ridiculous.  It was

8   a complicated insurance transaction that required a

9   certain kind of client.  And when it's already

10  expensive and you bring in the uncertainty of stuff

11  offshore, I had worked with a lot of asset protection

12  attorneys for a long time and there were a lot of

13  people who would never do anything offshore.

14           So I may not have had people come right

15  out and say, "I don't want to do this because of

16  Pan-Am," but my experience in having worked with a

17  lot of attorneys was some people are very happy to do

18  things offshore, and a whole lot of people aren't.

19  So -- and the idea of doing something that would

20  eliminate that potential concern was a big deal.

21           THE COURT REPORTER:  And I would remind

22  you to slow down.

23           THE WITNESS:  Sorry.

24  BY MR. ABERG:

25       Q.    Apart from the desire to move the pooling

Jarvis, Christopher                                    October 18, 2022

109

1    arrangement onshore, were there any other reasons

2    that the change from Pan-Am to Jade Re was made?

3        **A.     There were a lot of changes between Jade**

4    **and Pan-Am.  What were the motivations?  I'd like to**

5    **think some of the motivation was -- some of the**

6    **motivation was that I was willing to do it and I had**

7    **-- I had experience with pooling, and I had**

8    **experience with reinsurance.  And I had a lot**

9    **of ideas on -- I think, I had the capability**

10   **of managing a more complicated pool and I think that**

11   **was part of it.**

12       Q.     So Pan-Am -- so Jade Re was intended to be

13   different than Pan-Am in some ways.  I think I just

14   heard you say there were a lot of differences; right?

15       **A.     Yeah, there were.**

16       Q.     Well, we'll talk about some of those I

17   think here coming up.  So let's mark our next

18   exhibit, which is going to be U.S. Exhibit 32.

19              (United States Exhibit No. 32 was marked

20              for identification.)

21   BY MR. ABERG:

22       Q.     And it has the Bates number ACR_IRS

23   0327988.  I'm going to share that on my screen.

24   And Exhibit 32 is an e-mail dated May 14, 2012, and

25   it's from Ms. Clark to Alan Rosenbach with the

Jarvis, Christopher                                    October 18, 2022

110

1    subject line, "New Risk Pool."  Prior to this e-mail,

2    Mr. Jarvis, had you met Alan Rosenbach before?

3        A.    I had spoken to Al on the phone.  I don't

4    know if I had met him before.  I may or may not have

5    met him.  I honestly can't recall.  But I've talked

6    to Al on the phone.  I know who he is and I've spoken

7    on the phone with him 100 times.  So it's --

8        Q.    Okay.  Have you ever met him in person?

9        A.    I don't -- I don't know if I have.

10       Q.    By this time in 2012, were you familiar

11   with Mr. Rosenbach's actuarial practice, ACR

12   Solutions?

13       A.    Yes.

14       Q.    Had you worked with Mr. Rosenbach

15   previously in connection with any of your captive

16   clients?

17       A.    I believe so.

18       Q.    What did you think of his work as an

19   actuary?

20       A.    He seemed pretty knowledgeable.  There

21   aren't -- I can't -- I don't get to talk about

22   actuarial stuff with many people.  So as far as, you

23   know, I haven't had a ton of interaction with a lot

24   of actuaries since I left so he seemed to be --

25   seemed to be pretty knowledgeable.

Jarvis, Christopher                                    October 18, 2022

111

1      Q.      Were you aware of whether Mr. Rosenbach

2  had any kind of reputation within the insurance

3  field?

4      A.      No.

5      Q.      Okay.  At the very beginning of this

6  e-mail, Ms. Clark writes that, "After three years of

7  using terrorism risk through a reinsurance structure

8  to accomplish risk distribution, we are redesigning

9  the pool to include more types of coverage and

10  to increase the shared percentage to 50 percent in

11  most cases."

12          So the addition of more types of coverage

13  was a distinguishing feature, I take it, compared to

14  Pan-Am; right?

15      A.      Certainly.

16      Q.      Where did the concept of adding more types

17  of coverages to the pool come from?

18      A.      From -- I mean that's a -- that's

19  insurance risk distribution 101.  The more things you

20  can -- the more things you can cover, the greater --

21  the more -- more diversification you get.  So I mean,

22  that's common actuarial practice that insurance

23  practice, the more things you can put into a pool,

24  the better it is.

25      Q.      And whose idea was it -- whose idea was it

Jarvis, Christopher                                      October 18, 2022

112

1    to make that change for the pooling arrangement for

2    Ms. Clark's clients?

3          A.    Both of ours.

4          Q.    You and she?

5          A.    Yes.

6          Q.    You and Ms. Clark?

7          A.    Without a doubt, yes.  I mean, who came up

8    with it first, I don't know if she said -- if it was

9    her idea and I said it was a great idea, or if I said

10   -- or if I brought it up and she said it's a great

11   idea.  It's -- we both thought it was a great idea

12   otherwise, we wouldn't have done it.

13         Q.    And, Mr. Jarvis, I'll just remind you

14   again, because I see the court reporter shaking

15   her head.  Let's speak very slowly if we can.  Smooth

16   is, what is it -- slow is smooth, smooth is fast,

17   something like that.  I get the desire to move

18   quickly, but let's go a little slower if we can.

19             Why was the decision made to include more

20   coverages in the pool, to your recollection?

21         A.    It would create greater -- well,

22   increasing more coverages and increasing the shared

23   percentage hand-in-hand create -- it creates an

24   excellent risk pool that should satisfy -- that

25   should satisfy any -- any question as to whether or

Jarvis, Christopher                    October 18, 2022

113

1  not these captives are really insurance companies.
2  So satisfying regulators, satisfying the service,
3  satisfying their concerns about what's -- what's
4  really insurance, sharing every coverage and half
5  your premium seems pretty undeniable to me.
6      Q.    So there was a desire to increase the
7  amount of risk distribution is what I hear you
8  saying.  So was there some concern then that Pan-Am
9  was not adequately accomplishing that objective?
10     A.    I don't know.  I don't think it's an
11 indictment on Pan-Am because we wanted to innovate
12 and do something different.  It was -- we knew that
13 doing this would -- would scare a lot of people away
14 and you'd really have to find people who wanted to be
15 involved in insurance.  And we knew it would require
16 a lot of communication and people in your pool would
17 need to know each other a little better.  And it
18 was -- it was rather new and a different way of
19 handling reinsurance pooling in the captive world at
20 the time.
21          But it was something that we felt was --
22 we wanted to deal with people who really
23 saw insurance as -- as a business, and as a way
24 to improve their businesses and their business
25 profitability, not people who were chasing

Jarvis, Christopher                          October 18, 2022

114

1    deductions.  And, you know, this is what we came up

2    with.  So, you know, I didn't spend a lot of time

3    thinking about what Pan-Am wasn't, I was excited to

4    think about what Jade Re could be.

5         Q.    Pan-Am was a straight terrorism risk pool;

6    right?

7         A.    It looks that way.  I honestly don't --

8    don't remember.  I couldn't tell you what the logo

9    looked like.  I don't remember seeing that much of

10   the documents.  I don't think I referred that many

11   clients into it.  Jade Re was a whole different, you

12   know, I was very involved.  So, you know, it's -- you

13   know, it's --  it's hard to compare them.  I'm

14   looking at the documents you have and going off

15   memories of 10, 15 years ago, versus something that I

16   had a hand in building, which is -- I obviously know

17   a lot more about.

18        Q.    Well, were you generally aware at the time

19   of criticisms that had been levelled against

20   straight terrorism risk pools?

21        A.    I don't know that I had heard anything

22   about terrorism risk pools.  Well, that's not true.

23   I did hear something about -- I did hear from people

24   that terrorism wasn't a great risk pool.  And I

25   actually ran it by somebody in my vestige group who

Jarvis, Christopher                                    October 18, 2022

115

1    did defense work that was top secret and had been

2    involved in a lot of things with the government.  And

3    I talked about terrorism as a risk pool thing and his

4    response was, the risk is actually much greater than

5    you can possibly imagine and you're probably

6    underpaying for premiums.  And I asked if he could be

7    a source, and he's like, absolutely not.  And all the

8    things that we do and all the things we know about, I

9    can't share and, no, you can't use them in your

10   materials, and no.

11               But terrorism is a much bigger risk than

12   people think it is.  And this was around that 2008,

13   '09, '10 time.  So it became -- I knew the terrorism

14   risk was significant, but if we couldn't actually

15   justify how significant it was because all that data

16   was, you know, national security and top secret and

17   other stuff, then we're going to have to find

18   something else.  So the perception was becoming the

19   reality, even though I felt like the terrorism risk

20   was real.  If we can't -- can't get access to any of

21   the data that will prove the point, that's not going

22   to help the -- not going to help support the case.

23   So I was like, all right, if we can't do that, let's

24   do something else.  And I would say that conversation

25   with, you know, definitely helped change my mind on,

Jarvis, Christopher                          October 18, 2022

116

1    okay, we got find something that's not just

2    terrorism.

3         Q.    Well, are you aware of any claims that

4    were made against Pan-Am under the terrorism policies

5    that it insured?

6         A.    I'm not aware of any.

7         Q.    Well, let's turn back to this e-mail.  And

8    there's -- actually, let me follow up.

9              You mentioned that this -- this new

10   structure might scare some people away.  And is that

11   because it would involve new types of risks for the

12   clients that participated in the pool, is that what

13   you meant by scare them away?

14        A.    Yeah.  Well, two things.  One, you're

15   pooling more of your money.  So half of your money is

16   at risk -- is in a pool for other people and -- and

17   you're insuring other risks.  So, yes, that's --

18   that's absolutely -- this is much -- this pool would

19   have -- this pool was going to have losses with

20   terrorism or with any single line of coverage.  And

21   there are years that the U.S. flood insurance has

22   next to no claims and that doesn't mean that there

23   are no more floods, that just means there weren't any

24   significant floods this year.  And then all of a

25   sudden you have a heavy rain season and it's way

Jarvis, Christopher                           October 18, 2022

117

1   different.

2          So when you have any one line, it's all

3   super heavily concentrated and this is going to be a

4   lot of lines and a lot of different places.  This was

5   going to be -- this was certainly going to have --

6   this was going to have certainly a higher frequency

7   of claims, that's for sure.

8       Q.    In the third paragraph of this e-mail,

9   which is the point number one here, Ms. Clark writes

10  that, "All policies, other than business income,

11  contract cancellation, litigation expense and tax

12  indemnity are mostly ceded to the pool.  These four

13  types of coverage seem to be the ones people will be

14  most uncomfortable having in the pool."

15         Did part of your conversation with

16  Ms. Clark prior to forming Jade Re involve discussing

17  which additional policies could be included without

18  adding so much risk that clients would be

19  uncomfortable with it?

20      A.    I don't know if -- if I would say it that

21  way.  I would say -- I would say my thought for

22  design in the pool was to avoid things that -- avoid

23  trying to keep it to things that are -- that are very

24  random and that wouldn't be -- I don't want to say

25  not be punitive, but try to -- try to share risks

Jarvis, Christopher                                    October 18, 2022

118

1    that everybody has -- that everybody has similar

2    risks.  So it is -- is it product malfunction.  Is it

3    -- is it take -- take away the chance for fraud as

4    much as we could limit.  That -- so, you know, for

5    example, people -- I don't think people mind in

6    insurance sharing the risk for things that seem very

7    random.

8              I used flood as an example.  If you just

9    happen to have flood, power outages, theft, things

10   that just happen randomly to us, that's one thing.

11   But you don't want to pay for somebody who's a bad

12   character.  So somebody who gets hit with a sexual

13   allegation, you don't want to insure that person who

14   might just not respect other people the same.  So we

15   were looking at coverages to avoid the fraudulent

16   things that -- we didn't want somebody who was a bad

17   apple profiting off other people.  If that makes any

18   sense.

19             So it was -- so this conversation about --

20   I mean, I see Celia's memo, I don't know if that's

21   what happened in the pool, this is what her e-mail

22   says.  But there was a lot of discussion on what

23   things should be included, what things -- at

24   what rate, what's a good -- what things do we think

25   will be truly random and which things do we think

Jarvis, Christopher                                    October 18, 2022

119

1    will happen more frequently to people just because

2    they're bad operators or they're bad -- how do we get

3    rid of that opportunity for somebody to take

4    advantage.  You can't fake a hurricane.  Right.  You

5    could fake -- so we were just trying to look at the

6    fraud risk and get rid of that, because we thought

7    that would be, you know, we were just thinking of the

8    long term viability of the pool.

9          Q.    Let's mark U.S. Exhibit 33, which has a

10   Bates number ACR_IRS 0328012.

11               (United States Exhibit No. 33 was marked

12               for identification.)

13   BY MR. ABERG:

14         Q.    And I just have a couple questions about

15   this document and then we're going to try to knock

16   out some of the very generic stuff about how Jade

17   operated before we break from lunch.  We'll get

18   through as much as we can in 10 minutes.

19         A.    Sure.

20         Q.    But with respect to this document, this is

21   an e-mail from Ms. Clark to Mr. Rosenbach in May

22   of 2014, where she writes in the subject line, "We

23   will get you a list of ten," and then she continues

24   in the body of the e-mail, "standard companies

25   shortly.  In the meantime, Chris Jarvis says he needs

Jarvis, Christopher                          October 18, 2022

120

1    to be able to show that the projected losses of the

2    pool will not exceed 40 percent of the pooled premium

3    at a probability level of 90 to 99 percent."

4            Is it true that you made that statement to

5    Ms. Clark?

6       A.    I don't remember saying that, but that

7    seems reasonable.

8       Q.    Why was it important that projected losses

9    not exceed 40 percent?

10      A.    Well, the idea was to show people that you

11   were going to make a profit at some point.  So if the

12   pool has some probability of having -- there's still

13   going to be a 1-10 percent chance that you're going

14   to have massive losses.  But most of the time we'll

15   have some losses, we'll have some expenses, we'll

16   still end up having a profitable year.  I think

17   that's something people can stomach.

18           I mean, she wrote this.  I've never seen

19   this before, so it's, you know, but out of context I

20   don't know exactly.  But that would make sense to me

21   and that's a loss ratio for a lot of -- I mean, any

22   property coverage is running losses around 40.  So

23   that probably, you know, it could have been that

24   industry standard.

25      Q.    So based on your experience in the

Jarvis, Christopher                          October 18, 2022

121

1   insurance industry, losses equal to 40 percent of

2   premiums would be a favorable, unfavorable outcome,

3   about normal?

4        **A.      For property coverages, it would be good.**

5   **For liability, it would be extraordinary.**

6   **Liability coverages usually run 60.  Overhead runs 40**

7   **to 50.  So if you could run 40 to 50 overhead, 40**

8   **percent losses, ten percent profit on property, that**

9   **sounds pretty reasonable.  Liability coverages make**

10  **it up on investment income.  So they -- you know,**

11  **that just keeps it standard and it's not too crazy.**

12  **I could sell that.**

13       Q.    Okay.  And I'm sure everyone is wanting a

14  break, but let's -- let's cover two exhibits and then

15  we'll stop.

16            We'll move to exhibit -- U.S. Exhibit 34,

17  which is Clark_IRS 0213753.

18            And, Mr. Jarvis, you can see that this is

19  a memo from Celia Clark titled, "December 2012 Risk

20  Distribution Program Basic Information."  It is

21  similar to the 2011 memo that we looked at earlier

22  for Pan-Am; right?

23       **A.    I only see one page, but so far this looks**

24  **similar.**

25       Q.    Right.  Just the heading at least looks

Jarvis, Christopher                              October 18, 2022

122

1    similar; right?

2        **A.    Yes.**

3        Q.    And if we look at the last sentence in the

4    first paragraph, we see that Ms. Clark writes, "Our

5    risk distribution program for 2012 has been

6    redesigned and reorganized to be in compliance with

7    IRS rulings issued earlier this year to be

8    independently managed and to result in most cases in

9    risk distribution well above 30 percent."

10           So this appears to be the memo that was

11   sent out to advise Ms. Clark's clients about the

12   change to Jade Re in 2012; right?

13       **A.    Yeah.   I don't see Jade Re yet, but if --**

14   **I assume you know this already, so I'll say okay.**

15       Q.    Well, we'll move to the second page.  Oh,

16   you know what, I just realized I did this mark.  So

17   this is not U.S. Exhibit 34, this was the first

18   exhibit of the day.  This is U.S. Exhibit 21, just

19   for the record.  It's not important to you,

20   Mr. Jarvis.

21           The second paragraph of the -- on the

22   second page notes that, "Because of the important

23   role played by Jade and its principals, you will be

24   invited to attend one of several webinars to

25   be conducted by them in October and November."

Jarvis, Christopher                              October 18, 2022

123

1          Did you give webinars to Ms. Clark's

2    clients to discuss the Jade Re pool?

3          **A.    Yes.  I believe we did.**

4          Q.    And what was the subject matter of the

5    webinars?

6          **A.    Everything that's right in front of you,**

7    **just to give people a chance to put a face with a**

8    **name, answer questions, let them know -- introduce**

9    **them to -- basically to me and that's all I can**

10   **remember.**

11         Q.    And immediately below this, the memo reads

12   that, "The structure of the pool will be as follows,"

13   and there's a numbered list that describes generally

14   how the pool operates.  And forgive me, but just to

15   see if we can sort of cover this as quickly as

16   possible.

17         As I understand it, the way that Jade Re

18   generally operated was that first, the captive ceded

19   to Jade Re a percentage of the risk and the premiums

20   associated with the policies that they issued to the

21   insureds.  And this was done pursuant to reinsurance

22   agreements that Jade executed with the captives.  Is

23   that correct?

24         **A.    I think you -- I think you slightly**

25   **misspoke.  But individual captives would insure**

Jarvis, Christopher                          October 18, 2022

124

1   businesses.

2        Q.    Yeah.  Perhaps you want to take a minute

3   to review that list and then we'll try to summarize

4   it.

5        A.    No, I get it.  I know how it works.  I was

6   just saying --

7        Q.    Okay.

8        A.    -- you asked me, "is that correct," and I

9   was saying your -- your -- your recap I don't think

10  was -- I think you misspoke on one piece of it.

11       Q.    Okay.  Well, let me try it again.

12       A.    They still would insure -- the -- each

13  captive would insure an entity or entities.  Then

14  they would enter into a reinsurance agreement

15  with Jade Re.  And they would cede dollars as well as

16  risk as part of a reinsurance agreement.  That --

17       Q.    Okay.

18       A.    -- if that's what you meant to say, then

19  the answer is yes.

20       Q.    Right.  That's helpful.  Thank you.  And

21  the second piece was that Jade would simultaneously

22  retrocede 100 percent of the risk assumed from the

23  captives back out to the captives on a quota share

24  basis; is that correct?

25       A.    Yes.

Jarvis, Christopher                          October 18, 2022

125

1      Q.     And this part was done through something
2   called a retrocession agreement?
3      A.     Correct.
4      Q.     And we'll look at some examples of the
5   written agreements after lunch.  But just to confirm,
6   the applicable period for the reinsurance in the
7   retrocession agreements was the same --
8      A.     Yes.
9      Q.     -- or generally the same; right?
10     A.     Yes.  Exactly the same actually.
11     Q.     The period -- so the period generally ran
12  for about one year on each of those agreements; is
13  that correct?
14     A.     Correct.
15     Q.     And, for example, looking at this, the --
16  looking at this memo which is titled, "December 2012
17  Risk Distribution Program," this program would have
18  run from December 2012 to December 2013 --
19     A.     Yes.
20     Q.     -- right?
21     A.     Correct.
22     Q.     And on this memo, there's a diagram that
23  depicts how the pooling arrangement worked; right?
24     A.     Yes.
25     Q.     And this note on the diagram states that

Jarvis, Christopher                          October 18, 2022

126

1   Jade, as the reinsurer, would hold the premiums paid

2   to it under the reinsurance agreements in a trust

3   account.  Do you see that?

4         **A.    Yes.**

5         Q.    It mentions to a trust agreement.  So

6   there was also a trust agreement that the

7   captives executed with Jade Re; is that correct?

8         **A.    Yes.**

9         Q.    And pursuant to that agreement, it's

10  explained underneath the diagram that the rule would

11  be for 50 percent of the premiums to be paid back to

12  the captives after 90 days, 47 and a half percent

13  after 180 days, and then 2.5 percent of the premiums

14  would be held back for one year, the whole policy

15  period; is that accurate?

16        **A.    Yes.  That's how it was the first year.  I**

17  **don't believe it stayed that way, but --**

18        Q.    Okay.  Well, we'll look at a memo for the

19  second year after lunch.  And also appended to

20  this memo there's a checklist.  I've flipped to that

21  and one of the items listed here is a subscription

22  agreement to be signed by treasurer or other officer

23  of the CIC.  And we'll mark one of those and I just

24  have a couple of questions about that before we

25  break.

Jarvis, Christopher                                    October 18, 2022

                                                                    127

1              (United States Exhibit No. 34 was marked.

2              for identification.)

3    BY MR. ABERG:

4       Q.    That is going to be marked as U.S.

5    Exhibit 34, we are at 34 now.  And the Bates number

6    on that document is Clark_Prod 0207685.

7              All right.  Mr. Jarvis, you can see that

8    the title of this document is, "Subscription

9    Agreement December 2012 Reinsurance Agreement, Quota

10   Share Retrocession Agreement and Trust Agreement."

11   And it indicates on the first page that it is to be

12   completed and signed on behalf of the captive

13   insurance company; right?

14      **A.    Yes.**

15      Q.    And we can see on the last page of this

16   document that one is signed by the subscriber who

17   was, for this particular agreement, an insurance

18   company called BKG Insurance.  Do you see that?

19      **A.    I do.**

20      Q.    BKJ, excuse me.

21            And what was the purpose of this document?

22      **A.    I'm just trying to scroll down here to**

23   **see, if you can scroll down a bit.**

24      Q.    Sure.  Actually, I think the first

25   paragraph, if you review that, it would probably give

Jarvis, Christopher                           October 18, 2022

128

1   you an overview of what this document accomplished.

2        A.    Yeah.  This is basically the agreement.

3   That is the agreement between the captives and the

4   reinsurance pool that says we're all submitting a

5   certain amount of risk to you, to the -- we're ceding

6   this out and the pool is responsible for, Jade Re is

7   responsible for these things.  And in return for you

8   taking on this much of our risk, 30 percent,

9   50 percent, whatever it is, we're going to pick up X

10  percent of everything in the pool from everybody

11  else.  So we're submitting a bunch of grapes and we

12  expect back so much fruit salad.  Somebody else is

13  going to submit their stuff and their bananas

14  and melons and whatever else.  So it's that trade-off

15  of I give you some of my stuff and this is what it is

16  specifically, and I'll take a percentage of the

17  aggregate of everybody else on the other side.

18       Q.    Okay.  This agreement is effectively, sort

19  of, an all-in-one agreement where the

20  captive subscribes to all the different agreements

21  that are involved in the pooling arrangement; right?

22       A.    Correct.  By -- by not having separate

23  ones, it all happened simultaneously, so you don't

24  have a situation where someone cedes risk out and

25  doesn't have responsibility coming back and Jade Re

Jarvis, Christopher                               October 18, 2022

129

1    doesn't have any outside risk.  Everyone in the pool

2    is -- it's -- trying to find the right metaphor for

3    Jade Re, but it's certainly facilitating -- I don't

4    want to say it's like a client trust account, but

5    it's -- Jade didn't own any of it, but we just

6    facilitated in between.

7         Q.    So there was some need to be able to

8    execute all of these agreements all at once, and so

9    they were referenced on this subscription

10   agreement --

11        A.    Correct.

12        Q.    -- that the client would sign?

13        A.    Correct.

14        Q.    Right.

15              And on page 2 of this document, there's a

16   reference to this subscriber appointing a company

17   called Captive Insurance Management to act as its

18   attorney -- true and lawful attorney, in fact,

19   for purposes of entering into the different

20   agreements involved in the pooling arrangement;

21   right?

22        A.    I see that.

23        Q.    And I assume based on what you've covered

24   so far, that that was done really as a matter of

25   administrative convenience; is that correct?

Jarvis, Christopher                                    October 18, 2022

130

1      A.    Yeah.  I would -- I would -- I don't even

2  know who Captive Insurance Management, LLC is.  I

3  can't remember who that is.  Is that Norm Chandler's

4  company in Alabama?  I think it might be.  But the

5  power of attorney was -- was limited and was there to

6  simplify, I mean that part -- I mean, that's what I

7  see in the document.

8      Q.    Okay.  So in any case, by having the

9  captive submit these signed subscription agreements,

10 they were effectively agreeing to participate in the

11 reinsurance agreement, the retrocession agreement

12 and the trust account agreement that we talked about

13 earlier; right?

14     A.    Yes.

15     Q.    Okay.  All right.  Well, let's take a

16 break for lunch.  We'll go off the record.

17            THE VIDEOGRAPHER:  Okay.  The time is now

18 11:49 a.m., going off the record.

19            (Recess.)

20            THE VIDEOGRAPHER:  We're back on the

21 record.  The time is now 12:31 p.m.

22 BY MR. ABERG:

23     Q.    Mr. Jarvis, we're -- I just pulled up to

24 share with you the document that was marked as

25 Exhibit 21, which is the Risk Distribution Memo for

Jarvis, Christopher                                        October 18, 2022

131

1    Jade Re and I just pulled it up for one second

2    because I wanted to look at one portion of this on

3    this page.  Page 2 of the document under bullet point

4    three, there's an explanation that the policies will

5    be divided into categories by risk type, coverage

6    part A, B and C policies will be partially ceded to

7    Jade as reinsured.

8              So this portion of the memo has to do with

9    the mix of policies that would make up the Jade Re

10   pool; correct?

11        **A.     Correct.**

12        Q.    And in this point, Ms. Clark also mentions

13   a memorandum attached in a separate e-mail called,

14   "The December 2012 Risk Distribution Program

15   Technical Aspects Memo."  And I would like to mark

16   that as our next exhibit, which is U.S. Exhibit 35.

17             (United States Exhibit No. 35 was marked

18             for identification.)

19   BY MR. ABERG:

20        Q.    And I have it open, so we'll switch to

21   that.  And if we scan down just the first couple of

22   pages, Mr. Jarvis, you can see that there's a section

23   about coverage Part A and coverage Parts B and C.

24             So let's start if we could -- so just to

25   confirm the different -- the gist of the coverage

Jarvis, Christopher                                    October 18, 2022

132

1    parts is that the policies that the insureds -- or

2    the policies that the captives issued and then

3    partially ceded to Jade Re, they were grouped into

4    coverage parts; is that right?

5         A.    Yes.

6         Q.    And we can see, beginning with coverage

7    Part A -- in this first paragraph, we see that

8    coverage Part A included a number of different

9    policies.  It looks like 14 in total; right?

10        A.    Yes.

11        Q.    And if we follow the memo -- if we look at

12   the second page that continues to discuss coverage

13   Part A, we see that there's an explanation here about

14   the level of retained risk for the captives

15   with respect to Part A coverages; right?

16        A.    Yes.

17        Q.    And specifically, in this paragraph on

18   page 2, there's an explanation that each captive

19   would be liable for its own losses on the Part

20   A policies up to a certain amount, $200,000.  And

21   then the pool, Jade Re would be liable for 51 percent

22   of any loss in excess of 200,000 up to a claim of $1

23   million.  Have I described that accurately?

24        A.    You have.

25        Q.    So this sort of functions like a

Jarvis, Christopher                                    October 18, 2022

133

1    deductible in a way; right?

2         A.    Exactly.

3         Q.    The captives were responsible -- okay.

4               And then the captives would also retain

5    some risk, 49 percent of the risk above the

6    deductible amount and then the total coverage would

7    be capped at a claim of $1 million; right?

8         A.    Correct.

9         Q.    And then there's also a note here in the

10   next paragraph down -- or I suppose it's the last

11   sentence of this paragraph I have highlighted that,

12   with respect to Part A coverages, the maximum loss to

13   the pool for any single captive would be capped at

14   $816,000.

15              So my understanding is that no single

16   captive could receive loss payments out of the pool

17   for Part A policies that exceeded that dollar amount;

18   is that right?

19        A.    It is.

20        Q.    And I think that's -- okay.  And we talked

21   briefly about the retrocession agreement.  The way

22   that that would work, for example, with respect to a

23   claim made under one of the coverage Part A policies,

24   would be that a claim would be made and if it

25   exceeded the $200,000 amount, the pool would be

Jarvis, Christopher                                    October 18, 2022

134

1    responsible for some percentage of the loss above

2    that and each pool participant, under the

3    retrocession agreement, would be responsible for

4    paying some portion of the loss; is that right?

5         A.    It is.

6         Q.    And that portion that each participant had

7    to pay for any particular loss, was dependent on the

8    premiums -- the amount of premiums that they

9    themselves had ceded to the pool; right?  That has to

10   do with the quota share concept.

11        A.    Correct.

12        Q.    Moving to coverage Part B, the explanation

13   in the technical aspects -- that coverage Part B

14   would include general costs of defense policies.

15   What kind of coverage was provided under these

16   policies?

17        A.    Legal expenses.

18        Q.    Got it.  Okay.

19             And that would be like any lawsuit that

20   would be filed against the -- the company that was

21   insured?

22        A.    Yep.  Super -- super expensive coverage.

23   As you would except, it costs $7,000 a year for

24   $10,000 of coverage.  We expected most people to have

25   some legal expenses, a lot of them to have at least

Jarvis, Christopher                                    October 18, 2022

135

1    ten grand.  So -- but not everybody had that amount,

2    so that's why it was less than -- the premium was

3    seven and the benefit was 10.  So very high frequency

4    policy for sure.

5        Q.    Right.  And according to the memo, the

6    limits of the liability on these policies was 10,000

7    over 10,000 --

8        A.    Mm-hmm.

9        Q.    -- and that means that the

10   maximum allowable loss for a single event under the

11   policy was 10,000 --

12       A.    Yes.

13       Q.    -- and that the total losses for all

14   claims were also limited to 10,000.

15       A.    Yep.  Yes.

16       Q.    Is that right?

17             Yeah.

18             What's your understanding about who

19   drafted the cost of defense policies that were

20   included in Part B?

21       A.    I believe Celia's team.  I thought they

22   actually worked with another outside insurance.  I

23   know we talked to different insurance brokers at

24   different times.  I thought we brought in some other

25   people to give us some language and then -- it was my

Jarvis, Christopher                                    October 18, 2022

136

1  understanding that Celia then, either took them or

2  edited them.  I can't remember where they came from

3  100 percent.  I mean, I know I -- I didn't draft

4  them, but I know we were looking at policies from --

5  at one point, we grabbed policies from a whole bunch

6  of different people to -- whether it was ISO or --

7  which is I-S-O.  You know, we found policies

8  somewhere and then we -- Celia's team created

9  some standard policies.

10      Q.    Was this a new type of policy that was

11 offered to Ms. Clark's clients in 2012?

12      A.    I don't know if it was in there before or

13 not.  It was new that it was part of the pool.  But I

14 don't -- I can't tell you which of these policies

15 weren't -- I don't know if any of the policies -- I

16 can't tell you which policies in coverage A or B were

17 there before and after.  I just know -- I know that

18 they were all pooled now.  So that was a -- that was

19 a significant change.

20      Q.    And moving to coverage Part C.  Coverage

21 Part C under the pooling arrangement included

22 terrorism risk insurance, and here it's written that

23 the participating captives will cede varying

24 percentages of this risk depending on the client's

25 preference.  This is different than in previous

Jarvis, Christopher                              October 18, 2022

137

1    years; correct?

2         A.    Very.

3         Q.    Why was it done this way in 2012?

4         A.    Because we had other things being ceded,

5    so we didn't -- just -- just the math on how this

6    would work out.  So terrorism was much less -- was a

7    much smaller piece because we found -- we took the

8    decision to pool everything.  And so people had -- if

9    they wanted terrorism, they had it.  If they wanted

10   to -- you know, there was a lot more flexibility

11   around it, it wasn't something that people were going

12   to take it or leave it and give it, as best I

13   remember.

14        Q.    Are you aware of -- as a practical matter

15   how much of the terrorism insurance that

16   your own clients typically ended up ceding to the

17   Jade Re pool?

18        A.    I don't remember how much -- I don't

19   remember how much of their premium was terrorism.  I

20   don't remember how much was ceded, other than it was

21   a heck of a lot smaller than in previous years.

22   Because there was so much ceding going on in A and B.

23        Q.    Smaller in what way, do you mean?

24        A.    Less -- less premium -- less premium,

25   smaller percentage.  That was my recollection.  I

Jarvis, Christopher                                     October 18, 2022

138

1    could be wrong.  I don't remember coverage Part C

2    being a big part of the -- I don't remember it being

3    a big part of the overall premium.

4         Q.    So there's a note in here that in all

5    cases the total premiums ceded to Jade by a CIC would

6    be at least 30 percent and would usually be

7    substantially above that?

8         A.    Yes.

9         Q.    So was the thought that terrorism

10   insurance would only be ceded to the extent it was

11   needed to achieve a 30 percent threshold for the

12   captive -- for any given captive?

13        A.    No.  I think -- I think that note -- it's

14   hard to say what Celia was thinking when she drafted

15   the memo because I'm not Celia.  But I feel like

16   that last sentence could have been on its own the --

17   in all cases, could have been a separate paragraph

18   where it was the total premium ceded will be at

19   least 30, and most of the time will be substantially

20   more than that.  And that was -- you know, I feel

21   like that sentence applies to everything, not only to

22   coverage Part C.

23        Q.    At the end of this memo, there's a

24   reference to a feasibility study for Jade.  What is a

25   feasibility study for an insurance company, if you

Jarvis, Christopher                                    October 18, 2022

139

1    can describe it briefly?

2        A.    Usually it's -- it's the individual risks

3    -- it's been a while.  Usually it's -- it's the

4    individual risks.  It's the premiums.  It's some

5    forecast of losses with some confidence interval.

6    Gives you an idea of what you might find.  So I guess

7    forecast, budget.  I mean, budget is the wrong word.

8    But, you know, forecast might -- pro forma maybe.

9        Q.    Well, that makes sense.  We'll mark as

10   exhibit -- U.S. Exhibit 36, a document with the Bates

11   number Wilson-215827.

12            (United States Exhibit No. 36 was marked

13            for identification.)

14   BY MR. ABERG:

15       Q.    And I just pulled it up on my screen,

16   Mr. Jarvis.  This document you can see can is titled,

17   "Formation of Jade Reinsurance Group, Inc., Alabama

18   Captive Projections and Expected Adverse Case."

19       A.    Yes.

20       Q.    Is this the feasibility study that's

21   referenced in the memo we just looked at?

22       A.    I don't know if -- it's not titled that,

23   but --

24       Q.    You -- does this look like -- I'll scan

25   through a few pages for you.  Does this look like the

Jarvis, Christopher                                October 18, 2022

140

1    type of information or headings you would expect to

2    see included in a feasibility study?

3         **A.    This could be, yeah.  I don't know what's**

4    **being referenced.  But it could be -- you know, this**

5    **looks to be -- yeah, I mean, it looks like it.**

6         Q.    And this document was -- appears to have

7    been prepared by ACR Solutions Group.  And --

8         **A.    Al Rosenbach, yes.**

9         Q.    Okay.  And if we move to page 6 of

10   this report that was prepared by Mr. Rosenbach, we

11   see that there is some discussion relating to

12   expected losses.  Is an actuary ordinarily involved

13   in determining expected losses for an insurance or

14   reinsurance company?

15        **A.    Yes.**

16        Q.    And if we move down a section to page 7,

17   there's a paragraph that begins, "For Coverage A,

18   51 percent."  Do you see that?

19        **A.    Yes.**

20        Q.    And the last sentence of this paragraph

21   reads, "The combined portfolio ELR of 38.4 percent

22   was utilized for the expected case scenario."  Does

23   ELR in these types of reports generally stand for

24   expected loss ratio?

25        **A.    Yes.**

Jarvis, Christopher                                    October 18, 2022

141

1       Q.     And what is the expected loss ratio for an

2   insurer?

3       A.     Well, by --

4       Q.     I guess let me ask a different of

5   question.

6       A.     What percent -- sorry.

7       Q.     I think you actually were about to answer.

8   I guess my question is:  Is it equal to losses over

9   premiums earned, is that the percentage that you come

10  up with?

11      A.     Losses in the numerator, some premium in

12  the denominator, whether it's earned, written,

13  there's different ways to do it.  But it's losses

14  over -- it's losses over premium.  Sometimes it

15  includes -- often times it doesn't include loss

16  adjustment expense.  It doesn't include fixed

17  expenses.  It doesn't include profit.  This is just a

18  straight -- you took in a million dollars of premium,

19  you expect $384,000 of losses.  That's --

20      Q.     Okay.  That's helpful and makes sense.

21             So it appears that the expected loss ratio

22  that Mr. Rosenbach ultimately determined for Jade Re

23  was 38.4 percent; right?

24      A.     That's what it says.

25      Q.     Did you ever discuss the expected loss

Jarvis, Christopher                                    October 18, 2022

142

1    ratio that Mr. Rosenbach arrived at with Ms. Clark?

2         A.    In what sense?  We saw the e-mail before

3    lunch about Celia quoted me as saying 40.  So did I

4    have a separate conversation with Al?

5         Q.    Well, I think my question is:  Was

6    it important for you and Ms. Clark to understand what

7    the expected loss ratio would be for this pool?

8         A.    Well, it definitely was important for me

9    just to understand what -- it was definitely

10   important to me and I can recall having some

11   conversations with Al about how to -- how can we

12   structure this.  Do you go with higher deductibles?

13   Do you go with lower limits?  Do you go with

14   different percentages?  There's a million ways you

15   could have cut this.  I could probably get to 38.4 20

16   different ways.

17         This one is 200 deductible, so the first

18   200,000 of losses nobody pays but you.  And the

19   reason for that is you don't want to trouble the pool

20   with every little tiny case, you just want to go to

21   reinsurance when you have a big enough loss so you

22   don't create exorbitant claims management experience.

23   You don't -- you don't want to have to manage 50

24   claims if you can only manage -- if you only have to

25   manage the two big ones.  We could probably have done

Jarvis, Christopher                          October 18, 2022

143

1   a 190 deductible and gone to 200 and -- ceded 49

2   percent.  You know, you could have just played with

3   the numbers to get to the same thing.

4          And so I think Al did a really nice job at

5   finding round numbers.  It's harder to explain,

6   you have $171,243 deductible, that seems a little odd

7   and arbitrary.  So, you know, we definitely had

8   conversations about what the pieces were and came up

9   with a sizable enough deductible, but a limit on the

10  upside in case somebody really wanted $25 million

11  of product liability insurance.  You didn't have a

12  catastrophic claim that would wipe out everybody in

13  the pool.  So, you know, it was a blend of

14  participation, decent deductible, pretty high limit.

15  You know, so we definitely had combinations

16  about some philosophy on what might go into it.  But

17  Al was the one who did all the research, the research

18  on averages and, you know, he crafted it.  But

19  we definitely had conversations at one point just --

20  just around what the pieces might include.

21      Q.   Okay.

22      A.   But, you know, but it was never -- you

23  know, I never saw any spreadsheets.  I never did

24  any -- I never tested any of his variables or

25  assumptions that wasn't, you know, that's not my sort

Jarvis, Christopher                          October 18, 2022

144

1  of --

2      Q.    Did you ever -- excuse me.  Did you ever

3  discuss the 38.4 percent estimated loss ratio for

4  Jade Re with any of your clients?

5      A.    I can't remember having that conversation

6  with anybody.

7      Q.    Well, the estimated loss ratio of

8  almost 40 percent -- 38.4 percent would have been

9  much higher than the loss ratio that had been

10 experienced with the previous pooling arrangement,

11 Pan-Am --

12     A.    Without a doubt.

13     Q.    -- right?

14     A.    Absolutely.

15     Q.    And did any clients ever ask you about

16 that?

17     A.    Sure.  Well, maybe it wasn't -- I don't

18 know if it was existing clients that didn't like the

19 new one or if it was new clients who may have

20 compared us to other people in the industry and said

21 this looks a lot higher.  But, you know, my answer

22 was the same thing I shared before lunch, was if you

23 want the benefits of insurance you're going to have

24 to play -- you're going to have to be in the

25 insurance game.  And that's going to require you to

Jarvis, Christopher                                    October 18, 2022

145

1    pay some claims and that's part of the, you know, I

2    think the metaphor I used earlier was that's part

3    of -- you want to drive in that lane, you got to pay

4    the toll.  And part of that is going to be losses.

5           Q.    So there were concerns expressed to you

6    about the loss ratio -- or the expected loss ratio

7    that was determined for the new pool coming from

8    clients?

9           A.    I'm sure there were people who chose not

10   to work with us because our pool probably had higher

11   loss ratios than others.  I'm sure, you know, I -- I

12   mean, I can't give you a list of the people, but I'm

13   sure there were people who didn't like that idea.  I

14   don't think we lost many clients.

15          Q.    We'll move to our next exhibit, which is

16   U.S. Exhibit 36 and that is a document with the Bates

17   number Clark_Prod-0581196.

18                (United States Exhibit No. 37 was marked

19                for identification.)

20   BY MR. ABERG:

21          Q.    And I apologize.  This should actually be

22   marked as U.S. Exhibit 37.

23                And, Mr. Jarvis, you can see this is

24   another document on ACR Solutions letterhead which is

25   titled, "Feasibility Study-Jade Reinsurance Group,"

Jarvis, Christopher                                    October 18, 2022

146

1   and it's dated October 2, 2012.  And at the top

2   there's a heading that reads, "Jade Expected Losses."

3          Do you -- well, let me ask you a question

4   about something.  This is short document, so I'll

5   just ask you something specific.

6          It appears that Mr. Rosenbach wrote in the

7   bottom paragraph on page 1 that, "Although the

8   expected ratio" -- "expected loss ratio used in the

9   underlying pro formas is set under 40 percent

10  ultimate loss ratio, we expect much more favorable

11  run off.  For example, according to Clark and

12  Gentry's reported experience to date for policy years

13  2009 to 2011, the incurred loss ratio, without any

14  IBNR, incurred but not reported, is well under five

15  percent for each year."

16         So basically, what Mr. Rosenbach has

17  written here is that even though he stated an

18  estimated loss ratio of 38 percent, he expects actual

19  losses will be much less than that; right?

20     **A.     Yes.  That's what it says.  Kind of**

21  **confusing.  It's not consistent with the last memo at**

22  **all.**

23     Q.    Do you have any understanding as to why

24  Mr. Rosenbach would say that he determined an

25  estimated loss ratio for the pool at 38 percent when

Jarvis, Christopher                          October 18, 2022

147

1   he knows that the actual loss history is much lower

2   than that?

3        A.    Well, there was something in the last --

4   two things.  One is, the five to 40 doesn't make

5   sense to me at all.  But I did see in the last

6   memo part of what he wrote was a load factor for low

7   volume, which is very common.  That in the last --

8   the previous exhibit there was some conversation

9   about how much additional premium he charged because

10  it was the first year, and we don't have enough -- we

11  don't have enough data and that's not uncommon.  But

12  I also know that we expected -- I expected a much

13  higher rate, I don't think five -- five makes a lot

14  of sense.  I can tell you practically, and I don't

15  know what the hell Al was thinking when he wrote

16  that, because I'm not Al.  But I expected losses to

17  go up dramatically because we were pooling so much

18  more.

19           And just human nature of people -- I

20  believe one of the things that was probably happening

21  in the captive space was people had losses and didn't

22  file claims.  Because it was their money, the money

23  was sitting inside the captive, which was -- which

24  was tax-favored in their minds.  And I think people

25  had losses and didn't -- didn't file them, because

Jarvis, Christopher                                    October 18, 2022

148

1    there was no incentive for them.  They didn't need

2    the money.  The businesses were still profitable.

3              But once we saw much more significant

4    pooling, claims went through the roof.  I mean we saw

5    more claims in the first year of Jade and I think

6    every year we saw claims -- claim frequency on the

7    rise because people realized there was -- they

8    realized what the policies actually were.  That was

9    some of it.  And they realized other people would be

10   paying for them.  So I'm guessing -- again the five

11   doesn't make any sense to me.  But I do believe --

12   just because people didn't make claims doesn't mean

13   they didn't have losses.  So I think a big part of

14   this was people -- when we saw the frequency go up

15   dramatically, my guess is people realized -- they

16   realized, one, what they had, and, two, they realized

17   other people would pay for it.

18        Q.    Did you expect -- well, so are you aware

19   of whether this document that Mr. Rosenbach prepared

20   was distributed to clients?

21        A.    I don't -- I don't remember seeing this

22   document, but --

23        Q.    Was this information regarding the actual

24   loss ratio experienced by clients in previous

25   years shared with your clients who participated in

Jarvis, Christopher                          October 18, 2022

149

1  the Jade Re pool in any other way?

2      A.    I don't know.

3      Q.    So just to clarify, you don't have any

4  understanding as to why Mr. Rosenbach would

5  have written in the first memo that his expected loss

6  ratio is 38 percent, and then here he wrote he

7  expected a much more favorable run off.  Do you

8  understand that, why he would have said that?

9      A.    No.  I -- why he would have?  I understand

10  you can -- I can understand why you'd want a

11  favorable run off and why you would want better

12  results.  And I think that has to do with the load,

13  which I mentioned earlier, the additional load that

14  he put on, but not -- but not that big of a number.

15  That doesn't make any sense to me.

16      Q.    We'll move to U.S. Exhibit 38.

17            Well, before we do that, thinking back,

18  did you anticipate -- did you believe that an

19  expected loss ratio of 38.4 percent would occur with

20  the Jade Re pool?

21      A.    Did I believe it?  No.  I knew we would

22  never hit that number exactly, because it's an

23  estimate.  And I felt like one of the biggest

24  challenges we had -- I felt like one of the biggest

25  challenges we had was convincing people to file

Jarvis, Christopher                          October 18, 2022

150

1    claims.  The losses happened.  I had clients who had

2    lawsuits all the time.  But people -- the

3    challenge -- quite candidly, the challenge was people

4    liked having money in the captive, it wasn't subject

5    to creditors -- it was being treated -- it had the

6    opportunity to be treated positively for tax

7    purposes.  They never wanted to take claims.  And if

8    they were doing any estate planning, which later on

9    was eliminated with tax law change, there was

10   even greater disincentive to file claims.  So the

11   biggest challenge we had with Jade was educating

12   people on what they had coverage for and encouraging

13   them to have claims because we had real risk

14   distribution and we had losses.  We had losses all

15   the time in the captive, it was just hard to get

16   people to file claims.

17        Q.    So your experience was that --

18        A.    The losses really -- I believe the losses

19   really happened and Al's estimates were close.  I

20   think the challenge was getting people to file.

21   Which in the traditional insurance world, Liberty

22   Mutual is not begging you to file a claim; right?

23        Q.    Sure.  But captive --

24        A.    Different.

25        Q.    I understand.  Your point is that captive

Jarvis, Christopher                                    October 18, 2022

151

1     insurance is different and that customers are

2     hesitant to file claims because they would prefer

3     to keep that money in the captive; right?

4         A.     Yes.  For a rainy day and if you don't

5     have it -- if it's not a rainy day, why bother.

6     Let's let it sit until I really need it.  I mean,

7     during COVID, a ton of captives made a lot of claims

8     and they needed it.  I mean, these people

9     were really happy to have millions of dollars for

10    business interruption when all of a sudden your --

11    our previous example, our Sports Clips friend, all of

12    a sudden nobody is cutting hair and you're losing $5

13    million a week.  Pretty important to have access to

14    some business interruption insurance while you're

15    praying for some PPP money.

16            You know, I mean it's a tricky -- you

17    know, things happen.  Things happen.  So it's -- I

18    really believe the losses were there.  I think the

19    premiums were accurately priced.  I think the

20    challenge, again, was just that people didn't want to

21    file it, so does that make it -- if they didn't file

22    it, doesn't mean the -- doesn't mean the claim didn't

23    happen.

24        Q.    Well, it's not necessarily consistent

25    with ordinary insurance practice to not file a claim

Jarvis, Christopher                              October 18, 2022

152

1   you're entitled to.  Agreed?

2       **A.      Agreed.**

3       Q.      Let's move to Exhibit 38, which is going

4   to be U.S. Exhibit -- oh, I'm sorry.  This is U.S.

5   Exhibit 38, which has the Bates number Clark_IRS

6   2048932.

7               (United States Exhibit No. 38 was marked

8               for identification.)

9   BY MR. ABERG:

10      Q.      And earlier we talked, Mr. Jarvis, about

11  webinars you provided to Ms. Clark's clients who

12  were joining the Jade Re pool.  And this is an e-mail

13  you sent to Ms. Clark with the subject line, "Updated

14  Slides," and we can see that the slides are actually

15  attached to this document.  And I'll do my best to

16  rotate them so we can read them.  But before I do

17  that, it looks like -- would you have ordinarily

18  asked Ms. Clark to review something like this that

19  was going to be presented to all members in the pool?

20      **A.      Oh, absolutely.  I mean, is this -- is**

21  **this for the webinars in that October/November that**

22  **was previously mentioned?  I'm guessing it might be,**

23  **but --**

24      Q.      Well, the date is in October, so it would

25  appear to be.  And we can look at the slides and

Jarvis, Christopher                     October 18, 2022

153

1    maybe that will refresh your memory.  Is that okay?

2         A.    Sure.

3         Q.    You can see that the name of the

4    attachment, the PowerPoint is called, "Jade Re

5    Program."  And I'm going to modify this document just

6    for purposes of presenting it to you so we can read

7    the slides.  Now, you explained that the purpose of

8    these webinars was just to give clients an

9    opportunity to -- I think you said to meet you and

10   get to you know.  Is that what you said earlier?

11        A.    Yes.  Get to meet us and then

12   obviously information about the new pool, but, yes.

13        Q.    Okay.  And there's a slide here at the

14   beginning that is titled, "Why Change a Good Thing,"

15   and one of the points made here is recent PLRs give

16   guidance.  Is that a reference to -- well, what is

17   that a reference to, PLRs?

18        A.    Private letter rulings from the IRS.

19        Q.    Sure.  Okay.  So a form of IRS guidance?

20        A.    Yes.

21        Q.    Okay.  And if we go down to the next --

22   well there's a -- and if we go two slides down, we

23   can see this slide is titled, "Micro -- Macroeconomic

24   Highlights," and there appears to be a note

25   handwritten on here.  Are you aware of whether that's

Jarvis, Christopher                               October 18, 2022

154

1    Ms. Clark's handwriting on this document?

2        **A.    It's not mine, but --**

3        Q.    Okay.  All right.  And one of the points

4    made on this slide -- one of the bullet points reads,

5    "Global high wealth unit of IRS," and underneath that

6    bullet there's some discussion about audit rates.  So

7    at the time that you and Ms. Clark were working on

8    forming Jade Re, did you understand that she

9    was concerned about increasing IRS scrutiny on her

10   clients and their captives?

11       **A.    I was aware it was happening.  Whether I**

12   **was aware she was aware, I mean, I can't know what**

13   **she was aware of.**

14       Q.    Did you have any understanding that she

15   might be concerned about scrutiny that was focused on

16   her?

17       **A.    No. If anything, on the industry.  I don't**

18   **think -- I didn't -- I didn't get any feeling that**

19   **she felt like she was being targeted for anything.**

20       Q.    So we'll move to U.S. Exhibit -- what will

21   be marked as U.S. Exhibit 39 and this has the Bates

22   number OJM-013983.

23            (United States Exhibit No. 39 was marked

24            for identification.)

25   BY MR. ABERG:

Jarvis, Christopher                                    October 18, 2022

155

1       Q.    And this is an e-mail chain and at the top

2   of the chain on the first page you can see that there

3   are a few e-mails going back and forth between you,

4   Mr. Jarvis, and Ms. Clark that are dated March 21,

5   2011.  So this would be some amount of time before

6   the Jade Re pool was formed; right?

7       A.    I think so.

8       Q.    And I can see you're reviewing it.  It

9   appears that you and Ms. Clark were having something

10  like an argument or maybe -- maybe, really just a

11  disagreement over an issue related to a client, but

12  my question isn't about that part of the discussion.

13  I'd like to direct you to the last paragraph of Ms.

14  Clark's e-mail here, second from the top, where

15  she writes, "You need to calm down so we can discuss

16  some serious stuff that is brewing.  Let me know when

17  is a good time for us to talk tomorrow."

18          My question is:  What was the serious

19  stuff Ms. Clark mentioned here?

20      A.    I honestly don't know.

21      Q.    We will return to U.S. Exhibit 38, which

22  is the PowerPoint slides we were just looking at.

23  And it looked like you had drafted a slide here for

24  the presentation called, "Informal Guidance."  Is

25  that a reference to guidance issued by the IRS

Jarvis, Christopher                                    October 18, 2022

                                                                    156

1   regarding captives?

2       A.    That -- yeah, that was -- that was my

3   understanding.

4       Q.    And you've written here a number of

5   points, presumably gleaned from IRS guidance, right,

6   like losses are to be expected, pools must shift

7   risk, investments must be designed to pay claims, and

8   some other points; right?

9       A.    Yes.

10      Q.    And it looks like someone suggested that

11  you remove this content; correct?

12      A.    That's what it looks like.

13      Q.    Was it Ms. Clark who suggested you remove

14  this content from the presentation?

15      A.    I mean, that's my guess, but I can't -- I

16  assume she reviewed it and that was her comment.

17      Q.    Do you have an understanding about why she

18  would suggest that this content be removed?

19      A.    No, I don't.  I mean I can only guess at

20  this point that maybe it was taking the conversation

21  in a different direction.  I don't think it's because

22  she disputed any of the points.  But then, again, I

23  can't, you know, I shouldn't comment on what I think

24  she thought.  But I don't know.

25      Q.    Well, do you have any recollection about

Jarvis, Christopher                                    October 18, 2022

157

1    discussing these points with her?

2         A.    I don't see anything on there that

3    we hadn't -- that we hadn't discussed.  I don't see

4    anything we hadn't discussed and I didn't see

5    anything that we didn't agree on.  So it looks like

6    it would have more -- more about flow and where she

7    wanted the conversation to go.  Maybe it was -- maybe

8    it was that this -- if you're asking me to guess,

9    maybe it was these are tax-related things and she

10   wanted those conversations between her and her

11   clients and not have me as a non-attorney covering

12   points that may have -- may have been considered tax

13   advice.  I don't know.

14            MR. VOLLRATH:  Eric, would you mind

15   showing me the e-mail that these are attached to when

16   you have a moment?

17            MR. ABERG:  Sure.

18            MR. VOLLRATH:  Thanks.

19            MR. ABERG:  I can switch it back.  I think

20   -- you know what we're --

21            THE WITNESS:  Just stand on your head,

22   you'll be fine.

23            MR. VOLLRATH:  Yeah.  That was fine.  You

24   didn't need to rotate it.

25            MR. ABERG:  Yeah.  I'm about to close this

Jarvis, Christopher                          October 18, 2022

158

1    one.

2    BY MR. ABERG:

3       Q.    All right.  So, Mr. Jarvis, we talked

4    about -- or we looked at the risk distribution memos

5    for the 2012 year and I just wanted to quickly look

6    at the one that was prepared for the following year.

7    And this exhibit will be marked as U.S. Exhibit 40,

8    and it's going to be the document with the Bates

9    number OJM-0002930.

10              (United States Exhibit No. 40 was marked

11              for identification.)

12   BY MR. ABERG:

13      Q.    And, Mr. Jarvis, I'll represent that

14   there's a number of documents it appears in this --

15   in this -- a number of documents condensed within

16   this one file.  It appears to have just been sort of

17   a catalogue of documents that was produced to the

18   United States.  But I'm going to take us to one

19   document in particular that was produced, which is at

20   page 109 of Exhibit 40.  And we can see that this is

21   the "December 2013 Risk Distribution Program" memo.

22   And just quickly scanning down four or five pages.

23   So this first here -- I'm sorry, is the basic

24   information memo for 2013.  And then we can see that

25   there's also a memo titled, "Technical Aspects for

Jarvis, Christopher                                    October 18, 2022

159

1    December of 2013," which is -- two of the same memos

2    that were prepared for 2012; right?

3         **A.    Yes.**

4         Q.    And the December 2013 to December 2014

5    period was the second year that Jade Re operated a

6    pooling arrangement for Ms. Clark's captives;

7    correct?

8         **A.    Yes.**

9         Q.    And I don't want to spend a ton of time

10   rehashing how the pooling arrangement worked.  So

11   I'll just ask:  Is it true that the basic operations

12   of Jade Re were the same for the 2013-2014 period as

13   they were for the 2012-2013 period?

14        **A.    I believe they were similar.  I'd have to**

15   **read it to tell you how --**

16        Q.    Okay.

17        **A.    -- similar, but really close.**

18        Q.    Okay.  That's helpful.  You can see

19   actually and I'll just -- I'll represent that I

20   reviewed this and identified a couple of things that

21   appear to be different.  For example, in the

22   Technical Aspects Memo, you can see that the memo

23   explains that the risk assumed with respect to Part A

24   policies is a bit different --

25        **A.    Yes.**

Jarvis, Christopher                                    October 18, 2022

160

1       Q.      -- in year two than it was in year one;

2   correct?

3       **A.      Yes.  I see that.**

4       Q.      Okay.  And another part of this memo

5   referring to Part C coverage, the coverage included

6   in Part C is now referred to as political violence

7   insurance instead of terrorism risk insurance;

8   correct?

9       **A.      Yes.**

10      Q.      Okay.  So we've identified a couple

11  of changes in the particulars of the operation, but

12  the mechanics of how it worked, including the

13  reinsurance agreement, the retrocession agreement and

14  the trust agreement between Jade Re and the captives

15  were all largely the same in year two as they were in

16  year one.  Is that your understanding?

17      **A.      There are still three categories, that**

18  **part, yes.**

19      Q.      Okay.

20      **A.      And you can see also that -- well, number**

21  **one at the end of C, that sentence was removed.  So I**

22  **guess we caught that typo the next year.  The Part A,**

23  **we now had greater percentage of those policies and**

24  **we lowered the deductible.  So as people got used to**

25  **the coverage, we increased the amount we could cede**

Jarvis, Christopher                                    October 18, 2022

161

so the group was getting more comfortable with the
idea of covering other people's -- which is common,
we're using the actual experience we had in adjusting
some things over time.  So expanding the coverage,
not contracting it.

    Q.    How is -- how was Jade, your company,
compensated for the duties that it managed for the
Jade Re pool?

    A.    Flat fee as I recall, relatively modest.

    Q.    Did Jade Re change ceding commissions for
its role as the reinsurer?

    A.    No.  We charged a flat fee.

    Q.    Was there a reason that ceding commissions
were not charged?

    A.    I did a terrible job negotiating.

    Q.    Any other reason?

    A.    No.  I mean it's -- kept it -- no, it was
a very, you know, it was a very low cost operation.
I mean, for all the risk and aggravation and
everything else, I might have made a hundred grand.
I don't know what it was, it wasn't a big number.

    Q.    Did Ms. Clark receive compensation for
tasks that she performed with respect to Jade Re?

    A.    We didn't pay her.

    Q.    Did anyone pay her for duties she

Jarvis, Christopher                                    October 18, 2022

162

1   performed --

2          A.      Her clients.

3          Q.      -- for Jade Re?

4          A.      Well, the captives had relationships with

5   her firm and they paid her something.  So -- but I

6   don't -- I don't believe there were any payments from

7   Jade Re to her.  That was -- I believe all payments

8   to Celia came from -- came from the clients and their

9   engagements with the firm.

10         Q.     And there was some amount they paid her

11  that was attributable to the reinsurance pool; is

12  that your understanding?

13         A.      I thought I saw in a previous memo that

14  the cost to be in the pool was $5,000 or something.

15  I can't remember.  I thought I saw it on a previous

16  memo.  So it was a flat fee and I don't even remember

17  how much they sent of that to us to manage it.  So I

18  don't -- I can't -- it's been a long time.

19         Q.     And -- well, she was receiving a portion

20  of that payment, what -- what was she responsible for

21  doing with respect to the pool?

22         A.      Her firm did a lot.  They -- they managed

23  the policies.  They managed some of the

24  documents going back and forth.  I mean we handled

25  the financial side, the trustees, but they

Jarvis, Christopher                                    October 18, 2022

163

1    handled communicating with the clients and it's kind

2    of hard to do -- I shouldn't say kind of.  It was all

3    done at the same time, where you would pay your

4    premiums in, but then you would also have to cede out

5    losses and do the retrocessions.  So there was a lot

6    of -- a lot of things had to happen at the same time.

7    It's kind of a closing, where you're closing both

8    ways and simultaneous events and that's -- it's the

9    best metaphor to sell a house and buy a house, but --

10       Q.    So she assisted you in some respect with

11   respect to the management of the pool.

12       A.    Yeah.  Well, the pool was only for her

13   captive clients.  So it wasn't, you know, it was --

14   you know, they couldn't be done separately.  I mean,

15   all of this -- all of the stuff had to be

16   orchestrated and managed.  You know, and she and her

17   team, and Christine and Anthony and other people

18   whose names you've seen on other documents, they were

19   all integral in that.

20       Q.    Okay.  We'll mark U.S. Exhibit 41, which

21   is a copy of one of the reinsurance agreements with

22   one of the captives and it has Bates number

23   Wilson-080301.

24            (United States Exhibit No. 41 was marked

25            for identification.)

Jarvis, Christopher                          October 18, 2022

164

1    BY MR. ABERG:

2        Q.    And, Mr. Jarvis, you can see, this is an

3    example of one of the reinsurance agreements.  This

4    particular one appears to be between RIFA Jace

5    Insurance Company and Jade Re?

6        **A.    Yes.**

7        Q.    And Jade Re in any one year entered into

8    one of these with each of the participating captives

9    that was in the pool --

10       **A.    Yes.**

11       Q.    -- is that correct?

12       **A.    Yes.**

13       Q.    Okay.  And I just have one question about

14   one provision in this agreement, which is on page 6,

15   and under Article 10, which discusses claims

16   conditions.  The third paragraph underneath this

17   heading which begins, "In the event of a claim," this

18   provides in effect that a captive in the pool was

19   responsible for paying for its own claims review

20   process; correct?

21       **A.    It looks that way.  I don't remember that**

22   **being the case, but it looks that way.**

23       Q.    And it says that the claims review process

24   was going to be handled by a third-party

25   administrator --

Jarvis, Christopher                          October 18, 2022

165

1      A.      Correct.  That's true.

2      Q.      -- which was initially a company called

3   Hamlin & Burton Liability Management; is that right?

4      A.      Yes.  Correct.

5      Q.      And the other sentence in this paragraph

6   states that Jade Re and the reinsured captive would

7   agree to be bound by the decision of that third-party

8   administrator regarding the claim and the amount of

9   the loss; right?

10      A.      Yes.

11      Q.      Okay.

12      A.      Is there a question about Hamlin & Burton?

13      Q.      Not right now.  Did you -- well, here's a

14   question.  Did you have any experience working with

15   Hamlin & Burton?

16      A.      We did, quite a bit.

17      Q.      You, yourself or --

18      A.      Mm-hmm.

19      Q.      -- you and Ms. Clark?

20      A.      No, I did for sure.  Multiple claims.  Any

21   time there was a claim or there was a dispute, the

22   idea was to make sure it was fair and people didn't

23   feel like you were giving different treatment to

24   somebody because they -- the perception that maybe

25   you would file -- you would approve a claim for

Jarvis, Christopher                                    October 18, 2022

166

1    somebody who was a favored client or whatever that

2    might be.

3              We just eliminated all of that conflict by

4    going to -- outsourcing to Hamlin & Burton and we had

5    -- they had a bunch of -- I think the attorneys I

6    work with were former JAG attorneys who had since

7    gone into private practice and now they were working

8    there and reviewing claims and they were sticklers

9    for detail and knew their insurance and that was --

10   they were -- they were thorough.

11             MR. VOLLRATH:  Eric, when you're ready can

12   we take a break?

13             MR. ABERG:  Yeah.  Let me -- I have -- I

14   have one really quick question about the next

15   exhibit, which is going to be U.S. Exhibit 42.  And

16   it's a copy of the Retrocession Agreement for 2012.

17             THE WITNESS:  Sure.

18   BY MR. ABERG:

19       Q.    And that has a Bates number

20   Clark_Prod-0009159.

21             (United States Exhibit No. 42 was marked

22             for identification.)

23   BY MR. ABERG:

24       Q.    And, Mr. Jarvis, you can see at the

25   beginning of this document that it is an agreement

Jarvis, Christopher                                    October 18, 2022

167

1   between Jade Re as retrocedent and the

2   retrocessionaires.  And retrocessionaires would be

3   all the captives that had entered into reinsurance

4   agreements with Jade Re; correct?

5        A.    Yes.

6        Q.    And on page 3 of this document, under

7   Article 8, this provision appears to outline the

8   captives' obligation to pay a quota share of all

9   losses as defined herein, and that would refer to any

10  losses that resulted from claims against the pool

11  under the reinsurance agreement --

12       A.    I believe so.

13       Q.    -- is that correct?

14       A.    Yes.

15       Q.    Okay.  And if losses did have to paid for

16  a claim, those losses would have been paid out of the

17  pool's trust account --

18       A.    Yes.

19       Q.    -- is that right?

20       A.    Yes.

21            MR. ABERG:  All right.  We can pause

22  there, Derick, this is probably as good a place as

23  any.  So we'll go off the record.

24            THE VIDEOGRAPHER:  Okay.  The time is now

25  1:29 p.m., going off the record.

Jarvis, Christopher                          October 18, 2022

168

1               (Recess.)

2               THE VIDEOGRAPHER:  We're back on the

3   record.  The time is now 1:46 p.m.

4   BY MR. ABERG:

5       Q.    Mr. Jarvis, I'm going to -- we just

6   concluded the last segment talking about the --

7   looking at a copy of the Retrocession Agreement for

8   2012.  And now I'd like to ask you a couple of

9   questions about the Trust Agreement for Jade Re for

10  2012, which we'll mark as U.S. Exhibit 43.  And that

11  has a Bates number of Clark_Prod-0021021.

12              (United States Exhibit No. 43 was marked

13              for identification.)

14  BY MR. ABERG:

15      Q.    And looking at the this agreement at the

16  top, Mr. Jarvis, we can see that Jade Re was named as

17  the guarantor under the Trust Agreement; correct?

18      A.    Yes.

19      Q.    And the beneficiaries it says, "as defined

20  herein."  We can actually see it's defined right here

21  in this section immediately below are the captives

22  who executed reinsurance agreements with Jade Re;

23  right?

24      A.    Yes.

25      Q.    And then yourself and Mr. Lawrence

Jarvis, Christopher                              October 18, 2022

169

1    Anderson were named as trustees under the agreement;

2    right?

3         A.    Correct.

4         Q.    And in that capacity as trustees, were you

5    and he responsible for paying funds out of the trust

6    account to cover losses that may have been incurred

7    by the pool?

8         A.    Yes.

9         Q.    When we looked at the basic information

10   memo a little while ago, there was an explanation

11   that in effect 90 -- well, not 95, 97.5 percent

12   of the funds in the pool's trust account

13   were supposed to be paid back out to the captives

14   after 180 days.  Do you recall that?

15        A.    In the first year, yes.

16        Q.    And so only 2.5 percent of the premiums

17   were kept as a loss reserve for the reminder of the

18   year after 180 days; correct?

19        A.    Correct.

20        Q.    And who decided that just 2.5 percent

21   should be held back as a loss reserve?

22        A.    That was Celia.

23        Q.    How did Ms. Clark decide that 2.5 percent

24   was the appropriate number?

25        A.    We had this discussion on more than one

Jarvis, Christopher                                    October 18, 2022

170

1    occasion, and it was probably the only thing we

2    disagreed on, and -- well, one of the few things we

3    disagreed on.  And I think that was a carryover from

4    how cash was handled in the Pan-American pool.  And I

5    predicted we'd have much larger losses than that and

6    I was assured that the documents said that if we had

7    losses that were more than that, the pool had the

8    ability to go back to the captives and ask them to

9    pay out.

10           So just because we paid the money out,

11   didn't mean that the losses would be limited to two

12   and a half, they would only be -- that's just how the

13   cash flow would go, so we wouldn't disrupt the apple

14   cart so much.  But we would still go -- we could

15   still go back to the captives and get the money.  But

16   she made the decision that she wanted it to be

17   similar to the year before, just so we didn't change

18   as many things as possible.  And I didn't want to do

19   that, but that's how it went the --

20   Q.    What did --

21   A.    -- first year.

22   Q.    What did -- if that was Ms. Clark's idea

23   and you disagreed with it, what would you have

24   preferred to have been held back as a loss reserve

25   for the rest of the year?

Jarvis, Christopher                                          October 18, 2022

171

1        A.     All of it.  I would have kept it all and

2    waited until we settled the claims and then

3    distributed everything out.  That's what I would --

4    that's what I suggested, but --

5        Q.     Okay.  Did she ever explain why she -- so

6    she believed that 2.5 percent was enough because the

7    Retrocession Agreement provided that you could go

8    back and collect from each of the captives if -- if

9    losses were more than that.  That was her

10   explanation?

11               MR. VOLLRATH:  Object to form.

12               THE WITNESS:  Can you ask it again?

13   BY MR. ABERG:

14       Q.     Sorry.  I just -- just to make sure I

15   understood what you said.  Her -- her reasoning for

16   only holding back 2.5 percent when you would have

17   done more was that you had the authority under the

18   agreement with the captives to go back and collect

19   more if more was necessary --

20               MR. VOLLRATH:  Object to form.

21   BY MR. ABERG:

22       Q.     -- correct?

23       A.     No.  I think I --

24       Q.     Well, let me ask a different question just

25   so -- just so it's clear for the record.

Jarvis, Christopher                                          October 18, 2022

172

1          What was your understanding about why --

2    why she insisted on 2.5 percent being the amount that

3    was held back and not the full amount that you -- you

4    would have advised?

5          A.    So you're asking me what -- what I think

6    she thought or what I think she believed, which is

7    tricky.  But my thought on that is, you're making a

8    change, she was concerned with how was this change

9    going to go, how were people going to handle it.

10   We're already subjecting them to more risk, they're

11   going to have more losses, this is going to be

12   different.  And I think it was an issue of -- I don't

13   know if it was a fear of change or fear of how the --

14   or concern with how the clients might handle it.

15          And I had a different -- I had a different

16   -- I don't think we disagreed on losses as much as it

17   was I don't want to disrupt this and have them feel

18   like we're keeping their money longer and they're

19   going to get nervous and wonder what's going on.

20   Again, I guess it's all conjuncture, and I felt we

21   could hold their money and they would just be

22   happy -- I knew I wasn't going to steal it, it was

23   sitting in a trust account and we weren't going to

24   get three or four people to sign something.  And, you

25   know, it would have been impossible to steal the

Jarvis, Christopher                                    October 18, 2022

173

1    money, not that I would have stolen it if it were

2    possible.

3            But we just had a disagreement on -- I

4    felt like just holding it, wait until everything is

5    done, distribute it back.  She felt like it would

6    be too disruptive.  So that's, you know, I never

7    liked the two-and-a-half number, but that's what

8    other people did and that was kind of some of the

9    carryover from before.

10   Q.    Got it.  But you did have concerns about

11   the 2.5 percent number and you expressed that to her?

12   A.    I -- I had concerns that I was going to

13   have to go collect money from 100 people, which I

14   wasn't being paid enough to do.

15   Q.    Jade Re would have been the party

16   responsible for collecting payment from each of the

17   captives if losses exceeded 2.5 percent; is that

18   right?

19   A.    Yeah.  I wouldn't have been personally

20   liable, because all the risk was down to the

21   captives.  It just would have been the administrative

22   -- it's a whole lot easier to, that's why you hold

23   money in a trust account; right?

24   Q.    Right.

25   A.    If it's in the account, I know it's there.

Henderson Legal Services, Inc.

Jarvis, Christopher                                    October 18, 2022

174

1    If it's not, it's hard to replenish it.  So it was

2    just a -- that was more of an operations thing, it

3    wasn't -- I don't think it was a -- I was also

4    pretty confident we were going to have a lot

5    of losses, but -- I think it subsequently changed

6    over the years, if I remember correctly.

7         Q.    If it had ever been necessary for Jade to

8    go to each of the participating captives and ask them

9    to contribute some share of their money back for a

10   loss at the end of the year, and one of the companies

11   refused to do so, what were Jade's remedies?

12        A.    Harshly written letter, I don't know.  I

13   mean, I don't remember.  Luckily, it didn't --

14   luckily it didn't come to that.  But I don't remember

15   what it was.  I'm sure we had legal remedy, I just

16   didn't -- just administratively I didn't want to be

17   bothered with it.

18        Q.    But did you think that Jade Re faced a

19   risk where it might be put in a position where it

20   would have to go back to the captives and obtain

21   payments from them for a covered loss?

22        A.    Yep.  I thought it was definitely going to

23   happen.

24        Q.    And was there a real risk then, in your

25   mind, that some of those captives might fight you and

Jarvis, Christopher                                    October 18, 2022

175

1    say, I'm not going to pay that?

2        A.    I mean, in this situation, I think Celia

3    was right and I was wrong.  The economics showed that

4    we were going to have significant claims and it was

5    going to be a huge problem.  And, ultimately, people

6    didn't just file as many claims as we -- they didn't

7    file anywhere near the numbers that Al predicted that

8    I thought would be closer.  And so I was pretty

9    confident we'd have really high losses and it turned

10   out people were -- it was really hard to get people

11   to file claims, even when they had them.

12            So again, I don't -- you want me to

13   speculate what would have happened if it hadn't -- if

14   we had losses, I mean it's -- you start getting into

15   a legal battle and -- I mean, it could have been

16   hellish.  You guys would have been busy.  You know,

17   it would have been hard.

18       Q.    So did Ms. Clark disagree with your

19   assessment that there would be a large number of

20   losses, she didn't see it that way?

21       A.    I don't -- I don't know that we argued

22   about that as much as I really think it was more of a

23   conversation about, this is going to be really

24   disruptive and I just don't think we can do all of

25   this change at once.  And I took it, and Jade was a

Jarvis, Christopher                                    October 18, 2022

176

1   new company and it was -- I was leaning more on these

2   were mostly her clients and she knew what they wanted

3   and what they would handle and I said, okay.  So I

4   think it was much more about that than it was -- I

5   don't think it was an argument about loss ratios as

6   much as it was an argument about the -- the clients

7   wouldn't be comfortable with that, and so I

8   acquiesced.

9        Q.    So turning to a couple of the provisions

10  in the Trust Agreement that I'd like to ask about, we

11  can go down to page two.  And this is really just

12  more about the mechanics.  We can see that there's a

13  provision 2.1 and this provides that prior

14  to January 1, 2013, so before the first of the year,

15  each captive -- each beneficiary, which meant under

16  this agreement, each captive "Will deposit or cause

17  to be deposited with the trustees funds in an amount

18  not less than 100 percent of the gross written

19  premiums ceded by each beneficiary to the grantor."

20            So this effectively provides that each

21  captive would deposit with you funds equal to the

22  funds ceded under the reinsurance agreement with Jade

23  Re; right?

24       A.    Uh-huh.  Yes, into the trust account.

25       Q.    Into the trust account.  Okay.  Now, the

Jarvis, Christopher                          October 18, 2022

177

1   next provisions -- could you begin reading 2.2?  I

2   have a couple of questions about this so I want to

3   give you a chance to read and when you reach the

4   bottom of the page, let me know and I'll -- this

5   paragraph ends on the next page so I'll switch pages

6   for you.

7        **A.    Okay.**

8        Q.    And then here it continues.

9        **A.    Yep, I see it.  You don't have**

10   **to highlight it.**

11       Q.    Okay.

12             (Cross talk.)

13       **A.    God that's a mouthful, okay.**

14       Q.    So this article, part of it up here on the

15   second page, provides that each captive would receive

16   notice at least 30 days prior to any withdraw from

17   the trust account to pay losses?

18       **A.    Yes.  Yes.**

19       Q.    And this provision also contemplates that

20   a captive who contributes funds to the pool might

21   object to such a withdrawal --

22       **A.    Yes.**

23       Q.    -- correct?

24       **A.    Yes.  Both happened.**

25       Q.    Okay.  And well it says here that, "In the

Jarvis, Christopher                                    October 18, 2022

178

1  event a beneficiary objects to any part of a proposed

2  withdrawal at the direction of the guarantor, the

3  beneficiary shall have the right that the trustees

4  consult the third-party administrator, Hamlin &

5  Burton, and the objecting beneficiary and the

6  guarantor agree to be bound by the decision of the

7  third-party administrator regarding the amount of the

8  loss or expense in question."

9      **A.    Yes.**

10     Q.    So earlier we looked at a copy of one of

11  the reinsurance agreements and saw that that

12  agreement provided that any claim provided by an

13  insured -- or by a captive rather, would be reviewed

14  by Hamlin & Burton, the third-party administrator.

15  And under the reinsurance agreement, the captive and

16  Jade Re agree to be bound by that third-party

17  administrator's determination about the allowable

18  loss.  Do you recall that about the reinsurance

19  agreement?

20     **A.    I do.**

21          THE COURT REPORTER:  And don't forget to

22  slow down, Counsel, please.

23          MR. ABERG:  I will.

24  BY MR. ABERG:

25     Q.    And here in the Trust Agreement, there's a

Jarvis, Christopher                          October 18, 2022

179

1    provision that appears to lay out a process whereby a

2    different captive who may disagree with the proposed

3    payment of a loss from the trust funds could object

4    and ask the trustees, yourself and Mr. Anderson, to

5    consult with the same third-party administrator that

6    had already approved the claim.  Am I understanding

7    this provision in the Trust Agreement correctly?

8         A.    Yes, I believe so.

9         Q.    So how would that -- in practice, how

10   would that have actually worked in practice?  Would

11   it be that a loss would be approved by Hamlin &

12   Burton, but if one of the pool participants objected,

13   you would go back and ask Hamlin & Burton to

14   reconsider their determination?

15        A.    Yes.  That's exactly what would happen.

16   And they'd have somebody else or they would elevate

17   to it a different person or a manager, somebody with

18   more experience maybe.  And we had that happen.

19   Somebody complained about -- some company had a

20   business interruption and somebody said -- I can't

21   remember exactly who they were, if I thought about it

22   long enough I probably could remember.  But we did

23   have reviews all the time, is this a covered loss,

24   isn't it a covered loss.

25              And then we had some people dispute and

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Jarvis, Christopher                                October 18, 2022

180

1    didn't want to pay claims to a certain person because

2    we would notify them that there was a loss, it was

3    for $600,000, this is how much is coming out of the

4    pool, here's the person, these are the facts, does

5    anyone want to dispute this.  And we actually had a

6    number of people dispute one of them, and we went

7    back there and had a long -- I mean, lengthy

8    situation that went on for months and months and

9    months of -- it was very contentious and, yeah.

10        Q.    Well, my question was that having compared

11   both provisions, doesn't it seem like this objection

12   procedure in the Trust Agreement undercuts that bound

13   -- agreed to be bound provision set forth in the

14   reinsurance agreement?

15        A.    Maybe.  I mean, I'm not -- I'm not an

16   insurance lawyer, but it does seem odd that we'd use

17   them for both pieces.  I don't know if the dates are

18   different or if they're the same.  But, yeah, it does

19   -- it does seem strange that we have to go to them,

20   but then they go ahead and arbitrate it.  But is that

21   any different from the NFL fining a player and then

22   the player appeals to the NFL?  I don't know.  We

23   certainly didn't model this after the NFL, but the --

24   I can tell you in practicality it did -- it did work

25   and people brought up -- I think the -- in the -- you

Henderson Legal Services, Inc.

Jarvis, Christopher                          October 18, 2022

181

1    asked in practical application.

2              What happened was certain people brought

3    up different facts that might have -- that caused us

4    to -- that caused Hamlin & Burton to deny the claim

5    after it had previously been approved because the way

6    it was originally reported by the captive may not

7    have been the complete information.  And then

8    somebody brought up that, oh these people had been

9    sued for this other thing and this shouldn't count

10   and so it was with new information that they

11   reconsidered the information and they changed their

12   -- they changed their ruling, so it's like an appeal

13   process.

14        Q.    I guess it just seems -- it seems almost

15   contradictory that in one agreement, Jade would agree

16   to be bound by Hamlin & Burton's determination with

17   regard to the amount of the claim, but then this

18   directs them to effectively challenge that

19   determination if someone else complains; right?

20        A.    Eric, you're the attorney, I'm not.  But I

21   think if I had to rationalize it, which what the hell

22   does my legal opinion matter.  But we had to go by

23   what Hamlin & Burton said the claim was worth.  But

24   then subsequently, we have to go -- we're trustees

25   and now the beneficiaries feel that this is unfair or

Jarvis, Christopher                                October 18, 2022

182

1    shouldn't work for them so they wanted to be

2    considered based on other information.  So

3    ultimately, since they have to pay it, they're the

4    ones who have the right to question it.  So they --

5    we -- it just gives them -- I don't know, perhaps it

6    was done on purpose for a good reason, perhaps it's

7    bad law.  I don't -- I don't know, but it --

8         Q.    Okay.

9         A.    -- you know, I was certainly bound, and

10   you know.

11        Q.    Did Ms. Clark ever communicate to you that

12   one of her objectives was to limit the amount

13   of losses that would ultimately be paid out of the

14   risk pool?

15        A.    No, the opposite.

16        Q.    We're going to mark as exhibit -- U.S.

17   Exhibit 44, a document that has a Bates number

18   ACR_IRS 0327992.

19             (United States Exhibit No. 44 was marked

20             for identification.)

21   BY MR. ABERG:

22        Q.    And, Mr. Jarvis, you can see that U.S.

23   Exhibit 44 is an e-mail from Ms. Clark to Mr.

24   Rosenbach with yourself copied, and it's

25   dated May 15, 2012, which is around the time we saw

Jarvis, Christopher                                    October 18, 2022

183

1    earlier that you were working with her and Mr.

2    Rosenbach to form the Jade Re pool; right?

3        **A.    Yes.**

4        Q.    And Ms. Clark says in the second paragraph

5    to Mr. Rosenbach, "We think that there will be

6    meaningful deterrents to claims against the pool as

7    follows," and then there's a list of a few items.

8    And in this e-mail, Ms. Clark identifies a couple of

9    things that we had discussed today as deterrents to

10   claims.  For example, each captive has to pay up to

11   its retained limits before the insured can make a

12   claim against the pool.  We discussed the retained

13   limits earlier; right?

14       **A.    Yes.**

15       Q.    This e-mail also notes that insured would

16   have to pay for the expense of claims review, and we

17   saw that this provision was ultimately included in

18   the reinsurance agreements with the captives; right?

19       **A.    Correct.**

20       Q.    The e-mail also notes as one of the

21   deterrents that the pool would have authority to

22   exclude an insured for making excessive claims --

23   exclude an insured who makes excessive claims from

24   future pools.  Do you have an understanding about

25   what she meant by "excessive claims"?

Jarvis, Christopher                                    October 18, 2022

184

1        A.     Oh, yeah, people who constantly made --

2    the idea is if somebody was abusing this or somebody

3    was a bad character who had a lot of lawsuits and

4    they -- like any insurance company, if you have bad

5    -- bad loss experience, they'll just cancel you.  So

6    the idea was that you couldn't have somebody who's

7    constantly sexually harassing all their employees and

8    using the pool to pay for it.  We -- we'd get rid of

9    that person.

10            So the idea was -- and it wasn't -- it was

11   just a certain number of claims that if someone is

12   deemed to be excessive, it isn't you had one bad

13   result.  It's making excessive claims, meaning -- it

14   doesn't say making big claims, it's making excessive

15   claims, a lot of claims that that's someone who's

16   trying to get other people to subsidize their

17   bad business practices.  If that makes sense.  And --

18       Q.     Did -- did Jade Re's --

19       A.     Go ahead.  Well, you had asked the

20   question -- I'm sorry, go ahead.

21       Q.     Did Jade Re's board have the authority to

22   exclude insureds or participating captives from

23   future pools?

24       A.     I believe we did and we did.

25       Q.     So you agree that these things listed here

Jarvis, Christopher                                    October 18, 2022

185

1   were meaningful deterrents from claims being made?

2        A.    I think they were and the question you

3   asked before you pulled this up was, did I believe

4   that Ms. Clark wanted to limit the number of claims.

5   I don't -- I don't see this as a -- I mean, we wanted

6   claims.  We wanted claims, we wanted losses, we

7   wanted to have the highest loss ratio pool in the

8   country.  And this statement is not a -- it's not,

9   hey can we add more deterrent so we don't have

10  claims.  It looks like she's -- I mean, she cc'd me,

11  but it's her e-mail to Al:  What are the projected

12  losses, keeping in mind that there's a whole bunch of

13  things that are probably going to stop people from

14  filing claims?

15          And I was -- I mean, one of the biggest

16  things I did that year was try to convince people to

17  file claims.  Please file claims.  We need the losses

18  to match the real experience or people are going to

19  say we don't have a pool, and it was hard.  I mean,

20  she's -- she's right with the deterrents.  We had way

21  more losses than got -- than got filed.  It's tricky.

22  The same reason why people don't file car -- they get

23  in a fender bender and they want to pay cash because

24  they don't want their rates to go up.  People had

25  money in their captives, they just didn't want to

Jarvis, Christopher                                    October 18, 2022

186

1   **file claims.  It was hard.  Really tricky to get**

2   **accurate numbers.**

3        Q.    All right.  Thank you, Mr. Jarvis.  We're

4   going to move to our next exhibit, which is U.S.

5   Exhibit 45, which has a Bates number Wilson-125111.

6             (United States Exhibit No. 45 was marked

7             for identification.)

8   BY MR. ABERG:

9        Q.    And this is a spreadsheet that's got some

10  very small numbers on it, Mr. Jarvis, so I'm going to

11  navigate around it.  We can see at the top of

12  Exhibit 45 that it's got a title, "Schedule Regarding

13  Trust under Trust Agreement UAD 8/21/12 Reinsurance

14  Pool."  And if we pan down, we can see the document

15  contains a schedule of receipts and distributions for

16  pool recipients.  So --

17       **A.    I see it.**

18       Q.    -- and in the first left-most column it's

19  titled, "Captive Insurance Companies Reinsurer," that

20  first column there are numbers all beginning with

21  2012 dash.  Is this how participating captives in the

22  pool were identified for purposes of this

23  spreadsheet?

24       **A.    Yes.**

25       Q.    And as we move from left to right, we are

Jarvis, Christopher                          October 18, 2022

187

1   able to see the table is broken down and color-coded.

2   I'll zoom out a bit.  And it appears to show each of

3   the three distributions or withdrawals that were paid

4   to the captives from the trust account for 2012;

5   right?

6        **A.    Yes.**

7        Q.    Who was in charge of maintaining this

8   spreadsheet?

9        **A.    Good question.  I don't remember.  I**

10  **think -- I think it was Celia's office, but I don't**

11  **know.**

12       Q.    How did you use this spreadsheet?

13       **A.    When the spreadsheet was -- I mean, I know**

14  **I didn't create it.  But the -- the spreadsheet**

15  **numbers would then go into wire approvals from Credit**

16  **Swift to wire out to people or to distribute to their**

17  **accounts.**

18       Q.    Okay.

19       **A.    So it was just there for tracking.**

20       Q.    Okay.  So with respect to each of the

21  three withdrawals that's tracked on the spreadsheet,

22  there's a column that tracks the total deposit in the

23  trust account as of the date of that withdrawal.  Do

24  you see, for example, with respect to the first

25  column --

Jarvis, Christopher                                    October 18, 2022

188

1        A.    I see it.

2        Q.    -- there's a -- yeah, and it shows the

3    deposits in the trust account as of the date of the

4    first withdrawal of the captives, which is 2/28/13;

5    right?

6        A.    Yes.  I got it.

7        Q.    Okay.  And so if we scroll down -- since

8    this has to do with the first withdrawal in this

9    yellow color-coded section, we can see the total

10   deposits that were in the trust account that year.

11   See 100 percent equaled $22,698,300; right?

12       A.    I see it.

13       Q.    And if we scroll back up and look at the

14   column titles, we'll see that for the first

15   withdrawal there's a column for expenses and these

16   are shown as negative amounts.  Would these have been

17   the administrative expenses that would have to be

18   paid by each of the captives for participating in the

19   pool?

20       A.    It looks like it's a premium tax.  Look up

21   to the right in the box --

22       Q.    Okay.

23       A.    -- but that was the premium tax owed to

24   Alabama.

25       Q.    Okay.  I see that.  Okay.  And with

Jarvis, Christopher                        October 18, 2022

189

1    respect to the first withdrawal, there is a column

2    for gains or losses paid.  Would losses for claims

3    made against the pool under insurance policies have

4    been reflected in gains for losses paid?

5         **A.    If there had been any, but highly unlikely**

6    **there'd be any in three months.**

7         Q.    Okay.  And it shows $0.

8         **A.    Right.**

9         Q.    So no losses paid by the pool as of this

10   date; correct?

11        **A.    Correct.  I think the losses are at the**

12   **bottom if you scroll down on the left.**

13        Q.    We'll scroll down in just a second.  If we

14   move over to the second withdrawal, which is

15   color-coded in this -- I guess, this is teal or

16   greenish blue, there's a column for gains and losses

17   paid.  And as of the date of the second withdrawal,

18   there's also no losses paid by the pool; correct?

19        **A.    Correct.**

20        Q.    And then if we move to the final

21   withdrawal, which is color-coded in orange on this

22   table, there's a column for expenses and claims and

23   there's a negative balance shown of $29,199.73;

24   right?

25        **A.    Yes.**

Jarvis, Christopher                                    October 18, 2022

190

1      Q.     And you correctly pointed out that at the

2  bottom of this table, there's sort of a standalone

3  table that appears to show that this amount $29,199

4  was attributable to claims made under the reinsurance

5  agreements; correct?

6      **A.     Correct.**

7      Q.     So we would be able to compute the loss

8  ratio for the Jade Re pool using the total number of

9  deposits and the total number of losses reported on

10  this table; correct?

11      **A.     Yes.**

12      Q.     And the way --

13      **A.     It's less than one percent.  It's a**

14  **fraction of one percent.**

15      Q.     Right.  Are you able to do the math in

16  your head?

17      **A.     Yeah.  You want go to .3 percent, it's**

18  **small.**

19      Q.     Are you able to see my calculator?

20      **A.     I can see it.**

21      Q.     So if we were to take $29,199.73 and put

22  it over $22,698,300 we arrive at a loss ratio of

23  .129 percent rounded; right?

24      **A.     Yep.**

25      Q.     And so the 2.5 percent held back as a loss

Jarvis, Christopher                                      October 18, 2022

191

1    reserve at the end of the year was more than enough

2    to cover these losses in 20 -- for the 2012 to 2013

3    period; correct?

4        **A.    Correct.**

5        Q.    All right.  I apologize, I need just a

6    minute to review my notes.

7            We're going to very briefly return to an

8    exhibit that was previously marked, and I apologize

9    that I don't remember the number.  But it is the

10   document with the Bates stamp OJM-002930 and this

11   document at page 109 contained the basic

12   information for the 2013/2014 period, so the second

13   year of Jade's operation.  And I just bring this

14   up -- and we'll touch on this, but you reference that

15   you thought over time Jade's operations had changed

16   in that the 2.5 percent number had changed.  But it

17   appears from this document --

18       **A.    That it didn't.**

19       Q.    -- you see the table.  That at least in

20   the second year of Jade's operations the rule was

21   that -- still that the 2.5 percent would be held back

22   as loss reserves; right?

23       **A.    It looks that way, you're right.**

24           MR. VOLLRATH:  And, Eric, just for the

25   record, I think that's Government's Exhibit 40.

Jarvis, Christopher                                      October 18, 2022

192

1              MR. ABERG:   Thanks.

2   BY MR. ABERG:

3       Q.    This is Government's Exhibit 40 at page

4   110.

5              All right.  So we're going to talk about

6   something that you referenced, Mr. Jarvis, that a

7   loss that was claimed in the 2014 year -- the 2013 to

8   2014 period.  And first, we'll look at the Notice of

9   Claim that was received for that loss and we'll mark

10  that as Government's Exhibit 46, I believe.  U.S.

11  Exhibit 46.  And this has a Bates number Clark_IRS

12  0001588 -- that's not right.  Excuse me.

13             (United States Exhibit No. 46 was marked

14             for identification.)

15  BY MR. ABERG:

16      Q.    And this particular notice is at page 125

17  of exhibit -- U.S. Exhibit 45.

18             So, Mr. Jarvis, you can see that U.S.

19  Exhibit 45 is a Notice of Claim dated June 11, 2014,

20  and this is a letter from Ms. Clark's office to Jade

21  Re with the heading, "Business Income and Extra

22  Expense Insurance Policies" -- or it references

23  business income -- it references business income and

24  extra expense policies issued by Chelsea Insurance

25  Company and Flourens Insurance Company.  Those two

Jarvis, Christopher                                    October 18, 2022

193

1   were captives that participated in Jade Re's pool;

2   correct?

3        **A.    Correct.**

4        Q.    And this notice explains that the insured

5   under the policies issued by Chelsea and Flourens was

6   expected to claim losses of $4 million with two

7   million claimed from each captive.  And the insured,

8   according to this letter, is a firm called MTI USA;

9   correct?

10       **A.    Yes.**

11       Q.    And if you scan down to pages 127 and 128

12  of this document, you can see the actual claim

13  notifications that were filed for the Chelsea and

14  Flourens insurance companies, and under -- very hard

15  to read, I apologize for that.  But under the

16  description of the loss, it's written that this was a

17  loss of business income due to negative publicity

18  from a newspaper article alleging fraudulent business

19  practices.

20            So did you speak with Ms. Clark about

21  these claims after she notified you of them?

22       **A.    Numerous times.**

23       Q.    Okay.  Did you develop some understanding

24  about the incident that precipitated this loss?

25       **A.    From them, from Hamlin & Burton, from**

Jarvis, Christopher                                    October 18, 2022

194

1    Celia, from angry insureds, sure, I heard it from

2    everybody.

3         Q.    What was your understanding about what

4    happened that led to this loss?

5         A.    It's been a long time, but if -- they did

6    get some negative press, and I cannot remember for

7    the life of me what it was, other than people in the

8    pool actually read the notice.  And I don't know if

9    somebody knew them or knew somebody in the -- in who

10   had dealt with them, but basically said they lost

11   business because -- not because of -- because the

12   fraudulent business practices that were purported

13   were actually true.

14             And so somebody outed them for -- I think

15   they did online marketing, so the equivalent of

16   getting people likes and followers and all this

17   stuff, and they were found guilty of fraudulently

18   boosting those numbers and then all of a sudden

19   their business went to hell.  Because they --

20   somebody -- I don't know if it was the New York

21   Times -- or I don't remember what newspaper.  But

22   somebody outed them for not being legit and they lost

23   a lot of business.

24             So people really argued about and said

25   that's loss of income, but if it's for something they

Henderson Legal Services, Inc.

Jarvis, Christopher                                    October 18, 2022

195

1    didn't do -- something they did that was actually --

2    it was bad press, but bad press because they're bad

3    people.  So it -- became a nasty situation.

4         Q.    So understanding that there was a cap on

5    the total amount that the pool might actually be

6    required to pay for these claims, would you agree

7    that --

8         A.    55 percent of 1.8 million is still a lot

9    of money.

10        Q.    Okay.  To your recollection, was the MTI

11   loss the largest loss that was ever claimed by a

12   participant in the pooling arrangement?

13        A.    Oh, yeah.  And it would have been great if

14   it had happened.  If it had been legit, it would have

15   been fantastic.  A lot -- a lot of big claim, high

16   profile claim, justification for the pool.  It would

17   have encouraged other people to file more claims.  It

18   was -- it was a great -- you know, I thought it was a

19   great thing.  I wanted to see the claim go through,

20   but I don't get a say in that.

21        Q.    Why did you want the claim to go through?

22        A.    Because people weren't filing claims.  And

23   I knew we had a good reinsurance pool and I wanted to

24   see it used like an insurance pool.  And you've got

25   to pay for somebody else's claim, then you'll all of

Jarvis, Christopher                           October 18, 2022

196

1   a sudden be more interested in having people pay your

2   claim.  But if nobody's paying, nobody's -- that

3   super low loss ratio the first year was because -- it

4   wasn't because there wasn't insurance, it was because

5   people didn't know what they had.  There was a

6   document, but -- that told people what the captive

7   was, but they weren't used to filing claims.  They

8   didn't know what they really had.  They didn't pay a

9   lot of attention to it.  But that claim opened up the

10  flood gates for more -- for more claims to be filed,

11  which was good.

12      Q.    Okay.  Let's move to our next exhibit --

13  and I apologize, I think I maybe made an error on the

14  record.  This document, which has the Bates number

15  Clark_IRS 0001588 should be marked as U.S.

16  Exhibit 46.  And I think I said that right the first

17  time and wrong the second time.

18          Right now, we're going to move to U.S.

19  Exhibit 47, which has the Bates number Clark_IRS

20  001499.

21          (United States Exhibit No. 47 was marked

22          for identification.)

23  BY MR. ABERG:

24      Q.    And, Mr. Jarvis, I'll take us to page 40

25  of this exhibit, which has a letter from Hamlin &

Jarvis, Christopher                          October 18, 2022

197

1   Burton Liability Management which is dated

2   November 6, 2014, and it's titled, "Coverage Analysis

3   and Opinion."  Now Hamlin & Burton found that the MTI

4   loss was a covered loss --

5        **A.    It did.**

6        Q.     -- in this Coverage and Analysis Opinion;

7   correct?

8        **A.    Correct.**

9        Q.    And that's stated on page 9 of this

10  letter.  Here they write, "The Chelsea policy affords

11  coverage for the reputational damages suffered by MTI

12  for the negative publicity."

13       **A.    Yes.**

14       Q.    And underneath that determination there is

15  a section regarding the amount of the covered loss

16  and within that section there's an explanation that,

17  "The Chelsea policy, insofar as the amount of the

18  claim is concerned has indicated above the Chelsea

19  policy covers loss of income incurred during the

20  restoration period, defined as up to 12 consecutive

21  months following the occurrence of the covered cause

22  of loss.  MTI seeks coverage only for the three

23  months of April, May and June 2014."

24            So the initial claim submitted under this

25  policy only sought to recover three months of losses,

Jarvis, Christopher                                    October 18, 2022

198

1    but the policy provided it could cover claims

2    incurred over a period as long as 12 months; is that

3    correct?

4        A.    I think that's what that says.

5        Q.    Are you aware of whether Chelsea and

6    Flourens submitted additional claims to the pool

7    subsequent to this one for losses suffered after --

8        A.    I believe -- I believe they did.  I

9    remember numbers much bigger than what you're showing

10   me.  So I think they did -- they did submit

11   subsequent ones.

12       Q.    Okay.  And so that letter that we just

13   looked at that began at Exhibit 47 page 40 had to do

14   with Chelsea Insurance Company and we can also see

15   that this document -- this exhibit includes a letter

16   coverage analysis and opinion regarding Flourens

17   Insurance Company, which begins at page 49.  Do you

18   see --

19       A.    Yep, I do.

20       Q.    -- that I'm at now?

21       A.    I see it.

22       Q.    And this determination was the same as the

23   one that we just looked at for Chelsea; correct?

24       A.    Correct.

25       Q.    So is it correct that under the terms of

Jarvis, Christopher                         October 18, 2022

199

1    the reinsurance agreement with Chelsea and Flourens,

2    Jade Re was bound by the determinations that Hamlin &

3    Burton set forth in this letter?

4         **A.    Yes.**

5              MR. VOLLRATH:   I would object to form to

6    that question, but --

7              MR. ABERG:   Noted, thank you.

8    BY MR. ABERG:

9         Q.    We'll move to U.S. Exhibit 48, which is a

10   document with Bates number Clark_IRS 0002470.

11              (United States Exhibit No. 48 was marked

12              for identification.)

13   BY MR. ABERG:

14        Q.    And this is a an e-mail chain, and we can

15   see at the bottom that it is -- begins as an e-mail

16   from Pamela Burke at Hamlin & Burton and this appears

17   to be -- shows the transmittal of Hamlin and Burton's

18   determination about the Chelsea and Flourens loss to

19   you and someone named Jim Cushman; right?

20        **A.    Yep.**

21        Q.    Who was Jim Cushman?

22        **A.    He worked for me.**

23        Q.    And Ms. Clark was copied on this e-mail as

24   well; correct?

25        **A.    Yes.**

Jarvis, Christopher                    October 18, 2022

200

1      Q.    And further up the chain at the top, you

2   follow up with Ms. Clark and ask, "Will we have

3   enough money in Jade Re to cover all these claims or

4   do we have to ask for funds from everyone?"  Would

5   Ms. Clark have been the person best situated to

6   answer this question?

7      **A.    Sure.  I mean the best -- I mean, other**

8   **than me, yeah.  I think that would be -- she's on top**

9   **of -- she's paying attention to some of the claims**

10  **stuff too.  So, sure.**

11     Q.    And if there had not been -- so

12  what you're getting at here is, if there had not been

13  sufficient funds to cover these losses, Jade Re would

14  have been forced -- or put in a position, at least,

15  to need to -- excuse me -- Jade Re would have been

16  forced to go collect some payments from the

17  participants in the pool to make -- to cover the

18  loss; right?

19     **A.    That was my biggest fear from an hour ago,**

20  **yes.**

21     Q.    You say that was your biggest fear.  Is

22  that because that would have been a difficult

23  undertaking for you?

24     **A.    Yes.  Complete -- very much.**

25            **Do you have AR from 120 clients in**

Jarvis, Christopher                                October 18, 2022

201

1    your law firm?  Like, it's a big -- it's a -- it's

2    hard to collect money from people after the fact.  I

3    didn't want to have to do that.  That would have been

4    horrible.

5         Q.    Did that cause any tension between you and

6    Ms. Clark?  You noted previously that --

7         A.    No.  No, no.  That wasn't -- I mean, once

8    we made the decision, we made the decision.  I don't

9    -- it wasn't -- I wouldn't say it was -- it caused

10   any contention or any -- it was just do we have it.

11   It wasn't -- whether we had the money or didn't have

12   the money had nothing to do with the -- the decision.

13   We -- we had to abide by Hamlin & Burton's decision,

14   so we notified everybody.

15             And then as trustees, separately from as

16   the owner of Jade Re, as Jade Re I had to abide by

17   their decision, but as a trustee I had to abide by

18   the Trust Agreement, which said that I had to do what

19   was in the best interest of the beneficiaries, and

20   when the beneficiaries complained, I had to go back

21   to Hamlin & Burton and have them look at it again.

22   So I've got -- I'm wearing multiple hats in a no-win

23   situation.

24        Q.    Okay.  I'm going to mark U.S. Exhibit 49,

25   which has the Bates number Clark_IRS 0001885.

Jarvis, Christopher                                    October 18, 2022

202

1                    (United States Exhibit No. 49 was marked

2                    for identification.)

3     BY MR. ABERG:

4          Q.    And this is an e-mail from Ms. Clark to

5     you, Lawrence Anderson, and Jim Cushman dated

6     November 21, 2014, so roughly two weeks after the

7     e-mail we just looked at.  So it appears that Jade Re

8     did provide notice to the other participants in pool

9     -- in the pool about the loss; correct?

10         **A.    Ask the question again, I'm sorry.  I was**

11    **reading ahead.**

12         Q.    My question is -- sure.  This appears to

13    reflect that between the time that you received

14    notice of the loss and this e-mail, there was notice

15    conveyed to the participants in the pool about the

16    Flourens and Chelsea loss; right?

17         **A.    Yes.**

18         Q.    And Ms. Clark writes on November 21st,

19    "That you all would want to know that there's a group

20    of participants in the Jade 2013 pool that is

21    considering objecting to the pending claims of

22    Flourens and Chelsea."  So at least some of

23    the participants that had received notice had

24    complained about the Chelsea and Flourens claim --

25         **A.    Yes.**

Jarvis, Christopher                                    October 18, 2022

203

```
 1        Q.    -- right?
 2        A.    Yes.
 3        Q.    Which participants complained about the
 4   Chelsea and Flourens claim?
 5        A.    I don't remember honestly.  They
 6   complained to Celia at first, and then I believe we
 7   actually had a conference call with a few people on
 8   it.  It's been a long time.  But it wasn't just one
 9   or two people.
10        Q.    Did you ever know the names of the
11   participants that complained?
12        A.    I don't know that I do.  They might --
13   they might have been on a call and I should remember
14   their names, but it's been a long time so I don't.
15        Q.    Is there any way I would find out -- any
16   way I could find out?
17        A.    Ask Celia.
18        Q.    Did any of Jade Re's participants ever
19   contact you directly and complain about the loss that
20   was being claimed by Chelsea and Flourens?
21        A.    I don't believe I ever got a direct --
22   other than being on a call that I vaguely remember
23   with a group of people, nobody contacted me directly.
24        Q.    Are you referring to the conference call
25   that is referenced in this e-mail that was set up
```

Jarvis, Christopher                                    October 18, 2022

204

 1    between the objectors and the insured business, which

 2    presumably was MTI?

 3         A.    Well, that could have been it.

 4         Q.    What happened on the conference call that

 5    you were part of?

 6         A.    It's been a long time, I honestly don't

 7    remember.  Other than I know what came out of it,

 8    which was I had to ask Hamlin & Burton to do a deeper

 9    review based on some new information.

10         Q.    Who participated in that call?

11         A.    I don't remember.

12         Q.    Was Ms. Clark on that call?

13         A.    I can't imagine she wouldn't be.  But I

14    can't tell you I recall she was on it.  I mean, I

15    can't imagine any situation that serious that she

16    wouldn't have been there, but I can't say for sure.

17         Q.    All right.  Ms. Clark writes in the last

18    paragraph of this e-mail that, "If the objectors are

19    satisfied and do not file an objection by

20    December 6th, Jade and the Trustees are authorized to

21    pay the initial claims as approved.  The second round

22    of expenses has yet to be approved by the TPA.  If

23    the total amount exceeds the amount of retained

24    funds, the captives need to pay back their allocated

25    share of the excess.  That will be difficult.

Jarvis, Christopher                                      October 18, 2022

205

1    Hopefully it will not come to that."

2              So you've already expressed that you agree

3    with her that it would have been difficult to have

4    the captives pay back their allocated share of the

5    excess; right?

6         A.    Yeah.  It would have been horrible, but it

7    would have had to have happened.  I mean, that's what

8    we were legally obligated to do.  So I was prepared

9    to it if I had to.

10        Q.    How do you think -- it would have been

11   miserable because your clients would not have been

12   happy about that outcome; is that right?

13        A.    It just would have been administratively,

14   it's the end of the year and trying to get people to

15   pay -- it just would have been logistically difficult

16   to get people to do things by the end of the year to

17   close that out.  That's all.  It's a logistics issue,

18   it's not a -- like I said, collecting money from 120

19   people, even if it's for something you -- they want

20   to buy, it's not easy.

21        Q.    In all your interactions with your

22   clients, do you believe that any of them ever had the

23   expectation that the 2.5 loss reserve would not be

24   enough to cover claims at the end of the year?

25        A.    No, I think the clients I talked to

Jarvis, Christopher                                    October 18, 2022

206

 1   expected that there would be losses in excess and I

 2   encouraged them to -- encouraged them to make claims.

 3   I encouraged them to be happy if there were claims

 4   from other people, that it would all work out in the

 5   wash over time.  I said claims are good, no claims is

 6   probably bad.  I mean, I wanted this thing to go

 7   through.  And I would have -- I would have been happy

 8   to chase the money down so we had the higher loss

 9   ratio, quite frankly.

10              I mean, if the -- if the -- if the out --

11   if the conclusion you want to get to is, we rejected

12   it the second time around so we wouldn't have to go

13   beckon money, that's just false.  Because I wanted

14   claims.  I mean, I wanted this thing to get approved

15   and hoped it wasn't false and hoped these guys would

16   actually sue Ad Week and, you know, would do

17   everything they needed to do.  Like I -- I wanted

18   this thing -- I wanted losses.  I mean that's why I

19   designed the pool this way.  And this wasn't, you

20   know, logistically it was better, but it wasn't -- it

21   wasn't the loss ratio I was hoping for.

22        Q.    Well, I can appreciate that maybe you

23   wanted it, but it's clear that there were several

24   objectors who -- who didn't want to pay this loss --

25        A.    Of course.

Jarvis, Christopher                                    October 18, 2022

207

1      Q.    -- agreed?

2      **A.    100 percent.**

3      Q.    How many?  Do you recall how many there

4  were that didn't want to pay the Chelsea and Flourens

5  loss?

6      **A.    No. I don't remember.**

7      Q.    We're going to mark the next exhibit,

8  which is U.S. Exhibit 50, which has the Bates number

9  Clark_IRS 0002609.

10             (United States Exhibit No. 50 was marked

11             for identification.)

12  BY MR. ABERG:

13     Q.    And this is a letter dated December 8,

14  2014.  We can see on the second page that it was

15  signed by someone named Craig Benson.  Who is

16  Mr. Benson?

17     **A.    Craig is a -- I don't know if he's an**

18  **attorney or an insurance consultant.  But -- I**

19  **haven't heard that name in a long time, but I**

20  **remember talking to him.**

21     Q.    And the subject line of this letter is,

22  "Review and Advice Regarding Jade Reinsurance of MTI

23  USA/Film Annex claims."  So what did Craig Benson do?

24     **A.    Craig reviewed the information.  So we**

25  **were looking for a third party look at this and say**

Jarvis, Christopher                                    October 18, 2022

208

1    what are we dealing with.  And so we paid Craig to

2    look at the documents, and look at the situation

3    and -- I'm not sure what exactly the engagement said,

4    but he was -- he was somebody who knew something

5    about policies and insurance law, to the best of my

6    knowledge.  And we hired him to look at the documents

7    and advise us as to what -- what was going on.

8        Q.   Whose decision was it engage -- was it to

9    engage Mr. Benson to re-review the claimed loss for

10   MTI?

11       A.   I mean, ultimately, I signed the

12   engagement letter.  So I can't remember who

13   introduced me to Craig.  I mean, it'd be easy to say

14   Celia introduced me, but I can't say that she did.  I

15   can't remember how I found Craig.

16       Q.   In this letter in the first paragraph,

17   second sentence, Mr. Benson writes that, "I've

18   reviewed all the materials submitted to me from you

19   or the Celia Clark law office."  So what was Ms.

20   Clark's involvement in the project that Mr. Benson

21   undertook here?

22       A.   I believe it was looking at the

23   reinsurance agreements and the policies and so he

24   probably got some material from us and some from

25   Celia.

Jarvis, Christopher                                      October 18, 2022

209

1      Q.     Did MTI or Chelsea or Flourens, or anyone

2   representing those entities, have any participation

3   in Mr. Benson's review?

4      **A.     I don't remember whether -- I don't**

5   **remember whether he interviewed them or not.**

6      Q.     So you're not aware of whether they

7   participated in this second review of the claim?

8      **A.     I don't remember.**

9      Q.     And what was Mr. Benson's conclusion about

10  MTI's claims?

11     **A.     You'll have to scroll down so I can see.**

12     Q.     Well, I believe in the last paragraph on

13  page 1 he writes that he disagrees with the

14  determination that was reached by Hamlin & Burton;

15  right?

16     **A.     That's what the paragraph says, yes.**

17     Q.     So why did -- why did you have this --

18  this review performed?

19     **A.     Well, I thought it was obvious.  We -- we**

20  **had disagreement of people, we had requirements.  You**

21  **know, I'm in a conflicted situation where I've got --**

22  **as a trustee I have -- I have duties to the**

23  **beneficiaries and as -- and then I have a separate**

24  **contract under Jade Re on how to pay -- on how to**

25  **handle claims.  And so trying to get to the bottom of**

Jarvis, Christopher                                    October 18, 2022

210

1   what's -- what's there and then use his conclusion to

2   ideally negotiate a settlement that both sides will

3   be happy with.

4        Q.    We're going to move to our next -- next

5   exhibit, which will be U.S. Exhibit 51, and that has

6   the Bates number Clark_IRS 0002547.

7             (United States Exhibit No. 51 was marked

8             for identification.)

9   BY MR. ABERG:

10       Q.    And this is an e-mail from you,

11  Mr. Jarvis, to Ms. Clark dated February 25, 2015.

12  And in this e-mail you wrote that you had officially

13  asked Hamlin & Burton to reopen the claims for

14  Chelsea and Flourens.  So are you referring here to

15  the claims that Hamlin & Burton had already approved?

16       A.    Yes.

17       Q.    Did Hamlin & Burton agree to reopen the

18  claims?

19       A.    I believe so.

20       Q.    Why?

21       A.    Because we sent this information and they

22  reconsidered -- I believe they reconsidered based on

23  some of the information that Craig Benson was able to

24  come up with, and that was that.

25             MR. VOLLRATH:  Yeah.  I'd like to put on

Jarvis, Christopher                          October 18, 2022

211

1  the record an objection to form on that question.

2  I'm sorry, I'm not getting the mute button undone

3  timely enough.  But if we could note that for the

4  record.

5  BY MR. ABERG:

6       Q.   Okay.  So you provided Hamlin & Burton

7  with some of the information that they thought was

8  relevant to reopening the claims?

9       **A.   That's my recollection.**

10      Q.   What did you provide?

11      **A.   I think it's right there, isn't it?  The**

12  **attachments are my letter to Hamlin & Burton,**

13  **supporting documentation, the opinion letter from --**

14      Q.   So --

15      **A.   -- Benson Consulting.**

16      Q.   Okay.  So one of them looks like maybe it

17  was the letter we just looked at from Craig Benson;

18  right?

19      **A.   Yes.**

20      Q.   And some other attachments that are listed

21  here; correct?

22      **A.   Correct.**

23      Q.   What authority did you have to make a

24  request to reopen the Chelsea and Flourens claims?

25      **A.   The trust -- the Trust Agreement with the**

Jarvis, Christopher                                    October 18, 2022

212

1   **beneficiaries it says that if they ask, I have to**

2   **give it back to Hamlin & Burton.**

3        Q.    Have you ever asked Hamlin & Burton to

4   reopen claims for any captive claim prior to this

5   one?

6        **A.    No.  We had never had anybody argue.**

7        Q.    Also in this e-mail two paragraphs down

8   from the one we were looking at, you write that

9   you're "prepared to write a quick update for the rest

10  of the pool members, and that it will say that

11  outstanding claims are two times the reserves, so no

12  refunds will be paid."

13           So at this point, Jade Re was still

14  holding back the 2.5 percent of premiums that had

15  been left in the trust account until the end of the

16  year; is that correct?

17       **A.    That's what it looks like.**

18       Q.    But the amount of claims exceeded those

19  reserves at this time; is that right?

20       **A.    Yes.**

21       Q.    And you write in the next sentence of this

22  e-mail that, your update would also have to point out

23  that they may owe up to additional -- an additional

24  $8,950 on top of the existing loss reserves to pay

25  claims if all claims are approved as they have been

Jarvis, Christopher                            October 18, 2022

213

1    filed.
2                So just to make sure I'm understanding
3    this, there was a possibility you're pointing out in
4    this e-mail that participants in the pool might be
5    asked to pay as much as $8,950 each --
6         **A.    Yes.**
7         Q.    -- to cover Chelsea and Flourens' claims;
8    right?
9         **A.    Correct.**
10        Q.    Were pool members ever advised about this
11   possibility?
12        **A.    They were definitely notified of claims**
13   **and what they were, for sure.**
14        Q.    Did you receive any reactions from any of
15   your clients or any of the pool participants about
16   that possibility?
17        **A.    Not that I recall.**
18        Q.    All right.  Our next exhibit is U.S.
19   Exhibit 52, which has the Bates number Clark_IRS
20   0003136.
21             (United States Exhibit No. 52 was marked
22             for identification.)
23   BY MR. ABERG:
24        Q.    And this is an e-mail that's dated March
25   5, 2015, which is ten days after the e-mail which we

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Jarvis, Christopher                              October 18, 2022

214

1    just looked at.  And it's from you to Diana Chan with

2    Ms. Clark copied.  And if we scroll down we can see

3    that there was an initial e-mail that Ms. Chan wrote

4    to you where she writes that, "We've been receiving a

5    ton of questions about the 2013 risk pool."

6              Do you have an understanding about what

7    sort of questions Ms. Clark's office was receiving?

8        A.    Do I know what they were being asked?  No.

9    Other than -- other than the obvious, which is when

10   are we going to get our money and is the pool closed,

11   which that wouldn't -- that wouldn't be surprising.

12       Q.    Well, in the last e-mail you were

13   discussing the need to advise clients that they might

14   not receive any money back; right?  And that they

15   would, in fact, have to pay money into the pool;

16   right?

17       A.    That's what the last one said, yes.

18       Q.    So it would appear that perhaps Ms.

19   Clark's office was not communicating that information

20   to the clients; correct?

21       A.    I don't know what went on in that ten

22   days.  I mean, the fact that people were asking for

23   K-1s and other things, I don't -- I don't know what

24   happened in that ten-day period that caused us not to

25   communicate.  I don't -- you're asking me to go back

Jarvis, Christopher                                    October 18, 2022

215

1    **quite a ways.**

2         Q.    Well, in response to Ms. Chan's e-mail on

3    the -- beginning on page 1 of this document, you

4    write that you agree something should go out to

5    everyone.

6         **A.    Mm-hmm.**

7         Q.    And you write that yo, "have a few

8    comments that I would like to add to this, these key

9    points will reduce the total amount available to each

10   captive." So in the e-mail we looked at before this,

11   you noted the possibility that none of the

12   participants would receive any payment or

13   distribution from the pool and that they might have

14   to pay money back --

15        **A.    Right.**

16        Q.    -- but in this e-mail, you're talking

17   about funds being available for distribution to the

18   captives --

19        **A.    Yes.**

20        Q.    -- right?

21             So what changed between the date of your

22   last e-mail and this one?

23        **A.    It looks like Hamlin & Burton had denied**

24   **the claim in their subsequent review. That's my --**

25   **either that or they negotiated a settlement, I**

Jarvis, Christopher                          October 18, 2022

216

1  honestly can't remember what -- I believe they were

2  paid something.  So I don't know what -- I don't

3  remember the exact facts, but something happened.

4  There was some reconciliation for less than what

5  was -- less than the original amount, whether it was

6  a settlement or -- I honestly can't remember exactly.

7      Q.    Okay.  Okay.  So just to make sure I

8  understand what happened, so initially Hamlin &

9  Burton determined that the Chelsea and Flourens

10  claims were covered losses.

11      A.    Yes.

12      Q.    But then you asked them to reopen the

13  claims.

14      A.    Yes.

15      Q.    And after reopening the claims, Hamlin &

16  Burton withdrew -- or modified or withdrew their

17  determination that the losses were covered; is that

18  right?

19      A.    Yes, that's my -- yes.

20      Q.    And I'd like to mark this so we have it in

21  the record, a letter dated July 23, 2015, from Hamlin

22  & Burton.  That will be U.S. Exhibit 53, I think.

23  And it's got the Bates number Clark_IRS 000 -- excuse

24  me, won't mark this exhibit again.  This has been

25  marked.

Jarvis, Christopher                                    October 18, 2022

217

1          This is a -- this is a different exhibit

2    that has Bates number Clark_IRS 0001499.

3          So Exhibit 47 and if we look at -- no,

4    this is not it.  Here it is.

5          Mr. Jarvis, you can see that this letter

6    shown at page 59 of Exhibit 47 is titled, "Withdrawal

7    of Prior Coverage Evaluation," regarding Chelsea and

8    Flourens; right?

9     **A.    Yes.**

10         THE COURT REPORTER:  Counsel, after this

11   exhibit or whenever is a good time, can we have a

12   quick break?

13         MR. ABERG:  Totally.  We will -- I have

14   one exhibit I wanted to cover -- two and I'll -- I'll

15   go quickly.

16         (United States Exhibit No. 53 was marked

17         for identification.)

18   BY MR. ABERG:

19    Q.    The next exhibit, which will be Exhibit 53

20   -- U.S. Exhibit 53 is Clark_IRS 0002256.  And this is

21   an e-mail chain and if we can scan down to page 8 of

22   this document, we'll see that this is an e-mail,

23   Mr. Jarvis, from a gentleman named Christopher

24   Travis, an attorney, to you.

25    **A.    Yep.**

Jarvis, Christopher                                        October 18, 2022

218

1     Q.     Mr. Travis was an attorney who represented

2     Flourens and Chelsea Insurance Companies --

3     **A.     Yes.**

4     Q.     -- is that right?

5     **A.     Yes.**

6     Q.     And in this e-mail he says, "Please see my

7     responses below."  And then we scan down and see his

8     responses to questions you had asked.  And one of

9     your questions was, "Are you aware that the case has

10    been reopened by Hamlin & Burton and is under further

11    investigation?"  Mr. Travis' response to you is that,

12    "Any attempts by Jade Re to change the claim

13    adjudication constitutes inter alia, undue influence

14    and fraud."

15          So Mr. Travis representing Chelsea and

16    Flourens in this scenario did not think that Jade Re

17    -- Jade Re had the authority to ask for the claims to

18    be re-examined; right?

19          MR. VOLLRATH:  Objection to form.

20    BY MR. ABERG:

21    Q.     Isn't that right?

22    **A.     I don't know -- I don't know what they**

23    **thought.  I mean that's what he wrote.**

24    Q.     Well, we can scan up a few e-mails to page

25    5 of this document and -- he writes to you, "Let's be

Jarvis, Christopher                                    October 18, 2022

219

1   clear, there is no further investigation or review

2   pending.  Hamlin & Burton made determinations on

3   November 6th that there was coverage for MTI USA's

4   claims."  And then further down, "Jade is not

5   permitted to conduct a further review that Chelsea or

6   Flourens has to pay for.  There is no provision for

7   this in the reinsurance agreement."

8          Did you ever speak with Ms. Clark about

9   this issue, whether Jade Re actually had the

10  authority to ask Hamlin & Burton to reopen this claim

11  in the way that it did?

12      **A.      Sure.**

13      Q.    And what did she say?

14      **A.    Said yes, otherwise I wouldn't have opened**

15  **it.  And Craig Benson agreed.**

16      Q.    Craig Benson agreed with what?  That you

17  had the authority to ask Hamlin & Burton to reopen

18  the claims?

19      **A.    Yes, that's my recollection.**

20      Q.    All right.  This is the last document

21  we're going to cover in this section and we'll take a

22  break.  And we're nearing the conclusion.

23          I apologize, I'm trying to find the right

24  one.  I'm looking for exhibit -- U.S. Exhibit 47

25  which is here, and we'll go to page 86.  And this is

Jarvis, Christopher                              October 18, 2022

220

1   a memo, Mr. Jarvis, we'll mark this as exhibit --

2   U.S. Exhibit 54 from you to the trust beneficiaries

3   dated August 25, 2015.

4           So I'll give you a minute, Mr. Jarvis,

5   just to look at this.  So -- and I apologize for the

6   record, we're not marking this as Exhibit 54, this is

7   already Exhibit 47.

8           So, Mr. Jarvis, this is a memo updating

9   the Jade Re pool participants about the Chelsea and

10  Flourens claims; correct?

11      A.    Yes.

12      Q.    And it outlines -- well, in the third

13  paragraph you write, "The claimants have also

14  purported to incur additional losses by the

15  claimants insured, these claims are rather

16  significant.  If ultimately approved, the additional

17  losses would have resulted in a loss of $190,000 to

18  the beneficiaries."  Is that a reference to the

19  additional claims that Chelsea and Flourens

20  had submitted after the ones we had reviewed earlier?

21      A.    It looks that way.

22      Q.    And you explain at the bottom of page 1

23  and the paragraph that continues on page 2, that Jade

24  Re had reached a settlement regarding the Chelsea and

25  Flourens claims; right?

Jarvis, Christopher                          October 18, 2022

221

1      A.    Yes.

2      Q.    Who participated in that negotiation on

3  Jade Re's behalf?

4      A.    I don't remember.  I had lots

5  of conversations with Chris Travis, but I don't

6  remember the final -- I don't remember the final

7  negotiation, who was in it.

8      Q.    How did you decide that $310,000 was a

9  fair amount to settle the claims?

10          MR. VOLLRATH:  Object to form.

11          THE WITNESS:  I don't remember.  I'm

12  reading -- I'm reading the memo the same way you are.

13  I don't remember.  It's a long time ago.  I was happy

14  to have it over with.

15  BY MR. ABERG:

16     Q.    Was it based on the amount of funds that

17  remained in the trust account at that time?

18          MR. VOLLRATH:  Object to form.

19          THE WITNESS:  I don't remember.

20  BY MR. ABERG:

21     Q.    Were the funds remaining in the trust

22  account sufficient to make the settlement payment

23  that you negotiated?

24     A.    I don't recall.

25     Q.    Did Jade ultimately need to go back to any

Jarvis, Christopher                          October 18, 2022

222

1   of the participants to collect payments for the

2   Chelsea and Flourens losses?

3        **A.      I don't remember whether we had to or not.**

4        Q.    Okay.  We'll take a break here.

5             THE VIDEOGRAPHER:  The time is now

6   3:13 p.m., going off the record.

7             (Recess.)

8             THE VIDEOGRAPHER:  We're back on the

9   record.  The time now is 3:32 p.m.

10  BY MR. ABERG:

11       Q.    Mr. Jarvis, I'm going to show you what

12  will be marked as U.S. Exhibit 54.  It has a Bates

13  stamp Clark_IRS 0003180.

14            (United States Exhibit No. 54 was marked

15            for identification.)

16            THE WITNESS:  Okay.

17  BY MR. ABERG:

18       Q.    The first part of this document is an

19  e-mail chain, and we can see the second e-mail from

20  the top is from StephanieMatlock@JadeRisk.com.  What

21  position did Ms. Matlock have at Jade Risk?

22       **A.      She was administrative, handled**

23  **some client -- a lot of administrative stuff and a**

24  **lot of client management, I guess.**

25       Q.    And Ms. Matlock sends an e-mail to Jamie

Jarvis, Christopher                    October 18, 2022

223

1    Salmon at Clark & Gentry Law Office requesting the --

2    or stating that she does not have the 2013, 2014

3    withdrawal disbursement spreadsheet.  And in response

4    Ms. Salmon sent an attachment that is titled, "Final

5    Withdrawal for 9/14/2015 e-mail distribution."

6              Do you see the attachment?

7         A.   I do.

8         Q.   And if we pan down in this document we can

9    see the spreadsheet, which I'll help us look at in a

10   minute.  But this is very similar to the earlier

11   spreadsheet that we looked at for the withdrawal and

12   disbursements for the 2012/2013 period; correct?

13        A.   Yes.

14        Q.   And like the earlier one, this one is

15   broken out into sections moving from left to right to

16   show information about the pooling arrangements at

17   different periods in time; correct?

18        A.   Correct.

19        Q.   And the first section, which is

20   color-coded yellow, we can see there's columns for

21   original deposits and if we scan down this

22   spreadsheet will reflect the total amount of deposits

23   that were in the Jade Re pool for the 2013/2014

24   period, which was $29,364,300; correct?

25        A.   Correct.

Jarvis, Christopher                          October 18, 2022

224

1      Q.    And we can pan across the spreadsheet and
2  we can see that at the time of the first -- first
3  withdrawal, which is coded in yellow, we see approved
4  claims as $0; right?
5      **A.    Yes.**
6      Q.    And at the time of the second withdrawal,
7  which is coded in blue, we see approved claims again
8  as $0; correct?
9      **A.    Yes.**
10     Q.    And that takes us to these last two
11 sections, which appear to relate to dates after the
12 close of the reinsurance period.  For example, you
13 can see in the -- there's a green column titled,
14 "Deposits as of 4/7/2015."  Do you see that?
15     **A.    I do.**
16     Q.    And in these two sections at the end of
17 the spreadsheet, the green and also the peach colored
18 section, we do see some losses identified in a few
19 different columns; right?
20     **A.    Yes.**
21     Q.    There's one that appears to relate to the
22 settlement payment made to the Chelsea and Flourens
23 claim.  For example, it's this peach colored towards
24 the end that's titled, "Settlement of Loss Under
25 Reinsurance Agreements," and then there's two

Jarvis, Christopher                                    October 18, 2022

225

1    numbers; right?

2         A.    Yes.

3         Q.    And at the top right-hand corner there's a

4    summary table -- standalone table for the third

5    withdrawal, which identifies the total claims

6    approved for payment and that amount is $516,000 --

7    excuse me, $516,537.26.  Do you see that?

8         A.    I do.

9         Q.    So this would appear to include at least

10   the amount that was paid to settle the Chelsea and

11   Flourens claims, and also some other losses that are

12   shown on this spreadsheet for this year.  Do you

13   agree?

14        A.    I do, yes.

15        Q.    So if we compute the loss ratio for this

16   period, we would do that by putting this loss amount,

17   which is $516,537.26 over the total deposits number

18   that we looked at, which is $29,364,300, and that

19   generates -- or that yields a loss ratio of

20   approximately 1.8 percent; right?

21        A.    Correct.

22        Q.    So that loss ratio is higher than in the

23   prior period where it was only around .13 percent,

24   but it is also much lower than the estimated loss

25   ratio that Mr. Rosenbach originally determined for

Jarvis, Christopher                                    October 18, 2022

226

1    this pool; right?

2         A.    Yes.

3         Q.    Losses were ultimately minimal as a total

4    percentage of the pool premiums in both years.  Do

5    you agree?

6         A.    **They were low, for sure.**

7         Q.    A loss ratio of less than two percent

8    would have been an outstanding year for any other

9    insurance company in the insurance industry.  Do you

10   agree?

11        A.    **For a company that's been around a long**

12   **time with statistically significant numbers, sure.**

13   **It would be impossible actually.**

14        Q.    Did you receive complaints about the

15   amount of claims that were approved and paid by Jade

16   Re in 2013 or 2014?

17        A.    **I don't believe so.**

18        Q.    We'll mark our next exhibit, which is U.S.

19   Exhibit 55, which has Bates number Wilson-213168.

20             (United States Exhibit No. 55 was marked

21             for identification.)

22   BY MR. ABERG:

23        Q.    And this is an e-mail chain which contains

24   two e-mails.  The first of which is an e-mail dated

25   September 30, 2014, that Ms. Clark wrote to you where

Jarvis, Christopher                           October 18, 2022

227

1   she writes, "Dear Chris, we are going to have to

2   resign from the Jade pool this year."  And what is

3   your understanding about what she meant by resign?

4        **A.    Remove all of her clients.**

5        Q.    And what's your understanding about how

6   she was able to direct her clients to not participate

7   in Jade Re?

8        **A.    I have no idea.**

9        Q.    Had you spoken to Ms. Clark about the

10  possibility that she might direct her clients to not

11  participant in Jade Re before she sent this e-mail?

12       **A.    No.  Complete surprise.**

13       Q.    What's your understanding about why she

14  made this decision?

15       **A.    No idea actually.**

16       Q.    Had she voiced any concerns to

17  you previously about how the pool was being operated?

18       **A.    No.**

19       Q.    Had she voiced any concerns to you about

20  how the pool was operated since -- since then?

21       **A.    You mean, since this e-mail?**

22       Q.    Yeah.  I -- that was a bad question.  I

23  just meant, did she ever explain to you that she had

24  concerns or was -- or disapproved of how the pool

25  was -- was operated?

Jarvis, Christopher                                    October 18, 2022

228

1      A.      No.

2              MR. VOLLRATH:  Object to form.

3              THE WITNESS:  No. Complete and utter

4      surprise.

5      BY MR. ABERG:

6      Q.      Had she told you that she had received

7      complaints from any of her clients about how the pool

8      was being operated?

9      A.      No.

10     Q.      She references in this first paragraph,

11     second sentence, "A new year-end pool we are now

12     representing."  So is it your understanding that

13     she became involved in promoting a new pooling

14     arrangement?

15     A.      Yes.

16     Q.      And that arrangement involved

17     someone named Bill Johnson?

18     A.      Correct.

19     Q.      Who's Bill Johnson?

20     A.      He's an attorney in Texas.

21     Q.      Okay.  We'll move to the next exhibit,

22     which will be marked as U.S. Exhibit 56, that has a

23     Bates number of Clark_IRS 0213774.

24             (United States Exhibit No. 56 was marked

25             for identification.)

Jarvis, Christopher                                    October 18, 2022

229

1    BY MR. ABERG:

2        Q.    And this is a memorandum from

3    Ms. Clark titled, "December 2014 Risk Distribution

4    Program Basic Information," and it's dated

5    September 25, 2014.  And in the second paragraph of

6    this memo Ms. Clark writes that, "You are being" --

7    "In December 2014 you are being offered a choice

8    between the risk pool managed by Jade Reinsurance

9    Group and a new pool managed by Emerald Reinsurance,

10   Inc." -- Emerald -- or excuse me, "Emerald

11   International Reinsurance, Inc."  Emerald, was this

12   the name -- was this the name of the new pooling

13   arrangement that Ms. Clark mentioned in the e-mail we

14   just looked at?

15       **A.    It looks like that.**

16       Q.    And in this memo she writes that clients

17   are being offered a choice between Jade and Emerald.

18   Did you understand that that's how she would be

19   representing the situation to clients?

20       **A.    We ended up not offering Jade, so it**

21   **didn't --**

22       Q.    Oh.

23       **A.    -- there was no Jade pool.**

24       Q.    Okay.  Okay.  And I ask that because one

25   thing I'll point out about this memo that confused me

Henderson Legal Services, Inc.

Jarvis, Christopher                                October 18, 2022

230

1   is that it's actually dated five days before the

2   e-mail we just looked at where Ms. Clark informed you

3   that she was resigning from the Jade pool.  And I

4   think what I just want clarification on is, is it the

5   case that she -- she sent out this memo and then

6   informed you that none of her captives would be

7   participating?

8       A.    Yes, that's what it looks like.  And, yes.

9       Q.    Okay.

10      A.    And it looks to be that the last sentence

11  tells you everything on this page that you needed to

12  know.  We insisted on holding the funds longer and

13  not getting stuck with two and a half percent and

14  that was the -- that was the challenge.  I didn't

15  want to advance the money and -- and apparently, they

16  kept it that way.  So we had a disagreement.  I guess

17  that's what it was.  At least that's -- that's what

18  I'm reading from that memo.  So perhaps that was the

19  reason.

20      Q.    Okay.  You're talking about this last

21  paragraph on page one where she writes, "We

22  understand that Jade intends to change its trust fund

23  structure to release funds ratably as premiums are

24  earned."

25      A.    Yes.

Jarvis, Christopher                                    October 18, 2022

231

1        Q.     Okay.  And you're saying that you had

2   informed her at this point that you wanted to hold

3   back more than 2.5 percent of premiums; is that

4   right?

5        A.     Yes.

6        Q.     And she did not agree with that -- that

7   strategy?

8        A.     **That now all becomes clear, yes.**

9        Q.     And what drove that decision on your end?

10  Why did you think that was important?

11       A.     **I thought it's how the structure should**

12  **have been in the beginning, and we ran into a**

13  **challenge at the end of the previous year having to**

14  **pay claims and not having money.  And that just**

15  **seemed like a bad way to run business.  So we**

16  **insisted on doing it differently and then we got put**

17  **out of business.**

18       Q.     Well -- okay.  So you and she had an

19  agreement about that -- or disagreement, excuse me.

20              But just to be clear, at the end of the

21  2014 period, the 2.5 percent did ultimately end up

22  being sufficient to cover the claims that were made

23  against the pool; right?

24       A.     **Barely.  And it was trending up in a big**

25  **way.  We were 15 times the losses the year before.**

Jarvis, Christopher                                    October 18, 2022

232

1    So it looked like it was going to be not enough, but

2    I've been known to be wrong.

3        Q.    And so when you had this disagreement

4    about the amount of loss reserves that should be held

5    in the pool, did she provide you -- did Ms. Clark

6    provide you with an explanation about why she didn't

7    support this change?

8        A.    No.  I didn't even know she didn't support

9    it until all this came up.  But --

10       Q.    In this e-mail in the paragraph I've --

11   I've got my box around, she also writes that, "We are

12   offering Emerald as an alternative in response to

13   complaints we have received from various clients

14   relating to Jade's management, particularly claims

15   processing and fees."

16           Do you have an understanding about what

17   she's referring to?

18       A.    I think it's BS.  There's no complaint --

19       Q.    What do you mean by that?

20       A.    -- I never received one.  And I think it's

21   just convenient language to change -- to justify the

22   change.  There were never any complaints and I never

23   received one.

24       Q.    So you think she was just not being

25   truthful in this communication?

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

Jarvis, Christopher                        October 18, 2022

233

1      A.    Yeah.  I don't believe it was truthful.  I
2  never saw a complaint.
3      Q.    The only issue that you're aware of that
4  she had was that she did not want to hold back as a
5  loss reserve any more than 2.5 percent of premiums?
6      A.    Well, it looks like she's moving to a five
7  percent number, which I still wouldn't agree to,
8  but --
9      Q.    So on page 2 of this memo -- sorry -- you
10  can finish.
11      A.    Go ahead.  Nope, I've got nothing.
12      Q.    On page 2 of this memo under the heading,
13  "Structure of the Pool," there's a general
14  description about how the pool would operate.  Do you
15  have any understanding about how, if at all, the
16  Emerald arrangement differed from Jade Re?
17      A.    No.
18      Q.    The arrangement described in this -- go
19  ahead.
20      A.    Other than the five percent hold back, I
21  don't -- I don't recall anything different.
22      Q.    Okay.  The arrangement described here
23  under the structure of the pool section sounds a lot
24  like Jade Re.  Do you agree?
25      A.    I do.

Jarvis, Christopher                                    October 18, 2022

234

1      Q.    Are you aware of whether Chelsea and

2  Flourens were excluded from the Emerald pool?

3      A.    No idea.

4      Q.    Did some of your clients continue to work

5  with Clark and participate in the new pooling

6  arrangement that's described here?

7      A.    Yes.

8      Q.    And do you have any understanding about

9  what Emerald's loss history was in subsequent years

10  as compared to Jade's?

11      A.    No.

12      Q.    So I just have two more exhibits and the

13  first one, which we'll mark as U.S. Exhibit 57, is a

14  document with the Bates number OJM-0012587.

15            (United States Exhibit No. 57 was marked

16            for identification.)

17  BY MR. ABERG:

18      Q.    And this is an e-mail chain reflecting an

19  e-mail that you sent to Ms. Clark and her response to

20  you.  And the first e-mail that you sent appears

21  to contain a copy of an e-mail that one of your

22  clients received from a different adviser, someone

23  who you referred to as "these people in New Jersey."

24  Do you see this?

25      A.    I do.

Jarvis, Christopher                                    October 18, 2022

235

1      Q.     And this adviser we can see had some

2  pointed criticisms regarding captive insurance

3  arrangement.  Is that fair to say?

4      **A.     I haven't read it, so I don't know what it**

5  **says, but --**

6      Q.     Which one of your clients forwarded you

7  this e-mail?

8      **A.     No idea.**

9      Q.     Did you ever determine the name of the

10  adviser who gave your client this list of criticisms?

11      **A.     I don't even -- I don't remember this at**

12  **all.  So I have no idea who it was or when it was --**

13  **I mean, I can see it's 2010, but I have no**

14  **recollection of this at all.**

15      Q.     Well, at the bottom of the e-mail this

16  person signs off as regards Bert.  Do have any idea

17  who that might be referring to?

18      **A.     I -- no.  I'm reading the name, it's the**

19  **first time I remember seeing it.  I don't know Bert**

20  **Whitehead.**

21      Q.     Okay.  And Ms. Clark -- it sounds a lot

22  like Adkison, but I don't really know.  Who is

23  Adkison?

24      **A.     There's an attorney named Jay Adkison who**

25  **writes rather opinionated things about different**

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Jarvis, Christopher                                    October 18, 2022

                                                                    236

1    advisers and strategies.

2         Q.    He has been critical of captive insurance

3    arrangements before, Jay Adkison?

4         A.    It's funny because he's the first person

5    who taught me about them.  So it's ironic that he

6    bad-mouths them, but he does captive management so

7    it's not a very credible source.

8         Q.    How common was it for you to receive

9    criticisms like this about captive insurance

10   arrangements?

11        A.    I don't even know that this is about

12   captives.

13        Q.    You don't think is about captive insurance

14   from the context and the wording of the e-mail?

15        A.    I don't know what British Petroleum has to

16   do with -- let me see.  Yeah, I don't see where this

17   is -- I don't see where this is talking about

18   captives directly, but maybe it's in there somewhere

19   and I just haven't read enough of it.

20        Q.    Well, let's look at point one.  He writes

21   in the third sentence --

22             MR. VOLLRATH:  Eric, I think if you go

23   down to paragraph five or six, that might help move

24   this along.

25             THE WITNESS:  Oh, there you go.  Thank

Jarvis, Christopher                                    October 18, 2022

237

1    you.

2              MR. ABERG:  Thanks, Derick.

3    BY MR. ABERG:

4        Q.    So in paragraph one this gentleman writes

5    in the third sentence, "Since the premiums are geared

6    to be excessive with unneeded scope of coverage to

7    justify high tax deductions, it does smell like a

8    sham transaction to me."

9              Do you have any understanding of why the

10   person writing this comment would believe that the

11   premiums proposed to your client's captive -- or

12   captive arrangement were excessive?

13       **A.    No idea.**

14       Q.    Do you have any understanding of why this

15   person would believe that the captive arrangement

16   proposed would have involved unneeded scope of

17   coverage?

18             MR. VOLLRATH:  Object to form.

19             THE WITNESS:  Nope.  I don't know who

20   wrote it.  I don't know who sent -- I don't know who

21   they sent it to.  You know, I mean -- you're asking

22   what people were thinking about something and I'm not

23   even sure what they're talking about.  So --

24   BY MR. ABERG:

25       Q.    In your experience, what work was done for

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                         October 18, 2022

238

1   Ms. Clark's clients to ensure that premiums were not

2   excessive?

3       **A.     Every client had an actuary review their**

4   **business.   So I mean, I think -- I think that helps.**

5       Q.     What work was done to ensure that Ms.

6   Clark's clients were not paying for unnecessary

7   coverage?

8       **A.     Define unnecessary.**

9       Q.     Well, for example, if you have an

10  arrangement where losses -- let's say for an insured

11  or across a group of insureds, total just .1 percent

12  or 1.8 percent of the premiums that were paid, isn't

13  there a strong argument to be made that the coverage

14  involved in that arrangement is excessive or

15  unnecessary?

16           MR. VOLLRATH:  Object to form.

17           THE WITNESS:  I'd respond by asking you

18  how many times your house has burned down in your

19  life.  And if it's zero, then your loss ratio is zero

20  on your homeowner's insurance.  So does that mean

21  your homeowner's insurance is unnecessary or is it

22  just that claims don't happen that often.  So looking

23  at a two-year window, you can't make any -- you can't

24  any judgments on a two-year window.

25  BY MR. ABERG:

Jarvis, Christopher                                    October 18, 2022

239

1       Q.    So your argument is that maybe claims

2   would have been larger in other years --

3             MR. VOLLRATH:  Object to form.

4   BY MR. ABERG:

5       Q.    -- am I understanding that correctly?

6             MR. VOLLRATH:  Object to form.

7             THE WITNESS:  Judging if you had 2,000

8   people in a pool and you had a pool for 25 years,

9   you'd have a better idea of what the loss experience

10  was.

11  BY MR. ABERG:

12      Q.    Well, what about for an arrangement like

13  Pan-Am where there were no losses at all for several

14  years.  Isn't there an argument to be made that that

15  coverage is unnecessary?

16      **A.    I don't know.  I'm not as familiar with**

17  **Pan-Am.  But if you're covering terrorism risk and**

18  **you -- you had a business in Oklahoma City, I'd argue**

19  **that it was pretty important to have it.  I mean you**

20  **can be in a super low frequency/high severity claim**

21  **and not have a claim for 50 years.**

22           **You can not carry umbrella insurance or**

23  **carry umbrella insurance for 50 years and you never**

24  **have a car accident where your kid kills somebody or**

25  **you never have somebody slip and fall and die in your**

Jarvis, Christopher                                    October 18, 2022

240

1    pool.  Does it mean the insurance wasn't necessary?

2    Or was it just you were insured and you'd rather

3    spend some money to make sure that in case that

4    horrible thing happened you were covered.  I mean

5    that's the -- if you don't have it, is disability --

6    is life insurance unnecessary if you don't die.

7        Q.    Well, you're talking about the case

8    experience of perhaps one insured, my personal

9    experience.

10       A.    Sure.

11       Q.    But we're talking about -- in the pooling

12   arrangements for Ms. Clark's clients, we're talking

13   about more than 100 captives and perhaps as many as

14   300 insureds, right, over a several year period?

15       A.    Sure.  And statistical --

16       Q.    Agreed?

17       A.    -- significance is around I think 2,016 I

18   think is the number of risks to get statistical

19   significance, if I remember correctly.  But it's a

20   lot more than 300.  But -- it's just not a big

21   enough --

22       Q.    So is your suggestion that -- so as an

23   actuary, taking into account the fact that across

24   these pooling arrangements the loss ratios never

25   exceeded two percent, did it ever concern you that

Jarvis, Christopher                         October 18, 2022

241

1    your clients might be paying more for coverage than

2    was appropriate?

3              MR. VOLLRATH:  Object to form.

4              THE WITNESS:  No, I didn't have enough --

5    there wasn't enough data.  And it was trending upward

6    and I think if I continued to -- if I continued to

7    manage the pool, it would have continued upward.

8    BY MR. ABERG:

9        Q.    But that didn't happen; right?

10       **A.    I was replaced, I never got to see it.**

11       Q.    All right.  We'll move to our last

12   exhibit, which is U.S. Exhibit 58, and this has the

13   Bates number OJM-0000344.

14             (United States Exhibit No. 58 was marked

15             for identification.)

16   BY MR. ABERG:

17       Q.    And this is a document that appears to be

18   a chat log relating to the Jade Risk captive pooling

19   webinar dated November 9, 2012.  You recall that we

20   discussed webinars that you participated in at the

21   time Jade Re was formed for Ms. Clark's clients?

22       **A.    Yes.**

23       Q.    Who is John Kelly?

24       **A.    He's a financial adviser in Phoenix, I**

25       **think.**

Jarvis, Christopher                                    October 18, 2022

242

1      Q.     And Mr. Kelly asks you a question

2  apparently during this webinar about, "How you will

3  ensure that participants will be filing claims so

4  there will be activity?"  Do you see his question

5  about midway down through the chat?

6      **A.     I do.**

7      Q.     And your response to his question

8  several entries below that is, "I can't ensure

9  claims, but some policies will definitely have

10  losses.  Part of our secret sauce is the policy

11  structure."  And when you talk about "our secret

12  sauce," are you referring to you and Ms. Clark?

13      **A.     The overall Jade pool.**

14      Q.     And Ms. Clark participated in -- in

15  the formation of that pool; correct?

16      **A.     She did, yes.**

17      Q.     And what did you mean when you told

18  Mr. Kelly that part of your secret sauce was the

19  policy structure?

20      **A.     That was the new -- new model that we**

21  **discussed earlier with the A, B and C policies having**

22  **-- actually ensuring significant risk of all the**

23  **policies in A, having the legal expenses, the**

24  **litigation defense, a cost of defense policies in**

25  **category B.  And that was the change from the**

Jarvis, Christopher                              October 18, 2022

243

1   terrorism model from Pan-Am.

2         Q.    So was there something about the structure

3   of the policies included in Jade Re's pool that was

4   intended to create some volume of losses?

5         A.    Absolutely.

6         Q.    What policies were structured that way?

7         A.    All of them.  I mean, they weren't written

8   that way before.  We didn't have reinsurance

9   including all the -- all the policies.  It was

10  certain things were pooled and certain things

11  weren't, and now everything was pooled.

12        Q.    Okay.  I'm done for now, Mr. Jarvis.  I

13  may follow-up depending on what comes up in your chat

14  with Mr. Vollrath, but it'll be very short, I

15  promise.

16              MR. ABERG:  So, Derick, I'm passing the

17  baton to you if you're ready to go.

18              MR. VOLLRATH:  Okay.  Thank you.

19              During my cross, I might want to use some

20  of your exhibits.  Are you going to be able to pull

21  them up for me?  Because I don't have control of

22  them.

23              MR. ABERG:  You want me to -- well they're

24  available on the file share.  You're asking for the

25  sake of convenience, will I pull them up and navigate

Jarvis, Christopher                                    October 18, 2022

244

1    around them for you?

2              MR. VOLLRATH:  Yeah.  I mean, we haven't

3    been using the file share, we've been using the

4    screen share.

5              MR. ABERG:  Well, everything is on the

6    file share.

7              MR. VOLLRATH:  Okay.

8              MR. ABERG:  All right.  I'll help you out

9    though, because I want to get Mr. Jarvis out of here.

10             MR. VOLLRATH:  Yeah.  I appreciate that.

11   If someone wants to send me the link to the file

12   share, perhaps you have it Julia, I can take it over

13   if that's -- if you'd rather proceed that way.

14             MS. LEVINE:  I looked at the file share

15   this morning though, and it said there was no

16   documents in it.  So I don't know if there was

17   something wrong on my end or I'm not doing something

18   right.

19             MR. ABERG:  They were all added at the

20   time that the exhibits were marked.

21             MS. LEVINE:  Okay.  Okay.  So they should

22   all be there now.  Okay.  I'll forward it to you,

23   Derick.

24             MR. VOLLRATH:  Thank you.

25             EXAMINATION BY COUNSEL FOR PLAINTIFF

Jarvis, Christopher                    October 18, 2022

245

1    BY MR. VOLLRATH:

2         Q.    All right.  And thanks for bearing with

3    us, Mr. Jarvis.

4              I'm going to start, however, by showing

5    you an exhibit on my screen and I'd like to mark this

6    Plaintiff's Exhibit 13.

7              Are you familiar with this document,

8    Mr. Jarvis?

9              (Plaintiff's Exhibit No. 13 was marked for

10             identification.)

11             MR. ABERG:  I can't see anything, Derick.

12             THE WITNESS:  Yeah, there's nothing.

13   BY MR. VOLLRATH:

14        Q.    Let's see here.  There we go.

15        **A.    Sure.**

16        Q.    Okay.  Is this an opinion from a -- from a

17   case that you filed in a lawsuit in the Northern --

18   or in the Middle District of Alabama?

19        **A.    It is.**

20        Q.    Okay.  And if you could just take a moment

21   and read the last paragraph on this page beginning

22   here down to here (indicating) to yourself, please.

23   And you can let me know when you're finished.

24        **A.    Okay.**

25        Q.    Now, that opinion is a little glib, but is

Jarvis, Christopher                                     October 18, 2022

246

1  that consistent with your understanding of the law

2  back when you first got involved with captive

3  insurance companies?

4       A.    What?  That insurance companies were ways

5  for people to manage risk?

6       Q.    Yes, with that statement in the opinion.

7       A.    Sure.

8       Q.    And is that consistent with your

9  understanding of the law now?

10       A.    Everything except the estate planning

11  portion, yes.

12       Q.    Okay.  But I believe the opinion said that

13  for a time the estate --

14       A.    Yes.

15       Q.    -- planning portion was valid.

16       A.    Correct.

17       Q.    Okay.  So captive insurance companies are

18  lawful.

19       A.    Yes.

20            MR. ABERG:  Objection, form.

21  BY MR. VOLLRATH:

22       Q.    And 831(b) captives are lawful --

23       A.    Yes.

24       Q.    -- to your understanding?

25       A.    Yes.

Jarvis, Christopher                           October 18, 2022

247

1          MR. ABERG:  Objection, form.

2    BY MR. VOLLRATH:

3        Q.    Okay.  They lawfully provide favorable tax

4    treatment to their users.

5          MR. ABERG:  Objection, form.

6          THE WITNESS:  Yes.

7    BY MR. VOLLRATH:

8        Q.    And for a time, they allowed for favorable

9    estate tax treatment.  Is that your understanding?

10          MR. ABERG:  Objection, form.

11          THE WITNESS:  Yes.

12    BY MR. VOLLRATH:

13        Q.    And there was nothing wrong with that

14    until the Path Act was passed.  Is that your

15    understanding?

16          MR. ABERG:  Objection.

17          THE WITNESS:  Yes.

18          MR. ABERG:  Form.

19          THE WITNESS:  Yes.

20    BY MR. VOLLRATH:

21        Q.    Okay.  And after the Path Act was passed,

22    you stopped using captives for estate planning

23    purposes; is that right?

24        **A.    Yes.**

25        Q.    And to your knowledge, so did Ms. Clark?

Jarvis, Christopher                                    October 18, 2022

248

1      A.     To the best of my knowledge, yes.

2      Q.     And that's all we can ask.  The view

3 reflected in the Court's decision is reasonable in

4 your judgment; is that correct?

5             MR. ABERG:  Objection, form.

6             THE WITNESS:  You'll have to be more

7 specific, Derick.

8 BY MR. VOLLRATH:

9      Q.     Sure.  The -- the two paragraphs that you

10 just read, and I can put them back up on the page if

11 you need me to, that's a reasonable position on the

12 law; correct?

13     A.     Yes.

14            MR. ABERG:  Objection, form.

15 BY MR. VOLLRATH:

16     Q.     Okay.  That was your position in that

17 litigation; right?

18     A.     Yes.

19     Q.     And it was the position ultimately adopted

20 by the Court; is that right?

21     A.     Yes.

22     Q.     Okay.

23            MR. VOLLRATH:  Julie, I'd ask for you not

24 to take notes on this.  If you could open up a

25 different document.

Jarvis, Christopher                                October 18, 2022

249

 1              MS. LEVINE:  Sure.  Okay.

 2  BY MR. VOLLRATH:

 3      Q.   Okay.  And, in fact, you sold your captive

 4  insurance business to another company; correct?

 5      **A.   Correct.**

 6      Q.   And that was the subject of the lawsuit

 7  that the opinion we just reviewed was related to;

 8  correct?

 9      **A.   Correct.**

10      Q.   And the Court sided with you and enforced

11  the agreement and awarded you substantial

12  consideration for the business; is that correct?

13      **A.   Yes.**

14      Q.   The captive insurance companies weren't

15  shams.

16              MR. ABERG:  Objection, form.

17              THE WITNESS:  They were not.

18  BY MR. VOLLRATH:

19      Q.   Okay.  They were insurance companies; is

20  that right?

21      **A.   Correct.**

22              MR. ABERG:  Objection, form.

23  BY MR. VOLLRATH:

24      Q.   All right.  I'd like to go to exhibit --

25  Government's Exhibit 57, and if you give me a minute

Jarvis, Christopher                                    October 18, 2022

250

1     I can try to access it through the shared folder.

2              Okay.  All right.  And I apologize it's

3     going to get a little bit easier as I go.

4              Mr. Jarvis, I've just pulled up

5     Government's Exhibit Number 57 and that's the e-mail

6     with the comments that Celia said she believed or

7     sounded a lot like Adkison.  And Adkison, or whoever

8     wrote this e-mail, lists these potential dangers and

9     drawbacks with captive insurance companies.

10    Paragraph one states, "Since the premiums are geared

11    to be excessive with unneeded scope of coverage to

12    justify high deductions, it does smell like a sham

13    transaction to me."

14             Did any of the captive insurance companies

15    you were involved with have premiums that were geared

16    to be excessive?

17        **A.     No.**

18        Q.    Or with an unneeded scope of coverage to

19    justify high tax deductions?

20        **A.     No.**

21             MR. ABERG:  Objection, form.

22    BY MR. VOLLRATH:

23        Q.    And, to your knowledge, were any of the

24    captive insurance companies Ms. Clark was involved

25    with have premiums that were geared to be excessive

Jarvis, Christopher                          October 18, 2022

251

1   with an unneeded scope of coverage to justify high

2   tax deductions?

3              MR. ABERG:  Objection, form.

4              THE WITNESS:  No.

5   BY MR. VOLLRATH:

6       Q.    Did you ever advise any potential client

7   not to get a second opinion?

8       **A.    No.**

9       Q.    To your knowledge, did Clark ever advise a

10  client not to get a second opinion?

11      **A.    No.**

12      Q.    Were your fees outrageous?

13      **A.    No.**

14      Q.    To your knowledge, were Ms. Clark's fees

15  outrageous?

16      **A.    No.**

17      Q.    Does anything in this -- does this letter

18  describe your captive insurance companies?

19      **A.    No.**

20      Q.    Does it describe Ms. Clark's captive

21  insurance companies to your knowledge?

22      **A.    Given the -- the big profit center, number**

23  **eight about investment management, neither one of us**

24  **did that so I don't know.  I would say, no.**

25      Q.    All right.  You talked about risk

Jarvis, Christopher                    October 18, 2022

252

1  distribution during the Government's direct

2  examination.  You and Celia Clark wanted to satisfy

3  any risk distribution requirements; is that correct?

4       A.    Yes.

5       Q.    That's why Pan-American was set up and

6  used?

7       A.    **Pan-American was set up before I was**

8  **talking to Celia about this, so I don't -- I can't**

9  **comment on.**

10      Q.    That's fair enough.  But that's why Jade

11  Reinsurance was set up and used --

12      A.    **Correct.**

13      Q.    -- is that correct?

14      A.    **Yes.**

15      Q.    Okay.  You believed those pools

16  accomplished sufficient risk distribution; correct?

17      A.    **Correct.**

18      Q.    And you did what research in reaching that

19  conclusion that you felt was reasonable; is that

20  correct?

21           MR. ABERG:  Objection, form.

22  BY MR. VOLLRATH:

23      Q.    Did you always act --

24           MR. ABERG:  Derick, I'm going to object.

25  I don't think you're -- I don't think you're allowed

Jarvis, Christopher                          October 18, 2022

253

1    to lead this witness like you're doing.  If you have

2    questions about what happened, you can ask them.  But

3    I don't think this is a witness that you're allowed

4    to lead.

5         MR. VOLLRATH:  All right.  It's noted.

6    BY MR. VOLLRATH:

7         Q.   Did you always act in good faith with

8    regard to the risk pools?

9         **A.   Yes.**

10        Q.   And to your knowledge, did Clark always

11   act in good faith in regards to the risk pools?

12        **A.   Yes.**

13            MR. ABERG:  Objection, form.

14            MR. VOLLRATH:  If you'd like a standing

15   objection to the leading, I'm happy to do that.

16            MR. ABERG:  That's fine.  That wasn't my

17   issue with the last question.

18            MR. VOLLRATH:  It was whether to his

19   knowledge Clark always acted in good faith.

20            MR. ABERG:  And I don't know how he would

21   have that knowledge.

22            MR. VOLLRATH:  Okay.

23   BY MR. VOLLRATH:

24        Q.   And you think your beliefs that the pool

25   satisfied risk distribution requirements were

Jarvis, Christopher                                    October 18, 2022

254

1   reasonable?

2        A.    I do.

3        Q.    Okay.  You mentioned a transition from

4   Pan-American to Jade.  Do you remember that?

5        A.    Yes.

6        Q.    Okay.  Did that transition happen because

7   of some private letter rulings that the IRS issued?

8        A.    **That is the -- I remember being shown that**

9   **slide or that e-mail for why we were making a change.**

10  **I can't remember the actual PLRs right now, but --**

11       Q.    Okay.  You don't have any independent

12  recollection of why that change was made?

13       A.    I don't.

14       Q.    Okay.  So the key issue in this case is

15  false statements, and you reviewed a lot of documents

16  with the Government today.  Do you remember that?

17       A.    I did.

18       Q.    Okay.  And those documents some of them

19  contained statements from Celia; correct?

20       A.    Yes.

21       Q.    And some of them contained statements from

22  you; correct?

23       A.    Correct.

24       Q.    Were any of your statements in the

25  documents false?

Jarvis, Christopher                                    October 18, 2022

255

1       A.     No.

2       Q.     Okay.  To your knowledge, were any of the

3   statements that Celia made in her -- in those

4   documents false?

5       **A.     Only the one about the complaints, the one**

6   **with the introducing the Emerald pool and talking**

7   **about complaints about me, that part -- or about the**

8   **Jade management, that I don't -- that's not true.**

9   **But other than that, I have no reason to believe that**

10  **anything was untrue -- anything else.**

11      Q.     Are you aware of any false statements that

12  Celia made to your mutual clients, other than perhaps

13  the statement about the complaints?

14      **A.     No.**

15      Q.     Are aware to any -- of any false

16  statements, other than the statement about

17  complaints, that Celia made to her clients generally?

18          MR. ABERG:  Objection, form.

19  BY MR. VOLLRATH:

20      Q.     Not your mutual clients.

21      **A.     I have no idea what she said to people**

22  **that weren't my clients.**

23      Q.     That's fair.  Were clients required to use

24  Jade and Pan-Am or could they accomplish risk

25  shifting some other way?

Jarvis, Christopher                                    October 18, 2022

256

1        A.      There were other ways, not common.  But

2    there were other ways.  Not everybody did.

3        Q.      Can you give me an example?

4        A.      We had a client -- we had a client who had

5    a substantial number of businesses, I think 20 of

6    them, who because they had so many different

7    entities, risk shifting was satisfied by having so

8    many different companies writing premium.  So that

9    happened a couple of times with clients who just had

10   very substantial enterprises.  They weren't running

11   one -- one operation.

12              Then there were some clients who always

13   utilized a vehicle service contract pool where they

14   were reinsuring risk from auto service contracts and

15   they were assuming reinsurance from that pool, as

16   opposed to sharing -- as opposed to ceding out risk

17   and receiving back.  So there were two different

18   models that I knew of that some people would --

19       Q.      Okay.

20       A.      -- use just because they had a

21   different -- different appetite for risk or had a

22   different view on the risks, or just had a

23   different portfolio, a different profile.

24       Q.      Okay.  I want to turn to actuarial work.

25   You're an actuary; correct?

Jarvis, Christopher                                    October 18, 2022

257

1        A.     I'm not -- I didn't get certified.  I

2    didn't finish all my exams, but I did work -- I did

3    get through my first five exams and I worked in the

4    actuarial departments of five different -- four

5    different insurance companies over a period of six

6    years.  So --

7        Q.     So you're familiar with actuarial work?

8        A.     Yes.  I -- yes.

9        Q.     It's not something -- let me rephrase.  Is

10   it something a lawyer is qualified to do without

11   additional training?

12       A.     No. It's different.

13       Q.     Okay.  It's -- it's its own profession;

14   correct?

15       A.     Yes.

16       Q.     And it requires special training?

17       A.     Training, exams, accreditation, it's a

18   different -- mathematics and statistics and it's

19   different -- different from -- just different from

20   law.

21       Q.     It's reasonable for a -- is it reasonable

22   for a lawyer or a business executive to rely on an

23   actuary --

24              MR. ABERG:  Objection, form.

25

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                                    October 18, 2022

258

1   BY MR. VOLLRATH:

2        Q.    -- for actuarial work?

3        A.    I think the -- the short answer is yes.

4   The -- the long answer is, we get business -- you get

5   valuations in business all the time for what is

6   something worth, what's real estate worth, what's --

7   you get -- you get someone who is an evaluation

8   specialist to sign off on what something's worth.

9   And even if you've been around it for a long time,

10  you're a real estate attorney, you -- you're not

11  certified to do an appraisal, so you have an

12  appraiser do it.

13           And I think it's the same thing with

14  actuarial work that you can be around insurance, but

15  at the end of the day, there are people who have this

16  experience.  And my experience is people rely on

17  having actuaries price things, whether it's reserves

18  or it's policy premiums, that's -- it's a very

19  specific skill.

20       Q.    Right.  And it wouldn't be reasonable for

21  a lawyer without actuarial training to second guess

22  the actuary's work?

23           MR. ABERG:  Objection, form.

24           THE WITNESS:  I think anybody can second

25  guess anybody's work.  But at the end of the day, you

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                                    October 18, 2022

259

1    know, it's what the expert says is what the expert

2    says.  I mean, if you want to go a step further, I

3    worked as an actuary and I didn't second guess

4    actuarial opinions I got because it's not what I do

5    anymore, so it's -- you know, you hire experts to do

6    what they do.

7    BY MR. VOLLRATH:

8        Q.    You can ask an actuary to figure out how

9    much a premium should be based on a given risk and a

10   policy limit; correct?

11       **A.    With the right data, sure.**

12       Q.    Okay.  Can you also ask an actuary to run

13   the calculation, I guess, another way to figure out a

14   risk and a policy limit based on a premium?

15       **A.    You're going to have to be a little more**

16   **specific, Derick.**

17       Q.    Yeah.  Let me give you an example.  Let me

18   give you an example.  If I had a budget for $1,000 --

19   I guess $2,000 a year for car insurance.  You could

20   figure out what kind of a policy limit -- or an

21   actuary could figure out what kind of policy limit I

22   could afford; correct?

23       **A.    Auto insurance was my thing and I could**

24   **find out five different ways to structure five very**

25   **different policies with that amount of money, yes.**

Jarvis, Christopher                                     October 18, 2022

260

1      Q.    Right.  But you could start with the
2  premium and end up with an actuarially valid policy;
3  correct?
4      A.    Correct.
5      Q.    That doesn't make the actuarial
6  methodology unsound; correct?
7      A.    No.
8            MR. ABERG:  Objection, form.
9  BY MR. VOLLRATH:
10     Q.    Okay.  If -- if the data isn't there to
11  make an actuarially determined premium, is it up to
12  the actuary to say that?
13           MR. ABERG:  Objection, form.
14           THE WITNESS:  Is -- can you rephrase the
15  question, that's -- I'm not -- I want to be -- I want
16  to be --
17  BY MR. VOLLRATH:
18     Q.    No, I understand.
19     A.    -- specific -- accurate myself.
20     Q.    I understand, and it's a complicated issue
21  and if you have any questions or want
22  clarification --
23     A.    Sure.
24     Q.    -- it's totally appropriate to ask me.
25           But, for example, if there wasn't

Jarvis, Christopher                          October 18, 2022

261

1  enough underlying data, if there wasn't enough

2  history of a risk --

3      A.    Yes.

4      Q.    -- who is going to know that an actuary

5  can't determine the policy -- can't determine a

6  premium?

7          MR. ABERG:  Objection, form.

8          THE WITNESS:  If the question is, what do

9  you do if you don't have the data, you ask for it or

10  you make assumptions based on other risks, other

11  experience, other things.  So you fill in the --

12  BY MR. VOLLRATH:

13      Q.    Are there ever --

14      A.    -- you fill in the gaps or you make -- or

15  you make assumptions and -- I mean, in any actuarial

16  analysis is going -- you're not going to have a --

17  you never know what the future is going to hold, so

18  you're always making assumptions about trends and

19  filling in blanks and that's part of what you do.

20  So, I mean, you're never going to be right, it's

21  always -- you're going to be over or you're going to

22  be under.  But over time, you hope to be -- with

23  enough people, you hope the number comes out to be

24  right.

25

Jarvis, Christopher                                    October 18, 2022

262

1    BY MR. VOLLRATH:

2         Q.    Are there circumstances where an actuary

3    just doesn't have enough information to do -- to do

4    its analysis?

5              MR. ABERG:  Objection, form.

6              THE WITNESS:  Sure.

7    BY MR. VOLLRATH:

8         Q.    And is it up to the actuary to go back to

9    his client and say, I don't have enough information?

10             MR. ABERG:  Objection, form.

11             THE WITNESS:  Yes.  Well, what's normal?

12   You either you're on the side of conservative and you

13   pick a number that's a littler higher maybe, or you

14   ask for more information.  But that's -- I mean the

15   actuary's job is to price things in a way that there

16   is satisfactory capital for the company to make a

17   profit.  I mean that's the -- that's what you're

18   trained to do.  You're not trained to save the

19   insured money, you're saved to preserve -- you're

20   trained to preserve the long-term financial stability

21   of the company.  So all things being equal, you tend

22   to -- tend to err on the side of conservative

23   assumptions.

24   BY MR. VOLLRATH:

25        Q.    Okay.  Let me pull up Government's

Jarvis, Christopher                                    October 18, 2022

263

1    Exhibit 33.  Easier said than done.

2              Okay.  Do you recall this e-mail from

3    direct?

4        A.    Yes.

5        Q.    Can you briefly explain to me what -- what

6    is meant here or what -- what you mean here by saying

7    that you need be able to show projected losses of the

8    pool will not exceed 40 percent of the pooled

9    premium?

10       **A.    That's not my e-mail, that's Celia's**

11   **e-mail to Al.  And she's -- somewhere before this,**

12   **she had apparently -- came to the conclusion that I**

13   **wanted losses to be projected at 40 percent or less.**

14             MR. ABERG:  Derick, I'll just let you know

15   we're seeing your notes.  I think you need to make

16   sure you're sharing your application.  Make sure

17   you're sharing the screen --

18             MR. VOLLRATH:  The screen rather than --

19             MR. ABERG:  The screen rather than the --

20   I mean, no big deal.

21             MR. VOLLRATH:  I appreciate that.  I don't

22   think there's anything on there that you're not going

23   to hear in just a few minutes.

24             MR. ABERG:  Yeah.

25             MR. VOLLRATH:  But it's a pain.

Jarvis, Christopher                                    October 18, 2022

264

1              MR. ABERG:  I think there should be an

2    option just to share, you know, like Google Chrome.

3              (Cross talk.)

4              MR. VOLLRATH:  My notes are on Google

5    Chrome as well.

6              MR. ABERG:  Maybe you can separate the

7    screens out.

8              THE WITNESS:  I remember the document if

9    you need.

10             MR. VOLLRATH:  Okay.  Yeah.  We can stop

11   sharing.  Thank you, Mr. Jarvis.

12   BY MR. VOLLRATH:

13        Q.   All right.  So this e-mail was sent at a

14   time when you guys were still trying to figure out

15   what the composition of Jade Reinsurance should be;

16   is that right?

17        **A.   Correct.**

18        Q.   Okay.  And the projected losses of the

19   pool, that's something that an actuary figures out;

20   is that right?

21        **A.   We estimate, yes.**

22        Q.   Okay.  But it's an actuarial kind of

23   analysis --

24        **A.   It is.**

25        Q.   -- is that correct?

Jarvis, Christopher                                October 18, 2022

265

1          A.      Correct.

2          Q.      Okay.  And that can be influenced by what

3    kind of insurance contracts you pool -- you put in

4    the pool; is that correct?

5          A.      Not necessarily.  It's -- it's less

6    about -- it's less about the type of policy and more

7    about how you slice it.  So it's not about -- if you

8    think of it -- if you think of it -- hmm, I explained

9    this in the other -- in the other case.  How you

10   manage the risk and how you share it.  You share

11   it starting in the beginning, you share it starting

12   at the end, you share a little bit in the middle.

13   When do you -- when do you get yours?  You know, when

14   do you feed kind of a thing?

15               And so you saw that we went from a

16   51 percent share in 2013, anything above 200,000 to

17   all of a sudden with a little more experience we went

18   to 55 percent of everything above 100,000.  So the

19   percentages that you -- you share dramatically change

20   the loss ratio.  So when you bought your car

21   insurance, if you had a $250 deductible and you went

22   up to a $1,000 deductible, you would expect to pay a

23   whole lot less --

24          Q.      Right.

25          A.      -- because a lot of losses happen under

Jarvis, Christopher                              October 18, 2022

266

1    $1,000.

2         Q.    Okay.  The bottom line is that there are

3    variables that you can change that influence that

4    projected losses figure?

5         A.    I -- yes.  By moving the variables around,

6    you will dramatically change the expected loss ratio

7    or the long -- you know, the financials will

8    significantly be changed by moving a whole bunch of

9    variables around.

10        Q.    Okay.  So what Celia is talking about in

11   this e-mail is figuring out what those variables

12   would be to show that the projected losses of the

13   pool would not exceed 40 percent of the pool?

14        A.    It looks like she's giving Al the guidance

15   that if he's looking for a target, 40 is a good

16   number.  If he had -- if he had said no deductible,

17   no limit, and 100 percent went to the pool, then the

18   expected loss ratio would have been a hell of a lot

19   higher.

20        Q.    Okay.  And is that because a pool with

21   projected losses that don't exceed 40 percent is more

22   marketable to your clients?

23        A.    No.  I think you're striking a balance

24   between -- in the pool, you're striking a balance

25   between making sure you have some losses just for

Jarvis, Christopher                                    October 18, 2022

267

1    appearances and -- like -- when -- when Government

2    was direct -- directly questioning me, I mentioned

3    that just because you don't have losses doesn't mean

4    that you didn't have risk.  Because you don't have an

5    earthquake every day, you don't have a flood every

6    day, your don't have -- your house doesn't burn down

7    every year, that just because you have -- you don't

8    have losses, doesn't mean you don't have risk.  But

9    the appearance -- if we have losses in the pool it

10   would certainly look better, and you'd have less

11   unnecessary scrutiny.  So it's finding a balance

12   between what's reasonable -- what's reasonable and

13   what's acceptable with the clients.

14       Q.    Okay.  This -- this e-mail says, "Chris

15   Jarvis says he needs to be able to show this

16   40 percent figure."  Is that -- did you -- is that

17   your recollection?

18       A.    No.  I have -- I have no recollection of

19   saying that, but it's -- under direct I said

20   40 percent seemed reasonable for property coverages.

21   So a 40 percent loss ratio, 50 percent overhead

22   10 ten percent profit, that -- in a traditional

23   insurance market, that seems like a reasonable

24   number.  I'm not sure if that's where it came from,

25   but I have no reason --

Jarvis, Christopher                                    October 18, 2022

268

1       Q.    Okay.  So --

2       A.    -- I'm more likely to have come up with

3   that number than Celia, she -- I don't think she'd

4   have any idea what a reasonable number would be.  So

5   -- and I have no reason to believe that I didn't have

6   that conversation with Celia.

7       Q.    Okay.  What is the actuary's -- excuse me,

8   the actuary's role in deciding what insurance a

9   captive insurance company owner should buy?

10      A.    No role.  What they should buy, there's

11  nothing in that situation.  That's a business

12  decision with the client, the client CFO, the

13  accountant or whoever is advising the client on risk

14  management, what -- what policies do you want to

15  replace or amend.  Which risks do you want to cover,

16  that's -- that's up to you.  I mean, that's a

17  business -- business decision.  It's neither a -- you

18  know, I don't see it as an actuary's decision,

19  they're just pricing what it could be and then

20  it wasn't -- it wasn't uncommon for a client to come

21  back and say, I don't want to insure that much of

22  that.  I want less or I want more or --

23      Q.    Does an actuary have a role in deciding

24  what insurance a captive insurance company can buy?

25  Let me rephrase that.

Jarvis, Christopher                                    October 18, 2022

269

1      A.      Yeah, go ahead.

2      Q.      Does the actuary look at the business and

3  try to determine what insurable risk it might have?

4      A.      Yes.  Actuary, an underwriter could be

5  involved, a claims manager -- broker could be

6  involved, any -- any combination.

7      Q.      Okay.  But it's up to the insured to

8  decide what kind of insurance they actually want to

9  purchase?

10     A.      Absolutely, yes.

11     Q.      We've talked a bit about Al Rosenbach, do

12  you think that he was a competent actuary?

13     A.      Yes.

14     Q.      Okay.  Did he have a reputation as a

15  competent -- competent actuary?

16     A.      I've never asked around.  All I have is my

17  own dialogue with him, so I don't know anything about

18  his reputation.

19     Q.      Okay.  But in your experience, he was

20  competent?

21     A.      I -- I believe so.

22     Q.      Okay.  Did you have captive clients, other

23  than Clark?  I'm sorry, let me rephrase that.

24             Did you have captive -- clients -- excuse

25  me.  Did you have captive clients that you didn't

Jarvis, Christopher                                    October 18, 2022

270

1    share with Clark?

2         A.    In my career, yes.

3         Q.    How about during the years we've been

4    looking at, 2008 through 2016?

5         A.    That I didn't do anything with Celia?  No,

6    I don't think I did.

7         Q.    Okay.  What was Clark's involvement in

8    Jade Risk?

9         A.    So Jade Risk and Jade Re are two different

10   companies.  Jade Risk, when we were the captive

11   manager, we -- we hired Celia to -- or Celia's law

12   firm to draft policies for our clients.  So we were

13   the captive manager, we interacted with the Oklahoma

14   Insurance Department, but we outsourced -- we

15   outsourced the policy drafting to Clark & Gentry.

16        Q.    Okay.  And Clark wasn't involved with

17   OJM Group?

18        A.    OJM Group was a financial firm.  She

19   received some referrals from them -- from us and then

20   eventually my other two partners moved away from

21   working with Celia for some reason.  And then when I

22   left that firm, I reengaged and worked with Celia

23   again.

24        Q.    Okay.  What was Clark's role at Jade

25   Reinsurance?

Jarvis, Christopher                     October 18, 2022

271

1      A.     Well, they hired us to put together --

2  well, worked with us to create the exclusive pool for

3  their clients.  So they handled the administrative --

4  a great deal of the administration, legal documents

5  and they -- they technically didn't own it, but they

6  were our only client.

7      Q.     Okay.  Was there an engagement letter in

8  which Jade Reinsurance hired Clark & Gentry?

9      A.     Maybe.

10     Q.     Okay.

11     A.     Best I can do.

12     Q.     That's all we can ask.  I'm getting

13  dangerously close to the end.

14     A.     It's okay.  I'm still awake and Stephanie

15  hasn't quit yet.

16     Q.     Okay.  Was Clark providing captive

17  management services?

18     A.     No, not that I know of.

19     Q.     Okay.  What does captive management

20  services mean to you?

21     A.     Managing the -- well, it's a licensed

22  role.  So you have to be appointed in -- a captive

23  manager is actually a licensed provider, much like --

24  I don't want to say much like an accountant or an

25  attorney, because it wasn't quite as difficult as

Jarvis, Christopher                                   October 18, 2022

272

1  passing the Bar or the CPA exam.  But you did have to

2  apply in a jurisdiction and become appointed and pass

3  their -- whatever credentials they required and in

4  whatever jurisdiction you're going to work.  So in

5  that sense, it was maybe up -- more than a real --

6  more than a real estate appraiser, less than an

7  attorney or an accountant.

8          So when they were working in Nevis, they

9  worked with Heritor who served as the captive

10  manager.  With us, we did -- we handled Oklahoma at

11  Jade Risk.  When they worked domestically in Delaware

12  and other places, I don't know who they used for

13  captive management.  But to the best of my knowledge,

14  they didn't -- I -- I don't know that they served as

15  captive manager.  I don't believe so, but I don't

16  know.

17      Q.    Okay.  What -- what kind of functions does

18  a captive manger perform?

19      A.    Files the -- has to represent the -- the

20  company to the -- has to represent the company to the

21  insurance department when they're applying, is

22  responsible for filings, annual statements, any

23  compliance inquires.  It's -- I'm trying to think

24  what the right -- it's more than a registered agent

25  for a corporate entity, but it's not -- it's not a

Jarvis, Christopher                                    October 18, 2022

273

1  full power of attorney.  But it is -- it's the person

2  that's doing all of the interactions with the

3  insurance department on behalf of the -- on behalf of

4  the captive.

5      Q.    Okay.  What about claims?  Do they have a

6  role in the claims process?

7      A.    Usually.  Is a captive manager involved in

8  the claims?  I don't know that it's legally required

9  as such.  Some people will outsource that to a

10  separate claims adjudication or claims manager, so

11  it's not -- now always, but often.

12     Q.    Okay.  I want to shift gears.  You talked

13  on direct about audit risk.  What -- what is your

14  understanding of the audit risk inherent in a captive

15  -- in a captive insurance company?

16     A.    It certainly went up over the last 20

17  years.

18     Q.    Can we agree on a definition of that term

19  to mean that the -- it's the risk that the IRS will

20  disallow the tax benefits of the captive insurance

21  company?

22     A.    Sure.  I'm okay with that.

23     Q.    And was there an audit risk for these

24  companies between 2008 and 2016?

25     A.    Sure.

Jarvis, Christopher                           October 18, 2022

274

1      Q.    And was that risk conveyed to your
2    clients?
3      **A.    Always.**
4      Q.    And to your knowledge, was it conveyed to
5    Celia's clients?
6      **A.    No idea.**
7      Q.    Fair enough.
8            I'd like to go Government's Exhibit Number
9    25.  Okay.  Let's see if I can do it.
10     **A.    Got it.  Whoops.**
11     Q.    You got it before I do.
12     **A.    Almost.**
13     Q.    That's not the exhibit I was looking for.
14           MR. VOLLRATH:  I'm looking for the
15    diagram, Eric, for Gordon Logan.
16           MR. ABERG:  I think it's the next exhibit
17    after this one.
18           MR. VOLLRATH:  That's what I had up.
19           MR. ABERG:  It's 25.
20           THE WITNESS:  I know the diagram pretty
21    well, by the way.
22           MR. VOLLRATH:  There it is.
23           MR. ABERG:  Yeah.
24    BY MR. VOLLRATH:
25     Q.    Okay.  You're familiar with this exhibit

Jarvis, Christopher                                    October 18, 2022

275

1    and what's on it, Mr. Jarvis?

2        A.    Yes.

3        Q.    Okay.  I'm going to stop sharing.  Who

4    drafted that diagram?

5        A.    I did.

6        Q.    Okay.  All right.  We talked a little bit

7    on direct -- or you talked with the Government on

8    direct about limits on the investment that captive

9    insurance companies could make.  Do you recall that?

10       A.    I do.

11       Q.    Okay.  And what was your understanding of

12   those restrictions, if you could refresh my

13   recollection?

14       **A.    I don't remember any government**

15   **restrictions at all.  I remember Celia, at one point,**

16   **suggesting for a client who had a Nevis captive that**

17   **30 percent of one year's premium should be kept -- be**

18   **kept liquid.  That was the only thing that we, I**

19   **guess, agreed upon or talked about as far as numbers**

20   **go.**

21       Q.    Okay.  And you referred to government

22   restrictions.  Are you aware of a government

23   restriction requiring 30 percent of premiums --

24       **A.    No.  I'm not aware of any -- I'm not aware**

25   **of any statutory requirement by any regulator or by**

Henderson Legal Services, Inc.

202-220-4158                      www.hendersonlegalservices.com

Jarvis, Christopher                                    October 18, 2022

276

1    the government around 831(b) captives that says

2    anything about how much reserves have to be liquid or

3    -- I mean that -- that would be seem to be an

4    actuarial thing.  And it would be -- I'm not aware of

5    any restriction.

6         Q.    Okay.  Were any of your -- or the captive

7    insurance companies that you managed inadequately

8    capitalized?

9         A.    No.

10        Q.    Okay.  None of them ever went belly up?

11        A.    No, one did.  One client was subject to --

12   owned some senior living centers and had some -- had

13   some Medicare fraud issue or something come back with

14   a massive judgment and the -- their captive went out

15   of business, they went out of business.  I mean, it

16   was an issue where they had a captive for a couple of

17   years, but they put away some five or 10 million --

18   some giant assessment they had for billings or

19   something.  So I did have a client go out of business

20   who didn't have -- they just hadn't paid the captives

21   long enough, but they had massive claims.

22        Q.    Was it a mutual client with Ms. Clark?

23        A.    Yes.  Had to be.

24        Q.    What was the name of that insurance

25   company, do you recall?

Jarvis, Christopher                          October 18, 2022

277

1      A.     No.  It might have been Intervention, I'd
2  have to look it up.
3      Q.     Do you recall the name of the individual?
4      A.     No.  It was somebody in the southeast and
5  I'm trying to -- and I can't remember the name.
6      Q.     It's okay.
7      A.     Yep.
8      Q.     Who is ultimately responsible for ensuring
9  that a captive insurance company is compliant with
10  the law?
11      A.     Compliant with the law?
12      Q.     The law.
13      A.     Which --
14         MR. ABERG:  Objection to form.
15         THE WITNESS:  Which -- you've got a lot of
16  people, you've got a captive manager who's
17  responsible for filings with the state.  You've got
18  legal entities that have jurisdictional requirements.
19  You've got tax returns.  You've got -- I mean,
20  there's a lot of -- is it tax law, is it state law,
21  is it insurance law, I mean, there's -- there's a lot
22  of different people involved.  Parts, I can't -- you
23  can't make one person responsible for all of those
24  things.
25

Jarvis, Christopher                                October 18, 2022

278

1    BY MR. VOLLRATH:

2         Q.    Sure.  Are they all accountable to any one

3    particular person?

4         A.    **All who?  All of the --**

5         Q.    All of people that you spoke with -- or

6    that you spoke about?

7         A.    **Ultimately -- ultimately, the client is**

8    **the taxpayer; right?  So they're going to --**

9         Q.    And they're the owner of the captive?

10        A.    **Ever since the Path Act they are.  See If**

11   **the client owns the captive, the client owns the**

12   **company, or clients or group of clients, or whatever**

13   **the collective is.**

14        Q.    Well, is there someone who can decide --

15   who decides to fire the captive manager?

16        A.    **Sure.  The client -- the owner -- the**

17   **owner at any point in time can fire the captive**

18   **manager and hire somebody else.**

19        Q.    So if the captive manager isn't doing

20   their job, they can hire a new one?

21        A.    **Correct.**

22        Q.    Okay.  I do want to go back to that

23   Government's Exhibit 31, which is the memo

24   about Pan-Am.

25        A.    **Okay.**

Jarvis, Christopher                          October 18, 2022

279

1      Q.   Let me bring it up for you.  Do you

2  remember answering questions about this document on

3  direct?

4      **A.   I do.**

5      Q.   And do you remember being asked questions

6  about Pan-American on direct?

7      **A.   I do.**

8      Q.   Okay.  Do you have any independent

9  knowledge or personal knowledge about Pan-Am's

10  operations?

11      **A.   Nothing that I recall.**

12      Q.   Okay.  I want to talk about the 2.75

13  percent reserves in connection with Jade.  Do you

14  recall that discussion on direct?

15      **A.   2.75?**

16      Q.   Was it 2.75 or was it a different figure,

17  I apologize?

18      **A.   No.  The first year was -- no, the first**

19  **year was 2.5 after 60 days or 180 days or something**

20  **like that.**

21      Q.   2.5, okay.  Is there a regulation that

22  requires a threshold of -- of reserves held back?

23      **A.   No.  Not that I know of.**

24      Q.   Okay.  And it wasn't a capitalization

25  problem, was it?

Jarvis, Christopher                    October 18, 2022

280

1              MR. ABERG:  Objection, form.

2      BY MR. VOLLRATH:

3          Q.    You can answer, if you can.

4          A.    No.  Because the money wasn't distributed.

5      The money was still -- the money was -- the captive

6      still had all the money that had been distributed.

7      So I don't think there was anything technically wrong

8      with distributing the money out.  It was just

9      administratively a pain in the butt, that if you had

10     losses and you didn't have the money then you

11     couldn't pay the claim.  So --

12         Q.    Right.

13         A.    -- you know, so that's -- same reason why

14     you charge a retainer and then you work from it

15     because it's a whole lot easier to take money out of

16     an account then to go ask for it every time.

17         Q.    Right.  But in theory, you could have

18     collected that money --

19         A.    Yep.  Sure.

20         Q.    -- if you needed to?

21         A.    We were prepared to.  I wish we had.  I

22     wish we had because then it would have been better.

23     Then I wouldn't be answering these questions.

24         Q.    Fair enough.  But it would be a big hassle

25     and you didn't feel you were getting enough benefit

Jarvis, Christopher                                    October 18, 2022

281

1   out of Jade to -- to do that work, is that why -- is

2   that why you disagreed with that system?

3        A.    No, I was fired.

4             MR. ABERG:  Objection, form.

5             THE WITNESS:  I was fired.  We just -- we

6   came up with a model to change the numbers so it

7   would -- so it would work differently, you know, I

8   think raised our fees a bit and -- because we knew it

9   was a lot of work.  And -- and we're going to hold

10  the money and just pay it out over time and hold the

11  money longer so we wouldn't have that issue, and we

12  were immediately -- immediately replaced, so.

13  BY MR. VOLLRATH:

14       Q.    Fair enough.  All right.  I want to show

15  you -- I have two more exhibits and then we're done.

16       A.    Okay.

17       Q.    I want to show you Government's Exhibit

18  37.  All right.  All right.  This is the feasibility

19  study for Jade Reinsurance Group dated October 2,

20  2012.

21       A.    Yes.

22       Q.    You recall this document?

23       A.    I do.

24       Q.    Okay.  Do you recall this paragraph that

25  I'm highlighting here beginning, "Although the

Jarvis, Christopher                          October 18, 2022

282

1    expected loss ratio"?

2         A.    I do.

3         Q.    So Rosenbach writes here, "For example,

4    according to Clark & Gentry's reported experience to

5    date for policy years 2009 to 2011, the incurred loss

6    ratio without any IBNR is well under five percent for

7    each year on approximately $50 million of annual

8    premiums."  And it states that despite saying that

9    the expected loss ratio used for the underlying pro

10   formas is set under a 40 -- 40 percent ultimate loss

11   ratio; is that correct?

12        A.    That's what it says.

13        Q.    Okay.  The -- these past years, these 2009

14   through 2011, that was with the Pan-American risk

15   pool; is that your understanding?

16        A.    Yes.

17        Q.    And the Pan-American risk pool only

18   insured terrorism risk; is that your understanding?

19        A.    Yes.

20        Q.    But the Jade Reinsurance pool involved

21   much more than terrorism risk; correct?

22        A.    Yes.

23        Q.    So that could explain why in the past the

24   loss ratio had been under five percent; correct?

25              MR. ABERG:  Objection, form.

Jarvis, Christopher                              October 18, 2022

283

```
1              THE WITNESS:  It'd be easy to say, yes.
2     But I don't -- I don't interpret Al's memo that way.
3     I interpret --
4     BY MR. VOLLRATH:
5         Q.    How do you -- sorry.  How you interpret
6     the memo?
7         A.    I interpret Al's memo, because I do
8     believe he's a qualified person, that he wasn't -- he
9     wasn't making the -- he wasn't saying that there was
10    a terrorism experience that showed five percent, he
11    was saying that if I had -- if I had applied these
12    numbers to the policies that you had in 20 -- 2009
13    through 2011, it would have only shown around five
14    percent.  I believe that he was applying the
15    coverages that Celia had written.
16              Now there's two problems with that.  One
17    is -- well, three problems.  One is, the pool was
18    much smaller so we didn't have a whole lot of data.
19    We were up at 200 million or whatever the -- or
20    whatever the number was -- let's say 50 million over
21    three years so it was smaller than the 29 million or
22    whatever it was per year we were getting now.  And,
23    second is, the policies were different.  We did a
24    mass -- thorough rewriting of the policies in 2012.
25    So it wasn't really an apples-to-apples comparison of
```

Jarvis, Christopher                                    October 18, 2022

284

1    the policies that Celia had written in 29 -- 2009,

2    '10, and '11, versus 2012.  If you look at the

3    policies, they're not -- they're not the same.  There

4    was a massive overhaul that year in policies.

5              And also, now because there was sharing,

6    people were much more likely to file claims knowing

7    that somebody else might pay part of it, and I only

8    got to see two years of numbers, but to go from

9    .13 percent to 1.8 percent may not seem like much,

10   but that's a 15 times -- I mean, that's a 1400

11   percent increase and I think over time it would

12   have continued to go up more and more.  And, you

13   know, it would have gone way beyond five percent,

14   but -- so I don't -- I don't -- I do not take Al's

15   memo to say the number is really five but I put 40

16   because it'll look good to the government, like,

17   that's -- I don't read it that way at all.

18             I read it as, it was five, we expect

19   favorable, but if I had really read that and decided

20   to push him on it, he would -- I'm pretty certain Al

21   would say, well, the policies were different and

22   there were different motivations and -- it's just

23   different.  It's just -- you know, now that other

24   people are paying some of your risk, you have to

25   assume that people are going to make claims and that

Jarvis, Christopher                                          October 18, 2022

285

1   certainly was the case in -- in 2014.

2          Q.     Okay.  I want to move on to our last

3   exhibit.  I want to revisit Government's Exhibit

4   number 38.  I'll share that with you.  And

5   unfortunately, I cannot rotate within the browser.

6          A.     That's okay.

7          Q.     But do you recall -- do you recall this

8   exhibit?

9          A.     I do.  These are the slides.

10         Q.     Correct.  Do you know who drafted these

11  slides?

12         A.     I did, I think.

13         Q.     Okay.  And there's some handwriting on

14  them.  Do you know who -- whose handwriting that is?

15         A.     No.  It's not mine.

16         Q.     Okay.  You don't know if it's Celia

17  Clark's, though?

18         A.     I don't.

19         Q.     All right.  That's all the questions I

20  have.

21                MR. VOLLRATH:  Eric, if you have redirect.

22                MR. ABERG:  I just have probably five

23  minutes, maybe less.

24                EXAMINATION BY COUNSEL FOR DEFENSE

25

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

Jarvis, Christopher                          October 18, 2022

286

1   BY MR. ABERG:

2        Q.    There was some discussion, Mr. Jarvis,

3   about your clients versus Ms. Clark's clients and I

4   just wanted to confirm.  Over the years, how

5   many clients did you have that you either referred to

6   Ms. Clark or worked with her in connection with?  Can

7   you estimate?

8        **A.    Well, in that federal case document, you**

9   **can see that I had 36 at one point.  So I had 36**

10  **through Jade Risk.  How many did I refer to her**

11  **before that?  I don't know.  So 36 plus something.**

12       Q.    Okay.  Were you involved in calculations

13  of premiums for any of the clients that participated

14  in this arrangement with Ms. Clark?

15       **A.    No. I never took on -- I never took on any**

16  **of the actuarial work.**

17       Q.    And opposing counsel, I think, posited a

18  hypothetical about in reaching the coverage to be

19  provided under an insurance policy, you might start

20  with the premium amount you wanted to pay and then --

21  and then determine what the coverage would be.  Do

22  you remember that question?

23       **A.    I do.  I remember.**

24       Q.    To your understanding, is that how the

25  clients that worked with Ms. Clark determined the

Jarvis, Christopher                                    October 18, 2022

287

1    policies that they would buy?

2        A.    Sometimes.  I mean, sometimes clients

3    would say -- a company might say, we have a budget of

4    a million -- we have about a million dollars in

5    retained earnings that we could work with.  We have

6    half a million dollars, we have three-quarters of a

7    million, we have up to something.  That would

8    sometimes be the situation.  They knew -- you asked

9    me earlier today, where was that minimum number that

10   made it justifiable and I would tell people, it's at

11   least a half million or the administrative cost is

12   just too cost prohibitive for you to make this make

13   sense.

14           So the conversation would be, before we

15   would go to the actuary we might ask, hey, 500 is the

16   minimum, a million, two might be the max that you

17   could qualify for, is there a number that we should

18   work from.  And sometimes, people would say, no, just

19   tell me what I can get or some would say, it's a

20   million or it's 800,000 or there's some number I

21   can't -- just don't have the cash for, I'm not

22   willing to allocate.  So sometimes they would give us

23   a limit and sometimes they wouldn't.

24       Q.    And in your view, among the advisers that

25   worked with your clients, who was responsible for

Jarvis, Christopher                         October 18, 2022

288

1  ensuring that their captives complied with the tax

2  law?

3      A.    That's a combination of Celia, their

4  accountant, they had other -- they had another

5  attorney who was brought in.  Every client had to --

6  everybody had a -- everybody was represented by

7  somebody.  So it was never made in -- any client --

8  any company that has 10, 20, 50 million, $100 million

9  dollars of revenue, I mean, those people -- those

10  business owners all have -- they're all pretty well

11  represented.

12          And clients aren't making these kinds of

13  decision with this kind of risk without bringing in

14  their advisers, so I would say it was -- I don't want

15  to say it takes a village, that's a little cliche,

16  but there were a lot of people involved in that.  But

17  I would say the actual management of, you know, Celia

18  has to be one of those people I would say, or at

19  least I would think most people would be relying on

20  her a little bit, but they have other -- they have

21  other people, too.

22      Q.    Okay.  That's all my questions.  That's

23  all my questions.  So thank you.

24          MR. VOLLRATH:  Okay.  I have a brief

25  redirect --

Jarvis, Christopher                                    October 18, 2022

289

 1                     MR. ABERG:  Okay.

 2                     MR. VOLLRATH:  -- or a brief recross and

 3     then I would just like a minute to be able to call my

 4     client and see if there's anything they had -- they

 5     had to add.

 6                     MR. ABERG:  Okay.

 7                     EXAMINATION BY COUNSEL FOR PLAINTIFF

 8     BY MR. VOLLRATH:

 9         Q.    So going back to ultimate responsibility

10     for compliance with the tax laws.  An adviser can

11     give advice and tell someone what to do; correct?

12         **A.    Sure.**

13         Q.    They can't make them do it though; is that

14     right?

15         **A.    Sure.  Absolutely.**

16                     MR. VOLLRATH:  Okay.  If I could just have

17     a minute to call Ms. Clark.  I don't anticipate we

18     will have much more than perhaps just one question.

19                     THE WITNESS:  Can you give me 30-seconds?

20                     MR. ABERG:  Yeah, of course.

21                     THE WITNESS:  Maybe 90.

22                     MR. ABERG:  We'll go off the record.

23                     THE VIDEOGRAPHER:  The time is now 5:09 --

24     excuse me, 5:10 p.m., going off the record.

25                     THE VIDEOGRAPHER:  We're back on the

Jarvis, Christopher                                    October 18, 2022

290

1    record.   The time is now 5:12 p.m.

2              MR. VOLLRATH:   Okay.

3    BY MR. VOLLRATH:

4        Q.     I just have one more question about that

5    e-mail and memo where Emerald was announced and Jade

6    Risk was kind of discontinued.   Are you sure there

7    wasn't a personal meeting in New York City about that

8    decision before it was made?

9        A.     Hmm.   I remember being blind-sided by the

10   announcement.   I don't -- we did meet at one point,

11   whether it was before or after, I thought it might

12   have been after because that was essentially putting

13   us out of business.   And there was a conversation of,

14   "You're killing my business, like, you're killing

15   Jade Re and you're going to kill Jade Risk if you do

16   this."   And then we came to an agreement on how we

17   could continue to work together.

18             So I don't -- when the announcement

19   came -- when that message got sent out that there

20   were going to be two pools and they were going to

21   recommend one, that was absolutely a shock.   I had no

22   idea before that.   We did have a meeting after the

23   fact, but I don't think -- it wasn't before.

24             MR. VOLLRATH:   Okay.   I have no further

25   questions.

Jarvis, Christopher                                          October 18, 2022

291

1              MR. ABERG:  Okay.

2              THE VIDEOGRAPHER:  Okay.

3              MR. ABERG:  Me neither.  We're off the

4      record.

5              THE VIDEOGRAPHER:  Okay.  It is actually

6      October 18th --

7              MR. ABERG:  Actually wait --

8              THE VIDEOGRAPHER:  I'm sorry.  Go ahead.

9              MR. ABERG:  Can we continue?

10             Mr. Jarvis, I just want to get this on the

11     record.  You are able to review your transcript and

12     confirm that it accurately reflects your testimony.

13     Would you like to exercise that right?

14             THE WITNESS:  Sure.

15             MR. ABERG:  Okay.  I'll arrange to have a

16     copy sent to you whenever it's ready and you'll be

17     asked to sign an errata sheet if there are any

18     changes that should be made.  Okay.  All right.

19             THE VIDEOGRAPHER:  Okay.

20             MR. ABERG:  Okay.  I think that's it.

21     Thank you so much.

22             THE VIDEOGRAPHER:  One second while I

23     close the session.  It is October 18, 2022, the time

24     is now 5:15 p.m. concluding today's deposition.  Off

25     the record.

Jarvis, Christopher                                    October 18, 2022

292

1              (Whereupon, at 5:15 p.m., CDT, the taking

2      of the deposition ceased.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jarvis, Christopher                                    October 18, 2022

293

```
 1                  CERTIFICATE OF REPORTER

 2    UNITED STATES OF AMERICA ) ss.:

 3    COMMONWEALTH OF VIRGINIA )

 4              I, STEPHANIE BARNES, the officer

 5    before whom the foregoing deposition was taken, do

 6    hereby certify that the witness whose testimony

 7    appears in the foregoing deposition was duly sworn by

 8    me; that the testimony of said witness was taken by

 9    me to the best of my ability and thereafter reduced

10    to typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties for the action in which this deposition was

13    taken, and further that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto, nor financially or otherwise

16    interested in the outcome of the action.

17

18

19

20                      Notary public in and for

21                      the Commonwealth of Virginia

22              My commission expires: 1/31/2025

23

24

25
```

Jarvis, Christopher                                    October 18, 2022

294

```
 1                  CERTIFICATE OF DEPONENT
 2     I hereby certify that I have read and examined the
 3     foregoing transcript, and the same is a true and
 4     accurate record of the testimony given by me.  Any
 5     additions or corrections that I feel are necessary I
 6     will attach on a separate sheet of paper to the
 7     original transcript.
 8                         _____
 9                              Signature of Deponent
10
11     I hereby certify that the individual representing
12     himself/herself to be the above-named individual
13     appeared before me this _____ day of _____,
14     2022, and executed the above certificate in my
15     presence.
16                         _____
17                         NOTARY PUBLIC IN AND FOR
18
19                         _____
20                              County Name
21     MY COMMISSION EXPIRES: _____
22
23
24
25
```

Jarvis, Christopher

October 18, 2022

1

**A**

**A-I-P-S-O**
10:11
**A-M-I-C-A**
10:10
**a.m** 1:18 6:9
69:21,24
130:18
**Aberg** 2:15 4:4
6:19,19 7:8
7:10 12:12
29:25 38:10
38:12 43:25
44:3,23 45:1
45:4,7 52:20
57:14 58:24
60:21 61:19
61:21,22
62:5 68:5
69:7,25
75:25 77:7
78:19 79:7
80:12 83:25
90:6 92:15
97:7 101:7
101:10,13,16
101:17
103:16
108:24
109:21
119:13 127:3
130:22
131:19
139:14
145:20 152:9
154:25
157:17,19,25
158:2,12
164:1 166:13
166:18,23
167:21 168:4
168:14
171:13,21
178:23,24

182:21 186:8
192:1,2,15
196:23 199:7
199:8,13
202:3 207:12
210:9 211:5
213:23
217:13,18
218:20
221:15,20
222:10,17
226:22 228:5
229:1 234:17
237:2,3,24
238:25 239:4
239:11 241:8
241:16
243:16,23
244:5,8,19
245:11
246:20 247:1
247:5,10,16
247:18 248:5
248:14
249:16,22
250:21 251:3
252:21,24
253:13,16,20
255:18
257:24
258:23 260:8
260:13 261:7
262:5,10
263:14,19,24
264:1,6
274:16,19,23
277:14 280:1
281:4 282:25
285:22 286:1
289:1,6,20
289:22 291:1
291:3,7,9,15
291:20
**abide** 201:13

201:16,17
**ability** 9:2
81:23 83:15
170:8 293:9
**able** 19:24
20:15 33:10
53:15,19
59:4 78:25
81:16 94:3
96:13 98:21
98:22 120:1
129:7 187:1
190:7,15,19
210:23 227:6
243:20 263:7
267:15 289:3
291:11
**above-entitled**
1:15
**above-named**
294:12
**absent** 40:23
41:10 51:12
**absolute** 66:20
**absolutely**
38:6 41:14
42:10 72:5
81:17 115:7
116:18
144:14
152:20 243:5
269:10
289:15
290:21
**abusing** 184:2
**acceptable**
267:13
**accepted**
32:14
**access** 115:20
151:13 250:1
**accident**
239:24
**accidentally**

84:11
**accidents**
36:20,21
**accomplish**
111:8 255:24
**accomplished**
128:1 252:16
**accomplishi...**
113:9
**account** 66:13
66:15,16
72:17 126:3
129:4 130:12
167:17 169:6
169:12
172:23
173:23,25
176:24,25
177:17 187:4
187:23 188:3
188:10
212:15
221:17,22
240:23
280:16
**accountable**
278:2
**accountant**
41:23 42:4,9
268:13
271:24 272:7
288:4
**accountants**
22:11 42:24
**accounts**
187:17
**accreditation**
9:23 257:17
**accrediting**
14:7
**accrual-based**
87:20
**accurate**
126:15 186:2

260:19 294:4
**accurately**
32:23 132:23
151:19
291:12
**achieve** 30:3
30:12 60:17
138:11
**achieved**
30:17
**acquiesced**
176:8
**ACR** 110:11
140:7 145:24
**ACR_IRS** 4:22
4:23 5:9
109:22
119:10
182:18
**act** 129:17
247:14,21
252:23 253:7
253:11
278:10
**acted** 253:19
**action** 293:12
293:16
**actively** 14:19
**activity** 242:4
**actual** 22:21
146:18 147:1
148:23 161:3
193:12
254:10
288:17
**actuarial** 10:9
10:17 11:7
11:17 36:13
69:4 71:15
72:12 85:9
86:8,25 89:1
95:16 110:11
110:22
111:22

Jarvis, Christopher                                    October 18, 2022

2

256:24 257:4
257:7 258:2
258:14,21
259:4 260:5
261:15
264:22 276:4
286:16
**actuarially**
260:2,11
**actuaries** 38:1
65:16 67:5
95:9,21
97:21 110:24
258:17
**actuary** 10:23
10:25 11:3,4
11:11,14
12:3 96:1,8
96:19,23
97:3,11
98:20 99:24
100:1 104:12
110:19
140:12 238:3
240:23
256:25
257:23 259:3
259:8,12,21
260:12 261:4
262:2,8
264:19
268:23 269:2
269:4,12,15
287:15
**actuary's**
258:22
262:15 268:7
268:8,18
**Ad** 206:16
**add** 29:15
99:11 185:9
215:8 289:5
**added** 99:21
244:19

**adding** 111:16
117:18
**addition** 21:5
111:12
**additional**
55:20,24
83:3 85:13
117:17 147:9
149:13 198:6
212:23,23
220:14,16,19
257:11
**additions**
294:5
**address** 43:15
69:15
**adequate**
73:24
**adequately**
113:9
**adjudication**
218:13
273:10
**adjust** 28:18
**adjusting**
161:3
**adjustment**
141:16
**Adkison**
235:22,23,24
236:3 250:7
250:7
**administrati...**
271:4
**administrative**
68:8 129:25
173:21
188:17
222:22,23
271:3 287:11
**administrati...**
174:16
205:13 280:9
**administrator**

164:25 165:8
178:4,7,14
179:5
**administrato...**
178:17
**Adobe** 12:13
**adopted**
248:19
**advance**
230:15
**advantage**
39:10 55:17
119:4
**adverse** 43:12
67:21 139:18
**advice** 20:19
74:4 78:7
79:24 157:13
207:22
289:11
**advise** 42:10
122:11 208:7
214:13 251:6
251:9
**advised** 79:21
172:4 213:10
**adviser** 22:10
46:9,11,23
70:1 234:22
235:1,10
241:24
289:10
**advisers** 42:11
236:1 287:24
288:14
**advising** 42:16
268:13
**advisory** 10:4
16:1
**affect** 25:18,22
88:12,13
**affluent** 46:17
47:6,15
**afford** 259:22

**affords** 197:10
**agencies**
32:19
**agency** 11:20
13:17,18
15:13 16:2
37:19
**agent** 15:7
37:2 42:9
97:15 272:24
**aggravation**
99:22 161:1
**aggregate**
94:18 128:17
**ago** 80:1
114:15
169:10
200:19
221:13
**agree** 49:2
88:18 157:5
165:7 178:6
178:16
181:15
184:25 195:6
205:2 210:17
215:4 225:13
226:5,10
231:6 233:7
233:24
273:18
**agreed** 65:20
152:1,2
180:13 207:1
219:15,16
240:16
275:19
**agreeing**
130:10
**agreement**
30:12,15,19
77:13 93:15
94:3,7,17
124:14,16

125:2 126:5
126:6,9,22
127:9,9,10
127:10,17
128:2,3,18
128:19
129:10
130:11,11,12
133:21 134:3
160:13,13,14
164:14
166:16,25
167:11 168:7
168:9,15,17
169:1 171:7
171:18
176:10,16,22
178:12,15,19
178:25 179:7
180:12,14
181:15
186:13 199:1
201:18
211:25 219:7
231:19
249:11
290:16
**agreements**
93:16,18
123:22 125:5
125:7,12
126:2 128:20
129:8,20
130:9 163:21
164:3 167:4
168:22
178:11
183:18 190:5
208:23
224:25
**ahead** 45:1
51:22 56:17
60:20 180:20
184:19,20

Henderson Legal Services, Inc.

Jarvis, Christopher                                    October 18, 2022

3

202:11
233:11,19
269:1 291:8
**AIPSO** 10:11
**air** 67:9
**al** 6:5 110:3,6
140:8 142:4
142:11 143:4
143:17
147:15,16
175:7 185:11
263:11
266:14
269:11
284:20
**Al's** 150:19
283:2,7
284:14
**Alabama** 5:25
106:17,18,18
130:4 139:17
188:24
245:18
**Alabama-ba...**
105:1
**Alan** 109:25
110:2
**alia** 218:13
**all-in-one**
128:19
**allegation**
118:13
**alleging**
193:18
**allocate**
287:22
**allocated**
204:24 205:4
**allocation**
89:25
**allow** 89:16
**allowable**
135:10
178:17

**allowed** 247:8
252:25 253:3
**alternative**
47:6 232:12
**amend** 268:15
**America** 1:8
6:5 293:2
**Amica** 10:10
**amount** 17:17
27:11 28:21
34:14 35:19
36:24 39:21
40:21 53:16
55:21 67:2
71:1,7 74:4
74:15 79:17
80:14,20
81:14 87:10
88:21 95:2
98:22,23
99:25 100:4
103:3,13,24
104:7 113:7
128:5 132:20
133:6,17,25
134:8 135:1
155:5 160:25
162:10 165:8
172:2,3
176:17 178:7
181:17
182:12 190:3
195:5 197:15
197:17
204:23,23
212:18 215:9
216:5 221:9
221:16
223:22 225:6
225:10,16
226:15 232:4
259:25
286:20
**amounts**

84:25 95:18
188:16
**analysis** 84:22
85:13 89:3,8
96:13,18
98:3,11
99:10 197:2
197:6 198:16
261:16 262:4
264:23
**analyzed** 96:8
**analyzing**
11:24
**Anderson**
14:15,16,17
14:25 169:1
179:4 202:5
**Angeles** 16:19
**angry** 194:1
**Annex** 207:23
**announced**
290:5
**announcem...**
290:10,18
**annual** 49:19
79:17 102:22
272:22 282:7
**answer** 8:14
8:20 9:3 21:7
23:18 51:5
56:21 60:20
60:22 62:4,6
68:6,10 77:9
123:8 124:19
141:7 144:21
200:6 258:3
258:4 280:3
**answered**
21:12 98:14
**answering**
67:11 279:2
280:23
**answers** 21:15
86:12

**Anthony**
163:17
**anticipate**
149:18
289:17
**anxious** 65:15
**anybody** 42:19
144:6 212:6
258:24
**anybody's**
258:25
**anymore** 259:5
**apart** 34:11
108:25
**apologize**
43:25 145:21
191:5,8
193:15
196:13
219:23 220:5
250:2 279:17
**apparently**
78:24 230:15
242:2 263:12
**appeal** 181:12
**appeals**
180:22
**appear** 152:25
159:21
214:18
224:11 225:9
**appearance**
267:9
**appearances**
2:1 267:1
**appeared**
294:13
**appearing**
6:20
**appears** 12:16
12:19 45:23
46:15 65:17
122:10 140:6
141:21 146:6

153:24 155:9
158:14,16
164:4 167:7
179:1 187:2
190:3 191:17
199:16 202:7
202:12
224:21
234:20
241:17 293:7
**appended**
126:19
**appetite**
256:21
**apple** 118:17
170:13
**apples-to-ap...**
283:25
**applicable**
125:6
**application**
181:1 263:16
**applied** 9:13
70:3 71:19
73:23 74:1
283:11
**applies** 138:21
**apply** 50:16
71:22 108:5
272:2
**applying**
272:21
283:14
**appointed**
271:22 272:2
**appointing**
129:16
**appraisal**
258:11
**appraiser**
258:12 272:6
**appreciate**
25:23 86:20
206:22

Jarvis, Christopher

October 18, 2022

4

| | | | |
|---|---|---|---|
| 244:10 | 90:20 94:2 | **asking** 8:10 | 156:16 |
| 263:21 | 104:21 109:1 | 46:10 77:18 | 284:25 |
| **appropriate** | 112:1 125:23 | 157:8 172:5 | **assumed** |
| 72:13 80:20 | 128:21 | 214:22,25 | 93:18,23 |
| 86:24 87:10 | 129:20 | 237:21 | 124:22 |
| 88:20 169:24 | 136:21 | 238:17 | 159:23 |
| 241:2 260:24 | 144:10 159:6 | 243:24 | **assuming** |
| **approvals** | 159:10 | **asks** 242:1 | 24:24 102:24 |
| 187:15 | 195:12 | **aspect** 67:19 | 256:15 |
| **approve** | 228:14,16 | **aspects** | **assumption** |
| 165:25 | 229:13 | 131:15 | 67:2 |
| **approved** | 233:16,18,22 | 134:13 | **assumptions** |
| 179:6,11 | 234:6 235:3 | 158:25 | 143:25 |
| 181:5 204:21 | 237:12,15 | 159:22 | 261:10,15,18 |
| 204:22 | 238:10,14 | **assess** 86:2 | 262:23 |
| 206:14 | 239:12 | **assessment** | **assured** 170:6 |
| 210:15 | 286:14 | 72:6 85:8,9 | **attach** 294:6 |
| 212:25 | **arrangements** | 104:6 175:19 | **attached** 54:15 |
| 220:16 224:3 | 67:20 92:21 | 276:18 | 61:24 131:13 |
| 224:7 225:6 | 223:16 236:3 | **asset** 89:15 | 152:15 |
| 226:15 | 236:10 | 108:11 | 157:15 |
| **approximately** | 240:12,24 | **assets** 74:7,8 | **attaching** |
| 225:20 282:7 | **arrive** 190:22 | 75:14 79:23 | 101:4 |
| **April** 45:16 | **arrived** 142:1 | 80:14 81:25 | **attachment** |
| 197:23 | **article** 46:11 | 82:24 84:4 | 12:18 59:5 |
| **AR** 200:25 | 46:16,18,21 | 88:11,23 | 61:23 78:24 |
| **arbitrary** 143:7 | 47:5 48:2 | **assigned** | 79:3 153:4 |
| **arbitrate** | 49:13,19 | 10:12 | 223:4,6 |
| 180:20 | 50:14 164:15 | **assist** 57:24 | **attachments** |
| **argue** 212:6 | 167:7 177:14 | **assisted** 69:8 | 211:12,20 |
| 239:18 | 193:18 | 163:10 | **attempt** 12:22 |
| **argued** 175:21 | **ASAP** 76:6 | **associated** | 107:10 |
| 194:24 | **aside** 26:23 | 24:1,14 | **attempting** |
| **argument** | **asked** 33:5 | 41:18 48:25 | 60:16 |
| 155:10 176:5 | 42:25 72:11 | 49:14 67:15 | **attempts** |
| 176:6 238:13 | 76:17 115:6 | 123:20 | 218:12 |
| 239:1,14 | 124:8 152:18 | **assume** 10:21 | **attend** 122:24 |
| **arrange** | 181:1 184:19 | 27:3 29:1 | **attention** |
| 291:15 | 185:3 210:13 | 47:11 58:10 | 31:23 196:9 |
| **arrangement** | 212:3 213:5 | 58:14 65:5 | 200:9 |
| 18:18,19,19 | 214:8 216:12 | 68:20 80:17 | **attorney** 6:17 |
| 19:22 22:4 | 218:8 269:16 | 85:17 94:22 | 17:5,6 19:3 |
| 33:25 35:5 | 279:5 287:8 | 95:8 122:14 | 41:22 42:8 |
| 74:12 90:16 | 291:17 | 129:23 | 47:2 53:21 |

| | |
|---|---|
| 53:25 54:19 | |
| 59:21 68:14 | |
| 129:18,18 | |
| 130:5 181:20 | |
| 207:18 | |
| 217:24 218:1 | |
| 228:20 | |
| 235:24 | |
| 258:10 | |
| 271:25 272:7 | |
| 273:1 288:5 | |
| 293:14 | |
| **attorney/tax** | |
| 17:6 | |
| **attorneys** 2:19 | |
| 22:11 42:24 | |
| 106:23 | |
| 108:12,17 | |
| 166:5,6 | |
| **attractive** | |
| 102:16 | |
| **attributable** | |
| 102:9 162:11 | |
| 190:4 | |
| **audio** 44:9 | |
| **audit** 41:17 | |
| 43:1,3,6,21 | |
| 67:16 68:2 | |
| 154:6 273:13 | |
| 273:14,23 | |
| **audited** 43:8 | |
| **August** 53:2 | |
| 220:3 | |
| **authority** | |
| 171:17 | |
| 183:21 | |
| 184:21 | |
| 211:23 | |
| 218:17 | |
| 219:10,17 | |
| **authorized** | |
| 204:20 | |
| **auto** 10:12,13 | |
| 28:11 85:16 | |

Jarvis, Christopher

October 18, 2022

5

87:9 256:14
259:23
**available** 84:8
215:9,17
243:24
**Avenue** 2:7
**average** 36:15
36:15 37:3
37:25 38:19
39:11 52:11
**averages**
36:14 143:18
**avoid** 43:10
117:22,22
118:15
**Avoiding**
46:16
**awake** 271:14
**awarded**
249:11
**aware** 30:1
43:20,24
44:24 57:2
70:2,18,19
71:3,24
74:17 75:1
75:13 85:6,7
89:2 104:14
111:1 114:18
116:3,6
137:14
148:18
153:25
154:11,12,12
154:13 198:5
209:6 218:9
233:3 234:1
255:11,15
275:22,24,24
276:4

**B**

**B** 4:9 131:6,23
134:12,13

135:20
136:16
137:22
242:21,25
**baby** 29:19
**Bachelor** 9:12
**back** 10:18
16:19 21:13
22:1 36:7
38:23 40:7
64:12,14,15
66:8 69:23
70:10 71:1,7
71:15 72:10
85:6 86:13
87:10 89:12
95:20 96:13
101:12,19
116:7 124:23
126:11,14
128:12,25
130:20
149:17 155:3
157:19
162:24 168:2
169:13,21
170:8,15,24
171:8,16,18
172:3 173:5
174:9,20
179:13 180:7
188:13
190:25
191:21
201:20
204:24 205:4
212:2,14
214:14,25
215:14
221:25 222:8
231:3 233:4
233:20 246:2
248:10
256:17 262:8

268:21
276:13
278:22
279:22 289:9
289:25
**background**
9:9 10:17
25:24 68:15
83:18
**bad** 29:19,19
41:11 51:5
118:11,16
119:2,2
182:7 184:3
184:4,5,12
184:17 195:2
195:2,2
206:6 227:22
231:15
**bad-mouths**
236:6
**balance**
189:23
266:23,24
267:11
**balked** 26:1
**bananas**
128:13
**Bar** 272:1
**Barely** 231:24
**Barnes** 1:17
1:20 6:12
293:4
**based** 29:15
72:23 79:24
79:25 98:10
120:25
129:23 182:2
204:9 210:22
221:16 259:9
259:14
261:10
**basic** 43:19
93:3 121:20

158:23
159:11 169:9
191:11 229:4
**basically**
20:23 123:9
128:2 146:16
194:10
**basis** 17:21
86:4 89:9
124:24
**Bates** 12:6
44:20 45:3
52:17 57:8
58:20 61:14
75:21 78:15
79:8 90:7
92:11 109:22
119:10 127:5
139:10
145:16 152:5
154:21 158:8
163:22
166:19
168:11
182:17 186:5
191:10
192:11
196:14,19
199:10
201:25 207:8
210:6 213:19
216:23 217:2
222:12
226:19
228:23
234:14
241:13
**baton** 99:23
243:17
**battle** 175:15
**bay** 95:13
**bearing** 245:2
**beat** 52:1
**beckon** 206:13

**becoming**
115:18
**began** 92:4
198:13
**begging**
150:22
**beginning**
18:5 20:11
34:4 101:2
111:5 132:6
153:14
166:25
186:20 215:3
231:12
245:21
265:11
281:25
**begins** 6:3
90:8 140:17
164:17
198:17
199:15
**behalf** 2:3,14
6:14 14:13
127:12 221:3
273:3,3
**belief** 33:15
**beliefs** 253:24
**believe** 16:21
20:8 21:8,10
26:12 33:25
37:24 46:4
48:2 49:1,5
51:16,16
54:25 58:18
63:11 70:11
71:18,22
73:4 77:8
85:13 91:13
91:16 95:4
96:18,19
101:23 102:3
102:6,18
103:5 110:17

Jarvis, Christopher

October 18, 2022

6

123:3 126:17
135:21
147:20
148:11
149:18,21
150:18
151:18
159:14 162:6
162:7 167:12
179:8 184:24
185:3 192:10
198:8,8
203:6,21
205:22
208:22
209:12
210:19,22
216:1 226:17
233:1 237:10
237:15
246:12 255:9
268:5 269:21
272:15 283:8
283:14
**believed** 38:16
171:6 172:6
250:6 252:15
**belly** 276:10
**bender** 185:23
**beneficiaries**
168:19
181:25
201:19,20
209:23 212:1
220:2,18
**beneficiary**
176:15,19
178:1,3,5
**benefit** 12:23
35:24 47:18
48:8 49:21
51:2,18,23
51:24 52:2,3
55:3 63:15

63:20 64:1
65:5,25 66:2
100:17 135:3
280:25
**benefits** 27:6,7
35:4,7 36:7
46:21 47:7
48:6,25 49:7
49:13 50:2,3
50:5,19
52:12 55:24
56:5 63:1
68:17 144:23
273:20
**Benson**
207:15,16,23
208:9,17,20
210:23
211:15,17
219:15,16
**Benson's**
209:3,9
**Bert** 235:16,19
**best** 16:14
17:9 18:6
30:22 34:9
70:8 90:22
99:5,8
100:11,14,17
100:24
107:13
137:12
152:15 163:9
200:5,7
201:19 208:5
248:1 271:11
272:13 293:9
**better** 23:11
36:5,9 37:8
37:11,25
38:3,4,17
39:10,11
48:3 68:18
83:16 107:5

107:6 111:24
113:17
149:11
206:20 239:9
267:10
280:22
**Betty** 57:21,21
58:14 60:18
64:9
**beyond** 74:18
284:13
**bias** 69:3
**big** 26:17 33:1
33:2 63:21
64:1,1,7
70:13,15,16
73:9 107:2,3
107:21
108:20 138:2
138:3 142:21
142:25
148:13
149:14
161:21
184:14
195:15 201:1
231:24
240:20
251:22
263:20
280:24
**bigger** 115:11
198:9
**biggest** 68:20
68:21 69:6
106:13,14
149:23,24
150:11
185:15
200:19,21
**Bill** 228:17,19
**billings** 276:18
**billion** 73:18
73:21,21

87:22
**bio** 12:20
13:24 15:19
44:17
**bit** 9:9 19:13
36:2,2 38:9
54:5 70:22
96:7 101:12
127:23
159:24
165:16 187:2
250:3 265:12
269:11 275:6
281:8 288:20
**BKG** 127:18
**BKJ** 127:20
**blanks** 261:19
**blend** 143:13
**blind-sided**
290:9
**blown** 79:13
**blue** 189:16
224:7
**board** 184:21
**Bodden** 76:19
**bodily** 29:3
**body** 59:9
119:24
**bonds** 75:18
78:6,9 82:1
**book** 107:20
**boosting**
194:18
**bother** 151:5
**bothered**
174:17
**bottom** 52:25
90:9 146:7
177:4 189:12
190:2 199:15
209:25
220:22
235:15 266:2
**bought** 58:13

265:20
**bound** 165:7
178:6,16
180:12,13
181:16 182:9
199:2
**box** 2:21
188:21
232:11
**brainstorming**
31:16,18
32:1
**break** 8:16,19
8:21 44:4
57:2,6 63:10
69:18 119:17
121:14
126:25
130:16
166:12
217:12
219:22 222:4
**breeze** 7:23
**brewing**
155:16
**brief** 288:24
289:2
**briefly** 9:21
66:9 133:21
139:1 191:7
263:5
**bring** 29:4
63:22 108:10
191:13 279:1
**bringing**
288:13
**British** 236:15
**broken** 187:1
223:15
**broker** 37:2
97:15 269:5
**brokers**
135:23
**brought** 15:23

Jarvis, Christopher                          October 18, 2022

7

42:5 89:13
112:10
135:24
180:25 181:2
181:8 288:5
**browser** 285:5
**BS** 232:18
**buckets** 74:7
99:21
**budget** 139:7
139:7 259:18
287:3
**building**
114:16
**bulk** 10:19
11:25
**bullet** 131:3
154:4,6
**bumps** 44:8
**bunch** 15:3
128:11 136:5
166:5 185:12
266:8
**Burke** 199:16
**burn** 267:6
**burned** 238:18
**Burton** 85:25
86:7 165:3
165:12,15
166:4 178:5
178:14
179:12,13
181:4,23
193:25 197:1
197:3 199:3
199:16
201:21 204:8
209:14
210:13,15,17
211:6,12
212:2,3
215:23 216:9
216:16,22
218:10 219:2

219:10,17
**Burton's**
181:16
199:17
201:13
**business**
10:18 14:9
14:19 15:16
15:16 16:4
23:13,19
25:10 26:25
30:8 34:6,7
34:11,14,14
34:16,17,17
35:11,13,22
37:24 38:16
41:14 43:9
47:25 66:3
92:2 97:10
98:5,9
100:22
113:23,24
117:10
151:10,14
179:20
184:17
192:21,23,23
193:17,18
194:11,12,19
194:23 204:1
231:15,17
238:4 239:18
249:4,12
257:22 258:4
258:5 268:11
268:17,17
269:2 276:15
276:15,19
288:10
290:13,14
**businesses**
31:23 49:11
75:9 82:13
93:10 113:24

124:1 148:2
256:5
**Buss** 16:20
21:19,22
**busy** 45:20
175:16
**butt** 280:9
**button** 211:2
**buy** 64:15 95:7
95:12,25
97:1,11
163:9 205:20
268:9,10,24
287:1
**buying** 81:24
81:25 103:13
103:25 104:8

_____
**C**

**C** 4:1 6:1 131:6
131:23
136:20,21
138:1,22
160:5,6,21
242:21
**calculation**
103:6 259:13
**calculations**
96:1 286:12
**calculator**
190:19
**call** 203:7,13
203:22,24
204:4,10,12
289:3,17
**called** 1:14 7:5
9:19 12:18
26:15 49:11
71:8 93:23
125:2 127:18
129:17
131:13 153:4
155:24 165:2
193:8

**calls** 104:11
**calm** 155:15
**cancel** 184:5
**cancellation**
117:11
**candidate**
34:13
**candidly** 150:3
**cap** 195:4
**capability**
109:9
**capacity** 169:4
**capital** 36:1
41:7,8 80:25
100:16
262:16
**capitalization**
39:14,22
66:18 83:4
279:24
**capitalize** 41:6
**capitalized**
74:1,25
276:8
**capped** 133:7
133:13
**captive** 13:19
13:24,25
14:2,3,4,10
14:11 18:8
18:15 19:1,4
19:18 20:8
20:11,13,14
20:17,22
21:7,9,11,17
23:1,14,20
23:22 24:17
24:22 26:1
30:9,12 31:5
32:7,21
33:11,14,16
34:2,13 35:2
35:9,15,18
36:1 38:5,24

39:1,5 40:6
41:10,16,18
42:2,21
46:22 47:9
47:17 48:14
48:25 49:14
51:10,15
52:3,10 54:2
54:13,24
55:2,15,16
56:4 58:5,17
59:23 60:6,7
60:10,15
61:6,8,11
62:14,16,18
63:8,18
64:24 65:20
65:23 66:2
66:12,25
67:15 69:12
71:2,4,5,23
73:22 74:9
75:2 76:12
76:14 77:1
79:11,18,22
80:3 81:7
82:17 85:11
85:14 89:14
90:13 91:12
92:5 93:23
95:2 97:19
97:23,25
98:15,20,23
99:11,15
100:2 102:23
110:15
113:19
123:18
124:13
127:12
128:20
129:17 130:2
130:9 132:18
133:13,16

| | | | | |
|---|---|---|---|---|
| 138:12,12 | 49:3,8 59:17 | 239:24 | **cash-basis** | 42:19 45:19 |
| 139:18 | 70:2,4 71:20 | 259:19 | 87:21 | 54:21 91:22 |
| 147:21,23 | 72:1 74:22 | 265:20 | **cash-equiva...** | 96:21 104:11 |
| 150:4,15,23 | 77:10,15 | **career** 270:2 | 72:3 | 105:20 |
| 150:25 151:3 | 80:15,21 | **Caribbean** | **casualty** 11:4 | 121:19 136:1 |
| 163:13 | 81:11 84:22 | 91:3 | 11:5 13:18 | 138:14,15 |
| 164:18 165:6 | 86:20 89:4 | **carry** 239:22 | **catalogue** | 142:3 162:8 |
| 176:15,16,21 | 92:2 93:17 | 239:23 | 158:17 | 169:22 175:2 |
| 177:15,20 | 93:18 94:9 | **carryover** | **catastrophic** | 194:1 203:6 |
| 178:13,15 | 94:10 104:22 | 170:3 173:9 | 143:12 | 203:17 |
| 179:2 181:6 | 108:3 113:1 | **cart** 170:14 | **catching** 44:8 | 208:14,19,25 |
| 183:10 | 123:22,25 | **case** 1:3 6:6 | **categories** | 250:6 252:2 |
| 186:19 193:7 | 124:23,23 | 27:22 34:24 | 131:5 160:17 | 252:8 254:19 |
| 196:6 212:4 | 126:7,12 | 36:4 39:12 | **category** | 255:3,12,17 |
| 215:10 235:2 | 128:3 132:2 | 68:2 78:2 | 242:25 | 266:10 268:3 |
| 236:2,6,9,13 | 132:14 133:3 | 93:25 99:2,5 | **caught** 160:22 | 268:6 270:5 |
| 237:11,12,15 | 133:4 136:23 | 99:6,8,9 | **cause** 176:16 | 270:11,21,22 |
| 241:18 246:2 | 151:7 154:10 | 100:11,17,24 | 197:21 201:5 | 275:15 |
| 246:17 249:3 | 156:1 159:6 | 101:25 103:5 | **caused** 181:3 | 283:15 284:1 |
| 249:14 250:9 | 160:14 162:4 | 115:22 130:8 | 181:4 201:9 | 285:16 288:3 |
| 250:14,24 | 163:22 164:8 | 139:18 | 214:24 | 288:17 |
| 251:18,20 | 167:3 168:21 | 140:22 | **cc'd** 185:10 | **Celia's** 82:19 |
| 268:9,24 | 169:13 170:8 | 142:20 | **CDT** 292:1 | 84:7 118:20 |
| 269:22,24,25 | 170:15 171:8 | 143:10 | **ceased** 292:2 | 135:21 136:8 |
| 270:10,13 | 171:18 | 164:22 218:9 | **cede** 124:15 | 187:10 |
| 271:16,19,22 | 173:17,21 | 230:5 240:3 | 136:23 | 263:10 |
| 272:9,13,15 | 174:8,20,25 | 240:7 245:17 | 160:25 163:4 | 270:11 274:5 |
| 272:18 273:4 | 183:18 | 254:14 265:9 | **ceded** 117:12 | **center** 251:22 |
| 273:7,14,15 | 184:22 | 285:1 286:8 | 123:18 131:6 | **centers** 276:12 |
| 273:20 275:8 | 185:25 | **cases** 41:24 | 132:3 134:9 | **Central** 6:9 |
| 275:16 276:6 | 186:21 187:4 | 111:11 122:8 | 137:4,20 | **CEO** 57:19 |
| 276:14,16 | 188:4,18 | 138:5,17 | 138:5,10,18 | **certain** 27:11 |
| 277:9,16 | 193:1 204:24 | **cash** 72:3 | 143:1 176:19 | 36:24 37:4 |
| 278:9,11,15 | 205:4 215:18 | 74:21 76:21 | 176:22 | 40:19 98:22 |
| 278:17,19 | 230:6 236:12 | 76:23,25 | **cedes** 128:24 | 98:23 99:25 |
| 280:5 | 236:18 | 78:5,8 81:14 | **ceding** 128:5 | 108:9 128:5 |
| **captive's** | 240:13 | 81:14,17 | 137:16,22 | 132:20 180:1 |
| 70:18 74:7 | 246:22 | 82:1,4,6 84:9 | 161:10,13 | 181:2 184:11 |
| 77:23 78:8 | 247:22 276:1 | 84:12 88:13 | 256:16 | 243:10,10 |
| **captive-by-c...** | 276:20 288:1 | 88:15,21,23 | **Celia** 1:5 3:4 | 284:20 |
| 89:9,10 | **captives'** | 88:24 170:4 | 6:4,25 16:13 | **certainly** 41:13 |
| **captives** 18:20 | 167:8 | 170:13 | 16:22,22 | 41:15,22 |
| 21:16 26:11 | **car** 28:12 | 185:23 | 17:23 19:5 | 50:22 51:1 |
| 33:7 46:10 | 185:22 | 287:21 | 19:21 20:3 | 111:15 117:5 |

Jarvis, Christopher

October 18, 2022

9

117:6 129:3
180:23 182:9
267:10
273:16 285:1
**certificate**
9:18 293:1
294:1,14
**certifications**
9:17
**certified** 9:18
10:1 257:1
258:11
**certify** 293:6
294:2,11
**CFO** 268:12
**CFP** 9:19
**chain** 52:24
53:1 55:12
76:2 90:8
101:1,3
155:1,2
199:14 200:1
217:21
222:19
226:23
234:18
**challenge** 25:5
25:5,7 150:3
150:3,11,20
151:20
181:18
230:14
231:13
**challenges**
24:1,9 81:2
149:24,25
**Chan** 214:1,3
**Chan's** 215:2
**chance** 39:11
46:8 79:14
118:3 120:13
123:7 177:3
**Chandler's**
130:3

**change** 10:15
28:3 106:12
106:13,14
109:2 112:1
115:25
122:12
136:19 150:9
153:14
161:10
170:17 172:8
172:8,13
175:25
218:12
230:22 232:7
232:21,22
242:25 254:9
254:12
265:19 266:3
266:6 281:6
**changed** 21:20
174:5 181:11
181:12
191:15,16
215:21 266:8
**changes** 67:5
109:3 160:11
291:18
**character**
118:12 184:3
**charge** 187:7
280:14
**charged** 11:11
147:9 161:12
161:14
**chart** 63:22
**chase** 206:8
**chasing**
113:25
**chat** 241:18
242:5 243:13
**checklist**
126:20
**Chelsea**
192:24 193:5

193:13
197:10,17,18
198:5,14,23
199:1,18
202:16,22,24
203:4,20
207:4 209:1
210:14
211:24 213:7
216:9 217:7
218:2,15
219:5 220:9
220:19,24
222:2 224:22
225:10 234:1
**children** 50:18
58:13 60:3
61:1 64:6
94:18,20
**chime** 97:17
**choice** 229:7
229:17
**choose** 33:13
92:8
**chose** 55:2
145:9
**Chris** 12:19
119:25 221:5
227:1 267:14
**Christine**
45:17,24,25
163:17
**Christmas**
36:3
**Christopher**
1:13 4:3 6:3
7:4 217:23
**Chrome** 264:2
264:5
**Chubb** 37:1
39:15
**chunk** 63:21
**CIC** 58:3,4,4
58:10 126:23

138:5
**Cincinnati**
16:2
**circumstanc...**
262:2
**City** 239:18
290:7
**claim** 25:3
26:23 28:18
29:19 40:1,3
40:5 72:24
74:11 85:23
85:24 87:23
132:22 133:7
133:23,24
143:12 148:6
150:22
151:22,25
164:17 165:8
165:21,25
167:16
178:12 179:6
181:4,17,23
183:12 192:9
192:19 193:6
193:12
195:15,16,19
195:21,25
196:2,9
197:18,24
202:24 203:4
209:7 212:4
215:24
218:12
219:10
224:23
239:20,21
280:11
**claim-by-cla...**
86:4
**claimants**
220:13,15
**claimed** 49:23
66:1 192:7

193:7 195:11
203:20 208:9
**claims** 31:8
35:20 39:22
52:5 67:1
71:2,7,14
72:20,22,24
73:20 76:23
81:7,14,16
81:19,21
82:22 83:14
85:13,18
86:1,1,2,2,9
86:10,14
89:5 116:3
116:22 117:7
135:14
142:22,24
145:1 147:22
148:4,5,6,12
150:1,7,10
150:13,16
151:2,7
156:7 164:15
164:19,23
165:20 166:8
167:10 171:2
175:4,6,11
180:1 183:6
183:10,16,22
183:23,25
184:11,13,14
184:15,15
185:1,4,6,6
185:10,14,17
185:17 186:1
189:2,22
190:4 193:21
195:6,17,22
196:7,10
198:1,6
200:3,9
202:21
204:21

Henderson Legal Services, Inc.

205:24 206:2
206:3,5,5,14
207:23
209:10,25
210:13,15,18
211:8,24
212:4,11,18
212:25,25
213:7,12
216:10,13,15
218:17 219:4
219:18
220:10,15,19
220:25 221:9
224:4,7
225:5,11
226:15
231:14,22
232:14
238:22 239:1
242:3,9
269:5 273:5
273:6,8,10
273:10
276:21 284:6
284:25
**clarification**
230:4 260:22
**clarify** 21:14
32:12 38:15
85:12 149:3
**Clark** 1:5 3:4
6:4,25 8:12
12:17 16:13
16:24 17:8
17:11 18:7
19:1,24 22:3
22:25 23:9
30:1 33:24
43:2,15,20
45:25 46:10
46:25 48:24
54:21,24
56:4,14,16

57:16 58:1
58:16 59:2
59:12,15
60:16 62:1
62:17 63:14
69:8,15 76:5
76:11,17
77:8 78:21
78:23 79:9
79:16 80:2
80:13 84:20
89:3,19 92:4
92:17,20
94:18 95:2,6
95:9 103:2
103:22
109:25 111:6
112:6 117:9
117:16
119:21 120:5
121:19 122:4
131:12 142:1
142:6 146:11
152:13,18
154:7 155:4
155:9,19
156:13
161:22
165:19
169:23
175:18
182:11,23
183:4,8
185:4 193:20
199:23 200:2
200:5 201:6
202:4,18
204:12,17
208:19
210:11 214:2
219:8 223:1
226:25 227:9
229:3,6,13
230:2 232:5

234:5,19
235:21
242:12,14
247:25
250:24 251:9
252:2 253:10
253:19
269:23 270:1
270:15,16
271:8,16
276:22 282:4
286:6,14,25
289:17
**Clark's** 46:3
74:3 78:4
90:16 93:17
104:22
105:21 112:2
122:11 123:1
136:11
152:11 154:1
155:14 159:6
170:22
192:20
208:20 214:7
214:19 238:1
238:6 240:12
241:21
251:14,20
270:7,24
285:17 286:3
**Clark_IRS**
4:11,12 5:3
5:11,12,13
5:14,15,16
5:17,18,19
5:21 12:7
44:20 45:5
121:17 152:5
192:11
196:15,19
199:10
201:25 207:9
210:6 213:19

216:23 217:2
217:20
222:13
228:23
**Clark_Prod**
4:24 127:6
**Clark_Prod-...**
5:7 166:20
**Clark_Prod-...**
5:8 168:11
**Clark_Prod-...**
5:2 145:17
**clear** 8:6 65:22
171:25
206:23 219:1
231:8,20
**cleared** 51:5
**cliche** 288:15
**client** 11:13
14:17,24,25
19:4,14,24
20:20,24
25:1 26:1
34:1 35:3,8
38:24 42:2
53:7 58:12
65:24 71:3
71:22 76:6
90:10 96:6
98:7 103:11
108:9 129:4
129:12
155:11 166:1
222:23,24
235:10 238:3
251:6,10
256:4,4
262:9 268:12
268:12,13,20
271:6 275:16
276:11,19,22
278:7,11,11
278:16 288:5
288:7 289:4

**client's** 14:13
46:23 56:17
136:24
237:11
**clients** 10:1
15:13,15
16:3,5,10
17:18,19,21
17:22,22
18:1,14,20
18:21 19:1,2
19:5 20:6
21:2,17 22:4
22:8,12,16
22:21,25
24:21 25:14
26:11 30:2,5
30:8 31:22
32:22 33:6
41:20 42:16
43:16,22
49:8 51:8,8
51:16 56:15
56:19 59:17
60:8 69:9,11
69:16 70:1,3
70:25 71:19
71:24 74:4
74:16,20
75:1,4,10
80:16,22
81:24 82:12
89:20 90:16
92:5,21
93:10,17
95:1,5,11,16
96:14 97:19
103:1,23
104:3,6
105:25
106:25 107:5
107:14,22
110:16 112:2
114:11

Jarvis, Christopher

October 18, 2022

11

116:12
117:18
122:11 123:2
136:11
137:16 144:4
144:15,18,19
145:8,14
148:20,24,25
150:1 152:11
153:8 154:10
157:11 162:2
162:8 163:1
163:13
172:14 176:2
176:6 200:25
205:11,22,25
213:15
214:13,20
227:4,6,10
228:7 229:16
229:19
232:13 234:4
234:22 235:6
238:1,6
240:12 241:1
241:21
255:12,17,20
255:22,23
256:9,12
266:22
267:13
269:22,24,25
270:12 271:3
274:2,5
278:12,12
286:3,3,5,13
286:25 287:2
287:25
288:12
**clinic** 54:10
**Clips** 57:20
59:6 64:10
151:11
**close** 35:25

74:25 85:20
150:19
157:25
159:17
205:17
224:12
271:13
291:23
**closed** 214:10
**closely** 33:3,4
78:1
**closer** 37:9
64:22 175:8
**closing** 163:7
163:7
**club** 36:3
**co-counsel**
6:21
**Coast** 16:19
**code** 23:24
**coded** 224:3,7
**coffee** 40:17
40:18,20
**collect** 171:8
171:18
173:13
200:16 201:2
222:1
**collected**
280:18
**collecting**
173:16
205:18
**collective**
278:13
**college** 9:11
10:8
**color-coded**
187:1 188:9
189:15,21
223:20
**colored**
224:17,23
**column** 186:18

186:20
187:22,25
188:14,15
189:1,16,22
224:13
**columns**
223:20
224:19
**combination**
269:6 288:3
**combinations**
143:15
**combined**
140:21
**come** 36:1
62:1 64:2,25
68:17 96:9
100:15
107:11,11
108:14
111:17 141:9
174:14 205:1
210:24 268:2
268:20
276:13
**comes** 34:5
243:13
261:23
**comfort**
106:19
**comfortable**
25:12 26:5,7
27:4 39:24
107:17 161:1
176:7
**coming** 52:3
54:7 64:9
68:14 102:6
109:17
128:25 145:7
180:3
**comment**
156:16,23
237:10 252:9

**commenting**
42:24
**comments**
215:8 250:6
**commercial**
26:12 36:12
**commission**
293:22
294:21
**commissions**
161:10,13
**commit** 103:12
**common**
27:25 49:6
59:15 62:15
75:9,19
85:24 92:19
111:22 147:7
161:2 236:8
256:1
**commonly**
32:14 73:10
**Commonwe...**
1:17 293:3
293:21
**communicate**
182:11
214:25
**communicat...**
17:8
**communicat...**
163:1 214:19
**communicat...**
85:1 113:16
232:25
**comp** 37:3,20
**companies**
10:10 11:18
11:18 18:9
18:15 23:1
33:20,22
36:14 38:1
41:6 69:5
73:15 74:17

74:23 75:7,9
79:11 81:3
81:20 87:20
107:1 113:1
119:24
174:10
186:19
193:14 218:2
246:3,4,17
249:14,19
250:9,14,24
251:18,21
256:8 257:5
270:10
273:24 275:9
276:7
**company**
11:19 13:1
14:4,9,18
21:3 23:14
23:21 24:3,5
26:21 27:20
30:23 31:5
31:10 32:7,9
33:8 34:19
35:3,12,25
37:21 39:8
40:22,23
41:14 46:22
47:8,9,14
48:4,10
49:15 50:15
50:18,25
58:5,17
62:14,24
64:13,18,24
68:16,18,18
69:1,2 70:10
71:12,17,18
72:14,21
73:14,15,17
73:24,25
74:17 76:12
82:9,21

Jarvis, Christopher                                   October 18, 2022

12

83:15 86:13
86:23 87:8
88:22 90:13
92:25 102:1
102:23 105:1
106:15
127:13,18
129:16 130:4
134:20
138:25
140:14 161:6
164:5 165:2
176:1 179:19
184:4 192:25
192:25
198:14,17
226:9,11
249:4 262:16
262:21 268:9
268:24
272:20,20
273:15,21
276:25 277:9
278:12 287:3
288:8
**compare**
98:17 114:13
**compared**
36:11 74:23
111:13
144:20
180:10
234:10
**comparison**
283:25
**compensated**
161:7
**compensation**
161:22
**competent**
269:12,15,15
269:20
**complain**
203:19

**complained**
179:19
201:20
202:24 203:3
203:6,11
**complains**
181:19
**complaint**
232:18 233:2
**complaints**
226:14 228:7
232:13,22
255:5,7,13
255:17
**complete**
181:7 200:24
227:12 228:3
**completed**
127:12
**completely**
7:21 87:6
**complexity**
99:12
**compliance**
122:6 272:23
289:10
**compliant**
277:9,11
**complicated**
24:3 108:8
109:10
260:20
**complied**
288:1
**component**
62:13
**comported**
33:11
**composition**
264:15
**computation**
96:25
**compute**
190:7 225:15

**concentrated**
117:3
**concept**
111:16
134:10
**concern** 43:7
107:22
108:20 113:8
172:14
240:25
**concerned**
24:23 25:20
54:8 69:14
154:9,15
172:8 197:18
**concerns**
113:3 145:5
173:10,12
227:16,19,24
**concluded**
168:6
**concluding**
291:24
**conclusion**
206:11 209:9
210:1 219:22
252:19
263:12
**condensed**
158:15
**conditions**
164:16
**conduct** 219:5
**conducted**
122:25
**conference**
203:7,24
204:4
**conferencing**
6:11
**confidence**
139:5
**confident**
174:4 175:9

**confirm** 45:21
125:5 131:25
286:4 291:12
**conflict** 166:3
**conflicted**
209:21
**confused**
96:22 101:5
101:19
229:25
**confusing**
146:21
**confusion**
55:7
**conjuncture**
172:20
**connection**
22:24 110:15
279:13 286:6
**consecutive**
197:20
**conservative**
262:12,22
**consider**
34:11 38:5
**consideration**
51:18 249:12
**considered**
27:11 42:5
48:9,18 52:8
73:16,17,22
74:1,22
157:12 182:2
**considering**
35:3,9 38:25
98:10 202:21
**consistent**
84:7 146:21
151:24 246:1
246:8
**constant** 81:5
**constantly**
184:1,7
**constitutes**

218:13
**consult** 80:13
178:4 179:5
**consultant**
97:12 207:18
**consultants**
97:12
**consulting**
13:25 211:15
**consuming**
31:4 43:9
**contact** 203:19
**contacted**
203:23
**contain** 234:21
**contained**
191:11
254:19,21
**contains**
186:15
226:23
**contemplates**
177:19
**content**
156:11,14,18
**contention**
201:10
**contentious**
180:9
**context** 23:8
23:10 120:19
236:14
**contingency**
99:3
**continue**
234:4 290:17
291:9
**continued**
241:6,6,7
284:12
**continues**
119:23
132:12 177:8
220:23

Jarvis, Christopher

October 18, 2022

13

contract
117:11
209:24
256:13
contracting
161:5
contracts
256:14 265:3
contradictory
181:15
contribute
98:21 174:9
contributes
177:20
contributing
64:10
control 25:2
81:11 243:21
convenience
129:25
243:25
convenient
232:21
conversation
43:4 56:25
60:4 80:18
80:19 90:24
95:8,21
97:18 98:8
98:12 99:23
105:3,19
115:24
117:15
118:19 142:4
144:5 147:8
156:20 157:7
175:23 268:6
287:14
290:13
conversations
22:16 30:4
30:18 31:17
104:4,5,10
104:10,15

142:11 143:8
143:19
157:10 221:5
conveyed
202:15 274:1
274:4
convince
185:16
convincing
149:25
copied 59:3
182:24
199:23 214:2
copy 163:21
166:16 168:7
178:10
234:21
291:16
corner 225:3
Corp's 93:10
corporate
53:16 272:25
correct 9:19
13:8 14:8
18:3,4 22:5,6
24:15 32:6
46:12,20
47:17 48:20
48:21 49:15
49:24 50:6
52:13,15
53:9,11
57:22 59:11
71:9 78:9
79:19 84:19
90:17,18,23
93:12 95:3
96:2 104:15
123:23 124:8
124:24 125:3
125:13,14,21
126:7 128:22
129:11,13,25
131:10,11

133:8 134:11
137:1 156:11
159:7 160:2
160:8 164:11
164:20 165:1
165:4 167:4
167:13
168:17 169:3
169:18,19
171:22
177:23
183:19
189:10,11,18
189:19 190:5
190:6,10
191:3,4
193:2,3,9
197:7,8
198:3,23,24
198:25
199:24 202:9
211:21,22
212:16 213:9
214:20
220:10
223:12,17,18
223:24,25
224:8 225:21
228:18
242:15
246:16 248:4
248:12 249:4
249:5,8,9,12
249:21 252:3
252:12,13,16
252:17,20
254:19,22,23
256:25
257:14
259:10,22
260:3,4,6
264:17,25
265:1,4
278:21

282:11,21,24
285:10
289:11
corrections
294:5
correctly 53:3
84:5 94:13
174:6 179:7
190:1 239:5
240:19
cost 36:24
38:2 73:1
85:23 98:2,2
100:23
135:19
161:18
162:14
242:24
287:11,12
costs 24:1
28:18 40:14
40:17,20
54:8 55:20
97:23 134:14
134:23
counsel 1:14
4:2 6:15 7:5
7:9 42:4
178:22
217:10
244:25
285:24
286:17 289:7
293:11,14
count 181:9
country 185:8
County 294:20
couple 7:13,24
8:5 31:6,9
63:9 119:14
126:24
131:21
159:20
160:10 168:8

176:9 177:2
183:8 256:9
276:16
course 48:23
206:25
289:20
court 1:1 6:6
6:12,17 7:25
8:4 29:12
38:8 43:23
83:2,6
101:15
108:21
112:14
178:21
217:10
248:20
249:10
Court's 248:3
cover 81:7
96:13 98:6
111:20
121:14
123:15 169:6
191:2 198:1
200:3,13,17
205:24 213:7
217:14
219:21
231:22
268:15
coverage
26:22 28:3
31:22 37:5
41:4 95:15
96:15 97:1
97:10 103:25
104:7 111:9
111:12 113:4
116:20
117:13
120:22 131:5
131:23,23,25
132:4,6,8,12

Jarvis, Christopher

October 18, 2022

14

| | | | | |
|---|---|---|---|---|
| 133:6,23 | 210:23 | **customer** 37:7 | 226:24 229:4 | 269:8 278:14 |
| 134:12,13,15 | 211:17 | **customers** | 230:1 241:19 | **decided** 80:8 |
| 134:22,24 | 219:15,16 | 151:1 | 281:19 | 169:20 |
| 136:16,20,20 | **crazy** 29:24 | **cut** 142:15 | **dates** 180:17 | 284:19 |
| 138:1,22 | 121:11 | **cutting** 151:12 | 224:11 | **decides** |
| 140:17 | **create** 14:10 | | **David** 16:16,23 | 278:15 |
| 150:12 160:5 | 24:2 33:14 | **D** | 17:22 | **deciding** 268:8 |
| 160:5,25 | 39:8 40:21 | **D** 6:1 | **day** 91:23 | 268:23 |
| 161:4 197:2 | 49:19 55:23 | **D.C** 2:22 | 122:18 151:4 | **decipher** 93:6 |
| 197:6,11,22 | 65:23 97:24 | **damage** 28:12 | 151:5 258:15 | **decision** 95:25 |
| 198:16 217:7 | 99:11 106:19 | 28:13,20 | 258:25 267:5 | 112:19 137:8 |
| 219:3 237:6 | 107:6,6,6,11 | **damaged** | 267:6 294:13 | 165:7 170:16 |
| 237:17 238:7 | 112:21,23 | 28:15 | **days** 28:22 | 178:6 201:8 |
| 238:13 | 142:22 | **damages** | 29:1 94:9,10 | 201:8,12,13 |
| 239:15 241:1 | 187:14 243:4 | 197:11 | 126:12,13 | 201:17 208:8 |
| 250:11,18 | 271:2 | **dangerously** | 169:14,18 | 227:14 231:9 |
| 251:1 286:18 | **created** 35:11 | 271:13 | 177:16 | 248:3 268:12 |
| 286:21 | 55:7,15 | **dangers** 250:8 | 213:25 | 268:17,18 |
| **coverages** | 59:22 83:24 | **Darwitt** 2:16 | 214:22 230:1 | 288:13 290:8 |
| 27:16 111:17 | 136:8 | 6:21 | 279:19,19 | **decision-ma...** |
| 112:20,22 | **creates** 112:23 | **dash** 186:21 | **deal** 7:20 | 77:14 |
| 118:15 121:4 | **creating** 50:14 | **data** 96:8 | 11:23 42:17 | **decisions** |
| 121:6,9 | 50:15 55:20 | 115:15,21 | 84:25 108:20 | 96:25 |
| 132:15 | **creation** 20:19 | 147:11 241:5 | 113:22 | **deduct** 65:16 |
| 133:12 | 60:15 | 259:11 | 263:20 271:4 | **deductible** |
| 267:20 | **credentials** | 260:10 261:1 | **dealing** 24:4 | 133:1,6 |
| 283:15 | 272:3 | 261:9 283:18 | 24:21 208:1 | 142:17 143:1 |
| **covered** 96:12 | **credible** 236:7 | **date** 6:8 | **dealt** 194:10 | 143:6,9,14 |
| 129:23 | **Credit** 187:15 | 146:12 | **Dear** 227:1 | 160:24 |
| 174:21 | **creditors** | 152:24 | **December** | 265:21,22 |
| 179:23,24 | 150:5 | 187:23 188:3 | 4:25 92:17 | 266:16 |
| 197:4,15,21 | **critical** 236:2 | 189:10,17 | 121:19 | **deductibles** |
| 216:10,17 | **criticisms** | 215:21 282:5 | 125:16,18,18 | 142:12 |
| 240:4 | 114:19 235:2 | **dated** 45:16 | 127:9 131:14 | **deducting** |
| **covering** | 235:10 236:9 | 53:1 57:15 | 158:21 159:1 | 50:6 |
| 99:17 157:11 | **cross** 177:12 | 59:1 79:9 | 159:4,4 | **deduction** |
| 161:2 239:17 | 243:19 264:3 | 92:18 101:19 | 204:20 | 35:14,16 |
| **covers** 197:19 | **curious** 25:20 | 109:24 146:1 | 207:13 229:3 | 52:4 |
| **COVID** 151:7 | **current** 49:20 | 155:4 182:25 | 229:7 | **deductions** |
| **CPA** 272:1 | 50:2,4 65:18 | 192:19 197:1 | **decent** 143:14 | 49:23 65:19 |
| **crafted** 143:18 | **currently** 12:3 | 202:5 207:13 | **decide** 42:12 | 65:25 114:1 |
| **Craig** 207:15 | **Cushman** | 210:11 | 102:22 | 237:7 250:12 |
| 207:17,23,24 | 199:19,21 | 213:24 | 103:11 | 250:19 251:2 |
| 208:1,13,15 | 202:5 | 216:21 220:3 | 169:23 221:8 | **deem** 66:20 |

Jarvis, Christopher                                    October 18, 2022

15

deemed 102:2
184:12
deeper 204:8
defective
40:19
Defendants
1:10,15 2:14
4:3 7:5,9
defense 115:1
134:14
135:19
242:24,24
285:24
Define 238:8
defined 167:9
168:19,20
197:20
definitely
42:25 89:9
90:1 115:25
142:8,9
143:7,15,19
174:22
213:12 242:9
definition 23:2
23:15,23
24:17 102:11
273:18
degree 9:11,12
11:1
degrees 9:11
Delaware
272:11
delays 55:16
delta 100:19
denied 215:23
denominator
73:14 141:12
deny 181:4
department
2:20 10:9
14:13 70:20
74:15 89:1
106:17

270:14
272:21 273:3
department's
32:17
departments
11:17 12:2
24:4 36:13
69:4 257:4
depend 27:13
dependent
134:7
depending
136:24
243:13
depends 27:15
28:2
depict 61:25
depicts 125:23
Deponent
294:1,9
deposed 7:14
deposit 176:16
176:21
187:22
deposited
176:17
deposition
1:13 6:3,10
8:9 291:24
292:2 293:5
293:7,12
deposits 188:3
188:10 190:9
223:21,22
224:14
225:17
Derick 2:4
6:23,25 45:1
101:10
167:22 237:2
243:16
244:23
245:11 248:7
252:24

259:16
263:14
Derick's 72:25
derived 63:2
describe 10:6
11:6 14:1
28:9 70:6
72:16 139:1
251:18,20
described
12:21 18:17
21:5 48:15
94:2 132:23
233:18,22
234:6
describes
123:13
description
193:16
233:14
design 117:22
designed
105:24 156:7
206:19
designing
60:17
desire 108:25
112:17 113:6
despite 44:8
282:8
detail 20:16,16
166:9
determination
72:12,19
86:25 87:12
88:20 178:17
179:14
181:16,19
197:14
198:22
199:18
209:14
216:17
determinatio...

11:10 199:2
219:2
determine
71:12 72:13
80:20 85:10
86:24 87:10
88:20 89:4
95:6 235:9
261:5,5
269:3 286:21
determined
98:12 141:22
145:7 146:24
216:9 225:25
260:11
286:25
determining
34:12 71:17
95:22 97:10
140:13
deterrent
185:9
deterrents
183:6,9,21
185:1,20
develop
193:23
device 42:10
diagram 61:23
62:12 64:3
66:9,11,25
125:22,25
126:10
274:15,20
275:4
Diagram-1
59:7
dialogue
269:17
Diana 214:1
die 66:4
239:25 240:6
differed 30:21
233:16

difference
28:10
differences
109:14
different 10:10
13:22 14:6,8
16:4 19:14
20:20,21,21
21:8,9 22:23
28:6,9 31:12
31:14 36:18
42:22 54:12
60:3 62:25
85:16,21
86:21 97:16
98:16 99:18
106:19
109:13
113:12,18
114:11 117:1
117:4 128:20
129:19
131:25 132:8
135:23,24
136:6,25
141:4,13
142:14,16
150:24 151:1
156:21
159:21,24
165:23
171:24
172:12,15,15
179:2,17
180:18,21
181:3 217:1
223:17
224:19
233:21
234:22
235:25
248:25 256:6
256:8,17,21
256:21,22,23

Jarvis, Christopher                                    October 18, 2022

16

256:23 257:4
257:5,12,18
257:19,19,19
259:24,25
270:9 277:22
279:16
283:23
284:21,22,23
**differentiate**
28:8
**differently**
37:20 231:16
281:7
**difficult** 25:8
200:22
204:25 205:3
205:15
271:25
**difficulties**
55:8
**difficulty** 45:9
45:13
**direct** 104:24
155:13
203:21 227:6
227:10 252:1
263:3 267:2
267:19
273:13 275:7
275:8 279:3
279:6,14
**direction** 1:21
156:21 178:2
293:10
**directly** 108:2
203:19,23
236:18 267:2
**directs** 181:18
**disability**
240:5
**disagree** 72:6
81:13 175:18
179:2
**disagreed**

170:2,3,23
172:16 281:2
**disagreement**
155:11 173:3
209:20
230:16
231:19 232:3
**disagrees**
209:13
**disallow**
273:20
**disapproved**
227:24
**disbursement**
223:3
**disburseme...**
223:12
**discontinued**
290:6
**discuss** 22:25
23:8 30:7
43:1,3 48:24
49:6 53:18
54:2 56:17
123:2 132:12
141:25 144:3
155:15
**discussed**
43:5 48:6
49:21 54:4
60:17 63:6
65:22 67:14
157:3,4
183:9,12
241:20
242:21
**discusses**
164:15
**discussing**
25:25 117:16
157:1 214:13
**discussion**
19:19 67:10
95:11 97:3

118:22
140:11 154:6
155:12
169:25
279:14 286:2
**discussions**
32:4 59:16
106:3,9,11
**disincentive**
150:10
**dispute** 165:21
179:25 180:5
180:6
**disputed**
156:22
**disqualified**
67:25
**disrupt** 170:13
172:17
**disruptive**
173:6 175:24
**dissimilarly**
47:21
**distinct** 19:12
**distinguish**
50:3
**distinguishing**
111:13
**distribute**
173:5 187:16
**distributed**
71:25 148:20
171:3 280:4
280:6
**distributing**
74:21 280:8
**distribution**
24:6,10,12
25:7,21 26:2
30:2,8,13,16
31:13 39:18
39:19 40:2
40:24 74:10
77:4 92:18

102:10 111:8
111:19 113:7
121:20 122:5
122:9 125:17
130:25
131:14
150:14 158:4
158:21
215:13,17
223:5 229:3
252:1,3,16
253:25
**distributions**
71:6 81:1,3
82:24 186:15
187:3
**District** 1:1,2
6:6,6 245:18
**diversification**
111:21
**divided** 131:5
**Division** 2:19
**divorced** 55:6
55:10
**doctor** 54:6
**document**
12:6,8,16
45:15 46:15
49:10 52:21
57:8,15
58:20 61:14
62:8,10
75:21 79:1
92:11 119:15
119:20 127:6
127:8,16,21
128:1 129:15
130:7,24
131:3 139:10
139:16 140:6
145:16,24
146:4 148:19
148:22
152:15 153:5

154:1 158:8
158:19
166:25 167:6
182:17
186:14
191:10,11,17
193:12 196:6
196:14
198:15
199:10 215:3
217:22
218:25
219:20
222:18 223:8
234:14
241:17 245:7
248:25 264:8
279:2 281:22
286:8
**documentati...**
211:13
**documents**
55:21 114:10
114:14
158:14,15,17
162:24
163:18 170:6
208:2,6
244:16
254:15,18,25
255:4 271:4
**doing** 11:15,21
22:22 26:11
33:5 34:20
41:15 42:23
60:9,10 61:8
69:9,15 88:8
108:19
113:13 150:8
162:21
231:16
244:17 253:1
273:2 278:19
**dollar** 34:19

133:17
**dollars** 55:24
73:21 87:22
100:6,8
106:22
124:15
141:18 151:9
287:4,6
288:9
**domestically**
272:11
**domiciled**
106:15,16,25
**doors** 46:9
**doubt** 112:7
144:12
**downside**
41:15
**draft** 46:17
136:3 270:12
**drafted** 77:13
80:3,5
135:19
138:14
155:23 275:4
285:10
**drafting**
270:15
**dramatically**
28:2 147:17
148:15
265:19 266:6
**drawbacks**
250:9
**drawing** 67:21
**drive** 27:3
28:14 145:3
**drivers** 36:16
36:18
**drove** 72:25
231:9
**due** 81:15 89:6
193:17
**duly** 1:16 7:6

293:7
**duties** 161:7
161:25
209:22
**Dvollrath@....**
2:11
**dynasty** 62:15
64:5,8

_____

**E**

**E** 4:1,9 6:1,1
**e-mail** 45:16
45:23 46:5,7
52:24 53:1,1
53:12,13,17
54:14 55:12
55:19 56:11
57:15 58:1
59:1,5,9
61:24 63:13
65:1,17 76:2
76:4,4 77:18
78:21,23
90:8,11
101:1,19
102:14,18
103:8 109:24
110:1 111:6
116:7 117:8
118:21
119:21,24
131:13 142:2
152:12 155:1
155:14
157:15
182:23 183:8
183:15,20
185:11
199:14,15,23
202:4,7,14
203:25
204:18
210:10,12
212:7,22

213:4,24,25
214:3,12
215:2,10,16
215:22
217:21,22
218:6 222:19
222:19,25
223:5 226:23
226:24
227:11,21
229:13 230:2
232:10
234:18,19,20
234:21 235:7
235:15
236:14 250:5
250:8 254:9
263:2,10,11
264:13
266:11
267:14 290:5
**e-mails** 155:3
218:24
226:24
**earlier** 45:20
46:7 48:6
63:6 67:14
82:11 121:21
122:7 130:13
145:2 149:13
152:10
153:10
178:10 183:1
183:13
220:20
223:10,14
242:21 287:9
**earned** 48:8
88:4 141:9
141:12
230:24
**earning** 29:8
**earnings**
35:25 287:5

**earthquake**
267:5
**easier** 173:22
250:3 263:1
280:15
**East** 16:19
**easy** 28:18
205:20
208:13 283:1
**economic**
41:13 100:13
**economically**
82:7
**economics**
22:17 175:3
**Edgar** 3:5 7:2
91:22
**edited** 136:2
**educating**
150:11
**Edwards**
45:17,24,25
**effect** 164:18
169:11
**effective** 98:2
100:23
**effectively**
68:8 76:24
128:18
130:10
176:20
181:18
**effectuate**
31:13
**eight** 251:23
**either** 11:3
20:12 24:6
78:8 84:3,11
101:24 136:1
215:25
262:12 286:5
**element**
102:10
**Elephantis**

76:15,18
**elevate** 179:16
**eliminate**
40:24 107:18
108:20
**eliminated**
150:9 166:3
**ELR** 140:21,23
**else's** 26:7
195:25
**Emerald** 229:9
229:10,10,11
229:17
232:12
233:16 234:2
255:6 290:5
**Emerald's**
234:9
**employed**
11:19 293:11
293:14
**employee** 37:6
293:14
**employees**
31:7 34:21
34:25 37:10
37:17 184:7
**employers**
37:6
**encouraged**
195:17 206:2
206:2,3
**encouraging**
150:12
**ended** 31:19
32:2 52:10
64:21 137:16
229:20
**ends** 72:22
177:5
**enforced**
249:10
**engage** 11:14
14:25 19:8

Jarvis, Christopher

October 18, 2022

18

56:4 57:23
76:11 208:8
208:9
engaged 53:13
56:9 95:6
103:2
engagement
20:1,4 208:3
208:12 271:7
engagements
19:14 162:9
engaging
54:23
enjoy 26:22
enormous
29:20
enrolled 42:9
ensure 238:1,5
242:3,8
ensuring
242:22 277:8
288:1
entailed 14:2
enter 124:14
entered 93:16
164:7 167:3
entering
129:19
enterprises
256:10
entire 87:1
entities 20:21
20:21 21:9
89:25 124:13
209:2 256:7
277:18
entitled 152:1
entity 10:12
25:2 59:23
60:6 64:6,11
82:17 124:13
272:25
Entrepreneu...
9:15

entries 242:8
equal 103:3
121:1 141:8
176:21
262:21
equaled
188:11
equivalent
81:14 194:15
Eric 2:15 6:19
6:24 23:16
30:10 45:2
61:17 68:3
72:25 97:6
101:6 157:14
166:11
181:20
191:24
236:22
274:15
285:21
Eric.m.aber...
2:24
err 262:22
errata 291:17
error 196:13
ESQ 2:4,5,15
2:16,17,18
essentially
14:11 64:11
290:12
estate 17:6,18
18:2 19:6
47:14,16,18
48:7,13,24
49:4,7 50:3
50:19 54:5
54:11 55:3,5
55:8,18,22
55:24 56:5,6
56:8,22
57:24 60:1,4
60:9,14 61:2
61:3,4,10

62:10 63:1,7
63:20 64:19
65:5,8,9 66:3
75:8 81:25
82:13 150:8
246:10,13
247:9,22
258:6,10
272:6
estimate 16:14
87:13 149:23
264:21 286:7
estimated 99:8
144:3,7
146:18,25
225:24
estimates 65:6
85:5 87:15
87:18 150:19
estimating
85:22
et 6:5
evaluation
217:7 258:7
evasion 108:7
event 135:10
164:17 178:1
events 163:8
eventually
270:20
everybody
25:15,16
37:11 52:9
80:25 82:23
103:19 118:1
118:1 128:10
128:17 135:1
143:12 194:2
201:14 256:2
288:6,6
everyone's
44:6
exact 216:3
exactly 65:4

86:6 106:7
120:20
125:10 133:2
149:22
179:15,21
208:3 216:6
exam 71:16
272:1
examination
1:14 4:2 7:9
244:25 252:2
285:24 289:7
examined 7:7
294:2
example 36:22
37:14,14
87:11 93:8
95:12 102:19
118:5,8
125:15
133:22
146:11
151:11
159:21 164:3
183:10
187:24
224:12,23
238:9 256:3
259:17,18
260:25 282:3
examples
125:4
exams 11:2
257:2,3,17
exceed 120:2
120:9 263:8
266:13,21
exceeded
133:17,25
173:17
212:18
240:25
exceeds
204:23

excellent
112:24
excepting
33:15
exception
94:11
excess 50:13
132:22
204:25 205:5
206:1
excessive
183:22,23,25
184:12,13,14
237:6,12
238:2,14
250:11,16,25
exchange 90:9
excited 114:3
exclude
183:22,23
184:22
excluded
234:2
exclusive
51:14 271:2
excuse 13:21
44:25 57:9
78:16 127:20
144:2 192:12
200:15
216:23 225:7
229:10
231:19 268:7
269:24
289:24
execute 129:8
executed
123:22 126:7
168:22
294:14
executive
257:22
exercise
291:13

Jarvis, Christopher

October 18, 2022

19

| | | | | |
|---|---|---|---|---|
| **exhibit** 4:10,11 | 154:20,21,23 | 243:20 | 192:22,24 | 294:21 |
| 4:12,13,14 | 155:21 158:7 | 244:20 | **expenses** | **explain** 9:21 |
| 4:15,16,17 | 158:7,10,20 | 281:15 | 27:21 88:7 | 35:4 38:25 |
| 4:18,19,20 | 163:20,24 | **exist** 13:10 | 120:15 | 39:2,25 |
| 4:21,22,23 | 166:15,15,21 | **existing** 96:7 | 134:17,25 | 46:21 93:3 |
| 4:24,25 5:1,2 | 168:10,12 | 99:16 144:18 | 141:17 | 143:5 171:5 |
| 5:3,4,5,6,7,8 | 182:16,17,19 | 212:24 | 188:15,17 | 220:22 |
| 5:9,10,11,12 | 182:23 186:4 | **exorbitant** | 189:22 | 227:23 263:5 |
| 5:13,14,15 | 186:5,6,12 | 142:22 | 204:22 | 282:23 |
| 5:16,17,18 | 191:8,25 | **expanding** | 242:23 | **explained** 30:6 |
| 5:19,20,21 | 192:3,10,11 | 161:4 | **expensive** | 126:10 153:7 |
| 5:22,23,24 | 192:13,17,17 | **expect** 27:12 | 26:13 37:4,5 | 265:8 |
| 5:25 12:5,10 | 192:19 | 85:3 86:10 | 39:7 97:20 | **explaining** |
| 44:14,16,18 | 196:12,16,19 | 128:12 140:1 | 108:10 | 35:2 38:23 |
| 44:19,21 | 196:21,25 | 141:19 | 134:22 | 38:24 49:7 |
| 45:16 52:16 | 198:13,15 | 146:10 | **experience** | 51:7 92:20 |
| 52:18,24 | 199:9,11 | 148:18 | 10:6 24:21 | 103:18 |
| 57:7,8,10,11 | 201:24 202:1 | 265:22 | 33:7 39:12 | **explains** 90:13 |
| 57:12 58:19 | 207:7,8,10 | 284:18 | 51:7 69:3 | 93:1 94:5 |
| 58:20,22 | 210:5,5,7 | **expectation** | 83:19 92:19 | 159:23 193:4 |
| 61:12,13,15 | 213:18,19,21 | 205:23 | 95:5 103:1 | **explanation** |
| 63:12,12,25 | 216:22,24 | **expected** | 108:16 109:7 | 93:9 98:19 |
| 66:10,10 | 217:1,3,6,11 | 29:17 48:3 | 109:8 120:25 | 131:4 132:13 |
| 75:20,21,23 | 217:14,16,19 | 51:25 64:12 | 142:22 | 132:18 |
| 76:3 78:14 | 217:19,20 | 64:15 134:24 | 146:12 | 134:12 |
| 78:15,17,20 | 219:24,24 | 139:18 | 150:17 161:3 | 169:10 |
| 79:4,5 90:2,3 | 220:1,2,6,7 | 140:12,13,22 | 165:14 | 171:10 |
| 90:4 92:10 | 222:12,14 | 140:24 141:1 | 179:18 184:5 | 197:16 232:6 |
| 92:11,13 | 226:18,19,20 | 141:21,25 | 185:18 | **exposure** 35:1 |
| 101:1 104:17 | 228:21,22,24 | 142:7 145:6 | 237:25 239:9 | **expressed** |
| 104:18 | 234:13,15 | 146:2,8,8 | 240:8,9 | 145:5 173:11 |
| 109:18,18,19 | 241:12,12,14 | 147:12,12,16 | 258:16,16 | 205:2 |
| 109:24 119:9 | 245:5,6,9 | 149:5,7,19 | 261:11 | **extent** 30:16 |
| 119:11 | 249:24,25 | 156:6 193:6 | 265:17 | 138:10 |
| 121:16,16 | 250:5 263:1 | 206:1 266:6 | 269:19 282:4 | **extra** 8:19 |
| 122:17,18,18 | 274:8,13,16 | 266:18 282:1 | 283:10 | 192:21,24 |
| 127:1,5 | 274:25 | 282:9 | **experienced** | **extraordinary** |
| 130:25 | 278:23 | **expects** | 144:10 | 121:5 |
| 131:16,16,17 | 281:17 285:3 | 146:18 | 148:24 | **extremely** |
| 139:10,10,12 | 285:3,8 | **expense** 99:22 | **expert** 30:22 | 73:17 74:1 |
| 145:15,16,18 | **exhibits** 57:4 | 100:9,20 | 259:1,1 | |
| 145:22 147:8 | 104:19 | 117:11 | **experts** 39:8 | **— F —** |
| 149:16 152:3 | 121:14 | 141:16 178:8 | 259:5 | **face** 23:13 |
| 152:4,5,7 | 234:12 | 183:16 | **expires** 293:22 | 123:7 |

Jarvis, Christopher                                October 18, 2022

20

| | | | | |
|---|---|---|---|---|
| **faced** 30:8 | 195:15 | 154:18 | 185:17,17,22 | 27:24 51:10 |
| 43:21 69:16 | **fantastical** | **fees** 41:9 | 186:1 195:17 | 63:24 65:11 |
| 174:18 | 108:6 | 232:15 | 204:19 | 113:14 |
| **facilitated** | **far** 19:19 22:22 | 251:12,14 | 243:24 244:3 | 115:17 116:1 |
| 129:6 | 41:16 42:1 | 281:8 | 244:6,11,14 | 129:2 139:6 |
| **facilitating** | 71:3 74:24 | **felt** 37:3,8,9,10 | 284:6 | 203:15,16 |
| 129:3 | 95:14 110:22 | 98:7 113:21 | **filed** 28:24 | 219:23 |
| **fact** 26:22 43:5 | 121:23 | 115:19 | 105:9,10,17 | 259:24 |
| 43:6 78:1 | 129:24 | 149:23,24 | 134:20 | **finding** 143:5 |
| 129:18 201:2 | 275:19 | 154:19 | 185:21 | 267:11 |
| 214:15,22 | **fast** 112:16 | 172:20 173:4 | 193:13 | **fine** 157:22,23 |
| 240:23 249:3 | **favorable** | 173:5 252:19 | 196:10 213:1 | 253:16 |
| 290:23 | 47:24 63:8 | **female** 36:17 | 245:17 | **fining** 180:21 |
| **factor** 147:6 | 121:2 146:10 | **females** 36:21 | **files** 45:11 | **finish** 233:10 |
| **factors** 34:10 | 149:7,11 | **fence** 28:14,15 | 272:19 | 257:2 |
| **facts** 180:4 | 247:3,8 | 28:16,16,17 | **filing** 32:22 | **finished** 8:10 |
| 181:3 216:3 | 284:19 | 73:1 | 185:14 | 245:23 |
| **failing** 67:24 | **favored** 50:15 | **fender** 185:23 | 195:22 196:7 | **fire** 278:15,17 |
| **fair** 165:22 | 166:1 | **FIC** 47:8,8,11 | 242:3 | **fired** 281:3,5 |
| 221:9 235:3 | **fear** 172:13,13 | **fiduciary** 10:2 | **filings** 11:22 | **firm** 12:17 |
| 252:10 | 200:19,21 | **field** 10:7,18 | 14:12 272:22 | 15:21 16:1,1 |
| 255:23 274:7 | **feasibility** 98:4 | 95:23 111:3 | 277:17 | 16:20 19:6,8 |
| 280:24 | 138:24,25 | **fight** 174:25 | **fill** 261:11,14 | 19:10 21:6 |
| 281:14 | 139:20 140:2 | **figure** 65:1 | **filling** 261:19 | 21:15,18,21 |
| **faith** 253:7,11 | 145:25 | 88:7 99:20 | **final** 94:1 | 21:23 86:7,8 |
| 253:19 | 281:18 | 259:8,13,20 | 189:20 221:6 | 86:9 162:5,9 |
| **fake** 119:4,5 | **feasible** 31:2 | 259:21 | 221:6 223:4 | 162:22 193:8 |
| **fall** 239:25 | **feature** 111:13 | 264:14 266:4 | **finance** 9:15 | 201:1 270:12 |
| **Falls** 54:10 | **February** | 267:16 | 82:6 83:19 | 270:18,22 |
| **false** 206:13 | 210:11 | 279:16 | **financial** 9:18 | **firms** 21:20 |
| 206:15 | **federal** 286:8 | **figured** 77:20 | 9:24 10:1,4 | **first** 7:14 9:8 |
| 254:15,25 | **FedEx** 37:17 | **figures** 264:19 | 15:21 16:1 | 9:10 12:5 |
| 255:4,11,15 | **fee** 161:9,12 | **figuring** | 16:11 19:10 | 17:3,17 |
| **familiar** 110:10 | 162:16 | 266:11 | 19:16 20:14 | 25:19 33:24 |
| 239:16 245:7 | **feed** 265:14 | **file** 32:17 40:5 | 22:10 73:11 | 39:6 44:16 |
| 257:7 274:25 | **feel** 8:18 26:13 | 68:9 147:22 | 162:25 | 45:15 53:1 |
| **familiarity** 23:6 | 26:19 42:14 | 147:25 | 241:24 | 56:12 65:24 |
| **families** 46:17 | 71:21 138:15 | 149:25 | 262:20 | 68:15 79:12 |
| 47:15,18,22 | 138:20 | 150:10,16,20 | 270:18 | 90:11 92:4 |
| 49:3 | 165:23 | 150:22 151:2 | **financially** | 106:2 112:8 |
| **family** 47:8,13 | 172:17 | 151:21,21,25 | 293:15 | 122:4,17 |
| 64:21 | 181:25 | 158:16 | **financials** 96:7 | 123:18 |
| **family's** 46:8 | 280:25 294:5 | 165:25 175:6 | 266:7 | 126:16 |
| **fantastic** | **feeling** 9:5 | 175:7,11 | **find** 27:17,18 | 127:11,24 |

Jarvis, Christopher

October 18, 2022

21

131:21 132:7
142:17
147:10 148:5
149:5 155:2
158:23
169:15
170:21
176:14
186:18,20
187:24 188:4
188:8,14
189:1 192:8
196:3,16
203:6 208:16
222:18
223:19 224:2
224:2 226:24
228:10
234:13,20
235:19 236:4
246:2 257:3
279:18,18
**fits** 108:6
**five** 35:22
42:21 50:12
50:16,22
94:18 146:14
147:4,13,13
148:10
158:22 230:1
233:6,20
236:23 257:3
257:4 259:24
259:24
276:17 282:6
282:24
283:10,13
284:13,15,18
285:22
**fixed** 141:16
**flat** 161:9,12
162:16
**flexibility**
137:10

**flipped** 126:20
**flood** 116:21
118:8,9
196:10 267:5
**floods** 116:23
116:24
**floor** 75:11
**Florida** 1:2 2:9
6:6
**Flourens**
192:25 193:5
193:14 198:6
198:16 199:1
199:18
202:16,22,24
203:4,20
207:4 209:1
210:14
211:24 216:9
217:8 218:2
218:16 219:6
220:10,19,25
222:2 224:22
225:11 234:2
**Flourens'**
213:7
**flow** 64:14
67:12 157:6
170:13
**focused**
154:15
**focusing** 76:3
**folder** 250:1
**folks** 91:23
**follow** 32:20
68:25 116:8
132:11 200:2
**follow-up**
243:13
**followed** 6:17
**followers**
194:16
**following** 46:7
67:23 158:6

197:21
**follows** 7:7
123:12 183:7
**force** 82:24,24
82:25
**forced** 200:14
200:16
**forecast** 139:5
139:7,8
**forecasting**
11:21
**foregoing**
293:5,7
294:3
**foreign** 107:24
**forget** 29:12
178:21
**forgive** 123:14
**form** 13:1
18:14 23:22
25:11 26:11
54:24 55:2
56:4 58:17
60:19 62:3
68:4,9,12
77:5 80:10
97:4 103:15
105:18
153:19
171:11,20
183:2 199:5
211:1 218:19
221:10,18
228:2 237:18
238:16 239:3
239:6 241:3
246:20 247:1
247:5,10,18
248:5,14
249:16,22
250:21 251:3
252:21
253:13
255:18

257:24
258:23 260:8
260:13 261:7
262:5,10
277:14 280:1
281:4 282:25
**forma** 139:8
**formally** 99:19
**formas** 146:9
282:10
**formation**
98:24 100:2
139:17
242:15
**formed** 15:24
21:21,23
33:6 70:2
80:15,21
95:1 155:6
241:21
**former** 166:6
**forming** 23:20
24:22 26:1
30:9 35:9
39:4 41:18
47:17 51:10
51:15 54:2
67:15 105:22
106:9 117:16
154:8
**forms** 32:18
**Fort** 2:9
**forth** 155:3
162:24
180:13 199:3
**fortunate**
35:21 36:5
**forward**
244:22
**forwarded**
235:6
**found** 37:2,4
73:5 99:5
136:7 137:7

194:17 197:3
208:15
**founder** 91:18
**four** 10:9
11:18 117:12
158:22
172:24 257:4
**fourth** 15:18
**fraction**
190:14
**franchise**
60:11
**frankly** 206:9
**fraud** 107:18
118:3 119:6
218:14
276:13
**fraudulent**
118:15
193:18
194:12
**fraudulently**
194:17
**free** 27:5
**frequency**
26:15 117:6
135:3 148:6
148:14
**frequency/hi...**
26:16 239:20
**frequently**
29:16,16
119:1
**friend** 14:17
151:11
**front** 12:15
123:6
**fruit** 128:12
**full** 10:4,4 76:8
172:3 273:1
**fun** 91:25
**function** 33:18
**functions**
132:25

Jarvis, Christopher                                          October 18, 2022

22

272:17
**fund** 230:22
**funds** 20:8
  70:4,18 71:1
  71:4,13,25
  74:4 75:2
  77:23 78:6,8
  78:9 79:22
  82:2 106:25
  107:16 169:5
  169:12
  176:17,21,22
  177:20 179:3
  200:4,13
  204:24
  215:17
  221:16,21
  230:12,23
**fungible** 84:3
**funny** 236:4
**further** 49:10
  200:1 218:10
  219:1,4,5
  259:2 290:24
  293:13
**future** 35:20
  87:24 183:24
  184:23
  261:17

**G**
**G** 6:1
**gained** 48:14
  50:5
**gains** 36:1
  67:10 100:16
  189:2,4,16
**game** 144:25
**gaps** 261:14
**gates** 196:10
**geared** 237:5
  250:10,15,25
**gears** 273:12
**Geico** 35:16

37:1 39:16
**general** 30:19
  82:25 92:2
  134:14
  233:13
**generally**
  10:24 11:10
  15:14 20:18
  24:11 30:11
  32:8 34:6
  49:2 72:2
  74:8,8
  114:18
  123:13,18
  125:9,11
  140:23
  255:17
**generate** 48:1
**generates**
  225:19
**generic** 119:16
**genius** 82:19
**gentleman**
  53:23 91:16
  217:23 237:4
**Gentry** 3:5 7:2
  12:17 223:1
  270:15 271:8
**Gentry's**
  146:12 282:4
**getting** 10:20
  22:1 43:8
  150:20 161:1
  175:14
  194:16
  200:12 211:2
  230:13
  271:12
  280:25
  283:22
**Giannini** 2:17
  6:21
**giant** 276:18
**gift** 48:9,19

94:22
**gist** 131:25
**give** 32:20
  42:9 45:3
  47:23 56:19
  61:18 102:19
  123:1,7
  127:25
  128:15
  135:25
  137:12
  145:12 153:8
  153:15 177:3
  212:2 220:4
  249:25 256:3
  259:17,18
  287:22
  289:11,19
**given** 50:9
  96:13 138:12
  251:22 259:9
  294:4
**gives** 139:6
  182:5
**giving** 165:23
  266:14
**gleaned** 156:5
**glib** 245:25
**global** 73:8
  154:5
**go** 9:10 45:1
  48:6 51:22
  60:19 69:19
  71:15 85:6
  89:12 102:24
  112:18
  130:16
  142:12,13,13
  142:20
  143:16
  147:17
  148:14
  153:21,22
  157:7 167:23

170:8,13,14
170:15 171:7
171:18 172:9
173:13 174:8
174:20
176:11
179:13
180:19,20
181:22,24
184:19,20
185:24
187:15
190:17
195:19,21
200:16
201:20 206:6
206:12
214:25 215:4
217:15
219:25
221:25
233:11,18
236:22,25
243:17
245:14
249:24 250:3
259:2 262:8
269:1 274:8
275:20
276:19
278:22
280:16 284:8
284:12
287:15
289:22 291:16
**goals** 56:15,17
**God** 177:13
**goes** 27:22
**going** 10:18,21
  10:22 12:5,8
  12:9 15:24
  22:14 27:13
  28:25 31:7
  38:3,4,6,14

44:1,7,10,11
44:19 45:6
46:14 48:2
48:10 51:19
51:24 52:16
57:1,2,5,10
60:1 61:1,2
61:13 63:11
64:2 67:3,12
69:21 71:15
73:1,2,6
75:20 81:20
81:21 83:6
85:18,19
97:25 98:13
99:2,6,7,10
104:19
105:25
109:18,23
114:14
115:17,21,22
116:19 117:3
117:5,5,6
119:15
120:11,13,13
127:4 128:9
128:13
130:18
137:11,22
144:23,24,25
145:4 152:3
152:19 153:5
155:3 158:8
158:18
162:24
164:24 166:4
166:15
167:25 168:5
172:9,9,11
172:11,19,19
172:22,23
173:12 174:4
174:22 175:1
175:4,5,23

Jarvis, Christopher

October 18, 2022

23

182:16
185:13,18
186:4,10
191:7 192:5
196:18
201:24 207:7
208:7 210:4
214:10
219:21 222:6
222:11 227:1
232:1 243:20
245:4 250:3
252:24
259:15 261:4
261:16,16,17
261:20,21,21
263:22 272:4
275:3 278:8
281:9 284:25
289:9,24
290:15,20,20
**good** 26:8 27:9
28:7 34:12
54:16 65:2
69:18 96:14
118:24 121:4
153:14
155:17
167:22 182:6
187:9 195:23
196:11 206:5
217:11 253:7
253:11,19
266:15
284:16
**Google** 264:2
264:4
**Gordon** 57:17
57:18,19
59:2 60:18
60:18 63:14
64:10 65:15
101:18
274:15

**governed**
70:18
**government**
37:19 78:6
115:2 254:16
267:1 275:7
275:14,21,22
276:1 284:16
**Government's**
191:25 192:3
192:10
249:25 250:5
252:1 262:25
274:8 278:23
281:17 285:3
**grabbed** 136:5
**graduated**
10:8
**grand** 100:20
135:1 161:20
**grandchildren**
64:6
**grantor** 176:19
**grapes** 128:11
**Grapevine**
13:6
**great** 7:16,17
9:7 11:23
75:13 84:25
112:9,10,11
114:24
195:13,18,19
271:4
**greater** 34:22
34:23 111:20
112:21 115:4
150:10
160:23
**greatest** 67:20
68:7
**green** 224:13
224:17
**greenish**
189:16

**gross** 176:18
**group** 15:19
15:24 104:23
104:24,25
114:25
139:17 140:7
145:25 161:1
202:19
203:23 229:9
238:11
270:17,18
278:12
281:19
**grouped** 132:3
**grow** 35:19
64:13
**growing** 54:9
64:24 106:21
**grown** 61:3
**growth** 65:6
**guarantee**
85:19
**guaranteed**
52:3
**guaranteeing**
83:12,13
**guarantor**
168:17 178:2
178:6
**guess** 11:9
15:25 18:6
18:12 21:6
32:10 33:15
48:17,17
66:23 90:22
96:22 139:6
141:4,8
148:15
156:15,19
157:8 160:22
172:20
181:14
189:15
222:24

230:16
258:21,25
259:3,13,19
275:19
**guessing**
148:10
152:22
**guidance**
70:22 153:16
153:19
155:24,25
156:5 266:14
**guidelines**
32:20
**guilty** 194:17
**guys** 175:16
206:15
264:14

## H

**H** 4:9
**hair** 151:12
**half** 100:6,7
113:4 116:15
126:12
170:12
230:13 287:6
287:11
**Hamlin** 85:25
86:7 165:3
165:12,15
166:4 178:4
178:14
179:11,13
181:4,16,23
193:25
196:25 197:3
199:2,16,17
201:13,21
204:8 209:14
210:13,15,17
211:6,12
212:2,3
215:23 216:8

216:15,21
218:10 219:2
219:10,17
**hand** 88:21
89:5 114:16
**hand-in-hand**
112:23
**handle** 19:19
20:5,10,12
20:12,17
31:2 35:20
44:12 54:9
60:13,14
172:9,14
176:3 209:25
**handled** 15:3,5
22:18,19
37:19 162:24
163:1 164:24
170:4 222:22
271:3 272:10
**handles** 90:14
**handling**
17:20 20:23
21:16 32:24
38:1 113:19
**handwriting**
154:1 285:13
285:14
**handwritten**
153:25
**happen** 26:16
26:19 82:16
118:9,10
119:1 151:17
151:17,23
163:6 174:23
179:15,18
238:22 241:9
254:6 265:25
**happened**
55:4 73:4
88:2 90:1
118:21

Jarvis, Christopher

October 18, 2022

24

128:23 150:1
150:19
175:13
177:24 181:2
194:4 195:14
204:4 205:7
214:24 216:3
216:8 240:4
253:2 256:9
**happening**
64:17 147:20
154:11
**happens** 26:23
29:21 48:5
63:21
**happy** 32:12
56:14 108:17
151:9 172:22
205:12 206:3
206:7 210:3
221:13
253:15
**harassing**
184:7
**harbor** 101:21
102:5 103:7
**hard** 28:5
45:12 50:21
114:13
138:14
150:15 163:2
174:1 175:10
175:17
185:19 186:1
193:14 201:2
**harder** 143:5
**Harpers**
101:24
**Harshly**
174:12
**hassle** 280:24
**hat** 82:6
**hats** 201:22
**head** 86:18

101:15
112:15
157:21
190:16
**headed** 22:1
**heading** 47:5
49:11,12
93:8,14 94:2
121:25 146:2
164:17
192:21
233:12
**headings**
140:1
**heads** 56:19
**health** 11:3
13:17 31:4,8
**hear** 101:7,9
101:10,12,13
107:22 113:7
114:23,23
263:23
**heard** 31:25
109:14
114:21 194:1
207:19
**heavily** 74:24
98:20 117:3
**heavily-regu...**
11:23
**heavy** 116:25
**heck** 137:21
**held** 6:10 46:2
71:7,13 74:9
74:9 79:18
79:22 94:24
126:14
169:21
170:24 172:3
190:25
191:21 232:4
279:22
**hell** 147:15
181:21

194:19
266:18
**hellish** 175:16
**help** 24:8
31:23 33:16
46:21 47:25
48:1 53:14
53:15 54:24
56:15 58:17
107:17
115:22,22
223:9 236:23
244:8
**helped** 59:17
62:1 115:25
**helpful** 21:1
25:23 124:20
141:20
159:18
**helping** 21:1
60:12 64:21
**helps** 238:4
**Henderson**
6:14
**Heritor** 91:10
91:11,12,15
91:20,23
272:9
**hesitant** 25:17
151:2
**hey** 185:9
287:15
**high** 11:8
27:16,17
29:21,22,24
135:3 143:14
154:5 175:9
195:15 237:7
250:12,19
251:1
**higher** 29:7,10
36:17 117:6
142:12 144:9
144:21

145:10
147:13 206:8
225:22
262:13
266:19
**highest** 185:7
**highlight**
177:10
**highlighted**
133:11
**highlighting**
102:20
281:25
**Highlights**
153:24
**highly** 11:8
189:5
**himself/hers...**
294:12
**hire** 19:16 24:7
31:9 39:8
259:5 278:18
278:20
**hired** 15:2,2
208:6 270:11
271:1,8
**history** 147:1
234:9 261:2
**hit** 28:12,15,17
118:12
149:22
**hitting** 28:17
**hmm** 265:8
290:9
**hold** 9:16
27:22 71:1
73:2 74:5
86:13 87:10
126:1 172:21
173:22 231:2
233:4,20
261:17 281:9
281:10
**holding** 89:4

171:16 173:4
212:14
230:12
**Holdings**
76:20
**Holmstock** 3:6
6:13
**homeowner's**
238:20,21
**honestly** 94:23
110:5 114:7
155:20 203:5
204:6 216:1
216:6
**hope** 38:19
100:14
261:22,23
**hoped** 206:15
206:15
**Hopefully**
205:1
**hoping** 23:13
39:9 206:21
**horrible** 201:4
205:6 240:4
**hour** 200:19
**house** 163:9,9
238:18 267:6
**household**
36:22
**HR** 37:8
**Hub** 37:1
**huge** 45:21
175:5
**human** 147:19
**Humana**
101:25
**hundred** 31:6
72:7 73:20
161:20
**hurdles** 23:21
**hurricane**
119:4
**hypothetical**

Jarvis, Christopher

October 18, 2022

25

| | | | | |
|---|---|---|---|---|
| 67:7 286:18 | 154:24 | 89:24 | 160:12 243:9 | **individual** |
| | 158:11 | **important** 8:8 | **income** 50:19 | 24:13 123:25 |
| **I** | 163:25 | 30:3,6 31:24 | 51:2 65:11 | 139:2,4 |
| **I-S-O** 136:7 | 166:22 | 68:24 72:2 | 117:10 | 277:3 294:11 |
| **IBNR** 73:2 | 168:13 | 81:13,16,17 | 121:10 | 294:12 |
| 146:14 282:6 | 182:20 186:7 | 83:17,20 | 192:21,23,23 | **industry** 10:13 |
| **idea** 26:8 27:9 | 192:14 | 84:2 86:12 | 193:17 | 10:19 11:23 |
| 36:23 48:1,9 | 196:22 | 120:8 122:19 | 194:25 | 27:10 32:15 |
| 60:2 81:13 | 199:12 202:2 | 122:22 142:6 | 197:19 | 36:6 37:15 |
| 82:19 83:10 | 207:11 210:8 | 142:8,10 | **incorrect** 47:4 | 71:9,11 73:9 |
| 85:2 90:1 | 213:22 | 151:13 | **increase** 75:13 | 73:10 74:23 |
| 105:18 | 217:17 | 231:10 | 111:10 113:6 | 74:24 75:7 |
| 108:19 | 222:15 | 239:19 | 284:11 | 97:9 120:24 |
| 111:25,25 | 226:21 | **impossible** | **increased** 54:8 | 121:1 144:20 |
| 112:9,9,11 | 228:25 | 65:13 172:25 | 160:25 | 154:17 226:9 |
| 112:11 | 234:16 | 226:13 | **increasing** | **inexpensive** |
| 120:10 139:6 | 241:15 | **impropriety** | 112:22,22 | 24:2 33:18 |
| 145:13 161:2 | 245:10 | 107:19 | 154:9 | 39:7 |
| 165:22 | **identified** 35:8 | **improve** | **incur** 88:14 | **influence** |
| 170:22 184:2 | 94:12 159:20 | 113:24 | 220:14 | 218:13 266:3 |
| 184:6,10 | 160:10 | **improved** | **incurred** 73:3 | **influenced** |
| 227:8,15 | 186:22 | 39:10 | 87:25 88:6,6 | 265:2 |
| 234:3 235:8 | 224:18 | **inadequately** | 146:13,14 | **Informal** |
| 235:12,16 | **identifies** | 276:7 | 169:6 197:19 | 155:24 |
| 237:13 239:9 | 49:13 50:4 | **incentive** | 198:2 282:5 | **information** |
| 255:21 268:4 | 183:8 225:5 | 148:1 | **incurring** | 54:15,19 |
| 274:6 290:22 | **identify** 67:19 | **incident** | 52:11 | 70:12,23 |
| **ideal** 41:12 | **illiquid** 83:22 | 193:24 | **indemnity** | 121:20 140:1 |
| 106:25 | 83:23 89:15 | **include** 20:18 | 117:12 | 148:23 |
| **ideally** 34:1 | **image** 54:17 | 111:9 112:19 | **independent** | 153:12 |
| 210:2 | **imagine** 115:5 | 134:14 | 254:11 279:8 | 158:24 169:9 |
| **ideas** 30:25 | 204:13,15 | 141:15,16,17 | **independently** | 181:7,10,11 |
| 31:12 109:9 | **immediate** | 143:20 225:9 | 122:8 | 182:2 191:12 |
| **identification** | 65:25 83:24 | **included** 44:16 | **indicated** | 204:9 207:24 |
| 12:11 44:22 | **immediately** | 117:17 | 197:18 | 210:21,23 |
| 52:19 57:13 | 84:8 123:11 | 118:23 132:8 | **indicates** | 211:7 214:19 |
| 58:23 61:16 | 168:21 | 135:20 | 127:11 | 223:16 229:4 |
| 75:24 78:18 | 281:12,12 | 136:21 140:2 | **indicating** | 262:3,9,14 |
| 79:6 90:5 | **Impact** 49:11 | 160:5 183:17 | 245:22 | **informed** |
| 92:14 109:20 | **implement** | 243:3 | **indictment** | 230:2,6 |
| 119:12 127:2 | 23:13 | **includes** | 113:11 | 231:2 |
| 131:18 | **implemented** | 141:15 | **indirect** 108:1 | **infrequently** |
| 139:13 | 42:3 86:5 | 198:15 | **indirectly** | 29:21 |
| 145:19 152:8 | **implementing** | **including** | 108:2 | **inherent** |

273:14
**initial** 18:18
22:3 53:12
66:17 197:24
204:21 214:3
**initially** 56:2
104:22 165:2
216:8
**injury** 29:3
**innovate**
113:11
**inquires**
272:23
**inside** 20:8
35:18 147:23
**insisted** 172:2
230:12
231:16
**insofar** 197:17
**instances**
99:16,17
**insurable**
269:3
**insurance**
10:3,7,15,19
11:19,19,22
12:1 13:16
13:17,18,19
13:25 14:4
14:13 15:3,6
15:7,9,12,12
15:13 16:2
16:12 18:8
18:15 19:2
21:3 22:20
23:1,2,14,15
23:21,23
24:3,4,5,7,8
24:17 25:3,7
26:8,12,15
26:20 27:7
27:10,14
28:4,11
30:23,25

31:3,4,8,14
31:21 32:7,8
32:15,17
33:1,7,12,20
33:22 35:2
35:11 36:6
36:14,16,24
37:15 39:8
39:15 40:22
40:23 41:14
46:22 47:8,9
47:14 48:4
48:10 49:15
49:23 50:15
50:18,25
54:8,20 58:4
58:5,13,14
58:17 62:13
62:14 64:7
66:12,19
67:5,24
68:16,17,18
68:19,22,25
69:2,11
70:20 71:9
71:11,12,17
71:18 72:14
72:21 73:9
73:10 74:14
75:7,7 76:12
79:11 80:3
81:20 82:8
82:21 86:13
86:23 87:8,9
87:20 88:19
88:22 90:13
91:13 93:9
93:11 95:3,7
95:12,13,25
96:7,12 97:9
97:10 98:17
99:16,17,18
102:11,23
103:3,13

106:17 108:8
111:2,19,22
113:1,4,15
113:23
116:21 118:6
121:1 127:13
127:17,18
129:17 130:2
135:22,23
136:22
137:15
138:10,25
140:13
143:11
144:23,25
150:21 151:1
151:14,25
160:7,7
164:5 166:9
180:16 184:4
186:19 189:3
192:22,24,25
193:14
195:24 196:4
198:14,17
207:18 208:5
218:2 226:9
226:9 235:2
236:2,9,13
238:20,21
239:22,23
240:1,6
246:3,4,17
249:4,14,19
250:9,14,24
251:18,21
257:5 258:14
259:19,23
265:3,21
267:23 268:8
268:9,24,24
269:8 270:14
272:21 273:3
273:15,20

275:9 276:7
276:24 277:9
277:21
286:19
**insure** 26:18
38:7,19
40:14 85:14
118:13
123:25
124:12,13
268:21
**insured** 40:3,5
41:3 87:2
116:5 134:21
178:13
183:11,15,22
183:23 193:4
193:7 204:1
220:15
238:10 240:2
240:8 262:19
269:7 282:18
**insureds**
24:13 123:21
132:1 184:22
194:1 238:11
240:14
**insurer** 27:12
36:12 141:2
**insures** 87:8
**insuring** 26:13
38:20 98:7
99:19,20
116:17
**integral**
163:19
**integrating**
47:13
**integration**
22:14
**intend** 8:17
**intended**
109:12 243:4
**intends** 230:22

**inter** 218:13
**interact** 14:12
32:18
**interacted**
270:13
**interacting**
11:21 12:1
20:22 68:22
**interaction**
22:12 110:23
**interactions**
205:21 273:2
**interest** 64:23
89:16 94:19
94:21,24
107:14
201:19
**interested**
18:20 19:4
23:20 51:10
51:15 56:6,7
65:18 96:15
96:16 196:1
293:16
**interesting**
31:1,11
**interfere** 9:2
**INTERNAL** 1:9
**internally**
30:24
**International**
229:11
**interned** 10:10
**interpret** 283:2
283:3,5,7
**interruption**
151:10,14
179:20
**interval** 139:5
**Intervention**
277:1
**interviewed**
209:5
**introduce** 6:15

Jarvis, Christopher                                      October 18, 2022

123:8
**introduced**
53:20,25
54:1 208:13
208:14
**introducing**
255:6
**invest** 19:18
22:14,15
58:12 60:6
70:9 75:2,5
75:10 76:19
77:1 82:14
83:10 89:15
**invested** 14:18
**investigation**
218:11 219:1
**investing** 10:3
20:7,7,12,13
82:9,12
87:11
**investment**
16:1,11
58:11 60:6
77:4 78:22
78:25 79:10
83:13 121:10
251:23 275:8
**investments**
22:14,20
27:23 72:4
81:12 83:22
83:23 84:3
89:14 156:7
**investor** 14:18
**investors**
82:22
**invests** 82:17
**invited** 122:24
**involve** 116:11
117:16
**involved** 10:21
11:6 14:19
28:24 37:18

40:6 42:15
59:15,19
62:14 86:22
95:10 96:23
98:20 106:1
106:8 113:15
114:12 115:2
128:21
129:20
140:12
228:13,16
237:16
238:14 246:2
250:15,24
269:5,6
270:16 273:7
277:22
282:20
286:12
288:16
**involvement**
33:2 104:24
105:22
208:20 270:7
**ironic** 236:5
**irony** 87:19,19
**irresponsible**
82:7
**IRS** 41:17
43:12 67:16
67:21 70:21
101:22 122:7
153:18,19
154:5,9
155:25 156:5
254:7 273:19
**Island** 9:14
**ISO** 136:6
**issue** 26:2
30:8 80:23
80:24 81:9
155:11
172:12
205:17 219:9

233:3 253:17
254:14
260:20
276:13,16
281:11
**issued** 122:7
123:20 132:2
155:25
192:24 193:5
254:7
**issues** 10:3
19:7,20
23:12 31:24
53:14
**it'd** 208:13
283:1
**it'll** 28:25
52:11 243:14
284:16
**items** 20:18
21:16 126:21
183:7

_____

**J**

**Jace** 164:4
**Jacobs** 16:21
21:19,23
**Jade** 12:24
13:4,10,15
13:16,23,25
14:2,14
15:11,14
31:19 32:3
46:15 104:22
104:24,25
105:4,6,18
105:22,24
106:9 109:2
109:3,12
114:4,11
117:16
119:16
122:12,13,23
123:2,17,19

123:22
124:15,21
126:1,7
128:6,25
129:3,5
131:1,7,9
132:3,21
137:17 138:5
138:24
139:17
141:22 144:4
146:2 148:5
149:1,20
150:11
152:12 153:4
154:8 155:6
159:5,12
160:14 161:6
161:8,10,23
162:3,7
164:5,7
165:6 167:1
167:4 168:9
168:16,22
173:15 174:7
174:18
175:25
176:22
178:16
181:15 183:2
184:18,21
190:8 192:20
193:1 199:2
200:3,13,15
201:16,16
202:7,20
203:18
204:20
207:22
209:24
212:13
218:12,16,17
219:4,9
220:9,23

221:3,25
222:21
223:23
226:15 227:2
227:7,11
229:8,17,20
229:23 230:3
230:22
233:16,24
241:18,21
242:13 243:3
252:10 254:4
255:8,24
264:15 270:8
270:9,9,10
270:24 271:8
272:11
279:13 281:1
281:19
282:20
286:10 290:5
290:15,15
**Jade's** 174:11
191:13,15,20
232:14
234:10
**JAG** 166:6
**Jamie** 222:25
**January** 79:9
176:14
**Jarvis** 1:13 4:3
6:3 7:4,11
9:8 12:7,19
15:22 16:17
17:16 45:8
52:22 57:2
58:25 62:2
70:1 76:1
78:21 79:12
90:8 92:16
101:8 110:2
112:13
119:25
121:18

Jarvis, Christopher

October 18, 2022

28

| | | | | |
|---|---|---|---|---|
| 122:20 127:7 | judgement | 242:1,18 | 194:9,9 | 123:8 124:5 |
| 130:23 | 99:6 | **Ken** 53:21 | 195:23 208:4 | 130:2 135:23 |
| 131:22 | **Judging** 239:7 | **kept** 71:4,23 | 256:18 281:8 | 136:3,4,7,12 |
| 139:16 | **judgment** | 84:12 88:21 | 287:8 | 136:15,17,17 |
| 145:23 | 248:4 276:14 | 161:17 | **knock** 119:15 | 137:10 |
| 152:10 155:4 | **judgments** | 169:17 171:1 | **know** 8:16,20 | 138:20 139:8 |
| 158:3,13 | 238:24 | 230:16 | 20:5,25 21:6 | 139:22 140:3 |
| 164:2 166:24 | **Julia** 244:12 | 275:17,18 | 21:7,18,24 | 140:4 143:2 |
| 168:5,16 | **Julie** 2:5 7:2 | **key** 32:10 | 22:17,19 | 143:7,13,15 |
| 182:22 186:3 | 248:23 | 33:14 215:8 | 28:18,24,25 | 143:18,22,23 |
| 186:10 192:6 | **July** 216:21 | 254:14 | 29:17 34:3,3 | 143:25 |
| 192:18 | **June** 192:19 | **keyed** 86:25 | 34:4,5,9 | 144:18,21 |
| 196:24 | 197:23 | **kid** 239:24 | 39:23 42:1,5 | 145:1,11 |
| 210:11 217:5 | **jurisdiction** | **kids** 47:23,25 | 42:8 44:6,10 | 147:12,15 |
| 217:23 220:1 | 106:22,23 | 48:4,7,8,12 | 45:8,13,20 | 149:2 151:16 |
| 220:4,8 | 272:2,4 | 51:1 64:14 | 46:2 52:6,7,9 | 151:17 |
| 222:11 | **jurisdictional** | **kill** 290:15 | 53:24 56:9,9 | 153:10 |
| 243:12 244:9 | 277:18 | **killing** 290:14 | 56:10,23 | 154:12 |
| 245:3,8 | **Justice** 2:20 | 290:14 | 64:22 65:2 | 155:16,20 |
| 250:4 264:11 | **justifiable** | **kills** 239:24 | 65:10,10,18 | 156:23,24 |
| 267:15 275:1 | 287:10 | **kind** 17:14 | 67:4 70:21 | 157:13,20 |
| 286:2 291:10 | **justification** | 84:22 98:6,8 | 71:4,5,25 | 161:18,21 |
| **Jarvis'** 44:17 | 195:16 | 107:10 108:9 | 78:11 79:14 | 163:13,14,16 |
| **Jason** 15:23 | **justified** 100:1 | 111:2 134:15 | 79:25 80:8 | 172:13,25 |
| **Jay** 235:24 | **justify** 97:22 | 146:20 163:1 | 80:11,23 | 173:6,25 |
| 236:3 | 99:21 100:7 | 163:2,7 | 81:20 84:24 | 174:12 |
| **Jennifer** 76:10 | 100:8 115:15 | 173:8 259:20 | 91:6,7,14,16 | 175:16,21 |
| **jeopardized** | 232:21 237:7 | 259:21 | 94:23,24 | 177:4 180:17 |
| 83:15 | 250:12,19 | 264:22 265:3 | 97:5 98:15 | 180:22 182:5 |
| **Jersey** 234:23 | 251:1 | 265:14 269:8 | 99:3 100:24 | 182:7,9,10 |
| **Jim** 199:19,21 | | 272:17 | 104:2 105:13 | 187:11,13 |
| 202:5 | **K** | 288:13 290:6 | 106:4,5 | 194:8,20 |
| **Jlevin@mnrl...** | **K-1s** 214:23 | **kinds** 288:12 | 107:10 110:4 | 195:18 196:5 |
| 2:12 | **keep** 26:25 | **Kitt** 77:20 | 110:6,9,23 | 196:8 202:19 |
| **job** 32:17,24 | 41:11 77:16 | **Kitts** 54:20 | 112:8 113:10 | 203:10,12 |
| 143:4 161:15 | 81:13,17 | 91:4,13 | 113:17 114:1 | 204:7 206:16 |
| 262:15 | 85:14 88:11 | **Kitts'** 79:11,19 | 114:2,12,12 | 206:20 |
| 278:20 | 107:16 | 80:3,9 84:18 | 114:13,16,21 | 207:17 |
| **John** 241:23 | 117:23 151:3 | **knew** 34:3,4 | 115:8,16,25 | 209:21 214:8 |
| **Johnson** | **keeping** 85:22 | 56:6 113:12 | 117:20 118:4 | 214:21,23 |
| 228:17,19 | 172:18 | 113:15 | 118:20 119:7 | 216:2 218:22 |
| **joining** 152:12 | 185:12 | 115:13 | 120:19,20,23 | 218:22 |
| **joint** 75:12,14 | **keeps** 121:11 | 149:21 166:9 | 121:10 | 230:12 232:8 |
| 75:18 | **Kelly** 241:23 | 172:22 176:2 | 122:14,16 | 235:4,19,22 |

Henderson Legal Services, Inc.

Jarvis, Christopher                                      October 18, 2022

29

| | | | | |
|---|---|---|---|---|
| 236:11,15 | **Lake** 13:6,8,9 | 134:19 | 273:8 | 68:1 71:18 |
| 237:19,20,20 | **lane** 145:3 | 245:17 249:6 | **legislation** | 74:15 99:12 |
| 237:21 | **language** 9:24 | **lawsuits** 37:6 | 54:20 | 106:19,19 |
| 239:16 | 60:25 61:9 | 37:7 150:2 | **legit** 194:22 | 120:3 132:14 |
| 244:16 | 135:25 | 184:3 | 195:14 | **levelled** |
| 245:23 | 232:21 | **lawyer** 180:16 | **lending** 47:24 | 114:19 |
| 251:24 | **large** 85:17 | 257:10,22 | **lengthy** 180:7 | **leverage** 55:21 |
| 253:20 259:1 | 175:19 | 258:21 | **let's** 9:23 31:4 | 63:7 |
| 259:5 261:4 | **largely** 160:15 | **lay** 179:1 | 31:6 33:24 | **Leveraged** |
| 261:17 | **larger** 34:17 | **layers** 99:18 | 37:15 40:13 | 62:9 |
| 263:14 264:2 | 35:18 55:21 | **lead** 253:1,4 | 40:15,24 | **LEVIN** 2:5 |
| 265:13 266:7 | 170:5 239:2 | **leading** 253:15 | 107:15,15,16 | **Levine** 7:2 |
| 268:18 | **largest** 195:11 | **leaning** 176:1 | 107:17,17 | 244:14,21 |
| 269:17 | **Lauderdale** | **learn** 18:7 | 109:17 | 249:1 |
| 271:18 | 2:9 | **learned** 70:11 | 112:15,18 | **liabilities** |
| 272:12,14,16 | **Lauren** 2:16 | 78:2 | 115:23 116:7 | 49:20,22 |
| 273:8 274:20 | 6:21 | **leave** 11:9 | 119:9 121:14 | **liability** 28:5,8 |
| 279:23 | **Lauren.a.da...** | 19:21 76:18 | 121:14 | 28:15,23 |
| 280:13 281:7 | 2:25 | 76:25 78:5 | 130:15 | 29:6,10 37:4 |
| 284:13,23 | **law** 12:17 | 137:12 | 131:24 151:6 | 38:18,21 |
| 285:10,14,16 | 16:20 19:8 | **led** 194:4 | 152:3 196:12 | 40:16,16 |
| 286:11 | 21:6 79:19 | **left** 21:22 | 218:25 | 62:24 121:5 |
| 288:17 | 80:9 84:18 | 35:23 64:9 | 236:20 | 121:6,9 |
| **knowing** 284:6 | 85:17 150:9 | 77:24 110:24 | 238:10 | 135:6 143:11 |
| **knowledge** | 182:7 201:1 | 186:25 | 245:14 274:9 | 165:3 197:1 |
| 17:10 30:23 | 208:5,19 | 189:12 | 283:20 | **liable** 132:19 |
| 81:11 84:20 | 223:1 246:1 | 212:15 | **letter** 153:18 | 132:21 |
| 86:19 89:2 | 246:9 248:12 | 223:15 | 174:12 | 173:20 |
| 103:22 208:6 | 257:20 | 270:22 | 192:20 193:8 | **Liberty** 10:14 |
| 247:25 248:1 | 270:11 | **left-most** | 196:25 | 35:17 37:1 |
| 250:23 251:9 | 277:10,11,12 | 186:18 | 197:10 | 39:15 40:14 |
| 251:14,21 | 277:20,20,21 | **legal** 6:14 | 198:12,15 | 40:18 41:2 |
| 253:10,19,21 | 288:2 | 17:19 18:2 | 199:3 207:13 | 150:21 |
| 255:2 272:13 | **lawful** 129:18 | 19:9,20 | 207:21 | **license** 41:7 |
| 274:4 279:9 | 246:18,22 | 20:21 21:5 | 208:12,16 | 66:19,22 |
| 279:9 | **lawfully** 247:3 | 22:18 59:18 | 211:12,13,17 | **licensed** 13:16 |
| **knowledgea...** | **Lawrence** | 59:23 99:1 | 216:21 217:5 | 13:18,19,24 |
| 110:20,25 | 14:15,16,16 | 134:17,25 | 251:17 254:7 | 15:12 271:21 |
| **known** 232:2 | 14:17 168:25 | 174:15 | 271:7 | 271:23 |
| **knows** 147:1 | 202:5 | 175:15 | **letterhead** | **licensing** 14:6 |
| **Kryska** 2:18 | **laws** 80:3 | 181:22 | 46:15 145:24 | 14:8 32:19 |
| 6:22 | 289:10 | 242:23 271:4 | **letters** 20:1,4 | **life** 11:3 13:17 |
| | **lawsuit** 5:25 | 277:18 | 92:20 | 15:3,6 22:20 |
| ───── **L** ───── | 28:23 40:16 | **legally** 205:8 | **level** 30:16 | 25:11 58:4 |

Jarvis, Christopher                                October 18, 2022

30

| | | | |
|---|---|---|---|
| 58:13 64:7 | **liquidate** 89:16 | 149:12,13 | 66:1 |
| 99:12 194:7 | **liquidated** | **loan** 70:9 | **look** 19:6 |
| 238:19 240:6 | 84:5 | **located** 91:2 | 22:18 25:21 |
| **liked** 150:4 | **liquidity** 83:13 | **location** 34:21 | 42:11 52:25 |
| 173:7 | 83:24 84:15 | **locations** | 60:2 67:6,7 |
| **likes** 194:16 | **Lissa** 2:18 | 34:25 | 93:7 94:16 |
| **limit** 71:17 | 6:22 | **log** 241:18 | 98:5,9 99:24 |
| 118:4 143:9 | **list** 49:17 | **Logan** 57:17 | 119:5 122:3 |
| 143:14 | 119:23 | 57:18,21,23 | 125:4 126:18 |
| 182:12 185:4 | 123:13 124:3 | 58:16 59:2 | 131:2 132:11 |
| 259:10,14,20 | 145:12 183:7 | 59:10,12 | 139:24,25 |
| 259:21 | 235:10 | 60:18 63:14 | 152:25 158:5 |
| 266:17 | **listed** 49:18 | 65:17 90:10 | 188:13,20 |
| 287:23 | 105:9,13 | 90:12 101:2 | 192:8 201:21 |
| **limited** 62:23 | 126:21 | 101:5 103:19 | 207:25 208:2 |
| 62:23 130:5 | 184:25 | 103:21,23 | 208:2,6 |
| 135:14 | 211:20 | 274:15 | 217:3 220:5 |
| 170:11 | **lists** 250:8 | **Logans** 60:1 | 223:9 236:20 |
| **limits** 50:13 | **litigation** | 62:1 | 267:10 269:2 |
| 70:17 135:6 | 117:11 | **logistically** | 277:2 284:2 |
| 142:13 | 242:24 | 205:15 | 284:16 |
| 183:11,13 | 248:17 | 206:20 | **looked** 31:21 |
| 275:8 | **little** 9:9 19:13 | **logistics** | 61:24 63:19 |
| **line** 27:13 28:3 | 25:13 37:20 | 205:17 | 66:9 73:10 |
| 28:15 57:17 | 45:12 101:12 | **logo** 114:8 | 100:12,13 |
| 59:3 76:5 | 112:18 | **long** 60:23 | 114:9 121:21 |
| 78:22 110:1 | 113:17 | 80:1 108:12 | 139:21 |
| 116:20 117:2 | 142:20 143:6 | 119:8 162:18 | 155:23 158:4 |
| 119:22 | 169:10 | 179:22 180:7 | 169:9 178:10 |
| 152:13 | 245:25 250:3 | 194:5 198:2 | 198:13,23 |
| 207:21 266:2 | 259:15 | 203:8,14 | 202:7 211:17 |
| **lines** 28:6,6,8 | 265:12,17 | 204:6 207:19 | 214:1 215:10 |
| 28:9,10,23 | 275:6 288:15 | 221:13 | 223:11 |
| 29:6,10,11 | 288:20 | 226:11 258:4 | 225:18 |
| 31:3 117:4 | **littler** 262:13 | 258:9 266:7 | 229:14 230:2 |
| **link** 244:11 | **live** 106:18 | 276:21 | 232:1 244:14 |
| **liquid** 76:18,20 | **living** 276:12 | **long-term** | **looking** 26:11 |
| 77:24 78:8 | **LLC** 58:11 | 100:17 | 50:17 60:9 |
| 79:18,23 | 59:22 82:15 | 262:20 | 68:16 98:5 |
| 80:14,21 | 130:2 | **longer** 29:1 | 114:14 |
| 81:25 82:3 | **LLCs** 17:19 | 172:18 | 118:15 |
| 84:4 88:24 | 82:16 | 230:12 | 125:15,16 |
| 89:5 275:18 | **LLP** 2:6 | 281:11 | 136:4 155:22 |
| 276:2 | **load** 147:6 | **longer-term** | 168:7,15 |
| | | | 207:25 |
| | | | 208:22 212:8 |
| | | | 219:24 |
| | | | 238:22 |
| | | | 266:15 270:4 |
| | | | 274:13,14 |
| | | | **looks** 46:13 |
| | | | 50:13 59:14 |
| | | | 59:25 60:23 |
| | | | 60:24 61:8 |
| | | | 62:7 65:21 |
| | | | 93:2,25 |
| | | | 94:14,14 |
| | | | 96:14 103:18 |
| | | | 103:20 114:7 |
| | | | 121:23,25 |
| | | | 132:9 140:5 |
| | | | 140:5 144:21 |
| | | | 152:17 |
| | | | 156:10,12 |
| | | | 157:5 164:21 |
| | | | 164:22 |
| | | | 185:10 |
| | | | 188:20 |
| | | | 191:23 |
| | | | 211:16 |
| | | | 212:17 |
| | | | 215:23 |
| | | | 220:21 |
| | | | 229:15 230:8 |
| | | | 230:10 233:6 |
| | | | 266:14 |
| | | | **Los** 16:18 |
| | | | **lose** 39:13,13 |
| | | | 39:20 41:1,8 |
| | | | 41:8 67:1 |
| | | | **losing** 27:20 |
| | | | 66:11 151:12 |
| | | | **loss** 27:16,18 |
| | | | 27:25 28:4 |
| | | | 29:7,9,16,20 |
| | | | 29:23 39:10 |
| | | | 40:6 48:3 |
| | | | 52:1 63:8 |

Jarvis, Christopher

October 18, 2022

31

71:8,13 72:2
72:13 74:5,9
84:23 85:10
86:4,13,24
87:11 88:1
88:10 94:12
120:21
132:22
133:12,16
134:1,4,7
135:10
140:24 141:1
141:15,21,25
142:7,21
144:3,7,9
145:6,6,11
146:8,10,13
146:18,25
147:1 148:24
149:5,19
165:9 169:17
169:21
170:24
174:10,21
176:5 178:8
178:18 179:3
179:11,23,24
180:2 184:5
185:7 190:7
190:22,25
191:22 192:7
192:9 193:16
193:17,24
194:4,25
195:11,11
196:3 197:4
197:4,15,19
197:22
199:18
200:18 202:9
202:14,16
203:19
205:23 206:8
206:21,24

207:5 208:9
212:24
220:17
224:24
225:15,16,19
225:22,24
226:7 232:4
233:5 234:9
238:19 239:9
240:24
265:20 266:6
266:18
267:21 282:1
282:5,9,10
282:24
**losses** 24:13
27:11 39:20
40:25 41:1
51:25 52:11
66:16 67:10
72:24 73:4
84:24 85:1
87:1,23,24
88:5,5,6,21
102:25
116:19 120:1
120:8,14,15
120:22 121:1
121:8 132:19
135:13 139:5
140:12,13
141:8,11,13
141:14,19
142:18 145:4
146:2,19
147:16,21,25
148:13 150:1
150:14,14,18
150:18
151:18 156:6
163:5 167:9
167:10,15,16
169:6 170:5
170:7,11

171:9 172:11
172:16
173:17 174:5
175:9,14,20
177:17
182:13 185:6
185:12,17,21
189:2,2,4,9
189:11,16,18
190:9 191:2
193:6 197:25
198:7 200:13
206:1,18
216:10,17
220:14,17
222:2 224:18
225:11 226:3
231:25
238:10
239:13
242:10 243:4
263:7,13
264:18
265:25 266:4
266:12,21,25
267:3,8,9
280:10
**lost** 38:14 40:4
41:24,25
101:6 145:14
194:10,22
**lot** 22:11 27:14
29:1,22 34:8
34:15 37:13
38:13 42:18
42:23,23
43:7 47:22
54:7,11 55:7
55:7,7 60:11
67:8 75:8,8
75:12,17,18
97:16,18
98:16 99:15
100:23 108:1

108:3,11,12
108:17,18
109:3,8,14
110:23
113:13,16
114:2,17
115:2 117:4
117:4 118:22
120:21
134:25
137:10,21
144:21
147:13 151:7
162:22 163:5
163:6 173:22
174:4 184:3
184:15
194:23 195:8
195:15,15
196:9 222:23
222:24
233:23
235:21
240:20 250:7
254:15
265:23,25
266:18
277:15,20,21
280:15 281:9
283:18
288:16
**lots** 22:22
221:4
**low** 26:14,14
26:15 29:23
64:23 147:6
161:18 196:3
226:6 239:20
**lower** 142:13
147:1 225:24
**lowered**
160:24
**luckily** 174:13
174:14

**lumped** 37:12
**lunch** 27:5
119:17 125:5
126:19
130:16 142:3
144:22

---

**M**

**M** 16:16
**M-A-N-D-E-L-L**
16:17
**Macroecono...**
153:23
**main** 56:10
70:8
**maintain** 85:11
**maintained**
66:16 72:3
81:11 94:6
**maintaining**
187:7
**making** 8:6
11:11,25
32:21 34:22
72:19 96:24
172:7 183:22
184:13,14,14
254:9 261:18
266:25 283:9
288:12
**male** 36:16
**males** 36:19
**malfunction**
118:2
**malpractice**
27:17 29:17
**manage** 14:11
21:3 24:8
25:8 36:5,8
99:11 142:23
142:24,25
162:17 241:7
246:5 265:10
**manageable**

Jarvis, Christopher                              October 18, 2022

32

25:13
**managed** 91:9
122:8 161:7
162:22,23
163:16 229:8
229:9 276:7
**management**
16:11 19:7
21:4,9,11
31:8 33:17
54:6,10
60:15 86:9
129:17 130:2
142:22
163:11 165:3
197:1 222:24
232:14 236:6
251:23 255:8
268:14
271:17,19
272:13
288:17
**manager**
13:19,24
14:3,5,11
21:7 32:21
33:16 69:12
69:12 72:25
86:1,2 91:12
91:13 97:16
179:17 269:5
270:11,13
271:23
272:10,15
273:7,10
277:16
278:15,18,19
**managers**
42:21 83:1
**managing**
66:6 77:15
77:15 109:10
271:21
**Mandell** 15:22

16:16,18
17:16,24
**manger**
272:18
**manner** 20:6
**manufacture...**
37:7
**manufacturi...**
37:11
**March** 155:4
**Marcus** 2:6
**mark** 12:5
44:19 52:16
57:1,7,10
58:19 75:20
78:14 79:3
90:2 92:10
109:17 119:9
122:16
126:23
131:15 139:9
163:20
168:10
182:16 192:9
201:24 207:7
216:20,24
220:1 226:18
234:13 245:5
**marked** 12:10
44:16,21
52:18 57:12
58:22 61:15
63:12 75:23
78:17 79:5
90:4 92:13
101:1 109:19
119:11 127:1
127:4 130:24
131:17
139:12
145:18,22
152:7 154:21
154:23 158:7

158:10
163:24
166:21
168:12
182:19 186:6
191:8 192:13
196:15,21
199:11 202:1
207:10 210:7
213:21
216:25
217:16
222:12,14
226:20
228:22,24
234:15
241:14
244:20 245:9
**market** 78:6,9
267:23
**marketable**
266:22
**marketing**
194:15
**marking** 76:2
220:6
**mass** 283:24
**massive** 29:18
120:14
276:14,21
284:4
**match** 185:18
**material**
208:24
**materials**
115:10
208:18
**math** 11:1
137:5 190:15
**mathematical**
72:12 87:12
96:24
**mathematic...**
65:12

**mathematics**
9:13 257:18
**Matlock**
222:21,25
**matter** 1:15
6:4 7:1 123:4
129:24
137:14
181:22
**matters** 7:13
**max** 287:16
**maximize**
83:20
**maximum**
133:12
135:10
**MBA** 9:14 82:5
**mean** 15:6
18:16 21:18
22:20 34:16
36:8,19,20
38:15 39:6
41:12,13
51:12,14
61:9 66:15
68:13 82:5
83:16 88:9
88:11,25
93:5 105:7
107:4 111:18
111:21 112:7
116:22
118:20
120:18,21
130:6,6
136:3 137:23
139:7 140:5
145:12 148:4
148:12 151:6
151:8,16,22
151:22
152:20
154:12
156:15,19

161:17,19
162:24
163:14
170:11
174:13 175:2
175:14,15
180:7,15
185:5,10,15
185:19
187:13 200:7
200:7 201:7
204:14 205:7
206:6,10,14
206:18
208:11,13
214:22
218:23
227:21
232:19
235:13
237:21 238:4
238:20
239:19 240:1
240:4 242:17
243:7 244:2
259:2 261:15
261:20
262:14,17
263:6,20
267:3,8
268:16
271:20
273:19 276:3
276:15
277:19,21
284:10 287:2
288:9
**meaning** 11:12
75:16 184:13
**meaningful**
183:6 185:1
**means** 32:11
47:12 58:15
73:18 116:23

Jarvis, Christopher                                    October 18, 2022

33

| | | | | |
|---|---|---|---|---|
| 135:9 | 121:19,21 | 155:19 | 106:21 151:9 | 281:6 |
| **meant** 32:13 | 122:10 | 229:13 254:3 | **mind** 85:14 | **models** 256:18 |
| 48:18 116:13 | 123:11 | 267:2 | 100:1 115:25 | **modest** 161:9 |
| 124:18 | 125:16,22 | **mentions** | 118:5 157:14 | **modified** |
| 176:15 | 126:18,20 | 101:18 126:5 | 174:25 | 216:16 |
| 183:25 227:3 | 130:25 131:8 | 131:12 | 185:12 | **modify** 153:5 |
| 227:23 263:6 | 131:15 | **message** | **minds** 147:24 | **moment** |
| **mechanics** | 132:11 135:5 | 290:19 | **mine** 154:2 | 157:16 |
| 93:3 160:12 | 138:15,23 | **met** 16:22,22 | 285:15 | 245:20 |
| 176:12 | 139:21 | 16:24 17:3 | **minimal** 226:3 | **Monday** 45:22 |
| **mechanism** | 146:21 147:6 | 17:11 33:22 | **minimum** | **money** 26:20 |
| 74:12 | 149:5 158:21 | 53:21,22,22 | 66:21 79:17 | 26:23 27:20 |
| **medical** 27:17 | 158:24,25 | 53:24 110:2 | 287:9,16 | 27:22,23 |
| 29:17 | 159:22,22 | 110:4,5,8 | **minus** 88:6 | 29:8,8 31:22 |
| **Medicare** | 160:4 162:13 | **metaphor** | **minute** 20:16 | 34:22 35:17 |
| 276:13 | 162:16 | 129:2 145:2 | 124:2 191:6 | 35:19,23 |
| **medications** | 169:10 220:1 | 163:9 | 220:4 223:10 | 36:3 39:9 |
| 9:1 | 220:8 221:12 | **methodology** | 249:25 289:3 | 40:4,7,21 |
| **meet** 16:13,15 | 229:6,16,25 | 260:6 | 289:17 | 47:24,24 |
| 23:2 45:25 | 230:5,18 | **Micro** 153:23 | **minutes** 57:3 | 48:8 64:12 |
| 46:6,8 56:15 | 233:9,12 | **middle** 64:2 | 119:18 | 66:11 67:1,3 |
| 67:24 91:19 | 278:23 283:2 | 245:18 | 263:23 | 70:9 71:23 |
| 92:1 101:21 | 283:6,7 | 265:12 | 285:23 | 74:7 75:16 |
| 102:10 153:9 | 284:15 290:5 | **midway** 242:5 | **misdiagnosis** | 75:17 78:6,6 |
| 153:11 | **memorandum** | **million** 50:12 | 29:19 | 78:9 81:6,8 |
| 290:10 | 79:9 92:17 | 50:12,16,22 | **miserable** | 82:9 99:10 |
| **meeting** 45:21 | 131:13 229:2 | 63:17 64:2 | 205:11 | 99:13,13 |
| 53:18 57:17 | **memories** | 64:18,19,22 | **missed** 43:24 | 100:10,11,14 |
| 63:14 290:7 | 114:15 | 64:25 65:8 | **missing** 40:11 | 107:15 |
| 290:22 | **memory** | 65:11 67:4 | **misspoke** | 116:15,15 |
| **meets** 23:23 | 101:25 153:1 | 73:23 76:18 | 123:25 | 147:22,22 |
| **melons** 128:14 | **memos** 92:20 | 100:6,7 | 124:10 | 148:2 150:4 |
| **members** | 158:4 159:1 | 132:23 133:7 | **misundersta...** | 151:3,15 |
| 106:20 | **mention** 90:12 | 141:18 | 82:13 | 170:10,15 |
| 152:19 | 101:3 | 142:14 | **mix** 131:9 | 172:18,21 |
| 212:10 | **mentioned** | 143:10 | **Mm-hmm** | 173:1,13,23 |
| 213:10 | 11:18 13:23 | 151:13 193:6 | 25:23 27:19 | 174:9 185:25 |
| **memo** 4:25 | 14:24 21:15 | 193:7 195:8 | 28:7 31:25 | 195:9 200:3 |
| 78:22,25 | 21:19 24:10 | 276:17 282:7 | 66:23 135:8 | 201:2,11,12 |
| 79:3 80:7 | 46:5,8 65:24 | 283:19,20,21 | 165:18 215:6 | 205:18 206:8 |
| 84:7,9 90:12 | 70:21 80:2 | 287:4,4,6,7 | **model** 25:21 | 206:13 |
| 92:25 94:5 | 89:13 116:9 | 287:11,16,20 | 39:19 64:8 | 214:10,14,15 |
| 94:16 101:4 | 149:13 | 288:8,8 | 180:23 | 215:14 |
| 106:4 118:20 | 152:22 | **millions** 55:23 | 242:20 243:1 | 230:15 |

Jarvis, Christopher

October 18, 2022

34

231:14 240:3
259:25
262:19 280:4
280:5,5,6,8
280:10,15,18
281:10,11
**months** 180:8
180:8,9
189:6 197:21
197:23,25
198:2
**morning**
244:15
**motivation**
56:10 109:5
109:6
**motivations**
109:4 284:22
**Motors** 10:15
**mouthful**
177:13
**move** 16:19
44:11 57:5
61:12 104:17
107:15
108:25
112:17
121:16
122:15 140:9
140:16
145:15
149:16 152:3
154:20 186:4
186:25
189:14,20
196:12,18
199:9 210:4
228:21
236:23
241:11 285:2
**moved** 270:20
**moving** 38:23
51:19 66:8
134:12

136:20
223:15 233:6
266:5,8
**MTI** 193:8
195:10 197:3
197:11,22
204:2 207:22
208:10 209:1
219:3
**MTI's** 209:10
**mugs** 40:17,18
**multiple**
165:20
201:22
**mute** 211:2
**muted** 6:23
**mutual** 10:11
10:14 18:14
30:2 35:17
37:1 39:15
40:15,18
41:2 74:4
82:1 150:22
255:12,20
276:22

------

**N**

**N** 4:1,1 6:1
**name** 6:19
53:3 76:9,14
90:19 91:17
91:17 123:8
153:3 207:19
229:12,12
235:9,18
276:24 277:3
277:5 294:20
**named** 45:17
168:16 169:1
199:19
207:15
217:23
228:17
235:24

**names** 62:22
163:18
203:10,14
**Nancy** 3:6 6:13
**nasty** 195:3
**national**
115:16
**nature** 82:2
147:19
**navigate** 21:2
186:11
243:25
**near** 175:7
**nearing**
219:22
**necessarily**
25:1 51:13
61:11 64:24
85:24 86:8
87:16 151:24
265:5
**necessary**
35:13 66:20
83:24 84:23
89:11 171:19
174:7 240:1
294:5
**need** 8:16,18
8:23 14:5
24:16 36:4
63:5 71:1
73:21 76:25
77:23 82:3,4
82:4 97:2
113:17 129:7
148:1 151:6
155:15
157:24
185:17 191:5
200:15
204:24
214:13
221:25
248:11 263:7

263:15 264:9
**needed** 14:10
17:19,21
20:24 23:1
42:14 66:18
72:12 77:16
78:8 81:22
81:22 103:24
104:7,9
138:11 151:8
206:17
230:11
280:20
**needs** 24:17
32:8 84:8
119:25
267:15
**negative**
188:16
189:23
193:17 194:6
197:12
**negotiate** 29:5
210:2
**negotiated**
215:25
221:23
**negotiating**
161:15
**negotiation**
221:2,7
**Neiman** 2:6
**neither** 251:23
268:17 291:3
293:10
**nervous**
172:19
**never** 22:18,19
22:19 30:23
36:21 83:15
88:25 108:13
120:18
143:22,23,23
143:24

149:22 150:7
173:6 212:6
232:20,22,22
233:2 239:23
239:25
240:24
241:10
261:17,20
269:16
286:15,15
288:7
**Nevis** 91:4,13
91:21 272:8
275:16
**new** 7:21
16:21 54:19
110:1 113:18
116:9,11
136:10,13
144:19,19
145:7 153:12
176:1 181:10
194:20 204:9
228:11,13
229:9,12
234:5,23
242:20,20
278:20 290:7
**newspaper**
193:18
194:21
**NFL** 180:21,22
180:23
**nice** 8:6 143:4
**no-win** 201:22
**nobody's**
196:2,2
**Nods** 86:18
101:15
**nominal** 55:25
**non-attorney**
157:11
**Nope** 233:11
237:19

**Norm** 130:3
**normal** 28:3
 33:12 96:5
 121:3 262:11
**normally** 11:15
**Northern**
 245:17
**Notary** 1:17
 7:6 293:20
 294:17
**notation** 66:24
**note** 46:9
 64:11 125:25
 133:9 138:4
 138:13
 153:24 211:3
**noted** 199:7
 201:6 215:11
 253:5
**notes** 13:24
 122:22
 183:15,20
 191:6 248:24
 263:15 264:4
**notice** 1:16
 177:16 192:8
 192:16,19
 193:4 194:8
 202:8,14,14
 202:23
**notifications**
 193:13
**notified**
 193:21
 201:14
 213:12
**notify** 180:2
**November**
 57:16 59:1,6
 59:6 122:25
 197:2 202:6
 202:18 219:3
 241:19
**number** 6:7

12:6 29:22
30:18 34:25
34:25,25
44:15,20
45:3 49:18
50:1,4,23
52:17,17
54:4 57:8
58:20 60:5
61:13,14
62:25 64:5
65:4 69:5
72:23 75:22
76:3 78:15
78:15 79:8
80:18 90:7
92:11 109:22
117:9 119:10
127:5 132:8
139:11
145:17
149:14,22
152:5 154:22
156:4 158:9
158:14,15
160:20
161:21
163:22
166:19
168:11
169:24 173:7
173:11
175:19 180:6
182:17
184:11 185:4
186:5 190:8
190:9 191:9
191:16
192:11
196:14,19
199:10
201:25 207:8
210:6 213:19
216:23 217:2

225:17
226:19
228:23 233:7
234:14
240:18
241:13 250:5
251:22 256:5
261:23
262:13
266:16
267:24 268:3
268:4 274:8
283:20
284:15 285:4
287:9,17,20
**numbered**
123:13
**numbers**
50:10 73:8
85:17 143:3
143:5 175:7
186:2,10,20
187:15
194:18 198:9
225:1 226:12
275:19 281:6
283:12 284:8
**numerator**
73:13 141:11
**numerous**
53:23 55:16
193:22

---

**O**

**O** 4:1 6:1
**O'Dell** 15:23
**oath** 8:2
**object** 60:19
 62:3 68:4,11
 77:5 80:10
 103:15
 171:11,20
 177:21 179:3
 199:5 221:10

221:18 228:2
237:18
238:16 239:3
239:6 241:3
252:24
**objected**
179:12
**objecting**
178:5 202:21
**objection** 97:4
180:11
204:19 211:1
218:19
246:20 247:1
247:5,10,16
248:5,14
249:16,22
250:21 251:3
252:21
253:13,15
255:18
257:24
258:23 260:8
260:13 261:7
262:5,10
277:14 280:1
281:4 282:25
**objection's**
8:14
**objections**
8:11,13
**objective**
113:9
**objectives**
182:12
**objectors**
204:1,18
206:24
**objects** 178:1
**obligated**
205:8
**obligation**
167:8
**observing** 7:2

**obtain** 9:11
174:20
**obvious**
209:19 214:9
**obviously**
31:20 114:16
153:12
**occasion**
170:1
**occur** 149:19
**occurred**
55:13
**occurrence**
197:21
**October** 1:12
1:19 6:8 53:2
92:19 101:20
122:25 146:1
152:24
281:19 291:6
291:23
**October/Nov...**
152:21
**odd** 143:6
180:16
**odds** 52:2
**offered** 13:25
136:11 229:7
229:17
**offering**
229:20
232:12
**office** 13:4,5
46:3 187:10
192:20
208:19 214:7
214:19 223:1
**officer** 126:22
293:4
**officially**
210:12
**offshore**
106:22 107:8
107:23

Jarvis, Christopher

October 18, 2022

36

| | | | | |
|---|---|---|---|---|
| 108:11,13,18 | 5:4 154:22 | 198:12 | 279:8,12,21 | **operates** |
| **oh** 45:4 46:6 | **okay** 10:6 | 201:24 211:6 | 279:24 | 123:14 |
| 51:22 57:9 | 18:25 35:2 | 211:16 216:7 | 281:16,24 | **operating** 33:7 |
| 102:18 | 41:5 45:8,14 | 216:7 222:4 | 282:13 285:2 | 34:11 35:13 |
| 104:18 | 50:8,11 51:4 | 222:16 | 285:6,13,16 | 49:11 77:13 |
| 122:15 152:4 | 51:19 52:24 | 228:21 | 286:12 | 93:10 96:5 |
| 152:20 181:8 | 55:12 63:9 | 229:24,24 | 288:22,24 | **operation** 34:8 |
| 184:1 195:13 | 64:4 66:15 | 230:9,20 | 289:1,6,16 | 160:11 |
| 229:22 | 66:23 68:6 | 231:1,18 | 290:2,24 | 161:18 |
| 236:25 | 69:20 72:10 | 233:22 | 291:1,2,5,15 | 191:13 |
| **Ohio** 16:2 | 76:24 87:17 | 235:21 | 291:18,19,20 | 256:11 |
| **OJM** 15:19,24 | 88:3,16 | 243:12,18 | **Oklahoma** | **operations** |
| 16:3,5,7,10 | 92:10 101:13 | 244:7,21,21 | 13:20 33:4 | 62:13 66:12 |
| 16:16,18 | 101:14,16 | 244:22 | 239:18 | 105:15 |
| 57:8 270:17 | 103:22 | 245:16,20,24 | 270:13 | 159:11 174:2 |
| 270:18 | 104:17 110:8 | 246:12,17 | 272:10 | 191:15,20 |
| **OJM-0000344** | 111:5 116:1 | 247:3,21 | **once** 7:22,22 | 279:10 |
| 5:23 241:13 | 121:13 | 248:16,22 | 19:10 86:10 | **operators** |
| **OJM-0002930** | 122:14 124:7 | 249:1,3,19 | 129:8 148:3 | 119:2 |
| 5:5 158:9 | 124:11,17 | 250:2 252:15 | 175:25 201:7 | **opinion** 5:25 |
| **OJM-0011218** | 126:18 | 253:22 254:3 | **one-third** | 22:13 181:22 |
| 4:14 57:11 | 128:18 130:8 | 254:6,11,14 | 85:23 | 197:3,6 |
| 63:13 | 130:15,17 | 254:18 255:2 | **ones** 117:13 | 198:16 |
| **OJM-0011752** | 133:3,20 | 256:19,24 | 128:23 | 211:13 |
| 4:15 58:21 | 134:18 140:9 | 257:13 | 142:25 182:4 | 245:16,25 |
| **OJM-0011754** | 141:20 | 259:12 | 198:11 | 246:6,12 |
| 4:16 61:14 | 143:21 153:1 | 260:10 | 220:20 | 249:7 251:7 |
| 61:19 | 153:13,19,21 | 262:25 263:2 | **online** 194:15 | 251:10 |
| **OJM-0012385** | 154:3 159:16 | 264:10,18,22 | **onshore** | **opinionated** |
| 4:18 | 159:18 160:4 | 265:2 266:2 | 107:11,15,16 | 235:25 |
| **OJM-0012386** | 160:10,19 | 266:10,20 | 109:1 | **opinions** |
| 4:19 78:16 | 163:20 | 267:14 268:1 | **open** 46:9 | 259:4 |
| 79:8 | 164:13 | 268:7 269:7 | 131:20 | **opportunities** |
| **OJM-0012587** | 165:11 | 269:14,19,22 | 248:24 | 47:23 |
| 5:22 234:14 | 167:15,24 | 270:7,16,24 | **opened** 196:9 | **opportunity** |
| **OJM-0012589** | 171:5 176:3 | 271:7,10,14 | 219:14 | 46:6 47:15 |
| 4:17 75:22 | 176:25 177:7 | 271:16,19 | **operate** 33:11 | 49:3 99:13 |
| **OJM-0012601** | 177:11,13,25 | 272:17 273:5 | 233:14 | 119:3 150:6 |
| 4:20 90:7 | 182:8 187:18 | 273:12,22 | **operated** 32:8 | 153:9 |
| **OJM-0012745** | 187:20 188:7 | 274:9,25 | 32:10,13 | **opposed** |
| 4:13 52:17 | 188:22,25,25 | 275:3,6,11 | 47:23 119:17 | 256:16,16 |
| **OJM-002930** | 189:7 193:23 | 275:21 276:6 | 123:18 159:5 | **opposing** |
| 191:10 | 195:10 | 276:10 277:6 | 227:17,20,25 | 286:17 |
| **OJM-013983** | 196:12 | 278:22,25 | 228:8 | **opposite** |

Jarvis, Christopher

October 18, 2022

37

182:15
**option** 102:16
264:2
**options** 37:22
54:13
**orange** 189:21
**orchestrated**
163:16
**order** 23:22
**ordinarily**
56:16 100:12
103:2 140:12
152:17
**ordinary** 88:19
97:9 151:25
**organize** 76:12
**organized**
77:10 91:5
105:6,8
**organizer**
91:18 105:10
**organizing**
34:2
**original** 216:5
223:21 294:7
**originally**
14:22 15:22
181:6 225:25
**ought** 30:16
**outages** 118:9
**outcome**
121:2 205:12
293:16
**outed** 194:14
194:22
**outgrown**
47:16
**outline** 167:7
**outlines**
220:12
**outlining** 50:1
**outrageous**
251:12,15
**outside** 20:7

20:14 86:2,7
95:20 96:19
129:1 135:22
**outsource**
273:9
**outsourced**
33:17,17
270:14,15
**outsourcing**
166:4
**outstanding**
212:11 226:8
**overall** 138:3
242:13
**overcome**
23:22
**overhaul**
284:4
**overhead**
121:6,7
267:21
**overlap** 19:13
22:5,22
**overlooked**
84:10
**overseeing**
20:23
**overseen**
107:1,23
**overview** 62:9
128:1
**Overview-St...**
59:4
**owe** 66:4
212:23
**owed** 188:23
**owned** 51:1
59:22 62:15
62:21 74:11
93:10,17
94:18 276:12
**owner** 23:19
34:7,14
35:11 38:16

66:3 201:16
268:9 278:9
278:16,17
**owners** 14:14
15:16,17
16:4 37:24
43:10 62:16
91:7 288:10
**ownership**
14:20 20:19
62:17 63:2
**owning** 39:1,5
47:7 48:25
67:15
**owns** 34:7
64:6,6
278:11,11

_____

**P**

**P** 6:1
**p.m** 130:21
167:25 168:3
222:6,9
289:24 290:1
291:24 292:1
**P.O** 2:21
**page** 4:10 5:24
12:8 44:16
45:15 46:14
49:12 50:10
121:23
122:15,22
127:11,15
129:15 131:3
131:3 132:12
132:18 140:9
140:16 146:7
155:2 158:20
164:14 167:6
176:11 177:4
177:5,15
191:11 192:3
192:16
196:24 197:9

198:13,17
207:14
209:13 215:3
217:6,21
218:24
219:25
220:22,23
230:11,21
233:9,12
245:21
248:10
**pages** 131:22
139:25
158:22 177:5
193:11
**paid** 35:14,16
39:15 41:9
66:1 70:10
71:2 87:25
88:2,5 94:6,8
94:10 126:1
126:11 162:5
162:10
167:15,16
169:13
170:10
173:14
182:13 187:3
188:18 189:2
189:4,9,17
189:18 208:1
212:12 216:2
225:10
226:15
238:12
276:20
**pain** 54:6,9
263:25 280:9
**Pamela** 199:16
**pan** 186:14
223:8 224:1
**Pan-Am** 90:24
91:2,5,9 92:4
92:8,25 93:1

93:4,11,16
94:1,6,19,21
103:14
104:21
106:10,12
107:23
108:16 109:2
109:4,12,13
111:14 113:8
113:11 114:3
114:5 116:4
121:22
144:11
239:13,17
243:1 255:24
278:24
**Pan-Am's**
93:19 279:9
**Pan-American**
90:21 105:24
170:4 252:5
252:7 254:4
279:6 282:14
282:17
**paper** 45:11
294:6
**paperwork**
14:12 105:10
**paragraph**
12:22 15:18
54:16,17
56:13 58:2
63:16 65:14
79:12 90:11
94:13,17
102:14,17
117:8 122:4
122:21
127:25 132:7
132:17
133:10,11
138:17
140:17,20
146:7 155:13

Jarvis, Christopher

October 18, 2022

38

177:5 183:4
204:18
208:16
209:12,16
220:13,23
228:10 229:5
230:21
232:10
236:23 237:4
245:21
250:10
281:24
**paragraphs**
212:7 248:9
**paralegal** 46:4
**parlance** 99:2
**part** 15:10
24:15,16
27:2 32:16
32:20,25
33:1,2 43:24
61:6 64:2,8
82:1 94:1,5
95:10 98:11
99:9 102:21
109:11
117:15
124:16 125:1
130:6 131:6
131:23 132:7
132:8,13,15
132:19
133:12,17,23
134:12,13
135:20
136:13,20,21
138:1,2,3,22
145:1,2,4
147:6 148:13
155:12
159:23 160:4
160:5,6,18
160:22
177:14 178:1

204:5 222:18
242:10,18
255:7 261:19
284:7
**partially** 131:6
132:3
**participant**
134:2,6
195:12
227:11
**participants**
179:12
200:17 202:8
202:15,20,23
203:3,11,18
213:4,15
215:12 220:9
222:1 242:3
**participate**
97:13 130:10
227:6 234:5
**participated**
116:12
148:25 193:1
204:10 209:7
221:2 241:20
242:14
286:13
**participating**
90:17 136:23
164:8 174:8
184:22
186:21
188:18 230:7
**participation**
143:14 209:2
**particular**
38:18,20
85:11 95:15
96:15 127:17
134:7 158:19
164:4 192:16
278:3
**particularly**

106:24
232:14
**particulars**
160:11
**parties** 24:19
24:24 101:21
293:12,15
**partner** 15:23
16:17
**partners** 82:25
270:20
**partnership**
62:23
**parts** 93:8
131:23 132:1
132:4 277:22
**party** 83:12
173:15
207:25
**pass** 99:23
272:2
**passed** 247:14
247:21
**passing** 54:18
243:16 272:1
**Path** 247:14,21
278:10
**pause** 167:21
**pay** 27:2 38:20
40:1,13,21
41:10 52:5
66:25 71:7
73:6 76:23
81:14,16
86:14 87:13
87:22 88:21
89:5 97:25
98:22,24
102:22
103:12
118:11 134:7
145:1,3
148:17 156:7
161:24,25

163:3 167:8
170:9 175:1
177:17 180:1
182:3 183:10
183:16 184:8
185:23 195:6
195:25 196:1
196:8 204:21
204:24 205:4
205:15
206:24 207:4
209:24
212:24 213:5
214:15
215:14 219:6
231:14
265:22
280:11
281:10 284:7
286:20
**paying** 31:23
39:14,22
40:7 49:14
50:5 81:3
83:14 96:10
96:11 134:4
148:10
164:19 169:5
196:2 200:9
238:6 241:1
284:24
**payment**
162:20
173:16 179:3
215:12
221:22
224:22 225:6
**payments**
49:24 65:19
133:16 162:6
162:7 174:21
200:16 222:1
**pays** 142:18
**peach** 224:17

224:23
**pending** 8:21
202:21 219:2
**people** 19:11
22:10 24:6,7
25:16,19
26:6,7,17
27:4,4 31:9
33:13 37:18
37:21 39:19
39:22,23
40:19 42:12
42:18,22,23
43:7 52:5,7
55:6 69:13
75:17 81:7
89:23,24
97:17 99:15
106:8,22
107:17 108:3
108:4,13,14
108:17,18
110:22
113:13,14,16
113:22,25
114:23
115:12
116:10,16
117:13 118:5
118:5,14,17
119:1 120:10
120:17 123:7
134:24
135:25 136:6
137:8,11
144:20 145:9
145:12,13
147:19,21,24
148:7,9,12
148:14,15,17
149:25 150:2
150:3,12,16
150:20 151:8
151:20

Jarvis, Christopher

October 18, 2022

160:24
163:17
165:22 172:9
172:24 173:8
173:13 175:5
175:10,10
179:25 180:6
180:25 181:2
181:8 184:1
184:16
185:13,16,18
185:22,24
187:16 194:7
194:16,24
195:3,17,22
196:1,5,6
201:2 203:7
203:9,23
205:14,16,19
206:4 209:20
214:22
234:23
237:22 239:8
246:5 255:21
256:18
258:15,16
261:23 273:9
277:16,22
278:5 284:6
284:24,25
287:10,18
288:9,16,18
288:19,21
**people's** 24:14
161:2
**perceived**
107:7
**percent** 27:18
27:21,25
46:17 52:7,8
64:12,14
72:7 78:5,7
78:12 79:16
79:22 80:6,9

84:8,13 94:8
94:11,19
99:7 100:15
100:16,19,19
101:20 102:1
102:4,8,16
103:3,7,12
104:1 108:4
108:4 111:10
120:2,3,9,13
121:1,8,8
122:9 124:22
126:11,12,13
128:8,9,10
132:21 133:5
136:3 138:6
138:11
140:18,21
141:6,23
143:2 144:3
144:8,8
146:9,15,18
146:25 149:6
149:19
169:11,16,20
169:23 171:6
171:16 172:2
173:11,17
176:18
188:11
190:13,14,17
190:23,25
191:16,21
195:8 207:2
212:14
225:20,23
226:7 230:13
231:3,21
233:5,7,20
238:11,12
240:25 263:8
263:13
265:16,18
266:13,17,21

267:16,20,21
267:21,22
275:17,23
279:13 282:6
282:10,24
283:10,14
284:9,9,11
284:13
**percentage**
93:18,22
94:11 111:10
112:23
123:19
128:16 134:1
137:25 141:9
160:23 226:4
**percentages**
136:24
142:14
265:19
**perception**
107:7,13,18
107:19,19
115:18
165:24
**perform** 18:21
272:18
**performed**
89:3 96:1
161:23 162:1
209:18
**performing**
85:3
**period** 125:6
125:11,11
126:15 159:5
159:12,13
191:3,12
192:8 197:20
198:2 214:24
223:12,24
224:12
225:16,23
231:21

240:14 257:5
**periods** 28:19
223:17
**permitted**
219:5
**person** 16:24
25:2,8 53:22
77:21 110:8
118:13
179:17 180:1
180:4 184:9
200:5 235:16
236:4 237:10
237:15 273:1
277:23 278:3
283:8
**personal**
53:16 240:8
279:9 290:7
**personally**
173:19
**persons** 24:18
25:9
**Petroleum**
236:15
**philosophy**
143:16
**Phoenix**
241:24
**phone** 53:22
110:3,6,7
**physician** 53:6
**physicians**
15:17 16:8
16:10
**pick** 128:9
262:13
**piece** 69:5
74:9,11 84:2
84:9 124:10
124:21 137:7
**pieces** 143:8
143:20
180:17

**Pineiro** 2:6
**place** 10:20
28:7 30:20
30:20 76:19
167:22
**placed** 15:9,13
**places** 117:4
272:12
**Plaintiff** 1:6
2:3 3:4 4:3
7:1 244:25
289:7
**Plaintiff's** 3:5
5:24 245:6,9
**plan** 8:17 61:2
61:6 64:20
**planing** 54:5
**planner** 9:18
10:1
**planning**
16:11 17:6
17:18 18:2
19:6,14,16
20:14 47:14
47:16,18
48:7,24 49:4
49:7 50:3,19
53:14 54:11
54:12 55:3,5
55:8,18,21
55:22,24
56:5,7,8,23
57:24 59:3
60:1,4,10,14
61:4,10 62:9
62:9,10 63:1
63:7,20
64:20 65:5,8
65:9 150:8
246:10,15
247:22
**play** 144:24
**played** 95:22
122:23 143:2

Henderson Legal Services, Inc.

Jarvis, Christopher                              October 18, 2022

40

| | | | | |
|---|---|---|---|---|
| **player** 180:21 | **policies** 15:8,8 | **political** 160:6 | 185:19 | 74:12 90:19 |
| 180:22 | 15:9 85:15 | **pool** 74:10 | 186:14,16,22 | 92:21 108:25 |
| **playing** 95:16 | 85:15,16,22 | 84:12,13,14 | 188:19 189:3 | 109:7 112:1 |
| 95:19 | 86:21 87:9 | 84:25 85:2,3 | 189:9,18 | 113:19 |
| **please** 6:15 | 93:19 96:7 | 89:9 90:14 | 190:8 193:1 | 116:15 |
| 29:13 38:9 | 116:4 117:10 | 95:3 101:4 | 194:8 195:5 | 125:23 |
| 83:7 178:22 | 117:17 | 102:16,24 | 195:16,23,24 | 128:21 |
| 185:17 218:6 | 123:20 131:4 | 106:20 | 198:6 200:17 | 129:20 |
| 245:22 | 131:6,9 | 109:10 110:1 | 202:8,9,15 | 136:21 |
| **PLLC** 58:4 | 132:1,2,9,20 | 111:9,17,23 | 202:20 | 144:10 |
| **PLRs** 153:15 | 133:17,23 | 112:20,24 | 206:19 | 147:17 148:4 |
| 153:17 | 134:14,16 | 113:16 114:5 | 212:10 213:4 | 159:6,10 |
| 254:10 | 135:6,19 | 114:24 115:3 | 213:10,15 | 195:12 |
| **plus** 64:12 | 136:4,5,7,9 | 116:12,16,18 | 214:5,10,15 | 223:16 |
| 66:19 286:11 | 136:14,15,16 | 116:19 | 215:13 220:9 | 228:13 |
| **pocket** 66:21 | 148:8 159:24 | 117:12,14,22 | 223:23 226:1 | 229:12 234:5 |
| **point** 8:17,18 | 160:23 | 118:21 119:8 | 226:4 227:2 | 240:11,24 |
| 18:12,13 | 162:23 189:3 | 120:2,12 | 227:17,20,24 | 241:18 |
| 21:20,20,22 | 192:22,24 | 123:2,12,14 | 228:7,11 | **pools** 114:20 |
| 36:2 45:12 | 193:5 208:5 | 128:4,6,10 | 229:8,9,23 | 114:22 156:6 |
| 50:1,4 60:2 | 208:23 242:9 | 129:1 131:10 | 230:3 231:23 | 183:24 |
| 81:10 86:20 | 242:21,23,24 | 132:21 | 232:5 233:13 | 184:23 |
| 100:10 | 243:3,6,9 | 133:13,16,25 | 233:14,23 | 252:15 253:8 |
| 115:21 117:9 | 259:25 | 134:2,9 | 234:2 239:8 | 253:11 |
| 120:11 131:3 | 268:14 | 136:13 137:8 | 239:8 240:1 | 290:20 |
| 131:12 136:5 | 270:12 | 137:17 142:7 | 241:7 242:13 | **pop** 52:21 |
| 143:19 | 283:12,23,24 | 142:19 | 242:15 243:3 | **portfolio** |
| 150:25 | 284:1,3,4,21 | 143:13 145:7 | 253:24 255:6 | 140:21 |
| 156:20 | 287:1 | 145:10 | 256:13,15 | 256:23 |
| 212:13,22 | **policy** 25:3 | 146:25 149:1 | 263:8 264:19 | **portion** 131:2 |
| 229:25 231:2 | 40:4 72:22 | 149:20 | 265:3,4 | 131:8 134:4 |
| 236:20 | 73:5 126:14 | 152:12,19 | 266:13,13,17 | 134:6 162:19 |
| 275:15 | 135:4,11 | 153:12 155:6 | 266:20,24 | 246:11,15 |
| 278:17 286:9 | 136:10 | 161:8 162:11 | 267:9 271:2 | **poses** 67:20 |
| 290:10 | 146:12 | 162:14,21 | 282:15,17,20 | **posited** 286:17 |
| **pointed** 190:1 | 197:10,17,19 | 163:11,12 | 283:17 | **position** 46:2 |
| 235:2 | 197:25 198:1 | 164:9,18 | **pool's** 167:17 | 88:13 174:19 |
| **pointing** 213:3 | 242:10,19 | 167:10 169:7 | 169:12 | 200:14 |
| **points** 35:1 | 258:18 | 170:4,7 | **pooled** 84:25 | 222:21 |
| 49:17 153:15 | 259:10,14,20 | 177:20 | 120:2 136:18 | 248:11,16,19 |
| 154:3,4 | 259:21 260:2 | 179:12 180:4 | 243:10,11 | **positions** |
| 156:5,8,22 | 261:5 265:6 | 182:14 183:2 | 263:8 | 75:15,19 |
| 157:1,12 | 270:15 282:5 | 183:6,12,21 | **pooling** 10:12 | **positively** |
| 215:9 | 286:19 | 184:8 185:7 | 40:23 41:10 | 150:6 |

possibility
25:25 41:17
43:11 213:3
213:11,16
215:11
227:10
possible 39:18
66:6 103:9
123:16
170:18 173:2
possibly 115:5
postal 37:16
potential
26:23 35:4,7
38:25 46:22
48:6,13 49:8
51:23 52:12
62:25 63:17
66:11,16
71:2 73:19
108:20 250:8
251:6
potentially
55:23 63:3,4
63:4
power 106:24
118:9 130:5
273:1
powerful
47:15 49:3
PowerPoint
153:4 155:22
PPP 151:15
practical
137:14 181:1
practicality
180:24
practically
147:14
practice 11:7
12:3 88:19
97:9 110:11
111:22,23
151:25 166:7

179:9,10
practiced
10:23
practices
32:14 33:12
37:8 38:16
184:17
193:19
194:12
praying 151:15
precedent
101:24
precipitated
193:24
predict 36:6
predicted
170:5 175:7
predominant
17:17
predominan...
15:16 16:3
prefer 151:2
preference
136:25
preferred
58:11 75:15
75:19 82:15
82:16 89:24
170:24
preliminary
7:13
premium
39:21 40:22
41:2,9 49:23
50:24 73:12
73:18,21,23
74:13,19
84:14 87:22
88:1 98:1
99:25 100:6
101:20 102:9
102:17,21,22
113:5 120:2
135:2 137:19

137:24,24
138:3,18
141:11,14,18
147:9 188:20
188:23 256:8
259:9,14
260:2,11
261:6 263:9
275:17
286:20
premium-to-...
73:11,16
premiums
35:14,16
36:17 39:13
40:1 49:14
50:5 66:1
70:10 79:17
88:4,4 94:6,8
98:6,23
103:4,11
104:1 115:6
121:2 123:19
126:1,11,13
134:8,8
138:5 139:4
141:9 151:19
163:4 169:16
176:19
212:14 226:4
230:23 231:3
233:5 237:5
237:11 238:1
238:12
250:10,15,25
258:18
275:23 282:8
286:13
prepare 46:21
prepared
12:17 46:11
140:7,10
148:19 158:6
159:2 205:8

212:9 280:21
preparing
11:22
presence
294:15
PRESENT 3:3
presentation
155:24
156:14
presented
12:21 152:19
presenting
153:6
preserve
262:19,20
president
105:2,14
press 194:6
195:2,2
presumably
51:9 156:5
204:2
presume 43:9
pretty 10:4
11:23 28:18
30:6 56:22
85:19 110:20
110:25 113:5
121:9 143:14
151:13 174:4
175:8 239:19
274:20
284:20
288:10
prevent 8:24
previous
86:12 136:25
137:21
144:10 147:8
148:24
151:11
162:13,15
231:13
previously

10:23 99:20
110:15
152:22 181:5
191:8 201:6
227:17
price 55:25
258:17
262:15
priced 151:19
pricing 268:19
primarily
96:23 105:15
principals
122:23
prior 15:21
31:17,17
53:17,23
110:1 117:16
176:13
177:16 212:4
217:7 225:23
private 153:18
166:7 254:7
privy 104:5
pro 139:8
146:9 282:9
probability
26:14 120:3
120:12
probably 7:23
8:8 10:19
16:7,7 33:21
34:18,24
50:20 52:6
57:3 64:21
89:11 107:25
108:1 115:5
120:23
127:25
142:15,25
145:10
147:20
167:22 170:1
179:22

Jarvis, Christopher                                    October 18, 2022

42

185:13 206:6
208:24
285:22
**problem** 25:4
61:21 175:5
279:25
**problems**
23:12 283:16
283:17
**procedure**
96:6 180:12
**proceed**
244:13
**proceedings**
1:19
**process** 7:21
55:5 71:16
85:4 105:22
164:20,23
179:1 181:13
273:6
**processes**
20:5
**processing**
232:15
**produced**
158:17,19
**product** 40:15
40:16 118:2
143:11
**profession**
257:13
**professional**
9:16 11:2
12:19 15:19
20:6 44:17
**professionally**
17:12
**professionals**
42:6
**profile** 36:18
195:16
256:23
**profit** 26:25

49:19 63:5
88:7,9
120:11 121:8
141:17
251:22
262:17
267:22
**profitability**
113:25
**profitable**
26:25 48:11
120:16 148:2
**profiting**
118:17
**profits** 50:23
**program** 92:18
121:20 122:5
125:17,17
131:14 153:5
158:21 229:4
**prohibitive**
287:12
**project** 208:20
**projected**
120:1,8
185:11 263:7
263:13
264:18 266:4
266:12,21
**Projections**
139:18
**projects** 17:14
**promise**
243:15
**promoting**
228:13
**properly** 68:22
**property** 11:4
11:5 13:18
28:6,9,20
29:11 120:22
121:4,8
267:20
**proposed**

178:1 179:2
237:11,16
**proposition**
24:2 39:7
**prospect**
24:23
**protect** 61:2
75:14
**protection**
83:21 108:11
**prove** 115:21
**provide** 16:9
18:8 19:24
20:15 21:4
31:21 74:3
84:21,21
107:5 202:8
211:10 232:5
232:6 247:3
**provided** 19:1
22:3 94:7
134:15
152:11 171:7
178:12,12
198:1 211:6
286:19
**provider**
271:23
**provides**
164:18
176:13,20
177:15
**providing** 21:9
21:10 90:12
271:16
**provision**
164:14 167:7
176:13
177:19 179:1
179:7 180:13
183:17 219:6
**provisions**
60:25 176:9
177:1 180:11

**proxy** 34:18,24
**psychologist**
33:20
**public** 1:17 7:6
81:2 293:20
294:17
**publicity**
193:17
197:12
**publicly** 37:21
75:8
**pull** 44:14 45:6
81:5 243:20
243:25
262:25
**pulled** 130:23
131:1 139:15
185:3 250:4
**punitive**
117:25
**purchase** 93:9
93:11 103:2
269:9
**purchased**
95:2
**purchases**
64:7
**purported**
194:12
220:14
**purpose** 82:20
91:24 127:21
153:7 182:6
**purposefully**
84:11
**purposes** 8:8
23:3 32:7
55:22 129:19
150:7 153:6
186:22
247:23
**pursuant** 1:15
93:17 94:7
123:21 126:9

**pursued** 42:2
**push** 81:5
107:2,3,21
284:20
**put** 36:3 40:22
50:25 67:3
72:22 82:5
82:19,20
97:21 111:23
123:7 149:14
174:19
190:21
200:14
210:25
231:16
248:10 265:3
271:1 276:17
284:15
**putting** 26:22
31:5 82:6
97:22 225:16
290:12

---

**Q**

**qualified** 77:9
257:10 283:8
**qualify** 10:24
287:17
**quantitative**
11:8
**question** 8:10
8:14,21 9:10
13:22 23:11
23:17 27:14
37:23,24
43:19,24
44:11 47:17
51:5,13
56:12 65:2
66:24 68:4
72:10 76:24
77:6,9 85:7
88:18 97:6,8
97:20,20

Jarvis, Christopher

October 18, 2022

43

98:15 112:25
141:5,8
142:5 146:3
155:12,18
164:13
165:12,14
166:14
171:24 178:8
180:10 182:4
184:20 185:2
187:9 199:6
200:6 202:10
202:12 211:1
227:22 242:1
242:4,7
253:17
260:15 261:8
286:22
289:18 290:4
**questioning**
267:2
**questions**
8:24 9:3
56:21 63:9
119:14 123:8
126:24 168:9
177:2 214:5
214:7 218:8
218:9 253:2
260:21 279:2
279:5 280:23
285:19
288:22,23
290:25
**quick** 7:13,24
166:14 212:9
217:12
**quickly** 57:5
76:23 84:5,9
89:17 112:18
123:15 158:5
158:22
217:15
**quit** 271:15

**quite** 11:2
17:20 20:25
21:1,1 54:5
96:7 150:3
165:16 206:9
215:1 271:25
**quota** 93:23
124:23 127:9
134:10 167:8
**quoted** 142:3

─────────
**R**
**R** 1:5 6:1,4
**R&D** 37:10
**rain** 116:25
**rainy** 151:4,5
**raised** 281:8
**ran** 114:25
125:11
231:12
**random**
117:24 118:7
118:25
**randomly**
118:10
**range** 20:25
106:6
**rash** 37:6
**Rashbaum** 2:6
**ratably** 230:23
**rate** 11:24
36:25 40:19
47:24 96:24
118:24
147:13
**rates** 11:24
64:23 154:6
185:24
**ratio** 28:4 52:1
73:9,11,16
74:18,25
88:11 120:21
140:24 141:1
141:21 142:1

142:7 144:3
144:7,9
145:6,6
146:8,8,10
146:13,18,25
148:24 149:6
149:19 185:7
190:8,22
196:3 206:9
206:21
225:15,19,22
225:25 226:7
238:19
265:20 266:6
266:18
267:21 282:1
282:6,9,11
282:24
**rationalize**
181:21
**ratios** 27:16,18
27:25 29:7,9
29:23 39:10
48:3 63:8
73:23 74:2
145:11 176:5
240:24
**Re's** 184:18,21
193:1 203:18
221:3 243:3
**re-ask** 44:11
**re-examined**
218:18
**re-review**
208:9
**reach** 72:9
177:3
**reached**
209:14
220:24
**reaching**
252:18
286:18
**reactions**

213:14
**read** 45:12
79:11,13,15
93:5 152:16
153:6 159:15
177:3 193:15
194:8 235:4
236:19
245:21
248:10
284:17,18,19
294:2
**reading** 45:10
177:1 202:11
221:12,12
230:18
235:18
**reads** 123:11
140:21 146:2
154:4
**ready** 166:11
243:17
291:16
**real** 32:8 75:8
81:25 82:13
115:20
150:13
174:24
185:18 258:6
258:10 272:5
272:6
**reality** 115:19
**realize** 44:15
**realized**
122:16 148:7
148:8,9,15
148:16,16
**really** 7:24
23:18 26:17
26:24 27:16
27:16 28:2,5
29:18,20,21
29:23 37:3,5
37:8 38:17

40:6 41:11
97:20 98:24
100:22
107:17 113:1
113:4,14,22
129:24 143:4
143:10
150:18,19
151:6,9,18
155:10
159:17
166:14 175:9
175:10,22,23
176:11 186:1
194:24 196:8
235:22
283:25
284:15,19
**reason** 36:16
50:9 56:8
103:6 142:19
161:13,16
182:6 185:22
230:19 255:9
267:25 268:5
270:21
280:13
**reasonable**
27:12 120:7
121:9 248:3
248:11
252:19 254:1
257:21,21
258:20
267:12,12,20
267:23 268:4
**reasonably**
57:5 97:22
**reasoning**
171:15
**reasons** 51:14
55:2 56:3
87:20 109:1
**rebated**

Jarvis, Christopher                                October 18, 2022

44

102:24
**recall** 20:2
21:25 67:17
70:23 85:4
89:17,23
92:6 104:9
110:5 142:10
161:9 169:14
178:18
204:14 207:3
213:17
221:24
233:21
241:19 263:2
275:9 276:25
277:3 279:11
279:14
281:22,24
285:7,7
**recap** 124:9
**receipts**
186:15
**receive** 35:14
35:15 43:12
133:16
161:22
177:15
213:14
214:14
215:12
226:14 236:8
**received** 72:21
192:9 202:13
202:23 228:6
232:13,20,23
234:22
270:19
**receiving**
162:19 214:4
214:7 256:17
**Recess** 69:22
130:19 168:1
222:7
**recipients**

186:16
**recollection**
20:4 112:20
137:25
156:25
195:10 211:9
219:19
235:14
254:12
267:17,18
275:13
**recommend**
290:21
**recommend...**
78:11
**recommend...**
95:17
**recommended**
15:8 89:19
**reconcile**
28:20
**reconciliation**
216:4
**reconsider**
179:14
**reconsidered**
181:11
210:22,22
**record** 6:2 8:5
8:6,13 44:13
44:18 69:19
69:21,24
83:7 122:19
130:16,18,21
167:23,25
168:3 171:25
191:25
196:14 211:1
211:4 216:21
220:6 222:6
222:9 289:22
289:24 290:1
291:4,11,25
294:4

**recover**
197:25
**recross** 289:2
**red** 107:12
**redesigned**
122:6
**redesigning**
111:8
**redirect**
285:21
288:25
**redistributio...**
67:6
**reduce** 49:22
51:1,11
64:21 66:2
215:9
**reduced** 293:9
**reducing**
50:23
**reduction**
49:18,20
**reengaged**
270:22
**refer** 17:22
18:1,21 19:5
20:10 62:10
90:24 105:4
167:9 286:10
**reference**
12:23 15:19
66:10 90:15
92:25 129:16
138:24
153:16,17
155:25
191:14
220:18
**referenced**
65:1 129:9
139:21 140:4
192:6 203:25
**references**
192:22,23

228:10
**referral** 17:21
18:18 19:22
33:25
**referrals**
270:19
**referred** 17:22
19:2,11,25
21:17 22:8
42:19 43:16
56:15 62:17
69:10 76:20
114:10 160:6
234:23
275:21 286:5
**referring** 17:18
22:4 58:9
63:17 76:21
78:24 101:22
102:12 160:5
203:24
210:14
232:17
235:17
242:12
**refers** 58:5
**reflect** 202:13
223:22
**reflected**
189:4 248:3
**reflecting**
234:18
**reflects** 291:12
**refresh** 153:1
275:12
**refunds**
212:12
**refused**
174:11
**regard** 181:17
253:8
**regarding**
79:10 148:23
156:1 165:8

178:7 186:12
197:15
198:16
207:22 217:7
220:24 235:2
**regards**
235:16
253:11
**registered**
272:24
**regular** 75:6
**regularly**
80:13 82:12
**regulated**
68:19 107:9
**regulation**
107:12
279:21
**regulations**
67:24
**regulator**
67:25 78:1
275:25
**regulators**
11:22 12:1
20:22 32:23
33:3 66:20
68:9,22 69:4
81:5 83:18
105:11 107:2
107:16,24
113:2
**regulatory**
23:25 32:18
32:19 77:19
77:22
**rehashing**
159:10
**reinsurance**
20:23 74:12
84:12,13,14
85:3 92:1,25
93:14,16
104:23,24,25

Jarvis, Christopher

October 18, 2022

45

| | | | | |
|---|---|---|---|---|
| 105:1 106:20 | 224:21 | 137:13,18,19 | 216:12 | 14:5,10 42:3 |
| 109:8 111:7 | **related** 18:8 | 137:20 138:1 | 219:10,17 | 218:1 288:6 |
| 113:19 | 20:10 155:11 | 138:2 144:5 | **reopened** | 288:11 |
| 123:21 | 249:7 293:11 | 148:21 | 218:10 | **representing** |
| 124:14,16 | **relating** | 162:15,16 | **reopening** | 6:14,20 8:12 |
| 125:6 126:2 | 140:11 | 164:21 174:6 | 211:8 216:15 | 32:22 209:2 |
| 127:9 128:4 | 232:14 | 174:13,14 | **reorganized** | 218:15 |
| 130:11 | 241:18 | 179:21,22 | 122:6 | 228:12 |
| 139:17 | **relationships** | 187:9 191:9 | **repeat** 43:24 | 229:19 |
| 140:14 | 37:9 162:4 | 194:6,21 | **rephrase** 87:3 | 294:11 |
| 142:21 | **relative** 293:13 | 198:9 203:5 | 257:9 260:14 | **represents** |
| 145:25 | **relatively** 24:3 | 203:13,22 | 268:25 | 10:1 |
| 160:13 | 31:6 161:9 | 204:7,11 | 269:23 | **reproductions** |
| 162:11 | **release** 230:23 | 207:6,20 | **replace** 105:24 | 45:10 |
| 163:21 164:3 | **relevant** 211:8 | 208:12,15 | 106:9 268:15 | **reputation** |
| 167:3,11 | **rely** 257:22 | 209:4,5,8 | **replaced** | 111:2 269:14 |
| 168:22 | 258:16 | 216:1,3,6 | 241:10 | 269:18 |
| 176:22 | **relying** 288:19 | 221:4,6,6,11 | 281:12 | **reputational** |
| 178:11,15,18 | **remainder** | 221:13,19 | **replacing** | 197:11 |
| 180:14 | 94:9 | 222:3 235:11 | 99:16 | **request** |
| 183:18 | **remained** | 235:19 | **replenish** | 211:24 |
| 186:13 190:4 | 221:17 | 240:19 254:4 | 174:1 | **requesting** |
| 195:23 199:1 | **remaining** | 254:8,10,16 | **report** 140:10 | 223:1 |
| 207:22 | 221:21 | 264:8 275:14 | **reported** 72:20 | **require** 31:9 |
| 208:23 219:7 | **remedies** | 275:15 277:5 | 73:3 85:1 | 113:15 |
| 224:12,25 | 174:11 | 279:2,5 | 86:10,14 | 144:25 |
| 229:8,9,11 | **remedy** 174:15 | 286:22,23 | 146:12,14 | **required** 20:20 |
| 243:8 252:11 | **remember** | 290:9 | 181:6 190:9 | 21:2 108:8 |
| 256:15 | 18:10 43:4 | **remind** 38:8 | 282:4 | 195:6 255:23 |
| 264:15 | 47:10,11 | 108:21 | **reporter** 6:12 | 272:3 273:8 |
| 270:25 271:8 | 53:21,24 | 112:13 | 6:18 7:25 8:4 | **requirement** |
| 281:19 | 55:4,6,8,14 | **reminder** | 29:12 38:8 | 74:14 79:2 |
| 282:20 | 55:16 70:12 | 169:17 | 43:23 83:2,6 | 80:6 84:15 |
| **reinsured** | 74:6,6 86:6,6 | **reminders** | 101:15 | 84:17 275:25 |
| 131:7 165:6 | 86:6 88:23 | 7:24 8:6 | 108:21 | **requirements** |
| **reinsurer** | 89:7,8,21,22 | **remotely** 6:11 | 112:14 | 23:1,6,9 |
| 126:1 161:11 | 89:23,24,25 | **remove** 156:11 | 178:21 | 35:12 68:24 |
| 186:19 | 90:19 91:4 | 156:13 227:4 | 217:10 293:1 | 77:16,17 |
| **reinsuring** | 91:17 103:19 | **removed** | **reports** 140:23 | 209:20 252:3 |
| 256:14 | 104:11,12 | 156:18 | **represent** 6:16 | 253:25 |
| **reiterate** 8:7 | 105:12,13,17 | 160:21 | 73:19 158:13 | 277:18 |
| **rejected** | 114:8,9 | **reopen** 210:13 | 159:19 | **requires** 24:6 |
| 206:11 | 120:6 123:10 | 210:17 | 272:19,20 | 257:16 |
| **relate** 224:11 | 130:3 136:2 | 211:24 212:4 | **represented** | 279:22 |

Henderson Legal Services, Inc.

Jarvis, Christopher

October 18, 2022

46

requiring
275:23
research
42:12 99:4
143:17,17
252:18
reserve 35:19
66:13,15
71:8,13,24
72:3,13 73:2
73:7 74:5,10
84:23 85:10
86:3,24
87:11 169:17
169:21
170:24 191:1
205:23 233:5
reserves 29:8
71:17 72:23
74:20 79:18
80:21 85:22
86:14 89:5
94:12 191:22
212:11,19,24
232:4 258:17
276:2 279:13
279:22
reside 13:7,9
resign 227:2,3
resigning
230:3
resolve 28:25
resolved 28:21
respect 118:14
119:20
132:15
133:12,22
159:23
161:23
162:21
163:10,11
187:20,24
189:1
respected

32:6
respond 8:10
238:17
response
53:12 78:4
101:5 115:4
215:2 218:11
223:3 232:12
234:19 242:7
responses
218:7,8
responsibility
10:2 128:25
289:9
responsible
80:22 105:15
128:6,7
133:3 134:1
134:3 162:20
164:19 169:5
173:16
272:22 277:8
277:17,23
287:25
rest 170:25
212:9
restoration
197:20
restriction
275:23 276:5
restrictions
70:3,6 78:22
78:25 79:10
275:12,15,22
restrictive
60:24
result 122:8
184:13
resulted
167:10
220:17
results 38:3
41:12 149:12
retain 58:16

133:4
retained 35:25
74:13,15
80:15 85:5
94:12 132:14
183:11,12
204:23 287:5
retainer
280:14
retirement
10:3 54:12
retrocede
124:22
retrocedent
167:1
retrocession
125:2,7
127:10
130:11
133:21 134:3
160:13
166:16 168:7
171:7
retrocessio...
167:2,2
retrocessions
163:5
return 63:11
64:11 82:7
100:25 128:7
155:21 191:7
returns 82:9
83:16,21
277:19
revenue 1:9
23:24 34:19
288:9
revenues
34:23
review 46:11
46:25 79:14
124:3 127:25
152:18
164:19,23

183:16 191:6
204:9 207:22
209:3,7,18
215:24 219:1
219:5 238:3
291:11
reviewed 15:8
156:16
159:20
178:13
207:24
208:18
220:20 249:7
254:15
reviewing
155:8 166:8
reviews
179:23
revisit 285:3
rewriting
283:24
Rhode 9:14
rid 119:3,6
184:8
ridiculous
108:7
RIFA 164:4
right 24:19
25:3 32:1,24
34:15 38:21
43:12 52:1
52:10,14
61:7 66:4,14
66:23 67:1
68:9 69:18
70:24 77:2
77:20 80:3
86:17 87:2,5
87:6,14 88:9
93:1,24
94:16 98:19
98:25 102:1
103:17
104:19

108:14
109:14
111:14 114:6
115:23 119:4
121:22,25
122:1,12
123:6 124:20
125:9,20,23
127:7,13
128:21 129:2
129:14,21
130:13,15
132:4,9,15
133:1,7,18
134:4,9
135:5,16
141:23
144:13
146:19
150:22 151:3
154:3 155:6
156:5,8
158:3 159:2
165:3,9,13
167:19,21
168:20,23
169:2 173:18
173:23,24
175:3 176:23
178:3 181:19
182:4 183:2
183:13,18
185:20 186:3
186:25 187:5
188:5,11,21
189:8,24
190:15,23
191:5,22,23
192:5,12
196:16,18
199:19
200:18
202:16 203:1
204:17 205:5

Jarvis, Christopher

October 18, 2022

47

205:12
209:15
211:11,18
212:19 213:8
213:18
214:14,16
215:15,20
216:18 217:8
218:4,18,21
219:20,23
220:25
223:15 224:4
224:19 225:1
225:20 226:1
231:4,23
240:14 241:9
241:11 244:8
244:18 245:2
247:23
248:17,20
249:20,24
250:2 251:25
253:5 254:10
258:20
259:11 260:1
261:20,24
264:13,16,20
265:24
272:24 275:6
278:8 280:12
280:17
281:14,18,18
285:19
289:14
291:13,18
**right-hand**
225:3
**rights** 82:23
**rise** 148:7
**risk** 10:12
12:24 13:4
13:10,15,16
14:14 15:11
19:6 24:5,6

24:10,12,13
25:7,11,17
25:18,21
26:2,21 28:2
30:2,7,12,16
31:13 34:9
34:15,18,21
36:18,25
38:1,17,18
39:17,17,18
39:25 40:2
41:13,17,21
42:13,15
43:1,3,6,16
43:21,21
46:15 50:25
52:6 60:11
60:14 66:6
67:16,20
68:7,7,21,21
69:6,15
74:10 85:5
87:2 90:14
92:18 93:11
93:19,22,22
97:16 98:6,9
100:8,23
102:2,3,4,10
102:10,16
107:18 110:1
111:7,8,19
112:24 113:7
114:5,20,22
114:24 115:3
115:4,11,14
115:19
116:16
117:18 118:6
119:6 121:19
122:5,9
123:19
124:16,22
125:17 128:5
128:8,24

129:1 130:25
131:5,14
132:14 133:5
133:5 136:22
136:24
150:13 156:7
158:4,21
159:23 160:7
161:19
172:10
173:20
174:19,24
182:14 214:5
222:21 229:3
229:8 239:17
241:18
242:22 246:5
251:25 252:3
252:16 253:8
253:11,25
255:24 256:7
256:14,16,21
259:9,14
261:2 265:10
267:4,8
268:13 269:3
270:8,9,10
272:11
273:13,14,19
273:23 274:1
282:14,17,18
282:21
284:24
286:10
288:13 290:6
290:15
**Risk's** 15:15
**risk-free** 41:16
**risk-pooling**
90:15 92:5
104:21
**risks** 24:14,18
24:24 25:9
25:12 26:3,8

27:3,8,24
34:11 36:5,9
39:1,2,3,4,19
39:23,23
67:14,16
96:9,11
116:11,17
117:25 118:2
139:2,4
240:18
256:22
261:10
268:15
**road** 27:3
**Robin** 91:17
**role** 95:16,19
95:22 122:23
161:11 268:8
268:10,23
270:24
271:22 273:6
**roof** 148:4
**Rosenbach**
109:25 110:2
110:14 111:1
119:21 140:8
140:10
141:22 142:1
146:6,16,24
148:19 149:4
182:24 183:2
183:5 225:25
269:11 282:3
**Rosenbach's**
110:11
**rotate** 152:16
157:24 285:5
**roughly** 202:6
**round** 143:5
204:21
**rounded**
190:23
**routinely** 96:4
**rule** 80:9

126:10
191:20
**rules** 68:25
71:21 77:20
77:22
**ruling** 43:12
67:21 181:12
**rulings** 122:7
153:18 254:7
**run** 33:19 39:8
50:18 100:21
121:6,7
125:18
146:11 149:7
149:11
231:15
259:12
**running** 33:22
120:22
256:10
**runs** 121:6

─────────
**S**
─────────

**S** 4:1,9 6:1
**safe** 34:20
101:21 102:5
103:7
**safety** 107:6
**sake** 243:25
**salad** 128:12
**sale** 82:24
**sales** 34:23
**Salmon** 223:1
223:4
**Sanjoy** 53:2,5
53:13,18,20
55:11
**Sanjoy's** 53:10
**satisfactory**
102:2 262:16
**satisfied** 35:12
204:19
253:25 256:7
**satisfies** 23:14

Jarvis, Christopher                                  October 18, 2022

48

satisfy 23:2
24:16 84:14
84:15,17
102:5,5
112:24,25
252:2
satisfying
113:2,2,3
sauce 242:10
242:12,18
save 31:22
53:15,19
54:3 99:13
100:9 262:18
saved 262:19
savings 48:14
63:18,21
65:11,23
saw 91:22
113:23 142:2
143:23 148:3
148:4,6,14
162:13,15
178:11
182:25
183:17 233:2
265:15
saying 52:10
53:3 97:8
113:8 120:6
124:6,9
142:3 231:1
263:6 267:19
282:8 283:9
283:11
says 49:19
72:25 78:10
78:23 79:20
93:13,15
94:15,17
101:5 118:22
119:25 128:4
141:24
146:20

164:23
168:19
177:25 183:4
198:4 209:16
212:1 218:6
235:5 259:1
259:2 267:14
267:15 276:1
282:12
scan 12:23
49:12 52:25
131:21
139:24
193:11
217:21 218:7
218:24
223:21
scanned 45:11
scanning
158:22
scare 113:13
116:10,13
scenario 98:21
99:5 100:11
100:18,24
140:22
218:16
schedule
186:12,15
school 10:18
Science 9:13
scope 10:4
237:6,16
250:11,18
251:1
screen 12:9,13
45:9 52:22
59:1 76:1
109:23
139:15 244:4
245:5 263:17
263:18,19
screens 264:7
scroll 90:9

92:24 127:22
127:23 188:7
188:13
189:12,13
209:11 214:2
scrutiny 54:7
154:9,15
267:11
season 116:25
second 39:17
44:2,14
49:12 53:13
54:15,17
65:14 66:1
76:4 90:11
102:14
122:15,21,22
124:21
126:19 131:1
132:12
155:14 159:5
177:15 183:4
189:13,14,17
191:12,20
196:17
204:21
206:12
207:14
208:17 209:7
222:19 224:6
228:11 229:5
251:7,10
258:21,24
259:3 283:23
291:22
secret 115:1
115:16
242:10,11,18
section 131:22
140:16
168:21 188:9
197:15,16
219:21
223:19

224:18
233:23
sections
223:15
224:11,16
securities
75:10,11,19
76:22
security
115:16
see 9:23 12:13
28:20 29:18
32:24 35:24
36:7 45:10
45:15 47:2
52:21 53:1
54:18 58:25
59:4,11 65:3
65:3,16 69:6
76:1 78:25
80:7 90:11
92:16,24
93:20 94:3
98:7 102:20
112:14
118:20
121:18,23
122:4,13
123:15 126:3
127:7,15,18
127:23
129:22 130:7
131:22 132:6
132:7,13
139:16 140:2
140:11,18
145:23 147:5
152:14 153:3
153:23 155:2
155:8 157:2
157:3,4
158:20,24
159:18,22
160:3,20

164:2 166:24
168:16,20
175:20
176:12 177:9
182:22 185:5
186:11,14,17
187:1,24
188:1,9,11
188:12,14,25
190:19,20
191:19
192:18
193:12
195:19,24
198:14,18,21
199:15
207:14
209:11 214:2
217:5,22
218:6,7
222:19 223:6
223:9,20
224:2,3,7,13
224:14,18
225:7 234:24
235:1,13
236:16,16,17
241:10 242:4
245:11,14
268:18 274:9
278:10 284:8
286:9 289:4
seeing 114:9
148:21
235:19
263:15
seeks 197:22
seen 20:1
120:18
163:18
segment 89:13
168:6
sell 81:22
121:12 163:9

send 92:20
244:11
sends 222:25
senior 276:12
sense 37:13
38:13 98:1
98:16 100:21
118:18
120:20 139:9
141:20 142:2
147:5,14
148:11
149:15
184:17 272:5
287:13
sent 45:19
63:13 122:11
152:13
162:17
210:21 223:4
227:11 230:5
234:19,20
237:20,21
264:13
290:19
291:16
sentence 58:5
65:7,15
84:10 122:3
133:11
138:16,21
140:20
160:21 165:5
208:17
212:21
228:11
230:10
236:21 237:5
separate 19:9
19:10,12,12
60:5 73:7
82:17 89:7,8
96:17 128:22
131:13

138:17 142:4
209:23 264:6
273:10 294:6
separately
19:8 60:4
163:14
201:15
September
78:20 226:25
229:5
series 11:2
serious 155:16
155:18
204:15
served 272:9
272:14
serves 101:25
service 1:9
41:25 107:5
113:2 256:13
256:14
serviced 16:5
services 6:14
10:5,16
11:14 14:1
15:1 16:9
18:2,8 19:1
19:23 20:25
21:4,5,10,11
21:13 22:2
271:17,20
session
291:23
sessions
31:18 32:2
set 19:23 86:3
87:2 101:24
146:9 180:13
199:3 203:25
252:5,7,11
282:10
settle 221:9
225:10
settled 171:2

settlement
29:6 210:2
215:25 216:6
220:24
221:22
224:22,24
seven 135:3
severity 26:16
239:20
sexual 118:12
sexually 184:7
shaking
112:14
sham 237:8
250:12
shams 249:15
share 12:9
39:19 59:10
93:23 109:23
115:9 117:25
124:23
127:10
130:24
134:10 167:8
174:9 204:25
205:4 243:24
244:3,4,6,12
244:14 264:2
265:10,10,11
265:12,16,19
270:1 285:4
shared 111:10
112:22
144:22
148:25 250:1
shareholder
105:14
shareholders
81:4,6
sharing 45:9
113:4 118:6
256:16
263:16,17
264:11 275:3

284:5
she'd 268:3
sheet 291:17
294:6
shift 156:6
273:12
shifting 24:5
255:25 256:7
shipping
37:18
shock 290:21
shoehorn
108:6
short 28:19,21
73:3 79:12
146:4 243:14
258:3
shortly 44:5
119:25
show 120:1,10
187:2 190:3
222:11
223:16 263:7
266:12
267:15
281:14,17
showed 175:3
283:10
showing 69:3
157:15 198:9
245:4
shown 188:16
189:23 217:6
225:12 254:8
283:13
shows 188:2
189:7 199:17
sick 9:5
side 11:5
28:16 40:2
40:25 51:3
128:17
162:25
262:12,22

sided 249:10
sides 210:2
sign 129:12
172:24 258:8
291:17
Signature
294:9
signed 126:22
127:12,16
130:9 207:15
208:11
significance
25:18 240:17
240:19
significant
34:8,8 39:21
40:21 43:7
53:15 60:11
105:14,23
106:14
115:14,15
116:24
136:19 148:3
175:4 220:16
226:12
242:22
significantly
37:25 51:25
266:8
signs 235:16
silly 82:10
similar 118:1
121:21,24
122:1 159:14
159:17
170:17
223:10
simplify 130:6
simply 8:13
18:21 50:1
50:17
simultaneous
163:8
simultaneou...

Jarvis, Christopher                                              October 18, 2022

93:15 124:21
128:23
**single** 116:20
133:13,15
135:10
**sit** 23:5 29:8
151:6
**sitting** 35:18
147:23
172:23
**situated**
107:23 200:5
**situation** 41:8
41:16 50:17
95:17 97:14
128:24 175:2
180:8 195:3
201:23
204:15 208:2
209:21
229:19
268:11 287:8
**six** 236:23
257:5
**sizable** 143:9
**size** 34:14,16
34:17 50:10
108:6
**sized** 54:16
**skill** 258:19
**skilled** 17:20
**skip** 46:14
**slice** 265:7
**slide** 153:13
153:23 154:4
155:23 254:9
**slides** 152:14
152:14,25
153:7,22
155:22 285:9
285:11
**slightly** 123:24
**slip** 239:25
**slow** 29:13

38:9 83:7
108:22
112:16
178:22
**slower** 112:18
**slowly** 112:15
**small** 23:12,19
30:8 31:6
81:19 94:11
186:10
190:18
**smaller** 137:7
137:21,23,25
283:18,21
**smell** 237:7
250:12
**Smith** 16:20
21:19,22
**smooth**
112:15,16,16
**sold** 13:13
249:3
**soldier** 44:7
**sole** 97:12
**Solutions**
110:12 140:7
145:24
**somebody**
29:4 38:7
89:22 96:18
100:6 114:25
118:11,12,16
119:3 128:12
143:10
165:24 166:1
179:16,17,19
179:20 181:8
184:2,2,6
194:9,9,14
194:20,22
195:25 208:4
239:24,25
277:4 278:18
284:7 288:7

**somebody's**
28:13,14
**someone's**
40:3
**something's**
258:8
**sophisticated**
60:9
**sorry** 7:19
23:16 29:14
38:10 43:23
45:2,5 46:6
51:22 54:16
61:17 77:6
83:5 102:18
104:18
108:23 141:6
152:4 158:23
171:14
184:20
202:10 211:2
233:9 269:23
283:5 291:8
**sort** 13:14
19:23 40:7
72:8,11 75:4
87:12 96:24
123:15
128:18
132:25
143:25
158:16 190:2
214:7
**sorts** 16:4
**sought** 30:17
197:25
**sounded**
250:7
**sounds** 22:2
121:9 233:23
235:21
**source** 115:7
236:7
**South** 13:5,5,7

13:9
**southeast** 2:7
277:4
**Southern** 1:2
6:6
**space** 13:4,5
147:21
**speak** 56:16
70:25 112:15
193:20 219:8
**speaking**
15:14
**special** 23:12
82:15,20
257:16
**specialist**
258:8
**specific** 23:16
43:4,17
146:5 248:7
258:19
259:16
260:19
**specifically**
128:16
132:17
**speculate**
175:13
**spend** 9:8 39:9
99:10 114:2
159:9 240:3
**spent** 11:16,24
11:25
**spike** 29:23
**spill** 40:19
**split** 14:20
**spoke** 56:2
278:5,6
**spoken** 42:20
56:13 104:20
110:3,6
227:9
**Sports** 57:19
59:6 64:10

151:11
**spouse** 3:5
53:10,18
57:21,23
**spreadsheet**
186:9,23
187:8,12,13
187:14,21
223:3,9,11
223:22 224:1
224:17
225:12
**spreadsheets**
143:23
**ss** 293:2
**St** 54:20 77:20
79:10,18
80:3,9 84:18
91:4,13
**stability** 73:11
262:20
**stable** 73:16
**staff** 96:21
**stamp** 191:10
222:13
**stand** 140:23
157:21
**standalone**
190:2 225:4
**standard**
119:24
120:24
121:11 136:9
**standards**
32:13
**standing**
253:14
**standpoint**
100:13
**start** 43:18
51:19 57:9
66:19 67:23
131:24
175:14 245:4

Jarvis, Christopher                                    October 18, 2022

51

260:1 286:19
**started** 8:5,22
  16:20 18:24
  33:24 47:25
  89:23 106:5
**starters** 100:9
**starting** 6:16
  100:10
  265:11,11
**state** 6:16
  13:20 14:6
  68:1,19,25
  106:17
  277:17,20
**stated** 8:15
  146:17 197:9
**statement**
  120:4 185:8
  246:6 255:13
  255:16
**statements**
  254:15,19,21
  254:24 255:3
  255:11,16
  272:22
**states** 1:1,8
  4:10 6:5,5,20
  10:13 12:2
  12:10 14:6
  44:18,19,21
  52:16,18
  57:7,11,12
  58:19,22
  61:15 75:23
  78:17 79:5
  90:4 106:15
  106:16
  109:19
  119:11
  125:25 127:1
  131:17
  139:12
  145:18 152:7
  154:23

158:10,18
163:24 165:6
166:21
168:12
182:19 186:6
192:13
196:21
199:11 202:1
207:10 210:7
213:21
217:16
222:14
226:20
228:24
234:15
241:14
250:10 282:8
293:2
**stating** 223:2
**statistical**
  240:15,18
**statistically**
  226:12
**statistics** 11:1
  257:18
**statutory**
  275:25
**stayed** 81:6
  126:17
**steal** 172:22
  172:25
**Stenotype**
  1:20
**step** 259:2
**Stephanie**
  1:16,20 6:12
  7:8 38:11
  101:13
  271:14 293:4
**StephanieM...**
  222:20
**steps** 43:15
**sticklers** 166:8
**stock** 37:22

64:7,10,15
64:20 65:7
75:8 81:22
**stocks** 75:18
82:1
**stolen** 173:1
**stomach**
  120:17
**stop** 44:5
  104:19
  121:15
  185:13
  264:10 275:3
**stopped**
  247:22
**straight** 114:5
  114:20
  141:18
**straightforw...**
  56:22
**strange** 7:21
  180:19
**strategies**
  47:16 236:1
**strategy** 47:6
  231:7
**strike** 44:12
**striking**
  266:23,24
**strong** 73:18
  238:13
**structure** 14:8
  58:3,8,10,12
  59:12,16,18
  59:24 60:17
  61:25 62:13
  63:16,18
  83:23 89:20
  111:7 116:10
  123:12
  142:12
  230:23
  231:11
  233:13,23

242:11,19
243:2 259:24
**structured**
  84:4 243:6
**structures**
  20:20 62:25
**structuring**
  89:14
**stuck** 230:13
**study** 98:4
  138:24,25
  139:20 140:2
  281:19
**Study-Jade**
  145:25
**stuff** 10:20,21
  19:20 82:2
  107:9 108:10
  110:22
  115:17
  119:16
  128:13,15
  155:16,19
  163:15
  194:17
  200:10
  222:23
**stupid** 82:6
**subject** 57:17
  59:3 76:5
  78:22 106:16
  110:1 119:22
  123:4 150:4
  152:13
  207:21 249:6
  276:11
**subjecting**
  172:10
**submit** 96:6
  128:13 130:9
  198:10
**submitted**
  197:24 198:6
  208:18

220:20
**submitting**
  128:4,11
**subscriber**
  127:16
  129:16
**subscribes**
  128:20
**subscription**
  126:21 127:8
  129:9 130:9
**subsequent**
  198:7,11
  215:24 234:9
**subsequently**
  64:16 174:5
  181:24
**subsidize**
  184:16
**substantial**
  39:20 61:3
  71:4 100:22
  249:11 256:5
  256:10
**substantially**
  138:7,19
**successful**
  48:11,15
  66:5
**sudden** 82:22
  116:25
  151:10,12
  194:18 196:1
  265:17
**Sudha** 53:9
  55:11
**sue** 40:20
  206:16
**sued** 181:9
**sues** 29:2
**suffered**
  197:11 198:7
**sufficient**
  80:25 200:13

Jarvis, Christopher

October 18, 2022

52

221:22
231:22
252:16
**sufficiently**
79:13
**suggest**
156:18
**suggested**
72:11 87:9
156:10,13
171:4
**suggesting**
31:12 59:11
275:16
**suggestion**
240:22
**suit** 29:4
**Suite** 2:8
**suited** 34:2
**summarize**
124:3
**summary**
225:4
**Sundaresan**
53:3,9 55:11
**Sundaresans**
54:23
**super** 81:25
83:17 84:2
117:3 134:22
134:22 196:3
239:20
**superceded**
82:23
**support** 97:22
115:22 232:7
232:8
**supporting**
211:13
**suppose**
133:10
**supposed**
169:13
**sure** 8:6,9 9:25

17:25 23:4
23:19,25
31:25 32:11
32:21 33:4
36:10 39:2,6
40:12 41:19
42:18,25
43:5,13 45:4
46:20 48:16
51:18 55:17
55:25 56:8
61:19 63:23
72:18 75:3
78:23 83:9
83:14 84:1,6
86:22 87:4,7
89:25 90:25
93:7 98:14
117:7 119:19
121:13
127:24 135:4
144:17 145:9
145:11,13
150:23 153:2
153:19
157:17
165:20,22
166:17
171:14
174:15 194:1
200:7,10
202:12
204:16 208:3
213:2,13
216:7 219:12
226:6,12
237:23 240:3
240:10,15
245:15 246:7
248:9 249:1
259:11
260:23 262:6
263:16,16
266:25

267:24
273:22,25
278:2,16
280:19
289:12,15
290:6 291:14
**surplus** 73:13
73:22,24,25
**surprise**
227:12 228:4
**surprised** 30:5
**surprising**
214:11
**surrounding**
59:16
**swearing** 6:18
**Swift** 187:16
**switch** 131:20
157:19 177:5
**sworn** 1:16 7:6
7:25 293:7
**system** 281:2

--- **T** ---

**T** 4:1,1,9
**table** 42:6
187:1 189:22
190:2,3,10
191:19 225:4
225:4
**take** 24:18
26:10 27:8
29:3,4,5 31:7
39:9 44:4
57:2 65:19
73:12 75:15
77:1,3 81:8
87:21 99:2,9
111:13 118:3
118:3 119:3
124:2 128:16
130:15
137:12 150:7
158:18

166:12
190:21
196:24
219:21 222:4
244:12
245:20
248:24
280:15
284:14
**taken** 1:18,19
6:4 8:19
43:15 72:17
293:5,8,13
**takes** 224:10
288:15
**talk** 19:17
41:22,22
42:12 52:7
54:11 63:15
65:16 92:1
101:3 108:3
109:16
110:21
155:17
177:12 192:5
242:11 264:3
279:12
**talked** 31:20
42:18 54:9
54:12,13
67:16 103:7
104:2,3
108:5 110:5
115:3 130:12
133:20
135:23
152:10 158:3
205:25
251:25
269:11
273:12 275:6
275:7,19
**talking** 9:9
22:21 39:3

50:10,14,24
51:9 85:9
103:20 168:6
207:20
215:16
230:20
236:17
237:23 240:7
240:11,12
252:8 255:6
266:10
**talks** 65:8
**tap** 82:5
**tape** 107:12
**target** 29:9,9
266:15
**targeted**
154:19
**tasks** 161:23
**taught** 236:5
**tax** 2:19 17:5
19:3,6,19
20:19 23:3
30:22 31:24
32:7 35:4,7
35:14,24
41:22 42:10
42:15 46:17
47:2 48:6,14
49:20,21,22
50:2,4,15
50:19 51:1,2
51:2,3,18,21
51:23 52:2,3
52:12 53:14
63:18 65:11
65:18,23
66:3 68:14
68:17 87:19
108:6 117:11
150:6,9
157:12
188:20,23
237:7 247:3

Jarvis, Christopher

October 18, 2022

53

| | | | | |
|---|---|---|---|---|
| 247:9 250:19 | 27:22,24 | **Texas** 13:6,6,9 | 59:25 60:12 | 50:7 57:4 |
| 251:2 273:20 | 35:22 57:3 | 53:6 228:20 | 60:24 66:6 | 64:18 65:9 |
| 277:19,20 | 119:23 121:8 | **thank** 7:8,11 | 67:9 72:8,16 | 67:23,25 |
| 288:1 289:10 | 135:1 213:25 | 51:6 61:20 | 72:21 75:4 | 68:1,7,21 |
| **tax-favored** | 214:21 | 83:7 124:20 | 82:2,12,18 | 72:23 73:1 |
| 147:24 | 267:22 | 186:3 199:7 | 99:19 107:8 | 75:6 79:12 |
| **tax-related** | **ten-day** 214:24 | 236:25 | 108:18 | 82:19 84:2 |
| 157:9 | **tend** 28:19 | 243:18 | 111:19,20,23 | 87:1,13 |
| **taxation** 88:12 | 29:7 262:21 | 244:24 | 115:2,8,8 | 96:21 101:11 |
| **taxed** 88:1 | 262:22 | 264:11 | 116:14 | 101:12 103:9 |
| 100:15 | **tends** 29:8 | 288:23 | 117:22,23 | 106:5,11 |
| **taxes** 51:11 | **tension** 201:5 | 291:21 | 118:6,9,16 | 107:7,25,25 |
| 53:16,19 | **term** 24:11 | **thanks** 6:24 | 118:23,23,24 | 109:5,9,10 |
| 54:3 64:21 | 32:10 58:14 | 38:10 157:18 | 118:25 128:7 | 109:13,17 |
| **taxpayer** 278:8 | 119:8 273:18 | 192:1 237:2 | 137:4 147:4 | 110:18 |
| **taxpayers** 42:1 | **terms** 86:21 | 245:2 | 147:20 | 113:10 114:4 |
| 87:21,21 | 198:25 | **that'd** 100:10 | 151:17,17 | 114:10 |
| **teal** 189:15 | **terrible** 43:8 | **theft** 118:9 | 157:9 159:20 | 115:12 118:5 |
| **team** 19:21 | 161:15 | **theory** 280:17 | 161:4 163:6 | 118:24,25 |
| 135:21 136:8 | **terrorism** | **thereto** 293:15 | 170:2,18 | 120:16 |
| 163:17 | 90:14 93:11 | **they'd** 19:16 | 183:9 184:25 | 123:24,24 |
| **technical** 11:8 | 93:19 95:3,6 | 26:25 179:16 | 185:13,16 | 124:9,10 |
| 131:15 | 95:13 101:4 | **thing** 8:22 30:3 | 205:16 | 127:24 130:4 |
| 134:13 | 102:16 103:2 | 43:8 68:15 | 214:23 | 133:20 |
| 158:25 | 103:13,25 | 68:25 70:9 | 235:25 | 138:13,13 |
| 159:22 | 104:7,13 | 70:11 100:14 | 243:10,10 | 141:7 142:5 |
| **technically** | 111:7 114:5 | 100:21 115:3 | 258:17 | 143:4 145:2 |
| 47:3 271:5 | 114:20,22,24 | 118:10 143:3 | 261:11 | 145:14 |
| 280:7 | 115:3,11,13 | 144:22 | 262:15,21 | 147:13,24 |
| **tell** 26:3 35:10 | 115:19 116:2 | 153:14 170:1 | 277:24 | 148:5,13 |
| 41:20 59:9 | 116:4,20 | 174:2 181:9 | **think** 6:23 7:22 | 149:12 |
| 104:25 105:7 | 136:22 137:6 | 195:19 206:6 | 8:7 9:24 | 150:20 |
| 105:16 106:6 | 137:9,15,19 | 206:14,18 | 10:16 13:3 | 151:18,19 |
| 114:8 136:14 | 138:9 160:7 | 229:25 240:4 | 13:24 14:22 | 153:9 154:18 |
| 136:16 | 239:17 243:1 | 258:13 | 14:22 21:12 | 155:7 156:21 |
| 147:14 | 282:18,21 | 259:23 | 21:19 25:5 | 156:23 |
| 159:15 | 283:10 | 265:14 | 26:24,24 | 157:19 166:5 |
| 180:24 | **tested** 143:24 | 275:18 276:4 | 28:11 31:19 | 170:3 171:23 |
| 204:14 | **testified** 7:7 | **things** 12:20 | 32:2,12,16 | 172:5,6,12 |
| 287:10,19 | **testifying** 8:1 | 16:12 21:2 | 32:25 33:19 | 172:16 174:3 |
| 289:11 | **testimony** | 22:23 26:14 | 34:5,15,19 | 174:5,18 |
| **telling** 86:9 | 291:12 293:6 | 26:18 29:3 | 38:2,4,5,14 | 175:2,22,24 |
| **tells** 230:11 | 293:8 294:4 | 47:3 51:12 | 42:7 43:25 | 176:4,5 |
| **ten** 17:17 | **tests** 71:16 | 51:17 54:4 | 44:15 45:11 | 180:25 |

Henderson Legal Services, Inc.

Jarvis, Christopher                                    October 18, 2022

54

| | | | | |
|---|---|---|---|---|
| 181:21 183:5 | 117:8 164:16 | 283:17,21 | 191:15 194:5 | 125:16 |
| 185:2 187:10 | 207:25 | **three-quarters** | 196:17,17 | 139:16,22 |
| 187:10 | 220:12 225:4 | 287:6 | 202:13 203:8 | 145:25 |
| 189:11 | 236:21 237:5 | **three-to-one** | 203:14 204:6 | 153:14,23 |
| 191:25 | **third-party** | 73:15 74:18 | 206:5,12 | 158:25 |
| 194:14 | 90:14 102:1 | **threshold** | 207:19 | 186:19 197:2 |
| 196:13,16 | 102:2,3,4 | 138:11 | 212:19 | 217:6 223:4 |
| 198:4,10 | 164:24 165:7 | 279:22 | 217:11 | 224:13,24 |
| 200:8 205:10 | 178:4,7,14 | **throwing** | 221:13,17 | 229:3 |
| 205:25 | 178:16 179:5 | 26:20 | 222:5,9 | **titles** 188:14 |
| 211:11 | **thirty** 63:16 | **throws** 50:22 | 223:17 224:2 | **today** 7:12 8:2 |
| 216:22 | 64:2 78:5 | **tightly** 107:9 | 224:6 226:12 | 8:17,24 9:3 |
| 218:16 230:4 | **thorough** 20:3 | **time** 6:8,9 9:9 | 235:19 | 12:6 13:10 |
| 231:10 | 166:10 | 11:16,16,24 | 241:21 | 23:5 44:14 |
| 232:18,20,24 | 283:24 | 11:25 16:8 | 244:20 | 45:20,21 |
| 236:13,22 | **thought** 20:6,9 | 17:7,25 | 246:13 247:8 | 57:17 90:24 |
| 238:4,4 | 27:5 30:25 | 28:19,21 | 258:5,9 | 105:3 183:9 |
| 240:17,18 | 38:14 48:10 | 29:9 31:3 | 261:22 | 254:16 287:9 |
| 241:6,25 | 82:11,18 | 33:23 34:6 | 264:14 | **today's** 6:8 |
| 252:25,25 | 96:23 107:13 | 37:19 43:8 | 278:17 | 291:24 |
| 253:3,24 | 112:11 | 44:6 56:2,7 | 280:16 | **told** 30:1 70:11 |
| 256:5 258:3 | 117:21 119:6 | 56:17 60:24 | 281:10 | 196:6 228:6 |
| 258:13,24 | 135:21,24 | 63:17 69:18 | 284:11 | 242:17 |
| 263:15,22 | 138:9 156:24 | 69:20,24 | 289:23 290:1 | **toll** 27:2 145:4 |
| 264:1 265:8 | 162:13,15 | 78:3 80:1,1 | 291:23 | **tomorrow** |
| 265:8 266:23 | 172:6,7 | 85:25 90:17 | **timely** 32:22 | 155:17 |
| 268:3 269:12 | 174:22 175:8 | 99:4 101:23 | 211:3 | **ton** 27:20 |
| 270:6 272:23 | 179:21 | 102:3 107:8 | **times** 17:1 | 110:23 151:7 |
| 274:16 280:7 | 191:15 | 108:12 | 42:22 53:23 | 159:9 214:5 |
| 281:8 284:11 | 195:18 | 110:10 | 97:18 110:7 | **top** 62:8 76:4 |
| 285:12 | 209:19 211:7 | 113:20 114:2 | 135:24 | 115:1,16 |
| 286:17 | 218:23 | 114:18 | 141:15 | 146:1 155:1 |
| 288:19 | 231:11 | 115:13 | 193:22 | 155:14 |
| 290:23 | 290:11 | 120:14 | 194:21 | 168:16 |
| 291:20 | **three** 10:9,14 | 130:17,21 | 212:11 | 186:11 200:1 |
| **thinking** 24:22 | 11:17 16:12 | 138:19 150:2 | 231:25 | 200:8 212:24 |
| 56:20 114:3 | 34:21 42:21 | 150:15 154:7 | 238:18 256:9 | 222:20 225:3 |
| 119:7 138:14 | 49:18 50:1,4 | 155:5,17 | 284:10 | **total** 84:13 |
| 147:15 | 50:23 57:4 | 159:9 161:4 | **tiny** 142:20 | 102:17,21 |
| 149:17 | 99:21 111:6 | 162:18 163:3 | **title** 62:8 127:8 | 103:4,11 |
| 237:22 | 131:4 160:17 | 163:6 165:21 | 186:12 | 104:1 132:9 |
| **thinks** 40:18 | 172:24 187:3 | 167:24 168:3 | **titled** 46:16 | 133:6 135:13 |
| **third** 2:7 12:22 | 187:21 189:6 | 179:23 | 59:5 78:24 | 138:5,18 |
| 15:23 58:1 | 197:22,25 | 182:25 | 92:17 121:19 | 187:22 188:9 |

Jarvis, Christopher

October 18, 2022

55

190:8,9
195:5 204:23
215:9 223:22
225:5,17
226:3 238:11
**totally** 217:13
260:24
**touch** 191:14
**Toyota** 10:15
**TPA** 204:22
**tracked** 84:24
187:21
**tracking**
187:19
**tracks** 187:22
**trade-off**
128:14
**traded** 37:21
75:8
**traditional**
47:16 96:12
97:14 98:17
150:21
267:22
**train** 38:14
**trained** 262:18
262:18,20
**training**
257:11,16,17
258:21
**transaction**
108:8 237:8
250:13
**transactions**
51:8
**transcribed**
1:21
**transcript**
291:11 294:3
294:7
**transfer** 26:21
**transferring**
64:20
**transition**

254:3,6
**transmittal**
199:17
**travel** 91:19
**Travis** 217:24
218:1,15
221:5
**Travis'** 218:11
**treasurer**
126:22
**treated** 150:5
150:6
**treatment**
165:23 247:4
247:9
**treats** 37:16,17
**tree** 28:12,13
28:14
**trending** 11:21
231:24 241:5
**trends** 261:18
**trial** 2:19 27:23
29:6
**tricky** 151:16
172:7 185:21
186:1
**trillion** 73:19
73:20
**trip** 92:2
**trouble** 142:19
**true** 114:22
120:4 129:18
159:11 165:1
194:13 255:8
294:3
**truly** 33:19
118:25
**trust** 58:10
59:21 60:2,3
60:25 61:10
62:15,18,21
63:2 64:5,8
94:2,6,7,17
126:2,5,6

127:10 129:4
130:12
160:14
167:17 168:9
168:17 169:5
169:12
172:23
173:23
176:10,24,25
177:17
178:25 179:3
179:7 180:12
186:13,13
187:4,23
188:3,10
201:18
211:25,25
212:15 220:2
221:17,21
230:22
**trusted** 77:14
**trustee** 201:17
209:22
**trustees**
162:25 169:1
169:4 176:17
178:3 179:4
181:24
201:15
204:20
**trusts** 17:19
58:3
**truthful** 232:25
233:1
**try** 30:12 38:15
43:15 44:7
56:16,18
57:6 93:6
98:16 103:24
117:25,25
119:15 124:3
124:11
185:16 250:1
269:3

**trying** 9:24
23:17 40:10
81:7 117:23
119:5 127:22
129:2 184:16
205:14
209:25
219:23
264:14
272:23 277:5
**Tuesday** 1:12
1:18
**turn** 104:22
116:7 256:24
**turned** 76:22
84:9 175:9
**turning** 72:10
176:9
**two** 19:11,14
28:10 52:8
55:6 57:4
58:3 59:25
60:2,3,5 61:1
64:5 65:22
73:20 74:7,8
108:4 116:14
121:14
142:25 147:4
148:16
153:22 159:1
160:1,15
170:11
176:11
192:25 193:6
202:6 203:9
212:7,11
217:14
224:10,16,25
226:7,24
230:13
234:12
240:25 248:9
256:17 270:9
270:20

281:15
283:16 284:8
287:16
290:20
**two-and-a-half**
173:7
**two-to-one**
73:17 74:18
**two-year**
238:23,24
**type** 17:4 34:1
37:22 40:15
41:21 47:8
50:24 75:11
77:9 89:19
95:16 131:5
136:10 140:1
265:6
**types** 28:10
31:14 42:16
72:16 111:9
111:12,16
116:11
117:13
140:23
**typewriting**
293:10
**typical** 86:13
87:8 98:3
**typically** 71:12
72:14 86:24
88:22 137:16
**typo** 160:22

_____

**U**

**U.S** 2:20 37:16
61:13 63:12
66:10 75:21
78:14,20
90:3 92:11
101:1 104:18
107:1,1,1,10
109:18
116:21 119:9

Jarvis, Christopher

October 18, 2022

56

121:16
122:17,18
127:4 131:16
139:10
145:16,22
149:16 152:4
152:4 154:20
154:21
155:21 158:7
163:20
166:15
168:10
182:16,22
186:4 192:10
192:17,18
196:15,18
199:9 201:24
207:8 210:5
213:18
216:22
217:20
219:24 220:2
222:12
226:18
228:22
234:13
241:12
**UAD** 186:13
**UCLA** 9:15
10:18
**Uh-huh** 176:24
**ultimate**
146:10
282:10 289:9
**ultimately**
58:13,16
80:22 141:22
175:5 182:3
182:13
183:17
208:11
220:16
221:25 226:3
231:21

248:19 277:8
278:7,7
**umbrella**
239:22,23
**uncertainty**
108:10
**uncomforta...**
117:14,19
**uncommon**
25:16 60:13
147:11
268:20
**undeniable**
113:5
**undercuts**
180:12
**underlying**
146:9 261:1
282:9
**underneath**
126:10 154:5
164:16
197:14
**underpaying**
115:6
**understand**
8:1 9:3 18:17
24:7,7 25:9
25:12,14,17
40:2,10,12
56:3 79:23
80:5 81:10
84:5 86:11
90:23 103:10
103:24
104:23 105:4
123:17 142:6
142:9 149:8
149:9,10
150:25 154:8
216:8 229:18
230:22
260:18,20
**understandi...**

8:24 17:4,25
18:25 20:24
24:11,12
33:14 42:15
43:14 55:1
70:8 78:3
80:4 86:22
91:1 92:3,7
94:13,20
95:24 102:4
102:8 133:15
135:18 136:1
146:23 149:4
154:14 156:3
156:17
160:16
162:12 172:1
179:6 183:24
193:23 194:3
195:4 213:2
214:6 227:3
227:5,13
228:12
232:16
233:15 234:8
237:9,14
239:5 246:1
246:9,24
247:9,15
273:14
275:11
282:15,18
286:24
**understood**
17:5 19:23
84:1 171:15
**undertaking**
200:23
**undertook**
208:21
**underwriter**
269:4
**underwriting**
15:7

**undone** 211:2
**undue** 218:13
**unfair** 181:25
**unfavorable**
121:2
**unfortunately**
285:5
**unit** 154:5
**United** 1:1,8
4:10 6:4,5,20
10:13 12:10
44:18,19,21
52:16,18
57:7,10,12
58:19,22
61:15 75:21
75:23 78:17
79:5 90:4
106:15,16
109:19
119:11 127:1
131:17
139:12
145:18 152:7
154:23
158:10,18
163:24
166:21
168:12
182:19 186:6
192:13
196:21
199:11 202:1
207:10 210:7
213:21
217:16
222:14
226:20
228:24
234:15
241:14 293:2
**University**
9:14
**unnecessary**

238:6,8,15
238:21
239:15 240:6
267:11
**unneeded**
237:6,16
250:11,18
251:1
**unrelated**
24:18,24
25:2 26:3
101:21 102:9
**unsound**
260:6
**untrue** 255:10
**unusual**
107:11
**unwell** 9:5
**update** 212:9
212:22
**Updated**
152:13
**updating**
220:8
**upside** 143:10
**upward** 241:5
241:7
**upwards** 63:16
**USA** 193:8
**USA's** 219:3
**USA/Film**
207:23
**use** 33:13
36:21 37:15
67:8,13
70:18 88:6
99:1 115:9
180:16
187:12 210:1
243:19
255:23
256:20
**users** 247:4
**usually** 11:1

Jarvis, Christopher

October 18, 2022

57

28:21 56:18
56:18 59:19
121:6 138:6
139:2,3
273:7
**utilized** 140:22
256:13
**utter** 228:3

_____

**V**

_____

**v** 1:7
**vaguely**
203:22
**Valdman** 76:5
76:6,10,11
**Valdman's**
76:8,25
79:22
**valid** 246:15
260:2
**valuable** 44:6
**valuation**
95:18
**valuations**
95:20 258:5
**value** 64:13
65:7 66:3
**valued** 67:5
**Vanway** 53:21
**variables**
143:24 266:3
266:5,9,11
**varies** 29:15
**various** 12:2
232:13
**varying** 136:23
**vehicle** 82:15
83:11 92:5
256:13
**vehicles** 82:21
**venture** 75:18
**ventures** 75:2
75:12,14
**versus** 6:4

114:15 284:2
286:3
**vest** 62:17
**vestige** 114:25
**viability** 119:8
**video** 6:3,11
**Videographer**
3:6 6:2,13
69:20,23
130:17,20
167:24 168:2
222:5,8
289:23,25
291:2,5,8,19
291:22
**view** 248:2
256:22
287:24
**viewed** 43:20
**village** 288:15
**violence** 160:6
**Virginia** 1:18
2:17 6:21
45:4 293:3
293:21
**Virginia.gia...**
3:1
**visit** 91:24
**visited** 91:22
**voiced** 227:16
227:19
**volatility** 29:18
**Vollrath** 2:4
4:5 6:24,25
8:12 44:25
45:2 60:19
61:17,20
62:3 68:3,11
77:5 80:10
97:4 101:6
101:11
103:15
157:14,18,23
166:11

171:11,20
191:24 199:5
210:25
218:19
221:10,18
228:2 236:22
237:18
238:16 239:3
239:6 241:3
243:14,18
244:2,7,10
244:24 245:1
245:13
246:21 247:2
247:7,12,20
248:8,15,23
249:2,18,23
250:22 251:5
252:22 253:5
253:6,14,18
253:22,23
255:19 258:1
259:7 260:9
260:17
261:12 262:1
262:7,24
263:18,21,25
264:4,10,12
274:14,18,22
274:24 278:1
280:2 281:13
283:4 285:21
288:24 289:2
289:8,16
290:2,3,24
**volume** 86:21
147:7 243:4

_____

**W**

_____

**wait** 173:4
291:7
**waited** 55:15
171:2
**waiting** 100:5

**want** 9:8 14:7
22:12 23:18
26:10 27:7
31:10,25
37:12 40:11
43:10 44:4,5
44:5,12
56:11 57:3
59:10 87:3
89:12 93:6
97:1,11 99:1
99:3 108:15
117:24
118:11,13,16
124:2 129:4
142:19,20,23
144:23 145:3
149:10,11
151:20 159:9
170:18
172:17
174:16
175:12 177:2
180:1,5
185:23,24,25
190:17
195:21 201:3
202:19
205:19
206:11,24
207:4 230:4
230:15 233:4
243:19,23
244:9 256:24
259:2 260:15
260:15,21
268:14,15,21
268:22,22
269:8 271:24
273:12
278:22
279:12
281:14,17
285:2,3

288:14
291:10
**wanted** 14:9
16:19 18:14
19:7,17
20:21 21:14
22:17 33:19
47:2 56:4,20
95:7,12,13
103:12
113:11,14,22
131:2 137:9
137:9 143:10
150:7 157:7
157:10 158:5
170:16 176:2
182:1 185:4
185:5,6,6,7
195:19,23
206:6,13,14
206:17,18,23
217:14 231:2
252:2 263:13
286:4,20
**wanting** 107:4
121:13
**wants** 244:11
**wash** 50:20
206:5
**washers** 44:1
**Washington**
2:22
**wasn't** 22:21
30:4 52:9
60:13 62:19
62:20 74:25
78:2 81:4,6,8
86:8 89:11
95:15,18,18
95:23,23
100:23 104:4
104:4 107:20
108:5 114:3
114:24

Henderson Legal Services, Inc.

Jarvis, Christopher

October 18, 2022

58

137:11
143:25
144:17 150:4
161:21
163:13
172:22
173:14 174:3
184:10 196:4
196:4 201:7
201:9,11
203:8 206:15
206:19,20,21
240:1 241:5
253:16
260:25 261:1
268:20,20
270:16
271:25
279:24 280:4
283:8,9,9,25
290:7,23
**way** 28:6 30:10
30:24 33:11
35:15 37:16
48:1,15
51:11 54:2
59:14 62:7
66:13 74:18
74:19 75:13
86:23 89:15
96:3 113:18
113:23 114:7
116:25
117:21
123:17
126:17 133:1
133:21 137:3
137:23 149:1
164:21,22
175:20 181:5
185:20
190:12
191:23
203:15,16

206:19
219:11
220:21
221:12
230:16
231:15,25
243:6,8
244:13
255:25
259:13
262:15
274:21 283:2
284:13,17
**ways** 31:22
36:2 47:20
53:18 65:22
98:16,18
99:18 109:13
141:13
142:14,16
163:8 215:1
246:4 256:1
256:2 259:24
**we'll** 44:4,14
57:7 58:19
61:12 63:10
69:19 72:9
78:14 92:10
104:17
109:16
119:17
120:14,15,15
121:15,16
122:15 124:3
125:4 126:18
126:23
130:16
131:20 139:9
145:15
149:16
154:20
163:20
167:23
168:10

188:14
189:13
191:14 192:8
192:9 199:9
217:22
219:21,25
220:1 222:4
226:18
228:21
234:13
241:11
289:22
**we're** 11:21
44:7,8,8,19
46:14 50:10
50:22 52:16
57:1,5,10
63:11 69:23
73:1,6 75:20
76:2 103:18
104:18
115:17
119:15 128:4
128:5,9,11
130:20,23
157:20 161:3
168:2 172:10
172:18
181:24
182:16 186:3
191:7 192:5
196:18 207:7
210:4 219:21
219:22 220:6
222:8 240:11
240:12
263:15 281:9
281:15
289:25 291:3
**we've** 49:21
65:22 104:20
160:10 214:4
244:3 269:11
270:3

**wealth** 48:1
154:5
**wealthy** 46:8
47:22 51:8
54:6
**wearing**
201:22
**Webex** 6:11
8:8
**webinar**
241:19 242:2
**webinars**
122:24 123:1
123:5 152:11
152:21 153:8
241:20
**week** 151:13
206:16
**weeks** 202:6
**went** 58:3 86:1
91:21 95:20
100:11,14
148:4 170:19
180:6,8
194:19
214:21
265:15,17,21
266:17
273:16
276:10,14,15
**weren't** 81:2,7
85:12 99:19
116:23
136:15
172:23
195:22 196:7
243:7,11
249:14
255:22
256:10
**Westchester**
16:21
**Whitehead**
235:20

**Whoops**
274:10
**Wichita** 54:10
**wide** 20:25
**wife** 15:4
91:22
**willing** 27:6,8
109:6 287:22
**wills** 17:19
**Wilson** 92:13
**Wilson-0803...**
5:6 163:23
**Wilson-0834...**
4:21 92:12
**Wilson-1251...**
5:10 186:5
**Wilson-2131...**
5:20 226:19
**Wilson-2158...**
5:1 139:11
**wind** 13:12
**window** 44:1
238:23,24
**wipe** 52:12
143:12
**wire** 187:15,16
**wish** 280:21
280:22
**withdraw**
177:16
**withdrawal**
177:21 178:2
187:23 188:4
188:8,15
189:1,14,17
189:21 217:6
223:3,5,11
224:3,6
225:5
**withdrawals**
187:3,21
**withdrew**
216:16,16
**witness** 1:14

Jarvis, Christopher                                      October 18, 2022

59

1:16 4:2 6:18
7:5 29:14
68:13 80:11
83:3,9 97:5
101:9 108:23
157:21
166:17
171:12
221:11,19
222:16 228:3
236:25
237:19
238:17 239:7
241:4 245:12
247:6,11,17
247:19 248:6
249:17 251:4
253:1,3
258:24
260:14 261:8
262:6,11
264:8 274:20
277:15 281:5
283:1 289:19
289:21
291:14 293:6
293:8
**witnesses**
7:20
**won** 41:24,25
**wonder** 172:19
**word** 139:7
**wording**
236:14
**work** 11:6
13:14 14:1
15:10 17:4
17:12,15,17
17:19 18:16
18:22 19:9
20:5 22:7,13
22:18,22,24
33:24 36:14
37:18,21

42:20 48:23
56:14 99:4,9
102:19
103:23
110:18 115:1
133:22 137:6
145:10 166:6
180:24 182:1
206:4 234:4
237:25 238:5
256:24 257:2
257:7 258:2
258:14,22,25
272:4 280:14
281:1,7,9
286:16 287:5
287:18
290:17
**worked** 10:8
10:11,14,15
16:5 18:24
30:23 33:2
45:24 47:22
59:13 62:16
69:11,13
71:23 77:25
91:14,20
92:22 93:1,4
103:10
108:11,16
110:14
125:23
135:22
159:10
160:12
179:10
199:22 257:3
259:3 270:22
271:2 272:9
272:11 286:6
286:25
287:25
**workers** 37:16
**workers'** 37:3

37:20
**working** 11:5
11:17,20,20
16:18,20
17:24 18:14
22:9,11
31:17,20
32:3 33:3,4
33:23 69:4
84:21 85:8
88:25 154:7
165:14 166:7
183:1 270:21
272:8
**works** 10:12
36:15 63:6,6
124:5
**world** 26:15
113:19
150:21
**worse** 38:6
39:12 52:11
**worth** 42:13
55:25 64:18
64:19 98:10
98:24 99:4
100:2 181:23
258:6,6,8
**wouldn't** 14:7
19:12 28:4
34:20 41:12
50:16 67:9
68:1 69:1
97:1 99:9
112:12
117:24
170:13
173:19 176:7
201:9 204:13
204:16
206:12
214:11,11
219:14 233:7
258:20

280:23
281:11
287:23
**wow** 7:18
**wrinkle** 99:11
**write** 45:19
47:6,7,13
54:14 58:2
73:20 101:19
102:15,20
197:10 212:8
212:9,21
215:4,7
220:13
**writes** 111:6
117:9 119:22
122:4 155:15
202:18
204:17
208:17
209:13 214:4
218:25 227:1
229:6,16
230:21
232:11
235:25
236:20 237:4
282:3
**writing** 73:22
237:10 256:8
**written** 85:22
88:5 125:5
136:22
141:12
146:17 149:5
156:4 174:12
176:18
193:16 243:7
283:15 284:1
**wrong** 9:25
21:11 45:5
88:10 96:20
138:1 139:7
175:3 196:17

232:2 244:17
247:13 280:7
**wrote** 53:13
54:19 55:19
56:13 58:2
65:15 77:19
102:7 120:18
146:6 147:6
147:15 149:6
210:12 214:3
218:23
226:25
237:20 250:8

---
**X**
---
**X** 1:4,11 4:9
128:9

---
**Y**
---
**yeah** 28:11
32:16,25
43:25 47:10
51:4 55:14
68:3 72:20
77:5 97:5
99:1 101:11
104:16
107:25
109:15
116:14
122:13 124:2
128:2 130:1
135:17 140:3
140:5 156:2
157:23,25
163:12
166:13
173:19 180:9
180:18 184:1
188:2 190:17
195:13 200:8
205:6 210:25
227:22 233:1
236:16 244:2
244:10

Jarvis, Christopher                                    October 18, 2022

60

245:12
259:17
263:24
264:10 269:1
274:23
289:20
**year** 29:4
32:18 40:14
55:15,16
65:18 72:22
73:5,12
81:15 85:18
87:14,16
88:8 100:21
103:12
116:24
120:16 122:7
125:12
126:14,16,19
134:23
146:15
147:10 148:5
148:6 158:5
158:6 159:5
160:1,1,15
160:16,22
164:7 169:15
169:18
170:17,21,25
174:10
176:14
185:16
188:10 191:1
191:13,20
192:7 196:3
205:14,16,24
212:16
225:12 226:8
227:2 231:13
231:25
240:14
259:19 267:7
279:18,19
282:7 283:22

284:4
**year's** 275:17
**year-end**
228:11
**years** 10:14
15:2 17:9,17
18:24 27:15
27:22 29:22
35:22,22,22
88:25 111:6
114:15
116:21 137:1
137:21
146:12
148:25 174:6
226:4 234:9
239:2,8,14
239:21,23
257:6 270:3
273:17
276:17 282:5
282:13
283:21 284:8
286:4
**yellow** 188:9
223:20 224:3
**Yep** 134:22
135:15
174:22 177:9
190:24
198:19
199:20
217:25 277:7
280:19
**yields** 225:19
**yo** 215:7
**York** 16:21
54:19 194:20
290:7

___

**Z**

**zero** 238:19,19
**zoom** 1:18
187:2

___

**0**

**0** 189:7 224:4
224:8
**000** 216:23
**0001499** 217:2
**0001588** 5:11
192:12
196:15
**0001885** 5:14
201:25
**0002256** 5:18
217:20
**0002470** 5:13
199:10
**0002547** 5:16
210:6
**0002609** 5:15
207:9
**0003136** 5:17
213:20
**0003180** 5:19
222:13
**001** 57:9
**001499** 5:12
196:20
**0207685** 4:24
127:6
**0213753** 4:11
12:7 121:17
**0213774** 5:21
228:23
**0249016** 45:5
**0249061** 4:12
44:20
**03** 18:11
**0327988** 4:22
109:23
**0327992** 5:9
182:18
**0328012** 4:23
119:10
**05** 18:11
**07** 15:25
**08** 15:25

**09** 106:5
115:13

___

**1**

**1** 73:22 132:22
133:7 146:7
176:14
209:13 215:3
220:22
238:11
**1-10** 120:13
**1,000** 259:18
265:22 266:1
**1,000,000** 41:1
41:3
**1.1** 76:18
**1.2** 67:4
**1.8** 195:8
225:20
238:12 284:9
**1/31/2025**
293:22
**1:29** 167:25
**1:46** 168:3
**10** 28:1 59:1
85:15 106:5
114:15
115:13
119:18 135:3
164:15
267:22
276:17 284:2
288:8
**10,000** 55:23
134:24 135:6
135:7,11,14
**10:09** 69:24
**100** 2:7 100:20
110:7 124:22
136:3 173:13
176:18
188:11 207:2
240:13
266:17 288:8

**100,000** 40:14
40:17,22,25
41:2 97:24
99:6,8
265:18
**100,000,000**
34:19
**101** 111:19
**109** 4:22
158:20
191:11
**11** 106:6
192:19 284:2
**11:49** 130:18
**110** 192:4
**119** 4:23
**11th** 59:6,6
**12** 4:11 85:14
85:15,21
106:6 197:20
198:2
**12:31** 130:21
**120** 200:25
205:18
**125** 192:16
**127** 4:24
193:11
**128** 193:11
**129** 190:23
**13** 5:25 225:23
245:6,9
284:9
**131** 4:25
**139** 5:1
**14** 109:24
132:9
**1400** 284:10
**145** 5:2
**14th** 101:20
**15** 85:15,21
114:15
182:25
231:25
284:10

Jarvis, Christopher

October 18, 2022

61

**150,000** 102:23
**152** 5:3
**154** 5:4
**158** 5:5
**16-year-old** 36:16,19
**163** 5:6
**166** 5:7
**168** 5:8
**171,243** 143:6
**18** 1:12,19 6:8 291:23
**180** 94:10 126:13 169:14,18 279:19
**182** 5:9
**186** 5:10
**18th** 291:6
**190** 143:1
**190,000** 220:17
**192** 5:11
**196** 5:12
**199** 5:13
**1996** 10:16
**1999** 16:14 18:5

---
**2**

**2** 73:18,19,20 74:19 129:15 131:3 132:18 146:1 220:23 233:9,12 281:19
**2,000** 239:7 259:19
**2,000,000** 41:3
**2,016** 240:17
**2.1** 176:13
**2.2** 177:1
**2.5** 94:11

126:13
169:16,20,23
171:6,16
172:2 173:11
173:17
190:25
191:16,21
205:23
212:14 231:3
231:21 233:5
279:19,21
**2.75** 279:12,15 279:16
**2/28/13** 188:4
**20** 27:15 35:22 100:16,19,19 142:15 191:2 256:5 273:16 283:12 288:8
**200** 64:19 142:17 143:1 283:19
**200,000** 85:16 87:9 132:20 132:22 133:25 142:18 265:16
**2000** 13:2 15:24
**20044** 2:22
**2008** 18:11 115:12 270:4 273:24
**2009** 77:25 79:10 146:13 282:5,13 283:12 284:1
**2010** 13:3,3 53:2 57:16 78:20 102:22 235:13
**2011** 13:3 92:17,19

94:16 121:21
146:13 155:5
282:5,14
283:13
**2012** 4:25 109:24 110:10 121:19 122:5 122:12 125:16,18 127:9 131:14 136:11 137:3 146:1 158:5 159:2 166:16 168:8,10 182:25 186:21 187:4 191:2 241:19 281:20 283:24 284:2
**2012-2013** 159:13
**2012/2013** 223:12
**2013** 45:16 125:18 158:21,24 159:1,4 176:14 191:2 192:7 202:20 214:5 223:2 226:16 265:16
**2013-2014** 159:12
**2013/2014** 191:12 223:23
**2014** 119:22 159:4 192:7 192:8,19 197:2,23 202:6 207:14 223:2 226:16

226:25 229:3
229:5,7
231:21 285:1
**2015** 210:11 213:25 216:21 220:3
**2016** 13:13 270:4 273:24
**202** 2:23 5:14
**2020** 59:2
**2022** 1:12,19 6:8 291:23 294:14
**2048932** 5:3 152:6
**207** 5:15
**21** 4:11 12:10 44:18 122:18 130:25 155:4 202:6
**210** 5:16
**213** 5:17
**217** 5:18
**21st** 202:18
**22** 4:12 44:20 44:21 45:16 52:24
**22,698,300** 188:11 190:22
**222** 5:19
**226** 5:20
**228** 5:21
**23** 4:13 52:17 52:18 53:2 57:8 216:21
**23,000** 73:1,2
**234** 5:22
**2385** 78:16
**24** 4:14 57:11 57:12 63:12
**241** 5:23
**244** 4:5
**245** 5:25

**25** 4:15 17:2 58:20,22 92:19 143:10 210:11 220:3 229:5 239:8 274:9,19
**250** 265:21
**26** 4:16 61:13 61:15 66:10 66:10 78:20
**27** 4:17 75:21 75:23 76:3
**28** 4:18 78:15 78:17
**285** 4:4
**289** 4:5
**29** 4:19 79:4,5 102:1 283:21 284:1
**29,199** 190:3
**29,199.73** 189:23 190:21
**29,364,300** 223:24 225:18

---
**3**

**3** 46:14 167:6 190:17
**3.3** 64:12,14
**3:13** 222:6
**3:32** 222:9
**30** 4:20 64:25 65:7,11 78:7 78:12 79:16 79:21 80:6,8 84:7,13 90:3 90:4 99:7 101:1,20 102:4,8,16 103:3,7,12 103:25 122:9 128:8 138:6

Henderson Legal Services, Inc.

Jarvis, Christopher

October 18, 2022

62

138:11,19
177:16
226:25
275:17,23
**30-seconds**
289:19
**300** 240:14,20
**307-5892** 2:23
**31** 4:21 92:11
92:13 278:23
**310,000** 221:8
**32** 4:22 109:18
109:19,24
**32,000** 85:18
**33** 4:23 119:9
119:11 263:1
**333,000** 73:24
**33394** 2:9
**34** 4:24 121:16
122:17 127:1
127:5,5
**35** 4:25 131:16
131:17
**36** 5:1 66:21
139:10,12
145:16 286:9
286:9,11
**360** 66:21
**37** 5:2 145:18
145:22
281:18
**38** 5:3 146:18
146:25 149:6
149:16 152:3
152:5,7
155:21 285:4
**38.4** 140:21
141:23
142:15 144:3
144:8 149:19
**384,000**
141:19
**39** 5:4 154:21
154:23

---

**4**

**4** 193:6
**4/7/2015**
224:14
**40** 5:5 27:21
64:18 100:15
120:2,9,22
121:1,6,7,7
142:3 144:8
146:9 147:4
158:7,10,20
191:25 192:3
196:24
198:13 263:8
263:13
266:13,15,21
267:16,20,21
282:10,10
284:15
**400,000** 88:1
**41** 5:6 163:20
163:24
**42** 5:7 166:15
166:21
**43** 5:8 168:10
168:12
**44** 4:12 5:9
182:17,19,23
**45** 5:10 186:5
186:6,12
192:17,19
**45-year-old**
36:17,20
**46** 5:11 192:10
192:11,13
196:16
**462-1200** 2:10
**47** 5:12 126:12
196:19,21
198:13 217:3
217:6 219:24
220:7
**48** 5:13 199:9
199:11

---

**49** 5:14 133:5
143:1 198:17
201:24 202:1

---

**5**

**5** 74:19 151:12
213:25
218:25
**5,000** 162:14
**5:09** 289:23
**5:10** 289:24
**5:12** 290:1
**5:15** 291:24
292:1
**50** 5:15 27:21
64:18,22
94:8 100:20
111:10 121:7
121:7 126:11
128:9 142:23
207:8,10
239:21,23
267:21 282:7
283:20 288:8
**50,000** 97:23
97:25 100:8
**50/50** 14:23
**500** 100:20
287:15
**500,000** 73:25
102:23
**51** 5:16 132:21
140:18 210:5
210:7 265:16
**516,000** 225:6
**516,537.26**
225:7,17
**52** 4:13 5:17
213:19,21
**53** 5:18 216:22
217:16,19,20
**54** 5:19 220:2
220:6 222:12
222:14

---

**55** 5:20 195:8
226:19,20
265:18
**56** 5:21 228:22
228:24
**57** 4:14 5:22
234:13,15
249:25 250:5
**58** 4:15 5:23
241:12,14
**59** 217:6

---

**6**

**6** 4:4 140:9
164:14 197:2
**60** 121:6
279:19
**600,000** 87:24
180:3
**61** 4:16
**6th** 204:20
219:3

---

**7**

**7** 140:16
**7,000** 134:23
**70** 46:17
**70,000** 97:24
**7238** 2:21
**75** 4:17
**78** 4:18
**79** 4:19

---

**8**

**8** 167:7 207:13
217:21
**8,950** 212:24
213:5
**8/21/12** 186:13
**8:06** 6:9
**800,000**
287:20
**805** 2:8
**816,000**
133:14

---

**831(b)** 50:13
246:22 276:1
**86** 219:25

---

**9**

**9** 74:19 197:9
241:19
**9/14/2015**
223:5
**9:05** 1:18
**9:21-cv-820...**
1:3 6:7
**9:52** 69:21
**90** 4:20 27:18
28:1,22 29:1
94:9 120:3
126:12
169:11
289:21
**92** 4:21
**95** 169:11
**954** 2:10
**97.5** 169:11
**99** 18:10 120:3